**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, and LAWRENCE SLOANE, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN HOCHUL, in her Official Capacity as Governor of the State of New York, KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police, Judge MATTHEW J. DORAN, in his Official Capacity as the Licensing-official of Onondaga County, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse, P. DAVID SOARES in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, In his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, and JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County, <br><br> Defendants. | Civil Action No. 1:22-cv-986 (GTS/CFH) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

COME NOW Plaintiffs, Ivan Antonyuk, Corey Johnson, Alfred Terrille, Joseph Mann, Leslie Leman, and Lawrence Sloane ("Plaintiffs"), by and through undersigned counsel, and allege as follows:

1.      This case involves a challenge to various provisions of New York's newly minted but ineptly named "Concealed Carry Improvement Act" ("CCIA"), passed hastily in response to the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___ (2022) ("*Bruen*").  The CCIA took effect on September 1, 2022.  Nevertheless, as this Court has explained, the CCIA is an "unconstitutional statute" which "reads less like [] a measured response" to the *Bruen* decision, "than a wish list of exercise-inhibiting restrictions glued together by a severability clause."  *Antonyuk v. Bruen*, No. 1:22-CV-0734 (GTS/CFH), 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022), *72.  Plaintiffs thus seek emergency injunctive relief, in the form of a temporary restraining order and/or preliminary injunction, halting enforcement and further implementation of this patently unconstitutional statute, until a decision on the merits can be reached.

## I.      **PARTIES**

2.      Plaintiff Ivan Antonyuk is a natural person, a citizen of the United States and of the State of New York, and resides in Schenectady County, New York.  He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 2009, and who is eligible to possess and carry firearms in the State of New York.

3.      Plaintiff Corey Johnson is a natural person, a citizen of the United States and of the State of New York, and resides in Onondaga County, New York.  He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 2019, and who is eligible to possess and carry firearms in the State of New York.

4.      Plaintiff Alfred Terrille is a natural person, a citizen of the United States and of the State of New York, and resides in Albany County, New York.  He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 1994, and who is eligible to possess and carry firearms in the State of New York.

5.      Plaintiff Joseph Mann is a natural person, a citizen of the United States and of the State of New York, and resides in Oswego County, New York.  He is a law-abiding person, who currently possesses and has maintained a New York employment related carry license since 2014, and who is eligible to possess and carry firearms in the State of New York.

6.      Plaintiff Leslie Leman is a natural person, a citizen of the United States and of the State of New York, and resides in Greene County, New York.   He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 2012, and who is eligible to possess and carry firearms in the State of New York.

7.      Plaintiff Lawrence Sloane is a natural person, a citizen of the United States and of the State of New York, and resides in Onondaga County, New York.  He is a law-abiding person, who desires to apply for and obtain an unrestricted New York carry license, and thereafter to concealed carry a handgun in public for self-defense, and is (aside from not having a license) eligible to possess and carry firearms in the State of New York.

8.      Plaintiffs Antonyuk, Johnson, Terrille, Mann, Leman, and Sloane are the kind of persons discussed by the United States Supreme Court in its recent opinion in *Bruen* – that is, they are typical, law-abiding citizens with ordinary self-defense needs, who cannot be dispossessed of their right to bear arms in public for self-defense.

9.      Defendant Kathleen Hochul is sued in her official capacity as the Governor of the State of New York, elevated to that office in August of 2021 after the resignation of former

Governor Andrew Cuomo.  While other courts have found that the Governor is not a proper party in certain matters, (*see N.Y. Cty. Lawyers' Ass'n v. Pataki*, 727 N.Y.S.2d 851, 854 (NY Sup. Ct. 2001); *Antonyuk* at *41 (listing federal district court cases)), those decisions are non-binding on this Court, plus are either erroneous or distinguishable from here.  In this case, as this Court has noted, the CCIA's restrictions on sensitive locations and restricted locations apply "across the state," and the Superintendent of State Police (whose officers "are standing ready" to make CCIA arrests across the state[1]) works for the Governor.  *Antonyuk* at *41.  Moreover, Governor Hochul (1) has openly criticized and expressed contempt for[2] the Supreme Court's decision in *Bruen*, (2) took action to circumvent the Supreme Court's ruling by "merely chang[ing] the *nature* of th[e] open-ended discretion" from "proper cause" to "good moral character" (*Antonyuk* at *79-*80), (3) pushed enactment of the CCIA through the legislature and (4) signed the bill into law, and (5) subsequently has acted as the interpreter-in-chief with respect to the CCIA's provisions.  The Governor has opined on the statute's proper interpretation, and provided guidance and instructions to officials throughout the state of New York as to its implementation according to her desires.  For example, Governor Hochul (1) has instructed that the CCIA's new licensing process applies even to those whose carry license applications are already submitted and pending prior to

---

[1]  *See* statement by First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40 ("We ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law.  For those who choose to violate this law … Governor, it's an easy message.  I don't have to spell it out more than this.  We'll have zero tolerance.  *If you violate this law, you will be arrested.  Simple as that.* Because the New York state troopers are standing ready to do our job to ensure .. all laws are enforced.") (emphasis added).

[2]  https://www.foxnews.com/politics/ny-gov-hochul-defiant-supreme-court-handgun-ruling-were-just-getting-started

September 1, 2022;[3] (2) has claimed that the "good moral character" activity will involve door-to-door interviews of a person's neighbors;[4] (3) has claimed that the CCIA's plain text should not apply to certain parts of the Adirondack Park in contradiction to the wishes of the bill's sponsors;[5] and (4) has opined that the CCIA's "restricted locations" provision creates a "presumption … that they don't want concealed carry unless they put out a sign saying 'Concealed Carry Weapons Welcome Here.'" [6]   To be sure, Governor Hochul "is not the official to whom the Legislature delegated responsibility to implement the provisions of the challenged statutes" (*Pataki* at 854) but, by her actions, she certainly appears to believe that she is.   Moreover, and again, the Superintendent, who is tasked with implementing and enforcing various provisions of the CCIA, is the Governor's underling, making the Governor (whose hand is clearly at work in the Superintendent's actions) a proper Defendant.   Defendant Hochul may be served at the New York State Capitol Building, Albany, NY 12224.

10.    Defendant Kevin P. Bruen is sued in his official capacity as the Superintendent of the New York State Police.   As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including prescribing the form for Handgun Carry License applications. As this Court has explained, Defendant Bruen is the proper party with respect to Plaintiffs' challenge to the CCIA's

---

[3] https://buffalonews.com/news/local/crime-and-courts/hochul-last-minute-pistol-permit-seekers-may-have-waited-too-long-to-avoid-nys-new/article_ad5100a0-2943-11ed-af06-cbe41e631955.html
[4] https://nypost.com/2022/09/01/mayor-eric-adams-vows-door-to-door-checks-on-gun-permits/amp/?fr=operanews
[5] https://www.reuters.com/legal/new-york-gun-bans-alarm-residents-upstate-bear-country-2022-08-12/
[6] https://gothamist.com/news/supreme-court-new-york-guns-hochul-

training requirements (for new or renewed licenses), along with the CICA's sensitive locations and restricted locations prohibitions (with respect to state police enforcement). *Antonyuk* at *44. Defendant Bruen may be served at the New York State Police, Building 22, 1220 Washington Avenue, Albany, NY, 12226.

11.    Onondaga County Judge Matthew J. Doran is a County Court judge of Onondaga County, New York.  Defendant Doran is a "licensing officer" for Onondaga County described in N.Y. Penal Law § 265.00(10) and, as such, is responsible for the receipt and investigation of carry license applications, along with the issuance or denial of carry licenses.  N.Y. Penal Law § 400.00. Defendant Doran is the proper party with respect to Plaintiffs' challenge to the CCIA's requirement and definition of "good moral character," along with its associated requirements of an in-person interview, disclosure of a list of friends and family, provision of four "character references," and provision of three years of social media history.  Defendant Doran may be served at The Honorable James C. Tormey III Criminal Courthouse, 505 S. State Street, Syracuse, New York, 13202.  Judge Doran's fax number is 315-671-1190.

12.    Defendant William J. Fitzpatrick is the Onondaga County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Onondaga County, including all crimes under N.Y. Penal Law § 265.00 *et seq*.  *See* County Law § 700(1). Defendant Fitzpatrick stated at a press conference that violators of the CCIA will have their weapons confiscated while prosecutors investigate any other criminal activity.[7]  Additionally, he stated that violators' cases would be "referred to the judge who granted them concealed-carry licenses in the first place, possibly leading to the revocation of their carry privileges."  *Id*. While

---

[7] https://www.syracuse.com/crime/2022/09/syracuse-da-police-chief-we-wont-target-gun-owners-under-new-law-but-will-take-gun.html.

6

Defendant Fitzpatrick commendably "slammed the new legislation," he has not completely disavowed enforcement of the CCIA, instead threatening to confiscate lawfully owned firearms, while referring the matter to the courts for revocation of a constitutional right to public carry of a firearm. *Id.  See* Exhibit "2," at ¶ 23 (Declaration of Corey Johnson).  Defendant Fitzpatrick's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA.  Defendant Fitzpatrick is sued in his official capacity, and may be served with process at the Criminal Courthouse, 4th Floor, 505 South State Street, Syracuse, NY 13202.

13.    Defendant Eugene Conway is the Sheriff of Onondaga County, New York, with county-wide jurisdiction to enforce the laws of the State of New York, including the CCIA. Defendant Conway's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA.  Additionally, Sherriff Conway is the official to whom residents of Onondaga County submit their applications for firearms licenses.  The "Pistol License Unit" within the Sheriff's office "is responsible for maintaining pistol license files, issuing new NYS pistol licenses, processing license holder's amendments, process[ing] pistol license suspensions & revocations, conduct[ing] criminal investigation of pistol licensees when warranted and conduct[ing] deceased pistol licensee investigations."[8]  Sheriff Conway requires, as a preliminary threshold step, an applicant for a license to schedule an "appointment" in order to turn in the required paperwork. With respect to scheduling an appointment, the Sheriff's website states that "[i]n order to proceed … [a]ll four (4) Character Reference Forms [must be] completed and signed" and "[y]ou have attended and received a certificate from one of the APPROVED Handgun Safety Course Certified Instructors."[9]  A person is instructed not to even schedule an appointment until the application

---

[8] https://sheriff.ongov.net/pistol-license-unit/
[9] https://sheriff.ongov.net/pistol-license-unit/appointment-requirements/

prerequisites have been met, and that "[i]ncomplete applications will not be processed at the time of your appointment.  Your entire application will be returned to you and you will be instructed to reschedule your appointment."  *Id.*  To the extent that the Sheriff's custom, practice, or policy independently requires that an applicant provide four character references, that custom, policy, or practice is unconstitutional for the same reasons that New York State's four character references are unconstitutional.  The Sheriff may be served with process at 407 S State St, Syracuse, NY 13202.

14.     Defendant Joe Cecile, the Chief of Police of the Syracuse Police Department is the "final authority in all matters of Department policy, operations and discipline."[10]  Chief Cecile has not disavowed enforcement of the CCIA, claiming instead only that his office will "not be proactively enforcing the new law by trying to catch legal gun-owners in prohibited locations."[11]  However, Chief Cecile has expressly stated that he *would* enforce the CCIA on a "complaint driven" basis.  Defendant Cecile's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA.  He may be served with process at 511 S. State Street, Syracuse, New York, 13202.

15.     Defendant P. David Soares is the Albany County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Albany County, including all crimes under N.Y. Penal Law § 265.00 *et seq.  See* County Law § 700(1).  Defendant Soares is sued in his official capacity, and may be served with process at the Albany County Judicial Center, 6 Lodge Street, Albany, New York, 12207.

---

[10] https://www.syracusepolice.org/listing.asp?orgId=83.
[11] https://www.syracuse.com/crime/2022/09/syracuse-da-police-chief-we-wont-target-gun-owners-under-new-law-but-will-take-gun.html.

16.     Defendant Gregory Oakes is the Oswego County District Attorney, and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Oswego County, including all crimes under N.Y. Penal Law § 265.00 *et seq*.  *See* County Law § 700(1).  Defendant Oakes is sued in his official capacity, and may be served with process at the Public Safety Building, 39 Churchill Road, Oswego, NY, 13126.

17.     Defendant Don Hilton is the Sheriff of Oswego County, New York, the department head of the Oswego County Sheriff's Office, the law-enforcement entity which provides "county-wide coverage … includ[ing] road patrol, civil, court security, marine and snowmobile patrol, and criminal investigation division" within Oswego County.  Defendant Hilton has been a vocal critic of the CCIA, expressed his opinion that it is unconstitutional, yet (1) has stated that the CCIA is the law in New York whether he agrees with it or not, (2) stated that his office would engage in "enforcement" (albeit "very conservative enforcement") of the CCIA, and (3) has specifically explained how carrying a firearm in churches is a felony carrying significant potential penalties.  *See* Exhibit "8," at ¶ 24, Declaration of Joseph Mann.  Defendant Hilton's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA.  Defendant Hilton is sued in his official capacity, and may be served with process at 39 Churchill Rd, Oswego, NY 13126.

18.     Defendant Joseph Stanzione is the Greene County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Greene County, including all crimes under N.Y. Penal Law § 265.00 *et seq*.  *See* County Law § 700(1).  Defendant Stanzione is sued in his official capacity, and may be served with process at 411 Main Street, Catskill, New York 12414.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202 and 42 U.S.C. §§ 1983 and 1988.

20.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

21.     Previously, Plaintiff Antonyuk brought a challenge to the CCIA in *Antonyuk v. Bruen*, No. 1:22-CV-0734 (GTS/CFH), within this district, together with Gun Owners of America, Inc., Gun Owners Foundation, and Gun Owners of America New York, who were representing the interests of their members and supporters, including individual Plaintiffs named herein.

