# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, and LAWRENCE SLOANE, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN HOCHUL, in her Official Capacity as Governor of the State of New York, KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police, Judge MATTHEW J. DORAN, in his Official Capacity as the Licensing-official of Onondaga County, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse, P. DAVID SOARES in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, In his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, and JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County, <br><br> Defendants. | Civil Action No. _____ |

## DECLARATION OF LESLIE LEMAN

Exhibit "4"

Page **1** of **8**

1. My name is Leslie Leman. I am a U.S. citizen and resident of New York, and I live in Greene County. I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*.

2. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained therein.

3. I am a law-abiding person who currently possesses and has maintained an unrestricted New York carry permit since 2012. I am eligible to possess and carry firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

4. Not only do I possess a New York carry license, but also I have routinely carried my handgun concealed when I leave home, during the time I have had my permit.

5. I am a volunteer firefighter in the Windham Fire District. Previously, I was the elected fire commissioner in the same department, for seven years. I have held these responsibilities in one position or another for approximately 12 years. The nature of my work as a volunteer, without "on duty" shifts, means that I am on call 24 hours a day, 7 days a week, which means that I am generally at home, working, in my vehicle, or otherwise going about my daily life, when I receive a call from our dispatch, via radio and text message, that there is an emergency situation requiring an immediate response. I and the other members of my team are then expected to respond to the call immediately, without any opportunity to go home, to change clothes or, as relevant here, to disarm and stow my firearm. This means that there are times that I have responded to an emergency call while armed.

6. Our unit provides emergency services to all persons within the fire district or, when requested, under mutual aid agreements across the county, without regard to the nature of the

location to which we are called. Over many years, we have responded to calls at all sorts of locations that the Concealed Carry Improvement Act ("CCIA") now declares to be "sensitive locations," including government property and buildings, churches, schools, nurseries, daycares, libraries, playgrounds, parks, medical facilities and offices, shelters, vehicles used for public transit, restaurants that serve alcohol, theaters, sporting events, and others. If not a "sensitive location," our calls invariably involve private property now deemed a "restricted location."

7. For example, having the Catskills Park surrounding our town, we often have responded to calls in the park, such as injured hikers, forest fires, etc.

8. The CCIA, however, does not contain any emergency exemption or other sort of exception to its blanket prohibition of firearm possession in "sensitive locations" and "restricted locations."

9. This means that I would be guilty of a felony crime, should I, as a first responder, respond to an emergency situation while armed. The only way to avoid culpability would be for me to disarm, in compliance with the CCIA, by returning home or to my vehicle, prior to responding to an emergency call which would delay responding to what may be a life threatening emergency.

10. Moreover, under the CCIA, it would not be enough for me to simply place my handgun in the back seat, or under a newspaper, while on my way to a call. Rather, I would have spend significant time to unload the firearm by "removing the ammunition from" the firearm, and then "securely locking" the firearm "in an appropriate safe storage depository out of sight from outside the vehicle," realistically meaning a safe or lockbox attached to the structure of the vehicle. Failure to take these steps is a "class A misdemeanor."

11. Moreover, in various instances in the past, I have been called on to respond while traveling in a vehicle other than my own (such as that of my wife, a friend, etc.) where "safe storage" has

not been available to me, and where it is not otherwise safe or appropriate to simply leave my firearm in a vehicle.

12. It is safe to say there will be times that I cannot comply with the CCIA when responding to an emergency call. Nor have I ever met anyone in my line of work who would be able to comply.

13. As part of my job, I respond to house and structure fires, vehicle accidents, and medical emergencies including in state parks, fires on private and state land, etc. Many of these calls present life-and-death situations, where immediate action, including the provision of medical attention, is required in order to preserve life and property.

14. It would be simply absurd to ask a family, standing in their pajamas in knee-deep snow, to provide me with their "express consent" to carry my firearm prior to entering their home to put out a fire or to provide lifesaving medical care. Indeed, that is the absolute last thing I am thinking of in this sort of situation.

15. In fact, the town of Windham, New York is completely surrounded on all sides by the Catskills Park. This means that I often cannot respond to a call without traversing part of the Park, and thus being in violation of the CCIA. The only option for me would be to return home and leave my firearm there, prior to responding to a call – an untenable option.

16. The CCIA thus has put me to an unreasonable choice where either I can resign from being a firefighter, or I can forfeit my constitutional right to bear arms in public. I do not accept these terms.

17. Although the history of organized firefighting dates to ancient Rome, there is no historical analogue for a state law requiring first responders who are not on duty to disarm before responding to an emergency call, with the threat of felony prosecution hanging over their heads.

18. Moreover, in recent years, first responders including firefighters have been specifically targeted and killed by intended mass shooters, including in New York.[1] My need for self-defense does not end simply because I am called to respond at a "sensitive location" or "restricted location." On the contrary, historically many (if not most) mass shootings occur at locations that are declared by state governments to be gun-free zones. New York State's decision to disarm law-abiding persons, including first responders who respond to such situations, is illogical and untethered to any rational thought, to say the least.

