# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, and LAWRENCE SLOANE, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN HOCHUL, in her Official Capacity as Governor of the State of New York, KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police, Judge MATTHEW J. DORAN, in his Official Capacity as the Licensing-official of Onondaga County, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse, P. DAVID SOARES in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, In his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, and JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County, <br><br> Defendants. | Civil Action No. _____ |

## DECLARATION OF IVAN ANTONYUK

Exhibit "7"

Page **1** of **8**

1. My name is Ivan Antonyuk. I am a U.S. citizen and resident of New York, and I live in Schenectady County. I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*. I was also a plaintiff in that prior case.

2. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained therein.

3. As stated in my previous declaration filed in the prior case in this Court, I am originally from Ukraine. In the 1990s, when I lived in Ukraine, crime was rampant and out of control, with the country being run by mafia and criminals. Ordinary citizens were not allowed to own firearms to protect themselves. Instead, only the government and their guards had guns. This gun control regime left the Ukrainian people with no means to defend themselves from crime, whether committed by criminals or the government. In Ukraine in the 1990s, if you needed police, they were hours away when you called, if they even showed up at all. The Ukrainians also had no right to free speech and we had no right to protest. I personally witnessed many attacks on Ukrainian citizens simply for protesting. Once I was passing by a protest, and the police beat me because they thought I was a part of the protest, but I was not involved. I no longer felt safe in Ukraine, and it was a known fact that you should not leave your house at night due to crime. In 1994, I left Ukraine for the United States and its promise of freedom. I settled in New York, where I became a United States citizen in 1999. I have lived in New York ever since. I firmly believe in the Second Amendment and the right to keep and bear arms. I have seen what happens in countries when citizens are not allowed arms.

4. I am a law-abiding person who currently possesses and has maintained an unrestricted New York carry permit since 2009. I am eligible to possess and carry firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

5. Prior to the recent implementation of the New York Concealed Carry Improvement Act, I routinely carried my firearm in public, where permitted and lawful.

6. Now, the CCIA makes almost all places off limits to me while I am carrying a firearm in public. For instance, if I go to a store, restaurant, or gas station that is not specifically posted with a sign allowing me to carry there, I am unable to go in with my firearm, without violating the law.

7. The CCIA's implementation has greatly affected my daily life. This Court previously opined that "it would seem plausible that a plaintiff such as Mr. Antonyuk [is] going to violate both the CCIA's sensitive-location provision or restricted-location provision … while resuming his daily life in the coming weeks…." *Antonyuk* at ___. On the contrary, I have taken significant steps since the CCIA's implementation to comply with each of its provisions, in order to avoid violating the law. I have changed where I eat and get takeout meals. I have stopped shopping at certain stores that have not posted signs welcoming firearms. As the Governor opined, New Yorkers can carry now only in "some public streets," and that generally has been my reality since the CCIA took effect.

8. When I have gone to a place that the CCIA has made off limits, I have been forced to disarm myself. This includes separating the magazine and ammunition from my firearm, and storing them in a safe storage box, but not in my glovebox. Of course, it is well known that when people load and unload firearms, it introduces opportunities to have accidental discharges. As I stated previously, since I must unload my firearm, I have to do this in my vehicle as it does not make sense to exit the vehicle with a holstered, concealed firearm, draw the firearm, unload and

make safe, and then store the firearm in my trunk or locked safe.  And then when I return to my vehicle, I have to remove the firearm from the trunk, reload it, and then reholster it.  Often my family is present in my vehicle during this unnecessary performance.  The second of the four ubiquitous rules of gun safety is to keep the muzzle of an unholstered firearm from pointing in any unsafe direction yet, while in my vehicle with my family in a public place, there are few if any such directions.  This CCIA-mandated theater is wholly unnecessary and dangerous, and has completely changed the process of carrying a firearm in New York as it used to be prior to September 1, 2022.

9. Additionally, if someone sees me with an unconcealed handgun in my hand while I am unloading and storing it to comply with this new Act, I fear that I will be reported to the police and perhaps charged with a crime for having a firearm that is not concealed.  *See Antonyuk* at 49 n.16 ("[t]his discovery might be as obvious as a passeryby catching sight of a glimmer of steel as a permit holder is transferring his or her handgun to his trunk in the parking lot of a gas station").

10. As the Court found, I am "law-abiding and respectful."  *Antonyuk* at *49.  And now, because I am a "law-abiding and respectful" citizen, I have refrained from violating any of the provisions of the Act, and will not violate them.  However, the vast number of locations at which lawful carry is now banned, and despite my best efforts, this law creates the real danger that I will inadvertently violate this new law unintentionally --- but that would be no defense, as I understand it.

11. Additionally, I am harmed because I can no longer enjoy the Second Amendment freedoms I once had before the new law was implemented.  I no longer can carry in a number of places that I used to carry.  I am unable to go peaceably about my daily life without fear of inadvertently carrying in a prohibited location, and being prosecuted for doing so.

