**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IVAN ANTONYUK, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 22-cv-00986 (GTS-CFH) |
| v. | ) | |
| | ) | |
| KATHLEEN HOCHUL, in her Official | ) | |
| Capacity as Governor of the State of New | ) | |
| York, et. al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY**
**INJUNCTION, AND/OR PERMANENT INJUNCTION**

# TABLE OF CONTENTS

I.  Introduction…………………………………………………………………………1

II.  Plaintiffs Have Standing……………………………………………………….........2

III.  Plaintiffs Have Announced an Intent to Engage in Conduct Protected by the Federal Constitution, but in Violation of the CCIA …......………………………………….....2

    A. Defendants Have Threatened to Enforce the CCIA Against Plaintiffs...................5

    B. Plaintiff Sloane Has Standing to Challenge the Constructive Denial of His Application..................................................................................................................7

    C. Plaintiffs Leman and Antonyuk Have Standing to Challenge the CCIA's Compelled Speech Requirements..............................................................................................11

IV.  Plaintiffs Are Entitled to a Preliminary Injunction……………………………….....12

    A. Plaintiffs Are Likely to Succeed on the Merits……………………………….....13

       i.  The CCIA is repugnant to a plain reading of the Second Amendment, and contrary to the Supreme Court's clear teachings in *Bruen*……………….…13

       ii.  The CCIA is a legislative repudiation of *Bruen*………………………………15

       iii.  "Good Moral Character"……………………………………………………15

       iv.  In Person Interview, List of Family Members, "Such Other Information," "Character References," and Social Media History........................................17

       v.  The CCIA declares nearly all of New York to be a "sensitive place" or "restricted location.".................................................…………...............26

       vi.  The CCIA demands almost five-times the amount of training previously required…………………………………………………………………...30

       vii.  Under *Bruen's* "historical tradition" standard of review, New York cannot come close to justifying the CCIA's provisions……………………….…32

    B. Plaintiffs Are Likely to Suffer Irreparable Harm Absent Preliminary Relief….....35

    C. The Balance of Equities Tips Overwhelmingly in Plaintiffs' Favor…….................36

    D. An Injunction Is in the Public Interest……………………………….…………….37

V.  Conclusion…………………….....………………………………………………....39

## I.      Introduction.

New York continues to infringe the Second Amendment right to bear arms, treating most people as unworthy of the natural right to self-defense. In response to the U.S. Supreme Court's recent vindication of the People's rights to keep and bear arms in public in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 2022 U.S. LEXIS 3055 (2022), New York has enacted new restrictions in explicit contravention not only of the Court's holdings, but also the text of the First, Second, Fifth, and Fourteenth Amendments. Compl. ¶¶ 61-66. New Yorkers are now facing the reinstitution of discretionary licensing standards, imposition of draconian carry restrictions in a cornucopia of nonsensitive public places, invasion of protected First and Fifth Amendment conduct, a four-and-a-half-times expanded training requirement and accompanying exorbitant costs, and conversion of all private property into de facto "gun free zones" that "would eviscerate the general right to publicly carry arms for self-defense," *Bruen*, at \*38. Plaintiffs request that this Court enter a temporary restraining order, followed by a preliminary and/or permanent injunction, to stop the irreparable harm Plaintiffs are suffering and will continue to suffer absent emergency relief.

## II.     Plaintiffs Have Standing.

To show standing, an individual plaintiff must suffer a concrete and particularized invasion of a legally protected interest that is either actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This injury must be fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. *Id.* at 560–61. For pre-enforcement challenges, "[a] party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 158 (2014). Due to the incontrovertible constitutional violations at issue here, Plaintiffs easily satisfy these requirements.

A plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt* v. *Farm Workers,* 442 U. S. 289, 298 (1979). As the Second Circuit has explained, showing a credible threat of enforcement is a "forgiving" and "low threshold" standard, and "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022). Although "[a] credible threat is not established by 'imaginary or speculative' fears of prosecution" (*Adam v. Barr*, 792 F. App'x 20, 22 (2d Cir. 2019)), the Second Circuit has found a credible threat when a "[v]illage has announced its intention to enforce [its] Ordinance…." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).

Indeed, the Second Circuit appears to have a particularly lax threshold, wherein a credible threat exists merely where "[t]he state … does not dispute that it would apply those regulations to the plaintiffs" and "'nowhere in the record' have the defendants 'disavowed that they would criminally charge [the plaintiffs] again in the same circumstances.'" *Silva v. Farrish*, No. 21-0616, 2022 U.S. App. LEXIS 23841, at \*19-20 (2d Cir. Aug. 25, 2022). Likewise, within this district, a plaintiff was found to have asserted a credible threat of enforcement by announcing a "desire" to engage in conduct that "would be likely to result in his prosecution," even though "there is no indication that the District Attorney has articulated any specific policy positions regarding enforcement [or] made any specific statements that might be construed as targeting [the plaintiff's] conduct in particular." *Avitabile v. Beach*, 277 F. Supp. 3d 326, 331-32 (N.D.N.Y. 2017).

A.   **Plaintiffs Have Announced an Intent to Engage in Conduct Protected by the Federal Constitution, but in Violation of the CCIA.**

2

In *Antonyuk v. Bruen*, this Court explained that, in order to have Article III standing to challenge a criminal statutory provision, a plaintiff "must indicate his intent to violate the law," and such intent must include some "description of concrete plans," even if not amounting to a full "confess[ion] that [they] will in fact violate the law." *Id*. at *45-46, 48 (citation omitted).  On that basis, Plaintiffs have standing, as they have alleged numerous sensitive and restricted locations where they intend to carry their firearms in violation of the CCIA – in the near future.

For example, Johnson intends to carry his firearm when he routinely fishes in state parks (subsection d) (Ex. "2," ¶¶ 8, 9.  Compl. ¶¶ 152, 153); at a restaurant that serves alcohol (subsection o) "in the coming days" (*id*. at ¶ 11; Compl. ¶ 154); and the "next time" a pro-gun rally is scheduled (subsection s), all in violation of the CCIA.  *Id*. at ¶ 16; Compl. at ¶ 157.  He also "intends" to carry his firearm when he visits the Rosamond Gifford Zoo (subsection d) (*id*. at ¶ 17; Compl. at ¶ 158) and "intends" to continue to carry in "restricted locations" that are not posted with "conspicuous signage" and without "express consent." Ex "1", p. 19. *Id*. at ¶ 19; Compl. at ¶ 159. Finally, but for the CCIA, "self-censored" his behavior and did not carry his firearm at the New York State Fair. *Id*. at ¶ 13; Compl. ¶ 156.

Likewise, Terrille "intends" to carry his firearm when he goes to movie theaters (subsection p) (Ex. "9," at ¶ 7; Compl. at ¶ 166), and when he visits Thatcher State Park in Albany, County (subsection d). *Id*. at ¶ 8; Compl. at ¶ 167. He also intends to continue frequenting various businesses in Albany County that do not have conspicuous signage (*id*. at ¶ 13; Compl. at ¶ 172), in violation of the CCIA.  *Id*. at ¶ 15; Compl. at ¶ 172. He intends to attend the upcoming gun show, with his firearm, held at a "sensitive location" (subsection p) (*id*. at ¶ 16; Compl. ¶ 173), and intends to carry his firearm at restaurants that serve alcohol (subsection o).  *Id*. at ¶ 19; Compl. at ¶ 176.  He also intends to travel by plane to Tennessee, but the CCIA (subsection n) prohibits

him from bringing his firearm with him to declare and take with him in his checked baggage in accordance with TSA regulations. *Id*. at ¶ 9; Compl. at ¶¶ 168, 170.

Next, Pastor Mann intends to continue keeping and bearing firearms both within his church and within his own home, a "sensitive location" because it is part of his church. Ex. "8," ¶¶ 5, 12, 13, 14, 16; Compl. at ¶¶ 181, 183-84.  He intends to continue to provide both counseling and addiction recovery services, in spite of the CCIA. *Id*. at ¶¶ 26, 28, 29; Compl. at ¶¶ 189-91.  With respect to the CCIA's restrictions on firearms in the church because of its Sunday nursey, Sunday School, and Junior Church, Pastor Mann intends to not comply.  *Id*. at ¶ 30.  Compl. at ¶ 192. Additionally, even though a local homeschool co-op uses the Church facilities, where the Pastor and his wife teach classes (subsections f, m), the Pastor intends to continue to possess a firearm in his home and church.  *Id*. at ¶ 31. Compl. at ¶ 193.  Finally, the Pastor intends to continue possessing his firearm at the church despite the apparent violation of the CCIA's subsection (s) (collectively exercising constitutional rights), (n) (church van and bus), or (p) (banquet hall).  Ex. 8 ¶¶ 32-34; Compl. ¶¶ 194-196.  In sum, despite each of the numerous ways the CCIA appears to ban firearms at Pastor Mann's church and in his home, the Pastor intends to continue his Second Amendment protected activities, in violation of the CCIA.

