# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, and LAWRENCE SLOANE,<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN HOCHUL, in her Official Capacity as Governor of the State of New York, KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police, Judge MATTHEW J. DORAN, in his Official Capacity as the Licensing-official of Onondaga County, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse, P. DAVID SOARES in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, In his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, and JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,<br><br>Defendants. | Civil Action No. <u>1:22-cv-986 (GTS/CFH)</u> |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs, Ivan Antonyuk, Corey Johnson, Alfred Terrille, Joseph Mann, Leslie Leman, and Lawrence Sloane ("Plaintiffs"), by and through undersigned counsel, and allege as follows:

1.      This case involves a challenge to various provisions of New York's newly minted but ineptly named "Concealed Carry Improvement Act" ("CCIA"), passed hastily in response to the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___ (2022) ("*Bruen*"). The CCIA took effect on September 1, 2022. Nevertheless, as this Court has explained, the CCIA is an "unconstitutional statute" which "reads less like [] a measured response" to the *Bruen* decision, "than a wish list of exercise-inhibiting restrictions glued together by a severability clause." *Antonyuk v. Bruen*, No. 1:22-CV-0734 (GTS/CFH), 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022), *72. Plaintiffs thus seek emergency injunctive relief, in the form of a temporary restraining order and/or preliminary injunction, halting enforcement and further implementation of this patently unconstitutional statute, until a decision on the merits can be reached.

## I.      PARTIES

2.      Plaintiff Ivan Antonyuk is a natural person, a citizen of the United States and of the State of New York, and resides in Schenectady County, New York. He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 2009, and who is eligible to possess and carry firearms in the State of New York.

3.      Plaintiff Corey Johnson is a natural person, a citizen of the United States and of the State of New York, and resides in Onondaga County, New York. He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 2019, and who is eligible to possess and carry firearms in the State of New York.

4.      Plaintiff Alfred Terrille is a natural person, a citizen of the United States and of the State of New York, and resides in Albany County, New York.  He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 1994, and who is eligible to possess and carry firearms in the State of New York.

5.      Plaintiff Joseph Mann is a natural person, a citizen of the United States and of the State of New York, and resides in Oswego County, New York.  He is a law-abiding person, who currently possesses and has maintained a New York employment related carry license since 2014, and who is eligible to possess and carry firearms in the State of New York.

6.      Plaintiff Leslie Leman is a natural person, a citizen of the United States and of the State of New York, and resides in Greene County, New York.   He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry license since 2012, and who is eligible to possess and carry firearms in the State of New York.

7.      Plaintiff Lawrence Sloane is a natural person, a citizen of the United States and of the State of New York, and resides in Onondaga County, New York.  He is a law-abiding person, who desires to apply for and obtain an unrestricted New York carry license, and thereafter to concealed carry a handgun in public for self-defense, and is (aside from not having a license) eligible to possess and carry firearms in the State of New York.

8.      Plaintiffs Antonyuk, Johnson, Terrille, Mann, Leman, and Sloane are the kind of persons discussed by the United States Supreme Court in its recent opinion in *Bruen* – that is, they are typical, law-abiding citizens with ordinary self-defense needs, who cannot be dispossessed of their right to bear arms in public for self-defense.

9.      Defendant Kathleen Hochul is sued in her official capacity as the Governor of the State of New York, elevated to that office in August of 2021 after the resignation of former

Governor Andrew Cuomo.  While other courts have found that the Governor is not a proper party in certain matters, (*see N.Y. Cty. Lawyers' Ass'n v. Pataki*, 727 N.Y.S.2d 851, 854 (NY Sup. Ct. 2001); *Antonyuk* at *41 (listing federal district court cases)), those decisions are non-binding on this Court, plus are either erroneous or distinguishable from here.  In this case, as this Court has noted, the CCIA's restrictions on sensitive locations and restricted locations apply "across the state," and the Superintendent of State Police (whose officers "are standing ready" to make CCIA arrests across the state[1]) works for the Governor.  *Antonyuk* at *41.  Moreover, Governor Hochul (1) has openly criticized and expressed contempt for[2] the Supreme Court's decision in *Bruen*, (2) took action to circumvent the Supreme Court's ruling by "merely chang[ing] the *nature* of th[e] open-ended discretion" from "proper cause" to "good moral character" (*Antonyuk* at *79-*80), (3) pushed enactment of the CCIA through the legislature and (4) signed the bill into law, and (5) subsequently has acted as the interpreter-in-chief with respect to the CCIA's provisions.  The Governor has opined on the statute's proper interpretation, and provided guidance and instructions to officials throughout the state of New York as to its implementation according to her desires.  For example, Governor Hochul (1) has instructed that the CCIA's new licensing process applies even to those whose carry license applications are already submitted and pending prior to

---

[1]  *See* statement by First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40 ("We ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law.  For those who choose to violate this law … Governor, it's an easy message.  I don't have to spell it out more than this.  We'll have zero tolerance.  *If you violate this law, you will be arrested.  Simple as that.* Because the New York state troopers are standing ready to do our job to ensure .. all laws are enforced.") (emphasis added).

[2]  https://www.foxnews.com/politics/ny-gov-hochul-defiant-supreme-court-handgun-ruling-were-just-getting-started

September 1, 2022;[3] (2) has claimed that the "good moral character" activity will involve door-to-door interviews of a person's neighbors;[4] (3) has claimed that the CCIA's plain text should not apply to certain parts of the Adirondack Park in contradiction to the wishes of the bill's sponsors;[5] and (4) has opined that the CCIA's "restricted locations" provision creates a "presumption … that they don't want concealed carry unless they put out a sign saying 'Concealed Carry Weapons Welcome Here.'" [6]  To be sure, Governor Hochul "is not the official to whom the Legislature delegated responsibility to implement the provisions of the challenged statutes" (*Pataki* at 854) but, by her actions, she certainly appears to believe that she is.  Moreover, and again, the Superintendent, who is tasked with implementing and enforcing various provisions of the CCIA, is the Governor's underling, making the Governor (whose hand is clearly at work in the Superintendent's actions) a proper Defendant.  Defendant Hochul may be served at the New York State Capitol Building, Albany, NY 12224.

10.     Defendant Kevin P. Bruen is sued in his official capacity as the Superintendent of the New York State Police.  As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including prescribing the form for Handgun Carry License applications. As this Court has explained, Defendant Bruen is the proper party with respect to Plaintiffs' challenge to the CCIA's

---

[3] https://buffalonews.com/news/local/crime-and-courts/hochul-last-minute-pistol-permit-seekers-may-have-waited-too-long-to-avoid-nys-new/article_ad5100a0-2943-11ed-af06-cbe41e631955.html

[4] https://nypost.com/2022/09/01/mayor-eric-adams-vows-door-to-door-checks-on-gun-permits/amp/?fr=operanews

[5] https://www.reuters.com/legal/new-york-gun-bans-alarm-residents-upstate-bear-country-2022-08-12/

[6] https://gothamist.com/news/supreme-court-new-york-guns-hochul-

training requirements (for new or renewed licenses), along with the CICA's sensitive locations and restricted locations prohibitions (with respect to state police enforcement). *Antonyuk* at *44. Defendant Bruen may be served at the New York State Police, Building 22, 1220 Washington Avenue, Albany, NY, 12226.

11.    Onondaga County Judge Matthew J. Doran is a County Court judge of Onondaga County, New York. Defendant Doran is a "licensing officer" for Onondaga County described in N.Y. Penal Law § 265.00(10) and, as such, is responsible for the receipt and investigation of carry license applications, along with the issuance or denial of carry licenses. N.Y. Penal Law § 400.00. Defendant Doran is the proper party with respect to Plaintiffs' challenge to the CCIA's requirement and definition of "good moral character," along with its associated requirements of an in-person interview, disclosure of a list of friends and family, provision of four "character references," and provision of three years of social media history. Defendant Doran may be served at The Honorable James C. Tormey III Criminal Courthouse, 505 S. State Street, Syracuse, New York, 13202. Judge Doran's fax number is 315-671-1190.

12.    Defendant William J. Fitzpatrick is the Onondaga County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Onondaga County, including all crimes under N.Y. Penal Law § 265.00 *et seq*. *See* County Law § 700(1). Defendant Fitzpatrick stated at a press conference that violators of the CCIA will have their weapons confiscated while prosecutors investigate any other criminal activity.[7] Additionally, he stated that violators' cases would be "referred to the judge who granted them concealed-carry licenses in the first place, possibly leading to the revocation of their carry privileges." *Id*. While

---

[7] https://www.syracuse.com/crime/2022/09/syracuse-da-police-chief-we-wont-target-gun-owners-under-new-law-but-will-take-gun.html.

Defendant Fitzpatrick commendably "slammed the new legislation," he has not completely disavowed enforcement of the CCIA, instead threatening to confiscate lawfully owned firearms, while referring the matter to the courts for revocation of a constitutional right to public carry of a firearm. *Id.* *See* Exhibit "2," at ¶ 23 (Declaration of Corey Johnson). Defendant Fitzpatrick's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA. Defendant Fitzpatrick is sued in his official capacity, and may be served with process at the Criminal Courthouse, 4th Floor, 505 South State Street, Syracuse, NY 13202.

13. Defendant Eugene Conway is the Sheriff of Onondaga County, New York, with county-wide jurisdiction to enforce the laws of the State of New York, including the CCIA. Defendant Conway's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA. Additionally, Sherriff Conway is the official to whom residents of Onondaga County submit their applications for firearms licenses. The "Pistol License Unit" within the Sheriff's office "is responsible for maintaining pistol license files, issuing new NYS pistol licenses, processing license holder's amendments, process[ing] pistol license suspensions & revocations, conduct[ing] criminal investigation of pistol licensees when warranted and conduct[ing] deceased pistol licensee investigations."[8] Sheriff Conway requires, as a preliminary threshold step, an applicant for a license to schedule an "appointment" in order to turn in the required paperwork. With respect to scheduling an appointment, the Sheriff's website states that "[i]n order to proceed … [a]ll four (4) Character Reference Forms [must be] completed and signed" and "[y]ou have attended and received a certificate from one of the APPROVED Handgun Safety Course Certified Instructors."[9] A person is instructed not to even schedule an appointment until the application

---

[8] https://sheriff.ongov.net/pistol-license-unit/
[9] https://sheriff.ongov.net/pistol-license-unit/appointment-requirements/

prerequisites have been met, and that "[i]ncomplete applications will not be processed at the time of your appointment.  Your entire application will be returned to you and you will be instructed to reschedule your appointment."  *Id.*  To the extent that the Sheriff's custom, practice, or policy independently requires that an applicant provide four character references, that custom, policy, or practice is unconstitutional for the same reasons that New York State's four character references are unconstitutional.  The Sheriff may be served with process at 407 S State St, Syracuse, NY 13202.

14.     Defendant Joe Cecile, the Chief of Police of the Syracuse Police Department is the "final authority in all matters of Department policy, operations and discipline."[10]  Chief Cecile has not disavowed enforcement of the CCIA, claiming instead only that his office will "not be proactively enforcing the new law by trying to catch legal gun-owners in prohibited locations."[11]  However, Chief Cecile has expressly stated that he *would* enforce the CCIA on a "complaint driven" basis.  Defendant Cecile's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA.  He may be served with process at 511 S. State Street, Syracuse, New York, 13202.

15.     Defendant P. David Soares is the Albany County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Albany County, including all crimes under N.Y. Penal Law § 265.00 *et seq.*  *See* County Law § 700(1).  Defendant Soares is sued in his official capacity, and may be served with process at the Albany County Judicial Center, 6 Lodge Street, Albany, New York, 12207.

---

[10] https://www.syracusepolice.org/listing.asp?orgId=83.
[11] https://www.syracuse.com/crime/2022/09/syracuse-da-police-chief-we-wont-target-gun-owners-under-new-law-but-will-take-gun.html.

16.     Defendant Gregory Oakes is the Oswego County District Attorney, and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Oswego County, including all crimes under N.Y. Penal Law § 265.00 *et seq*.  *See* County Law § 700(1).  Defendant Oakes is sued in his official capacity, and may be served with process at the Public Safety Building, 39 Churchill Road, Oswego, NY, 13126.

17.     Defendant Don Hilton is the Sheriff of Oswego County, New York, the department head of the Oswego County Sheriff's Office, the law-enforcement entity which provides "county-wide coverage … includ[ing] road patrol, civil, court security, marine and snowmobile patrol, and criminal investigation division" within Oswego County.  Defendant Hilton has been a vocal critic of the CCIA, expressed his opinion that it is unconstitutional, yet (1) has stated that the CCIA is the law in New York whether he agrees with it or not, (2) stated that his office would engage in "enforcement" (albeit "very conservative enforcement") of the CCIA, and (3) has specifically explained how carrying a firearm in churches is a felony carrying significant potential penalties. *See* Exhibit "8," at ¶ 24, Declaration of Joseph Mann.  Defendant Hilton's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA.  Defendant Hilton is sued in his official capacity, and may be served with process at 39 Churchill Rd, Oswego, NY 13126.

18.     Defendant Joseph Stanzione is the Greene County District Attorney and has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Greene County, including all crimes under N.Y. Penal Law § 265.00 *et seq*.  *See* County Law § 700(1).  Defendant Stanzione is sued in his official capacity, and may be served with process at 411 Main Street, Catskill, New York 12414.

## II.      JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202 and 42 U.S.C. §§ 1983 and 1988.

20.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

21.     Previously, Plaintiff Antonyuk brought a challenge to the CCIA in *Antonyuk v. Bruen*, No. 1:22-CV-0734 (GTS/CFH), within this district, together with Gun Owners of America, Inc., Gun Owners Foundation, and Gun Owners of America New York, who were representing the interests of their members and supporters, including individual Plaintiffs named herein.

22.     This Court concluded that, based on Second Circuit precedent, that no representational standing can be had for Section 1983 claims. *Antonyuk* at 53-54. Although Plaintiffs separately brought causes of action directly under the Constitution, the Court concluded, again based on Second Circuit precedent, that a plaintiff cannot bring such an action when Section 1983 provides a remedy. *Id*. at 54-55. Boxed in on both sides, there is no way for organizations to vindicate the constitutional rights of their members and supporters within this Circuit. *Id*. at 55.

23.     As the individual Plaintiffs named above (who are all members of Gun Owners of America, Inc.) were not able to proceed in a representational capacity, they now bring this action as individuals asserting their own interests – making the same challenges, raising the same causes of action, and seeking the same relief as previously.

24.     Unexpectedly, Governor Hochul called this Court's *Antonyuk* "decision … just and right," apparently not cognizant that, although dismissing on standing grounds, this Court's "judicial dictum" explained in detail how the large majority of the CCIA's provisions are patently unconstitutional.[12]

---

[12] https://www.governor.ny.gov/news/statement-governor-kathy-hochul-dismissal-preliminary-injunction-antonyuk-v-bruen.

III.    STATEMENT OF FACTS

a.  The Second Amendment.

25. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

26.    In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly-uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Heller*, 554 U.S. at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

27.    Then, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791.

28.    In *Caetano v. Massachusetts,* 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding …" and that this "Second Amendment right is fully applicable to the States[.]" *Id.* at 411, 416.

29.    As the Supreme Court has now explained in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside

the home," free from infringement by either federal or state governments. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___ (2022), Slip Op. at 1.

30.    Importantly, in addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry" (Slip Op. at 29, fn 9), *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges.

31.    Prior to *Bruen*, the Second Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we 'determine whether the challenged legislation impinges upon conduct protected by the Second Amendment,' and second, if we 'conclude[] that the statute[] impinge[s] upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny.'" *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45, 55 (2d Cir. 2018). *See also Bruen*, Slip Op. at 10 fn. 4 (collecting cases using two-part test).  Other circuit courts also had adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected.  *See Heller* at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd* 742 Fed. Appx. 218 (9th Cir. 2018) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit.").

32.    Rejecting this widespread atextual, "judge empowering" (*Bruen*, Slip Op. at 13) interest-balancing approach, *Bruen* directed (again) the federal courts to first principles, to assess the text of the Second Amendment, informed by the historical tradition.  *Bruen*, Slip Op. at 10.

33.    First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, Slip Op. at 8.

12

34.     Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, Slip Op. at 8. (citation omitted).

35.     Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen*, Slip Op. at 30-51 (discussing the lack of relevant historical prohibitions on concealed carry in public).

36.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed." Period. There are no "ifs, ands or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's justification for or interest in infringing the right. It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public

understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868. *Bruen*, Slip Op. at 29.

37.     Lest there be any doubt, the Supreme Court has also instructed as to the scope of the protected persons, arms, and activities covered by the Second Amendment.

38.     First, *Heller* explained that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, at 580.  *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'[T]he people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*.

39.     Second, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Id*. at 581.  The Court explained that "'[k]eep arms'" was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id*. at 583.  Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id*. at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id*.  *Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, Slip Op. at 23.

40.     Third, with respect to the term "arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582.  Indeed, the "arms" protected by the Second Amendment include "weapons of offence, or armour of defence… Arms are any thing

that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, at 581 (punctuation omitted).

41.    Finally, it is worth nothing that, in addition to clearly establishing the framework by which lower courts are to analyze Second Amendment challenges, *Bruen* also provided several additional guideposts which are relevant to New York's CCIA challenged here.

42.    First, the Court rejected the statutory schemes of "may issue" states such as New York, whereby "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria," such as when "the applicant has not demonstrated … suitability for the relevant license." *Bruen,* Slip Op. at 5.  Rather, the Court pointed to "'shall issue' jurisdictions" wherein licenses are issued "whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen,* Slip Op. at 4.

43.    Second, the Court explained that states have extremely narrow latitude to limit the places where firearms may be carried in public, mentioning only "sensitive places such as schools and government buildings," along with "legislative assemblies, polling places, and courthouses." *Bruen,* Slip Op. at 21, 37.  Although the Court acknowledged that other "new and analogous sensitive places" may exist, such potential locations would be highly limited, and certainly cannot be defined so broadly as to "include all 'places where people typically congregate'" or for New York to "effectively declare the island of Manhattan a 'sensitive place'" by claiming nearly every category of place to be a sensitive one.[13]  *Bruen,* Slip Op. at 22.

---

[13] Plaintiffs note that neither *Heller* nor *Bruen* definitively determined any particular type of place to be a sensitive place, but only noted that certain narrow types of locations historically have been restricted to the bearing of arms.  Indeed, the question of any particular sensitive place was not before the Court in those cases.  *Heller*, for example, stated only that the Court's opinion should not "cast doubt upon" certain "longstanding prohibitions."  *Id*. at 626.  Moreover, *Bruen* seemed

44.     Third, the *Bruen* court acknowledged the inherent risk in *all* permitting schemes, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen,* Slip Op. at 30 n.9.

45.     But in spite of the Supreme Court's clear pronouncements in *Bruen*, New York apparently did not 'get the memo.' On the contrary, rather than representing a good-faith attempt to bring New York law into compliance with the Second Amendment and the *Bruen* decision, the CCIA instead doubles down, flouting the people's right to keep and bear arms and, in fact, creating a far more onerous and restrictive concealed carry scheme even than that which existed prior to the *Bruen* decision (if such thing is possible).

46.     This Court's intervention is therefore necessary, to again make it clear to New York that it is not free to thumb its nose at the text of the Second Amendment, and the opinions of the Supreme Court, and that the Second Amendment is neither a "constitutional orphan" or a "second-class right." *See Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Thomas, J., dissenting from denial of certiorari); *McDonald*, at 780; *Bruen*, Slip Op. at 62.

   **a.   New York's Gun Control Regime.**

47.     New York represents an extreme outlier among the states, imposing all manner of severe infringements on the constitutional right to keep and bear arms.

---

to anticipate that a challenge even to such "longstanding prohibitions" might occur, explaining only that "courts can use analogies … to determine whether modern regulations are constitutionally permissible," including in "schools and government buildings." *Id*. at 2119.  Thus, Plaintiffs do not concede the constitutionality of any such restriction.

48.     For example, New York requires a permit simply to purchase and possess any handgun.  Every handgun is thus registered with the state, and the serial number is affixed to the permit. *See* N.Y. Penal Law § 400.00(3).

49.     This requirement creates a de facto waiting period, due to the significant delay in issuance of such a permit, which New York estimates applicants "should expect [] to take a minimum of four months from the time of application until a license is either granted or denied."[14]

50.     Next, the 2013 New York "Safe Act" banned newly acquired so-called "assault weapons," while requiring registration of existing firearms for those individuals who had them.[15]

51.     So-called 'large capacity' magazines (which are really standard capacity magazines commonly sold in almost every other state) are generally banned in New York, subject to some exemptions.  *See* NY Pen. Law § 265.00(23); NY Pen. Law § 265.02(8).

52.     New York Requires background check for every firearm transfer,[16,17] including private sales, and requires a non-licensee to first notify the state that they are disposing (*i.e.*, selling) a firearm (N.Y. Penal Law § 265.10(7)).

53.     In order to simply possess a handgun, a person first must obtain permission from the state which includes, at minimum, a premise permit which permits one only to possess a handgun within the home or place of business, but does not permit the person to take the handgun outside of the home, subject to few exceptions, such as traveling to a shooting range, shooting competition, or another dwelling where the licensee is authorized to take the firearm. *See* N.Y. Penal Law § 400.00(6).

---

[14] *See* https://www.ny.gov/services/how-obtain-firearms-license
[15] *See* https://safeact.ny.gov/resources-gun-owners.
[16] Transfers between immediate family members are exempt. *See* https://safeact.ny.gov/resources-gun-dealers.
[17] *See* https://safeact.ny.gov/resources-gun-dealers.

54.     In order to carry a firearm outside the home, a person must obtain a carry permit, which could be "restricted" to allow carry only in certain places specifically identified on the license itself.  *Id.*  Indeed, a New York state carry license does not apply in New York City, which has its own permitting scheme.  *See* N.Y. Penal Law § 400.00(6) (discussing New York City's application process).[18]

55.     Moreover, refusing to participate in the "reciprocity" agreements that are common between states across the country, New York does not honor the concealed permits of any other state.

56.     The difference between "restricted" and "unrestricted" permits was created not by the legislature, but rather by the judiciary, with judges adding various restrictions to licenses to carry.  *See O'Brien v Keegan*, 87 N.Y.2d 436 (N.Y. 1996) ("It was not unreasonable for licensing officer to restrict petitioner's unrestricted carry concealed license to hunting and target shooting in view of petitioner's inability to show need for unrestricted license, which would permit him to carry several concealed firearms.").

57.     "Open carry," meaning the unconcealed carry of a firearm, although legal in most states even without a permit, is entirely illegal in New York, as a carry license (authorizing only concealed carry) is the only way to carry a firearm outside the home.

58.     Finally, prior to *Bruen*, New York law required that a person demonstrate a "proper cause" as a condition necessary to obtain a license to carry a firearm in public.  Proper cause had been interpreted to mean "a special need for self-protection distinguishable from that of the general

---

[18] *See also* https://www1.nyc.gov/site/nypd/services/law-enforcement/permits-licenses-firearms.page, and https://licensing.nypdonline.org/new-app-instruction/.

community or of persons engaged in the same profession." *Kaplan v. Bratton*, 249 A.D.2d 199, 201, 673 N.Y.S.2d 66, 68 (App. Div. 1st Dept. 1998).

59.     In practice, ordinary persons with typical self-defense needs were found not to have "proper cause," and few New York residents were able to obtain a permit.  *See Kaplan, supra*; *see also Klenosky v. N.Y.C. Police Dep't*, 53 N.Y.2d 685 (1981); *see also Matter of Agro v. Shea*, 2022 NY Slip Op 30816(U) (Sup. Ct.).  The end result was a statutory scheme that wholly deprived ordinary citizens of the ability to armed self-defense outside the home.

60.     Yet although this nation's highest court recently rejected the New York statutory scheme, the recently enacted CCIA largely ignores the Court's decision, acting as if it is business as usual in the state.

### c.   New York's Most Recent Unconstitutional Gun Control – the CCIA.

61.     After the Supreme Court's complete rejection of New York's restrictive "may issue" carry scheme, the state legislature immediately went to work to craft new and improved ways to infringe on New Yorker's Second Amendment rights, seemingly to impose retribution on New York gun owners for successfully challenging its prior statute.

62.     Unhappy with the Supreme Court's opinion, and searching for ways to continue to restrict the ordinary New Yorker's ability to armed self-defense outside the home, the new Governor of New York, Kathleen Hochul, who took the place of former Governor Andrew Cuomo, called an extraordinary session of the New York State Legislature for the purpose of enacting a new statutory scheme (the CCIA), designed to give the appearance of compliance with *Bruen*, but in reality thwarting and bypassing the Supreme Court's decision.

63.     The Governor herself issued several statements critical and disrespectful of the Supreme Court's ruling: "[t]he Supreme Court's reckless and reprehensible decision to strike down

New York's century-old concealed carry law puts lives at risk here in New York,"[19] and "[a] week ago, the Supreme Court issued a reckless decision removing century-old limitations on who is allowed to carry concealed weapons in our state — senselessly sending us backward and putting the safety of our residents in jeopardy[.]"[20]  In other words, the Governor appears to have no desire to comply with the Supreme Court's *Bruen* decision, and every intention to thwart and undermine it through signing the CCIA into law, as a sort of guerrilla warfare against the Supreme Court, the rule of law, and the Second Amendment.

64.    This new bill, rushed through the extraordinary session and passed without the required public posting, comment and debate, has now introduced a slew of new, unprecedented, and blatantly unconstitutional impediments to New Yorkers in their attempt to exercise their constitutional right to armed self-defense outside the home.

65.    The bill, ironically called the Concealed Carry *Improvement* Act, is New York's attempt to flout the Supreme Court's holding in *Bruen*.  Instead of complying with that decision, the Assembly and Senate, with the Governor's glowing approval, have promulgated several blatantly unconstitutional new infringements of the enumerated right to keep and bear arms.

66.    A true and correct copy of the Bill is attached as Exhibit "1" to the Complaint.

### i.  Good Moral Character.

67.    To be sure, the CCIA removes the now-unconstitutional "proper cause" requirement from the prior statute.  In its place, the CCIA defines the malleable term "good moral character" to now mean "having the essential character, temperament and judgement necessary to

---

[19] https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-begin-june-30.

[20] https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions.

be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others….." Exhibit "1" at 2; *Antonyuk* at *70.

68.     However, the Second Amendment does not leave it up to the state of New York to decide whether to "entrust[]" its citizens with arms. Rather, the right of all "the people" (not just the government's chosen favorites) "shall not be infringed."

69.     The concept of "good moral character" is a standardless notion, inevitably open to subjective interpretations by licensing individuals across the state who, based on history, may wish to continue to deny the law-abiding citizens of New York the ability to defend themselves in public. An "I'll know it when I see it" standard for bestowing the privilege of licensure is a concept entirely foreign to the Second Amendment. *Antonyuk* at *80 ("New York State's new definition of 'good moral character' does not in fact remove the open-ended discretion previously conferred….").

70.     As recently interpreted by a New York federal court, "[g]ood moral character is more than having an unblemished criminal record. A person of good moral character behaves in an ethical manner and provides the Court, and ultimately society, reassurance that he can be trusted to make good decisions." *Sibley v. Watches*, 501 F. Supp. 3d 210, 219 (W.D.N.Y. 2020)

71.     Yet, as noted above, the *Bruen* Court expressly rejected such a statutory scheme, which "grant[s] licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*." *Bruen*, Slip Op. at 4-5 (emphasis added). If a decision whether a person has "good moral character" is not a judgment about "suitability" to carry firearms, it is hard to see what would be. Indeed, as this Court has explained, the CCIA "merely changes the *nature* of that open-ended discretion." *Antonyuk,* at *79-80 and n.38.

72. Likewise, writing in concurrence in *Bruen*, Justice Kavanaugh rejected a "feature[] of New York's regime — the unchanneled discretion for licensing officials … in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" (Kavanaugh, J., concurring, Slip Op. at 2).

73. Yet that is precisely what the CCIA permits, allowing licensing officials unbridled discretion to decide whether to "entrust[]" a person with constitutional rights, and to "require … such other information … that is reasonably necessary" to making that determination, another open-ended grant of authority, thus opening the door to a host of abuses, unequal enforcement, arbitrary and capricious, actions and the further erosion of the Second Amendment through the exercise of unbridled power and "unchanneled discretion." As this Court has noted, "licensing officials may not arbitrarily abridge … the Second Amendment right … of self-defense … based on vague, subjective criteria." *Antonyuk* at *80.

74. Plaintiffs challenge the idea that, in addition to indisputably being part of "the people" protected by the Second Amendment, that they must prove they have "good moral character" to the satisfaction of a New York State licensing official. Plaintiff Sloane must make this showing in order to qualify for a license, while the other plaintiffs who already have licenses must maintain this status or else their licenses will be revoked.

       **i. List of Household Members and Family, In Person Meetings, Social Media, and "Character References."**

75. In addition to requiring an applicant to demonstrate (and maintain) "good moral character," as defined, the CCIA imposes a litany of demands on those seeking a New York carry permit, including a requirement that the applicant "shall meet in person with the licensing officer for an interview and shall, in addition to any other information or forms required by the license application submit to the licensing officer the following information:

22

i.        names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home;

ii.       names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others;

iii.     certification of completion of the training required in subdivision nineteen of this section;

iv.     a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants [sic] character and conduct as required in subparagraph (ii) of this paragraph; and

v.       such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."

*See* Exhibit "1" at 4-5.

76.     Each of these requirements is part of the "good moral character" requirement is ripe for abuse and discrimination, in that each is designed to allow a licensing official to determine if a person has the good moral character necessary to be "entrusted" with a license, by assessing one's demeanor during an interview, discussing one's temperament and behavior with friends,

family, and character references, and reviewing a person's history of speech and discourse on social media.

77.    In addition to constituting the State's blatant infringements of the Second Amendment right to keep and bear arms, several of the CCIA's demands (conditions of qualifying for a carry license) also represent gross infringements of applicants' First and Fifth Amendment rights.

78.    For example, demanding the names and contact information (presumably for interrogation by licensing authorities) of relatives and co-habitants violates the First Amendment right of association, along with anonymity rights of those who do not want to be contacted by government officials, or have their information entered into a government database.  The idea that constitutional rights can be conditioned on the government first interrogating *one's children* (even if adults) is particularly noxious, and no doubt is designed to serve as a deterrent to seeking licensure, due to the natural parental instinct to protect.  In fact, New York City Mayor Eric Adams has claimed that "police officers" would be "knocking our [sic] neighbors' doors, speaking to people, finding out who this individual is that we are about to allow to carry a firearm in our city."[21]

79.    Demanding a list of and potentially access to some vague class of "social media accounts of the applicant" in order to issue a permit to carry a concealed weapon requires disclosure of protected First Amendment speech and press as a condition of exercising another protected constitutional right, and violates the Fifth Amendment right against self-incrimination.

80.    Next, applicants must provide four character references to the government as a condition of exercising Second Amendment rights.  Unsurprisingly, other constitutional rights are not predicated upon what others think about you, or conditioned on having friends who will agree

---

[21] https://nypost.com/2022/09/01/mayor-eric-adams-vows-door-to-door-checks-on-gun-permits/

to stand up to government interrogation and scrutiny (or retaliation) in order to help another obtain

a carry license.  Notwithstanding that, those who do not have four "character references" (such as

new arrivals to the state) presumably will be unable to exercise their Second Amendment rights.

Exhibit "1" at 5.

81.      Making matters worse, the CCIA demands that "character references" attest that

the applicant "has not engaged in any acts, or made any statements that suggest they are likely to

engage in conduct that would result in harm to themselves or others."  *Id*. at 5.  Of course, requiring

someone to be in the omniscient position to attest that another person has not engaged in "*any act*"

or made "*any statements*" of a certain nature seems a tall order indeed.  *See Antonyuk* at *81.

82.      Next, the requirement that nothing "suggest [an applicant is] likely to engage in

conduct that would result in harm [justified or not] to themselves or others" is an open-ended and

vague standard, as one hundred percent of those applying for a permit to carry a handgun in public,

by definition, could be said to be "likely" to "harm" a carjacker through the morally legitimate and

entirely lawful act of self-defense.  *See Antonyuk* at *70-79.

83.      It is axiomatic that the exercise of one constitutional right cannot be conditioned on

the forfeiture or violation of another.  *See, e.g., Simmons v. United States*, 390 U.S. 377 (1968)

(rejecting a situation where a defendant was forced to forfeit his Fifth Amendment right to keep

silent in order to assert his Fourth Amendment right, calling that a "condition of a kind to which

this Court has always been peculiarly sensitive," and concluding it to be "intolerable that one

constitutional right should have to be surrendered in order to assert another.")  *Id*. at 393-94.  *See

also Perry v. Sindermann*, 408 U.S. 593 (1972) (the government may not deny a person a benefit

"on a basis that infringes his constitutionally protected interests ... For if the government could

deny a benefit to a person because of his constitutionally protected [rights], his exercise of those

freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly ... Such interference with constitutional rights is impermissible.") *Id*. at 597. (punctuation omitted). *See also Antonyuk* at *84-85.

### iii. Sensitive Locations.

84. The CCIA next creates a new Section 265.01-e entitled "Criminal Possession of a firearm, rifle or shotgun in a sensitive location." Exhibit "1" at 16.

85. The list of "sensitive locations" contained in this section is extensive, and serves to bar the carry of firearms in most public places.

