

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

**LETITIA JAMES**
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

Writer Direct: (518) 776-2620

September 28, 2022

**By ECF**

The Honorable Glenn T. Suddaby
United States District Court
Northern District of New York
Federal Building and U.S. Courthouse
P.O. Box 7367
Syracuse, NY 13261-7367

Re:   *Antonyuk, et al. v. Hochul, et al.*, No. 22 Civ. 986 (GTS) (CFH)

Dear Judge Suddaby,

This Office represents Defendants Kathy Hochul, in her official capacity as Governor of New York, Kevin P. Bruen, in his official capacity as Superintendent of the New York State Police, and Matthew J. Doran, in his official capacity as Judge of the Onondaga County Court and Licensing Official for Onondaga County. I write pursuant to the Court's September 23, 2022 Text Order, ECF No. 8, to oppose the Plaintiffs' motion for a temporary restraining order. Because the Plaintiffs' proposed temporary restraining order would alter rather than preserve the status quo, because the merits do not support the application, because there is no immediate and irreparable harm that would require a temporary restraining order, and because the equities are against one, the State Defendants ask that the Court deny the motion.

A Temporary Restraining Order Is Not Necessary To Preserve The Status Quo

"The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." Fox v. Lee, No. 15-cv-390, 2016 WL 4543509, at *2 (N.D.N.Y. Aug. 31, 2016) (quoting Garcia v. Yonkers Sch. Dist., 561 F.3d 97, 107 (2d Cir. 2009)). But "[b]y their motion, plaintiffs seek affirmative relief changing the status quo, therefore a temporary restraining order is inappropriate here." Id. (changed to the plural).

Here, New York's comprehensive gun licensing laws are in effect, and in the process of implementation by the State and its counties and municipalities. The relief the Plaintiffs seek would *change* the status quo rather than preserve it – a form of relief that may be appropriate in the context of a preliminary injunction, but not in the context of a temporary restraining order. See Sanchez v. Bonacchi, No. 14-cv-452, 2014 WL 2927795, at *2 (N.D.N.Y. June 27, 2014) (denying request for TRO that would function as "a mandatory injunction").

The Merits Do Not Support A Temporary Restraining Order

The State Defendants strongly disagree with the Court's previous *dictum* opinion on the merits, issued after finding a lack of subject-matter jurisdiction in Antonyuk v. Bruen, No. 22-cv-734, 2022 WL 3999791, at *25 *et seq.* (N.D.N.Y. Aug. 31, 2022) ("Antonyuk I"). This is a new and different case, and the Court must make a *de novo* determination on whether Plaintiffs have made the clear merits showing required for a party seeking a mandatory injunction against a duly-enacted statute.[1]

A. Significant Standing And Justiciability Problems Remain, Barring All Or Part Of The Claims Against The State Defendants

This action suffers from many of the same failings of standing and justiciability as Antonyuk I, requiring dismissal as against the State Defendants. For example, the Plaintiffs' motion papers are bereft of any allegation that Governor Hochul has taken any action against them; instead, the only mentions of Governor Hochul taking any concrete action are in the context of her role in enacting the Concealed Carry Improvement Act ("CCIA") legislation. ECF No. 6-1 at 15, 32 n.35. The Complaint acknowledges that "Governor Hochul is not the official to whom the Legislature delegated responsibility to implement the provisions of the challenged statutes," ECF No. 1 ¶ 9, but instead argues that she is a proper defendant based on her public statements, her role in enacting the CCIA, and the fact that the State Police work for her. This falls well short of alleging that any Plaintiff has suffered an injury-in-fact fairly traceable to the Governor, and raises a host of other threshold defenses, including absolute legislative immunity, lack of personal involvement, and the Eleventh Amendment. See, e.g., Libertarian Party of Erie Cty. v. Cuomo, 970 F.3d 106, 122 (2d Cir. 2020), abrogated in part on other grounds by Bruen, 142 S.Ct. 2111 (2022); Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020); Aron v. Becker, 48 F. Supp. 3d 347, 368-69 (N.D.N.Y. 2014); Riley v. Cuomo, No. 17-cv-1361, 2018 WL 1832929, at *7 (E.D.N.Y. Apr. 16, 2018).

