ROBB ELEMENTARY SCHOOL

# Texas House of Representatives
## Investigative Committee
## *on the* Robb Elementary Shooting

**Representative Dustin Burrows,** Chair
**Representative Joe Moody,** Vice Chair
**The Honorable Eva Guzman,** Member



July 17, 2022

**HOUSE INVESTIGATIVE COMMITTEE
ON THE ROBB  ELEMENTARY SHOOTING
TEXAS HOUSE OF REPRESENTATIVES
INTERIM REPORT 2022**

**A REPORT TO THE
HOUSE OF REPRESENTATIVES
88TH TEXAS LEGISLATURE**

**DUSTIN BURROWS
CHAIR**

**COMMITTEE CLERK
PAIGE HIGERD**



Investigative Committee On
the Robb Elementary Shooting

July 17, 2022

Dustin Burrows                                                    P.O. Box 2910
Chair                                                    Austin, Texas 78768-2910

The Honorable Dade Phelan
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The Investigative Committee on the Robb Elementary Shooting of the Eighty-seventh Legislature hereby submits its interim report for your consideration.

Respectfully submitted,

Rep. Dustin Burrows

Rep. Joe Moody

Justice Eva Guzman

# TABLE OF CONTENTS

Preface --------------------------------------------------------------------------------------1

Acknowledgments ----------------------------------------------------------------------1

Dedication------------------------------------------------------------------------------------1

**1 | Introduction & Executive Summary** ------------------------------------------ **5**

The School ---------------------------------------------------------------------------------5

The Responders --------------------------------------------------------------------------7

**2 | Background & History of Investigation** ------------------------------------- **10**

**3 | Robb Elementary School Security & Facilities Overview** ----------------- **13**

Uvalde CISD Police Department -------------------------------------------------13

Active Shooter Plan ------------------------------------------------------------------14

ALERRT Standard for Active Shooter Training ----------------------------17

Rise of "Bailout" Security Incidents--------------------------------------------22

Raptor Alert System -----------------------------------------------------------------23

Uvalde CISD Facilities & Maintenance ---------------------------------------24

Robb Elementary Facilities & Management----------------------------------24

Policies for Locking Doors----------------------------------------------------------25

Maintenance of Doors & Keys-----------------------------------------------------27

**4 | The Attacker** ------------------------------------------------------------------------ **29**

Family & Early Life-------------------------------------------------------------------29

School-----------------------------------------------------------------------------------------30

The Year Before-------------------------------------------------------------------------32

The Last Days ----------------------------------------------------------------------------34

**5 | May 24 Incident & Law Enforcement Response** ---------------------------- **39**

Coach Silva Alerts the School -----------------------------------------------------41

Law Enforcement Responds to Robb Elementary---------------------------41

Robb Elementary School Locks Down ------------------------------------------44

The Attacker Enters the West Building -----------------------------------------46

The Attacker Enters Rooms 111 & 112 -----------------------------------------46

First Law Enforcement Approaches & Enters --------------------------------48

What Happened for the Next 73 Minutes?-------------------------------------52

On the South … ------------------------------------------------------------------------52

On the North …-------------------------------------------------------------------------58

On the Outside …----------------------------------------------------------------------62

What Didn't Happen in Those 73 Minutes? ----------------------------------62

Law Enforcement Responder Headcount ---------------------------------------64

**6 | Information Flow** ------------------------------------------------------------------- **66**

The First Reports -----------------------------------------------------------------------66

ALERRT Report-------------------------------------------------------------------------67

Video Evidence --------------------------------------------------------------------------68

Compromised Trust -------------------------------------------------------------------69

**7 | Factual Conclusions** --------------------------------------------------------------- **70**

# Preface

This is the interim report of the Investigative Committee on the Robb Elementary Shooting of the Texas House of Representatives.

Conscious of the desire of the Uvalde community and the public at large to receive an accurate account of the tragedy at Robb Elementary School, the Committee has worked diligently and with care to issue this interim report of its factual findings. The Committee's work is not complete. We do not have access to all material witnesses. Medical examiners have not yet issued any reports about their findings, and multiple other investigations remain ongoing. The Committee believes this interim report constitutes the most complete telling to date of the events of and leading to the May 24, 2022, tragedy.

This Committee has prioritized factual accuracy, as will be evident from our attention to conducting our own interviews and documenting our sources of information. Still, based on the experiences of past mass-shooting events, we understand some aspects of these interim findings may be disputed or disproven in the future.

The Committee issues this interim report now, believing the victims, their families, and the entire Uvalde community have already waited too long for answers and transparency.

# Acknowledgments

The Committee gratefully acknowledges the assistance of all who helped with its investigation and the preparation of this interim report, including Clement Abbondandolo, Margo Cardwell, Courtney Chaplin, Matthew Crow, Casey Garrett, Harrison Garrett, Paige Higerd, Ted Liggett, Michael Massengale, Kolton McDougald, and Ellic Sahualla.

# Dedication

The Committee submits this report with great humility and the deepest respect for the victims and their families. It is the Committee's sincere hope that this brings some clarity for them as to the facts that happened. This report is meant to honor them.

You will notice the name of the attacker is not mentioned. We also will not use his image, so as not to glorify him.

## Nevaeh Alyssa Bravo

Nevaeh is remembered as a playful girl who put a smile on the faces of everyone around her. Her family meant the world to her, and she often helped her father around the house. Nevaeh loved the colors pink and purple and enjoyed playing softball and riding her bike.

## Jacklyn "Jackie" Jaylen Cazares

Jackie is remembered as a caring girl who enjoyed singing and making TikTok videos. Jackie loved animals (especially her four dogs) and wanted to become a veterinarian; she also dreamt of visiting Paris. Jackie was known as someone who would go out of her way to help anyone.

## Makenna Lee Elrod

Makenna is remembered as the light in the lives of those who knew her. She loved the color purple, softball and gymnastics, and spending time with her family—especially time on the ranch with her dad. Her smile lit up rooms, and she liked to leave hidden notes for her family to find.

## Jose Manuel Flores, Jr.

Jose is remembered as loving and kind. He was an honor roll student who wanted to be a police officer when he grew up to help protect other people. Jose was an amazing big brother who looked out for his siblings, and his parents called him "a helper" because he was always pitching in at home.

## Eliahna "Ellie" Amyah Garcia

Ellie is remembered as a gentle, kindhearted girl who loved spending time with her family and was very close with her grandparents. She enjoyed playing basketball and wanted to be a cheerleader one day. Ellie adored the colors pink and purple and loved a nice bowl of ramen noodles. She was a long-term planner who was already picking dresses and dances for her quinceañera five years away.

## Irma Garcia

Irma is remembered as courageous and selfless—a wife and mother of four who was always willing to lend a helping hand to anyone who needed one. She was a 23-year teacher. Irma died protecting her students, and her heroism will be remembered forever.

## Uziyah Sergio Garcia

Uziyah is remembered as an outgoing boy who loved his family as well as his "cousins and brothers from another mother." He was always fair and full of life, and he enjoyed running, swimming, football, and playing his Nintendo Switch and Oculus.

# Amerie Jo Garza

Amerie is remembered as considerate and fun-loving. She was protective of her three-year-old brother and would kiss him every morning before she went to school. Amerie loved swimming, drawing, and vanilla bean frappés from Starbucks. She dreamt of becoming an art teacher one day.

# Xavier James Lopez

Xavier is remembered as an active boy who loved swimming and playing little league baseball for his team, the Blue Jays. He was lively, energetic, and always eager to dance, especially the cumbia with his grandmother. Xavier was known for wearing stylish clothes and had a smile that could cheer anyone up.

# Jayce Carmelo Luevanos

Jayce is remembered as a happy, thoughtful boy with many friends who always seemed to be running around his yard with him. He made his grandparents a pot of coffee every morning and would leave notes saying that he loved them. Dinosaurs were one of his favorite things.

# Tess Marie Mata

Tess is remembered as a natural athlete who enjoyed softball, soccer, and gymnastics—she especially loved doing backbends in gymnastics. Tess was a fan of the Houston Astros and even played the same position as her favorite player, José Altuve, in softball. She was saving up money for a family vacation to Disney World.

# Maranda Gail Mathis

Maranda is remembered as smart and nice, a shy tomboy who loved the color purple, especially when it was on unicorns and mermaids. Maranda also enjoyed spending time outdoors and had an incredible imagination.

# Eva Mireles

Eva is remembered as dedicated and vibrant. She enjoyed CrossFit, hiking, spending time with her dog, Kane, and being with her family. Her smile was bright and her commitment to her students was still unwavering after 17 years as an educator. She was a hero who never gave up throughout an impossible ordeal.

# Alithia Haven Ramirez

Alithia is remembered as talented and bighearted. She was a gifted artist who wanted to go to art school in Paris one day. She was also a mature role model to her siblings and was always thoughtful about helping those in need.

### Annabell Guadalupe Rodriguez

Annabell is remembered as empathetic and loyal. She enjoyed spending time with her sisters and watching TikToks. Her favorite color was blue—especially blue found on butterflies. Annabell was on the honor roll and known for being a sharp student.

### Maite Yuleana Rodriguez

Maite is remembered as sweet and competitive. She loved learning about animals and the ocean, especially dolphins, whales, and dogs. She was an honor student who dreamt of attending Texas A&M to become a marine biologist. Her favorite color was green, and she enjoyed a #13 from Whataburger—always with a side of sliced jalapenos.

### Alexandria "Lexi" Aniyah Rubio

Lexi is remembered as intelligent and driven. She had a contagious smile and enjoyed playing softball and basketball, which she excelled at. Lexi was an all-A student who wanted to become a lawyer one day, and she was interested in social and political issues because she wanted to make a difference.

### Layla Marie Salazar

Layla is remembered as witty and lively. She loved singing with her parents while coming to and from school and going with her grandparents for tacos. She was also an avid swimmer, dancer, and runner who'd won six races at a recent field day.

### Jailah Nicole Silguero

Jailah is remembered as a joy to be around, a pure delight who enjoyed making TikToks to show off to her family and friends. Jailah was always dancing and liked to spend time outdoors as well.

### Eliahna Torres

Eliahna is remembered as loving and compassionate. She enjoyed making other people laugh and was a "master of jests." She was also an amazing softball player up for a spot on the city's all-star team. Eliahna was a natural leader who was also known for her warmth and selflessness.

### Rojelio Fernandez Torres

Rojelio is remembered as a clever, positive boy who enjoyed being outdoors in his free time as well as playing football and videogames like Pokémon. Rojelio was always eager to help others and had a real love for life.

# 1 | Introduction & Executive Summary

There is nothing we can do to heal the wounds suffered by the Uvalde community, nothing that can redress the loss of 21 souls stolen from their families and friends. We must critically examine the contributing factors to the horrific massacre at Robb Elementary School to try to provide answers and prevent similar tragedies in the future. A safer environment for all Texas children is one of the ways we can honor the memory of the students and teachers murdered in Uvalde.

Across our state, men and women who work in the fields of education and law enforcement exemplify both service and sacrifice. Teachers dedicate themselves to the betterment of society through the promise of a new generation. Police officers see danger and run to meet it, knowing the cost and stepping forward to pay it. In pursuing these high callings, teachers and police officers live in the public square—nurturing, encouraging, protecting, preserving. They render this service on behalf of us all, but especially for children, who are the most innocent and vulnerable among us. Like the rest of us, educators and law enforcement officers sometimes fail at crucial moments. When they do, that does not diminish the good work and sacrificial service of their professions as a whole.

Of necessity, this report will describe shortcomings and failures of the Uvalde Consolidated Independent School District and of various agencies and officers of law enforcement. At the outset, we acknowledge that those same shortcomings could be found throughout the State of Texas. We must not delude ourselves into a false sense of security by believing that "this would not happen where we live." The people of Uvalde undoubtedly felt the same way. We must all take seriously the threats to security in our schools and the need to be properly prepared to confront active shooter scenarios.

Other than the attacker, the Committee did not find any "villains" in the course of its investigation. There is no one to whom we can attribute malice or ill motives. Instead, we found systemic failures and egregiously poor decision making. We recognize that the impact of this tragedy is felt most profoundly by the people of Uvalde in ways we cannot fully comprehend.

## The School

With hindsight we can say that Robb Elementary did not adequately prepare for the risk of an armed intruder on campus.

The school's five-foot tall exterior fence was inadequate to meaningfully impede an intruder. While the school had adopted security policies to lock exterior doors and internal classroom

doors, there was a regrettable culture of noncompliance by school personnel who frequently propped doors open and deliberately circumvented locks. At a minimum, school administrators and school district police tacitly condoned this behavior as they were aware of these unsafe practices and did not treat them as serious infractions requiring immediate correction. In fact, the school actually suggested circumventing the locks as a solution for the convenience of substitute teachers and others who lacked their own keys.

The school district did not treat the maintenance of doors and locks with appropriate urgency. In particular, staff and students widely knew the door to one of the victimized classrooms, Room 111, was ordinarily unsecured and accessible. Room 111 could be locked, but an extra effort was required to make sure the latch engaged. Many knew Room 111's door had a faulty lock, and school district police had specifically warned the teacher about it. The problem with locking the door had been reported to school administration, yet no one placed a written work order for a repair.

Another factor contributing to relaxed vigilance on campus was the frequency of security alerts and campus lockdowns resulting from a recent rise of "bailouts"—the term used in border communities for the increasingly frequent occurrence of human traffickers trying to outrun the police, usually ending with the smuggler crashing the vehicle and the passengers fleeing in all directions. The frequency of these "bailout"-related alarms—around 50 of them between February and May of 2022—contributed to a diminished sense of vigilance about responding to security alerts.

Other factors delayed the reporting of the threat to the campus and to law enforcement. Low-quality internet service, poor mobile phone coverage, and varying habits of mobile phone usage at the school all led to inconsistent receipt of the lockdown notice by teachers. If the alert had reached more teachers sooner, it is likely that more could have been done to protect them and their students.

In violation of school policy, no one had locked any of the three exterior doors to the west building of Robb Elementary. As a result, the attacker had unimpeded access to enter. Once inside, the attacker continued into the adjoining Rooms 111 and 112, probably through the door to Room 111, and apparently completely unimpeded. Locking the exterior and interior doors ultimately may not have been enough to stop the attacker from entering the building and classrooms. But had school personnel locked the doors as the school's policy required, that could have slowed his progress for a few precious minutes—long enough to receive alerts, hide children, and lock doors; and long enough to give police more opportunity to engage and stop the attacker before he could massacre 19 students and two teachers.

Because of these failures of facilities maintenance and advance preparation, the attacker fired most of his shots and likely murdered most of his innocent victims before any responder set foot in the building. Of the approximately 142 rounds the attacker fired inside the building, it is almost certain that he rapidly fired over 100 of those rounds before any officer entered.

## The Responders

Since the 1999 Columbine tragedy, the law enforcement community has recognized the critical importance of implementing active shooter training for all officers, regardless of specialty. Also, all officers must now acknowledge that stopping the killing of innocent lives is the highest priority in active shooter response, and all officers must be willing to risk their lives without hesitation.

At Robb Elementary, law enforcement responders failed to adhere to their active shooter training, and they failed to prioritize saving the lives of innocent victims over their own safety.

The first wave of responders to arrive included the chief of the school district police and the commander of the Uvalde Police Department SWAT team. Despite the immediate presence of local law enforcement leaders, there was an unacceptably long period of time before officers breached the classroom, neutralized the attacker, and began rescue efforts. We do not know at this time whether responders could have saved more lives by shortening that delay. Regardless, law enforcement committed numerous mistakes in violation of current active shooter training, and there are important lessons to be learned from each faulty assumption and poor decision made that day.

The Uvalde CISD's written active shooter plan directed its police chief to assume command and control of the response to an active shooter. The chief of police was one of the first responders on the scene. But as events unfolded, he failed to perform or to transfer to another person the role of incident commander. This was an essential duty he had assigned to himself in the plan mentioned above, yet it was not effectively performed by anyone. The void of leadership could have contributed to the loss of life as injured victims waited over an hour for help, and the attacker continued to sporadically fire his weapon.

A command post could have transformed chaos into order, including the deliberate assignment of tasks and the flow of the information necessary to inform critical decision making. Notably, nobody ensured that responders making key decisions inside the building received information that students and teachers had survived the initial burst of gunfire, were trapped in Rooms 111 and 112, and had called out for help. Some responders outside and inside the building knew that information through radio communications. But nobody in

command analyzed this information to recognize that the attacker was preventing critically injured victims from obtaining medical care. Instead of continuing to act as if they were addressing a barricaded subject scenario in which responders had time on their side, they should have reassessed the scenario as one involving an active shooter. Correcting this error should have sparked greater urgency to immediately breach the classroom by any possible means, to subdue the attacker, and to deliver immediate aid to surviving victims. Recognition of an active shooter scenario also should have prompted responders to prioritize the rescue of innocent victims over the precious time wasted in a search for door keys and shields to enhance the safety of law enforcement responders.

An effective incident commander located away from the drama unfolding inside the building would have realized that radios were mostly ineffective, and that responders needed other lines of communication to communicate important information like the victims' phone calls from inside the classrooms. An offsite overall incident commander likely could have located a master key more quickly—several people on campus had one. An offsite overall incident commander may have suggested checking to see if officers could open the door without a key—in hindsight, they probably could have. An offsite overall incident commander who properly categorized the crisis as an active shooter scenario should have urged using other secondary means to breach the classroom, such as using a sledgehammer as suggested in active shooter training or entering through the exterior windows.

Uvalde CISD and its police department failed to implement their active shooter plan and failed to exercise command and control of law enforcement responding to the tragedy. But these local officials were not the only ones expected to supply the leadership needed during this tragedy.

Hundreds of responders from numerous law enforcement agencies—many of whom were better trained and better equipped than the school district police—quickly arrived on the scene. Those other responders, who also had received training on active shooter response and the interrelation of law enforcement agencies, could have helped to address the unfolding chaos.

