IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK et al.,

                *Plaintiffs*,

   v.

KATHLEEN HOCHUL, in her official capacity as Governor of the State of New York, et al.,

                *Defendants*.

Civil Action No.
1:22-cv-0986-GTS-CFH

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Alla Lefkowitz
Everytown Law
Bar Roll # 703313
P.O. Box 14780
Washington, DC 20044
Phone: 202-545-3257, ext. 1007
Fax: 917-410-6932
alefkowitz@everytown.org
*Counsel for Amicus Curiae
Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT .................................................................................................................................. 3

      I.      Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct ....................................................... 3

      II.     The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ............................................................................................................................. 5

      III.    This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers" ...................................................................................... 12

CONCLUSION ............................................................................................................................. 15

## TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. Bruen*,
  No. 1:22-cv-0986, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ............................................ 4

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ...................................................................................................... 1

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007) .......................................................................................................... 13, 14

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................................................................... 2, 4, 11, 13

*Drummond v. Robinson Township*,
  9 F.4th 217 (3d Cir. 2021) ......................................................................................................... 6

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ............................................................................................. 5, 10

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ................................................................................................... 14

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ...................................................................................................... 5

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) .............................................................................................................. 4

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ..................................................................................................... 6, 9, 13

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022) ..................................................................................................... passim

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) .............................................................................................................. 2

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022 WL
  2382319 (9th Cir. June 28, 2022) ............................................................................................. 2

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020)
  ................................................................................................................................................... 2

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) ..................................................................................6

*United States v. Tilotta*,
    No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ..............................5

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..............................8, 9

Brief for Independent Institute as Amicus Curiae, *New York Rifle & Pistol Ass'n
    v. Bruen*, No. 20-843....................................................................................10, 13

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
    Charleston L. Rev. 205 (2018)................................................................................10

Everytown Center for the Defense of Gun Safety, *Parks Restrictions*,
    https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/
    ...................................................................................................................12

Everytown Center for the Defense of Gun Safety, *Sensitive Places*,
    https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ .12

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*
    (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917........................9

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*,
    97 Ind. L.J. 1439 (2022).........................................................................................8

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n*, No. 20-843 (U.S.)...............11

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 650,000 in New York. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 40 cities, towns, and other localities in New York are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 50 amicus briefs in Second Amendment and other firearms cases, including in the prior action in this Court challenging the same provisions of New York's law, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Antonyuk v. Bruen*, No. 1:22-cv-734 (N.D.N.Y. Aug. 18, 2022), Dkt. 33. Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

n.11 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The challenged restrictions in New York's Concealed Carry Improvement Act ("CCIA") are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons stated in the State Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Dkt. 48).[2] Everytown submits this amicus brief to expand on three points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden (as they concede)—and, as discussed below, Plaintiffs do not meet that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claims. The Court should deny Plaintiffs' motion for a preliminary injunction in its entirety, as to all defendants, for the reasons the State set out.

tradition to the contrary. Although not directly implicated here, given the State's robust and extensive historical record, we highlight that point in case the Court chooses to address it (as it did in its opinion granting in part and denying in part Plaintiffs' motion for a temporary restraining order, *see* Dkt. 27 at 18-20).

## ARGUMENT

I.  **Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

Plaintiffs admit that they have the burden on the initial, textual inquiry. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Permanent Injunction, Dkt. 6-1 at 32 ("Under *Heller* and *Bruen*, the standard for assessing Second Amendment challenges requires Plaintiffs to show that their conduct falls under the Second Amendment's plain text."). This admission was inevitable, for at least two reasons. First, *Bruen* itself makes it clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of constitutional litigation— the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For

example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

Despite conceding that they bear the burden, however, Plaintiffs make virtually no effort to carry it. They assert that they "have clearly made this showing," Dkt. 6-1 at 32, but they cite no evidence (or even allegations) in support of that assertion. Plaintiffs instead merely state, without more, that (i) they "are part of 'the People' protected by the amendment," (ii) "the weapons (handguns) in question are in fact 'arms' protected by the amendment," and (iii) "the regulated conduct falls under the phrase 'keep and bear.'" *Id.* at 32-33.

These bare assertions cannot be enough to carry Plaintiffs' burden. For example, and as the State notes, in challenging the private property provision in Section 265.01-d, Plaintiffs must establish that "the plain text of the Second Amendment would provide a right to bear arms concealed *on someone else's premises*." Dkt. 48 at 73 (emphasis added). Because they fail to do so, they are not entitled to injunctive relief. This same analysis holds true for Plaintiffs' other Second Amendment challenges to the CCIA as well. *See, e.g.*, *id.* at 15-17, 29-30, 33, 34, 41-42.

While this Court has previously concluded, pointing only to *Heller* and *Bruen*, that "the Second Amendment's plain text covers the conduct in question," Dkt. 27 at 31; *see Antonyuk v. Bruen*, No. 1:22-cv-0986, 2022 WL 3999791, at *25 (N.D.N.Y. Aug. 31, 2022), we respectfully submit that was in error. The CCIA stands in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevented law-abiding citizens

with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150.³ Accordingly, Plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public for self-defense, as the *Bruen* petitioners did. At the very least, Plaintiffs should be required to prove that the Second Amendment's text protects their "proposed course of conduct," *Bruen*, 142 S. Ct. at 2134, with respect to each aspect of their challenge to the CCIA. They have failed to do so, and so are not entitled to injunctive relief.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.⁴ *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S.

