# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, *et. al.*,      )
                            )
Plaintiffs,                 )
                            )   Civil Action No. 22-cv-00986 (GTS-CFH)
v.                         )
                            )
KATHLEEN HOCHUL, in her Official   )
Capacity as Governor of the State of New   )
York, *et. al.*,              )
                            )
                            )
Defendants.               )
_____)

## PLAINTIFFS' REPLY TO STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR PERMANENT INJUNCTION

# TABLE OF CONTENTS[1]

I.   Defendants Have Failed to Undermine Plaintiffs' Standing...........................................1

   A. Injury-In-Fact...................................................................................................1

      1.  Plaintiff Sloane Was Denied the Ability to Submit His Application.......................1

      2.  Plaintiffs Alleged Clear Threats of Enforcement.....................................................2

   B. There Is Standing as to Governor Hochul......................................................4

      1.  The Eleventh Amendment Is No Bar to Suit Against Governor Hochul.................4

      2.  Defendant Hochul Is Directly Responsible for Plaintiffs' Injuries.........................5

      3.  Legislative Immunity Is No Bar to Suit Against Defendant Hochul.......................6

   C. There Is Standing as to Judge Doran...............................................................6

   D. There Is Standing as to Defendant Nigrelli.....................................................7

II.  Defendants' Distinction Between Facial and As-Applied Challenges Falls Flat............8

III. Plaintiffs Demonstrated a Substantial Likelihood of Success on the Merits...................9

   A.  The CCIA's Good Moral Character Requirement Is Patently Unconstitutional...........9

      1.  Plaintiffs Have Established a Presumption of Constitutional Protection.................9

      2.  "Good Moral Character" Is a Modern-Day Extreme Outlier.................................10

      3.  Defendants' Historical Analogues Are Not Remotely Similar to the CCIA...........11

      4.  *Bruen* Abrogated Prior Findings as to GMC to the Extent They Might Apply......14

      5.  New York's "Good Moral Character" Requirement Cannot Be Complied with Because It Lacks Any Exemption for Self-Defense.................................................15

   B. The CCIA's Remaining Licensing Requirements Are Similarly Unconstitutional......15

      1.  New York's Interview Requirement is an Affront to the Constitution..................15

---

[1] For ease of reference, Plaintiffs adopt Defendants numbering.

2. The CCIA's Character Reference Requirement Is Unconstitutional......................16

3. The CCIA's Household Occupant List Requirement Is Unconstitutional.............17

4. The CCIA's Onerous Training Requirement Is Unconstitutional.........................18

5. The CCIA's Social Media List Requirement Is Unconstitutional.........................19

6. The CCIA's "Additional Information" Catchall Requirement Is Unconstitutional.............................................................................................20

C. Defendants Fail to Establish Historical Analogs for the CCIA's "Sensitive Places"....21

1. New York Fails to Evade its Burden to Establish Relevant Historical Analogues............................................................................................................21

2. The Challenged "Sensitive Locations" Are Without Historical Analogue............23

i. Government Property.............................................................................24

ii. Places Critical to Other Constitutional Rights.........................................24

iii. Free Exercise of Religion.............................................................25

v. The Right to Peaceably Assemble................................................27

c. Public Functions Including Schools.........................................................28

d. Vulnerable People.....................................................................................29

e. Large Groups and Confined Spaces.........................................................31

3. The "Sensitive Places" Are Not Supported by American History or Tradition.............................................................................................................32

a. Libraries, public playgrounds, public parks, and zoos.............................32

b. Places Children are Present......................................................................33

c. Vulnerable Populations.............................................................................33

d. Public Transportation...............................................................................34

e. Places that Serve Alcohol.........................................................................35

f. Performance and Recreation Locations....................................................35

D.  Defendants Fail to Justify the Restricted Locations Statutory Prohibition....................36

IV.   Plaintiffs Have Shown a Likelihood of Success on their First Amendment Claims..........39

1.  List of Family and Cohabitants................................................................39

2.  GMC, Interview, Character Reference, Social Media...........................................40

3.  Express Consent and Interview................................................................44

V.   Plaintiffs Are Likely to Succeed on their Fifth Amendment Claims................................47

1.  Interview........................................................................................47

2.  Social Media....................................................................................48

VI.   Plaintiffs Have Demonstrated Irreparable Harm....................................................48

VII.   The Equities Tip Heavily in Plaintiffs' Favor....................................................48

VIII.   Any Injunctive Relief Should Be Statewide........................................................50

## I.       Defendants Have Failed to Undermine Plaintiffs' Standing.[2]

State Defendants ("Defendants") claim that "subject-matter jurisdiction remains lacking in this new action" because "no plaintiff has suffered an injury-in-fact that is fairly traceable to any State Defendant."  State Defendant's Opposition ("Opp.) 5.  Yet only once did Defendants address the claims and arguments made in Plaintiffs' Preliminary Injunction Memorandum.  Opp. 12.  For pre-enforcement challenges, "[a] party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Additionally, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  If these Plaintiffs do not have standing to challenge the CCIA, then no one could.

### A.       Injury-In-Fact

#### 1.  Plaintiff Sloane Was Denied the Ability to Submit His Application.

Defendants contest Sloane's standing because he "has not submitted an application for a license, let alone been denied[]" and that it "is fatal to his claim."  Opp. 6.  While Defendants concede *DeCastro*'s futility holding, they claim Sloane's "allegations of futility are unavailing." Opp. 7.  First, Defendants claim that Sloane is not "categorically barred" from receiving a license if he submits a deficient application, yet N.Y. Penal Law Section 400.00(1) makes clear that an incomplete application must be denied.  ("No license shall be issued or renewed pursuant to this section except … only after investigation and finding that all statements in a proper application for a license are true").  Second, Defendants claim that Sloane's year-long wait even to apply is of no

---

[2] The "status quo" "in preliminary-injunction parlance is really a 'status quo ante.'" *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018) (citation omitted). "This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing."  *Id*. Here, the "status quo" is the date before the CCIA went into effect.

moment, yet a year-long delay "would effectively deny him his Second Amendment right."  TRO 17.  Defendants opine that Sloane should have sought "an injunction requiring the county to process his application expeditiously."  Opp. 7.  But the 11th Amendment prohibits federal courts from ordering state actors to follow state law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Third, Defendants ignore Sloane's allegation that the Onondaga Sheriff has stated that he will neither process nor accept incomplete applications.[3]  Fourth, *Bruen predicted* Sloane's predicament and *invited* challenges: "where … lengthy wait times in processing license applications deny ordinary citizens their right to public carry." *Bruen* 2138 n.9.

### 2.  Plaintiffs Alleged Clear Threats of Enforcement.

Defendants claim that Plaintiffs "do not allege that they have been prosecuted, charged, or threatened with prosecution," including by "law enforcement in their municipalities."  Opp. 9. Defendants forget that Defendants Fitzpatrick and Cecile stated they would enforce the CCIA (Mem. 6), as did Defendant Hilton (including carrying a firearm in a church), (Mem. 7), and then-Defendant Bruen's second-in-command threatened all New Yorkers with arrest for CCIA violations (Mem. 5-6).  *See also* Johnson Dec. ¶ 24; Leman Dec. ¶¶ 23-24; Mann Dec. ¶ 23; Terrille Dec. ¶ 22.   The CCIA had only been in effect for 20 days when Plaintiffs filed the instant case,[4] and no Defendant has disavowed its enforcement even after this case was filed.

Defendants argue that Mr. Nigrelli's threat of arrest was not "against *the specific plaintiff*[s]" in this case, but at a news conference broadcast widely.  Opp. 8, 13.  On the contrary the fact that Mr. Nigrelli looked directly into the camera and threatened every New York gun

---

[3] https://sheriff.ongov.net/pistol-license-unit/appointment-requirements/.
[4] Counsel for Defendants stated whether Pastor Mann's parsonage is a "church," and thus off limits, is an "interesting question" and a decision on that question would result from a "course of enforcement actions by law enforcement..."  Tr. at 31:8-10.

owner does not mean he did not threaten Plaintiffs specifically.[5]  Indeed, "it does not matter how many [other] persons have [also] been injured … where a harm is concrete, though widely shared, the Court has found injury in fact." *Mass. v. EPA*, 549 U.S. 497, 517, 522 (2007).[6]

Plaintiffs have demonstrated a credible threat of enforcement under this Circuit's standards, in their Complaint, Declarations, and Memorandum.  *See also Stagg, P.C. v. United States Dep't of State*, 983 F.3d 589, 605 (2d Cir. 2020) ("credible threat … by DOS's public statements interpreting the ITAR as covering Stagg's intended speech."); *Berg v. Vill. of Scarsdale*, 2018 U.S. Dist. LEXIS 20180, *4 (S.D.N.Y. Feb. 6, 2018) ("confirmation of the Village's position that it is entitled to … commence criminal proceedings against residents.…").

Finally, a credible threat of enforcement is established by New York's history of prosecuting prohibited possession of a firearm in prohibited locations. *See Thoms v. Heffernan*, 473 F.2d 478, 484-85 (2d. Cir. 1973) (finding that "appellee faced a 'credible threat of enforcement'" when a "law enforcement official[]" said 'if you're in violation of the statute we'll lock you up,' and "there had been a series of prosecutions" in similar contexts); *Doe v. United States Immigration & Customs Enf't*, 490 F. Supp. 3d 672, 683 (S.D.N.Y. 2020) ("In light of the enforcement discretion accorded ICE and the dramatic increase in enforcement activity …. the fact

---

[5] Defendants cite one 2nd Circuit case that a "credible threat of prosecution … cannot rest on fears that are "'imaginary or speculative.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015). Opp. 8.  And then cite to a handful of non-2nd Circuit cases.  *Id*.  But there is nothing "imaginary or speculative" about state officials threatening arrests, prosecutions, loss of firearms, permit revocation, conviction of a felony and loss of constitutional rights, simply for conduct that prior to September 1, 2022 was perfectly legal.  Plaintiffs are on record stating their intent to violate numerous portions of the CCIA (*See* Mot. for PI at pp. 3-5 and Exhibits 2, 3, 8, 9).

[6] Defendants' claim that Plaintiffs are "asserting an abstract 'general interest common to all members of the public" (Opp. 5) conflicts with Defendants' later musings that the CCIA should not be enjoined state-wide (Opp. 94), and also with their claim that Plaintiffs' *facial* challenges to the CCIA fail (if Defendants concede the law is the same for *everyone*, and the Court finds that it is unconstitutional as applied to *anyone*, then Plaintiffs' facial challenges must succeed) (Opp. 13).

that Doe has not alleged any of the personal factors specified in the Directive does not diminish the credibility of the threat of enforcement alleged.").[7]

### B.     There Is Standing as to Governor Hochul.

#### 1.   The Eleventh Amendment Is No Bar to Suit Against Governor Hochul.

Defendants claim that Defendant Hochul is not a proper party because such a person "'must have some connection with the enforcement of the act.'"  Opp. 9 (citation omitted).  Defendants' reliance on (nonbinding) *Roberson v. Cuomo*, 524 F. Supp. 3d 196, 223 (S.D.N.Y. 2021), for the proposition that Governor Hochul must have a "particular duty" to enforce the law, misses the next part of that opinion, which explains that the "[p]laintiffs challenge regulations [requiring mandatory detention of all parole violators] that have been in place for decades," and then-Governor Cuomo's "directive led to emergency *exceptions* to this rule" rather than the "enforc[ement]" that the plaintiffs challenged.  *Id.*  Here, Governor Hochul provided significant guidance as to the CCIA's and application, and may be responsible for NYPD changing its policy as to whether pre-CCIA or post-CCIA requirements apply based on the date of application.[8]

As this Court previously noted, "the Governor could simply replace a Superintendent who refuses to enforce the CCIA."  *Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874, at *42 (N.D.N.Y. Aug. 31, 2022).  Indeed, though Superintendent Bruen has enforced anti-gun laws, Governor Hochul *replaced* him (after his "resignation") with Steven Nigrelli, who issued public announcements about enforcing CCIA, *speaking directly to the Governor*.  *See* Leman Dec. ¶ 22.[9]

---

[7] *See also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit" where state did not disavow enforcement, and court concluding "that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them.")

[8] https://politi.co/3gwyzPv.

[9] https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40.

