UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
IVAN ANTONYUK; COREY JOHNSON, ALFRED TERRILLE;
JOSEPH MANN; LESLIE LEMAN; and LAWRENCE SLOANE,

                    Plaintiffs,

vs.                    1:22-CV-986

KATHLEEN HOCHUL, in her Official Capacity
as Governor of the State of NY, et al.,

                    Defendants.
-------------------------------------------x

     Transcript of a Motion Hearing held on

October 25, 2022, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE GLENN T. SUDDABY, United

States District Judge, Presiding.

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

A P P E A R A N C E S

For Plaintiffs:        STAMBOULIEH LAW, PLLC
                       Attorneys at Law
                       P.O. Box 428
                       Olive Branch, Mississippi  38654
                         BY:  STEPHEN D. STAMBOULIEH, ESQ.

For Defendants:        STATE OF NEW YORK
(Hochul, Bruen,        Office of the Attorney General
 Doran)                28 Liberty Street
                       New York, New York  10005
                         BY:  JAMES M. THOMPSON, ESQ.

                       STATE OF NEW YORK
                       Office of the Attorney General
                       The Capitol
                       Albany, New York  12224
                         BY:  ALEXANDRIA TWINEM, ESQ.

For Defendants:        BARCLAY DAMON, LLP
(Oakes, Hilton)        Attorneys at Law
                       125 East Jefferson Street
                       Syracuse, New York  13202
                         BY:  EDWARD G. MELVIN, ESQ.

For Defendant:         ONONDAGA COUNTY DEPARTMENT OF LAW
(Fitzpatrick,          John H. Mulroy Civic Center
 Conway)               421 Montgomery Street, 10th Floor
                       Syracuse, New York  13202
                         BY:  JOHN E. HEISLER, JR., ESQ.

For Defendant:         CITY OF SYRACUSE DEPARTMENT OF LAW
(Cecile)               233 East Washington Street
                       300 City Hall
                       Syracuse, New York  13202
                         BY:  TODD M. LONG, ESQ.
                              DANIELLE R. SMITH, ESQ.
                              DARIENN P. BALIN, ESQ.

1              (Open Court, 10:06 a.m.)

2          THE CLERK:  Case is Ivan Antonyuk, et al. versus

3    Kathleen Hochul, et al., 22-CV-986.  Counsel, please note

4    your appearances for the record.

5          MR. STAMBOULIEH:  Stephen Stamboulieh for the

6    plaintiffs.

7          THE COURT:  Good morning.  Welcome back.

8          MR. THOMPSON:  Thank you, your Honor, James

9    Thompson for the state defendants, Governor Hochul, Judge

10   Doran, and Acting Superintendent Nigrelli.

11         MS. TWINEM:  Alexandria Twinem also for the state

12   defendants.

13         THE COURT:  We haven't seen you before.  Welcome.

14         MR. LONG:  Good morning, your Honor, Todd Long for

15   defendant Chief Cecile.  Also appearing with me are Danielle

16   Smith, Susan Katzoff, Corporation Counsel, and Darienn Balin.

17         THE COURT:  Okay.

18         MR. HEISLER:  Morning, your Honor, John Heisler for

19   defendants Eugene Conway and William Fitzpatrick.

20         THE COURT:  Mr. Heisler, you're more than welcome

21   to come to the table.  Mr. -- Buster, come on up.

22         MR. MELVIN:  Edward Melvin, defendants Oakes and

23   Hilton.

24         THE COURT:  Okay.  Please, please sit at counsel

25   table, make yourself comfortable.  We'll proceed in the

1   manner that we have in the past, letting plaintiffs present

2   their arguments.  I would emphasize that you spend the

3   majority of the argument on the areas that you think are most

4   critical to your case.  Certainly I think the court has

5   signaled a couple times that plaintiffs have some standing

6   issues that I'd like you to address, and certainly the state

7   has taken the position that this is a facial challenge and

8   the majority of your argument presumes that that's the case.

9   I'd like to hear about why you think it's that way and, you

10  know, maybe address some of the issues if it's not a facial

11  challenge, what does that do to your argument in certain

12  areas of where the statute's getting challenged, okay?  But

13  please, feel free to take your time, I'm not going to curtail

14  your time, I want you to have the time that you feel you need

15  to make the points you want to make before this court issues

16  a decision on this matter.  Okay?  And I would say to the

17  city, county of Oswego, county of Onondaga, if there's

18  anything that -- further, you submitted papers that state

19  your position, but certainly I want to hear from you should

20  you feel there are important matters that need to be

21  emphasized, okay?

22          Plaintiffs' counsel, when you're ready.

23          MR. STAMBOULIEH:  Judge, is it all right if I move

24  this?

25          THE COURT:  You sure can.  It's designed to do

1    that.

2              MR. STAMBOULIEH:  Just feels weird looking at it

3    from an angle.

4              THE COURT:  Looking at everybody sideways.  All

5    right.

6              MR. STAMBOULIEH:  Perfect.  Morning, your Honor,

7    may it please the court.

8              THE COURT:  Good morning.

9              MR. STAMBOULIEH:  Stephen Stamboulieh for the

10   plaintiffs, I got it right this time.  I wanted to just give

11   the court a brief story.  I'm going to address all of the

12   points that your Honor has raised but just a brief story

13   since I've been in Syracuse.  Like a normal day yesterday for

14   me, if I had an apartment in New York, I would have committed

15   six felonies.  I went to the hotel which was not posted, also

16   serves alcohol.  I went out, I went to Dunkin Donuts and had

17   a coffee, it wasn't posted guns allowed, that's a felony.

18   Then I went to get gas, the store wasn't posted, that's a

19   felony.  I did visit a gun store and that had a guns allowed

20   sign so that wasn't a felony, but since I'm not a resident,

21   I'm not even allowed to touch a handgun and so they wouldn't

22   even let me touch one so it was kind of a wasted trip.  But

23   as a nonresident, I have no Second Amendment rights in this

24   state but the plaintiffs here do.  And so this is kind of

25   what I wanted to make it a little real for the court saying

1    all of these places that normal, everyday permitted people

2    like Mr. Antonyuk, like Mr. Leman, Mr. Mann, they do all of

3    these just normal everyday activities and now they're all

4    felons if they continue to do it.

5            I wanted to point out some things with the

6    defendants' brief that -- I know we filed a 50-page reply,

7    your Honor, but there's still not enough room to address all

8    of the things.  They rely very heavily on then-Judge Amy

9    Coney Barrett's dissent in *Kanter* and it talks about how

10   history's --

11           THE CLERK:  Can you tell whoever's on there they

12   should be calling in the audio, not through the overhead?  I

13   don't know who it is, Ryan's trying to disable it.

14           THE COURT:  Somebody's --

15           THE CLERK:  Yeah, there's 19 people listening in,

16   so --

17           THE COURT:  Okay.  The individuals that may be on

18   and listening through technology need to mute yourself, any

19   speakers that you may have, or else we'll cut the whole

20   system.  I'm not going to have this proceeding interrupted by

21   people speaking remotely through computers or otherwise.  So

22   please, if you're attempting to attend this proceeding

23   through technology at a different location, make sure that

24   any ability to communicate is muted so that there is no

25   further interruption.  Thank you.  Sorry about that.

1          MR. STAMBOULIEH:  Thank you, Judge, thank you.

2          THE COURT:  All right, go ahead.

3          MR. STAMBOULIEH:  As I was saying, New York has

4   relied extensively on then-Judge Amy Coney Barrett's dissent

5   in *Kanter v. Barr* where she states, "History is consistent

6   with common sense:  It demonstrates that legislatures have

7   the power to prohibit dangerous people from possessing guns."

8   And here, New York is not preventing dangerous people from

9   getting guns.  In fact the plaintiffs here are the exact

10  opposite of the dangerous people that now-Justice Barrett was

11  discussing, and all but Sloane, who can't even apply for a

12  permit, has passed all the barriers New York enacted to

13  prevent them from carrying firearms in public.  They even met

14  the standard that the Supreme Court now says is

15  unconstitutional.  And we shouldn't even call it the

16  Concealed Carry Improvement Act, it should renamed the

17  Concealed Carry Impairment Act because that's the effect that

18  it has on all of the citizens that are in New York and are

19  permitted of course.  It only targets lawful permitted

20  firearm carriers and makes it a felony, as we've already

21  discussed, to carry in almost all of the places that

22  law-abiding citizens could carry prior to September 1st.  You

23  might ask why I say it only targets permitted carriers of

24  firearms, is because the default position in New York is that

25  all places are off limits, even your home, unless you have a

1    permit.  So you can't even carry, you can't even have a

2    handgun in your home unless you have a permit.  You can't

3    carry outside unless you have a permit.

4            So that was the default position or that is the

5    default position, and when you get a permit, even now, the

6    CCIA prevents normal people with permits from carrying, so

7    the CCIA was not this great crime control package that the

8    Governor claims it is.  It's only targeting the concealed

9    carry permit holders.  There's no evidence that concealed

10   carry permit holders are the ones that are causing the crime,

11   and that's fine, because *Bruen* doesn't require that we use

12   evidence-based -- that we have evidence like that to prove

13   that this restriction is lawful, unless New York claims that

14   there's this new societal problem.  But as *Bruen* already

15   addressed, gun violence is not some new societal problem,

16   we've always had gun violence.  What we haven't always had,

17   though, Judge, are permits to carry, and they started around

18   the 1880s, 1890s, and it's not these people that are

19   committing the crimes.

20           So while New York has this overall public interest,

21   right, they don't have an interest in preventing law-abiding

22   citizens from exercising their Second Amendment right to

23   public carry as was held in *Bruen*.

24           This, the opposition that the state filed, even

25   though it was 95 pages in length, over 550 exhibits, is very

1   light on 1791 law, and it's even light on 1868 law.  A lot of

2   the statutes they cite to come after 1868, when the 14th

3   Amendment was ratified.  The Supreme Court identified two

4   periods of time to look at these statutes.  I suggest that

5   the period that we really should look at and be focused on is

6   1791 because, as Justice Thomas said, the right is pegged

7   with the understanding that the framers had when they enacted

8   the Second Amendment and if the Second Amendment applies to

9   the federal government under a 1791 standard, it can't then

10  apply to the states under an 1868 standard because it applies

11  to both the federal governments and the state governments

12  with the same understanding, and that I believe was from

13  *Bruen*.

14          So if we look at the 1791 laws, there's almost no

15  analogues that support any of this.  We can look at some of

16  the 1868 laws, we might be able to pull out, well, you know,

17  is a banquet hall where a church would have someone eating

18  food in, you know, their -- I'm losing my thought here --

19  their cafeteria, right, but overall the church they've made

20  off limits and there's no analogue for a church being off

21  limits.  We've pointed to two statutes, one from 1740 which

22  is admittedly before the Second Amendment was ratified, from

23  a state and another from 1770 from a state that allowed --

24  I'm sorry, didn't allow, required people going to church to

25  carry arms.

1          As this court is aware, a few days ago, a Western

2     District Judge in *Hardaway v. Nigrelli* enjoined the church

3     provision.  I had meant to look to see if that had been

4     appealed yesterday, I did not but as of Sunday I do not

5     believe that it has been appealed yet.

6          And we can also look at New York's prior scheme

7     where, for hundreds of years, in fact all of New York's

8     history, the majority of these places have never been off

9     limits.  Had there been an argument even going back to 1911

10    that the Sullivan Law was meant to, or it stopped people from

11    carrying in churches and stopped people from carrying in

12    restaurants with alcohol, maybe we could analogize that in to

13    say that this has been a problem that New York is trying to

14    deal with, but it's just not and as we've said over and over

15    and over and I'm trying not to repeat myself, this law stops

16    law-abiding citizens from carrying firearms.

17         And then the second thing, or fourth or whichever

18    number I'm on, only four defendants filed -- I'm sorry, four

19    defendants filed nonoppositions to plaintiffs' motion for a

20    preliminary injunction and two just didn't respond.  Only --

21    out of the ten defendants, only four opposed, defendant

22    Cecile and then of course the state defendants.  And we know

23    a preliminary injunction is not afforded as a matter of right

24    but the fact that six of the defendants are not opposing the

25    relief or just failed to respond, I think it speaks volumes.

1          In this court's TRO order, footnote 15, the Judge,

2     you cited to the *Ezell* case.  It talks about the statute, it

3     says two statutes fall far short of establishing that the

4     regulated activity is outside the Second Amendment.  And I

5     know in this court's opinion, the court was looking at

6     whether or not there were three or more analogues.  I would

7     submit that three is not enough, your Honor.  Three wouldn't

8     show the tradition, it wouldn't show that it was a

9     well-established representative analogue.  And I can break

10    this down.

11         For instance, in 1791 we had 14 states.  Three

12    similar analogues from 1791 addressing the same issue would

13    show roughly 21 percent of the states had this particular

14    analogue.  But 21 is not well established and it certainly is

15    not representative.  And you might ask where am I getting

16    this language from.  It's exactly from *Bruen* at 2133.  It

17    says, *Bruen* requires that the government identify a

18    well-established and representative historical analogue, not

19    a historical twin.  But the analogue has to be two things

20    because it's joined by the "and", it must be well established

21    and it must be representative.  So 21 percent would be

22    neither of those.

23         And in 1870 when we see the majority of the

24    statutes that the state cites to, we had 37 states, so that

25    means we have 8 percent of the states agreeing on whatever

1    the analogue is at that time, whether it's, you know, not

2    carrying in church or something like that.

3           If we wait a few more years until 1890, then it

4    goes down, it's 7 percent but it's still, you know, another

5    drop, it's not a well represented -- we wouldn't say today

6    someone wouldn't become, like if the Governor got 7 percent

7    of the vote, we wouldn't say that's a well-established,

8    well-representative vote for the Governor, so I don't think

9    we can do the same thing for this.  And I don't know what the

10   right answer is, Judge, but it seems to me like it would have

11   to be, as the court said, well-established, representative.

12          THE COURT:  So let me ask you a question with

13   regard to -- as we've indicated and I've heard from both

14   sides, you're talking about prior statutes.  The analysis the

15   court has to do, do you have a recommendation as to how those

16   statutes should be treated and how that analysis should take

17   place?

18          MR. STAMBOULIEH:  Yes, sir, I do.  So if we look to

19   *Bruen*, they, of course they split, and *Heller* did the same

20   thing, they looked at the colonial time and then they looked

21   at the antebellum time and they looked at ratification and

22   they kind of separated all the statutes out and then they

23   decided how they were going to weigh each statute.  Some of

24   these statutes from -- there's a lot of dates here, I'm

25   sorry.  I think it's like 1870 were from courts like *English*

1   *v. State* and *Hill v. State* where they -- the court said that

2   you don't have a Second Amendment individual right, and *Bruen*

3   actually talks about *English v. State* and discounts *English*

4   *v. State* and so the cases that flow from that, we cited to

5   this in our reply brief when we talk about *Young v. Hawaii*

6   and the *Young* panel just went through all of these different

7   cases.  So to answer the court's question, I think the

8   statutes that have the most weight are ratification, what the

9   founders would have actually intended.  And we can look to

10   1868 for some support, right, so if we have 37 states in

11   1868, and 30 of them, and I'm not suggesting that 30 is the

12   number, but 30 would certainly show that it's a

13   well-established and representative agreement from all the

14   people that would have understood in 1868 when the 14th was

15   ratified what the Second Amendment meant.  And that would be

16   my answer for that, Judge.

17          THE COURT:  Okay.  And how about statutes from

18   territories, ordinances from cities?

19          MR. STAMBOULIEH:  So --

20          THE COURT:  How should the court treat them in this

21   analysis?

22          MR. STAMBOULIEH:  So *Bruen* discounted the statutes

23   from the territories, and they did it just wholesale, these

24   aren't worth anything, but they looked at the population

25   percentage from three of the ordinances I believe and said

1    that this has like .2 of 1 percent of the total population in

2    the United States in 1832 and they went back and they looked

3    at the census data, which I've done here but didn't have

4    enough room to do in my brief, and then they looked and said

5    1 percent isn't well representative and well established.

6    And they kind of treated them as to how, how much of the

7    population they affected and looked at, you know, how it

8    affected everyone.

9          And in the same footnote, 15, in the TRO order,

10   your Honor quoted to the *Illinois Association of Firearm*

11   *Retailers*, and it supports the reading that three is not

12   enough.  In fact it specifically says, the three statutes

13   Chicago proffered from three states, 1837, 1879, and 1901,

14   the isolated statutes were enacted 50 to 110 years after

15   1791, which is the critical year for determining the

16   amendment's historical meaning.  So I think *Bruen* says 1791,

17   maybe we look a little bit further if there's

18   well-represented, well-established statutes coming after that

19   that would show a coalescence around a tradition, but I would

20   submit that three is not that tradition, your Honor.

