Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 1

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, et al,

    Plaintiffs,

V                                   Index No.:  22-CV-986

STEVEN G. JAMES, IN HIS OFFICIAL

CAPACITY AS SUPERINTENDENT OF

THE NEW YORK STATE POLICE, et al,

    Defendants.

_____X

DEPOSITION OF: IVAN ANTONYUK

DATE:          April 21, 2026

TIME:          9:38 a.m. to 12:15 p.m.

VENUE:         Robert J. Abrams Building

Empire State Plaza, 4th Floor

Albany, New York 12224

Reported by Monique Hines

Exhibit 3

800-523-7887                              ARII@courtsteno.com

Serving all of New York State

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

APPEARANCES:

    FOR THE PLAINTIFFS:

        STAMBOULIEH LAW, PLLC

        BY:  STEPHEN STAMBOULIEH, ESQ.

        P.O. Box 428

        Olive Branch, Mississippi 38654

    FOR THE DEFENDANT STEVEN JAMES:

        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

        BY:  JAMES THOMPSON, A.A.G.

        28 Liberty Street

        New York, New York 10005

        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

        BY:  TIMOTHY P. MULVEY, A.A.G.

        300 South State Street, Suite 300A

        Syracuse, New York 13202

    FOR THE COUNTY OF ALBANY:

        ALBANY COUNTY

        BY:  PHILLIP BANASZEK, ESQ.

        24 Eagle Street, Room 106

        Albany, New York 12207

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

FOR THE DEFENDANT SYRACUSE:

CITY OF SYRACUSE OFFICE OF CORPORATION COUNSEL

BY:  TODD M. LONG

233 East Washington Street, Room 300

Syracuse, New York 13202

ALSO PRESENT:

JOHN HEISLER, ATTORNEY FOR FITZPATRICK

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 4

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

I N D E X   O F   P R O C E E D I N G S

IVAN ANTONYUK; Sworn

Direct Examination by Mr. Mulvey                                    9

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 5

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

E X H I B I T   I N D E X

Marked as

Described as

One                                                             26

Ivan Antonyuk's response to the states defendant's 1st set

of interrogatories

Two                                                             53

Ivan Antonyuk's Pistol permits

Three                                                           76

Declaration of Ivan Antonyuk

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

STIPULATIONS

It is HEREBY STIPULATED by and among the attorneys for the respective parties, in accordance with the Federal Rules of Civil Procedure, that this deposition may be taken by the Defendant at this time, pursuant to subpoena;

FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until trial;

FURTHER STIPULATED, that the witness may read and sign the deposition and make any corrections to same before any Notary Public;

AND FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time of trial or any hearing in this cause, a certified copy of the deposition may be used as though it were the original.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

(The deposition commenced at 9:38 a.m.)

COURT REPORTER:  So we are on the record.  Mr. Antonyuk?

MR. ANTONYUK:  Yes, sir.

COURT REPORTER:  Okay.  If you could raise your right hand for me, please.  Do you swear or affirm the testimony you're going to give today in this cause will be the truth, the whole truth and nothing but the truth?

MR. ANTONYUK:  I do.

IVAN ANTONYUK:  Sworn

COURT REPORTER:  And can you state your name and then spell it for the record, please?

THE WITNESS:  Ivan Antonyuk.  A-N-T-O-N-Y-U-K.

COURT REPORTER:  Okay.  Thank you. And then also, if the Attorneys could note their appearances for the record, please.

MR. STAMBOULIEH:  Stephen Stamboulieh for the Plaintiffs.

MR. MULVEY:  Timothy Mulvey, Assistant Attorney General for Defendant James.

MR. THOMPSON:  Good morning.  James

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Thompson also for Defendant James.

COURT REPORTER:  Mr. Long.

MR. LONG:  Yes.  Sorry.  I wasn't sure who was going to go next.  Todd Long, for -- Attorney for the City of Syracuse representing Chief of Police, Mark Rusin.

MR. BANASZEK:  Philip Banaszek for County of Albany representing District Attorney, David Soares.

COURT REPORTER:  All right.  Thank you.  The Witness is yours.

MR. MULVEY:  And the count -- John -- John is not -- the County -- Onondaga County Attorney is not participating today?

COURT REPORTER:  There's only --

MR. MULVEY:  Okay.

MR. STAMBOULIEH:  That's what he said yesterday.

MR. MULVEY:  Oh, did he?

MR. STAMBOULIEH:  Yeah.

MR. MULVEY:  Okay.

MR. STAMBOULIEH:  Informed he might not show up.  He has a link, but he might not show up.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

MR. MULVEY:  Okay.

COURT REPORTER:  Okay.

DIRECT EXAMINATION

BY MR. MULVEY:

Q.    Good morning, Mr. Antonyuk.  As you heard, I'm Timothy Mulvey, Assistant Attorney General defending the current Superintendent of New York State Police.  Have you ever been testified in a Deposition prior to today?

A.    Hell no.

Q.    All right.  So this is a question and answer format.  I'm going to present you with a series of questions.  I would ask you to please give me the opportunity to complete my question, and I will do the same and allow you to give your complete answer.  One -- the one thing we have to avoid is both speaking at the same time, makes it very difficult for the person who has to create the transcript of this.  So if you just wait till I finish, and I will give you your opportunity to give your complete and full answer.  Okay?

A.    Okay.

Q.    So prior to coming to the deposition today, have you taken any medication or

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

consumed any substances that would impair your ability to give complete, thorough, and truthful answers?

A.   No.

Q.   Are you currently taking any medications or any substances that would impair your ability to give complete answers today?

A.   No.

Q.   All right.  Mr. Antonyuk, I understand that you are originally a native of the Ukraine.  Is that correct?

A.   Correct.

Q.   What level of formal education did you receive in -- when you were a citizen of the Ukraine?

A.   I left Ukraine when I was eighteen.  Prior to that, I received a high school education and some portion of the college mix with the sports career that I had, that I was required to take.  So I fully completed only high school.

Q.   And -- but you did have some further education beyond the equivalent of -- of American High School in the Ukraine?

A.   I -- yes, but not completed

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

because I left before even that first semester was over.  And it was because of my sport career.  I was listed as a part of military and sport, and before starting going to college, I had to complete the course to -- to qualify for, you know, to enter the college.  So I was able to actually, to postpone the study before I left the country.

Q.   And when you re -- refer to sport, is that you were an athlete of some sort?

A.   No, I did martial arts.

Q.   Okay.  Was that a competitive --

A.   Yes.

Q.   -- martial arts?

A.   Yes.

Q.   And what category or type of martial arts competition --

A.   I was a --

Q.   Excuse me.  So Mr. Antonyuk, it's very important, so we'll just get off on the right foot.  If you let me complete the question --

A.   I'm sorry.

Q.   I understand, it's a natural reaction.  If you let me complete the question, I will let you give the full answer, then we're not

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

both talking at the same time.  Okay?  So let me start again.  What was the nature of the martial arts competition that you engaged in when you were still in Ukraine?

A.    Muay Thai.

Q.    Could you spell that, please?

A.    You can just put kickboxing.

Q.    Okay.  Is that something that you continued to engage in once you left Ukraine?

A.    No.

Q.    Other than high school and your brief sporting career in Ukraine up to the age of eighteen, did you have any formal education?

A.    No.

Q.    How about any type of career training of any sort?

A.    No.

Q.    Did you have any employment while you were still a resident of Ukraine?

A.    Not formal, just helping out my relatives.

Q.    Okay.  And you left Ukraine at age eighteen.  Did you come directly to the United States?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Yes.

Q.    Where did you arrive in the United States?

A.    New York City.  And then, brief -- brief stay there, and we went straight to Schenectady to my sister's house.

Q.    Other than a -- a brief stay in New York City upon your arrival in the United States, have you resided anywhere else but Schenectady, New York since then?

A.    No.

Q.    What is your current address?

A.    Fourteen Toriana Court.

Q.    Spell that, please.

A.    T-O-R-I-A-N-A Court, Schenectady, New York 12304.

Q.    How long have you resided there?

A.    Twenty sixteen, it's going to be ten years.

Q.    Did you have a prior address in Schenectady --

A.    Yes.

Q.    -- before Toriana Court?  What was that?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 14

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.   Forty-three sixteen Buckingham Drive.

Q.   How long did you reside at Buckingham Drive?

A.   I would say seven years.

Q.   And did you have a Schenectady address or residence prior to Buckingham Drive?

A.   Yes, it's in apartments.  I can't really remember.  I think it was -- I think it was Court -- Court Royale Apartments in Schenectady.  I don't remember apartment number, sorry.

Q.   Was -- was that your initial residence in Schenectady after you arrived from New York City?

A.   No.

Q.   Okay.  Where did you reside at -- at the first occasion that you came to Schenectady?

A.   My sister's house in Schenectady, her rental apartment for a couple months.  And it's -- it was Central Avenue.  I don't remember the name of the street.

Q.   And would it be fair to say that you went from your sister's house to the apartment?

A.   Yes, the first apartment was

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 15

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Jackson Avenue.  It was my first apartment.  And from Jackson Avenue, we went to Stevens Homes.  From Stevens Homes, we went to Court Royale.

Q.   Okay.  So a series of apartments then?

A.   Correct.

Q.   Yeah.  And -- and then did you rent or purchase in Buckingham Drive?

A.   Purchase.

Q.   Okay.  That was the fir -- your first ownership in Schenectady?

A.   Correct.

Q.   And then you've -- and then moved on to Toriana Court where you are now?

A.   Correct.

Q.   Now, when you first arrived in the United States, what is the first employment that you engaged in?  First job you had?

A.   I'm going to say, oh from international center, they got us a job at Peter Harris.

Q.   What is the international center?

A.   It's when -- when we come to United States, we've been sent to the National Center

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

to learn the language, to help us to learn the language and assist us with, you know, the process of immigration.  And it was on Central Avenue.  I don't think it exists anymore.

Q.   Did you have any English-speaking ability when you came to the United States?

A.   No.

Q.   Tell me just briefly how you studied and became proficient in English.

A.   Watching T.V.s, couple shows, making that goals to myself.  I had the tape that my niece gave it to me of Aladdin, and I promised myself I would be watching it at least two, three times a day right until the moment to understand every word of it.  Making notes to myself, try to watch any channels back then that had subtitles.  And I was so happy, my first V.C.R., so I was able to record, translate word by word, get kind of idea what conversation is all about.  And prepared myself to go to college.  After eight months I went to college.  And translated pretty much -- translated every word of every sentence until I got more proficient to skip some words, some sentences, understand what's going on in the books, on the T.V., around me.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Started working in Domino's after they let us off from Peter Harris.  Communicating with these -- my coworkers, going to college, continue watching as much T.V. as I can possibly can to listen.  MASH and Married Children, that's the only two shows I had on my black-and-white T.V., and that's pretty much helped me, you know, the process of learning the language.  And of course, college helped too because I had to learn it or fail.

Q.    Do -- do I understand that your employment history began with Peter Harris, a -- a clothing retailer --

A.    Correct.

Q.    -- clothing store, and then you went to the Domino's Pizza Company?

A.    Yes.

Q.    Okay.

A.    Right before I entered the college, my friend helped me to get a job in Domino's in Colonie.

Q.    You -- you mentioned college, how old were you when you began your col -- collegiate studies?

A.    Nineteen -- nineteen, twenty.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 18

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q. How long had you been in the United States?

A. Since 1994, so it would be my thirty-second year.

Q. Your -- your second year in -- in the -- the U.S.?

A. Oh, when I went to college?

Q. Yeah.

A. It was --

Q. How long -- let me -- let me be clear. How long had you been in the U.S. before you began your collegiate studies?

A. A year-and-a-half, a little bit less than a year.

Q. You were nineteen, twenty years old --

A. Correct.

Q. -- at that time? And you were working at the Domino's Pizza?

A. Correct.

Q. What college did you attend?

A. SUNY Albany.

Q. Was there any special particular program you were -- were enrolled in?

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.   No.

Q.   Just a regular undergraduate at SUNY Albany?

A.   Correct.

Q.   What course of study did you enroll in at that time?

A.   Computer Science.  I started with -- I'm sorry.  I started with Business Administration and then transferred to a Computer Science degree.

Q.   How long did you study at SUNY Albany?

A.   Four-and-a-half years.

Q.   Did you obtain any degree?

A.   Yes.

Q.   What degree did you obtain?

A.   Computer Science, Bachelors of Arts.

Q.   In 1998 or '99?

A.   Two thousand.

Q.   Two thousand.  Did you continue employment at Domino's during the course of your studies at SUNY Albany?

A.   No.

Q.   Did you have any other employment

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 20

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

between the time you left Domino's and you completed your Bachelor of Arts in Computer Science in 2000?

A.    I did.

Q.    What was that?

A.    Working in Ellis Hospital.

Q.    And what was your nature of your employment there?

A.    It was a computer operator, night shift, so.

Q.    What did that entail?

A.    Answering online calls, I mean, technical calls from the floors to help them use the computers, running the backups, printing reports, transition any outstanding issues from the night shift to the day shift technical team to address any issue that they couldn't fix it with my limited access to the system.  And later I got transitioned to working straight as I.T., as I.T. professional.

Q.    This was -- you continued at Ellis Hospital?

A.    Ellis Hospital.

Q.    Okay.  And you were doing this while you were completing your undergraduate --

A.    Correct.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 21

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   -- degree?  And what did the -- the I.T. professional position entail?

A.   That's considered in Ellis Hospital professional I.T., but it was I.T. Department outside computer operators who were taking care of, like I said before, printing, simple questions, answering over the phone from the floors. And I.T. department was actually responsible for installing the computer systems, maintaining the software systems, backups, aspects of communications, security of the hospital.

Q.   Did you engage in any other employment during the approximately four-and-a-half years while you were completing your computer science studies at SUNY Albany, other than Ellis Hospital?

A.   Trying to think.  Not -- not like long-term.  To help out here and there some of my friends, some small projects, but nothing -- it was my full-time job because I was going full-time to college and working full-time at Ellis Hospital.

Q.   Once you received your degree in the year 2000, what was the first full-time employment that you engaged in after graduating?

A.   I continued working in Ellis

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 22

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Hospital after I graduated, and I believe in a year or two, I was transferred to work at Amsterdam Memorial Hospital.

Q.    Okay.

A.    And in the process of me working at Amsterdam Memorial, relationship between Ellis Hospital and Memorial Hospital broke it down.  So two hospitals got dis-merged and I stayed working in Amsterdam Memorial Hospital.

Q.    How long did you work at Ell -- at Amsterdam Memorial?

A.    I would eight years -- seven, eight years.

Q.    What was your position there?

A.    I started as a Network Engineer and two years later transitioned to Director of I.T. Department.

Q.    Did there came a time when you left Amsterdam Memorial for a -- a different employment?

A.    Amsterdam Memorial got acquired by St. Mary's Hospital and Ascension Healthcare, and I became St. Mary's slash Ascension Health employee.

Q.    Where is that located?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 23

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    In Amsterdam.

Q.    Okay.  How long were you at St. Mary's?

A.    Four years.

Q.    Same -- same position?

A.    No, it was regional -- they're called ministries, so Ministry Manager, so Ministry Information Technology Manager.

Q.    But you were still in computer science --

A.    Correct.

Q.    -- related field?

A.    Correct.

Q.    Yes.  And did there come a time when you changed employer again after at St. Mary's?

A.    Yes.

Q.    When was that?

A.    In 2011, I start working for New York State Funeral -- Funeral Directors Association.

Q.    What was your position there?

A.    I started as a Senior Network Engineer and two years later became Director of I.T.

Q.    Where is the offices of the New York State Funeral Directors located?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 24

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    One South Family Drive, Albany.

Q.    How long did you hold that position?

A.    My current position since 2013.

Q.    And -- and you are in that position now, --

A.    Correct.

Q.    -- still with the Funeral Directors?

A.    Correct.

Q.    Okay.  Other than what you just told me, from Ellis Hospital, Amsterdam Memorial, St. Mary's, and now Funeral Directors, have you had any other regular employment since you graduated from SUNY Albany in 2026?

A.    Since the graduation, no.  Can I just say, besides that, I have my L.L.C.  I don't know if it's related or you just need the company that I work for, names.

Q.    No, I -- I guess you -- you are an employee of the Funeral Directors?

A.    Correct?

Q.    Okay.  That's -- that's fine.

A.    Okay.

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Page 25

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   Thank you.  You are here today with Mr. Stamboulieh.  You're -- he's your Attorney, correct?

A.   Yes.

Q.   He is representing you in this matter?

A.   Yes.  Did you have occasion to confer with Mr. Stamboulieh prior to your testimony today?

A.   Yes.

Q.   Okay.  I don't want to know anything that was said between either of you when I ask you about that.  I don't need to hear anything that you -- that you said to each other.  I just want to ask you about your preparation.  Did you meet with anyone else other than Mr. Stamboulieh to prepare for today's deposition?

A.   No.

Q.   Have you reviewed any documents in preparation for your testimony today?

A.   I did.

Q.   What?

A.   The court briefs, the information was disclosed since my last court hearing, and

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 26

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
paperwork prior to this deposition.

Q.   When you say paperwork, do you -- can you give a little bit more specific description, please?

A.   The P.D.F. files that my lawyer forwarded to me from the court, court paperwork, just briefly looked through them.

Q.   All right.  Have you conferred with anyone else other than Mr. Stamboulieh in preparation for your testimony today?

A.   No.

Q.   Have you discussed this Deposition with anyone other than Mr. Stamboulieh?

A.   No.

MR. MULVEY:  All right.  I'm handing you -- I'm going to ask you to have this -- Monique, mark that as Exhibit One, please.

MR. STAMBOULIEH:  No objection.

MR. MULVEY:  We -- we want to go with numbers again?

MR. THOMPSON:  I think that's fine.

MR. MULVEY:  Okay.  I mean, the numbers are so small, I don't think we're going to get confused.

Associated Reporters Int'l., Inc.                      www.courtsteno.com

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

MR. THOMPSON:  Yeah.

COURT REPORTER:  Oops.  The Exhibit One.

MR. MULVEY:  Okay.  Great.  That's -- that's for the record.  Okay?

COURT REPORTER:  Thank you.

Q.  Mr. Antonyuk, I want to direct your attention to -- I want to give you an opportunity to read question number one, very beginning, the bottom of page one, and your response that you gave in November of 2025, so last November. Just, I want to give you opportunity to -- to read that, familiarize yourself with it before I ask you. Just let me know when you're finished.

A.  Okay.

Q.  Just number one at this point.

A.  Okay.  Yeah.

Q.  All right.  So having read number one, what I'd like to know is, have you discussed this case with anyone since last November other than your wife, Mr. Toas, Mr. Russo, or Mr. Bucci?

A.  No.

Q.  What -- what aspect of this case have you discussed with your wife, Melissa?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 28

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.   Mostly my schedule, like today I told her I'm -- I'm not going to be available because we have kids, in case she needs to contact me, to contact me only in case of emergency.  I told her yesterday that I'm meeting with my Attorney, and today that we have this meeting today, and that's pretty much everything I told her about the deposition.

Q.   Did you discuss with her the substance of the case, the issues, or -- or any of the parties?

A.   No, I did not.

Q.   Have you discussed with her Superintendent James or the New York State Police's involvement in this case?

A.   No, I did not.

Q.   Have you discussed with her any of the persons, your -- either your co-plaintiffs or the defendants in this case, with your wife?

A.   No.

Q.   All right.  What was the nature of your discussion with Mr. Joshua Toas, T-O-A-S, regarding this matter?

A.   Couple questions, just

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

clarification, you know, this law, what does this entails to, just some aspects of details about caring, about -- because he's a lawyer and ask him more of a clarification because he was the first one who read the law and just clear understanding what this law entails, -- oops, sorry.  But not beyond anything that was going on inside the courtroom or with my Lawyer or my involvement in this case.

Q.    So it's my understanding -- am I pronouncing this correctly, Toas?

A.    Toas, yes.

Q.    Mr. Toas is an attorney?

A.    Correct.

Q.    He's an acquaintance of yours?

A.    Yes, my friend.

Q.    All right.  And does he represent you in any capacity officially in this matter?

A.    No.

Q.    Okay.  So you do not have an attorney-client relationship with him?

A.    No, I do not.

Q.    Okay.  So what's the first occasion that you discussed the issues in this case involving the concealed pistol permit statute in New

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 30

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

York with Mr. Toas?

A.   I don't remember exact day.  I think it was maybe in the first or second day that we heard about the new law.  And all of this complication entails in it from our meeting at the gun club, and we're starting researching more into it, what's it entails, what's new regulations are.

After SAFE Act, we were trying to make sure that we're not breaking any laws, just make sure that we understand this new law.  And most -- majority of our organization was not about disagreements about this law, but what's it entails and if we have kind of all scenarios covered and try to avoid any gotcha moments because of this law.

Q.   Now, your response on page two of Exhibit One makes reference to a cigar club, and your answer just now made reference to a gun club.  Are those the same entities or are they two different organizations?

A.   They are and they're not.  We used to get together at -- at the club to have a cigar on Friday nights.  And since then, we started going to Habana Cigar Shop on Central Avenue.

Q.   When you say the club, are you

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

referring to a gun club or to a -- to a cigar establishment?

A.   Gun club, it's on 155, and Habana Cigar Lounge, it's the lounge, cigar lounge on Central Avenue.

Q.   So -- so I am clear, what gun club are you referring to?

A.   Watervliet Fish and Games.

Q.   Were you and Mr. Toas both members of the Watervliet Fish and Games Gun Club?

A.   Yes.

Q.   How long were you a member there?

A.   I was a member since, I want to say, beginning of 2000 -- so it's, I want to say 2006, 2008.

Q.   Why did you join the Watervliet Fish and Gun Club?

A.   To practice, then compete in a firearm sport, and practice for hunting because I was planning to start hunting.

Q.   Did you know Mr. Toas prior to joining the Watervliet Fish and Gun Club?

A.   No.

Q.   Did you meet him there?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Yes.

Q.    Now turning back to your initial conversation with Mr. Toas regarding the -- the licensing law that's the subject of this lawsuit, what is your first recollection of discussing it with him?

A.    To answer the first question actually our wives raised, because they were in the process of acquiring the pistol permits, and they ask us, you know, if it's a process is the same or we -- we should do something else.  And the more we read in the laws, pretty much everything was on hold and requirements was unachievable.

