**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

IVAN ANTONYUK,                                       )
COREY JOHNSON, and                                   )
ALFRED TERRILLE,                                     )
                                                     )
    Plaintiffs,                            **)**
                                                     )
v.                                                   )    Civil Action No. 22-986 (GTS-PJE)
                                                     )
STEVEN G. JAMES, in his official capacity as         )
Superintendent of the New York State Police,         )
WILLIAM FITZPATRICK, in his official capacity        )
as Onondaga County District Attorney, TOBIAS J.      )
SHELLEY, in his official capacity as Sheriff of      )
Onondaga County, MARK RUSIN, in his official         )
capacity as Chief of Police of Syracuse, and         )
LEE C. KINDLON, in his official capacity as          )
District Attorney of Albany County,                  )
                                                     )
    Defendants.                            )
_____             )

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    I.      PLAINTIFFS HAVE STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.     NEW YORK'S NOVEL LOCATIONAL RESTRICTIONS ON
            THE RIGHT TO BEAR ARMS VIOLATE THE SECOND AND
            FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . 7

        A.  Second Amendment Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . ..  . . . . . . . . . . . . 7

        B.  The CCIA's Restrictions Are Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1.  Parks. . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            2.  Places that Serve Alcohol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.  Theaters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            4.  Zoos. . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . 21

            5.  Airports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            6.  Private property open to the public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            7.  Private property not open to the public. . . . . . . . .. . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**U.S. Constitution**

Amendment II .................................................................................................................... 7, 8

Amendment XIV ..................................................................................................................... 7

**Statutes**

Arizona 1901 territorial statutes, Section 391 of Title 11 ........................................................ 15

N.Y. Penal Law § 265.01-d ................................................................................................ 5, 24

N.Y. Penal Law § 265.01-e(2)(d) ........................................................................................ 5, 9

N.Y. Penal Law § 265.01-e(2)(n) ....................................................................................... 5, 22

N.Y. Penal Law § 265.01-e(2)(o) ............................................................................................ 5

N.Y. Penal Law § 265.01-e(2)(p) ............................................................................................ 5

Oklahoma 1890 territorial ordinance ................................................................................. 15, 16

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................................. 21

*Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022) ..................................................... 1

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ......................................................... 1, 4

*Antonyuk v. Hochul*, 635 F. Supp. 3d 111 (N.D.N.Y. 2022) ................................................... 3

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) ......................................... 3, 5, 21, 22

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ........................................................... passim

*Antonyuk v. James*, 144 S. Ct. 2709 (2024) .......................................................................... 4

*Antonyuk v. James*, 2026 U.S. Dist. LEXIS 35988 (N.D.N.Y. Feb. 23, 2026) ........................ 22

*Antonyuk v. Nigrelli*, 143 S. Ct. 481 (2023) ....................................................................... 1, 3

*Christian v. James*, 2026 U.S. App. LEXIS 14172 (2d Cir. May 18, 2026) ........................... 9, 24

*Citizens United v. FEC*, 558 U.S. 310 (2010) ....................................................................... 10

*District of Columbia v. Heller*, 554 U.S. 570 (2010) .............................................................. 7

*Dodd v. United States*, 545 U.S. 353 (2005) ....................................................................... 13

*Endo Pharms., Inc. v. Roxane Labs., Inc.*, 2014 U.S. Dist. LEXIS 160832 (S.D.N.Y. Nov. 14, 2014) .................................................................................................................................. 22

*English v. State*, 35 Tex. 473 (1872) ................................................................................... 21

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ............................................................................... 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................................ 8

*Miller v. Gammie*, 335 F.3d 889 (2d Cir. 2003) .................................................................. 17

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ............................................. passim

*Percoco v. United States*, 598 U.S. 319 (2023) ................................................................... 13

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................................................ 5

*State v. Shelby*, 90 Mo. 302 (1886) .................................................................................... 21

*Union of Needletrades, Indus. & Textile Emples. v. INS*, 336 F.3d 200 (2d Cir. 2003) ............... 17

*United States v. Hemani*, 2026 U.S. LEXIS 2559 (June 18, 2026) ...................................... passim

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) ........................................................... 5

*United States v. Rahimi*, 602 U.S. 680 (2024) ........................................................ passim
*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ................................... 5
*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988) ............................................ 13
*Wolford v. Lopez*, 125 F.4th 1230 (9th Cir. 2025) ..................................................... 25
*Wolford v. Lopez*, 2026 U.S. LEXIS 2720 (June 25, 2026) ................................... passim

**Rules**
Fed. R. Civ. P. 56(a) ................................................................................................ 5

**Other Authorities**
*Black Bear Management Plan for New York State 2014-2024*, <u>N.Y. State</u> (May 2014) .............. 11
*Bowman Lake State Park*, <u>N.Y. State</u> ........................................................................ 6
*DEC Announces Record-Breaking 2025 Bear Harvest Estimates*, <u>N.Y. State</u> (Mar. 23, 2026) .. 11
*Demographics & Geography*, <u>Village of Baldwinsville</u> ................................................. 6
*Governor Hochul Issues Response to Supreme Court Ruling Striking Down New York's Concealed Carry Restriction*, <u>N.Y. State</u> (June 23, 2022) ......................................... 1
H. Tapley, *Old Tavern Days in Danvers*, *in* 8 <u>The Historical Collections of the Danvers Historical Society</u> (1920) ......................................................................... 18
*Hunting Area*, <u>N.Y. State</u> ...................................................................................... 6
N. Struna, <u>People of Prowess: Sport, Leisure, And Labor In Early America</u> (1996) ................... 18
*Parks and Trails*, <u>Village of Baldwinsville</u> ............................................................... 6
*Thacher State Park*, <u>N.Y. State</u> .............................................................................. 6

**INTRODUCTION**

This case involves a constitutional challenge to various provisions of New York's ineptly named "Concealed Carry Improvement Act" ("CCIA"), which broadly criminalizes the Second Amendment right to bear arms in all manner of nonsensitive places that Plaintiffs and millions of other Americans frequent on a daily basis. As this Court observed nearly four years ago, the CCIA is an "unconstitutional statute" hastily enacted after the U.S. Supreme Court's landmark *Bruen* decision. *Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 247 (N.D.N.Y. 2022). Indeed, moments after the Supreme Court decided *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), striking down New York's discretionary firearms licensing regime, state politicians decried the decision as "reprehensible," vowing to resist the "insanity" of "gun culture" that apparently "possessed … the Supreme Court."[1] Thus, rather than follow *Bruen*, New York transparently enacted the CCIA to prevent ordinary citizens from publicly carrying firearms for self-defense.

In 2023, and again in 2024, a panel of the Second Circuit rejected portions of this Court's "thorough opinion,"[2] vacating this Court's preliminary injunction against several of the CCIA's most onerous provisions, while affirming this Court's injunction as to other provisions. *See Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024). In these interlocutory decisions, and contrary to *Bruen*'s instruction to focus on the *Founding era*, the Second Circuit upheld many of the CCIA's locational restrictions with a hodgepodge *Reconstruction-era* "tradition" of banning firearms wherever people congregate. *Contra Bruen*, 597 U.S. at 37 ("generally assum[ing] … 1791" is the operative time period); *id.* at 31 (warning "there is no historical basis for New York to effectively declare the island of

---

[1] *Governor Hochul Issues Response to Supreme Court Ruling Striking Down New York's Concealed Carry Restriction*, N.Y. State (June 23, 2022), https://tinyurl.com/43ns6xk8.