22.     This Court concluded that, based on Second Circuit precedent, that no representational standing can be had for Section 1983 claims.  *Antonyuk* at 53-54.  Although Plaintiffs separately brought causes of action directly under the Constitution, the Court concluded, again based on Second Circuit precedent, that a plaintiff cannot bring such an action when Section 1983 provides a remedy.  *Id.* at 54-55.  Boxed in on both sides, there is no way for organizations to vindicate the constitutional rights of their members and supporters within this Circuit.  *Id.* at 55.

23.     As the individual Plaintiffs named above (who are all members of Gun Owners of America, Inc.) were not able to proceed in a representational capacity, they now bring this action as individuals asserting their own interests – making the same challenges, raising the same causes of action, and seeking the same relief as previously.

24.     Unexpectedly, Governor Hochul called this Court's *Antonyuk* "decision … just and right," apparently not cognizant that, although dismissing on standing grounds, this Court's "judicial dictum" explained in detail how the large majority of the CCIA's provisions are patently unconstitutional.[12]

---

[12] https://www.governor.ny.gov/news/statement-governor-kathy-hochul-dismissal-preliminary-injunction-antonyuk-v-bruen.

### III.     STATEMENT OF FACTS

#### a.  The Second Amendment.

25. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

26.     In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly-uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia.  *Heller*, 554 U.S. at 581.  Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation.  *Id.* at 592.

27.     Then, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment.  *Id*. at 791.

28.     In *Caetano v. Massachusetts,* 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding …" and that this "Second Amendment right is fully applicable to the States[.]" *Id.* at 411, 416.

29.     As the Supreme Court has now explained in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside

the home," free from infringement by either federal or state governments. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___ (2022), Slip Op. at 1.

30.     Importantly, in addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry" (Slip Op. at 29, fn 9), *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges.

31.     Prior to *Bruen*, the Second Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we 'determine whether the challenged legislation impinges upon conduct protected by the Second Amendment,' and second, if we 'conclude[] that the statute[] impinge[s] upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny.'" *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45, 55 (2d Cir. 2018). *See also Bruen*, Slip Op. at 10 fn. 4 (collecting cases using two-part test).  Other circuit courts also had adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected.  *See Heller* at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd* 742 Fed. Appx. 218 (9th Cir. 2018) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit.").

32.     Rejecting this widespread atextual, "judge empowering" (*Bruen*, Slip Op. at 13) interest-balancing approach, *Bruen* directed (again) the federal courts to first principles, to assess the text of the Second Amendment, informed by the historical tradition.  *Bruen*, Slip Op. at 10.

33.     First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, Slip Op. at 8.

12

34.     Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, Slip Op. at 8. (citation omitted).

35.     Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen*, Slip Op. at 30-51 (discussing the lack of relevant historical prohibitions on concealed carry in public).

36.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed."  Period.  There are no "ifs, ands or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's justification for or interest in infringing the right.  It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment.  There are no relevant statistical studies to be consulted.  There are no sociological arguments to be considered.  The ubiquitous problems of crime or the density of population do not affect the equation.  The only appropriate inquiry then, according to *Bruen*, is what the "public

13

understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868. *Bruen*, Slip Op. at 29.

37.     Lest there be any doubt, the Supreme Court has also instructed as to the scope of the protected persons, arms, and activities covered by the Second Amendment.

38.     First, *Heller* explained that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, at 580.  *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'[T]he people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*.

39.     Second, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Id*. at 581.  The Court explained that "'[k]eep arms'" was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id*. at 583.  Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id*. at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id*. *Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, Slip Op. at 23.

40.     Third, with respect to the term "arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582.  Indeed, the "arms" protected by the Second Amendment include "weapons of offence, or armour of defence… Arms are any thing

14

that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, at 581 (punctuation omitted).

41.     Finally, it is worth nothing that, in addition to clearly establishing the framework by which lower courts are to analyze Second Amendment challenges, *Bruen* also provided several additional guideposts which are relevant to New York's CCIA challenged here.

42.     First, the Court rejected the statutory schemes of "may issue" states such as New York, whereby "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria," such as when "the applicant has not demonstrated … suitability for the relevant license." *Bruen,* Slip Op. at 5.  Rather, the Court pointed to "'shall issue' jurisdictions" wherein licenses are issued "whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen,* Slip Op. at 4.

43.     Second, the Court explained that states have extremely narrow latitude to limit the places where firearms may be carried in public, mentioning only "sensitive places such as schools and government buildings," along with "legislative assemblies, polling places, and courthouses." *Bruen,* Slip Op. at 21, 37.  Although the Court acknowledged that other "new and analogous sensitive places" may exist, such potential locations would be highly limited, and certainly cannot be defined so broadly as to "include all 'places where people typically congregate'" or for New York to "effectively declare the island of Manhattan a 'sensitive place'" by claiming nearly every category of place to be a sensitive one.[13]  *Bruen,* Slip Op. at 22.

---

[13] Plaintiffs note that neither *Heller* nor *Bruen* definitively determined any particular type of place to be a sensitive place, but only noted that certain narrow types of locations historically have been restricted to the bearing of arms.  Indeed, the question of any particular sensitive place was not before the Court in those cases.  *Heller*, for example, stated only that the Court's opinion should not "cast doubt upon" certain "longstanding prohibitions."  *Id*. at 626.  Moreover, *Bruen* seemed

44.     Third, the *Bruen* court acknowledged the inherent risk in *all* permitting schemes, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  *Bruen,* Slip Op. at 30 n.9.

45.     But in spite of the Supreme Court's clear pronouncements in *Bruen*, New York apparently did not 'get the memo.'  On the contrary, rather than representing a good-faith attempt to bring New York law into compliance with the Second Amendment and the *Bruen* decision, the CCIA instead doubles down, flouting the people's right to keep and bear arms and, in fact, creating a far more onerous and restrictive concealed carry scheme even than that which existed prior to the *Bruen* decision (if such thing is possible).

46.     This Court's intervention is therefore necessary, to again make it clear to New York that it is not free to thumb its nose at the text of the Second Amendment, and the opinions of the Supreme Court, and that the Second Amendment is neither a "constitutional orphan" or a "second-class right."  *See Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Thomas, J., dissenting from denial of certiorari); *McDonald*, at 780; *Bruen*, Slip Op. at 62.

   **a.  New York's Gun Control Regime.**

47.     New York represents an extreme outlier among the states, imposing all manner of severe infringements on the constitutional right to keep and bear arms.

---

to anticipate that a challenge even to such "longstanding prohibitions" might occur, explaining only that "courts can use analogies … to determine whether modern regulations are constitutionally permissible," including in "schools and government buildings." *Id*. at 2119.  Thus, Plaintiffs do not concede the constitutionality of any such restriction.

48.     For example, New York requires a permit simply to purchase and possess any handgun.  Every handgun is thus registered with the state, and the serial number is affixed to the permit. *See* N.Y. Penal Law § 400.00(3).

49.     This requirement creates a de facto waiting period, due to the significant delay in issuance of such a permit, which New York estimates applicants "should expect [] to take a minimum of four months from the time of application until a license is either granted or denied."[14]

50.     Next, the 2013 New York "Safe Act" banned newly acquired so-called "assault weapons," while requiring registration of existing firearms for those individuals who had them.[15]

51.     So-called 'large capacity' magazines (which are really standard capacity magazines commonly sold in almost every other state) are generally banned in New York, subject to some exemptions.  *See* NY Pen. Law § 265.00(23); NY Pen. Law § 265.02(8).

52.     New York Requires background check for every firearm transfer,[16],[17] including private sales, and requires a non-licensee to first notify the state that they are disposing (*i.e.*, selling) a firearm (N.Y. Penal Law § 265.10(7)).

53.     In order to simply possess a handgun, a person first must obtain permission from the state which includes, at minimum, a premise permit which permits one only to possess a handgun within the home or place of business, but does not permit the person to take the handgun outside of the home, subject to few exceptions, such as traveling to a shooting range, shooting competition, or another dwelling where the licensee is authorized to take the firearm. *See* N.Y. Penal Law § 400.00(6).

---

[14] *See* https://www.ny.gov/services/how-obtain-firearms-license
[15] *See* https://safeact.ny.gov/resources-gun-owners.
[16] Transfers between immediate family members are exempt. *See* https://safeact.ny.gov/resources-gun-dealers.
[17] *See* https://safeact.ny.gov/resources-gun-dealers.

54.     In order to carry a firearm outside the home, a person must obtain a carry permit, which could be "restricted" to allow carry only in certain places specifically identified on the license itself.  *Id.*  Indeed, a New York state carry license does not apply in New York City, which has its own permitting scheme.  *See* N.Y. Penal Law § 400.00(6) (discussing New York City's application process).[18]

55.     Moreover, refusing to participate in the "reciprocity" agreements that are common between states across the country, New York does not honor the concealed permits of any other state.

56.     The difference between "restricted" and "unrestricted" permits was created not by the legislature, but rather by the judiciary, with judges adding various restrictions to licenses to carry.  *See O'Brien v Keegan*, 87 N.Y.2d 436 (N.Y. 1996) ("It was not unreasonable for licensing officer to restrict petitioner's unrestricted carry concealed license to hunting and target shooting in view of petitioner's inability to show need for unrestricted license, which would permit him to carry several concealed firearms.").

57.     "Open carry," meaning the unconcealed carry of a firearm, although legal in most states even without a permit, is entirely illegal in New York, as a carry license (authorizing only concealed carry) is the only way to carry a firearm outside the home.

58.     Finally, prior to *Bruen*, New York law required that a person demonstrate a "proper cause" as a condition necessary to obtain a license to carry a firearm in public.  Proper cause had been interpreted to mean "a special need for self-protection distinguishable from that of the general

---

[18] *See also* https://www1.nyc.gov/site/nypd/services/law-enforcement/permits-licenses-firearms.page, and https://licensing.nypdonline.org/new-app-instruction/.

community or of persons engaged in the same profession." *Kaplan v. Bratton*, 249 A.D.2d 199, 201, 673 N.Y.S.2d 66, 68 (App. Div. 1st Dept. 1998).

59.     In practice, ordinary persons with typical self-defense needs were found not to have "proper cause," and few New York residents were able to obtain a permit. *See Kaplan, supra*; *see also Klenosky v. N.Y.C. Police Dep't*, 53 N.Y.2d 685 (1981); *see also Matter of Agro v. Shea*, 2022 NY Slip Op 30816(U) (Sup. Ct.). The end result was a statutory scheme that wholly deprived ordinary citizens of the ability to armed self-defense outside the home.

60.     Yet although this nation's highest court recently rejected the New York statutory scheme, the recently enacted CCIA largely ignores the Court's decision, acting as if it is business as usual in the state.

### c.   New York's Most Recent Unconstitutional Gun Control – the CCIA.

61.     After the Supreme Court's complete rejection of New York's restrictive "may issue" carry scheme, the state legislature immediately went to work to craft new and improved ways to infringe on New Yorker's Second Amendment rights, seemingly to impose retribution on New York gun owners for successfully challenging its prior statute.

62.     Unhappy with the Supreme Court's opinion, and searching for ways to continue to restrict the ordinary New Yorker's ability to armed self-defense outside the home, the new Governor of New York, Kathleen Hochul, who took the place of former Governor Andrew Cuomo, called an extraordinary session of the New York State Legislature for the purpose of enacting a new statutory scheme (the CCIA), designed to give the appearance of compliance with *Bruen*, but in reality thwarting and bypassing the Supreme Court's decision.

63.     The Governor herself issued several statements critical and disrespectful of the Supreme Court's ruling: "[t]he Supreme Court's reckless and reprehensible decision to strike down

New York's century-old concealed carry law puts lives at risk here in New York,"[19] and "[a] week ago, the Supreme Court issued a reckless decision removing century-old limitations on who is allowed to carry concealed weapons in our state — senselessly sending us backward and putting the safety of our residents in jeopardy[.]"[20]  In other words, the Governor appears to have no desire to comply with the Supreme Court's *Bruen* decision, and every intention to thwart and undermine it through signing the CCIA into law, as a sort of guerrilla warfare against the Supreme Court, the rule of law, and the Second Amendment.

64.     This new bill, rushed through the extraordinary session and passed without the required public posting, comment and debate, has now introduced a slew of new, unprecedented, and blatantly unconstitutional impediments to New Yorkers in their attempt to exercise their constitutional right to armed self-defense outside the home.

65.     The bill, ironically called the Concealed Carry *Improvement* Act, is New York's attempt to flout the Supreme Court's holding in *Bruen*.  Instead of complying with that decision, the Assembly and Senate, with the Governor's glowing approval, have promulgated several blatantly unconstitutional new infringements of the enumerated right to keep and bear arms.

66.     A true and correct copy of the Bill is attached as Exhibit "1" to the Complaint.

### i.  Good Moral Character.

67.     To be sure, the CCIA removes the now-unconstitutional "proper cause" requirement from the prior statute.  In its place, the CCIA defines the malleable term "good moral character" to now mean "having the essential character, temperament and judgement necessary to

---

[19] https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-begin-june-30.

[20] https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions.

be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others…."  Exhibit "1" at 2; *Antonyuk* at *70.

68.     However, the Second Amendment does not leave it up to the state of New York to decide whether to "entrust[]" its citizens with arms.  Rather, the right of all "the people" (not just the government's chosen favorites) "shall not be infringed."