19. It is my opinion, based on my professional training and experience that, in an emergency situation, seconds count, and the CCIA, by mandating disarmament by first responders, might literally result in the loss of life, to the extent that first any first responders abide by its requirements.

20. For these reasons, I intend to continue carrying my firearm and going about my daily life, including as a firefighter. This undoubtedly will put me in violation of the CCIA as I respond to calls.

21. Not only do I intend to engage in various constitutionally-protected acts which are now made unlawful under the CCIA, but also I face a credible threat of prosecution, as my specific intentions are now being made public through this filing.

22. For example, First Deputy Superintendent Steven Nigrelli of the New York State Police, has threatened persons such as me who will violate the CCIA that "[w]e ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law. For those who choose to violate this law ... Governor, it's an easy message. I don't have to spell it out more than this. We'll have zero tolerance. If you violate this law, you will be arrested. Simple as that.

---

[1] https://www.cnn.com/2012/12/24/us/new-york-firefighters-shooting

Because the New York state troopers are standing ready to do our job to ensure ... all laws are enforced."[2] If that is not a credible threat of enforcement, it is hard to see what would be.

23. What is more, I am far more likely than the average person to interact with the police who are called on the enforce the CCIA. Indeed, it is typical that we would respond to an emergency call alongside police officers, including both local law enforcement, and also the New York State Police. Indeed, many of my fellow firefighters are also in local law enforcement.

24. Moreover, it is not infrequently the case that firefighters can become overwhelmed by smoke, burned by fire, injured by falling objects, or otherwise seriously hurt when responding to a situation such as a structure fire. In the past, I and/or my colleagues have found ourselves in such situations, and have needed medical attention. My department also has policies that, at times, *requires* us to be evaluated by EMS personnel. In other words, it is common for firefighters such as myself to interact with law enforcement, EMS, arson investigators, etc. If, in the process of interacting with these persons or being treated for an injury (which can involve having clothes removed), the police or others discover my firearm, I could be arrested.

25. In addition to my job as a firefighter, my wife and I run a small hotel and breakfast restaurant in Windham, New York. In this business, we offer lodging to guests as well as a restaurant that serves breakfast and offers baked goods to guests and customers. In a given year, we cater to several thousand visitors from across New York, the United States, and around the world.

26. As the owners of this private property, which is now declared a "restricted location," the CCIA mandates that, in order to permit gun owners to continue staying in our rooms and eating at our restaurant, we must post "clear and conspicuous signage indicating that the carrying of firearms

---

[2] https://youtu.be/gC1L2rrztQs?t=2281 (at 38:00 minutes).

... is permitted." In our situation, signage is required because it is entirely impractical to provide person-by-person "express consent" to each individual who stops by.

27. The CCIA requires us to engage in this compelled speech in order to continue providing services to those who bring their firearms to our location. If we do not engage in this compelled speech, we will lose the business of gun owners who wish to travel lawfully with their firearms, as the CCIA prevents them from visiting our location.

28. On the other hand, many (if not most) of our customers are visiting from the southern part of the state, including New York City, Long Island, and northern New Jersey. Many (if not the majority) of these customers hold political views that are generally unaccepting of firearm ownership, and the idea of others bearing arms in public. Thus, if we were to post a sign stating that firearms and concealed carry are welcome on our premises, it is certain that we would lose some amount of business from customers who do not share that view.

29. In other words, the CCIA politicizes our business against our wishes, forcing us to a Hobson's choice between groups of customers and, no matter which option we choose, we will lose business.

30. Additionally, as part of our operations, we have been intending to apply and obtain a New York State wine and beer license, but now, under the CCIA, to do so would turn our business into a "sensitive location" and would put us in a position where we could not even possess firearms ourselves, on our own property, and potentially even in our own home which is appurtenant to our business.

31. Through the CCIA, the state has taken my rights as a property owner to decide the terms on which to invite or exclude visitors to my property (and my home). Moreover, the CCIA forces me to engage in compelled speech as a precondition to obtaining the business of a certain clientele.

The CCIA requires me to publicly take a position one way or the other on an issue that is highly contentious and divisive in this state, whereas before we could simply stay silent and follow state law with respect to firearms.

32. Finally, as I previously explained, the Catskills Park surrounds the town of Windham, New York, where I live. This means that I cannot leave my small town with a firearm, without entering the park, and thus violating the CCIA. The CCIA, which has no exception for travel, even when a firearm is unloaded, locked, and stored in a trunk, turns my town into an island where no firearms can come in, and none can go out. In essence, the CCIA reverts the state of the law to the situation which led to N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525 (2020), where the plaintiff was unable even to take his firearm from his home to the shooting range. In response to the Supreme Court agreeing to hear that case, New York state changed the law, in order to moot the matter and avoid a loss. Now, however, the CCIA reenacts the very same situation on a statewide level. Left with no reasonable choice, I intend to bring my firearm when I leave home to travel outside of Windham, New York, which will take me through state parkland, in violation of the CCIA.

I declare under penalty of perjury that the foregoing is true and correct.

September 19, 2022
**Date**

_____
**Leslie Leman**