12. If the Court enjoined this law, and made it lawful for me to carry without fear of arrest, prosecution, damaging my reputation, losing my Second Amendment rights for life, or losing the required "good moral character," I would immediately carry in those places again, but for the CCIA's unconstitutional restrictions. For instance, if I were able to carry at a gas station while pumping my gas, I would do so, but currently I refrain from doing so because I fear prosecution and because I obey the law. But for the CCIA making carrying of a firearm at a gas station that has not posted a sign permitting carry a felony, I would carry my firearm on my person while at a gas station that is otherwise not posted with "conspicuous signage."

13. I am also a property owner, of a single-family home within Schenectady County, New York. It is my right, as the property owner, to determine who, and under what circumstances, persons may visit my property, and what activities they may engage in while at my home. The CCIA, however, infringes my rights, declaring my home to be a "restricted location," and mandating that, in order to permit gun owners to visit my home while armed, I must post "clear and conspicuous signage indicating that the carrying of firearms … is permitted" or otherwise provide my "express consent," presumably either verbally or in writing.

14. Of course, without standing on my front lawn 24 hours a day, it is impossible for me to provide "express consent" to each and every visitor who stops by, especially in advance of their arrival. For example, a delivery driver, meter reader, Jehovah's Witness, or other visitor to my home might deliver a package, read my electric meter, or knock on my door when I am not at home or otherwise indisposed, and unable to greet them. Although I would have no problem with such persons peaceably and lawfully carrying their firearms on my property, the CCIA would prohibit that from occurring, in violation of my wishes, unless I posted "conspicuous signage."

15. Likewise, many law-abiding license holders, including my friends and associates, no doubt will be hesitant or afraid to ask my permission to exercise their Second Amendment rights (often a taboo topic in New York State), for example because they are unaware that I support gun rights. Thus, such persons would leave their gun at home, contrary to my wishes.  If I held a barbeque party for friends and associates, I may not know everyone who attends (such as if my wife invites one of her friends, who brings her husband who we have never met).  Such persons would not even be able to ask my permission to carry their firearms on my property before they visit, and thus would have no choice but to leave them at home.  Yet armed concealed carry license holders have successfully stopped intended mass shooters at family barbeques, neighborhood cookouts, and other similar events across the country.[1]

16. Since I am a firm believer in the adage "more guns, less crime," the CCIA reduces the safety of myself and my family, by prohibiting, against my wishes, firearms being peacefully carried by law-abiding permit holders on my property.

17. The CCIA could even prevent one of my neighbors from coming to my home to render aid and/or defend my family during a break in by violent criminals, unless he and I had previously had a conversation and exchanged "express consent" to bring firearms onto each other's property.  Or perhaps he would be forced to mill around in the dark, searching for "conspicuous signage" authorizing him to help.  Either way, the CCIA thus reduces the safety and security of myself and my family, prohibiting firearms on my property that I would otherwise welcome.

18. Unable to provide "express consent" in many circumstances, the only other option the CCIA provides is for me to engage in compelled speech by posting a sign on my property, in order

---

[1] https://www.foxnews.com/us/texas-man-shoots-robbery-suspect-second-amendment; https://www.foxnews.com/us/florida-armed-bystander-stops-gunman-at-crowded-back-to-school-event-at-park-police-say

to permit law-abiding gun owners to peaceably bring their firearms onto my property. However, I cannot safely comply with this requirement. As I mentioned, many New Yorkers are vehemently anti-gun, some militantly so. By posting a "clear and conspicuous" sign in favor of gun rights, I open myself and my family to criticism, harassment, and even possible hostile action (such as vandalism or a physical confrontation) by those who disagree with our political views. Likewise, by posting a gun-friendly sign, the CCIA requires me to identify my home as being the likely location of a gun owner (valuable property), raising the risk that my home would be targeted by burglars, thieves, home invaders, or other violent criminals, putting my family's safety at great risk. I will not post a sign, and self-identify my property as a gun friendly location and thereby reduce my family's security, as required by the CCIA.

19. The CCIA also politicizes my home against my wishes, and demands that I take affirmative steps and engage in compelled speech (either by making a government-required statement or posting a government-required sign) merely to fulfill my wishes that others be able to peaceably exercise their constitutional rights while on my property. On the contrary, there is no historical analogue for forcing me to "opt in" to constitutional rights.

20. I believe that the CCIA violates the constitution's guarantees, requiring armed visitors to private property to obtain what is essentially a license or permit (by receiving consent or permission) from each and every property owner, before they may visit the property while armed. Like in the First Amendment context, the CCIA violates not only the Second Amendment rights of visitors to my home, but also my right to receive them on my terms.

21. Through the CCIA, the state has taken my rights as a property owner to decide the terms on which to invite or exclude visitors to my property (and my home). The CCIA requires me to

publicly take a position one way or the other on an issue that is highly contentious and divisive in this state, whereas before we could simply stay silent.

I declare under penalty of perjury that the foregoing is true and correct.

September 19, 2022
**Date**

**Ivan Antonyuk**