Finally, Leman intends to continue his duties as a volunteer firefighter, which requires immediate travel from any current location (lawfully armed) to a place where firearms may be prohibited. Ex. "4" at ¶¶ 5-9; Compl. at ¶¶ 199-201.  Leman will not disarm before rendering life-saving aid (*id*. at ¶ 16) and intends to carry his firearm when responding to emergencies.  *Id*. at ¶ 20; Compl. at ¶ 205. Additionally, as there is no exception for travel in the CCIA (*id*. at ¶ 32; Compl. at ¶ 214), Leman cannot leave his town with a firearm as he has to drive through the Catskills Park.  Leman intends to "bring [his] firearm when [he] leave[s] home to travel outside of

Windham, New York, which will take [him] through [the Catskills Park], in violation of the CCIA." *Id.*

Finally, Antonyuk is "law-abiding and respectful[]" (*Antonyuk,* at *49) and currently "refrain[s] from violating any of the provisions of the Act[.]"  Ex. "7," ¶ 10.  If the CCIA were enjoined, however, he "would immediately carry in [sensitive and restricted] places again, but for the CCIA's unconstitutional restrictions." *Id.* at ¶ 12.  He is "self-censoring" and conforming his behavior to this unconstitutional law.

Each of these five plaintiffs have established their respective standing by declaring their intentions filed with the Complaint, and "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, that plaintiff should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689-90 (2d Cir. 2013) (punctuation omitted).  Plaintiffs meet these requirements.

### B.    Defendants Have Threatened to Enforce the CCIA Against Plaintiffs.

Superintendent Bruen, already found by this Court to be a proper defendant previously,[1] is responsible for the conduct for those under his authority, including threats they make against law-abiding gun owners such as Plaintiffs.  Indeed, the First Deputy Superintendent of the State Police, Steven Nigrelli, recently stated the following during a press conference, available on YouTube: "For those who choose to violate this law … Governor, it's an easy message.  I don't have to spell it out more than this.  We'll have zero tolerance.  *If you violate this law, you will be arrested.*

---

[1] *Antonyuk*, at *43 ("the Court finds that Superintendent Bruen is a proper defendant to Plaintiffs' claims challenging the enforcement of the CCIA's sensitive-location provision and restricted-location provision by state police members.").

*Simple as that.*  Because the New York state troopers are standing ready to do our job to ensure ...

all laws are enforced.") (emphasis added).[2]  This statement represents a direct threat to all who

violate the CCIA, on all fours with *Cayuga Nation's* "announce[ment] [of an] intention to enforce

the Ordinance" a group whose members would be "obvious targets of any criminal enforcement

of the Ordinance."  *Id.* at 331.  Here, the New York State Police, a law-enforcement entity with

statewide jurisdiction and officers stationed across New York, has specifically and expressly stated

a clear intent to enforce all aspects of the CCIA, without exception, through arrest and prosecution,

in every instance where it is violated.[3]  *See Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210

(9th Cir. 2022) (looking at "whether the prosecuting authorities have communicated a specific

warning or threat to initiate proceedings…").  Indeed, the CCIA, being of recent vintage, is at the

forefront of the department's enforcement priorities, with various officials making multiple

announcements and holding numerous press conferences regarding its provisions.

    In addition to the state police, various other Defendants have announced their intent to

enforce the CCIA against Plaintiffs,[4] even if they might disagree with its provisions.  For example,

Defendant Fitzpatrick has stated that he will have the firearms of CCIA violators seized, and refer

them to the judge who issued their permit for potential revocation.  Compl. ¶ 12.  Likewise,

Defendant Cecile has stated that his department will enforce the CCIA on a "complaint driven"

---

[2] https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40

[3] *See Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210 (9th Cir. 2022) (looking at "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings…").

[4] Plaintiffs also have alleged several plaintiff-specific risks they will run with respect to enforcement of the CCIA against them, such as Johnson, who routinely has his fishing license checked by state law enforcement (Compl. ¶ 161), Terrille, who intends to check a firearm with his baggage, in compliance with TSA regulations, on an upcoming trip (Compl. ¶ 168), Mann, whose congregation includes members of law enforcement who know he possess firearms in his home on the premises (Exhibit 8 ¶ 23), and Leman, who routinely works in close proximity to local and state law enforcement, many of whom know that he carries a firearm (Compl. ¶ 207).

basis. *Id.* ¶ 14.  Finally, Defendant Hilton likewise has stated that his office will enforce the CCIA because it is the law whether he likes it or not, and specifically pointed to the significant penalties for possessing a firearm in a church – the very conduct in which Plaintiff Mann, within the same jurisdiction, intends to engage. *Id.* at ¶¶ 17, 183.  Meanwhile, none of the Defendants has disavowed enforcement of the CCIA. *See Silva at 19-20.*  Short of being identified by name, and a finger pointed directly at them (something that is not required), it is hard to see how a more credible threat of enforcement could exist against Plaintiffs.

### C.   Plaintiff Sloane Has Standing to Challenge the Constructive Denial of His Application.

Plaintiff Sloane does not possess a license but, since *Bruen,* has been preparing and seeking to obtain, a New York carry license (Ex. "3," ¶ 4; Compl. at ¶ 218).  However, the CCIA has now changed the rules, and requires far more of Sloane than previously was required.  Sloane refuses to comply with these unconstitutional new requirements, such as possibly adding a government official as a "friend" on Facebook to view his nonpublic profile and posts, or divulging any other social media accounts to the state. *Id.* at ¶¶ 7, 9; Compl. at ¶¶ 220, 221.  Likewise, he refuses to provide the government with the required information about his loved ones (*id.* at  ¶ 10; Compl. at ¶ 222), or the four character references so that the government can interrogate his "friends and family." *Id.* at ¶¶ 15, 16; Compl. at ¶ 223. Next, he objects to and refuses to submit to an in person interview, because this would compel him to speak with law enforcement, and violate his "Fifth Amendment rights to remain silent and against self-incrimination." *Id.* at ¶ 17; Compl. at ¶224. Finally, as to the training requirements, Sloane will not complete the CCIA's new training requirement (*id.* at ¶ 24; Compl. at ¶ 231), and objects to paying a large sum of money to learn about "suicide prevention," as he is not suicidal and such subject matter has no bearing on his being a responsible gun owner (*id.* at ¶ 28; Compl. at ¶ 231).  However, he would take a four hour

"basic handgun safety course," in order to receive a license, despite his objections.  *Id*. at ¶ 29; Compl. at ¶ 231.  Thus, Sloane has sought to submit an application for carry license, completing all its parts and requirements except those above.  *Id*. at ¶ 30; Compl. at ¶ 232.

Yet even though Sloane has filled out the remaining parts of his license application, and although he desires to submit his application to the Sheriff tasked with accepting applications, Defendant Conway has refused to accept his application.  Rather, the Sheriff has concocted a framework whereby his office first requires "appointments" for an applicant merely to turn in his paperwork, and then offers would-be applicants, like Sloane, appointments more than 13 months from today, in obvious violation of *Bruen*'s footnote 9, which anticipates challenges to permitting regimes which require "lengthy wait times" to obtain a permit.  *Id*. at ¶ 23; Compl. at ¶ 226; *Bruen,* at 2138 n.9.  Indeed, Defendant Conway's absurd 13 month delay greatly exceeds even the significant time he has to process an application under the statute.[5]  By refusing to permit Sloane to "present" his application for processing, the Sheriff has not only violated the statute,[6] but has constructively denied Plaintiff Sloane's application, making his challenge ripe.

_____

[5] The Sheriff's delay in accepting license applications violates New York Penal Law 400(4-b), which requires that [a]pplications for licenses shall be accepted for processing by the licensing officer *at the time of presentment*," and that "[e]xcept upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment…." *See also*  https://portal.ct.gov/BFPE/General/General/How-do-I-Appeal  (permitting an appeal based on a "constructive denial" when a licensing officer takes longer than the statutory period to issue or deny an application).

[6] *See Marszalek v. Kelly*, No. 20-cv-4270, 2022 U.S. Dist. LEXIS 14047, at *18, *23 (N.D. Ill. Jan. 26, 2022) (plaintiffs stated a "plausible Second Amendment claim[]" alleging that "residents commonly wait[ ] as long as 60 to 90 days to receive a FOID card . . . The amended complaint recites the experience of a number of individuals who had been waiting between five (5) to nine (9) months for their FOID applications to be processed at the time the amended complaint was filed in November of 2020[]" when the statute requires the Illinois State Police to "adjudicate applications within thirty days.").