86. "Sensitive location" is defined as:

(a) any place owned or under the control of federal, state or local *government*, for the purpose of government administration, including courts;

(b) any location providing *health*, behavioral health, or chemical dependance *care* or services;

(c) any place of *worship* or religious observation;

(d) libraries, public *playgrounds*, public *parks*, and *zoos*;

(e) the location of any program licensed, regulated, certified, funded, or approved by the office of *children and family services* that provides services to children, youth, or young adults, any legally exempt *childcare provider*; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;

(f) nursery *schools*, *preschools*, and summer *camps*;

(g) the location of any program licensed, regulated, certified, operated, or funded by the office for people with *developmental disabilities*;

(h)  the location of any program licensed, regulated, certified, operated, or funded by office of *addiction* services and supports;

(i) the location of any program licensed, regulated, certified, operated, or funded by the office of *mental health*;

(j)  the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and *disability* assistance;

(k) homeless shelters, runaway homeless youth *shelters*, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;

(l) *residential settings* licensed, certified, regulated, funded, or operated by the department of health;

(m) in or upon any building or grounds, owned or leased, of any *educational institutions*, *colleges and universities*, licensed private career *schools*, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;

(n) any place, conveyance, or vehicle used for *public transportation* or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;

(o)  any establishment issued a license for on-premise *consumption* pursuant to article four, four-A, five, or six of the *alcoholic beverage* control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;

(p)  any place used for the *performance, art* entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;

(q) any location being used as a *polling place*;

(r) any *public sidewalk* or other public area *restricted from general public access* for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;

(s) ***any gathering of individuals to collectively express their constitutional rights to protest or assemble***;

(t)  the area commonly known as *Times Square*, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

*See* Exhibit "1" at pp. 16-18.

28

87.     In any of these dozens of types of places (which, in some instances, include persons' homes), firearms of any kind are completely banned, regardless of whether they are being used, carried, or merely stored.

88.     The CCIA has certain exemptions, including for the police, certain government employees engaged in the course of their duties, persons engaged in hunting, and persons operating a "program" in a "sensitive location out of their residence."  Exhibit "1" at 19.

89.     Unlawful possession of a firearm in any of these 20 categories of "sensitive locations" is a Class E Felony, conviction of which leads not only to a lengthy sentence but also to the permanent loss of Second Amendment rights.

90.     First, going far beyond the Supreme Court's sanction of "government *buildings*" as "sensitive places" (*Bruen*, Slip. Op. at 5), the CCIA declares "any *place* owned or under the control of federal, state or local government, for the purpose of government administration" to be a sensitive location.  Subsection (a).  This could be read to cover, for example, even public protests in Albany, attended by Plaintiffs Terrille[22] and Johnson[23] which have occurred in the public square and public streets in Empire State Plaza – hardly a sensitive place.

91.     Next, the CCIA widely bans firearms in any place offering healthcare or other medical related services (subsection b) and any "place of worship or religious observation" (subsection c).  Each of these restrictions applies not only to customers/visitors to a business and members of a church congregation, but also the proprietor (a doctor, dentist, massage therapist, acupuncturist, chiropractor, etc.) or pastor of a church.  *See* Exhibit "8," Declaration of Mann, ¶¶ 4, 12-15. Even for the *owners* of private property whose property has been declared a "sensitive

---

[22] *See* Exhibit "9," Declaration of Alfred Terrille, ¶ 18.
[23] *See* Exhibit "2," Declaration of Corey Johnson, ¶ 15.

location," carry is entirely off limits, and there is no ability for such persons to "opt out" of being a "sensitive location." For example, Plaintiff Mann, a pastor, cannot possess a firearm in his own church and, indeed, in his own home which is connected to the church. *Id*. at ¶ 12.

92. Indeed, the City of New York recently issued a letter to holders of "an active premise business, limited carry, special carry, or carry business license," threatening that the CCIA's new prohibition on firearms in a "sensitive location" "is a Class E Felony" and threatening that the licensee's "continued possession of a firearm at this location is unlawful." *See* Exhibit "5." (emphasis original). The NYC publication continues "*IF* **YOUR BUSINESS IS IN A SENSITIVE LOCATION … YOU ARE NO LONGER ABLE TO LAWFULLY POSSESS A FIREARM AT THAT LOCATION.**" *Id*. (emphasis original).

93. In fact, for Plaintiff Mann, or for a person "providing health, behavior health, or chemical dependence care or services" (such as Pastor Mann's counseling of congregants) *out of the home*, the CCIA completely eliminates such persons' Second Amendment rights, in that possession of any firearm in that "location" (the home) is flatly prohibited. Exhibit "1" at 16. See also Declaration of Mann, Exhibit "8," ¶¶ 26, 28, 29. Indeed, the only exception the CCIA provides is for "persons operating *a program* in a sensitive location out of their residence [sic], as defined by this section, which is licensed, certified, authorized, or funded by the state or a municipality…." Exhibit "1" at 19 (emphasis added). Whereas certain places in the list of "sensitive locations" use the word "program" (subsections e, g, h, i, j, and k), neither the "place of worship" subsection (b) nor the healthcare subsection (c) uses that word. Likewise, "any gathering of individuals to collectively express their constitutional rights to protest or assemble" that occurs *even within the home* (such as a Bible study held at Plaintiff Mann's home) would be a gun-free zone (subsection s). Exhibit "1" at 18. *See also* Declaration of Mann, Exhibit "8," ¶¶ 13, 32.

30

94.     In other words, parts of the CCIA make it a felony to keep an operable firearm in the home for self-defense. *But see Heller* at 635 ("we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.").  For that reason, these provisions of the CCIA are void on their face, without further analysis.

95.     The CCIA next prohibits firearms in various places (subsections d and f), including "libraries, public playgrounds, public parks, [] zoos … nursery schools, preschools, and summer camps," presumably due to nothing more than these being places where children are often present. Of course, there is no historical analogue for banning firearms in locations simply based on the presence of children and, quite to the contrary, children are a class of persons in much need of protection by armed and vigilant parents, grandparents, teachers, pastors, guardians, etc., including Plaintiff Terrille's grandchildren, and Pastor Mann's students and youth congregation. *See* Declaration of Alfred Terrille, Exhibit "9," ¶¶ 7, 8, 19.  *See* Declaration of Mann, Exhibit "8," ¶¶ 30, 31.The CCIA declares that these and other children cannot be protected, creating gun-free zones that are known to be targets of criminals who, by definition, do not obey the law – even if clearly posted by conspicuous signage.

96.     Next, the CCIA bans (subsection k) firearms in locations that provide services for the homeless, runaways, youth, families, and victims of domestic violence.  But again, these vulnerable populations are either often in greater than ordinary need of protection, such as a battered wife counseled by Plaintiff Mann, or themselves may present a risk to others, such as the drug addicts helped by the Pastor's church. *See* Declaration of Mann, Exhibit "8," ¶¶ 26, 27.

97.     The CCIA next, far too broadly (subsection m), sweeps into its ambit any type of "building or grounds" owned by any school or university – of any sort.  Presumably, this would

eliminate the numerous skeet, shooting, and ROTC ranges located on the grounds of several colleges and universities within the State of New York.[24]  Moreover, it would seem to apply not only to public grade schools (of the type discussed in *Heller*), but also would deprive *private* schools, *church* schools, and even *home* schools (such as the one that holds classes at Pastor Mann's church) from self-determination as to how best to provide protection for their students – including usurping and undermining parents' decisions how best to protect their own children under their own care and *within their own home*.  *See* Declaration of Mann, Exhibit "8," ¶ 31.

98.    Next, the CCIA broadly and without nuance prohibits firearms within all sorts of public transportation (subsection n), which would conflict with federal law (18 U.S.C. Section 926a) and regulation,[25] and prohibit Plaintiff Terrille even from, consistent with TSA regulations, checking his firearm into his luggage at the airport on his upcoming trip (Declaration of Alfred Terrille, Exhibit "9," ¶¶ 9, 11), or Pastor Mann's church from using the church van and bus for a skeet shooting trip by men in the congregation (*See* Declaration of Mann, Exhibit "8," ¶ 33.).

99.    Next, the CCIA prohibits (subsection o) firearms in places where alcohol is served, regardless of whether a person (like Plaintiffs Johnson[26] and Terrille[27]) is actually consuming alcohol, and even when eating with their families in nowhere near the general vicinity as the bar in a family restaurant – even if it is not in operation (such as during Sunday morning brunch).

100.    Next, the CCIA broadly bans (subsection p) firearms at "any place used for the performance, art entertainment, gaming, or sporting events," even though there is nothing "sensitive" about these places other than being places where people gather.   This would keep

---

[24] *See* https://competitions.nra.org/competitions/nra-national-matches/collegiate-championships/collegiate-shooting-sports-directory/
[25] https://www.tsa.gov/travel/transporting-firearms-and-ammunition
[26] *See* Declaration of Johnson, Exhibit "2," ¶¶ 11, 12.
[27] *See* Declaration of Terrille, Exhibit "9," ¶ 19.

Plaintiff Terrille from being armed when taking his grandchildren to the movies (Declaration of Terrille, Exhibit "9," ¶ 7), would entirely prohibit the gun shows attended by Plaintiff Terrille because they occur at various locations in the CCIA's long list (Declaration of Terrille, Exhibit "9," ¶ 16, and restrict even Pastor Mann's church from having both the church choir and a loaded firearm present at the same time (Declaration of Mann, Exhibit "8," ¶ 34) (that is, if the church were not already off limits under other subsections).

101.     Not done yet, the CCIA bans firearms even on sidewalks and streets (subsection r), if those locations are vaguely declared to be a "special event" and issued a "permit," such as the rallies and protests attended by Plaintiffs Johnson and Terrille (Exhibit "9," Declaration of Terrille, ¶ 18; Exhibit "2," Declaration of Johnson, ¶ 15).  But again, *Bruen* makes clear that a place is not a "sensitive place" merely because people congregate there, with or without a permit.

102.     Finally, and perhaps most outlandishly, the CCIA bans (subsection s) firearms at any gathering of people "to collectively express their constitutional rights to protest or assemble," such as Plaintiffs Terrille and Johnson when they attend rallies and gun shows (Declaration of Terrille, Exhibit "9," ¶¶ 16, 18; Declaration of Johnson, Exhibit "2," ¶¶ 14, 15), or Pastor Mann when he gives a sermon from the pulpit (Declaration of Mann, Exhibit "8," ¶ 32).  It is not difficult to see the blatant unconstitutionality of a law that conditions the exercise of one constitutional right on the forfeiture of others.  *See Antonyuk* at *84-85.

103.     Indeed, at least one New York gun show has already been canceled after conversations with "the St. Lawrence County Sheriff's Office, District Attorney's Office and New

York State Police," based on subsections (a) (government locations), (p) (entertainment and theater), and (s) (gatherings to exercise constitutional rights).[28]

104.    Although some of the CCIA's "sensitive locations" must be marked conspicuously with signage, many are not required to be so marked, leaving carry license holders in peril of unintentionally violating the statute (and becoming a *felon*) in a place they innocently and legitimately have no idea constitutes a "sensitive location" in the massive list above (such as a delivery driver dropping off a package at a residential garage that just so happens to double as a the homeowner's chiropractic clinic).

105.    Rather than concocting this extensive list of so-called "sensitive locations," it probably would have been easier for the legislature to list the places that New York, in its grace, *does allow* ordinary law-abiding citizens to exercise their rights.   Indeed, when a reporter questioned whether she was "shutting off all the public places," and asked "what would be left?" Governor Hochul quipped "probably some streets."[29]  Of course, not if the streets are a government location (subsection a) or holding a special event (subsection r).

106.    Indeed, the CCIA's cornucopia of "sensitive locations" will produce absurd results (in addition to those detailed above).  For example, there are 12 New York state counties "fully or partially in the" Adirondack Park,[30] "the largest park in the contiguous United States" comprised of 6 million acres, including numerous parcels of private land, and home to a "year-round population [of] 132,000."[31]  Although county officials in the area had reached out to Governor

---

[28] https://www.nny360.com/news/stlawrencecounty/state-s-new-gun-law-prompts-cancellation-of-west-potsdam-fire-department-gun-show/article_371ff533-4265-51ba-8d78-d2ed4a9c01a9.html

[29] https://www.cbsnews.com/newyork/news/fresh-off-primary-win-gov-kathy-hochul-dives-right-into-guns-who-can-get-them-and-where-they-can-take-them/

[30] https://en.wikipedia.org/wiki/Adirondack_Park.

[31] *See* https://apa.ny.gov/about_park/

Hochul's office for guidance, they were provided with nothing "more than verbal assurances" that the CCIA does not apply to Adirondack Park (in other words, that the CCIA does not mean what it clearly says).[32]

107.     In addition to these numerous "sensitive locations," the CCIA also bans the carry of firearms in what it calls a "restricted location," defined in "§ 265.01-d Criminal possession of a weapon in a restricted location":

> A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property *has not permitted such possession by clear and conspicuous signage* indicating that the carrying of firearms, rifles, or shotguns on their property is permitted *or has otherwise given express consent*. [Exhibit "1", p19 (emphasis added).]

108.     Violation of this prohibition, like the prohibition on "sensitive locations," is a "class E felony" conviction of which leads to the loss of Second Amendment rights for life.  Exhibit "1" at 20.

109.     In other words, the CCIA makes *all private property* in New York state a "restricted location" by default, adopting an anti-Second Amendment policy position on behalf of all property owners within the State, with a property owner (such as a storekeeper like Plaintiff Leman, Declaration of Leman, Exhibit "4", ¶ 25, 26) required to "conspicuously" post signage indicating that concealed carry is allowed.  *See Antonyuk* at *94-95 ("the Court agrees with Plaintiffs that the CCIA's definition of 'restricted locations' impermissibly encompasses all private property in the state unless the property owner expressly permits the carrying of firearms….").  Likewise, Plaintiff Antonyuk is forced to either give express consent to each person who comes onto his property or,

---

[32] https://www.wamc.org/news/2022-08-30/north-country-officials-say-clarification-on-impact-of-new-concealed-carry-law-on-adirondack-park-is-needed

because he cannot stand on his front lawn 24 hours a day, post "conspicuous signage" in order to permit New Yorkers to carry onto his property.  *See* Declaration of Ivan Antonyuk, Exhibit "7," ¶ 14, 18.

110.   Indeed, New York City recently issued a publication about the CCIA stating that "[a]ll private property (residential and commercial) that is not on the sensitive location list is considered 'restricted.'"  Exhibit "6" at 2.

111.   *Bruen* has expressly foreclosed the ability of New York to paint with such broad strokes, labeling vast swaths of the state to be "sensitive places" (or "sensitive locations" or "restricted locations"), explaining that:

> expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below…. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.  [*Bruen*, Slip Op. at 22.]

112.   Disregarding the Supreme Court's warning not to turn the entire state into a "sensitive place," New York has essentially told the Court "challenge accepted," with the CCIA effecting virtually that result.

113.   Moreover, as this Court has noted, although possibly a drafting error, a literal reading of the plain text of the CCIA indicates that *there is no way to opt out*, as carry would be prohibited either both where "the owner or lessee of such property *has not* permitted such possession by clear and conspicuous signage … or *has* otherwise given express consent." Emphasis added; *see Antonyuk* at 96.  Of course, courts do not interpret statutes contrary to their words unless in "one of those rare cases where the application of the statute as written will produce a result 'demonstrably at odds with the intentions of its drafters.'"  *Demarest v. Manspeaker*, 498

U.S. 184, 190 (1991); *see also United States v. X-Citement Video*, 513 U.S. 64, 82 (1994) (Scalia, J., dissenting) ("the *sine qua non* of any 'scrivener's error' doctrine … is that the meaning genuinely intended but inadequately expressed must be absolutely clear; otherwise we might be rewriting the statute rather than correcting a technical mistake."); *see also Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.").

114.    With "sensitive locations" covering most public locations and locations that have some tie to or involvement with state government, and "restricted location" covering all private property by default, it is hard to imagine how a carry license holder could so much as leave home without running afoul of the CCIA.  That is precisely the result that *Bruen* warned against.

115.    Not content with banning licensed carriers from carrying in most of New York, the CCIA now mandates that individuals who are otherwise licensed to carry, but who are entering a "no carry" zone, must remove the ammunition from their firearm and secure the firearm in an "appropriate safe storage depository out of sight from outside of the vehicle."  Exhibit "1" at 25. Mandating the removal of magazines and unloading firearms will unnecessarily introduce the possibility for accidental discharges. *See* Declaration of Antonyuk, Exhibit "7," ¶ 8. Mandating that individuals unload their lawfully carried firearms each time they leave their vehicle to enter a no carry zone will do nothing to ensure the safety of the firearm, will provide opportunities for the vehicle to be vandalized and the firearm stolen (by definition, by someone who is not law-abiding and, most likely by someone who is not a carry license holder), and can potentially cause injuries or, at a minimum, "man with a gun" calls to police when passersby witness a gun owner unloading, storing, or reloading his firearm.   *See Antonyuk* at *49 n.16.  Indeed, New York affirmatively

stated that a glove box or glove compartment "shall not be considered an appropriate safe storage depository," meaning something less discrete will be required. *Id*. at 25.

116. New York's new "sensitive locations" and "restricted locations" provisions are unconstitutional on their face, serve only to "eviscerate the general right to publicly carry arms for self-defense," and create a situation that is even more onerous and restrictive than that which existed prior to the *Bruen* decision.

117. Indeed, for many people like Pastor Mann, the CCIA entirely eliminates Second Amendment rights entirely, prohibiting them even from keeping a firearm in their own home (if their home is also a "sensitive location") and prohibiting them from bearing a firearm virtually everywhere else in the state.

118. Additionally, by listing as a "sensitive location" any location where individuals exercise their First Amendment rights to association and protest (subsection s), the CCIA takes away Second Amendment rights for those who exercise other constitutional rights.

119. Finally, both the CCIA's "restricted locations" and "sensitive locations" are facially unreasonable, in that they fail to provide any reasonable exceptions to their blanket bans such as, for example, a gun carrier who unwittingly drives across private property while traversing a logging road in the Adirondack Park or, vice-versa, an armed motorist whose route home from work cuts through a town park. Shockingly, the CCIA would demand that a person like Plaintiff Leman, a volunteer firefighter who responds to emergency calls for help no matter where they occur, to engage in the practical impossibility of disarming himself before rendering aid in a life-or-death situation. *See* Declaration of Leman, Exhibit "4," ¶¶ 5, 9, 19. Presumably, the only recourse of a person charged with a crime in such a situation would be the common law defense of necessity – hardly an assurance of any relief.

120.    Interestingly enough when, in 2020, the Supreme Court dismissed *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) ("*NYSRPA I*") on mootness grounds, Justice Alito, joined by Justices Thomas and Gorsuch, dissented from the dismissal, explaining how the challenged New York City ordinance "prohibited law-abiding New Yorkers with a license to keep a handgun in the home … from taking that weapon to a firing range outside the City." *Id.* at 1527 (Alito, J., dissenting from denial of cert.).  Justice Alito continued to recount that "once we granted certiorari, both the City and the State of New York sprang into action to prevent us from deciding this case.... [O]ur grant of review apparently led to an epiphany of sorts, and the City quickly changed its ordinance.  And for good measure the State enacted a law making the old New York City ordinance illegal." *Id.*  at 1527-1528.  The Court, however, dismissed and remanded on mootness grounds.

121.    Having successfully avoided the Court's review in *NYSRPA I*, the New York legislature has now in effect reenacted – *statewide* – the same state of the law that existed in New York City, wherein residents of New York may not leave their homes or towns with their firearms, whether carried or even merely possessed.

122.    Indeed, Plaintiff Leman, for example, lives in a small town that is surrounded on all sides by the Catskill Park, a purported "sensitive location."  Declaration of Leman, Exhibit "4," ¶ 32.  To leave his town and travel to a shooting range or to a friend's home in another town, he would be in violation of the CCIA merely to bring his firearm with him, as he would traverse state parkland.  Mr. Leman could not even purchase a new gun in another town, and bring it home.  The CCIA thus violates the federal safe harbor provision found in 18 U.S.C. Section 926A because, by banning *all possession* of firearms (not merely concealed carrying), Plaintiff Leman may not even unload, lock, and secure his firearm in the trunk of his car during such a trip.  The CCIA also

violates *Heller*, by prohibiting people in the situation of Mr. Leman from obtaining a handgun to keep in their homes for self-defense.  In fact, to the extent that a resident of a town or piece of property surrounded by state parkland does not already possess a firearm in his or her home, such person would be entirely unable to obtain one.

123.    In its steadfast refusal to recognize the Second Amendment rights of its residents, New York state has now, quite unironically, come full circle, replacing on a statewide level the same restrictions that it sought to avoid having the Supreme Court review in *NYSRPA I*.  Of course, it seems abundantly clear how the Court would have held had it decided the merits of that case.

### iv. New York's Second Amendment Tax.

124.    The CCIA's licensing scheme adds a slew of new requirements to the demands placed on a carry license applicant, some of which will disproportionately affect individuals who cannot devote the new "minimum of sixteen hours of in-person live curriculum" that New York demands all permittees acquire. *Id*. at 39.  This course also requires two hours of live-fire training, resulting in a total training demand of 18 hours.  *Id*.

125.    Prior to this new law, only a four-hour course was required, with many trainers offering the course for approximately $75.00[33,34] and some offering it for $50.00.[35]

126.    The new 16-hour course, with an additional two hours live-fire, is estimated to run in approximately the $400 dollar range, plus the cost of ammunition for "live fire" (perhaps $50 or more), not to mention the significant time investment required for individuals to take off potentially as many as three days of work to complete a training requirement that is now four and half times what was previously required.

---

[33] https://ftwny.com/coursedetails/.
[34] https://theindoorgunrange.com/basic-pistol-safety-1.
[35] https://www.donssecurityservices.com/product/nys-pistol-permit-safety-course/.

127.    Defendant Bruen previously objected that Plaintiffs' estimate of the costs of training being around $400 was "entirely speculative." *Antonyuk* Opp Br. at 60.  Interestingly enough, Plaintiffs' estimate seems to have been spot on, as one news story[36] reported a New York firearms instructor's opinion that "it's [training] going to be probably somewhere around $400 because we have to pay staff, we have to pay for the classroom we also have to pay for range use and we've got to pay for materials, there's a lot of material that's going to be involved in this." Indeed, such training is now being offered for $375[37] by at least one instructor, and $795[38] by another.  Within those bookends, other locations offer prices of $575,[39] $397,[40] $500,[41] $550,[42] and "up to about $600."[43]  Many New York instructors have not yet created and do not yet offer classes compliant with the CCIA.  For those New Yorkers who are in more rural areas that are distant from qualified trainers, it will be difficult to obtain the CCIA's required training without long-distance travel, exorbitant cost, and scheduling a class many months in the future.

128.    Adding further draconian layers to the application process, Governor Hochul (apparently the preeminent authority on all things CCIA) has opined that, even if an applicant has previously applied for a license prior to the CCIA taking effect, but a license has not been issued, such application will be considered null and void, meaning the person would need to reapply under

---

[36] https://www.whec.com/top-news/nys-issues-minimum-standards-for-firearm-safety-training/
[37] https://site.corsizio.com/c/6310d4f261d3a9b12d2734cd
[38] https://www.dark-storm.com/range/training/dsi-concealed-carry-permit-course-pre-registration/
[39] https://ftwny.com/ny-state-pistol-permit-class-conceaed-carry-class/
[40] https://gstny.com/events/nys-conceal-carry-training-sept-17-18-2022-2/
[41] https://www.shootershaven.com/events/new-york-state-basic-pistol-safety-course-141/
[42] https://www.learntoshootny.com/courses (https://www.learntoshootny.com/book-online
[43] https://www.news10.com/news/ny-news/confusion-remains-after-new-gun-laws-take-effect/amp/?fr=operanews. ("As an instructor in firearms, I'm not really qualified to give suicide prevention courses.").

the provisions of the CCIA:  prior application "won't make a difference, because it's who has a permit on [September 1, 2022] — not that you've applied."[44]

129.    The CCIA makes New York an extreme outlier among the states with respect to its training requirement, with only the state of California imposing a more onerous requirement.  As Defendant's briefing in *Antonyuk* showed, only five states have training requirements approaching anywhere near as expansive as New York's, and only California exceeds the CCIA's requirements.

130.    The CCIA's new training requirement and associated costs, which is obviously designed with the intent to increase the cost associated with exercising an enumerated right, especially for those with lesser means, ignores *Bruen*'s footnote 9 which stated that "we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." Slip Op. at 30.

131.    Prior to losing *Bruen*, New York did not require such an extensive and expensive training requirement.  Rather, for many years, New York has deemed four hours sufficient to train individuals to carry firearms in public.  The mere fact that *Bruen* now requires New York to recognize the rights of its citizens does not justify a 4.5-fold increase in training, especially absent any explanation why such an increase is necessary.

### d.    Plaintiff Ivan Antonyuk

132.    Plaintiff Ivan Antonyuk is an adult male citizen of the State of New York, residing in Schenectady County within this district, a citizen of the United States, and a member of Gun Owners of America, Inc.  He is a law-abiding person, and has no disqualification under state or

---

[44] https://www.politico.com/news/2022/09/01/ny-officials-disagree-on-how-to-handle-conceal-carry-requests-ahead-of-new-gun-control-law-00054411

federal law which would prohibit him from possessing a firearm.  *See* Declaration of Ivan Antonyuk, Exhibit "7," ¶¶ 1, 4.

133.    Plaintiff Antonyuk is originally from Ukraine.  *Id.* at ¶ 3.  In early 1990's, Ukraine, crime was rampant. The country was run by mafia and criminals, while ordinary citizens were not allowed to own firearms to protect themselves.  Indeed, only the government and its chosen protectors had access to arms.  *Id*. at ¶ 3.  This left the Ukrainian people with no means to defend themselves from crime, whether committed by petty criminals or the government itself.  The police were often hours away when called, if they came at all, and the Ukrainian people had no right to free speech and no right to protest. *Id*. at ¶ 3.  During his childhood, Plaintiff Antonyuk witnessed attacks on the citizens of Ukraine by the government for the simple act of protesting.  Indeed, he was a victim of government violence during a protest in which he was not involved, but nevertheless was beaten by the police for simply being in the general vicinity of the protest. *Id*. at ¶ 3.  In 1994, Mr. Antonyuk fled Ukraine in favor of the United States and its promise of freedom, moving to New York, where he became a citizen of the United States in 1999.  He has lived in New York ever since. *Id*. at ¶ 3.  In coming to the United States, and New York in particular, Mr. Antonyuk was not seeking to exchange one totalitarian regime for another.

134.    Prior to the implementation of the CCIA, Mr. Antonyuk carried his firearm in public, where permitted and where lawful.  *Id*. at ¶ 5.  But now, under the CCIA, almost all places where he previously carried are now off limits.  He is unable to go into a restaurant or gas station that is not specifically posted with a sign allowing firearms.  *Id*. at ¶ 6.

135.    Mr. Antonyuk states that the "CCIA's implementation has greatly affected [his] daily life" and that he has taken "significant steps ... to comply with its provisions."  *Id*. at ¶ 7.  He

has changed where he eats and gets his takeout meals and he no longer shops at stores that do not post signs welcoming firearms. *Id*.

136.     As previously alleged in the first *Antonyuk* case, Mr. Antonyuk is now forced to disarm himself and separate the magazine and ammunition from his firearm and store them in a "safe storage box, but not in [his] glovebox." *Id*. at ¶ 8. Mr. Antonyuk states, again, that in unloading his firearm, he has "to do this in [his] vehicle as it does not make sense to exit the vehicle with a holstered, concealed firearm, draw the firearm, unload and make safe, and then store the firearm in" his trunk or a locked safe. *Id*. at ¶ 8. And, of course, when he returns to his vehicle, he has to do the same but in reverse, removing the firearm from the locked container, loading it, and then reholstering it. Mr. Antonyuk states that this is "wholly unnecessary and dangerous, and completely changed the process of carrying a firearm in New York" prior to September 1, 2022. *Id*. at ¶ 8.

137.     Mr. Antonyuk repeats the Court's finding that he is a "law-abiding and respectful" person. *Id*. at ¶ 10. Precisely because he is so law-abiding, he has "refrained from violating any of the provisions of the Act and will not violate them." *Id*. at ¶ 10.

138.     Mr. Antonyuk then states that he is harmed because he can no longer enjoy the Second Amendment freedoms he once had before the CCIA was implemented and can no longer carry in a number of places he used to carry in. Notably, he is "unable to go peaceably about [his] daily life without fear of carrying in the wrong location and being prosecuted for doing so." *Id*. at ¶ 11.

139.     Mr. Antonyuk "would carry in those places again" IF "the Court enjoined this law, and made it lawful for [him] to carry without fear of arrest, prosecution, damaging [his] reputation

44

losing [his] Second Amendment rights for life, or losing the required 'good moral character[.]'" *Id*. at ¶ 12.

140.    Mr. Antonyuk is also a property owner and, as a property owner, he enjoys the right to determine who and under what circumstances, people visit his property.  The CCIA infringes on this right, as it declares his home a restricted location.  *Id*. at ¶ 13.  The CCIA requires that he post "clear and conspicuous signage indicating that the carrying of firearms ... is permitted" or otherwise provide his "express consent" to someone wanting to carry a firearm in his home or on his property.  *Id*.

141.    Mr. Antonyuk states that it is impossible to provide express consent to each and every visitor that stops by unless he is present on his front lawn 24 hours a day, as a delivery driver, or some other visitor may come to his home while he is unavailable.  *Id*. at ¶ 14.

142.    Mr. Antonyuk has no problem with people lawfully and peaceably carrying in his home or on his property without his "express consent" because many people may not know he supports gun rights and they will be hesitant to talk about gun rights, a "taboo topic in New York State;" however, failing to post "express consent" means that "such persons would leave their gun at home, contrary to my wishes."  *Id*. at ¶ 15.

143.    Mr. Antonyuk states that the CCIA could even prevent one of his neighbors from coming to his aid at his home unless he previously gave them "express consent" to carry a firearm on his property and that perhaps, that person "would be forced to mill around in the dark, searching for 'conspicuous signage' authorizing him to help."  *Id*. at ¶ 17.

144.    Mr. Antonyuk is left with, then, the option of posting "conspicuous signage."  But he "cannot safely comply with" that requirement because many "New Yorkers are vehemently anti-gun" and posting a "sign in favor of gun rights" can open him and his family to "criticism,

45

harassment and even possible hostile action (such as vandalism or a physical confrontation) by those who disagree" with his political views.  *Id*. at ¶ 18.

145.     Mr. Antonyuk will not post a sign that labels his home as being the "likely location of a gun owner" which would raise "the risk that [his] home would be targeted by burglars, thieves, home invaders, or other violent criminals[.]"  *Id*.

146.     Mr. Antonyuk believes the CCIA "politicizes [his] home against [his] wishes, and demands that [he] take affirmative steps and engage in compelled speech ... merely to fulfill [his] wishes that others be able to peaceably exercise their constitutional rights while on [his] property." *Id*. at ¶ 19.

147.     Mr. Antonyuk further states that the CCIA has "taken" his rights as a property owner "to decide the terms on which to invite or exclude visitors" to his property and his home, and that it requires him to "publicly take a position one way or the other on an issue that is highly contentious and divisive in this state, whereas before [he] could simply stay silent." *Id*. at ¶ 21.

148.     It is axiomatic that the government may not condition the exercise of one right on the forfeiture of another.[45]

### d.  Plaintiff Corey Johnson.

---

[45] *See State v. Irving*, 114 N.J. 427, 456-57, 555 A.2d 575, 590-91 (1989) (Handler, J., dissenting) "The right to an alibi defense and the right to remain silent are two separate constitutional rights. Exercise of one should not be conditioned on waiver of the other. Just as in *Simmons v. United States, supra*, 390 *U.S.* at 377, 88 *S.Ct.* at 967, 19 *L.Ed.*2d at 1247, where exercise of the fourth amendment cannot be conditioned on waiver of the fifth; *Lefkowitz v. Cunningham, supra*, 431 *U.S.* at 801, 97 *S.Ct.* at 2132, 53 *L.Ed.*2d at 1, where the first amendment right to hold political office cannot be conditioned on waiver of the fifth; and *Brooks v. Tennessee, supra*, 406 *U.S.* at 605, 92 *S.Ct.* at 1891, 32 *L.Ed.*2d at 358, where waiver of the privilege cannot be conditioned on giving up the right to have the prosecutor bear the burden of proof first, we should not allow such a choice between constitutional rights."

149.   Plaintiff Corey Johnson is a U.S. citizen, resident of New York, and resides in Onondaga County.  Plaintiff Johnson is a member of Gun Owners of America, Inc., and therefore, one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*. *See* Declaration of Corey Johnson, Exhibit "2", ¶ 1.

150.   Plaintiff Johnson has maintained an unrestricted New York carry permit since 2019 and is eligible to possess and carry firearms in the State of New York.  Because he has a permit, he has met all the qualifications for licensure, including having good moral character.  *Id*. at ¶ 2.

151.   Plaintiff Johnson routinely carries his handgun concealed when he leaves his home. Plaintiff Johnson does not carry his handgun in schools, courthouses, government buildings, or other obvious "sensitive places" which have been described by the Supreme Court.  *Id*. at ¶ 3. However, Plaintiff Johnson is responsible for his own security and for the security of his family, and thus, his firearm "generally does not leave [his] side when [he] leaves the house..."  *Id*. at ¶ 4.

152.   Plaintiff Johnson is an outdoorsman, an avid fisherman, and routinely goes on hiking and camping trips throughout the state of New York, including in parks which are now off-limits by the CCIA.  *Id*. at ¶ 6.  Given that parks do not appear in the Supreme Court's list of traditional sensitive locations and that there is nothing "sensitive" about a park, Plaintiff Johnson "intend[s] to continue to carry his firearm when [he goes] fishing in Mercer Park ... within the next month."  *Id*. at ¶ 8.

153.   Additionally, in October of 2022, Plaintiff Johnson will tour "several state parks within New York, where [he] will engage in various recreational activities..."  He will visit Bowman Lake State Park, where hunting with rifles is allowed, but carry of a concealed firearm is not allowed.  *Id*. at ¶ 9.  Plaintiff Johnson intends to carry his firearm "on this upcoming trip." *Id*. at ¶ 10.