Likewise, the Plaintiffs have not even attempted to argue that any of them has any injury-in-fact traceable to any action Onondaga County Judge Matthew Doran has taken. The Plaintiffs' moving brief does not mention Judge Doran, see ECF No. 6-1, while the Complaint mentions him only in a single paragraph, alleging that he "is responsible for the receipt and investigation of carry license applications, along with the issuance or denial of carry licenses." ECF No. 1 ¶ 11. Missing

---

[1] The *dictum* section of the Court's opinion in Antonyuk I indicated that the Court would not have found a likelihood of success on the merits on the Plaintiffs' challenge to the in-person interview, training, and character reference aspects of the CCIA. See 2022 WL 3999791 at *30, *31. In the interest of brevity, the State Defendants do not address those provisions here.

is any allegation that any Plaintiff actually filed an application that went to Judge Doran, that Judge Doran denied any Plaintiff's application, or that Judge Doran has taken any action that has impacted a Plaintiff in any manner. These omissions are fatal to any claim against Judge Doran, and to any challenge to the licensing laws: in order to have an injury-in-fact to support such a challenge, a plaintiff must either file an application that is denied (as the Plaintiffs in Bruen did), or make "the substantial showing of futility necessary to excuse his failure to apply for a handgun license in New York." U.S. v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012); accord Libertarian Party of Erie Cty. v. Cuomo, 300 F. Supp. 3d 424, 434 (W.D.N.Y. 2018) ("[C]ourts have only found standing where the individual applied for a license and was denied."); aff'd, 970 F.3d 106. Although certain of the Plaintiffs allege that filing an application would be futile because they will refuse to comply with several requirements, to establish standing "a plaintiff must submit to the challenged policy," and "[m]ere objection or antipathy to the law" does not equal futility. Libertarian Party, 970 F.3d at 121, 116.

The State Defendants respectfully request that the Court reconsider the holding that Superintendent Bruen may be a proper defendant for challenges to the CCIA's training requirements, prohibition on carrying guns in sensitive locations, and prohibition on carrying guns on other people's property without their consent. Antonyuk I, 2022 WL 3999791, at *15. In particular, the Court noted that any claim regarding the training requirements related to Superintendent Bruen based only on the Superintendent's role in promulgating and approving aspects of the training materials and curriculum, id. at *12, but no Plaintiff claims to have been harmed by the training materials or curriculum. As to the bars on taking guns into sensitive places or onto other people's private property without consent, Plaintiffs have still not established any specific threat of enforcement by the State Police, and any such claims therefore fail for lack of standing and under the Eleventh Amendment.

Although Plaintiffs quote a State Police Deputy Superintendent's statement at a press conference announcing an intent to enforce the CCIA, these allegations "do not establish an actual and well-founded fear of prosecution because they show nothing more than the fact that state officials stand ready to perform their general duty to enforce laws." Maryland Shall Issue, Inc. v. Hogan, 971 F.3d 199, 218 (4th Cir. 2020); see also Seegars v. Gonzales, 396 F.3d 1248, 1255 (D.C. Cir. 2005) (no threat of imminent prosecution even where District had said it would "prosecut[e] all violators of the statute," because "plaintiffs allege[d] no prior threats against them or any characteristics indicating an especially high probability of enforcement against them" for "engaging in specified conduct" (cleaned up)); Frey v. Bruen, No. 21 Civ. 5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) (no standing to bring pre-enforcement claim against Superintendent where plaintiffs have "not alleged any facts showing that they have been prosecuted in the past or have been threatened with enforcement of any of the statutes they are challenging."). Plaintiffs rely heavily on Cayuga Nation v. Tanner, but in that case, quite unlike here, the village defendant had specifically "announced its intention to enforce the Ordinance *against the Nation*." 824 F.3d 321, 331 (2d Cir. 2016) (emphasis added). Here, there has been no specific threat of enforcement by the State Police directed at any individual Plaintiff.

B. Controlling Precedent Requires That The Facial Challenge Standard Be Applied

Under the governing standard for a pre-enforcement facial challenge, a Court may invalidate a statute on constitutional grounds only if plaintiffs "[s]how that 'no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" Decastro, 682 F.3d at 168 (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)). The facial challenge standard is a lens through which each of the merits arguments must be viewed, and its application would have resulted in substantially different outcomes than those contemplated in the *dictum* section of the Court's opinion in Antonyuk I.