Yet in this crisis, no responder seized the initiative to establish an incident command post. Despite an obvious atmosphere of chaos, the ranking officers of other responding agencies did not approach the Uvalde CISD chief of police or anyone else perceived to be in command to point out the lack of and need for a command post, or to offer that specific assistance. Several will suggest they were misled by false or misleading information they received as they arrived; however, the "chaos" described by almost all of them demonstrates that at a

minimum, responders should have asked more questions. This suggests a training deficiency, in that responding officers failed to adequately question the absence of command. Other responders failed to be sufficiently assertive by identifying the incident commander and offering their assistance or guidance, or by assuming command in the absence of any other responder having expressly done so. In this sense, the entirety of law enforcement and its training, preparation, and response shares systemic responsibility for many missed opportunities on that tragic day.

## 2 | BACKGROUND & HISTORY OF INVESTIGATION

On June 3, 2022, Speaker of the Texas House of Representatives Dade Phelan created by proclamation the Investigative Committee on the Robb Elementary Shooting, pursuant to Rule 1, Section 17, and Rule 4, Sections 57 and 58, of the Rules of the House of Representatives. Three members were appointed to the Committee: Representative Dustin Burrows, Chair; Representative Joe Moody, Vice-Chair; and the Honorable Eva Guzman, Public Member. The Speaker gave the Committee the same authority and duties conferred on standing committees under the rules, and the Committee is set to expire on the date the 88th Legislature convenes.

Speaker Phelan charged the Committee with the duty to "conduct all inquiries into the actions of any State or local officer, employee, department, agency, institution, or instrumentality and any political subdivision needed to make a complete and thorough examination of the facts and circumstances of the events relating to the violent acts, shootings, and murders at Robb Elementary School in Uvalde." In the conduct of its investigation, the Speaker charged the Committee to "examine the evidence developed by all law enforcement authorities" and to "acquire and analyze additional evidence as needed to make comprehensive findings." The Committee has the additional duty of providing assistance to the Select Committee on Youth Health and Safety and the Committee on Homeland Security and Public Safety in the consideration of their joint charges on mass violence prevention and community safety. This Committee "shall submit a final report in the same manner as an interim study committee under Rule 4, Section 61, Rules of the House of Representatives."

Put more simply, this is a fact-finding committee. The Speaker has tasked other legislative committees with the difficult but critical responsibility of proposing policy in response to the tragedy at Robb Elementary School.

The Committee held its first meeting on June 9, 2022, in Austin, Texas. In an extensive briefing in executive session, Col. Steven C. McCraw, Director of the Texas Department of Public Safety, provided the Committee an overview of the status of the ongoing DPS investigation, including the attacker's background, the incident timeline, and the response by law enforcement. The Committee reviewed a composite video recording of the attacker's approach to the school and law enforcement's response. The meeting concluded with DPS agreeing to provide its evidence to the Committee.

The Committee then heard three days of testimony on June 16th, 17th, and 20th in Uvalde, Texas. Testifying witnesses included employees of the Uvalde CISD (including Robb

Elementary School staff), the Uvalde CISD Police Department, the Uvalde Police Department, the Department of Public Safety, and members of the attacker's family. On June 17th, all three members of the Committee visited the Robb Elementary School campus accompanied by Uvalde CISD Superintendent Dr. Hal Harrell, and the Committee paid its respects to the victims and to the community by laying a floral wreath at the school memorial.

Uvalde CISD Police Chief Pete Arredondo testified before the Committee in Austin, Texas, on June 21st followed by Sgt. Thomas Calabro with the Houston Police Department, who provided information about training and standard practices for law enforcement responses to active shooter scenarios and for the command and coordination of multiple responding law enforcement agencies.

The Committee returned to Uvalde on June 29th and 30th. On June 29th, the Committee interviewed Uvalde Mayor Don McLaughlin, four Robb Elementary School fourth grade teachers, and five employees of the Uvalde Police Department, including a dispatcher. The next day, June 30th, the Committee interviewed Uvalde CISD employee Becky Reinhardt, Uvalde County Precinct One Constable Johnny Field (by videoconference), and two peace officers who responded to the incident from the Department of Public Safety (a special agent and a lieutenant). That day, the Committee's investigators also interviewed Robb Elementary School teacher Arnulfo Reyes, the teacher in Room 111 who is still recovering from his injuries. The Committee received a report and an audio recording of the interview of Mr. Reyes.

On July 11th, the Committee reconvened in Austin to interview ALERRT Assistant Director John Curnutt and Uvalde County Sheriff Ruben Nolasco, both by videoconference. The Committee also conducted a follow-up interview of DPS Director McCraw.

The Committee interviewed all 35 witnesses in executive session, meaning that the sessions were closed to the public. Despite public expressions of frustration and even criticism that these meetings were conducted behind closed doors, the Committee is confident that its method served the goal of an objective fact-finding process. The Committee was able to engage witnesses in candid discussions that may not have been possible in public hearings or other settings.

In addition to the witnesses who appeared before the Committee in executive session, the Committee's investigators conducted at least 39 independent informal interviews, The Committee and its investigators have reviewed hundreds of crime-scene photos and dozens of audio and video recordings from the incident, including surveillance camera footage, mobile-phone video, 911 calls, radio transmissions, and body-worn camera footage. They reviewed recordings and summaries of witness interviews conducted and recorded by law

enforcement agencies. Documentation received from the Department of Public Safety and reviewed by the Committee included an enormous trove of digital evidence, including data from mobile phones, cloud storage, and social media messages. The Committee received and reviewed thousands of pages of documents received from numerous agencies including ALERRT, ATF, Texas DPS, FBI, Texas School Safety Center, and Uvalde CISD. These documents included school audits and safety plans, school disciplinary records, employment records, criminal-history reports, dispatch logs, ballistics reports, firearms traces, gun store records, information about the victims, and various diagrams, sketches, and timelines.The Committee also invited and received suggestions from witnesses about how to improve policies relating to school safety, firearm safety, law enforcement training and resources, and active shooter response. The Committee genuinely appreciates the input from all witnesses, and it will be shared with the House committees formed to evaluate and propose policies to address mass violence prevention and community safety.

# 3 | ROBB ELEMENTARY SCHOOL SECURITY & FACILITIES OVERVIEW

The Committee has great respect for teachers and all who dedicate their lives to the education of children.

As of the fall of 2020, there were 5,371,586 students in Texas schools. There are 1,204 school systems, most of which are independent school districts. The largest independent school district in Texas is in Houston, with 196,943 students enrolled for the 2020–21 school year. The smallest district is San Vicente ISD, which had five students for 2020–21.[1]

Most school districts have multiple campuses with multiple buildings. It is estimated that there could be as many as 80,000 buildings in the State of Texas that house children at various times during the school year. These are important facts to remember in the context of discussing policy related to school-hardening measures.

Uvalde CISD serves a rural community of 15,217 citizens.[2] The district's schools include Uvalde High School, Morales Junior High, Anthon, Flores, Robb, and Dalton elementary schools, and several alternative education programs.[3] The campus buildings range from over 100 years in age to the newest school, Uvalde High School, which was opened nearly four decades ago in 1983.[4] Uvalde CISD constructed many of those older buildings during times when the potential threats to students were much different than those faced today.[5] While no school could ever be built to prevent every conceivable threat, they can be built and operated in ways to better mitigate risk and impede potential threats from outside attackers.

## Uvalde CISD Police Department

Until recently, the Uvalde Police Department was responsible for security in the Uvalde public schools. In 2018, Uvalde CISD established its own police department, headquartered at Uvalde High School. With nine different schools and a budget for six police officers, Uvalde CISD oversees more campuses than it has officers, and it has assigned no officer specifically to Robb Elementary. Instead, officers would regularly visit the Robb campus for a walk-through several

---

[1] Source: Texas Education Agency.

[2] 2020 Census, https://data.census.gov/cedsci/all?q=Uvalde%20city,%20Texas.

[3] See generally www.ucisd.net.

[4] Committee testimony of Rodney Harrison, UCISD Maintenance and Operations Director (June 16, 2022).

[5] Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

times per week, usually lasting from 15–45 minutes.[6] Uvalde CISD Police Chief Pete Arredondo and his second-in-command, Lt. Mike Hernandez, also testified that they visited campuses and walked halls to "rattle doors" to confirm they were locked.[7]

Uvalde CISD police officers commonly carried two radios: one for the school district, and another "police radio" which transmitted communications from various local law enforcement agencies. While the school district radios tended to work reliably, the police radios worked more intermittently depending on where they were used.[8]

### Active Shooter Plan

As directed by state legislation enacted in 2019,[9] Uvalde CISD adopted a policy for responding to an active shooter emergency. And Uvalde CISD deserves credit for having done so—they are one of the few Texas school districts recognized by the School Safety Center as having submitted a viable active shooter policy.[10]

Uvalde CISD Police Chief Arredondo and Director of Student Services Kenneth Mueller prepared a document titled "Annex 1 Active Shooter" and adopted it on April 15, 2020.[11] The document identified its purpose as seeking to "outline the local organization, operational concepts, responsibilities, and procedures to accomplish coordinated Administration,

---

[6] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022) (couple times per week, approximately 15 minutes per visit); *see also* Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022) (usually took 30-45 minutes to walk Robb Elementary); Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022) (about once per day, usually for less than an hour unless dealing with a problem); Committee testimony of Kenneth Mueller (June 16, 2022) (officers would float, visiting all elementary-school campuses). Uvalde CISD police officer Ruby Gonzalez described how she and her colleagues would rotate shifts based at the high school. The 7:00 a.m.–4:00 p.m. shift would begin with traffic control and watching the courtyard at the high school, followed by rounds to check in at other campuses, walk halls, and check doors. Similarly, the officer working the 9:00 a.m.–6:00 p.m. shift would visit various campuses in the afternoon. Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[7] Testimony of Pete Arredondo, USCID police chief (June 21, 2022); Testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022).

[8] Committee testimony of Adrian Gonzalez, UCISD police officer (June 20, 2022).

[9] Tex. H.B. 2195, § 1, 86th Leg., R.S. (2019) ("A school district shall include in its multihazard emergency operations plan a policy for responding to an active shooter emergency. The school district may use any available community resources in developing the policy described by this subsection."), codified as Tex. Educ. Code § 37.108.

[10] *Cf.* Texas School Safety Center, 2017-2020 DAR Report: Findings on Safety and Security in Texas School Districts, *available* at https://txssc.txstate.edu/research/technical-reports/dar-2020/ ("[T]he EOP review indicated that of the 1,022 districts reviewed, only 200 had a viable active shooter policy. Of the remaining 822 districts, 626 districts did not have a policy in place and 196 districts had an insufficient policy.").

[11] *See* Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ I ("The Uvalde CISD police department along with the Director of Student Services makes recommendations and creates plans to develop a safe environment and to lead the District to Mitigate, Prevent, Prepare, Respond, and Recover from potential active shooter situations.").

Teachers, District police officers, local law enforcement and first responders to Prevent, Prepare, Respond, and Recover from the possibility of an active shooter entering any of the District campuses."[12]

The plan called for utilization of "the National Incident Management System (NIMS) during an emergency to coordinate response efforts."[13] It further stated that "[t]he District's police officers, administrators, and teachers and support staff, along with the students have the daily responsibility to mitigate and prevent an active shooter situation," and that "[a]ll staff members and student[s] will know the proper procedures to follow if a suspected shooter is on the campus."[14]

With respect to securing doors, the active shooter policy stated:

> Staff will conduct inspections of classrooms to make sure doors and windows can be secured … .Doors to all classrooms will remain locked during instruction and the campuses will have one main entry point to the school. *Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.*[15]

The active shooter policy outlined a series of preventative safety measures that served as the "primary preventative strategy" to address "problems of violence, vandalism, disruptions and fear."[16] As applicable to Robb Elementary, these preventative measures included:

> POLICE OFFICERS – The district employs 4 officers. This includes a Chief, a detective, and two officers.[17]
>
> PARTNERSHIPS WITH LOCAL LAW ENFORCEMENT. Local law enforcement agencies are invited to come to any of our campuses while they are on patrol. UCISD provides free breakfast or lunch to any law enforcement personnel visiting our campuses.[18]
>
> THREAT ASSESSMENT TEAMS – Every campus employs an interdisciplinary team of trained professionals that convene to identify, evaluate, classify and address threats or potential threats to school security. Following assessment, this team determines

---

[12] *Id.* ¶ II.

[13] *Id.* ¶ IV.A.1; *see also id.* ¶ V.B ("All personnel assigned responsibilities in this plan are trained on NIMS concepts, procedures and protocols."). Regarding NIMS, the, training that defines operational systems that guide how personnel work together to prevent, protect against, mitigate, respond to and recover from incidents see generally https://training.fema.gov/nims/.

[14] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.A.2.

[15] *Id.* ¶ IV.B.1.b (emphasis supplied).

[16] *Id.* ¶ IV.B.2.a.

[17] *Id.* ¶ IV.B.2.b. Uvalde CISD later hired two additional officers to bring its total force to six, though at the time of the attack on Robb Elementary there were only five officers employed.

[18] *Id.* ¶ IV.B.2.c.

appropriate response and intervention. This includes notification and involvement of parents, a suicide risk assessment, and the development of a written safety plan.[19]

SOCIAL MEDIA THREATS – UCISD utilizes Social Sentinel to monitor all social media with a connection to Uvalde as a measure to identify any possible threats that might be made against students and or staff within the school district.[20]

PERIMETER FENCING – Dalton, Anthon, and Robb have fencing that encloses the campus is designed to limit [*sic*] and/or restrict access to individuals without a need to be on the campus.[21]

RADIOS – Key staff have been provided radios to support campus communication processes.[22]

LOCKED CLASSROOM DOOR POLICY – Teachers are instructed to keep their classroom doors closed and locked at all times. Barriers are not to be used. Substitutes shall follow the same policy, with campuses ensuring they have access to the classrooms they need throughout the day. The Standard Response Protocol procedures are on the back of all of our badges issued to substitute teachers.[23]

STAFF TRAINING – All staff members are trained annually in emergency protocols for the campus. Key campus personnel are CPI-trained.[24]

STUDENT TRAINING & DRILLS – Students receive training on the Standard Response Protocol for lockout, lockdown, evacuate, shelter, and hold. In addition, drills are held for each of these emergency actions on a regular basis … .[25]

THREAT REPORTING SYSTEM – Students, parents, staff, and community members are encouraged to share information with us that is deemed troubling, so that we may take appropriate action. This includes information about weapons, threats, fights, drugs, self-harm, suicide or disclosures made that are concerning. Reports may be made online at ucisd.net, by contacting any campus administrator, district administrator or UCISD Police Officers.[26]

In the event of an active shooter incident, the policy expressly provided that upon verification of an active shooter, "the District police department Chief will become the person in control of the efforts of all law enforcement and first responders that arrive at the scene."[27] The response was to include, if possible, "secur[ing] the administration office as a command post

---

[19] *Id.* ¶ IV.B.2.g.

[20] *Id.* ¶ IV.B.2.g.

[21] *Id.* ¶ IV.B.2.l. The Uvalde CISD director of maintenance and operations, Rodney Harrison, confirmed for the Committee that the fence around Robb Elementary was five feet high.

[22] *Id.* ¶ IV.B.2.p.

[23] *Id.* ¶ IV.B.2.r.

[24] *Id.* ¶ IV.B.2.s. "CPI" refers to the Crisis Prevention Institute, an international training organization that specializes in the safe management of disruptive and assaultive behavior. *See* https://www.crisisprevention.com/About-Us.

[25] *Id.* ¶ IV.B.2.t.

[26] *Id.* ¶ IV.B.2.v.

[27] *Id.* ¶ IV.B.4.b.

and retriev[ing] the critical information and data about the school's emergency systems, including communications, staff and student's locations, detailed floor plans and other important information, documents, items, and supplies that are prepared and readily available for use during the incident."[28]

The active shooter policy recognized that "[t]he district has primary responsibility for the health and safety of students, staff, substitute teachers, and visitors while on district property," and that "[d]uring an emergency *the district should coordinate law enforcement, health and medical services with other local first responders.*"[29] The school district's police department was assigned the responsibility for "the Incident Command Center" and for being "first on scene to prevent or stop an active shooter,"[30] while the policy assigned to other "[l]ocal law enforcement and first responders" the function and responsibility to "follow the direction of the ICS leader to ensure proper procedures are followed" and to "[a]ccept assigned roles of ICS leader."[31]

Under a section titled "Direction and Control," the policy laid out a specific "line of succession":

>     1. Uvalde CISD police department – Chief Pete Arredondo
>
>     2. Uvalde CISD police department – Lt. Mike Hernandez
>
>     3. Director of Student Services – Kenneth Mueller[32]

The policy calls for the district to conduct a "post incident review … to analyze the process and make any corrective action as determined."[33]

### ALERRT Standard for Active Shooter Training

Before joining the Uvalde CISD Police Department, Chief Arredondo received active shooter training from the ALERRT Center,[34] which the FBI has recognized as "the National Standard

---

[28] *Id.* ¶ IV.B.4.f.

[29] *Id.* ¶ V.A.1 (emphasis supplied).

[30] *Id.* ¶ V.B.

[31] *Id.* ¶ V.B. "ICS" is not defined in Uvalde CISD's active shooter plan, but it refers to "Incident Command System." *See, e.g.,* Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1,* at STU 2-27 (v. 7.2, 2020) (noting that "[a] list of incident command courses can be found on the FEMA training web page at https://training.fema.gov/emiweb/is/icsresource/trainingmaterials.htm").

[32] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ VI.C.

[33] *Id.* ¶ VIII.C.

[34] Committee testimony of Pete Arredondo, UCISD Chief of Police (June 21, 2022). Chief Arredondo received the ALERRT training while working for the Laredo ISD police department, between his retirement from the Webb County Sheriff's Office in 2017 and his hiring as chief of the Uvalde CISD police in March 2020. *See id.* Uvalde Police Sgt. Daniel Coronado, who responded to Robb Elementary as well, also acknowledged receiving ALERRT training. Committee testimony of Sgt. Daniel Coronado, Uvalde Police Department (June 20, 2022).

in Active Shooter Response Training."[35] Every school district peace officer in Texas must be trained on how to respond in active shooter scenarios.[36] Not all of them get ALERRT training, but Chief Arredondo and other responders at Robb Elementary did.