---

³ *See United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (noting that the firearm regulation at issue "is not equivalent to near total bans on the possession of handguns in the home or in public" as in *Heller*, *McDonald*, and *Bruen*, and that, "[t]herefore, the Second Amendment's text does not cover [the challenger]'s course of conduct").

⁴ Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because the public understanding "for all relevant purposes" in the case before it was the same in both 1791 and 1868).[5] Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State's brief, this Court can uphold the challenged provisions of the CCIA under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around 1868. *See, e.g.*, Dkt. 48 at 20-26, 29-33 (individualized

---

[5] While Plaintiffs acknowledge that "the period around the ratification of … the Fourteenth Amendment" is "*perhaps*" relevant, their Second Amendment historical arguments appear to rest entirely on the claimed lack of "founding-era analogues" for the CCIA's provisions, which suggests that Plaintiffs may be misreading *Bruen* to have resolved the issue in favor of 1791. Dkt. 6-1 at 14, 33-34. However, the Court could not have resolved the issue it expressly left open. And to the extent that the majority put a thumb on the scale, it was in favor of 1868, not 1791. *See infra* pp. 8-10 (explaining that majority cited scholarship arguing for 1868 and none arguing for 1791, and approvingly cited consideration of 19th-century laws in sensitive places analysis).

assessment), 37-39 (disclosure), 42-71 (sensitive places); 74-77 (private property without consent).[6] Indeed, while leaving that question unresolved, *Bruen* makes clear that licensing requirements like many of those that Plaintiffs challenge—including requirements that an applicant "undergo a background check or pass a firearms safety course" as a condition of carrying a firearm in public—are constitutional. *Bruen*, 142 S. Ct. at 2138 n.9 (stating that "nothing" in its analysis casts doubt on state licensing regimes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"); *see id.* at 2162 (Kavanaugh, J., concurring) (similar). Similarly, after pointing to both "18th- and 19th-century" historical regulations, *Bruen* stresses that "*new* and analogous sensitive places [prohibitions] are constitutionally permissible." *Id.* at 2133; *see also infra* p. 10. And this Court, too, has already made clear that, in conducting the historical inquiry required under *Bruen*, it may properly consider founding-era, Reconstruction-era, and even later laws. *See, e.g.*, Dkt. 27 at 23 n.19, 25 n.22, 33 n.25, 36 n.33. But if this Court prefers to settle the issue the Supreme Court expressly left open, it should conclude that 1868 is the correct focus.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should

---

[6] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See infra* pp. 11-12.

7

control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government.").

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021)

8

(manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[7] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged,

---

[7] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Plaintiffs' apparent position (*see supra* note 5) that the Court should look only to "founding-era analogues," Dkt. 6-1 at 34, is therefore unfounded. Such a position is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[8] And, as noted, this Court has already correctly relied on mid- to late-19th-century laws, including from as late as 1880s and 1890s, in granting in part and denying in part Plaintiffs' motion for a temporary restraining order. *See, e.g.*, Dkt. 27 at 32-33 & n.25, 36 & n.33, 38 & n.35.

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

---

[8] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

> JUSTICE THOMAS: … [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Here, state and local laws from the second half of the 19th century and early 20th century—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of New York's law. *See, e.g.*, Dkt. 48 at 24-26, 30-31, 32, 42-44, 47-52, 55-56, 58-59, 65-66, 68-71, 75-77.[9] And even if this Court were to conclude (contrary to the scholars the

---

[9] To be clear, as this Court has acknowledged (Dkt. 27 at 17), whether laws precisely like the challenged provisions of the CCIA existed in 1868 (or 1791) is not the question before this

11

Supreme Court cited) that the relevant date is 1791, not 1868, and even if the Court is uncertain that the State's extensive founding-era evidence establishes the CCIA's constitutionality, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the CCIA.

### III. This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers"

Challengers in recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). No such argument is remotely tenable in this case, given the State's robust and extensive record of historical laws. *See, e.g.*, Dkt. 49 (declaration attaching more than 70 state, local, and other historical laws and regulations analogous to the challenged provisions of the CCIA).[10] But to the extent this Court chooses to address the issue here, as it did in its opinion granting in part and denying in part Plaintiffs' motion for a temporary restraining order, *see* Dkt. 27 at 18-20, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

---

Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

[10] *See also, e.g.*, Everytown Center for the Defense of Gun Safety, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ (last visited Oct. 18, 2022) (citing, excerpting, and linking to a selection of historical sensitive places laws); Everytown Center for the Defense of Gun Safety, *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (last visited Oct. 18, 2022) (same, for a selection of additional restrictions on guns in parks).

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations—legislative assemblies, polling places, and courthouses—were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. at 11-12. Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Indeed, this Court has already recognized that a small number is sufficient. *See* Dkt. 27 at 19-20 (noting that "[t]he Court generally has looked to instances where there have been three or more … historical analogues").[11]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of

---

[11] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places—as this Court recognized.

democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: October 18, 2022

Respectfully submitted,

Everytown Law
*/s/ Alla Lefkowitz*
Alla Lefkowitz
Bar Roll # 703313
P.O. Box 14780
Washington, DC 20044
Phone: 202-545-3257, ext. 1007
Fax: 917-410-6932
alefkowitz@everytown.org

*Counsel for Amicus Curiae
Everytown for Gun Safety*

Janet Carter*
William J. Taylor, Jr.*
Kari L. Still*
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
Phone: (646) 324-8174
jcarter@everytown.org

* Not admitted in the Northern District of New York

*Counsel for Amicus Curiae
Everytown for Gun Safety*