In addition to authority over the State Police, Article 13, § 13(a) of the N.Y. Constitution gives the Governor "the ability to remove from office 'any elective sheriff, county clerk, district attorney or register….'"  *Kearns v. Cuomo*, 415 F. Supp. 3d 319, 334-35 (W.D.N.Y. 2019).  The Governor thus has unbridled power to replace New York's elected sheriffs and district attorneys who oppose enforcing her law. The *New York Times* explains, while "[n]ationwide, conservative sheriffs have been at the front line of an aggressive pushback on liberal policies," yet "[i]n New York, dissent has walked a fine line between loud complaints and winking resistance, including pledges of selective — and infrequent — enforcement."[10]  While in other states sheriffs have refused to enforce unconstitutional gun control laws,[11] not a single New York sheriff has disavowed the CCIA.  It is not speculative to believe that Governor Hochul would act just as her predecessor, who reportedly threatened sheriffs opposing the Safe Act.[12]

In sum, while Defendants assert the Governor has no "connection with the enforcement of the act" (Opp. 9), she exercises near-plenary power regarding the CCIA's enforcement, through the State Police, the sheriff's departments, and district attorneys of the state's 62 counties.[13]

## 2. Defendant Hochul Is Directly Responsible for Plaintiffs' Injuries.

Before the ink was dry on *Bruen*, Defendant Hochul convened an extraordinary session of the legislature on June 30, 2022.[14]  Her "proclamation" states its purpose as "[c]onsidering legislation [she] will submit with respect to addressing necessary statutory changes regarding firearm safety, in a way that ensures protection of public safety and health, after the [*Bruen*

---

[10] https://www.nytimes.com/2022/10/09/nyregion/ny-gun-law-sheriffs.html.

[11] *See* https://bit.ly/3So9Km3 ("at least 20" sheriffs in Oregon who refused to enforce I-1639).

[12] https://www.businessinsider.com/cuomo-threatened-jobs-of-sheriffs-2013-5.

[13] Even if this Court were inclined to disagree, rather than dismissing the Governor now, Plaintiffs should be entitled to discovery on Defendant Hochul's role in enforcement of the CCIA.

[14] https://on.ny.gov/3DslVdn.

decision.]"  Yet *Bruen* struck only the "proper cause" licensing requirement, with no holdings on where licensed New Yorkers could carry or how much training was required.   Nevertheless, Defendant Hochul attacked and maligned *Bruen* as "reckless and reprehensible," and stated that she has "been working around the clock … to craft gun safety legislation in response to this ruling that will protect New Yorkers,"[15] making her primarily responsible for this unconstitutional law.

Even after enactment, Defendant Hochul has directed how the CCIA would be applied. When the "NYPD reiterated that anyone applying before [September 1st] would be subject to the old requirements," Governor Hochul overruled that decision,[16] leading the NYC Mayor's office to state it would be "working with the state to ensure [their] interpretations are fully aligned[]."  *Id.* When asked whether she was "shutting off all the public places," and "what would be left?" she said, "probably some streets."[17]

### 3.   Legislative Immunity Is No Bar to Suit Against Defendant Hochul.

Defendants claim that Governor Hochul is "entitled to absolute immunity … for her role in signing" the CCIA.  Opp. 11.  Plaintiffs do not challenge her "signing" the CCIA, but the role she has taken in its enforcement and interpretation.  Defendants' claim that Plaintiffs "do not allege that Governor Hochul has a role in enforcing the CCIA[]" (i*d.*) is false.  Defendant Hochul directs enforcement policy and has total control over those who make the arrests and bring the charges.[18]

### C.      There Is Standing as to Judge Doran.

Defendants concede "redressability" exists to Judge Doran (Opp. 11-12), but then claim he is not a proper party because he has not yet denied an application.  But Plaintiff Sloane alleged his

---

[15] https://on.ny.gov/3Di1MGt.
[16] https://politi.co/3Di3tnl.
[17] https://cbsn.ws/3SpFvuR.
[18] Defendant Hochul is not immune from suit for prospective injunctive relief. *See Ex parte Young*, 209 U.S. 123, 159 (1908).

application was rejected by the inability to submit it, and the State admitted that Judge Doran would follow the law[19] with respect to Sloane's application, which *requires* the judge to deny it. TRO 17.  Indeed, Defendants did not state that Judge Doran would **not** be Sloane's licensing officer, and it should not be assumed he would violate state law by granting an incomplete application.  Defendants seek to walk back their concession, focusing on *other* statements made at argument.  Opp. 12 n.1.  Moreover, that Judge Doran (a licensing official) is a proper party was conclusively decided by *Bruen* at 2138.   If this Court determines that CCIA's licensing requirements are unconstitutional, Sloane will be able to apply and have his permit issued.

### D.      There Is Standing as to Defendant Nigrelli.

Defendants have asked this Court to "reconsider" the Superintendent's standing to be sued with respect to training, sensitive locations, and restricted locations.  Opp. 12.  Yet Defendants offer no colorable reason why, and Nigrelli is a proper Defendant for all the reasons the Court specified.  First, Defendants claim that Plaintiffs do not claim harm from the training curriculum "***except***" with respect to suicide prevention.[20]  *Id.*  (emphasis added). In other words, Defendants concede that Plaintiffs "do [] claim harm" from the training curriculum.  Indeed, *all* of the numerous topics in the curriculum (some of which have no relevance to carrying a firearm in public), separate and aside from the number of hours demanded, lead directly to a prohibitively high cost to obtain such training. Ex. "3" Dec. of Sloane, ¶¶ 27, 28. Second, Defendants bootstrap

---

[19] Tr. 48:22-25 ("if and when he does, I'm sure it will be in accordance with the law...").

[20] The "harm" has been recast by Defendants to avoid Plaintiff Sloane's allegations about the cost and time required.  *See* Exhibit "3" Dec. of Sloane, ¶¶ 5, 24, 27. ECF 1-4.  Also, Bruen was previously found to be a proper Defendant in *Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874, at *44 (N.D.N.Y. Aug. 31, 2022) (proper defendant for "claims challenging the new 18-hour firearm training requirement for newly issued or renewed licenses") and, in this matter, "his involvement in requiring a certification of competition of 18-hours of firearm training in concealed-carry applications[]."  TRO 16.

their allegation that "[t]his claim fails on the merits" into the conclusion that Plaintiffs thus do not have standing to make the claim in the first place.  Opp. 12.  Third, Defendants claim that there is no credible threat of enforcement, alleging that Acting Superintendent Nigrelli's direct threat to arrest CCIA violators is merely a "generalized statement[] … that officials are ready to perform duty…."  Opp. 13. Not so.  Mr. Nigrelli looked directly into the camera and said, "If you violate this law, you will be arrested."  This is not a mere "generalized statement[]" of "read[iness]."

## II.    Defendants' Distinction Between Facial and As-Applied Challenges Falls Flat.

Defendants argue that only facial challenges may be brought before enforcement.[21]  Opp. 13-14.  Of course, this Court already explained that there is *no* constitutional application for many of the CCIA's provisions.  TRO 20 (GMC "fatally flawed"); 26 ("no such circumstances exist under which … list of family and cohabitants … would be valid);[22] 27 ("no … circumstances exist under which this provision would be valid" for listing social media accounts); 28 (in-person meetings); 43 (ten sensitive locations); 45 (enjoining "restricted locations" except for "fenced-in farmland" and "fenced-in hunting ground").  Many others the Court let stand only "for now."[23]

While the vast majority of the CCIA's restrictions are facially unconstitutional, Plaintiff Leman, as a non-law enforcement first responder, is not exempt from the CCIA in any

---

[21] The Supreme Court allows pre-enforcement as-applied challenges. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 234 (2010) ("preenforcement suit seeking declaratory relief" as-applied); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8, 15 (2010).

[22] *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges … goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.").

[23] Defendants claim that this "Court has already found several of the key provisions at issue to be constitutional in some circumstances," including "the good moral character requirement…."  Opp. 14.  Actually, the Court explained that the good moral character requirement "appears fatally flawed in two respects..." TRO 20, 22.  The Court opined that changing the CCIA to *include* an exception for self-defense and to *exclude* the requirement that an applicant prove his trustworthiness "may be valid under the Constitution." TRO 24. But the CCIA does not have those necessary characteristics. TRO 24.

sensitive or restricted location where CCIA may be left, even during an emergency. *See* TRO Mem. 4-5. Defendants make a similar claim as to the Court's interim conclusion not to enjoin restricted locations in "certain fenced-in land, but not otherwise." Opp. 14-15; TRO 46. While Plaintiffs urge this matter be reconsidered, they take the Court's interim approval of a few restricted locations as implying facial invalidity for all other locations.

Finally, in order for Plaintiffs to demonstrate facial invalidity, they "would need to show that 'no set of circumstances exists under which the [statute] would be valid, *i.e.,* that the law is unconstitutional in all of its applications,' <u>*or at least that it lacks a 'plainly legitimate sweep.'*</u>" *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (emphasis added). Plaintiffs submit that one or both of these showings have been made for each of the challenged provisions.

## III.   Plaintiffs Demonstrated a Substantial Likelihood of Success on the Merits

## A. The CCIA's Good Moral Character Requirement Is Patently Unconstitutional.

### 1.   Plaintiffs Have Established a Presumption of Constitutional Protection.

Defendants' claim that "good moral character" is somehow included in the "Second Amendment's plain text," conflating the concept with the phrase "law-abiding" found in *Bruen* (at 2126), which is nothing more than shorthand for referring to a person who is part of "the people" not prohibited by virtue of a historically supported rights deprivation.[24]   Defendants believe the CCIA is conclusively constitutional because "persons without good moral character … are not part of 'the people'…."[25] Opp. 16. True, *Heller* explains that the right to arms might not extend to

_____

[24] Notably absent from Defendants' brief is the textual analysis from *Bruen*, wherein the phrase "the people" "unambiguously refers to all members of the political community…." *Heller* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

[25] Defendants' claim ignores several problems, the first being the CCIA's burden shifting to the applicant to prove that he *is* of "good moral character" based on *subjective* criteria instead of the burden being on the government to show that an applicant is *not* entitled to a permit based on *objective* factors. As this Court explained, GMC vests extreme discretion in a licensing official.

felons or the mentally infirm (at 626), but that provides no support to remove an entirely undefined class of those whom licensing officials classify as unfit to possess firearms by branding with a "moral character" scarlet letter.  Nor, as Defendants claim, does *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) help their case, as that decision applied the very two step test and intermediate scrutiny standard that *Bruen* rejected.[26]  *Id.* at 127-28 (looking at how "onerous" the burden was on "core" rights).  The CCIA's "good moral character" subjective prohibitor is thus in addition to, not in furtherance of, the Second Amendment's protection of rights of "the people."  Thus, Defendants must show a historical trend of disarming a nebulous class of persons the ruling class does not trust with arms.  They cannot.

### 2. "Good Moral Character" Is a Modern-Day Extreme Outlier.

Defendants repeat their claim from *Antonyuk I* that *Bruen* somehow endorsed or approved the statutes of the few outlier states which contain good moral character ("GMC") type requirements.  *See* Pl. Reply in *Antonyuk I* at 10.  On the contrary, *Bruen* ruled on the laws of only one state (New York) and did so by contrasting its extreme nature with the more permissive regimes of other states.  That in no way amounts to "affirm[ation]" or a "designat[ion]" of "permissibil[ity]" of those other states.  Opp. 17-18.  On the contrary, the Court simply repudiated

---

Defendants' argument assumes that *any* test which is alleged to be "designed to ensure … that those bearing arms" are law abiding is therefore constitutional.  Opp. 17.  This illogical claim would justify a polygraph test, a urine sample (Nassau County now requires under the CCIA) (https://www.scribd.com/document/601633329/Nassau-Urine-Sample), or perhaps searches of one's cellular phone (emails and texts) and home (to uncover evidence of criminal activity).

[26] Defendants claim that "good moral character" "remains good law" under *Libertarian Party*. However, *Sibley v. Watches*, No. 21-1986-cv, 2022 U.S. App. LEXIS 19969, at *2 (2d Cir. July 20, 2022) remanded "good moral character" to the district court "to consider in the first instance the impact, if any, of *Bruen* on Sibley's claims…."  Defendant also claims that *Libertarian Party* was based on "'the first step of the [*Heller*] analysis'" — which Defendant believes was left unchanged by *Bruen*.  Opp. 7, 22, 25.  Yet the *Bruen* Court specifically pointed to the *Libertarian Party* decision as having applied the two-step test that the Court rejected.  *Id.* at 2126 n.4.

discretionary licensing criteria in no uncertain terms. *Bruen* at 2123–24, 2138 n.9 (rejecting "suitability," obviously the same thing as "good moral character," contrasting it with the "'narrow, objective, and definite standards'" of shall-issue states). For the Court to have, as Defendants claim, painted with such broad strokes would have meant dispensing with the case-specific textual analysis and historical survey the Court required. *See id.* at 2129–30.