21          I'm going to just add a couple of points and then I

22   will get into the court's questions.  The four character

23   references, footnote 22 of your Honor's opinion, relies on

24   three analogues.  I did the math, it covers about 1.9 percent

25   of the population at that time, and it starts off with an

1   1832 Delaware statute.  I had -- in 1832 Delaware had about

2   77,000 people and this statute, and the court even recognized

3   this, this had only to do with freed Blacks and freed

4   mulattos and they had to have five people say that they were,

5   you know, they had good moral character.  It didn't apply to

6   anybody else and it only applied to them.  But the most

7   important thing was it was repealed in 1843 so I don't think

8   we use it at all.  And then the freed Blacks and the freed

9   mulattos were completely banned in 1863 from having guns at

10  all.  Okay, not talking about the white folk at the time,

11  we're just talking about the freed slaves and the freed

12  mulattos.

13          Then we're left with two ordinances, one from 1871,

14  Jersey City, from that census had over 100,000, it didn't say

15  how much but I'm guessing, I'm just estimating over 100,000

16  and in 1881 New York City which the census said had over a

17  million.  That's 1.8 percent of the population, excluding

18  Delaware.  And I don't think that we can rely on those

19  because, number one, they come 80 and 90 years after the

20  Second Amendment, and again, they're just ordinances covering

21  a tiny percentage of the population.

22          And *Bruen* talks about this, your Honor, on -- at

23  2154 to 55 where it, it's -- says, "We've already explained

24  that we will not stake our interpretation of the Second

25  Amendment upon a law in effect in a single state or a single

1    city that contradicts the overwhelming weight of the other

2    evidence regarding the right to keep and bear arms in public

3    for self-defense."  And it says, "Similarly, we will not

4    stake our interpretation on a handful of temporary

5    territorial laws that were enacted nearly a century after the

6    Second Amendment's adoption, governed less than 1 percent of

7    the population and contradicts the overwhelming weight of

8    other more contemporaneous historical evidence."

9            So what is the other more contemporaneous

10   historical evidence?  It's that none of the other states had

11   these types of laws, and the vast majority of them had none

12   of these laws that we're now looking at.  So when we can

13   reach back in history and say, I've identified one statute

14   from 1791 that is close enough that would ban this one thing,

15   the overwhelming evidence is that the other states didn't do

16   it that way.

17           As to good moral character, the court said that it

18   could be rendered constitutional only if it were considered

19   as containing the following changes, and then the court said

20   how it could be constitutional.  I would submit, your Honor,

21   that having to have the court say this is the only way it

22   could be constitutional means that since it's not written

23   that way and instead of being, "No license shall be issued,"

24   the court rewrote it to, "A license shall be issued," means

25   that the statute is just unconstitutional.  If we look to

1    *Virginia v. American Booksellers Association*, it's a Supreme

2    Court case, it says holding of the statute must be readily

3    susceptible to a narrowing construction that would make it

4    constitutional as the court will not rewrite a state law to

5    conform it to constitutional requirements.  Since the court

6    cannot rewrite the law, the only solution is to strike it.

7         We've talked about the churches.  I would submit,

8    your Honor, following Judge Sinatra's opinion, the dearth of

9    statutes that are contemporaneous with 1791, I -- that law

10   falls.

11        And then it brings me to training.  California does

12   have a statute where they say it can be up to 24 hours.  I

13   have yet to be able to find a county that requires 24 hours.

14   I'm not saying it doesn't exist.  I can't find it.  All of

15   the places that I found, the big counties, San Diego, Los

16   Angeles, require eight hours.  That is half as much of what

17   New York says.  And while it does say they can require up to

18   24 hours, most of the requirements are eight hours.  And

19   those classes are 250 to 295, these are just quick samplings.

20   Illinois does require 16 hours, it got concealed carry in

21   2013 as a result of *Moore v. Madigan*.  It's a, you know, very

22   new statute.  They have a little bit different way to get

23   those 16 hours, is they can be in a combination of classes

24   and the statute actually says it, so I don't have to sign up

25   for one 16-hour class and devote blocks of time on a weekend

1   or however it is, I can split them up, might make it easier.

2   That course is only $225.

3           Alaska, 12 hours, kind of shocked me --

4           THE COURT:  Are you saying 225 hours or dollars?

5           MR. STAMBOULIEH:  Sorry, dollars.

6           THE COURT:  That's what I thought, okay.

7           MR. STAMBOULIEH:  Alaska surprised me with 12 hours

8   because it's Alaska, but you don't even need a permit to

9   carry so if you want a permit to carry, you got to get the

10  training but you don't even have to go, so I don't even think

11  we have to look at that.  But in any event, I looked at it,

12  it's $195 for the class out there.

13          And then New Mexico requires 15 hours but their

14  classes are $200.

15          So the classes that we found in this area, and when

16  we get into discovery and start deposing some people, we're

17  going to get all of these trainers to come in and give the

18  court, here's how much our classes cost rather than you just

19  relying on what the attorney says which I, you know, it is

20  what it is for now, but these classes are so expensive out

21  here, that plaintiff Sloane who doesn't have his permit yet

22  and hasn't been able to apply but does have an appointment,

23  is going to spend 800 to $1,000 just to get his permit.  And

24  we have that one case, I can't remember, I think it's a

25  Second Circuit case where it said that $340 licensing fee

1    isn't unconstitutional.  It's only $340, your Honor.  Okay.

2    But now we have the licensing fee plus the almost 800, 700,

3    whatever it is for the training costs so now we've tripled

4    what the $340 licensing fee is that was held constitutional.

5    And I think footnote 9 of *Bruen* supports -- or does not

6    support a licensing scheme that can cost so much.

7              Turning to your Honor's questions --

8              THE COURT:  If I could, I want to throw another one

9    at you, and you address it the way you want to, but the state

10   has indicated that their language of the statute tracks the

11   language of other shall-issue states' statutes and they

12   provide different states they say their statute tracks.  I

13   wonder if you want to address that.

14             MR. STAMBOULIEH:  I believe they're talking about

15   the Connecticut, if it's the Connecticut statute that talks

16   about good moral -- good moral character, is that your

17   Honor's question?  If I recall correctly from *Bruen*'s

18   footnote, I'm not sure what footnote it is, maybe it's 4,

19   where they talk about how the Connecticut -- or is your

20   Honor's question about the training associated with that?

21             THE COURT:  No, no, generally the statutes that

22   they're referring to, good moral conduct, other aspects of

23   the New York State statute that they say tracks what's going

24   on in other shall-issue states.

25             MR. STAMBOULIEH:  Right.  Wow, that's a big

1    question, I'm going to do my best to answer it.  So, I don't

2    think it -- it could track it in some ways, but I think

3    overall it doesn't track it.  In the majority of the states I

4    don't have to go get a permit to have a gun in my home.  You

5    have some states like New Jersey that have a permit to

6    acquire or permit to purchase and you have some states like

7    Hawaii where you have to have a permit to purchase, it takes

8    14 days generally to get, and New Jersey I think is quicker

9    than that.

10        Their language here that they've pulled from other

11   statutes is still super discretionary.  It's not like the

12   Connecticut statute that was identified in the *Bruen* decision

13   where it said, this kind of operates like shall-issue.  Here,

14   they've left so much open to the licensing official to

15   request anything, Judge.  And in our first *Antonyuk I* case, I

16   kind of made a passing comment about, you know, fingernail or

17   asking for urinalysis, and I don't know if Nassau County saw

18   that brief and said, hey, that's a great idea, but Nassau

19   County is requiring urinalysis, or a urine sample so they can

20   see if, in the application information you said you're not

21   taking any illegal drugs so we want to check your urine now.

22   And I think that's the kind of stuff that this law invites,

23   it's open-ended discretion.  They can ask for whatever they

24   want, and I don't know of another permitting statute that

25   allows such open-ended discretion, number one for what's

required.  New York could put stuff in their bill that's
objective, to not leave the licensing officer with
discretion.  If it was shall-issue, then they would be
entitled to, right, according to *Bruen*, maybe, and especially
according to the concurrence from Kavanaugh that they keep
citing to, where it talks about you could be subject to a
background check, training, and I think a mental health
records check.  Okay, great, that's really easy to do, Judge.
In fact the federal government has a system calls NICS that
I'm sure the court is familiar with, where I can -- if we
were in any other state but New York, I could walk into a gun
store, they could run my background immediately and could
sell me a firearm.  Checks mental health records, checks
federal crimes, state crimes, and then the only thing that's
left is training.  If New York -- we're not saying it's
constitutional but if it was a four-hour course that's been
offered forever here in New York, what was the problem with
that?  They haven't said that there's some new societal
problem that the people that are carrying guns, the
law-abiding ones that are carrying guns are, you know,
needing additional training or anything like that.  They just
passed it to make it more difficult for normal people to be
able to carry now that you don't need proper cause.  So I
don't think it's fair to say that the licensing statutes that
they've written track anything, like any -- any current law

1    other than them saying that it tracks it.

2         THE COURT:  Okay, then how would you apply -- reply

3    to the state's contention that this is not open-ended

4    discretion, that it does not give these public officials an

5    opportunity to get into these areas, and if there is, there

6    can be an as-applied challenge to that type of open-ended

7    discretion?

8         MR. STAMBOULIEH:  Well, I think, I think the

9    problem with that argument is that their statute invites even

10   the thought that there is this issue of open-ended

11   discretion, because they don't limit -- I mean, I know it

12   says on its face that it's limited to what's reasonable and

13   necessary to complete the application, such other

14   information, but that can be anything.  Because they want to

15   make sure, what, that you have good moral character so they

16   can go down the rabbit hole.  They say that it doesn't

17   require social media passwords and on its face it doesn't say

18   turn over your social media passwords, but on its face it

19   says that the licensing officer has to review your social

20   media, so how are they going to review it if it's private or

21   if it's set to, you know, friends only?  And this is the kind

22   of thing that I don't think you have to wait for an

23   as-applied challenge when you have someone in front of you

24   saying, number one, it's futile for me to apply because I

25   can't apply until next year sometime, and by law, by law,

1    they're not allowed to grant an incomplete application.  And

2    I know there was some pushback from the state on that the

3    last time about they're not going to speculate as to how

4    Judge Doran would rule.  I suggest that we ask Judge Doran.

5    There's no way under state law that he could grant that

6    permit without having done all of the stuff.  I guess he

7    could break the law, but it doesn't seem like a state judge

8    would do that, but that's something that we could absolutely

9    ask him in discovery.  Did I answer your question, Judge?

10            THE COURT:  Yes, I'm sorry to interrupt, go ahead.

11            MR. STAMBOULIEH:  No, that's fine, thank you.  The

12   judge entered a text order on October 19th identifying some

13   areas that we didn't challenge.  It's no secret we did not

14   challenge Times Square.  When I brought it up in the first

15   hearing, it was that they've sent the letter to the

16   businesses and to, I think it was also maybe to residences

17   that lived around Times Square in Times Square saying, hey,

18   look, your premise license is no longer good here because

19   Time Square is now a sensitive place so turn your guns in.

20   And I think I actually said that Times Square is not an

21   issue.  So there's a lot of these that we're not challenging.

22            Where we are challenging, we've been very explicit

23   in the declarations.  For all of the plaintiffs, we listed

24   out by the sections.  And I made a spreadsheet for myself

25   where we talk about, you know, locations providing health

1    care -- let me just match this up to yours, your Honor.  Your
2    Honor says, carefully considering whether plaintiffs have
3    sufficiently shown a concrete intention to carry concealed in
4    these paragraphs:  2B, health.  And if we look at 2B, it
5    talks about health, behavioral health and chemical
6    dependence.  So it seems that health would be subsumed or
7    would include behavioral health and chemical dependence.  It
8    seems like all of that's kind of the same thing to me.  And
9    of course, you know, plaintiff Mann, the pastor, is the one
10   that goes out and visits with people and brings people to his
11   church and provides his ministry and provides these services,
12   addiction recovery services through RU Recovery so I would
13   submit to the court that health and behavioral health are
14   kind of one and the same but to the extent your Honor
15   disagrees, you know, that's up to the court.

16           We talk, make sure I'm not ... the Judge identified
17   libraries, and we have not, we have not sought libraries,
18   Judge.

19           2E, we have not sought programs.

20           2F, we have not sought summer camps.

21           G through J, your Honor --

22           THE COURT:  When you say summer camps, specifically
23   you're saying youth summer camps?

24           MR. STAMBOULIEH:  One of the problems with the way
25   this law is written is that you can classify -- you know,

1    like what's the summer camp?  I don't know what a summer camp

2    is.  So you know, plaintiff Mann, the pastor, right, has kids

3    come over the summer and doing whatever he wants to do but,

4    you know, is that a summer camp?  I don't know if it's a

5    summer camp.  Maybe we get into that in discovery and I can,

6    and after I figure out what this law actually says for summer

7    camps, I can tell your Honor straight faced, yes, we're

8    challenging summer camps because they think it applies to

9    Pastor Mann's youth group in the summer.

10            THE COURT:  Okay.

11            MR. STAMBOULIEH:  G through J, where it talks about

12    the location of programs, funded, licensed and regulated by

13    the office and then it lists various offices, we're not

14    challenging that.

15            The shelters one on 2K -- make sure I'm looking at

16    this correctly.  Your Honor has questioned or has at least

17    raised a suspicion of standing as to shelters.  They listed

18    seven different, seven different programs within this one

19    term.  We have homeless shelters, runaway homeless youth

20    shelters, family shelters, shelters for adults, domestic

21    violence shelters.  The two other ones are emergency shelters

22    and residential programs for victims of domestic violence.

23    So Pastor Mann does not run an emergency shelter and does not

24    run a residential program for victims of domestic violence

25    but he absolutely does, you know, carry in a number of places

1  like homeless shelters when he goes and ministers to people.

2  The family shelters, the shelters for adults, I think those

3  are all fairly brought in under plaintiff Mann's intent to

4  continue to offer the services that he's been offering as

5  part of his addiction ministry, his ministry to other people

6  as well, so I would submit that we have done that.

7       And then L, where it talks about the Department of

8  Health residential setting, we're not challenging that.

9       I would suggest, your Honor didn't have 2M where it

10  talks about educational institutions, Mann has, and this is

11  another one of the problems with these laws, it's -- it lists

12  a lot of stuff that seem very specific but when you get down

13  to nonpublic schools, as plaintiff Mann has said, he has --

14  he allows his church to be used as a home school co-op.  If

15  that qualifies as a nonpublic school, it's something that we

16  briefed, then this law is unconstitutional because he should

17  be able to, number one, carry in his church which he can't

18  anyway, but the state shouldn't have a right to come into a

19  nonpublic school, if his is considered a school, and tell

20  whoever runs that school that they can't -- that they can't

21  carry there.  It's their kids, they should be able to take

22  care of them how they want to.

23       And in public transportation, your Honor in the

24  text order wrote everywhere but buses and I would like to

25  remind the court, one of the big problems is, plaintiff

1    Terrille cannot check a firearm into a plane to travel
2    consistent with TSA regulation, that's obviously airports
3    that would be included in that.  Nowhere in the
4    plaintiffs' -- I'm sorry, keep getting them confused,
5    right -- nowhere in the defendants' reply do they say, you
6    can check a firearm in an airport, it's okay, nowhere do they
7    say that.  And the reason is because you can't because on the
8    face of the CCIA, it excludes airports, and instead of saying
9    you can do it consistent with federal law, they say airports
10   are sensitive places, so they just keep going back to the
11   sensitive places.  It's like, well, maybe the airport where
12   you go through security and we're talking about the sterile
13   area of the airport, that's sensitive, it's full of police, I
14   go through metal detectors, right?  Airplanes, we're not
15   asking to carry on an airplane, we're asking for Mr. Terrille
16   to have his firearm checked with the baggage under the plane
17   in accordance with all TSA regulations.  But that, that
18   consumes a lot of the statute.  A place, conveyance, or
19   vehicle used for public transportation, maybe they don't mean
20   it to include airplanes but the gun's going to be on the
21   airplane, right?
22          As Pastor Mann talked about his buses, he uses it
23   to transport the public sometimes, that's public
24   transportation, that's buses.  Pastor -- we already discussed
25   airport.