So that's the only conversation we started with, and then questions raised about locations, were we still allowed carry, were we not supposed to carry, and just familiarize ourselves to a clear understanding of the new laws and new regulations.

Q.    So would it be fair for me to understand that you engaged in a conversation with Mr. Toas at your gun club regarding the rev -- revisions to the permitting -- the pistol permitting law in New York, as an outgrowth of your wife and his

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 33

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

wife, either contemplating or actually making applications for concealed carry permits?

A.    From my -- my best notion, ability to remember, that's how this whole conversation started.  Because gun laws was coming out left and right, and for us, that actually put us in a situation that we started discussing it to understanding this law.  And wives was with us, and the question was raised if we're still going to, you know, follow the process of applying for pistol permit, and --

Q.    This would be your wife you're speaking about, correct?

A.    Correct.

Q.    Okay.

A.    And I said, we're going to have to wait because we need to hear, you know, -- you know, final -- final -- this final bill and -- being posted, so we can review it and see what the changes are to acquiring pistol permit and what the new regulations are.

And we didn't talk for a while about it, and then when everything started coming out on the media and clearly understanding of the -- the new

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk regulations and the new laws became big topic discussion at the gun club, at the cigar lounge because a lot of my friends, law-obedient gun owners and everybody trying to stay safe and not to get themselves in trouble.  So we always trying to exchange information, our understanding and our knowledge, not just about firearms but aspects of law, too.

Q.    And you -- when you refer to we, does that include Mr. Russo and Mr. Bucci that you reference in your response on page one of Exhibit One?

A.    That's my closest friends.

Q.    Okay.  And were they -- well, let me take them one at a time.  Was Mr. Russo a member of the Watervliet Fish and Gun Club at the time?

A.    No.

Q.    Okay.  Was Mr. Bucci a member of the Watervliet Fish and Gun Club?

A.    I believe so, yes.

Q.    When -- when you had this initial conversation with Mr. Toas concerning the -- I -- I think we're going to -- we're going to refer to it as the basically the C -- C.C.I.A.  Are you familiar

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 35

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

with that reference?

A.    Yes.

Q.    So if I refer to C.C.I.A. going forward, you'll understand what we're that we're talking about?

A.    Right.  Right.

Q.    And would it be fair to say that this conversation about your wife's applying for concealed carry permits revolved around what the implications were going to be, or were emerging with the adoption of the C.C.I.A.?

A.    Yes, because she already had her pistol permit for a while and she was trying to get it unrestricted.  And the process before for that was certified with a local Sheriff Department of course, and she was in the process of scheduling her training.  And in a week of time, this C.C.I.A. law came around, and she postponed it because class was canceled until new regulations were in place.  And Sheriff Department and training entities were notified about new regulations and new requirements.

Q.    And the -- the she you are referring to is Melissa Antonyuk?

A.    Yes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 36

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   Your wife?  All right.  And you discussed this with Mr. Toas at the time?

A.   Yes.

Q.   Okay.  And Mr. Bucci was present?

A.   I -- I -- I do not -- I don't remember.

Q.   Other than Mr. Toas, Mr. Russo, and Mr. Bucci, did you have any other discussions with either members of the Watervliet Gun -- Rod and Gun Club or at the cigar club regarding the C.C.I.A. back when it was first adopted?

A.   We had conversations here and there, just strictly regarding understanding of this new law.

Q.   Have you discussed the -- the proceedings in this case with Mr. Toas at any time since that initial conversation about the C.C.I.A.?

A.   No, I did not.

Q.   Have you discussed anything further about this case in particular with Mr. Russo at any time?

A.   No, not about this case.

Q.   How about Mr. Bucci?

A.   Mr. Bucci wasn't present in some

800-523-7887                                    ARII@courtsteno.com
                    Serving all of New York State

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk conversations, but he never been part of conversation regarding this case.

Q.    Have you discussed the -- the substance of your challenge to the C.C.I.A. with anyone other than your Attorney and Mr. Toas, Mr. Russo, or Mr. Bucci since November 10th of last year?

A.    Not to -- not -- I've have been asked questions, but never answered.

Q.    I'm sorry.

A.    All --

Q.    Would you please repeat?

A.    I've been asked questions where we are with the case, if it's still going, I'm like, yes, that's the whole extent of the case I ever talked about it.

Q.    And who is presenting these questions to you?

A.    Randomly because people who knows me and they know that, you know, they Google my name, they can see that I'm part of this -- this lawsuit. And just quick questions.  Are we still in a battle? Are we still -- is the case still open?  Yes, we are still working on it.  That's the extent of conversations about this case I've had outside my --

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

my law -- my Attorney or Brief Room.

Q.    And your Attorney and whom?

A.    And like a conversation that we have right now with people who is here right now.

Q.    Oh, the form -- in the formal proceedings?

A.    Correct.

Q.    All right.  And when you -- when you make reference to persons asking you the status of the case, and you give them brief answers, are these co-workers or are these social acquaintances of yours, or both?

A.    Both.

Q.    Do your co-workers ask you about this case?

A.    Not -- not in a while.

Q.    And in what setting do your social acquaintances inquire about your participation in this matter?

A.    On any events that we attend, again, cigar lounge, gun club, birthday parties that we have with some, you know, similar friends and people who involved in Second Amendment information gathering who participate in hunting or gun sport

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 39

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
activities.

Q.   When you say Second Amendment
activities, what are you referring to?

A.   Activities like, for example,
when SAFE Act got introduced, we met some people that
we still kind of communication here and there from
the rallies that we attended in the -- in the courses
that we participated for safety, like hunting safety
course, gun safety course, some other safety courses
that we have to participate in order to participate
in some shooting sports.  Some of them was N.R.A.
hosted, some of them were local club hosted.

Q.   Do you -- do you participate in -
- in competitive firearms contests?

A.   I do.

Q.   Where do those take place?

A.   Most of them on -- in Colonie on
155, it's Rifle Road Gun Range, it's Watervliet Fish
and Rod Gun Range.

Q.   So that -- is that the same
Watervliet Fish and Gun Club that you referred to
earlier?

A.   Yes.

Q.   And -- and they have a facility

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

where competitive firearms activities take place?

A.    Correct.

Q.    And how do you participate?  What do you do as part of those competitions?

A.    We have shotgun competitions, which is Skeet, trap shooting, and sporting clays. In pistol, it's APSIC.  APSIC is a definition of tactical -- tactical shooting competition.  And Bullseye.  Bullseye is target shooting, you know, for scores.

Q.    In -- in the course of your participating in these competitions, is that where the Second Amendment activities that you referred to earlier take place?

A.    In order to shoot APSIC, I have to take the course.  And even when you're participating, applying for the club membership, there is a question if you are an N.R.A. member or not.  And in the meeting, sometimes they discuss Second Amendment, you know, fundraising or any other related to Second Amendment activities.  Like I said, meetings, and mostly meetings about information, what's going on with regulations, with the law on federal and state level, those kind of activities.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 41

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   When you say N.R.A., are you referring to the National Rifle Association?

A.   Correct.

Q.   Are you a member of the National Rifle Association?

A.   I am.

Q.   When did you join the -- the N.R.A.?

A.   I don't have my card on me, unfortunately.

Q.   Approximately.

A.   I want to say maybe twenty -- 2011, 2012.

Q.   Other than membership, do -- do you hold any official position within the N.R.A.?

A.   No, I do not.

Q.   Is there a local chapter or organization of the N.R.A. that you are a member of?

A.   No.

Q.   Other than the national organization, do you participate in any meetings or organizational activities in relation to the N.R.A.?

A.   No.

Q.   Other than being a member, what,

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

if any, activities do you engage in as an individual associated with the N.R.A.?

A.    I do hunting, I do competitions. That's about it.

Q.    Okay.  You -- you don't have any active role organizationally within the -- the association?

A.    No, I do not.

Q.    Are you a member of the Gun Owners of America?

A.    I am.

Q.    When did you join that organization?

A.    I want to say 2011, 2012.

Q.    Approximately the same time as you joined the -- the N.R.A.?

A.    A little bit later than that.

Q.    Why did you become a member of the Gun organize -- Gun Owners of America?

A.    To support Second Amendment as much as I can.

Q.    And how does the Gun Owners of America support the Second Amendment?

A.    By fighting for the rights of the

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

law-obedient gun owners, protecting our rights as much as I can, and we pretty much appreciate what they're trying to do, and we're trying to support them.

Q.    Other than membership, what role, if any, do you play in the organization Gun Owners of America?

A.    Just -- just a member.

Q.    Is there a local chapter of the Gun Owners of America that you attend meetings with?

A.    No, I do not.

Q.    Is there -- is there an organizational office or meeting place of the Gun Owners of America in the Albany area?

A.    I'm not aware of any.

Q.    Other than holding a membership, what activities do you participate in as a member of the Gun Owners of America?

A.    None.

Q.    Other than the N.R.A. and the Gun Owners of America, are you a member of any other groups that take political or legal stands on issues related to firearms?

A.    There is a bunch of them, but I

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 44

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
never really pay as much attention with small
organizations, mostly just N.R.A., and Gun Owners of
America.  But I do aware of other ones, but I don't
participate in them.

Q.    Are you -- are you a dues-paying member of any other organization?

A.    No.  No, I'm not.

Q.    As an Information Technology Professor -- professional, Mr. Antonyuk, I am going to assume that you are familiar with the term social media?

A.    Correct.

Q.    Do you own any social media accounts?

A.    I do.

Q.    What social media accounts do you own?

A.    Facebook.  I believe my children signed me up for TikTok and Instagram, but I'm not active in any of those platforms.

Q.    And -- I'm sorry?

A.    I'm not -- I'm not active on any of those platforms.

Q.    Do -- do you post information on

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 45

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Facebook?

A.    No, barely, maybe picture of family here and there, but I'm not active.

Q.    Okay.  Have you ever posted information related to this lawsuit or the C.C.I.A. on Facebook?

A.    No, I did not.

Q.    Same question with respect to TikTok.

A.    No.

Q.    How about Instagram?

A.    No.

Q.    Have you ever posted any information on any social media platform regarding your challenge to the C.C.I.A. that is a subject of this lawsuit?

A.    No.

Q.    Do you have an e-mail, a personal e-mail account?

A.    Yes.

Q.    Do you actively use that to communicate with other individuals?

A.    Yes.

Q.    Have you used your personal e-

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk mail account to commu -- communicate with anyone other than Mr. Stamboulieh regarding your challenge to the C.C.I.A. in federal district court?

A.   No.

Q.   You've never discussed over e-mail any aspect of this case with anyone other than Mr. Stamboulieh through your personal e-mail?

A.   No, never.

Q.   Do you have a professional e-mail account?

A.   I do.

Q.   Is that associated with the funeral director's position?

A.   Yes.

Q.   Have you ever use -- used that e-mail account to -- to communicate with anyone other than Mr. Stamboulieh regarding the substance of your challenge to the C.C.I.A. in this federal district court?

A.   No, not to anyone, just my lawyer.

Q.   Other than your Attorney, you've never discussed this case with anyone, either your personal or professional e-mail?

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 47

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Never.

Q.    Do you subscribe to YouTube?

A.    Yes.

Q.    Do you subscribe to any YouTube channels that are dedicated to issues related to the Second Ane -- Second Amendment gun ownership or the issues raised in this case?

A.    No.

Q.    Have you ever frequented or subscribed to any YouTube channels that related -- are related to Second Amendment type issues, gun ownership, or pistol permitting in New York?

A.    Subscribe?  No.

Q.    How about frequently watched or engaged in the videos related to those topics on YouTube?

A.    Sometimes I'm on YouTube, will click, you know, sometimes there'll be some updates in Virginia.  I'm like, okay what's going on over there?  You know, that would be stuff like in New York, New York City, the new gun laws.  I'm like, it's new.  And of course, sometimes time, it's just a scam just to get more clicks.  But yeah, it's something that I'm interested at, you know, clicking,

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

listen to it, but I do not subscribe to any of it. Am I doing it all the time?  No, it's just when this pops up, I will do it.

Q.   Are you familiar with the YouTube channel presented by an individual named Eric Pratt?

A.   Name doesn't ring a bell.

Q.   Do you have any recollection of viewing any Second Amendment or gun ownership-related issues presented on YouTube by an individual named Eric Pratt?

A.   God.  The name doesn't -- I -- I can't recall it.  Name doesn't sound familiar to me.

Q.   All right.  Antonyuk, I'm now going to direct your attention to Exhibit One, page two, question number two, and your response.  I'm going to give you an opportunity -- it's -- it's fairly lengthy, so I'm going to give you opportunity to read through that to refresh your recollection of what you attested to back in November of last year, and let me know when you're finished, please.

MR. STAMBOULIEH:  Can we -- can we go off for a minute, Steve?

MR. MULVEY:  Yeah, go ahead.

MR. STAMBOULIEH:  I'm going to -- I'm

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

going to visit –

COURT REPORTER:  Off the record.

(Off the record 10:27 p.m.)

(On the record 10:34 a.m.)

COURT REPORTER:  Back on the record.

BY MR. MULVEY:  (Cont'g.)

Q.    Mr. Antonyuk, have you had an opportunity to review question two in your response on page two and three of Exhibit One?

A.    Yes.

Q.    Okay.  So as you sit here today, other than a SIG SAUER P Three six five and a SIG SAUER P Three two zero, do you own -- currently own and possess any other firearms?

A.    Pistol-wise, I Do.

Q.    Any firearms at all, other than the SIG SAUER P Three six five and the SIG SAUER P Three two zero?

MR. STAMBOULIEH:  Since you've asked that question now, I would object to him discussing firearms that are not handguns for the purposes of this case.  I believe that the transcript is going to be filed, and Mr. Antonyuk does not want to list his rifles and shotguns if he owns them, just in case

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 50

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

this does get filed and he provides basically a shopping list to anyone that would be interested in reviewing it.  And since the New York State has all of his handguns registered, all that information would be available to the State.  So with that objection, I will let Mr. Antonyuk answer if he wants.

A.    No, I do not want to.  I plead the Fifth for that.

Q.    I'm sorry, sir.

A.    I plead the Fifth for that.  I'm not --

Q.    You -- you refuse to answer, you -- you're invoking your Fifth Amendment to refuse to provide me with an answer to my question as to what firearms you currently own other than a SIG SAUER P Three six five and a SIG SAUER P Three two zero?

A.    Correct.

Q.    Do you -- do you own any firearms other than the SIG SAUER P Three six five and the SIG SAUER P Three two zero listed on response number two, page three of Exhibit One?

A.    I do.

Q.    Do you own any other pistols

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 51

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

other than the SIG SAUER P Three six five and the SIG SAUER P Three two zero listed on page three of Exhibit One?

A.    I do.

Q.    Are those other pistols subject to your current permit issued by New York?

A.    They're all subject to permit.

Q.    So if I understand correctly, you are declining to disclose at this deposition, the licensed pistols that you own, other than the SIG SAUER P Three six -- P Three six five, and the SIG SAUER P Three two zero listed on page three of Exhibit One.  Is that correct?

A.    I do not.  All the pistols are listed under my license, and it's a public record, and all my pistols are listed in my license.

Q.    And you are declining to tell me what they are today in this deposition?

A.    I cannot recall all of them and I cannot remember the model numbers or anything like that, but majority is SIG SAUER.

Q.    You say the manufacturer, the majority of your -- the fire -- your licensed handgun firearms are manufactured by SIG SAUER?

Associated Reporters Int'l., Inc.                              www.courtsteno.com

Page 52

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Correct.

Q.    Do you own handguns that were created by any other manufacturer?

A.    I do.

Q.    What company is that?

A.    H and K, Glock, Smith and Wesson.

Q.    These are all handguns, correct?

A.    Correct.

Q.    And you are declining to disclose at this deposition any rifles, shotguns, or long guns that you own at this time, correct?

A.    Correct.

Q.    Is it fair to say, without identifying them, that you do own and possess rifles or -- and or shotguns?

A.    I refuse to answer this question. It's not related to the case.

Q.    Well, you do not have that right, sir. Your attorney can object or you can in -- invoke your right against self-incrimination, you cannot just refuse to answer a question.

A.    I'm -- I'm sorry. I'm sorry, I worded it wrong.

Q.    That's okay. I appreciate it.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

Go ahead.

A.   I plead the Fifth.

MR. MULVEY:  Okay.  Monique, we're going to mark that as two.  I'm going to hand them around.  Mark -- mark that as two, please.

COURT REPORTER:  Okay.

MR. MULVEY:  You give -- you give the one to James.

MR. STAMBOULIEH:  Thanks.  Two.

MR. MULVEY:  Two, please.  Mr. Antonyuk, I'm going to give you what's been marked for identification as Exhibit Two.  My apologies to the Albany County and the Syracuse Corp Counsel.  We will e-mail you copies of exhi -- exhibits.  Let's see.  One for James, I guess, right?

MR. THOMPSON:  I think I already got one.

MR. MULVEY:  You got one?  Okay.  So you would mark one for the record.

COURT REPORTER:  Thank you.

BY MR. MULVEY:  (Cont'g.)

Q.   All right.  Mr. Antonyuk, I'm going to ask you to take a look at Exhibit Two, that's been marked for identification in the -- I'll

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 54

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

make reference to the lower right-hand corner. You'll see Bates' numbering Antonyuk dash two zero dash two one dash two two and dash two three.  I ask just to take a brief look at that, familiarize yourself with those four pages of Exhibit Two.  Have you had opportunity to look at that?

A.    Yes.

Q.    Okay.  So I'm first going to direct your attention to the second page in the lower right-hand corner.  It is identified as Antonyuk dash zero two one.  Do you see that?

A.    Yes.

Q.    Okay.  Can you tell me what is depicted on Antonyuk zero two one.

A.    It's my Utah pistol permit.  A picture of my Utah pistol permit.

Q.    And how did it come about that you obtained a pistol permit from -- appears to be this -- the -- the -- is it the State of Utah?

A.    Yes.

Q.    All right.  So tell me, please, sir, how did it come about that you obtained a pistol permit from the State of Utah?

A.    I took a course that had been

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

offered in New York State to have ability to apply for pistol permit in the Utah State, which has provided me Visa rights to carry in additional States outside the New York State.

Q.   Okay.  And you obtained this permit in 2023?

A.   Correct.

Q.   And how does that work that this permit identified on Antonyuk dash zero two one allows you to carry a concealed handgun outside of New York?

A.   By define -- definition of the law of Utah and other states who allowed carriers of outside state, a list of outside State pistol permits will allow individuals to carry the guns in the states.  Utah will provide me an additional, I believe, eighteen to twenty-two states Visa rights to carry my firearm.

Q.   Am I correct, though, that the permit depicted on Antonyuk zero two one, does not authorize or allow you to carry a concealed weapon in the State of New York?

A.   Correct.

Q.   So have you utilized the Utah

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

permit depicted on zero two one to possess your firearm outside of the State of New York?

A.   I did.

Q.   What other states have you traveled to or in utilizing the permit depicted on Antonyuk zero two one?

A.   Ohio, Pennsylvania, Kentucky, places that I would usually go hunting.

Q.   When you say hunting, what type of hunting do you engage in?

A.   Big and small game.

Q.   What big game?

A.   Deer, bear.

Q.   And what small game in particular do you often hunt?

A.   Birds, geese, turkey, ducks.

Q.   Do you have a hunting permit for big game in the State of New York?

A.   I do.

Q.   For -- for both deer and bear?

A.   Yes.

Q.   Those are issued, I believe, by the Department of Environmental Conservation.  Is that correct?

800-523-7887                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Yes.

Q.    Are there firearms training or proficiency requirements associated with obtaining those licenses, the big game licenses from D.E.C.?

A.    Yes.

Q.    Have you completed those courses?

A.    Yes, I did.

Q.    Do you utilize your handgun for small game hunting?

A.    I do.

Q.    Now it's my understanding that it's awfully difficult to -- to shoot or bag a turkey with anything other than a shotgun, am I correct?

A.    Correct.

Q.    Yeah.

A.    But it's also, there is a lot of snakes.  Some of the areas that I go there are a lot of snakes, so I have guns, we use the small pellets, it's a handgun to protect me from the snakes or from coyote.

Q.    Yeah.  And I was just -- I'm most interested in the turkeys.

A.    Oh, I see.

Q.    But you need a -- you need a

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 58

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

shotgun to take a turkey is my understanding.

A.    You're correct.

Q.    Yeah.

A.    But there's also handgun, Judge Four ten in the close congress with the birds. That's what mostly mo -- most hunters are using.

Q.    For turkey?

A.    For turkey.

Q.    Good to know.  And I believe the -- these are a little bit out of order, Mr. Antonyuk. So I'm going to turn your attention to the Exhibit One at the bottom, Antonyuk dash zero two three.  It appears -- yes, it appears that that is the -- that the -- the -- the backside or the -- the opposite side of your Utah permit zero two one.  Is that correct?

A.    Yeah, looks like it.

Q.    Okay.

A.    I believe so.

Q.    Yeah.  And then in the -- in the upper left-hand corner, that appears to be a -- a finger or thumbprint impression?

A.    Correct.

Q.    Okay.  So Exhibit Zero two one

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 59

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

and Zero two three are the front and back of the Utah permit that you obtained in 2023.  Is that right?

A.    Yes.

Q.    Okay.

A.    It's renewal.  Yeah.

Q.    Yeah.  And you were able to -- to do so without traveling to Utah.  You obtained that here in New York, correct?

A.    Correct.

Q.    Okay.  Was that through the Watervliet Rod and Gun Club?

A.    No.

Q.    Okay.

A.    I don't remember name of this club, but it was --

Q.    In the -- in this area?

A.    Yes.  It was about hour -- about like hour drive from Albany.  It was another gun club.  Only been there once for this particular instance to obtain -- to finish my course and obtain my Utah license.  It's all-day course, two days course.

Q.    Okay.  And so let's -- let me turn your attention to now the page marked Antonyuk

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 60

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
zero two two and the -- at the bottom.  This just so
we have full clarification, there appears to be a
color photocopy, the -- the lower photograph color
photocopy of the same permit C as in cat, eight six
five two one nine depicted on Antonyuk zero two one.
Just -- just a color picture of the same permit.  Do
I have that correct?

A.   Looks like it is.  Yes.

Q.   Okay.  So those are -- on those
three pages, zero two one, the lower photograph on
zero two two and zero two three are all three of
photocopies of the front and or back black and white
and color of your Utah concealed firearm permit
issued in March of 2023.