[2] *Antonyuk v. Nigrelli*, 143 S. Ct. 481, 481 (2023) (Alito & Thomas, JJ., respecting denial of application to vacate stay).

1

Manhattan a 'sensitive place' simply because it is crowded").  But since then, this Court's original analysis has only been vindicated by subsequent Supreme Court decisions.  *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("'apply[ing] faithfully the balance struck by the founding generation to modern circumstances'"); *United States v. Hemani*, 2026 U.S. LEXIS 2559, at *14 (June 18, 2026) (grounding historical analysis "at the founding"); *Wolford v. Lopez*, 2026 U.S. LEXIS 2720, at *8 (June 25, 2026) (reaffirming "the right of Americans to carry arms for self-defense as they go about their daily lives").  Thus, although this Court is bound by certain erroneous conclusions in the Second Circuit's decision, other portions of the Second Circuit's "very early" analysis, which admittedly "[wa]s not a full merits decision" (*Antonyuk*, 120 F.4th at 1048 n.126), should be revisited in light of intervening Supreme Court decisions, together with the more fulsome record that the parties have now fleshed out.  Indeed, the Second Circuit made repeated efforts to acknowledge that its opinion was preliminary in nature and based on an incomplete record.  *See, e.g.*, *id.* at 1029, 1047 n.123.  With that in mind, Plaintiffs now move for summary judgment on the CCIA's ahistorical public carry bans in 1) public parks, 2) restaurants that serve alcohol, 3) theaters, 4) zoos, 5) non-secure areas of airports, and 6) private property.

### PROCEDURAL HISTORY

Plaintiffs Ivan Antonyuk, Corey Johnson, and Alfred Terrille, together with former Plaintiffs Joseph Mann, Leslie Leman, and Lawrence Sloane, originally filed this action on September 22, 2022.  *See* Complaint, Dkt. No. 1.  That same day, Plaintiffs filed a motion seeking to enjoin enforcement of the newly enacted CCIA.  *See* Dkt. No. 6.  One week later, this Court held oral argument on Plaintiffs' motion and, on October 6, 2022, this Court temporarily restrained enforcement of various CCIA provisions, including its restrictions on firearms in certain so-called "sensitive locations" such as public parks and restaurants that serve alcohol, as well as "restricted

locations," the CCIA's term for private property within the state. *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 150-52 (N.D.N.Y. 2022). The State Defendants immediately appealed this Court's Order to the Second Circuit, Dkt. No. 28, which granted the State Defendants an "interim stay." *See* No. 22-2379 (2d Cir.), Doc. No. 39. This Court held argument on Plaintiffs' Motion for Preliminary Injunction on October 25, 2022, and on November 7, 2022, granted in part and denied in part Plaintiffs' motion for an injunction. *See* Dkt. No. 78. In addition to preliminarily enjoining the CCIA's "good moral character" and social media disclosure requirements for licensing, this Court again enjoined enforcement of various "sensitive location" restrictions, including public parks, restaurants that serve alcohol, theaters, zoos, airports (assuming federal compliance), and "restricted locations." *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 349 (N.D.N.Y. 2022).

The State Defendants again appealed on November 8, 2022, Dkt. No. 80, filing a stipulation of voluntary dismissal of their previous appeal on November 9, 2022. *See* No. 22-2379 (2d Cir.), Doc. No. 74. Then-Syracuse Police Chief Cecile filed a later appeal on November 18, 2022. Dkt. No. 87. Thereafter, the State Defendants again sought an "emergency" stay of this Court's injunction from the Second Circuit (No. 22-2908 (2d Cir.), Doc. No. 18), which the Second Circuit granted on November 15, 2022. *See id.*, Doc. No. 31. The Second Circuit then granted a full stay pending consolidated appeals on December 7, 2022. *See* No. 22-2908 (2d Cir.), Doc. No. 75.

Plaintiffs filed an application to vacate the Second Circuit's stay in the U.S. Supreme Court, which was denied on January 11, 2023. *Antonyuk v. Nigrelli*, 143 S. Ct. 481 (2023). Even so, Justices Alito and Thomas issued a statement respecting the denial of Plaintiffs' application to vacate the stay, calling this court's opinion "thorough" and opining that the CCIA "presents novel and serious questions under both the First and the Second Amendments." *Id.* at 481. The Second Circuit then heard oral argument on March 20, 2023 and issued its first opinion in this case on

3

December 8, 2023.  *See Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).  In its opinion, the Second Circuit affirmed this Court's injunction with respect to social media disclosures and "private property held open to the general public."  *Id.* at 288.  The injunction was vacated "in all other respects."  *Id.*  Plaintiffs then filed a petition for writ of certiorari to the U.S. Supreme Court,[3] which granted the petition, vacated the Second Circuit's judgment, and remanded the case "for further consideration in light of *United States v. Rahimi*, [602 U.S. 680 (2024)]."  *Antonyuk v. James*, 144 S. Ct. 2709 (2024).

But on remand, the Second largely reissued the same opinion, claiming that *Rahimi* "ha[d] little direct bearing on our conclusions."  *Antonyuk v. James*, 120 F.4th 941, 955 (2d Cir. 2024).  The Second Circuit once again affirmed as to social media disclosures and "restricted locations" only.  *Id.* at 1048.  Noting a circuit split and methodological conflicts with *Bruen*, Plaintiffs filed another petition for writ of certiorari,[4] which ultimately was denied on April 7, 2025.

Since returning to this Court, Plaintiff Leman filed a stipulation of dismissal on August 2, 2025.  *See* Dkt. No. 155.  Plaintiff Mann was dismissed by this Court's Order on February 23, 2026.  *See* Dkt. No. 170.  And Plaintiff Sloane settled his lawsuit against Defendants Doran and James on March 30, 2026, culminating in a permanent injunction against the CCIA's social media disclosure requirement.  *See* Dkt. No. 174.  The only remaining Plaintiffs are Ivan Antonyuk, Corey Johnson, and Alfred Terrille.  The remaining Defendants are Steven G. James, William Fitzpatrick, Tobias J. Shelly, Mark Rusin, and Lee C. Klindon, all sued in their official capacities.  Plaintiffs' depositions were taken in April 2026, and discovery ended on May 1, 2026.

---

[3] *See* https://tinyurl.com/26c95d9v (docketed Feb. 22, 2024).
[4] *See* https://tinyurl.com/55652w76 (docketed Jan. 27, 2025).

**LEGAL STANDARD**

Summary judgment "is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30 (2d Cir. 2012); *see* Fed. R. Civ. P. 56(a). The "constitutionality of a criminal statute," and indeed the textual and historical analysis required by *Bruen*, 597 U.S. 1, present "pure question[s] of law." *United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002).

**ARGUMENT**

**I.    PLAINTIFFS HAVE STANDING.**

By this point, Plaintiffs' standing to challenge the CCIA's carry restrictions is either well-vetted or undisputed. As relevant here, the CCIA criminalizes the possession of a firearm (even if licensed) in numerous public and private places, including in so-called "sensitive locations" such as **1)** "public parks" (N.Y. Penal Law § 265.01-e(2)(d)); **2)** "any [licensed] establishment … where alcohol is consumed" (*id.* § 265.01-e(2)(o)); **3)** "theaters" (*id.* § 265.01-e(2)(p)); **4)** "zoos" (*id.* § 265.01-e(2)(d)); and **5)** "airports" (*id.* § 265.01-e(2)(n)), as well as in **6)** "restricted locations," meaning private property absent "clear and conspicuous signage" or other "express consent … indicating that the carrying of" firearms "is permitted" (*id.* § 265.01-d(1)). Plaintiffs Antonyuk, Johnson, and Terrille desire and intend to carry firearms in each of these locations, but for Defendants' threat of criminal enforcement. Accordingly, each Plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Indeed, in an earlier opinion in this case, this Court found that Plaintiffs have standing to challenge the CCIA's restrictions in each of the above-described locations. *See Antonyuk*, 639 F.