69.     The concept of "good moral character" is a standardless notion, inevitably open to subjective interpretations by licensing individuals across the state who, based on history, may wish to continue to deny the law-abiding citizens of New York the ability to defend themselves in public.  An "I'll know it when I see it" standard for bestowing the privilege of licensure is a concept entirely foreign to the Second Amendment.  *Antonyuk* at *80 ("New York State's new definition of 'good moral character' does not in fact remove the open-ended discretion previously conferred….").

70.     As recently interpreted by a New York federal court, "[g]ood moral character is more than having an unblemished criminal record. A person of good moral character behaves in an ethical manner and provides the Court, and ultimately society, reassurance that he can be trusted to make good decisions."  *Sibley v. Watches*, 501 F. Supp. 3d 210, 219 (W.D.N.Y. 2020)

71.     Yet, as noted above, the *Bruen* Court expressly rejected such a statutory scheme, which "grant[s] licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*."  *Bruen*, Slip Op. at 4-5 (emphasis added).  If a decision whether a person has "good moral character" is not a judgment about "suitability" to carry firearms, it is hard to see what would be.  Indeed, as this Court has explained, the CCIA "merely changes the *nature* of that open-ended discretion."  *Antonyuk,* at *79-80 and n.38.

72.     Likewise, writing in concurrence in *Bruen*, Justice Kavanaugh rejected a "feature[] of New York's regime — the unchanneled discretion for licensing officials … in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" (Kavanaugh, J., concurring, Slip Op. at 2).

73.     Yet that is precisely what the CCIA permits, allowing licensing officials unbridled discretion to decide whether to "entrust[]" a person with constitutional rights, and to "require … such other information … that is reasonably necessary" to making that determination, another open-ended grant of authority, thus opening the door to a host of abuses, unequal enforcement, arbitrary and capricious, actions and the further erosion of the Second Amendment through the exercise of unbridled power and "unchanneled discretion."  As this Court has noted, "licensing officials may not arbitrarily abridge … the Second Amendment right … of self-defense … based on vague, subjective criteria." *Antonyuk* at *80.

74.     Plaintiffs challenge the idea that, in addition to indisputably being part of "the people" protected by the Second Amendment, that they must prove they have "good moral character" to the satisfaction of a New York State licensing official.  Plaintiff Sloane must make this showing in order to qualify for a license, while the other plaintiffs who already have licenses must maintain this status or else their licenses will be revoked.

i.  **List of Household Members and Family, In Person Meetings, Social Media, and "Character References."**

75.     In addition to requiring an applicant to demonstrate (and maintain) "good moral character," as defined, the CCIA imposes a litany of demands on those seeking a New York carry permit, including a requirement that the applicant "shall meet in person with the licensing officer for an interview and shall, in addition to any other information or forms required by the license application submit to the licensing officer the following information:

i.     names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home;

ii.    names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others;

iii.   certification of completion of the training required in subdivision nineteen of this section;

iv.    a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants [sic] character and conduct as required in subparagraph (ii) of this paragraph; and

v.     such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."

*See* Exhibit "1" at 4-5.

76.    Each of these requirements is part of the "good moral character" requirement is ripe for abuse and discrimination, in that each is designed to allow a licensing official to determine if a person has the good moral character necessary to be "entrusted" with a license, by assessing one's demeanor during an interview, discussing one's temperament and behavior with friends,

family, and character references, and reviewing a person's history of speech and discourse on social media.

77.   In addition to constituting the State's blatant infringements of the Second Amendment right to keep and bear arms, several of the CCIA's demands (conditions of qualifying for a carry license) also represent gross infringements of applicants' First and Fifth Amendment rights.

78.   For example, demanding the names and contact information (presumably for interrogation by licensing authorities) of relatives and co-habitants violates the First Amendment right of association, along with anonymity rights of those who do not want to be contacted by government officials, or have their information entered into a government database.  The idea that constitutional rights can be conditioned on the government first interrogating *one's children* (even if adults) is particularly noxious, and no doubt is designed to serve as a deterrent to seeking licensure, due to the natural parental instinct to protect.  In fact, New York City Mayor Eric Adams has claimed that "police officers" would be "knocking our [sic] neighbors' doors, speaking to people, finding out who this individual is that we are about to allow to carry a firearm in our city."[21]

79.   Demanding a list of and potentially access to some vague class of "social media accounts of the applicant" in order to issue a permit to carry a concealed weapon requires disclosure of protected First Amendment speech and press as a condition of exercising another protected constitutional right, and violates the Fifth Amendment right against self-incrimination.

80.   Next, applicants must provide four character references to the government as a condition of exercising Second Amendment rights.  Unsurprisingly, other constitutional rights are not predicated upon what others think about you, or conditioned on having friends who will agree

---

[21] https://nypost.com/2022/09/01/mayor-eric-adams-vows-door-to-door-checks-on-gun-permits/

to stand up to government interrogation and scrutiny (or retaliation) in order to help another obtain

a carry license.  Notwithstanding that, those who do not have four "character references" (such as

new arrivals to the state) presumably will be unable to exercise their Second Amendment rights.

Exhibit "1" at 5.

81.     Making matters worse, the CCIA demands that "character references" attest that

the applicant "has not engaged in any acts, or made any statements that suggest they are likely to

engage in conduct that would result in harm to themselves or others." *Id*. at 5.  Of course, requiring

someone to be in the omniscient position to attest that another person has not engaged in "*any act*"

or made "*any statements*" of a certain nature seems a tall order indeed.  *See Antonyuk* at *81.

82.     Next, the requirement that nothing "suggest [an applicant is] likely to engage in

conduct that would result in harm [justified or not] to themselves or others" is an open-ended and

vague standard, as one hundred percent of those applying for a permit to carry a handgun in public,

by definition, could be said to be "likely" to "harm" a carjacker through the morally legitimate and

entirely lawful act of self-defense.  *See Antonyuk* at *70-79.

83.     It is axiomatic that the exercise of one constitutional right cannot be conditioned on

the forfeiture or violation of another.  *See, e.g., Simmons v. United States*, 390 U.S. 377 (1968)

(rejecting a situation where a defendant was forced to forfeit his Fifth Amendment right to keep

silent in order to assert his Fourth Amendment right, calling that a "condition of a kind to which

this Court has always been peculiarly sensitive," and concluding it to be "intolerable that one

constitutional right should have to be surrendered in order to assert another.")  *Id*. at 393-94.  *See*

*also Perry v. Sindermann*, 408 U.S. 593 (1972) (the government may not deny a person a benefit

"on a basis that infringes his constitutionally protected interests ... For if the government could

deny a benefit to a person because of his constitutionally protected [rights], his exercise of those

freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly ... Such interference with constitutional rights is impermissible.") *Id*. at 597. (punctuation omitted).  *See also Antonyuk* at *84-85.

       **iii.**   **Sensitive Locations.**

84.    The CCIA next creates a new Section 265.01-e entitled "Criminal Possession of a firearm, rifle or shotgun in a sensitive location."  Exhibit "1" at 16.

85.    The list of "sensitive locations" contained in this section is extensive, and serves to bar the carry of firearms in most public places.

86.    "Sensitive location" is defined as:

(a) any place owned or under the control of federal, state or local *government*, for the purpose of government administration, including courts;

(b) any location providing *health*, behavioral health, or chemical dependance *care* or services;

(c) any place of *worship* or religious observation;

(d) libraries, public *playgrounds*, public *parks*, and *zoos*;

(e) the location of any program licensed, regulated, certified, funded, or approved by the office of *children and family services* that provides services to children, youth, or young adults, any legally exempt *childcare provider*; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;

(f) nursery *schools*, *preschools*, and summer *camps*;

(g) the location of any program licensed, regulated, certified, operated, or funded by the office for people with *developmental disabilities*;

26

(h)  the location of any program licensed, regulated, certified, operated, or funded by office of *addiction* services and supports;

(i) the location of any program licensed, regulated, certified, operated, or funded by the office of *mental health*;

(j)  the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and *disability* assistance;

(k) homeless shelters, runaway homeless youth *shelters*, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;

(l) *residential settings* licensed, certified, regulated, funded, or operated by the department of health;

(m) in or upon any building or grounds, owned or leased, of any *educational institutions*, *colleges and universities*, licensed private career *schools*, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;

(n) any place, conveyance, or vehicle used for *public transportation* or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;

(o)  any establishment issued a license for on-premise *consumption* pursuant to article four, four-A, five, or six of the *alcoholic beverage* control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;

(p)  any place used for the *performance, art* entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;

(q) any location being used as a *polling place*;

(r) any *public sidewalk* or other public area *restricted from general public access* for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;

(s) ***any gathering of individuals to collectively express their constitutional rights to protest or assemble***;

(t)  the area commonly known as *Times Square*, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

*See* Exhibit "1" at pp. 16-18.

87.     In any of these dozens of types of places (which, in some instances, include persons' homes), firearms of any kind are completely banned, regardless of whether they are being used, carried, or merely stored.

88.     The CCIA has certain exemptions, including for the police, certain government employees engaged in the course of their duties, persons engaged in hunting, and persons operating a "program" in a "sensitive location out of their residence."  Exhibit "1" at 19.

89.     Unlawful possession of a firearm in any of these 20 categories of "sensitive locations" is a Class E Felony, conviction of which leads not only to a lengthy sentence but also to the permanent loss of Second Amendment rights.

90.     First, going far beyond the Supreme Court's sanction of "government *buildings*" as "sensitive places" (*Bruen*, Slip. Op. at 5), the CCIA declares "any *place* owned or under the control of federal, state or local government, for the purpose of government administration" to be a sensitive location.  Subsection (a).  This could be read to cover, for example, even public protests in Albany, attended by Plaintiffs Terrille[22] and Johnson[23] which have occurred in the public square and public streets in Empire State Plaza – hardly a sensitive place.

91.     Next, the CCIA widely bans firearms in any place offering healthcare or other medical related services (subsection b) and any "place of worship or religious observation" (subsection c).  Each of these restrictions applies not only to customers/visitors to a business and members of a church congregation, but also the proprietor (a doctor, dentist, massage therapist, acupuncturist, chiropractor, etc.) or pastor of a church.  *See* Exhibit "8," Declaration of Mann, ¶¶ 4, 12-15.  Even for the *owners* of private property whose property has been declared a "sensitive

---

[22] *See* Exhibit "9," Declaration of Alfred Terrille, ¶ 18.
[23] *See* Exhibit "2," Declaration of Corey Johnson, ¶ 15.

location," carry is entirely off limits, and there is no ability for such persons to "opt out" of being a "sensitive location."  For example, Plaintiff Mann, a pastor, cannot possess a firearm in his own church and, indeed, in his own home which is connected to the church. *Id*. at ¶ 12.

92.     Indeed, the City of New York recently issued a letter to holders of "an active premise business, limited carry, special carry, or carry business license," threatening that the CCIA's new prohibition on firearms in a "sensitive location" "is a Class E Felony" and threatening that the licensee's "continued possession of a firearm at this location is unlawful."  *See* Exhibit "5." (emphasis original).  The NYC publication continues "***IF* YOUR BUSINESS IS IN A SENSITIVE LOCATION … YOU ARE NO LONGER ABLE TO LAWFULLY POSSESS A FIREARM AT THAT LOCATION.**"  *Id*. (emphasis original).

93.     In fact, for Plaintiff Mann, or for a person "providing health, behavior health, or chemical dependence care or services" (such as Pastor Mann's counseling of congregants) *out of the home*, the CCIA completely eliminates such persons' Second Amendment rights, in that possession of any firearm in that "location" (the home) is flatly prohibited.  Exhibit "1" at 16. See also Declaration of Mann, Exhibit "8," ¶¶ 26, 28, 29.   Indeed, the only exception the CCIA provides is for "persons operating *a program* in a sensitive location out of their residence [sic], as defined by this section, which is licensed, certified, authorized, or funded by the state or a municipality…."   Exhibit "1" at 19 (emphasis added).  Whereas certain places in the list of "sensitive locations" use the word "program" (subsections e, g, h, i, j, and k), neither the "place of worship" subsection (b) nor the healthcare subsection (c) uses that word.  Likewise, "any gathering of individuals to collectively express their constitutional rights to protest or assemble" that occurs *even within the home* (such as a Bible study held at Plaintiff Mann's home) would be a gun-free zone (subsection s).  Exhibit "1" at 18.  *See also* Declaration of Mann, Exhibit "8," ¶¶ 13, 32.

94.     In other words, parts of the CCIA make it a felony to keep an operable firearm in the home for self-defense.  *But see Heller* at 635 ("we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.").  For that reason, these provisions of the CCIA are void on their face, without further analysis.

95.     The CCIA next prohibits firearms in various places (subsections d and f), including "libraries, public playgrounds, public parks, [] zoos … nursery schools, preschools, and summer camps," presumably due to nothing more than these being places where children are often present. Of course, there is no historical analogue for banning firearms in locations simply based on the presence of children and, quite to the contrary, children are a class of persons in much need of protection by armed and vigilant parents, grandparents, teachers, pastors, guardians, etc., including Plaintiff Terrille's grandchildren, and Pastor Mann's students and youth congregation. *See* Declaration of Alfred Terrille, Exhibit "9," ¶¶ 7, 8, 19.  *See* Declaration of Mann, Exhibit "8," ¶¶ 30, 31.The CCIA declares that these and other children cannot be protected, creating gun-free zones that are known to be targets of criminals who, by definition, do not obey the law – even if clearly posted by conspicuous signage.

96.     Next, the CCIA bans (subsection k) firearms in locations that provide services for the homeless, runaways, youth, families, and victims of domestic violence.  But again, these vulnerable populations are either often in greater than ordinary need of protection, such as a battered wife counseled by Plaintiff Mann, or themselves may present a risk to others, such as the drug addicts helped by the Pastor's church. *See* Declaration of Mann, Exhibit "8," ¶¶ 26, 27.