To be sure, even if the Sheriff did permit Sloane to submit his carry license application, applying would be a "futile gesture" for two reasons.  First, the Sheriff publicly states that he will not accept and will reject "incomplete applications" which "will not be processed."  *Id*. at ¶ 21; Compl. at ¶ 225.[7]  Second, as the Second Circuit makes clear, "failure to file a license application does not pose an obstacle to consideration of [] claims" when an applicant "was statutorily ineligible...."  *Bach v. Pataki*, 408 F.3d 75, 83 (2d Cir.  2005).  Indeed, New York's licensing statute specifically instructs that "[n]o license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for license are true," including fulfilling subsection (o) which, in order to be found to have good moral character, requires an in person meeting, information about co-habitants, family, and children, character references, social media, and a "certification of completion of the training required...."  *See* N.Y. Penal Law Section 400.00(1).

In other words, an applicant is "statutorily ineligible" until he submits a complete application, something that Sloane is unable to do without surrendering his constitutional rights and, for that reason, is unwilling to do.  It is certainly reasonable to assume that licensing officials, often local judges, will carefully read and follow the law, and deny a permit for an incomplete application.[8]  *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 580 (S.D.N.Y. 2018) *vacated and remanded by Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 ("all government officials are presumed to follow the law once the judiciary has said what the law is...").

---

[7] The Onondaga Sheriff's website instructs that "[i]ncomplete applications will not be processed at the time of your appointment.  Your entire application will be returned to you and you will be instructed to reschedule your appointment."  https://sheriff.ongov.net/pistol-license-unit/appointment-requirements/.

[8] And in fact, the Sheriff will not even accept an incomplete application.

In *Desiderio v. NASD*, 191 F.3d 198, 200 (2d Cir. 1999), the Second Circuit refused to require submission of a form by a person who would "sign the form only if the mandatory arbitration provision was stricken from it," just as Sloane will not submit an application unless the challenged good moral character provisions are struck from the application process. Paraphrasing *Desiderio*, "[i]t would have been futile for [Sloane] to submit an altered [application] after being told [in the text of the CCIA that his application] would not be accepted." *Id.* at 202.

Likewise, in a case directly on point to the CCIA's training requirements, the Second Circuit would not demand a midwife actually "apply for a license ... before going through the required training" in the form of "1800 hours of study and the physician-indorsement," finding that this "would serve no purpose. Litigants are not required to make such futile gestures to establish ripeness." *Sammon v. New Jersey Bd. of Medical Examiners*, 66 F.3d 639, 642-43 (3d Cir. 1995). *See also Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201-02 (2d Cir. 1977) ("undergo[ing] the expense of preparing a bid with the certainty that it will be rejected imposes unnecessary financial hardship....).

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) also supports Sloane's position: "Failure to apply for a license would not preclude Decastro's challenge if he made a 'substantial showing' that submitting an application 'would have been futile.'" *Id.* at 164. In *Decastro*, the plaintiff wanted a handgun but did not submit an application because a "NYPD desk officer" allegedly told him that "there was 'no way' his application would be approved," yet the evidence demonstrated "that roughly 2/3 to 3/4 of handgun license applications ... were granted" and his contrary evidence was merely a "hearsay statement of an unidentified police desk officer who had no apparent connection to the licensing process." *Id.* 161, 164. In Sloane's case, N.Y. Penal Law Section 400.00(1) makes licensure an impossibility without submitting to unconstitutional

demands that Sloane refuses to do and, therefore, it is futile for him to even attempt to apply. Sloane will not provide what the application requires, surrendering his First and Fifth Amendment rights and paying for excessively expensive (and in part unnecessary) training. Therefore, he has made the "substantial showing" required that submitting an application solely to be denied is futile, and he is "deterred from applying[,]" and ultimately has standing. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66, 97 S. Ct. 1843, 1870 (1977).

C.   **Plaintiffs Leman and Antonyuk Have Standing to Challenge the CCIA's Compelled Speech Requirement.**

A New York federal court has explained that "the fact that the [plaintiffs] are required to speak the Government's message in exchange for the Leadership Act subsidy is a sufficient injury-in-fact…." *All. for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 540 (S.D.N.Y. 2008). Leman runs a small hotel/bed and breakfast for guests (*id.* at ¶ 25; Compl. at ¶ 208), which is now a "restricted location." Ex. "1", at p.19. If he wants to allow his guests to carry, he must post a sign because "person-by-person 'express consent'" is impractical to give to each visitor. *Id.* at ¶ 26; Compl. at ¶ 209. The CCIA requires him to engage in compelled speech to continue to provide hotel services to gun owners, and if he refuses to speak, he will lose their business. *Id.* at ¶ 27; Compl. at ¶ 210. Most of his customers come from southern New York, including New York City, Long Island, and northern New Jersey. The majority of these customers hold views unaccepting of firearm ownership and bearing arms in public. So, if he posts a sign allowing concealed carry, he will lose business from customers that do not share that view.[9] *Id.* at ¶ 28; Compl. at ¶ 211. He also states he can no longer apply for a New York State wine and beer license because under the CCIA, it would automatically trigger his business to be a "sensitive

---

[9] "The NRA's allegations of significant interference with its business relationships ... and the damages caused by Defendants' actions [] are sufficient to establish a First Amendment injury." *NRA of Am. v. Cuomo*, 350 F. Supp. 3d 94, 118 (N.D.N.Y. 2018).

location" (subsection o) barring him from carrying on his own property.  *Id.* at ¶ 30; Compl. at ¶ 213.

Likewise, Antonyuk is a property owner of a home which is now a "restricted location" (Ex. "1", p. 19  *Id.* at ¶ 13; Compl. at ¶ 140.  He must engage in compelled speech by posting "clear and conspicuous signage" or otherwise providing his "express consent" to someone wanting to carry a firearm on his property (Ex. "1", p. 19).  *Id.*  But it is "impossible to provide express consent" unless he is outside 24 hours a day. *Id.* at ¶ 14; Compl. at ¶ 141. He would allow carry on his property, but will not post a sign for fear of burglars targeting his home, or physical confrontation "by those who disagree" with his political views which leads to a decrease in his and his family's safety.  *Id.* at ¶ 18; Compl. at ¶ 144.  The CCIA has revoked his right to accept guests at his home on his own terms. Ex. "7," ¶ 20.[10]

## III.    Plaintiffs Are Entitled to a Preliminary Injunction.

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Chestnut Hill NY, Inc. v. City of Kingston*, No. 1:17-CV-0095 (BKS/DJS), 2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017). The standard for a preliminary injunction requires Plaintiffs to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm.  Likelihood of success

---

[10] This violates his First Amendment rights comparable to *Martin v. Struthers*, 319 U.S. 141 (1943), wherein the Supreme Court held that the First Amendment protects not only "the right to distribute literature" but also "the right to receive it."

on the merits is therefore 'the dominant, if not the dispositive, factor.'" *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021).[11]  Due to the CCIA's blatant repudiation of the Second and Fourteenth Amendments' guarantees as affirmed by *Bruen*, as well as the significant, structural First and Fifth Amendment violations the CCIA enacts into law, Plaintiffs are able to demonstrate a substantial likelihood of success, and make a strong showing of irreparable harm.  Plaintiffs also easily demonstrate that the balance of equities tips in their favor and that, pursuant to the unambiguous guidance from *Bruen*, injunctive relief undoubtedly would be in the public interest.

    A.  <u>**Plaintiffs Are Likely to Succeed on the Merits.**</u>

      i.  <u>The CCIA is repugnant to a plain reading of the Second Amendment, and contrary to the Supreme Court's clear teachings in *Bruen*.</u>

The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."  U.S. Const. amend. II.  As the Supreme Court has now reiterated in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Bruen*, at *13.  In *Bruen*, the Supreme Court first "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, at 8. Second, the Supreme Court held that:

---

[11] In *Antonyuk*, this Court explained the dispute between the parties as to whether Plaintiffs sought a prohibitory or mandatory injunction, but noted that, even under the heightened "substantial likelihood of success and a strong showing of irreparable harm" standard, Plaintiffs would prevail. *Id*. at *68 n.25.  Even though Plaintiffs continue to believe that the relief they seek is "prohibitory" rather than "mandatory" in nature, they submit that they meet their burden under either standard.

> [t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' [*Bruen*, at *21 (citation omitted).]

Third, in reviewing the historical evidence, because "not all history is created equal," the *Bruen* Court cabined review of relevant history to a narrow time period, focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen*, at * 46 (discussing the lack of relevant historical prohibitions on concealed carry in public).

Under the *Bruen* test, then, it does not matter whether a government restriction "minimally" or "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868. *Bruen*, at *47.