154.    Likewise, Plaintiff Johnson eats at restaurants with his family, which are off-limits under the CCIA, not because they are a traditional sensitive place, but because they serve alcohol. He intends to carry his firearm within the restaurant in the coming days. *Id*. at ¶ 11.

155.    Plaintiff Johnson participates on what is called a "dice run" during New York winters. This is a competition where snowmobilers are required to follow a prescribed course, often through public parks and roads, and check in at various locations along the way with some of the locations being restaurants that serve alcohol. In any event, as in years past, he "intend[s] to go on a snowmobiling trip this winter, and [he] will carry [his] firearm with [him]" when he does, "including in those places where" he is required to "'check in' as part of the 'dice run.'" Id. at ¶ 12.

156.    Plaintiff Johnson routinely visits "various locations that are considered 'performance, art entertainment, gaming or sporting events' under the CCIA." Recently he had intended to attend the New York State Fairgrounds, until he learned it was adopting and enforcing the prohibition on concealed carrying. Because entrances to the fairgrounds may utilize "Bag Check Areas" for those entering, he did not attend the fair due to a significant risk that he would be discovered carrying an otherwise lawful firearm. *Id*. at ¶ 13.

157.    Plaintiff Johnson has also attended pro-gun and other rallies while armed. *Id*. at ¶ 14. Now, rallies are off-limits because people assemble to exercise constitutional rights, even though none of the rallies or locations are traditional sensitive places. *Id*. at ¶ 15. The next time such a rally is scheduled, Plaintiff Johnson intends to attend and do so while carrying his firearm, in violation of the CCIA. *Id*. at ¶ 16.

158.    Plaintiff Johnson frequently visits the Rosamond Gifford Zoo in Syracuse at least once or twice every fall. He will visit this Zoo within the next 90 days, and understands that, while

the Zoo has no policy against the carry of lawful firearms, the CCIA separately criminalizes such carry. However, he intends to carry when he visits the Zoo. *Id*. at ¶ 17.

159.    Plaintiff Johnson routinely carries his firearm when in public, as is his Second Amendment right. This includes shopping at various locations in Onondaga County, "such as gas stations, grocery stores, big box stores" and others. But the CCIA declares these locations "restricted locations" and bans carry of firearms unless he receives express consent of the owner. It is impractical for Plaintiff Johnson to ask permission at each location he visits. Moreover, as Plaintiff Johnson explains, "even if [he] receives permission at one point in time, such policy could change at any time and without notice, thus putting [him] at constant risk of committing crimes unawares." *Id*. at ¶ 18. Plaintiff Johnson intends to continue to carry in "various businesses and establishments in Onondaga County in violation of the CCIA's restriction on 'prohibited locations' that are not conspicuously posted with signage or otherwise provide [him] with their express consent." *Id*. at ¶ 19.

160.    Plaintiff Johnson is now exposed to criminal offenses for "simply going peaceably" about his daily life. *Id*. at ¶ 20. Plaintiff Johnson faces a credible threat of prosecution because his specific intentions are now public through this filing, and the State Police have made it clear that they intend to enforce the CCIA's provisions on a "zero tolerance" basis, stating "If you violate this law, you will be arrested." *Id*. at ¶ 22. Likewise, the District Attorney of Onondaga County has publicly stated his intent to confiscate firearms of "violators" and refer the "violators" back to their licensing judge who "granted them concealed-carry licenses in the first place, possibly leading to the revocation of their carry privileges."[46] *Id*. at ¶ 23.

---

[46] Notwithstanding public carry is not a "privilege," but an enumerated constitutional right, this further demonstrates New York's continued disdain for and mistreatment of gun owners who are

161.    Moreover, Plaintiff Johnson is at an enhanced risk for having contact with law enforcement, as he routinely engages in fishing activities and is required to have his fishing license on his person.   This is "subject to verification and review at any time by a New York Environmental Conservation Officer (who works for the State, not the County)."   Plaintiff Johnson states that, in recent years, he has been stopped by those officers to check his license "at least a couple of times per year."   In 2022, so far, he has had at least four such interactions.   *Id*. at ¶ 24.

**e.   Plaintiff Alfred Terrille.**

162.    Plaintiff Alfred "Al" Terrille is a U.S. citizen, resident of New York, and lives in Albany County.   He is a member of Gun Owners of America, Inc., and one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*.   *See* Declaration of Alfred Terrille, Exhibit "9", at ¶ 1.

163.    Plaintiff Terrille is a law-abiding person and currently possesses and has maintained an unrestricted New York carry permit since 1994.   He is eligible to possess and carry firearms in the State of New York, and has met all the qualifications for licensure, including having good moral character.   *Id*. at ¶ 3.

164.    He routinely carries his concealed handgun whenever he leaves home, but does "not carry in courthouses, schools, government buildings or other obvious "sensitive places" the Supreme Court has described, where the government often provides security in the form of armed guards and metal detectors."   *Id*. at ¶ 4.

165.    Due to the CCIA, he is "now in jeopardy of arrest and prosecution as a felon, not to mention having [his] firearm seized and [his] permit revoked, and [his] constitutional rights

---

just one "violation" of an unconstitutional law away from forever losing their constitutional right to bear arms.

50

forfeited, merely for carrying in the completely ordinary and entirely non-sensitive locations in which [he] previously carried [his] firearm." *Id*. at ¶ 5.

166.    Plaintiff Terrille is a grandfather to 5 grandchildren and it is his duty to protect his family, regardless of New York's attempts to disarm him, subjugate him, and infringe on his Second Amendment rights. *Id*. at ¶ 6. Plaintiff Terrille routinely goes to the movies, both at movie theaters and drive-in locations within Albany County. He does this repeatedly through the year, and will visit a theater at some point within the next 60 days. He has previously carried concealed during such outings in "entirely ordinary and non-sensitive locations." Because movie theaters nor anything like them appear in the Supreme Court's traditional sensitive location list, he intends to continue to carry his firearm when he goes to movie theaters with his grandchildren, in violation of the CCIA. *Id*. at ¶ 7.

167.    Plaintiff Terrille also takes his grandchildren to Thatcher State Park in Albany County, where he hikes, uses the picnic areas, and the playground with his grandchildren. He intends to carry his firearm when he visits this park in the future, something that occurs on a monthly basis. *Id*. at ¶ 8.

168.    In the next 60 days, Plaintiff Terrille will visit the State of Tennessee. He will take his firearm with him to Tennessee, as Tennessee respects the Second Amendment and allows him to carry there. He intends to fly to Tennessee, departing from Albany International Airport, and intends to purchase a ticket in the "coming weeks, for travel within the next two months." *Id*. at ¶ 9. The CCIA, however, criminalizes his taking of a firearm with him to the airport, even unloaded, locked, and properly declared in his checked baggage in compliance with federal regulations. He cannot even store his firearm in his vehicle if he were not to take it with him in his checked luggage. Since he intends to check his firearm in his luggage in accordance with TSA regulations, which

requires declaring the firearm, he would be confessing to being in illegal possession of a firearm, opening himself to prosecution under the CCIA. *Id*. at ¶ 9.

169.    However, even if he were traveling to Tennessee by car, it would take him approximately 2.5 to 3 hours to drive directly out of New York. And during his trip, he would be prohibited from stopping to use the bathroom (even onto the parking lot of a gas station, rest stop, fast food restaurant) unless he has prior knowledge that the business posted a sign welcoming him to carry in the establishment. *Id*. at ¶ 10. Plaintiff Terrille's freedom of travel is thus greatly impaired due to the CCIA. *Id*. at ¶ 11.

170.    Plaintiff Terrille, within the next 60 days, will travel to Tennessee via airplane, and intends to bring his firearm in his checked luggage, in full compliance with 18 U.S.C. Section 926A and TSA regulations. *Id*.

171.    Plaintiff Terrille also intends to carry in his local bank, and is unaware of any anti-gun bank policy, nor has the bank posted a sign stating firearms are not allowed. However, there is no sign expressly stating he can carry. He states this leaves him in an impossible situation where he must go into the bank, declare that he has a firearm, and ask if he has permission to carry. *Id*. at ¶ 12. Plaintiff Terrille intends to continue to carry his firearm unless the bank asks him to leave the firearm in his vehicle. *Id*.

172.    Also, Plaintiff Terrille routinely carries his firearm in public, including at gas stations, grocery stores, home improvement stores, and others. Many of these stores have corporate policies which permit firearm carry, including "Walmart, Walgreens and Target." He estimates he visits one or more of these retailers at least once a week. The CCIA makes these businesses "restricted locations," and bans him from carrying unless he has express consent of the owner or there is a sign allowing carry. But few, if any, of these businesses post signs allowing

carry, and asking for permission is impractical.  To his knowledge, none of the retailers listed above has taken the affirmative step to opt out of the CCIA.  *Id*. at ¶ 13.  He states that it is impractical to disarm, approach the business, ask permission from a low-level employee who will need to ask a manager (or contact corporate), then wait for a response, and then re-arm himself, simply to pick up a few things at the store.  Additionally, even if he receives "permission" at one point in time, such policy could change at any time without notice, thus placing him at constant risk of committing a crime unawares.  *Id*. at ¶ 14.  Plaintiff Terrille intends to continue to carry his firearm in various businesses and establishments in Albany County, in violation of the CCIA's restriction on "prohibited locations" that are not conspicuously posted with signage.  Plaintiff Terrille states that "[u]nless this Court strikes down that provision of the CCIA, simply going peaceably about [his] daily life will be a crime, pursuant to a statute which this Court has declared clearly unconstitutional."  *Id*. at ¶ 15.

173.    Additionally, Plaintiff Terrille is planning to attend the upcoming NEACA Polish Community Center Gun Show on October 8-9, 2022 in Albany.  The Polish Community Center describes itself as a "conference center, banquet hall & wedding venue in Albany, NY."  *Id*. at ¶ 16.  However, the CCIA bans firearms at "conference centers" and "banquet halls," and the Community Center may not opt out of this ban and expressly allow firearms.  *Id*.  One of his main reasons for attending is to converse with fellow gun owners, which includes discussion about New York State's tyrannical gun laws.  Plaintiff Terrille states that "a gun show is, almost by definition, a 'gathering of individuals to collectively express their constitutional rights to protest or assemble' ... and, thus, the CCIA appears to entirely ban gun shows."  *Id*.  But he will attend the gun show anyway, and he intends to carry his firearm with him when he does, in violation of the CCIA,

based on his understanding of this Court's recent opinion and the Supreme Court's opinion in *Bruen*. *Id*.

174.    Plaintiff Terrille currently lives in an apartment complex in Albany County.  As such, he is a tenant and he has a landlord.  He understands that his apartment complex does not allow him to post "signage" outside his unit.  And it is not feasible for him to provide express consent to each person who visits his home, including deliverymen, repairmen, friends, or family. *Id*. at ¶ 17.  So while the CCIA requires that he posts signage at his home declaring his home "pro-gun," he cannot post this sign per the terms of his lease.  He is also not allowed to post signs outside his unit permitting visitors to park in common parking lots and walk on the common sidewalks when visiting his home, so he is unable to fully "opt-out" of the CCIA's "taking [his] property and declaring it to be an anti-gun location, essentially converting [his] home from a 'restricted location' to a 'sensitive location.'" *Id*.

175.    Plaintiff Terrille also has attended pro-gun rallies in the past and, although he does not know of any planned rallies to occur in the future, if one were to be scheduled, he would attend it and carry his firearm, in violation of the CCIA. *Id*. at ¶ 18.

176.    Plaintiff Terrille routinely goes out to eat with his grandkids at restaurants which are considered "sensitive locations" because they serve alcohol, even if he were not sitting in the bar area and not consuming alcohol. Because neither restaurants nor anything like them appears in the Supreme Court's list of traditional sensitive places, he intends to continue to carry his firearm when he goes out to eat with his grandkids, "an event that will occur within the next 30 days." *Id*. at ¶ 19.

177.    Plaintiff Terrille states that he intends to engage in various acts which are constitutionally protected, but are now unlawful under the CCIA, and faces a credible threat of

prosecution because he his specific intentions to break the law are now public through this filing. *Id*. at ¶ 20.  He is aware that First Deputy Superintendent Steven Nigrelli of the New York State Police, has threatened people like him who violate the CCIA with a "zero tolerance" policy of arrest.  *Id*. at ¶ 21.  And because he intends to take a trip to Tennessee by airplane, he is almost guaranteed to "have a run-in with law enforcement when" he arrives at the "airport and declare to authorities that [he has] a firearm to check" with his luggage.  He anticipates that there is a "strong likelihood that [he] could be arrested and charged with a felony under the state's announced 'zero tolerance' policy" when he brings his firearm to the airport to check for his upcoming flight."  Id. at ¶ 22.

### f.   Plaintiff Pastor Joseph Mann.

178.    Plaintiff Pastor Joseph Mann is a U.S. citizen and a resident of New York, resides in Oswego County, and is a member of Gun Owners of America, Inc.  *See* Declaration of Pastor Joseph Mann, Exhibit "8," at ¶ 1.  Pastor Mann is the pastor of Fellowship Baptist Church in Parish, New York.  *Id*.

179.    Pastor Mann has possessed a New York "employment" carry permit since 2014, and is eligible to possess firearms in the State of New York and has met all qualifications for licensure, including good moral character.  *Id*. at ¶ 3.

180.    The CCIA has, in effect, rescinded Pastor Mann's permit, making most places off-limits to him, including his own home.  *Id*. at ¶ 4.

181.    For instance, the CCIA defines "sensitive location" to include "any place of worship or religious observation" (subsection c) which makes it a felony to even possess a firearm in that location.  *Id*. at ¶ 5.  Pastor Mann's church is a "place of worship" under the CCIA.  *Id*. at ¶¶ 6-8.

182.    Prior to the CCIA, the church maintained a "church security team, consisting of trusted church members who are licensed carry permit holders, and are designated to carry their firearms to provide security and protection to the congregation during worship services." Both Pastor Mann and his "team have received specialized firearms training from a firearms instructor who specializes in church security." *Id*. at ¶ 9.  Under the CCIA though, neither Pastor Mann nor his "security team may possess firearms on church property" and further, since they are a "small church, [they] are unable to afford to pay for private security who might be exempt from the CCIA." *Id*. at ¶ 10.

183.    Pastor Mann intends to continue to "possess and carry [his] firearm while on church property, in violation of the CCIA[]" because of this Court's "recent conclusion that the CCIA's list of sensitive locations is not deeply rooted in this Nation's historical tradition of firearm regulation and because neither churches nor anything like them appears in the Supreme Court's list of traditional sensitive locations." *Id*. at ¶ 11 (punctuation omitted).

184.    Pastor Mann also lives in a parsonage that is physically part of the same building as the Church.  This parsonage is not only used as his family's residence, but is also used for church business where they have Bible studies, meetings of elders, and other church gatherings.  *Id*. at ¶¶ 12, 13.  Under the CCIA, Pastor Mann's home is now a "sensitive location" where he is prohibited from possessing a firearm, "including a handgun for self-defense.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008)." *Id*. at ¶ 14.  Pastor Mann has for years, and still currently possesses firearms, in his home.  *Id*. at ¶ 16.

185.    In order to fully comply with the CCIA, Pastor Mann would have to turn all his firearms over to the government, and he refuses to do so.  Pastor Mann states that New York City has already sent letters to persons with registered firearms at certain locations, notifying them that

their premises have been deemed a "sensitive location" and threatening that those business owners to surrender their firearms. *Id*. at ¶¶ 17-18.

186.    Pastor Mann states that the CCIA deprives the Church from its ability to make its own rules governing the carry of firearms on Church property. *Id*. at ¶ 19.

187.    Additionally, Pastor Mann refers to First Deputy Superintendent of State Police Steven Nigrelli who threatened people like the Pastor, who violate the CCIA, with a policy of "zero tolerance" and arrest for committing an unconstitutional felony. *Id*. at ¶ 22. Pastor Mann alleges that at least one of his congregants is part of local law enforcement and is aware of the Pastor's inability to avoid violating the CCIA, because the Pastor keeps a firearm in his home on church property. *Id*. at ¶ 23. Likewise, Sheriff Don Hilton of Oswego County, whose personal belief is that the CCIA is unconstitutional and that much of it will be struck down, nevertheless has made posts on Facebook that "taking a legally licensed firearm into any sensitive area – such as a … church … is a felony punishable by up to 1 1/3 to 4 years in prison." In other words, the Sheriff has specifically articulated that the Pastor's conduct is illegal and that, even if the Sheriff disagrees with the law, "they will effect [sic] all gun owners[.]" *Id*. at ¶ 24. This is not a disavowal of enforcement of the law, but rather an intent to enforce it.

188.    Pastor Mann intends "this act of civil disobedience because the CCIA violates not only my Second Amendment rights and those of my congregation, but also my free exercise of religion protected by the First Amendment." *Id*. at ¶ 25.

189.    Additionally, Pastor Mann provides "counseling and assistance in the context of many of the 'sensitive location' settings in the CCIA, including to the homeless, youth, in the domestic violence and abuse setting, and others. To the extent that [the] church operates in that

capacity, the CCIA (subsection k) appears to prohibit [their] possession of firearms as well, and thus inhibits [their] ability to provide security for those under [their] care." *Id*. at ¶ 26.

190.    Pastor Mann's Church has an addiction recovery ministry, and he frequently travels to homes of people addicted to drugs, counseling them to seek help and voluntarily enter treatment facilities.  While doing this, he at times has carried his firearm.  But now, the CCIA makes it impossible for the Pastor to legally carry while ministering, as it declares all private property a "restricted location" and requires him to get express consent, sometimes of an addict, before entering his or her home while carrying a firearm for his own protection.  *Id*. at ¶ 28. But for the CCIA, he would continue carrying his firearm while providing this ministry as he has in the past. *Id*.

191.    As part of his addiction recovery ministry, the Pastor has brought people in the program to church property for counseling and care.  To the extent the CCIA applies to the church because it separately bans firearms in "any location providing health, behavioral health, or chemical dependence care or services" (subsection b)," Pastor Mann cannot comply with this prohibition and intends to continue to carry.  *Id*. at ¶ 29.

192.    Likewise, the church has a nursey, Sunday School, and a Junior Church.  The CCIA appears to separately prohibit the Pastor, church staff, and the church security from providing security to their children, as it bans firearms at "nursery schools, preschools, and summer camps" (subsection f).  Pastor Mann intends to not comply with this restriction.  *Id*. at ¶ 30.

193.    The Church provides its facilities to a local homeschool coop, and the Pastor and his wife teaches classes, including foreign languages.  As the Church operates at times as a school, firearms are likewise double banned.  Pastor Mann will not abide by this restriction and intends to continue to possess a firearm in his home and church.  *Id*. at ¶ 31.

194.    Pastor Mann believes that the CCIA places off limits "any gathering of individuals to collectively express their constitutional rights to ... assemble[.]" Subsection s.  This would seem to cover a church service.  To the extent that this section covers [] church activities, [the Pastor does] not intend to comply." *Id*. at ¶ 32.

195.    The Church maintains a church bus and a church van, used to take church members, youth, and members of the public with them when they travel.  The CCIA appears to ban firearm possession in their "bus[]" (subsection n), and Pastor Mann does not intend to comply with this restriction to the extent it applies to the church.  *Id*. at ¶ 33.

196.    And because the Pastor's church plays music before, during, and after worship services, the CCIA separately bans firearms at a "performance venue" or "concert[]" (subsection p) and additionally a "banquet hall," as they often break bread together.  The CCIA does not appear to include an exemption even for the Lord's Supper (the Sacrament).  *Id*. at ¶ 34.

197.    Pastor Mann believes that, "for Bible-believing Christians, it is clear that there may be times in which the civil authorities direct us to do what we cannot do while fulfilling our duty to God. In such circumstances, we are to obey God, and not men.  This is one of those times." *Id*. at ¶ 43.

**g.  Plaintiff Leslie Leman.**

198.    Plaintiff Leslie Leman is a U.S. citizen and resident of New York, residing in Greene County and is a member of Gun Owners of America, Inc.  *See* Declaration of Leslie Leman, Exhibit "4," at ¶ 1.  Plaintiff Leman is a law-abiding person and currently possesses an unrestricted New York carry permit since 2012.  He is eligible to possess and carry firearms in the State of New York, and has met all qualifications for licensure, including having good moral character. *Id*. at ¶ 2.

59

199.    Plaintiff Leman is a volunteer firefighter, meaning he is on call 24 hours a day, 7 days a week.  This usually means that he is going about his normal daily routines when he could receive a call.  If he were to receive a call to respond, he has no "opportunity to go home, to change clothes, or as relevant here, to disarm and stow [his] firearm.  This means that there are times that [he has] responded to an emergency call while armed."  *Id*. at ¶ 5.

200.    Plaintiff Leman has responded to calls at multiple locations that the CCIA now declares to be "sensitive locations."  Additionally, Plaintiff Leman responds to private property now deemed a "restricted location."  *Id*. at ¶ 6.

201.    The Catskills Park surrounds Plaintiff Leman's town, and he has often responded to calls for assistance in that park.  There is no exception for him to carry there or even drive with a firearm there during an emergency call, and he would be liable for a felony if he, as a first responder, responded to an emergency situation while armed.  *Id*. at ¶¶ 7-9.

202.    Plaintiff Leman would have to waste precious time in disarming himself according to the CCIA while responding to a call.  *Id*. at ¶ 10.  Plaintiff Leman cannot at all times comply with the CCIA while responding to emergency calls.  *Id*. at ¶ 12.

203.    Plaintiff Leman also responds to house and structure fires, and renders aid.  Plaintiff Leman states it would be "absurd" to have to "ask a family, standing in their pajamas in knee-deep snow, to provide [him] with their 'express consent' to carry [his] firearm prior to entering their home to put out a fire or to provide lifesaving medical care.  Indeed, that is the absolute last thing [he is] thinking of in this sort of situation."  *Id*. at  ¶ 14.

204.    Because the Catskills Park surrounds Plaintiff Leman's town, he is often not able to respond to a call without traversing part of the park, and thus being in violation of the CCIA while armed.  His only option would be to return home and leave his firearm at home.  *Id*. at ¶ 15.

205.    Plaintiff Leman does not accept the State of New York's command to disarm before rendering life-saving aid. *Id*. at ¶ 16. Thus, he intends to continue carrying his firearm and going about his daily life, including as a firefighter, which will put him in violation of the CCIA as he responds to calls. *Id*. at ¶ 20.

206.    Because he intends to engage in "constitutionally-protected acts which are now made unlawful under the CCIA" he also faces "a credible threat of prosecution, as my specific intentions are now made public through this filing." *Id*. at ¶ 21.

207.    First Deputy Superintendent Steven Nigrelli of the New York State Police has already threatened individuals like Plaintiff Leman with a "zero tolerance" policy of arrest for violation of the CCIA. *Id*. at ¶ 22. Additionally, Plaintiff Leman has an increased risk because of his routine interaction with the police, because it is typical that he responds to emergencies along with police officers, including members of his team, local law enforcement, and New York State Police. *Id*. at ¶ 23.

208.    Plaintiff Leman also runs a small hotel/bed and breakfast in this district. His business caters to guests from all over New York, the United States, and around the world. *Id*. at ¶ 25.

209.    Plaintiff Leman states that his now "restricted location" hotel would have to post signage to allow guests to carry, because "person-by-person 'express consent'" is impractical to give to each visitor. *Id*. at ¶ 26.

210.    He further states that the CCIA requires him to engage in compelled speech to continue to provide services to those who bring their firearms to his hotel, and that if he refuses to be compelled to speak, he will lose the business of gun owners who lawfully travel with their firearms. *Id*. at ¶ 27.

61

211. Most of his customers, though, come from the southern part of the State, including New York City, Long Island, and northern New Jersey. He states that the majority of these customers hold views unaccepting of firearm ownership and bearing arms in public. Therefore, he states, if he posts a sign allowing concealed carry, he will lose business from customers that do not share that view. *Id*. at ¶ 28.

212. "In other words," he states, "the CCIA politicizes our business against our wishes, forcing us to a Hobson's choice between groups of customers and, no matter which option we choose, we will lose business." *Id*. at ¶ 29.

213. Plaintiff Leman had further intended to apply for a New York State wine and beer license but, under the CCIA, that would automatically trigger his business to be a "sensitive location" where he would not even be able to possess firearms on his own property. *Id*. at ¶ 30. The CCIA thus forces him to the choice to either keep a firearm in his home or operate his business.

214. Plaintiff Leman is trapped in his small town, as he cannot leave without entering the park surrounding his town, with a firearm, even if the firearm is unloaded, locked and stored in a trunk because there is no exception for travel in the CCIA. *Id*. at ¶ 32.

215. Plaintiff Leman is aggrieved by the CCIA, which reverts to the previous New York policies which led to N.*Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020), where the plaintiff was unable even to take his firearm from his home to the shooting range. In response to the Supreme Court agreeing to hear that case, New York state changed the law, in order to moot the matter and avoid a loss, but New York has revived this policy on a statewide level. *Id*.

216. In any event, and "left with no reasonable choice," Plaintiff Leman intends to "bring [his] firearm when [he] leave[s] home to travel outside of Windham, New York, which will take [him] through state parkland, in violation of the CCIA." *Id*.

**h. Plaintiff Lawrence Sloane.**

217. Plaintiff Lawrence Sloane is a U.S. citizen, a resident of New York, lives in Onondaga County, and is a member of Gun Owners of America and thus, is one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*. *See* Declaration of Lawrence Sloane, Exhibit "3," ¶ 1.

218. Plaintiff Sloane is a law-abiding citizen who does not currently possess a New York carry license because, prior to *Bruen*, he did not believe he would be found to have "proper cause." *Id*. at ¶ 3. Since *Bruen* held "proper cause" unconstitutional, he has intended to apply for his carry license. *Id*. at ¶ 4. Before he could apply for a permit, however, New York changed the rules, implementing the CCIA and imposing a slew of new restrictions and requirements. *Id*.

219. Plaintiff Sloane challenges the following portions of the CCIA: "1) social media history requirement, 2) providing information about my family, 3) providing character references, 4) exorbitant training costs and the time required to complete it, 5) an in-person interview with a government agent, and 6) proving that I am of "good moral character" in addition to being a law-abiding, responsible person." *Id*. at ¶ 5.

220. Plaintiff Sloane has accounts on some "social media" platforms, of which his Facebook profile is set to "friends only." *Id*. at ¶ 7. This means that he would have to add a sheriff or investigator or perhaps even his licensing official as a "friend" so that they could view his Facebook posts. He refuses to comply with this requirement, or to divulge any social media accounts to the state. *Id*.

63

221.    Plaintiff Sloane states that, if here were "forced to produce all [his] speech," he would "self-censor for fear of retribution, unwilling to express [his] true feelings, especially on contentious issues involving political speech[.]"  *Id.* at ¶ 9.

222.    Plaintiff Sloane is unwilling to provide the government with "information about [his] family, on the carry license application."  *Id.* at  ¶ 10.

223.    Plaintiff Sloane is unwilling to provide the required four character references so that the government can interrogate his "friends and family."  *Id.* at ¶¶ 15, 16.

224.    Additionally, Plaintiff Sloane objects to the in person interview requirement, because it would violate his "Fifth Amendment rights to remain silent and against self-incrimination."  *Id.* at ¶ 17.

225.    Plaintiff Sloane cannot even apply for a license without first providing the licensing official with all of the required information on the application, as it will be rejected, both based on the statutory language, and also his local sheriff's statements to that effect.  Therefore, it is futile to even attempt to apply because he is unwilling to "submit to the unconstitutional requirements that [he] is unwilling to provide to the government."  *Id.* at ¶ 21.

226.    Moreover, Plaintiff Sloane's sheriff, Defendant Conway, does not have an appointment available for Plaintiff Sloane to even submit his application until October of 2023, more than 13 months from today, in violation of *Bruen*'s footnote 9 which anticipates challenges to permitting regimes which require "lengthy wait times" to obtain a permit.[47]  *Id.* at ¶ 23; *Bruen* at 2138 n.9.  Thus, not only is it futile for Plaintiff Sloane to submit his application to the sheriff

---

[47] This is akin to using one Second Amendment violation to get around another Second Amendment violation. At the end of the day, it is still a Second Amendment violation.

(knowing that it will denied), it is actually impossible for him to do so (because it will not even be *accepted* – much less *processed* – until October of next year).

227.    Moreover, the Sheriff's refusal to accept Plaintiff Sloane's application represents a constructive denial of that application.   Indeed, the Sheriff's current 13 month delay greatly exceeds even the time he has to process an application under the statute.[48]

228.    The Sheriff's delay in accepting license applications also violates New York Penal Law 400(4-b), which requires that [a]pplications for licenses shall be accepted for processing by the licensing officer at the time of presentment," and that "[e]xcept upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment…."

229.    By refusing to permit Plaintiff Sloane to "present" his application, the Sheriff not only has violated the statute, but has constructively denied Plaintiff Sloane's application, making Plaintiff Sloane's challenge ripe.

230.    An Illinois Northern District Court found that plaintiffs stated a "plausible Second Amendment claim[]" alleging that "residents commonly wait[ ] as long as 60 to 90 days to receive a FOID card . . . The amended complaint recites the experience of a number of individuals who had been waiting between five (5) to nine (9) months for their FOID applications to be processed at the time the amended complaint was filed in November of 2020[]" when the statute requires the Illinois State Police to "adjudicate applications within thirty days."  *Marszalek v. Kelly*, No. 20-cv-4270, 2022 U.S. Dist. LEXIS 14047, at *18, *23 (N.D. Ill. Jan. 26, 2022).

---

[48] *See* https://portal.ct.gov/BFPE/General/General/How-do-I-Appeal (permitting an appeal based on a "constructive denial" when a licensing officer takes longer than the statutory period to issue or deny an application).

231.    As to the training requirement, Plaintiff Sloane will not complete "sixteen hours of classroom instruction, plus two hours of live-fire training, [as it] is unnecessary and expensive." *Id*. at ¶ 24.  Plaintiff Sloane objects to the requirement that he has to pay to learn about "suicide prevention," as he is not suicidal and such subject matter has no bearing on his being a responsible gun owner.  *Id*. at ¶ 28.  Plaintiff Sloane would still object on principle to a four hour "basic handgun safety course," but alleges that the prior existing training standard "would be doable" and that he would obtain such training in order to receive a license, despite his objections.  *Id*. at ¶ 29.

232.    Plaintiff Sloane states if all the "unconstitutional requirements were removed from the application, and the Sheriff would accept [his] application, [he] would immediately submit [his] application for a concealed carry license, something [he] greatly desire to obtain and, but for the CCIA's unconstitutional demands, [he] would seek to obtain."  *Id*. at ¶ 30.  Plaintiff Sloane further states that he "otherwise meet[s] all of the requirements to be 'granted' a permit to carry [his] firearm in public and, in fact, [has] completed the remaining parts of [his] application (save for the portions [he] will not provide), and [he has] attempted to secure an appointment for submitting [his] application, but there is not one available until late next year, a completely unreasonable time frame" which makes application both futile and impossible.  *Id*.

## COUNT I

## U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST DEFENDANTS

233.    The foregoing allegations are repeated and realleged as if fully set forth herein.

234.    The CCIA infringes Plaintiffs' Second Amendment rights that "shall not be infringed."

235.    Plaintiffs are members of "the people" who desire to "bear" a quintessential protected "arm" (a handgun) in public.

236.     Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, Slip Op. at 8.

237.     Thus, the burden is on the government to justify the CCIA based on the historical tradition of the activity that it is now attempting to regulate and ban.

238.     However, there is no historical analogue for any of the new and onerous requirements in the CCIA. The exorbitant fees, slew of non-sensitive "sensitive locations" and "restricted locations" which include very public places (like parks and sidewalks), and incredulous "good moral character" and associated demands for carry license applicants, all are entirely without historical example, and thus violate the Second Amendment.   Indeed, the Defendant must historically justify *each* of its "sensitive locations" defined in the CCIA.  *See* Exhibit "1", pp. 16-18.

239.     Thus, the CCIA violates the Second Amendment, and conflicts with *Bruen*'s clear teachings.

240.     First, *Bruen* disapproved of discretion during the permitting process, instead making clear that governments may rely only rigid statutory criteria.  *Bruen*, Slip Op. at 4-5.  The CCIA, however, includes a malleable "good moral character," which is inherently a judgment call and invites discretion and the abuses that stem from unbridled discretion.

241.     Second, New York has abused the narrow exception for "sensitive places" to include innumerable places that clearly do not fall under that doctrine, doing precisely what the

Supreme Court found unavailing in *Bruen*: "effectively declare the island of Manhattan a 'sensitive place'…." *Bruen*, Slip Op. at 22.

242. Not to mention failing the *Bruen* framework, the CCIA expressly violates the Supreme Court's explicit instructions (and binding holdings) in *Bruen*. In addition, certain provisions of the CCIA completely eliminate Second Amendment rights for some, making them unable to keep firearms in their home, and unable to bear firearms in public.

243. Indeed, the CCIA has wandered far afield, coopting and declaring all private property to be a "restricted location," and requiring that property owners affirmatively allow firearms on the premises, and all visitors to seek permission before entering the property.

244. As such, Defendant's laws, customs, practices, and policies, reducing the Second Amendment's protection of the right to "bear arms" in public to an inkblot, damages Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

245. By infringing the Second Amendment right to bear arms in public in these ways, the New York laws and regulations discussed in the foregoing allegations violate the Second Amendment, which applies to Defendant by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and they are therefore invalid.

## COUNT II

## U.S. CONST., AMEND. I, 42 U.S.C. § 1983 AGAINST DEFENDANTS

246. The foregoing allegations are repeated and realleged as if fully set forth herein.

247. The CCIA unlawfully requires Plaintiffs to provide "social media" accounts to the government, along with a list of names and contact information of their family and friends. This blatantly unconstitutional demand to exercise a constitutionally protected right cannot stand.