Specifically, if the Court concludes that a statute would be constitutional in some applications, but not others, the facial challenge standard should result in that statute being *upheld* rather than struck down. For example, where the Court found that New York's law protecting sensitive places included "numerous locations that are nonsensitive in nature," but that other locations were sensitive such as "schools, government buildings, legislative assemblies, polling places and courthouses," id. at *32, the statute should be upheld on its face, subject of course to any future challenge brought as-applied. See Jacoby & Meyers, LLP v. Presiding Justices, 82 F.3d 178, 184 (2d Cir. 2017) ("the challenger must establish *that no set of circumstances* exists under which the regulation would be valid." (emphasis in the original)). Similarly, although the Court speculated that New York's licensing standard might be unconstitutional if the term "endanger oneself or others" were to be interpreted to preclude lawful self-defense, under the governing facial challenge standard a hypothetical scenario where the statute could be applied unconstitutionally is insufficient to strike a statute down – instead the statute must be upheld if *some* of its applications are constitutional, which the Second Circuit has already recognized to be the case. See Libertarian Party, 970 F.3d at 126 (listing examples of constitutional applications of prior good moral character standard and finding that "[s]uch examples are not beyond an ordinary person's comprehension; nor are they rare.").

C. New York's Good Moral Character Standard Is Facially Constitutional.

The State Defendants respectfully disagree with the Court's prior *dictum* regarding New York's "good moral character" standard for licensing, which the CCIA further clarified to mean "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." N.Y. Penal Law § 400.00(1). There is nothing unconstitutional about such a standard, particularly where, prior to Bruen, the Second Circuit correctly held that New York's requirement of "good moral character" was both "easily understandable" and consistently applied to disqualify applicants whose past acts had "not demonstrated law-abiding temperament." Libertarian Party of Erie County v. Cuomo, 970 F.3d at 126-28, abrogated in part on other grounds by Bruen, 142 S. Ct. 2111 (2022). Although the Second Amendment outcome primarily rested on the first step of the since-abrogated two-step judicial test, the Supreme Court has held that the first step of that analysis "is broadly consistent with" the present approach. Bruen, 142 S. Ct. at 2117-18.

Character-based standards such as New York's are common throughout the United States, including in many states that the Supreme Court designated as "shall-issue" and constitutional. See, e.g., Ind. Code § 35-47-2-3(g) ("If it appears to the superintendent that the applicant . . . is of good character and reputation [and] is a proper person to be licensed . . . the superintendent *shall issue* to the applicant a license to carry a handgun in Indiana." (emphasis added)); Ga. Code Ann. § 16-11-129(d)(4) (judge "*shall issue* such applicant a license or renewal license to carry any weapon . . . unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section" (emphasis added)); Conn. Gen. Stat. § 29-28(b); cf. Bruen, 142 S.Ct. at 2123 n.1 (citing each of these specific statutes as examples of permissible licensing regimes). New York's standard is significantly narrower than these statutes, and falls comfortably into a second set of states whose licensing laws involve not a broad determination of character, but rather a specific determination of potential dangerousness. See, e.g., Va. Code. § 18.2-308.09(13); Colo. Rev. Stat. § 18-12-203(2); 430 Ill. Comp. Stat. Ann. 66/10(a)(4); 18 Pa. Cons. Stat. § 6109(d)(3); cf. Bruen, 142 S.Ct. at 2123 n.1 (approving of each of these statutes as well). These state laws—including New York's—are constitutional because they "[a]re designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" Bruen, 142 S.Ct. at 2138 n.9 (quoting District of Columbia v. Heller, 554 U.S. 570, 635 (2008)).