ALERRT's training program identifies the challenge for law enforcement responders of possibly having to work "with a small ad hoc team of individuals they may have never trained with before," such that "the only way to swing the tactical advantage back in favor of the [law enforcement] responder is through the use of effective teamwork and tactics."[37] The training identifies lessons to be learned from past active shooter incidents. From the Columbine tragedy in 1999, one lesson was that responders must have tools and training to immediately make entry and neutralize an active shooter threat.[38] Another Columbine lesson was the "Priority of Life Scale": innocent civilians come before law enforcement and other responders.[39] After Columbine, "[w]hile protecting the lives of officers remained a high priority, Stopping the Killing of innocent civilians took first priority. From that moment forward, every law enforcement officer was expected to be willing to risk his or her life without hesitation."[40] "Law enforcement officers were expected to distract, isolate, and neutralize the threat, even in tactically complex situations and when they lacked special training."[41]

A lesson from the Navy Yard Building 197 incident in 2013 was that "[t]he earlier an Incident Command structure can be established, the better," and this tragedy prompted an "Initial Incident Command" block to be added to the ALERRT Level 1 course.[42] The Pulse Nightclub

---

But not all law enforcement officers receive this training, and several other law enforcement officers interviewed by the Committee stated they had not received ALERRT training. *E.g.*, Testimony of Sgt. Eduardo Canales, Uvalde Police Department (June 29, 2022) (none of UPD SWAT team has received ALERRT training); Committee testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022).

[35] *See generally* https://alerrt.org/about ("The ALERRT Center at Texas State University was created in 2002 as a partnership between Texas State University, the San Marcos, Texas Police Department and the Hays County, Texas Sheriff's Office to address the need for active shooter response training for first responders.").

[36] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.

[37] Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 1-9 (version 7.2, 2020).

[38] *Id.* at STU 2-6.

[39] *Id.*

[40] *Id.* at STU 2-7.

[41] *Id.*

[42] *Id.* at STU 2-10; *see also id.* at STU 2-13 (Rt. 91 Harvest Music Festival incident in 2017 taught lesson of establishing unified command early on). The Incident Command module teaches: "Ideally, Incident Command will be established as the first [law enforcement] responder arrives on-scene, provides dispatch with a brief LCAN [i.e. Location, Condition, Actions, and Needs] size-up report, and assumes command." *Id.* at STU 7-6. The

incident from 2016 taught the importance of awareness of the distinction between hostage/barricade and active shooter scenarios.[43] The Marjory Stoneman Douglas High School incident in 2018 taught the importance of incident command structure for appropriate management of resources and that law enforcement responders must be prepared to use word-of-mouth communication when radio communications are overloaded.[44]

On the subject of communicating effectively, the ALERRT course teaches that effective communication is necessary for successful teamwork.[45] "Regional law enforcement agencies should continually train together to establish radio protocols for use during multi-agency active shooter response."[46] "Law Enforcement responders should be familiar with their regional communications plan but also be prepared to respond effectively without reliable radio communications."[47] "After giving a message, [law enforcement] responders should look for confirmation that the intended party received and understood the message."[48] "If radio communications are unreliable, it may be necessary to use runners to deliver messages."[49]

With respect to establishing incident command, law enforcement responders are encouraged to complete Incident Command System (ICS) and National Incident Management System (NIMS) courses as early as possible in their careers.[50] The ALERRT training advises that "[t]he initial [law enforcement] responder to arrive at an active shooter scene becomes the Initial Incident Commander by default…."[51] Further, "[a]s soon as [a law enforcement] responder notices that there appears to be sufficient officers hunting for the attacker, that responder

---

training acknowledges that "sometimes this is difficult because the first [law enforcement] responder to arrive on-scene may find him or herself immediately involved in a gunfight," and "[s]urviving and winning the gunfight should always take priority over considering Incident Command matters." *Id.* But "[a]s soon as immediate threats have been neutralized," law enforcement responders need to ensure that they communicate critical information to dispatch, including the assumption of command. *Id.*

[43] *Id.* at STU 2-12.

[44] *Id.* at STU 2-14.

[45] *Id.* at STU 2-23.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at STU 2-27.

[51] *Id.* at STU 2-28.

should find a secure location, take out their Active Shooter Response Card, assume Initial Incident Command, and begin completing tasks listed on the card."[52]



**Slide 2-32. Active Shooter Response Card**

*Excerpt from ALERRT, Active Shooter Response—Level 1.*

A later, more in-depth module on incident command describes the ICS process:

**Take Command**

The first step in the ICS process is for the first [law enforcement] responder who arrives on the scene … to simply take command. Command is passed up the chain as the scene or situation grows larger. As more officers arrive on-scene, command is passed on and assumed by higher levels, building the ICS tree. All active shooter Incident Command structures will grow. This is a fact, and they will continue to grow for the next several days after the shooter is down.

Taking command is as simple as saying "I have command." … This allows all oncoming resources to receive information and report to one person. Taking command is important because it will help stop freelancing and possible blue-on-blue scenarios.

**Provide an LCAN Report**

Next, the first [law enforcement] responder in should give a size-up report, or LCAN report. This is simply a Location, Condition, Actions, and Needs report telling follow-up units where the officer is at, what he or she sees on arrival, what he or she is doing or plans on doing, and what he or she needs to complete the mission … .LCAN reports

---

[52] *Id.* ALERRT training teaches that every law enforcement responder, "even those recently hired, should carry the Active Shooter Response Card with them at all times," and "[t]hey should be prepared to assume command and start completing the tasks listed on the card within the first few minutes." *Id.* at STU 7-7; *see also id.* at STU 8-2 – 8-4(module 8.1, Incident Command System Instructor Walk-Throughs).

should be updated as more actions are needed to give follow-on responders updated information as they are coming in. This will help with overconvergence and allow the ICS system to begin to set up … .The LCAN report should continue to be updated as the situation changes.

**Assume Command**

As more [law enforcement] responders arrive on the scene, someone should assume command of the outside of the building. This person could be a higher-ranking officer or any responder who sees enough personnel are inside and realizes that things need to be taken care of on the outside of the building (e.g., perimeter control, ambulance exchange areas, staging for all to set up, more contact teams).

Command will be passed from the interior commander … to the command person outside who can begin getting control of the chaos of the emergency. Eventually, this person will be relieved of his or her position and an overall commander will take charge of the situation during the next several stages of the event. As the incident stabilizes, command will downsize and the situation will move into an investigative phase. Units will be released to service and cut loose.

The main points to remember about ICS are that the first [law enforcement] responder must take command. This [law enforcement] responder must also give an LCAN report for oncoming units. Someone else on the outside of the building must then assume command from the first [law enforcement] responder and begin to help gain control of the chaos.[53]

The ALERRT training includes a module on "Entering Locked Buildings Quickly, Discreetly, and Safely," advising that "[r]esponders should be creative and make use of improvised tools to get inside the building however they can."[54] With respect to using keys, ALERRT teaches that "[o]ften, the quickest, most discreet, and safest method of entering a locked building is to locate a key—as long as keys can be located immediately," but "if a key cannot be located quickly, [law enforcement] responders should use another technique to enter the area without delay."[55] The training also suggests sledgehammers and pry tools as reliable, practical, and affordable breaching tools,[56] and a separate module anticipates the challenge of breaching closed and locked outward-opening interior doors, noting that "[m]any public buildings are required by law to have outward-opening doors with self-closing mechanisms for all high-occupancy rooms," and that law enforcement responders "should be prepared to encounter this type of door during an active response."[57]

---

[53] *Id.* at STU 8-2 – 8-3 (emphasis in original).

[54] *Id.* at STU 3-8.

[55] *Id.* at STU 3-9.

[56] *Id.* at STU 3-11 – 3-12.

[57] *Id.* at STU 4-22.

Rise of "Bailout" Security Incidents

Uvalde CISD police officers visit school campuses in the event of lockdowns, which occurred relatively frequently at Robb Elementary due to its proximity to the intersection of Highway 83 and Highway 90. Chief Arredondo described a rise in bailouts: to avoid being stopped by law enforcement, vehicles loaded with undocumented immigrants traveling along highways leading from the border towns of Del Rio and Eagle Pass lead officers on high-speed chases that often end by crashing the vehicle and allowing the occupants to scatter.[58]



*Uvalde, at the intersection of Hwy. 83 & Hwy. 90.*          *Robb Elementary, near intersection of Hwy. 83 & Hwy. 90.*

Numerous witnesses testified to the Committee that there has been an increase in bailout activity over the past 18 months.[59] Uvalde CISD Director of Student Services Kenneth Mueller testified that since February 2021, high-speed chases have been a daily event in the Uvalde area, causing Uvalde CISD schools to be secured or locked down frequently, with 47 "secure" or "lockdown" events happening since late February 2022, and approximately 90% of those

---

[58] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 29-30 (June 21, 2022).

[59] *See, e.g.*, Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* Committee testimony of Lt. Mike Hernandez, Uvalde CISD Police(June 17, 2022) (confirming the frequency of bailouts in the neighborhood surrounding Robb Elementary). Regarding the impacts of bailouts on the Uvalde community, *see, e.g.*, Carine Hajjar, National Review, *Human-Smuggler 'Bailouts' Are Endangering Border Communities* (Apr. 12, 2022), available at https://www.nationalreview.com/corner/human-smuggler-bailouts-are-endangering-border-communities/ (featuring pre-tragedy interview of Uvalde Mayor Don McLaughlin, specifically identifying the risk to school-age residents of Uvalde).

being attributed to bailouts.[60] Uvalde CISD parents became so concerned about the number of bailouts occurring near the elementary-school campuses that they offered to hire off-duty police to supplement the Uvalde CISD police presence.[61]

### Raptor Alert System

School district witnesses also testified to another effect of the rising prevalence of bailouts. The alert system does not differentiate its signals between bailouts and other kinds of alerts, such as an active shooter situation. The series of bailout-related alerts led teachers and administrators to respond to all alerts with less urgency—when they heard the sound of an alert, many assumed that it was another bailout.



*Raptor Alert application.*

Raptor Technologies supplied the alert system Uvalde CISD used. Uvalde CISD had used Raptor's software to screen campus visitors for approximately 10 years. In the fall of 2021, Mueller viewed a presentation on Raptor's emergency management alert system, and he gathered the Uvalde CISD principals, who agreed that they needed it. Uvalde CISD purchased the software in October 2021, and the first Raptor alert occurred on February 8, 2022.[62]

By March 2022, as Uvalde CISD was implementing the Raptor alert system, there was a high volume of alerts. By utilizing the Raptor mobile phone application,[63] any Uvalde CISD employee could activate an alert. Staff at a school campus typically would first learn about a bailout from an external source. Then they would decide, depending on the proximity of the threat to the school, whether to initiate a "secure" or a "lockdown" alert.[64]

---

[60] Committee testimony of Kenneth Mueller (June 16, 2022); *see also* Committee testimony of Lynn Deming, Robb Elementary fourth-grade teacher (June 29, 2022) (describing how most Raptor alerts have been for bailouts, and one happened on the Robb Elementary campus near the bus lane).

[61] Committee testimony of Kenneth Mueller (June 16, 2022).

[62] *Id*; *see* https://raptortech.com/raptor-alert/.

[63] Raptor Emergency Management Brochure, available at https://raptortech.com/wp-content/uploads/2021/09/Raptor-EmergencyManagement-Brochure.pdf?emergency-management-software-for-schools.

[64] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

Chief Arredondo explained it was important to notify schools in the vicinity of the highways about bailouts because the passengers would scatter everywhere, and the school district police did not want them coming on campus. While there have been no incidents of bailout-related violence on Uvalde CISD school grounds, there have been examples of high-speed driving that sometimes crossed school parking lots and reports of some bailout incidents involving firearms in the surrounding neighborhoods.[65]

The Committee received evidence that Uvalde CISD employees did not always reliably receive the Raptor alerts. Reasons included poor wi-fi coverage, phones that were turned off or not always carried,[66] and employees who had to log-in on a computer to receive a message.

### Uvalde CISD Facilities & Maintenance

Uvalde CISD has a Maintenance & Operations Department overseen by director Rodney Harrison, who testified before the Committee. Harrison expressed his view that Uvalde CISD's buildings are in fairly good shape. To facilitate taking care of each campus, the Maintenance & Operations Department employs 14 full-time employees supplemented by six students employed to help move furniture. Harrison stated that it is difficult to keep his department staffed, and he has recently lost employees to two retirements during the COVID pandemic, one death, and another employee moving away.[67]

### Robb Elementary Facilities & Management

Robb Elementary School was built in 1955. Most recently, it served as the primary Uvalde CISD school for students in second through fourth grades.[68] "New" buildings were constructed at the elementary schools, including the west building at Robb, 22 years ago.[69]

Robb Elementary had a new principal beginning with the 2021–22 school year. Principal Mandy Gutierrez has worked for Uvalde CISD for over two decades, starting as a fourth grade

---

[65] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 30 (June 21, 2022); Committee testimony of Kenneth Mueller (June 16, 2022).

[66] Committee testimony of Kenneth Mueller (June 16, 2022).

[67] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[68] The only other option for second to fourth grades is the Uvalde Dual Language Academy. Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Uvalde CISD informed the Investigatory Committee that it intends to turn the former Robb Elementary School campus into a park dedicated to the memory of the students and teachers killed in the shooting tragedy. Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

[69] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022); Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

teacher at Robb in 2008. In 2018, she became assistant principal, and she served in that position until becoming the principal in 2021.[70]

Uvalde CISD had assigned two full-time custodians to Robb Elementary.[71] The lead custodian was Jaime Perez.

In 2019, Uvalde CISD received a state-funded grant to upgrade school security. The school district used its funds to add video cameras to various campuses, build a fence surrounding Flores Elementary School, and install magnetic entryways at some campuses.[72]

### Policies for Locking Doors

Robb Elementary's principal testified that the school's west building has three exterior doors, two of which policy required to remain locked. Each classroom in the west building had a door to a hallway, which policy required to remain locked at all times.[73] The interior classroom doors also were required to remain closed and locked at all times.[74] The interior doors were solid metal with a small pane of glass and could only be locked from the outside using a key.[75]

The school district's police officers conducted walk-throughs, during which they would check for locked doors.[76] When they found doors unlocked the officers would remind teachers to keep the doors locked, and in the event of repeat offenders, they would document the violations.[77]

Multiple witnesses reported to the Committee that people at Robb Elementary commonly left doors unlocked—as did people at all the other Uvalde CISD schools as well.[78] Teachers would use rocks to prop open exterior doors,[79] and they used door stops, wedges, and magnets to

---

[70] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[71] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[72] *Id.*

[73] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* Committee testimony of Pete Arredondo, Chief of Uvalde CISD Police Department (June 21, 2022) (assumed Rooms 111 and 112 were locked because the policy was for them to be locked at all times, particularly during a lockdown).

[74] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times.").

[75] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[76] *Id.*; Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[77] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[78] *E.g.*, Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[79] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

prevent interior door locks from latching.[80] Due to a key shortage, Robb Elementary School substitute teachers often were instructed to use the "magnet system" to circumvent the locks in violation of school district policy.[81]

Uvalde CISD Police Officer Adrian Gonzalez testified that when an officer was walking the floors and checking doors, the teachers would notify each other, and they would lock their doors.[82] The officers would speak to the teachers and to their supervisors, and they tried to discourage the use of magnets.[83] Common responses from teachers would include that they did not have a key (particularly in the case of substitute teachers) and that it was just temporary while a child was using the restroom.[84] For some teachers, the inconveniences of keeping up with a key outweighed their perception of the risk of leaving doors unlocked. Other teachers were "rule followers," always locking their doors.

At the time of the incident, all the doors in the building had been recently painted.[85] In March 2022, around spring break, school administrators received a report from the teacher in Room 111 that his classroom door was not always locking.[86] According to numerous witnesses who testified before the Committee, the door to Room 111 could lock, although it took some extra effort, and if the door closed softly it might not lock. But the head custodian at Robb Elementary testified that he never heard about any problems with the doors for Rooms 111 or 112, and if he had, he would have created a work order.[87] Robb Elementary maintenance records confirm the lack of any written work order to repair the door for Rooms 111 or 112 during the 2021–22 school year. Although Uvalde CISD policy required each staff member to

---

[80] Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022); Testimony of Rodney Harrison, Uvalde CISD Maintenance and Operations Director (June 16, 2022). Assistant principal Shawna Wolbert, who was not present on campus during the incident, told the Department of Public Safety that there was a "magnet system" with magnets provided to substitutes to keep doors from locking. DPS interview of Robb Elementary Assistant Principal Shawna Wolbert (May 28, 2022). Principal Gutierrez said the same thing in her statement to DPS. DPS interview of Robb Elementary Principal Mandy Gutierrez (May 28, 2022).

[81] *See* DPS interviews of Robb Elementary administrators (May 28, 2022); *see also* Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times. *Barriers are not to be used. Substitutes shall follow the same policy*, with campuses ensuring they have access to the classrooms they need throughout the day." (emphasis supplied)).

[82] Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022).

[83] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022); Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[84] Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[85] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* DPS interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[86] *See, e.g.*, Committee investigators' interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[87] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

know the procedures to follow to request repairs for a door that would not lock,[88] Robb Elementary teachers testified to the Committee that instead of requesting a work order themselves, they would call school administrators who were responsible for making the requests.

### Maintenance of Doors & Keys

Considering the district's policies about keeping doors locked, it was important that doors and locks be properly maintained. The manufacturer discontinued production of the door locks used at Robb Elementary. While the school district had acquired a supply of key blanks at the time the locks were purchased, that supply was gone by May 2022.[89]

The director of maintenance and operations, Mr. Harrison, testified that people frequently lose, forget, or simply do not want to carry school keys. As a result, the custodians spend a lot of time opening doors. The maintenance and operations department has one employee who specializes in door repairs, but it relies on YouTube instruction videos, online diagrams, and the help of a local locksmith to work on locks. Harrison testified that unless there is a work order notifying his department of a problem, his employees do not regularly check doors.[90]

There were numerous different master keys that worked with different sets of locks at the Robb Elementary School campus. People who had master keys included Harrison, Principal Gutierrez, Assistant Principal Shawna Wolbert, Robb Instructional Coach Rebecca Guzman, Principal Gutierrez's secretary, Janette Martinez, and lead custodian Jaime Perez.[91] Both Uvalde CISD Police Chief Arredondo and Lt. Mike Hernandez possessed a large number of keys to Uvalde CISD buildings. Chief Arredondo kept a number of keys in his car, but he was not sure whether he had master keys for Robb Elementary. He knew he did not have a key to every building, though he testified that he had requested a complete set for himself.[92] Of the over 50 keys that he carried with him, Lt. Hernandez testified that he had a Robb Elementary master

---

[88] Uvalde CISD, *Annex 1: Active Shooter* ¶ IV.B.1.b ("Doors to all classrooms will remain locked during instruction … . Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.").