Defendants continue to argue that New York's GMC requirement is the same as other states (Opp. 18-18) but, as this Court has explained, those statutes "compel[]" licensure *unless* a measure of dangerousness is proved "objective[ly]." TRO 20. But even such a regime is suspect, permitting the government to declare someone outside the class of "the people" without ever committing a disqualifying act.[27] No other constitutional right operates in this way. Opp. 20-21.

### 3. Defendants' Historical Analogues Are Not Remotely Similar to the CCIA.

Defendants fail to identify a single historical illustration before the late 1800s requiring a person to demonstrate GMC to a licensing official before being granted a permit to carry a firearm. *See Antonyuk I* at *78. Thus, Defendants address a different question entirely – whether governments can disarm "people who pose a danger to themselves or others." Opp. 21. First, Defendants' reference to discriminatory colonial laws against indigenous people and Catholics (showing a history of governments to disarm their political opponents, a concept foreign to a right that belongs to "the people") fails to advance the CCIA's "good moral character" requirement. The

---

[27]Several of the states that Defendants cited for the proposition that "good moral character" is acceptable—Georgia, Indiana, Missouri, Montana, and Utah—are in fact "constitutional carry." Others (VA, PA) generally allow open carry of firearms without licensing, imposing restrictions only on concealed carry. Defendants' remaining examples are either "shall issue" jurisdictions that do not "requir[e] the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'" or "operate like 'shall issue' jurisdictions" despite dormant discretionary statutory criteria. *Id.* at 2138 n.9, 2123 n.1. When *Bruen* discussed (but did not approve) of certain states like Connecticut, it explained that they (unlike New York) are *discretionary in name only* and "appear to operate like 'shall issue' jurisdictions." *Id.* at 2123 n.1.

purpose of these early laws was to categorically bar groups of people from possession and carry of arms based on race or religion.  In contrast, the CCIA applies to applicants of all races and religions equally.  *Antonyuk I* at 78.  Based on Defendants' analogues, the CCIA would be lawful only if it, too, created sweeping race-, class-, and religion-based prohibitions which everyone agrees would be unconstitutional for other reasons.  Second, Defendants' Revolutionary-era *wartime* loyalty oaths were forced upon the competing side during or shortly after a conflict, have no bearing on the domestic carry of arms for self-defense during peacetime. *See id.* at 2133 (cautioning that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted'").  Indeed, such oaths are patently unconstitutional. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943); *Speiser v. Randall*, 357 U.S. 513 (1958).  Moreover, refusal to swear these oaths resulted in loss of all civil rights, not just the right to arms, unlike the CCIA.  *See* Defs.' Ex. 8, at 4. Third, Defendants refer to "proposed amendments raised in the state conventions" which contained dangerousness standards.  Opp. 23.  But Defendants do not allege any were ever accepted by the people,[28] demanding the negative inference that the public understanding of the right did not include these failed proposals.[29] Defendants rely heavily on then-Judge Barrett for her dissent in *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) for the proposition that "legislatures had disqualified categories of people from the right to bear arms

---

[28] Rather, "the traditions of the American people . . . demand[] our unqualified deference," *Bruen*, 142 S. Ct. at 2131, and "[c]onstitutional rights are enshrined with the scope they were understood to have when the people *adopted* them." *Heller*, 554 U.S. at 634–35 (emphasis added).

[29] Defendants cite to a concurrence *Binderup v. AG of United States*, 836 F.3d 336 (3d Cir. 2016) for the proposition that "common law right to keep and bear arms did not extend to those who were likely to commit violent offenses."  Opp. 20.  But in *Binderup*, the Third Circuit held that both of those plaintiffs, despite their criminal offenses, had "rebutted the presumption that they lack Second Amendment rights by distinguishing their crimes of conviction from those that historically led to exclusion from Second Amendment protections."  *Id.* at 356-57.

'when they judged that doing so was necessary to protect the public safety.'"   Opp. 20.
Remarkably, Defendants omit Judge Barrett's next points – first, "that power extends only to
people who are dangerous … [f]ounding-era legislatures did not strip felons of the right to bear
arms simply because of their status as felons," and second, "[n]or have the parties introduced any
evidence the founding-era legislatures imposed virtue-based restrictions on the right."  *Kanter* at
451.  Judge Barrett's statements thus undermine Defendants' position here.

Defendants' references to *organized* militia mustering statutes (military discipline for the
standing military force, such as for being drunk or disobeying orders) bear no relevant similarity
to the CCIA. It is well-settled "that the Second Amendment right to bear arms [i]s an individual
right *unconnected* to militia service." *Id.* at 611 (emphasis added); *see also* at 584 ("carrying of
weapons *outside* of an organized militia").   Defendants' historical deficiencies continue into the
Reconstruction period, where they cite to a smattering of cities that began imposing discretionary
criteria—by Defendants' own admission—were "between 1881 and 1910." Opp. 25, 30. Although
*Bruen* left as an open question whether the 1868 time period (14th Amendment) is even relevant
(*id.* at 2137), these later statutes from a handful of cities have no relevance here.[30]   Indeed,
Defendants' reference to the "early 20th century" would legitimize the Sullivan Act.  Opp. 25.[31]

Finally, Defendants rely on a series of decisions finding that governments historically
disarmed persons such as "felons" (*Harperm*, *Siddoway*), "drug abusers" (*Daniels*, *Seiwert*), and
MCDV convictions (relevantly similar to felons) (*Jackson*).  Opp. 26.  From this, Defendants
deduce a broad general authority for New York to disarm any groups of persons who are believed

---

[30] Defendants' reference to 14th century sources is equally irrelevant here.  Opp. 24 n.7

[31] Indeed, "to the extent later history contradicts what the text says, the text controls. . . .
'[P]ostratification adoption or acceptance of laws that are inconsistent with the original meaning
of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137.

not to possess good moral character. On the contrary, the CCIA's "good moral character" requirement does not limit its analysis to such "narrow, objective, and definite standards," or prior convictions (for actual crimes) that can be found in a "background check…." *Id.* at 2138 n.9.[32]

### 4. *Bruen* Abrogated Prior Findings as to GMC to the Extent They Might Apply.

Any inference that the current "good moral character" requirement may be constitutionally permissible under prior precedent has been abrogated by the Supreme Court's explicit rejection of "suitability" requirements in *Bruen*. This issue is not "controlled by" *Libertarian Party* (*see* Sec III.A.1, *supra*), as Defendant claims. Moreover, the Second Circuit seems to disagree with Defendants. *See Sibley v. Watches*, No. 21-1986-cv, 2022 U.S. App. LEXIS 19969, at *2 (2d Cir. July 20, 2022). Defendants appear to argue that the CCIA's GMC requirement is somehow objective, referencing cases discussing "health and safety," but simultaneously argue that even "'flexible' standards granting 'considerable discretion' to public officials can pass constitutional muster." Opp. 27-28. Of course, any attempt to pound these round pegs into the CCIA's square hole is belied by *Bruen*, which explicitly rejected "open-ended discretion." Indeed, "concerns about health and safety" are *irrelevant* in the Second Amendment context. *Bruen* at 2126.

Finally, Defendants misstate *Bruen*'s first footnote. *See* Opp. 28 (claiming that "some 'shall-issue' states 'have discretionary criteria,' but are permissible because they do not require 'demonstration of a proper showing of need'"). But this is a logical fallacy – absence of one prohibited criterion does not make a statute therefore constitutional in all other ways. On the contrary, again, *Bruen* rejected "suitability" as a licensing standard – clearly the same thing as the

---

[32] Defendants opine that the GMC standard "can be applied constitutionally" *if* it is used to disarm a felon or drug user. Opp. 26. That is a *non sequitur*. The question is not *who* is denied a license, but *how* the license is denied. A warrantless search of a person's home as a requirement of licensure might turn up a child pornographer who could be denied a license, but that does not make such a requirement constitutional.

CCIA's GMC requirement.  Nor did *Bruen* contrast New York with other state' laws merely based on their lack of proper cause, but rather because they contain "contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than . . . the 'appraisal of facts, the exercise of judgment, and the formation of an opinion….'" *Bruen* at 2138 n.9 (citation omitted).

**5. New York's "Good Moral Character" Requirement Cannot Be Complied with Because It Lacks Any Exemption for Self-Defense.**

The Court has already addressed New York's impossible-to-comply-with GMC requirement because it leaves out "self-defense," since using a firearm in self-defense may in fact "endanger" an attacker.  *See Antonyuk* at *72.  All-but-admitting that the CCIA is unconstitutional as written, Defendants offer a different "interpretation," citing to three states whose laws they claim similarly lack an "express carve-out" for self-defense.  Opp. 28.  On the contrary, Montana's statute provides that the sheriff "may deny" an applicant if he "otherwise may be a *threat to the peace and good order* of the community."  Mont. Code Ann. § 45-8-321(2).  Likewise, 18 Pa. Cons. Stat. § 6109(e)(1)(i) permits denial if an applicant "would be likely to act in a manner *dangerous to public safety*."  These are very different standards than the CCIA's "endanger oneself or others."  Indeed, using a firearm to stop a carjacker does not threaten but rather *promotes* "peace and good order," and is not "dangerous" to but rather *beneficial* to "public safety."

**B. The CCIA's Remaining Licensing Requirements Are Similarly Unconstitutional.**

**1. New York's Interview Requirement is an Affront to the Constitution**

First, Defendants ask the Court to return to pre-*Bruen* interest balancing, claiming that Plaintiffs must show how the CCIA "*unduly* burdens" the bearing of arms.  Opp. 29 (emphasis added).  On the contrary, Plaintiffs wish to "bear arms," and the CCIA conditions the exercise of that right which "shall not be infringed" on the sitting for an "interview" with a government official.  That is more than enough to shift the burden to Defendants to prove a historical tradition

for such a requirement.  Second, Defendants cite (as they repeatedly do) to Justice Kavanaugh's *concurrence* in *Bruen*, arguing that his limited statement about objective hurdles such as fingerprinting and training somehow generally permits the CCIA's subjective interview process. Opp. 29.  Third, Defendants again reference Colonial-era loyalty oaths and militia statutes (Opp. 30), which have already been explained to be irrelevant (Sec II.A.3).  *See also Bruen* at 2132–33; *Heller*, at 605.  Fourth, Defendants' reference to "20 municipalities … between 1881 and 1910" (Opp. 30) are far too few (a tiny area of geography and population) and far too removed from 1791 (and even 1868) to be relevant. *See Bruen* at 2137, 2154.  Finally, Defendants argue that an interview is not burdensome (Opp. 31) and could be challenged on an as applied basis.  But that is not how the *Bruen* analysis works – a historical justification is required regardless of whether an unconstitutional requirement is *further* misused by licensing officials.

### 2.  The CCIA's Character Reference Requirement Is Unconstitutional.

In support of the CCIA's character reference requirements, Defendants rely on the same historical sources that have been discussed above, namely (i) discriminatory statutes disarming American Indians and Catholics, (ii) loyalty oaths, and (iii) militia statutes.  Opp. 31-32.  But even if these were relevant analogues, they are inapposite, and do not support a requirement that others *vouch for* an applicant's good character (*cf.* Virginia statute disarming people who are "know[n]" to be Catholics, and 1662 act disarming people "thought" to be dangerous).  Each of these involved notice from third parties that a person should be *disarmed*.  None required a person get others to provide *affirmation* of his character in order to be permitted to be *armed*.  Notably, Plaintiffs identified historical analogues in their briefing in *Antonyuk I*, however Defendants choose not to rely on these historical sources, namely (i) *State ex rel. Russo v. Parker*, 57 Fla. 170 (Fl. 1909), rejecting *affidavits* in support of a carry license, attesting to an Italian immigrant's good moral

16

character; (ii) a 1824 South Carolina application to permit a slave to travel outside the county based on the *attestation* of his owner that he "is a man of good moral character;" (iii) the 1853 auction for a slave girl complete with a paper *certifying* that she "has a sweet temper" and "good moral character;" and (iv) the 1829 sale of a slave with *certifications* that "he has good moral character and is not in the habit of running away." Pl. Reply in *Antonyuk I*, ECF #40, at 16-25.