1          Then we could bring in the facility used for the

2     transport of passengers, so that's obviously an airport even

3     though they also say airport in the statute.  And then they

4     say marine or aviation transportation, so they try to be very

5     specific and then they're so specific and then they keep

6     listing out other things so if we say, well, you can check a

7     firearm to the baggage, but I can't bring it into the airport

8     and I also can't bring it into the facility that's used for

9     the transport of passengers and it also would be considered

10    aviation transportation and it would also be considered a

11    place, a conveyance for public transportation, so it's like

12    all of these little things in the statute go with just

13    Mr. Terrille wanting to check his firearm into his bag.

14          And Judge, to put the court at ease, we have not

15    asked the court to grant drunk carry or stoned carry.  We're

16    not asking to go smoke pot and carry guns and we're not

17    asking to go get drunk and carry guns.  In fact, we don't

18    even mention, I think except where we quote the statute about

19    wanting to go into a place that dispenses cannabis, which is

20    illegal under federal law still, but that's for a different

21    time.

22          We do talk in 2P about the -- it says everywhere

23    except theaters, but Pastor Mann talks about performance

24    venues, concerts.  Terrille wants to do the gun show, that

25    would consider -- that would be an exhibit, I would assume,

1    again, depending on what the state says their statute says or

2    what the court finds their statute says.  The conference

3    center would be the exhibit hall that he wants to go to and

4    that also includes a banquet hall as well.  So all of the

5    statute -- all of the various places in the affidavits if the

6    court were to go look at them again and can match up Section

7    S or whatever it is, would -- should match up with what this

8    is saying.

9            We haven't -- we haven't asked for stadiums, race

10    tracks, museum, amusement parks, the gaming facilities, but a

11    lot of these could also be the other ones because a gaming

12    facility might also have a banquet hall, a gaming facility

13    might also have a conference center.  Where I come from, we

14    have a lot of casinos, I would assume that would be a gaming

15    facility but also a video lottery terminal which I would just

16    assume that, but it also has conference centers because we

17    have conferences down there, and it has banquet halls and it

18    was used to do exhibits, and it was the Hard Rock Casino so

19    of course they had concerts there, so I mean, there's all

20    these different places.

21            Times Square, we're not challenging Times Square,

22    Judge.  You know, the only way that -- I'll just go ahead and

23    say it.  So New York has finally codified in one place all

24    the places that licensed gun owners can't carry and it's in

25    265.01-e.  Since now, there's never been one place that

1   someone would be able to go to look, where are all the places

2   that I can't carry.  I actually had to have another local

3   attorney find all of the different places because they're

4   just spread throughout this statute and this statute, this

5   regulation, this environmental whatever.  There's not a good

6   place to look.  But here they put it in a really good place,

7   265.01-e.  So if the court finds that even though there is a

8   severability clause, the way to get to Times Square is we

9   just strike all of 265.01-e because it's all in the same

10  place.  And there's a Second Circuit case, the name escapes

11  me at the moment, that talks about severability, that if the

12  statute cannot be excised, like you can't take out certain

13  words like if it was just we want to carry in buses, we could

14  just strike through buses and it won't change the meaning of

15  the rest of the statute maybe.  The Second Circuit has said,

16  well, there's two instances where that might not happen or

17  might not be possible.  If changing the statute or excising

18  words from the statute fundamentally changes what that

19  statute means and it's not what the legislature would have

20  enacted, then the whole thing falls.  And the severability

21  clause is not dispositive to the severability analysis.

22          And so to the extent that if the judge were

23  inclined to grant the preliminary injunction and found that

24  in the various places that the plaintiffs have set forth the

25  concrete intent to carry and violate the law, then it would

1    be up to the judge to determine whether or not it can be

2    excised or whether it can be severed, all of the 265.01.

3              Does the court have any other questions?

4              THE COURT:  I'm good.

5              MR. STAMBOULIEH:  Thank you, your Honor.

6              THE COURT:  Thank you.  So Mr. Thompson, I see you

7    getting up so I assume we're going to go state, city, and the

8    counties can weigh in if you'd like.

9              MR. THOMPSON:  Yes, if that works for your Honor.

10             THE COURT:  That's fine.

11             MR. THOMPSON:  Thank you, your Honor, James

12   Thompson for the state defendants.

13             Your Honor, as we've said before, as Justice

14   Barrett said, "History is consistent with common sense:  It

15   demonstrates that legislatures have the power to prohibit

16   dangerous people from having guns."  It also demonstrates

17   that reasonable licensing procedures are lawful, that there

18   are places of critical importance where guns do not belong,

19   and that there is nothing unconstitutional about giving

20   property owners the right to make an informed decision about

21   whether others can bring guns onto their land or into their

22   homes.

23             The *Bruen* test is all about history, and the

24   plaintiffs spoke in their reply brief and today have devoted

25   much of their arguments to asking the court to ignore as much

1    history as possible.  Sometimes they argue that the history

2    is too early; sometimes that the history's too late;

3    sometimes it's from the wrong state or sometimes it's from

4    the city; sometimes it's from a court but not the right

5    court.  And either way, over and over and over again, the

6    argument is asking your Honor to close your eyes and pretend

7    that the history isn't there.  But the *Bruen* test is about

8    honoring history, not ignoring it.

9           And your Honor in your October 6th opinion took the

10   history seriously.  You looked at the statutes and the

11   sources that we had adduced in previous litigation, you did

12   research of your own, you found historical sources and you

13   considered what they said.  We obviously don't agree with all

14   your conclusions and I'm going to do my best today to try to

15   convince you why some of them should be changed or expanded,

16   but your Honor's analysis of the history was genuine.  You

17   looked straight at the history instead of trying to find

18   reasons to look away.  That's what the *Bruen* test requires if

19   it's going to be genuine, and we have faith that if your

20   Honor continues to look the history straight in the eyes,

21   that this motion will be denied.

22          First I want to just note something very briefly

23   that I think was a major focus of Mr. Stamboulieh's argument

24   and underscores just what we're looking at here.

25   Mr. Stamboulieh, both in his argument here and in the

1    plaintiffs' briefing, argues that permitting itself is

2    unconstitutional.  On page 16 of their brief they say that

3    the Second Amendment's plain text protects the right of

4    people to bear arms in public without having to demonstrate

5    anything to the government or obtain anything from the

6    government such as approval or license.  That's just wrong

7    under *Bruen*.  The majority says that, "To be clear, nothing

8    in our analysis should be interpreted to suggest the

9    unconstitutionality of the 43 states' shall-issue licensing

10   regimes, under which a general desire for self-defense is

11   sufficient to obtain a permit."  That's true of New York too.

12   Permitting is absolutely constitutional.  Similarly, Justice

13   Alito says, "Our holding decides nothing about who may

14   lawfully possess a firearm or the requirements that must be

15   met to buy a gun, nor have we disturbed anything that we said

16   in *Heller* or *McDonald* about restrictions that may be imposed

17   on the possession or carrying of guns."  Justice Kavanaugh,

18   joined by Chief Justice Roberts, likewise says that, "The

19   court's decision does not prohibit states from imposing

20   licensing requirements for carrying a handgun for

21   self-defense."

22           And so on the fundamental level, there is nothing

23   unconstitutional about permitting.  *Bruen* in fact endorses

24   that, and this is going to be something that we run into a

25   number of times when we talk about the arguments that the

1    plaintiffs are making.  They are pushing for a vision of the

2    Second Amendment that is not supported by *Bruen*, it's not

3    supported by *Heller*, and it's not supported by the text of

4    the amendment itself.

5         Before we get too far into the merits, I think

6    there is some fatal issues of standing and justiciability

7    that need to be addressed.  There is still no injury in fact

8    related to licensing.  There's no standing here under

9    *Decastro*, *Libertarian Party*, because no one has submitted an

10   application and had it denied.  And for that we cite to

11   *Decastro*, 682 F.3d at 164.  Because Decastro failed to apply

12   for a gun license in New York, he lacks standing to challenge

13   the licensing laws of the state.

14        Now obviously there is an exception that applies if

15   a plaintiff makes a substantial showing that submitting an

16   application would have been futile, but that's not the case

17   here.  Plaintiffs put forward two arguments for futility.

18   First of which they point to the Onondaga County Sheriff

19   saying that he isn't processing applications or at least not

20   expeditiously.  I don't personally know whether that's true,

21   we don't represent the sheriff, but even if it is true, I

22   think that may potentially give rise to a Second Amendment

23   claim against the sheriff but it doesn't give rise to a

24   constitutional claim against the licensing laws in general.

25        Second, they argue that there's futility because

1    plaintiff Sloane has decided unilaterally that he will not
2    comply with the licensing requirements.  But a party cannot
3    create its own futility.  Instead, and this is a quote from
4    *Decastro* quoting *Jackson-Bey* case, "To establish standing to
5    challenge an allegedly unconstitutional policy, a plaintiff
6    must submit to the challenged policy.  For there to be
7    futility, the plaintiff would need to show that, even if he
8    submitted a full application, there's no chance that it would
9    be successful."  That's what the *International Board of*
10   *Teamsters* case stands for.  Put it another way.  If plaintiff
11   Sloane were to apply for a permit and provide the required
12   information, is there anything before your Honor that
13   indicates that the application would be denied?  Is there
14   anything before your Honor that indicates that he would be
15   found to lack good moral character?  Is there any indication
16   that he would say something in the interview or that the
17   interview requirement would be applied in a way as to deny
18   him a license?  I don't think that there is anything in the
19   record to indicate that, and in fact, the plaintiffs say that
20   plaintiff Sloane is law-abiding citizen and there's nothing
21   in the record to indicate otherwise.  And so there is no
22   futility here, and certainly not as against the state
23   defendants, and futility is not something that a private
24   party can create for themselves.
25           Similarly, there's no injury in fact related to

1    sensitive places or private property.  All that the

2    plaintiffs have been able to show here is general public

3    statements that the government intends to enforce the laws

4    that are on the books.  There's no specific threat of

5    enforcement of any specific law against any specific

6    plaintiffs.  And the question here is whether the plaintiff

7    will suffer a personal and individual injury beyond a

8    generalized grievance, an injury that is concrete,

9    particularized, and imminent rather than conjectural or

10    hypothetical.  And that's particularly important because so

11    much of the argument that comes in is hypothetical.  It

12    assumes that New York will apply these statutes in an

13    unconstitutional way.  It assumes that there is -- there will

14    be a bizarre application of the statutes and there's a

15    question posed to your Honor, how do we know they won't do

16    that.  That's not the way the test works.  That's not the way

17    that standing is put together.

18          And so every time you see one of the hypotheticals,

19    whether during oral argument or in the briefing, I'd

20    encourage your Honor to ask yourself, did this actually

21    happen or have the plaintiffs adduced facts showing that it

22    is imminently, concretely likely to happen?  And I don't

23    think that that is the case.

24          In terms of the individual state defendants,

25    there's no standing as against Governor Hochul.  The court

1    noted in each of its two previous opinions that the Governor

2    may not be a proper defendant and there's been nothing that's

3    changed to show that she is.  The Eleventh Amendment bars

4    suit against her because the *Ex parte Young* exception only

5    applies when an official-capacity defendant has a particular

6    duty with relation to the challenged law.  And we cite to a

7    number of cases here including *Citizens Union*, *Roberson*, and

8    the complaint in fact acknowledges that, "Governor Hochul is

9    not the official to whom the legislature delegated

10   responsibility to implement the provisions of the challenged

11   statutes."  Likewise, no plaintiff alleges that Governor

12   Hochul has caused any injury directly to them.  She doesn't

13   rule on licensing applications, and there's no allegations

14   that she herself has enforced the CCIA against any plaintiff

15   in any way.

16          THE COURT:  And it's the state position that her

17   authority to direct the superintendent of state police is not

18   enough?

19          MR. THOMPSON:  I think that that would be

20   inconsistent with the case law.  If you take the plaintiffs'

21   argument to where it's going, they talk about how the

22   Governor could remove the head of the state police, the

23   Governor could remove any District Attorney under the New

24   York State Constitution, remove any sheriff or county clerk,

25   that argument would create standing against the Governor for

1    virtually any legal or law enforcement act in the state and
2    that's inconsistent with the law.
3              Similarly, there's this argument that Governor
4    Hochul somehow changed how the NYPD applies the law but even
5    if that were true, and there's nothing in the record about
6    it, it would be irrelevant here.  New York City makes its own
7    decisions, New York City is an independent actor and no
8    plaintiff alleges any injury connected to New York City.
9              Similarly, in terms of Judge Doran, there's no
10   standing against Judge Doran.  Unquestionably, undisputedly,
11   no one has submitted an application to Judge Doran, no one
12   has had an application denied.  Your Honor in your
13   October 6th opinion found that standing was proper because it
14   was analogous to standing against Judge McNally in the *Bruen*
15   opinion but the key difference is that there was an
16   application submitted to Judge McNally, Judge McNally ruled
17   on that application, he denied the application for a specific
18   reason under a specific part of the statute and that gave
19   rise to the ability to challenge that specific part of the
20   statute.  Here, there's been no application, there's been no
21   denial, but the scope of what the plaintiffs want to
22   challenge is vast, virtually comprehensive.  And I think the
23   *Libertarian Party* case controls here, where the Second
24   Circuit found that there was no standing to sue a judge
25   related to a licensing application unless one had been

1    denied.

2          Similarly on futility, if the sheriff in Onondaga

3    County is not adequately processing applications, that may

4    give rise to a claim against the sheriff, and let me just say

5    on the record that I don't know one way or another if that's

6    the case and I don't represent the sheriff, but it would not

7    mean that there's standing as against Judge Doran who there's

8    no allegation of futility related to him.  And as we

9    discussed, a party cannot voluntarily create their own

10   futility.  Judge Doran has not been given any application, he

11   has not made a ruling on any application, and there's nothing

12   before the court to indicate that a proper application

13   submitted by plaintiff Sloane would fail.

14          In terms of Acting Superintendent Nigrelli --

15          THE COURT:  There's nothing on the record that

16   indicates that an application submitted would fail?  How

17   about his statement that he says he would not provide the

18   names of his family?

19          MR. THOMPSON:  Well, I think that goes to the

20   question of creating your own futility.  I think that there's

21   nothing in the record before the court that indicates that if

22   plaintiff Sloane submitted a full application, submitted to

23   the policy as required under *Decastro*, there's nothing to

24   indicate that his application would be denied.  There's also

25   nothing to indicate that if it were to be denied, what the

1   basis of that would be, for instance good moral character,

2   you know, there's nothing to indicate that there would be

3   something disqualifying in his social media.

4          THE COURT:  I think it was just indicated Judge

5   Doran follows the law.

6          MR. THOMPSON:  I'm sure Judge Doran would follow

7   the law.

8          THE COURT:  Then necessarily that application would

9   be denied.

10         MR. THOMPSON:  I'm not sure that that's necessarily

11  the case.  It's possible that Mr. Stamboulieh would get up in

12  front of Judge Doran, make the same argument that he's making

13  to you, and maybe Judge Doran would agree with him.

14         THE COURT:  Convince him not to follow the law?

15         MR. THOMPSON:  Or convince him that the law

16  requires him to do something else.  Standing here today,

17  as --

18         THE COURT:  What else could he convince him to do

19  if the applicant refused to provide those names?

20         MR. THOMPSON:  If, if the plaintiffs were able to

21  convince Judge Doran, as they're trying to convince your

22  Honor, that this requirement is unconstitutional, Judge Doran

23  as a state court judge is fully capable of finding laws

24  unconstitutional under the federal Constitution.  And I

25  cannot tell you what he -- how he would rule on an

1    application made in front of him that's not in front of him,

2    any more than a lawyer representing you could say how your

3    Honor would rule on a case that you'll see a month or two

4    months or three months from now.

5            In terms of Acting Superintendent Nigrelli, with

6    regard to the licensing laws that he's only the licensing

7    officer for retired members of the state police, which none

8    of the plaintiffs are; your Honor in your October 6th opinion

9    discussed the superintendent's role in approving the training

10   curriculum but there's no injury alleged from the content of

11   the curriculum with the exception of plaintiff Sloane's

12   objection to the fact that it includes suicide prevention.  I

13   don't think that's a cognizable claim.  There's no basis in

14   the history for why someone would have an entitlement to a

15   training curriculum tailored to them or that meets their

16   approval, in fact very much the opposite in terms of what

17   we're talking about in militia service.  Beyond that, there's

18   still no specific threat of enforcement -- I'm sorry, your

19   Honor.

20           THE COURT:  I was just wondering if you wanted to

21   address the plaintiffs' argument about the onerous nature of

22   the number of hours, the expense, or do you intend to cover

23   that later?  I don't want to --

24           MR. THOMPSON:  I do intend to cover that later but

25   I'm happy to vault into it right now if your Honor wants to

1    address it.

2                 THE COURT:  You do it the way you'd like to.  Go

3    ahead.