A.   Yes.

Q.   All right.  Now turn your
attention to page, the front page of Exhibit One,
Antonyuk zero two zero.  Can you please tell me what
is depicted on that exhibit?

A.   It's my New York State pistol
permit.  Copy of my New York State issued pistol
permit back in -- back and front of the license.

Q.   And then we'll ju -- we'll just
go through this for clarification before I ask you in

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 61

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

more detail about that.  So let's just -- just turn your attention to the page marked zero two two -- Antonyuk zero two two, the color photographs, and the -- the picture at the top of the page, the color photo -- photocopy.  It appears to me and I just would like you to confirm that that is identical to the black and white photocopy depicted at the top of Antonyuk zero two zero.

A.   Yes, looks like it, yeah.

Q.   Okay.  Which indicates that -- I'm going to infer in the upper left-hand corner, there's a license number and underneath it the letters D.O.I., which I believe stand for date of issuance, March 11th, 2009?

A.   Correct.

Q.   And is this the current carry conceal permit that you are licensed to continue to hold currently?

A.   Yes.

Q.   Prior to March 11th, 2009, did you have or were you authorized to carry a concealed firearm in New York?

A.   I did not.

Q.   Please describe for me the

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 62

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

process that you went through on or before March 11th, 2009 to obtain the permit depicted on Antonyuk zero two zero, Exhibit Two.

A.   I had to register for a pistol safety course, attend three days course to acquire my certification, the completion of the course, in order to order or place the deposit on a firearm to obtain the receipt in order to apply for pistol permit at the State of New York.  And submitted my paperwork, submitted my fingerprints to F.B.I. and the State.  And after about eight months, I received notification to come to the court to obtain my pistol permit.

Q.   Was there any particular event or occurrence that motivated you prior to March of 2009 to pursue a permit to carry a concealed weapon in New York?

A.   I just wanted  -- it's mostly for recreational and hunting, and also the ability, you know, to progress my certification to obtain concealed carry, to start carrying it for my protection because of concern about safety of myself and my family.

Q.   Was -- was there any particular incident that occurred prior to March of 2009 that

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 63

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

motivated you or in -- influenced you in obtaining a concealed pistol permit related to your own personal safety or that of your immediate family?

A.    Not in the beginning, no.

Q.    When you say in the beginning, was there something after March of nine -- 2009 that occurred that related to your personal safety?

A.    Just concerns watching too much news and some accidents that happened on my road on 4316 Buckingham Drive, when there was a day some individual, you know, discharged his weapon in my neighbor's house.  And that's where kind of my concerns about my safety outside the house was raised, and I decided to apply for unrestricted pistol permit in order to conceal carry.

Q.    Did -- did this discharge of a weapon in the vicinity of your home on Buckingham occur before or after you applied for the permit that you obtained in March of 2009?

A.    After.

Q.    Does your -- your concealed -- concealed semi-automatic rifle permit contain any restrictions?

A.    I cannot carry that, openly

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk carry.  I can possess and I can only use it for hunting and recreational reasons.

Q.   Well I'm -- I'm going to direct your attention to Exhibit Zero two zero, upper right-hand corner.  The photocopy of your permit and I see you see the term restrictions.

A.   Yep.

Q.   And next to it, it says unrestricted.

A.   It applies only to the pistol.

Q.   All right.  Well what is the difference between the semi -- semi -- concealed carry semi-automatic rifle, and the pistol you just referred to?

A.   To my clarification by the pistol permit department, it was clarified to me, the semi-automatic statement above on the top of my license states that I have the right to purchase semi-automatic rifle, but on restriction on the bottom stating only for pistol only -- for pistols only.

Q.   So -- so if I understand correctly, that -- that you -- there is no restriction for you carrying -- on the license, there's no restriction listed for you carrying a

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk handgun?

A.    Correct.

Q.    But that the license depicted in Exhibit Zero two zero does allow you to purchase a semi-automatic rifle.  Is that right?

A.    Correct.

Q.    Okay.  And just so we're clear, you are declining to -- you're going to exercise your right to decline to -- to tell me whether or not you own at this time a semi-automatic rifle.  Is that correct?

A.    Correct.

Q.    Okay.  Are you familiar with the terms renewal and recertification, used in connection with handgun permitting in New York?

A.    Yes.

Q.    Are your -- is -- is the permit depicted in Exhibit Zero two zero subject to a renewal and recertification requirements?

A.    Yes.

Q.    What are those?

A.    They have to recertify online every three years.

Q.    Is that -- online you mean,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 66

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

through -- are you --

A.    Yes, you have to go online and recertify online by answering a number of questions in order to recertify and extend pistol permit.

Q.    Is there any training requirement or the like that goes along with that recertification?

A.    Not with mine, no.

Q.    This -- your -- this permit depicted in zero two zero, it just requires you to complete a series of questions, and I assume pay a fee.

A.    No fee.

Q.    No.

A.    But just recertify online.

Q.    Every three years?

A.    Every three years.

Q.    And do you know approximately when the next recertification requirement for your permit is?

A.    I want to say 2029 in January or February.

Q.    So other than recertification, there is no expiration or termination of your -- your

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

permit depicted in zero two zero.  Is that right?

A.    Correct.

Q.    Mr. Antonyuk, you mentioned an incident that occurred in your neighborhood where someone discharged a firearm in the vicinity of your home.  Were you present when that occurred?

A.    Yes.

Q.    Describe for me as much detail as you can recall what transpired on that occasion.

A.    Me and my wife were sitting downstairs watching T.V. when we heard shotgun shells -- shotgun shots outside our house.  And I instructed my wife go to, you know, deep in the basement and I went upstairs to see what's going on.  And a couple houses to my right from my house, an individual discharged his shotgun in neighbor's mailbox and at the door of the house.

And I think it was later that we found out it was dispute between employee and employer. And that's kind of scared my wife, scared me that somebody can do this right outside my house where we usually walking our dogs or going for the walk with the kids.  And it's going to raise a concern about safety for myself and for my family.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

When, prior to that, I did have my pistol permit but mostly used only for recreational and hunting.  And after this situation, I decided to upgrade my status of my pistol permit from restricted to unrestricted.  And I went through a set of courses and training in order to acquire unrestricted license.

Q.   And what -- what's the differentiation between a restricted and unrestricted license, as it applied to you at the time?

A.   A restricted license would only allow me to possess and use my firearm for hunting and practice at the range only.  I would not allowed to conceal carry my firearm outside traveling to the range or to my hunting ground and back to my house.

Q.   So is it fair to say that this incident whe -- where the -- the firearm was discharged in the vicinity of your home, motivated you, or was a factor in your deciding to upgrade your permit to allow you to -- to carry a concealed weapon for reasons other than hunting in the community?

A.   That was a, I want to say a final factor for me to start going through this lengthy, expensive process of taking the restriction off my

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk license.

Q.   Did you utilize your handgun at any time during that incident you just described with the neighbor?

A.   I utilized that going to the range and at the hunting ground, yes, but not outside.

Q.   Excuse me, I wasn't clear.  So at the -- at -- on the day of this incident, where you heard the shotgun report and you went out, did you utilize your handgun for self-protection at that time?

A.   My gun was in my house for protection, but that moment I didn't reach for it because I heard this shots away from my house.  So I did not reach for my gun because I can tell that was not close proximity.  But I did instructed my wife to seek for safety outside basement next to my office, where my firearms resides.

Q.   Other than that incident that you just described in your neighborhood, have you ever had occasion to utilize the handgun that you're permitted to carry, currently unrestricted, in -- in an incident involving your own personal safety or

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

those in your immediate vicinity?

MR. STAMBOULIEH:  Object to form.  You can answer.

A.   I did not utilize, but it was a couple situations that I wish I had my firearm on me.

Q.   And I'm -- I'm asking you strictly when you possessed your firearm?

A.   No, I did not.

Q.   Okay.  So if -- if we're clear, you've not had an occasion where you've had to rely upon the presence of your firearm to protect your own individual personal safety, other than in the context of being aware of this incident in your neighborhood where a firearm was discharged?

A.   Thank God, no.

Q.   Okay.  How about with respect to anyone in your immediate vicinity?  Same question.

MR. STAMBOULIEH:  Same objection.

A.   No.

Q.   Are there currently, as of today, any circumstances that you are aware of, that pose a particular threat to you, a specific threat, not just general, but a specific threat that require you to rely upon your firearm for your own personal safety?

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.   No.

Q.   Mr. Antonyuk, redirecting your attention back to your conversations with attorney Toas on or around the time that the C.C.I.A. was being implemented.  Did you discuss formal litigation, suing somebody with respect to the implementation of the C.C.I.A. with Mr. Toas at that time?

A.   No.

Q.   Did there come a time when you engaged in conversations with someone concerning becoming involved in a legal challenge to the enforcement of the C.C.I.A.?

A.   No.

Q.   Well, at -- at some point in time, you became involved in this matter that we're here about today, correct?

A.   Yes.

Q.   How did that initially come about?  What was the first instance where you were engaged by another person discussing the issues that have been raised by you against the Defendants in this case?

A.   I would say conversations with

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 72

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
discussing the new law with Mr. Michael Bucci.

Q.   He's a personal friend of yours?

A.   Yes.

Q.   Okay.  And he -- he's not an
attorney?

A.   No, sir.

Q.   Does Mr. Bucci, to your
knowledge, hold any position with the N.R.A. or the
Gun Owners of America?

A.   No.

Q.   Okay.  So what did you and Mr.
Bucci discuss with respect to formal legal challenge
to the implementation of the C.C.I.A.?

A.   Pretty much just like what
anybody discussed, what can -- wish we could do
something about it.  And because after SAFE Act, we
couldn't believe like anything else can happen,
something like this to infringe our rights even more.
And we started discussing, that's when I got
introduced to Stephen, and the challenge that Owners
of Gun of America, the one that questions this case,
and that's how I got involved.

Q.   Okay.  Do I understand correctly
that Mr. Bucci put you in contact with Mr.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 73

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Stamboulieh?

A.    Yes, sir.

Q.    How did that occur?

A.    From discussion.

Q.    Again, let me just caution.  I don't want to know anything that transpired between you and Mr. Stamboulieh directly.

A.    I understand.

Q.    I just wanted to understand how you met him.

A.    I understand.

Q.    All right.

A.    Mr. Bucci, after conversation, he introduced me to Ste -- Stephen.  And after conversation with Mr. Bucci, I decided to take the part of this lawsuit.  And Bucci informed Stephen about my willingness to be involved in this case.  That's how it's all started.

Q.    Why did you feel it necessary to become formally ga -- engaged in -- in the process of suing in federal court with respect to the Concealed Carry Improvement Act?

A.    Well, as you know my life story, I wasn't born in the United States.  I was born in

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 74

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Ukraine.  And growing up in a country with no rights back then, lot of stuff changed since then.  But in time of communism, socialism, and having no rights, no way to protect myself, and all criminals and political entities were armed or have a security and you were just like a sheep, you know, surrounded by wolves.

And so things like your rights, your ability to be individual, start to be really important to you.  And then becoming a father, becoming a husband, accept responsibility of protecting my family and protecting myself, and ability to do something to protect my rights and my strong beliefs to do as -- as much as I can possibly can.  And I -- I felt like there was something I can do about it, or at least try to do something about it, to protect my rights, protect my beliefs.

Q.  Is it fair to say at the time that you had already possessed an unrestricted concealed carry permit, that you could carry a handgun concealed on your person.  Is that right?

A.  Up till C.C.I.A., yes.

Q.  Yes.  So at -- at -- at the time.

A.  Correct.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   And you had exercised that right freely as -- as of March 11th, 2009, correct?

A.   After 2009, yes.

Q.   Yes.  When you -- you obtained your permit, Exhibit Two -- Exhibit lower right, Zero two zero, you obtained your unrestricted concealed carry semi-automatic rifle permit in March of 2009, right?

A.   I believe it's 2009 when I originally acquired my pistol.

Q.   Yeah.

A.   And then couple years later, I acquired unrestricted.  From that point, I start carrying one.

Q.   I -- I -- I stand corrected.  You did -- you clarified that you initially was just for hunting and then the restrictions were lifted later.

A.   Correct.  After taking the (overspeaking) --

Q.   Do you know --

A.   -- course.

Q.   -- do you know whether or not you -- you were upgraded to unrestricted concealed carry before or after the final effective date of the

800-523-7887                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 76

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

C.C.I.A..  If you know?

A.    Way before that.

Q.    So you -- you -- you had unrestricted concealed carry before the C.C.I.A. was implemented?

A.    Correct.

MR. MULVEY:  I apologize.  We're going to have to go off for a minute.  Thanks.

COURT REPORTER:  Off the record.

(Off the record 11:14 a.m.)

(On the record 11:23 a.m.)

COURT REPORTER:  Back on the record.

MR. MULVEY:  Okay.  All right.  You ready?

COURT REPORTER:  Yes.

BY MR. MULVEY:  (Cont'g.)

Q.    Mr. Antonyuk, I've handed you what's been marked for identification as Exhibit Three for this deposition.  It's a sworn statement that you made and attested to in September of 2022. I'll give you an opportunity to briefly look it over to re-familiarize yourself with it before I ask you any questions.

A.    Uh-huh.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   Let me know when you're ready.

A.   Okay.

MR. MULVEY:  Just for the record, for Counsel that are participating via video conference, this is Docket One, document one dash eight.  Just for -- for reference.

MR. LONG:  Thank you.

BY MR. MULVEY:  (Cont'g.)

Q.   You had an opportunity to review that, Mr. Antonyuk?

A.   Yes.

Q.   Okay.  So I'm going to direct your attention to page three of eight, paragraph numbered six on Exhibit Three.  Do you see that?

A.   Yes.

Q.   And -- and in September of 2022, you declared that, that if you go to a store, restaurant, or a gas station not specifically posted with a sign allowing you to carry there, you aren't able to go in with your firearm without violating the law.  Do you see that?

A.   Yes.

Q.   Right.  Has your position, your statement in any way changed from September of 2022

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 78

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

to today, that -- that statement, with respect to the C.C.I.A. and your own personal experience?

A.   No.

Q.   Okay.  So is it true that continuing from September of 2022 until today, that -- that you are unable to go into a store, restaurant, or gas station that is not specifically posted with a sign allowing you to exercise your permitted concealed carry right?

A.   I'm going to need a little clarification because of -- some of the laws was not suspended by as of right now, dormant, it's allowed us to carry in the gas stations and not require us to disarm before to gas stations.

Q.   Right.  So let's -- let's stay with gas stations.

A.   Uh-huh.

Q.   Is your statement, paragraph six on page three of Exhibit Three, still accurate that you made in September '22, that you may not exercise your permitted right to carry a concealed handgun at a gas station, unless there is a spot -- a sign specifically posted allowing you to do so?

A.   Again, as far as I know right

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 79

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

now, we are allowed, but prior to my statement, I was not allowed to do so.

Q.    Well so my question what -- that I asked you just a moment ago, was if paragraph six is -- is still accurate.  Let's clarify that with respect to gas stations.  Again, is paragraph six on page three of Exhibit Three in this deposition, with respect to gas stations only, still accurate?

A.    No.

Q.    All right.  Why not?

A.    Because as far as I know, this portion of the law was -- I don't know what's the exact definition put on post or suspended, dormant, that allowed us to carry our weapons at the gas stations in order to fill it up our cars.  Prior to that, to the submitment (sic) or post of this particular portion of the new C.C.I.A. law, we were not allowed to enter a gas station or a parking lot of gas station with our firearms on us.

Q.    So let me be very specific so I understand.  That it was your understanding on September 19th, 2022 that if you went to a gas station that did not specifically post a sign allowing you to -- to exercise your permitted

Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

carrying of a concealed firearm, you could not utilize the services of that facility?

A.    Correct.

Q.    Okay.  And that has changed.  So we -- we agree now that has changed since September of 2022.  That's your understanding?

A.    Correct.

Q.    All right.  Let's -- then let's redirect with respect to restaurants.  Were there restaurants that you patronized prior to September 19th, 2022 with your firearm concealed on your person, that you understood you could no longer legally visit pri -- after September '22 -- excuse me -- September 19th, 2022?

A.    Correct.

Q.    Okay.  What restaurants were those?

A.    The restaurant specialized for dine-in, some of them for carry out.  One particular, it's a Bourbon Street.  When I used to order takeout food or sometimes stop by for the wings for quick bite to eat.  And unfortunately because they serving alcohol, I'm no longer utilize that restaurant.

Another one would be LongHorn on the

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 81

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Wolf Road.  Another one would be couple place already closed out.  Sushi place that we like to go sometimes, we no longer go there because not -- I cannot carry over there and they're serving alcohol. So majority of the restaurants that I was using for dining or takeout, I no longer can use, unless I go home, disarm myself, and in order to enter the property to pick up my food or dine-in.

Q.   And is it your testimony today that, unlike gas stations, which we agree the circumstances changed, restaurants such as Bourbon Street or LongHorn -- LongHorn on Wolf Road, you believe are still subject to limitations, the same as they were in September of 2022 under the C.C.I.A.?

A.   Correct.

Q.   So is it fair to say that you -- that since on or after September 19th, 2022, that you have not patronized any of the establishments that you just referred to while in possession of your firearm?

A.   Correct.

Q.   And so you made reference to the fact that the these establishments serve alcohol. What -- what is that distinction?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 82

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Distinctions that in the laws, like if any businesses socialize serving of alcohol, it's not allowed for firearms.  Hold -- license holders carry the guns for one or another reason, how the law is written, and it's not allowed us to go to those facilities armed as long as they're serving alcohol.

Q.    What is your own personal understanding of the reason why the C.C.I.A. restricts the presence of a firearm, concealed firearm on an individual's person in an establishment serving alcohol?  Your own personal understanding?

A.    My personal understanding would be just infringement my rights.  It's maybe discouragement of individuals to initialize the Second Amendment Right and carry for protection.  Because clearly, I don't see no reason.  I particularly and most of my friends, we don't drink.

When we go into those facilities, we're not going to -- we never go directly to drink. We're going to have a dinner and maybe here and there, maybe a glass of wine with a good seafood meal.  But this extent of my alcohol taking, and I'm true believer that armed society is blessed society.

800-523-7887                           ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Because any individual that I met with my experience of competitions, attending gun club events, or like any other events related to, you know, club events like competitions or informational events, or safety events or training events, probably the best individuals you can meet to have a decent conversation, polite people, respected people, different set of responsibilities and different branches of their employment anywhere from -- from the plumber to lawyer to doctor.

And just the whole thing about, you know, not going to restaurant and not be able to actually go there and feel safe right away, there is going to be someone, you know, somebody who will object, say no.  But people drink and going drunk and starting using firearms, I never seen it happen.  I never heard this happening.  And it just makes no sense to me.  Same thing with camping grounds. People don't go there to hunt, people go there just to protect themselves in case event.

Q.   And -- and excuse me, let's just --- but let's just stay with -- with the premises that serve alcohol for the moment, if we may.

A.   Uh-huh.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 84

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   So you're familiar with establishments, I believe, a -- a bar that -- that has little or no food service, that's primary purpose is to serve alcohol.  Are you familiar with those types of establishments?

A.   I do.

Q.   Okay.  Do you understand that there is -- that there is a restriction on -- on individuals possessing or carrying a firearm, even with a permit in those types of establishments where the -- where the focus, the primary purpose is to serve alcohol to the patrons?  Do you understand that?

A.   I understand it.

Q.   All right.  And do you understand what the reasoning is behind the restriction of those types of establishments?

A.   Yes and no.

Q.   Okay.  Yes and no.  Well, which is it?

A.   This kind of question I cannot answer yes or no because of if I have, in my situation, if my friend called me and he wants me to be his designated driver to pick him up because the -

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk - the right he had over the no longer can provide him with the right.  I cannot just go in the bar while I'm driving by to pick him up because I'm carrying a gun.  I'm not drinking.  I'm not going there to contain any business, sit down, drink, and so on.

I'm just going there to pick up my -- my friend or stop by, pick up, you know, take out order, one or another.  I'm not allowed to do that even if I'm not a client.  If I was written, you know, in -- in facility, a hundred percent just like a straight bar, somewhere around the corner, owner of the bar don't feel comfortable people drinking and carrying a gun.  He put in a sign and every law-obedient citizen will obey that sign, that owner prefer people not to be armed in his facility.

Q.   You agree with that?

A.   I would agree with that.

Q.   So when a pri -- when a private property owner posts a -- a notification you -- that the guns are not allowed on his premises, you -- you understand and respect that outside of the C.C.I.A.?

A.   It's a private property.  He respect it.  He knows his surroundings and it's his decision making for profit, nonprofit for his beliefs

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
is his own right.  But most of the time, from what I heard and from what I see, you want to say movies, T.V.s, news, people.

Q.   Let's just stay -- let's stay -- let's stay with -- let's stay with premises that serve alcohol for a moment.  We're still on that.  All right?

A.   Yes, sir.

Q.   So I -- I now I want to make a distinction.  So you -- you -- you understand and respect and do not have an issue with a private bar owner.  Mr. and Mrs. O'Malley run a pub.

A.   Uh-huh.

Q.   And they don't want their patrons armed and they put a sign up, no firearms allowed.  You -- you -- you have no problem with that at all?

A.   It's his decision.

Q.   Right.

A.   But the matter tenses --

Q.   You -- you -- you don't -- you don't -- you do not have a C.C.I.A. problem with that sce -- scenario, correct?

A.   Uh-huh.  I do have a problem.  That is, it's mandated by the government and not

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 87

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

person who owns the place.

Q.    No, I'm not asking about the government.  I'm asking about Mr. and Mrs. O'Malley, who own a pub in a neighborhood and serve alcohol primarily, but maybe some pretzels, snacks or something.

A.    Yeah.

Q.    Right?  But that's the purpose of their establishment.  And they post a sign; no firearms allowed on the premises.  You have no problem with that, correct?

A.    Yes.  I want to say no.  No problems.

Q.    Okay.  Now how about the same circumstance with a restaurant that primary purpose is to serve meals, but also serves wine and beer and other alcohol drinks.  And it's the O'Malley's' restaurant, and they post a sign, the private property, they own the restaurant, and they post a sign, no firearms allowed on the premises.  The same position, you'd have no problem with that?

A.    I will have a problem with that.

Q.    Why?

A.    Because I don't believe people

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

who go the restaurant, it's not going just to drink, people who go there will not have the first requirement, like you will go in the bar just to have a drink, get drunk.  You're going there to have a nice dinner with your family and you want to feel safe; you should be allowed to carry it.