Supp. 3d at 268 (public parks, Terrille); *id.* at 285 (restaurants that serve alcohol, Johnson & Terrille); *id.* at 286 (theaters, Terrille); *id.* at 272 (zoos, Johnson); *id.* at 283 (airports, Terrille); *id.* at 293-94 ("restricted locations," Johnson). And on appeal, the Second Circuit affirmed. *See Antonyuk*, 120 F.4th at 1015 n.76 (public parks, "[t]he State defendants do not challenge the district court's holding … and we see no impediment to standing"); *id.* at 1027 (same for restaurants that serve alcohol); *id.* at 1036 (same for theaters); *id.* at 1016 (standing as to zoos); *id.* at 960 (noting injunction was not challenged as to airports); *id.* at 1043 (standing as to "restricted locations").

Plaintiffs' declarations and recent testimony further confirm their standing. For instance, Plaintiffs Johnson and Terrille specifically describe the public parks they visit in which they wish to carry firearms. Plaintiff Johnson visits Bowman Lake State Park, "'a 966.94-acre remote sylvan retreat known as 'a camper's paradise'"[5] that allows hunting.[6] SMF ¶3, Dkt. No. 1-3 ¶9; Complaint at ¶153; Exhibit 1, Johnson Depo. at 71. Johnson also frequently fishes at Mercer Park,[7] a riverside park in Baldwinsville, Onondaga County, a village of under 8,000 people.[8] SMF ¶4, Exhibit 1, Johnson Depo. at 124:2-5. Likewise, Plaintiff Terrille often visits Thacher State Park,[9] which features "miles of limestone cliff-face, rock-strewn slopes, woodland and open fields,"[10] and also allows hunting.[11] SMF ¶18, Dkt. No. 1-10 ¶8; Complaint at ¶ 167; Exhibit 6, Response to State Defendants' First Set of Interrogatories No. 3 (Terrille "visits … Town of Colonie town park … Thatcher [sic] Park in Albany County, Saratoga Spa State Park"); Exhibit 2, Terrille Depo at 61;

---

[5] *Bowman Lake State Park*, N.Y. State, https://tinyurl.com/4ukpdj55 (last visited June 30, 2026).

[6] *Hunting Area*, N.Y. State, https://tinyurl.com/mpaka4nu (last visited June 30, 2026).

[7] *Parks and Trails*, Village of Baldwinsville, https://tinyurl.com/yk2x3pjk (last visited June 30, 2026).

[8] *Demographics & Geography*, Village of Baldwinsville, https://tinyurl.com/2zja9j23 (last visited June 30, 2026).

[9] *Thacher State Park*, N.Y. State, https://tinyurl.com/2ktnz8n8 (last visited June 30, 2026).
[10] *Id.*

[11] *Hunting Area*, N.Y. State, https://tinyurl.com/cwzcc279 (last visited June 30, 2026).

at 62 (describing Thacher Park as "rural").  *See also generally* Exhibits 4 and 5 (supplemental declarations of Johnson and Terrille).  Next, Plaintiffs Antonyuk, Johnson, and Terrille all wish to carry firearms at restaurants that serve alcohol.  *See* SMF ¶35, Exhibit 3, Antonyuk Depo. at 77-78, 80-81; SMF ¶5, Johnson Depo. at 127, 183; SMF ¶5, Dkt. No. 1-3 ¶11; SMF ¶22, Terrille Depo. at 85-86; SMF ¶22, Dkt. No. 1-10 ¶19.  The same is true with respect to theaters.  *See* SMF ¶36, Antonyuk Depo. at 102-03; SMF ¶7, Johnson Depo. at 132, 139; SMF ¶28, Terrille Depo. at 80; SMF ¶28, Dkt. No. 1-10 ¶7.  Plaintiff Johnson wishes to carry a firearm at the Rosamond Gifford Zoo in Syracuse.  *See* SMF ¶8, Johnson Depo. at 104; SMF ¶8, Dkt. No. 1-3 ¶17.  And Plaintiff Terrille wishes to bring a firearm with him to the airport, in his checked baggage.  *See* SMF ¶29, Terrille Depo. at 97; SMF ¶29, Dkt. No. 1-10 ¶¶9, 11.  Finally, in addition to wishing to carry firearms in various private businesses *open* to the public, Plaintiffs wish to carry firearms on private property *not* open to the public.  *See* SMF ¶9, Johnson Depo. at 137.  All told, Plaintiffs have standing.  *See also Antonyuk*, 120 F.4th at 1016 ("presum[ing] 'that the government will enforce [a] … recent and not moribund'" statute).  *See also generally* Exhibits 4, and 5.

## II.   NEW YORK'S NOVEL LOCATIONAL RESTRICTIONS ON THE RIGHT TO BEAR ARMS VIOLATE THE SECOND AND FOURTEENTH AMENDMENTS.

### A.  Second Amendment Methodology.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In *District of Columbia v. Heller*, 554 U.S. 570, 592 (2010), the Supreme Court explained that the Second Amendment codifies the pre-existing "individual right to possess and carry weapons in case of confrontation."  Accordingly, the Amendment protects a "general right to publicly carry arms for self-defense...."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 31 (2022).  That right is fully applicable to the states under the Fourteenth Amendment, *McDonald v.*

*City of Chicago*, 561 U.S. 742, 750 (2010), and the scope of its protections against federal and state action is "uniform." *Wolford v. Lopez*, 2026 U.S. LEXIS 2720, at *13 (June 25, 2026).

To assess the constitutionality of a firearm regulation, *Bruen* directed courts to "the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. To that end, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "the government … must demonstrate … consisten[cy] with this Nation's historical tradition of firearm regulation. Only if [it does] may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17. Here, it is undisputed that Plaintiffs' proposed course of conduct – ordinary Americans carrying ordinary handguns for ordinary self-defense in ordinary public places – is covered by the plain text. *See generally Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) (proceeding to historical analysis for each locational restriction challenged here, except airports which was not appealed). First, as law-abiding Americans, Plaintiffs belong to "the people." *See Bruen*, 597 U.S. at 31-32. Second, Plaintiffs' handguns unquestionably are "Arms." *See id.* at 32. And third, the Second Amendment's plain text "naturally encompasses public carry." *Id.* Any further analysis is "out of place at *Bruen*'s first step," the challenged CCIA provisions are "presumptively unconstitutional," *Wolford*, 2026 U.S. LEXIS 2720, at *27, *14, and Defendants bear the burden to show otherwise.

Defendants will be unable to bear their historical burden here. Although the Second Circuit has held that firearm regulations from "1868 and 1791 are both focal points of our analysis," *Antonyuk*, 120 F.4th at 972, the Supreme Court consistently has grounded its Second Amendment decisions in *Founding-era* understandings, with later, "19th-century evidence … 'treated as mere confirmation of what the Court thought had already been established.'" *Bruen*, 597 U.S. at 37; *accord United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("'apply[ing] faithfully the balance

8

struck by the founding generation to modern circumstances'"); *United States v. Hemani*, 2026 U.S. LEXIS 2559, at *14 (June 18, 2026) (analyzing "the founding and … the decades following it"). Thus, even if the Reconstruction era is *a* "focal point" in this Circuit, this Court need only 'focus' on that time period insofar as it "'mere[ly] confirm[s] … what the Court thought had already been established'" at the Founding.  *Bruen*, 597 U.S. at 37.  On the other hand if, as here, nothing is "established" at the Founding, then there is nothing for a Reconstruction era tradition to "confirm."