97.     The CCIA next, far too broadly (subsection m), sweeps into its ambit any type of "building or grounds" owned by any school or university – of any sort.  Presumably, this would

eliminate the numerous skeet, shooting, and ROTC ranges located on the grounds of several colleges and universities within the State of New York.[24]  Moreover, it would seem to apply not only to public grade schools (of the type discussed in *Heller*), but also would deprive *private* schools, *church* schools, and even *home* schools (such as the one that holds classes at Pastor Mann's church) from self-determination as to how best to provide protection for their students – including usurping and undermining parents' decisions how best to protect their own children under their own care and *within their own home*.  *See* Declaration of Mann, Exhibit "8," ¶ 31.

98.    Next, the CCIA broadly and without nuance prohibits firearms within all sorts of public transportation (subsection n), which would conflict with federal law (18 U.S.C. Section 926a) and regulation,[25] and prohibit Plaintiff Terrille even from, consistent with TSA regulations, checking his firearm into his luggage at the airport on his upcoming trip (Declaration of Alfred Terrille, Exhibit "9," ¶¶ 9, 11), or Pastor Mann's church from using the church van and bus for a skeet shooting trip by men in the congregation (*See* Declaration of Mann, Exhibit "8," ¶ 33.).

99.    Next, the CCIA prohibits (subsection o) firearms in places where alcohol is served, regardless of whether a person (like Plaintiffs Johnson[26] and Terrille[27]) is actually consuming alcohol, and even when eating with their families in nowhere near the general vicinity as the bar in a family restaurant – even if it is not in operation (such as during Sunday morning brunch).

100.   Next, the CCIA broadly bans (subsection p) firearms at "any place used for the performance, art entertainment, gaming, or sporting events," even though there is nothing "sensitive" about these places other than being places where people gather.   This would keep

---

[24] *See* https://competitions.nra.org/competitions/nra-national-matches/collegiate-championships/collegiate-shooting-sports-directory/
[25] https://www.tsa.gov/travel/transporting-firearms-and-ammunition
[26] *See* Declaration of Johnson, Exhibit "2," ¶¶ 11, 12.
[27] *See* Declaration of Terrille, Exhibit "9," ¶ 19.

Plaintiff Terrille from being armed when taking his grandchildren to the movies (Declaration of Terrille, Exhibit "9," ¶ 7), would entirely prohibit the gun shows attended by Plaintiff Terrille because they occur at various locations in the CCIA's long list (Declaration of Terrille, Exhibit "9," ¶ 16, and restrict even Pastor Mann's church from having both the church choir and a loaded firearm present at the same time (Declaration of Mann, Exhibit "8," ¶ 34) (that is, if the church were not already off limits under other subsections).

101.    Not done yet, the CCIA bans firearms even on sidewalks and streets (subsection r), if those locations are vaguely declared to be a "special event" and issued a "permit," such as the rallies and protests attended by Plaintiffs Johnson and Terrille (Exhibit "9," Declaration of Terrille, ¶ 18; Exhibit "2," Declaration of Johnson, ¶ 15).  But again, *Bruen* makes clear that a place is not a "sensitive place" merely because people congregate there, with or without a permit.

102.    Finally, and perhaps most outlandishly, the CCIA bans (subsection s) firearms at any gathering of people "to collectively express their constitutional rights to protest or assemble," such as Plaintiffs Terrille and Johnson when they attend rallies and gun shows (Declaration of Terrille, Exhibit "9," ¶¶ 16, 18; Declaration of Johnson, Exhibit "2," ¶¶ 14, 15), or Pastor Mann when he gives a sermon from the pulpit (Declaration of Mann, Exhibit "8," ¶ 32).  It is not difficult to see the blatant unconstitutionality of a law that conditions the exercise of one constitutional right on the forfeiture of others.  *See Antonyuk* at *84-85.

103.    Indeed, at least one New York gun show has already been canceled after conversations with "the St. Lawrence County Sheriff's Office, District Attorney's Office and New

York State Police," based on subsections (a) (government locations), (p) (entertainment and theater), and (s) (gatherings to exercise constitutional rights).[28]

104.    Although some of the CCIA's "sensitive locations" must be marked conspicuously with signage, many are not required to be so marked, leaving carry license holders in peril of unintentionally violating the statute (and becoming a *felon*) in a place they innocently and legitimately have no idea constitutes a "sensitive location" in the massive list above (such as a delivery driver dropping off a package at a residential garage that just so happens to double as a the homeowner's chiropractic clinic).

105.    Rather than concocting this extensive list of so-called "sensitive locations," it probably would have been easier for the legislature to list the places that New York, in its grace, *does allow* ordinary law-abiding citizens to exercise their rights.   Indeed, when a reporter questioned whether she was "shutting off all the public places," and asked "what would be left?" Governor Hochul quipped "probably some streets."[29]  Of course, not if the streets are a government location (subsection a) or holding a special event (subsection r).

106.    Indeed, the CCIA's cornucopia of "sensitive locations" will produce absurd results (in addition to those detailed above).  For example, there are 12 New York state counties "fully or partially in the" Adirondack Park,[30] "the largest park in the contiguous United States" comprised of 6 million acres, including numerous parcels of private land, and home to a "year-round population [of] 132,000."[31]  Although county officials in the area had reached out to Governor

---

[28] https://www.nny360.com/news/stlawrencecounty/state-s-new-gun-law-prompts-cancellation-of-west-potsdam-fire-department-gun-show/article_371ff533-4265-51ba-8d78-d2ed4a9c01a9.html

[29] https://www.cbsnews.com/newyork/news/fresh-off-primary-win-gov-kathy-hochul-dives-right-into-guns-who-can-get-them-and-where-they-can-take-them/

[30] https://en.wikipedia.org/wiki/Adirondack_Park.

[31] *See* https://apa.ny.gov/about_park/

Hochul's office for guidance, they were provided with nothing "more than verbal assurances" that the CCIA does not apply to Adirondack Park (in other words, that the CCIA does not mean what it clearly says).[32]

107.    In addition to these numerous "sensitive locations," the CCIA also bans the carry of firearms in what it calls a "restricted location," defined in "§ 265.01-d Criminal possession of a weapon in a restricted location":

> A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property *has not permitted such possession by clear and conspicuous signage* indicating that the carrying of firearms, rifles, or shotguns on their property is permitted *or has otherwise given express consent*. [Exhibit "1", p19 (emphasis added).]

108.    Violation of this prohibition, like the prohibition on "sensitive locations," is a "class E felony" conviction of which leads to the loss of Second Amendment rights for life.  Exhibit "1" at 20.

109.    In other words, the CCIA makes *all private property* in New York state a "restricted location" by default, adopting an anti-Second Amendment policy position on behalf of all property owners within the State, with a property owner (such as a storekeeper like Plaintiff Leman, Declaration of Leman, Exhibit "4", ¶ 25, 26) required to "conspicuously" post signage indicating that concealed carry is allowed.  *See Antonyuk* at *94-95 ("the Court agrees with Plaintiffs that the CCIA's definition of 'restricted locations' impermissibly encompasses all private property in the state unless the property owner expressly permits the carrying of firearms…..").  Likewise, Plaintiff Antonyuk is forced to either give express consent to each person who comes onto his property or,

---

[32] https://www.wamc.org/news/2022-08-30/north-country-officials-say-clarification-on-impact-of-new-concealed-carry-law-on-adirondack-park-is-needed

because he cannot stand on his front lawn 24 hours a day, post "conspicuous signage" in order to permit New Yorkers to carry onto his property. *See* Declaration of Ivan Antonyuk, Exhibit "7," ¶ 14, 18.

110.   Indeed, New York City recently issued a publication about the CCIA stating that "[a]ll private property (residential and commercial) that is not on the sensitive location list is considered 'restricted.'" Exhibit "6" at 2.

111.   *Bruen* has expressly foreclosed the ability of New York to paint with such broad strokes, labeling vast swaths of the state to be "sensitive places" (or "sensitive locations" or "restricted locations"), explaining that:

> expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below…. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department. [*Bruen*, Slip Op. at 22.]

112.   Disregarding the Supreme Court's warning not to turn the entire state into a "sensitive place," New York has essentially told the Court "challenge accepted," with the CCIA effecting virtually that result.

113.   Moreover, as this Court has noted, although possibly a drafting error, a literal reading of the plain text of the CCIA indicates that *there is no way to opt out*, as carry would be prohibited either both where "the owner or lessee of such property *has not* permitted such possession by clear and conspicuous signage … or *has* otherwise given express consent." Emphasis added; *see Antonyuk* at 96.  Of course, courts do not interpret statutes contrary to their words unless in "one of those rare cases where the application of the statute as written will produce a result 'demonstrably at odds with the intentions of its drafters.'" *Demarest v. Manspeaker*, 498

U.S. 184, 190 (1991); *see also United States v. X-Citement Video*, 513 U.S. 64, 82 (1994) (Scalia, J., dissenting) ("the *sine qua non* of any 'scrivener's error' doctrine … is that the meaning genuinely intended but inadequately expressed must be absolutely clear; otherwise we might be rewriting the statute rather than correcting a technical mistake."); *see also Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.").

114.    With "sensitive locations" covering most public locations and locations that have some tie to or involvement with state government, and "restricted location" covering all private property by default, it is hard to imagine how a carry license holder could so much as leave home without running afoul of the CCIA.  That is precisely the result that *Bruen* warned against.

115.    Not content with banning licensed carriers from carrying in most of New York, the CCIA now mandates that individuals who are otherwise licensed to carry, but who are entering a "no carry" zone, must remove the ammunition from their firearm and secure the firearm in an "appropriate safe storage depository out of sight from outside of the vehicle."  Exhibit "1" at 25. Mandating the removal of magazines and unloading firearms will unnecessarily introduce the possibility for accidental discharges. *See* Declaration of Antonyuk, Exhibit "7," ¶ 8. Mandating that individuals unload their lawfully carried firearms each time they leave their vehicle to enter a no carry zone will do nothing to ensure the safety of the firearm, will provide opportunities for the vehicle to be vandalized and the firearm stolen (by definition, by someone who is not law-abiding and, most likely by someone who is not a carry license holder), and can potentially cause injuries or, at a minimum, "man with a gun" calls to police when passersby witness a gun owner unloading, storing, or reloading his firearm.  *See Antonyuk* at *49 n.16.  Indeed, New York affirmatively

stated that a glove box or glove compartment "shall not be considered an appropriate safe storage depository," meaning something less discrete will be required.  *Id*. at 25.

116.   New York's new "sensitive locations" and "restricted locations" provisions are unconstitutional on their face, serve only to "eviscerate the general right to publicly carry arms for self-defense," and create a situation that is even more onerous and restrictive than that which existed prior to the *Bruen* decision.

117.   Indeed, for many people like Pastor Mann, the CCIA entirely eliminates Second Amendment rights entirely, prohibiting them even from keeping a firearm in their own home (if their home is also a "sensitive location") and prohibiting them from bearing a firearm virtually everywhere else in the state.

118.   Additionally, by listing as a "sensitive location" any location where individuals exercise their First Amendment rights to association and protest (subsection s), the CCIA takes away Second Amendment rights for those who exercise other constitutional rights.

119.   Finally, both the CCIA's "restricted locations" and "sensitive locations" are facially unreasonable, in that they fail to provide any reasonable exceptions to their blanket bans such as, for example, a gun carrier who unwittingly drives across private property while traversing a logging road in the Adirondack Park or, vice-versa, an armed motorist whose route home from work cuts through a town park.  Shockingly, the CCIA would demand that a person like Plaintiff Leman, a volunteer firefighter who responds to emergency calls for help no matter where they occur, to engage in the practical impossibility of disarming himself before rendering aid in a life-or-death situation.  *See* Declaration of Leman, Exhibit "4," ¶¶ 5, 9, 19.  Presumably, the only recourse of a person charged with a crime in such a situation would be the common law defense of necessity – hardly an assurance of any relief.

120.    Interestingly enough when, in 2020, the Supreme Court dismissed *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) ("*NYSRPA I*") on mootness grounds, Justice Alito, joined by Justices Thomas and Gorsuch, dissented from the dismissal, explaining how the challenged New York City ordinance "prohibited law-abiding New Yorkers with a license to keep a handgun in the home … from taking that weapon to a firing range outside the City." *Id*. at 1527 (Alito, J., dissenting from denial of cert.).  Justice Alito continued to recount that "once we granted certiorari, both the City and the State of New York sprang into action to prevent us from deciding this case.... [O]ur grant of review apparently led to an epiphany of sorts, and the City quickly changed its ordinance.  And for good measure the State enacted a law making the old New York City ordinance illegal." *Id.*  at 1527-1528.  The Court, however, dismissed and remanded on mootness grounds.

121.    Having successfully avoided the Court's review in *NYSRPA I*, the New York legislature has now in effect reenacted – *statewide* – the same state of the law that existed in New York City, wherein residents of New York may not leave their homes or towns with their firearms, whether carried or even merely possessed.

122.    Indeed, Plaintiff Leman, for example, lives in a small town that is surrounded on all sides by the Catskill Park, a purported "sensitive location."  Declaration of Leman, Exhibit "4," ¶ 32.  To leave his town and travel to a shooting range or to a friend's home in another town, he would be in violation of the CCIA merely to bring his firearm with him, as he would traverse state parkland.  Mr. Leman could not even purchase a new gun in another town, and bring it home.  The CCIA thus violates the federal safe harbor provision found in 18 U.S.C. Section 926A because, by banning *all possession* of firearms (not merely concealed carrying), Plaintiff Leman may not even unload, lock, and secure his firearm in the trunk of his car during such a trip.  The CCIA also

violates *Heller*, by prohibiting people in the situation of Mr. Leman from obtaining a handgun to keep in their homes for self-defense.  In fact, to the extent that a resident of a town or piece of property surrounded by state parkland does not already possess a firearm in his or her home, such person would be entirely unable to obtain one.