In striking down New York's discretionary "proper cause" requirement, the Supreme Court found no Founding-era historical tradition that permits a state to condition the right to carry arms in public on subjective requirements within the discretion of licensing officials. *See id.* at *47–48. In doing so, the Court pointed to the entirely different "shall-issue" licensing schemes that a

supermajority[12] of states have implemented, so long as they "contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'" *Id.* at *48 n.9 (citation omitted).

      ii.      <u>The CCIA is a legislative repudiation of *Bruen*.</u>

After *Bruen* was handed down, the Governor of New York called an extraordinary session of the state legislature for the purpose of enacting a new statutory scheme (the CCIA), designed to give some appearance of compliance with *Bruen* while, in reality, thwarting the Supreme Court's decision. Indeed, during the process, Governor Kathy Hochul issued several statements critical and disrespectful of the Supreme Court's ruling:

> [t]he Supreme Court's reckless and reprehensible decision to strike down New York's century-old concealed carry law puts lives at risk here in New York,[13] [and] [a] week ago, the Supreme Court issued a reckless decision removing century-old limitations on who is allowed to carry concealed weapons in our state — senselessly sending us backward and putting the safety of our residents in jeopardy[.][14]

On the contrary, it is the Governor's signing of the CCIA which was the "reckless," "reprehensible," "senseless[]" and "backward" act, which unconstitutionally puts the safety of New Yorkers in jeopardy by ensuring their continued disarmament in public.

      iii.     <u>"Good Moral Character."</u>

The CCIA made one "improvement" to New York's licensing scheme, removing from the statute the repudiated "proper cause" requirement held unconstitutional by *Bruen.* However, the CCIA replaces the tyranny of "proper cause" with an entirely new tyranny, redefining the phrase

---

[12] In fact, more than half of the states do not require any sort of government issued-permit in order for a law-abiding person to carry a firearm in public, known as "constitutional carry" or "permitless carry." Many more are "shall issue" states where licensing officials must issue permits if an applicant meets certain basic criteria. Altogether, a reported 41 states operate under one or the other of these permissive regimes. *See* https://bit.ly/3OjmyYE.

[13] https://on.ny.gov/3aLXqwc.

[14] https://on.ny.gov/3zglMY3.

"good moral character" with an utterly subjective and amorphous standard. Ex. "1" at p 2 ("[G]ood moral character . . . for the purposes of this article, shall mean having the essential character, temperament and judgement [sic] necessary to be entrusted with a weapon . . . ."). This "entrust[ment]" contemplated by the CCIA is a perversion of the Second Amendment's unqualified guarantee of a right of all "the people," not just those lucky few who government officials choose to "entrust" with a firearm.  Indeed, those disqualified from licensure on the basis of allegedly not having "good moral character" will be those who otherwise would have qualified for a permit – those who the *Bruen* Court describes as "ordinary, law-abiding citizens" (*Bruen*, at *102) – but who nevertheless are disfavored by a licensing official applying a vague standard.

On the contrary, the Second Amendment's plain text protects the right of the people to bear arms in public without having to demonstrate *anything* to the government or obtain *anything* from the government (such as approval, or a license).  No other constitutional right works in that way. *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002).  Indeed, more than half of states within this country now properly recognize the right to bear arms in its purest form, without the government "permitting" its citizens to exercise their natural rights.  Moreover, as *Bruen* notes, even when it comes to states that require a permit, the supermajority represent "shall issue" states which freely issue permits to those who meet clear, attainable, objective licensing requirements, such as the passing of a background check or receipt of a training certification, entirely immune from government officials' assessments of suitability, character, or purpose. *See Bruen*, at *48 n.9. Indeed, the *Bruen* Court explicitly rejected such a

statutory scheme as New York has enacted, which "grant[s] licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*." *Bruen*, at *17 (emphasis added).[15]

This Court previously stated its "agree[ment] … that a majority of Justices on the Supreme Court would find that New York State's new definition of 'good moral character' does not in fact remove the open-ended discretion previously conferred by New York State's licensing regime on licensing officials and condemned by those Justices."  *Antonyuk*, at *80.  As such, Plaintiffs demonstrate a "strong likelihood of success on their claims challenging the open-ended discretion[.]"  *Id*. at 81.

     iv.     <u>In Person Interview, List of Family Members, "Such Other Information," "Character References," and Social Media History.</u>

After requiring a license applicant to meet the amorphous standard of having "good moral character" before being permitted to exercise Second Amendment rights, the CCIA imposes a litany of related unconstitutional prerequisites on those applying for, or recertifying, a carry license.  Ex. "1" at 4-5.

First, the CCIA's requirement of an in-person interview with a "licensing officer" (Ex. "1" at 5) violates numerous constitutional protections.  A right that can only be exercised after an in-person interview with a "licensing officer" is no right at all. This interview has no bounds, to discuss whatever the officer wishes to discuss, for however long or to whatever satisfaction the licensing officer sees fit.  This is an affront to applicants' First[16] and Second Amendment rights

---

[15] The Second Amendment unequivocally protects a law-abiding citizen's exercise of the right to "bear arms," because "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at *31 (quoting *Heller*, 554 U.S. 570, 635 (2008)).

[16] The Second Circuit held that "… compelled speech presents a unique affront to personal dignity. The decision to withhold speech depends on views and calculations known only to the individual..." and "[a]s the Supreme Court has explained, between compelled silence and

and, depending on the questions, also their Fifth Amendment right to *remain silent*.  Indeed, the only universally applicable piece of legal advice from any lawyer to any client is "don't talk to the police," and yet the CCIA requires precisely that as a condition of exercising Second Amendment rights.[17]

Second, the CCIA requires that an applicant provide "names and contact information" for the applicant's "spouse or domestic partner," other adults in the home, adult children in the home, and whether minors reside "full time or part time" in the home.  This, presumably, allows New York to contact and interrogate those persons, however desired, on any topic allegedly bearing on suitability, without regard to existing protections such as the spousal privilege (*Obergefell v. Hodges*, 576 U.S. 644, 670, 135 S. Ct. 2584, 2601 (2015)) that "protects private and confidential communications between spouses from disclosure." *Shih v. Petal Card, Inc.*, 565 F. Supp. 3d 557, 572 (S.D.N.Y. 2021) (citations omitted).  This violates both the applicant's right of association, as well as the anonymity rights of those who do not want to be contacted by government officials, or have their personal information entered into a government database.  *See also* Compl. ¶ 78.

 Third, the CCIA mandates that the applicant provide "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing

---

compelled speech, compelled speech is the more serious incursion on the First Amendment. . ." *Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018).

[17] For example, as Plaintiffs have explained, a license interviewer might delve into questions, the answers to which might *not* disqualify a person from a license, but nevertheless *would* require admission to a misdemeanor crime.  *See* Compl. ¶ 259.  The CCIA thus creates a forced interview with a law enforcement official, yet provides no right to remain silent, no right to decline to answer questions, and no right to consult or have an attorney present during questioning.  Moreover, because the licensing process is likely to be considered civil or quasi-civil in nature, an adverse inference (such as that an applicant does not possess "good moral character") might be drawn if a person refuses to answer a question posed by the licensing officer.  *See Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).

application." *Id*. at 5.  This is in direct contravention of *Bruen*, which repudiates the "grant[ing] [of] open-ended discretion to licensing officials…." *Id*. at 2161.  Indeed, it is an invitation to a fishing expedition using a casting net rather than a rod and reel.  Could the officer decide to require a report of a blood or urine sample to check whether the applicant has any medications or drugs in his system?  Could the officer require a report from a hair or fingernail sample to test for ethyl glucuronide (EtG) to determine if the applicant abuses alcohol?[18] While the "interview" is ostensibly limited to only those things "reasonably necessary and related to the review of the licensing application," the CCIA's invitation for a licensing official to probe "any other information" invites abuse.  It is hardly speculative to predict that some licensing officer will conduct a deep dive into an applicant's activities and lifestyle simply because he is able to.

Fourth, the CCIA requires the "names and contact information" of four character references who must attest to the applicant's "good moral character."[19] *Id*. at 5.  No other constitutional right is predicated upon what others think about you, or conditioned on having friends who will agree to stand up to government interrogation and scrutiny (or retaliation) in order to help you obtain a carry license (or a license to post on Twitter).  Those who do not have four qualifying "character references" (such as new arrivals to the state) presumably will be unable to exercise their Second Amendment rights.  Making matters worse, the CCIA demands that "character references" attest that the applicant "has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others." *Id*.  Of course, how

---

[18] *See* https://bit.ly/3PyMMHy ("Ethyl glucuronide, especially in fingernails, may have potential as a quantitative indicator of alcohol use.").

[19] Current state law does not require "character references," however the permit application has a section requiring "four character references *who by their signature* attest to your good moral character." *See* https://on.ny.gov/3PGQorf.  Unlike the CCIA, the application requires nothing more than a signature from the reference.

someone would be in the omniscient position to attest that another person has never engaged in "*any act*" or made "*any statements*" of a certain nature seems a tall order indeed.  The requirement that nothing "suggest [an applicant is] likely to engage in conduct that would result in harm [justified or not] to themselves or others" would deny a carry permit to those who would defend their own life in a lawful act of self-defense.  This Court found this requirement troubling.  *See Antonyuk* at *81 (CCIA may "not require that the references provide an impossible assurance to the licensing officer.").  The CCIA's character reference requirement thus should be struck on that basis alone.