68

248.     The CCIA will chill protected speech, as Plaintiffs will not know what they can and cannot say in their private lives and in their social media, and whether their exercise of protected speech and press rights may one day give a licensing officer pause in issuing a license to exercise an entirely different constitutionally protected right.

249.     As such, persons such as Plaintiff Sloane will self-censor, knowing that government agents will have access to and be required to scrutinize their social media in the future.

250.     Entirely legitimate First Amendment speech can theoretically form the basis for denial of good moral character, such as (for example) from sovereign citizens who do not recognize and reject government authority, those who engage in antigovernment rhetoric, or those who exaggerate and use hyperbole in their social media posts.

251.     Justice Thomas, in a dissent to denial of certiorari in a previous Second Amendment challenge, listed various cases where the First Amendment has been held to protect speech that would likely run afoul of New York's social media censors, leading to a denial on the basis that the applicant is not of "good moral character:" *see Silvester v. Becerra*, 138 S. Ct. 945, 951 (2018) (Thomas, J., dissenting from denial of certiorari) "*Forsyth County v. Nationalist Movement*, 505 U. S. 123 (1992) (holding that the First Amendment forbids a county from charging even a small permitting fee to offset the costs of providing security for a white-nationalist rally); *Virginia v. Black*, 538 U. S. 343 (2003) (holding that the First Amendment protects the burning of a 25-foot cross at a Ku Klux Klan rally); *Brandenburg v. Ohio*, 395 U. S. 444, 446, n. 1 (1969) (per curiam) (holding that the First Amendment protects a film featuring Klan members wielding firearms, burning a cross, and chanting "'Bury the n*****s'")."

252.     If the above is protected speech under the First Amendment, then New York may not use similar protected First Amendment activity to deny the exercise of another right simply

based upon content or opinions of which the State of New York does not approve (such as a picture of a "dead frog"). *See Antonyuk* Opp. Br., ECF #19 at 41.

253.    Additionally, the CCIA's required interview with a government official as a condition of licensure, and required posting of sign to permit firearm possession on private property, is compelled speech.

254.    The New York laws and regulations discussed in the foregoing allegations violate the First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and they are therefore invalid.

255.    Because Defendants' laws, customs, practices, and policies, violating the First Amendment's guarantee of freedom of speech to New York approved speech, it damages Plaintiffs in violation of 42 U.S.C. § 1983.  Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## COUNT III

### U.S. CONST., AMEND. V, 42 U.S.C. § 1983 AGAINST DEFENDANTS

256.    The Fifth Amendment protects the "right to remain silent," in that "[n]o person … shall be compelled in any criminal case to be a witness against himself…."

257.    Yet the CCIA's requirements of an open-ended in-person interview, apparently to discuss whatever the licensing officer wishes to discuss, for however long or to whatever satisfaction the official sees fit, conditioning the exercise of Second Amendment rights on the forfeiture of Fifth Amendment rights not to incriminate one's self to government officials.

258.    Indeed, the only universally applicable piece of legal advice from any lawyer to any client is "don't talk to the police," and yet the CCIA requires precisely that as a condition of exercising Second Amendment rights.

259.     For example, a licensing official might ask whether an applicant has ever used drugs and, if so, when, what, and how much.  Certainly, such a question could be seen as relevant not only to basic eligibility under N.Y. Penal Law Section 400.00(1), but also to "good moral character" (depending on an official's arbitrary understanding of the standard).  If an applicant, for example, confessed that he had smoked (but did not inhale) a joint 18 months ago, presumably he might still be eligible for a carry license, since the FBI considers[49] only drug possession or use "within the past year" to be a federal prohibitor.  However, even though perhaps eligible for a carry license, the applicant might have admitted to having violated of N.Y. Pen. Law § 220.03, "criminal possession of a controlled substance in the seventh degree," a Class A misdemeanor carrying a penalty of up to one year in jail and with a statute of limitations of two years.

260.     The CCIA thus creates a forced interview with a government law enforcement official, yet provides no right to remain silent, no right to decline to answer questions, and no right to consult or have an attorney present during questioning.

261.     Moreover, because the licensing process is likely to be considered civil or quasi-civil in nature, an adverse inference (such as that an applicant does not possess "good moral character") might be drawn if a person refuses to answer a question posed by the licensing officer. *See Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).

262.     Likewise, the CCIA violates the Fifth Amendment by forcing a person "to disclose self-incriminating statements on a social-media posting in order to exercise his or her Second Amendment right in New York State." *Antonyuk* at 85.  Indeed, it is axiomatic that the Amendment "protects against any disclosures that the witness reasonably believes could be used in a criminal

---

[49] https://www.scribd.com/document/512294320/Guidance-for-Requesting-a-Submission-of-the-NICS-Indices-Unlawful-User-Addicted-of-a-Controlled-Substance-Files#download&from_embed

prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972).

263.    The Fifth Amendment's safeguards are all the more necessary in this case, as the forced disclosure mandated by the CCIA likely is made to the *very same official* whose job it is to arrest and initiate criminal prosecution through the bringing of charges.

264.    The New York laws and regulations discussed in the foregoing allegations violate the Fifth Amendment, which applies to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and they are therefore invalid.

265.    Because Defendants' laws, customs, practices, and policies violate the First Amendment's guarantee of the right to remain silent, it damages Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.    An order temporarily restraining, and/or preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the challenged sections of the CCIA;

2.    An order declaring that the challenged sections of the CCIA are unenforceable, unconstitutional and violate the First, Second, Fifth, and Fourteenth Amendments to the United States Constitution;

3.    Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988; and

4.      Such other further relief as is necessary to effectuate the Court's judgment or that

the Court otherwise deems just and appropriate.

Dated:  September 20, 2022.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383

Robert J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com
NDNY Bar Roll# 703779

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, et al.                    )
                                         )
Plaintiffs,                              )
                                         )    Civil Action No. ___1:22-cv-986 (GTS/CFH)___
v.                                       )
                                         )
KATHLEEN HOCHUL, in her Official         )
Capacity as Governor of the State of New )
York, et al.                             )
                                         )
                                         )
Defendants.                              )
_____ )

---

## DECLARATION OF STEPHEN D. STAMBOULIEH

---

1.  My name is Stephen D. Stamboulieh and I am counsel for the Plaintiffs in this matter.  I am a member of the Bar of this Court.

2.  I make this declaration for the limited purposes of putting certain documents referenced in the Complaint before the Court.

3.  Unless otherwise stated, the facts and circumstances set forth in this declaration are based upon my personal knowledge and review of the documents and information available to me.

4.  Attached as Exhibit "1" is a true and correct copy of the text of the Bill known as the Concealed Carry Improvement Act (CCIA).

5.  Attached as Exhibit "2" is a true and correct copy of the Declaration of Corey Johnson.

6.  Attached as Exhibit "3" is a true and correct copy of the Declaration of Lawrence Sloane.

7.  Attached as Exhibit "4" is a true and correct copy of the Declaration of Leslie Leman.

8.   Attached as Exhibit "5" is a true and correct copy a letter sent by the City of New York to holders of firearms licenses.

9.   Attached as Exhibit "6" is a true and correct copy of a "Legal Bureau Bulletin" issued by the Office of the Deputy Commissioner.

10. Attached as Exhibit "7" is a true and correct copy of the Declaration of Ivan Antonyuk.

11. Attached as Exhibit "8" is a true and correct copy of the Declaration of Pastor Joseph Mann.

12. Attached as Exhibit "9" is a true and correct copy of the Declaration of Alfred Terrille.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:

September 20, 2022                                    /s/ Stephen D. Stamboulieh
                                                     **Stephen D. Stamboulieh**

EXTRAORDINARY SESSION #1

Legislative Bill Drafting Commission
12053-04-2

S.         --------
              Senate
           --------

IN SENATE--Introduced by Sen

--read twice and ordered printed,
and when printed to be committed
to the Committee on

           -------- A.
              Assembly
           --------

IN ASSEMBLY--Introduced by M. of A.

with M. of A. as co-sponsors

--read once and referred to the
Committee on

*PENALA*
(Relates to licensing and other
provisions relating to firearms)

           --------

Pen L. licensing of firearms

                 AN ACT

to amend the penal law, the general
business law, the executive law, the
civil practice law and rules and the
state finance law, in relation to
licensing and other provisions
relating to firearms

The People of the State of New
York, represented in Senate and
Assembly, do enact as follows:

## IN SENATE

### Senate introducer's signature

The senators whose names are circled below wish to join me in the sponsorship of this proposal:

| | | | | |
|---|---|---|---|---|
| s15 Addabbo | s17 Felder | s07 Kaplan | s58 O'Mara | s10 Sanders |
| s52 Akshar | s59 Gallivan | s26 Kavanagh | s62 Ortt | s23 Savino |
| s36 Bailey | s05 Gaughran | s63 Kennedy | s01 Palumbo | s32 Sepulveda |
| s34 Biaggi | s12 Gianaris | s28 Krueger | s21 Parker | s41 Serino |
| s57 Borrello | s22 Gounardes | s15 Lanza | s19 Persaud | s29 Serrano |
| s04 Boyle | s47 Griffo | s11 Liu | s13 Ramos | s39 Skoufis |
| s44 Breslin | s40 Harckham | s50 Mannion | s61 Rath | s16 Stavisky |
| s25 Brisport | s54 Helming | s42 Martucci | s38 Reichlin- | s45 Stec |
| s08 Brooks | s46 Hinchey | s02 Mattera | Melnick | s35 Stewart- |
| s55 Brouk | s27 Hoylman | s53 May | s48 Ritchie | Cousins |
| s30 Cleare | s31 Jackson | s37 Mayer | s33 Rivera | s49 Tedisco |
| s14 Comrie | s43 Jordan | s20 Myrie | s60 Ryan | s06 Thomas |
| s56 Cooney | s09 Kaminsky | s51 Oberacker | s18 Salazar | s03 Weik |

## IN ASSEMBLY

### Assembly introducer's signature

The Members of the Assembly whose names are circled below wish to join me in the multi-sponsorship of this proposal:

| | | | | |
|---|---|---|---|---|
| a049 Abbate | a032 Cook | a066 Glick | a014 McDonough | a121 Salka |
| a092 Abinanti | a039 Cruz | a034 Gonzalez- | a146 McMahon | a111 Santabarbara |
| a031 Anderson | a043 Cunningham | Rojas | a137 Meeks | a090 Sayegh |
| a122 Angelino | a063 Cusick | a150 Goodell | a017 Mikulin | a099 Schmitt |
| a107 Ashby | a045 Cymbrowitz | a075 Gottfried | a101 Miller, B. | a076 Seawright |
| a035 Aubry | a018 Darling | a021 Griffin | a051 Mitaynes | a084 Septimo |
| a120 Barclay | a053 Davila | a100 Gunther | a015 Montesano | a016 Sillitti |
| a030 Barnwell | a072 De Los Santos | a114 Hawley | a145 Morinello | a052 Simon |
| a106 Barrett | a203 DeStefano | a083 Heastie | a065 Niou | a114 Simpson |
| a082 Benedetto | a070 Dickens | a028 Hevesi | a037 Nolan | a005 Smith |
| a042 Bichotte | a054 Dilan | a128 Hunter | a144 Norris | a118 Smullen |
| Hermelyn | a081 Dinowitz | a029 Hyndman | a069 O'Donnell | a022 Solages |
| a117 Blankenbush | a147 DiPietro | a079 Jackson | a091 Otis | a110 Steck |
| a098 Brabenec | a009 Durso | a104 Jacobson | a132 Palmesano | a010 Stern |
| a026 Braunstein | a048 Eichenstein | a011 Jean-Pierre | a088 Paulin | a127 Stirpe |
| a138 Bronson | a048 Englebright | a134 Jensen | a141 Peoples- | a102 Tague |
| a020 Brown, E. | a074 Epstein | a115 Jones | Stokes | a064 Tannousis |
| a012 Brown, K. | a109 Fahy | a077 Joyner | a023 Pheffer | a086 Tapia |
| a093 Burdick | a061 Fall | a125 Kelles | Amato | a071 Taylor |
| a085 Burgos | a080 Fernandez | a040 Kim | a089 Pretlow | a001 Thiele |
| a142 Burke | a008 Fitzpatrick | a105 Lalor | a073 Quart | a033 Vanel |
| a119 Buttenschon | a057 Forrest | a013 Lavine | a019 Ra | a116 Walczyk |
| a094 Byrne | a124 Friend | a097 Lawler | a038 Rajkumar | a055 Walker |
| a133 Byrnes | a046 Frontus | a126 Lemondes | a006 Ramos | a143 Wallace |
| a103 Cahill | a095 Galef | a060 Lucas | a062 Reilly | a112 Walsh |
| a044 Carroll | a050 Gallagher | a135 Lunsford | a087 Reyes | a041 Weinstein |
| a058 Chandler- | a131 Gallahan | a123 Lupardo | a078 Rivera, J. | a024 Weprin |
| Waterman | a007 Gandolfo | a129 Magnarelli | a149 Rivera, J.D. | a059 Williams |
| a136 Clark | a068 Gibbs | a036 Mamdani | a027 Rosenthal, D. | a113 Woerner |
| a047 Colton | a002 Giglio, J.A. | a130 Manktelow | a067 Rosenthal, L. | a096 Zebrowski |
| a140 Conrad | a148 Giglio, J.M. | a108 McDonald | a025 Rozic | a056 Zinerman |

1) Single House Bill (introduced and printed separately in either or both houses). Uni-Bill (introduced simultaneously in both houses and printed as one bill. Senate and Assembly introducer sign the same copy of the bill).

2) Circle names of co-sponsors and return to introduction clerk with 2 signed copies of bill and: in Assembly 2 copies of memorandum in support, in Senate 4 copies of memorandum in support (single house); or 4 signed copies of bill and 6 copies of memorandum in support (uni-bill).

LBDC 05/31/22

Case 1:22-cv-00986-GTS-CFH Document 71-2 Filed 09/20/22 Page 77 of 180

1    Section 1. The section heading and subdivisions 1, 1-a, 2, 4, 4-a,

2    4-b, 10 and 11 of section 400.00 of the penal law, subdivisions 1 and 10

3    as amended by chapter 1 of the laws of 2013, paragraph (c) of subdivi-

4    sion 1 as amended by chapter 60 of the laws of 2018, paragraph (j) of

5    subdivision 1 as amended by chapter 208 of the laws of 2022, subdivision

6    1-a as added by section 2 of part N of chapter 55 of the laws of 2020,

7    subdivision 2 as amended by chapter 212 of the laws of 2022, subdivision

8    4 as amended by chapter 242 of the laws of 2019, subdivision 4-a as

9    added by chapter 233 of the laws of 1980, subdivision 4-b as added by

10   chapter 446 of the laws of 1997, paragraph (c) of subdivision 10 as

11   added by chapter 212 of the laws of 2022, subdivision 11 as amended by

12   chapter 207 of the laws of 2022, are amended and a new subdivision 4-c

13   is added to read as follows:

14   [Licenses to carry, possess, repair and dispose of] Licensing and other

15   provisions relating to firearms.

16      1. Eligibility. No license shall be issued or renewed pursuant to this

17   section except by the licensing officer, and then only after investi-

18   gation and finding that all statements in a proper application for a

19   license are true. No license shall be issued or renewed except for an

20   applicant (a) twenty-one years of age or older, provided, however, that

21   where such applicant has been honorably discharged from the United

22   States army, navy, marine corps, air force or coast guard, or the

23   national guard of the state of New York, no such age restriction shall

24   apply; (b) of good moral character, which, for the purposes of this

25   article, shall mean having the essential character, temperament and

26   judgement necessary to be entrusted with a weapon and to use it only in

27   a manner that does not endanger oneself or others; (c) who has not been

28   convicted anywhere of a felony or a serious offense or who is not the

1    subject of an outstanding warrant of arrest issued upon the alleged

2    commission of a felony or serious offense; (d) who is not a fugitive

3    from justice; (e) who is not an unlawful user of or addicted to any

4    controlled substance as defined in section 21 U.S.C. 802; (f) who being

5    an alien (i) is not illegally or unlawfully in the United States or (ii)

6    has not been admitted to the United States under a nonimmigrant visa

7    subject to the exception in 18 U.S.C. 922(y)(2); (g) who has not been

8    discharged from the Armed Forces under dishonorable conditions; (h) who,

9    having been a citizen of the United States, has not renounced his or her

10   citizenship; (i) who has stated whether he or she has ever suffered any

11   mental illness; (j) who has not been involuntarily committed to a facil-

12   ity under the jurisdiction of an office of the department of mental

13   hygiene pursuant to article nine or fifteen of the mental hygiene law,

14   article seven hundred thirty or section 330.20 of the criminal procedure

15   law or substantially similar laws of any other state, section four

16   hundred two or five hundred eight of the correction law, section 322.2

17   or 353.4 of the family court act, has not been civilly confined in a

18   secure treatment facility pursuant to article ten of the mental hygiene

19   law, or has not been the subject of a report made pursuant to section

20   9.46 of the mental hygiene law; (k) who has not had a license revoked or

21   who is not under a suspension or ineligibility order issued pursuant to

22   the provisions of section 530.14 of the criminal procedure law or

23   section eight hundred forty-two-a of the family court act; (l) in the

24   county of Westchester, who has successfully completed a firearms safety

25   course and test as evidenced by a certificate of completion issued in

26   his or her name and endorsed and affirmed under the penalties of perjury

27   by a duly authorized instructor, except that: (i) persons who are honor-

28   ably discharged from the United States army, navy, marine corps or coast

1   guard,  or  of  the national guard of the state of New York, and produce

2   evidence of official  qualification  in  firearms  during  the  term  of

3   service  are  not  required  to have completed those hours of a firearms

4   safety  course pertaining to the safe use, carrying, possession, mainte-

5   nance and storage of a firearm; [and] (ii) persons who were licensed  to

6   possess  a  pistol or revolver prior to the effective date of this para-

7   graph are not required to have completed a firearms  safety  course  and

8   test, provided, however, persons with a license issued under paragraph

9   (f) of subdivision two of this section prior to the  effective  date  of

10  the  laws  of two thousand twenty-two which amended this paragraph shall

11  be required to complete the training required by subdivision nineteen of

12  this section prior to the recertification of  such  license;  and  (iii)

13  persons applying for a license under paragraph (f) of subdivision two of

14  this  section  on or after the effective date of the chapter of the laws

15  of two thousand twenty-two which amended this  paragraph  who  shall  be

16  required to complete the training required under subdivision nineteen of

17  this  section for such license; (m) who has not had a guardian appointed

18  for him or her pursuant to any provision of state law, based on a deter-

19  mination that as a  result  of  marked  subnormal  intelligence,  mental

20  illness, incompetency, incapacity, condition or disease, he or she lacks

21  the  mental  capacity to contract or manage his or her own affairs; [and

22  (n) concerning whom no good cause exists for the denial of the license.]

23  (n) for a license issued under paragraph (f) of subdivision two of  this

24  section,  that the applicant has not been convicted within five years of

25  the date of the application of any of the following: (i)  assault    in

26  the   third  degree, as defined in section 120.00 of this chapter; (ii)

27  misdemeanor driving  while intoxicated,  as  defined  in  section  eleven

28  hundred ninety-two of the vehicle and traffic law; or (iii) menacing, as

1   defined in section 120.15 of this chapter; and (o) for a license  issued

2   under  paragraph  (f)  of subdivision two of this section, the applicant

3   shall meet in person with the licensing officer for an  interview    and

4   shall,  in  addition  to  any other information or forms required by the

5   license application submit to the licensing officer the following infor-

6   mation:  (i) names and  contact  information  for    the    applicant's

7   current  spouse,  or domestic  partner, any other adults residing in the

8   applicant's home,  including  any  adult children of the applicant, and

9   whether or not there are minors residing, full time or part time, in the

10  applicant's home; (ii) names and contact information  of  no  less  than

11  four  character  references  who   can attest to the   applicant's good

12  moral character and that such applicant has not engaged in any acts,  or

13  made  any  statements   that suggest they are likely to engage in conduct

14  that would result in harm to themselves or others;  (iii)  certification

15  of  completion  of the training required in subdivision nineteen of this

16  section; (iv) a list of former and current social  media  accounts   of

17  the  applicant  from  the  past  three  years to confirm the information

18  regarding the applicants character and conduct as required  in  subpara-

19  graph (ii) of this paragraph; and (v) such other information required by

20  the  licensing  officer that is reasonably necessary and related to the

21  review of the licensing application.

22  1-a. No person shall engage in the business of gunsmith or  dealer  in

23  firearms  unless  licensed  pursuant  to  this  section. An applicant to

24  engage in such business shall also be a citizen of  the  United  States,

25  more  than  twenty-one  years of age and shall be required to maintain a

26  place of business in the city or county where the license is issued. For

27  such business, if the applicant is a firm or  partnership,  each  member

28  thereof  shall  comply  with  all  of the requirements set forth in this

1  subdivision and if the applicant is a corporation, each officer  thereof

2  shall so comply.

3     [1-a.]  1-b.  For purposes of subdivision one of this section, serious

4  offense shall include an offense in any jurisdiction or the former penal

5  law that includes all of the essential elements of a serious offense  as

6  defined  by  subdivision  seventeen  of  section 265.00 of this chapter.

7  Nothing in this subdivision shall preclude the denial of a license based

8  on the commission of, arrest for or conviction  of  an  offense  in  any

9  other  jurisdiction which does not include all of the essential elements

10  of a serious offense.

11     2. Types of licenses. A license for gunsmith  or  dealer  in  firearms

12  shall be issued to engage in such business. A license for a semiautomat-

13  ic rifle, other than an assault weapon or disguised gun, shall be issued

14  to  purchase  or take possession of such a [firearm] semiautomatic rifle

15  when such transfer of ownership occurs on or after the effective date of

16  [the] chapter two hundred twelve of the laws of two thousand  twenty-two

17  that amended this subdivision. A license for a pistol or revolver, other

18  than  an  assault weapon or a disguised gun, shall be issued to (a) have

19  and possess in his dwelling by a householder; (b) have  and  possess  in

20  his  place  of business by a merchant or storekeeper; (c) have and carry

21  concealed while so employed by a messenger employed by a banking  insti-

22  tution  or express company; (d) have and carry concealed by a justice of

23  the supreme court in the first or second judicial departments, or  by  a

24  judge  of  the  New  York city civil court or the New York city criminal

25  court; (e) have and carry concealed while  so  employed  by  a  regular

26  employee of an institution of the state, or of any county, city, town or

27  village,  under  control  of a commissioner of correction of the city or

28  any warden, superintendent or head keeper of any state prison,  peniten-

1  tiary, workhouse, county jail or other institution for the detention of

2  persons convicted or accused of crime or held as witnesses in criminal

3  cases, provided that application is made therefor by such commissioner,

4  warden, superintendent or head keeper; (f) have and carry concealed,

5  without regard to employment or place of possession subject to the

6  restrictions of state and federal law, by any person [when proper cause

7  exists for the issuance thereof]; and (g) have, possess, collect and

8  carry antique pistols which are defined as follows: (i) any single shot,

9  muzzle loading pistol with a matchlock, flintlock, percussion cap, or

10 similar type of ignition system manufactured in or before [1898] 1898,

11 which is not designed for using rimfire or conventional centerfire fixed

12 ammunition; and (ii) any replica of any pistol described in clause (i)

13 hereof if such replica[--].

14    (1) is not designed or redesigned for using rimfire or conventional

15 centerfire fixed ammunition, or

16    (2) uses rimfire or conventional centerfire fixed ammunition which is

17 no longer manufactured in the United States and which is not readily

18 available in the ordinary channels of commercial trade.

19    4. Investigation. Before a license is issued or renewed, there shall

20 be an investigation of all statements required in the application by the

21 duly constituted police authorities of the locality where such applica-

22 tion is made, including but not limited to such records as may be acces-

23 sible to the division of state police or division of criminal justice

24 services pursuant to section 400.02 of this article. For that purpose,

25 the records of the appropriate office of the department of mental

26 hygiene concerning previous or present mental illness of the applicant

27 shall be available for inspection by the investigating officer of the

28 police authority. Where the applicant is domiciled in a foreign state,

1  the investigation shall include inquiry of the foreign state for records

2  concerning the previous or present mental illness of the applicant, and,

3  to the extent necessary for inspection by the investigating officer, the

4  applicant shall execute a waiver of confidentiality of such record in

5  such form as may be required by the foreign state. In order to ascertain

6  any previous criminal record, the investigating officer shall take the

7  fingerprints and physical descriptive data in quadruplicate of each

8  individual by whom the application is signed and verified. Two copies of

9  such fingerprints shall be taken on standard fingerprint cards eight

10 inches square, and one copy may be taken on a card supplied for that

11 purpose by the federal bureau of investigation; provided, however, that

12 in the case of a corporate applicant that has already been issued a

13 dealer in firearms license and seeks to operate a firearm dealership at

14 a second or subsequent location, the original fingerprints on file may

15 be used to ascertain any criminal record in the second or subsequent

16 application unless any of the corporate officers have changed since the

17 prior application, in which case the new corporate officer shall comply

18 with procedures governing an initial application for such license. When

19 completed, one standard card shall be forwarded to and retained by the

20 division of criminal justice services in the executive department, at

21 Albany. A search of the files of such division and written notification

22 of the results of the search shall be forwarded to the investigating

23 officer and shall be made without unnecessary delay. Thereafter, such

24 division shall notify the licensing officer and the executive depart-

25 ment, division of state police, Albany, of any criminal record of the

26 applicant filed therein subsequent to the search of its files. A second

27 standard card, or the one supplied by the federal bureau of investi-

28 gation, as the case may be, shall be forwarded to that bureau at Wash-

1  ington with a request that the files  of  the  bureau  be  searched  and

2  notification  of  the results of the search be made to the investigating

3  police authority. Of the remaining two fingerprint cards, one  shall  be

4  filed  with  the executive department, division of state police, Albany,

5  within ten days after issuance of  the  license,  and  the  other  shall

6  remain  on file with the investigating police authority. No such finger-

7  prints may be inspected by any person other than a peace officer, who is

8  acting pursuant to his or her  special  duties,  or  a  police  officer,

9  except  on  order of a judge or justice of a court of record either upon

10  notice to the licensee or without notice, as the judge  or  justice  may

11  deem  appropriate.  Upon  completion  of  the  investigation, the police

12  authority shall report the results  to  the  licensing  officer  without

13  unnecessary delay.

14    4-a.  Appeals  from denial of an application, renewal, recertification

15  or license revocation. If an application for a license  is  denied,  not

16  renewed,  not recertified, or revoked, the licensing officer shall issue

17  a written notice to the applicant setting forth  the  reasons  for  such

18  denial.  An applicant may, within ninety days of receipt of such notice,

19  request a hearing to appeal the denial to the appeals board  created  by

20  the  division  of  criminal  justice  services and the superintendent of

21  state police. An individual may be represented by counsel at any appear-

22  ance before the appeals board and shall be afforded  an  opportunity  to

23  present  additional  evidence  in  support  of  their application.  The

24  commissioner of criminal justice services  and  the  superintendent  of

25  state  police  shall  promulgate  rules  and  regulations governing such

26  appeals process.

27    4-b. Processing of license  applications.  Applications  for  licenses

28  shall be accepted for processing by the licensing officer at the time of

1  presentment. Except upon written notice to the applicant specifically

2  stating the reasons for any delay, in each case  the licensing  officer

3  shall act upon any application for a license pursuant to this section

4  within six months of the date of presentment of such an application to

5  the appropriate authority. Such delay may only be  for  good  cause  and

6  with respect to the applicant.  In acting  upon an application, the

7  licensing officer shall either deny the application for reasons  specif-

8  ically and concisely stated in  writing or grant the application and

9  issue the license applied for.

10  [4-b.] 4-c. Westchester county firearms safety course certificate.  In

11  the county of Westchester, at the time of application, the licensing

12  officer to which the license application is made shall provide a copy of

13  the safety course booklet to each license applicant. Before such license

14  is issued, such licensing officer shall require that the applicant

15  submit a certificate of successful completion of a firearms safety

16  course and test issued in his or her name and endorsed and affirmed

17  under the penalties of perjury by a duly authorized instructor.

18  10. License: expiration, certification and renewal. (a) Any license

19  for gunsmith or dealer in firearms and, in the city of  New  York,  any

20  license to carry or possess a pistol or revolver, issued at any time

21  pursuant to this section or prior to the first day of July, nineteen

22  hundred sixty-three and not limited to expire on an earlier date fixed

23  in the license, shall, except as otherwise provided in paragraph (d)  of

24  this subdivision, expire not more than three years after the date of

25  issuance. In the counties of Nassau, Suffolk and Westchester,  any

26  license to carry or possess a pistol or revolver, issued at any time

27  pursuant to this section or prior to the first day of July, nineteen

28  hundred sixty-three and not limited to expire on an earlier date fixed

1  in the license, shall expire not more than five years after the date  of

2  issuance;  however, in the county of Westchester, any such license shall

3  be certified prior to the first day of April, two thousand,  in  accord-

4  ance  with  a schedule to be contained in regulations promulgated by the

5  commissioner of the division of criminal  justice  services,  and  every

6  such  license  shall, except as otherwise provided in paragraph (d) of

7  this subdivision, be  recertified  every  five  years  thereafter.  For

8  purposes  of  this  section  certification  shall mean that the licensee

9  shall provide to the licensing officer the following  information  only:

10 current name, date of birth, current address, and the make, model, cali-

11 ber  and serial number of all firearms currently possessed. Such certif-

12 ication information shall be filed by the licensing officer in the  same

13 manner  as  an amendment. Elsewhere than in the city of New York and the

14 counties of Nassau, Suffolk and Westchester, any  license  to  carry  or

15 possess  a  pistol  or  revolver,  issued  at  any time pursuant to this

16 section or prior to the first day of July, nineteen hundred  sixty-three

17 and  not  previously  revoked or cancelled, shall be in force and effect

18 until revoked as herein provided. Any license not  previously  cancelled

19 or  revoked shall remain in full force and effect for thirty days beyond

20 the stated expiration date on such license. Any application to  renew  a

21 license that has not previously expired, been revoked or cancelled shall

22 thereby extend the term of the license until disposition of the applica-

23 tion  by the licensing officer. In the case of a license for gunsmith or

24 dealer in firearms, in counties having a population  of  less  than  two

25 hundred  thousand  inhabitants,  photographs  and  fingerprints shall be

26 submitted on original applications and upon renewal thereafter [only] at

27 [six] three year intervals. Upon satisfactory proof  that  a  currently

28 valid  original  license  has  been despoiled, lost or otherwise removed

1  from the possession of the licensee and upon application  containing  an

2  additional photograph of the licensee, the licensing officer shall issue

3  a duplicate license.

4     (b) All licensees shall be recertified to the division of state police

5  every  five  years thereafter, except as otherwise provided in paragraph

6  (d) of this subdivision. Any license issued before the effective date of

7  the chapter of the laws of two thousand thirteen which added this  para-

8  graph  shall be recertified by the licensee on or before January thirty-

9  first, two thousand eighteen, and not less than one year prior  to  such

10  date,  the  state  police shall send a notice to all license holders who

11  have not recertified by such time. Such recertification shall  be  in  a

12  form  as  approved by  the  superintendent of state police, which shall

13  request the license holder's name, date of birth, gender, race, residen-

14  tial address, social security number, firearms possessed by such license

15  holder, email address at the option of the license holder and an  affir-

16  mation  that  such  license  holder  is  not  prohibited from possessing

17  firearms. The form may be in an electronic form if so designated by  the

18  superintendent  of  state  police.  Failure  to recertify shall act as a

19  revocation of such license. If the New York state police discover  as  a

20  result  of the recertification process that a licensee failed to provide

21  a change of address, the New York state police  shall  not  require  the

22  licensing officer to revoke such license.

23     (c)  A license to purchase or take possession of a semiautomatic rifle

24  as defined in subdivision two of this section shall  be  recertified  to

25  the applicable licensing officer every five years following the issuance

26  of  such  license.  Failure to renew such a license shall be a violation

27  punishable by a fine not to exceed two hundred fifty dollars,  and  such

28  failure  to  renew  shall  be  considered  by the licensing officer when

1   reviewing future license applications by the license holder pursuant  to

2   this chapter.

3       (d)  Licenses  issued  under  paragraph (f) of subdivision two of this

4   section shall be recertified or renewed in the same form and  manner  as

5   otherwise  required  by  this  subdivision,  provided however, that such

6   licenses shall be recertified or renewed every three years following the

7   issuance of such license. For licenses issued  prior  to  the  effective

8   date  of  this paragraph that were issued more than three years prior to

9   such date, or will expire in less than one year from such date shall  be

10  recertified or renewed within one year of such date.

11      11. License: revocation and suspension. (a) The conviction of a licen-

12  see  anywhere  of  a felony or serious offense or a licensee at any time

13  becoming ineligible to obtain a license [under this section shall  oper-

14  ate  as],  including engaging in conduct that would have resulted in the

15  denial of a license, under this section shall operate as or  be  grounds

16  for,  a revocation of the license. A license may be revoked or suspended

17  as provided for in section 530.14 of  the  criminal  procedure  law  or

18  section  eight hundred forty-two-a of the family court act. Except for a

19  license issued pursuant to section 400.01 of this article, a license may

20  be revoked and cancelled at any time in the city of New York, and in the

21  counties of Nassau and Suffolk, by the licensing officer, and  elsewhere

22  than  in  the  city  of  New  York by any judge or justice of a court of

23  record; a license issued pursuant to section 400.01 of this article  may

24  be  revoked  and  cancelled  at any time by the licensing officer or any

25  judge or justice of a court of record. A license to engage in the  busi-

26  ness  of  dealer  may  be  revoked or suspended for any violation of the

27  provisions of article thirty-nine-BB of the general  business  law.  The

28  official  revoking  a  license shall give written notice thereof without

1  unnecessary delay to the executive department, division of state police,

2  Albany, and shall also notify immediately the  duly  constituted  police

3  authorities  of  the  locality.  The licensing officer shall revoke any

4  license  issued  in  which  an applicant knowingly made a material false

5  statement on the application.  Notice of a revocation under this  subdi-

6  vision  shall  be  issued in writing and shall include the basis for the

7  determination, which shall  be  supported  by  a  preponderance  of  the

8  evidence. Such notice shall also include information regarding the abil-

9  ity  to  appeal  such  decision in accordance with subdivision four-a of

10  this section.