Although the Court indicated in the *dictum* section of Antonyuk I that it viewed the good moral character requirement as unconstitutional because it impermissibly involved "open-ended discretion," 2022 WL 3999791 at *29, Supreme Court and Second Circuit precedent establishes that statutes that tie licensing officials' decisions to concerns about health and safety are constitutional because they "are reasonably specific and objective, and do not leave the decision to the whim of the administrator." Field Day, LLC v. County of Suffolk, 463 F.3d 167, 179 (2d Cir. 2006) (quoting Thomas v. Chicago Park District, 534 U.S. 316, 324 (2002)). "'Perfect clarity and precise guidance have never been required even of regulations that restrict [constitutionally-protected] activity,' and 'flexible' standards granting 'considerable discretion' to public officials can pass constitutional muster." Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989). The Bruen Court also recognized as much. See 142 S.Ct. at 2123 n.1 (noting that some "shall-issue" states "have discretionary criteria," but are permissible because they do not require "demonstration of a proper showing of need.").

To the extent Bruen's history-and-tradition test applies to the good moral character requirement, New York's law satisfies that standard as well because "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). As discussed previously, there are a wealth of examples from Seventeenth-, Eighteenth-, and Nineteenth-Century America that reflect a public understanding that dangerous persons could be disarmed in order to protect the public. These include statutes where "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety," id. at 458, as well as Revolutionary-era loyalty laws where persons potentially "disaffected to the cause of America" would be required to appear in person and take an oath of allegiance, or else be disarmed, see, e.g., 1775-1776 Mass. Acts & Laws 31; 1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, and militia mustering laws that provided for the disarmament and court-martial of persons who showed

up to muster unfit to bear arms. See, e.g., 1806 N.J. Laws 536; 1822 Penn. Laws 316. The precedents also include discretionary armed carriage licensing laws adopted in the late 19th Century including in municipalities throughout New York State. See, e.g., Ordinance to Regulate the Carrying of Pistols, Oct. 25, 1880, reprinted in Brooklyn Daily Eagle, Oct. 26, 1880, at 1; Charter and Ordinances of the City of Syracuse, New York 242 (1894).

Although the Court raised concerns *sua sponte* that the term "endanger," as used in New York's standard, must also necessarily prohibit lawful self-defense, see Antonyuk I, 2022 WL 3999791 at *27, that strained reading would run afoul of the doctrine of constitutional avoidance, which "command[s] courts, when faced with two plausible constructions of a statute – one constitutional and the other unconstitutional – to choose the constitutional reading." Voisine v. United States, 579 U.S. 686, 713-14 (2016) (Thomas, J., dissenting). Moreover, the conclusion ignores the settled principle that an initial aggressor is the one who endangers *himself*, and assumes the risk that the other person will react in lawful self-defense. See, e.g., N.Y. Penal Law § 35.15(1) ("A person may, . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself, or a third person . . ."); U.S. v. Desinor, 525 F.3d 193, 199 (2d Cir. 2008) ("[w]here, as in this case, the defendant commits a felony which includes an immediate threat of violence, he has created a situation so fraught with peril as to preclude his claim of self-defense to any act of violence arising therefrom." (quotation omitted)).

D. The Social Media Disclosure Requirement Is Facially Constitutional

The CCIA's social media disclosure requirement – which requires only that an applicant provide "a list of former and current social media accounts," N.Y. Penal Law § 400.00(1)(o)(iv), is also constitutional. The Plaintiffs' hypothetical that the law requires the applicant to "add[] a government official as a 'friend' on Facebook" or disclose one's "nonpublic profile and posts," is plainly wrong.[2] See ECF No. 6-1 at 7. Both the majority opinion in Bruen, 142 S.Ct. at 2138 n.1, and the concurrence by Justice Kavanaugh and Chief Justice Roberts, id. at 2162, emphasize that a "background check" is an appropriate and constitutional part of the gun licensing process. And in the third decade of the 21st Century, after America has experienced one mass shooting after another where the perpetrator had previously left a trail of disturbing and violent public social media postings, it is both prudent and reasonable to conduct a background check by looking into an applicant's publicly-available online presence. See, e.g., Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022, 32-34, 36-38, available at https://bit.ly/3dHRbLl.