[89] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[90] *Id.*

[91] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022); Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[92] Committee testimony of Pete Arredondo, USCID police chief (June 21, 2022).

key that had worked, although sometimes he had to jiggle keys to make them work. Additionally, sometimes staff would change locks without notice to him.[93]

Arnulfo Reyes, the fourth grade teacher in Room 111 stated in an interview that teachers and students in his building widely knew that the door to his classroom frequently did not lock, and he had gotten in "trouble" several times when Uvalde CISD police officers found the door unlocked. He stated that, on multiple occasions, he reported the malfunctioning lock to school administrators, who stated that the request had been turned in. As was the apparent practice among Robb Elementary teachers, Reyes never submitted a work order to repair the door lock for Room 111 himself.[94] Principal Gutierrez, in her testimony, confirmed that school administration knew about the issues with that door, stating that it was reported around spring break of 2022.[95]

---

[93] Committee testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022). Lt. Hernandez's keys were sent into the west building in response to the request for a master key during the May 24, 2022, incident, but officers inside the building were unable to identify the correct key from among the dozens of keys on his key rings.

[94] DPS interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[95] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

## 4 | THE ATTACKER

One motive that drove the man behind the massacre at Robb Elementary School was a desire for notoriety and fame. The Committee refuses to perpetuate his memory in that way; our focus is to ensure that Texas never forgets the children and beloved teachers who have been lost and the lessons this tragedy can teach. So, instead of naming him, we call him by a generic term used in active shooter training: "the attacker." In consultation with the local community in Uvalde, the Committee arranged to show victims' families, in advance of public release, a prudently edited version of Robb Elementary's hallway surveillance video that did not include images of him.[96] We regret that others, under cover of anonymity and for their own motives, have sensationalized evidence of this horrible tragedy at the risk of glorifying a monster.[97]

### Family & Early Life

The attacker was born in Fargo, North Dakota on May 16, 2004, the second child born to the mother, Uvalde native A.R., and her then-boyfriend, S.R. The couple split shortly after the attacker's birth, and A.R. returned to Uvalde with the two children. The father had limited and inconsistent involvement in his children's lives from that point onward.[98]

Mother A.R. was known to several witnesses who testified before the Committee from her work as a server at local Uvalde restaurants. A.R. was involved in the attacker's early life, but over time, her relationship with both her children became strained.[99] A.R. struggled with a long history of drug use and other personal issues, though her only criminal history was a 2005 misdemeanor theft that ended in probation and a dismissed 2007 charge of misdemeanor family-violence assault.[100] The FBI interviewed a former girlfriend of the attacker who

---

[96] The Committee incorporates into its report, by reference, the edited videorecording of the May 24, 2022, law enforcement response at Robb Elementary uploaded at https://www.youtube.com/watch?v=vYjDc5sDZyU. This video is considered part of this report.

[97] Tragically, there is evidence that national media coverage of mass shootings has played a role in increasing their frequency. *See generally* https://www.dontnamethem.org/.

[98] The evidence shared by other law enforcement agencies includes the attacker's birth certificate and school records as well as notes from interviews of both of his parents.

[99] In addition to various interviews of family members conducted by law enforcement agencies in the wake of the Robb Elementary tragedy, the Committee heard testimony from an aunt and a cousin of the attacker. Also, the Committee learned many details in this section from a review of the attacker's mobile phones and cloud-based data storage, which were imaged by law enforcement and provided to the Committee.

[100] Records of the mother's criminal history were provided to the Committee.

believed one of A.R.'s boyfriends sexually assaulted him at an early age, but that A.R. didn't believe his outcry.[101]

The attacker and his family had some support from extended family, most notably A.R.'s mother, C.G. Testimony before the Committee portrayed C.G. as well-known and well-regarded in the Uvalde community, particularly within the local school district, from which she retired after twenty-seven years. C.G. took on the role of a maternal figure in the lives of both the attacker and his sister, especially as they grew older.

Relatives described the attacker as shy and quiet. The Committee heard testimony that he was reluctant to interact with peers because of a speech impediment. Poverty is not an unfamiliar circumstance in Uvalde—86% of the children in the school district may be economically disadvantaged.[102] The attacker often wore the same clothing day after day.

### School

Records from the attacker's early school years reveal varied accounts of his character and school performance. His pre-K teacher's report described him as "a pleasure to have … a wonderful student … always ready to learn," and it praised his "hard work and positive attitude in the classroom." Yet early assessments showed he was behind other students academically, and by third grade, school officials already had identified him as "at-risk" due to consistently poor test results. School records reveal that someone may have requested speech therapy for the attacker, and his later internet searches show he himself sought information on dyslexia. Ultimately, he received no special education services.[103]

The attacker's fourth grade year at Robb Elementary School was significant to him. The shooting took place in his former fourth grade classroom, and he discussed bad memories of fourth grade with an acquaintance just weeks beforehand. In testimony before the Committee, two different narratives have emerged.

The attacker's fourth grade teacher testified before the Committee. Not only did she know the attacker from having been his teacher, but she was also in Robb Elementary's fourth grade building, in a different classroom, at the time of the attack. This teacher told the Committee she knew the attacker needed extra help in her class because he claimed to be a victim of bullying. She testified that she met with the attacker's mother, A.R., over the mother's concerns about bullying, and that she had promised A.R. that her son would have a good fourth grade

---

[101] FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP).

[102] Committee testimony of Dr. Becky Reinhardt, Uvalde CISD (June 30, 2022).

[103] *Id.*

year. According to the teacher, it was a good year for the attacker. She said she believed her classroom was a safe place for him and that he made friends there.

Members of the attacker's family, however, reported to the Committee their belief that other students still bullied the attacker throughout his fourth grade school year over his stutter, clothing, and short haircut. A cousin of the attacker said she was in the same fourth grade class with him, and she corroborated this version of his experience that year. She reported an incident in which another girl in the class tied the attacker's shoelaces together, resulting in him falling over and injuring his face. The family also reported their belief that some teachers also picked on the attacker and his cousin.

Despite the accounts that suggest bullying of the attacker had become a concern by the fourth grade, in notes found on his phone, he described them as beginning in middle school. It is not known to the Committee whether the attacker ever shared these notes with anybody.

Records show the attacker had declining attendance, with more than one hundred absences annually beginning in 2018, along with failing grades and increasingly dismal performance on standardized and end-of-course exams. While Uvalde CISD "school success officers" do try to bring truant children back to school, many Uvalde students have spotty attendance, and the local judicial system reportedly does not consistently enforce truancy rules.[104] It is unclear whether any school resource officers ever visited the home of the attacker.

Despite his absences, or perhaps because of them, the attacker had almost no disciplinary history at school. The single infraction on his school record is for "mutual combat" with another student in a hallway in late 2018, resulting in a three-day suspension.

By 2021, at age seventeen, the attacker had only completed the ninth grade. On October 28, 2021, Uvalde High School involuntarily withdrew him, citing poor academic performance and lack of attendance.[105]

---

[104] *Id.*

[105] There has been some public reference to a Uvalde High School teacher, identified in FBI investigative reports as Rhiannon Bates, who was identified by yet another teacher as having purportedly stated in the past that the attacker was the one student of whom she was afraid, and that "if any student was going to become a school shooter, it would be him." FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP). The Committee's investigators interviewed Ms. Bates, and she categorically denies this account, specifically denying any knowledge about the attacker. In her testimony to the Committee, Uvalde CISD administrator Dr. Becky Reinhardt confirmed that the attacker had not been one of Bates's students, and there is no indication that she ever had any interaction with him. Committee testimony of Dr. Becky Reinhardt, Uvalde CISD (June 30, 2022).

The Year Before

In a year distinguished by the general school-age population's return to school in Uvalde and elsewhere after the COVID pandemic, the attacker dropped out of school and turned down a dark path. While in earlier years, notes in his phone reflect that he unsuccessfully sought to fit in (including a fixation with weight and fitness that resulted in an eating disorder), in 2021 he appears to have increasingly withdrew and isolated himself.

An ex-boyfriend of his mother A.R. described the attacker to an investigating Texas Ranger as a loner who punched holes in the walls of his room after arguments with her. By this time the attacker's sister already had graduated and left home, and his best (perhaps only) friend was living in San Antonio. The attacker had no driver's license or vehicle. Family members told the Committee and other investigators that a group of the attacker's former friends "jumped" him early in the year. The attacker began trying to teach himself boxing and mixed martial arts with a punching bag in his room at home.

In mid-2021, his relationship with the girlfriend later interviewed by the FBI ended. She described the attacker as lonely and depressed, constantly teased by friends who called him a "school shooter." She said he told her repeatedly that he wouldn't live past eighteen, either because he would commit suicide or simply because he "wouldn't live long."[106] The attacker responded to the breakup by harassing the girl and her friends.

The attacker began wearing black clothes, combat boots, and long, unkempt hair. He was active on several social media platforms, including TikTok, Instagram, YouTube, and the French livestreaming platform Yubo. He networked with local peers in ongoing group chats on Snapchat, and he played a range of videogames, including the Call of Duty and Grand Theft Auto series. Most of his usernames and even his email address reflected themes of confrontation and revenge.

The attacker began to demonstrate interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online. Those with whom he played videogames reported that he became enraged when he lost. He made over-the-top threats, especially towards female players, whom he would terrorize with graphic descriptions of violence and rape.

His online interactions grew more manipulative and controlling as the year wore on, and he presented a more commanding personality online than he did in person. He pretended to a

---

[106] FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP).

greater level of maturity than he had, searching the internet for information on sexual practices mentioned by others in conversation. The attacker wrote about his difficulty connecting to other people or feeling empathy for them; he said he was "not human," and he called others "humans," apparently intending it as an insult. Later internet usage suggests he may have wondered if he was a sociopath and sought out information on the condition. His internet research resulted in him receiving an email about obtaining psychological treatment for sociopathy.

The attacker became focused on achieving notoriety. He believed his TikTok and YouTube channels would be successful. The small number of views he received led him to tell those with whom he interacted that he was "famous," that they were mere "randoms" by comparison, and that they were lucky to interact with him.

On Yubo, the attacker spoke enviously of publicity given to a murderer and animal abuser whose story became widely known after a Netflix documentary. In late 2021, he shared a video online that showed him driving around with "someone he met on the internet" holding a clear plastic bag that contained a dead cat, which he discarded in the street and spit on while his driver laughed. The video then showed the attacker wearing a tactical plate carrier, went on to show him dryfiring BB guns at people, and ended with footage of emergency services responding to a serious car accident, which he claimed his driver had caused.

The attacker got a job in late 2021. He first worked at Whataburger, where a friend's grandmother saw him. She snapped a picture and sent it to her grandson, warning that it was "an example of what your life will be if you quit school"—a sentiment some of his peers expressed to him directly. His employer fired him after a month for threatening a female coworker, and he fared similarly at his next job at Wendy's. A coworker there described him as "not a good person" and "troubled," someone who "put himself in a box and would not talk or associate with anyone he worked with." An exception to that approach was when he tried discussing guns with another employee. When the other employee received the discussion negatively, the attacker challenged him to a fight. The attacker also occasionally worked with his grandfather, who had an air conditioning business and paid him in cash.

Living at home, the attacker had no real expenses and hoarded money, telling acquaintances that he was "saving for something big" and that they would all see him in the news one day. Family members believed he was saving money for his own apartment or car, but clues to his real plans surfaced near the end of 2021. That is when he ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn in both the video he shared and on the day of the Robb Elementary massacre. Still seventeen at the time, the attacker asked at

least two different people to buy guns for him,[107] which they both refused to do. Interviews conducted by other investigators indicate that family members and friends were aware of his efforts to buy guns before he was legally permitted to do so.

Finally, the attacker developed a fascination with school shootings, of which he made no secret. His comments about them coupled with his wild threats of violence and rape earned him the nickname "Yubo's school shooter" on that platform. Those with whom he played games taunted him with a similar nickname so often that it became a running joke. Even those he personally knew in his local chat group began calling him "the school shooter" after he shared pictures of himself wearing the plate carrier he'd bought and posing with a BB gun he tried to convince them was real. None of his online behavior was ever reported to law enforcement, and if it was reported by other users to any social media platform, it does not appear that actions were taken to restrict his access or to report him to authorities as a threat.

### The Last Days

While a vague idea for a school shooting appears to have been in the attacker's mind as early as late 2021, he began to pursue his evil plan in early 2022 after a falling-out with his mother. A blowout argument between them was livestreamed on Instagram, and several members of their family viewed it. Although sheriff's deputies responded to a call, they made no arrests. Soon afterwards, the attacker left home and moved in with his grandmother, just blocks away from Robb Elementary School.

His relationship with his mother never improved. He retained similar antipathy toward his father, who last saw him about a month before the shooting. The father felt his son had no love left for him. He noticed that the attacker had cuts on his own face that appeared to be self-inflicted (something other witnesses had observed on prior occasions), and he claimed he was "doing something" soon.

The attacker had moved into his grandmother's small home, where he had no room of his own and slept on the living-room floor. A few days before the shooting, he confided in an older cousin who was also staying there, telling her that he did not want to live anymore. After

---

[107] The straw purchase of a firearm as proposed by the attacker would violate federal law. *See* 18 U.S.C. § 922(a)(6) ("It shall be unlawful— for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a … licensed manufacturer, [or] licensed dealer … knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such … manufacturer, [or] dealer … with respect to any fact material to the lawfulness of the sale … under the provisions of this chapter"). Additionally, Texas law provides that "A person commits an offense if the person …  intentionally or knowingly sells, rents, leases, or gives or offers to sell, rent, lease, or give to any child younger than 18 years of age any firearm … ." Tex. Pen. Code § 46.06(a)(2).

a lengthy heart-to-heart, the cousin believed she'd gotten through to him. The attacker's uncle also recalled having similar discussions with him.

Meanwhile, the attacker's planning and preparation became more focused. The Committee received extensive documentation compiled and created by the Bureau of Alcohol, Tobacco, Firearms and Explosives in the course of its investigation of the attacker's purchases. He began buying more firearms accessories beginning in February 2022, including 60 30-round magazines, a holographic weapon sight, and a Hellfire Gen 2 snap-on trigger system.

On March 23, 2022, a suspicious person dressed in all black with a backpack was seen canvasing Robb Elementary, but no one ever identified the person.



The attacker's rifles; the leftmost was used at Robb.

As soon as the attacker turned eighteen on May 16, 2022—just one week before the shooting on May 24, 2022—he was finally able to purchase guns and ammunition. An online retailer shipped 1,740 rounds of 5.56mm 75-grain boat tail hollow point to his doorstep, at a cost of $1,761.50. He ordered a Daniel Defense DDM4 V7 (an AR-15-style rifle) for shipment to a gun store in Uvalde, at a cost of $2,054.28 (including tax and transfer fee). On May 17, 2022, he bought a Smith and Wesson M&P15 (also an AR-15-style rifle) at the same store in Uvalde, at a cost of $1,081.42. He returned the next day for 375 rounds of M193, a 5.56mm 55-grain round with a full metal jacket, which has a soft core surrounded by a harder metal. He returned again to pick up his other rifle when it arrived on May 20, 2022, and he had store staff install the holographic sight on it after the transfer was completed.[108]

The owner of the gun store described the attacker as an "average customer with no 'red flags' or suspicious conditions"—just that he was always alone and quiet. The owner of the store remembered asking how an 18-year-old could afford such purchases (the rifles alone were over $3,000), and the attacker simply said he had saved up. Patrons of the store who saw him told

---

[108] The exact cost of all magazines, sights, and other accessories in addition to the amounts listed above likely ranged from $1,500–2,000 based on market value and the amounts the attacker reported to those he told about the purchases.

a different story in FBI interviews, saying after the tragedy that the attacker was "very nervous looking" and that he "appeared odd and looked like one of those school shooters"; another described his all-black clothing as simply giving off "bad vibes."

A background check was conducted, and the attacker qualified for the purchases. While multiple gun sales within such a short period are and were reported to the ATF, the law only requires purchases of handguns to be reported to the local sheriff. Here, the information about the attacker's gun purchases remained in federal hands.

The attacker's uncle drove him to the gun store twice. He said he did not know they were going to pick up a rifle the first time; the store is connected to a popular restaurant, and the attacker said he was hungry. When he returned with a long box and no food, it was obvious he had purchased a rifle. The Committee has not learned who took the attacker to the gun store on May 18th, but the uncle drove him back on May 20th after the attacker falsely told him he needed to pick up ammunition purchased online. The uncle said he did not see what was in the attacker's package, and he was too unfamiliar with firearms to know what might have been inside. It is now known that the package contained the second, more expensive rifle used in the shooting.

The attacker's grandmother and cousin both told him he could not have a gun in the home, so the uncle agreed to store the first rifle at his house. He believes the attacker snuck it out after staying the night a few days later. The attacker apparently hid the second rifle outside his grandmother's house until he brought it in the night before the shooting, as he related to an acquaintance by text messages.

The attacker had no experience with firearms, and based on other investigators' interviews of friends and family, the shooting was likely the first time he fired one. The uncle recalled the attacker attempting to seat a magazine in the rifle and the magazine repeatedly falling out onto the floor. Internet search history shows the attacker sought out ranges but was unable to get to one that allowed long guns before the shooting. He also searched the internet for basic information such as what kind of ammunition an AR-15 fires and whether a magazine can be reused after being emptied, and he looked for information on how to buy "juggernaut armor," a fictional armor system depicted in videogames.

Online interactions involving the attacker continued to foreshadow a tragedy. In March 2022, in an Instagram group conversation, a student told him that "people at school talk [expletive] about you and call you school shooter." Later, the attacker began referencing a timeline. On April 2nd, he asked in a direct message on Instagram, "Are you still gonna remember me in 50 something days ?" After the answer, "probably not 🤷," he retorted with, "Hmm alright

we'll see in may 👍." The attacker often connected those dates with doing something that would make him famous and put him "all over the news," and many of those with whom he chatted suspected his cryptic deadlines meant violence. For example, in a May 14th conversation he simply wrote "10 more days," leading to immediate speculation that he meant he'd "shoot up a school or something" or commit "mass murder" on that date. On May 17th, a friend told him that an acquaintance of theirs was "telling everyone u shooting up the school."