In its October 6 opinion, the Court "acknowledge[ed] the apparent dearth of historical analogues requiring a responsible, law-abiding citizen to provide character references in order to be permitted to carry a gun." TRO 25. Moreover, the Court recognized the lack of "historical analogues requiring a responsible, law-abiding citizen to even *apply* to be able to carry a gun." *Id*. Indeed, the Second Amendment says "bear arms" without qualification, and there were no "carry permits" at the time of the founding (or at any time prior to the late 19th and early 20th centuries). To be sure, this case does not involve a challenge to permitting, but Plaintiffs submit that this lack of any historical pedigree means that the CCIA's character reference requirement must be struck. Defendants' claim that character references are "necessary to verify the information" in an application. But this conflicts with Justice Kavanaugh's concurrence in *Bruen*. *Id.* at 2162 (Kavanaugh, J., concurring). In order to find the answers to *objective* questions about eligibility, New York can rely on a person's fingerprints, background checks either through its State Police or through the FBI's NICS system, mental health record checks, or training certificate. None of these verifications requires the government to talk to a person's family, friends, and associates.[33]

### 3.  The CCIA's Household Occupant List Requirement Is Unconstitutional.

---

[33] Defendants footnote that "nothing in the CCIA requires that the four character references be New York residents." Opp. 32 n.9. On its face, the application seems to support New York's assertion. However, in Onondaga County, where Plaintiff Sloane would be applying (but cannot for another year), it requires the references to be 21 years old, "residents of Onondaga County and cannot be family members or reside in the same household". *See* https://bit.ly/3TrpIgt.

Despite Defendants' contention that a household occupancy requirement imposes no "burden" on the Second Amendment, Plaintiffs easily satisfy *Bruen* step one, because they cannot "bear arms" until they provide this information.  It is irrelevant if the information is available to the state via other means.  Opp. 33.  When providing "historical justification," Defendants claim this requirement "is analogous to the historical practices listed above" without identifying any specifically (it is not up to the Court to do so).  *Id*.  Defendants claim that the requirement can be justified based on "considering an individual's associates when deciding whether that person could go armed," apparently believing that a person can be denied constitutional rights based on the character, reputation, or actions *of others*.  *See Matter of Biganini v. Gallagher*, 293 A.D.2d 603, 603 (App. Div. 2nd Dept. 2002) (denying carry license to member of motorcycle gang where another member had convictions); *but see Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957) (state may not deny bar license to suspected member of communist group).

### 4.  The CCIA's Onerous Training Requirement Is Unconstitutional.

To support the CCIA's training requirement, Defendant relies exclusively on organized militia statutes.  Of course, *Heller* made clear that that the right to keep and bear arms is *unconnected* with service in a militia. *Id.* at 570.  Indeed, even if these statutes were helpful, failure to muster typically resulted in a fine (*see* Virginia's 1777 "Act for regulating and disciplining the militia;" J.R. Hummel, "The American Militia and the Origin of Conscription: A Reassessment," Journal of Libertarian Studies, Vol. 15 No. 4 (Fall 2001) ("[b]ecause militia service could be avoided by paying a fine or hiring a substitute, some economic historians have treated compulsory militia duty as a mere tax-in-kind…").  The CCIA, however, enacts a far more serious penalty, depriving Sloane of his Second Amendment rights entirely until he completes the required training. There is no historical analogue for *that*.

Moreover, the CCIA's text creates various structural problems with training. First, a person may not even possess a handgun in New York without a license, but may not obtain a license without "live fire," necessitating possession of a handgun. This appears to place would-be applicants at the mercy of trainers, ranges, or others to loan them a firearm. Second, and more fundamentally, the CCIA's training requirement makes applicants beholden to private parties to receive the training required to exercise constitutional rights (as opposed to militia statutes where the government provided the training).[34] Third, Defendants assert that firearms are banned anywhere people "assemble for educational … purposes." Opp. 52; CCIA subsection 2(m). Presumably this would include education with respect to how to use a firearm at the "live fire" required by the CCIA, meaning the CCIA bans completion of its own training requirement.[35]

### 5. The CCIA's Social Media List Requirement Is Unconstitutional.

Defendants' defense of the CCIA's social media requirement consists of a series of straw men. First, Defendants focus (again) on one potential *result* that could obtain ("specific online threats or indicators of violence") to paper over the *violation* (the demand for a "list"). Opp. 38. But again, the illegal search of a trunk does not become permissible simply because drugs are found. Second, Defendants focus on (and provide purported analogues for) the legality of the

---

[34] Although objecting in *Antonyuk I* to Plaintiffs' $400 estimate for training as "entirely speculative," Defendants now pick the lowest end of the spectrum ($375, Opp. at 35) whereas Plaintiffs chronicled a range "between $375 and $795." Mem. at 31 (with the average Plaintiffs found being about $550). By any estimation, as much as $800 for training and ammunition, plus the fees associated with licensure, is an exorbitant government-imposed cost to exercise constitutional rights (although Defendants argue they are not the ones imposing the cost, Opp. 36).

[35] Finally, the CCIA is an extreme outlier among training. Defendants offer California's "up to a maximum of 24 hours" (Cal. Penal Code § 26165) (Opp. 35 n.10), but the standard practice in California appears to be about 8-16 hours. *See* https://lasd.org/ccw/#ccw_training. Moreover, Alaska is a constitutional carry state where no permit is required. The CCIA thus represents the most extreme training requirement in the country, and violates *Bruen's* footnote 9 ("permitting scheme … put toward abusive ends" by imposing "exorbitant fees").

review process (opining that it is permissible for licensing officials to review a person's public statements) as justification for demanding that the person *turn over* the information to be reviewed. Opp. 39.  Contrary to Defendants' claims (Opp. 37, arguing Plaintiffs' challenge requires officials to "ignore[]" criminal behavior, Plaintiffs have not claimed that government officials are not free to spend their day reading Twitter posts, but only that the government may not require an applicant to provide his accounts (including his user names or "pseudonyms" (TRO 26) which will identify anonymous accounts the government would never otherwise be able to link to him).[36]

### 6.   The CCIA's "Additional Information" Catchall Requirement Is Unconstitutional.

As this Court noted, there are no "historical analogues supporting this requirement…." TRO 27.  This is likely because there are no historical analogues for permitting itself.  Nor do Defendants offer any historical sources in their response.  Opp. 39-40.  Rather, Defendants claim that Plaintiffs must wait and make an as-applied challenge when the requirement is misused.  Opp. 40.  In its prior order, the Court opined that licensing officials could ask for "very minor follow-up information … such as identifying information."  TRO 27.  But that would merely mean that a person had submitted an incomplete application (such as failing to list all prior addresses). Plaintiffs submit that this is not what the CCIA's catchall is designed to obtain.  As Defendants have admitted, each of the challenged requirements (social media, interview, cohabitants, character references, and such other information) goes towards determining whether a person has good moral character.  *See* Def. Opp. in *Antonyuk I*, ECF 33-34 ("any applicant seeking a license to carry a firearm must meet in person … and provide certain information … [t]hese requirements …

---

[36]  Of course, even then, an application cannot be denied based on some subjective belief about a person's "good moral character," based on pictures of guns or dead frogs.  Not only was this the very type of invasion into privacy that the founders feared, and which led to the inclusion of the Fourth Amendment, but also this "minority report" style attempt at predicting future violence (rather than prosecuting actual crimes) leads to a very real potential of abuse.

go to the heart of his fitness to possess a firearm."). Indeed, the GMC purpose of the CCIA's catchall is demonstrated by Nassau County's recent demand of a urine sample prior to licensure.

**C. Defendants Fail to Establish Historical Analogs for the CCIA's "Sensitive Places."[37]**

    **1.   New York Fails to Evade its Burden to Establish Relevant Historical Analogues.**

    Defendants claim New York was merely "[f]ollowing *Bruen*" when CCIA codified "a roster of 'sensitive locations'…." Opp. 40. Yet the CCIA's list is far more expansive than even before *Bruen*, which would wrongly indicate that *Bruen* loosened the definition of sensitive locations where New York could ban possession. To be sure, *Bruen* explained that while *Heller* had recognized "schools and government buildings" as potential sensitive places, the historical record suggested that "legislative assemblies, polling places, and courthouses" might be added to that list. *Bruen* at 2133. But *Bruen* in no way provided the overarching broad protection Defendants seek and, in fact, made clear that there would be few (if any) sensitive places in addition to those the Court had already (prospectively) identified.

    Next, Defendants shift their burden to Plaintiffs to justify the CCIA's restrictions, arguing that Plaintiffs must show something more than that "the regulated conduct falls under the phrase 'keep and bear….'" Opp. 41. Defendants erroneously claim that the burden is on the Plaintiffs to rebut (presumably with historical analogues) the "presumptive *lawfulness* of sensitive places." Opp. 41 (citing pre-*Bruen* cases). Defendants' argument is novel in its approach to skirt *Bruen*, but it is meritless. First, it would be impossible to provide evidence of *a lack of* historical statutory

---

[37] Defendants discuss many locations not challenged in this litigation. While not conceding the constitutionality of any part of the CCIA, Plaintiffs do not address Defendants' arguments to places they have not challenged. Defendants repeatedly malign that "Plaintiffs ask the Court to strike down *each and every one*" of the CCIA's sensitive locations" (Opp. 42) and criticize the "extraordinary breadth of the Plaintiffs' challenge to all protected places" (Opp. 57), but provide no citation to where Plaintiffs actually make this claim or seek that relief. Rather, Plaintiffs' pleadings are explicitly clear and precise as to which specific provisions they are challenging.

prohibitions on certain forms of carry.  But more fundamentally, Defendants' merely asserting that a place is a "sensitive place" does not make it so.  Indeed, New York has declared nearly the entire state to be either sensitive or restricted, something *Bruen* explicitly prohibited.  *Bruen* at 2134.  Under *Bruen*, the burden is *always* squarely on the government to show a historical analog, not on a plaintiff to rebut a presumption.  *See Bruen* at 2133-34.

New York boldly claims that under *Bruen* (at 2127), the "first step entails an analysis of 'the Second Amendment's text, as informed by history.'"  Opp. 41.  From this, Defendants posit that it is Plaintiffs who must show the history.  But New York grossly misreads Justice Thomas.  The "first step" that he was describing there was the first step of the *two-step test* that was being rejected — not the framework to be used in the future.  New York omits what Justice Thomas then stated: "**the government must affirmatively prove** that its firearms regulation is part of the **historical tradition**…." *Bruen* at 2127 (emphasis added).  Defendants object to this burden, claiming that "there is no cause to assess individually the constitutionality of every place that may be protected."  Opp. 44.  But that is precisely what *Bruen* requires.  New York's panicked arguments about a reign of mayhem befalling a state if it honored the Second Amendment must be viewed in the context of the fact that, prior to the effective date of CCIA, New York banned carrying in only a handful of the sensitive places.[38]  New York's fear of a raft of shootings in sensitive places comes not from criminals who do not obey gun laws, and who *always* pose a

---

[38]  New York statutes banning licensed persons from carrying are not codified in any one location, but it appears that, prior to CCIA, New York banned licensed persons from carrying at only a handful of locations, primarily schools and colleges (N.Y. Penal Law §§ 265.01-a), and residential childcare facilities (18 CRR-NY 441.19(f)).  Other restrictions related mostly to campgrounds and parks: state parks, except for allowed hunting (9 CRR-NY 375.1); public campgrounds except during hunting seasons (6 CRR-NY 190.7(a)(3)); Lake George Battlefield Park (6 CRR-NY 190.7(c)(1)); Zoar Valley Multiple-Use Area, except during hunting seasons (6 CRR-NY 190.25); and specified trails on the Adirondack Mountain Reserve (6 CRR-NY 190.25). National Park Service rules banned carrying on ferries to Ellis Island and Liberty Island.

threat.  Rather, New York expands its list of sensitive places because it fears that under *Bruen's* liberalized licensing standards, that law-abiding, licensed New Yorkers pose a threat.  *See* Opp. 94.