4                 MR. THOMPSON:  Thank you.  Beyond that, there's

5    still no specific threat of enforcement by the state police

6    in specific directed at any specific plaintiff based on any

7    specific element of the CCIA.  That fact pattern is not here

8    and standing rules are there for a very important reason.

9    There's no case or controversy here with regard to any of the

10   state defendants.

11               In terms of the facial challenge standard, and

12   I'm -- I look forward to addressing your Honor's question,

13   but this is a facial challenge, it is a pre-enforcement

14   challenge to a criminal law statute and I think that under

15   settled Second Circuit precedent, it is facial in nature.

16   For that we'd cite to *Jacoby & Meyers v. Presiding Justices*,

17   852 F.3d at 178.  Where a plaintiff makes a pre-enforcement

18   challenge to a statute "before they've been charged with any

19   violation of the law, it constitutes a facial rather than an

20   as-applied challenge."  And under that standard, because it's

21   a challenge to the law on its face in its entirety and in all

22   its applications, a plaintiff must show "that the law is

23   unconstitutional in all of its applications."  That's from

24   the *Washington State Grange* case, 552 U.S. at 449.

25               And here in the October 6th opinion, the court has

1    found that there are constitutional applications of several

2    aspects of the law.  We may disagree with your Honor as to

3    the scope of the constitutional applications and I look

4    forward to discussing that with your Honor, but your Honor

5    found that there was a constitutional application of the good

6    moral character standard, of several of the sensitive

7    locations including government buildings, places of worship,

8    schools and universities, and other private property

9    protection and that's all the analysis that there needs to be

10   at this point in the facial challenge.  Because there are

11   constitutional applications of the statute, it should be

12   facially upheld.  And if New York or its cities or its

13   counties apply it in an unconstitutional manner, then there

14   can and should be, as your Honor said to Mr. Stamboulieh,

15   as-applied challenges in the future.

16          And in particular, although we may disagree and we

17   may have thoughts about what the sweep of the statute

18   legitimately is, the court should not use its injunctive

19   powers to essentially rewrite the statute through an

20   injunction.  For that we cite to *Picard v. Magliano* from the

21   Second Circuit just this year, 42 F.4th at 104, in which the

22   Circuit reversed the grant of facial injunction and said that

23   it would not "delve into whether a more narrowly-drawn

24   statute could surgically identify conduct that may be

25   constitutionally restricted without impinging on other

1    conduct that's constitutionally protected."  Writing and

2    tailoring laws is something that the legislature does and can

3    do in response to comments from the public and it's something

4    that judges can do in the context of genuine and as-applied

5    cases and controversies.  It's not the right thing to do in

6    the course of a facial challenge such as this one.

7          And your Honor had, before we got up and began the

8    argument, had asked about whether this was a facial challenge

9    or an as-applied one?  Does this address your question?

10         So moving on to the merits, let's start with the

11   private property protection because that's one of the areas

12   that your Honor indicated was constitutional in some

13   applications and I think it's one that's very central and one

14   that Mr. Stamboulieh focused on.

15         I think it's important to start at first

16   principles.  There are two parts to the *Bruen* test -- one

17   about text and one about history.  And the plaintiffs have

18   given no basis in their briefing or in their argument to

19   conclude that the Second Amendment right to bear arms extends

20   onto someone else's property, particularly without their

21   knowledge or consent.  This is a key part of the analysis and

22   as much as the plaintiffs don't want to deal with it, it's

23   their burden to show that the conduct at issue, carrying a

24   gun onto someone else's property, is covered by the Second

25   Amendment's plain text.  There's nothing in *Heller*, there's

1    nothing in *Bruen* that suggests that the right to bear arms

2    extends onto other people's property.  *Bruen* stands for the

3    proposition that the Second Amendment "guarantees," there's

4    an ellipsis here, "a right to bear arms in public for

5    self-defense," it's 142 S.Ct. at 2135.  *Heller*, meanwhile, is

6    contrary to that position.  "There is no way that the Second

7    Amendment could elevate above all other interests the right

8    of law-abiding responsible citizens to use arms in defense of

9    hearth and home," that's 554 U.S. at 635, "if it also

10   guaranteed the right of strangers to carry concealed guns

11   onto that same home without their knowledge and without their

12   agreement."

13           It's also contrary to the fundamental

14   constitutional right of private property which is equally

15   fundamental and equally constitutional as the right to bear

16   arms.  And for that we cite the *GeorgiaCarry* case out of the

17   11th Circuit which rejected the contention that, "The

18   individual right protected by the Second Amendment in light

19   of *Heller* and *McDonald* trumps the private property owner

20   right to exclusively control who and under what circumstances

21   is allowed on his or her own premises."

22           The plaintiffs' discussion of this point on pages

23   36 and 37 of their brief cites no law for the proposition.

24   All they do is call for the burden to be shifted onto us.

25   And I think it would be extraordinary based on that and based

1    on the text of *Bruen* and *Heller* to hold that there is a

2    Second Amendment right to carry guns onto other people's

3    property without knowledge and without consent.

4         I think that's enough to resolve the issue on the

5    first part of the *Bruen* test, but if we move on to the second

6    part, we have provided the court with eight statutes from

7    seven states stretching from 1715 through 1893 and just

8    excerpting a couple of them, Pennsylvania 1721, "If any

9    person or persons shall presume to carry a gun or hunt on the

10   improved or inclosed lands of any plantation other than his

11   own, unless he have license or permission from the owner of

12   such lands or plantation," he will suffer criminal penalties.

13        New York 1763 establishes criminal liability "if

14   any person or persons whatsoever other than the owner,

15   proprietor, or possessor or his or her servant or servants,"

16   white servant or servants here, "do and shall carry, shoot,

17   or discharge any firearm whatsoever."  There are a couple of

18   ellipses in this just so that I don't belabor all of us with

19   the reading.  "Into, on or through any orchard, garden,

20   cornfield or other enclosed land whatever within the city of

21   New York or the liberties thereof without license in writing

22   first had and obtained for that purpose," in writing, not

23   express, not verbal, "from such owner, proprietor, or

24   possessor."

25        New Jersey 1771.  The law says, provides for

1    liability "if any person or persons shall presume at any time

2    after the publication hereof, to carry any gun on any lands

3    not his own, and for which the owner pays taxes, or is in his

4    lawful possession, unless he hath license or permission in

5    writing from the owner or owners."

6            We have a couple more.  Louisiana 1865 forbade "any

7    person or persons to carry firearms on the premises or

8    plantations of any citizen without the consent of the owner

9    or proprietor."  And this one was particularly fun because

10   they also passed it in French.

11           Texas in 1866, "it shall not be lawful for any

12   person or persons to carry firearms on the inclosed premises

13   or plantation of any citizen, without the consent of the

14   owner or proprietor."

15           THE COURT:  And has the state done the historical

16   analogy of those various ordinances and statutes during the

17   period of time to indicate what they represent with regard to

18   the entire picture of what was being enforced with regard to

19   the Second Amendment at that time?

20           MR. THOMPSON:  I'm not sure if I understand the

21   question, your Honor, I apologize.

22           THE COURT:  The analogy of, okay, you're talking

23   about city ordinances, you're talking about state statutes

24   and you know what those populations in the whole represent

25   across the country at that time with regard to the

1   enforcement of the Second Amendment, has that been done, do

2   you want to comment on that?

3             MR. THOMPSON:  So each of these are state laws and

4   it's over a significant period.  When -- I'm still, I'm not

5   totally sure if I understand your question and I apologize if

6   I'm being dense, your Honor, what are you --

7             THE COURT:  You heard the plaintiff talk about the

8   fact that you need to look at the census material, you need

9   to look at the time period to see how the -- it's being

10  enforced, with respect to the entire country.

11            MR. THOMPSON:  So I think there's -- I think the

12  plaintiff has made more of that than the *Bruen* test requires.

13  I think that if we've shown your Honor eight statutes from

14  seven states over such a significant period --

15            THE COURT:  You think that's enough.

16            MR. THOMPSON:  I think it's absolutely enough.  I

17  think your Honor's analysis in the October 6th opinion was

18  correct.  It's --

19            THE COURT:  So any statute that's been passed

20  anywhere, a city ordinance, a territory, any of the states,

21  regardless of size and population, would suggest a historical

22  position that tells this court that that statute should be

23  upheld?

24            MR. THOMPSON:  I think any statute or any ordinance

25  is certainly relevant and should not be brushed aside, should

1    not be ignored.  I think the question of what a tradition is

2    is a relevant one.  I think your Honor struck a good balance

3    in your October 6th opinion.  And I think it's worth

4    remembering here that when we look at a statute from history,

5    from 1866 or from 1722, and we say that this is irrelevant,

6    that it doesn't -- that it does not bear consideration, I

7    think that is implicitly a finding that that statute is

8    unconstitutional, that that statute that was passed at that

9    time is unconstitutional because it's inconsistent with our

10   understanding here in 2022.  I think that would be an

11   extraordinary position to take.  And I think that *Bruen*

12   requires us to be humble and to take history seriously.  One

13   of the great concerns I think that everyone, commentators

14   have had after the *Bruen* test is that the goalposts will

15   always move, is that there will always be a way to say,

16   except for all this history, there's not enough history.  And

17   that's not what your Honor did in the October 6th opinion.

18   That's -- and that's not what we think that you should do

19   now.

20          We would also say that *Bruen* at no point required a

21   majority of states, and in fact in some of the areas that

22   *Bruen* looks at, in particular in the sensitive places areas,

23   the -- they noted that there was at points scant historical

24   evidence for some of the locations that they talk about, like

25   schools and courthouses, and yet they said that there was no

1    question about the lawfulness of these prohibitions.  So I

2    think that the -- when you look at history, we need to look

3    at history humbly and we need to not brush it aside.

4         THE COURT:  But don't you, do you think -- I'm not

5    suggesting that we brush it aside, but as a part of the

6    evaluation, are there different weights that they should be

7    given based on the population that that statute is

8    addressing?

9         MR. THOMPSON:  That's a good question.  What I

10   would say is we don't give different weights to different

11   state laws today, we don't say that a law in South Dakota is

12   less viable than a law in New York because New York is

13   bigger.  I think certainly every law merits consideration.

14   We could maybe say that the laws that we talk about in

15   New York or New Jersey are more important than the laws we

16   talk about in Maryland or Oregon, but I think that does a

17   disservice to federalism frankly.  It's certainly possible to

18   say that some laws are more meaningful than others, but I

19   think every law is meaningful at least to some extent.  And

20   every law needs to be looked at and considered.  And

21   certainly in this case on a practical level, eight laws from

22   seven states over such a long period of time, it's difficult

23   to, it's -- I shouldn't say that, but that is a very

24   substantial showing, and I think not one to be brushed aside

25   lightly.

1          Similarly, these laws are not merely to stop
2     poaching.  The plain text of the statute shows that their
3     purpose applied to carrying of guns, protecting private
4     property, not merely to stop poaching.  We quote from a
5     number of these statutes in the brief, "to carry any gun or
6     hunt" from Pennsylvania, "carry, shoot or discharge any
7     musket" from New York, "carry any gun on any lands not his
8     own" from New Jersey.  To carry firearms, it's not just about
9     hunting.  We did drop a footnote in our brief with a handful
10    of state laws that were about hunting on other people's
11    property and limited their scope to carrying guns on other
12    people's property for purposes of hunting in specific.  I
13    think those statutes only further bolster the
14    constitutionality here because it shows that the carriage
15    could be regulated.
16         Similarly, there's no limitation in these statutes
17    to fenced-in farmland or fenced-in hunting land.  The text of
18    the statutes are broader than that.  In many cases the
19    statutes deal with areas like woods or gardens or orchards
20    that are specifically not fenced in, and many of these
21    statutes don't contain any limitations as to enclosure.
22    Furthermore, the term enclosure is understood broadly to mean
23    any land that is set off from, you know, from the wilderness,
24    any land that's set off to indicate private property, I think
25    very much including buildings.  And many of these statutes

1   talk about plantations or premises, and Black's defines

2   premises as the house or building along with its grounds.  So

3   I think these laws cannot be so limited merely to fenced-in

4   farmland.

5           And we also cite to, again, the *GeorgiaCarry*

6   decision which says that, "An individual's right to bear arms

7   as enshrined in the Second Amendment, whatever its full

8   scope, certainly must be limited by the equally fundamental

9   right of a private property owner to exercise exclusive

10  dominion and control over its land."  And that was decided,

11  again, through historical analysis on the first part of the

12  then-dominant *Heller* analysis.

13          THE COURT:  And again, you take the position of the

14  default situation where the state's, you know, making the

15  decision for the property owner, it's not about informed

16  consent, it's about it being illegal unless the property

17  owner says no, your gun is welcome here, and says so

18  publicly?

19          MR. THOMPSON:  I think it's -- I think it's

20  absolutely about informed consent and the reason that the

21  default is set where it is is because if the default is guns

22  allowed, then someone can carry onto someone else's property,

23  into someone else's home without ever needing to tell the

24  property owner that the gun is there.

25          THE COURT:  Don't those other statutes do exactly

1    that?

2             MR. THOMPSON:  No, they don't.

3             THE COURT:  Say you need to get informed consent?

4             MR. THOMPSON:  Yes, they say you need to get

5    informed consent and that's what New York statute requires,

6    it's entirely constitutional and entirely supported.

7    Informed consent is, I don't think there's anything

8    unreasonable, unconstitutional, or unhistoric about it.

9             THE COURT:  You say the New York statute's no

10   different than the ones you've cited.

11            MR. THOMPSON:  I think it accomplishes the same

12   fundamental thing.

13            THE COURT:  That's not my question.  It's no

14   different?

15            MR. THOMPSON:  I think there's, between informed

16   consent and express consent, I wouldn't say no difference,

17   some of these statutes require consent in writing

18   historically.  New York only requires express consent.  Your

19   Honor said briefly earlier that it requires a public

20   statement, it does not require a public statement.  A private

21   statement, a verbal statement, any form of express consent

22   satisfies the statute.  And there's nothing ahistorical and

23   there's nothing unconstitutional about that requirement.

24            Your Honor, moving on to the good moral character

25   standard, your Honor found in your October 6th opinion that

1   the standard was constitutional to the extent that an
2   applicant could be disqualified based on a finding about his
3   or her conduct and so long as the standard was not applied in
4   such a way as to bar lawful self-defense.  State defendants
5   would submit that the constitutionality of the statute is not
6   so limited but for the purpose of facial challenge, that's
7   enough to end this analysis.  Under the facial challenge
8   standard, a plaintiff can only succeed by establishing that
9   no set of circumstances exists under the law under which the
10  law would be valid.  That's, again, the *Washington State*
11  *Grange* case.  Your Honor found that there was a set of
12  circumstances in which it would be, and that's enough to
13  settle the issue.  And it's entirely consistent with the
14  Second Circuit's holding in *Libertarian Party*.

15          As an initial matter, the conclusion stems from the
16  first step of the *Bruen* analysis.  Again and again, in *Bruen*
17  and *Heller* and *McDonald*, the court emphasizes that the people
18  as used in the text of the Second Amendment refers to
19  law-abiding responsible citizens.  But undisputedly, some
20  people aren't law-abiding or responsible and the Second
21  Amendment is not implicated if they're denied the ability to
22  have the power of life and death over their fellow citizens.
23  The good moral character standard and the equivalent
24  standards from 43 other shall-issue licensing states is how
25  we figure out which is which.  And the *Bruen* court

1    acknowledged that licensing laws are constitutional when they

2    "are designed to ensure that applicants are in fact

3    law-abiding responsible citizens."

4         The same conclusion stems from the *Libertarian*

5    *Party* case in the Second Circuit which upheld the previous

6    good moral character requirement which is broader and less

7    defined than the one that we have currently on the first step

8    of the *Heller* analysis.  The Second Circuit held that the

9    statute as it was previously "does not burden the ability of

10   law-abiding responsible citizens to use arms in defense of

11   hearth and home."  That's 970 F.3d at 127.  The Circuit also

12   exampled -- identified examples of several sound bases where

13   the standard could constitutionally lead to the denial of

14   licensing application "such as threats to harm others or his

15   addiction to drugs or his repeatedly reckless conduct with a

16   weapon while intoxicated."  It's from 970 F.3d at 126.  Those

17   examples I think would satisfy your Honor's standard as well,

18   as laid out in the October 6th opinion.  And those examples

19   are enough to sustain the facial constitutionality of the

20   statute.

21        The Second Circuit in *Libertarian Party* found that

22   the definition of good moral character was not difficult to

23   understand and that examples of its application "are not

24   beyond an ordinary person's comprehension, nor are they

25   rare."  And the CCIA has only made this definition of good

1   moral character clearer and more precise since.