If owner decides not to honor the ability of the people to protect themselves and exercise their rights, I would not give a business to this facility, I would go to another facility that still believe in Second Amendment, belief of the good of the people, and I will give my business there. But I will not attend the restaurant that will display the sign with no particular reason not -- not to -- not to honor my rights.

Q.   So you would choose not to patronize that restaurant that restricts that -- the -- the -- the patrons from carrying the firearms. That you would choose not to patronize the restaurant?

A.   Correct.

Q.   All right.  Are there stores that you patronized prior to September 19th, 2022, that you continue to avoid, or cannot go into with -- with

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 89

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

your firearm since September of 2022?

A.    I do.

Q.    Yes.  What are those?

A.    Colonie Mall, Crossgate.

Q.    Any others?

A.    Latham Circle Mall.  There's a number of places became Amazon Shopper.  Dick's another place.  Mostly like food places.

Q.    Let's just stick with stores.  We covered restaurants already, if we can please.

A.    The -- the locals, not really big variety.  So I said the main ones.  It's a Crossgate Mall, Colonie Mall.  With Hobby Lobby, it's not like I was there a lot, but my kids asked me to pick up some stuff over there.  Yeah, I would say this major is -- major malls, Colonie, Latham Circle Mall, and Crossgate.

Q.    So let's take Crossgate Mall as an example.  All right.  Would you agree with me that that is a privately owned property?

A.    Yes, I believe so.

Q.    So the -- the -- the private property owner is -- is the -- has certain rights to restrict activities on -- on their property, such as

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk skateboarding, or soliciting contributions in the parking lot, things like that, I believe.  Correct?

A.    Correct.

Q.    Okay.  And how has the C.C.I.A. made it impossible for you to -- well let me rephrase that.  Strike that.

Has the C.C.I.A. made it impossible for you to patronize the Colonie Mall or the Crossgates Mall?

A.    First of all, the businesses didn't post any signs that would allowed or disallowed entrance with a firearm.  Number two, got you moment.  Because a lot of those places have bars, restaurants that serve alcohol.  Sometimes entrances require you to enter through those facilities or right next to those facilities.  And in the law, it doesn't specify how many feet you have to stay away from those places.

So as of right now, I'm avoiding any place or any business that sold alcohol, like, I don't know, like a plague.  You want to say that. Because of it's not qualified and it doesn't state it in the law about distance, about is it -- if it's a joint parking lot between the restaurant and I don't

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

know, the toy store, whatever it's next to it or some other store, is it still considered to be property of the facility that sells alcohol?  So there's a lot of confusions.  That's why again, again, I don't want to be in situation of got you.  I'm trying to avoid those kind of places as much as I can.

Q.   Right.  And my question was, is it impossible for you to patronize any of these establishments?

A.   If strictly obeying to the law correct, correct.  It's impossible because none of the facilities up till now have signs to allow me to one way or another carry or not carry the signs.

Q.   I -- I don't think I'm being clear enough, Mr. Antonyuk.

A.   Yes.

Q.   How is it impossible for you to enter the Crossgates Mall at this time?

A.   At this time?

Q.   Yes.

A.   If just like a gas stations, until this amendment that allowed us to carry it on the gas station, we will not allowed to carry on the gas station and the malls.

800-523-7887                                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   I -- I -- I'm not making myself clear.

A.   Uh-huh.

Q.   Maybe I should just specify.  You -- you -- you are answering it's -- it's -- it's impossible for you if you're armed.  It's what I'm asking you is, is it impossible entirely?

A.   Oh, I'm sorry.  No.

Q.   No.

A.   It's not impossible.

Q.   Okay.

A.   Yeah.

Q.   And I wasn't clear.  So you -- you -- you are, I believe, inferring that I'm suggesting that you -- that you have to be armed. I'm asking you, just as a threshold matter, you can still freely attend the LongHorn Steakhouse on Wolf Road or the Crossgate Mall, or Dick's Sporting Goods. Your -- your responses were related to whether or not you can do so while in possession of a concealed firearm?

A.   Correct.

Q.   Okay.  So -- and it's my understanding that -- that you are pursuing this,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

your claim against Superintendent James and the other Defendants to -- so that the Court will permit you to -- to continue to patronize those establishments while you are armed.  Is that right?

A.    Correct.

Q.    Okay.  And I further my understanding that the purpose, the primary purpose, that you believe that it's necessary for you to be armed in those establishments is for your own personal safety?

A.    Correct.

Q.    What is the first occasion on or after September 20 -- 19th, 2022, when you were forced to disarm yourself to go into a place that the C.C.I.A. made off limits?

A.    Gas station.

Q.    When was that?

A.    Don't remember a particular day. But I remember was APSIC competition.  And on the way -- on the way back from the range, I need to -- I want to stop by to pick up some -- something to drink and get gas.  So I had to pull over on Central Avenue outside, you know, right outside the bus stop and disarm myself by placing my firearm in -- in a safe

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

that was embedded in my old truck between the seats in order for me to go and fill up the car and go get something, you know, cold to drink.

It was a summer.  I remember that part.  And after that, I have to again pull up from gas station, stop again on the road, and arm myself again.

Q.   And we are in agreement that currently the -- that restriction, with respect to gas stations, is no longer in place.

A.   Correct.

Q.   Okay.  So other than gas stations, what is the first occasion you can recall when you have gone into a place that the C.C.I.A. made off-limits and you were forced to disarm yourself?

A.   Pick up pizza and wings for my son's birthday last year, and I had to stop in Central Avenue, I was going back from one of the clients' meetings, and I had my firearm on me, and I had my -- I received a call from my wife asking me to pick up food.

So I had to pull up on the road, disarm myself in order to go inside the place to pick

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

up my pickup order, and then went back home.  I mean, I went back to my car and drove off from the parking lot of facility and armed myself again.

Q.   And what is the -- what is the application, the -- the effect, the -- the enforcement of the C.C.I.A. at the takeout facility that you believe restricts your right to utilize your concealed carry permit?

A.   You mean, it's -- because it's (overspeaking) --

Q.   What about the law, in your -- in your understanding, required you to remove your firearm, lock it in your vehicle in order to pick up the food from the -- was it a restaurant?

A.   It's a restaurant.  It's a restaurant, bar, restaurant.  They have a bar inside. And that's the reason why I cannot initialize my rights to carry because they serve alcohol.

Q.   So the -- the place that you were picking up the first food also served alcohol.  In order for you to enter into the premises in conformity with the C.C.I.A., you had to disarm yourself?

A.   Correct.

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   On -- on your son's birthday last year?

A.   Correct.

Q.   Okay.  What was the next occasion you recall when you had to do the same thing?

A.   Pretty much every other day.  If I have to go to the store, if I have to go to, you know, pick up some food or go in facility that's not in the list of allowed places to go, I would disarm.

Sometimes I can do a couple times a day. Sometimes I'm not doing it at all.  Sometimes I'm doing it more often than other days.  It's really hard, you know, because it became such -- such automatic thing and dangerous thing too, for many reasons, disarming myself while I'm sitting in the car and then arming myself again.

Majority of the, you know, of the time, it's going to pick up food or go to restaurant, go somewhere to, you know, to greet my wife for lunch, that I'm not allowed to bring my firearm again because the serve alcohol.

Meeting my clients, some places that we usually go have a drink and we have like food. Again I have to disarm, arm myself again.  So for me,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk

it was always, before this C.C.I.A. came in effect, only had on my guns twice a day when I put them on, when I put it away in afternoon.

But sometimes I'm doing it six, eight times a day, which is creating a danger to myself and for people around me, because I have to do this in the car. Sometimes my family on the back seats and from the course one I took for the safety course for the pistol permit, always point the gun in a safe direction and car doesn't have the safe direction.

So I'm putting myself in danger all the time. I'm -- I'm proficient in the firearms, but accidents do happen and I've tried to avoid as much as I can. I more prefer, like I said before on the handle my gun twice a day. When I put it on from my safe to my hip, and at night when I come back home, from my hip to my safe.

Q. Do you carry your weapon in a holster?

A. Yes, I do.

Q. Mr. Antonyuk, most of your references have been in the context of restaurants or facilities associated with the collection of stores,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

the malls, and the like where there's alcohol involved.  Are there -- are there any other circumstances other than bars, restaurants, or stores approximate to faci -- to facilities that serve alcohol, where you have engaged in the same disarming procedure that you described earlier?

A.    Parks, camping grounds, State parks, that if you're planning to go there making sure they're going home to disarm.

Q.    What parks are you referring to? In your own experience, where that has occurred, that's on or after September of 2022?

A.    Thatcher Park.  Camping ground that we used to go to -- what was the name of it? There was no -- no -- no restrictions.  I've only been there once or twice.  But after that, you're not even thinking about to go camping because after experience of bear our property, wife refused to go. So that was a -- camping no longer kind of an idea to go because of --

Q.    Did you say the bears?

A.    Bears, yeah.

Q.    Yeah.

A.    Then, kind of like I noticed at

800-523-7887                              ARII@courtsteno.com

Serving all of New York State

Associated Reporters Int'l., Inc.                                www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

night they came and scared my wife and my children. Same thing with the malls.  When the shooting happens in the Crossgate, my wife refused to go there at all, so am I.  It just, you know, things in life just -- just like a -- I wouldn't extend it like story outside.

Q.   You -- you mentioned hunting earlier, deer and the like -- have you ever hunted in Thatcher State Park?

A.   In where?

Q.   Thatcher State Park.

A.   No, not at all.

Q.   Did you know that hunting is allowed at Thatcher State Park?

A.   No, I'm trying to avoid the -- the -- the, you know, the widely available area for hunt.  I'm more like to go like more for like a bigger game like Kentucky in the New York, the farms that we know, the people who actually hunt there and we have better games.  We're not shooting just anything that walks on the four legs.

Q.   Okay.

A.   So it's more challenge more. Some of my friends go for trophy.  I'm going for

800-523-7887                                           ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 100

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk experience of hunting.

Q. Okay. And any other local parks that you claim have been impacted by the C.C.I.A. and your -- and your individual rights other than now, other than Thatcher State Park?

A. From my personal, from what I'm exposed to, no, not at all.

Q. Okay.

A. But if tomorrow it's going to be situation, I have to go to another park and I'm going to see the sign, it's different story.

Q. Right. So other than the parks, are there any other places, facilities, services that -- that you believe have -- have been impacted your day-to-day activities, outside of the alcohol service that we discussed in relation to restaurants and the -- and the shopping centers.

So I'm -- I'm looking for anything else. Not parks and not any place impacted by the service of alcohol that you claim has been --impacted your day-to-day activities because of your handgun permit.

A. Before there was portion of the law that was pos -- that allowed us to carry in the

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

gas station or prior to that?

Q.   No, we've -- we've covered gas stations.

A.   Okay.

Q.   We've covered faci -- both bars and restaurants that serve alcohol.

A.   Uh-huh.

Q.   And we talked about the stores --

A.   Yeah.

Q.   -- in the shopping mall that are proximate to bars and restaurants that serve alcohol.

A.   Okay.

Q.   We talked about the takeout and we talked about the park.  So I'm asking if there's anything else --

A.   Doctor --

Q.   Excuse me.

A.   I'm sorry.

Q.   -- in your day-to-day life that's -- that's been impacted?  Thank you.

A.   Sorry.  Doctor offices.

Q.   Anything else?

A.   From the top of my head, doctor offices, hospitals, nursing homes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 102

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Q.   Do you -- do you have a problem with other -- the prohibition in carrying firearms in schools and churches?

MR. STAMBOULIEH:  Object to form.

A.   Only law enforcement in schools, churches, I see no issue not to carry.

Q.   And government buildings.

MR. STAMBOULIEH:  Same objection.

Q.   Same -- same question.

A.   If it's a courtroom, it's one thing.  Federal building, just like any other building, I will be looking for people to exercise their right to carry.  But again there's the limitation to what federal building is in question.

Q.   Have you ever patronized the movie theaters at Crossgates or Colonie Mall?

A.   Yes, I did.

Q.   Okay.  Have -- have you attended any -- any films at any of those facilities since September of 2022?

A.   No, I did not.

Q.   Was that a result of the implementation of the C.C.I.A. or just your movie-going habits?

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 103

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Because of the C.C.I.A.

Q.    Okay.  Do you -- how frequently did you -- did you par -- patronize the movie theaters in -- in your area prior to September of 2022?

A.    Quite a bit because of the kids, and back then it wasn't streaming so much more than today.  And today, when the kids want to go, fortunately, I was trying to avoid the situation to go there, to the movie theaters, to go to the malls themselves too.

Q.    Right.  Do you -- you have not attended any films in the public theater since September of 2022?

A.    Only once.  And because kind of like I had to promise to my friends that we went there for a Top Gun Two.  That's the only movie that I saw since 2022 in the movie theatre.

Q.    And at that time, were you in possession of your firearm?

A.    No.

Q.    What type of motor vehicle do you own currently?

A.    The -- I have G.M.C. Sierra

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

Pickup Truck.

Q.   Does that current vehicle contain some secure storage component for your firearm?

A.   It has the portable safe and I'm about to acquire because I finally release for my model between the seats invented case.

Q.   Is -- is that what you utilize currently when you quote, disarm, close quote yourself as you described earlier?

A.   Portable safe, yes.

Q.   Okay.  And that's where you place your firearm when you go into establishments that are listed, or in your -- your understanding covered by the C.C.I.A.?

A.   Correct.

Q.   But not gas stations anymore. Correct?

A.   Correct.

Q.   Right.  But you -- you self-impose that -- that restriction on yourself for some of the places that we've discussed earlier.  The restaurants, the takeout and -- and the mall and the like, correct?

A.   Correct.

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 105

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

MR. STAMBOULIEH:  Object to form.

Q.    Mr. Antonyuk, have you posted a sign on your Toriana Court property with respect to firearms at all?

A.    Not permanent.  I had portable when C.C.I.A. came in effect to avoid any issues.  I had a portable sign that I would put on the lawn when I had somebody I invite to my house.  So my friends can come in without hesitation, carrying the guns, and after that I'll take it out because I live in the the (unintelligible) area and I would like not to advertise what I have in my garage or have it in my gun safe or even if I'm in possession of the firearm.

Q.    So if I understand correctly, you -- that -- you did post a sign temporarily in your yard with respect to your own premises with -- in relation to firearms when you invited friends or acquaintances to your -- to your home?

A.    Correct.

Q.    Okay.  Do you still engage in that practice?

A.    Correct.

Q.    And is it -- is it only when you are expecting persons that you have invited?

800-523-7887                                      ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 106

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.    Yes.

MR. MULVEY:  Okay.  Let's go off for a minute.

MR. STAMBOULIEH:  Yep.

COURT REPORTER:  Off the record.

(Off the record 12:05 p.m.)

(On the record 12:10 p.m.)

COURT REPORTER:  Back on the record.

BY MR. MULVEY:  (Cont'g.)

Q.    Mr. Antonyuk, other than the rather exhaustive list of bars and restaurants, and the shopping stores and malls that we've discussed and gas stations and the movie theatres and the doctor's office, are there any other places or situations that you contend that the enforcement of the C.C.I.A. has changed or altered your day-to-day activities?

MR. STAMBOULIEH:  Object to form.

A.    From the top of my head, no.

Q.    And what is your understanding, if any, of the reason that you brought this complaint against the Superintendent of the New York State Police?

A.    My safety.  The safety of the

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

security and safety of harming myself.

Q.    But -- but my -- my question is a little bit narrower, Mr. Antonyuk.  What is your understanding of why you're bringing that claim against the Superintendent of the State Police?  I understand what your reason is, but what -- what is it that -- that he is doing or not doing that has caused you to sue him?

MR. STAMBOULIEH: Object to form.

A.    But --

Q.    If you know.

A.    But from my understanding, I'm not the lawyer, the whole C.C.I.A., the case, it's infringing on my day-to-day activities, my safety and my rights.

Q.    Okay.  And do you have an understanding of how Superintendent James factors into that?

MR. STAMBOULIEH:  Object to form.

A.    She's a part of defense of this, the new laws, the C.C.I.A. Act.

Q.    Other than the speeding ticket that you disclose that you received from the State Police within the last couple of years, --

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

A.   Uh-huh.

Q.   -- have you had any other direct interaction with the New York State Police since you commenced this lawsuit?

A.   No.

Q.   Have you had any -- other than the speeding ticket you've already disclosed, have you had any adverse or bad experience interacting with the New York State Police?

A.   No.

Q.   Have you ever -- ever had any opportunity to interact with the New York State Police in any respect associated with your concealed carry permit that is on Exhibit Two that we've already covered today?

A.   No.

Q.   Okay.  Mr. Antonyuk, just giving you an opportunity to quickly review in your own mind everything we've gone over today.  Are there any answers that you provided that you, at this time, wish to change or clarify?  Anything that you might have perhaps mistakenly misstated or forgotten?

A.   No.  Not really, no.

Q.   Okay.  I believe that concludes

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-21-26 - Ivan Antonyuk the questioning of this Witness by Defendant James.

MR. MULVEY:  Monique, I think, would turn it over to the other attorneys if they have any questions.

MR. LONG:  On behalf of Chief of Police, Mark Rusin, no questions, from City of Syracuse Defendants.

MR. BANASZEK:  County of Albany also has no further questions.

MR. HEISLER:  Onondaga County Defendants, I have no questions.

MR. MULVEY:  Okay.

MR. STAMBOULIEH:  And Plaintiffs have no questions.  So would you like to explain to him his right to read and sign or would you like me to?

MR. MULVEY:  Go ahead, Stephen.

MR. STAMBOULIEH:  So in this deposition, you've given a number of verbal statements to the Court Reporter.  She is very well competent to take down your responses.  However, you do have a right to read and sign your deposition to make sure that the Court Reporter has taken down all of your verbal answers correctly.  It is not an opportunity to change your testimony if you said yes

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 110

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

and change it to no, anything like that, but to make sure that she's recorded it accurately.  Would you like to invoke your right to read and sign?  You don't have to, it's your right to do so.

THE WITNESS:  I'm okay.

MR. STAMBOULIEH:  You're fine with it?  Okay.  He will not read and sign.  We would like a copy.  We'll -- we'll provide.

MR. MULVEY:  Oh, yeah, thanks.  And when -- tell us when we're off, Monique.  I think we can go off.

COURT REPORTER:  Okay.  Off the record.

MR. MULVEY:  Well gentlemen, I believe we're -- we're off.

(The deposition concluded at 12:15 p.m.)

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 111

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

STATE OF                   )

COUNTY OF                  )

        I, IVAN ANTONYUK, have read the foregoing record of my testimony taken at the time and place noted in the heading hereof and do hereby acknowledge: (Please check one)

        ( ) That it is a true and correct transcript of same.

        ( ) With the exceptions noted in the attached errata sheet, it is a true and correct transcript of same.

                          X_____

                          IVAN ANTONYUK

Sworn to before me this

_____day of _____, 2026.

X_____

NOTARY PUBLIC

My Commission Expires:

_____

800-523-7887                              ARII@courtsteno.com

Serving all of New York State

Associated Reporters Int'l., Inc.                              www.courtsteno.com

Page 112

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk

I, MONIQUE HINES, do hereby certify that the foregoing testimony of IVAN ANTONYUK was taken by me, in the cause, at the time and place, and in the presence of counsel, as stated in the caption hereto, at Page 1 hereof; that before giving testimony said witness was duly sworn to testify the truth, the whole truth and nothing but the truth; that the foregoing typewritten transcription, consisting of pages number 1 to 110, inclusive, is a true record prepared by Associated Reporters Int'l., Inc. from materials provided by me.