**B.  The CCIA's Restrictions Are Unconstitutional.**

1.    **Parks.**  The CCIA criminalizes the carry of firearms in any "public park," except that the term "shall not include (i) any privately held land within a public park not dedicated to public use or (ii) the forest preserve …."  N.Y. Penal Law § 265.01-e(2)(d).  The Second Circuit theorized that this provision reaches both "*urban* parks" and "*rural* parks" – without fully defining or explaining the distinction.  *Antonyuk*, 120 F.4th at 1019.  Then, claiming the existence of a historical tradition of "regulating firearms in quintessentially crowded areas and public forums, at least insofar as the regulation prohibits firearms in *urban* parks," the Second Circuit facially upheld this portion of the CCIA while indicating implicitly that an as-applied challenged might succeed. *Id.*; *see also Christian v. James*, 2026 U.S. App. LEXIS 14172, at *5 (2d Cir. May 18, 2026) ("declin[ing] to address any as-applied challenge … to the extent it applies to rural parks, because [those] Plaintiffs failed to raise that challenge in the district court").

But while Plaintiffs here did not specifically seek relief as applied to "rural parks" in their motion for preliminary relief – indeed, that distinction did not exist until the Second Circuit created it on appeal – Plaintiffs clearly have challenged the CCIA's parks ban *both facially and also as applied*.  *See* Complaint ¶245, Dkt. No. 1 ("the New York laws … violate the Second Amendment … both facially and as applied to Plaintiffs").  Plaintiffs' Complaint, declarations, and depositions

9

specifically describe their intent to visit state parks that clearly count as "rural parks." *See* citations in Section I, *supra*; *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges … goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."). Thus, if this Court does not grant facial relief against the CCIA's parks ban then, at a minimum, this Court should grant Plaintiffs relief as-applied to Bowman Lake State Park and Thacher State Park (and perhaps others), which clearly would count as rural parks. And further, because it is impossible to judicially line-draw some "as applied" urban-rural distinction into the statute, or to decide where along the spectrum (much less on which side of some arbitrarily declared dividing line) suburban parks like Mercer Park and various portions of Saratoga Spa State Park fall, this Court should strike the parks provision in its entirety, or at least as applied to all parks that do not clearly constitute "urban parks" or "public squares" or "city parks." *Antonyuk*, 120 F.4th at 1019, 1024.

Consider the historical issues the Second Circuit already highlighted. The panel "doubt[ed] that the evidence presently in the record could set forth a well-established tradition of prohibiting firearm carriage in rural parks...." *Antonyuk*, 120 F.4th at 1025. Indeed, in the panel's view, "rural parks much more resemble the commons of yore than the historical and often-crowded public squares … regulated under the State's historical analogues." *Id.* These sorts of "rural parks" may feature "'vast forests, rolling farmlands, towns and villages, mountains and valleys, lakes, ponds and free-flowing rivers...." *Id.* Indeed, such places often constitute vast expanses of wilderness, at times preserved in largely the same form as the Founding generation would have experienced them. And since the Founding largely consisted of large numbers of people walking around the woods carrying guns, it is impossible to see how the State might establish a historical tradition of

*banning the very same thing* now.[12]  As the Second Circuit explained, "the more proper analogue for rural parks based on the record … appear[ed] to be 'commons' and 'wilderness areas'" where firearms were never restricted.  *Id.*  Thus, banning firearms in so-called "rural parks" is *ahistorical and unconstitutional*, even under the Second Circuit's approach to *Bruen*.

Of course, that presents a "line-drawing issue" (*Antonyuk*, 120 F.4th at 1025) – one that was not addressed above but will need to be addressed here.[13]  The Second Circuit indicated that the "Adirondack Park … 'one-third of the total land area of New York State'" – certainly was a "rural park" (*id.*) on one side of the urban-rural spectrum, where the CCIA's carry ban is unconstitutional.  Meanwhile, on the other side of the Second Circuit's spectrum are "often-crowded public squares" and "city parks" are allegedly "urban parks" where a carry ban might be upheld.  *Id*. at 1019, 1024.  But the parks Plaintiffs frequent involve neither extreme.  For example, Bowman[14] and Thacher[15] State Parks represent approximately 1,000 and 2,400 acres, respectively.  Bowman State Park is located in Chenango County, which has one of the lowest population densities in New York State (52.84 persons per square mile).[16]  This makes those parks

---

[12] During appellate oral argument, Second Circuit Judge Lynch theorized that there are "certainly bears" found in public parks against which an ordinary person might need to defend.  *See* https://ww3.ca2.uscourts.gov/audio/22-2908.mp3 at 11:10 ("I feel much safer in the streets of Manhattan than in some of these places, because that's where I come from and I'm used to it. … It seems to me that going out in the wilderness armed … there's some attraction to that, if I ever went in the wilderness...").  Indeed, "[b]ears now occupy most areas of the state except Long Island and New York City, and all areas of the state are open to bear hunting except Long Island and areas closed to big game hunting." *See DEC Announces Record-Breaking 2025 Bear Harvest Estimates*, N.Y. State (Mar. 23, 2026), https://tinyurl.com/mh6fxsrb.  It is estimated that New York has, "at a minimum[,] … 6,000-8,000 bears...." *See Black Bear Management Plan for New York State 2014-2024*, N.Y. State (May 2014), https://tinyurl.com/566ebmej, at 14.  A bear might be a rare sight in a city square, but hardly would be out of place in the parks Plaintiffs frequent.

[13] Defendants' experts have not even attempted to provide guidance on that front, offering no evidence or testimony as to what might be considered a "rural" park versus an "urban" park.

[14] https://parks.ny.gov/visit/state-parks/bowman-lake-state-park.

[15] https://www.openspaceinstitute.org/places/john-boyd-thacher-state-park.

[16] https://pad.human.cornell.edu/maps2020/maps/PopulationDensityAtlas2020.pdf.

11

undoubtedly rural – hardly places which could be construed to be a "public forum [or] quintessentially crowded place[]" (*Antonyuk* at 1019) – yet they are nowhere near the Adirondack Park's 2.6 million acres of public lands.[17]  Nevertheless, this Court should – at a minimum – find them to be akin to "rural parks" and grant Plaintiffs relief as applied to them.  *See* Second Circuit Oral Argument at 11:45 (State counsel conceding that "there may be room for an as-applied challenge," but theorizing that Plaintiffs were not seeking that at the preliminary stage).