123.    In its steadfast refusal to recognize the Second Amendment rights of its residents, New York state has now, quite unironically, come full circle, replacing on a statewide level the same restrictions that it sought to avoid having the Supreme Court review in *NYSRPA I*.  Of course, it seems abundantly clear how the Court would have held had it decided the merits of that case.

### iv. New York's Second Amendment Tax.

124.    The CCIA's licensing scheme adds a slew of new requirements to the demands placed on a carry license applicant, some of which will disproportionately affect individuals who cannot devote the new "minimum of sixteen hours of in-person live curriculum" that New York demands all permittees acquire. *Id*. at 39.  This course also requires two hours of live-fire training, resulting in a total training demand of 18 hours.  *Id*.

125.    Prior to this new law, only a four-hour course was required, with many trainers offering the course for approximately $75.00[33,34] and some offering it for $50.00.[35]

126.    The new 16-hour course, with an additional two hours live-fire, is estimated to run in approximately the $400 dollar range, plus the cost of ammunition for "live fire" (perhaps $50 or more), not to mention the significant time investment required for individuals to take off potentially as many as three days of work to complete a training requirement that is now four and half times what was previously required.

---

[33] https://ftwny.com/coursedetails/.
[34] https://theindoorgunrange.com/basic-pistol-safety-1.
[35] https://www.donssecurityservices.com/product/nys-pistol-permit-safety-course/.

127. Defendant Bruen previously objected that Plaintiffs' estimate of the costs of training being around $400 was "entirely speculative." *Antonyuk* Opp Br. at 60. Interestingly enough, Plaintiffs' estimate seems to have been spot on, as one news story[36] reported a New York firearms instructor's opinion that "it's [training] going to be probably somewhere around $400 because we have to pay staff, we have to pay for the classroom we also have to pay for range use and we've got to pay for materials, there's a lot of material that's going to be involved in this." Indeed, such training is now being offered for $375[37] by at least one instructor, and $795[38] by another. Within those bookends, other locations offer prices of $575,[39] $397,[40] $500,[41] $550,[42] and "up to about $600."[43] Many New York instructors have not yet created and do not yet offer classes compliant with the CCIA. For those New Yorkers who are in more rural areas that are distant from qualified trainers, it will be difficult to obtain the CCIA's required training without long-distance travel, exorbitant cost, and scheduling a class many months in the future.

128. Adding further draconian layers to the application process, Governor Hochul (apparently the preeminent authority on all things CCIA) has opined that, even if an applicant has previously applied for a license prior to the CCIA taking effect, but a license has not been issued, such application will be considered null and void, meaning the person would need to reapply under

---

[36] https://www.whec.com/top-news/nys-issues-minimum-standards-for-firearm-safety-training/
[37] https://site.corsizio.com/c/6310d4f261d3a9b12d2734cd
[38] https://www.dark-storm.com/range/training/dsi-concealed-carry-permit-course-pre-registration/
[39] https://ftwny.com/ny-state-pistol-permit-class-concealaed-carry-class/
[40] https://gstny.com/events/nys-conceal-carry-training-sept-17-18-2022-2/
[41] https://www.shootershaven.com/events/new-york-state-basic-pistol-safety-course-141/
[42] https://www.learntoshootny.com/courses (https://www.learntoshootny.com/book-online
[43] https://www.news10.com/news/ny-news/confusion-remains-after-new-gun-laws-take-effect/amp/?fr=operanews. ("As an instructor in firearms, I'm not really qualified to give suicide prevention courses.").

41

the provisions of the CCIA:  prior application "won't make a difference, because it's who has a

permit on [September 1, 2022] — not that you've applied."[44]

129.    The CCIA makes New York an extreme outlier among the states with respect to its

training requirement, with only the state of California imposing a more onerous requirement.  As

Defendant's briefing in *Antonyuk* showed, only five states have training requirements approaching

anywhere near as expansive as New York's, and only California exceeds the CCIA's requirements.

130.    The CCIA's new training requirement and associated costs, which is obviously

designed with the intent to increase the cost associated with exercising an enumerated right,

especially for those with lesser means, ignores *Bruen*'s footnote 9 which stated that "we do not

rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in

processing license applications or exorbitant fees deny ordinary citizens their right to public carry."

Slip Op. at 30.

131.    Prior to losing *Bruen*, New York did not require such an extensive and expensive

training requirement.  Rather, for many years, New York has deemed four hours sufficient to train

individuals to carry firearms in public.  The mere fact that *Bruen* now requires New York to

recognize the rights of its citizens does not justify a 4.5-fold increase in training, especially absent

any explanation why such an increase is necessary.

### d.    Plaintiff Ivan Antonyuk

132.    Plaintiff Ivan Antonyuk is an adult male citizen of the State of New York, residing

in Schenectady County within this district, a citizen of the United States, and a member of Gun

Owners of America, Inc.  He is a law-abiding person, and has no disqualification under state or

---

[44] https://www.politico.com/news/2022/09/01/ny-officials-disagree-on-how-to-handle-conceal-carry-requests-ahead-of-new-gun-control-law-00054411

federal law which would prohibit him from possessing a firearm.  *See* Declaration of Ivan Antonyuk, Exhibit "7," ¶¶ 1, 4.

133.    Plaintiff Antonyuk is originally from Ukraine.  *Id.* at ¶ 3.  In early 1990's, Ukraine, crime was rampant. The country was run by mafia and criminals, while ordinary citizens were not allowed to own firearms to protect themselves.  Indeed, only the government and its chosen protectors had access to arms.  *Id.* at ¶ 3.  This left the Ukrainian people with no means to defend themselves from crime, whether committed by petty criminals or the government itself.  The police were often hours away when called, if they came at all, and the Ukrainian people had no right to free speech and no right to protest. *Id.* at ¶ 3.  During his childhood, Plaintiff Antonyuk witnessed attacks on the citizens of Ukraine by the government for the simple act of protesting.  Indeed, he was a victim of government violence during a protest in which he was not involved, but nevertheless was beaten by the police for simply being in the general vicinity of the protest. *Id.* at ¶ 3.  In 1994, Mr. Antonyuk fled Ukraine in favor of the United States and its promise of freedom, moving to New York, where he became a citizen of the United States in 1999.  He has lived in New York ever since. *Id.* at ¶ 3.  In coming to the United States, and New York in particular, Mr. Antonyuk was not seeking to exchange one totalitarian regime for another.

134.    Prior to the implementation of the CCIA, Mr. Antonyuk carried his firearm in public, where permitted and where lawful.  *Id.* at ¶ 5.  But now, under the CCIA, almost all places where he previously carried are now off limits.  He is unable to go into a restaurant or gas station that is not specifically posted with a sign allowing firearms.  *Id.* at ¶ 6.

135.    Mr. Antonyuk states that the "CCIA's implementation has greatly affected [his] daily life" and that he has taken "significant steps ... to comply with its provisions."  *Id.* at ¶ 7.  He

43

has changed where he eats and gets his takeout meals and he no longer shops at stores that do not post signs welcoming firearms.  *Id*.

136.    As previously alleged in the first *Antonyuk* case, Mr. Antonyuk is now forced to disarm himself and separate the magazine and ammunition from his firearm and store them in a "safe storage box, but not in [his] glovebox."  *Id*. at ¶ 8.  Mr. Antonyuk states, again, that in unloading his firearm, he has "to do this in [his] vehicle as it does not make sense to exit the vehicle with a holstered, concealed firearm, draw the firearm, unload and make safe, and then store the firearm in" his trunk or a locked safe.  *Id*. at ¶ 8.  And, of course, when he returns to his vehicle, he has to do the same but in reverse, removing the firearm from the locked container, loading it, and then reholstering it.  Mr. Antonyuk states that this is "wholly unnecessary and dangerous, and completely changed the process of carrying a firearm in New York" prior to September 1, 2022.  *Id*. at ¶ 8.

137.    Mr. Antonyuk repeats the Court's finding that he is a "law-abiding and respectful" person.  *Id*. at ¶ 10.  Precisely because he is so law-abiding, he has "refrained from violating any of the provisions of the Act and will not violate them."  *Id*. at ¶ 10.

138.    Mr. Antonyuk then states that he is harmed because he can no longer enjoy the Second Amendment freedoms he once had before the CCIA was implemented and can no longer carry in a number of places he used to carry in.  Notably, he is "unable to go peaceably about [his] daily life without fear of carrying in the wrong location and being prosecuted for doing so."  *Id*. at ¶ 11.

139.    Mr. Antonyuk "would carry in those places again" IF "the Court enjoined this law, and made it lawful for [him] to carry without fear of arrest, prosecution, damaging [his] reputation

losing [his] Second Amendment rights for life, or losing the required 'good moral character[.]'" *Id*. at ¶ 12.

140.    Mr. Antonyuk is also a property owner and, as a property owner, he enjoys the right to determine who and under what circumstances, people visit his property.  The CCIA infringes on this right, as it declares his home a restricted location.  *Id*. at ¶ 13.  The CCIA requires that he post "clear and conspicuous signage indicating that the carrying of firearms ... is permitted" or otherwise provide his "express consent" to someone wanting to carry a firearm in his home or on his property.  *Id*.

141.    Mr. Antonyuk states that it is impossible to provide express consent to each and every visitor that stops by unless he is present on his front lawn 24 hours a day, as a delivery driver, or some other visitor may come to his home while he is unavailable.  *Id*. at ¶ 14.

142.    Mr. Antonyuk has no problem with people lawfully and peaceably carrying in his home or on his property without his "express consent" because many people may not know he supports gun rights and they will be hesitant to talk about gun rights, a "taboo topic in New York State;" however, failing to post "express consent" means that "such persons would leave their gun at home, contrary to my wishes."  *Id*. at ¶ 15.

143.    Mr. Antonyuk states that the CCIA could even prevent one of his neighbors from coming to his aid at his home unless he previously gave them "express consent" to carry a firearm on his property and that perhaps, that person "would be forced to mill around in the dark, searching for 'conspicuous signage' authorizing him to help."  *Id*. at ¶ 17.

144.    Mr. Antonyuk is left with, then, the option of posting "conspicuous signage."  But he "cannot safely comply with" that requirement because many "New Yorkers are vehemently anti-gun" and posting a "sign in favor of gun rights" can open him and his family to "criticism,

45

harassment and even possible hostile action (such as vandalism or a physical confrontation) by those who disagree" with his political views. *Id*. at ¶ 18.

145.    Mr. Antonyuk will not post a sign that labels his home as being the "likely location of a gun owner" which would raise "the risk that [his] home would be targeted by burglars, thieves, home invaders, or other violent criminals[.]" *Id*.

146.    Mr. Antonyuk believes the CCIA "politicizes [his] home against [his] wishes, and demands that [he] take affirmative steps and engage in compelled speech ... merely to fulfill [his] wishes that others be able to peaceably exercise their constitutional rights while on [his] property." *Id*. at ¶ 19.

147.    Mr. Antonyuk further states that the CCIA has "taken" his rights as a property owner "to decide the terms on which to invite or exclude visitors" to his property and his home, and that it requires him to "publicly take a position one way or the other on an issue that is highly contentious and divisive in this state, whereas before [he] could simply stay silent." *Id*. at ¶ 21.

148.    It is axiomatic that the government may not condition the exercise of one right on the forfeiture of another.[45]

### d.  Plaintiff Corey Johnson.

---

[45] *See State v. Irving*, 114 N.J. 427, 456-57, 555 A.2d 575, 590-91 (1989) (Handler, J., dissenting) "The right to an alibi defense and the right to remain silent are two separate constitutional rights. Exercise of one should not be conditioned on waiver of the other. Just as in *Simmons v. United States, supra*, 390 *U.S.* at 377, 88 *S.Ct.* at 967, 19 *L.Ed.*2d at 1247, where exercise of the fourth amendment cannot be conditioned on waiver of the fifth; *Lefkowitz v. Cunningham, supra*, 431 *U.S.* at 801, 97 *S.Ct.* at 2132, 53 *L.Ed.*2d at 1, where the first amendment right to hold political office cannot be conditioned on waiver of the fifth; and *Brooks v. Tennessee, supra*, 406 *U.S.* at 605, 92 *S.Ct.* at 1891, 32 *L.Ed.*2d at 358, where waiver of the privilege cannot be conditioned on giving up the right to have the prosecutor bear the burden of proof first, we should not allow such a choice between constitutional rights."

149. Plaintiff Corey Johnson is a U.S. citizen, resident of New York, and resides in Onondaga County. Plaintiff Johnson is a member of Gun Owners of America, Inc., and therefore, one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*. *See* Declaration of Corey Johnson, Exhibit "2", ¶ 1.

150. Plaintiff Johnson has maintained an unrestricted New York carry permit since 2019 and is eligible to possess and carry firearms in the State of New York. Because he has a permit, he has met all the qualifications for licensure, including having good moral character. *Id*. at ¶ 2.

151. Plaintiff Johnson routinely carries his handgun concealed when he leaves his home. Plaintiff Johnson does not carry his handgun in schools, courthouses, government buildings, or other obvious "sensitive places" which have been described by the Supreme Court. *Id*. at ¶ 3. However, Plaintiff Johnson is responsible for his own security and for the security of his family, and thus, his firearm "generally does not leave [his] side when [he] leaves the house..." *Id*. at ¶ 4.