Fifth, the CCIA's requirement to list "former and social media accounts … for the past three years" is a staggering overreach into protected First Amendment activity, requiring citizens to disclose protected information to the government so that an unnamed "licensing officer" can rummage through their personal affairs, as a condition precedent to engaging in protected Second Amendment activity.  As a preliminary matter, it is entirely unclear what is meant by the CCIA's use of the term "social media accounts," which is left undefined. Thus, it is a certainty that different licensing officials across New York state will interpret the phrase differently, some applying it far more broadly and to numerous more platforms and interfaces than others. As the dictionary definition of "social media" is all "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos),"[20] a broad understanding of the phrase "social media" is hardly unreasonable.[21]

---

[20] https://www.merriam-webster.com/dictionary/social%20media.

[21] Indeed, the Supreme Court in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) used the terms "social media" and "social networking" interchangeably, likely because it is next to impossible to draw any sort of meaningful distinction between the two.  The very same websites, apps, and other platforms that permit a person to post information publicly also permit quasi-public

Many social media platforms permit entirely anonymous speech and profiles, such as Reddit, *etc*., and the CCIA would *breach that anonymity*, forcing a person to specifically identify his anonymous speech.  The First Amendment clearly protects even anonymous speech, and the CCIA's demand that anonymous individuals unmask themselves violates those protections.  *See Doe v. 2TheMart.com, Inc.*, 140 F. Supp. 2d 1088, 1092-93 (W.D. Wash. 2001) (noting that the exchange of ideas on the internet is 'driven in large part by the ability of Internet users to communicate anonymously').  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342, 115 S. Ct. 1511, 1516 (1995) ("The freedom to publish anonymously extends beyond the literary realm.").  The CCIA's demand for social media accounts is analogous to the government demanding to see what books a person is buying and reading: "The right to engage in expressive activities anonymously, without government intrusion *or observation*, is critical to the protection of the First Amendment rights of book buyers and sellers, precisely because of the chilling effects of such disclosures."  *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1053 (Colo. 2002).  *See* Exhibit "3," at ¶¶ 7, 9.

What is more, even the *existence of* a particular social media account, username, or screen name can serve to divulge highly personal information to the government.  Like a phone number or seemingly innocuous cell-site location information, such information can paint a "precise, comprehensive record of a person's public [life] that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations [including] 'trips to the psychiatrist, the

---

postings, private communications and anonymous postings.  For example, a Facebook profile can be set to "Public," or to be viewable only to "Friends (+ friends of anyone tagged)," to "Only Me," or even to "Custom" which allows a user to "selectively share something with specific people, or hide it from specific people."  https://bit.ly/3PExm4N.  LinkedIn allows for both public postings and private communications, with some information available only in relation to how many degrees of connection a user is with another user.  *See* https://bit.ly/3B41fHO.

plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.'"   *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring); *see also Carpenter v. United States*, 138 S. Ct. 2206 (2018).   For example, an applicant's reporting his "Grindr" screen name could divulge his sexual orientation, an AR15.com, Armslist, or Gunbroker profile reveals a fairly-serious Second Amendment advocate, a "Gatalog" account reveals a likely hobbyist engaged in 3-D printing homemade firearms, and a Truth Social, Parler, or Gab profile indicates someone with probable alt-right and pro-Trump political views.

The list of "social media" apps, websites, and platforms that would be covered under the CCIA is nearly endless,[22] and a given carry applicant is likely to have numerous such profiles and accounts (*see* Exhibit 3 ¶ 7), the existence of each of which would need to be turned over to the state in order to qualify for a carry license (good luck remembering them all, since the application is signed upon penalty of fines and imprisonment[23]).   Like the ubiquitous cellular phone, a person's social media history paints "a digital record of nearly every aspect of their lives."   *Riley v. California*, 573 U.S. 373, 375 (2014).   New York cannot demand that "digital record" as a condition of a person being permitted to exercise enumerated Second Amendment rights.

Moreover, the CCIA is entirely unclear *to what end* a licensing official will be reviewing a person's social media history.[24]   An invitation to a licensing official to consider a person's morality – aside from their law-abiding record – invites inconsistency, corruption, abuse,

---

[22] Google, YouTube, Discord, Snapchat, Pinterest, Twitch, Instagram, and on and on.

[23] *See* https://troopers.ny.gov/system/files/documents/2020/12/ppb-3.pdf.

[24] *See* Compl. ¶¶ 250-251 (explaining how entirely legitimate First Amendment speech can theoretically form the basis for a finding that a person does not have good moral character). Indeed, as Plaintiffs noted, the State has already indicated an intent to do so, in its briefing in *Antonyuk* (*see* Compl. ¶ 252) (opining that merely posting a picture of a "dead frog" might be used to show a lack of good moral character).

discriminatory, prejudicial, arbitrary and capricious behavior.   For example, the vague nature of the CCIA's standard begs the question whether someone who attends a BLM "parade" or "rally" that turns violent could be denied a permit.   Does a teacher who regrets her appearance on "OnlyFans" have "good moral character?"[25]  How about those who believe that the 2020 election was "stolen," or who publicly advocate against COVID-19 vaccination?  Does a person lack "good moral character" if he has multiple speeding tickets within school zones?  How about those who have engaged in quintessentially political speech that happens to be critical of the Governor, the local sheriff, a judge, or even the licensing official considering the application? Indeed, numerous past publications by federal and state governments have warned of potential domestic extremist tendencies by those who stockpile firearms and ammunition, receive tactical training, or even who vigorously advocate for constitutional rights.[26] The constitutional problems are evident when government licensing officials are equipped with unbridled discretion to engage in not only content-based discrimination, but also viewpoint discrimination.[27]  *See Rosenberger v. Rectors and Visitors of the University of Virginia*, 515 U.S. 819 (1995) ("When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. … The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.).  The CCIA's creation of a "pre-crime"[28] style prohibition on the exercise of an enumerated right is expressly foreclosed by the Supreme Court's admonition in *Bruen* that states

---

[25] *See* https://bit.ly/3v2vStn.

[26] *See, e.g.*, "Crisis Controlled, Assessing Potential Threats of Violence," Virginia State Police, https://bit.ly/3yU7Th2.

[27] *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 307, 85 S. Ct. 1493, 1496-97 (1965) (holding unconstitutional a requirement that an individual wanting to receive "communist propaganda" write the post office and inform it of his intent to receive that mailer. . . ).

[28] *See* "Minority Report," 20th Century Fox (2002).

must enact licensing schemes "without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.")  Ex. "1" at 4.

Additionally, the CCIA's social media requirement undoubtedly will chill protected speech, as individuals seeking to exercise their Second Amendment rights will stop using social media, delete their accounts, or self-censor (*see* Exhibit 3 ¶ 9) what they are saying prior to applying for or renewing a carry license. *See FEC v. Wis. Right to Life, Inc*., 551 U.S. 449, 457 (2007) ("the First Amendment requires us to err on the side of protecting political speech rather than suppressing it[]").

Lastly, the CCIA's social media requirement violates the Fifth Amendment, as this Court has explained.  *Antonyuk* at *85 ("a citizen's Fifth Amendment right would be surrendered if he or she were compelled to disclose self-incriminating statements on a social-media posting in order to exercise his or her Second Amendment right in New York State."); *see* Compl. ¶¶ 262-263 ("The Fifth Amendment's safeguards are all the more necessary in this case, as the forced disclosure mandated by the CCIA likely is made to the *very same official* whose job it is to arrest and initiate criminal prosecution through the bringing of charges.").

It is axiomatic that the exercise of one constitutional right cannot be conditioned on the forfeiture or violation of another.  *See, e.g., Simmons v. United States*, 390 U.S. 377, 393-394 (1968) (rejecting a situation where a defendant was forced to forfeit his Fifth Amendment right to keep silent in order to assert his Fourth Amendment right, calling that a "condition of a kind to which this Court has always been peculiarly sensitive," and concluding it to be "intolerable that one constitutional right should have to be surrendered in order to assert another."); s*ee also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the government may not deny a person a benefit "on a basis that infringes his constitutionally protected interests"); *see also* Antonyuk at *85.