11  (b) Whenever the director of community services or his or her designee

12  makes a report pursuant to section 9.46 of the mental hygiene  law,  the

13  division  of  criminal  justice  services shall convey such information,

14  whenever it determines that the person named in the report  possesses  a

15  license  issued  pursuant  to this section, to the appropriate licensing

16  official, who shall issue an order suspending or revoking such license.

17  (c) In any instance in  which  a  person's  license  is  suspended  or

18  revoked  under  paragraph  (a)  or  (b) of this subdivision, such person

19  shall surrender such license to the appropriate licensing  official  and

20  any  and  all  firearms,  rifles, or shotguns owned or possessed by such

21  person shall be surrendered to an appropriate law enforcement agency  as

22  provided  in  subparagraph  (f)  of  paragraph  one  of subdivision a of

23  section 265.20 of this chapter. In  the  event  such  license,  firearm,

24  shotgun,  or  rifle  is not surrendered, such items shall be removed and

25  declared a nuisance and any  police  officer  or  peace  officer  acting

26  pursuant  to  his  or her special duties is authorized to remove any and

27  all such weapons.

1    § 2. Section 837 of the executive law  is  amended  by  adding  a   new

2    subdivision 23 to read as follows:

3    23.  (a)  In  conjunction with the superintendent of the state police,

4    promulgate policies and procedures with  regard  to  standardization  of

5    firearms  safety training required under subdivision nineteen of section

6    400.00 of the penal law, which shall  include  the  approval  of  course

7    materials and promulgation of proficiency standards for live fire train-

8    ing; and

9    (b)  In conjunction with the superintendent of state police, create an

10   appeals board for the purpose of hearing appeals as provided in subdivi-

11   sion four-a of section 400.00 of the penal law and promulgate rules  and

12   regulations governing such appeals.

13   § 3. The executive law is amended by adding a new section 235 to read

14   as follows:

15   § 235. Firearms safety training, and licensing appeals. 1. The  super-

16   intendent shall, in conjunction with the commissioner of the division of

17   criminal  justice  services,  promulgate  policies  and  procedures with

18   regard to standardization of firearms  safety  training  required  under

19   subdivision  nineteen  of  section  400.00 of the penal law, which shall

20   include the approval of course materials and the promulgation of  profi-

21   ciency standards for live fire training.

22   2.  The  superintendent,  in  conjunction with the commissioner of the

23   division of criminal justice services, shall create an appeals board for

24   the purpose of hearing appeals as  provided  in  subdivision  four-a  of

25   section  400.00  of  the  penal law and promulgate rules and regulations

26   governing such appeals.

27   § 4. The penal law is amended by adding a new section 265.01-e to read

28   as follows:

1  § 265.01-e Criminal possession of a  firearm,  rifle  or  shotgun  in  a

2                 sensitive location.

3   1.  A  person  is guilty of criminal possession of a firearm, rifle or

4  shotgun in a sensitive location when such person  possesses  a  firearm,

5  rifle  or shotgun in or upon a sensitive location, and such person knows

6  or reasonably should know such location is a sensitive location.

7   2. For the purposes of this section, a sensitive location shall mean:

8   (a) any place owned or under the control  of federal, state  or  local

9  government,  for  the  purpose  of  government administration, including

10  courts;

11   (b) any location providing  health,  behavioral  health,  or  chemical

12  dependance care or services;

13   (c) any place of worship or religious observation;

14   (d) libraries, public playgrounds, public parks, and zoos;

15   (e)  the location of any program licensed, regulated, certified, fund-

16  ed, or approved by the office of  children  and  family  services  that

17  provides  services  to  children,  youth,  or  young adults, any legally

18  exempt childcare provider; a childcare program for  which  a  permit  to

19  operate  such  program  has  been issued by the department of health and

20  mental hygiene pursuant to the health code of the city of New York;

21   (f) nursery schools, preschools, and summer camps;

22   (g) the location of any program licensed, regulated, certified,  oper-

23  ated,  or  funded  by the office for people with developmental disabili-

24  ties;

25   (h) the location of any program licensed, regulated, certified,  oper-

26  ated, or funded by office of addiction services and supports;

27   (i)  the location of any program licensed, regulated, certified, oper-

28  ated, or funded by the office of mental health;

1    (j) the location of any program licensed, regulated, certified, oper-

2    ated, or funded by the office of temporary and disability assistance;

3    (k) homeless shelters, runaway homeless youth shelters, family shel-

4    ters, shelters for adults, domestic violence shelters, and emergency

5    shelters, and residential programs for victims of domestic violence;

6    (l) residential settings licensed, certified, regulated, funded, or

7    operated by the department of health;

8    (m) in or upon any building or grounds, owned or leased, of any educa-

9    tional institutions, colleges and universities, licensed private career

10   schools, school districts, public schools, private schools licensed

11   under article one hundred one of the education law, charter schools,

12   non-public schools, board of cooperative educational services, special

13   act schools, preschool special education programs, private residential

14   or non-residential schools for the education of students with disabili-

15   ties, and any state-operated or state-supported schools;

16   (n) any place, conveyance, or vehicle used for public transportation

17   or public transit, subway cars, train cars, buses, ferries, railroad,

18   omnibus, marine or aviation transportation; or any facility used for or

19   in connection with service in the transportation of passengers,

20   airports, train stations, subway and rail stations, and bus terminals;

21   (o) any establishment issued a license for on-premise consumption

22   pursuant to article four, four-A, five, or six of the alcoholic beverage

23   control law where alcohol is consumed and any establishment licensed

24   under article four of the cannabis law for on-premise consumption;

25   (p) any place used for the performance, art entertainment, gaming, or

26   sporting events such as theaters, stadiums, racetracks, museums, amuse-

27   ment parks, performance venues, concerts, exhibits, conference centers,

1  banquet  halls, and gaming facilities and video lottery terminal facili-

2  ties as licensed by the gaming commission;

3   (q) any location being used as a polling place;

4   (r)  any  public sidewalk or other public area restricted from general

5  public access for a limited time or special event that has been issued a

6  permit for such time or event by a governmental entity,  or  subject  to

7  specific,  heightened  law  enforcement protection, or has otherwise had

8  such access restricted by a governmental entity, provided such  location

9  is identified as such by clear and conspicuous signage;

10   (s) any gathering of individuals to collectively express their consti-

11  tutional rights to protest or assemble;

12   (t)  the  area  commonly known as Times Square, as such area is deter-

13  mined and identified by the city of New York; provided such  area  shall

14  be clearly and conspicuously identified with signage.

15   3. This section shall not apply to:

16   (a)  consistent with federal law, law enforcement who qualify to carry

17  under the federal law enforcement officers safety act, 18 U.S.C. 926C;

18   (b) persons who are police officers as defined in subdivision  thirty-

19  four of section 1.20 of the criminal procedure law;

20   (c)  persons  who are designated peace officers by section 2.10 of the

21  criminal procedure law;

22   (d) persons who were employed as police officers as defined in  subdi-

23  vision thirty-four of section 1.20 of the criminal procedure law but are

24  retired;

25   (e) security guards as defined by and registered under article seven-A

26  of  the  general  business  law,  who  have been granted a special armed

27  registration card, while at the location of their employment and  during

28  their work hours as such a security guard;

1    (f) active-duty military personnel;

2    (g) persons licensed under paragraph (c), (d) or (e) of subdivision

3  two of section 400.00 of this chapter while in the course of his or her

4  official duties;

5    (h) a government employee under the express written consent of such

6  employee's supervising government entity for the purposes of natural

7  resource protection and management;

8    (i) persons lawfully engaged in hunting activity, including hunter

9  education training; or

10    (j) persons operating a program in a sensitive location out of their

11  residence, as defined by this section, which is licensed, certified,

12  authorized, or funded by the state or a municipality, so long as such

13  possession is in compliance with any rules or regulations applicable to

14  the operation of such program and use or storage of firearms.

15    Criminal possession of a firearm, rifle or shotgun in a sensitive

16  location is a class E felony.

17    § 5. The penal law is amended by adding a new section 265.01-d to read

18  as follows:

19  § 265.01-d Criminal possession of a weapon in a restricted location.

20    1. A person is guilty of criminal possession of a weapon in a

21  restricted location when such person possesses a firearm, rifle, or

22  shotgun and enters into or remains on or in private property where such

23  person knows or reasonably should know that the owner or lessee of such

24  property has not permitted such possession by clear and conspicuous

25  signage indicating that the carrying of firearms, rifles, or shotguns on

26  their property is permitted or has otherwise given express consent.

27    2. This section shall not apply to:

1    (a) police officers as defined in section 1.20 of the criminal  proce-

2  dure law;

3    (b)  persons  who  are designated peace officers as defined in section

4  2.10 of the criminal procedure law;

5    (c) persons who were employed as police officers as defined in section

6  1.20 of the criminal procedure law, but are retired;

7    (d) security guards as defined by and registered under article seven-A

8  of the general business law who has been granted a special armed  regis-

9  tration card, while at the location of their employment and during their

10  work hours as such a security guard;

11    (e) active-duty military personnel;

12    (f)  persons  licensed  under paragraph (c), (d) or (e) of subdivision

13  two of section 400.00 of this chapter while in the course of his or  her

14  official duties; or

15    (g) persons lawfully engaged in hunting activity.

16    Criminal  possession of a weapon in a restricted location is a class E

17  felony.

18    § 6. Subdivision a of section 265.20 of the penal law  is  amended  by

19  adding a new paragraph 3-a to read as follows:

20    3-a.  Possession  of a pistol or revolver by a person undergoing live-

21  fire range training pursuant to section 400.00  of  this  chapter  while

22  such  person  is  undergoing  such  training and is supervised by a duly

23  authorized instructor.

24    § 7. Section 400.02 of the penal law, as amended by chapter 244 of the

25  laws of 2019, is amended to read as follows:

26  § 400.02 Statewide license and record database.

27    1. There shall be a statewide license and record database which  shall

28  be  created  and  maintained by the division of state police the cost of

1   which shall not be borne  by  any  municipality.  Records  assembled  or

2   collected  for  purposes  of  inclusion  in  such  database  shall not be

3   subject to disclosure pursuant to article six  of  the  public  officers

4   law.  [Records] <u>All records</u> containing granted license applications <u>from</u>

5   <u>all licensing authorities</u> shall be [periodically] <u>monthly</u> checked by the

6   division of criminal justice services <u>in conjunction with  the  division</u>

7   <u>of state police</u> against criminal conviction, <u>criminal indictment,</u> mental

8   health,  <u>extreme  risk  protection orders, orders of protection,</u> and all

9   other records as are necessary to determine their continued accuracy  as

10  well  as  whether an individual is no longer a valid license holder. The

11  division of criminal justice services shall also check pending  applica-

12  tions  made  pursuant  to this article against such records to determine

13  whether a license may be granted. All state  <u>and local</u>  agencies  shall

14  cooperate  with  the division of criminal justice services, as otherwise

15  authorized by law, in making their records available  for  such  checks.

16  The  division  of  criminal  justice  services, upon determining that an

17  individual is ineligible to possess a license, or is no longer  a  valid

18  license  holder,  shall notify the applicable licensing official of such

19  determination and such licensing official shall not issue a  license  or

20  <u>shall</u>  revoke  such  license  and any weapons owned or possessed by such

21  individual shall be removed consistent with the provisions  of  subdivi-

22  sion  eleven  of  section  400.00  of  this article. Local and state law

23  enforcement shall have access to such database  in  the  performance  of

24  their  duties.  Records assembled or collected for purposes of inclusion

25  in the database established by this section shall be  released  pursuant

26  to a court order.

27  <u>2. There shall be a statewide license and record database specific for</u>

28  <u>ammunition  sales  which shall be created and maintained by the division</u>

1   of state police the cost of which shall not be borne by any municipality

2   no later than thirty days upon designating the division of state  police

3   as   the  point  of   contact to perform both firearm and ammunition back-

4   ground  checks  under  federal  and  state  law.  Records  assembled  or

5   collected for purposes of  inclusion  in  such  database  shall  not  be

6   subject  to  disclosure  pursuant  to article six of the public officers

7   law. All  records  containing  granted  license  applications  from  all

8   licensing authorities shall be monthly checked by the division of crimi-

9   nal  justice  services  in conjunction with the division of state police

10  against  criminal  conviction,  criminal  indictments,  mental   health,

11  extreme  risk  protection  orders,  orders  of protection, and all other

12  records as are necessary to determine their continued accuracy  as  well

13  as  whether an individual is no longer a valid license holder. The divi-

14  sion of criminal justice services shall also check pending  applications

15  made  pursuant to this article against such records to determine whether

16  a license may be granted. All state and local agencies  shall  cooperate

17  with  the division of criminal justice services, as otherwise authorized

18  by law, in making their records available for such checks. No later than

19  thirty days after the superintendent of the state police certifies  that

20  the  statewide  license and record database established pursuant to this

21  section and the statewide license and record  database  established  for

22  ammunition  sales  are  operational  for the purposes of this section, a

23  dealer in firearms licensed pursuant to section 400.00 of this  article,

24  a  seller of ammunition as defined in subdivision twenty-four of section

25  265.00 of this chapter shall not transfer any ammunition  to  any  other

26  person who is not a dealer in firearms as defined in subdivision nine of

27  such  section 265.00 or a seller of ammunition as defined in subdivision

28  twenty-four of section 265.00 of this chapter, unless:

1    (a) before the completion of the  transfer,  the  licensee  or  seller

2  contacts  the  statewide  license  and  record database and provides the

3  database with information sufficient to identify such dealer  or  seller

4  transferee based on information on the transferee's identification docu-

5  ment  as  defined  in  paragraph (c) of this subdivision, as well as the

6  amount, caliber, manufacturer's name and serial number, if any, of  such

7  ammunition;

8    (b)  the  licensee  or seller is provided with a unique identification

9  number; and

10    (c) the transferor has verified the  identity  of  the  transferee  by

11  examining a valid state identification document of the transferee issued

12  by  the department of motor vehicles or if the transferee is not a resi-

13  dent of the state of New York, a valid identification document issued by

14  the transferee's state or country of residence containing  a  photograph

15  of the transferee.

16    § 8. Subdivisions 2 and 6 of section 400.03 of the penal law, as added

17  by chapter 1 of the laws of 2013, are amended to read as follows:

18    2. Any seller of ammunition or dealer in firearms shall keep [a record

19  book]  either  an  electronic  record,  or  dataset,  or  an  organized

20  collection of structured information, or data,  typically  stored  elec-

21  tronically  in  a computer system approved as to form by the superinten-

22  dent of state police. In the record [book] shall be entered at the  time

23  of  every  transaction involving ammunition the date, name, age, occupa-

24  tion and residence of any person from whom ammunition is received or  to

25  whom  ammunition  is  delivered, and the amount, calibre, manufacturer's

26  name and serial number, or if none, any other distinguishing  number  or

27  identification  mark on such ammunition. [The record book shall be main-

28  tained on the premises mentioned and described in the license and  shall

1  be open at all reasonable hours for inspection by any peace officer,

2  acting pursuant to his or her special duties, or police officer. Any

3  record produced pursuant to this section and any transmission thereof to

4  any government agency shall not be considered a public record for

5  purposes of article six of the public officers law.]

6  6. If the superintendent of state police certifies that background

7  checks of ammunition purchasers may be conducted through the national

8  instant criminal background check system or through the division of

9  state police once the division has been designated point of contact, use

10  of that system by a dealer or seller shall be sufficient to satisfy

11  subdivisions four and five of this section and such checks shall be

12  conducted through such system, provided that a record of such trans-

13  action shall be forwarded to the state police in a form determined by

14  the superintendent.

15  § 9. Section 265.45 of the penal law, as amended by chapter 133 of the

16  laws of 2019, is amended to read as follows:

17  § 265.45 Failure to safely store rifles, shotguns, and firearms in the

18            first degree.

19  1. No person who owns or is custodian of a rifle, shotgun or firearm

20  who resides with an individual who: (i) is under [sixteen] eighteen

21  years of age; (ii) such person knows or has reason to know is prohibited

22  from possessing a rifle, shotgun or firearm pursuant to a temporary or

23  final extreme risk protection order issued under article sixty-three-A

24  of the civil practice law and rules or 18 U.S.C. § 922(g) (1), (4), (8)

25  or (9); or (iii) such person knows or has reason to know is prohibited

26  from possessing a rifle, shotgun or firearm based on a conviction for a

27  felony or a serious offense, shall store or otherwise leave such rifle,

28  shotgun or firearm out of his or her immediate possession or control

1  without  having  first securely locked such rifle, shotgun or firearm in

2  an appropriate safe storage depository or rendered it incapable of being

3  fired by use of a gun locking device appropriate to that weapon.

4      2.  No  person  shall  store  or  otherwise leave a rifle, shotgun, or

5  firearm out of his or her immediate possession or control inside a vehi-

6  cle without first removing the ammunition from and securely locking such

7  rifle, shotgun, or firearm in an appropriate safe storage depository out

8  of sight from outside of the vehicle.

9      3. For purposes of this section "safe storage depository" shall mean a

10  safe or other secure container which, when locked, is incapable of being

11  opened without the key, keypad, combination or other unlocking mechanism

12  and is capable of  preventing  an  unauthorized  person  from  obtaining

13  access  to  and  possession of the weapon contained therein and shall be

14  fire, impact, and tamper resistant. Nothing in  this  section  shall  be

15  deemed  to affect, impair or supersede any special or local act relating

16  to the safe storage of rifles, shotguns or firearms which  impose  addi-

17  tional  requirements  on the owner or custodian of such weapons. For the

18  purposes of subdivision two of this  section,  a  glove  compartment  or

19  glove  box shall not be considered an appropriate safe storage deposito-

20  ry.

21      4. It shall not be a violation of this section to allow a person  less

22  than  [sixteen] eighteen years of age access to: (i) a firearm, rifle or

23  shotgun for lawful use as authorized under paragraph seven or seven-e of

24  subdivision a of section 265.20 of this article,  or  (ii)  a  rifle  or

25  shotgun  for  lawful use as authorized by article eleven of the environ-

26  mental conservation law when such person less  than  [sixteen]  eighteen

27  years of age is the holder of a hunting license or permit and such rifle

28  or shotgun is used in accordance with such law.

1    Failure  to  safely  store rifles, shotguns, and firearms in the first

2    degree is a class A misdemeanor.

3        § 10. The penal law is amended by adding a new section 400.30 to read

4    as follows:

5    § 400.30 Application.

6        Nothing in this article shall be construed to impair  or  in  any  way

7    prevent  the enactment or application of any local law, code, ordinance,

8    rule or regulation that is more restrictive  than  any  requirement  set

9    forth in or established by this article.

10       § 11.  Section 270.20 of the penal law, as added by chapter 56 of the

11   laws of 1984, and subdivision 1 as amended by chapter 317 of the laws of

12   2001, is amended to read as follows:

13   § 270.20 Unlawful wearing of [a] body [vest] armor.

14       1. A person is guilty of the unlawful wearing of [a] body [vest] armor

15   when acting either alone or with one or more other  persons  he  commits

16   any  violent  felony offense defined in section 70.02 while possessing a

17   firearm, rifle or shotgun and in the course of  and  in  furtherance  of

18   such crime he or she wears [a] body [vest] armor.

19       2.  For  the purposes of this section [a] "body [vest] armor" means [a

20   bullet-resistant soft body armor providing, as a minimum  standard,  the

21   level  of  protection  known as threat level I which shall mean at least

22   seven layers of  bullet-resistant  material  providing  protection  from

23   three  shots of one hundred fifty-eight grain lead ammunition fired from

24   a .38 calibre handgun at a velocity of  eight  hundred  fifty  feet  per

25   second] any product that is a personal protective body covering intended

26   to  protect against gunfire, regardless of whether such product is to be

27   worn alone or is sold as a complement to another product or garment.

28       The unlawful wearing of [a] body [vest] armor is a class E felony.

1    § 12. Section 270.21 of the penal law, as added by chapter 210 of  the

2   laws of 2022, is amended to read as follows:

3   § 270.21 Unlawful purchase of [a] body [vest] armor.

4    A  person  is guilty of the unlawful purchase of [a] body [vest] armor

5   when, not being engaged or employed  in  an  eligible  profession,  they

6   knowingly  purchase or take possession of [a] body [vest] armor, as such

7   term is defined in subdivision two of section 270.20  of  this  article.

8   This  section  shall  not  apply  to  individuals or entities engaged or

9   employed in eligible professions, which shall include police officers as

10   defined in section 1.20 of the criminal procedure law, peace officers as

11   defined in section 2.10 of the criminal procedure law, persons in  mili-

12   tary  service  in the state of New York or military or other service for

13   the United States, and such other professions designated by the  depart-

14   ment of state in accordance with section one hundred forty-four-a of the

15   executive law.

16    Unlawful  purchase  of  [a] body [vest] armor is a class A misdemeanor

17   for a first offense and a class E felony for any subsequent offense.

18    § 13. Section 270.22 of the penal law, as added by chapter 210 of  the

19   laws of 2022, is amended to read as follows:

20   § 270.22 Unlawful sale of [a] body [vest] armor.

21    A  person is guilty of the unlawful sale of [a] body [vest] armor when

22   they sell, exchange, give or dispose of [a] body [vest] armor,  as  such

23   term is defined in subdivision two of section 270.20 of this article, to

24   an  individual  whom  they  know  or reasonably should have known is not

25   engaged or employed in an eligible profession, as such term  is  defined

26   in section 270.21 of this article.

27    Unlawful  sale  of  [a] body [vest] armor is a class A misdemeanor for

28   the first offense and a class E felony for any subsequent offense.

1    § 14. Section 396-eee of the general business law, as added by chapter

2    210 of the laws of 2022, is amended to read as follows:

3    § 396-eee. Unlawful sale or delivery of body [vests] <u>armor</u>. 1. No

4    person, firm or corporation shall sell or deliver body [vests] <u>armor</u> to

5    any individual or entity not engaged or employed in an eligible profes-

6    sion, and except as provided in subdivision [three] <u>two</u> of this section,

7    no such sale or delivery shall be permitted unless the transferee meets

8    in person with the transferor to accomplish such sale or delivery.

9    2. The provisions of subdivision one of this section regarding in

10   person sale or delivery shall not apply to purchases made by <u>federal,</u>

11   state<u>,</u> or local government agencies for the purpose of furnishing such

12   body [vests] <u>armor</u> to employees in eligible professions.

13   3. For the purposes of this section, "body [vest] <u>armor</u>" shall have

14   the same meaning as defined in subdivision two of section 270.20 of the

15   penal law.

16   4. Any person, firm or corporation that violate the provisions of this

17   section shall be guilty of a violation punishable by a fine in an amount

18   not to exceed five thousand dollars for the first offense and in an

19   amount not to exceed ten thousand dollars for any subsequent offense.

20   § 15. Section 144-a of the executive law, as added by chapter 210 of

21   the laws of 2022, is amended to read as follows:

22   § 144-a. Eligible professions for the purchase, sale, and use of body

23   [vests] <u>armor</u>. The secretary of state in consultation with the division

24   of criminal justice services, the division of homeland security and

25   emergency services, the department of corrections and community super-

26   vision, the division of the state police, and the office of general

27   services shall promulgate rules and regulations to establish criteria

28   for eligible professions requiring the use of [a] body [vest] <u>armor</u>, as

1  such  term  is defined in subdivision two of section 270.20 of the penal

2  law. Such professions shall include those in which the duties may expose

3  the individual to serious physical injury that may be prevented or miti-

4  gated  by  the  wearing  of [a] body [vest] <u>armor</u>.  Such rules and regu-

5  lations shall also include a process by which an  individual  or  entity

6  may  request  that  the  profession in which they engage be added to the

7  list of eligible professions, a process by which  the  department  shall

8  approve  such  professions, and a process by which individuals and enti-

9  ties may present  proof  of  engagement  in  eligible  professions  when

10  purchasing [a] body [vest] <u>armor</u>.

11    § 16. The executive law is amended by adding a new section 228 to read

12  as follows:

13    <u>§  228. National instant criminal background checks. 1.  (a) The divi-</u>

14  <u>sion is hereby authorized and directed to serve  as  a  state  point  of</u>

15  <u>contact  for implementation of 18 U.S.C. sec. 922 (t), all federal regu-</u>

16  <u>lations and applicable guidelines  adopted  pursuant  thereto,  and  the</u>

17  <u>national  instant  criminal  background check system for the purchase of</u>

18  <u>firearms and ammunition.</u>

19    <u>(b) Upon receiving a  request  from  a  licensed  dealer  pursuant  to</u>

20  <u>section  eight  hundred  ninety-six or eight hundred ninety-eight of the</u>

21  <u>general business law, the division shall initiate a background check  by</u>

22  <u>(i)  contacting  the  National  Instant Criminal Background Check System</u>

23  <u>(NICS) or its successor to initiate a national  instant  criminal  back-</u>

24  <u>ground  check,  and  (ii)  consulting the statewide firearms license and</u>

25  <u>records database established  pursuant  to  subdivision  three  of  this</u>

26  <u>section, in order to determine if the purchaser is a person described in</u>

27  <u>sections  400.00 and  400.03 of the penal law, or is prohibited by state</u>

1  or federal law from possessing, receiving, owning, or purchasing a

2  firearm or ammunition.

3     2.  (a) The division shall report the name, date of birth and physical

4  description of any person prohibited from possessing a firearm  pursuant

5  to  18  U.S.C. sec. 922(g) or (n) to the national instant criminal back-

6  ground check system index, denied persons files.

7     (b) Information provided pursuant to this section shall remain  privi-

8  leged and  confidential,  and  shall  not  be disclosed, except for the

9  purpose of enforcing federal or state  law  regarding  the  purchase  of

10  firearms or ammunition.

11     (c)  Any  background  check  conducted  by  the division, or delegated

12  authority, of any applicant for a permit, firearms  identification  card

13  license,  ammunition  sale,  or  registration,  in  accordance  with the

14  requirements of section 400.00 of the penal law, shall not be considered

15  a public record and shall not be disclosed to any person not  authorized

16  by  law or this chapter to have access to such background check, includ-

17  ing the applicant. Any application for a permit, firearms identification

18  card, ammunition sale, or license, and any document reflecting the issu-

19  ance or denial of such permit, firearms identification card, or license,

20  and any permit, firearms identification  card,  license,  certification,

21  certificate,  form of register, or registration statement, maintained by

22  any state or municipal governmental agency, shall not  be  considered  a

23  public record and shall not be disclosed to any person not authorized by

24  law  to  have  access  to  such  documentation, including the applicant,

25  except on the request of persons acting in their governmental capacities

26  for purposes of the administration of justice.

27     3. The division shall create and maintain a statewide firearms license

28  and records database which shall contain records held by  the  division

1  and any records that it is authorized to request from the division of

2  criminal justice services, office of court administration, New York

3  state department of health, New York state office of mental health, and

4  other local entities. Such database shall be used for the certification

5  and recertification of firearm permits under section 400.02 of the penal

6  law, assault weapon registration under subdivision sixteen-a of section

7  400.00 of the penal law, and ammunition sales under section 400.03 of

8  the penal law. Such database shall also be used to initiate a national

9  instant criminal background check pursuant to subdivision one of this

10 section upon request from a licensed dealer. The division may create and

11 maintain additional databases as needed to complete background checks

12 pursuant to the requirements of this section.

13 4. The superintendent shall promulgate a plan to coordinate background

14 checks for firearm and ammunition purchases pursuant to this section and

15 to require any person, firm or corporation that sells, delivers or

16 otherwise transfers any firearm or ammunition to submit a request to the

17 division in order to complete the background checks in compliance with

18 federal and state law, including the National Instant Criminal Back-

19 ground Check System (NICS), in New York state. Such plan shall include,

20 but shall not be limited to, the following features:

21 (a) The creation of a centralized bureau within the division to

22 receive and process all background check requests, which shall include a

23 contact center unit and an appeals unit. Staff may include but is not

24 limited to: bureau chief, supervisors, managers, different levels of

25 administrative analysts, appeals specialists and administrative person-

26 nel. The division shall employ and train such personnel to administer

27 the provisions of this section.

Case 1:22-cv-00986-GTS-CFH Document 71-2 Filed 09/20/22 Page 107 of 180

1    (b) Procedures for carrying out the duties under this section, includ-

2  ing hours of operation.

3    (c)  An  automated  phone  system  and  web-based  application system,

4  including a toll-free  telephone  number  and/or  web-based  application

5  option for any licensed dealer requesting a background check in order to

6  sell, deliver or otherwise transfer a firearm which shall be operational

7  every  day  that  the  bureau  is  open  for business for the purpose of

8  responding to requests in accordance with this section.

9    5. (a) Each licensed dealer that submits  a  request  for  a  national

10  instant  criminal  background check pursuant to this section shall pay a

11  fee imposed by the bureau for performing such background check. Such fee

12  shall be allocated to the background check fund established pursuant  to

13  section  ninety-nine-pp  of the state finance law. The amount of the fee

14  shall not exceed the total amount of direct and indirect costs  incurred

15  by the bureau in performing such background check.

16    (b)  The  bureau  shall transmit all moneys collected pursuant to this

17  paragraph to the state comptroller, who shall credit  the  same  to  the

18  background check fund.

19    6. On January fifteenth of each calendar year, the bureau shall submit

20  a report to the governor, the temporary president of the senate, and the

21  speaker of the assembly concerning:

22    a.  the  number  of employees used by the bureau in the preceding year

23  for the  purpose  of  performing  background  checks  pursuant  to  this

24  section;

25    b.  the  number  of  background  check requests received and processed

26  during the preceding calendar year, including the  number  of  "proceed"

27  responses and the number and reasons for denials;

1    c. the calculations used to determine the amount of the fee imposed

2  pursuant to this paragraph.

3    7. Within sixty days of the effective date of this section, the super-

4  intendent shall notify each licensed dealer holding a permit to sell

5  firearms of the requirement to submit a request to the division to

6  initiate a background check pursuant to this section as well as the

7  following means to be used to apply for background checks:

8    i. any person, firm or corporation that sells, delivers or otherwise

9  transfers firearms shall obtain a completed ATF 4473 form from the

10  potential buyer or transferee including name, date of birth, gender,

11  race, social security number, or other identification numbers of such

12  potential buyer or transferee and shall have inspected proper identifi-

13  cation including an identification containing a photograph of the poten-

14  tial buyer or transferee.

15    ii. it shall be unlawful for any person, in connection with the sale,

16  acquisition or attempted acquisition of a firearm from any transferor,

17  to willfully make any false, fictitious oral or written statement or to

18  furnish or exhibit any false, fictitious, or misrepresented identifica-

19  tion that is intended or likely to deceive such transferor with respect

20  to any fact material to the lawfulness of the sale or other disposition

21  of such firearm under federal or state law. Any person who violates the

22  provisions of this subparagraph shall be guilty of a class A misdemea-

23  nor.

24    8. Any potential buyer or transferee shall have thirty days to appeal

25  the denial of a background check, using a form established by the super-

26  intendent. Upon receipt of an appeal, the division shall provide such

27  applicant a reason for a denial within thirty days. Upon receipt of the

28  reason for denial, the appellant may appeal to the attorney general.

1  § 17.  Subdivision  2  of section 898 of the general business law, as

2  added by chapter 129 of the laws of 2019, is amended to read as follows:

3     2.  Before  any sale, exchange or disposal pursuant to this article, a

4  national instant criminal background check must be completed by a dealer

5  who [consents] shall submit a request to the division of  state  police

6  pursuant  to  section  two  hundred twenty-eight of the executive law to

7  conduct such check[, and upon completion of such background check, shall

8  complete a document, the form of which shall be approved by  the  super-

9  intendent  of state police, that identifies and confirms that such check

10  was performed]. Before a dealer who [consents] has submitted  a  request

11  to  the  division of state police to conduct a national instant criminal

12  background check delivers a firearm, rifle or  shotgun  to  any  person,

13  either   (a) NICS shall have issued a "proceed" response [to the dealer],

14  or (b) thirty calendar days shall have elapsed since the date the dealer

15  [contacted] submitted a request to  the  division  of  state  police  to

16  contact  the  NICS  to  initiate  a national instant criminal background

17  check and NICS has not notified the [dealer] division  of  state  police

18  that the transfer of the firearm, rifle or shotgun to such person should

19  be denied.

20     § 18.  Paragraph  (c)  of subdivision 1 of section 896 of the general

21  business law, as added by chapter 189 of the laws of 2000, is amended to

22  read as follows:

23     (c)  coordinate with the division of state police to provide access  at

24  the  gun  show  to  [a  firearm dealer licensed under federal law who is

25  authorized to] perform a  national  instant  criminal  background  check

26  [where  the  seller  or transferor of a firearm, rifle or shotgun is not

27  authorized to conduct such a check by (i) requiring  firearm  exhibitors

28  who  are  firearm dealers licensed under federal law and who are author-

1   ized to conduct a national instant criminal background check to  provide

2   such  a check at cost or (ii) designating a specific location at the gun

3   show where a firearm dealer licensed under federal law who is authorized

4   to  conduct a national instant criminal background check will be present

5   to perform such a check at cost] prior to any firearm sale or  transfer.