Although the Court's *dictum* opinion points out that New York did not produce any statutes "requiring persons to disclose their published political pamphlets . . , or their personal correspondence," Antonyuk I, 2022 WL 3999791 at *31, Bruen emphasizes that an analogous

---

[2] The Plaintiffs' vivid hypotheticals overstate the impact of the social media disclosure provision, which requires only "a list of former and current social media accounts of the applicant from the past three years," and does not require passwords or access to nonpublic conduct. N.Y. Penal Law. § 400.00(o)(iv). Moreover, the usage of social media is limited by statute "to confirm[ing] the information regarding the applicants character and conduct" provided by other sources. Id.

standard need not be "a historical twin" or a "dead ringer," but need only be "relevantly similar." 142 S.Ct. at 2132, 2133. The broad historical tradition permitting an individualized assessment of a person's dangerousness supports this requirement. See, e.g., Kanter, 919 F.3d at 451 (person can be barred from possessing a gun if he "either belongs to a dangerous category or bears individual markers of risk"); United States v. Coombes, No. 22-cr-189, 2022 WL 4367056, at *6 (N.D. Okla. Sept. 21, 2022) ("Even those advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public.").

The Plaintiffs' First and Fifth Amendment challenges to the social media disclosure provision should also fail on the merits. The provision is content-neutral and therefore subject to intermediate scrutiny, see Rock Against Racism, 491 U.S. at 791, and passes the applicable standard because it is narrowly tailored to the "substantial, indeed compelling, governmental interests in public safety and crime prevention." NYSRPA v. Cuomo, 804 F.3d 242, 261 (2d Cir. 2015); see also id. ("the fit between the challenged regulation [and the government interest] need only be substantial, not perfect." (brackets omitted)). As to the Plaintiffs' new Fifth Amendment challenge, no Plaintiff has any injury-in-fact relating to a Fifth Amendment violation, the social media disclosure requirement does not compel testimonial evidence, and a carry permit application is civil in nature.

E.  New York's Laws Protecting Sensitive Places Are Facially Constitutional

The State Defendants also respectfully disagree with the Court's *dictum* opinion that New York's list of sensitive locations in which guns should not be permitted is unconstitutional. The conclusion was based in part on the Court interpreting that "the Supreme Court in [Bruen] effectively barred the expansion of sensitive locations beyond schools, government buildings, legislative assemblies, polling places and courthouses." Antonyuk I, 2022 WL 3999791 at *32. But the Bruen court said just the opposite, emphasizing that "we have no occasion to comprehensively define 'sensitive places' in this case," and that there will be instances where "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 142 S.Ct. at 2133 (emphasis in the original). The State Defendants disagree with the way the *dictum* decision brushed aside the significant history put forward, and note that the *dictum* decision would have struck down protections from guns in even these few locations that are undisputedly sensitive, as the statute the Plaintiffs target includes categories such as schools, courts and polling places. See N.Y. Penal Law § 265.01-e; compare Antonyuk I, 2022 WL 3999791 at *34 (indicating that the Court would have struck down the list of sensitive locations in its entirety).

The *dictum* part of the Antonyuk I opinion appears to have applied the inverse of the facial-challenge standard, concluding that the entire list of sensitive locations should be struck down absent "historical analogs for restricting firearms at *all* of the above-listed locations." 2022 WL 3999791 at *34 (emphasis in the original). Because sensitive places laws are unquestionably constitutional in many circumstances, see Bruen, 142 S.Ct. at 2133 ("we are [] aware of no disputes regarding the lawfulness of such prohibitions"), the constitutionality of each of the enumerated

sensitive locations must be adjudicated individually and in the context of genuine cases and controversies, not en masse in a single, amalgamated pre-enforcement challenge.

   F. The Second Amendment Does Not Require A Right To Carry Guns Into Another Person's Home Or Property Without Their Knowledge Or Consent

The Plaintiffs' challenge to New York's law empowering owners or lessees to determine whether guns are permitted on their property is premised on the idea that the Second Amendment presumptively grants a right to carry a gun onto other people's property – even into their homes – without the owner's knowledge or consent. See, e.g., Compl. ¶ 190 (objecting that the law "requires [plaintiff] to get express consent, sometimes of an addict, before entering his or her home while carrying a firearm"); id. ¶ 203 (arguing that it would be "absurd to have to ask a family . . . to provide him with their express consent to carry his firearm prior to entering their home"). This extraordinary interpretation of the law finds no support in the text of the Second Amendment or the Supreme Court's jurisprudence. See Bruen, 142 S. Ct. at 2135 (Second Amendment protects right to bear arms "in public"); Heller, 554 U.S. at 592 (Second Amendment protects right to keep arms in one's own home). It would also run afoul of the longstanding statutory and common-law of trespass.