The attacker also began sharing photos of his rifles, including with total strangers. Those in his Snapchat group claimed they believed the guns were fake (despite the attacker posting the receipt) because he had tried to pass off a BB gun as real the year before. For those with no reason for doubts, the context often made the shared images disturbing, such in late April when a friend proposed visiting the attacker in Uvalde:



After the attacker sent a picture of the rifle he intended to buy—to great approval—their discussion continued just after his birthday when he made his first gun and ammo purchases:

Just spent 1652 on ammo

and 2150on some ar

Smhh 💀❗

😂

Givin me school shooter vibes

In the last days before the shooting, the attacker saved news stories and other information about the mass shooting in a Buffalo, N.Y. supermarket on May 19, 2022. He also spent time with his cousin's son, who attended Robb Elementary. After playing the children's videogame Roblox, the attacker elicited from him details about his schedule and how lunch periods worked at the school.

On the eve of the shooting, the attacker began contacting numerous people with vague but ominous messages about doing something the next day. In one Snapchat exchange with a German teenager he had befriended, he commented: "I got a lil secret 😮 😊." When she became curious, he told her it was "impossible for today" because he was still waiting for something "being delivered Monday 23 by 7 pm." His order of 1,740 hollow points arrived later that day.

Prior to the shooting, the attacker had no criminal history and had never been arrested. He is not known to have espoused any ideology or political views of any kind. Private individuals alone knew the many warning signals.

# 5 | May 24 Incident & Law Enforcement Response

May 24, 2022, marked the beginning of the end of the 2022 school year at Robb Elementary School. Parents, teachers, and students came to school that day ready to celebrate the students' accomplishments and awards and to look forward to another peaceful Uvalde summer. The students had completed all their tests and school instruction was over for the year. It was awards day, and parents were coming to school to see their children's ceremonies. Many students anticipated going home early or remaining with their classmates to watch a movie.

In a nearby neighborhood, a former Robb Elementary student and Uvalde High School dropout had made other grim plans for that now-fateful day. In private messages, the Robb Elementary School attacker had indicated to acquaintances that he had chosen this date in advance for a significant event. Some in the Uvalde community have speculated that the attacker intended to choose the date when, carrying out a local tradition, the Class of 2022 seniors would return to Robb Elementary to walk the halls at lunchtime. If the attacker's former classmates were his intended targets, they were spared because the seniors' visit occurred on May 23, 2022, the day before the tragic attack.

The attacker was at home with his grandparents on the morning of May 24th when he sent eerie online messages, including to an Instagram model he'd never met whom he had tagged in pictures of his guns the week before. "I'll text you in an hour," he wrote, "But you HAVE TO RESPOND. I got a lil secret. I wanna tell u 🙄."

Evidence shows that the attacker had been getting in increasing conflicts with his grandmother, and she had threatened to remove him from her mobile phone plan. On the morning of May 24th, she called customer service to do just that. After a nearly hour-long FaceTime conversation with his online acquaintance in Germany, the attacker began texting her live updates:

While these text messages have been circulated in media reports, those reports do not include a message deleted by the attacker's correspondent before the screenshot was taken. Just twenty-eight seconds after the attacker informed her that he



had shot his grandmother and intended to "shoot up" an elementary school, the German teenager replied with a single word: "Cool."[109]

The attacker actually did shoot his grandmother in her face. Despite not having a driver's license, he then proceeded to steal her truck, abandoning her to seek help from a neighbor as he set out to complete his plan.

Driving toward Robb Elementary on South Grove Street, the attacker apparently lost control of the truck while approaching Geraldine Street, crashing the vehicle into a ditch.



*Truck crashed by attacker near Robb Elementary.*

Surveillance cameras at the nearby Hillcrest Memorial Funeral Home captured the crash on video at approximately 11:28 a.m. Two men saw the crash and began to walk from the funeral home, across Geraldine Street, to the location of the truck. The attacker emerged from the wreckage and began shooting toward the two men, who turned and fled back toward the funeral home. Immediately, a report was made to 911 about a man at that location shooting a gun.

---

[109] The above depiction of the text messages is one that has been posted by news outlets—an image of the teenager's phone taken after the shooting. The Committee reviewed data from the attacker's phones, which contained an additional message that appears to have been deleted in the image shared by the teenager.



*Robb elementary and surroundings.*

The attacker proceeded to advance toward Robb Elementary School. There was a five-foot fence around the perimeter of the school property. The attacker tossed a backpack over the fence, then he climbed over it, as documented on the funeral home's surveillance camera.

### Coach Silva Alerts the School

Robb Elementary Coach Yvette Silva was outdoors at that time with a group of third graders, and she spotted the backpack being tossed over the fence followed by a person dressed in black climbing over it. She then saw the person raise a gun and begin to shoot. Coach Silva thought the attacker was shooting at her, and she ran from the field toward her classroom. She used her school radio to report: "Coach Silva to office, somebody just jumped over the fence and he's shooting." She ran toward a group of third graders on the school playground to tell them to lock down. She expected to then hear an announcement of a lockdown, but she did not hear one right away.[110] Meanwhile, the attacker proceeded to the fourth grade teachers' parking lot, continuing to fire his gun.

### Law Enforcement Responds to Robb Elementary

While this was unfolding, Uvalde Police Department dispatch communicated to local law enforcement the initial 911 report from the funeral home about the vehicle crash. Numerous officers immediately began to respond in the direction of Robb Elementary School.

---

[110] Committee testimony of Coach Yvette Silva, Robb Elementary (June 16, 2022).

Uvalde Police SSgt. Eduardo Canales, commander of the SWAT team, had been at Robb Elementary just an hour before for his son's end-of-year school ceremonies. While working at his office, other officers ran down the hallway and said there had been a vehicle accident with shots fired. He followed Lt. Mariano Pargas, the acting chief of the Uvalde Police. (Uvalde Police Chief Daniel Rodriguez was out of town that day, and on this occasion, Lt. Pargas had been designated as acting chief.) On arrival at the school, SSgt. Canales saw cars stopped and a man shooting a gun. He grabbed his rifle, put a magazine into it, and grabbed an extra magazine. He saw people at the funeral home pointing in the direction of the school, and he heard somebody say the attacker was in or near the building. SSgt. Canales entered an open gate where he met Lt. Javier Martinez, also of the Uvalde Police.[111]

Lt. Martinez also heard the report of a vehicle accident with shots fired. He drove toward the intersection of Geraldine and South Grove, and as he arrived, he saw a man on the side of the road pointing. He jumped out of his car, popped the trunk to get his vest, then proceeded toward the west side of the school's west building.[112]

At around the same time, another Uvalde Police officer, Sgt. Daniel Coronado, also arrived on the scene. He wore his uniform and a vest, but he had no rifle plates for protection. Sgt. Coronado first stopped his patrol vehicle at the south end of South Grove Street where it dead-ends into Geraldine Street. He saw two Uvalde Police officers at the intersection who had arrived before him. Sgt. Coronado exited his vehicle, heard gunfire, and asked where the shooting was occurring. At first, the other officers said they did not know, and they could not see the attacker.[113]

One of those officers testified to the Committee that, based on the sound of echoes, he believed the shooter had fired in their direction.[114] That officer saw children dressed in bright colors in the playground, all running away. Then, at a distance exceeding 100 yards, he saw a person dressed in black, also running away. Thinking that the person dressed in black was the attacker, he raised his rifle and asked Sgt. Coronado for permission to shoot.[115]

---

[111] Committee testimony of SSgt. Eduardo Canales, Uvalde Police (June 29, 2022).

[112] Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022).

[113] Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[114] The Committee is unaware of any public reporting about this episode that has identified the police officer by name. The officer testified before the Committee. In light of the Committee's determination that the description of this episode by ALERRT—then widely reported by the media—is likely incorrect, we likewise decline to identify him by name for purposes of this report.

[115] *See, e.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

Sgt. Coronado testified he heard the request, and he hesitated. He knew there were children present. He considered the risk of shooting a child, and he quickly recalled his training that officers are responsible for every round that goes downrange.[116]

According to the officer who made the request, there was no opportunity for Sgt. Coronado to respond before they heard on the radio that the attacker was running toward the school. The officers testified to the Committee that it turned out that the person they had seen dressed in black was not the attacker, but instead it was Robb Elementary Coach Abraham Gonzales.[117] Coach Gonzales had been on his way to the parking lot to leave the school after his lunch duty when he heard a gunshot and then Coach Garcia's report about the attacker over the radio. He told the children around him to run away.[118] Robb Elementary fourth grade teachers Lynn

---

[116] *Id.*

[117] Part 1 of the ALERRT report, included the following narrative in its timeline:

> Prior to the suspect's entry into the building at 11:33:00, according to statements, a Uvalde Police Officer on scene at the crash site observed the suspect carrying a rifle outside the west hall entry. The officer, armed with a rifle, asked his supervisor for permission to shoot the suspect. However, the supervisor either did not hear or responded too late. The officer turned to get confirmation from his supervisor and when he turned back to address the suspect, he had entered the west hallway unabated. (OS per investigating officer interview).

ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations*, at 4 (July 6, 2022). The ALERRT report appears to rely on an interview conducted by Texas Ranger Michael Schraub, who interviewed the officer in question on May 27, 2022. That report stated:

> While in route to the scene Officer [A] advised Officer [B] located the shooter. However, the shooter was located a couple blocks away from the dispatch location. Officer [A] advised upon arrival, the shooter was shooting at Officer [B]. Officer [A] advised he positioned his patrol vehicle while ducking down and grabbing his rifle between the shooter and Officer [B]. Officer [A] advised the purpose was to protect Officer [B] while he exited his patrol vehicle. Officer [A] advised his vehicle was not struck by any projectiles.

> Officer [A] advised upon exiting his patrol vehicle he observed the shooter in the distance. When he observed the shooter, Officer [A] advised there were kids in the background. Therefore, Officer [A] advised he hesitated shooting at the suspect. Officer [A] advised he requested permission to shoot, looked back very briefly at Sergeant Coronado, but never received a response. Upon looking back the direction of the shooter Officer [A] advised the shooter was gone.

DPS interview (May 27, 2022). In a subsequent DPS interview, the officer in question described the person he saw not as "the shooter" but as "a person in black toward the back of the school, but kids were behind that individual." DPS interview (June 13, 2022). These DPS interview reports do not include or support the detail suggested in the ALERRT report that a Uvalde police officer "observed the suspect carrying a rifle *outside the west hall entry*." Based on its review of evidence to date, this Committee concludes that it is more likely that the officer saw Coach Gonzales dressed in black near a group of schoolchildren than that there was an actual opportunity to shoot the attacker from over 100 yards away, as assumed by ALERRT's partial report.

[118] DPS interview of Coach Abraham Gonzales (May 28, 2022).

Deming and Sasha Martinez each testified that Coach Gonzales yelled at their children to lock down as the attacker approached.[119]

Sgt. Coronado saw people at the funeral home also indicating the attacker was running toward the school. He returned to his car and drove east down Geraldine Street to attempt to flank and engage the attacker. He parked his car on the northeast corner of the campus and saw Uvalde CISD Police Chief Pete Arredondo arrive.[120]

Just minutes before, Chief Arredondo had been in his office at Uvalde High School when he heard "shots fired" on the radio. He rushed out, heard something about Robb Elementary School, and drove toward the school. He arrived with his radios, but as he exited his vehicle, he was fumbling with them and they bothered him, so he dropped them by the school fence knowing that Sgt. Coronado, the sergeant on patrol, was there and "fully uniformed" with his radio.[121]

### Robb Elementary School Locks Down

As the attacker approached the school and as law enforcement responders were arriving, staff at Robb Elementary were beginning to lock down, based mostly on word-of-mouth reports of an armed man on campus.

Principal Mandy Gutierrez had just finished an awards ceremony and was in her office when she heard Coach Silva's report over the radio. She attempted to initiate a lockdown on the Raptor application, but she had difficulty making the alert because of a bad wi-fi signal.[122] She did not attempt to communicate the lockdown alert over the school's intercom. By phone, she called and spoke with Chief Arredondo, who told her, "shut it down Mandy, shut it down."[123] She told head custodian Jaime Perez to ensure that all the doors were locked. She initially locked down in her own office, but she later moved to the cafeteria.[124]

---

[119] Committee testimony of Lynn Deming, Robb Elementary teacher (June 29, 2022); Committee testimony of Sasha Martinez, Robb Elementary teacher (June 29, 2022).

[120] Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[121] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[122] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).

[123] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161 (June 21, 2022).

[124] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

Perez was in the cafeteria when he also heard Coach Silva's report on the radio. He immediately started to implement a lockdown, starting to lock doors from the outside. He heard shots and returned to the cafeteria where he remained for the duration of the incident.[125]

In the west building, the fourth grade teachers in and around the building also started to initiate lockdown procedures upon hearing about the approaching attacker. Sasha Martinez taught a fourth grade class in Room 110. She and her class had left their classroom ahead of schedule for recess. They were on their way to the playground when they heard a coach yelling, pointing at the roof, and telling them to run. Martinez started to hear gunshots, and her students started running, some toward the cafeteria, others joining her toward the direction of their classroom in the west building. She then decided to take them to another open classroom in another building instead.[126]

Lynn Deming in Room 104 was getting her class ready to go early to recess. She was standing at the south door of the west building waiting for a child to get a water bottle when her students heading out the south door reported that a coach was yelling at them. She heard "pow pow" and told her kids to get back into the classroom.[127]

Elsa Avila taught fourth grade in Room 109. She had lined-up her students at 11:30 a.m. to go to recess. Some of the children reported to her that students from Deming's classroom were returning screaming and crying. She opened the door and did not see anybody, but she heard a female voice saying, "get in your rooms." She returned to her classroom and slammed the door shut, because otherwise the lock would not latch. She turned off the lights and closed the door. Her students knew what to do—they positioned themselves away from the windows and the doors.[128]

Nicole Ogburn, the fourth grade teacher in Room 102 at the southwest corner of the west building, heard a sound like metal on brick from the outside. She looked out her window and saw a man in dark clothes with a gun and a bag walking up the sidewalk. She told her students to get down. She heard shots coming from the outside into the window, and she hid underneath a curtain in the room.[129]

---

[125] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

[126] Committee testimony of Sasha Martinez, Robb Elementary teacher (June 29, 2022). Martinez commented that she thought a lot of time passed between hearing gunshots and then later receiving the Raptor alert. *Id.*

[127] Committee testimony of Lynn Deming, Robb Elementary teacher (June 29, 2022).

[128] Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[129] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022).

In Room 105, fourth grade teacher Jennieka Rodriguez received a Raptor alert of a lockdown at 11:32 a.m. Her students knew what to do and where to hide. She stepped outside and checked her classroom door to ensure it was locked. As she did so, she looked across the hall and locked eyes with another fourth grade teacher, Ms. Garcia, who was locking the door to her classroom, Room 112.[130]

### The Attacker Enters the West Building

After walking north along the west side of the west building, as observed by Ms. Ogburn,[131] the attacker entered the unlocked west door of the west building.[132] The exterior doors on the east and south sides of the building also were unlocked, such that even if the west door had been locked, the attacker still would have had the ability to enter the building, but his progress likely would have been slowed.

After passing through the west door, the attacker walked east into the building, then turned to his right, south into a hallway. He proceeded down to the vestibule for Rooms 111 and 112 and turned left to face those classroom doors.

### The Attacker Enters Rooms 111 & 112

The surveillance video in the hallway shows that the attacker fired his gun toward Rooms 111 and 112 at approximately 11:33 a.m. He walked forward toward the doors and could be seen stepping back into the hallway before proceeding again into one of the classrooms.

We cannot be certain which of the doors the attacker entered. But, based on the evidence available to the Committee, it is most likely that the attacker found the door to Room 111 unlocked or unsecured and entered through that door.[133] There is no evidence that the attacker

---

[130] Committee testimony of Jennieka Rodriguez, Robb Elementary teacher (June 29, 2022).

[131] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022).

[132] The Committee received some evidence that this door was usually kept locked, as it was supposed to be. Committee investigator interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022). The Committee also heard some evidence that staff often propped open the door with a rock so that teachers could run out and come back in. *See, e.g.,* Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022). The surveillance camera inside the west building recorded that someone had propped open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the attacker arrived, the door was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the building. *Id.*

[133] As discussed later in this report, responding officers assumed, but did not verify, that the doors to Rooms 111 and 112 were locked because of school policies and door designs intended to ensure locked classroom doors. Acting on that assumption, officers spent a great amount of time seeking a master key that could open a door they presumed to be locked. Other information described in this report casts doubt on the suggestion the door

made a forced entry through either door. As noted previously, there is evidence that Ms. Garcia, a teacher in Room 112, locked her classroom door as witnessed by the teacher in Room 105 across the hall, Ms. Rodriguez.[134]

As for Room 111, there was substantial evidence that door did not secure properly, The teacher in Room 111, Arnulfo Reyes, knew this, and on several occasions reported the condition of the door to the school.[135] There was also evidence that teachers and students throughout the fourth grade knew the condition of Room 111's door, as they regularly would enter the door to access the printer in that room.[136] Reyes has no recollection of ever receiving a lockdown alert[137] or any memory that he undertook the special effort needed to get his classroom door to lock before the arrival of the attacker.[138]

According to an analysis provided to the Committee, after entering the attacker spent about 2½ minutes rapidly firing over 100 rounds between the two rooms,[139] ultimately killing many innocent victims.[140] Law enforcement discovered a Hellfire trigger system in the room with the attacker, but based on the evidence provided to date, the Committee is unable to determine whether it was used to increase the weapon's rate of firing. The Department of Public Safety

---

was actually locked. The Committee has been advised that none of the Border Patrol agents who used a key and ultimately opened the door were wearing body cameras which might have shed additional light on this question.

[134] Committee testimony of Jennieka Rodriguez, Robb Elementary teacher (June 29, 2022). One of the surviving students in Room 112 also reported that she saw Ms. Garcia lock the door. DPS interview of Khloie Torres (June 2, 2022).