### 2.   The Challenged "Sensitive Locations" Are Without Historical Analogue.

Defendants demean Plaintiffs' Second Amendment rights as "negligible."   Opp. 42. Defendants claim that all of Plaintiffs' challenges to specific laws fail generally because "our forebears understood that there were a wide variety of locations in which carrying weapons was inappropriate and prohibited..." *Id*.  But Defendants' referenced laws are generally unhelpful. *All* came into effect after the ratification of the 14th Amendment. *See generally* Opp. 42-43. *English v. State*, 35 Tex. 473 (1871) was called an "outlier" and "provide[s] little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen* at 2153.  Defendants offer *Hill v. State*, 53 Ga. 472 (1874).  Opp. 44.  Of course, the Ninth Circuit discounted both *Hill* and *English*, because they followed *State v. Buzzard, 4 Ark. 18 (1842)* which held that "the Second Amendment served as no bar to the Arkansas legislature's authority to restrict *any* carrying of firearms..." *See Young v. Hawaii*, 896 F.3d 1044, 1057 (9th Cir. 2018) (overruled by *Young v. Hawaii, 992 F.3d 765, 773 (CA9 2021) (en banc) (reversed and remanded by Young v. Hawaii*, 142 S. Ct. 2895 (2022)).  The *Young* panel explained that, "with *Heller* on the books, cases in *Buzzard*'s flock furnish us with little instructive value." *Id*.  Finally, Defendants cite to *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318 (11th Cir. 2015), where the Eleventh Circuit explained "we have not had the opportunity for a thorough historical survey." *Id*. at 1327. Importantly – since Defendants rely almost exclusively on post-Civil War authorities – when determining the correct period of history to examine, Justice Barrett cautioned that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-

late 19th century to establish the original meaning of the Bill of Rights," and recognized that the Supreme Court was "careful to caution 'against giving postenactment history more weight than it can rightly bear.'" *Bruen* at 2163 (Barrett, J., concurring). Because "when it comes to interpreting the Constitution, not all history is created equal." *Bruen* at 2136.

**a. Government Property**. Although Plaintiffs have not contested New York's proprietor rights with respect to certain locations such as courthouses, that principle cannot be expanded to ban firearms on every square inch of land owned by the state. Earlier this month the Tennessee Court of Appeals ruled that tenants in public housing (government-owned housing) did not forfeit their Second Amendment rights. C*olumbia Hous. & Redevelopment Corp. v. Braden*, No. M2021-00329-COA-R3-CV, 2022 Tenn. App. LEXIS 395, *10 (Ct. App. Oct. 13, 2022). *See also Morris v. United States Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1125 (D. Idaho 2014) ("The regulation banning the use of handguns on Corps' property by law-abiding citizens for self-defense purposes violates the Second Amendment…. The Court recognizes that this result conflicts with *GeorgiaCarry.Org, Inc*…."). Rather, whether the government has the authority to regulate constitutional activity involves the government's relationship with the property, as explained in Plaintiffs' PI Memorandum. Moreover, *Bruen* already provides the limits of the sorts of "government property" where firearms can be banned.

**b. Places Critical to Other Constitutional Rights.** Defendants claim that "history demonstrates that the right to bear arms may be restricted in places where it would conflict with other fundamental Constitutional rights." Opp. 46. (Heavy reliance on *Hill v. State*, 53 Ga. 472 (1874), which was heavily criticized by the panel opinion in *Young v. Hawaii*). Yet *Bruen* added only to *Heller* that polling places and legislative assemblies can be off limits to carry (*Id.* at 2133), neither of which is challenged here.

     **iii. Free Exercise of Religion.** Defendants base their claim to regulate places of worship on a historical analogue of seven state statutes (GA, VA, TX, MO, AZ, OK, TN) from 1870 to 1890 (out of 37 states in 1870 and 44 in 1890) and four cases between 1871 and 1878. Opp. 48-49. Of course, *Bruen* explained that these "late-19th century, state courts … that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*." *Id.* at 2155. Moreover, *Bruen* was explicitly critical of some of these decisions. *Id*. at 2153 (for example, calling the *English* reasoning an "outlier"). Additionally, *all* these statutes and cases were after ratification of the 14th Amendment (some significantly so). Two of the states were then territories (AZ, OK), which are not helpful. *Bruen* at 2155. The Virginia statute banned firearms not only at churches but also "at any place other than his own premises" (TRO 33 n.25), evidencing a fundamental misunderstanding of the Second Amendment. Moreover, as late as 1738, Virginia *required* carrying firearms in churches. C. Cramer, *Lock, Stock, and Barrel: The Origins of American Gun Culture* (2018) at 2. Same for Georgia (1770). *Id*. at 15. The same for South Carolina (1740). 7 David J. McCord, Statutes at Large of South Carolina 417-19 (Columbia, S.C.: A.S. Johnston, 1840) (enacted 1740, re-enacted 1743.[39] At a minimum, these earlier statutes should cancel out later statutes from the same states. Finally, as the Court has explained, many state statutes had broad exceptions. TRO 33.

     Notably, Defendants point to *no* statute banning carry in a church or place of worship from the key periods between the time of ratification of the 2nd Amendment through ratification of the 14th. Indeed, Revolutionary era churches provided a significant source of support for armed resistance against the Crown.[40] Defendants also failed to provide any analogues prior to

---

[39] https://bit.ly/3eVrdEG.
[40] https://www.winchestersun.com/2022/01/05/who-was-the-black-robed-regiment/.

ratification, but there are many from 1619 through 1642, requiring all comers to church to be armed. *See Under Fire: the Right to Keep and Bear Arms: Article: Take Your Guns to Church: the Second Amendment and Church Autonomy*, 8 LIBERTY U. L. REV. 653, 697; *see also* Johnson, Nicholas, et al., *Firearms Law And The Second Amendment: Regulation, Rights And Policy* (3d ed. 2021) at 189-91 (referencing more than a dozen such laws from 1619 through 1770).

Likewise, *Heller* observed that "[m]any colonial statutes required individual arms bearing for public-safety reasons – such as the 1770 Georgia law that 'for the security and *defence of this province* from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.'" *Heller* at 601. It would be a strange reading of *Heller* to argue that firearms can be banned in places of worship when *Heller* specifically acknowledged that firearms were ordered to be carried in churches, and thereafter only stated that firearms could be banned in "schools and government buildings." *Id.* at 626.

Due to the far greater number of colonial and founding era statutes *requiring* carrying arms to church, the few remaining state statutes (all after 1868, *see* TRO 34, during a time where *Bruen* explained that state courts misunderstood the Second Amendment) *at best* create some a divergence of historical sources, which falls far short of establishing a definitive trend or practice of banning guns in church. This Court should strike down the CCIA's ban on firearms in churches in its entirety. Of course, churches would, as always, remain entirely free to decide whether, and under what circumstances, visitors could carry firearms on the premises.[41]

---

[41] Although the Court in its TRO opinion explained that no reasonable person could conclude that the CCIA applies to Pastor Mann in his home at the church, that prohibition appears to be evident from the face of the CCIA, and thus this Court should declare that those whose homes are on church premises may continue to possess firearms. TRO at 35 n.32 (finding a closer question for church meetings in the home, which may apply to any home where people worship). Because of the plainly invalid "sweep" of the CCIA's church restriction, it must be struck. *See Hardaway v. Nigrelli*, 22-CV-771 (W.D.N.Y.), ECF #35 at 13 n.7.

Just two days ago, a federal district court in the Western District of New York struck down the CCIA's restriction on places of worship, finding that New York's reliance on "1870-1890 enactments by four states (Texas, Georgia, Missouri, and Virginia) and the territories of Arizona and Oklahoma" "does not carry the State's burden[]". *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 U.S. Dist. LEXIS 191998 at *31 (W.D.N.Y. Oct. 20, 2022). That court also held that "New York's restriction finds no analog in any recognized 'sensitive place.'" *Id*. at *33. That court held that there was no "American tradition supporting" the ban on carry in places of worship. *Id*. In the end, that court found that the State's analogues "are of unknown duration, and the State has not met is [sic] burden to show *endurance over time*. As a result, the Court is left with a handful of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of population. And they were passed nearly a century after the Second Amendment's ratification in 1791." *Id*. at *38-39. This Court should reach the same conclusion here.

**v. The Right to Peaceably Assemble.** Defendants claim they can restrict firearms from essentially any place where people gather. Opp. 50. In support, they cite to six statutes — all from the post-Civil War period – including two from territories (AZ, OK). Defendants also cite to *Presser v. Illinois*, 116 U.S. 252, 264-65 (1886), which addresses drilling or parading with arms, completely unrelated to the concealed carry at issue in this case. None of the Plaintiffs have alleged they want or intend to drill or parade in military formation. And *Heller*'s citation to *Presser* is not as "reaffirming" as Defendants think: "*Presser* said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations." *Heller* at 621. Moreover, *Presser* and the remaining post-Civil war statutes should be discounted entirely, due to the overwhelming practice of the colonists assembling to protest while armed during the period immediately preceding the Revolutionary War, such as at Lexington

and Concord.  Indeed, this nation is *the result of* armed assembly and protest, and such prohibitory statutes would have been entirely foreign to Americans at the time.  New York obviously does not believe that Americans can be trusted to be armed and displeased with their government at the same time, and still to remain peaceful, respectful, and law-abiding.  But Virginia's recent experiences with its 2020 Lobby Day[42] (where upwards of 50,000 armed American gun owners peaceably converged on the state capitol in Richmond, and even picked up their own trash when they left), and subsequent armed rallies in virtually every county in the state to lobby for Second Amendment Protection Ordinances, demonstrate otherwise.  *See also Stickley v. Winchester*,[43] CL21-206 (Winchester VA Circuit Court, Sep. 27, 2022) at *33-34 (striking down City ban on firearms in parks and "public event[s]" as having no relevant historical analogues).

Moreover, while Defendants' analogues discuss prohibitions in "public assemblies" (*see also* TRO 38), the CCIA sweeps *far more broadly* than that.  As Plaintiffs explained, "any gathering of individuals" is in no way confined to a "public assembly," but would include a private meeting of likeminded individuals "assembled" in the home to watch election results, or a meeting of armed gun owners at a local restaurant to discuss pro-Second Amendment issues.  Because the CCIA lacks a "plainly legitimate sweep," it must be struck.

**c. Public Functions Including Schools.**  Defendants state that firearms may be banned from schools in every form.[44]  Opp. 51.  To be sure, *Bruen* mentioned "schools" as one likely permissible sensitive location.  But Defendants go further and allege that "[n]either the historical statutes [nor] the Supreme Court's jurisprudence limit the ability to protect students from guns to

---

[42] https://www.theguardian.com/us-news/2020/jan/20/virginia-gun-rally-activists-richmond.
[43] https://bit.ly/3VQJBip (DropBox link to opinion).
[44] Defendants do not claim that Plaintiff Mann's church, where he conducts Sunday School and allows others to use it as a homeschool co-op, is *not* prohibited in the statute referencing "schools."

only government-run schools." Opp. 51.  For this support, Defendants produced four post-14[th] Amendment statutes: 1870 Texas; 1878 Mississippi; 1883 Missouri; and 1889 Arizona.  But again, Arizona was then a territory.  Neither Defendants (nor the Court, *see* TRO 36 n.33) have identified any statute circa 1791 that created such a prohibition.  Regardless, Plaintiffs have not broadly challenged a ban on firearms in all schools or even public schools, but rather in privately owned and operated schools and locations such as Pastor Mann's church and its homeschool co-op (seemingly within the CCIA's broad language "any educational institution[]" and "non-public school[]" in 2(m)).  *Even if* a statute could be narrowly written in a way to comport with *Bruen* and the Second Amendment, the CCIA is not such a statute.  Here, the Pastor and parents of the students he teaches (not the New York legislature) should have the authority to decide how to protect the children.  There is *absolutely no historical support* for a ban on firearms in any location that operates as a "school" (such as a private home or a homeschool co-op).

Defendants further assert that firearms can be banned anywhere people "assemble for educational, literary or social purposes" or "scientific" purposes.  Opp. 52.  Defendants do not explain which sections of the CCIA this claim is designed to defend, but this lacks a plainly legitimate sweep, as it would prohibit firearms from being used even in a class to receive the CCIA's required training, to Pastor Mann's church (since religious worship often goes hand-in-hand with "educational" and "social" purposes) or to a family reunion and barbeque in a local park.

**d. Vulnerable People.** Defendants claim broadly that all sorts of areas where "vulnerable populations" gather – not just "children" and schools – may be made off limits for firearms.  Opp. 52-55.  Of course, *Bruen* indicated that it was the nature of the *place* (not the nature of the *people*) which makes a location a sensitive one.  *Id*. at 2133-34 (rejecting banning guns merely because "people congregate," and referring to "sensitive locations," not "sensitive populations").  Indeed,

*Bruen* explained that people are especially entitled to be armed where "confrontation can surely take place outside the home." *Id.* at 2135. By Defendants' logic, New York could ban firearms in homes where parents have more than three children (or children with "physical or developmental disabilities," Opp. 54), or prohibit a battered wife from possessing a firearm in her own home to protect herself from an abusive husband (she is part of a "vulnerable population," after all).