2          Now the plaintiffs talk about a bunch of bizarre

3   scenarios where licensing officials would implement this

4   requirement in an abusive way, but there's no evidence of

5   that, certainly not in the case of any specific plaintiff.

6   And the Second Circuit noted in *Libertarian Party* that the

7   plaintiff in that case had not "alleged that any law-abiding

8   responsible citizen who has applied for a New York firearm

9   license has been denied."  That's from page 128 of the

10  opinion.  And the plaintiffs have not alleged that either.

11         Now the plaintiffs have misstated the law in their

12  reply where they imply that the Second Circuit has somehow

13  implicitly overruled the *Libertarian Party* case in *Sibley v.*

14  *Watches*.  Your Honor can read the *Sibley* order on Westlaw as

15  well as the rest of us, it was a, you know, a standard remand

16  order because the case was pending when *Bruen* was decided,

17  they remanded to the District Court "to consider in the first

18  instance the impact, if any, of *Bruen* on Sibley's claims."

19  They also said, "We express no view as to that issue or any

20  other issue that may arise."  So there it does not mention

21  *Libertarian Party*, it does not cite *Libertarian Party*, it

22  certainly does not indicate that any part of the *Libertarian*

23  *Party* case was implicitly overruled.

24         So as your Honor discussed with Mr. Stamboulieh,

25  the good moral character standard as revised and narrowed by

1     the CCIA is fully consistent with *Bruen* and the other

2     shall-issue state laws discussed in that case.

3            Now before we get into that comparison I just want

4     to address, your Honor in your October 6th opinion indicated

5     that you view the statute as containing a negative

6     presumption where the applicant must persuade a licensing

7     official of their character and that there is, the applicant

8     must rebut a presumption that he or she is a danger to

9     himself or herself.  That's not what the statute says, that's

10    not in the text of the statute, there is no such negative

11    presumption in the statute.  All that's required is that the

12    licensing officer find that the applicant has the character,

13    temperament, and judgment necessary to be entrusted with a

14    weapon and use it only in a manner that does not endanger

15    oneself or others.  There's no negative presumption there,

16    just a straightforward standard that's similar to those of

17    other shall-issue states.  In fact the New York standard is

18    much narrower and less discretionary than many of those

19    states.

20            THE COURT:  In what way?

21            MR. THOMPSON:  So we put up examples for your Honor

22    of many, of several of those states that have standards that

23    are really about character or suitability.  We talked about

24    Connecticut, Rhode Island, Georgia, and Indiana, where they

25    have statutes that just say good moral character, period.  Or

1    suitability, period.  Or a suitable person, where it is

2    really about the judgment of the person in general and their

3    character in general and that, even that sort of statute was

4    endorsed by the court, by the *Bruen* court, and I think would

5    be consistent with *Libertarian Party*.

6         But the New York standard is narrower than that

7    because New York ties its determination specifically to

8    dangerousness; to the question of whether the person is going

9    to be a danger to others or to themselves.  That's a narrower

10   standard than one that's about character.  And that puts us

11   in line with many of the other states.  We have I think a

12   lengthy string cite in our brief but just as an example, in

13   Pennsylvania, the question is "whether the applicant's

14   character and reputation are such that the applicant will not

15   be likely to act in a manner dangerous to public safety."

16   Montana, it's about whether the person "may be a threat to

17   the peace and good order of the community to the extent that

18   the applicant should not be allowed to carry a concealed

19   weapon."  These are standards that are about dangerousness,

20   not character.  And New York's standard fits comfortably into

21   that area.

22        Now different states have different standards and

23   that's fine, under the *Bruen* opinion.  They are all

24   shall-issue states and the *Bruen* opinion makes clear that "to

25   be clear, nothing in our analysis should be interpreted to

1    suggest the unconstitutionality of the 43 states' shall-issue

2    licensing regimes, under which a general desire for

3    self-defense is sufficient to obtain a permit."  That's true

4    in New York as well.  And so I would submit to your Honor

5    that a formulation of the Constitution that indicates that

6    some of these states' standards are unconstitutional and some

7    of them aren't would be inconsistent with the court's holding

8    in *Bruen*.  *Bruen* said that all 43 of these states are

9    constitutional.  And New York says as well, a general desire

10   for self-defense is sufficient to obtain a permit, there's no

11   proper cause requirement.  New York State's falls into that,

12   the same group as the other shall-issue states and it's

13   constitutional just like their laws are.

14           THE COURT:  Can you tell me where in *Bruen* it says

15   all 43 of those states' statutes were found to be

16   constitutional?

17           MR. THOMPSON:  I don't have the pin cite but I

18   believe it's footnote 9, but again, that's a direct quote,

19   "Nothing in our analysis should be interpreted to suggest the

20   unconstitutionality of the 43 states," and I think that --

21           THE COURT:  That's different than what you just

22   said.

23           MR. THOMPSON:  I don't -- I don't think it is.  I

24   think that to the extent that there is an argument that *Bruen*

25   implicitly found those states' regimes unconstitutional,

1    that's clearly against what the court is saying.

2              THE COURT:  Okay.

3              MR. THOMPSON:  Your Honor, I'm happy to address

4    that if you see a distinction that I don't.

5              THE COURT:  You're saying two different -- that's

6    not what *Bruen* said.  It doesn't, it's -- there's nothing in

7    that decision that says that those 43 shall-issue states'

8    statutes are constitutional.

9              MR. THOMPSON:  It's, I guess --

10             THE COURT:  There's nothing to presume that they're

11   unconstitutional at this point, but I don't know if they've

12   gone through this process at this point after *Bruen*, so to

13   stand there and say that the Supreme Court said that all 43

14   states who have shall-issue statutes are constitutional is

15   just disingenuous.

16             MR. THOMPSON:  I apologize, I certainly would never

17   intend to be disingenuous to the court.  I guess I have a

18   hard time seeing the daylight between nothing in this opinion

19   says they're unconstitutional and saying that they are

20   constitutional, and in fact if you look at --

21             THE COURT:  Because doesn't the decision suggest

22   that this process is going to occur across the country and

23   there's going to be challenges and analysis of those statutes

24   just like is going on here?  Isn't that what that would

25   suggest?

1          MR. THOMPSON:  I'm not sure, and your Honor, I

2    would point to the Kavanaugh and Roberts concurrence that

3    says that the 43 states that have these shall-issue regimes

4    can continue to use them.  I'm paraphrasing, that is not

5    quoting directly, but, and I suppose the question, I suppose

6    the question would be based on where the source of the

7    challenge is, but *Bruen* I think says that the challenge can't

8    come from *Bruen*, *Bruen* says that nothing in *Bruen* suggests

9    their unconstitutionality.  And so I don't think that there's

10   any basis from the *Bruen* decision to find that some of these

11   state statutes are unconstitutional.  I think, if anything,

12   both the majority opinion and Justice Kavanaugh and Chief

13   Justice Roberts are saying quite the opposite.  And Justice

14   Alito --

15          THE COURT:  So what you're saying is your position

16   is that the Supreme Court did that analysis of those 43

17   states?

18          MR. THOMPSON:  I think that the Supreme Court

19   endorsed their constitutionality, yes, and emphasized that

20   *Bruen* as a decision should not be read to, in a way as to

21   render them unconstitutional.

22          THE COURT:  Okay.

23          MR. THOMPSON:  So yes, that's --

24          THE COURT:  Okay.

25          MR. THOMPSON:  I'm sorry, your Honor, I certainly

1    didn't mean to talk over you.

2              THE COURT:  No, that's fine, go ahead.

3              MR. THOMPSON:  So in terms of the historical

4    analogues here, I won't belabor this point because we're --

5    we have a lot to discuss and your Honor's well familiar with

6    them, we talked about five different groups of analogues,

7    laws providing for the disarmament of dissident or hostile

8    groups, revolutionary laws, disarming persons disaffected to

9    the cause of America.

10             You know, the plaintiffs again in this case put in

11   their sort of hypothetical of William Floyd, New York's

12   delegate to the Constitutional Congress countenancing,

13   sitting down with the licensing official but in fact it was

14   the Constitutional Congress in March of 1776 that said that

15   Americans needed to appear in person to swear loyalty or be

16   disarmed.  We talked about militia mustering statutes that

17   provided for disarmament if a person was inspected and found

18   unfit to be carrying arms.  We added a couple of references

19   in our opposition this time to proposals at the

20   Constitutional ratification conventions.

21             For instance, Pennsylvania said that "no law shall

22   be passed for disarming the people or any of them unless for

23   crimes committed or real danger of public injury from

24   individuals."  Massachusetts likewise said "no law to prevent

25   the people of the United States who are peaceable citizens

1    from keeping their own arms."  This is discussed in the

2    *Coombes* case, 2022 WL 4367056.  And all of that goes to the

3    point that if there is indicia of dangerousness, an indicator

4    that a person is dangerous, it is entirely consistent with

5    history that that person be disarmed.

6            Lastly, we also talk about 19th century licensing

7    requirements like New York City's, I think we put it, we put

8    in, we kept our examples only to New York just because we're

9    New York, but a number of examples from Brooklyn, Buffalo,

10   here in Syracuse.  And there are similar examples across the

11   country of statutes requiring someone to appear in person,

12   apply to the officer in command of the station house or the

13   precinct where he resides, here I'm quoting from 1878 New

14   York City licensing law, and that if the officer was

15   satisfied that the applicant is a proper and law-abiding

16   person, the officer would make a recommendation to the chief

17   of police.  And again, we've included a bunch of other

18   New York laws, we could have included similar laws across the

19   country, but again, we felt like we had deluged the court in

20   enough paper as it was.

21           THE COURT:  Certainly done that.

22           MR. THOMPSON:  Well, we try, your Honor.  So your

23   Honor in your October 6th opinion found that this history

24   showed that the statutes "treated people as being entitled to

25   a firearm unless they posed, or more specifically, found by

1    the government to pose such a danger."  I'm not sure if

2    that's quite right since there are a number of statutes that

3    provided for disarmament unless someone physically appeared

4    and swore an oath or otherwise showed that they were not a

5    danger.  But in any event, I think it's undisputed that if

6    someone is found to be a danger, if there are indicia of

7    dangerousness that there's no entitlement to a firearm as the

8    court indicated, and that undisputedly constitutional

9    application is enough to defeat a pre-enforcement facial

10   challenge.

11          I want to push back a little bit on

12   Mr. Stamboulieh's argument that the good moral character

13   standard is impermissibly discretionary, that it allows a

14   licensing official to deny a license for any reason or no

15   reason.  There is a body of law in the Supreme Court and the

16   Second Circuit stemming from the First Amendment case and

17   this is the same body of law that the Supreme Court cited in

18   *Bruen*.  And the interpretation of this law establishes that

19   standards that are tied to dangerousness or safety "are

20   reasonably specific and objective and do not leave the

21   decision to the whim of the administrator."  That's a quote

22   from the *Field Day* case, 463 F.3d at 179.

23          First, in the *Libertarian Party* case, the Second

24   Circuit already determined that the prior good moral

25   character standard which, again, is broader than the one that

1    we have now after the CCIA, was not unconstitutionally vague.

2    The Circuit found that it was not beyond the ordinary

3    person's comprehension, that it was "easily understandable",

4    that there was "no evidence of confusion" and that "the

5    repeated use for decades without evidence of mischief or

6    misunderstanding suggests that the language is

7    comprehensible."  That's from 970 F.3d at 126-27.  And the

8    fact that the new CCIA standard is tied to safety and to

9    dangerousness is adequate to cabin any impermissible

10   discretion.  For that we cited to *Thomas v. Chicago Park*

11   *District*, 534 U.S. at 324, which upheld a standard allowing

12   for the denial of a permit when there was "an unreasonable

13   danger to the health or safety of park users," and to the

14   *Field Day* case, 463 F.3d at 180-81 which the Circuit held

15   that the challenged law "establish[es] an objective test,"

16   and that that test was "whether unreasonable risks to genuine

17   issues of life or health are presented."  So when there's a

18   statute that's tied to safety or dangerousness, that is a

19   standard that is not impermissibly subjective or

20   discretionary.

21           And as the Circuit said in *Field Day*, "Perfect

22   clarity and precise guidance have never been required even of

23   regulations that were strict [constitutionally-protected]

24   activity," constitutionally-protected is in brackets, I think

25   it says First Amendment in the case itself.  Continuing with

1    the quote, "and flexible standards, including considerable

2    discretion to public officials, can pass constitutional

3    muster."  That's a quote from *Field Day*, 463 F.3d at 179,

4    quoting *Ward v. Rock Against Racism*, 491 U.S. at 794.

5         So we would submit that the standard here which

6    talks about potential harm to oneself or others is not

7    impermissibly discretionary, it's a standard that can be

8    applied in an effective and in a constitutional manner.

9         Moving on to the question of licensing procedures.

10   The court in its October 6th opinion sustained the character

11   reference requirement in that, in both of your Honor's

12   opinions.  The in-person interview requirement your Honor

13   found constitutional in *Antonyuk I* but unconstitutional in

14   the October 6th opinion.  We would submit that both

15   provisions are constitutional based on historical antecedents

16   and that those antecedents allow for an assessment of

17   someone's reputation and required an in-person appearance.

18        So for instance, the Massachusetts law disarming

19   followers of a dissident preacher did so insomuch as there is

20   just cause of suspicion that they might become violent, and

21   it names specific persons but they also allowed that if any

22   of them appeared before a magistrate and made an oath, that

23   they would not be disarmed.

24        Similarly, many of the laws targeting people for

25   group membership had a reputational element to determining

1    whether someone would be subject to the law but also provided

2    that the person would not be disarmed if they appeared in

3    person and gave assurances that they were not dangerous and

4    took an oath of allegiance.  Likewise, the revolutionary

5    loyalty laws enacted at the order of the 1776 Continental

6    Congress required people to come and take an in-person oath

7    of loyalty and not be disarmed.  So Pennsylvania said, "Take

8    and subscribe the following oath or affirmation before some

9    one of the justices of the peace of the city or county where

10   they shall respectively inhabit."  And these requirements

11   frequently had a reputational element, so for instance,

12   New York's applied to "all persons," and there's an ellipsis

13   here, "who are known to be disaffected to the cause of

14   America."  Militia mustering laws likewise involved an

15   in-person assessment of someone's fitness to bear arms and

16   people who failed would be disarmed and court martialed.

17          Nineteenth century licensing laws also generally

18   involved an in-person appearance at one's local police

19   precinct and then a recommendation by the local officers to

20   the superintendent or to the chief of police.

21          Moving on to the discussion of training which your

22   Honor raised earlier, your Honor already upheld this

23   requirement twice in both *Antonyuk I* and in your October 6th

24   opinion.  Training is specifically endorsed and called for in

25   the text of the Second Amendment.  As *Heller* noted, that "the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1   adjective well-regulated applies nothing more than the

2   imposition of proper discipline and training."  So training

3   is core to the Second Amendment and training requirements are

4   explicitly contemplated in both *Heller* and *Bruen*.

5        And when you look at the historical analogues for

6   what training was required in the Founding Era, New York's

7   training requirements are far, far less than what was

8   required.  We've put a number of statutes before your Honor,

9   but the statutes show that people could be mustered for

10  training up to six times a year and for up to six hours or

11  more per session.  New Jersey had a law requiring six hours

12  but other states had no upper limit on the number, on the

13  length of time in a particular session of militia training.

14  You do the math on that, you're talking about a requirement

15  greater than the CCIA's requirement, and that's every single

16  year until a person turns 45.  Certain people were exempted,

17  judges were exempted, but the rest of us were all going to be

18  out there marching and being trained.

19       Today's requirement applies just once for people

20  like the plaintiffs who are applying for a license upstate.

21  It applies only once, only when you apply, for an initial

22  carry permit.

23       In terms of cost, let me just point out to start

24  with that the costs of the training are not imposed by the

25  state.  The state does not set a fee for how much the

1    training costs.  And historically, participating in training

2    was both mandatory and expensive.  A citizen had to leave his

3    home and often their farm with a significant opportunity

4    cost, a citizen had to provide all his own weapons,

5    ammunition, equipment, pay for food and drink, travel

6    significant distances.  All of this was at the citizen's own

7    expense as the militia would only pay and were only given

8    rations in times of "actual service."