MONIQUE HINES, Reporter

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-21-26 – Ivan Antonyuk
           ASSOCIATED REPORTERS INTERNATIONAL, INC.
                        (800) 523-7887

Date:
Case Name:  Ivan Antonyuk, et al v Steven James, et al
Index Number: 22-CV-986
Deponent:  Ivan Antonyuk
Deposition Date:  4-21-22
Examining Attorney:  Timothy Mulvey, Esq.
Dear Mr. Antonyuk:

Please read and make any changes and/or corrections in
your testimony and sign the transcript in the presence of

a notary public.  Please do so within thirty (30) days.
If you fail to sign the transcript within thirty (30)
days, it will be delivered to the appropriate parties
without signature.  Return the transcript with
corrections, if any, to:

            OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
            BY:  TIMOTHY MULVEY, A.A.G.
            300 South State Street, Suite 300
            Syracuse, New York 13202

CORRECTIONS:

_____      Word or phrase: _____
              Corrected to:   _____

_____      Word or phrase: _____
              Corrected to:   _____
_____      Word or phrase: _____
              Corrected to:   _____
_____      Word or phrase: _____
              Corrected to:   _____
_____      Word or phrase: _____
              Corrected to:   _____
_____      Word or phrase: _____
              Corrected to:   _____
_____      Word or phrase: _____

              Corrected to:   _____
_____

Date Signed                   _____
                              IVAN ANTONYUK

800-523-7887                              ARII@courtsteno.com
                  Serving all of New York State

**A**

**A-N-T-O-** 7:16
**A.A.G** 2:10,15 113:13
**a.m** 1:14 7:3 49:5 76:11,12
**ability** 10:3,8 16:7 33:5 55:2 62:19 74:10,14 88:9
**able** 11:7 16:18 59:7 77:21 83:13
**Abrams** 1:15
**accept** 74:12
**access** 20:18
**accidents** 63:10 97:15
**account** 45:20 46:2,11,17
**accounts** 44:15,17
**accurate** 78:20 79:6,9
**accurately** 110:3
**acknowledge** 111:4
**acquaintance** 29:15
**acquaintances** 38:12,19 105:19
**acquire** 62:6 68:7 104:6
**acquired** 22:22 75:11,14
**acquiring** 32:10 33:21
**Act** 30:9 39:6 72:17 73:23 107:22
**active** 42:7 44:21,23 45:4
**actively** 45:22
**activities** 39:2,4,5 40:2,14,22 40:25 41:23 42:2 43:18 89:25 100:16,22 106:18 107:15
**additional** 55:4,17
**address** 13:13,21 14:8 20:16
**Administration** 19:9
**adopted** 36:12
**adoption** 35:12
**adverse** 108:9
**advertise** 105:13
**affirm** 7:9
**afternoon** 97:4
**age** 12:13,24
**ago** 79:5
**agree** 80:6 81:11 85:17,18 89:20
**agreement** 94:9
**ahead** 48:24 53:2 109:17

**al** 1:1,1,4,9 2:1,1 3:1,1 4:1,1 5:1,1 6:1,1 7:1,1 8:1,1 9:1 9:1 10:1,1 11:1,1 12:1,1 13:1,1 14:1,1 15:1,1 16:1,1 17:1,1 18:1,1 19:1,1 20:1,1 21:1,1 22:1,1 23:1,1 24:1,1 25:1,1 26:1,1 27:1,1 28:1,1 29:1,1 30:1,1 31:1,1 32:1,1 33:1,1 34:1,1 35:1,1 36:1,1 37:1,1 38:1,1 39:1,1 40:1,1 41:1,1 42:1,1 43:1,1 44:1,1 45:1,1 46:1,1 47:1,1 48:1,1 49:1,1 50:1,1 51:1,1 52:1,1 53:1,1 54:1,1 55:1,1 56:1,1 57:1,1 58:1,1 59:1,1 60:1,1 61:1,1 62:1,1 63:1,1 64:1,1 65:1,1 66:1,1 67:1,1 68:1,1 69:1,1 70:1,1 71:1,1 72:1,1 73:1,1 74:1,1 75:1,1 76:1,1 77:1,1 78:1,1 79:1,1 80:1,1 81:1,1 82:1,1 83:1,1 84:1,1 85:1,1 86:1,1 87:1,1 88:1,1 89:1,1 90:1,1 91:1,1 92:1,1 93:1,1 94:1,1 95:1,1 96:1,1 97:1,1 98:1,1 99:1,1 100:1 100:1 101:1,1 102:1,1 103:1,1 104:1,1 105:1,1 106:1,1 107:1,1 108:1,1 109:1,1 110:1,1 111:1,1 112:1,1 113:1,1,4,4
**Aladdin** 16:13
**Albany** 1:17 2:18,19,22 8:9 18:23 19:4,12,23 21:16 24:2,16 43:15 53:14 59:19 109:9
**alcohol** 80:24 81:5,24 82:3,8 82:13,24 83:24 84:5,13 86:7 87:5,18 90:15,21 91:4 95:19,21 96:22 98:2,6 100:16,21 101:7,12
**all-day** 59:22
**allow** 9:16 55:16,22 65:5 68:13,21 91:13
**allowed** 32:17 55:14 68:14 78:13 79:2,3,15,19 82:4,6 85:9,21 86:16 87:11,21

88:7 90:12 91:23,24 96:10 96:21 99:15 100:25
**allowing** 77:20 78:9,24 79:25
**allows** 55:11
**altered** 106:17
**Amazon** 89:8
**amendment** 38:24 39:3 40:14,21,22 42:21,24 47:7 47:12 48:9 50:15 82:17 88:12 91:23
**America** 42:11,20,24 43:8,11 43:15,19,22 44:4 72:10,22
**American** 10:24
**Amsterdam** 22:3,7,10,12,20 22:22 23:2 24:13
**and/or** 113:8
**Ane** 47:7
**answer** 9:13,17,22 11:25 30:18 32:8 50:7,14,16 52:17,22 70:4 84:23
**answered** 37:9
**answering** 20:12 21:8 66:4 92:6
**answers** 6:9 10:4,8 38:11 108:21 109:24
**Antonyuk** 1:1,1,4,12 2:1,1 3:1,1 4:1,1,3 5:1,1,11 6:1,1 7:1,1,5,6,12,13,16 8:1,1 9:1 9:1,6 10:1,1,10 11:1,1,19 12:1,1 13:1,1 14:1,1 15:1,1 16:1,1 17:1,1 18:1,1 19:1,1 20:1,1 21:1,1 22:1,1 23:1,1 24:1,1 25:1,1 26:1,1 27:1,1 27:8 28:1,1 29:1,1 30:1,1 31:1,1 32:1,1 33:1,1 34:1,1 35:1,1,24 36:1,1 37:1,1 38:1,1 39:1,1 40:1,1 41:1,1 42:1,1 43:1,1 44:1,1,10 45:1,1 46:1,1 47:1,1 48:1,1 48:14 49:1,1,8,24 50:1,1,7 51:1,1 52:1,1 53:1,1,12,23 54:1,1,3,11,15 55:1,1,10,21 56:1,1,7 57:1,1 58:1,1,11 58:13 59:1,1,25 60:1,1,6,19 61:1,1,4,9 62:1,1,3 63:1,1 64:1,1 65:1,1 66:1,1 67:1,1

67:4 68:1,1 69:1,1 70:1,1
71:1,1,3 72:1,1 73:1,1 74:1
74:1 75:1,1 76:1,1,18 77:1
77:1,11 78:1,1 79:1,1 80:1
80:1 81:1,1 82:1,1 83:1,1
84:1,1 85:1,1 86:1,1 87:1,1
88:1,1 89:1,1 90:1,1 91:1,1
91:16 92:1,1 93:1,1 94:1,1
95:1,1 96:1,1 97:1,1,23
98:1,1 99:1,1 100:1,1 101:1
101:1 102:1,1 103:1,1
104:1,1 105:1,1,3 106:1,1
106:11 107:1,1,4 108:1,1
108:18 109:1,1 110:1,1
111:1,1,3,9 112:1,1,3 113:1
113:1,4,5,7,25
**Antonyuk's** 5:6,9
**anybody** 72:16
**anymore** 16:5 104:17
**apartment** 14:12,20,24,25
15:2
**apartments** 14:9,11 15:5
**apologies** 53:13
**apologize** 76:8
**appearances** 2:2 7:20
**appears** 54:19 58:14,14,22
60:3 61:6
**application** 95:6
**applications** 33:3
**applied** 63:19 68:11
**applies** 64:11
**apply** 55:2 62:9 63:15
**applying** 33:11 35:9 40:18
**appreciate** 43:3 52:25
**appropriate** 113:10
**approximate** 98:5
**approximately** 21:14 41:12
42:16 66:19
**April** 1:13
**APSIC** 40:8,8,16 93:20
**area** 43:15 59:17 99:17 103:5
105:12
**areas** 57:18
**arm** 94:7 96:25
**armed** 74:6 82:7,25 85:16
86:16 92:7,16 93:5,10 95:4

**arming** 96:17
**arrival** 13:9
**arrive** 13:3
**arrived** 14:14 15:17
**arts** 11:11,14,17 12:3 19:18
20:3
**Ascension** 22:23,24
**asked** 37:9,13 49:20 79:5
89:15
**asking** 38:10 70:7 87:3,4
92:8,17 94:22 101:15
**aspect** 27:24 46:7
**aspects** 21:11 29:3 34:8
**assist** 16:3
**Assistant** 7:23 9:7
**associated** 42:3 46:13 57:4
97:25 108:14 112:10 113:2
**association** 23:20 41:3,6
42:8
**assume** 44:11 66:12
**athlete** 11:10
**attached** 111:6
**attend** 18:22 38:21 43:11
62:6 88:14 92:18
**attended** 39:8 102:19 103:14
**attending** 83:3
**attention** 27:9 44:2 48:15
54:10 58:12 59:25 60:18
61:3 64:5 71:4 77:14
**attested** 48:20 76:21
**attorney** 2:9,14 3:8 6:15 7:24
8:5,9,14 9:7 25:3 28:6
29:13 37:6 38:2,3 46:23
52:20 71:4 72:6 113:6,12
**attorney-client** 29:21
**attorneys** 6:3 7:19 109:4
**authorize** 55:22
**authorized** 61:22
**automatic** 64:18,20 96:15
**available** 28:3 50:6 99:17
**Avenue** 14:21 15:2,3 16:4
30:24 31:6 93:23 94:20
**avoid** 9:17 30:15 88:25 91:6
97:15 99:16 103:10 105:7
**avoiding** 90:20
**aware** 43:16 44:4 70:14,22

**awfully** 57:13

---

### B

**B** 5:2
**Bachelor** 20:3
**Bachelors** 19:17
**back** 16:17 32:3 36:12 48:20
49:6 59:2 60:13,23,23
68:16 71:4 74:3 76:13
93:21 94:20 95:2,3 97:8,18
103:8 106:9
**backside** 58:15
**backups** 20:14 21:11
**bad** 108:9
**bag** 57:13
**Banaszek** 2:20 8:8,8 109:9
**bar** 84:3 85:3,12,13 86:12
88:4 95:17,17
**barely** 45:3
**bars** 90:14 98:4 101:6,12
106:12
**basement** 67:14 69:19
**basically** 34:25 50:2
**Bates** 54:3
**battle** 37:22
**bear** 56:14,21 98:19
**bears** 98:22,23
**becoming** 71:13 74:11,12
**beer** 87:17
**began** 17:12,23 18:13
**beginning** 27:11 31:15 63:5
63:6
**behalf** 109:6
**belief** 88:12
**beliefs** 74:15,18 85:25
**believe** 22:2 34:21 44:19
49:23 55:18 56:23 58:10,20
61:14 72:18 75:10 81:14
84:3 87:25 88:12 89:22
90:3 92:15 93:9 95:8
100:15 108:25 110:15
**believer** 82:25
**bell** 48:7
**best** 33:4 83:7
**better** 99:21
**beyond** 10:23 29:7

**big** 34:2 56:12,13,19 57:5 89:12
**bigger** 99:19
**bill** 33:19
**birds** 56:17 58:6
**birthday** 38:22 94:19 96:2
**bit** 18:14 26:4 42:18 58:11 103:7 107:4
**bite** 80:23
**black** 60:13 61:8
**black-and-white** 17:7
**blessed** 82:25
**books** 16:25
**born** 73:25,25
**bottom** 27:11 58:13 60:2 64:20
**Bourbon** 80:21 81:12
**Box** 2:6
**Branch** 2:7
**branches** 83:10
**breaking** 30:10
**brief** 12:13 13:5,6,8 38:2,11 54:5
**briefly** 16:9 26:8 76:22
**briefs** 25:24
**bring** 96:21
**bringing** 107:5
**broke** 22:8
**brought** 106:22
**Bucci** 27:22 34:11,19 36:5,9 36:24,25 37:7 72:2,8,13,25 73:14,16,17
**Buckingham** 14:2,5,8 15:9 63:11,18
**building** 1:15 102:12,13,15
**buildings** 102:8
**Bullseye** 40:10,10
**bunch** 43:25
**bus** 93:24
**business** 19:9 85:6 88:10,13 90:21
**businesses** 82:3 90:11

---
**C**

**C** 4:2 34:25 60:5
**C.C.I.A** 34:25 35:4,12,18

36:11,18 37:5 45:6,16 46:4 46:19 71:5,8,14 72:14 74:23 76:2,5 78:3 79:18 81:15 82:10 85:22 86:22 90:5,8 93:16 94:15 95:7,23 97:2 100:4 102:24 103:2 104:15 105:7 106:17 107:14,22
**call** 94:22
**called** 23:8 84:24
**calls** 20:12,13
**camping** 83:19 98:8,14,18,20
**canceled** 35:20
**capacity** 1:8 29:18
**caption** 112:5
**car** 94:3 95:3 96:17 97:8,11
**card** 41:10
**care** 21:7
**career** 10:20 11:3 12:13,16
**caring** 29:4
**carriers** 55:14
**carry** 32:17,18 33:3 35:10 55:4,11,16,19,22 61:17,22 62:16,21 63:16,25 64:2,14 68:15,21 69:24 73:23 74:21 74:21 75:8,24 76:5 77:20 78:10,14,22 79:15 80:20 81:5 82:5,17 88:7 91:14,14 91:23,24 95:9,19 97:20 100:25 102:7,14 108:15
**carrying** 62:21 64:24,25 75:15 80:2 84:10 85:4,14 88:19 102:3 105:10
**cars** 79:16
**case** 27:21,24 28:4,5,11,16 28:20 29:9,24 36:17,21,23 37:3,14,15,23,25 38:11,16 46:7,24 47:8 49:23,25 52:18 71:24 72:22 73:18 83:21 104:7 107:14 113:4
**cat** 60:5
**category** 11:16
**cause** 6:16 7:10 112:4
**caused** 107:9
**caution** 73:6
**center** 15:21,23,25

**centers** 100:18
**Central** 14:21 16:4 30:24 31:6 93:23 94:20
**certain** 89:24
**certification** 62:7,20
**certified** 6:16 35:16
**certify** 112:2
**challenge** 37:5 45:16 46:3,19 71:13 72:13,21 99:24
**change** 108:22 109:25 110:2
**changed** 23:16 74:3 77:25 80:5,6 81:12 106:17
**changes** 33:20 113:8
**channel** 48:6
**channels** 16:17 47:6,11
**chapter** 41:18 43:10
**check** 111:5
**Chief** 8:6 109:6
**children** 17:6 44:19 99:2
**choose** 88:17,20
**churches** 102:4,7
**cigar** 30:17,23,24 31:2,5,5 34:3 36:11 38:22
**Circle** 89:7,17
**circumstance** 87:16
**circumstances** 70:22 81:12 98:4
**citizen** 10:15 85:15
**City** 3:3 8:6 13:5,9 14:15 47:22 109:7
**Civil** 6:5
**claim** 93:2 100:4,21 107:5
**clarification** 29:2,5 60:3,25 64:16 78:12
**clarified** 64:17 75:17
**clarify** 79:6 108:22
**class** 35:19
**clays** 40:7
**clear** 18:12 29:6 31:7 32:19 65:8 69:9 70:10 91:16 92:3 92:14
**clearly** 33:25 82:18
**click** 47:19
**clicking** 47:25
**clicks** 47:24
**client** 85:10

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

clients 96:23
clients' 94:21
close 58:6 69:18 104:9
closed 81:3
closest 34:14
clothing 17:13,15
club 30:7,17,18,22,25 31:2,4
  31:8,11,18,23 32:23 34:3
  34:17,20 36:11,11 38:22
  39:13,22 40:18 59:12,16,20
  83:3,5
co-plaintiffs 28:19
co-workers 38:12,15
col 17:23
cold 94:4
collection 97:25
college 10:19 11:5,7 16:21,21
  17:4,9,20,22 18:8,22 21:21
collegiate 17:23 18:13
Colonie 17:21 39:18 89:5,14
  89:17 90:9 102:17
color 60:4,4,7,14 61:4,5
come 12:24 15:24 23:15
  54:18,23 62:13 71:11,20
  97:18 105:10
comfortable 85:13
coming 9:24 33:6,24
commenced 7:2 108:5
Commission 111:12
commu 46:2
communicate 45:23 46:2,17
Communicating 17:3
communication 39:7
communications 21:11
communism 74:4
community 68:22
company 17:16 24:19 52:6
compete 31:19
competent 109:21
competition 11:17 12:4 40:9
  93:20
competitions 40:5,6,13 42:4
  83:3,5
competitive 11:12 39:15
  40:2
complaint 106:22

complete 9:15,16,22 10:3,8
  11:5,21,24 66:12
completed 10:21,25 20:2
  57:7
completing 20:24 21:15
completion 62:7
complication 30:6
component 104:4
computer 19:8,10,17 20:3,9
  21:6,10,15 23:10
computers 20:14
conceal 61:18 63:16 68:15
concealed 29:25 33:3 35:10
  55:11,22 60:14 61:22 62:16
  62:21 63:3,22,23 64:13
  68:21 73:22 74:21,22 75:7
  75:24 76:5 78:10,22 80:2
  80:12 82:11 92:21 95:9
  108:14
concern 62:22 67:24
concerning 34:23 71:12
concerns 63:9,14
concluded 110:17
concludes 108:25
confer 25:9
conference 77:5
conferred 26:9
confirm 61:7
conformity 95:23
confused 26:25
confusions 91:5
congress 58:6
connection 65:15
Conservation 56:24
considered 21:4 91:3
consisting 112:9
consumed 10:2
Cont'g 49:7 53:22 76:17
  77:9 106:10
contact 28:4,5 72:25
contain 63:23 85:6 104:3
contemplating 33:2
contend 106:16
contests 39:15
context 70:13 97:24
continue 17:4 19:21 61:18

88:25 93:4
continued 12:10 20:20 21:25
continuing 78:6
contributions 90:2
conversation 16:20 32:4,15
  32:22 33:6 34:23 35:9
  36:18 37:2 38:4 73:14,16
  83:8
conversations 36:13 37:2,25
  71:4,12,25
copies 53:15
copy 6:16 60:22 110:9
corner 54:2,11 58:22 61:12
  64:6 85:12
Corp 53:14
CORPORATION 3:3
correct 10:12,13 15:7,13,16
  17:14 18:18,21 19:5 20:25
  23:12,14 24:8,11,23 25:4
  29:14 33:14,15 38:8 40:3
  41:4 44:13 50:19 51:14
  52:2,8,9,12,13 55:8,20,24
  56:25 57:14,15 58:3,17,24
  59:9,10 60:8 61:16 65:3,7
  65:12,13 67:3 71:18 74:25
  75:3,19 76:7 80:4,8,16
  81:16,22 86:23 87:12 88:22
  90:3,4 91:12,12 92:23 93:6
  93:12 94:12 95:25 96:4
  104:16,18,19,24,25 105:20
  105:23 111:5,7
corrected 75:16 113:16,18
  113:19,20,21,22,23
corrections 6:11 113:8,11,15
correctly 29:11 51:9 64:23
  72:24 105:15 109:24
counsel 3:3 53:14 77:5 112:5
count 8:13
country 11:8 74:2
County 2:18,19 8:9,14,14
  53:14 109:9,11 111:2
couple 14:20 16:11 28:25
  67:15 70:6 75:13 81:2
  96:11 107:25
course 11:6 17:9 19:6,22
  35:16 39:10,10 40:12,17

47:23 54:25 59:21,22,23 62:6,6,7 75:22 97:9,9
**courses** 39:8,10 57:7 68:6
**court** 1:2 7:4,7,14,18 8:3,11 8:16 9:3 13:14,16,24 14:11 14:11 15:4,15 25:24,25 26:7,7 27:3,7 46:4,20 49:3 49:6 53:7,21 62:13 73:22 76:10,13,16 93:3 105:4 106:6,9 109:20,23 110:13
**courtroom** 29:8 102:11
**covered** 30:14 89:11 101:3,6 104:14 108:16
**coworkers** 17:4
**coyote** 57:21
**create** 9:19
**created** 52:4
**creating** 97:6
**criminals** 74:5
**Crossgate** 89:5,13,18,19 92:19 99:4
**Crossgates** 90:10 91:19 102:17
**current** 9:8 13:13 24:5 51:7 61:17 104:3
**currently** 10:6 49:14 50:17 61:19 69:24 70:21 94:10 103:24 104:9

**D**

**D** 4:2,2 5:2
**D.E.C** 57:5
**D.O.I** 61:14
**danger** 97:6,13
**dangerous** 96:15
**dash** 54:3,4,4,4,11 55:10 58:13 77:6
**date** 1:13 61:14 75:25 113:3 113:5,24
**David** 8:10
**day** 16:15 20:16 30:3,4 63:11 69:10 93:19 96:7,11 97:3,6 97:17 111:11
**day-to-day** 100:16,22 101:20 106:17 107:15
**days** 59:22 62:6 96:13 113:9

113:10
**Dear** 113:7
**decent** 83:7
**decided** 63:15 68:4 73:16
**decides** 88:8
**deciding** 68:20
**decision** 85:25 86:18
**Declaration** 5:11
**declared** 77:18
**decline** 65:10
**declining** 51:10,18 52:10 65:9
**dedicated** 47:6
**deep** 67:14
**deer** 56:14,21 99:9
**Defendant** 2:8 3:2 6:6 7:24 8:2 109:2
**defendant's** 5:6
**defendants** 1:10 28:20 71:23 93:3 109:8,12
**defending** 9:8
**defense** 107:21
**define** 55:13
**definition** 40:8 55:13 79:14
**degree** 19:10,14,16 21:2,22
**delivered** 113:10
**department** 21:6,9 22:18 35:16,21 56:24 64:17
**depicted** 54:15 55:21 56:2,6 60:6,20 61:8 62:3 65:4,19 66:11 67:2
**Deponent** 113:5
**deposit** 62:8
**deposition** 1:12 6:5,11,14,15 6:17 7:2 9:10,25 25:18 26:2 26:14 28:9 51:10,19 52:11 76:20 79:8 109:19,22 110:17 113:5
**describe** 61:25 67:9
**described** 5:4 69:4,22 98:7 104:10
**description** 26:4
**designated** 84:25
**detail** 61:2 67:9
**details** 29:3
**Dick's** 89:8 92:19

**difference** 64:13
**different** 22:20 30:19 83:9,9 100:12
**differentiation** 68:10
**difficult** 9:19 57:13
**dine-in** 80:20 81:9
**dining** 81:7
**dinner** 82:22 88:6
**direct** 4:4 9:4 27:8 48:15 54:10 64:4 77:13 108:3
**direction** 97:11,11
**directly** 12:24 73:8 82:21
**Director** 22:17 23:23
**director's** 46:14
**Directors** 23:20,25 24:10,14 24:22
**dis-merged** 22:9
**disagreements** 30:13
**disallowed** 90:13
**disarm** 78:15 81:8 93:15,25 94:16,25 95:23 96:10,25 98:10 104:9
**disarming** 96:16 98:6
**discharge** 63:17
**discharged** 63:12 67:6,17 68:19 70:15
**disclose** 51:10 52:10 107:24
**disclosed** 25:25 108:8
**discouragement** 82:16
**discuss** 28:10 40:20 71:6 72:13
**discussed** 26:13 27:20,25 28:14,18 29:24 36:3,16,20 37:4 46:6,24 72:16 100:17 104:22 106:13
**discussing** 32:6 33:8 49:21 71:22 72:2,20
**discussion** 28:23 34:3 73:5
**discussions** 36:9
**display** 88:15
**dispute** 67:20
**distance** 90:24
**distinction** 81:25 86:11
**Distinctions** 82:2
**district** 1:2,3 8:9 46:4,19
**Docket** 77:6

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

doctor 83:11 101:17,22,24
doctor's 106:15
document 77:6
documents 25:20
dogs 67:23
doing 20:23 48:3 96:12,13
  97:5 107:8,8
Domino's 17:16 18:20 19:22
  20:2
Domino's 17:2,20
door 67:18
dormant 78:13 79:14
downstairs 67:12
drink 82:19,21 83:16 85:6
  88:2,5 93:22 94:4 96:24
drinking 85:5,13
drinks 87:18
drive 14:3,5,8 15:9 24:2
  59:19 63:11
driver 84:25
driving 85:4
drove 95:3
drunk 83:16 88:5
ducks 56:17
dues-paying 44:6
duly 6:14 112:6