Plaintiff Johnson's Mercer Park sits between the two extremes.  Merriam-Webster defines "rural" as "of or relating to the country, country people or life, or agriculture."[18]  But that is of little help.  Mercer Park is neither a vast, uninhabited rural expanse, nor an urban city basketball court hemmed in by downtown office buildings.  Rather, it is situated at the end of a cul-de-sac in a quintessentially _sub_urban neighborhood with single family homes and backyards with swimming pools.  And what about Saratoga Spa State Park?  It is comprised of "roughly 2,500-acre[s]" and was recently expanded by "79 acres" to "preserve wetlands, forest and open space for wildlife and future park uses."[19]  But along with those vast open spaces, the park also houses swimming pools, a golf course, seasonal ice skating, and a range of other outdoor spaces.[20]  Does that make these parks "often-crowded … *city* parks," or more resembling the "vast forests, rolling farmlands" of *rural* parks?  *Antonyuk*, 120 F.4th at 1025-26.  Is there a building height requirement, population density, vehicle traffic, or other numerical threshold that renders such a park sufficiently "urban" or "rural" under the statute?  Does the presence of cows – versus public transportation – within a half-mile radius change the calculus?  Who knows – and that is the point.  Either way, attempting to line-draw between and among all of the State's different sorts of park spaces is not the job of

---

[17] https://visitadirondacks.com/about/adirondack-park.
[18] https://www.merriam-webster.com/dictionary/rural.
[19] https://tinyurl.com/298ua5d8.
[20] https://parks.ny.gov/visit/state-parks/saratoga-spa-state-park#amenities.

this Court, because a legislature may not "give the Judiciary uncut marble with instructions to chip away all that does not resemble David." *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch & Thomas, JJ., concurring in the judgment). Because this Court has no authority to enact the sort of fact-sensitive statute that a legislature may, it cannot blue pencil the statute.

Indeed, no court can "rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988). Thus, "even assuming the [Second Circuit's] reading would eliminate [Second] Amendment problems, we may adopt it only if we can see it in the statutory language. And we cannot. … The statute as written does not draw the line at [urban or rural]. … Rather, to cut the statute off where … urge[d] is not to interpret the statute Congress enacted, but to fashion a new one." *Iancu v. Brunetti*, 588 U.S. 388, 397-98 (2019). And "[w]hen the statute's language is plain, the sole function of the courts … is to enforce it according to its terms." *Dodd v. United States*, 545 U.S. 353, 359 (2005). Here, the statute restricts "public parks" without saying more. And while the Second Circuit found that the parks ban "has a plainly legitimate sweep as to urban parks" (*Antonyuk* at 1019), it also noted that this Court's task could include "line-drawing" on remand (*id*. at 1026). Even if the public parks restriction has a "plainly legitimate sweep," it is impossible for this Court to *determine precisely what that "sweep" is*. And for that reason, the parks ban must be invalidated in its entirety. Alternatively, and at a minimum, this Court should grant Plaintiffs as-applied relief at the rural and suburban parks where they desire and intend to carry their firearms.

**2.    Places that Serve Alcohol.** The Second Circuit vacated this Court's preliminary injunction as to places that serve alcohol on two grounds, "not limited to persons who have been served and/or who are consuming alcohol." *Id*. at 2018. First, the court found that that "crowded space analogues justify prohibiting firearms in heavily trafficked places" as a general category,

13

and second, that "intoxicated-persons analogues justify prohibiting firearms to intoxicated persons who cannot be trusted with weapons." *Antonyuk*, 120 F.4th at 1031.  Together, the Second Circuit claimed, these historical laws "justify regulating firearms [as to everyone] in crowded spaces in which intoxicated persons are likely present," such as restaurants that serve alcohol.  *Id.*  But the Second Circuit's admittedly "very early" analysis – which it made clear was "not a full merits decision" and was based only upon "the record before us" at the time (*id.* at 1048 n.126, 1029) – should be revisited here, for three reasons.  First, Plaintiffs now show that the territorial laws critical to the Second Circuit's analysis in fact were "short lived" and "did not survive … admission" to statehood," *Bruen*, 597 U.S. at 69, rendering them inapplicable under the Second Circuit's own telling.  Second, the Supreme Court's recent *Wolford* decision abrogates and implicitly overrules the Second Circuit's analysis as to "crowded spaces."  And third, the Supreme Court's recent *Hemani* decision repudiates notion that persons can be disarmed when they are not presently intoxicated.  All told, this Court's original opinion has aged quite well in light of these new developments, while the Second Circuit's opinion has spoiled.  For the reasons below, this Court should enter judgment against the CCIA's ban on firearms in places that serve alcohol.

**Territorial Laws.**  At the outset of its *preliminary* analysis, the Second Circuit faulted this Court for discounting Defendants' territorial laws from 1889 Arizona and 1890 Oklahoma. *Antonyuk*, 120 F.4th at 1029.  These territorial laws were critical to the Second Circuit's analysis – *the only* "dead ringer[s]" (*Bruen*, 597 U.S. at 30) for the CCIA's ban on restaurant carry which disarmed patrons regardless of whether they were intoxicated.  Indeed, while *four* of Defendants' laws prevented only the *presently intoxicated* from either purchasing or carrying firearms *while intoxicated*, only the two territorial laws went further, prohibiting firearms in "drinking saloon[s]"

14

(1889 Arizona[21]) and "any place where intoxicating liquors [we]re sold" (1890 Oklahoma[22]). *Antonyuk*, 120 F.4th at 1030. And, despite *Bruen*'s rejection of the very same sort of territorial ordinances, the Second Circuit credited the Arizona and Oklahoma laws towards its historical tradition, claiming that "[t]he circumstances leading to the Court's cautions in *Bruen*" regarding territorial laws "are not present here," because "*there is no evidence in the record before us* that the territorial laws [i] were short-lived, [ii] did not survive admission to the Union, or [iii] were later held unconstitutional." *Id.* at 1029 (emphasis added). In so holding, the Second Circuit implied that, were such considerations present, the ordinances could not provide historical support.

Upon review, that proves to the be the case. In fact, *both* of these territorial laws were short-lived, and *neither* survived statehood by more than a short period, rendering these transient ordinances inapposite for precisely the same reasons *Bruen* (and this Court) originally articulated. First, consider Arizona's 1912 statehood. In a 1901 territorial statutory compilation, Section 391 of Title 11 of the Penal Code contained the "drinking saloon[s]" analogue the Second Circuit cited.[23] But immediately following its 1912 statehood and statutory recodification into Title 12, the "drinking saloon[s]" section *disappeared* from Arizona's 1913 statutory compilation.[24] In contrast, the nearest neighbors of Section 391 in 1901 – Sections 390 and 392 – each reappeared as neighboring provisions in 1913, having been recodified as Sections 431 and 432, respectively. But Section 391 is conspicuously missing. In other words, the "drinking saloon[s]" section was *specifically repealed upon statehood*.[25] The Arizona ordinance thus lasted only 24 years, hardly a

---

[21] *See* https://firearmslaw.duke.edu/laws/act-of-mar-18-1889-1889-ariz-sess-laws-16-17.
[22] *See* https://firearmslaw.duke.edu/laws/1890-okla-laws-495-art-47.
[23] https://tinyurl.com/bdrwntyj at 1253.
[24] *See* https://tinyurl.com/mwyyvyec at 91.
[25] Indeed, as Section 1487 of the 1913 compilation explained, "[a]ll statutes contained in that portion of the book of statutes known as the Revised Statutes of Arizona, 1901, designated as the Penal Code, … *are hereby repealed* … the foregoing sections contained in this act *shall take the place of the ones hereby repealed*." https://tinyurl.com/mwyyvyec at 282 (emphases added).