152. Plaintiff Johnson is an outdoorsman, an avid fisherman, and routinely goes on hiking and camping trips throughout the state of New York, including in parks which are now off-limits by the CCIA. *Id*. at ¶ 6. Given that parks do not appear in the Supreme Court's list of traditional sensitive locations and that there is nothing "sensitive" about a park, Plaintiff Johnson "intend[s] to continue to carry his firearm when [he goes] fishing in Mercer Park ... within the next month." *Id*. at ¶ 8.

153. Additionally, in October of 2022, Plaintiff Johnson will tour "several state parks within New York, where [he] will engage in various recreational activities..." He will visit Bowman Lake State Park, where hunting with rifles is allowed, but carry of a concealed firearm is not allowed. *Id*. at ¶ 9. Plaintiff Johnson intends to carry his firearm "on this upcoming trip." *Id*. at ¶ 10.

154.    Likewise, Plaintiff Johnson eats at restaurants with his family, which are off-limits under the CCIA, not because they are a traditional sensitive place, but because they serve alcohol. He intends to carry his firearm within the restaurant in the coming days.  *Id*. at ¶ 11.

155.    Plaintiff Johnson participates on what is called a "dice run" during New York winters.  This is a competition where snowmobilers are required to follow a prescribed course, often through public parks and roads, and check in at various locations along the way with some of the locations being restaurants that serve alcohol.  In any event, as in years past, he "intend[s] to go on a snowmobiling trip this winter, and [he] will carry [his] firearm with [him]" when he does, "including in those places where" he is required to "'check in' as part of the 'dice run.'"  Id. at ¶ 12.

156.    Plaintiff Johnson routinely visits "various locations that are considered 'performance, art entertainment, gaming or sporting events' under the CCIA."  Recently he had intended to attend the New York State Fairgrounds, until he learned it was adopting and enforcing the prohibition on concealed carrying.  Because entrances to the fairgrounds may utilize "Bag Check Areas" for those entering, he did not attend the fair due to a significant risk that he would be discovered carrying an otherwise lawful firearm.  *Id*. at ¶ 13.

157.    Plaintiff Johnson has also attended pro-gun and other rallies while armed.  *Id*. at ¶ 14.  Now, rallies are off-limits because people assemble to exercise constitutional rights, even though none of the rallies or locations are traditional sensitive places.  *Id*. at ¶ 15. The next time such a rally is scheduled, Plaintiff Johnson intends to attend and do so while carrying his firearm, in violation of the CCIA.  *Id*. at ¶ 16.

158.    Plaintiff Johnson frequently visits the Rosamond Gifford Zoo in Syracuse at least once or twice every fall.  He will visit this Zoo within the next 90 days, and understands that, while

the Zoo has no policy against the carry of lawful firearms, the CCIA separately criminalizes such carry.  However, he intends to carry when he visits the Zoo.  *Id*. at ¶ 17.

159.    Plaintiff Johnson routinely carries his firearm when in public, as is his Second Amendment right.  This includes shopping at various locations in Onondaga County, "such as gas stations, grocery stores, big box stores" and others.  But the CCIA declares these locations "restricted locations" and bans carry of firearms unless he receives express consent of the owner. It is impractical for Plaintiff Johnson to ask permission at each location he visits.  Moreover, as Plaintiff Johnson explains, "even if [he] receives permission at one point in time, such policy could change at any time and without notice, thus putting [him] at constant risk of committing crimes unawares."  *Id*. at ¶ 18.  Plaintiff Johnson intends to continue to carry in "various businesses and establishments in Onondaga County in violation of the CCIA's restriction on 'prohibited locations' that are not conspicuously posted with signage or otherwise provide [him] with their express consent."  *Id*. at ¶ 19.

160.    Plaintiff Johnson is now exposed to criminal offenses for "simply going peaceably" about his daily life.  *Id*. at ¶ 20.  Plaintiff Johnson faces a credible threat of prosecution because his specific intentions are now public through this filing, and the State Police have made it clear that they intend to enforce the CCIA's provisions on a "zero tolerance" basis, stating "If you violate this law, you will be arrested."  *Id*. at ¶ 22.  Likewise, the District Attorney of Onondaga County has publicly stated his intent to confiscate firearms of "violators" and refer the "violators" back to their licensing judge who "granted them concealed-carry licenses in the first place, possibly leading to the revocation of their carry privileges."[46]  *Id*. at ¶ 23.

---

[46] Notwithstanding public carry is not a "privilege," but an enumerated constitutional right, this further demonstrates New York's continued disdain for and mistreatment of gun owners who are

161.     Moreover, Plaintiff Johnson is at an enhanced risk for having contact with law enforcement, as he routinely engages in fishing activities and is required to have his fishing license on his person.   This is "subject to verification and review at any time by a New York Environmental Conservation Officer (who works for the State, not the County)."  Plaintiff Johnson states that, in recent years, he has been stopped by those officers to check his license "at least a couple of times per year."  In 2022, so far, he has had at least four such interactions.  *Id*. at ¶ 24.

**e.  Plaintiff Alfred Terrille.**

162.     Plaintiff Alfred "Al" Terrille is a U.S. citizen, resident of New York, and lives in Albany County.  He is a member of Gun Owners of America, Inc., and one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*.  *See* Declaration of Alfred Terrille, Exhibit "9", at ¶ 1.

163.     Plaintiff Terrille is a law-abiding person and currently possesses and has maintained an unrestricted New York carry permit since 1994.  He is eligible to possess and carry firearms in the State of New York, and has met all the qualifications for licensure, including having good moral character.  *Id*. at ¶ 3.

164.     He routinely carries his concealed handgun whenever he leaves home, but does "not carry in courthouses, schools, government buildings or other obvious "sensitive places" the Supreme Court has described, where the government often provides security in the form of armed guards and metal detectors."  *Id*. at ¶ 4.

165.     Due to the CCIA, he is "now in jeopardy of arrest and prosecution as a felon, not to mention having [his] firearm seized and [his] permit revoked, and [his] constitutional rights

---

just one "violation" of an unconstitutional law away from forever losing their constitutional right to bear arms.

forfeited, merely for carrying in the completely ordinary and entirely non-sensitive locations in which [he] previously carried [his] firearm." *Id*. at ¶ 5.

166.    Plaintiff Terrille is a grandfather to 5 grandchildren and it is his duty to protect his family, regardless of New York's attempts to disarm him, subjugate him, and infringe on his Second Amendment rights. *Id*. at ¶ 6. Plaintiff Terrille routinely goes to the movies, both at movie theaters and drive-in locations within Albany County. He does this repeatedly through the year, and will visit a theater at some point within the next 60 days. He has previously carried concealed during such outings in "entirely ordinary and non-sensitive locations." Because movie theaters nor anything like them appear in the Supreme Court's traditional sensitive location list, he intends to continue to carry his firearm when he goes to movie theaters with his grandchildren, in violation of the CCIA. *Id*. at ¶ 7.

167.    Plaintiff Terrille also takes his grandchildren to Thatcher State Park in Albany County, where he hikes, uses the picnic areas, and the playground with his grandchildren. He intends to carry his firearm when he visits this park in the future, something that occurs on a monthly basis. *Id*. at ¶ 8.

168.    In the next 60 days, Plaintiff Terrille will visit the State of Tennessee. He will take his firearm with him to Tennessee, as Tennessee respects the Second Amendment and allows him to carry there. He intends to fly to Tennessee, departing from Albany International Airport, and intends to purchase a ticket in the "coming weeks, for travel within the next two months." *Id*. at ¶ 9. The CCIA, however, criminalizes his taking of a firearm with him to the airport, even unloaded, locked, and properly declared in his checked baggage in compliance with federal regulations. He cannot even store his firearm in his vehicle if he were not to take it with him in his checked luggage. Since he intends to check his firearm in his luggage in accordance with TSA regulations, which

requires declaring the firearm, he would be confessing to being in illegal possession of a firearm, opening himself to prosecution under the CCIA. *Id*. at ¶ 9.

169.    However, even if he were traveling to Tennessee by car, it would take him approximately 2.5 to 3 hours to drive directly out of New York.  And during his trip, he would be prohibited from stopping to use the bathroom (even onto the parking lot of a gas station, rest stop, fast food restaurant) unless he has prior knowledge that the business posted a sign welcoming him to carry in the establishment.  *Id*. at ¶ 10.  Plaintiff Terrille's freedom of travel is thus greatly impaired due to the CCIA.  *Id*. at ¶ 11.

170.    Plaintiff Terrille, within the next 60 days, will travel to Tennessee via airplane, and intends to bring his firearm in his checked luggage, in full compliance with 18 U.S.C. Section 926A and TSA regulations.  *Id*.

171.    Plaintiff Terrille also intends to carry in his local bank, and is unaware of any anti-gun bank policy, nor has the bank posted a sign stating firearms are not allowed.  However, there is no sign expressly stating he can carry.  He states this leaves him in an impossible situation where he must go into the bank, declare that he has a firearm, and ask if he has permission to carry. *Id*. at ¶ 12.  Plaintiff Terrille intends to continue to carry his firearm unless the bank asks him to leave the firearm in his vehicle.  *Id*.

172.    Also, Plaintiff Terrille routinely carries his firearm in public, including at gas stations, grocery stores, home improvement stores, and others.  Many of these stores have corporate policies which permit firearm carry, including "Walmart, Walgreens and Target."  He estimates he visits one or more of these retailers at least once a week.  The CCIA makes these businesses "restricted locations," and bans him from carrying unless he has express consent of the owner or there is a sign allowing carry.  But few, if any, of these businesses post signs allowing

carry, and asking for permission is impractical. To his knowledge, none of the retailers listed above has taken the affirmative step to opt out of the CCIA.  *Id*. at ¶ 13.  He states that it is impractical to disarm, approach the business, ask permission from a low-level employee who will need to ask a manager (or contact corporate), then wait for a response, and then re-arm himself, simply to pick up a few things at the store.  Additionally, even if he receives "permission" at one point in time, such policy could change at any time without notice, thus placing him at constant risk of committing a crime unawares.  *Id*. at ¶ 14.  Plaintiff Terrille intends to continue to carry his firearm in various businesses and establishments in Albany County, in violation of the CCIA's restriction on "prohibited locations" that are not conspicuously posted with signage.  Plaintiff Terrille states that "[u]nless this Court strikes down that provision of the CCIA, simply going peaceably about [his] daily life will be a crime, pursuant to a statute which this Court has declared clearly unconstitutional."  *Id*. at ¶ 15.

173.    Additionally, Plaintiff Terrille is planning to attend the upcoming NEACA Polish Community Center Gun Show on October 8-9, 2022 in Albany.  The Polish Community Center describes itself as a "conference center, banquet hall & wedding venue in Albany, NY."  *Id*. at ¶ 16.  However, the CCIA bans firearms at "conference centers" and "banquet halls," and the Community Center may not opt out of this ban and expressly allow firearms.  *Id*.  One of his main reasons for attending is to converse with fellow gun owners, which includes discussion about New York State's tyrannical gun laws.  Plaintiff Terrille states that "a gun show is, almost by definition, a 'gathering of individuals to collectively express their constitutional rights to protest or assemble' ... and, thus, the CCIA appears to entirely ban gun shows."  *Id*.  But he will attend the gun show anyway, and he intends to carry his firearm with him when he does, in violation of the CCIA,

based on his understanding of this Court's recent opinion and the Supreme Court's opinion in *Bruen*. *Id*.

174.    Plaintiff Terrille currently lives in an apartment complex in Albany County.  As such, he is a tenant and he has a landlord.  He understands that his apartment complex does not allow him to post "signage" outside his unit.  And it is not feasible for him to provide express consent to each person who visits his home, including deliverymen, repairmen, friends, or family. *Id*. at ¶ 17.  So while the CCIA requires that he posts signage at his home declaring his home "pro-gun," he cannot post this sign per the terms of his lease.  He is also not allowed to post signs outside his unit permitting visitors to park in common parking lots and walk on the common sidewalks when visiting his home, so he is unable to fully "opt-out" of the CCIA's "taking [his] property and declaring it to be an anti-gun location, essentially converting [his] home from a 'restricted location' to a 'sensitive location.'"  *Id*.

175.    Plaintiff Terrille also has attended pro-gun rallies in the past and, although he does not know of any planned rallies to occur in the future, if one were to be scheduled, he would attend it and carry his firearm, in violation of the CCIA.  *Id*. at ¶ 18.

176.    Plaintiff Terrille routinely goes out to eat with his grandkids at restaurants which are considered "sensitive locations" because they serve alcohol, even if he were not sitting in the bar area and not consuming alcohol. Because neither restaurants nor anything like them appears in the Supreme Court's list of traditional sensitive places, he intends to continue to carry his firearm when he goes out to eat with his grandkids, "an event that will occur within the next 30 days."  *Id*. at ¶ 19.

177.    Plaintiff Terrille states that he intends to engage in various acts which are constitutionally protected, but are now unlawful under the CCIA, and faces a credible threat of

prosecution because he his specific intentions to break the law are now public through this filing.
*Id*. at ¶ 20.   He is aware that First Deputy Superintendent Steven Nigrelli of the New York State
Police, has threatened people like him who violate the CCIA with a "zero tolerance" policy of
arrest.  *Id*. at ¶ 21.   And because he intends to take a trip to Tennessee by airplane, he is almost
guaranteed to "have a run-in with law enforcement when" he arrives at the "airport and declare to
authorities that [he has] a firearm to check" with his luggage.   He anticipates that there is a "strong
likelihood that [he] could be arrested and charged with a felony under the state's announced 'zero
tolerance' policy" when he brings his firearm to the airport to check for his upcoming flight."  Id.
at ¶ 22.