Notwithstanding the CCIA's blatant First and Fifth Amendment overreach, its draconian licensing provisions also fail under the simple standard articulated most recently in *Bruen*, because there is no historical analog requiring an individual seeking to bear arms in public to provide his newspaper clippings, private letters, or handbills before he is deemed "suitable" to carry a firearm. Quite to the contrary, the Fourth Amendment was designed specifically to protect against such a "general warrant" by the government, and this nation's Founders often used *anonymous* political speech to discuss the importance of protecting the right to keep and bear arms. For example, in Federalist No. 46, James Madison (under the pseudonym "Publius") wrote of "the advantage of being armed, which the Americans possess over the people of almost every other nation," which "forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form," in contrast with "the several kingdoms of Europe, which … are afraid to trust the people with arms." It is ludicrous to imagine that this nation's founding generation would have countenanced a New York statute which required Madison to seek permission to bear arms from his government in the first place[29] (something not required in New York until the Sullivan Act was enacted in 1911, a period in history that the Supreme Court has explained is most definitely *not* part of this nation's "historical tradition" (*Bruen*, at *46-47*)), much less to unmask his true identity in the Federalist Papers to a licensing official, as a condition of "being armed." Indeed, this Court has already determined that New York "has adduced no historical analogs requiring persons to disclose their published political pamphlets (which  might be considered to be akin to a social-media posting), or their personal correspondence (which might be akin to a private message, or a message to a restricted group, on social media)." *Antonyuk* at *85-86*. Nor

---

[29] *See Bruen*, at *57* ("there is little evidence of an early American practice of regulating public carry by the general public").

is there any historical analogue for demanding a list of a person's family, the provision of character references attesting to his character, an in-person interview in order to exercise an enumerated right, or the provision of "open-ended discretion" to delve into "such other information" as a government official believes is relevant.

       v.      <u>The CCIA declares nearly all of New York to be a "sensitive location" or "restricted location."</u>

The CCIA's laundry list of "sensitive locations" includes places which are sensitive in name only, sweeping up all manner of entirely ordinary venues that New Yorkers visit on a daily basis for a whole host of activities that are entirely unrelated to the administration of government, and is "indeed almost limitless." *Antonyuk*, at * 89.  In fact, the CCIA's grossly overexpansive nature of "sensitive locations" makes analysis for purposes of injunctive relief clear cut.  As the *Bruen* Court explained, a "sensitive place" under Second Amendment jurisprudence is not just any "place[] where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* at *38.  Rather, the Court explained, states have extremely narrow latitude to limit the places where firearms may be carried in public, mentioning only a limited number of potential "sensitive places such as schools and government buildings." *Bruen,* at *38.  Although the Court acknowledged that other "new and analogous sensitive places" may exist, it cautioned that such potential locations would be highly limited, and certainly could not be defined so broadly as to "include all 'places where people typically congregate,'" or for New York to "effectively declare the island of Manhattan a 'sensitive place'" by claiming nearly every category of place to be a sensitive one. *Bruen,* at *38.

The concept of a "sensitive place" as used by the Court in *Bruen* and *Heller* relates to the government's control as proprietor of facilities designated for certain specific and limited government purposes. The term involves the government's relationship with the facility and the

facility's designated use — not the number or type of people who might attend an event there. In a "sensitive place," such as a courthouse designated for official judicial business, the government as proprietor enjoys the power of exclusion, just as would any other private property owner would possess.  On the other hand, the government's relationship with places like public parks and transit is entirely different.  Instead of the location being used for a designated and specific *governmental use*, the government merely manages or operates the property or public accommodation on behalf of the public and *for the public's use*, with such a location designated for public use and widely available to all comers to use for any of a variety of lawful purposes. The government is not thereafter free to single out for discriminatory treatment a subclass of citizens attempting to use or frequent those venues, who merely happen to be exercising a constitutionally-protected right while otherwise lawfully making use of the space.

As this Court has previously concluded, the CCIA "impermissibly includes numerous locations that are nonsensitive in nature…." *Antonyuk* at *88.  Indeed, the Court stated that the CCIA's list of "sensitive locations" "is precisely the definition of 'sensitive locations' that the Supreme Court in NYSRPA considered and rejected." *Antonyuk*, at *92; *see also* at *93-94 fn. 43, 44 (finding that "the Supreme Court in *NYSRPA* effectively barred the expansion of sensitive locations beyond schools, government buildings, legislative assemblies, polling places and courthouses," and explaining, with respect to "places of worship and educational institutions," that "some of the states even had contrary [permissive] statutes").  In closing, this Court stated that "the CCIA's list of 'sensitive locations' is not deeply rooted in the Nation's historical tradition of firearm regulation."  *Id*. at *94.

Interestingly enough, by indiscriminately labeling huge swaths of the state as "sensitive locations," and prohibiting *all possession* of firearms in those locations under any circumstance, it

appears that New York has returned the state of the law to what it was prior to 2020, when the Supreme Court dismissed *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) ("NYSRPA I") on mootness grounds.  What gave rise to that case was a New York City ordinance which "prohibited law-abiding New Yorkers with a license … from taking that weapon to a firing range outside the City." *Id*. at 1527 (Alito, J., dissenting from denial of cert.).  Of course, once the Court granted certiorari and the jig was up, the State quickly moved to change the city ordinance and moot the case.  *Id*.  at 1527-1528.  Yet now, under the CCIA, anyone who lives, for example, within a state park (or, like Leman, in a town within a state park), will be entirely unable to bring firearms in or out of their own homes and, thus, for a person who does not already own a firearm in the home, such person would be entirely unable to obtain one, or ever carry one when he or she leaves home.  For such persons, Second Amendment rights are entirely extinguished.

In addition to the large number of designated "sensitive locations," the CCIA also bans the carry of firearms in what it calls "a restricted location," when a person:

> enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property *has not permitted such possession by clear and conspicuous signage* indicating that the carrying of [firearms] on their property is permitted *or has otherwise given express consent*. [Ex. "1" at 19 (emphasis added).]

Violation of this prohibition, like the prohibition on "sensitive locations," is a "class E felony," conviction of which leads to the loss of Second Amendment rights for life.  Ex. "1" at 20.[30]  This provision, declaring much of the state off limits to firearms, usurps the right of land owners and makes all private property in the entire state of New York a "restricted location" by default,

---

[30] Not content with banning licensed carriers from carrying in most of New York, the CCIA would require individuals who are otherwise licensed to carry, but who are entering a "no carry" zone, remove the ammunition from their firearm and secure the firearm in an "appropriate safe storage depository out of sight from outside of the vehicle."  Ex. "1" at 25.

requiring the property owner to "opt out" of the regime by placing a "conspicuous" sign to allow the carry of a firearm in that location.  *See* Exhibit "7," ¶ 13; Exhibit "4," ¶¶ 26, 31.   In doing so, New York has again violated one constitutional right in order to violate another, taking private property without compensation, and putting it to public use in order to enact the legislature's anti-gun political agenda and deprive New Yorkers of their constitutional right to bear arms – requiring all property owners to engage in compelled speech in order to get around the state's anti-gun agenda.  *See* Exhibit "4," ¶ 27; Exhibit "7," ¶ 19.  *See National Institute of Family and Life Advocates v. Becerra*, 585 U.S. ___, 138 S. Ct. 2361 (2018) (striking down California's compelled-speech requirement that pro-life clinics post signage and provide information about abortion options).

The CCIA violates not only the Second Amendment rights of visitors to private property, but also the right of property owners to receive them.  *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) (striking down on First Amendment grounds a town ordinance requiring door-to-door canvassers to first register and receive a permit from local officials); *see also Martin v. Struthers*, 319 U.S. 141 (1943) (finding that the First Amendment protects not only "the right to distribute literature" but also "the right to receive it").

Finally, the CCIA's designation of "restricted locations" makes New York the extreme outlier among the states, where the general rule leaves it to property owners to decide whether to allow or prohibit firearms, such as through the posting of a "no guns" sign.  Even then, in some states, "no guns" signs do not carry the force of law unless they mirror specific language.[31]  This

---

[31] *See* https://bit.ly/3aTd3Sn ("… if the private property owner chooses to post a notice, it must comply with the 1-inch block-letter, contrasting color, and other requirements specified in Sections 30.06 and 30.07.").

is based on the notion that it is up to a property owner – not the legislature – to decide what sorts of persons and activities are permitted on the property.

With respect to "restricted locations," this Court previously agreed with the plaintiffs in *Antonyuk v. Bruen* that the "CCIA's definition of 'restricted locations' impermissibly encompasses *all* private property in the state," "usurp[s] ... the rights of property owners to decide things for themselves, effectively seizing people's private property and declaring it to be a gun-free zone," and marshals little to no historical support. *Antonyuk*, at \*94-95. At bottom, the Court concluded, the "CCIA's expansive definition of 'restricted locations' is not deeply rooted in the Nation's historical tradition of firearm regulation." *Id*. at \*98.

Together, the CCIA's "sensitive locations" and "restricted locations" provisions convert most of New York into a gun free zone, in violation of the First and Second Amendments. In enacting these provisions, New York has thumbed its nose at the Supreme Court, which in *Bruen* disapproved of the very situation the CCIA codifies into law.

    vi.    <u>The CCIA demands almost five-times the amount of training previously required.</u>

For years, New York implemented various training requirements in different counties and left some counties to come up with their own standards. But after *Bruen*, New York now has implemented a statewide mandate of 16 hours of classroom training, plus an additional 2 hours of live-fire. This new training requirement adds a significant time and monetary cost to the price of obtaining the license necessary to "bear arms" in New York state, of a sort that is not required prior to the exercise of any other constitutional right or, even with respect to the "disfavored" Second Amendment, by any other state except one.