6   Any  firearm  dealer licensed under federal law who [performs] submits a

7   request to the division of state police to perform  a  national  instant

8   criminal  background  check pursuant to this paragraph shall provide the

9   seller or transferor of the firearm, rifle or shotgun with a copy of the

10  United States Department of Treasury, Bureau  of  Alcohol,  Tobacco  and

11  Firearms  Form  ATF  F 4473 and such dealer shall maintain such form and

12  make such form available for inspection by law enforcement agencies  for

13  a period of ten years thereafter.

14     § 19.  Subdivision  6 of section 400.03 of the penal law, as added by

15  chapter 1 of the laws of 2013, is amended to read as follows:

16     6. If the superintendent of state police  certifies  that  background

17  checks  of  ammunition  purchasers may be conducted through the national

18  instant criminal background check system, [use  of  that  system  by]  a

19  dealer  or  seller shall contact the division of state police to conduct

20  such check which shall be sufficient to satisfy  subdivisions  four  and

21  five  of  this  section [and such checks shall be conducted through such

22  system, provided that a record of such transaction shall be forwarded to

23  the state police in a form determined by the superintendent].

24     § 20. The penal law is amended by adding a new section 400.06 to  read

25  as follows:

26  § 400.06 National instant criminal background checks.

27     1.  Any dealer in firearms that sells, delivers or otherwise transfers

28  any firearm shall contact the division of  state  police  to  conduct  a

1  national  instant  criminal  background  check  pursuant  to section two

2  hundred twenty-eight of the executive law.

3    2.  Failure to comply with the requirements of this section is a class

4  A misdemeanor.

5    § 21. The state finance law is amended by adding a new  section  99-pp

6  to read as follows:

7    § 99-pp. Background check fund. 1. There is hereby established in the

8  joint custody of the state comptroller and commissioner of taxation  and

9  finance a special fund to be known as the "background check fund".

10   2.  Such  fund  shall  consist  of  all revenues received by the comp-

11  troller, pursuant to the provisions of section two hundred  twenty-eight

12  of  the executive law and all other moneys appropriated thereto from any

13  other fund or source pursuant to law. Nothing contained in this  section

14  shall prevent the state from receiving grants, gifts or bequests for the

15  purposes of the fund as defined in this section and depositing them into

16  the fund according to law.

17   3. The moneys of the background check fund, following appropriation by

18  the legislature, shall be allocated for the direct costs associated with

19  performing  background  checks  pursuant  to section two hundred twenty-

20  eight of the executive law.

21   4. The state comptroller may invest any moneys in the background check

22  fund not expended for the purpose of this section as  provided  by  law.

23  The  state comptroller shall credit any interest and income derived from

24  the deposit and investment of moneys in the background check fund to the

25  background check fund.

26   5. (a) Any unexpended and unencumbered moneys remaining in  the  back-

27  ground  check fund at the end of a fiscal year shall remain in the back-

28  ground check fund and shall not be credited to any other fund.

1    (b) To the extent practicable, any such remaining funds shall be  used

2    to  reduce the amount of the fee described in subdivision two of section

3    two hundred twenty-eight of the executive law.

4       § 22. Subdivision 19 of section 265.00 of the penal law, as amended by

5    chapter 150 of the laws of 2020, is amended to read as follows:

6       19. "Duly authorized instructor" means (a) a duly commissioned officer

7    of  the United States army, navy, marine corps or coast guard, or of the

8    national guard of the state of New York; or (b) a duly  qualified  adult

9    citizen  of  the  United States who has been granted a certificate as an

10   instructor in small arms practice issued by the United States army, navy

11   or marine corps, or by the adjutant general of this  state,  or  by  the

12   division  of criminal justice services, or by the national rifle associ-

13   ation of America, a not-for-profit corporation duly organized under  the

14   laws of this state; (c) by a person duly qualified and designated by the

15   department  of environmental conservation [under paragraph c of subdivi-

16   sion three of section 11-0713 of the environmental conservation law]  as

17   its  agent in the giving of instruction and the making of certifications

18   of qualification in responsible hunting practices; or  (d)  a  New  York

19   state 4-H certified shooting sports instructor.

20      § 23.  Subdivision 18 of section 400.00 of the penal law, as added by

21   chapter 135 of the laws of 2019, is amended and a new subdivision 19  is

22   added to read as follows:

23      18.  Notice.  Upon  the  issuance  of a license, the licensing officer

24   shall issue therewith, and such licensee shall attest to the receipt of,

25   the following [notice] information and notifications:  (a)  the  grounds

26   for which the license issued may be revoked, which shall include but not

27   be  limited  to  the  areas  and locations for which the licenses issued

28   under paragraph (f) of subdivision two of  this  section  prohibits  the

1  possession of firearms, rifles, and shotguns, and that a conviction

2  under sections 265.01-d and 265.01-e of this chapter are felonies for

3  which licensure will be revoked;

4   (b) a notification regarding the requirements for safe storage which

5  shall be in conspicuous and legible twenty-four point type on eight and

6  one-half inches by eleven inches paper stating in bold print the follow-

7  ing:

8   WARNING: RESPONSIBLE FIREARM STORAGE IS THE LAW IN NEW YORK STATE.

9  WHEN STORED IN A HOME FIREARMS, RIFLES, OR SHOTGUNS MUST EITHER BE

10  STORED WITH A GUN LOCKING DEVICE OR IN A SAFE STORAGE DEPOSITORY OR NOT

11  BE LEFT OUTSIDE THE IMMEDIATE POSSESSION AND CONTROL OF THE OWNER OR

12  OTHER LAWFUL POSSESSOR IF A CHILD UNDER THE AGE OF EIGHTEEN RESIDES IN

13  THE HOME OR IS PRESENT, OR IF THE OWNER OR POSSESSOR RESIDES WITH A

14  PERSON PROHIBITED FROM POSSESSING A FIREARM UNDER STATE OR FEDERAL LAW.

15  FIREARMS SHOULD BE STORED [UNLOADED AND LOCKED] BY REMOVING THE AMMUNI-

16  TION FROM AND SECURELY LOCKING SUCH FIREARM IN A LOCATION SEPARATE FROM

17  AMMUNITION. LEAVING FIREARMS ACCESSIBLE TO A CHILD OR OTHER PROHIBITED

18  PERSON MAY SUBJECT YOU TO IMPRISONMENT, FINE, OR BOTH. WHEN STORED IN A

19  VEHICLE OUTSIDE THE OWNER'S IMMEDIATE POSSESSION OR CONTROL, FIREARMS,

20  RIFLES, AND SHOTGUNS MUST BE STORED IN AN APPROPRIATE SAFE STORAGE

21  DEPOSITORY AND OUT OF SIGHT FROM OUTSIDE OF THE VEHICLE.

22   (c) any other information necessary to ensure such licensee is aware

23  of their responsibilities as a license holder.

24   Nothing in this subdivision shall be deemed to affect, impair or

25  supersede any special or local law relating to providing notice regard-

26  ing the safe storage of rifles, shotguns or firearms.

27   19. Prior to the issuance or renewal of a license under paragraph (f)

28  of subdivision two of this section, issued or renewed on or after the

1   effective date of this subdivision, an applicant shall complete an

2   in-person live firearms safety course conducted by a duly authorized

3   instructor with curriculum approved by the division of criminal justice

4   services and the superintendent of state police, and meeting the follow-

5   ing requirements: (a) a minimum of sixteen hours of in-person live

6   curriculum approved by the division of criminal justice services and the

7   superintendent of state police, conducted by a duly authorized instruc-

8   tor approved by the division of criminal justice services, and shall

9   include but not be limited to the following topics: (i) general firearm

10  safety; (ii) safe storage requirements and general secure storage best

11  practices; (iii) state and federal gun laws; (iv) situational awareness;

12  (v) conflict de-escalation; (vi) best practices when encountering law

13  enforcement; (vii) the statutorily defined sensitive places in subdivi-

14  sion two of section 265.01-e of this chapter and the restrictions on

15  possession on restricted places under section 265.01-d of this chapter;

16  (viii) conflict management; (ix) use of deadly force; (x) suicide

17  prevention; and (xi) the basic principles of marksmanship; and (b) a

18  minimum of two hours of a live-fire range training course. The applicant

19  shall be required to demonstrate proficiency by scoring a minimum of

20  eighty percent correct answers on a written test for the curriculum

21  under paragraph (a) of this subdivision and the proficiency level deter-

22  mined by the rules and regulations promulgated by the division of crimi-

23  nal justice services and the superintendent of state police for the

24  live-fire range training under paragraph (b) of this subdivision. Upon

25  demonstration of such proficiency, a certificate of completion shall be

26  issued to such applicant in the applicant's name and endorsed and

27  affirmed under the penalties of perjury by such duly authorized instruc-

28  tor. An applicant required to complete the training required herein

1   prior to renewal of a license issued prior to the effective date of this

2   subdivision shall only be required to complete such training for the

3   first renewal of such license after such effective date.

4   § 24. Subdivisions 11 and 12 of section 265.00 of the penal law are

5   amended to read as follows:

6   11. "Rifle" means a weapon designed or redesigned, made or remade, and

7   intended to be fired from the shoulder and designed or redesigned and

8   made or remade to use the energy of the explosive [in a fixed metallic

9   cartridge] to fire only a single projectile through a rifled bore for

10  each single pull of the trigger using either: (a) fixed metallic

11  cartridge; or (b) each projectile and explosive charge are loaded indi-

12  vidually for each shot discharged. In addition to common, modern usage,

13  rifles include those using obsolete ammunition not commonly available in

14  commercial trade, or that load through the muzzle and fire a single

15  projectile with each discharge, or loading, including muzzle loading

16  rifles, flintlock rifles, and black powder rifles.

17  12. "Shotgun" means a weapon designed or redesigned, made or remade,

18  and intended to be fired from the shoulder and designed or redesigned

19  and made or remade to use the energy of the explosive [in a fixed shot-

20  gun shell] to fire through a smooth or rifled bore either a number of

21  ball shot or a single projectile for each single pull of the trigger

22  using either: (a) a fixed shotgun shell; or (b) a projectile or number

23  of ball shot and explosive charge are loaded individually for each shot

24  discharged. In addition to common, modern usage, shotguns include those

25  using obsolete ammunition not commonly available in commercial trade, or

26  that load through the muzzle and fires ball shot with each discharge, or

27  loading, including muzzle loading shotguns, flintlock shotguns, and

28  black powder shotguns.

1    § 25. Severability. If any clause, sentence, paragraph or section of

2    this act shall be adjudged by any court of competent jurisdiction to be

3    invalid, the judgment shall not affect, impair or invalidate the remain-

4    der thereof, but shall be confined in its operation to the clause,

5    sentence, paragraph or section thereof directly involved in the contro-

6    versy in which the judgment shall have been rendered.

7    § 26. This act shall take effect on the first of September next

8    succeeding the date on which it shall have become a law; provided,

9    however:

10    (a) the amendments to subdivision 1 and subdivision 4-b of section

11    400.00 of the penal law made by section one of this act shall apply only

12    to licenses for which an application is made on or after the effective

13    date of this act;

14    (b) if chapter 208 of the laws of 2022 shall not have taken effect on

15    or before such date then the amendments made to paragraph (j) of subdi-

16    vision one of section 400.00 of the penal law made by section one of

17    this act shall take effect on the same date and in the same manner as

18    such chapter of the laws of 2022, takes effect;

19    (c) the amendments to sections 270.20, 270.21 and 270.22 of the penal

20    law made by sections eleven, twelve and thirteen of this act, the amend-

21    ments to section 396-eee of the general business law as amended by

22    section fourteen of this act, and the amendments to section 144-a of the

23    executive law as amended by section fifteen of this act, shall take

24    effect on the same date and in the same manner as chapter 210 of the

25    laws of 2022, takes effect;

26    (d) if chapter 207 of the laws of 2022 shall not have taken effect on

27    or before such date then the amendments to subdivision 11 of section

28    400.00 of the penal law made by section one of this act shall take

1  effect  on  the  same date and in the same manner as such chapter of the

2  laws of 2022, takes effect;

3    (e)  if chapter 212 of the laws of 2022 shall not have taken effect on

4  or before such date then the amendments  to  subdivision  2  of  section

5  400.00  of  the  penal  law  made  by section one of this act shall take

6  effect on the same date and in the same manner as such  chapter  of  the

7  laws of 2022, takes effect;

8    (f)  sections  sixteen,  seventeen,  eighteen,  nineteen,  twenty, twenty-

9  one and twenty-two shall take effect July 15, 2023; and

10    (g) subdivision 4-a of section 400.00 of the penal law, as amended  by

11  section one of this act, shall take effect April 1, 2023.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, COREY JOHNSON, )
ALFRED TERRILLE, JOSEPH MANN, )
LESLIE LEMAN, and LAWRENCE )
SLOANE, )
                                  )
Plaintiffs, )
                                  )   Civil Action No. _____
v. )
                                  )
KATHLEEN HOCHUL, in her Official )
Capacity as Governor of the State of New )
York, KEVIN P. BRUEN, in his )
Official Capacity as Superintendent of the )
New York State Police,  Judge MATTHEW )
J. DORAN, in his Official Capacity as the )
Licensing-official of Onondaga County, )
WILLIAM FITZPATRICK, in his Official )
Capacity as the Onondaga County District )
Attorney, EUGENE CONWAY, in his )
Official Capacity as the Sheriff of )
Onondaga County, JOSEPH CECILE, in )
his Official Capacity as the Chief of Police )
of Syracuse, P. DAVID SOARES in his )
Official Capacity as the District Attorney )
of Albany County, GREGORY OAKES, )
In his Official Capacity as the District )
Attorney of Oswego County, DON )
HILTON, in his Official Capacity as the )
Sheriff of Oswego County,  and JOSEPH )
STANZIONE, in his Official Capacity as )
the District Attorney of Greene County, )
                                  )
Defendants. )
_____)

---

## DECLARATION OF COREY JOHNSON

---

Exhibit "2"

1.  My name is Corey Johnson.  I am a U.S. citizen and resident of New York, and I live in Onondaga County.  I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen.*

2.  I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief.  Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained therein.

3.  I am a law-abiding person who currently possesses and has maintained an unrestricted New York carry permit since 2019.  I am eligible to possess and carry firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

4.  Not only do I possess a New York carry license, but also I routinely carry my handgun concealed when I leave home.  To be sure, I do not carry in courthouses, schools, government buildings, or the other obvious "sensitive places" the Supreme Court has described, locations where the government often provides security in the form of armed guards and metal detectors.  Otherwise, being responsible for my own security and that of my family, my gun generally does not leave my side when I leave the house, and goes where I go for lawful purposes.

5.  However, due to the recent implementation of the Concealed Carry Improvement Act, I am now in jeopardy of arrest and prosecution as a felon, not to mention having my firearm seized and my permit revoked, merely for carrying in the completely ordinary and entirely non-sensitive locations in which I previously carried my firearm.

6.  For example, I consider myself to be an outdoorsman, am an avid fisherman, and routinely go on hiking and camping trips throughout the state, including in numerous parks covered by the CCIA (subsection d).

7. For example, many times recently I have gone fishing in Mercer Park on the Seneca River in Baldwinsville, New York, a place previously open to carry. There is nothing in any way "sensitive" about this location, yet the CCIA makes the park off limits to me if I wish to exercise my Second Amendment right to carry a firearm while fishing.

8. Based on this Court's recent conclusion that "the CCIA's list of 'sensitive locations' is not deeply rooted in this Nation's historical tradition of firearm regulation," and because neither parks nor anything like them appears in the Supreme Court's list of traditional sensitive locations, I intend to continue to carry my firearm when I go fishing in Mercer Park. Although I cannot provide a definitive day and time that this will next occur, it is safe to say that I will go fishing within the next month, before the water gets too cold and the bass stop biting.

9. In addition, I currently have plans with my wife to take a trip in October of 2022, to include a tour of several state parks within New York, where we will engage in various recreational activities such as fishing and sightseeing. For example, as part of our trip, we plan to visit Bowman Lake State Park, which the state describes as "a 966.94 acre remote sylvan retreat known as 'a camper's paradise'" and which has a "lake … regularly stocked with trout" and offers "rustic cabins."[1] In other words, this is hardly a "sensitive location." In fact, hunting with firearms is permitted at the park.[2] I fail to see how high-powered rifles for hunting bear can be allowed at a purported "sensitive location," while low-powered handguns for self-defense (including from bear) are prohibited. Nevertheless, the CCIA makes Bowman Lake State Park off limits to me if I wish to carry my firearm to protect myself and my wife during our visit to this and other various parks during our trip.

---

[1] https://parks.ny.gov/parks/76/
[2] https://parks.ny.gov/documents/parks/BowmanLakeBowmanLakeSelfIssueHuntingPermit.pdf

10. There is no realistic way for me to repeatedly disarm and re-arm, in order to comply with the CCIA's prohibition on possession of my firearm in the various parks my wife and I will visit on our trip, as there is no place for me to leave my firearm while on the road. Even leaving my firearm in my vehicle while at such a park would seem to violate the CCIA, and make me a felon. Thus, due to the CCIA's unconstitutionality, and being left with no reasonable alternative, I am left with no choice but to carry my firearm for self-defense, which I intend to do on this upcoming trip.

11. I also routinely go out to eat with my family, including at restaurants such as Longhorn Steakhouse, which is considered a "sensitive location" by the CCIA (subsection o) because it serves alcohol, even if I am not sitting at the bar or consuming any alcoholic beverage. Longhorn Steakhouse, owned by Darden Restaurants, reports that "[o]ur approach has always been that we abide by all local and state laws,"[3] meaning that I would be permitted to carry my firearm when I go to eat, if not for the CCIA. Based on this Court's recent opinion, and because neither restaurants nor anything like them appears in the Supreme Court's list of traditional sensitive locations, I intend to continue to carry my firearm when I go out to eat with my family, an event that will occur within the next month or so.

12. During New York winters, I often take extended snowmobile trips throughout public parks and roads, often participating in "dice runs" – competitions where snowmobilers are required to follow a prescribed course and check in various locations along the way, with some of those locations being restaurants that serve alcohol. Under the CCIA, I would become a felon merely for getting off my snowmobile while carrying my firearm, and quickly checking in at such a location. Nevertheless, in reliance on the conclusions in this Court's prior opinion, and the

---

[3] https://www.cnbc.com/2014/05/21/restaurants-were-not-pulling-a-chipotle.html

Supreme Court's *Bruen* decision, the CCIA's restriction is clearly unconstitutional, and thus void. Therefore, as in years past, I intend to go on a snowmobiling trip this winter, and I will carry my firearm with me when I do, including in those places where I "check in" as part of the "dice run."

13. I routinely visit various locations that are considered "performance, art entertainment, gaming, or sporting events" under the CCIA (subsection p). For example, late last month I had fully intended to attend the state fair at the New York State Fairgrounds (a locations at which carry is also prohibited under subsection (d)), until I learned that the Fairgrounds had expressed its intent to adopt and enforce the provision of the CCIA. The news reported that "NYS Fair flexes policy prohibiting firearms in wake of conceal carry ruling."[4] Moreover, because "[a]ll entrances may utilize 'Bag Check Areas' for guests, and some or all guests and/or vendors may be subject to manual scanning with the use of a metal detector wand or other similar device," I did not attend the fair, believing there to be a significant risk that my concealed carry firearm would be discovered and I would be charged with a crime. To the extent that the fair previously may have had a weapons policy, it is my understanding that was merely a policy, for violation of which I could be asked to leave – not charged with a felony crime.

14. In the past, I have attended pro-gun rallies, and done so while armed. For example, in August of 2020, I attended the "Back the Blue" rally in Albany. I have attended similar rallies in other states, such as the January 2020 VCDL Lobby Day that takes place annually in January in Richmond, Virginia. Suffice it to say, I take any realistic opportunity to exercise and advocate for my Second Amendment and other rights, preferably doing both at the same time. The CCIA,

---

[4] https://www.timesunion.com/state/article/Maintaining-policy-NYS-fair-to-allow-only-law-17362602.php

however, makes me choose between the two rights, banning firearms at First Amendment protected activities, potentially under multiple subsections (subsections a, d, p, r, and s).

15. Whereas *Bruen* discussed restrictions in subsection (a) in "government buildings," the CCIA broadly bans guns in "any place owned or under the control of federal, state or local government, for the purpose of government administration...." If firearms were not already prohibited permanently at such a location, then a rally likely would constitute a "special event" where a permit is required under subsection (r), meaning firearms would be prohibited anyway. These CCIA provisions would restrict firearms at protests such as the 2014 pro-gun rally at the Empire State Plaza, which occurred in the wake of enactment of the New York SAFE Act in 2013.[5] None of these rallies or locations is a "sensitive place" under *Bruen*, merely because lots of people gather together to exercise constitutional rights.

16. I do not presently know of any upcoming pro-gun or pro-freedom rally currently scheduled but, when one is scheduled, I intend to attend it, and to do so while carrying my firearm, in violation of the CCIA.

17. The CCIA makes it a crime to possess a firearm at a zoo (subsection d), about as far from a "sensitive place" as I can imagine. My wife and I frequently visit the Rosamond Gifford Zoo in Syracuse, at least once or twice every fall, so that my wife can see the otters and wolves, which are her favorites. We will visit the zoo this fall as well, at least once, within the next 90 days. It is my understanding that the zoo has no policy prohibiting firearms on the premises.[6] Thus, but for the CCIA, it would seem to be perfectly permissible for me to carry my firearm at the zoo.

---

[5] https://www.poughkeepsiejournal.com/story/news/local/new-york/2014/04/02/gun-rally-in-albany-draws-donald-trump/7180313/

[6] https://rosamondgiffordzoo.org/visit/plan-your-visit/guest-etiquette/

Since the CCIA's blanket ban on firearms at zoos is unconstitutional, I intend to carry my firearm when my wife and I visit the Rosamond Gifford Zoo.

18. Finally, I routinely carry my firearm when out and about in public, including when I go shopping at various locations in Onondaga County, such as gas stations, grocery stores, home improvement stores, big box stores, etc. It is my understanding that none of these places has expressed any objection to the lawfully carrying of my firearm. However, the CCIA now declares such locations to be "restricted locations," and bans my carrying of a firearm on the premises unless I have the affirmative consent of the owner. However, obtaining such consent is entirely impractical. Indeed, since the CCIA's implementation, few if any locations have posted signs welcoming concealed carry license holders, even if the business otherwise supports or allows concealed carry. Nor is it practical for me to disarm, approach such a business, ask permission from a low-level employee who will no doubt be unfamiliar with store policy and need to ask the manager (if not contact corporate), wait for a response, then re-arm myself – all merely to pick up a few things at the store. Indeed, even if I receive permission at one point in time, such policy could change at any time and without notice, thus putting me at constant risk of committing a crime unawares.

19. Since it is between me and a business owner – not New York state – whether I carry my firearm in a certain business, I intend to continue carrying my firearm in various businesses and establishments in Onondaga County, something that occurs regularly, in violation of the CCIA's restriction on "prohibited locations" that are not conspicuously posted with signage or otherwise provide me their express consent.

20. Unless this Court strikes down that provision of the CCIA, my simply going peaceably about my daily life will be a crime, pursuant to a statute which this Court has already declared

clearly unconstitutional. As such, as "an act of the legislature, repugnant to the constitution," the CCIA "is void." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

21. Not only do I intend to engage in various constitutionally-protected acts which are now made unlawful under the CCIA, but also I face a credible threat of prosecution, particularly since my specific intentions are now being made public through this filing.

22. For example, First Deputy Superintendent Steven Nigrelli of the New York State Police, has threatened persons such as me who violate the CCIA that "[w]e ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law. For those who choose to violate this law … Governor, it's an easy message. I don't have to spell it out more than this. We'll have zero tolerance. If you violate this law, you will be arrested. Simple as that. Because the New York state troopers are standing ready to do our job to ensure ... all laws are enforced."[7] If that is not a credible threat of enforcement, it is hard to see what would be.

23. Likewise, Onondaga County District Attorney William Fitzpatrick, although generally critical of the draconian provisions of the CCIA, recently stated that "[v]iolators will have their weapons confiscated while prosecutors investigate any other criminal activity," and "[t]heir cases will be referred to the judge who granted them concealed-carry licenses in the first place, possibly leading to the revocation of their carry privileges."[8] DA Fitzpatrick was joined at the press conference by Syracuse Police Chief Joe Cecile. In other words, the top law enforcement officials where I live have expressed a specific intent to enforce the provisions of the CCIA against violators, which might include having a firearm seized by police and a carry license revoked.

---

[7] https://youtu.be/gC1L2rrztQs?t=2281 (at 38:00 minutes).
[8] https://www.syracuse.com/crime/2022/09/syracuse-da-police-chief-we-wont-target-gun-owners-under-new-law-but-will-take-gun.html

24. What is more, I am far more likely than the average person to have a run-in with law enforcement, particularly during some of the times I intend to be in violation of the CCIA. For example, when fishing, I am required to be in possession of a valid New York State Fishing License, which is subject to verification and review at any time by a New York Environmental Conservation Officer (who works for the State, not the County). In recent years, I have had such officers stop and check my license at least a couple of times per year. In 2022 alone, I recall two such interactions along the Erie Canal in Camillus, one in Fair Haven State Park, and one at Oneida Shores State Park. If, for example, an officer saw a bulge from my concealed firearm while I was retrieving my fishing license and driver's license from my wallet, I could be arrested charged with a felony under the state's clearly-announced "zero tolerance" policy.

I declare under penalty of perjury that the foregoing is true and correct.

September  14, 2022
**Date**

*Corey Johnson*
**Corey Johnson**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, COREY JOHNSON,  )
ALFRED TERRILLE, JOSEPH MANN,   )
LESLIE LEMAN, and LAWRENCE      )
SLOANE,                         )
                                )
Plaintiffs,                     )
                                )   Civil Action No. _____
v.                              )
                                )
KATHLEEN HOCHUL, in her Official )
Capacity as Governor of the State of New )
York, KEVIN P. BRUEN, in his    )
Official Capacity as Superintendent of the )
New York State Police,  Judge MATTHEW )
J. DORAN, in his Official Capacity as the )
Licensing-official of Onondaga County, )
WILLIAM FITZPATRICK, in his Official )
Capacity as the Onondaga County District )
Attorney, EUGENE CONWAY, in his )
Official Capacity as the Sheriff of )
Onondaga County, JOSEPH CECILE, in )
his Official Capacity as the Chief of Police )
of Syracuse, P. DAVID SOARES in his )
Official Capacity as the District Attorney )
of Albany County, GREGORY OAKES, )
In his Official Capacity as the District )
Attorney of Oswego County, DON )
HILTON, in his Official Capacity as the )
Sheriff of Oswego County,  and JOSEPH )
STANZIONE, in his Official Capacity as )
the District Attorney of Greene County, )
                                )
Defendants.                     )
_____ )

---

## DECLARATION OF LAWRENCE SLOANE

---

Exhibit "3"

1. My name is Lawrence Sloane. I am a U.S. citizen and resident of New York, and I live in Onondaga County. I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*.

2. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained therein.

3. I am a law-abiding person who does not currently possesses a New York carry license. However, I have always wanted to obtain a carry permit to exercise my Second Amendment rights to acquire and carry a handgun for self-defense, but did not believe I would be found to have a special "proper cause" which was required before the Supreme Court's opinion in *Bruen*.

4. After *Bruen,* which held the "proper cause" test to be unconstitutional, I intended to apply for my carry license, and began looking into the process. I am part of "the people" that the Second Amendment applies to and protects. However, before I could apply for a license, the State of New York passed the Concealed Carry Improvement Act (CCIA), which imposes a slew of new and improved infringements on my constitutional right to obtain a license to keep and bear arms.

5. I want to make clear that I object to the following requirements of the CCIA: 1) social media history requirement, 2) providing information about my family, 3) providing character references, 4) exorbitant training costs and the time required to complete it, 5) an in-person interview with a government agent, and 6) proving that I am of "good moral character" in addition to being a law-abiding, responsible person. I will address each in turn.

6.  After the CCIA was enacted, the application for carry license was updated[1] by the state, and now mandates that I must turn over my "social media" history to the government for review. The legislature has not seen fit to define what "social media" is, but my understanding of "social media" would include various forums where people congregate to speak, many times anonymously.  I also believe this to include Facebook, Twitter, Instagram and other more well-known "social media" platforms.

7.  To be sure, I have accounts on several of these and other platforms but, specifically, my Facebook profile is set to "friends" only, which means that only my friends can view my profile and my postings on that platform.  I refuse to add a state licensing official as a "friend" so that he or she can review my Facebook postings.

8.  The First Amendment protects my speech, and neither requires nor permits the government to review what I say, and certainly not as a condition of exercising my constitutional right to bear arms.  Moreover, the Fifth Amendment protects my right to remain silent and against self-incrimination.  In short, I will not turn over my "social media," however and whatever that means, to the government, as a condition of applying for a license.

9.  To the extent that I were forced to produce all my speech, even in an electronic format, to the government for review, from now on I would self-censor for fear of retribution, unwilling to express my true feelings, especially on contentious issues involving political speech, knowing that the state's prying anti-gun eye is looking over my shoulder.  It would also be likely that I would edit or delete some or all my social media and other online postings, so as not to allow the government to review what I have said, not because I regret anything that I have posted, but

---

[1] The "revised" State of New York Pistol/Revolver License Application can be found at https://troopers.ny.gov/system/files/documents/2022/09/ppb-3-08-22-_0.pdf.

because it is none of the government's business what I believe, how I vote, what my hobbies are, with whom I associate, where I travel, which constitutional rights I exercise, etc.

10. Likewise, the government of New York has no business contacting my family members to interrogate them about my life, my speech, my actions, or anything else about me, so that New York feels comfortable to "permit" me to exercise my constitutional rights. I will not provide the government of New York with information about my family, on the carry license application.

11. The license application further requires four character references. Supposedly, this is required so that the government can interrogate my associates to determine if I have the "essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others[.]" N.Y. Penal Law § 400.00(1).

12. Of course, as this Court acknowledged in *Antonyuk v. Bruen*, this definition does not include "other than in self-defense" which means that, apparently, merely being willing to use a handgun in self-defense in New York would automatically disqualify me from having "good moral character," because using a handgun, even in legitimate self-defense, would be to "endanger" whoever is attacking me. Worse, this may mean that even applying for a carry license is impossible, because the whole purpose of carrying a concealed firearm is to be able to use it for self-defense or defense of others which, taken to its logical conclusion, would result in "endanger[ing]" a criminal attacker.

13. Indeed, "good moral character" is a completely subjective standard that gives the licensing officer or interrogator wide discretion to ask whatever questions of me they wish.

14. While I believe I have "good moral character" insofar as I am a law-abiding citizen, it is none of the state's business when it comes to the exercise of my constitutional rights.

15. Likewise, I do not wish to ask those who I know to stand up to the government on my behalf, and testify to my good moral character, so that I may keep and bear arms. If the State of New York wished to check my criminal history to see if I have ever committed a crime, it can do so immediately by utilizing the innumerable databases that exist currently, and does not need to interrogate my friends and family. I know of no other constitutional right that is predicated on what friends think about you, and my right to keep and bear arms should not be any different.

16. I will not provide the State with information about my associates, so some licensing official can interrogate them about my life, including my exercise of my constitutional rights. It is none of the government's business what my friends and I discuss, either in person or online, and merely attempting to exercise an enumerated right does not give New York the right to invade my privacy and my other constitutional rights, and I should not be required to surrender my First Amendment right to exercise my Second Amendment rights, as this Court also acknowledged in the *Antonyuk* case.

17. Further, requiring me to sit down with a government agent for an in person interview, so that he or she can interrogate me, violates my Fifth Amendment rights to remain silent and against self-incrimination, because there do not appear to be any limits on the questions I am asked. Rather, I would be compelled to answer any and all questions posed to me as a condition of obtaining a license. I believe that is generally not a good idea for a person to answer questions posed by government officers during interrogations, such as if stopped for speeding or questioned by police, *regardless* of whether that person is innocent or not. Yet the CCIA requires me to submit to an "interview" of the sort that I believe most lawyers would advise against.

18. In order to obtain a carry license, I would be unable to skip answering the questions or invoke my Fifth Amendment rights to consult with counsel or to remain silent, should the need

arise. Indeed, I am not a lawyer, but my understanding is that an invocation of Fifth Amendment rights is not an admission of guilt or wrongdoing, as people are often "incriminated" or even found guilty of crimes that they did not commit. But common sense tells me that, if I were to invoke the Fifth Amendment to a government agent's question during this type of interview, it would probably be looked at with skepticism about why I am invoking my constitutional right.

19. Moreover, with the proliferation of thousands upon thousands of "crimes" that do not require any intent to violate, within the laws of federal, state, and local governments, it is my understanding that the average person unwittingly commits numerous crimes over the course of their lifetime, without ever having knowledge or intent to do so. I am a law-abiding person and always try to follow the law, but the CCIA's demand that I be interrogated by the police as a condition of exercising my right to keep and bear arms violates my First, Second, and Fifth Amendment rights.

20. Without me surrendering my First and Fifth Amendment rights, I am unable to fully complete the application for a carry license.

21. Since the CCIA states that "No license shall be issued" without first providing the licensing official with all of the required information, there is no way for me even to apply for the permit and be rejected, as my application will not even be accepted. As such, is futile for me even to attempt to apply and be denied a license, refusing to submit to the unconstitutional requirements that I am unwilling to provide to the government. It is my understanding that other applicants in the past have had their applications rejected or denied for failure to provide all of the required information, which I will not provide.[2]

---

[2] In fact, the Onondaga Sheriff's website instructs that "[i]ncomplete applications will not be processed at the time of your appointment. Your entire application will be returned to you and

22. Indeed, the only way for me to apply and be granted or denied a license would be for me first to forfeit my constitutional rights, something I will not do. Therefore, I am left in the untenable position of surrendering and waiving some of my constitutional rights in order to exercise my Second Amendment rights.