Although the Court suggests in its *dictum* opinion that "New York State is usurping (not protecting) the rights of property owners to decide things for themselves, effectively seizing people's private property and declaring it to be a gun-free zone," Antonyuk I, 2022 WL 3999791, at *35, this is not the case. Nothing in the challenged statute takes away "the rights of property owners to decide things for themselves." Instead, the law ensures that the owner or lessee is *informed* that a gun will be present and has the opportunity to make his or her own decision about whether to permit guns on the property. A rule allowing guns on everyone's property by default would deprive a property owner of the right to knowingly exclude that activity. Cf. GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244 (11th Cir. 2012) (rejecting the contention that "the individual right protected by the Second Amendment, in light of Heller and McDonald, trumps a private property owner's right to exclusively control who, and under what circumstances, is allowed on his or her own premises."). And there is a significant Eighteenth- and Nineteenth-Century tradition of states forbidding persons from carrying guns onto another's property without their permission. See, e.g., 1771 N.J. Laws 344 (forbidding "any person . . . to carry any Gun on any Lands not his own, . . unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor.").

Moreover, the choices reached by private property owners and lessees about whether to permit or exclude guns are not state action, and even if the state were to enforce the decisions of private property owners via the trespassing laws – which has not happened here – there is nonetheless no state action and no constitutional violation. See, e.g., Kalfus v. N.Y. & Presbyterian Hosp., 706 F. Supp. 2d 458, 470 (S.D.N.Y. 2010); cf. Hudgens v. NLRB, 424 U.S. 507, 519 (1976) (constitution safeguards rights "by limitations on State action, not on action by the owner of private property used nondiscriminatorily for private purposes only." (quotation omitted)). As to the Plaintiffs' argument that the provision somehow amounts to "compelled speech," the private property protection does not compel anyone to speak at all, nor does it require any party to carry

the government's message – instead, it empowers property owners or lessees to choose for themselves whether to allow guns on their premises and how to communicate their decision.

A Temporary Restraining Order Is Not Necessary To Prevent Irreparable Harm

Any "presumption of irreparable harm arising from a constitutional deprivation is not automatic." Joglo Realties, Inc. v. Seggos, No. 16-CV-1666, 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016). Instead, it is "more appropriate" to ask whether and how the plaintiff's rights would actually be violated without an injunction. Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir. 1997). Moreover, "the Court must examine whether the movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a temporary restraining order," whereas "a preliminary injunction takes a longer view." Omnistone Corp. v. Cuomo, 485 F. Supp. 3d 365, 36-68 (E.D.N.Y. 2020) (emphasis in the original).

Plaintiffs have not put forward any facts or allegations that would establish "immediate and irreparable injury," Fed. R. Civ. P. 65(b)(1), if a temporary restraining order is not granted; indeed, there does not appear to be any specific event alleged that will happen within the period before the Court rules on the preliminary injunction motion where any plaintiff will suffer any tangible harm. No Plaintiff alleges that he has submitted an application for a concealed carry permit, and none has been denied – certainly not by Judge Doran. To be sure, several of the Plaintiffs allege that they intend at some point to violate New York's laws barring gun possession in sensitive places, or to take their guns onto other people's private property without their consent. But no one has alleged with specificity that they plan to do so, let alone must do so, before a preliminary-injunction motion can be heard. No one has been threatened with likely enforcement in the next few weeks. There simply is no basis to find that any Plaintiff will, in the coming days, "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until [the preliminary injunction decision] to resolve the harm." Hart v. Town of Guilderland, No. 20-cv-475, 2020 WL 2838604, at *7 (N.D.N.Y. June 1, 2020) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)).

The Balance Of Equities And Public Interest Weigh Against A Temporary Restraining Order

In addressing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. NRDC, 555 U.S. 7, 24 (2008). And the balance of the equities and the public interest merge when the Government is the opposing party. See Nken v. Holder, 556 U.S. 418, 435 (2009).