[135] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[136] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022); *see also* interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[137] DPS (Elizondo) interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[138] *E.g.*, DPS (Williamson/Benitez) interview of Arnulfo Reyes, Robb Elementary teacher (May 27, 2022). Reyes told the Committee's investigators that he believes the attacker entered through Room 112 and from there shot through the wall into Room 111. Interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022). The Committee finds that suggestion to be unlikely for the reasons previously explained about why Room 112 likely was locked and Room 111 likely was unlocked. It is more likely, and otherwise consistent with his account, that Reyes heard bullets fired by the attacker from outside in the hallway, through the doors, and into Room 111.

[139] *Cf.* Texas Department of Public Safety (@TexasDPS), https://twitter.com/TxDPS/status/1539256179234332673 (June 21, 2022) (reference materials for testimony before Texas Senate Special Committee to Protect All Texans).

[140] *See also* Committee interview of DPS Director Col. Steven C. McCraw (June 9, 2022) (incident timeline). The analysis provided to the Committee strongly suggests that of approximately 142 total rounds fired by the attacker in the building, approximately 21 of those rounds can be identified as being fired after officers entered the building. The first 11 officers to enter the building did so over the course of approximately 6 seconds. It thus appears to be virtually certain that over 100 rounds were fired before the arrival of the first responders.

has advised the Committee there is no indication that the Hellfire device was used by the attacker. It is also possible that it was used. [141]

Terrified teachers and students throughout the west building heard this extended burst of gunfire, as did law enforcement officers who were arriving on the campus and closing in on the west building.[142] Responders heard the tail end of this gunfire as they entered the building through the south and west doors.[143] During those two and a half minutes of gunfire, it is likely that one of the bullets passed through the walls and struck Ms. Avila, the teacher in Room 109.[144]

Also during this time, at approximately 11:36 a.m., Uvalde Police Department dispatch received a call reporting a woman "shot in the head on Diaz Street."[145]

### First Law Enforcement Approaches & Enters

After the attacker already had fired over 100 shots in Robb Elementary's west building, two separate groups of officers converged on the building at the same time from different directions. From the time of their initial entry and over the course of the next five minutes, the attacker fired approximately 16 additional rounds.

On the south side of the building, Chief Arredondo and Officer Adrian Gonzalez of the Uvalde CISD Police and Uvalde Police Officer Page and Sgt. Coronado approached. Officers Page and Gonzalez were the first to enter,[146] followed by Chief Arredondo, then by Sgt.

---

[141] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Report of Investigation #13 (June 2, 2022).

[142] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[143] *E.g.*, Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022); *see also* Robb Elementary surveillance video.

[144] *See* Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[145] Uvalde County Sheriff Ruben Nolasco testified to the Committee that while he was on his way to respond to the report of shots fired in the vicinity of Robb Elementary, he learned about the shooting of a woman on Diaz Street (who turned out to be the attacker's grandmother) from a man in a vehicle who flagged him down in the street. *See* Uvalde Police Department Call Sheet Report (May 24, 2022); Committee testimony of Uvalde County Sheriff Ruben Nolasco (July 11, 2022). Other information provided to the Committee has suggested that Sheriff Nolasco learned about the shooting on Diaz Street by other means, and perhaps earlier than he has acknowledged. In a desire to put this issue to rest, and to foreclose the suggestion that earlier reporting of the attacker's assault on his grandmother could have led to an earlier law enforcement intervention, the Committee has requested records from Sheriff Nolasco's mobile phones to confirm that he was not contacted directly for assistance on Diaz Street. The Committee has not yet received these records. The issue is important if a more timely report of the Diaz Street shooting could have prompted an earlier call from dispatch for law enforcement response to the area or an earlier Raptor alert at the school.

[146] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); DPS interview of Officer Donald Page, Uvalde Police (May 25, 2022).

Coronado. Officers Page and Gonzales both heard rounds as they were approaching.[147] So did Sgt. Coronado, who yelled "shots fired."[148]

Meanwhile, on the north side of the building, Lt. Martinez and Ssgt. Canales of the Uvalde Police entered the building first, followed by Uvalde Police Officer Louis Landry.[149] Lt. Martinez told a DPS investigator that he heard gunfire from inside the building, then he entered.[150] He testified to the Committee that he suspected the attacker was inside shooting,



*West Building, Robb Elementary.*

[147] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); DPS interview of Officer Donald Page, Uvalde Police (May 25, 2022).

[148] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022); *see also* Sgt. Coronado's body-worn camera footage (11:36).

[149] DPS interview of Officer Louis Landry, Uvalde Police (May 26, 2022); *see also* Robb Elementary surveillance video.

[150] DPS interview of Lt. Javier Martinez, Uvalde Police (May 25, 2022); *see also* Robb Elementary surveillance video.

but that as he entered the building it was definitely quiet, with no screaming or crying. He said that on arrival inside the building, he heard "a few muffled shots."[151]

The evidence establishes that as they arrived at the west building, the initial responders knew there had been gunfire inside the building. They heard it as they were approaching. When they entered, they could see a cloud of debris in the hallway from drywall, as well as bullet holes in the walls and spent rifle casings on the floor. Yet the testimony received by the Committee also indicated that none of these initial responders recalled hearing screams or having any contemporaneous understanding, as they arrived in the building, that teachers and students just then had been shot inside the classrooms.



*Uvalde Police officers enter from north end of hallway.*

---

[151] *E.g.*, Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022); *see also* Robb Elementary surveillance video.

After entering the west building, the two separate groups of officers converged on Rooms 111 and 112. Coming from the south, Officer Page saw smoke and fog and observed that both classrooms were dark. Officer Gonzales remembers smelling gunpowder, saying that it looked smoky or cloudy, like someone set off a fire extinguisher.[152] Chief Arredondo made similar observations of smoke, and he also saw spent casings on the ground.[153] As Sgt. Coronado followed this group and Chief Arredondo from the south, he heard no more active gunfire as recorded on his body camera. It was quiet, and he could see bullet holes through the sheetrock.[154] On Sgt. Coronado's body camera footage, another officer can be heard saying, "it's an AR."[155] Upon entering the building, the officers tried but were unable to communicate on their radios. Officer Page stopped near Rooms 111 and 112,[156] and the school surveillance video suggests that the officers coming north from the south door were the first to reach the near vicinity of Rooms 111 and 112.

Simultaneously, Lt. Martinez followed by SSgt. Canales entered the hallway and approached Rooms 111 and 112, with Lt. Martinez approaching along the east wall and SSgt. Canales following along the west wall, as recorded on SSgt. Canales's body camera and the school surveillance video. Immediately behind them, four additional officers entered the building and remained in the north hallway.

At approximately 11:37 a.m., the officers converged from both sides of the hallway on Rooms 111 and 112. Coming from the north, Lt. Martinez peered into the vestibule for Rooms 111 and 112, and he faced gunfire, getting grazed by fragments of building material on the top of his head.[157] He immediately retreated to the north end of the hallway.[158] On the opposite side

---

[152] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022).

[153] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 87 (June 21, 2022). Chief Arredondo testified that he recalled seeing "the locking mechanism" for the door to Room 111, or what he calls "a thumb, the locking mechanism that goes in the throw." He explained, "there's a small gap in between the door and the frame, and you could see, you know, a fraction of an inch. I have an image in my head of seeing that—that throw." *Id.* at 97. For the reasons explained above, the Committee finds it is most likely that the door to Room 111 was not properly or effectively locked.

[154] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[155] Sgt. Coronado's body-worn camera footage (11:36).

[156] DPS interview of Uvalde Police Department Officer Donald Page (May 25, 2022).

[157] ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* (July 6, 2022) (stating that Lt. Martinez and Ssgt. Canales were hit by "building material fragments caused by the suspect's rounds passing through the walls," citing "Investigating Officer Interview" and "Internal School Surveillance").

[158] *See* Robb Elementary surveillance video (11:36). The recent ALERRT report states that "[o]nce the officers retreated, they should have quickly made a plan to stop the attacker and gain access to the wounded," noting "[t]here were several possible plans that could have been implemented." "Perhaps the simplest plan," according to ALERRT, "would have been to push the team back down the hallway and attempt to control the classrooms

of the hall, fragments also hit SSgt. Canales on his ear. He likewise retreated and exited the building on the west side. No shots were fired at that time toward the attacker by the law enforcement responders.

### What Happened for the Next 73 Minutes?

Like the initial approach into the west building, the remainder of law enforcement actions at Robb Elementary School until the ultimate breach of the classroom and neutralization of the attacker was a tale of two separate responses on the north and south sides of the hallway.

### On the South …

After the attacker fired on the responders, Chief Arredondo noticed the light on in Room 110—the room immediately south of Room 111 which was used by Ms. Martinez, who had taken her class out of the building early for recess. Chief Arredondo wondered if there could be a threat in Room 110. The door was either open or unlocked. He entered to clear the room, and he saw holes in the wall. The room was vacant. He told the Committee he thought, "There's no babies in here. It's awards day."[159] He testified that he prayed that if Room 110 was empty, the children might be gone from the rooms occupied by the attacker as well.

Although the encounter had begun as an "active shooter" scenario, Chief Arredondo testified that he immediately began to think of the attacker as being "cornered" and the situation as being one of a "barricaded subject" where his priority was to protect people in the other classrooms from being victimized by the attacker.[160]

With the benefit of hindsight, we now know this was a terrible, tragic mistake.

Testifying before the Committee, Chief Arredondo explained his thinking on this subject at the time as follows:

> We have this guy cornered. We have a group of officers on … the north side, a group of officers on the south side, and we have children now that we know in these other rooms. My thought was: We're a barrier; get these kids out -- not the hallway, because the bullets

---

from the windows in the doors." The report explains the purported simplicity of the plan by noting: "Any officer wearing rifle-rated body armor (e.g., plates) would have assumed the lead as they had an additional level of protection." ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* (July 6, 2022). A problem with ALERRT's depiction of its "simplest plan" is that no officer present was wearing "rifle-rated body armor (e.g., plates)." The Committee agrees the officers should have attempted to breach the classrooms even without armor, but it is inflammatory and misleading to release to the public a report describing "plans that could have been implemented" that assume the presence of protective equipment that the officers did not have.

[159] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[160] *Id.*

are flying through the walls, but get them out the wall – out the windows, because I know, on the outside, it's brick.

***

[T]o me … once he's … in a room, you know, to me, he's barricaded in a room. Our thought was: "If he comes out, you know, you eliminate the threat," correct? And just the thought of other children being in other classrooms, my thought was: "We can't let him come back out. If he comes back out, we take him out, or we eliminate the threat. Let's get these children out."

It goes back to the categorizing. … I couldn't tell you when -- if there was any different kind of categorizing. I just knew that he was cornered. And my thought was: " … We're a wall for these kids." That's the way I looked at it. "We're a wall for these kids. We're not going to let him get to these kids in these classrooms" where … we saw the children.[161]

Chief Arredondo's testimony about his immediate perception of the circumstances is consistent with that of the other responders to the extent they uniformly testified that they were unaware of what was taking place behind the doors of Rooms 111 and 112. They obviously were in a school building, during school hours, and the attacker had fired a large number of rounds from inside those rooms. But the responders testified that they heard no screams or cries from within the rooms, and they did not know whether anyone was trapped inside needing rescue or medical attention. Not seeing any injured students during their initial foray into the hallway, Sgt. Coronado testified that he thought that it was probably a "bailout" situation.[162]

Chief Arredondo and other officers contended they were justified in treating the attacker as a "barricaded subject" rather than an "active shooter" because of lack of visual confirmation of injuries or other information. Chief Arredondo explained his reasoning for not continuing an active shooter-style response, telling the Committee:

[W]hen there's a threat … you have to visibly be able to see the threat. You have to have a target before you engage your firearm. That was just something that's gone through my head a million times … .[G]etting fired at through the wall … coming from a blind wall, I had no idea what was on the other side of that wall. But … you eliminate the threat when you could see it. … I never saw a threat. I never got to … physically see the threat or the shooter.[163]

This "barricaded subject" approach never changed over the course of the incident despite evidence that Chief Arredondo's perspective evolved to a later understanding that fatalities

---

[161] *Id.* at 122, 125-25.

[162] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022). Chief Arredondo also testified that the possibility of a bailout "came over my mind at some point … because they happen so often, and there's been a few that were armed." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 49 (June 21, 2022).

[163] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

and injuries within the classrooms were a very strong probability.[164] He effectively conceded his error when asked what he would have done differently had he known injured victims were in the classroom. Chief Arredondo responded to the Committee: "I guess, if I knew there was somebody in there, I would have—we probably would have rallied a little more, to say, 'Okay, someone is in there.'"[165]

Chief Arredondo went to Room 109, found it locked and dark, saw a child's head, and realized there were students in that room.[166] Officer Gonzales asked Chief Arredondo if he wanted to activate the SWAT team, which he confirmed, so Gonzales then stepped out and made the call.[167] As mentioned earlier, however, the head of the Uvalde Police SWAT team already was in the building.

Chief Arredondo then used his mobile phone to call the Uvalde Police. The Department of Public Safety supplied the following transcription of that call:

> Hey..hey it's Arredondo..it's Arredondo can you hear me? No I have to tell you where we're at..it's an emergency right now. I'm inside the building, I'm
>
> *dispatcher can be heard talking in the background asking what room number*
>
> Is the teacher with him? Is the teacher with him? Is the teacher with him? Is she in the same room as him? Can you hear me? Ma'am?
>
> *dispatcher: I'm right here*
>
> Ma'am, is the teacher with him? In his classroom?
>
> *dispatcher: She's in another classroom she's in room 102. Another person possible shot across from her.*
>
> Okay, we have him in the room. he's got an AR15, he's shot a lot. He's in the room, he hasn't come out yet. We're surrounded, but I don't have a radio
>
> *dispatcher confirms SWAT location*
>
> Yes and they need to be outside of this building prepared. Because we don't have enough fire power right now it's all pistol and he has an AR15. If you
>
> *dispatcher asked if you can stay on the phone with me as long as you can*
>
> I am but I'm gonna drop it when he comes out of that door. Alright.
>
> *dispatcher advises over the radio that 401 has the shooter in 111 or 112. He's going to be armed with a rifle. He's requesting SWAT by the funeral home.*

---

[164] For example, later in the incident, Sgt. Coronado's body-worn camera footage recorded that somebody asked, at 12:34 p.m., "we don't know if he has anyone in the room with him, do we?" Chief Arredondo responded, "I think he does. There's probably some casualties." Sgt. Coronado agreed, saying "yeah, he does … casualties." Then at 12:41 p.m.: "Just so you understand, we think there are some injuries in there."

[165] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[166] *Id.*

[167] Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

So. So I need you to bring a radio for me, and give me my radio for me. I need to get one
rifle. Hold on. I'm trying to set him, I'm trying to set him up.

By 11:42 a.m., Constable Johnny Field had arrived on the north end of the hallway.[168]
Constable Field saw Chief Arredondo on the other end and held up his phone. Chief
Arredondo called and began communicating with him by phone as his primary contact on the
north end.[169] They discussed the need to evacuate children from the building,[170] and Chief
Arredondo decided to accomplish that by breaking windows.[171] Officers Gonzales and Page
proceeded to start breaking classroom windows and helping to evacuate students from
classrooms.[172] Chief Arredondo found another unlocked classroom on the east side of the
hallway with a teacher and students locked down inside, and he told them to stay down.[173]

Meanwhile, Sgt. Coronado had exited the building through the south door and made his own
report by radio.[174] He requested shields and flashbangs from the police department, and he
asked for helicopter support and ballistic shields from the Department of Public Safety.
Agreeing with Chief Arredondo's assessment, he reported the shooter was "contained" inside
the building and "barricaded in one of the offices." Dispatch asked Sgt. Coronado if the
classroom door was locked. He responded he was not sure, but that they had a Halligan tool
to break it. Radio traffic indicated the attacker was in Ms. Mireles's classroom (Room 112) and
asked whether her students were inside. In response, Sgt. Coronado requested a mirror to look
around corners. A voice on the radio stated that "the class should be in session."[175]

After the initial responders took fire from the attacker, Sgt. Coronado remained outside the
building on the south and west sides for a total of approximately 30 minutes,[176] regularly

---

[168] *See* Robb Elementary surveillance video.

[169] Testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022); Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[170] Testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022).

[171] Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[172] Testimony of Officer Adrian Gonzalez, UCISD Police (June 20, 2022) (stating that after calling for SWAT, he began to help evacuating children on his own initiative and received no further orders from Chief Arredondo).

[173] Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[174] Sgt. Coronado's body-worn camera footage (11:38).

[175] Sgt. Coronado's body-worn camera footage (11:43).

[176] Sgt. Coronado's body-worn camera documented his activity. At 11:44 a.m., a responder asked by radio where he was needed, and received direction to head to the south side of the school. The responder then stated that a lot of people were pulling up by the funeral home. Sgt. Coronado responded to have some officers available to keep everybody back. At 11:48 am he suggested locking down the high school and all the other schools. At 11:49 a.m., a little more than 10 minutes after their initial encounter with the attacker, Sgt. Coronado warned arriving officers about a doorway and a "fatal funnel." He asked them to prop open the south door.

advising other officers to be careful about potential crossfire or a "fatal funnel" in the hallway and assisting the evacuation of students and teachers through windows on the west side of the building. When some newly arrived responders appeared to suggest that the officers should clear out of the south side of the hallway because United States Border Patrol Tactical Unit (BORTAC) responders were operating on the opposite end, Sgt. Coronado responded, "Chief is in there, Chief is in charge right now,"[177] suggesting both that Chief Arredondo was in control and in communication with the other side of the building.

While Sgt. Coronado was outside, his body camera recorded several people commenting on the need to find a master key to the classrooms. Once Sgt. Coronado returned inside the south side of the hallway, he found Chief Arredondo on his phone also asking for a key, which was a primary focus of his attention for the next 40 minutes. Chief Arredondo personally tried all of one large set of keys brought to him,[178] and when Sgt. Coronado cautioned him to stay clear of the hallway and the "fatal funnel," Chief Arredondo responded, "just tell them to f***ing wait."[179]

Much of this time was spent by Chief Arredondo on the phone with Constable Field. He issued a series of additional requests for equipment and support, including snipers,[180] a master key,[181] and breaching tools,[182] repeatedly referencing the need for a key and breaching tools before they could attempt to enter the classrooms with the attacker. While waiting, he also periodically attempted to communicate with the attacker in English and Spanish, including immediately after four shots were fired inside the classroom at 12:21 p.m.