In fact, Defendants egregiously posit that those with "physical … disabilities" and "homeless persons" might not be part of "the people" protected by the Second Amendment. Opp. 54-55 (citing to Thomas Cooley that "the woman" is not part of "the people."). On the contrary, the physically infirm and disabled are often the most in need of the ability to protect themselves. Although couched in terms of protecting the innocent and defenseless, the CCIA is not in any way designed to protect vulnerable populations. *See* Opp. 55 ("the law must be able to protect … vulnerable or marginalized persons ... from having arms used against them…."). Rather, the CCIA declares that *everyone* must be disarmed, including not only those who would defend the vulnerable (such as the proprietor of a domestic violence shelter, or Pastor Mann at his church and home), but also *the vulnerable themselves*. By disarming those in "shelters," and those who have been abused, Defendants perpetuate the vulnerability of the very people they claim to protect. In fact, a concealed handgun may be the only way these individuals can protect themselves, when a parchment barrier restraining order fails.[45] Defendants concede that there are no historical analogues for the CCIA's restrictions disarming the vulnerable (Opp. 53), which makes perfect sense, as the essence of the Second Amendment is the right to armed self-defense, which the CCIA seeks to curtail. *See Heller* at 630.

---

[45] https://en.wikipedia.org/wiki/Murder_of_Carol_Bowne.

**e. Large Groups and Confined Spaces.** Defendants broadly argue that firearms can be prohibited in "private places where people gather in large crowds and confined spaces." Opp. 55. But this is exactly what *Bruen* said was not permissible. *Id*. at 2133 ("places where people typically congregate"). Defendants posit (without evidence) that "it is not possible to safely defend oneself with a gun in a crowded theater or stadium." Opp. 56. But if that were so, then the CCIA would not provide an exception for police carrying their firearms in such locations. Defendants' ridiculous assertion is also belied by numerous examples where self-defense has occurred in such locations, such as the Indiana mall shooter who was stopped by an armed concealed carrier who – in a crowded mall – landed 8 of 10 shots from 40-50 yards away within 15 seconds.[46]

In further support, Defendants cite to five state statutes, including one Virginia statute from 1786, which is based on the Statute of Northampton, and leave out the qualifier "in terror of the county[]." Opp. 55. As *Bruen* teaches, "Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Bruen* at 2139. And again, Oklahoma and Arizona were territories in 1889 and 1890. Defendants' ubiquitous use of the 1870 Texas statute is belied by the 1871 *English* case which, again, was discounted in *Bruen* – meaning the Texas law survived only because it was never subjected to proper Second Amendment analysis.

Lastly, Defendants rely on "post-Heller" cases, including *Masciandaro* (whose reasoning about "large numbers of people" was undone by Congressional enactment (16 U.S.C. § 1a-7b(b)) and repudiated by *Bruen* "where people congregate"), and a Minnesota federal court decision (*Christopher v. Ramsey County*) which applied the two-step test even after *Bruen's* repudiation thereof – the judge perhaps unaware even that *Bruen* had been decided.

---

[46] https://www.usacarry.com/40-yards-elisjsha-dicken-landed-shots-mall-shooter/.

### 3. The "Sensitive Places" Are Not Supported by American History or Tradition.

For almost all of New York's sensitive locations, there are no ratification era analogues. New York claims that "approximate" analogues are sufficient, in light of "cases implicating unprecedented societal concerns or dramatic technological changes." Opp. 57. Yet New York provides no evidence or anything "approximating" "unprecedented societal concerns" with permit holders carrying firearms. There likewise has been no "dramatic technological changes" requiring New York to enact all these sensitive and restricted locations. If New York believes that permit holders are the source of crime in New York, requiring that they be disarmed almost everywhere they go, New York should have presented such evidence.

**a. Libraries, public playgrounds, public parks, and zoos.** As to public parks, a district court in Idaho held that that 36 C.F.R. § 327.13 violated the Second Amendment and rejected the "sensitive place" argument, finding that *Heller* and its progeny "limited the 'sensitive place' analysis to facilities like 'schools and government buildings[]'" not "outdoor parks" like Army Corps recreational areas. *Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1124-25 (D. Idaho 2014). *See also Solomon v. Cook Cty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 695 (N.D. Ill. 2021), which distinguished "zoos, amusement parks, sports arenas, athletic facilities, child care facilities, hospitals, bars, and so on" as not being "places where the state government manages its own affairs, and the sections prohibiting concealed carry in those places, like the forest preserves, are legislative rules, not managerial rules." *Id*. Defendants' statutes provide limited historical value as they either only apply to one specific park (Exs. 57, 58, 60) or are city rules banning firearms in all parks in the city (Ex. 59). *See Stickley* at 33-34 (rejecting ban in public parks and public events). Defendants rely on the same tired statutes of four states and territories (TX, MO, AZ, OK) (Opp. 59), which are unhelpful for the reasons stated above. Defendants further offer

the ordinances of various cities (New York, Philadelphia, Saint Paul, Detroit).  *But see Bruen* at 2156 (rejecting the ordinances of a few cities as being representative of anything).

     **b. Places Children are Present.** Defendants paint a broad brush over these as they "involve caring for children" and can "be protected under the broad tradition of protecting vulnerable populations."  Opp. 60.  Defendants cite to *Miller v. Smith*, No. 18 Civ. 3085, 2022 WL 782735, at \*8-9 (C.D. Ill. Mar. 14, 2022) for the proposition that the "presence of children militates in favor of a given place being sensitive[]."  This pre-*Bruen* case applied the now-rejected two-step test and applied intermediate scrutiny in upholding a ban on firearms in day cares and upholding storage requirements for foster homes.  It also analogized that as a foster family, those parents, as "government contractors" may be required to relinquish constitutional rights (like the First and the Fourth Amendment) as a requirement of being a foster family.  *Id*. at 37-38.  Finally, that Court's analysis conflicts with *Bruen*, opining that firearms can be banned based on the nature of the *people* instead of the nature of the *place*.  Defendants argue that "children do not stop being vulnerable to violence" once they leave school (Opp. 60), but this argument undercuts Defendants' claim, as it would justify banning firearms everywhere (since children are present everywhere, like the home).

     **c. Vulnerable Populations.** Defendants claim that Plaintiffs have not shown any standing to challenge various sections of the CCIA's sensitive locations (Opp. 61) (sections (g), (h), (i), (j), (l)), but Plaintiffs have never claimed otherwise (other than to the extent Plaintiff Leman challenges the general lack of any emergency exception).  To the extent that Plaintiffs' activities are directly implicated (sections (b), (k)), Defendants posit that providing services to the homeless, families, adults, or victims at Pastor Mann's church does not constitute a "shelter."  Opp. 61.  But the CCIA does not define "shelter," and churches have long been seen as "shelters" for those

suffering from addiction, abuse, criminals, and even governments. The Catholic Church sheltered Jews from the Nazis during World War II.[47]  Likewise, Defendants argue that "any place" where Pastor Mann's church provides counseling, addiction, and other services is not a "location providing" health "services," and that Plaintiffs' reading is "strained."  *See* Ex. "8" to Pls.' Compl. at ¶¶ 26, 28, 29; Compl. at ¶¶ 189-91.  On the contrary, it is the scope of the CCIA which is ridiculous, not Plaintiffs' reading thereof.  Moreover, Defendants cannot save the CCIA by offering *post hoc* limiting interpretations (which binds no one).

Defendants then admit "there are no direct analogues" for any of these restrictions, but claim *Bruen* "emphasized the need to relax the historical analysis."  Opp. 62.  To be sure, *Bruen* explained that there may be some restrictions that are "analogous enough to pass constitutional muster."  *Id.* at 2133.  But these are not such restrictions.  Finally, Defendants claim they are permitted to disarm vulnerable populations (Opp. 62), but that is not what the CCIA does.  Rather, its restrictions disarm *places*, not *persons* (for example, the homeless, who are free to possess firearms outside a homeless shelter restricted location).

**d. Public Transportation.** Defendants acknowledge that Plaintiff Terrille intends to take a plane trip to Tennessee.  Opp. 64. And they do not disavow that Plaintiff Terrille will not be able to take a firearm in his checked luggage.  Rather, they claim that "the designation of public transportation and airports as sensitive places must be upheld" because "airports, subways, and buses are all government property."  Opp. 64; *see* Dec. of Terrille, Ex. "9" at ¶ 9; Compl. at ¶¶ 168, 170.  Of course, it is otherwise legal to fly with checked firearms, as long as following TSA regulations.  *See* 49 C.F.R. § 1540.1111(c)(2).  Nor do Defendants dispute that the CCIA's ban on travel conflicts with federal law's safe harbor provision in 18 U.S.C. § 926A.  Defendants offer

---

[47] https://bit.ly/2T19V7Q.

little more than the same arguments and historical sources they already have proffered, which are unhelpful as already discussed. Opp. 65-67 (people congregate, protect children). Indeed, as this Court has explained, quite to the contrary of the CCIA's ban on armed travel being justifiable, the opposite is in fact true: "historical analogues exist … permitting the carrying firearms while traveling…." TRO 37. Finally, Defendants posit that Fourth Amendment exceptions permitting searches at airports also permits the CCIA's ban on travel with firearms in checked baggage. Opp. 67. Defendants do not explain how a traveler bringing a firearm in his checked baggage implicates any of the safety considerations as do airport screening procedures.

    **e. Places that Serve Alcohol.** Defendants' reliance on laws banning intoxicated persons from carrying firearms is irrelevant as, again, Defendants use disarmament of certain *people* to justify disarmament of everyone at a certain *location*. No Plaintiff asks the Court to authorize drunk carry, nor is that what the CCIA targets (under the CCIA, a drunk patron leaving a bar would be permitted to return to his vehicle and re-arm). Defendants assume (without providing any evidence) that, "if someone carries a deadly weapon into a bar or place where cannabis is consumed, it is entirely to be expected that he or she will be carrying that weapon while intoxicated upon leaving." Opp. 68. Of course, every day tens of millions of Americans visit locations that serve alcohol, without consuming a drop (or, if they do, without becoming intoxicated). And for all of its anti-gun history, New York cannot point to one of its own laws banning firearms in restaurants that serve alcohol, indicating that this has never been a problem that has been experienced from law-abiding concealed carry license holders. Of course, the relevant question is *not* whether it is the best *public policy* to allow guns in places where alcohol is served, but whether there are *relevant historical analogues* of such a practice. Defendants have offered none.

**f. Performance and Recreation Locations.** New York defends this prohibition – again – as dealing with places where there are "large groups of people gathered in confined spaces." Opp. 69 (again offering the same unhelpful state statutes as elsewhere). But again, that is not the test under *Bruen* (at 2134), and the CCIA applies not only when there are "large groups of people gathered in confined spaces," but applies to "any place used" — even when there are no groups gathered for that purpose.

**D.  Defendants Fail to Justify the Restricted Locations Statutory Prohibition.**

Defendants attempt to justify one of the most "infringing" provisions of the New York statute — the ban on possession in so-called restricted locations — with a three-part argument: (i) the Second Amendment is not even implicated by the New York ban; (ii) very different state laws somehow establish that New York's new restriction is "Deeply Rooted in Anglo-American Property Law and Tradition;" and (iii) a single poll indicates support for this particular restriction on gun rights. Addressing the third point first (Opp. 72), as *Heller* teaches, the scope of constitutional rights is not determined by an opinion poll. *See id.* at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them….").

Defendants' argument that the Second Amendment is not even implicated is reminiscent of the approach by governments prior to *Bruen*, asserting that firearm bans did not even implicate the Second Amendment, seeking to avoid step two of the two-step test. Similarly, here, New York seeks to be relieved of its burden to establish that there was a deeply rooted tradition at the time the Constitution was adopted. Defendants offer the novel but unpersuasive argument that Plaintiffs must show "a Second Amendment right to carry guns *into another person's home* without their knowledge or consent." Opp. 73. The same argument could be made for *any* location by italicizing the operative language to make it seem extreme (*i.e.*, "*into a church*"). Of course, the Second Amendment's text broadly protects the right to "bear arms" without limitation. That the bearing

36

arms is restricted by the CCIA is all Plaintiffs must demonstrate for the burden to shift to Defendants.[48]  If there is any bearing of arms (such as in certain locations) that is categorically outside the scope of protection guaranteed by the Second Amendment, that is for Defendants to prove.  Indeed, Defendants' argument is expressly foreclosed by *Bruen*.  *Id.* at 2133 (demanding analogues for categories of places off-limits for carry).

The default position that applied until the masses obtained their rights to concealed carry under *Bruen*, was illustrated by the Maryland law cited by Defendants — that to commit an offense, the person had to "hav[e] been once before warned."  Opp. 74.  Thus, the Maryland law provides authority for the longstanding default rule in effect before CCIA — that there was no offense committed until the property owner told the person carrying a gun to leave.[49]  That was the way in which property rights took precedence over the license to carry concealed.  The three statutes cited by Defendants from the latter half of the 19th Century have little weight in view of *Bruen's* caution that "post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"  *Bruen* at 2137 (citing *Heller*).