9             THE COURT:  Is there any threshold amount which

10   would be seen as an impediment to the exercise of their

11   Second Amendment right?

12            MR. THOMPSON:  It's a good question.  First of all,

13   I would say that that amount would have to be state imposed

14   for the question to be presented, and certainly there's no --

15   there's no indication with respect to any specific plaintiff

16   here that that question is posed to them.  I'm not sure what

17   that amount would be, but certainly the *Kwong* case which we

18   cited, which Mr. Stamboulieh refers to, indicates that that

19   amount would be far higher than what's contemplated here.

20            THE COURT:  Plaintiffs' counsel in his argument

21   indicated that he expects that it would cost $1,000 at least

22   to, for an applicant to exercise their Second Amendment

23   rights by satisfying the training requirement.  Your reaction

24   to that and is that an amount that's acceptable?

25            MR. THOMPSON:  I think that's a hypothetical that's

1    not, that there's no evidence for that in the record.

2    It's -- that number is much higher than my understanding of

3    what's offered at a number of places throughout the state of

4    New York.  That number is, you know, also not something that

5    is imposed by the state.  This is not a fee that is set by

6    the state, it's set by private trainers.  There is nothing

7    requiring that licensing classes can't be given pro bono or

8    for any amount.  So that's something that is set by the

9    private market and not by the state.  But, and again, I think

10   it's one that's not established in the record and not before

11   the court on a facial challenge.

12           Your Honor, in terms of requesting additional

13   information in connection with a licensing application, I

14   think that requirement could only be struck down if there

15   were no set of circumstances where it was ever permissible to

16   ask a question that is not specifically enumerated in the

17   statute.  I think we can all imagine harmless and anodyne

18   questions.  And also no plaintiff has standing to raise this

19   challenge, no plaintiff has been asked any question that they

20   view as inappropriate in connection with an interview because

21   no plaintiff has gone to an interview.  So if such a

22   situation were to arise in future, it could be dealt with in

23   an as-applied challenge, but there is no basis for a facial

24   invalidity of that part of the statute, as your Honor found

25   in the October 6th opinion.

1          Moving on to the social media disclosure provision,

2     and to be clear, the social media disclosure requirement does

3     not work the way that the plaintiffs have portrayed it in

4     their papers.  All that is required is "a list of former and

5     current social media accounts from the past three years."

6     That's all that it requires.  Nothing in the statute requires

7     that applicant disclose their nonpublic posts, turn over

8     their passwords, make the licensing official your Facebook

9     friend, and I appreciated -- I interpreted Mr. Stamboulieh, I

10    won't put words in his mouth, but I believe he acknowledged

11    in his portion of the argument that the list is all that's

12    required by the statute.  *Bruen* states in specific that

13    states may require a background check as part of the

14    licensing process, 142 S.Ct. at 2138, footnote 9.  Justice

15    Kavanaugh and Chief Justice Roberts specified that this can

16    involve fingerprinting and a mental health records check,

17    page 2162.  Those are also anachronistic requirements without

18    any 18th century antecedents.  I don't know what the 18th

19    century version of fingerprinting was, but the court has told

20    us that fingerprinting is a constitutional application here.

21    And there's no question --

22          THE COURT:  So you see the social media as

23    analogous to these other --

24          MR. THOMPSON:  I see social media analysis as

25    analogous to the inquiry that would be done in connection

1    with these other statutes in terms of looking at someone's

2    reputation, looking at whether someone is dangerous.  I think

3    that the historical tradition establishes that it is

4    constitutional for licensing officials to look into whether a

5    person is dangerous and to cabin that inquiry into whether,

6    into dangerousness itself but to look into the question of

7    dangerousness in a way that is appropriate for the time.

8         THE COURT:  But again, there's no historical

9    analogous statute that you can point to.

10        MR. THOMPSON:  I think it depends on how tight the

11   analysis goes.  Your Honor in your October 6th opinion talked

12   about, is there something requiring persons to disclose the

13   pseudonyms that they used while publishing political

14   pamphlets or newspaper articles.  That would be the "dead

15   ringer" as *Bruen* talks about, but *Bruen* says that a dead

16   ringer is not required; instead, what you need is something

17   analogous.  And the court similarly emphasized that in areas

18   implicating unprecedented societal concerns or dramatic

19   technological changes, there should be a more nuanced

20   approach, and this is an example of where that should be.

21   And I think *Bruen* gives us an example of why the analysis

22   needs to be flexible and this is a, this is an analogue that

23   *Bruen* specifically discusses when it talks about the types of

24   weapons that are permitted under the Second Amendment.  The

25   Second Amendment does not only permit muzzle-loaded muskets

1    as were the standard in 1791.  The court looked at the

2    history and tradition and found a principle that unified the

3    history and tradition which is that the Second Amendment

4    protects guns that are commonly in use for lawful purposes.

5            Similarly, the history and tradition establishes

6    that there can be an assessment of dangerousness, and I think

7    that general principle, the assessment of dangerousness, is

8    what the history establishes and I think that here in the

9    third decade of the 21st century, it's entirely reasonable

10   that that assessment would include a look into someone's

11   social media.  We have seen too many examples of when that

12   was not done and when there was social media presence, public

13   posts that would have warned us of an upcoming massacre.

14           Similarly, you can look to *Libertarian Party* where

15   the Second Circuit identified examples of several sound bases

16   for denying requests to possess a firearm such as threats to

17   harm others, such as addiction to drugs, or repeatedly

18   reckless conduct with a firearm while intoxicated.  All of

19   these can show up on social media and there's no reason why

20   the licensing process shouldn't be able to look for and

21   consider them and shouldn't be able to know what the --

22           THE COURT:  All those examples would show up

23   someplace else as well, without getting into somebody's

24   social media, isn't that right?

25           MR. THOMPSON:  I'm not sure.

1            THE COURT:  Police records?

2            MR. THOMPSON:  I'm not sure, they could show up in

3    police records but they could also show up in social media

4    and not be reflected in police records.  Police records only

5    show up once there has been a crime committed or at least an

6    arrest made.  The question is can the licensing official look

7    into the person's public profile, their public posts that

8    they themselves have shared and for these indicia of

9    dangerousness and I don't think there's any reason why that

10   would be unconstitutional or ahistorical.

11           THE COURT:  And is there a standard with regard to

12   what indicates dangerousness in this social media search?  Is

13   it somebody espousing that they thought the January 6th, you

14   know, assault on the Capitol was appropriate, is that enough

15   to say that they should not get a weapon?

16           MR. THOMPSON:  So two answers to that question.

17           THE COURT:  And I know we're getting into

18   hypotheticals and that's not what we're here to do --

19           MR. THOMPSON:  That's the first answer.

20           THE COURT:  -- and that's what you're about to say,

21   but is there a standard?

22           MR. THOMPSON:  Yes.

23           THE COURT:  Let's answer that question.

24           MR. THOMPSON:  The standard is what's provided for

25   in the statute, the standard is the good moral character

1    standard, whether someone is likely to use a weapon in a way

2    that is going to endanger himself or others.

3              THE COURT:  Other than self-defense.

4              MR. THOMPSON:  I think --

5              THE COURT:  That you suggest is presumed in your

6    statute.

7              MR. THOMPSON:  I think we would certainly agree

8    that if someone were to be denied a license based on a

9    finding that they were -- that they would engage in lawful

10   self-defense, that would be unconstitutional, yes.  I don't

11   think it's required to be in the statute, expressly, just as

12   it isn't in many other shall-issue states, but we certainly

13   would agree that they would be an unconstitutional

14   application.

15             THE COURT:  The effect of that is it gives your

16   licensing officer more discretion.

17             MR. THOMPSON:  I don't think it does.  I think that

18   the -- I think that that's the entire point of having

19   as-applied challenges.  We don't --

20             THE COURT:  So the licensing officer who will

21   decide what's appropriate self-defense when they look at

22   somebody's history.

23             MR. THOMPSON:  I don't -- I think that if the -- I

24   think that if that were to happen, then there would be review

25   of that decision and that that review of that decision which,

1    again, has not been made certainly --

2            THE COURT:  Your position would be as-applied

3    standard.

4            MR. THOMPSON:  I think that that would be dealt

5    with in an as-applied challenge and certainly we would agree

6    with your Honor that if someone were to be denied a firearms

7    license based on a finding that they would engage in lawful

8    self-defense if threatened, I think we would certainly agree

9    that that would be an unconstitutional application.

10           Moving on to the question of sensitive locations,

11   your Honor.

12           THE COURT:  Excuse me, I'm sorry, go ahead.

13           MR. THOMPSON:  I think we certainly appreciate the

14   clarity that we've gotten, or at least partial clarity we've

15   gotten from Mr. Stamboulieh in terms of what's being

16   challenged.  I think we've noted at every stage of the

17   litigation that the waters were muddy as to what exactly the

18   plaintiffs were challenging and what the basis of their

19   challenge was, and that the -- and that the question of the

20   plaintiffs' standing to challenge any of the individual

21   sensitive locations was often, let's just say highly dubious.

22   The assertion that their standing to challenge public

23   transportation because plaintiff Mann's church van counts as

24   public transportation if they organized a hunting trip, I

25   think that's incredibly dubious.  We know what public

1    transportation is, it's not a church van.

2            Similarly, the injunction against prohibition on

3    guns in locations managed by state agencies like the Office

4    for People With Developmental Disabilities, Times Square, we

5    appreciate Mr. Stamboulieh saying that these are not being

6    challenged, but it was certainly news to us that they weren't

7    being challenged, as I suspect it was news to the court

8    because your Honor enjoined several of them in the

9    October 6th opinion.

10           So I think in many cases, the basis for standing is

11   dubious at best.  Because it was not clear what they were

12   challenging, we tried to give the court sort of an

13   overarching theory of sensitive places, of the categories of

14   places that have historically been considered sensitive.  I'm

15   happy to walk through those with your Honor, starting with

16   government property.

17           In *Heller*, Justice Scalia endorsed laws forbidding

18   the carrying of firearms in schools and in government

19   buildings and stated that such laws were presumptively

20   lawful.  Justice Thomas reemphasized that in *Bruen* saying

21   that, "We are aware of no disputes regarding the lawfulness

22   of such prohibitions," and similarly Justice Kavanaugh joined

23   by Chief Justice Roberts --

24           THE COURT:  I don't think there's any issues there,

25   let's get to the ones that they are challenging.

1          MR. THOMPSON:  Great.  So we also speak about

2     places critical to other constitutional rights, the right to

3     vote, right to representative government, right to free

4     exercise of religion.  As your Honor found in the October 6th

5     opinion, "Based on historical analogues, it is permissible

6     for New York State to generally restrict concealed carry in a

7     place of worship or religious observation."  Your Honor based

8     that conclusion on six historical analogues from your own

9     research.  We've supplemented that in our briefing, we put in

10     at least seven state laws and four state supreme court

11     decisions.  Your Honor in your opinion raised concerns

12     indicating there should be an exception for persons who have

13     been tasked with the duty to keep the peace in a place of

14     worship.  I think that's very reasonable as a policy concern.

15     Section 265.01-d(3) contains a list of exceptions that we

16     hope addresses or mitigates those concerns, including federal

17     law enforcement, police officers, security guards, and active

18     duty military personnel.

19          THE COURT:  And that's found where?

20          MR. THOMPSON:  It is Section 265.01-d(3) so same

21     statute, further down below the list of sensitive locations.

22     To be sure, there are statutes from well before the founding

23     of America that required persons to bring firearms to church.

24     Those statutes do not "cancel out the history" that the state

25     defendants have adduced as the plaintiffs asked that they do.

1    If anything, they show that presence or absence of firearms

2    was a valid subject of government action.  And so there is

3    absolutely a tradition that supports the banning of guns in

4    places of worship.  People should be able to worship God

5    without worrying that guns are around them.

6         We talk about the right to a fair trial, due

7    process, jury service.  That's, and that tradition is what

8    allows the magnetometers outside the courthouse that we all

9    walked through today.

10        And we talk about the right to peacefully assemble

11   as being a fundamental right.  As your Honor noted in your

12   October 6th opinion, it appears permissible for New York

13   State to restrict concealed carry in any gathering of

14   individuals to collectively express their constitutional

15   rights to protest or assemble.  And in addition to the five

16   different state laws that your Honor pointed to in the

17   October 6th opinion, we added in the Supreme Court ruling

18   from *Illinois v. Presser*, 1886, finding that laws that

19   "forbid bodies of men to ... drill or parade with arms in

20   cities or towns unless authorized by law do not infringe on

21   the right of people to keep or bear arms."  This is another

22   area where history is consistent with common sense.  There is

23   a massive potential for violence and intimidation, either

24   from large groups assembling while armed, or from large

25   groups of people assembling unarmed who deserve the right to

1    express themselves in peace and free from intimidation.

2           We talk about the locations containing vulnerable

3    people, I'm not sure how deeply we need to go into that given

4    the plaintiffs' restriction on what they're challenging and

5    so we'll stand on our papers on that.  Other than to say that

6    vulnerable people were understood to be outside the phrase

7    "the people" who were able to carry arms to defend themselves

8    and so they should be able to rely on the laws to defend

9    them.

10          We also talk about a category of places where there

11   are large groups in confined spaces, and history supports the

12   idea that weapons can be prohibited in such places because of

13   the dangers that they pose.  This category includes laws on

14   fairs, markets, race courses, ballrooms, social parties, a

15   circus, a show or public exhibition of any kind, a ballroom,

16   social party or social gathering and the discussion of places

17   of public assembly.  What sets all of these, the through line

18   of all of these areas is that these are places where people

19   gather together, in confined spaces, where people are

20   vulnerable, where they are often distracted, and where

21   engaging in self-defense in using firearms is not practical

22   and would cause as great a harm to public as it might to an

23   aggressor.

24          To be clear, *Bruen* states that the category of

25   sensitive places cannot be expanded to all places of public

1       congregation that are not isolated from law enforcement

2       because that would in effect exempt cities from the Second

3       Amendment.  Obviously we cannot, do not declare all of

4       Manhattan a sensitive place.  But *Bruen* does not state either

5       in its holding or in *dicta* that concentration of people is

6       irrelevant to making a place sensitive, and history supports

7       the idea.  So all of Manhattan is not a sensitive place but

8       Madison Square Garden is, Carnegie Hall is, and so is a

9       packed subway train at rush hour.

10              Moving into the specific statutory provisions

11      discussed in the October 6th opinion, unless your Honor wants

12      to get into any of them, I think it best in the interest of

13      time not to go into the ones that your Honor upheld beyond

14      what we already have said.

15              In terms of the challenge to libraries,

16      playgrounds, parks, and zoos, I believe Mr. Stamboulieh said

17      that they're not challenging libraries so I won't address

18      that here.

19              Playgrounds I think are pretty clearly analogous

20      both to parks and to schools.  I'm not sure what principle

21      distinction there is between schools and playgrounds, they're

22      both places where children congregate and family and

23      caregivers congregate and where guns do not belong on that

24      basis.

25              In terms of public parks, parks were really sort of

1    in their infancy as an institution during the relevant

2    period, but we've given your Honor eight examples of statutes

3    prohibiting guns in parks in New York, Philadelphia, Saint

4    Paul, Detroit, Chicago, Salt Lake City, and Pittsburgh, and

5    I'll represent to your Honor that we could have given your

6    Honor at least as many more on top of that.

7            Zoos I think are analogous to parks and to schools,

8    they're places where people come together for education,

9    literary, scientific purposes, and in particular, the three

10   oldest zoos in America are the Central Park Zoo in New York,

11   the Lincoln Park Zoo in Chicago, and the Philadelphia Zoo

12   which is located in Fairmount Park in Philadelphia.  All

13   three of those zoos are covered by statutes we put before

14   your Honor, and that's at Exhibits 57, 58, and 74.

15           Summer camps, programs authorized by office of care

16   services, Mr. Stamboulieh indicated that he wasn't

17   challenging those so we can go through them.

18           Child care providers and child care programs, my

19   notes don't indicate whether they're challenging that.  I

20   will just say briefly those are clearly analogous to schools

21   and for that we would cite the *Warden* case, Western District

22   of Washington, where, "The court sees no logical distinction

23   between a school on the one hand and the community center

24   where educational and recreational programming is also

25   provided on the other."  I don't think that there's a

1    principle distinction to be drawn between schools and child

2    care facilities in terms of what is sensitive.

3            State license programs for vulnerable populations,

4    I believe Mr. Stamboulieh said that they weren't challenging

5    that so I won't address it unless your Honor wants me to.

6            It's not clear whether they're challenging -- or

7    actually I think they say they are still challenging

8    subsections B and K of the statute.  Let me just say that I

9    don't think that they properly allege a sufficient connection

10   to either of them for standing purposes.  Subsection K is the

11   one that covers "homeless shelters, runaway homeless youth

12   shelters, family shelters, shelters for adults, domestic

13   violence shelters, and emergency shelters and residential

14   programs for victims of domestic violence."  What ties these

15   locations together is that these are all residential

16   facilities for vulnerable populations.  The plaintiffs don't

17   operate or carry weapons into any such facility, I don't

18   think they've alleged that.