_____ E _____

e- 45:25 46:6,16
E 4:2,2,2 5:2,2
e-mail 45:19,20 46:8,10,25
  53:15
Eagle 2:21
earlier 39:23 40:15 98:7 99:9
  104:10,22
East 3:5
eat 80:23
education 10:14,19,23 12:14
effect 95:6 97:2 105:7
effective 75:25
eight 16:21 22:13,14 60:5
  62:12 77:6,14 97:5
eighteen 10:18 12:14,24
  55:18
either 25:13 28:19 33:2
  36:10 46:24

Ell 22:11
Ellis 20:6,21,22 21:4,16,21
  21:25 22:7 24:13
embedded 94:2
emergency 28:5
emerging 35:11
Empire 1:16
employee 22:24 24:22 67:20
employer 23:16 67:20
employment 12:19 15:18
  17:12 19:22,25 20:8 21:14
  21:24 22:21 24:15 83:10
enforcement 71:14 95:7
  102:6 106:16
engage 12:10 21:13 42:2
  56:11 105:21
engaged 12:4 15:19 21:24
  32:22 47:16 71:12,22 73:21
  98:6
Engineer 22:16 23:23
English 16:10
English-speaking 16:6
enroll 19:7
enrolled 18:25
entail 20:11 21:3
entails 29:3,7 30:6,8,13
enter 11:6 79:19 81:8 90:16
  91:19 95:22
entered 17:19
entirely 92:8
entities 30:19 35:21 74:6
entrance 90:13
entrances 90:15
Environmental 56:24
equivalent 10:23
Eric 48:6,11
errata 111:7
Esq 2:5,20 113:6
establishment 31:3 82:12
  87:10
establishments 81:19,24
  84:3,6,11,18 91:10 93:4,10
  104:13
et 1:1,1,4,9 2:1,1 3:1,1 4:1,1
  5:1,1 6:1,1 7:1,1 8:1,1 9:1
  9:1 10:1,1 11:1,1 12:1,1

13:1,1 14:1,1 15:1,1 16:1,1
  17:1,1 18:1,1 19:1,1 20:1,1
  21:1,1 22:1,1 23:1,1 24:1,1
  25:1,1 26:1,1 27:1,1 28:1,1
  29:1,1 30:1,1 31:1,1 32:1,1
  33:1,1 34:1,1 35:1,1 36:1,1
  37:1,1 38:1,1 39:1,1 40:1,1
  41:1,1 42:1,1 43:1,1 44:1,1
  45:1,1 46:1,1 47:1,1 48:1,1
  49:1,1 50:1,1 51:1,1 52:1,1
  53:1,1 54:1,1 55:1,1 56:1,1
  57:1,1 58:1,1 59:1,1 60:1,1
  61:1,1 62:1,1 63:1,1 64:1,1
  65:1,1 66:1,1 67:1,1 68:1,1
  69:1,1 70:1,1 71:1,1 72:1,1
  73:1,1 74:1,1 75:1,1 76:1,1
  77:1,1 78:1,1 79:1,1 80:1,1
  81:1,1 82:1,1 83:1,1 84:1,1
  85:1,1 86:1,1 87:1,1 88:1,1
  89:1,1 90:1,1 91:1,1 92:1,1
  93:1,1 94:1,1 95:1,1 96:1,1
  97:1,1 98:1,1 99:1,1 100:1
  100:1 101:1,1 102:1,1
  103:1,1 104:1,1 105:1,1
  106:1,1 107:1,1 108:1,1
  109:1,1 110:1,1 111:1,1
  112:1,1 113:1,1,4,4
event 62:14 83:21
events 38:21 83:4,4,5,6,6,6
everybody 34:5
exact 30:3 79:14
Examination 4:4 9:4
Examining 113:6
example 39:5 89:20
exceptions 111:6
exchange 34:7
excuse 11:19 69:9 80:14
  83:22 101:18
exercise 65:9 78:9,21 79:25
  88:10 102:13
exercised 75:2
exhaustive 106:12
exhi 53:15
exhibit 26:18 27:3 30:17
  34:12 48:15 49:10 50:23
  51:4,14 53:13,24 54:6

800-523-7887                                                    ARII@courtsteno.com
Serving all of New York State

58:12,25 60:18,20 62:4 64:5 65:5,19 75:6,6 76:19 77:15 78:20 79:8 108:15
**exhibits** 53:15
**exists** 16:5
**expecting** 105:25
**expensive** 68:25
**experience** 78:3 83:3 98:12 98:19 100:2 108:9
**expiration** 66:25
**Expires** 111:12
**explain** 109:15
**exposed** 100:8
**extend** 66:5 99:6
**extent** 37:15,24 82:24

**F**

**F** 4:2
**F.B.I** 62:11
**Facebook** 44:19 45:2,7
**faci** 98:5 101:6
**facilities** 82:7,20 90:16,17 91:13 97:25 98:5 100:14 102:20
**facility** 39:25 80:3 85:11,16 88:11,11 91:4 95:4,7 96:9
**fact** 81:24
**factor** 68:20,24
**factors** 107:18
**fail** 17:10 113:10
**fair** 14:23 32:21 35:8 52:14 68:17 74:19 81:17
**fairly** 48:18
**familiar** 34:25 44:11 48:5,13 65:14 84:2,5
**familiarize** 27:14 32:18 54:5
**family** 24:2 45:4 62:23 63:4 67:25 74:13 88:6 97:8
**far** 78:25 79:12
**farms** 99:19
**father** 74:11
**February** 66:23
**federal** 6:4 40:25 46:4,19 73:22 102:12,15
**fee** 66:13,14
**feel** 73:20 83:14 85:13 88:6

**feet** 90:18
**felt** 74:16
**field** 23:13
**Fifth** 50:10,12,15 53:3
**fighting** 42:25
**filed** 49:24 50:2
**files** 26:6
**fill** 79:16 94:3
**films** 102:20 103:14
**final** 33:19,19,19 68:23 75:25
**finally** 104:6
**fine** 24:24 26:22 110:7
**finger** 58:23
**fingerprints** 62:11
**finish** 9:21 59:21
**finished** 27:15 48:21
**fir** 15:11
**fire** 51:24
**firearm** 31:20 55:19 56:3 60:14 61:23 62:8 67:6 68:13,15,18 70:6,8,12,15 70:25 77:21 80:2,12 81:21 82:11,12 84:10 89:2 90:13 92:22 93:25 94:21 95:14 96:21 103:21 104:4,13 105:14
**firearms** 34:8 39:15 40:2 43:24 49:15,17,22 50:17,20 51:25 57:3 69:20 79:20 82:4 83:17 86:16 87:11,21 88:19 97:14 102:3 105:5,18
**first** 11:2 14:18,25 15:2,12 15:17,18,19 16:18 21:23 29:5,23 30:4 32:6,8 36:12 54:9 71:21 88:3 90:11 93:13 94:14 95:21
**Fish** 31:9,11,18,23 34:17,20 39:19,22
**FITZPATRICK** 3:8
**five** 49:13,18 50:18,21 51:2 51:12 60:6
**fix** 20:17
**Floor** 1:16
**floors** 20:13 21:8
**focus** 84:12

**follow** 33:11
**food** 80:22 81:9 84:4 89:9 94:23 95:15,21 96:9,19,24
**foot** 11:21
**forced** 93:15 94:16
**foregoing** 111:3 112:3,8
**forgotten** 108:23
**form** 6:8 38:6 70:3 102:5 105:2 106:19 107:10,20
**formal** 10:14 12:14,21 38:6 71:6 72:13
**formally** 73:21
**format** 9:13
**fortunately** 103:10
**Forty-three** 14:2
**forward** 35:5
**forwarded** 26:7
**found** 67:19
**four** 23:5 54:6 58:6 99:22
**four-and-a-half** 19:13 21:14
**Fourteen** 13:14
**freely** 75:3 92:18
**frequented** 47:10
**frequently** 47:15 103:3
**Friday** 30:23
**friend** 17:20 29:16 72:3 84:24 85:8
**friends** 21:19 34:4,14 38:23 82:19 99:25 103:17 105:9 105:18
**front** 59:2 60:13,18,23
**full** 9:22 11:25 60:3
**full-time** 21:20,20,21,23
**fully** 10:21
**fundraising** 40:21
**funeral** 23:20,20,25 24:9,14 24:22 46:14
**further** 6:7,10,13 10:23 36:21 93:7 109:10

**G**

**G** 1:7 4:2
**G.M.C** 103:25
**ga** 73:21
**game** 56:12,13,15,19 57:5,10 99:19

Associated Reporters Int'l., Inc.                                          www.courtsteno.com

**games** 31:9,11 99:21
**garage** 105:13
**gas** 77:19 78:8,14,15,17,23
  79:7,9,15,19,20,23 81:11
  91:22,24,25 93:17,23 94:7
  94:11,13 101:2,3 104:17
  106:14
**gathering** 38:25
**geese** 56:17
**general** 2:9,14 7:24 9:8
  70:24 113:12
**gentlemen** 110:15
**give** 7:9 9:14,16,21,21 10:3,8
  11:25 26:4 27:9,13 38:11
  48:17,18 53:8,8,12 76:22
  88:10,13
**given** 109:19
**giving** 108:18 112:6
**glass** 82:23
**Glock** 52:7
**go** 8:5 16:20 26:20 48:22,24
  53:2 56:9 57:18 60:25 66:3
  67:14 76:9 77:18,21 78:7
  81:3,4,7 82:6,20,21 83:14
  83:20,20 85:3 88:2,3,4,11
  88:25 93:15 94:3,3,25 96:8
  96:8,9,10,19,20,24 98:9,15
  98:18,19,21 99:4,18,25
  100:11 103:9,11,11 104:13
  106:3 109:17 110:12
**goals** 16:12
**God** 48:12 70:16
**goes** 66:7
**going** 7:9 8:5 9:13 11:5
  13:19 15:20 16:24 17:4
  21:20 26:17,24 28:3 29:8
  30:24 33:10,17 34:24,24
  35:4,11 37:14 40:24 44:10
  47:20 48:15,17,18,25 49:2
  49:23 53:5,5,12,24 54:9
  58:12 61:12 64:4 65:9
  67:15,23,24 68:24 69:6
  76:8 77:13 78:11 82:21,22
  83:13,15,16 85:5,7 88:2,5
  94:20 96:19 98:10 99:25
  100:10,11 102:25

**good** 7:25 9:6 58:10 82:23
  88:12
**Goods** 92:19
**Google** 37:20
**gotcha** 30:15
**government** 86:25 87:4
  102:8
**graduated** 22:2 24:15
**graduating** 21:24
**graduation** 24:17
**Great** 27:5
**greet** 96:20
**ground** 68:16 69:7 98:14
**grounds** 83:19 98:8
**groups** 43:23
**growing** 74:2
**guess** 24:21 53:16
**gun** 30:7,18 31:2,4,7,11,18
  31:23 32:23 33:6 34:3,4,17
  34:20 36:10,11 38:22,25
  39:10,19,20,22 42:10,20,20
  42:23 43:2,7,11,14,19,21
  44:3 47:7,12,22 48:9 59:12
  59:19 69:14,17 72:10,22
  83:3 85:5,14 97:10,17
  103:18 105:14
**guns** 52:11 55:16 57:19 82:5
  85:21 97:3 105:10

---

### H

**H** 5:2 52:7
**Habana** 30:24 31:4
**habits** 102:25
**hand** 7:8 53:5 64:6
**handed** 76:18
**handgun** 51:24 55:11 57:9
  57:20 58:5 65:2,16 69:3,12
  69:23 74:22 78:22 100:22
**handguns** 49:22 50:5 52:3,8
**handing** 26:16
**handle** 97:17
**happen** 72:18 83:17 97:15
**happened** 63:10
**happening** 83:18
**happens** 99:3
**happy** 16:18

**hard** 96:14
**harming** 107:2
**Harris** 15:22 17:3,12
**head** 101:24 106:20
**heading** 111:4
**Health** 22:24
**Healthcare** 22:23
**hear** 25:14 33:18
**heard** 9:7 30:5 67:12 69:11
  69:16 83:18 86:3
**hearing** 6:16 25:25
**HEISLER** 3:8 109:11
**Hell** 9:11
**help** 16:2 20:13 21:18
**helped** 17:8,10,20
**helping** 12:21
**hereof** 111:4 112:6
**hereto** 112:5
**hesitation** 105:10
**high** 10:18,21,24 12:12
**Hines** 1:21 112:2,13
**hip** 97:18,19
**history** 17:12
**Hobby** 89:14
**hold** 24:3 32:13 41:16 61:19
  72:9 82:4
**holders** 82:5
**holding** 43:17
**holster** 97:21
**home** 63:18 67:7 68:19 81:8
  95:2 97:18 98:10 105:19
**homes** 15:3,4 101:25
**honor** 88:8,16
**hospital** 20:6,21,22 21:5,12
  21:16,21 22:2,4,8,8,10,23
  24:13
**hospitals** 22:9 101:25
**hosted** 39:13,13
**hour** 59:18,19
**house** 13:7 14:19,24 63:13
  63:14 67:13,16,18,22 68:16
  69:14,16 105:9
**houses** 67:16
**hundred** 85:11
**hunt** 56:16 83:20 99:18,20
**hunted** 99:9

800-523-7887                                                          ARII@courtsteno.com
Serving all of New York State

hunters 58:7
hunting 31:20,21 38:25 39:9
    42:4 56:9,10,11,18 57:10
    62:19 64:3 68:4,13,16,22
    69:7 75:18 99:8,14 100:2
husband 74:12

**I**

I.T 20:19,19 21:3,5,5,9 22:17
    23:23
I'll 76:22
I'm 78:11 82:24
I've 98:16
idea 16:19 98:20
identical 61:7
identification 53:13,25 76:19
identified 54:11 55:10
identifying 52:15
immediate 63:4 70:2,18
immigration 16:4
impacted 100:4,15,20,21
    101:21
impair 10:2,7
implementation 71:8 72:14
    102:24
implemented 71:6 76:6
implications 35:11
important 11:20 74:11
impose 104:21
impossible 90:6,8 91:9,12,18
    92:7,8,11
impression 58:23
Improvement 73:23
incident 62:25 67:5 68:18
    69:4,10,21,25 70:14
include 34:11
inclusive 112:10
Index 1:6 113:4
indicates 61:11
individual 42:2 48:6,10
    63:12 67:16 70:13 74:10
    83:2 100:5
individual's 82:12
individuals 45:23 55:16
    82:16 83:7 84:10
infer 61:12

inferring 92:15
influenced 63:2
information 23:9 25:24 34:7
    38:24 40:23 44:9,25 45:6
    45:15 50:5
informational 83:5
informed 8:23 73:17
infringe 72:19
infringement 82:15
infringing 107:15
initial 14:13 32:3 34:22
    36:18
initialize 82:16 95:18
initially 71:20 75:17
inquire 38:19
inside 29:8 94:25 95:17
Instagram 44:20 45:12
installing 21:10
instance 59:21 71:21
instructed 67:13 69:18
Int'l 112:11
interact 108:13
interacting 108:9
interaction 108:4
interested 47:25 50:3 57:23
international 15:21,23 113:2
interrogatories 5:7
introduced 39:6 72:21 73:15
invented 104:7
invite 105:9
invited 105:18,25
invoke 52:21 110:4
invoking 50:15
involved 38:24 71:13,17
    72:23 73:18 98:3
involvement 28:16 29:9
involving 29:25 69:25
issuance 61:15
issue 20:17 86:12 102:7
issued 51:7 56:23 60:15,22
issues 20:15 28:11 29:24
    43:23 47:6,8,12 48:10
    71:22 105:7
it's 57:20 95:10
Ivan 1:1,4,12 2:1 3:1 4:1,3
    5:1,6,9,11 6:1 7:1,13,16 8:1

9:1 10:1 11:1 12:1 13:1
    14:1 15:1 16:1 17:1 18:1
    19:1 20:1 21:1 22:1 23:1
    24:1 25:1 26:1 27:1 28:1
    29:1 30:1 31:1 32:1 33:1
    34:1 35:1 36:1 37:1 38:1
    39:1 40:1 41:1 42:1 43:1
    44:1 45:1 46:1 47:1 48:1
    49:1 50:1 51:1 52:1 53:1
    54:1 55:1 56:1 57:1 58:1
    59:1 60:1 61:1 62:1 63:1
    64:1 65:1 66:1 67:1 68:1
    69:1 70:1 71:1 72:1 73:1
    74:1 75:1 76:1 77:1 78:1
    79:1 80:1 81:1 82:1 83:1
    84:1 85:1 86:1 87:1 88:1
    89:1 90:1 91:1 92:1 93:1
    94:1 95:1 96:1 97:1 98:1
    99:1 100:1 101:1 102:1
    103:1 104:1 105:1 106:1
    107:1 108:1 109:1 110:1
    111:1,3,9 112:1,3 113:1,4,5
    113:25

**J**

J 1:15
Jackson 15:2,3
James 1:1,7 2:1,8,10 3:1 4:1
    5:1 6:1 7:1,24,25 8:1,2 9:1
    10:1 11:1 12:1 13:1 14:1
    15:1 16:1 17:1 18:1 19:1
    20:1 21:1 22:1 23:1 24:1
    25:1 26:1 27:1 28:1,15 29:1
    30:1 31:1 32:1 33:1 34:1
    35:1 36:1 37:1 38:1 39:1
    40:1 41:1 42:1 43:1 44:1
    45:1 46:1 47:1 48:1 49:1
    50:1 51:1 52:1 53:1,9,16
    54:1 55:1 56:1 57:1 58:1
    59:1 60:1 61:1 62:1 63:1
    64:1 65:1 66:1 67:1 68:1
    69:1 70:1 71:1 72:1 73:1
    74:1 75:1 76:1 77:1 78:1
    79:1 80:1 81:1 82:1 83:1
    84:1 85:1 86:1 87:1 88:1
    89:1 90:1 91:1 92:1 93:1,2

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,18 108:1 109:1,2 110:1 111:1 112:1 113:1,4
**January** 66:22
**job** 15:19,21 17:20 21:20
**John** 3:8 8:13,14
**join** 31:17 41:8 42:13
**joined** 42:17
**joining** 31:23
**joint** 90:25
**Joshua** 28:23
**ju** 60:24
**Judge** 58:5

**K**

**K** 52:7
**Kentucky** 56:8 99:19
**kickboxing** 12:8
**kids** 28:4 67:24 89:15 103:7 103:9
**kind** 16:19 30:14 39:7 40:25 63:13 67:21 84:22 91:7 98:20,25 103:16
**know** 11:6 16:3 17:8 24:19 25:12 27:15,20 29:2 31:22 32:11 33:11,18,19 37:20,20 38:23 40:10,21 47:19,21,25 48:21 58:10 62:20 63:12 66:19 67:14 73:7,24 74:7 75:21,23 76:2 77:2 78:25 79:12,13 83:5,13,15 85:8 85:11 90:22 91:2 93:24 94:4 96:9,14,18,20 99:5,14 99:17,20 107:12
**knowledge** 34:8 72:9
**knows** 37:19 85:24

**L**

**L.L.C** 24:18
**language** 16:2,3 17:9
**Latham** 89:7,17
**law** 2:4 29:2,6,7 30:5,11,13 30:15 32:5,25 33:9 34:9 35:18 36:15 38:2 40:24

55:14 72:2 77:22 79:13,18 82:6 90:17,24 91:11 95:12 100:25 102:6
**law-** 85:14
**law-obedient** 34:4 43:2
**lawn** 105:8
**laws** 30:10 32:13,19 33:6 34:2 47:22 78:12 82:2 107:22
**lawsuit** 32:5 37:21 45:6,17 73:17 108:5
**lawyer** 26:6 29:4,9 46:22 83:11 107:14
**learn** 16:2,2 17:10
**learning** 17:9
**left** 10:17 11:2,8 12:10,23 20:2 22:20 33:7
**left-hand** 58:22 61:12
**legal** 43:23 71:13 72:13
**legally** 80:14
**legs** 99:22
**lengthy** 48:18 68:24
**let's** 59:24 61:2 78:16,16 79:6 80:9,9 83:22,23 86:5,5 86:6,6 89:10,19 106:3
**Let's** 53:15
**letters** 61:14
**level** 10:14 40:25
**Liberty** 2:11
**license** 51:16,17 59:22 60:23 61:13 64:18,24 65:4 68:8 68:11,12 69:2 82:4
**licensed** 51:11,24 61:18
**licenses** 57:5,5
**licensing** 32:5
**life** 73:24 99:5 101:20
**lifted** 75:18
**limitation** 102:15
**limitations** 81:14
**limited** 20:17
**limits** 93:16
**link** 8:24
**list** 49:24 50:3 55:15 96:10 106:12
**listed** 11:4 50:22 51:3,13,16 51:17 64:25 104:14

**listen** 17:6 48:2
**litigation** 71:7
**little** 18:14 26:4 42:18 58:11 78:11 84:4 107:4
**live** 105:11
**Lobby** 89:14
**local** 35:16 39:13 41:18 43:10 100:3
**locals** 89:12
**located** 22:25 23:25
**locations** 32:17
**lock** 95:14
**long** 3:4 8:3,4,5 13:18 14:4 18:2,11,12 19:11 22:11 23:3 24:3 31:13 52:11 77:8 82:7 109:6
**long-term** 21:18
**longer** 80:13,24 81:4,7 85:2 94:11 98:20
**LongHorn** 80:25 81:13,13 92:18
**look** 53:24 54:5,7 76:22
**looked** 26:8
**looking** 100:19 102:13
**looks** 58:18 60:9 61:10
**lot** 34:4 57:17,18 74:3 79:19 89:15 90:3,14,25 91:4 95:4
**lounge** 31:5,5,5 34:3 38:22
**lower** 54:2,10 60:4,11 75:6
**lunch** 96:21

**M**

**M** 3:4
**mail** 46:2,7,17
**mailbox** 67:17
**main** 89:13
**maintaining** 21:10
**major** 89:16,17
**majority** 30:12 51:22,24 81:6 96:18
**making** 16:12,16 33:2 85:25 92:2 98:9
**mall** 89:5,7,14,14,17,19 90:9 90:10 91:19 92:19 101:11 102:17 104:23
**malls** 89:17 91:25 98:2 99:3