15

longstanding tradition of anything. The same was true for Oklahoma which, after enacting its 1890 ordinance, joined the Union in 1907. And soon thereafter, in Section 2551 of Oklahoma's 1910 statutory compilation, the legislature explicitly *removed* "[r]eference to 'any place where intoxicating liquors are sold'" from the new state's "[p]ublic buildings and gatherings" carry ban, noting that the "intoxicating liquors" provision was thereby "stricken" from the statute.[26] The Oklahoma ordinance thus had an even shorter lifespan – 20 years – than the Arizona ordinance. Thus, contrary to the Second Circuit's preliminary finding based on the limited record before it, the Arizona and Oklahoma laws were "short-lived" and "did not survive admission to the Union." Since *Bruen*'s cautions "are … present here," this Court should reject those ordinances accordingly, as the Second Circuit's opinion all but invites. *Antonyuk*, 120 F.4th at 1029.

The Second Circuit's remaining analogues – *five* of which disarmed only intoxicated persons (*id*. at 1030), the *rest* of which involved only "crowded" and "heavily-trafficked spaces" generally (1031), and *none of which* disarmed all persons regardless of their intoxication status – likewise fail under the Supreme Court's recent precedents.

***Wolford v. Lopez.*** For instance, the Second Circuit claimed laws "prohibiting carriage in heavily-trafficked spaces" as part of its historical tradition. *Antonyuk*, 120 F.4th at 1031 (citing "crowded space analogues"). But that supposed principle cannot be reconciled with *Bruen* or *Wolford*'s plain terms. As *Bruen* already explained, "*there is no historical basis* for … a 'sensitive place' *simply because it is crowded*...." *Bruen*, 597 U.S. at 31 (emphases added). Indeed, reading historical regulations "at such a high level of generality … waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). Thus, *Wolford* recently rejected a Hawaii law that banned

---

[26] https://tinyurl.com/3j66wzxj at 629.

firearms in "gas stations, convenience stores, restaurants,[27] coffee shops, drug stores, grocery stores, 'big box' stores, home improvement stores, barber shops or hair salons, dry cleaners, and laundromats." *Wolford*, 2026 U.S. LEXIS 2720, at *8. All of those locations are quintessentially "crowded" and "heavily-trafficked" public places – the very same sorts of places where the Second Circuit erroneously found that firearms can be banned – and yet the Supreme Court held that the government cannot ban firearms in them, declaring broadly that "the Second Amendment protects[] the right of Americans to carry arms for self-defense as they go about their daily lives." *Id.* The Second Circuit's prior opinion simply cannot be reconciled with *Wolford*. Thus, this Court should follow *Wolford* because it has implicitly overruled the Second Circuit's reasoning. This Court should reject any purported historical tradition of banning guns in "crowded" places.[28]

**United States v. Hemani.** The Second Circuit's five remaining analogues involved disarming intoxicated persons, but did not apply to those not consuming alcohol. *See id.* at 1030 (Kansas, Wisconsin, Missouri, Mississippi, *State v. Shelby*). Of course, this is the as-applied challenge Plaintiffs brought from the very start, and so they support no more than a ban on behavior that Plaintiffs have disclaimed. *See* Compl., ECF #1, ¶¶99, 155, 176; ECF # 69 at 35: ("No Plaintiff asks the Court to authorize drunk carry…."); ECF # 71 at 1 ("not asking the Court to 'approve' carrying while intoxicated."); Exhibit 1, Johnson Depo. at 127:19-22 ("I do not drink

---

[27] In explaining that the government cannot ban guns in public places like "restaurants," *Wolford* never limited its holding to restaurants *that do not serve alcohol*. Indeed, most restaurants do. Thus, Plaintiffs believe that *Wolford* has overruled the Second Circuit in this case when it comes to its sanctioning the CCIA's gun ban *as applied to restaurants that serve alcohol*.

[28] At a minimum, Plaintiffs preserve the issue for appeal, as "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should … reject the prior circuit opinion as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003); *see also Union of Needletrades, Indus. & Textile Emples. v. INS*, 336 F.3d 200, 210 (2d Cir. 2003) (court must follow precedent except "where there has been an intervening Supreme Court decision that casts doubt on our controlling precedent. … for this exception to apply, the intervening decision need not address the precise issue already decided by our Court.").

when I'm carrying my firearm."); Exhibit 2, Terrille Depo. at 86:13-17 (never drinks alcohol). This Court should grant Plaintiffs relief as applied to those who are not intoxicated.

*United States v. Hemani* provides further support, having rejected prosecution of a regular marijuana user in spite of historical laws regulating "habitual drunkards." *Hemani*, 2026 U.S. LEXIS 2559, at \*14-15. Critically, the Court explained, the government produced no evidence that Mr. Hemani was "presently intoxicated" during firearm possession. *Id.* at \*30. It follows that, if a regular drug user cannot be prohibited from possessing a firearm when not intoxicated, then Plaintiffs – who wish to carry firearms *while sober* – cannot either.[29]

**3.      Theaters.** Although agreeing that Plaintiffs have standing to pursue their challenge, the Second Circuit vacated this Court's injunction as to theaters, asserting at the "high[est] level of generality" (*Rahimi*, 602 U.S. at 740 (Barrett, J., concurring)) that the CCIA's

---

[29] For reason already briefed, the 19th-century historical laws cited in the Second Circuit's opinion do not justify the CCIA's restaurant carry ban under *Bruen* and its progeny. *See* Plaintiffs' Answering Brief to State, Document 202, at 43-47. First, none dates to the Founding, the primary time period for historical analysis. Second, only "six analogues, which applied to nine-and-a-half percent of Americans by 1889" (*Antonyuk*, 120 F.4th at 1030), are definitional *outliers* that applied only to a small minority of Americans and did not evince a *national* tradition. And third, aside from short-lived territorial restrictions, none of these laws banned public carry in locations by *sober* individuals; they reached intoxicated persons only and therefore fail *Bruen*'s "how." Not to mention, Plaintiffs already have briefed the extensive historical tradition of early Americans ubiquitously carrying firearms in all manner of places that served alcohol – and getting quite drunk in the process. *See* Plaintiffs-Appellees' Answering Brief to Defendant-Appellant Cecille at 27-29. Indeed, it was so common for patrons of taverns to carry their firearms that taverns typically had "hooks to hang firearms" on (H. Tapley, *Old Tavern Days in Danvers*, in 8 The Historical Collections of the Danvers Historical Society 1, 1 (1920)), and taverns regularly hosted shooting matches (N. Struna, People of Prowess: Sport, Leisure, And Labor In Early America 152 (1996)). *Hemani* confirms that tradition, explaining that most of the Framers "drank regularly," including John Adams who "took 'a tankard of hard cider' with his 'daily breakfast,'" James Madison who "consumed a pint of whiskey daily," and George Washington who "often drank three glasses of madeira in the evening." 2026 U.S. LEXIS 2559, at \*18-19. If the Framers remained armed while *drunk*, there can be no historical tradition prohibiting a *sober* dinner with family while armed.

ban on carrying a firearm in a theater is "consistent with" the "tradition of regulating firearms in quintessentially crowded places." *See Antonyuk*, 120 F.4th at 1038. But the Second Circuit's analysis was based on the repudiated theory that firearms can be banned in "quintessentially crowded social places" as a general category. *Id.* at 1037. Indeed, as discussed *supra*, both *Bruen* and now *Wolford* have rejected that notion. *Bruen*, 597 U.S. at 31 (courts cannot declare "a 'sensitive place' simply because it is crowded"); *Wolford*, 2026 U.S. LEXIS 2720, at *8 (striking a ban on firearms in quintessentially crowded places like "restaurants" and "'big box' stores"). And on closer examination, the Second Circuit's analogues evince no such tradition.