### f.   Plaintiff Pastor Joseph Mann.

178.    Plaintiff Pastor Joseph Mann is a U.S. citizen and a resident of New York, resides
in Oswego County, and is a member of Gun Owners of America, Inc.  *See* Declaration of Pastor
Joseph Mann, Exhibit "8," at ¶ 1.   Pastor Mann is the pastor of Fellowship Baptist Church in
Parish, New York.  *Id*.

179.    Pastor Mann has possessed a New York "employment" carry permit since 2014,
and is eligible to possess firearms in the State of New York and has met all qualifications for
licensure, including good moral character.  *Id*. at ¶ 3.

180.    The CCIA has, in effect, rescinded Pastor Mann's permit, making most places off-
limits to him, including his own home.  *Id*. at ¶ 4.

181.    For instance, the CCIA defines "sensitive location" to include "any place of
worship or religious observation" (subsection c) which makes it a felony to even possess a firearm
in that location.  *Id*. at ¶ 5.   Pastor Mann's church is a "place of worship" under the CCIA.  *Id*. at
¶¶ 6-8.

182.    Prior to the CCIA, the church maintained a "church security team, consisting of trusted church members who are licensed carry permit holders, and are designated to carry their firearms to provide security and protection to the congregation during worship services." Both Pastor Mann and his "team have received specialized firearms training from a firearms instructor who specializes in church security." *Id*. at ¶ 9.  Under the CCIA though, neither Pastor Mann nor his "security team may possess firearms on church property" and further, since they are a "small church, [they] are unable to afford to pay for private security who might be exempt from the CCIA." *Id*. at ¶ 10.

183.    Pastor Mann intends to continue to "possess and carry [his] firearm while on church property, in violation of the CCIA[]" because of this Court's "recent conclusion that the CCIA's list of sensitive locations is not deeply rooted in this Nation's historical tradition of firearm regulation and because neither churches nor anything like them appears in the Supreme Court's list of traditional sensitive locations." *Id*. at ¶ 11 (punctuation omitted).

184.    Pastor Mann also lives in a parsonage that is physically part of the same building as the Church.  This parsonage is not only used as his family's residence, but is also used for church business where they have Bible studies, meetings of elders, and other church gatherings.  *Id*. at ¶¶ 12, 13.  Under the CCIA, Pastor Mann's home is now a "sensitive location" where he is prohibited from possessing a firearm, "including a handgun for self-defense.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008)." *Id*. at ¶ 14.  Pastor Mann has for years, and still currently possesses firearms, in his home.  *Id*. at ¶ 16.

185.    In order to fully comply with the CCIA, Pastor Mann would have to turn all his firearms over to the government, and he refuses to do so.  Pastor Mann states that New York City has already sent letters to persons with registered firearms at certain locations, notifying them that

their premises have been deemed a "sensitive location" and threatening that those business owners to surrender their firearms. *Id*. at ¶¶ 17-18.

186.    Pastor Mann states that the CCIA deprives the Church from its ability to make its own rules governing the carry of firearms on Church property. *Id*. at ¶ 19.

187.    Additionally, Pastor Mann refers to First Deputy Superintendent of State Police Steven Nigrelli who threatened people like the Pastor, who violate the CCIA, with a policy of "zero tolerance" and arrest for committing an unconstitutional felony. *Id*. at ¶ 22.  Pastor Mann alleges that at least one of his congregants is part of local law enforcement and is aware of the Pastor's inability to avoid violating the CCIA, because the Pastor keeps a firearm in his home on church property. *Id*. at ¶ 23.  Likewise, Sheriff Don Hilton of Oswego County, whose personal belief is that the CCIA is unconstitutional and that much of it will be struck down, nevertheless has made posts on Facebook that "taking a legally licensed firearm into any sensitive area – such as a … church … is a felony punishable by up to 1 1/3 to 4 years in prison."  In other words, the Sheriff has specifically articulated that the Pastor's conduct is illegal and that, even if the Sheriff disagrees with the law, "they will effect [sic] all gun owners[.]"  *Id*. at ¶ 24. This is not a disavowal of enforcement of the law, but rather an intent to enforce it.

188.    Pastor Mann intends "this act of civil disobedience because the CCIA violates not only my Second Amendment rights and those of my congregation, but also my free exercise of religion protected by the First Amendment."  *Id*. at ¶ 25.

189.    Additionally, Pastor Mann provides "counseling and assistance in the context of many of the 'sensitive location' settings in the CCIA, including to the homeless, youth, in the domestic violence and abuse setting, and others.  To the extent that [the] church operates in that

capacity, the CCIA (subsection k) appears to prohibit [their] possession of firearms as well, and thus inhibits [their] ability to provide security for those under [their] care." *Id.* at ¶ 26.

190.    Pastor Mann's Church has an addiction recovery ministry, and he frequently travels to homes of people addicted to drugs, counseling them to seek help and voluntarily enter treatment facilities.  While doing this, he at times has carried his firearm.  But now, the CCIA makes it impossible for the Pastor to legally carry while ministering, as it declares all private property a "restricted location" and requires him to get express consent, sometimes of an addict, before entering his or her home while carrying a firearm for his own protection.  *Id.* at ¶ 28. But for the CCIA, he would continue carrying his firearm while providing this ministry as he has in the past. *Id.*

191.    As part of his addiction recovery ministry, the Pastor has brought people in the program to church property for counseling and care.  To the extent the CCIA applies to the church because it separately bans firearms in "any location providing health, behavioral health, or chemical dependence care or services" (subsection b)," Pastor Mann cannot comply with this prohibition and intends to continue to carry.  *Id.* at ¶ 29.

192.    Likewise, the church has a nursery, Sunday School, and a Junior Church.  The CCIA appears to separately prohibit the Pastor, church staff, and the church security from providing security to their children, as it bans firearms at "nursery schools, preschools, and summer camps" (subsection f).  Pastor Mann intends to not comply with this restriction.  *Id.* at ¶ 30.

193.    The Church provides its facilities to a local homeschool coop, and the Pastor and his wife teaches classes, including foreign languages.  As the Church operates at times as a school, firearms are likewise double banned.  Pastor Mann will not abide by this restriction and intends to continue to possess a firearm in his home and church.  *Id.* at ¶ 31.

194.    Pastor Mann believes that the CCIA places off limits "any gathering of individuals to collectively express their constitutional rights to ... assemble[.]" Subsection s.  This would seem to cover a church service.  To the extent that this section covers [] church activities, [the Pastor does] not intend to comply." *Id*. at ¶ 32.

195.    The Church maintains a church bus and a church van, used to take church members, youth, and members of the public with them when they travel.  The CCIA appears to ban firearm possession in their "bus[]" (subsection n), and Pastor Mann does not intend to comply with this restriction to the extent it applies to the church.  *Id*. at ¶ 33.

196.    And because the Pastor's church plays music before, during, and after worship services, the CCIA separately bans firearms at a "performance venue" or "concert[]" (subsection p) and additionally a "banquet hall," as they often break bread together.  The CCIA does not appear to include an exemption even for the Lord's Supper (the Sacrament).  *Id*. at ¶ 34.

197.    Pastor Mann believes that, "for Bible-believing Christians, it is clear that there may be times in which the civil authorities direct us to do what we cannot do while fulfilling our duty to God. In such circumstances, we are to obey God, and not men.  This is one of those times." *Id*. at ¶ 43.

**g.  Plaintiff Leslie Leman.**

198.    Plaintiff Leslie Leman is a U.S. citizen and resident of New York, residing in Greene County and is a member of Gun Owners of America, Inc.  *See* Declaration of Leslie Leman, Exhibit "4," at ¶ 1.  Plaintiff Leman is a law-abiding person and currently possesses an unrestricted New York carry permit since 2012.  He is eligible to possess and carry firearms in the State of New York, and has met all qualifications for licensure, including having good moral character. *Id*. at ¶ 2.

199.    Plaintiff Leman is a volunteer firefighter, meaning he is on call 24 hours a day, 7 days a week.  This usually means that he is going about his normal daily routines when he could receive a call.  If he were to receive a call to respond, he has no "opportunity to go home, to change clothes, or as relevant here, to disarm and stow [his] firearm.  This means that there are times that [he has] responded to an emergency call while armed."  *Id*. at ¶ 5.

200.    Plaintiff Leman has responded to calls at multiple locations that the CCIA now declares to be "sensitive locations."  Additionally, Plaintiff Leman responds to private property now deemed a "restricted location."  *Id*. at ¶ 6.

201.    The Catskills Park surrounds Plaintiff Leman's town, and he has often responded to calls for assistance in that park.  There is no exception for him to carry there or even drive with a firearm there during an emergency call, and he would be liable for a felony if he, as a first responder, responded to an emergency situation while armed.  *Id*. at ¶¶ 7-9.

202.    Plaintiff Leman would have to waste precious time in disarming himself according to the CCIA while responding to a call.  *Id*. at ¶ 10.  Plaintiff Leman cannot at all times comply with the CCIA while responding to emergency calls.  *Id*. at ¶ 12.

203.    Plaintiff Leman also responds to house and structure fires, and renders aid.  Plaintiff Leman states it would be "absurd" to have to "ask a family, standing in their pajamas in knee-deep snow, to provide [him] with their 'express consent' to carry [his] firearm prior to entering their home to put out a fire or to provide lifesaving medical care.  Indeed, that is the absolute last thing [he is] thinking of in this sort of situation."  *Id*. at  ¶ 14.

204.    Because the Catskills Park surrounds Plaintiff Leman's town, he is often not able to respond to a call without traversing part of the park, and thus being in violation of the CCIA while armed.  His only option would be to return home and leave his firearm at home.  *Id*. at ¶ 15.

205.    Plaintiff Leman does not accept the State of New York's command to disarm before rendering life-saving aid.  *Id.* at ¶ 16.  Thus, he intends to continue carrying his firearm and going about his daily life, including as a firefighter, which will put him in violation of the CCIA as he responds to calls.  *Id.* at ¶ 20.

206.    Because he intends to engage in "constitutionally-protected acts which are now made unlawful under the CCIA" he also faces "a credible threat of prosecution, as my specific intentions are now made public through this filing."  *Id.* at ¶ 21.

207.    First Deputy Superintendent Steven Nigrelli of the New York State Police has already threatened individuals like Plaintiff Leman with a "zero tolerance" policy of arrest for violation of the CCIA.  *Id.* at ¶ 22.  Additionally, Plaintiff Leman has an increased risk because of his routine interaction with the police, because it is typical that he responds to emergencies along with police officers, including members of his team, local law enforcement, and New York State Police.  *Id.* at ¶ 23.

208.    Plaintiff Leman also runs a small hotel/bed and breakfast in this district.  His business caters to guests from all over New York, the United States, and around the world.  *Id.* at ¶ 25.

209.    Plaintiff Leman states that his now "restricted location" hotel would have to post signage to allow guests to carry, because "person-by-person 'express consent'" is impractical to give to each visitor.  *Id.* at ¶ 26.

210.    He further states that the CCIA requires him to engage in compelled speech to continue to provide services to those who bring their firearms to his hotel, and that if he refuses to be compelled to speak, he will lose the business of gun owners who lawfully travel with their firearms.  *Id.* at ¶ 27.

211.    Most of his customers, though, come from the southern part of the State, including New York City, Long Island, and northern New Jersey.  He states that the majority of these customers hold views unaccepting of firearm ownership and bearing arms in public.  Therefore, he states, if he posts a sign allowing concealed carry, he will lose business from customers that do not share that view.  *Id.* at ¶ 28.

212.    "In other words," he states, "the CCIA politicizes our business against our wishes, forcing us to a Hobson's choice between groups of customers and, no matter which option we choose, we will lose business." *Id.* at ¶ 29.

213.    Plaintiff Leman had further intended to apply for a New York State wine and beer license but, under the CCIA, that would automatically trigger his business to be a "sensitive location" where he would not even be able to possess firearms on his own property.  *Id.* at ¶ 30. The CCIA thus forces him to the choice to either keep a firearm in his home or operate his business.

214.    Plaintiff Leman is trapped in his small town, as he cannot leave without entering the park surrounding his town, with a firearm, even if the firearm is unloaded, locked and stored in a trunk because there is no exception for travel in the CCIA.  *Id.* at ¶ 32.

215.    Plaintiff Leman is aggrieved by the CCIA, which reverts to the previous New York policies which led to N.*Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020), where the plaintiff was unable even to take his firearm from his home to the shooting range.  In response to the Supreme Court agreeing to hear that case, New York state changed the law, in order to moot the matter and avoid a loss, but New York has revived this policy on a statewide level.  *Id.*

216.   In any event, and "left with no reasonable choice," Plaintiff Leman intends to "bring [his] firearm when [he] leave[s] home to travel outside of Windham, New York, which will take [him] through state parkland, in violation of the CCIA." *Id*.

**h.   Plaintiff Lawrence Sloane.**

217.   Plaintiff Lawrence Sloane is a U.S. citizen, a resident of New York, lives in Onondaga County, and is a member of Gun Owners of America and thus, is one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*. *See* Declaration of Lawrence Sloane, Exhibit "3," ¶ 1.

218.   Plaintiff Sloane is a law-abiding citizen who does not currently possess a New York carry license because, prior to *Bruen*, he did not believe he would be found to have "proper cause." *Id*. at ¶ 3.  Since *Bruen* held "proper cause" unconstitutional, he has intended to apply for his carry license.  *Id*. at ¶ 4.  Before he could apply for a permit, however, New York changed the rules, implementing the CCIA and imposing a slew of new restrictions and requirements.  *Id*.