Whereas training previously could be had in an evening after work, and for a modest fee (Compl. ¶ 125), training now will take multiple entire days (likely three or more), and cost

hundreds of dollars that many New Yorkers will not be able to afford.  Compl. ¶ 126-127 (explaining the range of fees being charged for the CCIA's training between $375 and $795).  In addition, the handgun ammunition expended during two hours of live-fire could conservatively be 100-200 rounds or more, at an additional cost.  *See* Exhibit "3," ¶ 27.  Of course, there are also the various licensing fees (application, fingerprinting) charged by the government.  Finally, in addition to these direct fees of licensing, if a license applicant were required to take even a single day off work to obtain the necessary training, that could run another $300 or more, on average.[32]

Altogether, Plaintiff Sloane estimates that his cost to obtain a permit "could easily exceed $1,000" before he, a typical law-abiding person, would be permitted to exercise his constitutional right to bear arms in public.[33]  *Id.*  For those who cannot afford such costs,[34] their right to bear arms is extinguished, evidencing the CCIA's clear attempt to deprive the lower earning classes of society their constitutional rights.  Yet that is precisely what the Supreme Court in *Bruen* warned against, noting that the Court would "not rule out constitutional challenges to … regimes where, for example, lengthy wait times in processing license applications *or exorbitant fees deny ordinary citizens their right to public carry*."  *Bruen*, at fn. 9.

In addition to the CCIA's means-testing the exercise of a constitutional right, the state has also required education in, among other topics, "suicide prevention."  But as Plaintiff Sloane is not suicidal (Compl. ¶ 28), this mandate has no bearing on his being a responsible gun owner and his

---

[32] *See* https://on.ny.gov/3IQ4og4 (estimating New York state's average hourly earnings to be about $36/hr. in May of 2022).

[33] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 2770, 189 L. Ed. 2d 675 (2014) is likewise analogous here, albeit in the context of the First Amendment: "[A] law that operates so as to make...beliefs more expensive in the context of business activities imposes a burden on [First Amendment Rights]."

[34] Indeed, only 44 percent of Americans report that they would be able to afford an unplanned expense of $1,000.  https://thehill.com/changing-america/respect/poverty/590453-survey-finds-over-half-of-americans-cant-afford-a-1000/

lawfully bearing arms in public, but instead operates as a platform (which he must fund) for the

state's anti-gun views, forcing his participation in government-mandated indoctrination (that guns

are icky because they can be used in suicide) as a condition of exercising his pre-existing,

enumerated rights.  Of course, New York would have no authority to demand that a person attend

journalism school before being allowed to publish an article, or to receive counseling in the

potential dangers associated with anti-government protests before being allowed to attend a

political rally.  Similarly, the state has no authority to demand 18 hours of training and the payment

of many hundreds of dollars of costs[35] prior to the exercise of an enumerated Second Amendment

right.  To the extent that the state believes it can rely on founding-era militia training statutes as

justification for its onerous training requirements, then New York, like the colonial governments,

should foot the bill for its residents' training in the proficient use of arms.

> vii.   Under *Bruen's* "historical tradition" standard of review, New York cannot come
> close to justifying any of the challenged provisions.

Under *Heller* and *Bruen*, the standard for assessing Second Amendment challenges

requires Plaintiffs to show that their conduct falls under the Second Amendment's plain text. *Bruen*

at \*20.  Plaintiffs have clearly made this showing.  Under "text, history, and tradition," the initial

analysis of the Second Amendment's plain text requires an examination of whether 1) Plaintiffs

---

[35] The CCIA's prohibitive fees are an exact example of what the Supreme Court forbade in Murdock v. Pennsylvania, 319 U.S. 105 (1943): "a flat tax imposed on the exercise of a privilege granted by the Bill of Rights."  *See also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("wealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned."); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected.... and the threat of burdensome taxes becomes acute....").  Particularly given that the fees have effectively quadrupled (or more) as part of New York's response to *Bruen*, coupled with statements from legislators and the Governor that the state refuses to accept the Court's decision, the inference is too great for much doubt that New York's onerous licensing scheme and fees are designed to infringe on Second Amendment rights.

are part of "the People" protected by the amendment (they are),[36] 2) the weapons (handguns) in

question are in fact "arms" protected by the amendment (they are),[37] and 3) the regulated conduct

falls under the phrase "keep and bear" (it does). *See id.* at *39–41 (*see Antonyuk* at *68-69, making

the same findings).  Thus, as Plaintiffs have shown that the conduct regulated by the CCIA falls

under the Second Amendment's plain text, New York must rebut the strong resulting presumption

of Second Amendment protection:

> [T]he government may not simply posit that the regulation promotes an important interest.
> Rather, the government must demonstrate that the regulation is consistent with this
> Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent
> with this Nation's historical tradition may a court conclude that the individual's conduct
> falls outside the Second Amendment's "unqualified command." [*Bruen* at *20–21.]

Defendant thus bears the burden of justifying the regulation by "affirmatively prov[ing] that [the]

firearms regulation is part of the historical tradition that delimits the outer bounds of the right to

keep and bear arms." *Bruen*, at *23.  Defendant cannot even come close.

The Second Amendment analysis "requires courts to assess whether modern firearms

regulations are consistent with" the Second Amendment's "text and historical understanding," *Id.*

at *31–32, meaning courts must examine the *original public understanding* of the right when it

was adopted. *See id.* at *42 (quoting *Heller*, 554 U.S. at 634–35) ("[W]hen it comes to interpreting

the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope

they were understood to have *when the people adopted them.*'").  Courts must consider whether

the challenged regulation finds constitutional support from directly related or analogous historical

regulation from the Founding era, which evidences adoption-era acceptance of the regulation as

---

[36] The Court in *Bruen* explicitly found that ordinary, law-abiding persons such as Plaintiffs carrying handguns in public is clearly within the bearing of arms protected by the Amendment.

[37] Numerous courts and, most importantly, the Supreme Court, have acknowledged that handguns are "arms" because they are "typically possessed by law-abiding citizens for lawful purposes," "in common use," and the "quintessential self-defense weapon[]". *Heller*, 554 U.S. at 625–27, 629; *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010); *Bruen*, at *39.

not infringing on the pre-existing right to keep and bear arms. *See id.* at *32–39; *Antonyuk* at 69. In assessing the existence of historical analogues, if any, *Heller* and *McDonald* guide courts with "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at *36.

Suffice it to say there are no founding-era analogues in accord with the CCIA's demands. In 1776, it would have been preposterous to have required William Floyd (an original signatory to the Declaration of Independence from New York)[38] to sit down with a British licensing official to receive a permit to carry a firearm.  Perhaps one of those interview questions would be, "Why do you need to carry a firearm, Mr. Floyd?" And perhaps the answer would have been, "Well governor, we intend to sign a Declaration of Independence, and withdraw our consent to be governed."  It is doubtful the Crown's licensing official would have given Mr. Floyd a license. Would Alexander Hamilton have been approved to carry a firearm if the government learned that he wrote Federalist No. 33: "If the federal government should overpass the just bounds of its authority and make a tyrannical use of its powers, the people, whose creature it is, must appeal to the standard they have formed, and take such measures to redress the injury done to the Constitution as the exigency may suggest and prudence justify"?  Likely no British "licensing officer" would have found any of this nation's Founders to have "good moral character" defined as "the essential character, temperament and judgement [sic] necessary to be entrusted with a weapon."  And because licensing for concealed firearms did not start until the 1890s, long after ratification, none of these absurd and imaginary analogues could have occurred in the first place.

Likewise, as this Court has already determined, most of the CCIA's list of "sensitive locations … impermissibly includes numerous locations that are nonsensitive in nature" (*Antonyuk*

---

[38] https://www.archives.gov/founding-docs/declaration-transcript.

at 88), many of which are challenged in Plaintiffs' Complaint.  Finally, there is no "tradition" and at best "an exception to a tradition" for the CCIA's declaration of all private property to have a default of being off-limits to firearm possession.  *Id.* at *97-98.

### B.  Plaintiffs Are Likely to Continue Suffering Irreparable Harm Absent Preliminary Relief.

"Irreparable harm is 'injury for which a monetary award cannot be adequate compensation.'" *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (citation omitted).  Further, "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *French*, 985 F.3d at 176.  Even an ephemeral constitutional violation causes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *French*, 985 F.3d at 184 (quoting *Int'l Dairy Foods Ass'n*, 92 F.3d at 71) ("The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods'….").