23. Notwithstanding the futility of providing an application without all of the information required by the application, I am unable to even secure an appointment with the Onondaga Sheriff's Office until **October 24, 2023**, or 58 weeks from now. This is simply to *submit* my application to the Sheriff's Office so it will be processed.[3]



24. Likewise, the CCIA's mandate of sixteen hours of classroom instruction, plus two hours of live-fire training, is unnecessary and expensive, and would occupy a minimum of two full days for me to complete.

---

you will be instructed to reschedule your appointment." https://sheriff.ongov.net/pistol-license-unit/appointment-requirements/.

And "walk-in service" is not available, so I must make an appointment to even submit my application. https://sheriff.ongov.net/pistol-license-unit/.

[3] https://sheriff.ongov.net/pistol-license-unit/appointment/ (current as of September 19, 2022).

25. This is far in excess from what other states require, and I do not know of any other state that requires a total of 18 hours of training before you are granted permission to exercise a constitutional right.

26. Prior to the CCIA, my county only required only a basic handgun safety course which, while I believe is still objectionable because it conditions my right to bear arms on clearing government-imposed hurdles and paying government-imposed fees, was not nearly as bad as the new 18 hour requirement.[4],[5]

27. I understand that, previously, a basic handgun safety course could be completed for around $50.00 and four hours of time. But to comply with the CCIA's training requirement would require a minimum of two days, and cost me hundreds of dollars. Some facilities are charging upwards of $700 for the class. This will represent a significant cost to me, plus it will be necessary for me to pay for the ammunition used at such a class, and also the other associated licensing fees charged by my county. The cost for me to obtain a permit could easily exceed $1,000, a significant investment, and an exorbitant cost for me to be licensed to exercise my constitutional rights.

28. Certainly, I believe that responsible gun owners have a moral responsibility to obtain training in the safe and effective use of firearms. However, I do not want to expend my hard earned dollars to further the State's anti-gun agenda. For instance, New York Penal Law 400(19) demands that I pay to learn about "suicide prevention," as if this has something to do with my being a responsible gun owner. I am not suicidal. Moreover, in a free society, all constitutional

---

[4]    https://sheriff.ongov.net/wp-content/uploads/2021/04/NYS-Pistol-License-Application-4-30-21.pdf.

[5] Prior to *Bruen* being released, Onondaga stated that it took "approximately 6 months" for a pistol license to be processed. See the previous footnote. Now, I cannot even schedule an appointment to simply *apply* for a license for over 1 year.

rights can be misused, but that does not mean the government can require a person to obtain a lecture on the dangers of free speech as a condition of receiving a license to post on Twitter.

29. If all that were required were a basic handgun safety course of four hours, at a cost of $50.00, that would be doable and, even though I would still object on principle, I would "bite the bullet," so to speak, in order to get my license. However, spending two or more full days in a class, at a cost of several hundreds of dollars, plus expensive ammunition, is unreasonable and unconstitutional.

30. If these unconstitutional requirements were removed from the application, and the Sheriff would accept my application, I would immediately submit my application for a concealed carry license, something I greatly desire to obtain and, but for the CCIA's unconstitutional demands, I would seek to obtain. I otherwise meet all of the requirements to be "granted" a permit to carry my firearm in public and, in fact, I have completed the remaining parts of my application (save for the portions I will not provide), and I have attempted to secure an appointment for submitting my application, but there is not one available until late next year, a completely unreasonable time frame.

I declare under penalty of perjury that the foregoing is true and correct.

September 19, 2022
**Date**

**Lawrence Sloane**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

IVAN ANTONYUK, COREY JOHNSON,  )
ALFRED TERRILLE, JOSEPH MANN,  )
LESLIE LEMAN, and LAWRENCE  )
SLOANE,  )
 )
Plaintiffs,  )
 )  Civil Action No. _____
v.  )
 )
KATHLEEN HOCHUL, in her Official  )
Capacity as Governor of the State of New  )
York, KEVIN P. BRUEN, in his  )
Official Capacity as Superintendent of the  )
New York State Police,  Judge MATTHEW  )
J. DORAN, in his Official Capacity as the  )
Licensing-official of Onondaga County,  )
WILLIAM FITZPATRICK, in his Official  )
Capacity as the Onondaga County District  )
Attorney, EUGENE CONWAY, in his  )
Official Capacity as the Sheriff of  )
Onondaga County, JOSEPH CECILE, in  )
his Official Capacity as the Chief of Police  )
of Syracuse, P. DAVID SOARES in his  )
Official Capacity as the District Attorney  )
of Albany County, GREGORY OAKES,  )
In his Official Capacity as the District  )
Attorney of Oswego County, DON  )
HILTON, in his Official Capacity as the  )
Sheriff of Oswego County, and JOSEPH  )
STANZIONE, in his Official Capacity as  )
the District Attorney of Greene County,  )
 )
Defendants.  )
_____)

**DECLARATION OF LESLIE LEMAN**

Exhibit "4"

1. My name is Leslie Leman. I am a U.S. citizen and resident of New York, and I live in Greene County. I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*.

2. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained therein.

3. I am a law-abiding person who currently possesses and has maintained an unrestricted New York carry permit since 2012. I am eligible to possess and carry firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

4. Not only do I possess a New York carry license, but also I have routinely carried my handgun concealed when I leave home, during the time I have had my permit.

5. I am a volunteer firefighter in the Windham Fire District. Previously, I was the elected fire commissioner in the same department, for seven years. I have held these responsibilities in one position or another for approximately 12 years. The nature of my work as a volunteer, without "on duty" shifts, means that I am on call 24 hours a day, 7 days a week, which means that I am generally at home, working, in my vehicle, or otherwise going about my daily life, when I receive a call from our dispatch, via radio and text message, that there is an emergency situation requiring an immediate response. I and the other members of my team are then expected to respond to the call immediately, without any opportunity to go home, to change clothes or, as relevant here, to disarm and stow my firearm. This means that there are times that I have responded to an emergency call while armed.

6. Our unit provides emergency services to all persons within the fire district or, when requested, under mutual aid agreements across the county, without regard to the nature of the

location to which we are called. Over many years, we have responded to calls at all sorts of locations that the Concealed Carry Improvement Act ("CCIA") now declares to be "sensitive locations," including government property and buildings, churches, schools, nurseries, daycares, libraries, playgrounds, parks, medical facilities and offices, shelters, vehicles used for public transit, restaurants that serve alcohol, theaters, sporting events, and others. If not a "sensitive location," our calls invariably involve private property now deemed a "restricted location."

7. For example, having the Catskills Park surrounding our town, we often have responded to calls in the park, such as injured hikers, forest fires, etc.

8. The CCIA, however, does not contain any emergency exemption or other sort of exception to its blanket prohibition of firearm possession in "sensitive locations" and "restricted locations."

9. This means that I would be guilty of a felony crime, should I, as a first responder, respond to an emergency situation while armed. The only way to avoid culpability would be for me to disarm, in compliance with the CCIA, by returning home or to my vehicle, prior to responding to an emergency call which would delay responding to what may be a life threatening emergency.

10. Moreover, under the CCIA, it would not be enough for me to simply place my handgun in the back seat, or under a newspaper, while on my way to a call. Rather, I would have spend significant time to unload the firearm by "removing the ammunition from" the firearm, and then "securely locking" the firearm "in an appropriate safe storage depository out of sight from outside the vehicle," realistically meaning a safe or lockbox attached to the structure of the vehicle. Failure to take these steps is a "class A misdemeanor."

11. Moreover, in various instances in the past, I have been called on to respond while traveling in a vehicle other than my own (such as that of my wife, a friend, etc.) where "safe storage" has

not been available to me, and where it is not otherwise safe or appropriate to simply leave my firearm in a vehicle.

12. It is safe to say there will be times that I cannot comply with the CCIA when responding to an emergency call. Nor have I ever met anyone in my line of work who would be able to comply.

13. As part of my job, I respond to house and structure fires, vehicle accidents, and medical emergencies including in state parks, fires on private and state land, etc. Many of these calls present life-and-death situations, where immediate action, including the provision of medical attention, is required in order to preserve life and property.

14. It would be simply absurd to ask a family, standing in their pajamas in knee-deep snow, to provide me with their "express consent" to carry my firearm prior to entering their home to put out a fire or to provide lifesaving medical care. Indeed, that is the absolute last thing I am thinking of in this sort of situation.

15. In fact, the town of Windham, New York is completely surrounded on all sides by the Catskills Park. This means that I often cannot respond to a call without traversing part of the Park, and thus being in violation of the CCIA. The only option for me would be to return home and leave my firearm there, prior to responding to a call – an untenable option.

16. The CCIA thus has put me to an unreasonable choice where either I can resign from being a firefighter, or I can forfeit my constitutional right to bear arms in public. I do not accept these terms.

17. Although the history of organized firefighting dates to ancient Rome, there is no historical analogue for a state law requiring first responders who are not on duty to disarm before responding to an emergency call, with the threat of felony prosecution hanging over their heads.

18. Moreover, in recent years, first responders including firefighters have been specifically targeted and killed by intended mass shooters, including in New York.[1] My need for self-defense does not end simply because I am called to respond at a "sensitive location" or "restricted location." On the contrary, historically many (if not most) mass shootings occur at locations that are declared by state governments to be gun-free zones. New York State's decision to disarm law-abiding persons, including first responders who respond to such situations, is illogical and untethered to any rational thought, to say the least.

19. It is my opinion, based on my professional training and experience that, in an emergency situation, seconds count, and the CCIA, by mandating disarmament by first responders, might literally result in the loss of life, to the extent that first any first responders abide by its requirements.

20. For these reasons, I intend to continue carrying my firearm and going about my daily life, including as a firefighter. This undoubtedly will put me in violation of the CCIA as I respond to calls.

21. Not only do I intend to engage in various constitutionally-protected acts which are now made unlawful under the CCIA, but also I face a credible threat of prosecution, as my specific intentions are now being made public through this filing.

22. For example, First Deputy Superintendent Steven Nigrelli of the New York State Police, has threatened persons such as me who will violate the CCIA that "[w]e ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law. For those who choose to violate this law … Governor, it's an easy message. I don't have to spell it out more than this. We'll have zero tolerance. If you violate this law, you will be arrested. Simple as that.

---

[1] https://www.cnn.com/2012/12/24/us/new-york-firefighters-shooting

Because the New York state troopers are standing ready to do our job to ensure ... all laws are enforced."[2] If that is not a credible threat of enforcement, it is hard to see what would be.

23. What is more, I am far more likely than the average person to interact with the police who are called on the enforce the CCIA. Indeed, it is typical that we would respond to an emergency call alongside police officers, including both local law enforcement, and also the New York State Police. Indeed, many of my fellow firefighters are also in local law enforcement.

24. Moreover, it is not infrequently the case that firefighters can become overwhelmed by smoke, burned by fire, injured by falling objects, or otherwise seriously hurt when responding to a situation such as a structure fire. In the past, I and/or my colleagues have found ourselves in such situations, and have needed medical attention. My department also has policies that, at times, *requires* us to be evaluated by EMS personnel. In other words, it is common for firefighters such as myself to interact with law enforcement, EMS, arson investigators, etc. If, in the process of interacting with these persons or being treated for an injury (which can involve having clothes removed), the police or others discover my firearm, I could be arrested.

25. In addition to my job as a firefighter, my wife and I run a small hotel and breakfast restaurant in Windham, New York. In this business, we offer lodging to guests as well as a restaurant that serves breakfast and offers baked goods to guests and customers. In a given year, we cater to several thousand visitors from across New York, the United States, and around the world.

26. As the owners of this private property, which is now declared a "restricted location," the CCIA mandates that, in order to permit gun owners to continue staying in our rooms and eating at our restaurant, we must post "clear and conspicuous signage indicating that the carrying of firearms

---

[2] https://youtu.be/gC1L2rrztQs?t=2281 (at 38:00 minutes).

… is permitted." In our situation, signage is required because it is entirely impractical to provide person-by-person "express consent" to each individual who stops by.

27. The CCIA requires us to engage in this compelled speech in order to continue providing services to those who bring their firearms to our location. If we do not engage in this compelled speech, we will lose the business of gun owners who wish to travel lawfully with their firearms, as the CCIA prevents them from visiting our location.

28. On the other hand, many (if not most) of our customers are visiting from the southern part of the state, including New York City, Long Island, and northern New Jersey. Many (if not the majority) of these customers hold political views that are generally unaccepting of firearm ownership, and the idea of others bearing arms in public. Thus, if we were to post a sign stating that firearms and concealed carry are welcome on our premises, it is certain that we would lose some amount of business from customers who do not share that view.

29. In other words, the CCIA politicizes our business against our wishes, forcing us to a Hobson's choice between groups of customers and, no matter which option we choose, we will lose business.

30. Additionally, as part of our operations, we have been intending to apply and obtain a New York State wine and beer license, but now, under the CCIA, to do so would turn our business into a "sensitive location" and would put us in a position where we could not even possess firearms ourselves, on our own property, and potentially even in our own home which is appurtenant to our business.

31. Through the CCIA, the state has taken my rights as a property owner to decide the terms on which to invite or exclude visitors to my property (and my home). Moreover, the CCIA forces me to engage in compelled speech as a precondition to obtaining the business of a certain clientele.

The CCIA requires me to publicly take a position one way or the other on an issue that is highly contentious and divisive in this state, whereas before we could simply stay silent and follow state law with respect to firearms.

32. Finally, as I previously explained, the Catskills Park surrounds the town of Windham, New York, where I live. This means that I cannot leave my small town with a firearm, without entering the park, and thus violating the CCIA. The CCIA, which has no exception for travel, even when a firearm is unloaded, locked, and stored in a trunk, turns my town into an island where no firearms can come in, and none can go out. In essence, the CCIA reverts the state of the law to the situation which led to N.Y. *State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020), where the plaintiff was unable even to take his firearm from his home to the shooting range. In response to the Supreme Court agreeing to hear that case, New York state changed the law, in order to moot the matter and avoid a loss. Now, however, the CCIA reenacts the very same situation on a statewide level. Left with no reasonable choice, I intend to bring my firearm when I leave home to travel outside of Windham, New York, which will take me through state parkland, in violation of the CCIA.

I declare under penalty of perjury that the foregoing is true and correct.

September 9, 2022
**Date**

**Leslie Leman**



**License Division**
**Hearings & Appeals Unit**
**One Police Plaza, Room 110A**
**New York, NY 10038**
**Tel. 1-646-610-5560**

August 31, 2022

Dear Licensee:

You are receiving this letter because you currently maintain an active premise business, limited carry, special carry, or carry business license. As you should be aware, New York State has recently enacted laws that prohibit those who are licensed to carry firearms from carrying their firearm in certain locations. Specifically, <u>Penal Law Section 265.01-e prohibits the possession of any firearm, even a licensed one, in a "sensitive location." A violation of this law is a class E Felony. This law goes into effect on Thursday, September 1, 2022</u>. A copy of the applicable law is attached for your careful review. You are being sent this letter because your place of business <u>may</u> now be a sensitive location under this new law and thus, continued possession of a firearm at this location is unlawful.

***IF*** **YOUR BUSINESS IS IN A SENSITIVE LOCATION UNDER P.L. 265.01-E, YOU ARE NO LONGER ABLE TO LAWFULLY POSSESS A FIREARM AT THAT LOCATION.**

<u>If this applies to your place of business</u>, please bring your applicable firearm(s) to your local precinct in order for it to be safeguarded for you. Alternatively, you may bring your firearm(s) to another location where you are lawfully allowed to possess and store it. Lastly, you may contract with a Federally Licensed Firearms dealer (FFL) to store the firearm(s) for you – they may, however, charge for this service.

Additionally, if your place of business is located in Times Square or in the surrounding blocks, please consult sections 5-34 and 5-35 of Title 38 of the Rules of the City of New York. A copy of this rule is also attached. Some exceptions are made within the rules for transport in and out of the Times Square Sensitive Location Zone.

The License Division will endeavor to provide licensees affected by this change in law with alternative means to exercise their 2nd Amendment rights. Questions may be directed to the License Division by email to **[LicenseDivisionDesk@nypd.org](mailto:LicenseDivisionDesk@nypd.org)**.

Exhibit "5"



OFFICE OF THE DEPUTY COMMISSIONER - LEGAL MATTERS

# LEGAL BUREAU
# BULLETIN

**Vol. 51, No. 2**                                        **August 2022**

## New York State Restrictions on Carrying Concealed Firearms

### Key Points

- Possessing a firearm in New York City requires a special license issued by the New York City Police Department.
- Carrying a firearm in New York City requires a concealed carry license issued by the New York City Police Department.
- Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise.
- License holders are required to carry their license when carrying a firearm and must provide their license to law enforcement upon request.
- Recent changes in law do not impact the way officers conducts investigative encounters. Officers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm (Level 3) and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous.

### Overview

It is a crime in New York State (NYS) to possess a firearm without a firearms license. Since the early 1900s, NYS required people who wanted a license to carry a firearm to demonstrate a particular need to carry a gun – such as threats, attacks, or other extraordinary danger to personal safety. On June 23, 2022, the United States Supreme Court (SCOTUS) ruled that New York State cannot require people to demonstrate a particular need for a carry license, but may still require a license.[1]

Specifically, the Court stated that: (1) state and local governments are still authorized to require people to obtain licenses in order to lawfully carry guns, and (2) state and local governments may continue to have criteria that must be met before a license will be issued. For these reasons, the SCOTUS decision does not affect the legal requirement that those who want to carry a firearm in New York City must still obtain a license from the New York City Police Department's License Division, with some exceptions.[2]

---

[1] *New York State Rifle & Pistol Assn., Inc. v Bruen*, 142 S.Ct. 2111 (2022).

[2] *See* Penal Law Section 400.00(6) which says that a handgun license issued in New York State is valid throughout the state, except in New York City, where a special permit is granted by the Police Commissioner. Exceptions to this rule apply to those who: (1) have a lawfully-issued firearms license from another state, (2) are traveling through New York City in a continuous and

After the SCOTUS ruling, New York State passed new laws that prohibit people who are licensed to carry firearms from bringing their firearms to certain locations. This bulletin outlines the new laws which take effect on September 1, 2022.

It is important to note that possessing a firearm *without* a license continues to be a crime in New York State. Also, the SCOTUS decision does not change the Department's training or guidance on investigative encounters. Officers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm (Level 3) and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous.

## Sensitive vs. Restricted Locations

The new law designated certain locations as "sensitive" and others as "restricted."

- **Sensitive Locations**: Even though a person may be licensed to carry a firearm, they *may not* bring a firearm to a "sensitive" location. The list of sensitive locations is outlined below. However, there are exceptions:
    - **Active and Retired Law Enforcement**: May bring firearms to sensitive locations, as long as they are lawfully carrying the firearm.
    - Additional exceptions are outlined below.

- **Restricted Locations**: All private property (residential and commercial) that is not on the sensitive location list is considered "restricted." People who are licensed to possess firearms *may not* bring firearms to a restricted location unless they get permission from the property owner. However, there are exceptions:
    - **Off-Duty Active Law Enforcement and Retired Law Enforcement**: May bring firearms to restricted locations without getting permission from the property owner, so long as they are lawfully carrying the firearm. However, if the owner expressly prohibits all firearms on the property, they *may not* bring firearms onto the property.
    - Additional exceptions are outlined below.

- **On-Duty Law Enforcement**: There are *no* restrictions at either sensitive or restricted locations for on-duty law enforcement. Owners *may not* prohibit on-duty law enforcement from carrying firearms on their property.

## Sensitive Locations

Under new Penal Law § 265.01-e, it is a class E felony for a person, even if they have a license, to possess a firearm, rifle or shotgun in a "sensitive location." However, there are some exceptions to this rule as outlined below.

uninterrupted fashion, and (3) the firearm is stored in a locked container. Exceptions also exist for retired police officers and federal law enforcement officers, licensed New York State peace officers, and others.

**The following are sensitive locations:**

- Government buildings or property used for government administration (i.e., courts, City Hall, city agencies)
- Hospitals, doctor's offices, health clinics, urgent care facilities, substance abuse or mental health screening and treatment centers, or other behavior health services
- Places of worship
- Public libraries, parks, playgrounds, and zoos
- Facilities where child care, daycare, after-school programs or foster care are administered
- All public and private schools, including college and university buildings and campuses, as well as preschools, nursery schools, and summer camps
- All shelters for homeless, youth or domestic violence victims, or areas where domestic violence services are provided
- Adult care, nursing homes or assisted living facilities, veteran homes or school-based health centers
- On public transportation and in public transportation facilities including buses, bus terminals, subways, subway stations, trains, train stations, ferries, ferry terminals, airports, etc.
- Any establishment where on-premises consumption of alcohol or cannabis is authorized, such as a bar, restaurant or cannabis lounge
- In or on the grounds of performing arts centers, theaters, stadiums, arenas, racetracks, museums, art galleries, amusement parks, banquet and catering halls, and casinos
- Any location being used as a polling location
- Any public sidewalk or public area that is restricted from general public access by a government entity for a limited time or for an authorized event such as a parade or outdoor concert (signs **must** be posted alerting the public that the area is temporarily a sensitive location)
- Protests, demonstrations, marches, or any assembly where individuals are gathered to collectively express their constitutional rights of free speech
- Times Square, as the area will be designated by signage[3]

**Exceptions:  The following individuals *are allowed* to possess a firearm in sensitive locations:[4]**

- Off-duty active police officers
- Retired police officers who are lawfully carrying
- Active peace officers employed in NYS

___

[3] For the purposes of section 265.01-e of the Penal Law, Times Square means and includes the following two tracts: (i) the tract in Manhattan including and bounded on the west by the west side of Eighth Avenue, on the south by the south side of West Fortieth Street, on the east by the east side of Sixth Avenue, and on the north by the north side of West Fifty-third Street; and (ii) the tract in Manhattan including and bounded on the west by the west side of Ninth Avenue, on the south by the south side of West Fortieth Street, on the east by the east side of Eighth Avenue, and on the north by the north side of West Forty-eighth Street.

[4] See Penal Law Section 265.01-e(3) for full list of exceptions.  If a person operates a licensed or certified program, such as a daycare or health services, in their home, they may possess a firearm in their home so long as the possession is lawful and does not violate the terms of the program's license or certificate.  This exception only applies to the operator of the program.

3

- Licensed security guards while on duty
- Armored truck guards while on duty
- Judges, licensed to possess a firearm, while in the course of their official duties
- Corrections officers in the course of their official duties
- Active-duty military personnel

## Restricted Locations

Under new Penal Law § 265.01-d, it is a class E felony for a person, even if they have a license, to possess a firearm, rifle or shotgun at a "restricted location" unless permission is granted by the owner or lessee of the property. However, retired law enforcement and off-duty law enforcement may bring firearms to restricted locations without getting express permission from the property owner, but if the owner expressly prohibits all firearms on the property, they may not bring firearms onto the property. Note that owners *may not* prohibit on-duty law enforcement from carrying firearms on their property. Additional exceptions are outlined below.

Property owners and lessees who want to authorize lawful firearms holders to bring firearms onto the property may post clear and conspicuous signs granting permission. Owners may also give express permission to individual people.

**The following are restricted locations**:

- All residential property
- All commercial property including stores and businesses which are not on the sensitive location list noted above[5]

**Exceptions: The following individuals *are allowed* to possess firearms at restricted locations without express permission from the owner:** [6]

- Off-duty active police officers
- Retired police officers who are lawfully carrying
- Active peace officers employed in NYS
- Licensed security guards while on duty
- Armored truck guards while on duty
- Judges, licensed to possess a firearm, while in the course of their official duties
- Corrections officers in the course of their official duties
- Active-duty military personnel

However, if a property owner expressly prohibits firearms on their property, the individuals listed above must comply. If they do not, they may be committing trespass.[7] Remember, owners *may not* prohibit on-duty law enforcement from carrying firearms on their property.

---

[5] For example, since a bar that is licensed by the NYS Liquor Authority is a "sensitive" location under Penal Law Section 265.01-e, the owner may not give customers permission to bring licensed firearms onto the premises.
[6] See Penal Law 265.01-d(2) for full list of exceptions.
[7] If any such individuals bring a firearm onto private property against the owner's articulated wishes, they may be committing a trespass. However, they are not violating § 265.01-d, because they are not required to get an owner's permission before bringing a firearm onto their property.

4

## Storage of Licensed Firearms

As of *September* 1, 2022, individuals who are licensed to possess or carry a firearm are prohibited from *storing*[8] a rifle, shotgun, or firearm in a vehicle unless the ammunition has been removed and locked in a safe storage box that is not visible from outside of the vehicle. A glove compartment *does not* qualify as a safe storage box. This law applies to all people who are licensed to carry firearms. A violation of this law is a class A misdemeanor.

## Investigative Encounters

This Supreme Court decision does not change the way the Department conducts investigative encounters. **People who are carrying firearms in New York State are presumed to be doing so unlawfully, until proven otherwise**. Officers may stop an individual when the officer has reasonable suspicion that such individual is carrying a firearm (Level 3) and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous. Officers may conduct a common law right of inquiry (Level 2) if they have founded suspicion that the individual is carrying a firearm. Officers may effect an arrest of an individual when the officer has probable cause that the individual is carrying a firearm without being licensed to do so. Officers are reminded that under New York State law, all firearms license holders are required to carry their license while carrying a firearm and must produce their license to law enforcement upon request.

## Pending Legislation

At this time, the New York City Council is drafting proposed legislation that may impact the guidance provided in this bulletin. If the draft legislation becomes law, this bulletin will be amended.

## Summary

- Unlicensed firearm possession in New York State is still a crime under the Penal Law.
- New laws place restrictions on where firearm license holders may carry firearms.
- None of the changes in law impact an officer's ability to carry a firearm in the course of their duties at any location.
- No changes are being made to the way the Department conducts investigative encounters.
- License holders are required by law to provide their firearm license to law enforcement upon request.
- Officers should carefully review and understand the above concepts as a result of these new laws. Questions regarding the contents of this Bulletin may be directed at the Legal Bureau by contacting 646-610-5400. The Legal Bureau will update this bulletin as the laws on this subject continue to develop.

---

[8] This prohibition applies when the firearm is left in a vehicle that is not attended by the firearm license holder.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, and LAWRENCE SLOANE, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. _____ ) ) |
| KATHLEEN HOCHUL, in her Official Capacity as Governor of the State of New York, KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police,  Judge MATTHEW J. DORAN, in his Official Capacity as the Licensing-official of Onondaga County, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse, P. DAVID SOARES in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, In his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County,  and JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

---

**DECLARATION OF IVAN ANTONYUK**

---

Exhibit "7"

1. My name is Ivan Antonyuk. I am a U.S. citizen and resident of New York, and I live in Schenectady County. I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*. I was also a plaintiff in that prior case.

2. I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. Unless otherwise stated, I make this declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained therein.

3. As stated in my previous declaration filed in the prior case in this Court, I am originally from Ukraine. In the 1990s, when I lived in Ukraine, crime was rampant and out of control, with the country being run by mafia and criminals. Ordinary citizens were not allowed to own firearms to protect themselves. Instead, only the government and their guards had guns. This gun control regime left the Ukrainian people with no means to defend themselves from crime, whether committed by criminals or the government. In Ukraine in the 1990s, if you needed police, they were hours away when you called, if they even showed up at all. The Ukrainians also had no right to free speech and we had no right to protest. I personally witnessed many attacks on Ukrainian citizens simply for protesting. Once I was passing by a protest, and the police beat me because they thought I was a part of the protest, but I was not involved. I no longer felt safe in Ukraine, and it was a known fact that you should not leave your house at night due to crime. In 1994, I left Ukraine for the United States and its promise of freedom. I settled in New York, where I became a United States citizen in 1999. I have lived in New York ever since. I firmly believe in the Second Amendment and the right to keep and bear arms. I have seen what happens in countries when citizens are not allowed arms.

4. I am a law-abiding person who currently possesses and has maintained an unrestricted New York carry permit since 2009. I am eligible to possess and carry firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

5. Prior to the recent implementation of the New York Concealed Carry Improvement Act, I routinely carried my firearm in public, where permitted and lawful.

6. Now, the CCIA makes almost all places off limits to me while I am carrying a firearm in public. For instance, if I go to a store, restaurant, or gas station that is not specifically posted with a sign allowing me to carry there, I am unable to go in with my firearm, without violating the law.

7. The CCIA's implementation has greatly affected my daily life. This Court previously opined that "it would seem plausible that a plaintiff such as Mr. Antonyuk [is] going to violate both the CCIA's sensitive-location provision or restricted-location provision … while resuming his daily life in the coming weeks…." *Antonyuk* at ___. On the contrary, I have taken significant steps since the CCIA's implementation to comply with each of its provisions, in order to avoid violating the law. I have changed where I eat and get takeout meals. I have stopped shopping at certain stores that have not posted signs welcoming firearms. As the Governor opined, New Yorkers can carry now only in "some public streets," and that generally has been my reality since the CCIA took effect.

8. When I have gone to a place that the CCIA has made off limits, I have been forced to disarm myself. This includes separating the magazine and ammunition from my firearm, and storing them in a safe storage box, but not in my glovebox. Of course, it is well known that when people load and unload firearms, it introduces opportunities to have accidental discharges. As I stated previously, since I must unload my firearm, I have to do this in my vehicle as it does not make sense to exit the vehicle with a holstered, concealed firearm, draw the firearm, unload and

make safe, and then store the firearm in my trunk or locked safe. And then when I return to my vehicle, I have to remove the firearm from the trunk, reload it, and then reholster it. Often my family is present in my vehicle during this unnecessary performance. The second of the four ubiquitous rules of gun safety is to keep the muzzle of an unholstered firearm from pointing in any unsafe direction yet, while in my vehicle with my family in a public place, there are few if any such directions. This CCIA-mandated theater is wholly unnecessary and dangerous, and has completely changed the process of carrying a firearm in New York as it used to be prior to September 1, 2022.

9. Additionally, if someone sees me with an unconcealed handgun in my hand while I am unloading and storing it to comply with this new Act, I fear that I will be reported to the police and perhaps charged with a crime for having a firearm that is not concealed. *See Antonyuk* at 49 n.16 ("[t]his discovery might be as obvious as a passeryby catching sight of a glimmer of steel as a permit holder is transferring his or her handgun to his trunk in the parking lot of a gas station").

10. As the Court found, I am "law-abiding and respectful." *Antonyuk* at \*49. And now, because I am a "law-abiding and respectful" citizen, I have refrained from violating any of the provisions of the Act, and will not violate them. However, the vast number of locations at which lawful carry is now banned, and despite my best efforts, this law creates the real danger that I will inadvertently violate this new law unintentionally --- but that would be no defense, as I understand it.

11. Additionally, I am harmed because I can no longer enjoy the Second Amendment freedoms I once had before the new law was implemented. I no longer can carry in a number of places that I used to carry. I am unable to go peaceably about my daily life without fear of inadvertently carrying in a prohibited location, and being prosecuted for doing so.

12. If the Court enjoined this law, and made it lawful for me to carry without fear of arrest, prosecution, damaging my reputation, losing my Second Amendment rights for life, or losing the required "good moral character," I would immediately carry in those places again, but for the CCIA's unconstitutional restrictions. For instance, if I were able to carry at a gas station while pumping my gas, I would do so, but currently I refrain from doing so because I fear prosecution and because I obey the law. But for the CCIA making carrying of a firearm at a gas station that has not posted a sign permitting carry a felony, I would carry my firearm on my person while at a gas station that is otherwise not posted with "conspicuous signage."

13. I am also a property owner, of a single-family home within Schenectady County, New York. It is my right, as the property owner, to determine who, and under what circumstances, persons may visit my property, and what activities they may engage in while at my home. The CCIA, however, infringes my rights, declaring my home to be a "restricted location," and mandating that, in order to permit gun owners to visit my home while armed, I must post "clear and conspicuous signage indicating that the carrying of firearms … is permitted" or otherwise provide my "express consent," presumably either verbally or in writing.

14. Of course, without standing on my front lawn 24 hours a day, it is impossible for me to provide "express consent" to each and every visitor who stops by, especially in advance of their arrival. For example, a delivery driver, meter reader, Jehovah's Witness, or other visitor to my home might deliver a package, read my electric meter, or knock on my door when I am not at home or otherwise indisposed, and unable to greet them. Although I would have no problem with such persons peaceably and lawfully carrying their firearms on my property, the CCIA would prohibit that from occurring, in violation of my wishes, unless I posted "conspicuous signage."

15. Likewise, many law-abiding license holders, including my friends and associates, no doubt will be hesitant or afraid to ask my permission to exercise their Second Amendment rights (often a taboo topic in New York State), for example because they are unaware that I support gun rights. Thus, such persons would leave their gun at home, contrary to my wishes. If I held a barbeque party for friends and associates, I may not know everyone who attends (such as if my wife invites one of her friends, who brings her husband who we have never met). Such persons would not even be able to ask my permission to carry their firearms on my property before they visit, and thus would have no choice but to leave them at home. Yet armed concealed carry license holders have successfully stopped intended mass shooters at family barbeques, neighborhood cookouts, and other similar events across the country.[1]

16. Since I am a firm believer in the adage "more guns, less crime," the CCIA reduces the safety of myself and my family, by prohibiting, against my wishes, firearms being peacefully carried by law-abiding permit holders on my property.

17. The CCIA could even prevent one of my neighbors from coming to my home to render aid and/or defend my family during a break in by violent criminals, unless he and I had previously had a conversation and exchanged "express consent" to bring firearms onto each other's property. Or perhaps he would be forced to mill around in the dark, searching for "conspicuous signage" authorizing him to help. Either way, the CCIA thus reduces the safety and security of myself and my family, prohibiting firearms on my property that I would otherwise welcome.

18. Unable to provide "express consent" in many circumstances, the only other option the CCIA provides is for me to engage in compelled speech by posting a sign on my property, in order

---

[1] https://www.foxnews.com/us/texas-man-shoots-robbery-suspect-second-amendment; https://www.foxnews.com/us/florida-armed-bystander-stops-gunman-at-crowded-back-to-school-event-at-park-police-say

to permit law-abiding gun owners to peaceably bring their firearms onto my property. However, I cannot safely comply with this requirement. As I mentioned, many New Yorkers are vehemently anti-gun, some militantly so. By posting a "clear and conspicuous" sign in favor of gun rights, I open myself and my family to criticism, harassment, and even possible hostile action (such as vandalism or a physical confrontation) by those who disagree with our political views. Likewise, by posting a gun-friendly sign, the CCIA requires me to identify my home as being the likely location of a gun owner (valuable property), raising the risk that my home would be targeted by burglars, thieves, home invaders, or other violent criminals, putting my family's safety at great risk. I will not post a sign, and self-identify my property as a gun friendly location and thereby reduce my family's security, as required by the CCIA.

19. The CCIA also politicizes my home against my wishes, and demands that I take affirmative steps and engage in compelled speech (either by making a government-required statement or posting a government-required sign) merely to fulfill my wishes that others be able to peaceably exercise their constitutional rights while on my property. On the contrary, there is no historical analogue for forcing me to "opt in" to constitutional rights.

20. I believe that the CCIA violates the constitution's guarantees, requiring armed visitors to private property to obtain what is essentially a license or permit (by receiving consent or permission) from each and every property owner, before they may visit the property while armed. Like in the First Amendment context, the CCIA violates not only the Second Amendment rights of visitors to my home, but also my right to receive them on my terms.

21. Through the CCIA, the state has taken my rights as a property owner to decide the terms on which to invite or exclude visitors to my property (and my home). The CCIA requires me to

publicly take a position one way or the other on an issue that is highly contentious and divisive in this state, whereas before we could simply stay silent.

I declare under penalty of perjury that the foregoing is true and correct.

September __19__, 2022
**Date**

**Ivan Antonyuk**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, COREY JOHNSON, )
ALFRED TERRILLE, JOSEPH MANN, )
LESLIE LEMAN, and LAWRENCE )
SLOANE, )
                                         )
Plaintiffs, )
                                         )    Civil Action No. _____
v. )
                                         )
KATHLEEN HOCHUL, in her Official )
Capacity as Governor of the State of New )
York, KEVIN P. BRUEN, in his )
Official Capacity as Superintendent of the )
New York State Police, Judge MATTHEW )
J. DORAN, in his Official Capacity as the )
Licensing-official of Onondaga County, )
WILLIAM FITZPATRICK, in his Official )
Capacity as the Onondaga County District )
Attorney, EUGENE CONWAY, in his )
Official Capacity as the Sheriff of )
Onondaga County, JOSEPH CECILE, in )
his Official Capacity as the Chief of Police )
of Syracuse, P. DAVID SOARES in his )
Official Capacity as the District Attorney )
of Albany County, GREGORY OAKES, )
In his Official Capacity as the District )
Attorney of Oswego County, DON )
HILTON, in his Official Capacity as the )
Sheriff of Oswego County, and JOSEPH )
STANZIONE, in his Official Capacity as )
the District Attorney of Greene County, )
                                         )
Defendants. )
_____)

---

## DECLARATION OF PASTOR JOSEPH MANN

---

Exhibit "8"

1.  My name is Pastor Joseph Mann.  I am a U.S. citizen and resident of New York, and I live in Oswego County.  I am the pastor of Fellowship Baptist Church in Parish, New York.  I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen, and in this case as well.*

2.  I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief.  Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained therein.

3.  I am a law-abiding person, currently possesses and, since 2014, have maintained an New York carry permit authorizing me to possess and carry a handgun during the course of my employment.  I am eligible to possess firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

4.  The recently enacted Concealed Carry Improvement Act ("CCIA"), however, in effect rescinds that permit.  It makes off limits all the places I ordinarily possess my firearm, renders my church unable to  provide for its own security, forces me to choose between my First and Second Amendment rights in pursuing my ministry and, indeed, utterly destroys my ability to possess firearms, even within my own home.  I will be unable to comply with many of the CCIA's restrictions on our ministry, and thus I intend to continue various activities in violation of the CCIA, as explained in detail below.

5.  The CCIA defines a "sensitive location" to include "any place of worship or religious observation" (subsection c).  In such a location, "a person is guilty of criminal possession of a firearm … when such person possesses a firearm…."

6.  Painting with such broad and absurd strokes, one is left to wonder whether New York actually has banned *all religious observation* where firearms are present, as the Bible teaches that

"where two or three are gathered together in my name, there am I in the midst of them." Matthew 18:20. In other words, a Christian family reading the Bible together, a Muslim family fasting during Ramadan, or a Jewish family lighting a menorah in the home, would seem to constitute a "place of worship or religious observation," and thus none of these families could possess firearms within their own homes. Indeed, in early Christianity, churches were typically little more than small gatherings that occurred within the home. Acts 2:46 ("And they, continuing daily with one accord in the temple, and breaking bread from house to house, did eat their meat with gladness and singleness of heart.); Acts 20:20. Even today, many smaller churches that do not have access to a designated "church" building continue to meet in the homes of their members. Each of these locations would seem to constitute a "place of worship or religious observation" where firearms are banned under the CCIA.

7. But even when applied to locations like Fellowship Baptist Church, that are explicitly designated as a "place of worship," the CCIA is still patently immoral and unconstitutional.

8. Fellowship Baptist Church is a small ministry located in the rural upstate town of Parish, New York. We have morning and evening services every Sunday, together with an evening service every Wednesday. In addition, we regularly have other gatherings and events at the church, not only for church attendees but also the general public.

9. Prior to the CCIA's designation of our church as a defenseless, gun-free zone, we have maintained a church security team, consisting of trusted church members who are licensed carry permit holders, and are designated to carry their firearms to provide security and protection to the congregation during worship services. Both myself and this team have received specialized firearms training from a firearms instructor who specializes in church security.

10. Under the CCIA, however, neither myself nor our security team may possess firearms on church property. And, since we are a small church, we are unable to afford to pay for private security who might be exempt from the CCIA. Nor do the taxpayers provide us with armed security or a constant police presence, unlike the Governor and legislators in Albany who have seen fit to disarm us.

11. Based on this Court's recent conclusion that "the CCIA's list of 'sensitive locations' is not deeply rooted in this Nation's historical tradition of firearm regulation," and because neither churches nor anything like them appears in the Supreme Court's list of traditional sensitive locations, I intend to continue to possess and carry my firearm while on church property, in violation of the CCIA.

12. As Pastor of Fellowship Baptist Church, I live in a parsonage on the property. Indeed, my residence is part of the same building as the sanctuary building. In other words, not only is my home on Church property but, in fact, it is part of the church.

13. Moreover, my home is used not only as my family's residence, but also by the church for church business. For example, we have had Bible studies, meetings of elders, and other church gatherings in my home.

14. In other words, under the CCIA, my home is now a "sensitive location." This means that I may not even "possess a firearm" within my own home, including a handgun for self-defense as expressly authorized under *District of Columbia v. Heller*.

15. As the CCIA makes it nearly impossible for ordinary persons such as myself to carry firearms in public, and makes it a felony for me to keep firearms in my own home, ***the CCIA has completely eliminated my rights under the Second Amendment***.

16. Indeed, since I have for many years and still currently possess firearms within my home, it appears as though now I am already in violation of the CCIA by merely possessing an operable firearm in my home for self-defense, even though this conduct is protected under *Heller*.

17. The only way I could come into compliance with the CCIA would be to turn all of my firearms over to the government.  In fact, New York City already has sent letters to persons with registered firearms at certain locations, notifying them that their premises have been deemed a "sensitive location," and threatening that they now must turn their firearms over to the police.[1]

18. Under the CCIA, then, I am left with the choice to either hand over my firearms to the state, or to refuse to comply.  In other words, as has happened throughout history, my prior ***registration*** of my firearms with the state now has ***led to the point of confiscation*** by the state.  I refuse to surrender my firearms to New York State, even though my mere possession of firearms in my home appears to be directly criminalized by the CCIA.

19. In addition to destroying my Second Amendment rights, the CCIA deprives our church of the ability to make its own rules governing the carrying of firearms on church property.  Unlike the CCIA's restricted locations, there is no ability to opt out of the prohibitions on firearms in "sensitive locations."  Thus, I am unable to permit parishioners, even law-abiding ones with carry licenses and substantial training, to carry during services.  We may not even have our church security team, of the type that have successfully stopped mass shootings in other states, such as Jack Wilson who stopped an intended mass shooter at the West Freeway Church of Christ in Texas,[2] or Charl Van Wyk, a churchgoer in South Africa who deterred "[a] group of attackers" who "stepped through the doorway and lobbed grenades affixed with nails at the congregation,"

---

[1] https://i.redd.it/m4uk6vzrr3l91.png
[2] https://en.wikipedia.org/wiki/West_Freeway_Church_of_Christ_shooting

"[t]hen [] opened fire with their assault rifles."[3]  In fact, under the CCIA, Stephen Willeford presumably would today be a felon for stopping the Sutherland Springs church shooter with his AR-15.[4]

20. Unwilling to allow the CCIA to turn my church family into unarmed, defenseless sitting ducks, I have no choice but to violate this immoral, unbiblical, and unconstitutional law, and intend to continue to possess my firearm in my church and in my home.

21. As Martin Luther explained five centuries and five years ago: "Here I stand, I can do no other, so help me God. Amen."

22.  I am aware that First Deputy Superintendent Steven Nigrelli of the New York State Police, has threatened persons such as me who violate the CCIA with a policy of "zero tolerance," and intends to arrest me for committing a felony for exercising an enumerated right.[5]

23. Likewise, at least one of the congregants in my church is in local law enforcement and, as part of the church, is aware of my inability to avoid violating the CCIA by keeping a firearm in my home on church property.

24. Additionally, Sheriff Don Hilton of Oswego County, although pro-gun, highly critical of CCIA, expressing support of Second Amendment rights, and who states his belief the CCIA to be unconstitutional and that much will be struck down, nevertheless has also made statements about

---

[3] https://www.wnd.com/2016/07/dodge-my-bullets-st-james-massacre-hero-pushes-self-defense/#MwgdpWoZ232ZP1bY.01/
[4] https://en.wikipedia.org/wiki/Sutherland_Springs_church_shooting
[5] For example, First Deputy Superintendent Steven Nigrelli of the New York State Police stated that "[w]e ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law.  For those who choose to violate this law … Governor, it's an easy message.  I don't have to spell it out more than this.  We'll have zero tolerance.  If you violate this law, you will be arrested.  Simple as that.  Because the New York state troopers are standing ready to do our job to ensure ... all laws are enforced."  https://youtu.be/gC1L2rrztQs?t=2281 (at 38:00 minutes).  If that is not a credible threat of enforcement, it is hard to see what would be.

enforcement of the CCIA.  For example, in a July 13, 2022 Facebook post, Sheriff Hilton stated that "I'll be clear, as long as I'm the Sheriff in this county … we're going to be very conservative in enforcement of this law."[6]  However, even conservative enforcement is still enforcement. Likewise, in a July 20, 2022 Facebook post, the Sheriff explained how, "Under the new law, taking a legally licensed firearm into any sensitive area – such as a … church … is a felony punishable by up to 1 1/3 to 4 years in prison."  In other words, the Sheriff specifically articulated how my intended conduct is a felony.  Finally, in an August 31, 2022 Facebook post, the Sheriff warned that "If you own a firearm please be aware of these new laws as they will effect [sic] all gun owners *whether we agree with them or not*."  Emphasis added.

25. I intend this act of civil disobedience because the CCIA violates not only my Second Amendment rights and those of my congregation, but also my free exercise of religion protected by the First Amendment.  As an elder and the pastor of my church, I understand my role to be that of an under-Shepherd, under the authority of the chief Shepherd, Jesus Christ.  I am instructed to "Feed the flock of God which is among you...."  I Peter 5:1-4.  Likewise, Acts 20:28 instructs "Take heed therefore unto yourselves, and to all the flock, over the which the Holy Ghost hath made you overseers, to feed the church of God, which he hath purchased with his own blood."  In other words, part of my duty is to provide protection for persons in my congregation, as shepherds do their flock.  While that protection is primarily spiritual, I view providing physical protection to the best of my ability to be part of my duty as well.

26. In addition to the church ministry, Fellowship Baptist Church provides and has provided counseling and assistance in the context of many of the "sensitive location" settings in the CCIA, including to the homeless, youth, in the domestic violence and abuse setting, and others.  To the

---

[6] **Error! Main Document Only.**https://www.facebook.com/SheriffDonHilton

extent that our church operates in that capacity, the CCIA (subsection k) appears to prohibit our possession of firearms as well, and thus inhibits our ability to provide security for those under our care.

27. Indeed, there has been more than one situation over my years as a pastor where the security of myself, my family, and the members of our church has been far from a guarantee. In such situations, I have felt necessary to be armed with my handgun, not in any way wishing to use it, but being prepared to defend myself and others if the need arose.

28. In addition to being a place of "religious observation," Fellowship Baptist Church also provides an addiction recovery ministry through "RU Recovery." In that capacity, I frequently have traveled to the homes of persons addicted to drugs, in order to counsel them to seek help and voluntarily enter treatment. In this role, I have carried my firearm for my own defense and the defense of others. Drug users are often unpredictable, do not think and reason clearly, and potentially can present a risk to themselves or others. The CCIA, however, makes it impossible for me to both perform this ministry and also carry my firearm, as it declares all private property to be a "restricted location," and requires me to obtain the "express consent" of a drug user (often high on drugs) before entering his or her home to provide help. That is an absurd choice (either stop helping people, or forfeit my constitutional rights), and I cannot comply. Rather, but for the CCIA, I would intend to continue to carry my firearm while providing this ministry, as I have in the past.

29. Moreover, as part of the RU Recovery program, we have brought persons in the program to church property for counseling and care. To that extent, the CCIA appears to separately ban firearms, as in "any location providing health, behavioral health, or chemical dependence care or

services" (subsection b). I cannot comply with that prohibition, and intend to continue to operate as I always have with respect to possessing my firearms at the church.

30. Next, during our Sunday services, Fellowship Baptist Church has a nursery, a Sunday School, and a Junior Church, both of which cater to the younger members of our congregation. It would appear that the CCIA separately would prohibit me, our staff, and our church security from providing security to our children, as it bans firearms at "nursery schools, preschools, and summer camps" (subsection f). I cannot comply with that restriction, and I intend to continue to possess firearms on church property to protect our entire congregation, including our children.

31. Additionally, Fellowship Baptist Church offers its facilities to a local homeschool coop, wherein we provide students not only with a place to meet and interact, but also my wife and I teach various classes to the students, including foreign language classes, including in my home. In other words, our church at times operates as a school for the education of children, and thus firearms are once again banned on church property (subsection m) by the CCIA. I cannot comply with that restriction, and intend to continue to operate as I always have with respect to possessing firearms at the church, in order to protect our entire congregation, including our students when they are under our care.

32. Likewise, the CCIA places off limits "any gathering of individuals to collectively express their constitutional rights to ... assemble[.]" Subsection s. This would seem to seem to cover a church service. To the extent that this section covers our church activities, I do not intend to comply.

33. Next, our church also maintains both a church bus and a church van which we use for church business to travel to various locations. We routinely take our own church members, our youth, and members of the public with us when we travel. Widely banning firearms in "public

transportation" vehicles, the CCIA appears as if it might ban possession of a firearm in our "bus[]" (subsection n), even if, hypothetically, a group of men from the church met with their firearms to go on a hunting trip, or to the shooting range. To the extent that the CCIA applies to our church bus or van, I do not intend to comply.

34. Finally, notwithstanding that our church is specifically listed in the CCIA as off-limits, it separately appears to be covered by another section of the CCIA, in that our church plays music before, during, and after worship services, and the CCIA bans firearms at a "performance venue" or "concert[]" (subsection p) and additionally a "banquet hall" as we often break bread together. The CCIA does not appear to include an exemption even for the Lord's Supper (the Sacrament).

35. The principle of self-defense and defense of others is well established in Scripture. Many who oppose gun ownership are quick to refer to Isaiah 2:4: "[T]hey shall beat their swords into plowshares, and their spears into pruninghooks: nation shall not lift up sword against nation, neither shall they learn war any more." However, that verse applies only to the Millenial Kingdom when Christ rules. The verse that applies to this time is Joel 3:10 which teaches the exact opposite: "Beat your plowshares into swords and your pruninghooks into spears: let the weak say, I am strong."

36. When Jesus was instructing his followers at the Last Supper to go out into the world after he would leave his earthly ministry, he made it clear that they would need to be armed: "Then said he unto them ... and he that hath no sword, let him sell his garment, and buy one." Luke 22:36. I view a firearm as today's equivalent to a sword in those days.

37. In addition to its Biblical roots, the principle of self-defense and defense of others is built into the common law, which had Christianity as its core. St. George Tucker's version of Blackstone's Commentaries states: "This may be considered as the true palladium of liberty.... The

right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction."[7]

38. St. George Tucker was expressing a Biblically-based truth with which I agree. Governments which restrict the Biblical, inherent, right of self-defense and defense of others are moving the state to the annihilation of liberty and the bringing the nation to the brink of destruction.

39. Particularly as a pastor of my church, I view any act by a governmental entity to disarm me as a violation of my right of self-defense and to defend others. Such a law would be unrighteous, rendering me incapable of carrying out my duty to defend of myself, my family, and my congregation. "No man can enter into a strong man's house, and spoil his goods, except he will first bind the strong man; and then he will spoil his house." Mark 3:27. With enactment of the CCIA, the government seeks to bind me by disarming me, rendering me unable to protect those entrusted to me.

40. I believe that God has ordained and created all authority consisting of three basic institutions: 1) the home; 2) the church; and 3) the state. Every person is subject to these authorities, but all (including the authorities themselves) are answerable to God and governed by His Word. God has given each institution specific Biblical responsibilities and balanced those responsibilities with the understanding that *no institution has the right to infringe upon the other*. The home, the church, and the state are equal and sovereign in their respective Biblically assigned spheres of responsibility under God (Romans 13:1-7; Ephesians 5:22-24; Hebrews 13:17; 1 Peter 2:13-14).

---

[7] https://press-pubs.uchicago.edu/founders/documents/amendIIs7.html

41. The CCIA, however, alters and usurps that balance, intruding into matters of the church. Moreover, as this Court has explained, the CCIA upsets the constitutional balance and violates enumerated rights. As "[a] Law repugnant to the Constitution is void" (*Marbury vs. Madison*, 5 US (2 Cranch) 137, 174, 176, (1803)), I cannot comply with its unconstitutional restrictions.

42. Whenever possible, I obey the law of the civil government. However, in the book of Acts, we learn that Peter and the other Apostles were ordered not to teach in the name of Jesus. Obedience to that order would constitute disobedience to God. How was this to be resolved? In Acts 5:29, we are told: "Then Peter and the other apostles answered and said, We ought to obey God rather than men."

43. Therefore, for Bible-believing Christians, it is clear that there may be times in which the civil authorities direct us to do what we cannot do while fulfilling our duty to God. In such circumstances, we are to obey God, and not men. This is one of those times.

I declare under penalty of perjury that the foregoing is true and correct.

September 19 2022
Date

Joseph Mann

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, COREY JOHNSON,  )
ALFRED TERRILLE, JOSEPH MANN,  )
LESLIE LEMAN, and LAWRENCE  )
SLOANE,  )
  )
Plaintiffs,  )
  )
  )   Civil Action No. _____
v.  )
  )
KATHLEEN HOCHUL, in her Official  )
Capacity as Governor of the State of New  )
York, KEVIN P. BRUEN, in his  )
Official Capacity as Superintendent of the  )
New York State Police,  Judge MATTHEW )
J. DORAN, in his Official Capacity as the  )
Licensing-official of Onondaga County,  )
WILLIAM FITZPATRICK, in his Official  )
Capacity as the Onondaga County District  )
Attorney, EUGENE CONWAY, in his  )
Official Capacity as the Sheriff of  )
Onondaga County, JOSEPH CECILE, in  )
his Official Capacity as the Chief of Police  )
of Syracuse, P. DAVID SOARES in his  )
Official Capacity as the District Attorney  )
of Albany County, GREGORY OAKES,  )
In his Official Capacity as the District  )
Attorney of Oswego County, DON  )
HILTON, in his Official Capacity as the  )
Sheriff of Oswego County,  and JOSEPH  )
STANZIONE, in his Official Capacity as  )
the District Attorney of Greene County,  )
  )
Defendants.  )
_____)

---

## DECLARATION OF ALFRED TERRILLE

---

## Exhibit "9"

1.  My name is Alfred ("Al") Terrille.  I am a U.S. citizen and resident of New York, and I live in Albany County.  I am a member of Gun Owners of America, Inc., and thus am one of the individuals whose interests were represented by the organizational plaintiffs in *Antonyuk v. Bruen*, and in this case.

2.  I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief.  Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained therein.

3.  I am a law-abiding person who currently possesses and has maintained an unrestricted New York carry permit since 1994.  I am eligible to possess and carry firearms in the State of New York, and have met all the qualifications for licensure, including having good moral character.

4.  Not only do I possess a New York carry license, but also I routinely carry my handgun concealed when I leave home.  To be sure, I do not carry in courthouses, schools, government buildings, or the other obvious "sensitive places" the Supreme Court has described, where the government often provides security in the form of armed guards and metal detectors.  Otherwise, being responsible for my own security and that of my family, my gun generally does not leave my side when I leave the house, and goes where I go.

5.  However, due to the recent implementation of the Concealed Carry Improvement Act ("CCIA"), I am now in jeopardy of arrest and prosecution as a felon, not to mention having my firearm seized and my permit revoked, and my constitutional rights forfeited, merely for carrying in the completely ordinary and entirely non-sensitive locations in which I previously carried my firearm.

6.  For example, in addition to being a father, I am now grandfather to 5 grandchildren.  In that role, it is my duty to protect my family, regardless of the State of New York's attempts to

disarm me, subjugate me, and infringe my Second Amendment rights through passage of the CCIA. Put simply, my duty to my family trumps any duty to disarm in acquiescence to a clearly unconstitutional statute.

7. As part of my activities with my grandchildren, we routinely see movies, both at movie theaters and at drive-in locations within Albany County. This activity occurs repeatedly throughout the year, and we will see a movie again at some point within the next 60 days. In the past, I have carried my concealed firearm during such outings, yet the CCIA will now make me a felon for doing this entirely ordinary family activity in entirely ordinary and non-sensitive locations (subsection p). Indeed, this sort of public location is the type of place where I absolutely need to be able to protect my family. Based on this Court's recent conclusion that "the CCIA's list of 'sensitive locations' is not deeply rooted in this Nation's historical tradition of firearm regulation," and because neither movie theaters nor anything like them appears in the Supreme Court's list of traditional sensitive locations, I intend to continue to carry my firearm when I go to movie theaters with my grandchildren, in violation of the CCIA.

8. I also routinely take my grandkids to Thatcher State Park, in Albany County, where we utilize the hiking trails, picnic areas, and playground for children. I intend to carry my firearm when my family visits the Park in the future, something that occurs and will continue to occur on at least a monthly basis (CCIA subsection d).

9. I have been planning and, within the next 60 days, I will take a trip to visit the state of Tennessee. Since Tennessee is a constitutional carry state that respects the Second Amendment rights of all Americans to bear arms, I will bring my firearm with me. I have not yet booked a flight, but I plan to travel by airplane, departing via the Albany International Airport. I have done some research into flights, and it looks like a ticket with one stop in Charlotte, NC will be under

$500 to Chattanooga, TN, or under $350 to Nashville, TN.  Thus, I will continue watching prices, and will purchase a ticket in the coming weeks, for travel within the next two months.  However, the unconstitutional CCIA makes it a crime for me to take this trip, criminalizing my taking my firearm with me to the airport, even unloaded, locked, and properly declared in my checked luggage in compliance with federal regulations.  In fact, the CCIA bans possession of firearms in "any place … or vehicle used for public transportation," which expressly includes "airports" and by inference would include an airplane as well (since it is a vehicle) (subsection n).  Nor would I be able to store my firearm in my vehicle in an airport parking lot, before taking a trip.  In other words, the CCIA will subject me to arrest and criminal prosecution should I bring my firearm to the airport for my upcoming trip.  Since I intend to check my firearm with my luggage in accordance with TSA regulations, which requires declaring the firearm, I would be essentially telling authorities that I am in illegal possession of a firearm, opening myself to prosecution under the CCIA.

10. Although I intend to travel to Tennessee by airplane, even if I were to travel by car, it would take me approximately 2.5 to 3 hours to drive directly out of New York State.  Along the way, I would be effectively prohibited from making any stops, such as to use the bathroom, or even onto the parking lot of a gas station, rest stop, or fast-food restaurant, unless I have foreknowledge that a sign has been posted welcoming carrying (an impossibility in places where I do not routinely travel and/or have never been).  In fact, I *cannot even stop in a parking lot to find out* if I may carry at a specific location, without violating the CCIA.

11. In other words, the CCIA greatly impairs my freedom of travel.  I find this highly ironic, given that Governor Hochul has publicly asked all Republicans to leave New York State,[1] but also

---

[1] https://nypost.com/2022/08/25/kathy-hochuls-call-for-5-4m-republicans-to-leave-new-york-is-dangerous/

has signed into law a bill making it difficult (if not impossible) for me to do so with my firearm. In the next 60 days, I will travel to Tennessee via airplane, and I intend to bring my firearm with me in my checked luggage, in full compliance with 18 U.S.C. Section 926A, and/or TSA regulations.

12. The CCIA also makes it a felony for me to peaceably carry my firearm to entirely ordinary and non-sensitive locations that I routinely visit. For example, my bank, the First National Bank of Scotia, is a local bank with only a few branches in upstate New York. I have never been made aware of any anti-gun policy of the bank, nor does the bank have any posted signage stating that firearms are not allowed. On the other hand, nor does the bank have any sign stating that I *may* carry. This leaves me in an impossible situation where I essentially need to go into a bank, declare that I have a gun, and ask if it is permissible for me to carry. That is ridiculous, and I will not do that. Rather, I intend to continue carrying my firearm to my local bank in violation of the CCIA, because I will be doing so without the presence of "conspicuous signage" or having received "express consent," unless the bank asks me to leave my firearm in my vehicle.

13. In addition to my local bank, I routinely carry my firearm when out and about in public, including when I go shopping at various locations in Albany County, such as gas stations, grocery stores (such as Hannaford Supermarket and Price Shopper), home improvement stores, big box stores, etc. Many of the stores have corporate policies which permit the carry of firearms, including Walmart, Walgreens and Target.[2] I would estimate that, at least once a week, I visit one or more of these retailers. However, the CCIA now declares such locations to be "restricted locations," and bans my carrying of a firearm on the premises unless I have the affirmative consent of the owner, or there is specific signage posted. However, obtaining such consent is entirely

---

[2] https://thehill.com/policy/finance/460336-here-are-the-gun-policies-for-americas-largest-retailers/#:~:text=Since%20July%202014%2C%20Target%20has,a%20statement%20at%20the%20time.

impractical. Moreover, since the CCIA's implementation, few if any locations have posted signs welcoming concealed carry license holders, even if the business otherwise supports or allows concealed carry. In fact, to my knowledge, *none* of these retailers listed above has taken the affirmative steps to post signage to opt out of the CCIA.

14. Nor is it practical for me to disarm, approach such a business, ask permission from a low-level employee who will no doubt be unfamiliar with store policy and need to ask the manager (if not contact corporate), wait for a response, then re-arm myself – all merely to pick up a few things at the store. Indeed, even if I receive permission at one point in time, such policy could change at any time and without notice, thus putting me at constant risk of committing a crime unawares.

15. Since it is between me and a business – not New York state – whether I carry my firearm there, I intend to continue carrying my firearm in various businesses and establishments in Albany County, in violation of the CCIA's restriction on "prohibited locations" that are not conspicuously posted with signage. Unless this Court strikes down that provision of the CCIA, simply going peaceably about my daily life will be a crime, pursuant to a statute which this Court has already declared clearly unconstitutional. As such, as "an act of the legislature, repugnant to the constitution," the CCIA "is void." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

16. I plan to attend the upcoming NEACA Polish Community Center Gun Show, to occur on October 8-9, 2022, in Albany.[3] The gun show is hosted by The Polish Community Center, which describes itself as "a conference center, banquet hall & wedding venue in Albany, NY."[4] Under the CCIA, however, guns are entirely banned at "conference centers" and "banquet halls" (subsection p), and there is no provision for the community center to opt out and expressly allow firearms. Moreover, one of my main reasons for attending, and a huge part of any gun show, is

---

[3] https://gunshowtrader.com/gun-shows/albany-ny-gun-show/
[4] https://www.albanypcc.com/

the conversations with fellow gun owners, which invariably includes discussion of New York State's tyrannical gun laws. In other words, a gun show is, almost by definition, a "gathering of individuals to collectively express their constitutional rights to protest or assemble" (subsection s) and, thus, the CCIA appears to entirely ban gun shows. I currently plan to attend the upcoming Albany gun show, and I intend to carry my firearm with me when I do, in violation of the CCIA, but based on my understanding of this Court's recent opinion and the Supreme Court's decision in *Bruen* that "'sensitive places' may not include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.'" *Antonyuk* at *87.

17. I currently live in an apartment complex in Albany County. In other words, I am a tenant, and I have a landlord. Although I have certain property rights as a leaseholder, it is my understanding that my apartment complex does not permit residents to post signage outside their units. Although I have given myself express consent to be armed in my own home, it is not feasible for me to expressly consent to the carry of firearms by each individual person who visits my home, including deliverymen, repairmen, friends, family, etc. Thus, the CCIA requires that I post "clear and conspicuous signage" stating that my home is pro-gun. However, I am unable to post such signage as per the terms of my lease. Certainly, I am not permitted to post signage outside my own unit, to permit visitors to my home to park in the common parking lots, and walk on the common sidewalks, when visiting my home. I am thus unable to fully "opt out" of the CCIA's taking my property and declaring it to be an anti-gun location, essentially converting my home from a "restricted location" to a "sensitive location."

18. In the past, I have attended pro-gun rallies, and done so while armed. For example, in 2013 and 2014, I attended more than one rally in Albany, before and after the New York SAFE Act was

passed, which occurred on public sidewalks and streets. The CCIA, however, makes me choose between two constitutional rights, banning Second Amendment rights at First Amendment protected activities, potentially under multiple subsections (subsections a, d, p, r, and s). If firearms were not already prohibited at a rally under subsection (s), then alternatively a rally likely might constitute a "special event" where a permit is required under subsection (r). The CCIA's restrictions are clearly unconstitutional, because the rallies I have attended, where guns are now banned, are in no way "sensitive locations," as they occur on public streets, sidewalks, parks, and squares. I do not presently know of any upcoming pro-gun or pro-freedom rally currently scheduled in New York but, if there were one, I would jump at the opportunity to attend it to express my political views, and I would do so while carrying my firearm, in clear violation of the CCIA.

19. I also routinely go out to eat with my grandkids, including at restaurants such as Applebee's and Mo's Southwest Grill, which are considered "sensitive locations" by the CCIA (subsection o) because they serve alcohol, even if I am not sitting at the bar or consuming any alcoholic beverage. Neither restaurant has any signs prohibiting the carrying of firearms, nor appears to publicly state any anti-gun policy. In other words, I would be permitted to carry when I go to eat, if not for the CCIA. Based on this Court's recent opinion, and because neither restaurants nor anything like them appears in the Supreme Court's list of traditional sensitive locations, I intend to continue to carry my firearm when I go out to eat with my grandkids, an event that will occur within the next 30 days.

20. Not only do I intend to engage in various constitutionally-protected acts which are now made unlawful under the CCIA, but also I face a credible threat of prosecution, as my specific intentions to break the law are now made public through this filing.

21. For example, First Deputy Superintendent Steven Nigrelli of the New York State Police, has threatened persons such as me who violate the CCIA that "[w]e ensured that the lawful, responsible gun owners have the tools now to remain compliant with the law.  For those who choose to violate this law … Governor, it's an easy message.  I don't have to spell it out more than this.  We'll have zero tolerance.  If you violate this law, you will be arrested.  Simple as that. Because the New York state troopers are standing ready to do our job to ensure ... all laws are enforced."[5]  If that is not a credible threat of enforcement, it is hard to see what would be.

22. What is more, I am far more likely (if not guaranteed) to have a run-in with law enforcement when I arrive at the airport and declare to authorities that I have a firearm to check with my baggage.  Under the CCIA's plain text, I believe there to be a strong likelihood that I could be arrested charged with a felony under the state's announced "zero tolerance" policy, when I bring my firearm to the airport to check for my upcoming flight.

I declare under penalty of perjury that the foregoing is true and correct.

September 19, 2022
**Date**

*Alfred Terrille*
**Alfred Terrille**

---

[5] https://youtu.be/gC1L2rrztQs?t=2281 (at 38:00 minutes).

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ivan Antonyuk, Corey Johnson, Alfred Terrille, Joseph Mann, Leslie Leman, Lawrence Sloane

**DEFENDANTS**

Kathleen Hochul, In her official capacity as Governor, et al.

**(b)** County of Residence of First Listed Plaintiff    Schenectady
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Stamboulieh Law, PLLC, P.O. Box 428, Olive Branch MS 601-852-3440 +

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [x] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983 (First, Second & Fifth Amendments)

Brief description of cause:
Action over whether New York's Concealed Carry Improvement Act violates the First, Second and Fifth Amendments

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    Suddaby      DOCKET NUMBER   1:22-cv-734 (GTS/CFH)

DATE   9/20/2022

SIGNATURE OF ATTORNEY OF RECORD   /s/ Stephen D. Stamboulieh

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT   $402.00    APPLYING IFP    JUDGE   GTS    MAG. JUDGE   CFH

ANYNDC-6039505

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V.   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.