Here, as discussed above, there does not appear to be any specific, imminent, or actual, harm that any Plaintiff will suffer in the time prior to the Court's ruling on the preliminary injunction. No application for a carry permit has been denied (or even submitted), and there has been no specific threat of any civil or criminal enforcement against any Plaintiff for any event expected to occur in the coming days. In contrast to the absence of imminent harm to the Plaintiffs, the entry of a temporary restraining order enjoining a State "from effectuating statutes enacted by representatives of its people" is itself "a form of irreparable injury," Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), to say nothing of the public confusion that would

be caused by immediately (but temporarily and for an indeterminate period) halting statutes that New York, its counties, and municipalities are in the process of implementing.

Moreover, the interests of New Yorkers who do not own or carry guns also merit consideration. These are the parents and children at the zoos where the Plaintiffs intend to carry, Compl. ¶ 158, the other people watching at the movie theater, id. ¶ 166, or the other diners at the restaurant, id. ¶ 176, who want to go about their lives without fear of strangers with guns. These are the homeowners where the Plaintiffs refuse to "get express consent . . . before entering his or her home," id. ¶ 190, or the business owners (and patrons) whose premises they intend to carry weapons onto without inquiring whether those guns are welcome. Id. ¶ 159. Their interests also matter, and ought to be considered in the balance of equities.

This Case Should Not Have Been Deemed Related

Although the Court issued an order on Monday accepting this case as related to the previous Antonyuk I matter, see ECF No. 11, the State Defendants suggest for the purpose of appellate preservation that the two cases should not have been deemed related. See N.D.N.Y. Gen. Ord. 12(G)(3) ("A civil case shall not be deemed related to another civil case merely because the civil case: (a) involves similar legal issues, or (b) involves the same parties.").

Any Temporary Restraining Order Should Be Limited To The Moving Parties

If the Court were to issue a temporary restraining order, its effect should be limited to the Plaintiffs, or alternatively confined in operation to the Northern District of New York. The Second Circuit has emphasized that "as a general rule, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Kane v. De Blasio, 19 F.4th 152, 173 (2d Cir. 2021) (emphasis added) (collecting cases); see also Trump v. Hawaii, 138 S.Ct. 2392, 2427 (2018) (Thomas, J., concurring) ("American courts' tradition of providing equitable relief only to parties [i]s consistent with their view of the nature of judicial power."). This Court should heed these principles and issue relief no broader than necessary to vindicate the claims for which Plaintiffs purportedly allege imminent harm to themselves.

Any Temporary Restraining Order Should Be Stayed Pending Appeal

Lastly, in the event that the Court were to issue a temporary restraining order, the State Defendants intend to appeal. The State Defendants therefore request that this Court stay the TRO pending appeal, or at a minimum, stay the TRO for three business days to allow the State Defendants to seek emergency relief in the Second Circuit.[3] "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" King, 567 U.S. at 1303 (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J. in chambers). That injury is particularly stark

---

[3] As this Court has previously noted, "as a result of Fed R. App. P. 8, the State Defendants [a]re required to file a motion for a stay in this Court before filing any such motion with the Second Circuit," absent exceptions not applicable here. DiMartile v. Cuomo, No. 20-cv-859, 2020 WL 4877239, at *12 (N.D.N.Y. Aug. 19, 2020) (Suddaby, J.).

where, as here, a proposed injunction would impact the State's performance of its public safety functions. See id. at 1303 (noting that injunction to be stayed inflicted "an ongoing and concrete harm to Maryland's law enforcement and public safety interests," and "[t]hat Maryland may not employ a duly enacted statute to help prevent these injuries constitutes irreparable harm.").

Plaintiffs have not articulated any harm so dire that a temporary restraining order could not be stayed, at least for three business days. There is no indication that any of them would be harmed by a stay to allow for appellate review.

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York
Attorney for the State Defendants

By: _____
James M. Thompson
Special Counsel
Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
(212) 416-6556
james.thompson@ag.ny.gov

s/ *Michael McCartin*

Michael G. McCartin
Assistant Attorney General | Special Counsel
Bar Roll No. 511158
(518) 776-2620
Michael.McCartin@ag.ny.gov

cc: By ECF
   All Counsel of Record

#