Despite all of the discussion of breaching tools, Chief Arredondo testified no one made him aware when one arrived at the building.[183]

Chief Arredondo prioritized making certain all other classrooms in the building were cleared of teachers and students, including the evacuation of Room 109, where the attacker had shot Ms. Avila through the walls.[184] In the context of this evacuation, Chief Arredondo commented

---

[177] Sgt. Coronado's body-worn camera footage.

[178] Sgt. Coronado's body-worn camera footage (12:17 p.m.).

[179] *Id.* (12:17 p.m.).

[180] *Id.* (12:14 p.m.).

[181] *Id.* (12:16 p.m.).

[182] *Id.* (12:21 p.m.); *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[183] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[184] *See* Sgt. Coronado's body-worn camera footage (12:26 p.m.).

that "people are going to ask why we're taking so long," and, in an apparent reference to the ongoing evacuations, that they were trying to care of "the rest of the lives first."[185]

In addition to seeking keys and a breaching tool, the other predominant theme on the south side of the building was waiting for BORTAC to breach the classrooms. Chief Arredondo discussed with Constable Field various means of assisting the breach, such as by using a sniper or flashbangs to kill or distract the attacker.[186]

Beginning around 12:30 p.m., various officers entered through the south door and walked by Chief Arredondo and Sgt. Coronado, stacking up south of Rooms 111 and 112 and on the west side of the hallway, anticipating a move to breach the classrooms.[187]



*Responders stack in hallway south of Rooms 111 & 112.*

At 12:45 p.m., somebody commented that a Ranger had a set of keys that was being tested. And finally, at 12:50 p.m., a team of officers made entry into the classrooms and killed the attacker, with officers stationed in the south part of the hallway quickly falling in behind them and entering Rooms 111 and 112.

---

[185] Other public reports about this particular quote appear to be inaccurate.

[186] Sgt. Coronado's body-worn camera footage (12:17 p.m.).

[187] Sgt. Coronado's body-worn camera footage; *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022); Committee testimony of Trooper Joshua Bordovsky, Tex. Dep't of Public Safety (June 20, 2022).

Chief Arredondo testified that the only direction he gave to the north side of the building, through Constable Field, was for them to evacuate the kids and to test the keys before trying to go into the room with the attacker. He said he did not make any decision for BORTAC to breach the classrooms.[188]

On the North …

Rewinding the clock to the point at which the attacker shot at the initial responders in the building, there were three Uvalde Police officers who led the way down the hallway from the north side of the building: Lt. Martinez, followed by SSgt. Canales, followed by Officer Landry. Building fragments hit Lt. Martinez and SSgt. Canales as the attacker shot into the hallway, and all three officers retreated to the north end.

As Ssgt. Canales ran out, his body camera documented the presence of multiple officers in the north hallway and a Department of Public Safety trooper stationed at the door as he exited to the west. Ssgt. Canales stated "we got to get in there," and he made a phone call requesting more help.[189] Uvalde Police Officer Landry, who had been third in line on the north side behind Lt. Martinez and Ssgt. Canales, also exited the building on the west side, then moved to the south side of the building where he began helping to clear classrooms and waiting for specialized teams to arrive.[190] After the initial shock of taking gunfire, Lt. Martinez returned south back down the hallway. Following active shooter training, he began to advance again toward Rooms 111 and 112 in an evident desire to maintain momentum and to "stop the killing," but this time no other officers followed him. Several law enforcement officers suggested to the Committee that if others had followed him as backup, Lt. Martinez might have made it back to the classroom doors and engaged. Later, he helped to evacuate children from classrooms and moved to the south side of the building, and ultimately he was part of the stack of officers on that side of the hallway when BORTAC finally breached the classrooms.

The school surveillance camera installed where the north-south hallway intersects the east-west hallway at the north end of the building captured the movement and activity of law enforcement officers on the north side of the building. From that perspective, the period from 11:37 a.m., when Lt. Martinez, Ssgt. Canales, and Officer Landry made their retreat from the attacker's gunfire, to 12:50 p.m., when a BORTAC-led stack finally made entry into the

---

[188] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[189] *See* Ssgt. Canales's body-worn camera footage.

[190] DPS interview of Uvalde Police Department Officer Louis Landry (May 26, 2022).

classrooms, saw the movement of dozens of officers from a variety of law enforcement agencies in and out of the north hallway, positioning and preparing themselves for the eventual breaching effort.

At first, responders from the Uvalde Police Department, including the acting chief of police on that day, Lt. Mariano Pargas, dominated the north end of the building. Lt. Pargas, who was one of the earliest responders, testified that he was never in communication with Chief Arredondo, and that he was unaware of any communication with law enforcement officers on the south side of the building. He told the Committee he figured that Chief Arredondo had jurisdiction over the incident and that he must have been coordinating the law enforcement response—and that the Uvalde Police were there to assist. He did not coordinate with any of the other agencies that responded, such as the Uvalde Sheriff's Office and the Department of Public Safety. Lt. Pargas did receive a phone call from the chief of the Uvalde Police, who was out of town on vacation, who called to tell him to set up a command post right away. Lt. Pargas testified that he went to the back of the funeral home to start a command post, that the funeral home provided an office, and that then he went back outside to try to keep up with what was going on.[191] This did not result in the establishment of an effective command post.

Lt. Pargas was present when a Uvalde CISD officer, Ruben Ruiz, entered through the west door and stated, "she says she is shot." Officer Ruiz was referring to his wife, Ms. Mireles, who was one of the teachers in Room 112. Officer Ruiz was escorted away from the building. Lt. Pargas also testified he heard on the radio about 911 calls that had come from inside the classrooms, and he told the Committee that it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the attacker. According to Lt. Pargas, while nobody said it, the officers on the north side of the building were waiting for other personnel to arrive from Department of Public Safety or BORTAC, with better equipment like rifle-rated shields.[192]

As responders continued to arrive on the scene, officers stationed outside the building directed them to assist on the perimeter. Special Agent Luke Williams of the Department of Public Safety testified that upon his arrival he disregarded a request that he assist at the perimeter, and instead he proceeded into the east door on the north side of the building. He began to clear rooms along the north hallway, and he found a student hiding in the boys' restroom. The student had his legs up so as not to be seen, and as he had been trained to do, he demanded

---

[191] Committee testimony of Lt. Mariano Pargas, Jr., Uvalde Police (June 29, 2022).

[192] *Id.*

that Special Agent Williams confirm he was with law enforcement, which he did by showing his badge under the stall.

As Special Agent Williams then approached the intersection of the hallways from the east where a group of officers was positioned at the west side of the intersection with weapons pointed south, he heard somebody ask, "y'all don't know if there's kids in there?" Special Agent Williams interjected, "if there's kids in there we need to go in there."



An officer who had been positioned in the hallway responded to Special Agent Williams that whoever was in charge would figure that out. Another officer pointed out to him that his position on the east side of the intersection was creating a crossfire situation relative to the group of officers pointing their weapons toward Rooms 111 and 112 from the south. Special Agent Williams departed to continue clearing other classrooms.[193]

*Responders positioned in north end of hallway (Special Agent Williams's body camera).*

Between 11:52 a.m. and 12:21 p.m., the surveillance video shows four different ballistic shields arriving in the building. Importantly, however, only the last shield, furnished by the U.S. Marshals, was rifle-rated. The Committee heard evidence that the rifle-rated shield was the only one that would have provided meaningful protection to officers against the attacker's AR-15 rifle. The Committee received no evidence that anyone told Chief Arredondo or anyone else on the south side of the building about the arrival of the rifle-rated shield.

Just before 12:30 p.m., there was a burst of activity on the north side. A group of officers moved past the position previously established at the north hallway intersection, and they began to establish a stack close to the north side of Rooms 111 and 112. Viewed from the south, Sgt. Coronado announced the arrival of BORTAC.[194] Another group of officers began to stage medical triage equipment in the east side of the north hallway. This indicates that BORTAC likely assumed tactical command of the incident at this time.

---

[193] *See* Special Agent Williams's body-worn camera footage.

[194] Sgt. Coronado's body-worn camera footage (12:29 p.m.).

BORTAC Acting Commander Paul Guerrero came to the north side of the building upon his arrival at Robb Elementary. In a post-incident statement, he said he was advised "that the subject had possibly shot multiple children and was still in the classroom." He requested surveillance through the back windows of Rooms 111 and 112 to possibly deploy gas as they made entry. He then went to retrieve a Halligan tool from his car.[195] The school's surveillance camera shows the arrival of a Halligan breaching tool at 12:35 p.m..[196] The Committee received no evidence that the arrival of the breaching tool ever was communicated to Chief Arredondo or anyone else on the south side of the building.

According to his statement, Cdr. Guerrero attempted to pry open a door in the hallway to see if the Halligan tool would work. He determined it would take too long and dangerously expose an officer to gunfire coming from inside the classroom. He observed that the classroom doorway had multiple holes consistent with bullet holes, and he did not want to expose or jeopardize the safety and lives of any officers by trying to pry the door open.[197]

Cdr. Guerrero then obtained a master key from an officer at the scene. As he made his way to the classroom door, an officer advised him to try it on another door first. He attempted to open another door along the hallway, and it did not work. He saw a few Border Patrol agents and advised them to start setting up for a triage situation of mass casualties. He then received a second master key, which he successfully used to open another door.[198]

Working with the BORTAC team, Cdr. Guerrero had another agent use the rifle-rated ballistic shield to give him cover as he opened the classroom door. Cdr. Guerrero placed the key in the door to Room 111 and opened the door. (Cdr. Guerrero's contemporaneous report stated that he unlocked the door,[199] but as explained above, there is reason to question whether the door was actually locked.)

---

[195] Statement of Agent Paul Guerrero (undated, taken by Ranger Ricardo Guajardo).

[196] *See* Special Agent Williams's body-worn camera footage.

[197] *Id.*

[198] *Id.*

[199] In his statement, Commander Guerrero said "I placed the key into the keyhole. The key worked and I was able to unlock and open the door." *Id.*; *see also* Statement of Agent Warren John Becker (undated, taken by Ranger Tyler Williamson) ("The door was locked, and I utilized the shield to provide cover for Acting BORTAC Commander Guerrero as he opened the door with the master key.").

The attacker was standing in front of a closet in the corner of Room 111, and he fired his rifle at the stack of officers coming through the classroom door. The officers fired on the attacker, killing him.[200]

The Committee has been advised that none of the Border Patrol agents involved in opening the door were wearing activated body cameras.

### On the Outside …

As mentioned in the narratives above, there were important events happening outside the north and south ends of the west building. In part due to the difficulty of maintaining radio communications within the building, not everybody inside the building received all of this information.

A police radio communication of unknown origin stated at 11:56 a.m.: "[I]t is critical for everybody to let PD take point on this."[201] None of the witnesses interviewed by the Committee indicated any knowledge of this communication or what it meant by "PD" taking "point on this." The general consensus of witnesses interviewed by the Committee was that officers on the scene either assumed that Chief Arredondo was in charge, or that they could not tell that anybody was in charge of a scene described by several witnesses as "chaos" or a "cluster."

There was a series of phone calls with a student inside Room 112, initiated by the student calling 911 at 12:03 p.m.. Radio traffic communicated to those officers who could hear it the fact that a student had called from within the classroom. Several witnesses indicated that they were aware of this, but not Chief Arredondo. The Committee has received no evidence that any officer who did learn about phone calls coming from inside Rooms 111 and 112 acted on it to advocate shifting to an active shooter-style response or otherwise acting more urgently to breach the classrooms.

### What Didn't Happen in Those 73 Minutes?

A major error in the law enforcement response at Robb Elementary School was the failure of any officers to assume and exercise effective incident command. Uvalde Police officers responding to a vehicle wreck and shots fired appear to have arrived first on the scene, which would make one of them the initial incident commander. Uvalde CISD Police Chief Arredondo quickly arrived as the incident moved to school property and the law enforcement

---

[200] Statement of Agent Paul Guerrero (undated, taken by Ranger Ricardo Guajardo).

[201] Source: DPS timeline.

response evolved. This made him a natural person to assume command over an incident as it developed. But Chief Arredondo does not consider himself to have assumed incident command. He explained to the Committee:

> [W]hile you're in there, you don't title yourself … .I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as … I'm talking about the command part … the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.
>
> ***
>
> you can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[202]

Other people could have assumed command, including the next people in Uvalde CISD's preassigned line of command for active shooter response or others on the scene with more experience or training. ALERRT training teaches that any law enforcement officer can assume command, that somebody must assume command, and that an incident commander can transfer responsibility as an incident develops. That did not happen at Robb Elementary, and the lack of effective incident command is a major factor that caused other vital measures to be left undone. Also, the misinformation reported to officers on the outside likely prevented some of them from taking a more assertive role. For example, many officers were told to stay out of the building because Chief Arredondo was inside a room with the attacker actively negotiating.

Responders did not remain focused on the task of "stopping the killing" as instructed by active shooter training.[203] They never attempted to breach the classroom before BORTAC accomplished entry. Chief Arredondo explained:

> I knew those doors … .Those doors opened outward. … They're thick, heavy doors with a metal frame. Most people are used -- as police officers, used to going to a residence and you kick in doors. That's just such a common thing in our business. You didn't have that option here. I knew a ramrod, which I call a buddy, which is … a heavy pipe with two handles, that wasn't going to work … and that's why I called for that extraction tool and keys.[204]

---

[202] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[203] *E.g.*, *id.*

[204] *Id.*

But nobody ever checked the doors of Rooms 111 or 112 to confirm they were actually locked or secured.[205] Room 111 probably was not. Chief Arredondo's search for a key consumed his attention and wasted precious time, delaying the breach of the classrooms.[206]

Nobody called Principal Gutierrez to ask about the location of a master key.[207] She had a key, and the head custodian had a key. Yet despite all the effort to find a key, nobody called her.

Although discussed on both the south and north sides of the building, nobody ever created a diversion on the east side of the building, where Rooms 111 and 112 had windows.[208]

And although it should not have proved necessary had responders remained focused on "stopping the killing" as soon as possible, as the incident dragged on, nobody tasked any law enforcement responder to establish reliable communications between the south and north sides of the building and with resources outside the building. Radio communication was ineffective, so something else was needed for decisionmakers to receive critical information, such as the fact that victims had called from inside the rooms with the attacker.[209] To the extent there was confusion among officers about whether the scenario was an "active shooter" or "barricaded subject," information that there were wounded victims in the rooms would have clarified the existence of an active shooter scenario.

Law Enforcement Responder Headcount

In total, 376 law enforcement officers responded to the tragedy at Robb Elementary School.

---

[205] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[206] ALERRT has noted the failure to check the lock in its criticisms. *See* ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* at 18-19 (July 6, 2022). A representative of ALERRT testified before the Committee that the "first rule of breaching" is to check the lock. *See* Testimony of John Curnutt, ALERRT (July 11, 2022). Unfortunately, ALERRT apparently has neglected to include that "first rule of breaching" in its active-shooter training materials, which includes modules entitled "Closed and Locked Interior Doors" and "Entering Locked Buildings Quickly, Discreetly, and Safely." *See* Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 3-8 – 3-10, 4-20 – 4-25.

[207] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022) (no recollection of communicating with Principal Gutierrez).

[208] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[209] *See* Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022) (did not recall tasking anyone, commented "it would be fantastic" to have the most up-to-date information and that his "priority was to get into that classroom," and "I didn't have communication with … what was going on outside. My big thing was getting through that door.").

The breakdown of responders, by agency, is as follows:[210]

| | |
|---|---|
| 149 | United States Border Patrol |
| 91 | Texas Department of Public Safety |
| 25 | Uvalde Police Department |
| 16 | San Antonio Police Department (SWAT) |
| 16 | Uvalde County Sheriff's Office |
| 14 | Department of Homeland Security – HIS |
| 13 | United States Marshals |
| 8 | Drug Enforcement Agency |
| 7 | Frio County Sheriff's Office |
| 5 | Kinney County Sheriff's Office |
| 5 | Uvalde Consolidated Independent School District |
| 4 | Dilley Police Department |
| 4 | Zavala County Sheriff's Office |
| 3 | Medina County Sheriff's Office |
| 3 | Sabinal Police Department |
| 2 | City of Uvalde Fire Marshals |
| 2 | Pearsall Police Department |
| 2 | Texas Parks and Wildlife |
| 2 | Uvalde County Constables |
| 2 | Val Verde County Sheriff's Office |
| 1 | Frio County Constables |
| 1 | Southwest Texas Junior College |
| 1 | Zavala County Constables |

---

[210] Source: Texas Department of Public Safety.

# 6 | Information Flow

This Committee's chief goal from the very beginning has been to provide accurate information from dependable sources. The public's need for accurate information only has intensified as we have investigated the facts surrounding the tragedy. Problems with the flow of information have plagued government, media, and public discussion about what happened at Robb Elementary from the outset—damaging public trust, inflicting a very real toll on the people of Uvalde, and creating an imperative to provide a reliable set of facts.

## The First Reports

Shortly after the shooting, authorities first reported to the public that the shooter killed fourteen students and one teacher, and the attacker was reported dead at that time.[211]

The next day, state leaders looked to law enforcement for more information in preparation for a broader press conference. The briefing was planned to be led by a Uvalde police lieutenant who had been at the scene, but that officer literally passed out while waiting in the hallway beforehand. In his place, the DPS Regional Director for South Texas, Victor Escalon, agreed to conduct the briefing.[212] Director Escalon, who is not based in Uvalde, had arrived on the scene shortly before the attacker was killed. He did not personally witness the bulk of the day's events, leaving him to depend on secondhand knowledge acquired from other law enforcement officers who had been part of the response.[213]

That briefing was the basis for the press conference the day after the shooting, in which Governor Abbott and other leaders relied on the information law enforcement gave them. After correcting the death toll to nineteen students and two teachers, they made statements based upon Director Escalon's briefing (which itself was based entirely on secondhand knowledge). These statements repeated a false narrative that the entire incident lasted as little as forty minutes thanks to officers who rapidly devised a plan, stacked up, and neutralized the attacker. The general sentiments shared that day were that law enforcement responders were courageous in keeping the attacker pinned down while children were evacuated.

---

[211] All press conferences referenced in this report were recorded.

[212] Committee testimony of DPS Director Col. Steven C. McCraw (July 11, 2022).

[213] Uvalde CISD Police Chief Pete Arredondo said he approached Regional Director Escalon after the briefing because he was surprised and frustrated after hearing his comments that a school district officer had engaged the attacker. "Y'all haven't even gotten our statements yet," he told Escalon. "We were all the first ones there." Chief Arredondo testified: "he corrected that. But during the press conference, it still came out that way." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 180-81 (June 21, 2022).

Another press conference was held the next day outside of Robb Elementary School, and new details emerged. One was: "The back door was propped open. It wasn't supposed to be … a teacher … propped it open [and] that was an access point that the subject used." The idea that the door was propped open led to public outcry, and even a teacher who was not implicated was devastated as she wondered whether she had accidentally left a door open.[214] The truth—confirmed by video—is that while a teacher had propped open the west exterior door, she actually saw the attacker approaching and slammed that door shut as she called 911 for help. The door was closed; it simply was either already unlocked or the lock failed to engage, which she could not have known because the doors lock from the outside.[215] On May 31, it was confirmed that her account was correct.[216]

The media repeated the communication failures of relevant authorities, supplemented by leaks released uncritically. The Committee certainly does not question the role or value of reporting by the press, but it is unfortunate that caution and context have been so uncommon. Various people commenting publicly perpetually have taken information at face value, presenting it as definitive when provided as tentative, and they rarely have characterized it as one small part of a vastly larger body of evidence. (To their credit, some outlets did produce original investigative pieces questioning many of the inconsistencies documented earlier.)

The Committee recognizes the natural tension between providing the public with immediate information and the need for accuracy. A complete and thorough investigation can take months or even years to confirm every detail, especially when this many law enforcement officers are involved. However, one would expect law enforcement during a briefing would be very careful to state what facts are verifiable, and which ones are not.

While this is by no means an exhaustive list, the Committee draws attention to two instances to make its broader points.

### A L E R R T   R e p o r t

The first instance is based upon the report, and subsequent media coverage, of the report released by the Advanced Law Enforcement Rapid Response Training (ALERRT) Center. The report was "based on an incident briefing held for select ALERRT staff . . . for approximately

---

[214] One teacher emotionally testified to the Committee that she had spent several distraught days thinking it was her fault the attacker had entered the building, and she had gone as far as apologizing to people.

[215] Like virtually all schools, Robb Elementary made use of "Columbine" doors that can only be locked from the outside; from the inside, exterior doors are opened with a push bar.

[216] Travis Considine, chief communications officer for DPS, confirmed this for the Associated Press as one of their reporters explored the story.

1 hour" along with some unspecified "additional information" staff later received from DPS.[217] ALERRT conducted no investigation of its own and spoke to no witnesses, relying instead on a snapshot of an evolving investigation. One of its conclusions was a bombshell: a "UPD officer was armed with a rifle and sighted in to shoot the attacker; however, he asked his supervisor for permission to shoot."[218] He failed to get a response, and the attacker quickly slipped into the school.

During testimony before the Committee, an ALERRT representative admitted he had learned that DPS had received an additional statement from the officer, stating he no longer believed he had seen the attacker when he sought permission to shoot. In fact, and as the Committee has concluded, that officer saw a coach ushering kids inside—something the Texas Rangers, under the purview of DPS, had discussed with the officer during a later interview. Uvalde Mayor McLaughlin issued a statement explaining as much, and ALERRT quickly caveated its findings, saying it did not know "the officer gave a third statement to investigators that was different from the first two statements."

Video Evidence

The Committee fought hard to make sure the public could see the hallway video (although, as previously stated, the Committee would not have shown the images of the attacker and would have let the families of the victims see it first). Our justification was that we could tell people all day long what we saw, but everyone needed to see it for themselves.

After the leak of part of a composite video prepared by the FBI, images began circulating condemning some shown on it. "Cellphone cop" was said to be standing around checking his phone, indifferent. What those sharing it did not know was that it was an image of Eva Mireles's husband. She had been in contact with him already, and when he moved off camera later, she told him she was dying. After receiving this call, he was naturally devastated and was not permitted to return by other law enforcement officers. While this report has cited numerous failures by law enforcement, the actions of this man were not among them.

The problem, of course, is the power, speed, and unaccountable nature of social media. While it allows the truth to spread, it has done far more to amplify incorrect or incomplete information. This is an example of how a picture without context can lead to an incomplete or false impression that is repeated even by respected news organizations. Mark Twain said it best: "A lie can travel halfway around the world before the truth puts on its shoes."

---

[217] See ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* at 3 (July 6, 2022).

[218] *Id.* at 15.

Compromised Trust

This report has addressed many of the discrepancies and loose threads related to the Robb Elementary shooting, and the Committee focused on research and documentation to support its findings, in part because we expected to be met with rightful skepticism after everything that has happened. The results of the information issues surrounding the shooting are wide ranging and will be felt for a long time to come.

An uncertain narrative also opens the door much wider for conspiracy theories, many of which have been harmful. The fear of a coverup is palpable here, and while most see it as simply part of an intragovernmental "blame game," others have made wild accusations that authorities are sweeping some major scandal under the rug.[219] Comments on social media have repeated and shared specific false allegations about the attacker's identity and associations. And predictably, some have promoted the disgusting Sandy Hook-style claim that Robb Elementary was home to a hoax or "false flag" operation.[220] While this and similar claims might seem obviously beneath our dignifying with a response, it does become harder to proclaim the truth when it is so opaque.

Most fundamentally, there has been a loss of trust in government. As peace officers' union CLEAT said in a recent release, the "great deal of false and misleading information" means that sources "Texans once saw as iron-clad and completely reliable have now been proven false."[221] The Committee certainly has felt the distrust and doubt about its work from those who have cynically but justifiably worried about the way we conducted our investigation.

We tried at every turn to elevate and respect the needs of Uvalde, because nowhere has unreliable information more impacted a community. We saw wounds continuously ripped open and agonizing disillusionment grow there among the people who most deserve swift, sure answers about the tragedy that shook their community. Uvalde itself has paid a terrible price as it has waited for the truth and waded through the shaky narrative given instead.

---

[219] In fact, #uvaldecoverup is a popular hashtag for tweets related to the Robb Elementary School shooting, and those are the kinds of claims regularly associated with it.

[220]   Some   coverage   can   be   found   at   the   *Houston   Chronicle* (https://www.houstonchronicle.com/politics/texas/politifact/article/fact-check-uvalde-false-flag-17214816.php), among other outlets.

[221] CLEAT's release is at https://www.cleat.org/cleat-response-to-uvalde-mass-shooting/.

# 7 | Factual Conclusions

Based on the foregoing information developed through its investigation, the Committee has drawn the following preliminary conclusions:

1. **Uvalde CISD and Robb Elementary**

    a. *Communications and lockdown alerts*:

        i. Poor wi-fi connectivity in Robb Elementary likely delayed the lockdown alert through the Raptor application.

        ii. Once the alert was sent, not all teachers received it immediately for a variety of reasons including wi-fi coverage, whether the teacher used the Raptor phone application (as opposed to logging in through a web browser), and whether the teacher was carrying a phone at the time.

        iii. No one used the school intercom as another means to communicate the lockdown.

        iv. As a result, not all teachers received timely notice of the lockdown, including the teacher in Room 111.

    b. *Effect of bailouts*:

        i. The frequency of less-serious bailout-related alerts in Uvalde diluted the significance of alerts and dampened everyone's readiness to act on alerts.

        ii. In response to the May 24, 2022, lockdown alert at Robb Elementary, the initial reaction of many administrators, teachers, and law enforcement responders was that it likely was a less-dangerous bailout.

    c. *Doors and locks*:

        i. Robb Elementary had recurring problems with maintaining its doors and locks.

        ii. In particular, the locking mechanism to Room 111 was widely known to be faulty, yet it was not repaired.

            1. The Robb Elementary principal, her assistant responsible for entering maintenance work orders, the teacher in Room 111, other teachers in the fourth grade building, and even many fourth grade students widely knew of the problem with the lock to Room 111.

2. Nevertheless, no one placed a work order to repair the lock—not the principal, her secretary, the teacher to Room 111, or anyone else.

iii. Robb Elementary had a culture of noncompliance with safety policies requiring doors to be kept locked, which turned out to be fatal.

1. Exterior doors.

a. Teachers at Robb Elementary often used rocks to prop open exterior doors.

b. The west door to the west building was supposed to be continuously locked. When the attacker approached on May 24, 2022, it was unlocked, and he was able to enter the building there.

c. If the door had been locked as policy required, the attacker likely would have been slowed for some period of time as he either circumvented the lock or moved to another point of entry into the building.

2. Interior classroom doors.

a. Teachers at Robb Elementary commonly left interior doors unlocked for convenience, and they also used magnets and other methods to circumvent door locks.

b. The doors to Rooms 111 and 112 were required to be locked at all times, and in a lockdown, the teachers were supposed to check that they were locked.

i. A teacher in Room 112 was seen locking her classroom door after the lockdown alert.

ii. The door to Room 111 probably was not locked. The teacher in Room 111 does not recall hearing the lockdown alert. The door required special effort to lock it, and the teacher has no memory of having done so. The attacker apparently did not have to take any actions to overcome a locked door before entering the classrooms.

c. If the door to Room 111 had been locked, the attacker likely would have been slowed for some time as he either circumvented the lock or took some other alternative course of action.

2. **Information that was known or knowable about the attacker**

   a. *Home and family*:

      i. The attacker had an unstable home life with no father figure and a mother struggling with *a* substance abuse disorder.

      ii. The attacker's family moved often and lived in relative poverty.

      iii. The attacker developed sociopathic and violent tendencies, but he received no mental health assistance

      iv. Various members of the attacker's family were aware during the time leading up to the attacker's 18th birthday that he was estranged from his mother and that he had asked for help in buying guns through straw purchases that would have been illegal. Family members uniformly refused to buy guns for him.

      v. During the week between his 18th birthday and the events of May 24, 2022, the attacker expressed suicidal ideation to a cousin, who talked to him and did not believe he was an imminent suicide risk.

      vi. During the week between his 18th birthday and the events of May 24, 2022, the attacker's grandparents and other family members became aware that the attacker had bought guns. The grandparents demanded that the guns be removed from their home.

   b. *School*:

      i. The attacker struggled academically throughout his time in school.

      ii. The school made no meaningful intervention with the attacker before he was involuntarily withdrawn for poor academic performance and excessive absences.

      iii. The attacker had few disciplinary issues at school, but he was suspended once for a fight.

      iv. Due to his excessive absences, there apparently was no information actually known to the school district that should have identified this attacker as a threat to any school campus.

   c. *Law enforcement*: There apparently was no information actually known to local Uvalde law enforcement that should have identified this attacker as a threat to any school campus before May 24, 2022.

   d. *Friends and acquaintances*: Some of attacker's social media contacts received messages from the attacker related to guns, suggesting that he was going to do

something they would hear about in the news, and even referring to attacking a school.

 e. *Social media*:

  i. Reports suggest that some social-media users may have reported the attacker's threatening behavior to the relevant social media platforms. The social media platforms appear to have not done anything in response to restrict the attacker's social media access or report his behavior to law enforcement authorities.

  ii. The services used by Uvalde CISD to monitor social media for threats did not provide any alert of threatening behavior by the attacker.

 f. *Firearms and ammunition sellers*: There was no legal impediment to the attacker buying two AR-15-style rifles, 60 magazines, and over 2,000 rounds of ammunition when he turned 18. The ATF was not required to notify the local sheriff of the multiple purchases.

**3. Law enforcement response on May 24, 2022**

 a. There was no law enforcement officer on the Robb Elementary campus when the attacker came over the fence and toward the school.

 b. Citizens at the scene quickly alerted local law enforcement about a vehicle accident, a man with a gun, and shots fired near the Robb Elementary campus.

 c. As initially reported by Uvalde Police dispatch and as understood by most initial responders, the incident began off-campus and as one that would have been in the jurisdiction of the Uvalde Police Department. Uvalde Police officers were among the first, if not the first, law enforcement responders on the scene as a man firing a gun moved toward Robb Elementary School.

 d. As the situation developed and responders received more information, it became apparent that the threat moved on to the school campus and within the jurisdiction of the Uvalde CISD Police Department.

 e. Multiple law enforcement officers arrived at Robb Elementary within a few minutes of the attacker coming over the fence.

 f. A Uvalde Police Department officer saw a person dressed in black and thought it might have been the attacker. From a distance of over 100 yards, that officer requested permission to shoot. Subsequent analysis suggests that the person in black was a school coach, and the officer did not have an opportunity to stop the attacker by shooting him before he entered the west building.

 g. Robb Elementary School Coach Yvette Silva acted heroically and almost certainly saved lives by alerting the school to the attacker's advance. Most fourth grade classes successfully locked down as a result of her quick response.

h. After entering through the unlocked west door, the attacker had about three minutes in the west building before first responders arrived at the building, including approximately two and a half minutes during which the attacker is estimated to have fired over 100 rounds.

i. The initial responders to the west building heard gunfire and encountered a hallway with a fog of drywall debris, bullet holes, and empty rifle casings. They converged on Rooms 111 and 112, which they identified as the location of the attacker. They acted appropriately by attempting to breach the classrooms and stop the attacker. The attacker immediately repelled them with a burst of rifle fire from inside the classrooms.

j. The responders immediately began to assess options to breach the classroom, but they lost critical momentum by treating the scenario as a "barricaded subject" instead of with the greater urgency attached to an "active shooter" scenario.

k. It actually was an "active shooter" scenario because the attacker was preventing critically injured victims from getting medical attention.

    i. An active shooter scenario differs from a barricaded-subject scenario in that law enforcement officers responding to an active shooter are trained to prioritize the safety of innocent victims over the safety of law enforcement responders.

    ii. At first, the first responders did not have "reliable evidence" about whether there were injured victims inside Rooms 111 and 112, although circumstantial evidence strongly suggested that possibility, including the fact that the attacker had fired many rounds inside classrooms at a time when students were in attendance.

    iii. The ALERRT training "reliable evidence" standard does not align with the "reasonable officer" standard applied by ALERRT in its preliminary and partial report.

l. Uvalde CISD's active shooter policy called for Uvalde CISD Police Chief Arredondo to be the incident commander in any active shooter response.

    i. Chief Arredondo was one of the first responders to arrive at the west building.

    ii. In the initial response to the incident, Chief Arredondo was actively engaged in the effort to "stop the killing" up to the point when the attacker was located in Rooms 111 and 112, and the attacker fired on responding officers.

    iii. By this time, there were dozens of officers on the scene, but Chief Arredondo did not assume his preassigned responsibility of incident command, which would have entailed informing other officers that he

was in command and also leaving the building to exercise command, beginning with establishing an incident command post.

   iv. Instead, he remained in the hallway where he lacked reliable communication with other elements of law enforcement, and he was unable to effectively implement staging or command and control of the situation.

m. Over the course of the next hour, hundreds of law enforcement officers arrived at the scene.

   i. The scene was chaotic, without any person obviously in charge or directing the law enforcement response.

   ii. To the extent any officers considered Chief Arredondo to be the overall incident commander, they also should have recognized that was inconsistent with him remaining inside the building.

   iii. There was an overall lackadaisical approach by law enforcement at the scene. For many, that was because they were given and relied upon inaccurate information. For others, they had enough information to know better.

n. Despite obvious deficiencies in command and control at the scene which should have been recognized by other law enforcement responders, none approached Chief Arredondo or any of the officers around him or subordinate to him to affirmatively offer assistance with incident command.

o. Chief Arredondo and the officers around him at the south end of the building were focused on gaining access to the classrooms (through use of a breaching tool, a key, or other means) and protective equipment for officers (through rifle-rated ballistic shields, flashbangs, etc.).

p. Meanwhile, dozens of law enforcement officers were assembling in the hallway on the north side of the building, stacking up for an assault on the classrooms, and mostly waiting for further instructions pending the arrival of protective gear and breaching equipment.

q. While 911 received communications from victims inside Rooms 111 and 112, Chief Arredondo did not learn about it because of his failure to establish a reliable method of receiving critical information from outside the building.

r. Eventually, Chief Arredondo came to understand there probably were casualties inside Rooms 111 and 112. Even if he had received information of surviving injured victims in the classrooms, it is unclear that he would have done anything differently to act "more urgently."

s. U.S. Marshals provided a rifle-rated shield and it arrived around 12:20 p.m., approximately 30 minutes before the classroom was finally breached.

t.  While officers acted on the assumption that the doors to Rooms 111 and 112 were locked, as they were designed to be, nobody tested that assumption.

u.  Room 111's door probably was not effectively locked shut.

v.  Chief Arredondo did not actually exercise tactical incident command over the BORTAC team, nor did the BORTAC team seek instruction from Chief Arredondo.

w.  By the time the BORTAC team breached the classrooms, the tactical command inside the building had been de facto assumed by BORTAC.

x.  Acting on effectively the same information available to Chief Arredondo, including an assumption of injured victims in the room, the BORTAC commander on scene waited until arranging a rifle-rated shield and obtaining a working master key before attempting to breach the classrooms.

y.  The Committee has not received medical evidence that would inform a judgment about whether breaching the classroom sooner than the approximately 73 minutes that passed between the first responders' initial arrival at the west building and their eventual breach of the classrooms could have been saved lives or mitigated injuries.

  i.  As described above, it is likely that most of the deceased victims perished immediately during the attacker's initial barrage of gunfire.

  ii.  However, given the information known about victims who survived through the time of the breach and who later died on the way to the hospital, it is plausible that some victims could have survived if they had not had to wait 73 additional minutes for rescue.

I N   M E M O R Y   O F

Nevaeh Bravo

Jacklyn Cazares

Makenna Elrod

Jose Flores, Jr.

Eliahna Garcia

Irma Garcia

Uziyah Garcia

Amerie Jo Garza

Xavier Lopez

Jayce Luevanos

Tess Mata

Maranda Mathis

Eva Mireles

Alithia Ramirez

Annabell Rodriguez

Maite Rodriguez

Alexandria Rubio

Layla Salazar

Jailah Silguero

Eliahna Torres

Rojelio Torres