Defendants rely on essentially the same statutes as previously found unpersuasive by the Court.[50]  They now claim eight antecedent statutes (Opp. 74), but two of those are the same New Jersey law, three clearly were intended to prevent unauthorized *hunting* (Maryland, Pennsylvania,

---

[48] Defendants offer the slender reed that bearing arms "on private property must be subject to one of two default rules...."  Opp. 74.  But the prior default rule (that a property owner can exclude firearms by sign or other notice) did not require affirmative legislation to enact.

[49] Defendants say little about how the CCIA prevents licensed New Yorkers from entering businesses, preferring to focus on "the right of strangers to carry concealed guns into [a] home."  Opp. 73.  Defendants must believe that homeowners routinely fling their doors open to strangers.

[50] Defendants' note 21 identifies four *modern* statutes (AK 2003; SC 1996; LA 1996; DC 2015) which currently limit concealed carry in residences (and one *modern* statute prohibiting carry of assault weapons – CT 1993) — not businesses — providing no historical analogues under *Bruen*.

and New Jersey),[51] and three were enacted three quarters of a century or more **after** the Second Amendment was ratified (Louisiana, Texas, and Oregon).  Opp. 74-75.  Three were enacted by royal governors or "His Majesty" roughly three-quarters of a century **before** ratification (Maryland, Pennsylvania, New Jersey) – certainly not representative of what the colonists thought when they ratified the Second Amendment after throwing off that colonial rule.

Moreover, the Maryland statute only applied to persons previously convicted of certain crimes, and only after the person had "been once before warned," and the ban was applied to "shoot, kill or hunt or be seen to carry."  Also, the purpose of the Maryland statute was "to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses with dogs, or otherwise…." Def. Ex. 64.  Both provisions of the Pennsylvania statute likewise focused on hunting ("to carry any gun or hunt," and "shall ... carry any gun, or hunt"), as with each provision of the New Jersey statute ("to carry any Gun or hunt..." and "carry any Gun or hunt").

Moreover, *all* of the statutes on which Defendants rely appear to envision *some sort of trespass* (*see, e.g.,* Oregon, "to go or trespass … without the consent," Maryland "be seen"), wherein the property owner *would not know* the violator was present on his lands (far different from the CCIA).  *None* of the statutes relied on by Defendants say anything about residences or businesses (instead discussing plantations, lands, and woods).

New York has other statutes which prohibit trespass and hunting without a property owner's consent (modern versions of the historical sources cited by Defendants).  *See* N.Y. Env't

---

[51] Defendants claim these statutes "are not limited to hunting in any way" since they discuss carrying firearms (Opp. 76) even though the Pennsylvania statute is sandwiched between a section discussing "destroy[ing] any buck, doe, fawn, or other sort of deer" or "expose to sale … deer's flesh," and "kill with a firearm any pigeon, dove, partridge, or other fowl…."  Def. Ex. 63.  The second New Jersey statute is similar ("hunt or watch for Deer with a Gun" and "kill, destroy, hunt or take any Doe, Buck, Fawn," trapping "Foxes and Muskrats," etc.).

Conserv. Law § 11-0321(1); § 11-1101(12); N.Y. Penal Law § 140.05.[52]  Moreover, the CCIA's provisions *exempt* lawful hunting activity.  Exhibit "1", p20, l.15.  Plaintiffs urge the Court to enjoin the CCIA's "restricted locations" provision in its entirety, rather than excepting "fenced-in farmland … or fenced-in hunting ground" (TRO at 46), as any historical analogues sought to control activities, not properties (like the CCIA), and are already covered by other New York laws.

Lastly, New York's argument that every property owner must be informed as to who is engaged in concealed carry is bogus, and defeats the very notion of "concealed" carry.  Before CCIA, property owners exercised their "right to exclude" by posting a sign banning gun owners, and choosing to turn away that business or visitors.  The only firearms case cited by Defendants was *GeorgiaCarry.Org. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), where a gun owner asserted "a right to bring a firearm on the private property of another *against the wishes of the owner*."  *Id.* at 1261 (emphasis added).  The right affirmed there was of the property owner to exclude, not the right of the government to order that exclusion on behalf of the property owner.[53]

## IV.    Plaintiffs Have Shown a Likelihood of Success on their First Amendment Claims.

**1. List of Family and Cohabitants**.  Defendants dispute Plaintiffs' claim that the CCIA's demand for a list of family members and cohabitants violates the First Amendment rights of association and anonymity.  Compl. ¶78, Opp. 77-79.  First, Defendants claim there is no "intimate association" violation, because Plaintiffs have not alleged "causation between the speech act and

---

[52] N.Y. Envtl. Conserv. Law § 11-2113 discusses the effect of "posting" land for hunting and other activities.  § 11-2115 provides that it is unlawful, if hunting or fishing, to not "leave immediately when requested..."  A violator would lose his hunting license for a year and maybe for an "additional period not exceeding one license year."  Also, New York makes it a misdemeanor if an unethical hunter harvests an "illegal" deer or a "bear less than one year old..." § 71-0921

[53] In any event, Georgia amended its law in 2013 to specifically allow the "governing body or authority of the place of worship" to "permit the carrying of weapons or long guns by license holders...." 2013 Ga. HB 60, Codified at Ga. Code Ann. § 16-11-127.

the adverse action taken by a defendant." *Pavone v. Puglisi*, 353 F. App'x 622, 625-26 (2d Cir. 2009); Opp. 78.  But Plaintiff Sloane alleged just that – explaining that if he does not provide the State a list of his family and cohabitants, the statute requires Defendants deny his application. Sloane Dec. ¶¶16, 21.  The CCIA demands the equivalent of a "membership list" of a person's household, which is even more intrusive than that protected in *NAACP v. Ala. Ex rel. Patterson*, 357 U.S. 449, 460 (1958) where, the Court explained "the vital relationship between freedom to associate and privacy in one's associations." *Id.* at 462 ("the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause.").  What's more, Defendants admit they do not even need this information, claiming they "already routinely collect information about Plaintiff's" family and associates using unspecified "methods."  Opp. 78.

Second, while apparently conceding that an interview of a person's family members by a government official constitutes "interference in these relationships," Defendants claim it is a "minimal intrusion" that is "justified by the State's compelling interest in ensuring the safety of the public."  Opp. 78.  The state's claim of a "compelling interest" echoes the *Bruen*-rejected two-step interest balancing test.  The right of the government to question those household members living in intimate association with the applicant, including spouses, children, extended family, and others, clearly and directly compromises those protected relationships.

Third, Defendants audaciously claim no "expressive-association claim" can succeed because "family units" do not "come together for the purpose of expressive activity or advocacy." Opp. 79.  On the contrary, the family unit provides the basic building block of society, and there is no group of persons whose interests on "political, economic, religious or cultural matters" are more closely aligned, or a group whose rights should be more jealously guarded.

      **2.   GMC, Interview, Character Reference, Social Media.**   Defendants' primary

objection to Plaintiffs' First Amendment claims is the unsupported allegation that the CCIA operates differently than written.  Opp. 80.  Defendants opine that they do not have "unbounded discretion" to look at social media or "question applicants or character references," but instead may perform these tasks "<u>only</u> to confirm that an individual has a proper temperament...."  *Id.*  Defendants likewise posit that the CCIA permits "a licensing officer ... only ... to see communications an applicant has already chosen to share publicly."  Opp. 82.  But nothing in the CCIA provides any such limitations and, in fact, the CCIA's authority for licensing officials to seek "such other information" they desire undermines this claim.  Of course, even if the CCIA limited the purpose of the information sought to GMC, this Court has already determined it is the *GMC inquiry itself* which provides the unbounded discretion, involving "undefined assessments of 'temperament and 'judgment' and '[]trust[].'"  TRO at 22.  New York has no right to demand the applicant facilitate its "general warrant" rummaging into his online affairs.

Second, Defendants claim that "Plaintiff Sloane lacks standing" and must show that the state will deny his license application "or harm[] him in [an]other manner."  Opp. 79-80.  But nothing of the sort is required for a compelled speech claim.  Defendants mistakenly rely on *Laird v. Tatum*, 408 U.S. 1, 11 (1972), which actually demonstrates that a person "challeng[ing] exercise of governmental power ... regulatory, proscriptive, or compulsory in nature [must only be] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging."  *Id.* at 11 (listing cases which "fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights.").  Plaintiff Sloane easily clears that threshold.

Third, Defendants claim the CCIA is "content- and viewpoint-neutral," and "subject only to intermediate scrutiny."  Opp. 81.  But social media disclosure is not content neutral in three

important ways.  First, the disclosure requirement only applies to persons who are pro-gun, in that they are seeking to exercise rights relating to firearms.  Second, the disclosure is made directly to "licensing officials" who, at least prior to *Bruen*, granted only a handful of licenses, and thus most can be expected to be disinclined to believe Second Amendment rights are particularly robust.  Third, any pro-gun New Yorker who might wish to apply for a license will be incentivized to "self-censor" his on-line presence.[54]  There is no way to anticipate what a licensing official, especially those historically hostile to gun rights, will find disqualifying.  Defendants opine unpersuasively that they "do not attempt to discourage anyone from speaking a message disfavored by the government," yet that is the obvious effect when a person must later show those messages to the government and seek its permission to exercise an enumerated right.  Thus, applicants would be less willing to criticize elected or appointed officials, when those very same officials could later determine the scope of that person's constitutional rights.  In this way, the CCIA will have altered the public debate on all manner of topics, just by its required disclosure of social media, and conditioning the exercise of gun rights on the content of those posts.  Both speech which identifies the speaker, and anonymous speech, would be chilled.[55]  It would be difficult to believe that the politicians who enacted the CCIA were oblivious to the law's effect in tamping down of criticism of government officials.[56]  The CCIA could scarcely be more content and viewpoint based.

---

[54]  K.  Waddell, "How Surveillance Stifles Dissent on the Internet," *The Atlantic* (Apr. 5, 2016).

[55]  Each American has the First Amendment right to determine whether or not to disclose his identity on both electoral and issue-related matters.  *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995).  The history of anonymous speech in America was reviewed by Justice Thomas in his concurring opinion in *McIntyre*.  Social media postings should have no less protection than the humble pamphlet distributed by Margaret McIntyre.  To identify one's prior anonymous speech would destroy its anonymity, and New Yorkers would have their speech chilled knowing that, under CCIA, their future statements could never remain anonymous.

[56]  In fact, New York's overtly anti-gun Attorney General recently sent a letter to General Michael Flynn and other "extremist" conservative leaders about an upcoming event at a New York church, threatening to exact retribution against her political opponents.  *See* https://bit.ly/3Az8tTo.

Fourth, New York asks the court to defer to the legislature.  Opp. 82.  Yet Plaintiffs have brought a constitutional challenge, not a policy challenge, and an appeal to policy is reminiscent of Justice Breyer's dissents in both *Heller* and *Bruen*, where he advocated "interest balancing" based on competing policy considerations and, in both cases, the Court refused.  New York acts as if the Second Amendment is the only constitutional provision that is associated with risk, but it is not.  *See Bruen* at 2126 n.3.  Nor is the Second Amendment a second class right.  *Id.* at 2156

Fifth, Defendant's conclusory analysis under "intermediate scrutiny" (Opp. 82-84) fails because, again, that is not the proper test for viewpoint discrimination.  Defendant claims the intermediate scrutiny standard is met because of its "important governmental interest in ... public safety and crime prevention."  Opp. 82.  But this is not a magic talisman to be waived, and Defendants do not further explain their claimed interest.  Defendants claim the CCIA's provisions "do not burden <u>any</u> speech because they do not prevent anyone from speaking any message...."  *Id.* But the question is whether the CCIA *chills* speech, not whether it *prohibits* speech.  Since much (if not most) speech in today's world occurs online, it is safe to say the CCIA chills the large majority of a person's speech.  Interestingly, Defendants claim that "*a significant portion* of the speech" that would demonstrate a lack of good moral character "is speech not protected by the First Amendment at all."  Opp. 82 (emphasis added).  Put another way, Defendants *concede that the CCIA burdens protected speech*, and a license *could be denied* on that basis, but demur that this "can be justified by the government's interest in protecting public safety."  Opp. 83.

Sixth, Defendants object to Plaintiffs' characterization that a carry license could be denied "based merely on a picture of a dead frog" (Opp. 84), but apparently forget this was Defendants' assertion, not Plaintiffs'.  *Antonyuk I* Opp., ECF #19, at 41 (also discussing as red flags "photos of himself with masks and guns, in body armor, showing off his 'arsenal' of weaponry," which by

themselves are entirely protected – and legitimate – speech and expression).  *See also* Opp. 83-84 (opining that other protected speech could form the basis of a license denial, including carving swastikas, anti-Jewish images, conspiracy theories, "criticism of President Trump," and use of "the number 1488.").  While much of this speech may be morally objectionable, it is entirely protected under the First Amendment.   In other words, Defendants (like in *Antonyuk I*) again openly announce their intent to deny carry licenses based on certain kinds of protected First Amendment speech. *Cf. Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957) (state may not deny bar license to suspected communist) with Defendants' desire to deny a license based on unpopular imagery.

Seventh, Defendants' assumption that mass shooters can be stopped by the CCIA (Opp. 83) assumes facts not in evidence (indeed, the Uvalde, Parkland, and Buffalo shooters were 18 or 19 years old and flatly ineligible to obtain a license under the CCIA). Likewise, Defendant's hypothetical also assumes a mass shooter will be stopped from committing murder merely by being denied a license to carry a firearm.  Defendants offer no plausible link between the CCIA's restrictions and actually stopping the heinous crimes they parade in front of the Court.

Eighth, Defendants appear to argue that, in order to bring an anonymous speech claim, Plaintiff Sloane must identify his anonymous speech.  Opp. 84 n.26.  Additionally, regardless of whether strict or intermediate scrutiny applies (*see* Opp. 84) to an anonymous speech claim, Defendants argue that "the CCIA would certainly be constitutional in instances where social media posts contain indicia of a desire to engage in imminent mass violence, which implicates the State's compelling interest in protecting public safety."  Opp. 85. The state assumes violations of constitutional rights are rendered constitutional if they aid law enforcement – but an unconstitutional vehicle search is not cured if the police find cocaine in the trunk.

**3.  Express Consent and Interview.**  In response to Plaintiffs' compelled speech claims,

Defendants first posit that "the CCIA does not compel any plaintiff to speak." Opp. 85. Practicing by headnote, and relying on the Second Circuit's decision in *Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018), Defendants argue that the First Amendment provides *nothing more than* "a prohibition against compelling a particular message favored by the government." Opp. 86. But, as *Burns* explains, "compelled speech will vitiate the individual's decision either to express a perspective by means of silence, or to remain humbly absent from the arena.… The decision to withhold speech depends on views and calculations known only to the individual." *Id.* at 84-85.

This is precisely what Plaintiff Leman has alleged, explaining his "calcul[us]" that "to remain humbly absent from the" contentious issue of firearms is best for his business, and that being forced to take a public position either way will result in loss of a customer base. Leman Dec. ¶¶ 27-29, 31. Likewise, Plaintiff Antonyuk has explained that he does not wish to communicate the government's required message, because he does not consent to a situation where constitutional rights apply only if a government-mandated conversation first occurs, and that he does not want to run the risk of posting a government-mandated sign communicating his publicly unpopular opinions. Antonyuk Dec. ¶¶ 13-21. *See Burns* at 85 ("the right not to speak is the right not to reveal one's mind publicly."). Likewise, Plaintiff Sloane objects to an interview with a government agent where he is forced to speak about himself, his actions, lifestyle, activities, and relationships, in the hopes of convince the licensing official that he is a trustworthy person. Sloane Dec. ¶¶ 17, 19-20. This too is on all fours with *Burns*, where a prisoner could not be "forced to (i) provide false, inculpatory information to guards … or (ii) provide true, inculpatory information to guards by acting as their snitch." Likewise, a carry license applicant could be forced either to temper his true political views lest they appear "extreme" to an anti-gun licensing official, or provide information that the licensing official might use to deny him a permit.

Second, the government claims that no one is forced by the CCIA to "express a government-chosen message with which they disagree," arguing that "property owners retain the right to choose to give permission," and that speaking this message "reflect[s] their own beliefs," not the government's. Op. 86-87. On the contrary, it is the "giv[ing]" of "permission" to exercise constitutional rights that is the government-mandated speech to which Plaintiffs object – speech which must occur prior to the Second Amendment applying on private property. Plaintiffs Leman and Antonyuk wish others to be able to bring firearms to their properties *without* having to engaging in government-mandated, and at times uncomfortable, speech. Defendants claim that an invitation to carry arms is the Plaintiffs' message, not the state's, but the point is that the state mandates the message be communicated prior to constitutional activity occurring. *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) (requiring a permit before engaging in door-to-door advocacy protected by the First Amendment).

Third, Defendants argue the CCIA survives intermediate scrutiny, on the grounds that the restricted location prohibition and the in-person interview "regulate[] conduct rather than speech…." Opp. 88 (requires a person "to meet" and prohibits "the carrying of firearms"). Defendants play word games. The purpose of the in-person interview is to elicit *speech* from an applicant, and the restricted locations prohibition requires *speech* as a precursor to conduct, neither of which is "plainly incidental to the [allegedly] conduct-based goal of the statute." Opp. 88; *see also* at 89 (admitting that the property restriction requires an owner to "clearly communicate [*i.e.,* speech*] that decision to guests").

Once again, the government asserts "public safety" as a "substantial government interest," but fails to explain *how* the CCIA's elimination of private property rights furthers this interest with respect to either provision (*id*. at 88-89), apparently expecting this Court to fill in the blanks.

**V.    Plaintiffs Are Likely to Succeed on their Fifth Amendment Claims.**

**1.  Interview.**  Defendants object to Plaintiffs' Fifth Amendment claim with respect to the mandates that an applicant "shall meet in person with the licensing officer for an interview") based on their new proffer (not contained in the CCIA) that "a license applicant has the 'right to decline to answer questions' on Fifth Amendment grounds…."  Opp. 89.  Defendants however assert that "[t]he Fifth Amendment does not permit someone to decline an interview altogether…."  Opp. 90.  Defendants concede that refusal to answer licensing official's questions will lead to an adverse inference as to a person's good moral character (Opp. 89-90) as though this was analogous to civil litigation, but here that adverse inference automatically undermines the exercise of another constitutional right.  The CCIA is not merely an "administrative action."  Opp. 90.

Defendants again offer word games, claiming that the "adverse action" under the CCIA (denial of a license) would be "'imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right.'" Opp. 90.   On the contrary, the privilege against self-incrimination protects "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty…."  *Malloy v. Hogan*, 378 U.S. 1 (1964).  Moreover, this "penalty" is "not restricted to fine or imprisonment," but extends to "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Spevack v. Klein*, 385 U.S. 511, 515 (1967) (giving a "liberal construction").  In fact, in *Spevack*, the Court found that a lawyer was improperly disbarred (loss of a license) for failure to testify at his own disciplinary proceeding.  This case is far worse than that, involving inability to obtain a license to exercise an enumerated right (not merely the privilege of professional licensure).  *See also Garrity v. N.J.*, 385 U.S. 493, 497 (1967) ("[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain

silent.").  The loss of one's constitutional rights is *at least* on par with the loss of one's livelihood. Like the Court concluded in *Garrity*, gun owners "like … policemen … teachers and lawyers, are not relegated to a watered-down version of constitutional rights.").

   **2. Social Media.**  In defense of the CCIA's social media demand, Defendants offer further word games, claiming that "the statute does not require [Sloane] to 'turn over' anything" but "only provide a list of former and current social media accounts."  Opp. 91.  Apparently a "list" is not part of "anything," and "provid[ing]" something does not equate to turning it over. Defendants claim that these accounts and postings are "already public," but that does not mean Defendants know who made them (*see* Plaintiffs' First Amendment anonymity claim), such as postings by a pseudonym or username.  Finally, Defendants appear to argue that the Fifth Amendment protects the disclosure only of statements that could lead to criminal prosecution, arguing that the CCIA merely has a "statutorily declared goal of" ferreting out "irresponsible future gun use."  Opp. 91. But merely being forced to disclose postings that would lead to a finding that a person does not have "good moral character" (and thus loss of Second Amendment rights) represents "costly" harm protected against by the privilege of self-incrimination, even if it might not lead to imprisonment.

## VI.    Plaintiffs Have Demonstrated Irreparable Harm.

   Defendants' claim that Plaintiffs suffer no irreparable harm is supported only by its claims that Plaintiffs do not have standing and are unlikely to succeed on the merits and.  Opp. 91-92 (relying on two S.D.N.Y. cases for the proposition that likelihood of success and irreparable harm are the same inquiry).  Those claims have already been rebutted, *supra*.  Moreover, at the TRO stage, this Court explained that irreparable harm does in fact exist.  TRO at 46-48.

## VII.   The Equities Tip Heavily in Plaintiffs' Favor.

Seeking a stay of this Court's order in the Second Circuit, Defendants argued that they would be harmed due to their having "devoted significant resources" to implementing the challenged statute – consisting of (i) the state's construction of a website listing frequently asked questions; (ii) a New York City (not a defendant here) press release; and (iii) New York City's (again, not a defendant here) investment in laminated paper and zip ties to put up some "gun free zone" signs around Times Square.   Mem. in Support of Stay Motion, Doc. 22 at 19, n.7. Defendants repeat the same allegation of "significant resources" here, and claim that an injunction would force them to "communicate to the public that guns again are allowed…."   Opp. 92-93. This absurd claim fails on its face.   It cannot possibly be an irreparable harm to be forced to respect the Constitution.   Second, Defendants similarly posit that a preliminary injunction would mean "guns would immediately be allowed in a host of inappropriate places" (Opp. 93), but any injunctive relief would be premised on this Court's finding that the CCIA's *prohibitions are inappropriate*, because that the Second Amendment protects the carry of firearms in those locations.  Third, Defendants opine that law-abiding Americans being armed will lead to accidental shootings and deaths.   Opp. 93-94.   Even if this were true (it is not), a state's public safety speculations do not determine the scope of Second Amendment rights.  *Bruen* at 2126 n.3.  Finally, Defendants argue that an injunction will lead to "inconsistent enforcement of the CCIA…."   Opp. 93.  Of course, that does not provide a reason for allowing enforcement of an unconstitutional law, and instead provides justification for a statewide injunction which Defendants ask this Court not to issue.  Opp. 94.  In other words, Defendants' side of the scale is entirely empty.  On the other side of the balance is Plaintiffs' real and legitimate fear of arrest, imprisonment, prosecution (and accompanying permanent loss of constitutional rights), as well as the current ongoing infringements of their First, Fifth, Fourteenth and Second Amendment rights.

## VIII.   Any Injunctive Relief Should Be Statewide.

Defendants posit that any injunctive relief issued by this Court should be "limited to the Plaintiffs, or alternatively confined in operation to the Northern District of New York." Opp. 94. But that proposal would not give full relief even to Plaintiffs, such as Plaintiff Terrille whose planned upcoming flight to Tennessee may (depending on flight path) encompass other federal districts within the state (Terrille Dec. ¶ 9), and Plaintiff Johnson, who has planned an upcoming trip to various state parks across New York.  Johnson Dec. ¶ 9.  Indeed, *all* of the named plaintiffs need complete relief from the CCIA's unconstitutional provisions, which means throughout the State. *See Russman v. Bd. of Educ.*, 260 F.3d 114, 120 (2d Cir. 2001) (approving of statewide injunction for student who might "re-enroll in another district."). Should the Court find the CCIA's provisions are facially unconstitutional (in every application), they should be enjoined everywhere.

Finally, Defendants seek a three-day stay of any injunctive relief this Court provides. Plaintiffs respond only to note that the CCIA is clearly, on its face, violative of *Bruen* and the Second Amendment right. To the extent the Court finds ongoing constitutional violations (which are, by definition, irreparable), the Second Amendment is not a "second-class right," nor the only one with "controversial public safety implications." No irreparable injury will befall the state from being unable to enforce an unconstitutional law.[57]

Respectfully submitted, this the 22nd of October, 2022.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654

---

[57] Defendants appealed the Court's TRO to the Second Circuit on an "*emergency*" basis, but yesterday they requested a December 7, 2022 due date for their brief (certainly not evidencing any "emergency"). To the extent this Court decides to issue a Preliminary Injunction, it should go into effect immediately to prevent any further irreparable harm.

(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com
NDNY Bar Roll# 703779

## **CERTIFICATE OF SERVICE**

    I, Stephen D. Stamboulieh, hereby certify that on October 22, 2022, I filed a true and correct copy of the foregoing document or pleading utilizing the Court's ECF system, which generated a Notice and provided a copy of this document or pleading to all counsel of record.

                                /s/ *Stephen D. Stamboulieh*