19           THE COURT:  The allegation of Reverend Mann you're

20   saying doesn't do that?  Or affidavit, excuse me.

21           MR. THOMPSON:  So the argument that they made in

22   their papers was that churches, and this is a quote from the

23   reply at pages 33 and 34, "The CCIA does not define shelter,

24   and churches have long been seen as shelters for those

25   suffering from addiction, abuse, criminals, and even

1    governments.  The Catholic church sheltered Jews from the

2    Nazis during World War II."  And I think the linked article,

3    let's just say does not fully support that.  But I think that

4    the question of whether a church would count as a shelter

5    under these --

6              THE COURT:  It was more that he was going to be

7    going to these shelters and would be carrying.

8              MR. THOMPSON:  I don't believe that's been

9    specifically alleged.  If I'm wrong about that, then I

10   apologize and I'm sure your Honor can scrutinize the

11   affidavits as well as I can.  What I would say is these

12   shelter facilities are defensible under the category of

13   sensitive places that include vulnerable populations and in

14   many of these cases, they include significant numbers of

15   children.  So even if your Honor were to view the category of

16   sensitive places as only involving children, certainly family

17   shelters, domestic violence shelters, homeless shelters are

18   all going to contain children.  But more broadly, I think

19   this speaks to one of the core issues of standing, as it

20   applies, as it is applied in the sensitive place context.

21   Oftentimes, the allegation of standing depends on a

22   hypothetical where New York is going to apply these statutory

23   terms in a way that does not necessarily make sense.  So you

24   know, the question of whether a church is a behavioral health

25   facility, there's no evidence before your Honor that New York

1   would apply, would apply the statute that way, New York would

2   interpret it that way.  If New York were to interpret the

3   statute that way, I think that would give rise to an

4   as-applied challenge, but I think in each case, your Honor

5   needs to ask yourself, is there a concrete imminent threat

6   that New York is going to interpret the statute in this

7   strained manner, in such a way that is going to cause an

8   injury in fact to the plaintiff.

9           In terms of subsection B which covers locations

10  providing behavioral health -- health, behavioral health,

11  chemical dependence care services, again, that finding would

12  essentially mean holding that any church or a pastor who

13  counsels a parishioner at a location providing behavioral

14  health services, I don't think that's supported.  And lastly,

15  as discussed in our briefing, history supports the idea that

16  guns can be prohibited to protect vulnerable populations.

17  And again, these are situations where there are going to be

18  many children present.

19          In terms of public transportation, public transit

20  and airports, I think there are serious problems with

21  plaintiffs' challenge here.  We've discussed the idea that

22  the church bus is not public transportation.  And similarly,

23  in terms of the airport, you have a situation where one of

24  the plaintiffs says that he will take a trip to Tennessee,

25  hasn't bought a ticket, done some research into flights, he's

1    going to watch prices, there's no allegations that he has

2    bought a ticket and any state defendant has taken any

3    enforcement action against him.  Particularly if he is

4    carrying his weapon in a case as he says that he will,

5    there's no indication that any state defendant is imminently

6    and concretely about to enforce the statute against that.

7    Even if there were -- I apologize, your Honor.

8              THE COURT:  I'm just curious as to the state

9    position, would they be violating the statute if they brought

10   the gun in the manner that they described?

11             MR. THOMPSON:  I think that's an interesting

12   hypothetical that has not been presented.  What I would say

13   is I think that airports are absolutely a sensitive place.

14   Public transportation, airports are government property and

15   the government can restrict the possession of weapons in its

16   role as property owner and proprietor.

17             THE COURT:  But again, does your statute prohibit

18   an individual from bringing a weapon to an airport in New

19   York State in compliance with federal law to be transported

20   in baggage; does the statute prohibit that?

21             MR. THOMPSON:  I think it certainly prohibits the

22   carrying of a weapon --

23             THE COURT:  Into an airport.

24             MR. THOMPSON:  -- into an airport.

25             THE COURT:  No matter how it's carried?

1          MR. THOMPSON:  Take a look at section -- it

2     discusses possession in a sensitive location, and so yes, I

3     think it would apply to the carrying of a gun in an airport.

4     And I think that's a reasonable thing that's supported by the

5     fact that airports are unquestionably sensitive.

6          THE COURT:  So as a result of this statute,

7     New Yorkers would not be able to travel with their weapon,

8     concealed carry weapon.

9          MR. THOMPSON:  I think that the statute covers

10    that.  I think that, you know, in the question of whether

11    there's -- how that interacts with federal regulations, I

12    don't think it's presented here, I don't think it's been

13    argued to your Honor, but I think that airports are

14    unquestionably sensitive places.

15         THE COURT:  How has it not been argued?

16         MR. THOMPSON:  I don't think that there have

17    been -- that there's been any sort of federal preemption

18    argument made to your Honor.

19         THE COURT:  Oh, I see what you're saying, I thought

20    you meant that they weren't going -- they haven't alleged

21    that they were going to do it.

22         MR. THOMPSON:  No, I think they've alleged that

23    they're going to do it, they've alleged that they are

24    concretely and imminently going to do it.  Whether they have

25    alleged that the statute is going to be applied to them in

1    this manner, whether they've alleged that the state police in

2    particular are going to make an enforcement decision to apply

3    this statute in a manner that would be inconsistent with

4    federal law, I think none of that's in front of your Honor,

5    none of that's supported by the record.  But certainly

6    airports are sensitive places and the possession of a gun in

7    an airport is prohibited.  And justified I would point out.

8         THE COURT:  So again, according to the statute,

9    there's no way to legally travel with your permitted weapon

10   in New York State as a result of this statute?

11        MR. THOMPSON:  I think that it would be -- I think

12   that the question of how it would be enforced and interpreted

13   is one that law enforcement has the right to make and has the

14   discretion to make and I think that the standing laws

15   recognize that a law can be subjected to a limited

16   construction and that law enforcement has the ability to

17   enforce a statute in a way that is constitutional and that is

18   in compliance with federal law if that comes up.

19        But what I would say is that the bar on carrying

20   guns in airports is constitutional, it is state property, in

21   many cases, or state entities, and the government may

22   restrict possession of weapons in its role as property owner.

23   These are places where people congregate in confined spaces,

24   they're certainly more sensitive than a fair or a market or a

25   circus or a race course or a ballroom.  They're places that

1    carry out critical public functions.  Several federal courts

2    have found that airports are sensitive places.  We cite to

3    the *Davis*, I'm going to mispronounce this one, *Huitron-Guizar*

4    case, and *Ferguson* in our briefing.

5          And I think Fourth Amendment precedent also

6    establishes that these are locations that are sensitive.

7    Your Honor in your October 6th opinion talked about statutes

8    on the journey, allowing people to carry guns on a journey.

9    None of those discussed statutes have analogues to airplanes

10   or public transportation, they talk about people journeying

11   alone.

12         Moving on to the question of places where alcohol

13   or cannabis are consumed.  That's also consistent, an area

14   where history is consistent with common sense.  Firearms,

15   drugs, and alcohol do not mix.  States have recognized that

16   fact and tried to address it in various ways.  We cite to

17   several state laws that prohibit the carrying of weapons by

18   people who are intoxicated as well as other statutes

19   forbidding the sale of weapons to intoxicated persons.

20   Statutes prohibiting people addicted to alcohol from being

21   part --

22         THE COURT:  There's no challenge to this.

23         MR. THOMPSON:  There's not?  Then I'll move on.

24   Lastly, places for performance, art, gaming, sporting events,

25   I don't think that plaintiffs seriously dispute this.

1    Mr. Stamboulieh mentioned that he's not challenging stadiums

2    but that he was challenging some subset of this category.

3    It's still not entirely clear to me what is being challenged.

4    But I think you can look at their reply brief and that

5    makes -- gives it two sentences and the first sentence says

6    that these can't be justified as places where people gather

7    in confined spaces.  We think that those certainly can be so

8    justified and that, you know, there are plenty of more or

9    less direct historical analogues that cover recreational

10   spaces, race courses, fairs, ballrooms, social parties,

11   circuses.

12           And the second sentence that the plaintiffs give to

13   this in their reply brief objects that some of the places

14   might not be sensitive at times when there are not large

15   groups gathered, so maybe the Carrier Dome -- actually it's

16   not the Carrier Dome anymore, is it?

17           THE COURT:  No.

18           MR. THOMPSON:  They changed it.  Maybe it's

19   sensitive when Syracuse is playing and it's not at 2 in the

20   morning afterwards.  That's an issue for an as-applied

21   challenge.  I think unquestionably these places when people

22   are gathered are sensitive, and these -- the statute is

23   facially constitutional.  Times Square, they say that they

24   aren't challenging it so I won't get too deep into that.

25           Similarly, I'll try to go quickly so that I don't

1   belabor things any more than I already have by going quickly

2   through the First Amendment points raised.  The free

3   association argument, free association has two -- has two

4   different aspects to it, intimate association and express

5   association.  The CCIA has not violated either of them, has

6   not interfered with anyone's right or ability to intimate

7   association with a particular individual.  There's no

8   allegation that it burdens or targets any group that comes

9   together for the purpose of expressive activity.  No

10  plaintiff has alleged any harm that would give rise to a

11  violation under either of these theories, and even if they

12  had, any burden to associational interests is minimal and the

13  interests involved in protecting the public from gun violence

14  is significant, with a cite to the *Chi Iota* case, 502 F.3d

15  136.

16          In terms of the chilling effect, allegations of a

17  subjective chill are not an adequate substitute for a claim

18  of specific present objective harm.  For that we cite *Laird*,

19  *Davis*, *Clapper v. Amnesty International*.  Here again, there's

20  a lot of allegations about how a licensing officer could do

21  this or that in some hypothetical but no allegation that any

22  licensing officer has actually done so or will do so; and in

23  particular when no application has been submitted, where the

24  only licensing officer is Judge Doran who has never had an

25  application in front of him.  And so in many other -- as in

1      many other ways here, this argument is a solution in search

2      of a problem.

3              If a licensing officer were to abuse his or her

4      position in the way hypothesized, that would be grounds for

5      an as-applied challenge.  And even if plaintiff Sloane did

6      have a genuine injury in fact traceable to any state

7      defendant, which there is not here, the interview, character

8      reference and social media disclosure provisions would

9      satisfy intermediate scrutiny which is the governing test in

10     the First Amendment space.  At one point plaintiffs' reply

11     brief says, you know, all this, all these First Amendment

12     arguments sound like the interests balancing found not

13     applicable in *Bruen* but intermediate scrutiny very much is

14     still the governing standard in the First Amendment space.

15     We'd also just point out that the First Amendment is not

16     violated when a law requires disclosure in connection with

17     the essential operations of the government, and for that we

18     cited your Honor's case in *Medina v. Cuomo*.

19             In terms of the application of the intermediate

20     scrutiny standard here, I'll again try to go through very

21     quickly.  These regulations are content neutral, they advance

22     support interests, they do not burden more substantially,

23     more speech than necessary.  "A regulation that serves

24     purposes unrelated to the content of expression is deemed

25     neutral even if it has incidental effect on some speakers or

1    messages but not others."  That's a quote from *Ward v. Rock*

2    *Against Racism*, 491 U.S. at 791.  And a law need not be the

3    least restrictive means of furthering the public interest;

4    instead, the narrow tailoring is satisfied so long as the

5    regulation promotes a substantial government interest that

6    would be achieved less effectively absent the regulation.

7    That's also from *Ward*, there at 798-99.

8            The public interest here in preventing gun violence

9    is substantial.  The CCIA provisions do not burden any

10   speech, they don't prevent anyone from speaking any message,

11   whether verbally or on social media, and the provisions are

12   narrowly tailored, in particular the social media disclosure

13   provision.  All that's required is a list of accounts.

14   There's no requirement to access any nonpublic postings or

15   data, and the CCIA expressly cabins what they can be used for

16   to the question of whether the applicant will use a weapon

17   only in a manner that does not endanger himself or others.

18           Similarly, there is no compelled speech here.  The

19   private property protection does not compel anyone to speak,

20   no one is required to speak at all and even if they do speak,

21   the statute does not dictate what choice the property owner

22   should make or how she should express it.  It certainly does

23   not force individuals to express a government-chosen message

24   with which they disagree.  In order for there to be a

25   compelled speech issue, the government must force individuals

1    to either speak a particular message or compel affirmants

2    with a belief with which the speaker disagrees.  And I have

3    not written down what case I'm quoting from, but it's one of

4    the cases.  Private property --

5              THE COURT:  I'm sure it's in your papers.

6              MR. THOMPSON:  It is in my papers, your Honor.  The

7    private property protection does neither of those things.

8              In terms of the Fifth Amendment, no plaintiff has

9    standing to bring a Fifth Amendment claim.  No licensing

10   application has been submitted, no interview has occurred, no

11   plaintiff has declined to answer any specific question, no

12   adverse determination has been reached certainly in a

13   criminal context.  To claim the privilege, the hazards of

14   incrimination must be substantial and real, not merely

15   trifling or imaginary.  That's from the *U.S. v. Zappola* case.

16   And even if there were an actual Fifth Amendment case or

17   controversy here, there's no compelled incriminating

18   testimony, no one is required to testify, there's no

19   provision where anyone would suffer any criminal consequences

20   for failure to do so.  Even if there were an adverse

21   inference taken against a plaintiff in an administrative

22   context which, to be clear, has not happened, is not provided

23   for in the statute, we are well into the realm of

24   hypotheticals, but state officials, this is a quote, "State

25   officials are permitted to take adverse administrative action

1    for failure to respond to inquiries even where the answers

2    might tend to incriminate, so long as the adverse consequence

3    is imposed for failure to answer a relevant inquiry and not

4    for refusal to give up a constitutional right." That's the

5    *Johnson v. Baker* case, 108 F.3d at 11.

6            Lastly, on irreparable harm, again, to show

7    irreparable harm the plaintiffs must show that they

8    personally will suffer an imminent violation of their

9    constitutional rights. One that is imminent and concrete,

10    not speculative or hypothetical. That just hasn't been

11    shown, nor has it happened in the multiple months that this

12    case has been pending. On the balance of equities, the harm

13    to the plaintiffs is and remains entirely speculative, while

14    the harm to public safety from injunction would be real. As

15    your Honor noted in *Antonyuk I*, there is an associational

16    relationship between some lenient right-to-carry laws and

17    violent crime. Here in New York, we are lucky to live in a

18    state with the fifth lowest rate of death by firearm

19    according to the CDC. Gun laws play an important role in

20    keeping the public safe and they should not be enjoined,

21    particularly based on the insubstantial and hypothetical

22    harms alleged here.

23            Lastly, as we asked under the TRO context, in the

24    event that the court were to grant an injunction, we would

25    request that its scope be limited to the specific plaintiffs

1   and that its effective date be stayed for three business days

2   to allow for potential appeal.

3            Unless your Honor has any further questions, we

4   would say that this statute is historically justified, passes

5   the *Bruen* test, and that the motion for preliminary

6   injunction should be denied.

7            THE COURT:  Thank you, sir.

8            MR. THOMPSON:  Thank you, Judge.

9            THE COURT:  We've been going since a little after

10  10:00.  I'm going to give everybody a five-minute bathroom

11  break.  Stand up, stretch, go to the bathroom, come back,

12  we'll hear from the city, and then if the county defendants

13  want to say anything at all, I'll give you an opportunity.

14  But I think it appropriate that we give everybody a quick

15  break.  Okay.  No more than five minutes.  Please.

16            (Court in recess, 12:24 p.m. to 12:32 p.m.)

17            THE COURT:  Okay.  We're back in session.  It's

18  good to see the city here.

19            MR. LONG:  Thank you, your Honor, good to be here.

20            THE COURT:  Welcome to the court.

21            MR. LONG:  Thank you.  Good afternoon, your Honor.

22  I'm Todd Long, I'm representing Deputy -- or Chief Cecile in

23  his official capacity here.  I know there have been

24  voluminous filings and I know that you've been fully briefed

25  on our position with respect to the preliminary injunction

1    and I know there's already been a lot of oral argument today

2    so I'm just going to highlight a few specific points with

3    respect to the preliminary injunction motion made by

4    plaintiff Corey Johnson as to defendant Chief Cecile as that

5    seems to be the only nexus to Chief Cecile himself in his

6    official capacity.

7            Fundamentally, the issue here with respect to

8    preliminary injunction is if the burden has been met by the

9    plaintiff with respect to irreparable harm and/or the

10   likelihood of success.  Specifically with respect to the

11   likelihood of success, I would focus on the issue of

12   standing.  As to what we're relying upon here as establishing

13   standing and irreparable harm, the only thing on the record

14   that I would say is before the court is not just the -- not

15   the allegations in the complaint but the declaration from

16   plaintiff Johnson itself.  And with respect to that

17   declaration, I just want to highlight some issues, just three

18   important points.

19           Number one, it's in plaintiff Johnson's reply

20   papers that it's first raised that he's a resident of the

21   city of Syracuse.  Even if that was something that would then

22   become a part of the record as a fact, in reply, I would

23   offer that it shouldn't determine or change the court's

24   opinion as to whether or not there is irreparable harm

25   according to the preliminary injunction standard.  And the

1    reason I say that is because the only nexus that's made to

2    the city of Syracuse as a jurisdiction with respect to

3    locations where under CCIA he would not be allowed to carry a

4    firearm are vague.  The very notion that within the entire

5    county of Onondaga, that that plaintiff intends to go to gas

6    stations, big box stores, grocery stores, et cetera, there's

7    no identification of a specific location within the city of

8    Syracuse where he has been denied access or would be denied

9    access.  And even then if he would be denied access, it would

10   not be enough.  It would still be well within the realm of

11   speculation.

12            The only location that is within the city of

13   Syracuse that has specifically been identified is the

14   Rosamond Gifford Zoo which resides nestled with Burnet Park

15   within the city of Syracuse.  I believe it's clear from the

16   record that the Rosamond Gifford Zoo is not a

17   city-of-Syracuse-operated park but is a county-operated park.

18   And so the reason I state that and the reason why that is a

19   part of our opposition motion is not to state that the city

20   of Syracuse itself and the Syracuse Police Department just

21   lacks complete jurisdiction over a county facility within the

22   city of Syracuse, but rather as to highlight the speculative

23   nature that the city of Syracuse Police Department would be

24   involved, if at all, in any CCIA-related allegation of

25   violation at the zoo.

1       As we note in our papers, specifically that, first

2   off, the county park system has its own county park ranger

3   system and, having myself even gone to the zoo, have seen

4   armed county park rangers myself there.  So in the event that

5   there is a chasm essentially that plaintiff would have to

6   cross to say, I'm going to the zoo within the next 90 days,

7   to say Chief Cecile is going to direct his police department

8   to arrest me at the zoo and take my gun.  That's a series of

9   events that have not yet occurred and have not even been

10  alleged in plaintiff's papers or his declaration in the realm

11  of speculation.  So it would have to be that it was

12  identified that there was a firearm, that there was a

13  complaint made, because the only allegation that Chief Cecile

14  would ever be involved in the potential arrest of an

15  individual as a violation of CCIA would be complaint driven.

16  There would be no proactive policing to that effect.  So then

17  there would have to be a complaint, and that complaint would

18  have to be made and identify the Syracuse Police Department

19  as the responding party.  Well, given the fact that there's a

20  complete other police force that polices these parks, it

21  could very well also be a park ranger that would respond and

22  address the issue.  So clearly then does not establish --

23          THE COURT:  But there's nothing indicating that it

24  wouldn't be the Syracuse Police Department?

25          MR. LONG:  Correct, there's nothing indicating that

1    it wouldn't.

2         THE COURT:  So in fact the -- you tell me because

3    I'm not certain and the court is curious, Burnet Park Zoo

4    sits within the city park, Burnet Park?

5         MR. LONG:  It does sit within the park, correct.

6         THE COURT:  So there's no way to get to the zoo

7    other than going into a city park?

8         MR. LONG:  I would have to reference the map, but

9    you may have to traverse through the park to get into the

10   zoo, correct.  But that's working under the assumption that

11   there would be somebody checking at the park for somebody to

12   have a firearm.

13        THE COURT:  So if there's a complaint of a person

14   with a weapon in the parking area of the Burnet Park Zoo,

15   they would indeed be on city property?

16        MR. LONG:  I do not believe the parking lot is

17   within city property.

18        THE COURT:  You think that's county.

19        MR. LONG:  I believe that it's county.

20        THE COURT:  How about traveling to the zoo?

21        MR. LONG:  Traveling to the zoo through Burnet

22   Park?

23        THE COURT:  Yes.

24        MR. LONG:  If traveling through the zoo at Burnet

25   Park -- excuse me, through Burnet Park into the zoo, on a

1    city park, there could be a situation complaint driven, but

2    again, we have to get to the point where there was a

3    complaint made and there is still that chasm, no

4    identification of who would make that complaint, under the

5    circumstances such a complaint would be made.  And so we're

6    still within this realm of speculation.  Dipping a little

7    further into that pool of speculation would be that even

8    traveling through the park itself, if that would result in,

9    you know, if that complaint would then result in a Syracuse

10   police response.

11           THE COURT:  And with regard to the affiant's

12   indication that he intends to frequent restaurants, stores

13   within the city of Syracuse?

14           MR. LONG:  Correct me if I'm wrong, your Honor, but

15   I do not believe the affiant at any point identifies a

16   specific store or restaurant within the city of Syracuse,

17   it's generally within the County of Onondaga which the city

18   of Syracuse is subsumed within the much larger county.  We

19   represent probably one-third of the entire population of the

20   county and probably less than that in land mass.  So it's,

21   again, with respect to the analysis under preliminary

22   injunction as to irreparable harm, vague, vague countenances

23   of locations that I will go are too vague to articulate an

24   actual irreparable harm and the burden is on, again,

25   50 percent plus likelihood.

1          And I would just add then further to that how we,
2     or one would identify what the zoo is as a location.  It's
3     not clear that it's specifically just a zoo.  As we offered
4     in our papers, it's clear that the zoo operates with Cornell
5     as an educational veterinary training facility for students
6     of Cornell's veterinary school.  Also upon information and
7     belief, the employees that administer all of the programs at
8     the zoo, their officers are co-located on the property.  So
9     understanding that it's not just a zoo but it's an
10    educational facility that in your Honor's October 6th
11    decision understood educational facilities, particularly even
12    of universities, would be areas that gun carrying could be
13    restricted.
14          I would say that for the sake of this preliminary
15    injunction that there is not a likelihood of success on the
16    merits based on the record that's been presented as material
17    fact that the zoo is also not an educational facility.  And
18    for the rest, we rest on our papers, your Honor.
19               THE COURT:  Thank you, sir.
20               MR. LONG:  Thank you, your Honor.
21               THE COURT:  Appreciate you being here.
22               MR. LONG:  Thank you.
23               THE COURT:  Onondaga County, Mr. Heisler?
24               MR. HEISLER:  Nothing, thank you, your Honor.
25               THE COURT:  Thank you, sir, thank you for being

1    here.  Mr. Melvin.

2              MR. MELVIN:  Nothing to add, your Honor.

3              THE COURT:  Okay, thank you.  I'll leave it to

4    counsel, would you like the opportunity for a brief reply?

5              MR. STAMBOULIEH:  Brief reply, your Honor, yes.

6              THE COURT:  I'm going to keep them briefer, we've

7    been going extensively, so I think we'll limit it a little

8    bit, I can see everybody I think is in agreement with that.

9    Okay.  So I would say, you know, things that you think are

10   critical to your argument.

11             MR. STAMBOULIEH:  Yes.

12             THE COURT:  Let's focus on them and keep it short

13   and sweet.

14             MR. STAMBOULIEH:  May I proceed, your Honor?

15             THE COURT:  You may, sir.

16             MR. STAMBOULIEH:  I'd like to address Mr. Long's

17   argument about Chief Cecile.  If we go to the declaration of

18   Johnson on paragraph 23, he talks about DA Fitzpatrick who's

19   the DA of Onondaga County and Chief Cecile and he says the

20   top law enforcement officials where I live.  He doesn't

21   specifically say I live in Syracuse but he does say, talks

22   about these individual people who are the top law enforcement

23   officials where he lives.  So to the extent that they don't

24   believe that he announced it until his reply papers, I think

25   it was plain from his -- the face of his declaration.

1          There's a couple things I want to touch on from my
2     friend the state's argument.  The application for Sloane is
3     100 percent futile, if we look at the admission in -- I have
4     this open here, from Sheriff Conway, and we go down to
5     paragraph 13, you know, they filed answers in this case,
6     they're not opposing the relief that is being sought here,
7     but their answer specifically says and it's -- I hope I
8     didn't put in the wrong page, give me one second, Judge, I'm
9     sorry.  It's Docket Number 35, paragraph 5, I apologize.
10    Defendants admit to allegations of paragraph number 13, that
11    the sheriff is responsible for maintaining the pistol files,
12    that Conway requires an applicant for a license to schedule
13    an appointment, and that it's, to proceed, all four character
14    references forms must be completed and signed and applicants
15    must have attended and they can't schedule an appointment
16    until the application prerequisites have been met, and all of
17    the things that we alleged in the complaint, Judge, they're
18    admitting that the application is not going to be processed,
19    it's going to be returned.  I don't know how much more futile
20    we can get from this other than to actually apply, wait
21    until -- actually Sloane's appointment is in November of 2023
22    now, so November 6th I believe is what the appointment is, so
23    we would have to wait for November 6th to come around before
24    he goes to see Sheriff Conway for Sheriff Conway to say, I'm
25    sorry, I'm not going to approve or send to Judge Doran this

1    incomplete application.

2            THE COURT:  So it's your position that the law does

3    not allow a constitutional right to be frustrated in that

4    manner?

5            MR. STAMBOULIEH:  A hundred percent.

6            THE COURT:  Not to be delayed, shouldn't have to

7    wait until November 6, 2023 to bring this challenge because

8    he intends and has applied.

9            MR. STAMBOULIEH:  Judge, I have the application

10   with me, if Sheriff Conway would take the application without

11   Mr. Sloane having to trade his constitutional rights which,

12   as the Supreme Court has said, you shouldn't have to

13   surrender one right to exercise another, I've got the

14   application, it's right here on the table, I could hand it to

15   his attorney and give it to the sheriff, but he's not going

16   to do it because he can't, because the law makes plaintiff

17   Sloane trade one right for another which the Supreme Court

18   has said is -- I don't even remember the right word but they

19   don't like it, how about that?

20           So the standard as Mr. Thompson said is that for a

21   facial challenge, it has to be constitutional in all its

22   applications but he left out the qualifier, or lack a plainly

23   legitimate sweep.  And one of the problems with the Concealed

24   Carry Improvement Act, and I'm -- I hate to belabor it,

25   Judge, is that it lacks the plainly legitimate sweep because

1    it only deals with law-abiding gun owners.  There's no new

2    technological change, no new societal problem with

3    law-abiding gun owners carrying their firearms in places in

4    New York that they've always been allowed to carry.  And so

5    the CCIA on its face lacks the plainly legitimate sweep

6    because all of the places that they couldn't have carried in

7    prior to this, if the 265.01-e goes away, they're still not

8    going to be allowed to carry in schools because a separate

9    part of the code blocks them from doing that.

10           And the *Sibley v. Watches* about the good moral

11   character, the Second Circuit, if *Libertarian Party* still

12   controls good moral character, there's no need to remand it

13   to see how *Bruen* changes good moral character.  And I

14   understand what they say in the order and that it's just a

15   remand order, I got one too in *Young*, it's okay, but it just

16   seems like it would be odd that there would be a necessity to

17   remand it if *Libertarian Party* was still controlling and

18   so ...

19           My last thing that I'm -- well, two last things.

20   Airports, I think Mr. Thompson has made clear, airports are

21   off limits and there's nothing -- you can't even travel,

22   there's no safe harbor under 18 U.S.C. 926(a) and all of this

23   is in our reply brief.  It appears that he touched on all of

24   the things in his opposition which we have already addressed

25   in our reply.

1          I do 100 percent disagree with vulnerable people as

2     being outside of the people that the Second Amendment applies

3     to.  I'll give your Honor one citation, it's the *Jamie*

4     *Caetano* case about the stun gun at the Supreme Court from

5     2016 where she -- one of the vulnerable people, a domestic

6     violence surviver and a victim had a stun gun that she used

7     to keep her abusive ex-boyfriend away from her.  So I don't

8     believe that vulnerable people, just because their status is

9     victims, if we're talking vulnerable people as someone that's

10    mentally deficient, mentally retarded, someone who's been

11    mentally ill, it's different than saying all vulnerable

12    people who could be classified as victim of domestic

13    violence, domestic assault, things like that.  I don't

14    believe those people are outside of the Second Amendment.

15         I will respond to one other thing.  Please, if your

16    Honor is inclined to grant the temporary re -- I'm sorry,

17    preliminary injunction, don't stay it.  The Second Circuit

18    has not moved with alacrity in addressing the motion by the

19    state and the state has asked for their brief to be due on

20    December 7th.  Chief Cecile, who also appealed it, has asked

21    for his brief to be due in January.  The TRO, while I enjoyed

22    reading it, has not provided any actual relief to the

23    plaintiffs because, because it's been stayed.

24         And as to the last point with applying just to the

25    plaintiffs, Judge Sinatra from the Western District --

1           THE COURT:  Counsel, I just want to touch on that.

2      It seems completely feasible to the court that the Second

3      Circuit is aware of the fact that this motion is pending and

4      that there will be a decision forthcoming, so what you're

5      saying is that the briefing on the temporary restraining

6      order are December and January?

7           MR. STAMBOULIEH:  That is what the appellants have

8      requested, yes, sir.

9           THE COURT:  Okay.  But it has not been set?

10          MR. STAMBOULIEH:  It has not been set, that is what

11     has been requested and there's been nothing further from

12     them.  Sorry.  I literally just had it and I lost it but it's

13     the last footnote on, in Judge Sinatra's opinion where he

14     says, when the state asks him to apply this temporary

15     restraining order simply for the plaintiff in front of him,

16     he said no, if the exception applies -- if it's

17     unconstitutional, basically has to apply everywhere and we

18     would ask for the same thing.  Thank you, Judge.

19          THE COURT:  Thank you, sir.  Mr. Thompson.

20          MR. THOMPSON:  Thank you very much, your Honor.

21     Just a couple of very quick points responding to what

22     Mr. Stamboulieh had to say.

23          In terms of futility and any delay that's coming

24     from Sheriff Conway, again, that might support a Second

25     Amendment claim against Sheriff Conway because of the delay

1   being a bar to the right to bear arms, but it doesn't create

2   standing against state defendants and there's no futility

3   stemming from the actions of the state defendants.

4        Similarly to the allegation that CCIA applies only

5   to law-abiding gun owners, that's not the case.  The

6   licensing requirements are in fact designed to make sure that

7   people applying for gun licenses are in fact law-abiding

8   responsible citizens.  That's something that's contemplated

9   in *Bruen* specifically.  And the laws on sensitive places, the

10  laws on private property apply to everyone, including people

11  without a license as well.  It is illegal for anyone without

12  a license also to carry a gun into a school or into a zoo.

13       *Sibley*, I think Mr. Stamboulieh is correct that it

14  is just a remand order, and *Sibley* specifically says that it

15  has no precedential effect as to anything else, doesn't

16  mention *Libertarian Party*, certainly there's no basis to view

17  it as overruling really a foundational case.

18       And so with that, your Honor, outside of that, I

19  will rest on our papers and thank you very much for hearing

20  us today.

21       THE COURT:  Thank you, sir.  Okay.  If there's

22  nothing further from the city?

23       MR. LONG:  No, your Honor.

24       THE COURT:  Okay.  Counties' good, both counties?

25       MR. HEISLER:  Yes, your Honor.

1          THE COURT:  Okay, thank you.  All right, then that

2     will conclude our hearing today, a decision will be

3     forthcoming, and we'll go from there.  I don't know if I'll

4     see you again, but thank you for your advocacy and your

5     arguments and we'll get a decision out as quickly as

6     possible.  Thank you.

7          THE CLERK:  Court's adjourned.

8              (Court Adjourned, 12:51 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5     Official Realtime Court Reporter, in and for the

6     United States District Court for the Northern

7     District of New York, DO HEREBY CERTIFY that

8     pursuant to Section 753, Title 28, United States

9     Code, that the foregoing is a true and correct

10    transcript of the stenographically reported

11    proceedings held in the above-entitled matter and

12    that the transcript page format is in conformance

13    with the regulations of the Judicial Conference of

14    the United States.

15

16                    Dated this 26th day of October, 2022.

17

18

19                    /S/ JODI L. HIBBARD
                      _____

20                    JODI L. HIBBARD, RPR, CRR, CSR
                      Official U.S. Court Reporter
21

22

23

24

25