Associated Reporters Int'l., Inc.                                      www.courtsteno.com

103:11 106:13
**Manager** 23:8,9
**mandated** 86:25
**manufactured** 51:25
**manufacturer** 51:23 52:4
**March** 60:15 61:15,21 62:2
  62:15,25 63:7,20 75:3,8
**mark** 8:7 26:18 53:5,6,6,20
  109:7
**marked** 5:3 53:12,25 59:25
  61:3 76:19
**Married** 17:6
**martial** 11:11,14,17 12:3
**Mary's** 22:23,24 23:4,16
  24:14
**MASH** 17:6
**materials** 112:11
**matter** 25:7 28:24 29:18
  38:20 71:17 86:20 92:17
**meal** 82:24
**meals** 87:17
**mean** 20:12 26:23 65:25 95:2
  95:10
**media** 33:25 44:12,14,17
  45:15
**medication** 9:25
**medications** 10:7
**meet** 25:16 31:25 83:7
**meeting** 28:6,7 30:6 40:20
  43:14 96:23
**meetings** 40:23,23 41:22
  43:11 94:21
**Melissa** 27:25 35:24
**member** 31:13,14 34:16,19
  40:19 41:5,19,25 42:10,19
  43:9,18,22 44:7
**members** 31:11 36:10
**membership** 40:18 41:15
  43:6,17
**Memorial** 22:4,7,8,10,12,20
  22:22 24:13
**mentioned** 17:22 67:4 99:8
**met** 39:6 73:11 83:2
**Michael** 72:2
**military** 11:4
**mind** 108:19

**mine** 66:9
**ministries** 23:8
**Ministry** 23:8,8
**minute** 48:23 76:9 106:4
**Mississippi** 2:7
**misstated** 108:23
**mistakenly** 108:23
**mix** 10:19
**mo** 58:7
**model** 51:21 104:7
**moment** 16:15 69:15 79:5
  83:24 86:7 90:14
**moments** 30:15
**Monique** 1:21 26:17 53:4
  109:3 110:11 112:2,13
**months** 14:20 16:21 62:12
**morning** 7:25 9:6
**motivated** 62:15 63:2 68:19
**motor** 103:23
**moved** 15:14
**movie** 102:17 103:4,11,18,19
  106:14
**movie-** 102:24
**movies** 86:3
**Muay** 12:6
**Mulvey** 2:15 4:4 7:23,23
  8:13,17,20,22 9:2,5,7 26:16
  26:20,23 27:5 48:24 49:7
  53:4,8,11,19,22 76:8,14,17
  77:4,9 106:3,10 109:3,13
  109:17 110:10,15 113:6,13

---

### N

**N** 4:2,2 5:2
**N-Y-U-K** 7:17
**N.R.A** 39:12 40:19 41:2,9,16
  41:19,23 42:3,17 43:21
  44:3 72:9
**name** 7:15 14:21 37:20 48:7
  48:12,13 59:15 98:15 113:4
**named** 48:6,10
**names** 24:20
**narrower** 107:4
**national** 15:25 41:3,5,21
**native** 10:11
**natural** 11:23

**nature** 12:3 20:7 28:22
**necessary** 73:20 93:9
**need** 24:19 25:14 33:18
  57:25,25 78:11 93:21
**needs** 28:4
**neighbor** 69:5
**neighbor's** 63:13 67:17
**neighborhood** 67:5 69:22
  70:14 87:5
**Network** 22:16 23:22
**never** 37:2,9 44:2 46:6,9,24
  47:2 82:21 83:17,18
**new** 1:3,9,17 2:9,12,12,14,17
  2:22 3:6 9:8 13:5,9,10,17
  14:14 23:19,24 28:15 29:25
  30:5,8,11 32:19,19,25
  33:21,25 34:2 35:20,22,22
  36:15 47:13,21,22,22,23
  50:4 51:7 55:2,5,12,23 56:3
  56:19 59:9 60:21,22 61:23
  62:10,16 65:16 72:2 79:18
  99:19 106:23 107:22 108:4
  108:10,13 113:12,14
**news** 63:10 86:4
**nice** 88:6
**niece** 16:13
**night** 20:9,15 97:18 99:2
**nights** 30:23
**nine** 60:6 63:7
**nineteen** 17:25,25 18:16
**nonprofit** 85:25
**NORTHERN** 1:3
**notary** 6:12 111:12 113:9
**note** 7:19
**noted** 111:4,6
**notes** 16:16
**noticed** 98:25
**notification** 62:12 85:20
**notified** 35:22
**notion** 33:4
**November** 27:12,12,21 37:7
  48:20
**number** 14:12 27:10,17,19
  48:16 50:22 61:13 66:4
  89:8 90:13 109:19 112:9
  113:4

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

**numbered** 77:15
**numbering** 54:3
**numbers** 26:21,24 51:21
**nursing** 101:25

**O**

**O** 4:2,2
**O'Malley** 86:13 87:4
**O'Malley's** 87:18
**obedient** 85:15
**obey** 85:15
**obeying** 91:11
**object** 49:21 52:20 70:3
  83:16 102:5 105:2 106:19
  107:10,20
**objection** 26:19 50:7 70:19
  102:9
**objections** 6:7
**obtain** 19:14,16 59:21,21
  62:3,8,13,20
**obtained** 54:19,23 55:6 59:3
  59:8 63:20 75:5,7
**obtaining** 57:4 63:2
**occasion** 14:18 25:8 29:24
  67:10 69:23 70:11 93:13
  94:14 96:5
**occur** 63:19 73:4
**occurred** 62:25 63:8 67:5,7
  98:12
**occurrence** 62:15
**off-limits** 94:16
**offered** 55:2
**office** 2:9,14 3:3 43:14 69:19
  106:15 113:12
**offices** 23:24 101:22,25
**official** 1:7 41:16
**officially** 29:18
**oh** 8:20 15:20 18:8 38:6
  57:24 92:9 110:10
**Ohio** 56:8
**okay** 7:7,18 8:17,22 9:2,3,22
  9:23 11:12 12:2,9,23 14:17
  15:5,11 17:18 20:23 22:5
  23:3 24:12,24,25 25:12
  26:23 27:5,6,16,18 29:20
  29:23 33:16 34:15,19 36:5

42:6 45:5 47:20 49:12
  52:25 53:4,7,19 54:9,14
  55:6 58:19,25 59:5,11,14
  59:24 60:10 61:11 65:8,14
  70:10,17 72:5,12,24 76:14
  77:3,13 78:5 80:5,17 84:8
  84:20 87:15 90:5 92:12,24
  93:7 94:13 96:5 99:23
  100:3,9 101:5,13 102:19
  103:3 104:12 105:21 106:3
  107:17 108:18,25 109:13
  110:6,8,13
**old** 17:23 18:17 94:2
**Olive** 2:7
**once** 12:10 21:22 59:20
  98:17 103:16
**ones** 44:4 89:13
**online** 20:12 65:23,25 66:3,4
  66:16
**Onondaga** 8:14 109:11
**oops** 27:3 29:7
**open** 37:23
**openly** 63:25
**operator** 20:9
**operators** 21:6
**opportunity** 9:15,21 27:10
  27:13 48:17,18 49:9 54:7
  76:22 77:10 108:13,19
  109:25
**opposite** 58:15
**order** 39:11 40:16 58:11 62:7
  62:8,9 63:16 66:5 68:7
  79:16 80:21 81:8 85:9 94:3
  94:25 95:2,14,22
**organization** 30:12 41:19,22
  42:14 43:7 44:7
**organizational** 41:23 43:14
**organizationally** 42:7
**organizations** 30:20 44:3
**organize** 42:20
**original** 6:13,17
**originally** 10:11 75:11
**outgrowth** 32:25
**outside** 21:6 37:25 55:5,11
  55:15,15 56:3 63:14 67:13
  67:22 68:15 69:8,19 85:22

93:24,24 99:7 100:16
**outstanding** 20:15
**overspeaking** 75:20 95:11
**owned** 89:21
**owner** 85:12,15,20 86:13
  88:8 89:24
**owners** 34:4 42:11,20,23
  43:2,7,11,15,19,22 44:3
  72:10,21
**ownership** 15:12 47:7,13
**ownership-related** 48:9
**owns** 49:25 87:2

**P**

**P** 2:15 4:2 49:13,14,18,18
  50:17,18,21,22 51:2,3,12
  51:12,13
**P.D.F** 26:6
**p.m** 1:14 49:4 106:7,8
  110:18
**P.O** 2:6
**page** 27:11 30:16 34:12
  48:15 49:10 50:23 51:3,13
  54:10 59:25 60:18,18 61:3
  61:5 77:14 78:20 79:8
  112:5
**pages** 54:6 60:11 112:9
**paperwork** 26:2,3,7 62:10
**par** 103:4
**paragraph** 77:14 78:19 79:5
  79:7
**park** 98:14 99:10,12,15
  100:6,11 101:15
**parking** 79:19 90:3,25 95:3
**parks** 98:8,9,11 100:3,13,20
**part** 11:4 37:2,21 40:5 73:17
  94:6 107:21
**participate** 38:25 39:11,11
  39:14 40:4 41:22 43:18
  44:5
**participated** 39:9
**participating** 8:15 40:13,18
  77:5
**participation** 38:19
**particular** 18:24 36:21 56:15
  59:20 62:14,24 70:23 79:18

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

80:20 88:15 93:19
**particularly** 82:19
**parties** 6:4 28:12 38:22
    113:10
**patronize** 88:18,20 90:9 91:9
    93:4 103:4
**patronized** 80:11 81:19
    88:24 102:16
**patrons** 84:13 86:15 88:19
**pay** 44:2 66:12
**pellets** 57:19
**Pennsylvania** 56:8
**people** 37:19 38:5,24 39:6
    83:8,8,16,20,20 85:13,16
    86:4 87:25 88:3,9,13 97:7
    99:20 102:13
**percent** 85:11
**permanent** 105:6
**permit** 29:25 33:12,21 35:14
    51:7,8 54:16,17,19,24 55:3
    55:7,10,21 56:2,6,18 58:16
    59:3 60:5,7,14,22,23 61:18
    62:3,9,13,16 63:3,16,19,23
    64:6,17 65:18 66:5,10,21
    67:2 68:3,5,21 74:21 75:6,8
    84:11 93:3 95:9 97:10
    100:23 108:15
**permits** 5:9 32:10 33:3 35:10
    55:15
**permitted** 69:24 78:9,22
    79:25
**permitting** 32:24,24 47:13
    65:16
**person** 9:19 71:22 74:22
    80:13 82:12 87:2
**personal** 45:19,25 46:8,25
    63:3,8 69:25 70:13,25 72:3
    78:3 82:9,13,14 93:11
    100:7
**persons** 28:19 38:10 105:25
**Peter** 15:21 17:3,12
**Philip** 8:8
**PHILLIP** 2:20
**phone** 21:8
**photo** 61:6
**photocopies** 60:13

**photocopy** 60:4,5 61:6,8
    64:6
**photograph** 60:4,11
**photographs** 61:4
**phrase** 113:16,17,18,19,20
    113:21,22
**pick** 81:9 84:25 85:4,7,8
    89:15 93:22 94:18,23,25
    95:14 96:9,19
**picking** 95:21
**pickup** 95:2 104:2
**picture** 45:3 54:17 60:7 61:5
**pistol** 5:9 29:25 32:10,24
    33:11,21 35:14 40:8 47:13
    54:16,17,19,23 55:3,15
    60:21,22 62:5,9,13 63:3,16
    64:11,14,16,21 66:5 68:3,5
    75:11 97:10
**Pistol-wise** 49:16
**pistols** 50:25 51:6,11,15,17
    64:21
**pizza** 17:16 18:20 94:18
**place** 35:20 39:17 40:2,15
    43:14 62:8 81:2,3 87:2 89:9
    90:21 93:15 94:11,15,25
    95:20 100:20 104:12 111:4
    112:4
**places** 56:9 89:8,9 90:14,19
    91:7 96:10,23 100:14
    104:22 106:15
**placing** 93:25
**plague** 90:22
**Plaintiffs** 1:5 2:3 7:22 109:14
**planning** 31:21 98:9
**platform** 45:15
**platforms** 44:21,24
**play** 43:7
**Plaza** 1:16
**plead** 50:9,12 53:3
**please** 7:8,15,20 9:14 12:7
    13:15 26:5,18 37:12 48:21
    53:6,11 54:22 60:19 61:25
    89:11 111:5 113:8,9
**PLLC** 2:4
**plumber** 83:11
**point** 27:17 71:16 75:14

97:10
**Police** 1:9 8:7 9:9 106:24
    107:6,25 108:4,10,14 109:7
**Police's** 28:15
**polite** 83:8
**political** 43:23 74:6
**pops** 48:4
**portable** 104:5,11 105:6,8
**portion** 10:19 79:13,18
    100:24
**pos** 100:25
**pose** 70:22
**position** 21:3 22:15 23:6,21
    24:4,5,7 41:16 46:14 72:9
    77:24 87:22
**possess** 49:15 52:15 56:2
    64:2 68:13
**possessed** 70:8 74:20
**possessing** 84:10
**possession** 81:20 92:21
    103:21 105:14
**possibly** 17:5 74:15
**post** 44:25 79:14,17,24 87:10
    87:19,20 90:12 105:16
**posted** 33:20 45:5,14 77:19
    78:8,24 105:3
**postpone** 11:7
**postponed** 35:19
**posts** 85:20
**practice** 31:19,20 68:14
    105:22
**Pratt** 48:6,11
**prefer** 85:16 97:16
**premises** 83:23 85:21 86:6
    87:11,21 95:22 105:17
**preparation** 25:16,21 26:11
**prepare** 25:17
**prepared** 16:20 112:10
**presence** 70:12 82:11 112:4
    113:8
**present** 3:7 9:13 36:5,25
    67:7
**presented** 48:6,10
**presenting** 37:17
**pretty** 16:22 17:8 28:8 32:13
    43:3 72:15 96:7

800-523-7887                                              ARII@courtsteno.com
Serving all of New York State

**pretzels** 87:6
**pri** 80:14 85:19
**primarily** 87:6
**primary** 84:4,12 87:16 93:8
**printing** 20:14 21:7
**prior** 9:10,24 10:18 13:21
 14:8 25:9 26:2 31:22 61:21
 62:15,25 68:2 79:2,16
 80:11 88:24 101:2 103:5
**private** 85:19,23 86:12 87:19
 89:23
**privately** 89:21
**probably** 83:6
**problem** 86:17,22,24 87:12
 87:22,23 102:2
**problems** 87:14
**procedure** 6:5 98:7
**proceedings** 36:17 38:7
**process** 16:3 17:8 22:6 32:10
 32:11 33:11 35:15,17 62:2
 68:25 73:21
**professional** 20:19 21:3,5
 44:10 46:10,25
**Professor** 44:10
**proficiency** 57:4
**proficient** 16:10,23 97:14
**profit** 85:25
**program** 18:25
**progress** 62:20
**prohibition** 102:3
**projects** 21:19
**promise** 103:17
**promised** 16:13
**pronouncing** 29:11
**property** 81:9 85:20,23
 87:20 89:21,24,25 91:3
 98:19 105:4
**protect** 57:20 70:12 74:5,14
 74:18,18 83:21 88:9
**protecting** 43:2 74:13,13
**protection** 62:22 69:15 82:17
**provide** 50:16 55:17 85:2
 110:9
**provided** 55:4 108:21 112:11
**provides** 50:2
**proximate** 101:12

**proximity** 69:18
**pub** 86:13 87:5
**public** 6:12 51:16 103:14
 111:12 113:9
**pull** 93:23 94:6,24
**purchase** 15:9,10 64:19 65:5
**purpose** 84:4,12 87:9,16
 93:8,8
**purposes** 49:22
**pursuant** 6:6
**pursue** 62:16
**pursuing** 92:25
**put** 12:8 33:7 72:25 79:14
 85:14 86:16 97:3,4,17
 105:8
**putting** 97:13

**Q**

**qualified** 90:23
**qualify** 11:6
**question** 9:12,15 11:21,24
 27:10 32:8 33:10 40:19
 45:9 48:16 49:9,21 50:16
 52:17,22 70:18 79:4 84:22
 91:8 102:10,15 107:3
**questioning** 109:2
**questions** 6:8 9:14 21:8
 28:25 32:16 37:9,13,18,22
 66:4,12 72:22 76:24 109:5
 109:7,10,12,15
**quick** 37:22 80:22
**quickly** 108:19
**Quite** 103:7
**quote** 104:9,9

**R**

**R** 4:2
**raise** 7:8 67:24
**raised** 32:9,16 33:10 47:8
 63:15 71:23
**rallies** 39:8
**Randomly** 37:19
**range** 39:19,20 68:14,16
 69:7 93:21
**re-familiarize** 76:23
**reach** 69:15,17

**reaction** 11:24
**read** 6:10 27:10,13,19 29:6
 32:12 48:19 109:16,22
 110:4,8 111:3 113:8
**ready** 76:15 77:2
**really** 14:10 44:2 74:10
 89:12 96:13 108:24
**reason** 82:5,10,18 88:15
 95:18 106:22 107:7
**reasoning** 84:17
**reasons** 64:3 68:22 96:16
**recall** 48:13 51:20 67:10
 94:14 96:6
**receipt** 62:9
**receive** 10:15
**received** 10:18 21:22 62:12
 94:22 107:24
**recertification** 65:15,20 66:8
 66:20,24
**recertify** 65:23 66:4,5,16
**recollection** 32:6 48:8,19
**record** 7:5,15,20 16:18 27:6
 49:3,4,5,6 51:16 53:20
 76:10,11,12,13 77:4 106:6
 106:7,8,9 110:14 111:4
 112:10
**recorded** 110:3
**recreational** 62:19 64:3 68:3
**redirect** 80:10
**redirecting** 71:3
**refer** 11:9 34:10,24 35:4
**reference** 30:17,18 34:12
 35:2 38:10 54:2 77:7 81:23
**references** 97:24
**referred** 39:22 40:14 64:15
 81:20
**referring** 31:2,8 35:24 39:4
 41:3 98:11
**refresh** 48:19
**refuse** 50:14,15 52:17,22
**refused** 98:19 99:4
**regarding** 28:24 32:4,23
 36:11,14 37:3 45:15 46:3
 46:18
**regional** 23:7
**register** 62:5

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

registered 50:5
regular 19:3 24:15
regulations 30:8 32:20 33:22
  34:2 35:20,22 40:24
related 23:13 24:19 40:22
  43:24 45:6 47:6,11,12,16
  52:18 63:3,8 83:4 92:20
relation 41:23 100:17 105:18
relationship 22:7 29:21
relatives 12:22
release 104:6
rely 70:11,25
remember 14:10,12,21 30:3
  33:5 36:7 51:21 59:15
  93:19,20 94:5
remove 95:13
renewal 59:6 65:15,20
rent 15:9
rental 14:20
repeat 37:12
rephrase 90:6
report 69:11
Reported 1:21
Reporter 7:4,7,14,18 8:3,11
  8:16 9:3 27:3,7 49:3,6 53:7
  53:21 76:10,13,16 106:6,9
  109:20,23 110:13 112:13
Reporters 112:11 113:2
reports 20:14
represent 29:17
representing 8:6,9 25:6
require 70:24 78:14 90:16
required 10:20 95:13
requirement 66:6,20 88:4
requirements 32:14 35:22
  57:4 65:20
requires 66:11
researching 30:7
reserved 6:9
reside 14:4,17
resided 13:10,18
residence 14:8,14
resident 12:20
resides 69:20
respect 45:9 70:17 71:7
  72:13 73:22 78:2 79:7,9

80:10 85:22,24 86:12 94:10
  105:4,17 108:14
respected 83:8
respective 6:4
response 5:6 27:11 30:16
  34:12 48:16 49:9 50:22
responses 92:20 109:21
responsibilities 83:9
responsibility 74:12
responsible 21:9
responsiveness 6:8
restaurant 77:19 78:7 80:19
  80:24 83:13 87:16,19,20
  88:2,14,18,21 90:25 95:15
  95:16,17,17 96:19
restaurants 80:10,11,17 81:6
  81:12 89:11 90:15 97:24
  98:4 100:17 101:7,12
  104:23 106:12
restrict 89:25
restricted 68:5,10,12
restriction 64:20,24,25 68:25
  84:9,17 94:10 104:21
restrictions 63:24 64:7 75:18
  98:16
restricts 82:11 88:18 95:8
result 102:23
retailer 17:13
Return 113:11
returned 6:15
rev 32:23
review 33:20 49:9 77:10
  108:19
reviewed 25:20
reviewing 50:4
revisions 32:24
revolved 35:10
rifle 39:19 41:3,6 63:23
  64:14,20 65:6,11 75:8
rifles 49:25 52:11,15
right 7:8 8:11 9:12 10:10
  11:20 16:15 17:19 26:9,16
  27:19 28:22 29:17 33:7
  35:7,7 36:2 38:5,5,9 48:14
  52:19,21 53:16,23 54:22
  59:3 60:17 64:12,19 65:6

65:10 67:2,16,22 73:13
  74:22 75:2,6,9 76:14 77:24
  78:10,13,16,22,25 79:11
  80:9 82:17 83:14 84:16
  85:2,3 86:2,8,19 87:9 88:23
  89:20 90:17,20 91:8 93:5
  93:24 95:8 100:13 102:14
  103:13 104:20 109:16,22
  110:4,5
right- 64:5
right-hand 54:2,11
rights 42:25 43:2 55:4,18
  72:19 74:2,4,9,14,18 82:15
  88:10,16 89:24 95:19 100:5
  107:16
ring 48:7
road 39:19 63:10 81:2,13
  92:19 94:7,24
Robert 1:15
Rod 36:10 39:20 59:12
role 42:7 43:6
Room 2:21 3:5 38:2
Royale 14:11 15:4
Rules 6:5
run 86:13
running 20:14
Rusin 8:7 109:7
Russo 27:22 34:11,16 36:8
  36:21 37:7

**S**

S 4:2
safe 30:9 34:5 39:6 72:17
  83:14 88:7 93:25 97:10,11
  97:18,19 104:5,11 105:14
safety 39:9,9,10,10 62:6,22
  63:4,8,14 67:25 69:19,25
  70:13,25 83:6 93:11 97:9
  106:25,25 107:2,15
SAUER 49:13,14,18,18
  50:17,18,21,22 51:2,3,12
  51:13,22,25
saw 103:19
says 64:9
scam 47:24
scared 67:21,21 99:2

800-523-7887                                                        ARII@courtsteno.com

Associated Reporters Int'l., Inc.                                www.courtsteno.com

sce 86:23
scenario 86:23
scenarios 30:14
schedule 28:2
scheduling 35:17
Schenectady 13:7,10,16,22
  14:7,11,14,18,19 15:12
school 10:18,21,24 12:12
schools 102:4,6
science 19:8,10,17 20:3
  21:15 23:11
scores 40:11
seafood 82:23
seats 94:2 97:8 104:7
second 18:6 30:4 38:24 39:3
  40:14,21,22 42:21,24 47:7
  47:7,12 48:9 54:10 82:17
  88:12
secure 104:4
security 21:12 74:6 107:2
see 33:20 37:21 53:16 54:3
  54:12 57:24 64:6,7 67:15
  77:15,22 82:18 86:3 100:12
  102:7
seek 69:19
seen 83:17
self- 104:20
self-incrimination 52:21
self-protection 69:12
sells 91:4
semester 11:2
semi 64:13,13
semi- 64:17,19
semi-automatic 63:23 64:14
  65:6,11 75:8
Senior 23:22
sense 83:19
sent 15:25
sentence 16:23
sentences 16:24
September 76:21 77:17,25
  78:6,21 79:23 80:6,11,14
  80:15 81:15,18 88:24 89:2
  93:14 98:13 102:21 103:5
  103:15
series 9:14 15:5 66:12

serve 81:24 83:24 84:5,13
  86:7 87:5,17 90:15 95:19
  96:22 98:5 101:7,12
served 95:21
serves 87:17
service 84:4 100:16,21
services 80:3 100:14
serving 80:23 81:5 82:3,7,13
set 5:6 68:6 83:9
setting 38:18
seven 14:6 22:13
sheep 74:7
sheet 111:7
shells 67:12
Sheriff 35:16,21
shift 20:10,16,16
shoot 40:16 57:13
shooting 39:12 40:7,9,10
  99:3,21
Shop 30:24
Shopper 89:8
shopping 50:3 100:18 101:11
  106:13
shotgun 40:6 57:14 58:2
  67:12,13,17 69:11
shotguns 49:25 52:11,16
shots 67:13 69:16
show 8:24,24
shows 16:11 17:7
sic 79:17
side 58:16
Sierra 103:25
SIG 49:13,13,18,18 50:17,18
  50:21,21 51:2,2,11,12,22
  51:25
sign 6:11 77:20 78:9,23
  79:24 85:14,15 86:16 87:10
  87:19,21 88:15 100:12
  105:4,8,16 109:16,22 110:4
  110:8 113:8,10
signature 113:11
signed 6:14 44:20 113:24
signs 90:12 91:13,14
similar 38:23
simple 21:7
sir 7:6 50:11 52:20 54:23

  72:7 73:3 86:9
sister's 13:7 14:19,24
sit 49:12 85:6
sitting 67:11 96:16
situation 33:8 68:4 84:24
  91:6 100:11 103:10
situations 70:6 106:16
six 49:13,18 50:18,21 51:2
  51:12,12 60:5 77:15 78:19
  79:5,7 97:5
sixteen 13:19 14:2
skateboarding 90:2
Skeet 40:7
skip 16:23
slash 22:24
small 21:19 26:24 44:2 56:12
  56:15 57:10,19
Smith 52:7
snacks 87:6
snakes 57:18,19,20
Soares 8:10
social 38:12,19 44:11,14,17
  45:15
socialism 74:4
socialize 82:3
society 82:25,25
software 21:11
sold 90:21
soliciting 90:2
somebody 67:22 71:7 83:15
  105:9
son's 94:19 96:2
sorry 8:4 11:22 14:12 19:9
  29:7 37:10 44:22 50:11
  52:23,23 92:9 101:19,22
sort 11:10 12:17
sound 48:13
South 2:16 24:2 113:13
speaking 9:18 33:14
special 18:24
specialized 80:19
specific 26:4 70:23,24 79:21
specifically 77:19 78:8,24
  79:24
specify 90:18 92:5
speeding 107:23 108:8

800-523-7887                                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

**spell** 7:15 12:7 13:15
**sport** 11:3,4,10 31:20 38:25
**sporting** 12:13 40:7 92:19
**sports** 10:20 39:12
**spot** 78:23
**St** 22:23,24 23:3,16 24:13
**Stamboulieh** 2:4,5 7:21,21
    8:18,21,23 25:3,9,17 26:10
    26:14,19 46:3,8,18 48:22
    48:25 49:20 53:10 70:3,19
    73:2,8 102:5,9 105:2 106:5
    106:19 107:10,20 109:14
    109:18 110:7
**stand** 61:14 75:16
**stands** 43:23
**start** 12:3 23:19 31:21 62:21
    68:24 74:10 75:14
**started** 17:2 19:8,9 22:16
    23:22 30:23 32:16 33:6,8
    33:24 72:20 73:19
**starting** 11:5 30:7 83:17
**state** 1:9,16 2:9,14,16 7:14
    9:9 23:20,25 28:15 40:25
    50:4,6 54:20,24 55:2,3,5,15
    55:15,23 56:3,19 60:21,22
    62:10,11 90:23 98:8 99:10
    99:12,15 100:6 106:23
    107:6,24 108:4,10,13 111:2
    113:12,13
**stated** 112:5
**statement** 64:18 76:20 77:25
    78:2,19 79:2
**statements** 109:20
**states** 1:2 5:6 12:25 13:4,9
    15:18,25 16:7 18:3 55:4,14
    55:17,18 56:5 64:19 73:25
**stating** 64:21
**station** 77:19 78:8,23 79:19
    79:20,24 91:24,25 93:17
    94:7 101:2
**stations** 78:14,15,17 79:7,9
    79:16 81:11 91:22 94:11,14
    101:4 104:17 106:14
**status** 38:10 68:5
**statute** 29:25
**stay** 13:6,8 34:5 78:16 83:23

    86:5,5,6,6 90:18
**stayed** 22:9
**Ste** 73:15
**Steakhouse** 92:18
**Stephen** 2:5 7:21 72:21
    73:15,17 109:17
**Steve** 48:23
**Steven** 1:7 2:8 113:4
**Stevens** 15:3,4
**stick** 89:10
**STIPULATED** 6:3,7,10,13
**STIPULATIONS** 6:2
**stop** 80:22 85:8 93:22,24
    94:7,19
**storage** 104:4
**store** 17:15 77:18 78:7 91:2,3
    96:8
**stores** 88:23 89:10 97:25
    98:4 101:9 106:13
**story** 73:24 99:6 100:12
**straight** 13:6 20:19 85:12
**streaming** 103:8
**street** 2:11,16,21 3:5 14:22
    80:21 81:13 113:13
**strictly** 36:14 70:8 91:11
**Strike** 90:7
**strong** 74:15
**studied** 16:10
**studies** 17:24 18:13 19:23
    21:16
**study** 11:8 19:6,11
**stuff** 47:21 74:3 89:16
**subject** 32:5 45:16 51:6,8
    65:19 81:14
**submitment** 79:17
**submitted** 62:10,11
**subpoena** 6:6
**subscribe** 47:3,5,14 48:2
**subscribed** 47:11
**substance** 28:11 37:5 46:18
**substances** 10:2,7
**subtitles** 16:17
**sue** 107:9
**suggesting** 92:16
**suing** 71:7 73:22
**Suite** 2:16 113:13

**summer** 94:5
**SUNY** 18:23 19:4,11,23
    21:16 24:16
**Superintendent** 1:8 9:8
    28:15 93:2 106:23 107:6,18
**support** 42:21,24 43:4
**supposed** 32:18
**sure** 8:4 30:10,10 98:10
    109:23 110:3
**surrounded** 74:7
**surroundings** 85:24
**Sushi** 81:3
**suspended** 78:13 79:14
**swear** 7:8
**sworn** 4:3 7:13 76:20 111:10
    112:7
**Syracuse** 2:17 3:2,3,6 8:6
    53:14 109:8 113:14
**system** 20:18
**systems** 21:10,11

---

**T**

**T** 5:2
**T-O-A-S** 28:23
**T-O-R-I-A-N-A** 13:16
**T.V** 16:25 17:5,7 67:12
**T.V.s** 16:11 86:4
**tactical** 40:9,9
**take** 10:21 34:16 39:17 40:2
    40:15,17 43:23 53:24 54:5
    58:2 73:16 85:8 89:19
    105:11 109:21
**taken** 6:6 9:25 109:23 111:4
    112:3
**takeout** 80:21 81:7 95:7
    101:14 104:23
**talk** 33:23
**talked** 37:16 101:9,14,15
**talking** 12:2 35:6
**tape** 16:12
**target** 40:10
**team** 20:16
**technical** 20:13,16
**Technology** 23:9 44:9
**tell** 16:9 51:18 54:14,22
    60:19 65:10 69:17 110:11

800-523-7887                                                          ARII@courtsteno.com
Serving all of New York State

temporarily 105:16
ten 13:20 58:6
tenses 86:20
term 44:11 64:7
termination 66:25
terms 65:15
testified 9:9
testify 112:7
testimony 7:9 25:9,21 26:11
  81:10 109:25 111:4 112:3,6
  113:8
Thai 12:6
Thank 7:18 8:11 25:2 27:7
  53:21 70:16 77:8 101:21
thanks 53:10 76:9 110:10
Thatcher 98:14 99:10,12,15
  100:6
theater 103:14
theaters 102:17 103:5,11
theatre 103:19
theatres 106:14
There's 8:16
thing 9:17 83:12,19 96:6,15
  96:15 99:3 102:12
things 74:9 90:3 99:5
think 14:10,10 16:5 21:17
  26:22,24 30:4 34:24 53:17
  67:19 91:15 109:3 110:11
thinking 98:18
thirty 113:9,10
thirty-second 18:5
Thompson 2:10 7:25 8:2
  26:22 27:2 53:17
thorough 10:3
thousand 19:20,21
threat 70:23,23,24
three 5:10 16:14 49:10,13,14
  49:18,19 50:18,18,21,22,23
  51:2,3,3,12,12,13,13 54:4
  58:13 59:2 60:11,12,12
  62:6 65:24 66:17,18 76:20
  77:14,15 78:20,20 79:8,8
threshold 92:17
thumbprint 58:23
ticket 107:23 108:8
TikTok 44:20 45:10

till 9:20 74:23 91:13
time 1:14 6:6,15 9:18 12:2
  18:19 19:7 20:2 22:19
  23:15 34:16,17 35:18 36:3
  36:17,22 42:16 47:23 48:3
  52:12 65:11 68:11 69:4,13
  71:5,9,11,17 74:4,19,24
  86:2 91:19,20 96:19 97:14
  103:20 108:21 111:4 112:4
times 16:14 96:11 97:6
Timothy 2:15 7:23 9:7 113:6
  113:13
Toas 27:22 28:23 29:11,12
  29:13 30:2 31:10,22 32:4
  32:23 34:23 36:3,8,17 37:6
  71:5,8
today 7:9 8:15 9:10,25 10:8
  25:2,10,21 26:11 28:2,7,7
  49:12 51:19 70:21 71:18
  78:2,6 81:10 103:9,9
  108:16,20
today's 25:18
Todd 3:4 8:5
told 24:13 28:3,5,8
tomorrow 100:10
top 61:5,8 64:18 101:24
  103:18 106:20
topic 34:2
topics 47:16
Toriana 13:14,24 15:15
  105:4
toy 91:2
training 12:17 35:18,21 57:3
  66:6 68:7 83:6
transcript 9:20 49:23 111:5
  111:7 113:8,10,11
transcription 112:9
transferred 19:10 22:3
transition 20:15
transitioned 20:18 22:17
translate 16:19
translated 16:22,22
transpired 67:10 73:7
trap 40:7
traveled 56:6
traveling 59:8 68:15

trial 6:9,16
tried 97:15
trophy 99:25
trouble 34:6
truck 94:2 104:2
true 78:5 82:25 111:5,7
  112:10
truth 7:10,10,11 112:7,7,8
truthful 10:3
try 16:16 30:14 74:17
trying 21:17 30:9 34:5,6
  35:14 43:4,4 91:6 99:16
  103:10
turkey 56:17 57:13 58:2,8,9
turkeys 57:23
turn 58:12 59:25 60:17 61:2
  109:4
turning 32:3
twenty 13:19 17:25 18:16
  41:13
twenty-two 55:18
twice 97:3,17 98:17
two 5:8 16:14 17:7 19:20,21
  22:3,8,17 23:23 30:16,19
  48:16,16 49:9,10,14,19
  50:18,22,22 51:3,13 53:5,6
  53:10,11,13,24 54:3,4,4,4,4
  54:6,12,15 55:10,21 56:2,7
  58:13,16,25 59:2,22 60:2,2
  60:6,6,11,12,12,12,19 61:3
  61:3,4,4,9 62:4,4 64:5 65:5
  65:19 66:11 67:2 75:6,7
  90:13 103:18 108:15
type 11:16 12:16 47:12 56:10
  103:23
types 84:6,11,18
typewritten 112:8

---

**U**

U.S 18:7,12
Uh-huh 76:25 78:18 83:25
  86:14,24 92:4 101:8 108:2
Ukraine 10:12,16,17,24 12:5
  12:10,13,20,23 74:2
unable 78:7
unachievable 32:14

Associated Reporters Int'l., Inc.                    www.courtsteno.com

**undergraduate** 19:3 20:24
**underneath** 61:13
**understand** 10:11 11:23
    16:15,24 17:11 30:11 32:22
    35:5 51:9 64:22 72:24 73:9
    73:10,12 79:22 84:8,13,15
    84:16 85:22 86:11 105:15
    107:7
**understanding** 29:6,10
    32:19 33:9,25 34:7 36:14
    57:12 58:2 79:22 80:7
    82:10,13,14 92:25 93:8
    95:13 104:14 106:21 107:5
    107:13,18
**understood** 80:13
**unfortunately** 41:11 80:23
**unintelligible** 105:12
**United** 1:2 12:24 13:4,9
    15:18,25 16:7 18:3 73:25
**unrestricted** 35:15 63:15
    64:10 68:6,7,10 69:24
    74:20 75:7,14,24 76:5
**updates** 47:19
**upgrade** 68:5,20
**upgraded** 75:24
**upper** 58:22 61:12 64:5
**upstairs** 67:15
**use** 20:13 45:22 46:16 57:19
    64:2 68:13 81:7
**usually** 56:9 67:23 96:24
**Utah** 54:16,17,20,24 55:3,14
    55:17,25 58:16 59:2,8,22
    60:14
**utilize** 57:9 69:3,12,23 70:5
    80:3,24 95:8 104:8
**utilized** 55:25 69:6
**utilizing** 56:6

**V**

**v** 1:1,6 2:1 3:1 4:1 5:1 6:1
    7:1 8:1 9:1 10:1 11:1 12:1
    13:1 14:1 15:1 16:1 17:1
    18:1 19:1 20:1 21:1 22:1
    23:1 24:1 25:1 26:1 27:1
    28:1 29:1 30:1 31:1 32:1
    33:1 34:1 35:1 36:1 37:1
    38:1 39:1 40:1 41:1 42:1
    43:1 44:1 45:1 46:1 47:1
    48:1 49:1 50:1 51:1 52:1
    53:1 54:1 55:1 56:1 57:1
    58:1 59:1 60:1 61:1 62:1
    63:1 64:1 65:1 66:1 67:1
    68:1 69:1 70:1 71:1 72:1
    73:1 74:1 75:1 76:1 77:1
    78:1 79:1 80:1 81:1 82:1
    83:1 84:1 85:1 86:1 87:1
    88:1 89:1 90:1 91:1 92:1
    93:1 94:1 95:1 96:1 97:1
    98:1 99:1 100:1 101:1
    102:1 103:1 104:1 105:1
    106:1 107:1 108:1 109:1
    110:1 111:1 112:1 113:1,4
**V.C.R** 16:18
**variety** 89:13
**vehicle** 95:14 103:23 104:3
**VENUE** 1:15
**verbal** 109:19,24
**vicinity** 63:18 67:6 68:19
    70:2,18
**video** 77:5
**videos** 47:16
**viewing** 48:9
**violating** 77:21
**Virginia** 47:20
**Visa** 55:4,18
**visit** 49:2 80:14

**W**

**wait** 9:20 33:18
**walk** 67:23
**walking** 67:23
**walks** 99:22
**want** 25:12,15 26:20 27:8,9
    27:13 31:14,15 41:13 42:15
    49:24 50:9 66:22 68:23
    73:7 86:3,10,15 87:13 88:6
    90:22 91:5 93:22 103:9
**wanted** 62:18 73:10
**wants** 50:8 84:24
**Washington** 3:5
**wasn't** 8:4 36:25 69:9 73:25
    92:14 103:8

**watch** 16:16
**watched** 47:15
**watching** 16:11,14 17:5 63:9
    67:12
**Watervliet** 31:9,11,17,23
    34:17,20 36:10 39:19,22
    59:12
**way** 74:5 76:3 77:25 91:14
    93:20,21
**we'll** 11:20 60:24,24 110:9,9
**we're** 11:25 26:24 30:7,10
    33:17 34:24,24 35:5,5 43:4
    53:4 65:8 70:10 71:17 76:8
    82:21,22 86:7 99:21 110:11
    110:16,16
**we've** 15:25 101:3,3,6 104:22
    106:13 108:15,20
**we're** 33:10
**weapon** 55:22 62:16 63:12
    63:18 68:21 97:20
**weapons** 79:15
**week** 35:18
**went** 13:6 14:24 15:3,4 16:21
    17:16 18:8 62:2 67:15 68:6
    69:11 79:23 95:2,3 103:17
**Wesson** 52:7
**whe** 68:18
**white** 60:13 61:8
**widely** 99:17
**wife** 27:22,25 28:20 32:25
    33:2,13 36:2 67:11,14,21
    69:18 94:22 96:20 98:19
    99:2,4
**wife's** 35:9
**willingness** 73:18
**wine** 82:23 87:17
**wings** 80:22 94:18
**wish** 70:6 72:16 108:22
**witness** 6:10,14 7:16 8:12
    109:2 110:6 112:6
**wives** 32:9 33:9
**Wolf** 81:2,13 92:18
**wolves** 74:8
**word** 16:15,19,19,22 113:16
    113:17,18,19,20,21,22
**worded** 52:24

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

**words** 16:24
**work** 22:3,11 24:20 55:9
**working** 17:2 18:20 20:6,19
  21:21,25 22:6,9 23:19
  37:24
**wouldn't** 99:6
**written** 82:6 85:10
**wrong** 52:24

**X**

**X** 1:11 4:2 5:2,2 111:8,11

**Y**

**yard** 105:17
**yeah** 8:21 15:8 18:9 27:2,18
  47:24 48:24 57:16,22 58:4
  58:18,21 59:6,7 61:10
  75:12 87:8 89:16 92:13
  98:23,24 101:10 110:10
**year** 18:5,6,15 21:23 22:2
  37:7 48:20 94:19 96:3
**year-and-a-half** 18:14
**years** 13:20 14:6 18:16 19:13
  21:15 22:13,14,17 23:5,23
  65:24 66:17,18 75:13
  107:25
**Yep** 64:8 106:5
**yesterday** 8:19 28:6
**York** 1:3,9,17 2:9,12,12,14
  2:17,22 3:6 9:9 13:5,9,11
  13:17 14:15 23:20,25 28:15
  30:2 32:25 47:13,22,22
  50:4 51:7 55:2,5,12,23 56:3
  56:19 59:9 60:21,22 61:23
  62:10,17 65:16 99:19
  106:23 108:4,10,13 113:12
  113:14
**you'd** 87:22
**you're** 107:5
**YouTube** 47:3,5,11,17,18
  48:5,10

**Z**

**zero** 49:14,19 50:18,22 51:3
  51:13 54:3,12,15 55:10,21
  56:2,7 58:13,16,25 59:2

60:2,6,11,12,12,19,19 61:3
  61:4,9,9 62:4,4 64:5,5 65:5
  65:5,19,19 66:11,11 67:2,2
  75:6,7

**0**

**1**

**1** 112:5,9
**10:27** 49:4
**10:34** 49:5
**10005** 2:12
**106** 2:21
**10th** 37:7
**11:14** 76:11
**11:23** 76:12
**110** 112:9
**11th** 61:15,21 62:3 75:3
**12:05** 106:7
**12:10** 106:8
**12:15** 1:14 110:17
**12207** 2:22
**12224** 1:17
**12304** 13:17
**13202** 2:17 3:6 113:14
**155** 31:4 39:19
**1994** 18:4
**1998** 19:19
**19th** 79:23 80:12,15 81:18
  88:24 93:14
**1st** 5:6

**2**

**20** 93:14
**2000** 20:3 21:23 31:15
**2006** 31:16
**2008** 31:16
**2009** 61:15,21 62:3,15,25
  63:7,20 75:3,4,8,10
**2011** 23:19 41:14 42:15
**2012** 41:14 42:15
**2013** 24:5
**2022** 76:21 77:17,25 78:6
  79:23 80:7,12,15 81:15,18
  88:24 89:2 93:14 98:13
  102:21 103:6,15,19

**2023** 55:7 59:3 60:15
**2025** 27:12
**2026** 1:13 24:16 111:11
**2029** 66:22
**21** 1:13
**22** 78:21 80:14
**22-CV-986** 1:6 113:4
**233** 3:5
**24** 2:21
**26** 5:5
**28** 2:11

**3**

**30** 113:9,10
**300** 2:16 3:5 113:13,13
**300A** 2:16
**38654** 2:7

**4**

**4-21-22** 113:5
**4-21-26** 1:1 2:1 3:1 4:1 5:1
  6:1 7:1 8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1 56:1
  57:1 58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1 71:1
  72:1 73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1 81:1
  82:1 83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1 91:1
  92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1
  106:1 107:1 108:1 109:1
  110:1 111:1 112:1 113:1
**428** 2:6
**4316** 63:11
**4th** 1:16

Associated Reporters Int'l., Inc.                                        www.courtsteno.com

**5**

**523-7887** 113:2
**53** 5:8

**6**

**7**

**76** 5:10

**8**

**800** 113:2

**9**

**9** 4:4
**9:38** 1:14 7:2
**99** 19:19

800-523-7887                                                          ARII@courtsteno.com

Serving all of New York State