First, the Second Circuit relied on "going armed" laws from 1382 (England[30]), 1786 (Virginia), and 1792 (North Carolina). *Antonyuk*, 120 F.4th at 1037. But that category of early law restricted only certain types of *activities* while armed, the modern-day equivalent of brandishing, which definitionally occurs with openly carried firearms – since the public cannot be in "terror" of a *concealed* firearm. Indeed, as the Supreme Court has subsequently explained, "going armed" laws were "a particular subset of the ancient common-law prohibition on affrays" – the act of "fighting in public" or "disrupt[ing] the public order" by wielding weapons in a manner that "'terrif[ied] the good people of the land.'" *Rahimi*, 602 U.S. at 697; *accord id.* at 770 (Thomas, J., dissenting) (Affray laws "regulated a niche subset of Second Amendment-protected activity, … prohibit[ing] only carrying certain weapons … in a particular manner ('terrifying the good people of the land' without a need for self-defense) and in particular places (in public)."). The Court's

---

[30] The Second Circuit rejected *Bruen*'s rejection of the English Statute of Northampton, claiming it had been offered "as an analogue for a broad prohibition on public carriage generally, not as offered here for a specific prohibition on carriage in confined, crowded spaces." *Antonyuk*, 120 F.4th at 1039 n.115. But *Bruen* did not draw any such distinction when it rejected the 1328 statute, not to mention the Court rejected the notion that a legislature can declare "a 'sensitive place' simply because it is crowded." 597 U.S. at 31. Either way, at worst Plaintiffs respectfully preserve this issue for purposes of further appeal.

19

subsequent explanation in *Rahimi* undermines the Second Circuit's claim that such analogues can support flat bans on the *peaceable* carry of *concealed* firearms.  At bottom, affray laws serve as no analogues for prohibiting the concealed carry of firearms for self-defense – whether generally, or in any particular public place.  Moreover, it does not matter if the "going armed" laws "*evolved over the years* between the Founding and Reconstruction toward … prohibit[ing] firearms in quintessentially crowded places absolutely...." *Antonyuk*, 120 F.4th at 1039 (emphasis added).  In fact, *evolution* demonstrates the *opposite* of a Founding-era historical tradition.

Next, the Second Circuit relied on five laws purportedly banning firearms in "crowded places such as assemblies." *Antonyuk*, 120 F.4th at 1037 (1869 Tennessee, 1870 Texas, 1883 Missouri, 1889 Arizona, and 1890 Oklahoma).  But as discussed *supra*, the Oklahoma and Arizona territorial laws were short-lived and did not survive admission to statehood, and they therefore fail as analogues under *Bruen*.  Moreover, each law postdates the Fourteenth Amendment's incorporation of the Second Amendment against the states and fails to evince a *Founding-era* tradition.  *See Bruen*, 597 U.S. at 37 ("mere confirmation").  Next, the Tennessee and Texas laws covered only "5.3 percent of the population" nationwide.  *Antonyuk*, 120 F.4th at 1038 n.113. *Bruen* already discounted a law covering *6.5 percent* of one state's population, finding it to offer no proof that that state itself had a tradition restricting public carry.  *Bruen*, 597 U.S. at 69-70. Next, the Second Circuit discounted historical silence (*Antonyuk*, 120 F.4th at 1038 n.112), but the "best evidence" of a historical tradition is "historical analogues." *Wolford*, 2026 U.S. LEXIS 2720, at *15.  Finally, the Second Circuit cited three court cases upholding the Missouri, Texas, and Tennessee laws. *Antonyuk*, 120 F.4th at 1038.  But the Missouri and Tennessee cases claimed the Second Amendment was inapplicable because it applied only to the *federal government*.  *State v. Shelby*, 90 Mo. 302, 304 (1886); *Andrews v. State*, 50 Tenn. 165, 175 (1871).  And the Texas case

20

interpreted the Second Amendment as protecting military weapons only, and held the state constitution to allow regulation in public assemblies. *English v. State*, 35 Tex. 473, 478-79 (1872). Thus, because those opinions completely misunderstood the scope of Second Amendment rights in the first place, they can offer no analogue for the challenged statute today. All told, the historical record does not support banning firearms in theaters, and the Second Circuit's paltry historical record has been undermined by subsequent Supreme Court pronouncements. This Court should follow the nation's *highest* Court. At a minimum, Plaintiffs preserve the issue for appeal.

      **4.**      **Zoos.** On appeal, the Second Circuit claimed a historical tradition supporting the CCIA's firearm ban in zoos, likening zoos to 1) "places of educational and scientific opportunity," 2) "places heavily trafficked by children," and 3) "places that are densely crowded."[31] *Antonyuk*, 120 F.4th at 1027. Of course, articulating supposed historical principles "at such a high level of generality … waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). Taken to its logical conclusion here, the Second Circuit's conclusion would justify banning the Second Amendment in nearly all public places.[32] This Court already concluded as much and rejected those implications. *Antonyuk*, 639 F. Supp. 3d at 326-27. But if this Court finds itself bound by the Second Circuit's reasoning,[33] Plaintiffs respectfully disagree. Even so, three points bear emphasis.

      *First*, the Second Circuit's citation to 1869 Tennessee, 1870 Texas, 1883 Missouri, 1889 Arizona, and 1890 Oklahoma laws in support of banning firearms in "spaces that provide

---

[31] Crowds, and vulnerable or impaired persons, have *always* existed. *See* Plaintiffs' Answering Brief to New York State, Document 262, at 51.

[32] *See* Plaintiffs' Answering Brief to Chief Cecile, Document 202, at 20-23 (explaining the preposterous logic of a "tiny speck of real estate" on zoo property turning the entire zoo into a "sensitive place.").

[33] *But see Endo Pharms., Inc. v. Roxane Labs., Inc.*, 2014 U.S. Dist. LEXIS 160832, at *5 (S.D.N.Y. Nov. 14, 2014) ("It is less clear … whether an appeals court's conclusions in reviewing the denial of a preliminary injunction have a preclusive effect on those same issues in the lower court.").

educational opportunities" fails under *Bruen* and its progeny for lack of a Founding-era basis. *Second*, the Second Circuit's reliance on "*Bruen* for … the tradition of regulating firearms in spaces frequented by children" is belied by *Bruen* itself, which noted the Reconstruction-era practice of teachers carrying weapons *to schools* "to defend themselves and their communities." *Bruen*, 597 U.S. at 61.  *Third*, and again, governments cannot declare "a 'sensitive place' simply because it is crowded...."  *Bruen*, 597 U.S. at 31; *see also Wolford*, 2026 U.S. LEXIS 2720, at *8 (striking crowded place locational restrictions).  Thus, each of the historical principles the Second Circuit previously (and preliminarily) identified fail to support the CCIA's firearm ban in zoos.

     **5.**     **Airports.**  This Court previously enjoined enforcement of N.Y. Penal Law § 265.01-e(2)(n) as applied to airports, finding a lack of historical tradition to support a ban on "law-abiding license holders … who merely want to bring their unloaded, locked, stored and declared firearm into the airport in a soon-to-be *checked* luggage bag in compliance with Federal Aviation Administration regulations...."  *Antonyuk*, 639 F. Supp. 3d at 331.  This part of the Court's injunction was not appealed.  *See Antonyuk*, 120 F.4th at 960.  Even so, in what appears to be something of an oversight akin to a scrivener's error, the Second Circuit "vacate[d] the injunction in all … respects" other than those portions it explicitly affirmed.  *Id.* at 1048.  Since then, the parties have disputed whether this vacatur applied to that portion of this Court's injunction that reached airports.  *See Antonyuk v. James*, 2026 U.S. Dist. LEXIS 35988, at *4 (N.D.N.Y. Feb. 23, 2026) (acknowledging Second Circuit's holding).  But either way, that portion of this Court's preliminary order was never appealed, and its reasoning has not been challenged and therefore stands.  This Court should reinstate its injunction and enter judgment for Plaintiffs on this issue.[34]

---

[34]    As Plaintiff Terrille explained at his deposition, given the lingering questions surrounding the issue, including whether the Second Circuit vacated this Court's injunction as to airports, he never took his trip to Tennessee.  Exhibit 2, Terrille Depo at 97:13-16 (there "was no clarity as far as going into a government facility.  So I did not – I did not want to be arrested.").

6.        **Private Property**.  Plaintiffs challenge the CCIA's default rule against firearms on all private properties ("restricted locations") under both the First and Second Amendments.  *See Antonyuk*, 639 F. Supp. 3d at 294, 339-47.  Previously, this Court found "Plaintiffs had standing to challenge this provision" on both grounds and, on appeal, the Second Circuit agreed, analyzing the Second Amendment only.[35]  *Antonyuk*, 120 F.4th at 1042.  As the Second Circuit found, Plaintiffs' harm flows from the CCIA's "criminally enforceable presumption against carriage," not property owners themselves.  *Id.* at 1043.  Ultimately, the Second Circuit affirmed this Court's injunction with respect to private properties open to the public under the Second Amendment, but did not reach the issue of private property not open to the public.

**Private properties open to the public.**  Plaintiffs are entitled to judgment as it relates to private property open to the public.  The Supreme Court has definitively decided the issue in

---

However, Terrille also explained that he continues to desire to "bring[] a firearm in checked luggage in compliance with T.S.A. regulations…." *Id.* at 98:15-20.  And as now explained in his supplemental declaration, Terrille intends to make future trips which will require airplane flights, both a recently planned trip in the coming few months, and also repeatedly into the future.  *See* Terrille Supplemental Declaration, Exhibit 5 at ¶15.

[35]  The Second Circuit "confess[ed] to a certain skepticism" about Plaintiffs' First Amendment compelled-speech argument (*id.* at 1048 n.125) but did "not address" (*id.*) Plaintiffs' claim.  Plaintiffs adopt their prior compelled-speech arguments here.  The CCIA's "restricted locations" provision compels Plaintiff Antonyuk either to "post a sign" (a form of speech) or otherwise stand "outside [his home] 24 hours a day" to "provide express consent" (a form of speech) in order to "allow carry on his property...." Dkt. No. 6-1 at 12.  Of course, "compelled statements of fact … like compelled statements of opinion, are subject to First Amendment scrutiny," *Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47, 62 (2006), and "the Supreme Court has consistently 'prohibit[ed] the government from telling people what they must say.'" *Antonyuk*, 639 F. Supp. 3d at 344.  The Second Circuit's observation that "someone will need to express his wishes regardless of the chosen default rule" is not compelling. *Antonyuk*, 120 F.4th at 1048 n.125.  The state does not affirmatively compel expression of wishes in *the absence of a law* – which is just normal human interaction.  In contrast, when the state *affirmatively enacts a law*, and the only way to engage in conduct in compliance with that law is to *say something*, the state is compelling speech.  Indeed, "the choice between these two default rules is often outcome-determinative," as many "may be reluctant to post a sign" and "may only be willing to consent discreetly to the entry of permit holders who make the effort to inquire." *Wolford*, 2026 U.S. LEXIS 2720, at *23.  The same applies to the home. *See id.* at *27 ("consent need not always be express … there are circumstances in which consent may be inferred").

23

*Wolford*.  *See Wolford*, 2026 U.S. LEXIS 2720, at \*7 (striking a similar Hawaii law); *see also Antonyuk*, 120 F.4th at 1048; *Christian*, 2026 U.S. App. LEXIS 14172, at \*44.

**Private properties not open to the public.**  Plaintiffs also move for summary judgment under the Second Amendment as to the *rest* of N.Y. Penal Law § 265.01-d, which reaches private properties that are not open to the public.  Previously, this Court declined to extend its injunction to these properties under the Second Amendment, reasoning that the Second Amendment "is not the best place to look for protection," on the theory that the right applies "only in one's *own* home or in *public*."  *Antonyuk*, 639 F. Supp. 3d at 343.  But, in light of recent authorities, that conclusion was incorrect, and should be revisited.[36]

*First*, this Court is bound by the Supreme Court's recent pronouncements in *Wolford*, which clarified that nothing more is needed to pass the Second Amendment's textual subject-matter qualifier than answering the following question: "does the law place *any restrictions* on either the 'keep[ing]' (*i.e.,* possession) or the 'bear[ing]' (*i.e.*, carrying) of arms?"  *Wolford*, 2026 U.S. LEXIS 2720, at \*14 (emphasis added).  Here, the answer unequivocally is *yes* – the CCIA places a criminal restriction on Plaintiffs' ability to "carry … arms."  That is all that is needed to render the entirety of N.Y. Penal Law § 265.01-d "presumptively unconstitutional" (*Wolford*, 2026 U.S. LEXIS 2720, at \*14) – even as to private properties not open to the public – and so this Court must conduct the *Bruen* analysis, and Defendants must bear their historical burden.

*Second*, and relatedly, Defendants will be unable to bear their burden.  As *Wolford* already explained, the historical "enclosed" land analogues "principally targeted unauthorized hunting" and the "distinctive harms and risks associated" with such practice.  *Wolford*, 2026 U.S. LEXIS

---

[36]  Because this Court "did not analyze this aspect of the regulation under *Bruen*," the Second Circuit did "not decide … whether the Second Amendment includes a right to carry on private property *not* open to the public."  *Antonyuk*, 120 F.4th at 1044.  Thus, this question remains open, and this Court is not bound by the Second Circuit on this front.

2720, at *32. Moreover, the Court assumed that not even "enclosed land" was *actually* closed to the public. *See id.* at *30 n.15 ("assum[ing] that" the argument that "the term 'enclosed land' was understood at the time to include some property that was generally open to the public" is "correct"). These laws offer no support for banning firearms on private property not open to the public.

*Third*, other judges already have concluded similarly. As Ninth Circuit Judge Lawrence VanDyke persuasively explained in *Wolford v. Lopez*:

To be sure, the Second Amendment does not restrict private-property owners' ability to decide whether to exclude firearms, or certain people for that matter, from their property. … But that is the property owner's right, not the governments. Nothing about a property owner's authority to exclude would extend to the government a correlative power to make new presumptions that control the exclusion of firearms from private property without any decision by the property owner. [*Wolford v. Lopez*, 125 F.4th 1230, 1237 (9th Cir. 2025) (VanDyke, J., dissenting from denial of rehearing en banc).]

Likewise, in *Kipke v. Moore*, 2024 U.S. Dist. LEXIS 137003, at *20 (D. Md. Aug. 2, 2024), one district court enjoined Maryland's "private building consent rule" in its entirety. The Fourth Circuit reversed that portion of the decision only on standing grounds, because the plaintiffs only had alleged an intention to carry on private properties open to the public. *See Kipke v. Moore*, 165 F.4th 194, 220 (4th Cir. 2026). This Court should follow those persuasive opinions here.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

Dated: June 30, 2026

*/s/ Stephen D. Stamboulieh*

25

Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll # 520383

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
rob@wjopc.com
NDNY Bar Roll # 703779
Counsel for Plaintiffs

26