219.   Plaintiff Sloane challenges the following portions of the CCIA: "1) social media history requirement, 2) providing information about my family, 3) providing character references, 4) exorbitant training costs and the time required to complete it, 5) an in-person interview with a government agent, and 6) proving that I am of "good moral character" in addition to being a law-abiding, responsible person." *Id*. at ¶ 5.

220.   Plaintiff Sloane has accounts on some "social media" platforms, of which his Facebook profile is set to "friends only."  *Id*. at ¶ 7.  This means that he would have to add a sheriff or investigator or perhaps even his licensing official as a "friend" so that they could view his Facebook posts.  He refuses to comply with this requirement, or to divulge any social media accounts to the state.  *Id*.

221.    Plaintiff Sloane states that, if here were "forced to produce all [his] speech," he would "self-censor for fear of retribution, unwilling to express [his] true feelings, especially on contentious issues involving political speech[.]"  *Id*. at ¶ 9.

222.    Plaintiff Sloane is unwilling to provide the government with "information about [his] family, on the carry license application."  *Id*. at  ¶ 10.

223.    Plaintiff Sloane is unwilling to provide the required four character references so that the government can interrogate his "friends and family."  *Id*. at ¶¶ 15, 16.

224.    Additionally, Plaintiff Sloane objects to the in person interview requirement, because it would violate his "Fifth Amendment rights to remain silent and against self-incrimination."  *Id*. at ¶ 17.

225.    Plaintiff Sloane cannot even apply for a license without first providing the licensing official with all of the required information on the application, as it will be rejected, both based on the statutory language, and also his local sheriff's statements to that effect.  Therefore, it is futile to even attempt to apply because he is unwilling to "submit to the unconstitutional requirements that [he] is unwilling to provide to the government."  *Id*. at ¶ 21.

226.    Moreover, Plaintiff Sloane's sheriff, Defendant Conway, does not have an appointment available for Plaintiff Sloane to even submit his application until October of 2023, more than 13 months from today, in violation of *Bruen*'s footnote 9 which anticipates challenges to permitting regimes which require "lengthy wait times" to obtain a permit.[47]  *Id*. at ¶ 23; *Bruen* at 2138 n.9.  Thus, not only is it futile for Plaintiff Sloane to submit his application to the sheriff

---

[47] This is akin to using one Second Amendment violation to get around another Second Amendment violation. At the end of the day, it is still a Second Amendment violation.

(knowing that it will denied), it is actually impossible for him to do so (because it will not even be *accepted* – much less *processed* – until October of next year).

227.    Moreover, the Sheriff's refusal to accept Plaintiff Sloane's application represents a constructive denial of that application.   Indeed, the Sheriff's current 13 month delay greatly exceeds even the time he has to process an application under the statute.[48]

228.    The Sheriff's delay in accepting license applications also violates New York Penal Law 400(4-b), which requires that [a]pplications for licenses shall be accepted for processing by the licensing officer at the time of presentment," and that "[e]xcept upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment…."

229.    By refusing to permit Plaintiff Sloane to "present" his application, the Sheriff not only has violated the statute, but has constructively denied Plaintiff Sloane's application, making Plaintiff Sloane's challenge ripe.

230.    An Illinois Northern District Court found that plaintiffs stated a "plausible Second Amendment claim[]" alleging that "residents commonly wait[ ] as long as 60 to 90 days to receive a FOID card . . . The amended complaint recites the experience of a number of individuals who had been waiting between five (5) to nine (9) months for their FOID applications to be processed at the time the amended complaint was filed in November of 2020[]" when the statute requires the Illinois State Police to "adjudicate applications within thirty days."  *Marszalek v. Kelly*, No. 20-cv-4270, 2022 U.S. Dist. LEXIS 14047, at *18, *23 (N.D. Ill. Jan. 26, 2022).

---

[48] *See* https://portal.ct.gov/BFPE/General/General/How-do-I-Appeal (permitting an appeal based on a "constructive denial" when a licensing officer takes longer than the statutory period to issue or deny an application).

231.   As to the training requirement, Plaintiff Sloane will not complete "sixteen hours of classroom instruction, plus two hours of live-fire training, [as it] is unnecessary and expensive." *Id*. at ¶ 24.  Plaintiff Sloane objects to the requirement that he has to pay to learn about "suicide prevention," as he is not suicidal and such subject matter has no bearing on his being a responsible gun owner.  *Id*. at ¶ 28.  Plaintiff Sloane would still object on principle to a four hour "basic handgun safety course," but alleges that the prior existing training standard "would be doable" and that he would obtain such training in order to receive a license, despite his objections.  *Id*. at ¶ 29.

232.   Plaintiff Sloane states if all the "unconstitutional requirements were removed from the application, and the Sheriff would accept [his] application, [he] would immediately submit [his] application for a concealed carry license, something [he] greatly desire to obtain and, but for the CCIA's unconstitutional demands, [he] would seek to obtain."  *Id*. at ¶ 30.  Plaintiff Sloane further states that he "otherwise meet[s] all of the requirements to be 'granted' a permit to carry [his] firearm in public and, in fact, [has] completed the remaining parts of [his] application (save for the portions [he] will not provide), and [he has] attempted to secure an appointment for submitting [his] application, but there is not one available until late next year, a completely unreasonable time frame" which makes application both futile and impossible.  *Id*.

## COUNT I

## U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST DEFENDANTS

233.   The foregoing allegations are repeated and realleged as if fully set forth herein.

234.   The CCIA infringes Plaintiffs' Second Amendment rights that "shall not be infringed."

235.   Plaintiffs are members of "the people" who desire to "bear" a quintessential protected "arm" (a handgun) in public.

236.    Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, Slip Op. at 8.

237.    Thus, the burden is on the government to justify the CCIA based on the historical tradition of the activity that it is now attempting to regulate and ban.

238.    However, there is no historical analogue for any of the new and onerous requirements in the CCIA. The exorbitant fees, slew of non-sensitive "sensitive locations" and "restricted locations" which include very public places (like parks and sidewalks), and incredulous "good moral character" and associated demands for carry license applicants, all are entirely without historical example, and thus violate the Second Amendment.   Indeed, the Defendant must historically justify *each* of its "sensitive locations" defined in the CCIA.  *See* Exhibit "1", pp. 16-18.

239.    Thus, the CCIA violates the Second Amendment, and conflicts with *Bruen*'s clear teachings.

240.    First, *Bruen* disapproved of discretion during the permitting process, instead making clear that governments may rely only rigid statutory criteria.  *Bruen*, Slip Op. at 4-5.  The CCIA, however, includes a malleable "good moral character," which is inherently a judgment call and invites discretion and the abuses that stem from unbridled discretion.

241.    Second, New York has abused the narrow exception for "sensitive places" to include innumerable places that clearly do not fall under that doctrine, doing precisely what the

67

Supreme Court found unavailing in *Bruen*: "effectively declare the island of Manhattan a 'sensitive place'…." *Bruen*, Slip Op. at 22.

242.    Not to mention failing the *Bruen* framework, the CCIA expressly violates the Supreme Court's explicit instructions (and binding holdings) in *Bruen*.  In addition, certain provisions of the CCIA completely eliminate Second Amendment rights for some, making them unable to keep firearms in their home, and unable to bear firearms in public.

243.    Indeed, the CCIA has wandered far afield, coopting and declaring all private property to be a "restricted location," and requiring that property owners affirmatively allow firearms on the premises, and all visitors to seek permission before entering the property.

244.    As such, Defendant's laws, customs, practices, and policies, reducing the Second Amendment's protection of the right to "bear arms" in public to an inkblot, damages Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

245.    By infringing the Second Amendment right to bear arms in public in these ways, the New York laws and regulations discussed in the foregoing allegations violate the Second Amendment, which applies to Defendant by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and they are therefore invalid.

## COUNT II

### U.S. CONST., AMEND. I, 42 U.S.C. § 1983 AGAINST DEFENDANTS

246.    The foregoing allegations are repeated and realleged as if fully set forth herein.

247.    The CCIA unlawfully requires Plaintiffs to provide "social media" accounts to the government, along with a list of names and contact information of their family and friends.  This blatantly unconstitutional demand to exercise a constitutionally protected right cannot stand.

248.    The CCIA will chill protected speech, as Plaintiffs will not know what they can and cannot say in their private lives and in their social media, and whether their exercise of protected speech and press rights may one day give a licensing officer pause in issuing a license to exercise an entirely different constitutionally protected right.

249.    As such, persons such as Plaintiff Sloane will self-censor, knowing that government agents will have access to and be required to scrutinize their social media in the future.

250.    Entirely legitimate First Amendment speech can theoretically form the basis for denial of good moral character, such as (for example) from sovereign citizens who do not recognize and reject government authority, those who engage in antigovernment rhetoric, or those who exaggerate and use hyperbole in their social media posts.

251.    Justice Thomas, in a dissent to denial of certiorari in a previous Second Amendment challenge, listed various cases where the First Amendment has been held to protect speech that would likely run afoul of New York's social media censors, leading to a denial on the basis that the applicant is not of "good moral character:" *see Silvester v. Becerra*, 138 S. Ct. 945, 951 (2018) (Thomas, J., dissenting from denial of certiorari) "*Forsyth County v. Nationalist Movement*, 505 U. S. 123 (1992) (holding that the First Amendment forbids a county from charging even a small permitting fee to offset the costs of providing security for a white-nationalist rally); *Virginia v. Black*, 538 U. S. 343 (2003) (holding that the First Amendment protects the burning of a 25-foot cross at a Ku Klux Klan rally); *Brandenburg v. Ohio*, 395 U. S. 444, 446, n. 1 (1969) (per curiam) (holding that the First Amendment protects a film featuring Klan members wielding firearms, burning a cross, and chanting "'Bury the n*****s'")."

252.    If the above is protected speech under the First Amendment, then New York may not use similar protected First Amendment activity to deny the exercise of another right simply

based upon content or opinions of which the State of New York does not approve (such as a picture of a "dead frog").  *See Antonyuk* Opp. Br., ECF #19 at 41.

253.    Additionally, the CCIA's required interview with a government official as a condition of licensure, and required posting of sign to permit firearm possession on private property, is compelled speech.

254.    The New York laws and regulations discussed in the foregoing allegations violate the First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and they are therefore invalid.

255.    Because Defendants' laws, customs, practices, and policies, violating the First Amendment's guarantee of freedom of speech to New York approved speech, it damages Plaintiffs in violation of 42 U.S.C. § 1983.  Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

**COUNT III**

**U.S. CONST., AMEND. V, 42 U.S.C. § 1983 AGAINST DEFENDANTS**

256.    The Fifth Amendment protects the "right to remain silent," in that "[n]o person … shall be compelled in any criminal case to be a witness against himself…."

257.    Yet the CCIA's requirements of an open-ended in-person interview, apparently to discuss whatever the licensing officer wishes to discuss, for however long or to whatever satisfaction the official sees fit, conditioning the exercise of Second Amendment rights on the forfeiture of Fifth Amendment rights not to incriminate one's self to government officials.

258.    Indeed, the only universally applicable piece of legal advice from any lawyer to any client is "don't talk to the police," and yet the CCIA requires precisely that as a condition of exercising Second Amendment rights.

259.    For example, a licensing official might ask whether an applicant has ever used drugs and, if so, when, what, and how much.  Certainly, such a question could be seen as relevant not only to basic eligibility under N.Y. Penal Law Section 400.00(1), but also to "good moral character" (depending on an official's arbitrary understanding of the standard).  If an applicant, for example, confessed that he had smoked (but did not inhale) a joint 18 months ago, presumably he might still be eligible for a carry license, since the FBI considers[49] only drug possession or use "within the past year" to be a federal prohibitor.  However, even though perhaps eligible for a carry license, the applicant might have admitted to having violated of N.Y. Pen. Law § 220.03, "criminal possession of a controlled substance in the seventh degree," a Class A misdemeanor carrying a penalty of up to one year in jail and with a statute of limitations of two years.

260.    The CCIA thus creates a forced interview with a government law enforcement official, yet provides no right to remain silent, no right to decline to answer questions, and no right to consult or have an attorney present during questioning.

261.    Moreover, because the licensing process is likely to be considered civil or quasi-civil in nature, an adverse inference (such as that an applicant does not possess "good moral character") might be drawn if a person refuses to answer a question posed by the licensing officer. *See Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).

262.    Likewise, the CCIA violates the Fifth Amendment by forcing a person "to disclose self-incriminating statements on a social-media posting in order to exercise his or her Second Amendment right in New York State." *Antonyuk* at 85.  Indeed, it is axiomatic that the Amendment "protects against any disclosures that the witness reasonably believes could be used in a criminal

---

[49] https://www.scribd.com/document/512294320/Guidance-for-Requesting-a-Submission-of-the-NICS-Indices-Unlawful-User-Addicted-of-a-Controlled-Substance-Files#download&from_embed

prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972).

263.    The Fifth Amendment's safeguards are all the more necessary in this case, as the forced disclosure mandated by the CCIA likely is made to the *very same official* whose job it is to arrest and initiate criminal prosecution through the bringing of charges.

264.    The New York laws and regulations discussed in the foregoing allegations violate the Fifth Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and they are therefore invalid.

265.    Because Defendants' laws, customs, practices, and policies violate the First Amendment's guarantee of the right to remain silent, it damages Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.    An order temporarily restraining, and/or preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the challenged sections of the CCIA;

2.    An order declaring that the challenged sections of the CCIA are unenforceable, unconstitutional and violate the First, Second, Fifth, and Fourteenth Amendments to the United States Constitution;

3.    Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988; and

4.      Such other further relief as is necessary to effectuate the Court's judgment or that

the Court otherwise deems just and appropriate.

Dated:  September 20, 2022.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383

Robert J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com
NDNY Bar Roll# 703779