The CCIA declares a large portion of New York's public places to be "sensitive locations," with all private property labeled "restricted locations;" increases the training requirement to almost five-times as much as previously required thereby unnecessarily raising the cost to exercise a right; and mandates waiver of numerous First and Fifth Amendment rights in exchange for the state's permission to exercise Second Amendment rights.  Each of these constitutes an irreparable injury which an injunction can prevent.[39]  Indeed, Plaintiff Sloane has been unable even to apply for a

---

[39] Moreover, Plaintiffs' First Amendment concerns bear a striking similarity to those of the dairy-manufacturer plaintiffs who won a preliminary injunction on appeal in *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996).  In that case, Dairy manufacturers challenged a statute compelling speech, requiring labeling when a certain growth hormone had been used.  *Id.* at 69–70.  The Second Circuit found that "[b]ecause the statute at issue requires appellants to make an involuntary statement whenever they offer their products for sale . . . the statute causes the dairy

license, denied an appoint for *more than one year*, and even then cannot do so without forfeiting several constitutional rights.  Plaintiffs Johnson, Terrille, Leman and Mann are unable to go about their daily lives (something they each intend to keep doing irrespective of the CCIA) without violating the CCIA's provisions, and exposing themselves to serious and likely (if not certain) criminal prosecution.  Shockingly, Plaintiff Mann is prohibited even from possessing firearms in his own home, and Plaintiff Leman is prohibited from acquiring new firearms and bringing them home.  Finally, Plaintiff Antonyuk has had his property declared by the state to be a no-gun zone, and has been forced repeatedly to disarm himself in order to comply with the CCIA's restrictions, both of which reduce the safety and security not only of himself but also his family.  *See Antyonuk* at *50, *100.

This Court concluded in *Antonyuk* that the "Plaintiffs have made a strong showing that they will experience irreparable harm," including various "adverse factual consequences that they – and especially Plaintiff Antonyuk – will suffer if an injunction is not issued."  *Id.* at *98-99.  Since the Plaintiffs here, including Plaintiff *Antonyuk*, challenge the same provisions of the CCIA, making the same (and additional) arguments, and alleging the same (and additional) harms, Plaintiffs submit they have made the requisite showing of harm necessary for either a temporary restraining order or preliminary injunction.

### C.  The Balance of Equities Tips Overwhelmingly in Plaintiffs' Favor.

---

manufacturers irreparable harm," regardless of whether or not the compelled speech was merely commercial in nature. *Id.* at 71–72. "The wrong done" by a statute to the "constitutional right *not* to speak is a serious one," and it must be "given proper weight by [a] district court." *Id.* at 71. Here, private property and business owners must engage in compelled speech by posting "clear and conspicuous signage" to derestrict their own properties from the CCIA's mandates. Compelled speech through submitting to an "interview" by government licensing officials, or to indicate a property owner's public support for constitutionally guaranteed rights, is anathema to the First Amendment.

In assessing this injunction factor, courts "must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Yang*, 960 F.3d at 135 (quoting *Winter*, 555 U.S. at 24). This prong is closely tied to whether the injunction is in the public interest and, to satisfy it, this Court need look no further than the extensive explanation of the right to bear arms outside of the home in *Bruen*. In its zeal to engage in guerrilla warfare with the Supreme Court, New York's legislature has tripped over the Constitution in its rush to limit the rights of the people to bear arms outside the home. Rather than learning from *Bruen* that the right to keep and bear arms is no longer a "second-class right," New York turned the Second Amendment's protections into the equivalent of constitutional "steerage," unilaterally reversing the Supreme Court by trampling clearly enumerated rights. *Bruen*, at *12. Further, as explained above, the impact of the CCIA is not only to enumerated Second Amendment rights, but also to well established First Amendment rights.

### D. An Injunction Is in the Public Interest.

"[T]he public consequences in employing the extraordinary remedy of injunction" are not just the vindication of constitutional rights but also the prevention of their egregious curtailment. *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24). Here, such egregious curtailment is exactly the types of limitations that the Supreme Court warned would be unconstitutional in *Bruen*. Furthermore, although public interest is a necessary prong for injunctive relief, under *Bruen,* New York can no longer rely on the typical public safety talisman as an automatic justification for public interest. As Justice Thomas explained, "the Second Amendment does not permit—let alone require—'judges to assess the costs and benefits of firearms restrictions' under means-end scrutiny." *Bruen*, at *27.

Because Plaintiffs are part of "the people" and the CCIA infringes upon their right to "bear arms," New York carries the burden of justifying, via historical analog, how the CCIA is constitutionally permissible.  New York cannot shoulder this burden, because the CCIA consists of unprecedented restrictions and cost imposed on constitutional rights that have no historical analog. Without historical support, the public interest requirement clearly weighs in favor of the Plaintiffs, as it is always in the public interest to enjoin an unconstitutional law. *See, e.g., Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).[40]  Additionally, with respect to Plaintiff Leman in particular, his continued carrying of his firearm, unimpeded by the CCIA's absurd restrictions, is clearly in the public interest to permit him, in his duties as an emergency responder, to quickly respond in protection of life and property, without running the risk of inadvertently becoming a felon for his troubles.

As this Court previously concluded in *Antonyuk*, "Plaintiffs have made a strong showing that balance of equities tips in their favor and that the public interest would not be disserved by the Court's granting of their requested relief…." *Id*. at *99.  While the Court concluded that reference to "modern social-science studies" might be appropriate with respect to the non-merits preliminary injunction factors, the Court concluded that such studies "establish, at most, an associational relationship" between guns and crime, and moreover "fail to measure the effect of deterrence." *Id*. at *100.  Rather, the Court explained, responsible armed citizens "provide … safety" for those unable to otherwise defend themselves, which the Court found "would tip the scales in favor of

---

[40] Although Fed. R. Civ. P. 65(c) requires that a bond or other security be provided as a condition of issuing preliminary injunctions, this requirement may be dispensed with when there is no risk of financial harm. *Federal Prescription Serv. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Even courts that view Rule 65(c) as mandatory are open to the idea of the bond being set at zero. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 n.3 (4th Cir. 1999). Given the nature of this case, the Court should dispense with the bond requirement.

granting Plaintiffs' motion…." *Id.* at *101. Indeed, Plaintiffs submit that there is significant public benefit to responsible, armed citizens being free to bear arms in public, in defense of themselves, others, and the security of a free state.

## IV.   Conclusion.

For the foregoing reasons, the Court should issue a temporary restraining order prohibiting enforcement of, and then preliminarily and permanently enjoining, the challenged provisions of New York's Concealed Carry Improvement Act.

Respectfully submitted, this the <u>22nd</u> of September, 2022.

<u>/s/ Stephen D. Stamboulieh</u>
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com
NDNY Bar Roll# 703779

## <u>CERTIFICATE OF SERVICE</u>

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing

document or pleading to be electronically mailed and mailed by United States Postal Mail, postage

prepaid, to the following non-ECF participants:

**The Honorable Kathy Hochul**
Governor of New York State
NYS State Capitol Building
Albany, NY 12224
Phone:  518-474-8390
c/o James M. Thompson, Special Counsel for Second Amendment Litigation
james.thompson@ag.ny.gov
Michael McCartin, Assistant Attorney General
michael.mccartin@ag.ny.gov

**Kevin P. Bruen**
Superintendent NYS Police
nyspmail@troopers.ny.gov
1220 Washington Ave., Building 22
Albany, NY 12226
Phone:  518-783-3211

**Hon. Matthew J. Doran, County Court Judge**
Onondaga County
Phone:  315-671-1054
Fax:  315-671-1190
Onondaga Supreme & County Court Clerk's Office
505 South State Street, Suite 110
Syracuse, NY 13202
mdoran@nycourts.gov

**William Fitzpatrick, Onondaga County District Attorney**
Criminal Courthouse 4th floor
505 South State Street
Syracuse, NY 13202
Phone: 315-435-2470
Fax:     315-435-3969
Williamfitzpatrick@ongov.net
michelerobbins@ongov.net

**Eugene Conway**
**Onondaga County Sheriff's Office**
407 S. State St.

Syracuse, NY 13202
Phone:  315-435-3044
Fax:  315435-2942
eugeneconway@ongov.net

**Joseph Cecile, Chief of Police of Syracuse**
511 S State Street
Syracuse, NY 13202
315-442-5200
Via Syracuse Law Department:
law@syrgov.net

**P. David Soares, District Attorney Albany County**
6 Lodge Street
Albany, NY 12207
518-487-5460;  Fax 518-487-5093
**david.soares@albanycountyny.gov**

**Gregory Oakes, Oswego County District Attorney**
Public Safety Bldg., 39 Churchill Road
Oswego, NY 13126
Phone 315-349-3200; fax 315-349-3212
gregory.oakes@oswegocounty.com

**Don Hilton, Oswego County Sheriff**
39 Churchill Road
Oswego, NY 13126
Phone:  315-349-3304; Fax 315-342-3519
don.hilton@oswegocounty.com

**Joseph Stanzione, Greene County District Attorney**
411 Main Street, 3rd Floor
Catskill, NY 12414
Phone: 518-719-3590; Fax 518-719-3792
districtattorney@discovergreene.com

Dated: September 22nd,  2022

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh