Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 1

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

IVAN ANTONYUK, COREY JOHNSON,

ALFRED TERRILLE, JOSEPH MANN,

LESLIE LEMAN, AND LAWRENCE

SLOANE,

        Plaintiff,

V                                    Index No.:  22-cv-986

KATHLEEN HOCHUL, in her Official

Capacity as Governor of the State

Of New York, KEVIN P. BRUEN, in his

(Cont'g.)

        Defendants.

_____X

DEPOSITION OF: COREY JOHNSON

DATE:           April 29, 2026

TIME:           9:33 a.m. to 12:53 p.m.

VENUE:          Syracuse Attorney General Office

                300 South State Street, Suite 300

                Syracuse, New York 13202


Reported by Kristen Lawler

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson (Cont'g.)

Official Capacity as Superintendent of the New York State Police, Judge MATTHEW J. DORAN, in his Official Capacity as the Licensing-official of Onondaga County, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse, P. DAVID SOARES in his

Official Capacity as the District Attorney of Oswego County, DON

HILTON, in his Official Capacity as the Sheriff of Oswego County, and JOSEPH STANZIONE, in his Official Capacity as The District Attorney of Greene County

_____X

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

APPEARANCES:

    FOR THE PLAINTIFF:

        STAMBOULIEH LAW PLLC

        BY:  STEPHEN STAMBOULIEH, ESQ.

        P.O. Box 428

        Olive Branch, Mississippi 38654

    FOR THE DEFENDANT STEVEN JAMES:

        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

        BY:  JAMES THOMPSON, A.A.G.

        28 Liberty Street

        New York, New York 10005

    FOR THE DEFENDANT STEVEN JAMES:

        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

        BY:  TIMOTHY P. MULVEY, A.A.G.

        300 South State Street, Suite 300A

        Syracuse, New York 13202

    FOR THE COUNTY OF ALBANY:

        ALBANY COUNTY

        BY:  PHILLIP BANASZEK, ESQ.

        24 Eagle Street, Room 106

        Albany, New York 12207

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 4

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

FOR THE DEFENDANT SYRACUSE:

CITY OF SYRACUSE OFFICE OF CORPORATION COUNSEL

BY:  TODD M. LONG

233 East Washington Street, Room 300

Syracuse, New York 13202

FOR ONONDAGA COUNTY:

COUNTY OF ONONDAGA

BY:  JOHN HEISLER JR, ESQ.

421 Montgomery Street

Syracuse, New York 13202

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

I N D E X   O F   P R O C E E D I N G S

COREY JOHNSON; Sworn

Direct Examination by Mr. Thompson                    9

Direct Examination by Mr. Long                        159

R E Q U E S T

. Emails to Mr. Crump and Mr. Jenkins      32

800-523-7887                                ARII@courtsteno.com
                Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 6

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

E X H I B I T   I N D E X

Marked as

Described as

One                                                                    51

Corey Johnson's Response to the states defendant's 1st set

of interrogatories

Two                                                                    51

Photos Bates Johnson 002-003

Three                                                                  63

Photo

Four                                                                   80

Complaint 73 pages

Five                                                                  112

Declaration 9 pages

Six                                                                   119

McKinney's Penal Law 265.01

Seven                                                                 144

Syracuse Mets Fan Code of Conduct

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

STIPULATIONS

It is HEREBY STIPULATED by and among the attorneys for the respective parties, in accordance with the Federal Rules of Civil Procedure, that this deposition may be taken by the Defendant at this time, pursuant to subpoena;

FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until trial;

FURTHER STIPULATED, that the witness may read and sign the deposition and make any corrections to same before any Notary Public;

AND FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time of trial or any hearing in this cause, a certified copy of the deposition may be used as though it were the original.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

(The deposition commenced at 9:33 a.m.)

COURT REPORTER:  Okay.  We are on the record.  It is nine thirty-three a.m., April 29th, 2026.  First, if the attorneys would note their appearance for the record.  If we want to start over here.

MR. HEISLER:  Stephen?

MR. STAMBOULIEH:  Oh, okay.  Stephen Stamboulieh for the Plaintiffs.

COURT REPORTER:  Okay.

MR. HEISLER:  John Heisler Jr. for the Onondaga County Sheriff, Tobias Shelley, and the Onondaga County District Attorney William Fitzpatrick.

MR. MULVEY:  Timothy Mulvey, Assistant Attorney General co-counsel on behalf of Superintendent James.

MR. THOMPSON:  James Thompson, also with the Office of the Attorney General, also on behalf of Superintendent James.

COURT REPORTER:  Okay.

MR. THOMPSON:  You got -- you got --

COURT REPORTER:  Oh, yeah.

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 9

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

MR. LONG:  Todd Long.  Yeah.  Good morning.  Todd Long, Attorney for the City of Syracuse on behalf of the City of Syracuse Chief of Police.

MR. BANASZEK:  Phil Banaszek, Assistant Attorney, counsel for -- counsel for Albany County and Albany County District Attorney.

COURT REPORTER:  Okay.  Would you, sir, please state and spell your full name for the record?

MR. JOHNSON:  Corey Johnson.  C-O-R-E-Y, J-O-H-N-S-O-N.

COURT REPORTER:  Okay.  Raise your right hand for me.  Do you swear or affirm the testimony you're going to give will be the truth, the whole truth, and nothing but the truth?

MR. JOHNSON:  I do.

(COREY JOHNSON:  Sworn)

COURT REPORTER:  Okay.  He's all set.

DIRECT EXAMINATION

BY MR. THOMPSON:

Q.   Mr. Johnson, thank you so much for coming out today.  My name is James Thompson.  As I mentioned, I'm an attorney here at the Office of

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson the Attorney General and I represent the Superintendent of State Police in this lawsuit.  So, the deposition is -- is basically it's a long Q and A.  I ask questions, you give answers.  And so during the deposition I'm going to ask you a number of questions and there are a handful of things to remember for the aid of the Court Reporter who's going to be taking all of this down.

The first is to please wait until the end of my question before you give an answer, because the single thing that that makes Kristen's job harder and gets us a -- a more difficult transcript is if more than one person is talking at the same time.

If at any point I don't ask -- or sorry, if at any point I do ask a question that you don't understand, please ask me to clarify it.  If you give me an answer, I'll assume you understood the question.  Does that make sense?

A.   Yes.

Q.   Similarly, in regular conversation, people will shake their head, shrug their shoulders, say huh-uh or uh-huh; that makes it difficult to come through on the transcript.  So please, if you would, make sure all of your answers

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson are verbal.  From time to time, Mr. Stamboulieh may make an objection.  Unless your attorney instructs you not to answer based on a claim of privilege, you should still answer the question that I've asked.

And if at any point you need to take a break, just ask me and we'll take one.  I may ask you to finish answering the question that's been presented or the line of questioning, but I'm always happy to take a break if you need to take five.

A.    Okay.

Q.    Does that all make sense?

A.    Yes.

Q.    Great.  So, Mr. Johnson, have you ever been deposed before?

A.    No.

COURT REPORTER:  I can't hear you.  You're going to have to speak up a little bit.  I'm going to move that closer, so that will help us.  Okay.  Your answer was no?

THE WITNESS:  No.

COURT REPORTER:  Yes.  Thank you.

MR. THOMPSON:  Is it coming through better?

COURT REPORTER:  It works decent.  Can

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

you give me something?  Say your name, maybe.

THE WITNESS:  Corey Johnson.

COURT REPORTER:  Yes, much better. Thank you.

MR. THOMPSON:  Great.

BY MR. THOMPSON:  (Cont'g.)

Q.   And so, Mr. Johnson, do you understand that you're under oath today?

A.   Yes.

Q.   And what's your understanding of the meaning of that oath?

A.   Tell the truth.

Q.   Got you.  Are you suffering from any illness or other conditions today that could affect your ability to answer questions truthfully?

A.   No.

Q.   Did you take any medication that could affect your ability to answer questions?

A.   No.

Q.   And is there any other reason that you might not be able to give complete and truthful answers to the questions that you're asked today?

A.   No.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q. Great. So, Mr. Johnson, are you represented by counsel today?

A. Yes.

Q. And is that Mr. Stamboulieh?

A. Yes.

Q. Can I ask you what you did to prepare for today's deposition?

A. I read over all the documents that have been given to me so far and my statement -- my previous statement.

Q. Got you. And when you say the documents that have been given to you, what documents are those?

A. Questionnaire that you guys sent to me to fill out, my previous statement, the court proceedings so far.

Q. And when you say the questionnaire is -- do you mean the -- the interrogatories?

A. Yes.

Q. And the court proceedings so far, are -- are you referring to the opinions or the transcripts or -- or -- or what documents in specific are you referring to?

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 14

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

A.    Everything that's -- I've been at the case war in front of Judge Suddaby.

Q.    All right.  Do you remember any specific document, any specific case document that you looked at?

A.    I don't know what it's called, the ruling papers, whatever is written by the judge.

Q.    The opinion?

A.    Yeah.  Opinion.

Q.    Okay.  And let me just preface by saying I'm not asking into any conversation that you've had with Mr. Stamboulieh into the substance of what you've talked about.  And none of my questions will be inquiring into the substance of anything you've talked about with your counsel.  But did you meet with your counsel in preparation for today's deposition?

A.    Yes.

Q.    Approximately how many times?

A.    Once.

Q.    And when was that?

A.    Last night.

Q.    And about how long was the meeting?

800-523-7887                                         ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    An hour, hour and a half.

Q.    Was anyone present other than your attorney?

A.    No.

Q.    Other than Mr. Stamboulieh, have you discussed this deposition with anybody else?

A.    No.  Sorry, I'm trying to understand the question.

Q.    Sure.  Yeah.  Is there anybody else who you've talked to about this deposition coming up or what you'd say?

A.    Not what I've said, but I did tell my boss that I had an appointment today.

Q.    Got you.  And did you discuss with anyone other than Mr. Stamboulieh how you would plan to answer certain questions?

A.    No.

Q.    Anything else that you did to prepare other than what we've already discussed?

A.    No.

Q.    All right.  So, Mr. Johnson, can you tell me a little bit about yourself?

A.    I am a normal person.  New Yorker, born and raised.  I don't know what you want

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

to know.

Q.   It's -- it's -- I suppose it's kind of a -- a broad question.  Were you born here in Syracuse?

A.   Yes.

Q.   Did you go to high school here?

A.   Yes.  And outside the state as well.

Q.   Where -- where outside the state did you live?

A.   North Carolina.

Q.   Where in?

A.   Charlotte, China Grove.

Q.   Oh.  Beautiful, beautiful area. My grandparents are down there.  And so did -- at some point, did you come back to Syracuse?

A.   Yes.

Q.   And how come?

A.   To get married.

Q.   Congratulations.  Did you go to college?

A.   No.

Q.   And so, let's say from the time that you graduated high school, what was the first

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 17

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

significant place of employment that you had?

A.   Can you define significant?

Q.   First full-time job you had that lasted more than a year.

A.   That's a long time ago.  Ames in Baldwinsville, New York.

Q.   And with -- my apologies for being here from Downstate.  Where's Baldwinsville in relation to Syracuse?

A.   North of Syracuse.

Q.   And when did you work for Ames?

A.   '91 maybe, '92.

Q.   All right.  And --

A.   I honestly don't remember.  It's -- I'm fifty years old.  It's a long time.

Q.   Got you.  What did you do for Ames?

A.   I was -- worked in layaway, worked in stocking shelves.

Q.   And after Ames, what did you do?

A.   Moved to North Carolina.  Worked at Pest and Seymour Ground (phonetic spelling) then moved back to New York.

Q.   Okay.  And when was that?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   In '96.

Q.   Okay.  And when you moved back to New York, did you move back to Syracuse?

A.   Yes.  Baldwinsville.

Q.   Baldwinsville.  And what did you do at that point for work?

A.   I worked as a temporary for a while.  I worked at PaperWorks in Baldwinsville.  End up working for PharmaLogic in Syracuse.  That brings me up to 2015.

Q.   When did you start working for PharmaLogic?

A.   2020.  I'm sorry, 2000.  2000.

Q.   2000.  And you said you worked for them until 2015?

A.   Yes.

Q.   Is that correct?  What did you do for PharmaLogic?

A.   I started off as a driver and then I became a pharmacy technician.

Q.   And why did you cease working for PharmaLogic?

A.   Downsizing.

Q.   I'm sorry.

Associated Reporters Int'l., Inc.    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    It is what it is.

Q.    After PharmaLogic, what did you do for work?

A.    I worked for Lowe's and then currently work for Graybar.

Q.    Got you.  What did you do for Lowe's?

A.    Started off as a warehouse and then became a delivery driver.

Q.    And approximately when did you -- when were your start date and end date at Lowe's?

A.    2016 to 2018.

Q.    And why did you cease working for Lowe's?

A.    Pay.  Pay was not that great.

Q.    And after Lowe's, where did you go to -- go for work?

A.    I did a very short time working for a company, I think it was called Magnificent Seven.  It was seasonal and then brought me to Graybar -- or actually brought me back to PharmaLogic shortly and then back to Graybar.

Q.    And what is Graybar?

A.    It's an electrical

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson telecommunications warehouse.  Basically, supply all the electricians in Syracuse area for parts.

Q.    And what do you -- do you still work for Graybar?

A.    Yes.  Material handler.

Q.    And can you describe for me what your day-to-day responsibilities are as a material handler?

A.    Cut wire, pull pipe, telecommunications equipment, prep it, get it ready for delivery.

Q.    And are you currently employed at Graybar?

A.    Yes.

Q.    All right.  So, where do you live, Mr. Johnson?

A.    Syracuse -- ████████████ ██████ Syracuse, New York ██████.

Q.    Do you have any other residences?

A.    No.

Q.    Do you own or rent?

A.    Own.

Q.    And does anybody else live with you at your residence?

800-523-7887                                 ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

A.    My wife.

Q.    And I apologize, I have to ask, are you now or have you ever been a lawyer or an attorney?

A.    No.

Q.    It's just as well.  So Mr. Johnson, are you a member of the Gun Owners of America?

A.    Yes.

Q.    And how long have you been a member?

A.    Four years, I believe.  Just after COVID.

Q.    Why did you decide to join?

A.    I'm a gun owner.

Q.    So, what makes G.O.A. different from other organizations working the gun space?

A.    They are pretty much -- it's the same as Firearms Policy Coalition and Second Amendment Foundation.  They do the same work.  Just one organization can't do everything, so.

Q.    Are you a member of any other gun related organizations?

A.    Yes.

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    Which ones?

A.    Firearms Policy Coalition and Second Amendment Foundation.

Q.    Are you a member of the N.R.A.?

A.    No.

Q.    Are you a member of NYSRPA?

A.    No.

Q.    So, you mentioned three organizations, G.O.A., F.P.C. and the Second Amendment Foundation.  Why those and not the N.R.A. or NYSRPA?

A.    The N.R.A. is divided into two major sections.  One is legal, one is training.  I am an unofficial -- I'm not a member of N.R.A. for training, but I do have credentials for the training that I've gone through there.

Q.    And --

A.    NYSRPA is run by -- it's a subsidiary of the N.R.A., so basically the same thing.

Q.    And when did you join the Second Amendment Foundation?

A.    2023.  Or -- or early 2024.  I honestly don't know.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 23

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    And same question, when did you join the Firearms Policy Coalition?

A.    Same.  Same time.

Q.    So let me ask you, in -- in 2021, what was it that made you decide to join the G.O.A.?

A.    I wasn't fond of what I was seeing from other states to here.  The fact that I could compete in Pennsylvania, Ohio, Vermont, New Hampshire, and then I couldn't compete the same way here, I didn't like those laws.  So, I figured I'd put my money someplace that would do something about it.

Q.    When you say compete, could you explain that a little more?

A.    I'm a competitive shooter.

Q.    And when you say that you couldn't compete in the same way in New York the way that you could in other states, can -- can you explain what you mean by that?

A.    Magazine capacity limits, firearms limits, restrictions.

Q.    Can you be more specific about the firearms limits and -- and restrictions?

A.    The requirements on A.R. style

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson weapons, limits on features for them magazine capacities, limited ten rounds in New York, where it's not limited in other states.

Q.   And so in 2021 when you were frustrated by this, why did you decide to join G.O.A. rather than these other organizations?

A.   I wasn't aware of the other ones at the time.

Q.   And so, was there anyone who referred you to G.O.A. or put you onto G.O.A.?

A.   Originally, no.

Q.   And when you -- when you say originally no, did something happen subsequent to that?

A.   There was a YouTube video that came out from John Crump News that got me interested in this particular case, and that's how I got involved in this.

Q.   And who is John Crump?

A.   He is an in -- what's the word? He makes YouTube videos.  He's not an influencer.  He is a content creator.  Sorry.

Q.   I'm never sure of the difference between an influencer and a content creator.  And so

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

did you at any point speak with Mr. Crump about this case?

A.    Just an exchange of email.

Q.    And can you tell me in -- in sum and substance what you said and what he said?

A.    His video was looking for people in New York that had a concealed carry license, gave his email to contact him.  I sent -- I sent him an email saying I was interested in joining G.O.A.'s case.  He sent me contact information for Rob Olson, I believe it was, and that was it.  I didn't speak to him more than that.

Q.    And is this before or after you joined G.O.A.?

A.    After.

Q.    After.  And did you ever speak with Mr. Crump by telephone?

A.    I don't believe so.

Q.    Is there -- have you had conversations with any other content creator, influencer, YouTube, or -- or other social media personality about this case?

A.    Dave Jenkins is -- he's the founder of Rochester Personal Defense.  I wouldn't

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

call him a content creator.  He does have a podcast he puts on YouTube, but he's also my boss.  So being that this could affect my employment there, I did talk to him about -- not about the case itself, but the fact that I was part of it.

Q.    And in sum and substance, what did you have to say to Mr. Jenkins?

A.    I had to explain that if things went bad and for some reason, if I was to lose my firearms license, that I would not be able to work for him anymore.

Q.    And when you say he's your boss, is that at Graybar?

A.    No, that's at Rochester Personal Defense.

Q.    So --

A.    It's a -- it's non -- it's a part-time.  I'm a third-party contractor for him.

Q.    Got you.  So, what is Rochester Personal Defense?

A.    It's a firearms training, and he does have a carry gear store as well.

Q.    And you -- I note you're wearing you're a --

800-523-7887                         ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   Yes.

Q.   -- Rochester Personal Defense hoodie today.

A.   Yes.

Q.   What do you do at Rochester Personal Defense?

A.   I teach the eighteen hour pistol safety course.

Q.   And when did you start working with Rochester Personal Defense?

A.   I started my training at the middle of 2025 and just recently got licensed off in April to run the classes myself.

Q.   Understood.  Other than the training course, do you do anything else for Rochester Personal Defense?

A.   No.

Q.   And other than at Rochester Personal Defense and at Graybar, do you have any other current employment?

A.   No.

Q.   Apologies for a personal question.  Approximately how much money per year do you make with Rochester Personal Defense?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 28

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   So far, I've made a hundred and fifty dollars.

Q.   Okay.  How much -- how much do you charge for the training course?

A.   The course is one hundred and fifty dollars a day.

Q.   Is -- is that for two days?

A.   Yes.  Well, it's three hundred dollars for the total class for Saturday and Sunday.

Q.   And about how many times have you taught the course?

A.   I have taught it once for pay. The other ones have just been for training purposes.

Q.   Understood.  So, how many times in total?

A.   Six, I believe.

Q.   How's it gone --

A.   Three for Saturday three for Sunday.

Q.   And how has it gone when you teach the course?

A.   I'm a phenomenal trainer.

Q.   I'm glad to hear it.  What makes you a phenomenal trainer?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 29

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    I'm very good at what I do.

Q.    Can you explain to me -- that to me a little more?  When you say I'm very good at what I do, what qualities do you have?  What work do you do that makes you effective with that?

A.    I'm very good at safety handling firearms.  I'm very good at teaching the legalities what New York State requires for the class.

Q.    And do you think that your students come away from the training understanding those things better?

A.    Yes.

Q.    Have your students been satisfied with the way you teach?

A.    Everyone I've talked to so far.

Q.    Glad to hear it.  And what made you want to do the training course?

A.    I like to make sure people are safe when using firearms.  I've been to many ranges where I've seen things that aren't safe and I want to make people better.

Q.    Understood.  So, going back to the gun organizations that you're a part of, you mentioned G.O.A., F.P.C., and the Second Amendment

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson Foundation, correct?

A.   Yes.

Q.   So, are you active in any of these organizations?

A.   In what way do you mean active? I'm taking part in this case.

Q.   Other than in this case or in being a due paying member, do you do any additional activities with any of these three organizations?

A.   I watch the videos.  Stay up to - - up to date on the news.

Q.   Do you ever go to meetings?

A.   No.

Q.   Do you ever post on social media?

A.   Sure, I posted at times on social media.

Q.   Do you create content for any of these organizations?

COURT REPORTER:  No?

A.   No.  Sorry.

COURT REPORTER:  Thank you.

Q.   And do you have any sort of leadership or other position in any of these three organizations?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   No.

Q.   And outside of the gun issue, are you a member of any other groups that take stands in politics?

A.   No.

Q.   Are you a registered voter?

A.   Yes.

Q.   Do you vote?

A.   Yes.

Q.   But no other political organizations?

A.   No.   No.

Q.   So, you mentioned -- actually, let me withdraw that.

Mr. Johnson, do you use email?

A.   Yes.

Q.   And what email address do you usually use?

A.   Frgm1363@gmail.com.

Q.   And what's the meaning of that address?

A.   Forgotten Realms G.M. year 1363. It's a D and D reference.

Q.   Dungeons and Dragons?

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 32

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   Yes.

Q.   Yeah, I got that.  Nerdy enough to get that.  Do you have any other email addresses that you use?

A.   No.

Q.   And you mentioned emailing Mr. Crump and Mr. Jenkins earlier.

A.   Yes.

Q.   Other than them, have you emailed anybody else about this case or about any of the laws that are at issue in it?

A.   No.

MR. THOMPSON:  All right.  Stephen, we'd like to request a copy of those emails.

MR. STAMBOULIEH:  He will look for them.

COURT REPORTER:  I'm sorry.  What did you say?

MR. STAMBOULIEH:  I said yes, he will look for them.

COURT REPORTER:  Thank you.

Q.   Do you have any accounts on social media?

A.   Yes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Which ones?

A.   Facebook.

Q.   Anything other than Facebook?

A.   No.

Q.   No Instagram, no X?

A.   I do have a Twitter account I have not used.

Q.   And what is -- what is your account name on Twitter?

A.   I have no idea.  I don't use it. I created it years ago when my wife joined.  I have no interest in it.  The platform is useless to me.

Q.   Have you ever posted on that account?

A.   No.

Q.   And so on Facebook, do you have a username or a user I.D. on Facebook?

A.   It would be my name.

Q.   And how often do you use Facebook?

A.   Daily.

Q.   And what do you use it to do?

A.   Play games, communicate, see what's going on in the world.

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    Have you posted or sent messages about this case?

A.    No, not on Facebook.

Q.    Have you posted or sent messages about guns or gun laws?

A.    Probably.

Q.    Can you tell me some of the posts that you've made about gun laws?

A.    I've corrected people's comments regarding Article 35, use of force.  I've corrected people's -- especially with the gun show recently, people's understanding of how to get a permit, the process of getting a permit.  It's what I do.  It's part of what I like to do.

Q.    Can you say -- when you say the gun show recently, what are you referring to?

A.    The Gun Show in Syracuse.

Q.    Did something happen there or that --

A.    People talk, there's thousands of people there.  People don't understand the law.  New York State makes it very, very difficult to understand the law.  So, I'd like to make sure people are updated so you don't commit crimes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Sure.  When you say people don't understand the law, what is the sum and substance of that misunderstanding?

A.   What part?  There's a lot of it.

Q.   The part you're referring to.

A.   Article 35, people don't understand what use of force actually means, when you can use it and when you can't use it.  People don't understand that your right to have a firearm is run through the counties, not through the state itself.  So that's -- when they ask why we have to recertify through New York State Police, not through the county that they get the permit from, why you need to have a pistol permit in order to have a semi-auto rifle when there's actually a rule -- a law that says that you have to have a semi-auto rifle license, it's not a pistol license.

Q.   Understood.  What are some of the most common misconceptions about those laws?

A.   That you have to run away every chance you get in New York, that somehow, it's impossible to get a license in New York State that now you can't get one if you're outside of New York, if you live outside New York State, which is not

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 36

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson
true.

Q.    All right.  Do you post on any internet forums?

A.    I posted on Smith and Wesson's forums a couple times, mainly just asking questions about firearms themselves.  I used to belong to New York State Gun Owners something page.  New York State Firearms page, but it just turned into a flame thrower -- nothing I'm interested in.

Q.    And approximately when did you stop posting on that page?

A.    Several years.  Three, four years ago.

Q.    And do you recall if you had a I.D. or a username on that page?

A.    It would probably be my email address.

Q.    Did you ever post about this case or about the laws at issue in this case --

A.    No.

Q.    -- on that forum?

A.    It was far before that.

COURT REPORTER:  I'm sorry, can you --

A.    It was far before that.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 37

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

COURT REPORTER:  -- thank you.

Q.   Okay.  Did you ever post about this case or the laws at issue in this case on the Smith and Wesson forum?

A.   No.

Q.   Other than the Smith -- Smith and Wesson forum and the -- I apologize, you said it was the New York State Firearms Forum?

A.   I don't remember the exact name of it.  Something along those lines, yes.

Q.   Any other forums that you post on?

A.   No.

Q.   Mr. Johnson, have you ever been a party to any lawsuit other than this one?

A.   I don't understand the question. Have I sued somebody?  Is that what you're asking?

Q.   Have -- have you ever been a party, so a Plaintiff or a Defendant or you know, or a third party in any other lawsuit?

A.   I believe the answer to your question would be no.

Q.   You sound like you're not totally sure.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 38

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   I -- I've never sued anybody or been sued, if that's what you're asking.

Q.   Sure.  Is there something that you're thinking of that --

A.   There --

Q.   -- may or may not fit into the question?

A.   There was an instance where I was charged with a crime that ended up getting dismissed.

Q.   Understood.  Can you tell me a little bit about that?

A.   I was charged with -- I don't even know the -- the charge.  A person almost rear-ended me, start an accident -- started a road rage incident.  In the process, I ended up breaking his mirror on his vehicle and went to court for that.

Q.   Sure.  And approximately when was this?

A.   I believe June of 2020 -- no, it must have been June of 2023, I believe.

Q.   And where was this?

A.   This happened on the corner of 57 and John Glenn.

Q.   Here in Syracuse?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                              www.courtsteno.com

Page 39

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Yes.

Q.    And do you recall what court?

A.    I believe it was the Town of Clay.

Q.    Town of Clay, is that a village court or a --

UNIDENTIFIED SPEAKER:   Town.

A.    Town.

Q.    Town Court.  And can you recount for me what happened in the incident?

A.    I was on my motorcycle driving home.  A person was on his phone, distracted, missed my bike by about a foot, pulled up on the shoulder of the road to turn right, started yelling and swearing at me through his window.  I couldn't hear him because I had my radio going.  So I turned my radio off, lifted my visor to talk to him.

He then began to tell me he was going to effing kill me if I didn't move.  I was -- my intention was to turn right there, but since he was on the shoulder, I couldn't, so I had to go straight. In the process, he opened his door to yell at me and I ended up breaking his window -- or breaking his mirror, sorry.

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   When you say breaking the mirror, you mean the -- the left side mirror?

A.   Yes.  Driver side mirror.

Q.   And how did you break his mirror?

A.   With my glove.

Q.   You just hit it?

A.   Yes.

Q.   And did he engage in any threatening or violent behavior toward you?

A.   Telling me he was going to kill me, yes.

Q.   Makes sense.

A.   Curtis A. Prevost turned out to be a very bad person.  So --

Q.   I'm sorry?

A.   Curtis A. Prevost turned out to be a very bad person.

Q.   Is that the name of the other guy?

A.   Yes.

Q.   When you say he turned out to be a bad person, can you tell me more about that?

A.   As far as I'm aware, after the case started, he was busted in 2008 in the largest

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson D.A. drug sting in New York for drug possession, trafficking stolen cars, firearms, a bunch of other stuff.

Q.   And so this was 2023, was he --

A.   I believe it was 2023.

Q.   Was he out, did he --

A.   As far as I know, he was out on parole.

Q.   And how did the encounter between you and Mr. Prevost end?

A.   When he pulled a knife in his car, I got back and went straight instead of turning.

Q.   And were you carrying your firearm during this incident?

A.   I did not have my firearm at -- at the time.

Q.   Do you wish you had it?

A.   In the moment, yes, but I'm kind of glad I didn't.  It was an issue that didn't need to be escalated.  Deescalation was definitely the best option at that point.

Q.   And can you explain to me a little bit more about that?

A.   He didn't get out of his car to

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 42

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

attack me.  He was defending his property.  He was in his car.  I understand that.

Q.    How do you think it would've gone if you did have your gun with you?

A.    Exactly the same.  The way the situation turned out, exactly the same.  That would not be a situation to draw a firearm.

Q.    And so, why not?

A.    My life wasn't in danger.

Q.    He's got a knife.

A.    He didn't get out of his car.

Q.    And so how did that incident result in a charge?

A.    It was for breaking the mirror, property damage.

Q.    So, did Mr. Prevost call the police?

A.    Yes.

Q.    And did the police come?  Were you present for that?

A.    Yes.

Q.    I thought you said you had driven on?

A.    I did.  They didn't go there.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

They came to my house later on.

Q. Oh, okay. And can you sort of walk me through what happened then and after that?

A. The police questioned me. They ultimately arrested me. Later on that night, they came to take my pistol license and permit. After going through the court process, Judge Doran signed my license back to me knowing that the case was bogus.

Q. And how did the case resolve itself?

A. I believe it was dismissed.

Q. Was it --

A. I don't know the legal jargon. I apologize.

Q. Sure. Are you familiar with the term an adjournment in contemplation of dismissal?

A. I don't know what that means.

Q. It's -- usually, it's a agreement that prosecutors will make with someone who's charged often with something that's not a particularly serious crime where they will essentially adjourn the charge, and with the understanding that if there are no other instances in a certain period of time, it'll

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson
be dismissed.

A.   That sounds familiar, yes.

Q.   So, did you have any agreement like that with the prosecutor's office?

A.   I believe it was similar to that.

Q.   And the prosecutor's office, was that on Onondaga County?

A.   I don't know who the D.A. was.  I never spoke to the D.A.

Q.   Do you remember the name of the A.D.A. who you talked to?

A.   I never spoke to an A.D.A.  I had an attorney.

Q.   Oh, okay.  Makes sense.  Who was your attorney for that?

A.   Scott Brenneck, I believe.

Q.   And the charges were ultimately dismissed?

A.   Yes.

Q.   And your pistol license was returned?

A.   Yes.

Q.   And you mentioned Judge Doran earlier.  Was the criminal case in front of Judge

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 45

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Doran or was it -- was it only the license?

A.   Only -- he's my sign -- he signed off my pistol license.

Q.   Got you.

A.   It was Town of Clay court.  I do not remember the judge's name.

Q.   Understood.  So other than this -- this road incident, have you been involved in any other criminal proceeding as a defendant or as a complainant or in any other way?

A.   Not that I'm aware of.

COURT REPORTER:  Not that you're aware of?

A.   Yes, not that I'm aware of.

Q.   And have you been involved in any sealed or dismissed criminal proceeding other than the one we talked about?

A.   Oh, there was one back in -- I have no idea when.  When I worked at Ames a long time ago, I was young and stupid and I stole some stuff and did community service.

Q.   Got you.  Approximately when was this?

A.   I have no idea.  I was fifteen,

800-523-7887                                      ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

so '90, 1990-ish.

Q.   Okay.  And have you ever been involved in any sort of administrative proceeding?  So, like a court like proceeding that's in front of a administrative agency rather than a court?

A.   Does jury duty count?

Q.   No.

A.   Then no.

Q.   But thank you for doing your jury duty.

A.   Of course.

Q.   Mr. Johnson, have you ever had any interactions with the New York State Police?

A.   I'm sure I have.  I can't -- I mean, I can't tell you every single time I've ever talked to somebody from the New York State Police, but I'm sure I've been pulled over at some point or shot with them at competitions.

Q.   Sure.  So let me ask you the question in a -- in another way that may -- may work better.  What's the last time you recall interacting with a member of the New York State Police?

A.   I honestly don't remember.  I actually -- I was pulled over one time, I believe in

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 47

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

the Town of Ava for speeding in an area that didn't have a marked zone.  I believe he was a -- I think -- believe -- believe he was a New York state trooper.

Q.   And approximately when was this?

A.   2020, 2021 maybe.

Q.   And --

A.   He let me go.  There was no charge or no ticket.  It was -- he realized that the sign was not there.

Q.   And before that, can you remember any other interactions with people from the state police?

A.   Not that I remember.  I know I have shot with police in competitions though, state police, local police.

Q.   And has any member of the state police ever threatened you with prosecution or any other negative action?

A.   No.

Q.   Have you ever been a member of the state police or worked for the state police?

A.   No.

Q.   And other than the two times we've mentioned, the road incident and the incident

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

back at Ames in the '90s, have you ever been arrested?

A.    Not that I'm aware of.

Q.    And have you ever tried to buy a firearm or ammunition and had a background check denied?

A.    Not denied, no.

Q.    Have you ever tried to buy a firearm or ammunition and had a background check result that was something other than proceed?

A.    Delayed.  Conveniently after I joined this case.

Q.    When was that?

A.    Back in 2022.  That I joined the case or that I --

Q.    That you had the delay response.

A.    Every single time since I joined this case.

Q.    And so is that -- approximately how many times have you had that response?

A.    Six plus.

Q.    And how long is the delay usually?

A.    Anywhere from three days to the

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 49

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

full eighty-eight days with no response.  I could also say that Corey Johnson is a very common name. Christopher Johnson is the most commonly delayed firearm name.

Q.   And is -- is your -- is your full name Christopher?

A.   No, it's Corey Johnson.

Q.   Yeah.  All right.  And do you have any reason to think that those delays have any connection with your participation in this case?

A.   It's my personal belief it does, but I don't have proof of that.

Q.   Any evidence of it?

A.   No.

Q.   All right.  So Mr. Johnson, I'm going to show you a document.  As soon as I dig it out from this --

A.   I should've brought my glasses.

COURT REPORTER:  Do you want me to mark it?

MR. THOMPSON:  Yeah, in just a sec.

THE WITNESS:  I can do it at some point.

MR. STAMBOULIEH:  If you say

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

something, you have to say it loud so the Court Reporter can get us.  If you want to read it to yourself, that's okay.

BY MR. THOMPSON:  (Cont'g.)

Q.   Mr. Johnson, do you recognize this document?

A.   I believe this is the questionnaire I spoke of earlier that you sent for me to fill out, or your office at least.

Q.   And turning to the last page, page seven.  Is that your signature?

A.   Yes.

Q.   And you had said that you reviewed this again ahead of this deposition, correct?

A.   Yes.

Q.   Do you still stand by the responses that you verified here?

A.   Yes.

MR. THOMPSON:  All right.  Kristen, could I ask you to mark this as Exhibit One?

COURT REPORTER:  Yes.

MR. STAMBOULIEH:  No objection.

Q.   Now, Mr. Johnson, I'm going to

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 51

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

show you another document.  And I'll -- let me ask,

Mr. Johnson, do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It's my New York State pistol license.

Q.   And this is two pages, Bates stamp Johnson O O two and Johnson O O three, correct?

A.   Yes.

Q.   Little -- little stamp on the bottom left.

A.   Yeah.

MR. THOMPSON:  And Kristen, could I ask this -- for this to be marked as Exhibit Number Two?

COURT REPORTER:  Yes.

MR. STAMBOULIEH:  No objection.

Q.   So I've put these pages together in the order they were produced.  So is one of the documents on the page that's marked O O two, the back of the license that's shown on the page ending in O O three?

A.   Yes.

Q.   And which one?

800-523-7887                         ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 52

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   I honestly don't know which one is two or three, I believe --

Q.   I'm sorry, which of the two documents on O O two is the back of the license on O O three?

A.   I believe it's the one on the right.

Q.   With the fingerprint?

A.   Yes.  I can look at my license and show you.  I'm not sure.  I don't look at it very often.

Q.   I -- I think we're probably better for the record if we're looking at the -- the document rather than the -- rather than your actual license.

A.   Okay.

Q.   So, let's stick with that if you don't mind.

A.   Okay.

Q.   So, can you tell me about why you obtained the pistol license and -- and what the process was for obtaining it?

A.   Why I got the pistol license?  Is that what you asked?

800-523-7887                              ARII@courtsteno.com
                    Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Q.   Yeah, let's start there.

A.   I am a competition shooter.  I needed a pistol in order to shoot pistol competition. As time went on, I've noticed that the world's changed to a -- a horrible place, and that's why I wanted -- wanted a concealed carry to have it on me at all times.  What was the second question?

Q.   The second question was about the process for obtaining it.  But let's -- let's talk about for the first time.  So, this license has a date of issue of December 6th, 2019, is that correct?

A.   Yes, I believe so.  Yes.

Q.   Did you have a license prior to that?

A.   No.

Q.   Was there anything in particular in 2019 that inspired you to get the license?

A.    I was interested in competition, shooting for single action shooting society, also known as cowboy shooting.  I went to watch a match and obviously, I can't handle a firearm without a pistol license, so it made me want to get that.

Q.   And talk to me a little bit about cowboy shooting and the nature of the competition.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 54

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    It's basically what it sounds like.  People dress up like cowboys that time period, shoot a period-appropriate firearms, all single action pistols, lever guns, shotguns.

Q.    It's like the single action -- Colt single action army and that sort of --

A.    We do that, yeah.

Q.    -- erA.    And you said that you felt like the world had become a horrible place.

A.    Yes.

Q.    Can you tell me a little bit more about that?

A.    Things that I would see on, you know, state news would be coming closer to home.  My son had a car broken into and left in his parking lot.  Somebody tried to break into his house.  Seeing things like that just made me want to have a firearm on me in the event that I ever needed it.

Q.    And does your son have a firearm permit?

A.    No.

Q.    And he lives -- does he live with you?

A.    No, not anymore.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Q.   Have you encouraged him to get a firearm permit?

A.   Yes.

Q.   Does he not want to do it?

A.   He does.  He's got all the things he does.  He's more of a rifle shooter.

Q.   Does he own a -- a rifle?

A.   Yes.

Q.   And so can you talk to me about the process that you went through to obtain the pistol permit?

A.   My process was a little different than current because it was before the C.C.I.A., but I had to fill out the Onondaga county permit form, get full references, submit two fingerprints, photo I.D., wait in line to get a time to turn my paperwork in, turn my paperwork in, wait for them to get back to me, and then finally get my license back.

Q.   And about how long did the process take?

A.   From the time I started filling out the application to the time I got it, approximately four months.

Q.   And from the time that you

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 56

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

submitted the completed application until you --

A.    Six weeks to the day.

Q.    Okay.  And was that process run by Onondaga County or by the state police?

A.    Onondaga County.

Q.    Are you aware of whether the state police had any role in that licensing process?

A.    I don't believe they have any process in that part of it.  They do have in the recertification process.

Q.    Sure.  And we'll -- we'll -- we'll get there in probably about ten minutes.

A.    Okay.

Q.    So who made the ultimate decision on your permit application?

A.    I believe it would be the licensing officer and Judge Doran.

Q.    Is -- is the licensing officer someone different from Judge Doran?

A.    Whoever does my -- whoever's in the Sheriff's Department that does my background check.

Q.    Got you.  And so Matthew J. Doran, whose signature is on your license, is that

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 57

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

the same Matthew J. Doran who was formerly a defendant in this case?

A.    I believe so.  That's the only Doran that I -- I'm aware of.

Q.    Did you, at any point, meet or interview with Judge Doran?

A.    No.

Q.    Have you ever spoken with Judge Doran?

A.    No.

Q.    Do you feel like he was fair when he adjudicated your application?

A.    Yes.

Q.    And do you feel like he was fair when he restored the license after the incident --

A.    Yes.

Q.    -- on the road?

A.    Yes.

Q.    Are you aware of the superintendent of state police having any role in either of those decisions?

A.    I don't believe so.

Q.    Do you know if the superintendent has the power to grant you or deny you a license?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 58

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Not that I'm aware of.

Q.    And do you have any reason to believe that the state police controls licensing decisions?

A.    Not that I'm aware of.

Q.    Are you familiar with the P.P.B. three application form?

A.    I'm sorry, could you repeat that?

Q.    Sorry.  Are you familiar with the P.P.B. three form?  P as in Peter, P as in Peter, B as in boy.

A.    I don't know it by that name.

Q.    Are you familiar with the statewide application form for pistol license applicants?

A.    Statewide through -- the only statewide one I know of would be through New York -- New York City, which was -- which would allow me to carry anywhere in the state.

Q.    I -- I apologize.  My question may not be clear.  When you applied for a license, was there a form that you needed to fill out?

A.    Yes.

Q.    And do you know, was that form

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson issued by the State Police?

A.   As far as I'm aware, it was issued through the Onondaga County Sheriff's.

Q. Okay.

A.   It was downloaded off the Onondaga County Sheriff's page.  And it said Onondaga County Sheriff's at the top.

Q.   All right.  So, a couple minutes earlier you mentioned recertification, correct?

A.   Yes.

Q.   Can you explain the recertification process for me?

A.   It is a process that New York State Police get to verify every firearm that I own every three years.

Q.   And when you recertify your license, what do you need to do?

A.   Log into a website and verify all my information, my name, address, social security number, all the firearms, serial numbers that I own.

Q.   And you're essentially just verifying that that's still true?

A.   Yes.

Q.   And you said it could be done

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 60

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

online?

A.    I believe it's the only way to do it now.  They no longer take phone calls or mail.

Q.    And when is the last time that you recertified your firearm?

A.    I believe it was August 2025.

Q.    About how long did it take you to do?

A.    I had to add a few firearms to it, so probably about fifteen minutes.

Q.    Okay.  And are you familiar with the term renewal --

A.    Yes.

Q.    -- of a firearm license?

A.    Yes.

Q.    And what's your understanding of renewal?

A.    Renewal would be if you live in the five boroughs or New York City, that you have to actually go through this whole process every three years to keep your license.  Go through the process of an eighteen hour course, fingerprinting, everything that you go through currently to get a pistol license.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    And since you live in Onondaga County, you don't need to renew your license, correct?

A.    Correct.

Q.    And does your license have any expiration date?

A.    It -- it is life unless revoked.

Q.    So taking a look at your license, there's a reference right under the word Onondaga at the top to not just pistols but semi-automatic rifles, correct?

A.    Yes.

Q.    Did you need to apply for that semi-automatic rifle endorsement separately?

A.    Yes.

Q.    Can you tell me about that process?

A.    You -- next time you do an amendment to your license, you go in, fill out the form, check a little box that adds auto rifle license to it, and then pay your three-dollar fee to get a new license.

Q.    And were there any requirements in addition to those?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Not that I'm aware of.  Being over the age of twenty-one.

MR. THOMPSON:  And all right.  And so Mr. Johnson, I'm going to show you -- actually, before we stop with this, just to double check, Kristen, we did mark this as Exhibit Two, correct?

COURT REPORTER:  Yes.

MR. THOMPSON:  Okay.  Great.

Q.    Mr. Johnson, I'm going to show you a third document.  And do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It is my Pennsylvania license to carry.

Q.    And why did you decide to get a Pennsylvania license?

A.    Because I shoot competitions in Pennsylvania.

MR. THOMPSON:  And Kristen, can I ask that this be marked as Exhibit Three?

COURT REPORTER:  Sure.

MR. STAMBOULIEH:  No objection.

MR. THOMPSON:  Thanks very much.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    Do you need a separate license from Pennsylvania in order to carry a weapon in Pennsylvania?

A.    If I am driving through the State of Pennsylvania without stopping, I can drive with carrying my firearm on me.  But if I stop at any point, I have to have it on me in order to carry it on me.

Q.    And so this license says it was issued in May of 2024, correct?

A.    Yes.

Q.    Was there any particular incident or -- or particular reason that you sought the license then?

A.    My wife and I often drive through Pennsylvania, go on sighting tours, leaf peeping, and I wanted to have it on me.

Q.    You said leaf peeping?

A.    Yes.  Looking at leaves.

Q.    And can you describe the process that you went through to get this license?

A.    I drove down to Montrose County Clerk, which is also as the Sheriff's station.  Spent about thirty minutes filling out paperwork, paid my

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

money and got my license mailed to me the next day. Actually, I believe it was on Monday.  Went down on Friday, got to me on Monday.

Q.    All right.  So going back to Exhibit Number Two.  If I could direct you to the first page that says Johnson O O two on the bottom left.

A.    Okay.

Q.    So, are these all the guns that you own?

A.    At the time the picture was taken, yes.

Q.    And have you purchased more since then?

A.    Yes.

Q.    Approximately how many more?

A.    At least three.

Q.    And can you briefly summarize the additional firearms that you're referring to?

A.    I bought three Glock forty-fours, which I use for the pistol safety class.

Q.    And these are all handguns or revolvers, correct?

A.    They're all handguns, yes.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   And so let me ask, why do you need ten handguns?

A.   They all have different purposes.

Q.   Can you walk me through them?

A.   Some of them are for competition shooting, some of them for -- are for training.  Some of them are for protection against larger animals such as bears.  Some of them are just training tools.  Let's see, some of them I use for hunting.

Q.   Could I ask you to walk -- walk me through some of the specific handguns listed here --

A.   Sure.

Q.   -- and explain the -- the unique purposes for each?

A.   Sure.  Did you want to start with one or --

Q.   Wherever you think appropriate.

A.   Basically, just a description of every single one?

Q.   Yeah, sure.  Short -- short description.

A.   My M nine, I've always liked the M nine style is from -- from movies.  I just love

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

that style.  I wanted a military -- an actual military firearm, one that has been modified to make it sporty, that's the M nine.  My G forty-five is my current carry gun.  My first -- that's actually my second P.D.P. is my match gun.  It's my -- one of my competition guns.  My S.R. twenty-two is a training pistol.

I also use it for this eighteen hour class.  My A.P.X. was my very first carry gun.  My Smith and Wesson forty-five is -- I mean, and M&P.45 is one of the guns I use for hunting, dispatching deer.  The other Walther P.D.P. is my first competition gun, and the Glock twenty-nine is my carry gun when I'm hiking.

Q.    And you said that the G forty-five is your sort of daily carry gun, correct?

A.    Yes.

Q.    And the G.L.C. under make is that Glock?

A.    I'm sorry, what was -- oh, yeah, that stands for Glock.

Q.    So why do you generally carry the G forty-five?

A.    It's the perfect size modular

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Page 67

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

weapon.  It has a full-size grip.  I don't need a long -- super long barrel.  It is efficient for its packaging.  They're very reliable.

Q.    And when you say modular, what do you mean by that?

A.    You can -- if you need to, you can always remove the slide and barrel and make -- and turn it into a G forty-seven, which would be a longer sliding barrel.

Q.    And why would you do that?

A.    If you were to use iron sights and wanted to shoot at farther distances.

Q.    And you said you have a different Glock, the G twenty-nine --

A.    Yes.

Q.    -- for hiking?

A.    Yes.

Q.    Can you explain to me why you would use that over the G forty-five?

A.    That's a ten millimeter.  It's far more powerful.  When used up against bear, nine millimeters is not a very effective round, neither is a forty-five.  Ten millimeter is a far more effective round.  A lot of the places that I hike, I have seen

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

bear out on the trails.

Q.    And so in addition to the ten handguns that we've discussed, do you own any rifles, shotguns, or other firearm?

A.    I do.

Q.    Can you walk me through the ones that you own?

A.    I don't see how rifles are relevant to a pistol carry case.

Q.    Well, it's not just a pistol carry case.  You're --

A.    C.C.I.A. doesn't have anything to do with rifles.  I can't conceal carry a rifle or a shotgun.

Q.    Do you understand the concealed - - do you understand the C.C.I.A. to allow carriage of rifles or shotguns in sensitive places?

A.    It's never been brought up to be a member.  Its -- Concealed Carry Improvement Act was meant for concealed carry.  People don't conceal carry A.R.s or bolt action rifles or shotguns.

Q.    Understood.

A.    I don't see that as being anything to do with the C.C.I.A.

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Page 69

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Q.   Understood.  But I'm -- I'm not -- the -- the question I asked is a little different, which is do you understand it to be legal to carry a long gun, a rifle, or a shotgun into a sensitive location?

A.   As it stands now, no.

Q.   And is that part of the relief that you're seeking in this case?

A.   If I don't -- I'm not concerned about carrying a rifle in the places -- places I would bring a rifle, I'm allowed to bring rifles into anyway.

Q.   Sure.  But --

A.   I'm not asking to bring an A.R. fifteen into a zoo, if that's what you're asking.

Q.   So is that not part of the relief that you're seeking in this case, the ability to bring a long gun into these sensitive locations?

A.   I don't believe long guns were ever mentioned anywhere in any of the documents I've had so far, or any of the questions I've been asked so far.

Q.   Sure.  But the question I'm asking is a little different.  The question I'm

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

asking is about what you're trying to accomplish with this case that you've brought.  Are you hoping to get an order that would allow long guns, rifles, or shotguns in sensitive locations?

A.  That's not my intention so far.  It's not my intention in any of this.  It has nothing to do with rifles.

Q.  So, is that a no?

A.  That would be a no.

Q.  Do you think it would be Constitutional to prohibit an A.R. fifteen in a zoo?

A.  I don't see why it would be.  I don't see why it would be Constitutional prohibit.  I mean, any firearm anywhere.

Q.  So you think it's --

A.  Except restrictions that have already applied such as schools, federal buildings, things like that.

Q.  So I'm trying to see if I can -- if I can summarize what you're telling me.  Is what you're saying that you think it's unconstitutional to keep long guns out of sensitive locations like zoos, but that's not part of what you're seeking in this case?

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   I think if you've read the Second Amendment, you would understand that shall not be infringed is pretty self-explanatory.  The idea that I can't carry a firearm somewhere is ridiculous.  I'm not -- I'm not asking to carry an A.R. fifteen into the zoo, but I don't see why I can't.  Prior to the C.C.I.A., I could take a bolt action rifle or an A.R. and walk anywhere I wanted with it.  There was no restriction to it, obviously not schools or things that are pre-existed.

But I could walk down the street, I could walk into Three Rivers Wildlife Management area without an issue, but carrying a fire -- carrying a pistol is the issue?  I could go on a trip down to Bowman Lake and hunt deer, but I couldn't carry a pistol with me?  That seems kind of ridiculous.

Q.   Did you in fact carry long guns prior to the C.C.I.A. down the street?

A.   No.

Q.   And so again, let me just sort of try and get the question down to -- to the clearest yes or no format.  Is what you're saying that you believe that it's unconstitutional to keep long guns out of these locations, but that that's not what

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

you're seeking to do in this case?

A.   I don't see why there would be a reason to have -- or I don't see why there'd be a reason to restrict long guns in any form, rifle, shotgun, whatever, same as I would say there's no reason to restrict pistols.

Q.   I'm not asking whether you can see the reason.  I'm asking what you're trying to do.

A.   I'm very simply trying to be able to carry my pistol everywhere I would go during the day.

Q.   So therefore, the relief that you're seeking is not about long guns, correct?

A.   Correct.

Q.   All right.  That said, I'd like to go back to the question that I asked, which is what long guns do you own in addition to the pistols that we've discussed.

MR. STAMBOULIEH:  And I'm going to object to the extent that the Witness needs to invoke his Fifth Amendment right against self-incrimination, and I will leave it up to the Witness to -- to decide if he wants to invoke his right.

THE WITNESS:  I invoke my Fifth

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Amendment right.

Q.   Do you own any semi-automatic rifles?

MR. STAMBOULIEH:  I would make the same objection and leave it up to the Witness to decide if he wants to invoke his right.

THE WITNESS:  I invoke my Fifth.

Q.   Do you own anything that meets the definition of an assault weapon?

MR. STAMBOULIEH:  Same object -- objection and leave it up to the Witness to decide if he wants to invoke his rights against self-incrimination.

A.   No, I do not.

Q.   Do you own anything that meets the definition of a machine gun?

A.   No.

Q.   And do you own anything that meets the definition of a ghost gun?

MR. STAMBOULIEH:  Same objection, and I'll leave it up to the Witness to decide if he wants to invoke his Fifth Amendment right against self-incrimination.

A.   No, I do not.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Are you familiar with the term Glock switch?

A.   Yes.

Q.   What's your understanding of a Glock switch?

A.   Glock Switch is a device that attaches onto the rear of the slide that allows conversion of semi-auto to full -- full auto fire.

Q.   And do you own any Glock switches or any Glocks that have been modified with a switch?

MR. STAMBOULIEH:  With same objection. I'll leave it up to the wit -- well, I'm going to instruct the Witness not to answer the question and to invoke your Fifth Amendment right against self-incrimination.

A.   No.

Q.   So is the answer no, or are you invoking the Fifth Amendment?

A.   I'm sorry.  I'm invoke -- invoking the Fifth Amendment.  I'm sorry.

Q.   Let me just --

A.   I mean, listening to two people, I apologize.

Q.   Of course.  And I -- I want to

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

make sure that we have a -- a clear transcript.  So I -- I asked you several questions, assault weapon, machine gun, ghost gun, and Glock switch.  Are you invoking the Fifth as to all of them?  Or you said no as to --

A.  I -- I apologize.  I was invoking the Fifth Amendment.  I -- I'm not familiar with legal proceedings, so I apologize if I did it wrong.

Q.  So you're invoking the Fifth Amendment --

A.  Yes.

Q.  -- as to all of those questions?  Understood.  Do you own any weapons that you keep outside the State of New York?

A.  No.

Q.  So you talk about -- you talked about how you usually carry your G forty-five with you, is that correct, Mr. Johnson?

A.  Yes.

Q.  And can you tell me how you carry it?

A.  I don't understand the question.  Concealed.

Q.  Do you carry it in a holster?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 76

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Yes.

Q.    And where on the body is the holster?

A.    I usually carry appendix.

Q.    So sort of --

A.    Inside the waistband in the front.

Q.    And is the holster visible?

A.    No, it's concealed.

Q.    And how often do you carry a gun with you?

A.    Every day.

Q.    Do you carry your weapon with you to work?

MR. STAMBOULIEH:  I object and would instruct the Witness not to answer the question and invoke his Fifth Amendment right against self-incrimination.

A.    I invoke my Fifth.

Q.    Would your workplace permit you to carry a gun to work?

A.    No.

Q.    Do you carry your weapon with you on weekends, or on days when you're not at work?

800-523-7887                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 77

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Yes.

Q.    Are there ever cases where you don't carry a weapon with you?

A.    Yes.

Q.    And what are those cases?

A.    If I know I'm going someplace that would have security or checkpoints that would prevent me from carrying a firearm.

Q.    And so, how do you decide when to carry your weapon and when not to carry your weapon?

A.    If I know ahead of time that I'm going someplace that would prevent me from carrying a firearm, I will leave it in my vehicle or not bring it at all.

Q.    And when you leave it in your vehicle, how do you store it?

A.    Unloaded, secured with the magazine and ammunition separately.

Q.    And where do you place -- where in the vehicle do you place your firearm?

A.    In a console vault.

Q.    So -- and when you say console, is this the space in between the front seats of the vehicle?

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 78

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    It's a vault, yes.

Q.    And what do you mean by vault?

A.    It's a secured area.  It's not just an open console.  It's a locked, armored, concealed.

Q.    And when you say locked, is it with a key, biometric, is --

A.    It's locked.

Q.    -- how does one open it?

A.    With bypassing the lock.  I don't see why that's relevant.  I don't see why you would need to know what my lock is.

Q.    Well, I'm --

A.    New York State requires me to have a locked, fire resistant, tamper-proof container, which it is.

Q.    And I'm interested in the locking mechanism.

A.    I don't really want to talk about it.  I don't see why anybody would need to know that just like I don't -- would not tell anybody that I carry a firearm.

Q.    It's a deposition.  You have sworn to tell the truth and the whole truth.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   I am telling the truth.  I wouldn't tell anybody else on the street that I have this or how to access it.  I would not give somebody the access means to access my firearms while they're in my car.  Would you walk out on the street and just ask -- just give information away to somebody?

Q.   If you're --

A.   I don't know who you are.

Q.   If you're concerned that I'm going to steal your gun, you don't need to be concerned about that.  If what you're concerned about is having the text in your deposition transcript, I'm happy to stipulate to redacting your answer to this question.  But I do need to get an answer to the question.

A.   Okay.  If my question -- if my answer is redacted so nobody else will see it, then just the people in this room.

MR. THOMPSON:  Is that fine by everybody in the room?

MR. STAMBOULIEH:  Yes.

MR. HEISLER:  It's up to the Witness.

COURT REPORTER:  I can do that.

A.   Okay.  (Redacted by request)

Associated Reporters Int'l., Inc.                      www.courtsteno.com

Page 80

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    Okay.  I'm not going to ask you the combination.

A.    Thank you.

Q.    So, I'm going to show you another document, Mr. Johnson.  This one, I apologize, is a large one.

MR. STAMBOULIEH:  I have it.

Q.    And Mr. Johnson, do you recognize this document?

A.    I believe this is the original -- I don't know what it'd be, the original charge.  The original complaint.

MR. THOMPSON:  And Kristen, could I ask for this to be marked as Exhibit Four?

COURT REPORTER:  Yes.

MR. STAMBOULIEH:  No objection.

MR. THOMPSON:  We're on Four, right?

COURT REPORTER:  Yes.

Q.    So Mr. Johnson, I'd like to direct your attention to paragraph number one hundred fifty-one on page forty-seven.  Can I ask you to read that out loud for me?

A.    (Reading) Plaintiff Johnson routinely carries his handgun concealed when he

800-523-7887                           ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson leaves the home.  Plaintiff Johnson does not carry his handgun in schools, courthouses, government buildings, or other obvious sensitive places which have been described by the Supreme Court.  However, Plaintiff Johnson is responsible for his own security and security of his family, and thus his firearm generally does not leave his side when he leaves the house.

Q.    And is that correct?

A.    Yes.

Q.    So when you write routinely, does that mean, as you testified, whenever you're not going to be in a secured location that doesn't permit firearms?

A.    I'm sorry, I wasn't focused on that.

Q.    Sure.  Let me just ask the -- ask the question a different way.  When you write in the first sentence, Plaintiff Johnson routinely carries his handgun concealed when he leaves his home, what's the meaning of routinely?

A.    Every day, unless I know I'm going someplace where I can't carry it.

Q.    And so when's the last time you

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

carried your gun outside the home?

A.   This morning.

Q.   Did you bring your gun with you today?

A.   No.

Q.   And when you write, Plaintiff Johnson does not carry his handgun in schools, courthouses, government buildings, or other obvious sensitive places which have been described by the Supreme Court, can you explain what you mean by that?

A.   I don't understand.  It's pretty self-explanatory.  I don't -- I don't understand what -- what you're asking.

Q.   Sure.  So, when you say you don't carry your handgun in schools and courthouses, that means you never carry a gun when you're in those places?

A.   Correct.

Q.   What about government buildings? Do you ever carry a gun in a government building?

A.   One, I don't have often reason to go to government buildings, but when I do go to them, I do not carry my firearm.

Q.   In any government building ever?

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   Any government building that I'm aware of.

Q.   And next you say, obvious sensitive places which have been described by the Supreme Court.  Can you tell me what's meant by that?

A.   Places that already currently existed: schools, federal buildings, sheriff's department, places like that, places the Supreme Court's already said that you can't carry a firearm.

Q.   So when you say other obvious sensitive places, is that referring to the three categories we just talked about, schools, courthouses, and government buildings?

A.   Yes.

Q.   Is there any location that's not a school, a courthouse, or government building that you view as -- as covered by that, other obvious sensitive places phrase?

A.   I -- going to need clarification on the question because while I understand New York State has a list of sensitive locations and restricted areas, they -- those places are not schools, courthouses, or government buildings.

Q.   Yes, correct.  So the question

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

I'm trying to get at is the sentence says that Plaintiff Johnson does not carry his handgun in other obvious sensitive places which have been described by the Supreme Court.  And what I'm asking you is, does that term refer to any location other than schools, courthouses, and government buildings?

A.    The Supreme Court, no.  The State has made different restrictive places and sensitive areas, but not what the Supreme Court has said.  So if you're asking me, do I carry places the Supreme Court says I can't carry, no.

Q.    I'm asking you do you carry -- do you refrain from carrying your handgun in any sensitive places other than schools, courthouses, and government buildings?

A.    That wouldn't be what the Supreme Court said.  That'd be what New York State said.

Q.    So, is that a no?

A.    Are you asking me if I carry guns in places that New York State says that I can't carry?

Q.    Other than schools, courthouses and government buildings.

MR. STAMBOULIEH:  I'm going to object

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

to that question and instruct the Witness to invoke the Fifth Amendment right against self-incrimination.

A.    I invoke my Fifth.

Q.    Okay.  Mr. Johnson, have you ever been involved in a situation where you needed to use a firearm for self-defense?

A.    Against humans, no.

Q.    Against anything?

A.    Against coyotes, yes.

Q.    Can you describe that situation?

A.    I was hunting here locally, and I had three coyotes stalking me, so I had to use my pistol because rifle -- I had already unloaded my shotgun and was unable to use that.

Q.    And when was this incident?

A.    It's going to be, I believe winter -- or actually it'd be fall of 2023 going into 2024, I believe.

Q.    And where was this incident?

A.    This was in Plainville, New York.

Q.    And where in Plainville?

A.    My mother-in-law's house.

Q.    And I'm assuming not inside the house?

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    No, in the woods.

Q.    So, on her property?

A.    Yes.

Q.    And other than that incident, have you ever been involved in a situation where you needed to use a firearm for self-defense?

A.    No.

Q.    Have you ever used a firearm against another person?

A.    No.

Q.    Have you ever needed to draw or brandish your firearm?

A.    No.

Q.    And are you currently under any particular threat that would mean you need a firearm for self-defense?

A.    Other than every other American, nothing specific to me.

Q.    Do you feel threatened on a regular day?

A.    Have you read the news?  Yes.

Q.    Can you explain what threats you see and -- and why you feel threatened?

A.    I mean, just a couple weeks ago,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

a bunch of kids decided they were going to re-enact Columbine, constantly Carousel Malls having people bring guns in there.  Just recently, there's a person arrested -- two people arrested at the zoo, one for brandishing his firearm, the other for claiming that he had one on him, so yes.

Q.   Do you think that you'd be safer if those places didn't allow firearms in?

A.   I don't see how that would make any difference making a big announcement that I can't carry a gun but yet a criminal can isn't going to make me safer in any way.

Q.   You think that anybody makes announcements that criminals can carry guns?

A.   I don't understand the question.

Q.   You just referred to a big announcement that you can't carry a gun, but a criminal can.

A.   A sign saying you can't carry a gun here is an awful good way to let people know that people are going to be unarmed there.

Q.   Are you aware of whether gun-free zones make an area safer or more dangerous?

A.   I would say they inherently make

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

them less safe.

Q.   Why?

A.   Because people who are going to break the law aren't going to be -- care about a little sign that says you can't carry a gun here. That's been proven time and time again.  How many -- how many people get busted with guns in Times Square?

Q.   Proven by whom?

A.   Proven by the news.

Q.   Which -- is there any specific story or any specific article that you're referring to?

A.   Pick a day, you can read any article or read or listen to any review of crimes that have happened where people have carried guns. The Syracuse Police and the Onondaga County Sheriff both post online all the time of guns captured through investigation in Downtown, pretty much most of them end up referring to somebody who shouldn't have a firearm in the first place, that which would make them a criminal.

Q.   Would it surprise you to hear that social science studies indicate that laws banning gun carriage actually do reduce crime in the

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 89

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

instance -- in the areas where guns are prohibited?

A.   I don't believe that.

Q.   Why not?

A.   I've seen it.  If -- if -- if having signs that said you can't carry a gun eliminated crime or reduced crime, then you wouldn't have people every week bringing guns down to Carousel Mall.  You wouldn't have people shooting up the streets in -- on the south side.  You wouldn't have people breaking into cars and leaving guns and ammo in the cars that they left.  If that was the case, then you wouldn't be seeing these things.  I've seen them far more now than I have in the last ten years.

Q.   When you say, I've seen it, can you tell me what instances you personally have seen?

A.   The news, the reports that the Syracuse Police put on, it's the Onondaga Sheriff's put on, the Fulton County police put on, the New Hartford police put on.

Q.   Sure.  I guess the question that I'm asking is a little different though, which is, have you personally witnessed any incident or been present at any event that gives you any basis to opine on the effectiveness of sensitive places laws?

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    My wife and I were actually pulling into the parking lot for Carousel Mall the night that a person shot the garbage can on the bottom -- bottom floor.

Q.    And do you know, does Carousel Mall permit guns?

A.    They have a policy that has no firearms allowed.

Q.    And are they -- is Carousel Mall a public or a private institution?

A.    I believe it's a private property.  I don't know how that'd work.  It's open to the public, but it's owned privately.

Q.    And a sensitive places law means that someone could be stopped or arrested for having a gun in the location prior to using it in a violent or criminal way, correct?

A.    I'm sorry, I don't understand the question.

Q.    Sure.  Would you agree that a sensitive place law means that someone with a gun in that location can be stopped or arrested for having a gun there before they use it in a way that's violent or criminal?

Page 91

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   If it was known that they had it, yes.

Q.   So let's -- let's just zoom out a little bit.

A.   Okay.

Q.   Can you tell me in your own words why are you suing New York?

A.   Because as it stands, they have decided to unilaterally infringe upon my Constitutional rights to carry a firearm and that of every other New Yorker.  Despite the fact that Supreme Court said these are the rules you have to follow, and New York State decided we're just going to do it anyway, we don't care what the Supreme Court says.

Q.   Let's break that down a little bit.  Which laws would you say are infringing on your Second Amendment rights?

A.   The SAFE Act for starters, the C.C.I.A.  The C.C.I.A. is the one we're going after right here.

Q.   Are there any other gun laws in addition to the SAFE Act and C.C.I.A that you believe are unconstitutional?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 92

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Those in themselves incorporate lots of different gun laws, so you have to be specific.

Q.    Yes.  Well, I'm asking, are there any gun laws outside of the SAFE Act and C.C.I.A. that you view as unconstitutional?

A.    Anything that would tell me that I can't carry a firearm on my day-to-day business would be an infringement upon my Second Amendment rights.

Q.    Are there any gun laws that you do believe are Constitutional?

A.    Not in particular.  I understand the basis of them, but I still don't think they're Constitutional.

Q.    So do you believe that any restriction on weapons is Constitutional?

A.    I don't see an instance where there should be a restriction on firearms with the exception of people who are federally prohibited. But even then, if you've gone and committed a crime and then served your time and done your penance, you should be able to get your rights back.  If the state or the government feels that you've done your due

800-523-7887                                        ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 93

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

diligence, then you should be able to get your firearms back.

Q.   So, in terms of the types of weapons that can be regulated, do you believe that all gun prohibitions are unconstitutional?

A.   You're going to have to be specific.  There's a lot of gun prohibitions.

Q.   Do you believe it's Constitutional to prohibit an assault weapon?

A.   No.

Q.   Do you believe --

A.   Wait, hold on.  Yes, I think it's unconstitutional.  I'm sorry, I was on --

Q.   I -- I think the question was whether you thought it was Constitutional, but -- but you -- you answered it no, you -- you don't, correct?

A.   Correct.

Q.   Do you believe it is Constitutional to prohibit ownership of a machine gun?

A.   No.

Q.   Do you believe it's Constitutional to prohibit the ownership of explosives?

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    No.

Q.    Do you believe it's constitutional to prohibit the ownership of missiles?

A.    No.

Q.    Do you believe that it's Constitutional to prohibit the ownership of a nuclear weapon?

A.    No.  Any -- okay, you're right. Never mind.

Q.    No, feel free to say what you wanted to say.

A.    No.

Q.    Okay.  And you previously testified that you got involved in this lawsuit through Mr. Crump, correct?

A.    Yes.

Q.    Did anyone else play a role in your getting involved in this lawsuit?

A.    No.

Q.    Did anybody else recruit you or connect you to this lawsuit?

A.    No.

Q.    And are you paying for your lawyers in this lawsuit?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    No.

Q.    Do you know who --

A.    Other than my membership fee to Gun Owners of America.

Q.    Do you know who is paying for the lawyers in this lawsuit?

A.    I have no idea.

Q.    All right.  Let me go back to Exhibit One, which is the interrogatories.  And I would direct you to interrogatory number three, which is the bottom of page three and the top of page four.  If I could ask you to read that quickly?

A.    Let's see.  (Reading) Identify with specificity each sensitive location within --

Q.    Oh, you can read it -- you can read it quietly if you want.

A.    Oh, I'm sorry.

Q.    Let me know when you're ready.

A.    Okay.

Q.    So, here you're discussing the sensitive locations that you're challenging in this case, correct?

A.    Yes, I believe so.  Part of them, yes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Q.    Is the list inaccurate or is anything missing?

A.    No.  Okay.  I -- I get it.  I -- I understand.  Yes, it does.

Q.    So that's, yes, it is accurate?

A.    Yes.

Q.    And so, if you take a look at the last paragraph, you say (reading) that Plaintiff has no knowledge that any manager of any particular place he's visits prior to the enactment of the Concealed Carry Improvement Act banned the carry of lawfully owned firearms.

Can you explain what you mean by that?

A.    Well, first I would say that I don't often talk to the managers of the places unless it's a small business, and it would be somebody that I would deal with on a normal basis.  But also, the places I go to don't have no carry signs or have ever made any instance known to me that they would not want me to carry a firearm there.

Q.    Understood.  And when you wrote, prior to the enactment of the Concealed Carry Improvement Act, do you know whether any of the places that you're referring to banned firearms

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson today?

A.   We gave the instance of the mall, but places I go to on a day-to-day basis, I particularly look for no gun signs.  I don't see them, and if they do, I just don't go into -- I just don't frequent their business.

Q.   And you testified earlier that you don't carry a gun in schools, courthouses, or government buildings, correct?

A.   Yes.

Q.   Do you want to carry a gun in schools, courthouses, or government buildings?

A.   I don't see why I shouldn't be able to.

Q.   Let me ask the same question a different way.  Is part of the relief that you are seeking in this case an order that would allow the carriage of firearms in schools, courthouses, or government buildings?

A.   This case doesn't challenge that, I believe, because those laws existed prior to the C.C.I.A.  If I had my option, if I had my choice, I would say yes, I would like to go after those, but I don't believe those were topics brought up simply by

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson the C.C.I.A.   Those existed long before that.

Q.   So let me ask the same question a different way.  Yes or no, are you asking for Judge Suddaby to issue an order saying that you can carry a gun in schools, courthouses, or government buildings?

A.   No.

Q.   Have you ever carried a gun in a school, courthouse or a government building?

MR. STAMBOULIEH:  Object to the question and instruct the Witness to answer -- to invoke his Fifth Amendment right against self-incrimination.

A.   I plead the Fifth.

Q.   Do you think it's a good idea for people to carry guns in schools, courthouses, or government buildings?

A.   I think people that are trained should absolutely carry guns in schools.  Schools don't have people there to protect them.  Courthouses that you -- you have to go through metal detectors would be protected by guys with guns.  But schools, there's school shootings all the time.  The one just recently where three kids wanted to be Columbine imitators.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 99

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   I can tell you as the parent of a school child, I would not want a stranger with a gun, trained or not, carrying a weapon in my child's school.

A.   Well, I can also say that if you knew how poorly the police shoot, I can understand that.  I've taken a qualifier for all fifty states, law enforcement qualifier from all fifty states.  I've aced every single one except for Texas.  If the state police or the government or the local police only have to do a seventy, that means thirty percent of their rounds don't hit what they're intending.  That's pretty scary.  I'd be worried for my child too.

Q.   Understood.  But what I said is not that I'm concerned about the police, it's that I would be concerned about strangers with guns, people who aren't law enforcement, people who I don't know and haven't sworn an oath to protect me.

A.   Fair enough.  That's you.  But I can tell you that of the thousands of matches that I've shot, of all the police officers, all the law enforcement that I've ever shot against, including Marshalls, U.S. Marshals, Secret Service, F.B.I.,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

none of them have ever beat me in a competition.

Q.   All right.  Well, let me ask you, you -- you mentioned earlier that you had a son, correct?

A.   Yes.

Q.   When he was little in, you know, kindergarten or first grade, second grade, would you have wanted the other moms and dads in his class to carry a gun into his school?

A.   Twenty-eight years ago, I didn't hear about these school shootings.  This wasn't a common thing.  You asked me earlier why, because this has become a more common thing.  It went from hearing about one thing, Columbine and Sandy Hook, to now six, ten times a year.

Q.   So let me ask you the question a different way.  If you were the parent of a small child now, would you want the other moms and dads from your child's class to be carrying a gun in the school?

A.   I would want people who are trained in the use and safety of a firearm to carry a firearm.

Q.   So, is that a yes?

800-523-7887                                   ARII@courtsteno.com
Serving all of New York State

Page 101

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Yes.

Q.    Would you want trained people to be able to walk in on the street --

A.    Why would --

Q.    -- into the school carrying a gun?

A.    If you don't have business in a school, you shouldn't be there in the first place.

Q.    I think I'd agree with that, but especially not if you have a gun.

A.    That has nothing to do with it. If you've got -- if somebody walks in there had -- has no kid at the school, there's no reason for them to be there. If I had a kid in school, I don't see why I shouldn't be able to have a gun there. It's -- if I'm his parent, it's my job to protect my child.

Q.    Let me ask the same question a different way. A lot of people come into schools, right, who aren't just parents: janitors, gym teachers, contractors, the people who fix the lights when it goes out. Would you want them to have guns in your child's school?

A.    If they're trained and safe in using those, yes.

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Okay.   What about courthouses? Do you think it would be good for civilians to be able to carry guns into a courthouse?

A.   I would like to think that the people that are arming the security booths that have firearms themselves are going to be there to protect me.

Q.   Okay.  So, is that a no?

A.   I wouldn't carry a gun -- I'm sorry, can you repeat the question?

Q.   Got it.  So, yes or no question. Do you think it's good for people who are not court officers or law enforcement officers to have guns in courthouses?

A.   I don't see why they shouldn't.

Q.   Do you think that the presence of guns in a courthouse would intimidate the people inside it?

A.   If they're not intimidated by the police officers having guns, why would they be intimidated by anybody else having a gun?

Q.   Okay.  Do you think as a practical matter, jurors or judges would be intimidated by the presence of strangers with guns in

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

the courtroom?

A.   Well, one, New York State has concealed carry.  There is no open carry, so nobody should know that you have it on you to begin with.  You go through your every day, you have no idea how many people you interact with they have firearms.

Q.   So, is that a yes or a no?

A.   I don't understand the question.

Q.   Do you think that if jurors, or witnesses, or judges knew that people had guns in the courtroom, that the result would be intimidation?

A.   No.

Q.   Okay.  So, I'd like to ask you a little bit about zoos.  Taking a look at Exhibit One, you identify the Rosamond Gifford Zoo in your interrogatories, correct?

A.   Yes.

Q.   And that's the only zoo that you identify, right?

A.   That was the one that came up, yes.

Q.   So, can you tell me about the Rosamond Gifford Zoo?

A.   What would you like to know about

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

it?

Q.    Where is it, what's it like, what kind of animals are there --

A.    It's Syracuse --

Q.    -- how often do you go?

A.    It's not too far from Carousel Mall, up on the West Side.  They have elephants, camels, flamingos, wolves, large cats, elephants I think I had mentioned, otters, a whole sea life aquarium, a whole bird section.

Q.    And about how often do you go to the Rosamond Gifford Zoo?

A.    Right now, probably about once a quarter.

Q.    And what do you do there?

A.    Take my wife, walk through, see the exhibits, especially when they have special events going on.

Q.    And where is the Rosamond Gifford Zoo located?

A.    Syracuse, New York.  I don't -- do you want more specific?

Q.    Yeah, a specific neighborhood.

Q.    The West Side.

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    Is it within a --

A.    It's not far from Tipperary Hill.

Q.    Is it within a park?

A.    I believe so.  I'm not sure how the structure works.  I believe the park itself is -- is a separate entity from the land around it.  The way it's been explained to me at least.

Q.    So let me ask, who runs the Rosamond Gifford Zoo?

A.    I'm not sure.  I know there's a collective and a foundation from The Gifford Family.

Q.    Do you know, is it public property or private property?

A.    I would assume it's private, open to the public.

Q.    And do you know whether the zoo is operated by a private corporation, or a non-profit, or a government entity?

A.    I honestly don't know.

COURT REPORTER:  I'm sorry, I didn't hear that.

A.    I honestly don't know.

Q.    Do you have to buy a ticket to enter?

800-523-7887                                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 106

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    Unless you're a member.

Q.    Are firearms permitted?

A.    As -- according to C.C.I.A., no.

Q.    And are you a member of the Rosamond Gifford Zoo?

A.    Yes.

Q.    Is there security at the zoo?

A.    I have seen park rangers there.

Q.    Do you have to go through a -- a gate, or a -- other sort of checkpoint?

A.    There is a gate there, yes.

Q.    And what's the crowd usually like at the zoo?

A.    Depends on the day.  It's -- never been there where it's been empty.  There's usually a good amount of people there.

Q.    And who usually goes to the zoo?

A.    People.  I don't understand how to answer the question.

Q.    Would you say that most of the people who go to the zoo are families with kids?

A.    Not always, maybe half.  I see a lot of elderly people there just walking.

Q.    So you think -- you think about

Associated Reporters Int'l., Inc.                www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

half?

A.    It'd be fair to assume.

Q.    Are there school trips or field trips to the zoo?

A.    I'm sure.

Q.    Do you ever see classes of kids at the zoo?

A.    I purposely try to avoid when schools are there.  I find large groups of kids annoying.

Q.    Fair enough.  Would you agree that many of the people who go to zoos are children or families with children?

A.    Sure.  Yes.

Q.    And you said zoos can get pretty crowded.

A.    Yeah.

Q.    Correct?

A.    Yes.

COURT REPORTER:  I can't hear.

A.    Yes, they can.

Q.    How do you think that the kids would feel if they knew you had a gun?

A.    I'm not a kid.  I don't know.

800-523-7887                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   You've had a kid.  You know kids. How do you think kids would feel if they knew a stranger had a gun?

MR. STAMBOULIEH:  Object to speculation.

Q.   You can answer.

A.   I don't know.  When I was my kid's age, I don't think guns were even an issue.  I never really thought about them.

Q.   Do you think some kids might be scared if they knew a stranger was next to them with a gun?

A.   I don't see how -- one, I don't see how they would know that a stranger has a gun. If they saw somebody that was actively threatening them, I'm sure they'd be scared.  I don't see if they saw a police officer with a gun that they would be scared just because the person had a gun.

Q.   Do you think that the kids would be scared if they knew they were in an area where there might be strangers with guns?

A.   I don't believe so.

Q.   No?

A.   I've seen references to people

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson claiming that kids aren't affected by signs that say no guns allowed or guns allowed, other than the fact that they know it now makes them a target.

Q. Can you explain what you mean by it makes them a target?

A. That if you have a sign out there that says no guns allowed, it means there are parents and teachers and custodians and principals who can't carry firearms, that means that it's very easy for somebody who doesn't care about the law to go in there and start shooting people.

Q. Do you think it would be easy for someone to go into the Rosamond Gifford Zoo and start shooting people?

A. Yes. It would be the same as any place.

Q. Have you ever taken a gun into the Rosamond Gifford Zoo?

MR. STAMBOULIEH: Objection. And I will instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

THE WITNESS: I invoke the Fifth.

Q. Have you taken a gun into the Rosamund Gifford Zoo recently?

800-523-7887                          ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Page 110

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

MR. STAMBOULIEH:  Objection.  And I'm going to instruct the Witness to invoke his Fifth Amendment right against self-incrimination?

THE WITNESS:  I invoke the Fifth.

Q. Have you ever been threatened with any violence or harm while visiting the Rosamond Gifford Zoo?

A.   Yes.

Q.   Can you tell me about that incident?

A.   I had a gentleman who was not very happy that I took the last otter at the gift shop.  And after -- after him wanting to buy it off me and saying no, some names were called and he followed me halfway out to my car.

Q.   And how did that incident resolve itself?

A.   He eventually stopped and decided it wasn't a good idea to keep going.

Q.   Any idea why he did?

A.   I told him to stop.

Q.   Did you tell him that you were armed?

A.   No.

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    So, you just said stop and he stopped.

A.    Uh-huh.

MR. STAMBOULIEH:  Yes or no?

A.    I said yes.

Q.    Do you anticipate any particular danger if you go to the Rosamond Gifford Zoo?

A.    Same as any other place I would go during my day.

Q.    So, I'm going to show you another document here.  And Mr. Johnson, do you recognize this document?

A.    I believe this is my original declaration.

Q.    And let me direct you to page nine of nine, the very back page.  Is that your signature?

A.    It is a computer generated signature.

Q.    Did you in fact review and sign this document --

A.    Yes.

Q.    -- electronically?

A.    Yes.

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

MR. THOMPSON:  All right.  Kristen, could I ask that this be marked as Exhibit Five?

MR. STAMBOULIEH:  No objection.

Q.   So Mr. Johnson, I'm going to direct you to paragraph seventeen.  The first sentence you write, (reading) the C.C.I.A. makes it a crime to possess a firearm at a zoo about as far from a sensitive place as I can imagine.

Is that correct?

A.   Yes.

Q.   Why do you think a zoo is as far from a sensitive place as you can imagine?

A.   Because there's no historical reference to preventing people from carrying a firearm at a zoo.  In fact, back when zoos weren't nearly as safe as they are, it was actually encouraged for people to carry firearms in the event the animals got loose.

Q.   Can I ask you, what's -- what's the basis of that belief?

A.   Which?

Q.   That it was previously encouraged to carry firearms at zoos?

A.   It's historically documented.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 113

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    By whom?

A.    I've seen in several books.  The 1800-1900's people were encouraged to carry firearms in zoos in the event that bears or lions and tigers escaped.  Same thing with amusement parks or circuses.

Q.    Can you recall which books these were?

A.    No idea.

Q.    And are you aware of whether zoos existed at the time of the founding of the United States?

A.    Back in 1750 to 1790, I -- I don't know of any particular instance of a zoo.  I'm sure they probably did.  They existed back in, you know, 200 in Asia.

Q.    Why do you believe that zoos existed at the time of the founding?

A.    I don't know if they did.  I'm assuming they did because they do exist prior in other countries, in other cultures.

Q.    But you don't have any personal knowledge?

A.    I wasn't alive in 1776.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   So ,is that a no?

A.   That'd be a no.

Q.   Okay.  Are you aware of whether zoos existed in 1868 at the time of the ratification of the Fourteenth Amendment?

A.   I don't have firsthand knowledge, but I believe they did.

Q.   And why do you believe that they did?

A.   Because we have -- we know for a fact zoos have existed in Asian countries or Asian cultures long before that.

Q.   Okay.

A.   It would make sense that they would have them here.

Q.   And how do you know that for a fact?

A.   I've read it.  I've seen it on documentaries.  I've seen it on History Channel.

Q.   And when you say you've read it, where have you read it?

A.   I don't have the name of every book that I've ever read.

Q.   Let me ask another question.  Are

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

you testifying as a historical expert in this case?

A.   No.

Q.   Do you have any professional or academic background in history?

A.   No.

Q.   Okay.  So, when you say about as far from a sensitive place as I can imagine, what do you think would be a sensitive place, or would be close to a sensitive place?

A.   Someplace that would be restricted from normal people accessing.  A nuclear facility, a prison, something like that.

Q.   So what are the -- let me ask the same question a different way.  What are the qualities that make a place sensitive in your understanding?

A.   Someplace that would be a danger for people to go.  Someplace that is under armed guard.

Q.   And so is it your understanding that a place needs to be either a danger for people to go or under armed guard for guns to be Constitutionally prohibited?

A.   I don't believe that would be

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

either an all-inclusive list or the only list.  But in my example, I don't think people would be carrying guns at a nuclear reactor because it's already guarded by people with guns.

Q.   So you think it would be Constitutional to prohibit gun carriage there?

A.   No.  I don't believe that you should be able to limit guns anywhere.  But if that - - what you're asking is, what I consider a sensitive place, I would consider that a sensitive place.  I still don't believe it means that I shouldn't be able to carry a gun there.

Q.   So, do you think you should be able to carry a gun into a nuclear reactor?

A.   I don't see why not.

Q.   Do you think you should be able to carry a gun into a prison?

A.   I don't see why not.  If it's my job to keep that gun secure, I should.  I can understand where the government would say no because obviously you don't want prisoners to get it.

Q.   So let me see if I'm summarizing your testimony correctly.  You think that places like prisons or nuclear reactors are sensitive locations,

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 117

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

but you still don't think it's Constitutional.

A.   I don't believe they're sensitive locations.  I believe that would be -- be a classification for a sensitive location.

Q.   Okay.  I'm sorry.

A.   I don't believe the C.C.I.A. says anywhere that a nuclear reactor, other than being a place where federal or state -- or government employees would cons -- would do their normal duty business would constitute a sense of location.

Q.   All right.

A.   I don't recall seeing nuclear reactor anywhere in any of these papers.

Q.   Got you.  I -- what I'm trying to get at, and maybe you can help me to understand this, is when you use the term sensitive place here in paragraph seventeen of your declaration, what are you referring to?  Are you talking about a sensitive place Constitutionally?  Are you talking about a sensitive place under the statute?

A.   A sensitive place that currently exists.  What we consider a sensitive place now, prior to the C.C.I.A., schools, courthouses, federal buildings, governmental buildings, something like

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

that, I would consider that a sensitive place.  Those are places I per -- don't carry.  That's what I would consider a sensitive place.  I don't see a zoo being a sensitive place.

Q.   Got it.  And so let me ask you -- I'm going to show you another document.  And Mr. Johnson, do you recognize this?

A.   Not off hand.

Q.   Feel free to take a closer look.

A.   Okay.  I mean, it says Mc -- McKinney's Penal Law, two -- Section 265.  I'm aware of parts of 265.

Q.   Have you ever read the statute before?

A.   I've read parts of the statute that I -- that I teach, yes.

Q.   I can't say that I've gone through and read it from front to back.

Q.   And would you agree with me that this is the sensitive location statute that we've been talking about in this case?

A.   Yes.

Q.   All right.

MR. THOMPSON:  Kristen, could I ask

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 119

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

that this be marked as Exhibit Six?

COURT REPORTER:  Yes.

MR. STAMBOULIEH:  No objection.

Q.  And you see item two, for the purposes of this section essential location shall mean.

A.  Okay.

Q.  Can I ask you to just skim those locations and tell me which ones you think are a sensitive place?  We can go one by one if that would be more helpful.

A.  Okay.  I agree with A, disagree with B, C, agree with D to the parts that apply to being related to a school.

Q.  So libraries and playgrounds only if they're attached to a school?

A.  If they're part of school, such as B'ville Library is actually owned by the school, so it's considered school property.

Q.  But libraries and playgrounds that aren't connected to a school you don't think are sensitive?

A.  No.

Q.  Okay.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 120

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

A.    The subsets that are in there I disagree with as well.  Disagree with E.  F, only to the part that is specifically related to schools.

Q.    So, preschool and summer camps you don't think are sensitive?

A.    Preschool would be considered a school, so I agree they're sensitive.

Q.    But not summer camps?

A.    If it's not part of a school, then no.  G, no.  H, no.  All those parts go into places connected to medical facilities.  So, G through L, no.  M, I'm torn on.

Q.    Torn what?

A.    Because if you are of the age to legally purchase a firearm, you should be able to carry it with you while you're on your college campus.  N, no.  O, no.  P, no.  Q, if it's on a school or place that already exists as a sensitive location, yes, otherwise, no.  R, no.  S, obviously no.  T, no, but it doesn't actually apply to us anyway.

Q.    Can you explain to me what you mean?

A.    We're not challenging Times

800-523-7887                           ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson Square.  As far as I know, there's nobody in New York State that -- or in New York City that's challenging Times Square.

Q.   Okay.  So, next I'd like to ask you about parks.

A.   Uh-huh.

Q.   And I'll -- I'll refer you back to your interrogatory responses which were, I believe, Exhibit One, page -- bottom of page three, top of page four.

A.   This was one.  I'm sorry, what page was that?

Q.   Bottom of page three, top of page four.

Q.   Okay.  So, you just wrote here all parks.  Is that correct?

A.   I don't understand the question.

Q.   So right, at the top of page four where you are listing the sensitive locations that you're putting at issue in this case, you just wrote all parks.  Is that correct?

A.   Yes.

Q.   Why didn't you specify any parks?

A.   Because all parks originally

Associated Reporters Int'l., Inc.                                        www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

included basically every park, whether it be local, state, federal.  And then after that, there was controversy about whether or not Catskill and Adirondack parks were part of that, to which Kathy publicly said that -- sorry, Kathy Hochul, specifically said that she did not mean Adirondack and Catskill Parks.

Q.   So, are you familiar with the term Forest Preserve?

A.   Yes.

Q.   And what's your understanding of the term Forest Preserve?

A.   Forest Preserve falls under the production of D.E.C. or park rangers.

Q.   And is it your understanding that the Adirondack and Catskill parks are technically Forest Preserves?

A.   Yes.

Q.   Because the Adirondack and Catskill parks are enormous, correct?

A.   Yes.

Q.   And they have all kinds of things inside them?

A.   Yes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 123

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    And is it your understanding that guns are forbidden just because you're in a forest preserve?

A.    I -- it's my understanding that the C.C.I.A. is trying to say that you can't bring a concealed carry weapon into these places simply because it's a park.  Although they allow you to hunt there with high powered rifles.

Q.    Let me restate the question.  Do you understand that the -- do you -- do you understand the C.C.I.A. to prohibit carrying a gun in the Adirondack and Catskill parks?

A.    I believe that part was removed.

Q.    Okay.  So, is that a no?

A.    If no means I believe it's been removed, then that would be my answer.  I don't understand how to answer the question.

Q.    Sure.  Let me just ask it as -- as straightforward as I can.  Do you believe that it is illegal to carry a gun in the Adirondack and Catskill parks today?

A.    No.

Q.    Okay.  So, what parks do you frequent?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 124

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    I frequent Mercer Park mainly when I fish locally.  The zoo when I go through the park, into the park, Onondaga County when I walk around the lake.  Several parks.

Q.    Any other specific parks sitting here today that you can think of?

A.    Whenever my wife and I go on trips, if there's a park, we usually try to get pictures, especially if it's near water.

Q.    So the parks you mentioned, you mentioned Mercer Park, the -- the park around the Gifford Zoo.  Was there a third that you mentioned?

A.    Onondaga Lake Park.

Q.    Onondaga Lake Park.

A.    Long Ranch park.

Q.    Are these urban or rural parks?

A.    I would say they're mostly urban. They're within city -- Syracuse City and suburbs.

Q.    Okay.  Do you ever carry your gun with you into these parks?

MR. STAMBOULIEH:  Objection.  And instruct a Witness to invoke his Fifth Amendment right against self-incrimination.

A.    I invoke my Fifth.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 125

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Okay.  Have you ever been threatened while visiting one of these parks?

A.   No.  Other than the zoo.

Q.   Do you anticipate any particular danger at any of these parks?

A.   It's possible.  The trail around Onondaga Lake has been recently kind of a high for people going after women, purses, older people walking.

Q.   Would you agree with me that one of the purposes of parks is to be a peaceful place where people can relax?

A.   I agree.

Q.   Do you think that it would make it more difficult for people to relax or find peace if they thought strangers had guns there?

A.   I don't see how that'd be -- how that'd affect them.  There's a possibility that people have guns now and it doesn't seem to affect them.

Q.   Do you think that some people would be concerned or nervous or anxious if they knew that people could carry guns there?

A.   I can't say what nine billion

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 126

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

other people would do.  But the average person, if they don't see it and they don't know, I don't understand why they would be concerned about it at all.  Is -- I don't see that as being something that people usually concern themselves with unless they can see it.  Just seeing other people on the trail wouldn't necessarily be a threat.

Q.   Do you think it's unconstitutional to prohibit open-carry and require concealed carry?

A.   I don't understand how to answer the question.  I don't -- I personally don't believe in open carry.  But I don't see why it should be restricted.

Q.   So the question then is, if people were open-carrying, or if people were carrying long guns that can't be concealed, do you think it would interfere with other people's enjoyment of the park?

A.   No.  I've had people walk past me when I've been hunting at Three Rivers and nobody seems to care walking their dogs, and I'm walking around with a hunting rifle.

Q.   Do you think some people would be

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 127

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

concerned?

A.   Again, I can't say what nine billion other people would do or think.

Q.   Okay.  So next, you talk about restaurants that serve alcohol, correct?

A.   Yes.

Q.   And you list a couple of specific locations here.  Buffalo Wild Wings, Ponchito's, Taqueria, and Better Burger, correct?

A.   Yes.  Yes.

Q.   Which of these locations serve alcohol?

A.   I know Buffalo Wild Wings does, Ponchito's used to.  I don't get drinks in there anymore, so I don't actually look.  And when we were at Better Burger, I believe they were serving alcohol.

Q.   And do you ever have a drink at any of these restaurants?

A.   No, I do not drink when I'm carrying my firearm.

Q.   Why not?

A.   Personal choice.  I don't drink. I was recently diagnosed diabetic, so alcohol's not

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 128

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

good for me.

Q.   So you don't drink period or you don't drink when you're carrying a firearm?

A.   I may have one drink a month, but not when I'm carrying my firearm.

Q.   Do you think everyone with a gun is going to be as responsible as you?

A.   I can't say what nine billion other people would do, but probably not.  But I would also like to point out that prior to the C.C.I.A., Onondaga County had no restriction on being able to carry a firearm in a bar or any place that served alcohol.  Though, if you walked over to Madison County, they did have a restriction on that.

Q.   Would you agree with me that it's not a good idea for people to drink alcohol while carrying a gun?

A.   I think it's not a good idea.

Q.   And would you agree that alcohol lowers people's inhibitions?

A.   That is the purpose of it, yes.

Q.   Would you agree that sometimes people who have been drinking alcohol make bad decisions that they wouldn't make if they didn't

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 129

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

drink?

A.    About the same as people that don't drink make bad decisions, yes.

Q.    Do you think that people who have been drinking are more likely to make bad decisions?

A.    That is possible.

Q.    And would you agree that people who have been drinking sometimes get into conflicts or fights that they wouldn't get into if they were sober?

A.    Yes.

Q.    You mentioned that two of those restaurants, Better Burger and Buffalo Wild Wings serve alcohol.  Do you know whether those restaurants permit firearms?

A.    I do not see any signs on the outside of those that say no firearms allowed.

Q.    Have you ever inquired whether --

A.    No.

Q.    -- those restaurants --

A.    No.

Q.    -- permit firearms?

A.    No, I have not.

Q.    Why not?

800-523-7887                                 ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                              www.courtsteno.com

Page 130

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

A.   Because it's not my purpose to go talk to the manager and find somebody.  If they don't post it, then I'm allowed to carry there.

Q.   Would it be difficult to ask?

A.   It would be beyond what I would normally do.

Q.   What --

A.   But I don't know of anybody that walks into a restaurant purposely to ask a manager a question.

Q.   But I'm asking you if you were to say, I'm lawfully carrying a firearm, I'm a licensed gun owner, is that allowed here?  Does that harm you in any way to ask?

A.   Yes.

Q.   Why?

A.   Why should I have to?

Q.   That's --

A.   Do you have to walk in someplace and say, can I speak here because it's a violation of my First Amendment?

Q.   What I'm asking you is how does it harm you?

A.   It's an infringement upon my

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 131

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

normal activities.  Why should I now have to do something extra that I wouldn't normally do?  Why should anybody have to do something extra that they don't normally have to do?  Why should I have to walk into a facility unarmed to ask permission to carry a firearm there to go back out to my car and arm myself to walk back through the store?

Q.   Well, I'm asking you, how does it harm you just to ask?

A.   It's more time, my wasted time. Again, it's not something that should be legally allowed.  It's an infringement.

Q.   All right.  Let me ask you next about theaters.  You write in your response to interrogatory three, movie theaters in general.  Why didn't you identify any specific theaters?

A.   Because I figured you guys can see these local theaters I would normally go to.

Q.   Sitting here today, can you tell me what movie theaters you attend?

A.   Movie Plex and Camillus. Carousel Mall.  I've been to the Auburn Movie Plex, the drive-in theater in -- I don't know the name of the town, up towards Oswego.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    Why would you want to bring a gun into a movie theater?

A.    Because those are places that could potentially have a situation that would require the use of a firearm.

Q.    How do you think the other members of the audience would feel if you brought a gun into a movie theater?

A.    Again, I can't tell you what nine billion other people would do, but if it's not being an issue, I don't see why anybody would care.  As it stands, people prior to the C.C.I.A. carried firearms all the time.  It was not an issue then.  Nobody ran around screaming like, oh my God, somebody next to me might have a firearm.

Q.    Do you care if you -- if the presence of a gun would scare someone or make them nervous?

A.    If somebody pulled a gun out and was threatening people, yes.  If they had it and didn't tell anybody and it was concealed, it wouldn't concern me at all.

Q.    Let me ask you the same question another way.  Do you think that other people have the

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 133

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

right to a gun-free space anywhere?

A.    I believe their feelings don't trump my Constitutional protected rights.

Q.    So, is that a no?

A.    I don't understand how to answer the question.

Q.    Yes or no?  Do you think that anyone else has the right to a gun free space anywhere?

A.    No.

Q.    Okay.

A.    Yeah.  Well, let me rephrase that.  No, except for their own property.

Q.    So, do you agree that property owners have the right to control whether people bring guns onto their property?

A.    I believe property owners have every right to post a sign that says no firearms allowed.

Q.    That's not the question I asked though.  The question I asked --

A.    That's exactly the question you asked.

Q.    No, I didn't ask about the sign,

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 134

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

did I?

A.   If they can control it, that'd be the way to control it, by putting up a sign that says no firearms allowed.

Q.   My question is about the principle.  Do property owners have a right to decide whether people bring a gun onto their property?

A.   Yes.

Q.   Do private property owners have the right to know whether people are bringing guns onto their property?

A.   They can ask.  They're not under any obligation to tell them.

Q.   Why do you think that it should be the property owner's responsibility to ask and not the person bringing the gun onto the property?

A.   Because nobody knows I've got it. That's the whole point of concealed.  If it's that much of an issue that somebody doesn't want a gun on their property, then post a sign or split -- or let them know ahead of time that firearms are not allowed there.  That's the whole point.

It has to be posted -- I mean, the C.C.I.A. made a change that you had to post a sign

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

that said you can carry here, that was a change to the law.  The law has always been you can't carry here unless -- or you can't carry here unless there's a signed posted.

Q.   And so I guess the question is, why do you believe that it should be the -- the property owner's responsibility and not the person with the guns responsibility to make sure that guns are welcome?

A.   Because I think the government is greatly overstepping by saying that all properties automatically gun free.  The government is -- is stepping in and saying all property is automatically a -- a violation to your Constitutional rights unless somebody gives you permission to do so.

Q.   Understood.  But I'm not asking -- I -- I'd appreciate it if you -- if you answered the precise question, which is --

A.   You asked me the question.

Q.   Why do you think that it should be the property owner's responsibility to ask rather than the responsibility of the person who carries the gun?

A.   Because I don't recall seeing a

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Constitutional amendment that says that there's a guaranteed right to not have a gun on your property where there is one that says, I have the guaranteed right to own and carry a firearm.

Q.   Do you know whether under American law, the property owner's right to control his -- his or her property is a fundamental Constitutional right?

A.   Not that I'm aware of.

Q.   If I represent to you that the Supreme Court has recognized that it is a fundamental Constitutional right, would that change your answer?

A.   That gives them the right to say that there's no guns on my property.  I believe that's what you're asking.  Then that would be -- yes, I understand that.

Q.   Do you believe that it would be Constitutional to require someone to carry a -- sorry, withdrawn.  Let me start that again.

Do you believe that it would be Constitutional to require someone to ask permission to carry a gun into someone's home?

A.   Sorry, I'm trying to unpack that one.  Would it -- I'm sorry, can you repeat that one

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson again?

Q.   Sure.  Do you believe it's Constitutional to require someone carrying a gun to ask permission before carrying that gun into someone else's home?

A.   No, I do not believe that's Constitutional.

Q.   Have you ever carried a gun onto someone's private property without permission?

MR. STAMBOULIEH:  Object.  And instruct the Witness to revoke his Fifth Amendment right against self-incrimination.

A.   I invoke my Fifth.

Q.   Have you ever carried a gun into someone else's home without permission?

MR. STAMBOULIEH:  Objection.  And instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.   I invoke my Fifth.

Q.   Have you ever carried a gun onto someone's property when you knew that gun was not welcome?

MR. STAMBOULIEH:  Object and instruct the Witness to invoke his Fifth amendment right

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 138

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson against self-incrimination.

A.    I invoke my Fifth.

Q.    Have you ever carried a gun onto someone's property when you knew what -- sorry, withdrawn.

Have you ever carried a gun into someone's home when you knew that gun was not welcome?

MR. STAMBOULIEH:  Object and instruct a Witness to invoke his Fifth Amendment right against self-incrimination.

A.    I invoke the Fifth.

Q.    What about your home?  Do you ask -- would you want someone to tell you before they carry a gun into your home?

A.    No.

Q.    No?

A.    No.

Q.    If somebody came to fix your dishwasher, you would want them to tell you that they had a gun?

A.    I would never ask anybody to tell me if they have a gun.

Q.    All right.  And why not?

800-523-7887                         ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.   Because I'm a gun owner and I respect the fact that other people have the right to carry a firearm.

Q.   All right.  Back to the question about movie theaters.  Theaters are crowded spaces, correct?

A.   Yes.

Q.   You can have hundreds of people inside a single theater, correct?

A.   Yes.

Q.   And there are limited excerpt points from a theater, correct?

A.   Yes.

Q.   Do you believe that you could defend yourself safely with a firearm in a crowded movie theater without endangering innocent lives?

A.   Absolutely.

Q.   Why?

A.   Because I'm that good.

Q.   Okay.  I will represent to you that virtually every major theater chain, including A.M.C. and Regal prohibits firearms in the theaters. Does that change whether you would want to carry a gun into a movie theater?

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 140

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

A.    No.

Q.    So, would you carry your gun into an A.M.C. or Regal Theater despite their policy?

A.    I'm sorry, can you repeat the question?  Would -- would I carry?

Q.    Would you carry a gun into an A.M.C. or Regal movie theater despite their policy?

MR. STAMBOULIEH:  I would object to the ex -- extent that you want to invoke your Fifth Amendment right against self-incrimination.

A.    I am going invoke my Fifth Amendment right, but I would also like to make a -- a statement that --

Q.    Sure.

A.    -- while they do have those policies and it is written on their websites, all the theaters I've been to do not have signs that say no firearms allowed.

Q.    So, you're aware that many companies have firearm policies on their websites?

A.    Some of them do, yes.

Q.    Do you think a sign is necessary in order for them to prohibit guns on their policy?

A.    Yes.  A sign was required to

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 141

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

allow permission to carry firearms there.

Q.    So if you see a company that has a place on the website saying that firearms are not permitted, do you think you can carry a gun onto their property anyway as long as they don't have a sign?

A.    Sorry, I'm trying to unpack the question.  I -- if someplace has it on their website, but no sign in the door?

Q.    Yes.

A.    I would say it's a company policy and not a law.

Q.    So, do you think it's legal?

A.    I think I should be able to carry there.  I also accept the fact that if they decide to kick me out, then that's fine too.  It'd be considered a trespassing issue if I chose not to leave.

Q.    All right.

A.    I'd also like to point out that if a place had signs that -- like that I simply would just wouldn't use their service.

Q.    So, going back to Exhibit One, you write baseball games in your list of sensitive

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 142

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson locations.

A.    Yes.

Q.    Why didn't you list any specific team or stadium?

A.    Because the only ones I go to are local.

Q.    So, are you referring to the -- the Mets, the Syracuse Mets?

A.    Mets, Syracuse Mets.

Q.    And baseball teams are private companies, correct?

A.    Yes.

Q.    Have you ever brought a gun to the Syracuse Mets?

MR. STAMBOULIEH:  Object and instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.    I invoke my Fifth.

Q.    I'm going to show you a document, if you would.

A.    Thanks.

MR. STAMBOULIEH:  Hey, James.  At --

MR. THOMPSON:  Yeah?

MR. STAMBOULIEH:  -- some point, like

Associated Reporters Int'l., Inc.                         www.courtsteno.com

Page 143

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

maybe in the next ten or so minutes, could we take a break?

MR. THOMPSON:  Oh, whenever you want.

MR. STAMBOULIEH:  Yeah.

MR. THOMPSON:  If you want to take a break right now, we can do that.

MR. STAMBOULIEH:  I just don't want to interrupt your questioning.

MR. THOMPSON:  No.  I mean, we're about to start new documents.

MR. STAMBOULIEH:  Oh.

MR. THOMPSON:  So this is a -- this is a good time.

MR. STAMBOULIEH:  Perfect.  I just need to use the rest room.

MR. THOMPSON:  You want to come back and -- what time is it now?  You want to come back at noon?

COURT REPORTER:  Okay.  All right. We're off record.

(Off the record; 11:48 a.m.)

(On the record; 12:02 p.m.)

COURT REPORTER:  We're back on the record then.

800-523-7887                                      ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 144

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

MR. THOMPSON:  All right.  Thank you, everyone.

BY MR. THOMPSON:  (Cont'g.)

Q.   So Mr. Johnson, did you see the document that I sent -- that I passed to you right before we went off the record?

A.   Yes.

Q.   And what is that document?

A.   Fan Code of Conduct for the Syracuse Mets.

MR. THOMPSON:  And Kristen, I apologize.  I've completely forgotten which number we're on exhibit wise.

COURT REPORTER:  Seven.

MR. THOMPSON:  Could I have it marked as Exhibit Seven?

COURT REPORTER:  Yes.

MR. STAMBOULIEH:  No objection.

Q.   And can I direct your attention to the last of the bullet point items on page one?

A.   Yes.

Q.   It says that firearms or other weapons, e.g., knives are prohibited, correct?

A.   Yes.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   So the Syracuse Mets don't allow firearms into the stadium, correct?

A.   Okay.  Yes.

Q.   And is it their right to forbid firearms into the stadium?

A.   They have every right to post a sign and not want firearms on the property.

Q.   Do they need to post a sign separate from having this statement on their website for you to not carry a gun there?

A.   I believe they should.

Q.   Understood.  But that's not quite the question.  The question is, do they need to post a sign in addition to this for you not to carry a gun there?

A.   Yes.

Q.   So, will you continue carrying a gun there even having read this?

MR. STAMBOULIEH:  Object.  Instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.   I invoke my Fifth.

Q.   Do you intend to carry a gun despite having read this into the Syracuse Mets?

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

MR. STAMBOULIEH:  Objection.  And instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.  Invoke my Fifth.

Q.  Let me direct you back again to Exhibit One, to page four, where you list the locations that you carry guns.

MR. STAMBOULIEH:  I object to the framing of that statement.

MR. THOMPSON:  Withdrawn.

Q.  Let me -- let me direct you back to the list that you provided on page four of Exhibit One.  Are you with me?

A.  Yes.

Q.  So you write pro-gun rallies, correct?

A.  Where are we?  Yes.

Q.  And why didn't you indicate any specific rally?

A.  Because it would apply to any rally that I have gone to or intend to go to.

Q.  So, what rallies have you gone to, or intend to go to?

A.  I went to the Back the Blue, and

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

I was -- went with some friends to Virginia at the time.  I don't recall the name of that one.  I believe it's written down somewhere.

Q.  And that took place in Virginia?

A.  Yeah.

Q.  So, not in New York?

A.  Right.

Q.  So, the Back the Blue rally, when and where was that?

A.  It was in Albany.  I don't recall the exact date.  Sorry, all the years since COVID have kind of run together, so I believe 2021, '22.  I honestly don't remember the date.

Q.  And that Back the Blue rally, was that a pro-gun rally or a pro-police rail -- rally?

A.  It was -- it wasn't really a Pro-gun rally.  It was more of a stop giving grief to the police rally.

Q.  Sitting here today, is there any other pro -- pro-gun rally you can think of that you've been to or intend to go to?

A.  None that are un -- none that I'm aware of that are scheduled or that I'm going to go to, no.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 148

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

Q. Okay. So, generally speaking, rallies and protests have large numbers of people, correct?

A. Yes.

Q. In fact, the point of rally is to have a large number of people show up to show that your cause has support, right?

A. Yes.

Q. And rallies and protests frequently involve counter protests, correct?

A. Usually, yes.

Q. And that can sometimes lead to conflict between the two sides, right?

A. It can.

Q. Would you agree with me that people would get angry or agitated or fired up at rallies?

A. Absolutely.

Q. It's also one of the point of having a rally, right? You rally.

A. Yeah, to protest. Not to be violent.

Q. Would you agree with me that a large number of angry people with guns would be

Associated Reporters Int'l., Inc.                www.courtsteno.com

Page 149

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

frightening to members of the general public?

A.   I'm sorry, I don't -- would a large -- would a large number of people with guns be scary to the general public?  Is that what you asked?

Q.   Yes.

A.   If they can't see them, I don't see why they would be concerned.  I -- I -- I mean, if people were walking around with A.R.s and -- and pointing them at them, I could see that.  But again, nobody freaks out if you've got fifty cops standing there with guns.  Why would you be concerned if somebody has a gun that you can't see?

Q.   Understood.  I mean, I think the difference, of course, would be that all cops are trained and all cops are sworn to protect the public.

A.   Okay.  I'm trained.  I'm trained better than the police.

Q.   But you don't know how well trained the other people at a rally are.

A.   That's true.

Q.   So, do you think a large number of armed people at a rally would be frightening to members of the public?

A.   I'm sure if those other people

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

were against guns that they would be afraid of people that might possibly have guns.

Q.   Are you familiar with the death of Alex Pretti --

A.   Yes.

Q.   -- during the protests in Minnesota this -- this winter?

A.   Yes.

Q.   And Mr. Pretti brought a gun to a protest and ended up being killed by law enforcement, correct?

A.   He -- yes.  You're skipping on a lot of details, but yes.

Q.   Sure.  If you'd like to add details, please.

A.   He laid hands on a police officer.  That's a felony.

Q.   Uh-huh.

A.   He did -- he committed a felony in possession of a firearm, which is another felony. I -- he did so in a manner that was unnecessary.

Q.   I think --

A.   The cops shooting him wasn't a -- wasn't a matter of they did it because he had a gun.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 151

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

It's my belief from watching the video that his Sig P three twenty went off as the officer pulled the gun off of him. It's clear as day that the light moves back. It wasn't done in retaliation because of what he did a gunshot went off. They heard somebody yell, gun, gun, gun, and then they shot him.

Q. Do you think it was an accidental discharge?

A. Yes.

Q. And the --

A. Of his firearm?

Q. Yes.

A. Yes.

Q. And the -- the Sig P three twenty has whether justified or not, a reputation for accidental dis -- discharges, correct?

A. Negligent discharges, yes. Uncommitted discharges, yes.

Q. I'll -- I'll represent to you that after Mr. Pretti's death President Trump gave an interview where he said about Mr. Pretti, you can't have guns, you can't walk in with guns, you just can't. And then later he said, I don't like that he had a gun. I don't like that he had two fully loaded

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 152

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

magazines.  That's a lot of bad stuff.

A.    I understand that.

Q.    Was the President wrong?

A.    I don't believe the President's a gun guy.  I don't believe the President's a lawyer. I -- his opinion means nothing to me other than the fact that he's the President of the United States. His opinion on guns means nothing to me.

Q.    I'll represent to you that around the same time, Secretary of Homeland Security, Kristi Noem said, (reading) I don't know of any peaceful protestor that shows up with a gun and ammunition rather than a sign.

A.    She has invented very many protests then.

Q.    So is she wrong?

A.    Yes.

Q.    Why do you think she said that?

A.    Trying to make some point.  Why not take advantage of a horrible situation?

Q.    Do you think Mr. Pretti should have brought the gun to that protest?

A.    I think he had every right to have a gun at the protest, provided he wasn't a

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 153

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson prohibited person.

Q.   Which he wasn't, correct?

A.   Correct.  And I believe Minnesota law allowed him to carry a gun at a protest.

Q.   Do you think that his bringing a gun to the protest increased the risk to his own life?

A.   No.

Q.   No?  Do you think he would've died if he hadn't haven't had the gun?

A.   I have no idea how far that police officer would've gone after he got his hand -- somebody laid hands on him.  You can very easily be a threat to somebody without a gun.

Q.   But when law enforcement realized that there was a gun, they said gun, gun, gun.

A.   Yes.

Q.   Would you agree with me that bringing a gun to a protest means that law enforcement may see you as a threat?

A.   I can't tell you what police officers are going to do.  I can tell you with my interactions with police officers that I have had a gun, none of them consider me a threat.  In fact, the

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

most common -- and I wonder if they actually teach this in the academy, the most common thing they said to me is, don't reach for yours, I won't reach for mine.

Q.   Going back to Exhibit One on -- on page four.  You list, rest stops.  Correct?

A.   Where are we?  Sorry.

Q.   Sorry, page four of Exhibit One.

A.   I don't see rest stops.

Q.   Are you on page four?

A.   Yeah.

Q.   Should be third row down -- third line down.

A.   Oh, okay.  I see it, rest stops.  Right in the middle.

Q.   Six -- six --

A.   Yes.

Q.   Can you tell me why you listed rest stops?

A.   Rest stops are a fairly large area of crime.  People -- people get cars broken into.  People that stop at rest stops are often travelers or tourists, making them a good mark for people to go after them.

800-523-7887                                      ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 155

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Are rest stops one of the locations at issue in this case that you're looking for Judge Suddaby issue an order on?

A.   Yes.  But I know rest stops did exist as a prohibited place before the C.C.I.A. along state routes.

Q.   So, let me ask the same question a different way.  Do you understand rest stops to be the sensitive location because they're government buildings, or do you believe they fall into one of the other categories under the statute?

A.   I'm not sure exactly why they do that.  I'm assuming because prior -- prior to the C.C.I.A., rest stops along state routes were prohibited from carrying firearms.  I assumed it was a state or a governmental thing, but I don't see why a rest stop would be considered a sensitive area in any way.

Q.   So, going back to the earlier question.  Are you asking for -- for Judge Suddaby to issue an order permitting the carriage of guns at rest stops?

A.   I believe I said that, yes.

Q.   Okay.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 156

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

MR. THOMPSON:  Do you mind if we take five minutes quickly?

MR. THOMPSON:  Off the record.

COURT REPORTER:  Okay.  We're off.

(Off the record; 12:15 p.m.)

(On the record; 12:19 p.m.)

COURT REPORTER:  We're back on the record.

BY MR. THOMPSON:  (Cont'g.)

Q.   So Mr. Johnson, just a -- a couple more quick questions.  You mentioned in the list of places in your response to Interrogatory Three, The State Fair.

A.   Yes.

Q.   Can you describe the State Fair for me?

A.   The New York State Fair is a large fair that's hauled during summer vacation at the New York State Fairgrounds in Syracuse.

Q.   Here in Syracuse, right?

A.   Yeah.

Q.   And would you agree with me that the State Fair is a very crowded place?

A.   Most of the time.  Most years,

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 157

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

yes.

Q.    Would you agree with me that there's a bunch of kids and families?

A.    Sure.

Q.    Would you agree with me that entrance into the State Fair is controlled?

A.    It is now, yes.

Q.    Can you describe to me how it's controlled?

A.    Within the last two years, they now have a gate with tables.  They check bags.  They check various -- not every person but every couple people with a wand.  That's the main gate.  The smaller gates, not so much.  They usually have a bag check, but it's not necessarily for every person.

Q.    And do you believe that that sort of security is sufficient to render the location sensitive?

A.    No.  Not even close.

Q.    What level of security do you think is sufficient to render something a sensitive location?

A.    Actually having people that can respond at a moment's notice to a situation.  I mean,

Associated Reporters Int'l., Inc.                          www.courtsteno.com

Page 158

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

you can walk around the Midway and see a cop every ten minutes.  I have no idea if there's undercover -- un -- you know, non-uniform police officers there, but the presence of law enforcement there is skimpy at best.

Q.    But you would agree with me that there are law enforcement officers on duty at the State Fair?

A.    Yes.

Q.    Have you ever taken a gun to the state fair?

MR. STAMBOULIEH:  Object and invoke -- and instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.    I invoke the Fifth.

Q.    Similarly -- actually I think beyond that, Mr. Johnson, is there anything in the testimony that you've given today that you want to add to, or change or amend?

A.    Not that I'm aware of.

MR. THOMPSON:  Beyond that, I think that's it for us.

MR. STAMBOULIEH:  Okay.  Just the people behind you maybe?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 159

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

MR. THOMPSON:  John, do you?

MR. HEISLER:  No questions.

MR. THOMPSON:  Todd, do you have any questions?

MR. LONG:  Yes, I do. Thank you, James.  Unless Philip, you have any questions you want to ask, because I probably have like fifteen minutes.

MR. BANASZEK:  No, no.  Go ahead. I don't have any questions.

MR. LONG:  Thank you.

DIRECT EXAMINATION

BY MR. LONG:

Q.   Hi.  Good afternoon, Mr. Johnson.

MR. STAMBOULIEH:  Can you turn it up just a little bit?

MR. LONG:  Can you hear me?

THE WITNESS:  Yeah, I can hear you. It's just, it's very soft.

MR. THOMPSON:  If not, then that's okay.

COURT REPORTER:  Oh, right here. Yeah.  Is that better?  Can you say something?

MR. LONG:  Test one, two.

800-523-7887                            ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

THE WITNESS:  Okay.

MR. STAMBOULIEH:  Perfect.

COURT REPORTER:  Got it?  Okay.

MR. LONG:  Okay.  Okay.  Great.

BY MR. LONG:  (Cont'g.)

Q.  I said -- I'll say it again. Good afternoon, Mr. Johnson.

A.  Good afternoon.

Q.  My name is Todd Long.  I'm an attorney for the City of Syracuse.  You understand that you're still under oath, correct?

A.  Yes.  Yes.

Q.  Okay.  Great.  Thank you.  If you can give a verbal response, please, because I -- I'm actually not there with you, so I -- it is difficult for me to infer whether or not you're saying yes or no.  And I believe James gave you the basic guidelines to a deposition.  Just make sure we -- because we have a little bit of a delay here until I finish my question before you give an answer, and I'll extend that same courtesy to you, okay?

A.  Okay.

Q.  All right.  I only have a few just follow up questions that were asked by Mr.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Thompson.  You indicated, I think, that you live at

_____ in Syracuse, correct?

A.   Yes.

Q.   Okay.  Is that actually within the City of Syracuse, or is that in a different municipality?

A.   I honestly don't know.  I know my mail sometimes says Solvay, some -- sometimes says Lakeland, but it is a Syracuse address.

Q.   Okay.  I -- would you -- would it refresh your recollection if I were to indicate that it is -- well, technically, I mean, I can -- I can just indicate you have looked at the County tax record that's available and it indicates that you pay into Baldwinsville school tax, I believe.

A.   Okay.

Q.   Does that sound true?

A.   Yes.

Q.   Okay.  So, is it your understanding then that you would technically then live in the Baldwinsville jurisdiction?

A.   The Baldwinsville School District, yes.  I -- I don't know if that --

Q.   Okay.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    -- what -- what that means actually.

Q.    Yeah.  It -- it -- well, yeah, I just want to establish whether or not you actually live within the geographical limits of the City of Syracuse.

A.    Okay.

Q.    Okay.  So, have you -- have you ever had -- you talked about having just one or two arrests in your past.  Have you ever had any interactions with the Syracuse Police Department in your time entering the City of Syracuse?

A.    For legal matters, not that I'm aware of.  I -- I may have talked to --

Q.    You may --

A.    I may have talked to Syracuse Police, but I don't -- nothing that has been for a legal matter.

Q.    Okay.  So, when you say not for a legal matter, what are you referring to?

A.    I've never been arrested or pulled over or been questioned by Syracuse Police that I'm aware of.

Q.    Have you ever been involved in an

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 163

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

incident or -- withdraw the question.

Have you ever been involved in any event where the Syracuse Police Department were present?

A.    Nothing comes to mind.

Q.    Okay.  Do you know anybody that works for the Syracuse Police Department or formally worked for the Syracuse Police Department?

A.    I don't know what his official title is.  I -- I know Matt Kurimsky, he works for the Syracuse Forensics Department.  I don't know if that's actually part of the Syracuse Police.  I know he helps the Syracuse Police.

Q.    Okay. Great. That's fine.  And who is the current chief of police at the City of Syracuse?

A.    I believe that is Mr. Cecile.

Q.    Okay.  Would you be surprised to find out that since the new mayor has been elected, there's been appointed --

A.    Oh, yeah.

Q.    -- a new chief of police as of this year?

A.    Yeah.

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 164

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Okay.  And do you know who that is?

A.   I do not remember his name offhand.

Q.   Okay.  And that current chief of police, are you aware what if any policy he has with respect to the enforcement of the C.C.I.A.?

A.   I have not seen anything posted, no.

Q.   Okay.  And you mentioned Chief Cecile before.  He was the previous Chief of Police when you filed -- or when you participated in the filing of this lawsuit, correct?

A.   Yes.

Q.   Okay.  And what did Chief Cecile say or do in that official capacity that prompted you to believe that he intended to enforce the C.C.I.A.?

A.   I know there was a press conference early on after the C.C.I.A. where both him, I believe -- the name is forgetting me for the Onondaga County Sheriff, both had made a comment that they would enforce a C.C.I.A. fully.  And I don't know the exact quote, but they said that anybody that was in violation of C.C.I.A. would be -- would be

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 165

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson prosecuted.

Q. Okay. And you had indicated in your declaration and we -- I -- I -- you can -- if you have it in front of you, you can -- you can pull it up because I know it's an exhibit. But you had indicated in your declaration that this had an impact on your feeling of security to go to the Rosamond Gifford Zoo. Does that refresh your recollection? Or you -- if you want, you can refer your declaration.

A. I guess I don't understand the question. Are you saying that --

Q. Sure.

A. -- because of the -- what they said, it affected my decision?

Q. Yeah. Yes. Well, it -- it's indicated in your declaration, and if you want to pull it up and I can find it here.

A. I remember a reference to the New York State Fair, but I don't remember anything saying that I wouldn't go to the zoo.

Q. Right. If you want -- do you have your declaration in front of you?

A. Yes.

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   If you could please move to paragraph seventeen of your declaration.

MR. LONG:  And Phil, do you want me to -- I can show the screen if you want, but.

MR. BANASZEK:  Yeah.

MR. LONG:  Sure.  Just need a moment. Do you see that on my screen, P.D.F., Phil?

THE WITNESS:  Yes.

MR. BANASZEK:  I do.  Yes.

Q.   Okay.  And I'm just going to read paragraph seventeen for you, okay?  All right.  It says quote (reading) the C.C.I.A. makes it a crime to possess a firearm at a zoo parentheses Subsection D close parentheses, about as far from a quote sensitive place close quote as I can imagine.  My wife and I frequently visit the Rosamond Gifford Zoo in Syracuse at least once or twice every fall, so that my wife can see the otters and wolves, which are her favorites.  We will visit the zoo this fall as well at least once within the next ninety days.

It is my understanding that the zoo has no policy prohibiting firearms on the premises. Thus -- but for the C.C.A -- C.C.I.A, all right, excuse me, it would seem to be perfectly permissible

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

for me to carry my firearm at the zoo. Since the C.C.I.A.'s blanket ban on firearms at zoos as unconstitutional, I intend to carry my firearm when my wife and I visit the Rosamond Gifford Zoo.

Okay. Did I read paragraph seventeen correctly?

A.   I believe so. Yes.

Q.   Okay. So -- I'm going to stop sharing here. So my question is, in light of the fact that you intended at that time, this having been filed on September 20th, 2022, to go to the zoo, is it your understanding first as you said before that the zoo was within the City of Syracuse?

A.   Yes.

Q.   Okay. And knowing that the chief of police at the time -- Chief of Police Cecile, stated that the Syracuse Police Department will enforce the C.C.I.A., what impact, if any, did that have on your -- your feelings about going to the zoo, which was within the City of Syracuse, understanding that it's a sensitive place?

A.   None. Zero. I -- I understand that -- what he said, but I also understand that my life is worth more than a felony charge, and so is my

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

wife's.  So in the event that concealed carry becomes non-concealed carry, my life is far more important than a felony charge.

Q.   Okay.  So you had zero -- and I don't need to put words in your mouth, you had zero concern about having a concealed carry at the Rosamond Gifford Zoo after that statement by Chief Cecile?

A.   I -- I didn't have any concern. I understood that what I was doing could potentially be a crime, but it wasn't going to stop me from going to the zoo.

Q.   Okay.  And within ninety days of this particular filing as it states in here, did you in fact go to the Rosamond Gifford Zoo?

A.   Yes.  I don't know exactly what date, but I know it was within ninety days.

Q.   Okay.  Great.  Did you go more than once within those ninety days?

A.   No, but I believe we did go again by the -- a second time by the end of the year.

Q.   Okay.  And when you were there, did you see any Syracuse Police Officers?

A.   I did not.  I don't believe I saw

Associated Reporters Int'l., Inc.                     www.courtsteno.com

Page 169

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

a Syracuse Police.  I believe it was Onondaga Parks, is it park rangers?  I think who -- there was a gentleman walking around the park.

Q.   Yeah.  Yes, I believe so.  And I -- I do believe, and I -- I'm not under oath, but I do believe that the park rangers do road patrol at the zoo.  How many times since this filing September of 2022, have you been to the Rosamond Gifford Zoo?

A.   Close to a dozen.

Q.   You could provide an estimate. I'm sorry, go ahead.

A.   Close to a dozen.

Q.   And at any of those close to a dozen times, did you observe Syracuse Police Officers at the zoo?

A.   I -- not -- not at the zoo or the parking lot, but I did see Syracuse Police on the street outside the main entrance.

Q.   Okay.  And in those dozen times, or close to a dozen times that you did go to the zoo in that time period.  During any of those times, did you bring your firearm with you?

MR. STAMBOULIEH:  Object.  Instruct the Witness to invoke his Fifth Amendment right

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

against self-incrimination.

A.   I invoked my Fifth.

Q.   Okay.  Thank you.  You indicate in your testimony earlier that you believed that there was an arrest at the zoo recently for an individual that they were claiming had a firearm on him?

A.   Yes.

Q.   Okay.  When did that occur?

A.   I'm going to say about a month ago.  I honestly don't know the date.

Q.   And what's the basis for your knowledge of that incident?

A.   I'm sorry, who -- like, are you asking who -- like, who -- who told me?  Is that?

Q.   Yeah.  How -- how do you -- because I -- I wasn't aware of it.  I -- I was just wondering what's the basis of your knowledge of that incident was.

A.   I am friends with a Onondaga County Park Ranger who was involved in the arrest.

Q.   Okay.  And did the Onondaga County Park Ranger tell you what if -- if any Syracuse Police Department involvement there was in

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

that arrest?

A.   He just explained the basis of what happened.  I don't know what law enforcement agency took control of it.

Q.   Do you know what -- you said -- you said it was within the last month, or it was about a month ago?

A.   It -- it'd be at least a month ago.

Q.   At least.  Okay.

A.   Or right --

Q.   Was that --

A.   -- right around that ballpark.  I don't know exactly when, but.

Q.   Sure.  I just -- I'm just curious, that's all.

A.   But that information was also confirmed by Matt Kurimsky.  Again, he couldn't give me the details, but he said that that did happen.

Q.   Okay.  And you also indicated, and I don't know if this was a separate event or the same event, you indicated that somebody was brandishing a firearm at the zoo.  Is that the same event or is that another event you were describing?

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 172

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

A. That was the same event. Apparently a gentleman --

Q. The same event?

A. -- an elderly gentleman bumped into a guy at the gift shop. As he was leaving, the -- the gentleman that had the firearm purposely put himself in the way to get bumped into again, followed the group out of their car, made threats. When the older gentleman's family member, I believe it was brother or son-in-law came back to the car, those two bumped into each other. That's when the guy drew his firearm.

During the questioning later on, the son-in-law was asked and he had mentioned if the guy hadn't turned around and left, I would've drawn my firearm. That's when he was arrested. Never admit to anything.

Q. There's lot of -- there's a lot of rage in that -- that gift shop.

A. There are a lot of nasty people that go to the zoo, unfortunately.

Q. That's true. That's true. Well, I can tell you, after spending a couple hours there with my daughter, I -- last thing I want to do is go

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 173

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

to the gift shop, so I understand.

So -- just one moment.  I want to go back to your interrogatories that -- that questionnaire that you filled out.  And I don't remember the exact exhibit number, but Mr. Thompson was going through question number three that starts on page three and moves into page four.  Do you have that in front of you?

A.    Yes.

Q.    Okay.  All right.  So, I'm going to move just to -- if you go to the top of page four, and I just want to go through these lists of these locations here.  First, before I go there, I know that you're not a -- a law enforcement expert, but would it be your understanding that the City of Syracuse Police Department's geo -- jurisdiction is the geographical limits of the City of Syracuse?

A.    I would believe so.

Q.    Okay.  So, as to the Rosamond Gifford Zoo, you indicate that additional places included all parks.  When you say all parks, what if any parks have you gone to since, let's just say January 1st.  This is -- we'll use the date of January 1st, 2022, okay?  What if any parks have you

Associated Reporters Int'l., Inc.                www.courtsteno.com

Page 174

Antonyuk, et al v James, et al - 4-29-26 - Corey Johnson

gone to within the City of Syracuse since January 1st of 2022, other than Rosamond Gifford Zoo, and -- which is separate.

A.   None that I can think of offhand.

Q.   Okay.  You say after that restaurants that serve alcohol, before getting Panchito's and Buffalo Wild Wings.  What if any restaurants that serve alcohol have you been to in the City of Syracuse since January 1st, 2022?

A.   Besides Buffalo Wild Wings?

Q.   Yeah.  Yeah.

A.   Let's see.  I'm trying to think. There's a lot of places in Syracuse.  None come to mind.

Q.   Okay.

A.   At this -- at this moment.

Q.   You talked about movie theater before.  I think the only one that you mentioned that was within the City of Syracuse, I'll just represent to you, I'm sure you'll agree, is the movie theater in the Carousel Mall, correct?

A.   Yes.

Q.   Okay.  And as spoken to you before, and I believe you said this -- it's your

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 175

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

understanding that firearms are banned within the Carousel Mall, correct?

A.   I believe there is a policy that says no firearms are allowed.

Q.   Okay.  And the movie theater is within the -- the mall itself, correct?

A.   Yes.

Q.   Okay.  And how many times have you been to that movie theater, and you can provide me an estimate, since January 1st, 2022?

A.   Three, maybe four.

Q.   And on those three to four occasions, did you bring your firearm with you to the mall into that theater?

MR. STAMBOULIEH:  Objection.  Instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.   I invoke my Fifth.

Q.   Okay.  Great.  Next, baseball games.  I know you spoke about the -- the Syracuse Mets.  It's the only stadium I know of that's within the City of Syracuse.  And since January 1st of 2022, how many baseball games have you been to, or any events that you've been to at the Syracuse Mets

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 176

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Stadium?

A.    Two.

Q.    Two, okay.  And although you indicated that you're not aware of any sign there, are you aware that prior to entry as part of the general admission that you were required to go through metal detectors during those games, correct?

A.    They are -- they do have them now.

Q.    Okay.  Did they have metal detectors at -- at the -- either of the two games that you attended?

A.    No.  They did have bag checks.

Q.    Did you, at any point, during --

COURT REPORTER:  I'm sorry.

A.    They did have bag checks.

Q.    I'm sorry, go ahead.

COURT REPORTER:  One more time.

A.    They did have bag checks.

Q.    Bag checks?  Okay.

A.    Yes.

Q.    Bag checks.  Did you ever submit to a bag check on either of those two occasions?

A.    No.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.    And -- and why not?

A.    I didn't have a bag.

Q.    Oh, that's a good answer.  And on those two occasions that you went to an event at the Syracuse Mets stadium, did you bring your firearm with you?

MR. STAMBOULIEH:  Objection.  And instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.    I invoke my Fifth.

Q.    Okay.  As far as pro-gun rallies, were any of those pro-gun rallies within the City of Syracuse?

A.    No.

Q.    Okay.  This is a -- these are going to get into tough ones.  Obviously, these are very general things like restaurants.  Gas stations. Since January 1st, 2022, have you been to any gas stations within the City of Syracuse?

A.    Yes.

Q.    Okay.  And -- it might be few, I don't know.  But would you be able to provide the -- provide an estimate as to how many gas stations you've been to in the City of Syracuse, or -- and the

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 178

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

number of times you've been to the City of Syracuse gas station?

A.   I can think of four offhand, but I can't tell you how many times.  I get gas usually once a week.

Q.   Okay.  All right.  So four offhand, do you know the location of those gas stations?

A.   There'd be the Speedway on Carrier Circle.  The Mirabito off Court Street, the Speedway off Court Street further down.  God, what's the other -- the Byrne Dairy heading into Mattydale.

Q.   And of the -- and these are the only four ones that you -- that you know of, correct?

A.   Those are the ones I use most of the time.

Q.   Okay.  And what if any knowledge do you have about the location of these gas stations being within the geographical boundaries of the City of Syracuse?

A.   I believe all of them would be in the City of Syracuse.  The Byrne Dairy, maybe not.  I'm not sure where the Mattydale would separates from Syracuse.

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 179

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

Q.   Okay.  Did you say that was the - - the Byrne Dairy -- what's the location of the Byrne Dairy that you go to?

A.   It's on -- oh God, I don't know the name of the road.  If you go down Wolf Street and you are heading towards Mattydale, it's that one.

Q.   Okay.  So those --

A.   Just -- just past where the -- the airport turnoff is.

Q.   Okay.  Great.  As far as grocery stores, what grocery stores have you been to within the City of Syracuse?

A.   I've been to the Wegmans over on Thompson route -- is it Thompson route?

Q.   Is -- is that on James Street as well?

A.   I believe so.

Q.   Commonly referred to as the James Street Wegmans.

A.   Okay.  I don't -- yeah, possibly. I don't live there, so.

Q.   That's okay.  You'll see me going there quite often.  And how many times have you been to that James Street Wegmans, since January 1st,

Associated Reporters Int'l., Inc.  www.courtsteno.com

Page 180

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

2022?

A.   A couple.  I --

Q.   Okay.

A.   -- two, three, four, maybe.

Q.   Sorry.  Go ahead.  Okay.  And in those two, three, four times you've been to the what we'll call it James Street Wegmans.  Have you ever brought your firearm with you?

MR. STAMBOULIEH:  Object and instruct the Witness not to answer the question.

A.   I invoke my Fifth.

Q.   Okay.  Any other grocery stores that you've been to within the City of Syracuse?

A.   Not that I'm aware of.

Q.   Okay.  Home improvement stores. What home improvement stores have you been to within the City of Syracuse since January 1st, 2022?

A.   Tractor Supply.  Let's see.

Q.   And where's that located?

A.   That would be -- I -- I think it's Bridge Street.

Q.   On Bridge Street?  Okay.  And how many times have you been there since January 1st of 2022?

800-523-7887  ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 181

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

A.    At least six.

Q.    Okay.

A.    Home Depot as well.

Q.    And the same route -- the Home Depot that's also on Bridge Street?

A.    Yes.

Q.    Okay.  And at both of those locations, have you ever brought your firearm with you?

MR. STAMBOULIEH:  Object and instruct the Witness to invoke his Fifth Amendment right against self-incrimination.

A.    I invoke my Fifth.

Q.    Okay.  Any other home improvement stores within the City of Syracuse that you've been to since January 1st, 2022?

A.    Not that I'm aware of.

Q.    Okay.  Great.  Big box stores.  Which big box stores have you been to in the City of Syracuse since January 1st, 2022?

A.    I would include -- I would include those as big box stores as well.

Q.    Okay.

A.    I don't know if they were open

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

prior to 2022, but the -- the Big Lots.  And actually, that might be Mattydale.  I'm not sure.

Q.   Okay.  The -- the one you think might -- the Big Lots that might be in Mattydale, what's the general location of that one?

A.   It's the one -- it's just down the street from the Byrne Dairy.  I --

Q.   Okay.

A.   -- I know it closed recently, but I'm not sure when it closed.  That was one of the big ones I would go to after work.

Q.   Okay.  And since January 1st of 2022, when you had gone to that specific Big Lots, had you brought your firearm with you?

MR. STAMBOULIEH:  Object.  Instruct the Witness to invoke his Fifth Amendment right.

A.   I invoke my Fifth.

Q.   Okay.  Other than Big Lots and the home improvement stores that you mentioned, have you been to any other big box stores within the City of Syracuse since January 1st, 2022?

A.   None that come to mind.

Q.   Okay.  Rest stops within the City of Syracuse.  Have you been to any rest stops within

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 183

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

the City of Syracuse since January 1st of 2022?

A.    I don't know where the rest stops fall.  I've stopped at pretty much every -- every rest stop on 81, 481, within fifty miles of Syracuse.

Q.    Okay.  And -- but you don't recall a specific rest stop that you've been to within -- within the limits of the City of Syracuse?

A.    No.  But through my daily travel and work, I stopped at pretty much every single one of them at some point.

Q.    Are you aware of any rest stop being within the -- the geographical boundaries in the City of Syracuse?

A.    None come to mind.

Q.    Okay.  Thank you.  Just two final questions here.  You said that you eat at a number of restaurants including Panchito's Taqueria in Syracuse, New York.  It's my understanding, I believe there are two Panchito's locations.  Which Panchito's location have you been to since January 1st of 2022?

A.    I've been to both.

Q.    Both?  Okay.

A.    Yes.

Q.    And one of them is on -- is that

800-523-7887                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 184

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

the one that's on Geddes Street there?

A.    There -- yeah, there's one on Geddes Street and there's one, I believe on Midler.

Q.    Is it?  I -- I -- I -- I know the location you're talking about.  It -- it -- it's -- it's in that area.  And how many times have you been to the one on Getta's since January 1st, 2022?

A.    Small number.  Three, maybe four.

Q.    Okay.  And on those three to four occasions, have you brought your firearm with you?

MR. STAMBOULIEH:  Object and instruct the Witness to invoke his Fifth Amendment right.

A.    I invoke my Fifth.

Q.    Okay.  And same question for the -- the other location that you think is near Midler.

A.    I --

Q.    Have you brought your firearm with you?

MR. STAMBOULIEH:  Object and instruct the Witness not to answer and invoke his Fifth Amendment right.

A.    I invoke my Fifth.

Q.    Okay.  How many times have you been to that location, the second location, which I

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 185

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

think is the original location, since January 1st, 2022?

A.    I usually go at least two to three times a week.

Q.    Okay.  Buffalo Wild Wings in Syracuse, New York, where -- where is that located?

A.    I know -- the one I know most of is over in Camillus.  I'm not sure where -- oh, God. I'm not sure where there's a Buffalo Wild Wings inside the City of Syracuse.

Q.    Yeah, I would agree with you.  I -- I -- I couldn't find a Buffalo Wild Wings within the City of Syracuse.

A.    I think it -- it is -- I think that might be considered Cicero.  Is it the --

Q.    Yeah.  There's one --

A.    -- the one that used to be over by the Lowe's?

Q.    Yes, I think there's one in Cicero and -- and there's the one in Camillus.

A.    Okay.

Q.    Have you, since January 1st of 2022 been to the one in Cicero?

A.    No, I believe that one's been

800-523-7887                                ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

closed since then.

Q.   Oh, okay.  And -- and you go to the -- you've gone to the one in Camillus though, correct?

A.   Yes.

Q.   Okay.  And roughly how many times have you been there since January 1st, 2022?

A.   I don't know.  We go there at least once or twice a quarter.  So, maybe almost a dozen times.

Q.   Okay.  Great.  This entire section really has to do with what we're referring to as sensitive locations, correct?  This -- this -- this section of locations that you've been to, or that you intend to go to?

A.   This section we're just talking about?  Yes.

Q.   Yeah, this one we're talking about.  Sensitive or restricted locations.

A.   No.  Restricted -- restricted locations would be private property that you can't go in.

Q.   Uh-huh.  Okay.  So other than the ones that you've mentioned here in your

800-523-7887                              ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 187

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

interrogatories and the ones that you've described to me here today of these restricted and sensitive locations within the City of Syracuse, are there any other restricted or sensitive locations that you've been to in the City of Syracuse since January 1st of 2022?

A.   Any store that I've gone into? Yes, but I couldn't give you an example offhand.

Q.   Okay.  And we would go to -- withdraw the question.

All right. Just give me one minute.

MR. LONG:  I don't have any further questions.  Thank you so much, Mr. Johnson.

THE WITNESS:  Thank you.

MR. THOMPSON:  Steven, anything from you?

MR. STAMBOULIEH:  I don't.  Did he have any -- did Philip have any?

MR. BANASZEK:  I do not have any questions.

MR. STAMBOULIEH:  Awesome.  I don't have any questions either.

COURT REPORTER:  Okay.

MR. THOMPSON:  So, I think with that

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 188

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

we're done.  Okay.

COURT REPORTER:  Okay.  We're off the record.

(The deposition concluded at 12:53 p.m.)

800-523-7887                                  ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                         www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

STATE OF                    )
COUNTY OF                   )

         I, COREY JOHNSON, have read the foregoing record of my testimony taken at the time and place noted in the heading hereof and do hereby acknowledge: (Please check one)
         ( ) That it is a true and correct transcript of same.
         ( ) With the exceptions noted in the attached errata sheet, it is a true and correct transcript of same.

                              X_____

                              COREY JOHNSON

Sworn to before me this
_____day of _____, 2026.
X_____
NOTARY PUBLIC
My Commission Expires:
_____

800-523-7887                                    ARII@courtsteno.com
                Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 190

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson

I, KRISTEN LAWLER, do hereby certify that the foregoing testimony of COREY JOHNSON was taken by me, in the cause, at the time and place, and in the presence of counsel, as stated in the caption hereto, at Page 1 hereof; that before giving testimony said witness was duly sworn to testify the truth, the whole truth and nothing but the truth; that the foregoing typewritten transcription, consisting of pages number 1 to 188, inclusive, is a true record prepared by Associated Reporters Int'l., Inc. from materials provided by me.

KRISTEN LAWLER, Reporter

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Antonyuk, et al v James, et al – 4-29-26 – Corey Johnson
        ASSOCIATED REPORTERS INTERNATIONAL, INC.
                    (800) 523-7887

Date:
Case Name:  Ivan Antonyuk, et al v Steven James, et al
Index Number: 22-cv-986
Deponent:  Corey Johnson
Deposition Date:  4-29-22
Examining Attorney:  James Thompson, A.A.G.
Dear Mr. Johnson:

Please read and make any changes and/or corrections in your testimony and sign the transcript in the presence of a notary public.  Please do so within thirty (30) days. If you fail to sign the transcript within thirty (30) days, it will be delivered to the appropriate parties without signature.  Return the transcript with corrections, if any, to:

            OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
            BY:  JAMES THOMPSON, A.A.G.
            28 Liberty Street
            New York, New York 10005

CORRECTIONS:

_____       Word or phrase: _____
               Corrected to:   _____

_____       Word or phrase: _____
               Corrected to:   _____
_____       Word or phrase: _____
               Corrected to:   _____
_____       Word or phrase: _____
               Corrected to:   _____
_____       Word or phrase: _____
               Corrected to:   _____
_____       Word or phrase: _____
               Corrected to:   _____
_____       Word or phrase: _____

               Corrected to:   _____
_____

Date Signed                         _____
                                    COREY JOHNSON

800-523-7887                              ARII@courtsteno.com
                    Serving all of New York State

Associated Reporters Int'l., Inc.                    www.courtsteno.com

| A | | |
|---|---|---|
| **A.A.G** 3:10,15 191:6,13 | 123:13,21 | 62:1,1 63:1,1 64:1,1 65:1,1 |
| **A.D.A** 44:12,13 | **adjourn** 43:23 | 66:1,1 67:1,1 68:1,1 69:1,1 |
| **a.m** 1:18 8:3,5 143:22 | **adjournment** 43:18 | 70:1,1 71:1,1 72:1,1 73:1,1 |
| **A.M.C** 139:23 140:4,8 | **adjudicated** 57:13 | 74:1,1 75:1,1 76:1,1 77:1,1 |
| **A.P.X** 66:10 | **administrative** 46:4,6 | 78:1,1 79:1,1 80:1,1 81:1,1 |
| **A.R** 23:25 69:15 70:12 71:6 | **admission** 176:7 | 82:1,1 83:1,1 84:1,1 85:1,1 |
| 71:8 | **admit** 172:17 | 86:1,1 87:1,1 88:1,1 89:1,1 |
| **A.R.s** 68:22 149:9 | **advantage** 152:21 | 90:1,1 91:1,1 92:1,1 93:1,1 |
| **ability** 12:16,19 69:18 | **affect** 12:16,19 26:4 125:19 | 94:1,1 95:1,1 96:1,1 97:1,1 |
| **able** 12:22 26:11 72:10 92:24 | 125:20 | 98:1,1 99:1,1 100:1,1 101:1 |
| 93:2 97:15 101:4,16 102:4 | **affirm** 9:15 | 101:1 102:1,1 103:1,1 |
| 116:9,12,15,17 120:16 | **afraid** 150:2 | 104:1,1 105:1,1 106:1,1 |
| 128:12 141:15 177:23 | **afternoon** 159:15 160:8,9 | 107:1,1 108:1,1 109:1,1 |
| **absolutely** 98:19 139:18 | **age** 62:3 108:9 120:15 | 110:1,1 111:1,1 112:1,1 |
| 148:19 | **agency** 46:6 171:5 | 113:1,1 114:1,1 115:1,1 |
| **academic** 115:5 | **agitated** 148:17 | 116:1,1 117:1,1 118:1,1 |
| **academy** 154:3 | **ago** 17:6 33:12 36:14 45:21 | 119:1,1 120:1,1 121:1,1 |
| **accept** 141:16 | 86:25 100:11 170:12 171:8 | 122:1,1 123:1,1 124:1,1 |
| **access** 79:4,5,5 | 171:10 | 125:1,1 126:1,1 127:1,1 |
| **accessing** 115:12 | **agree** 90:21 101:10 107:12 | 128:1,1 129:1,1 130:1,1 |
| **accident** 38:15 | 118:20 119:13,14 120:8 | 131:1,1 132:1,1 133:1,1 |
| **accidental** 151:8,17 | 125:11,14 128:16,20,23 | 134:1,1 135:1,1 136:1,1 |
| **accomplish** 70:2 | 129:8 133:15 148:16,24 | 137:1,1 138:1,1 139:1,1 |
| **account** 33:7,10,15 | 153:19 156:23 157:3,6 | 140:1,1 141:1,1 142:1,1 |
| **accounts** 32:23 | 158:7 174:21 185:12 | 143:1,1 144:1,1 145:1,1 |
| **accurate** 96:6 | **agreement** 43:20 44:4 | 146:1,1 147:1,1 148:1,1 |
| **aced** 99:10 | **ahead** 50:15 77:12 134:22 | 149:1,1 150:1,1 151:1,1 |
| **acknowledge** 189:4 | 159:10 169:12 176:18 | 152:1,1 153:1,1 154:1,1 |
| **Act** 68:20 91:20,24 92:6 | 180:6 | 155:1,1 156:1,1 157:1,1 |
| 96:12,24 | **aid** 10:8 | 158:1,1 159:1,1 160:1,1 |
| **action** 47:19 53:20 54:5,6,7 | **airport** 179:10 | 161:1,1 162:1,1 163:1,1 |
| 68:22 71:8 | **al** 1:1,1 2:1,1 3:1,1 4:1,1 5:1 | 164:1,1 165:1,1 166:1,1 |
| **active** 30:4,6 | 5:1 6:1,1 7:1,1 8:1,1 9:1,1 | 167:1,1 168:1,1 169:1,1 |
| **actively** 108:16 | 10:1,1 11:1,1 12:1,1 13:1,1 | 170:1,1 171:1,1 172:1,1 |
| **activities** 30:10 131:2 | 14:1,1 15:1,1 16:1,1 17:1,1 | 173:1,1 174:1,1 175:1,1 |
| **actual** 52:15 66:2 | 18:1,1 19:1,1 20:1,1 21:1,1 | 176:1,1 177:1,1 178:1,1 |
| **add** 60:10 150:15 158:20 | 22:1,1 23:1,1 24:1,1 25:1,1 | 179:1,1 180:1,1 181:1,1 |
| **addition** 61:25 68:3 72:18 | 26:1,1 27:1,1 28:1,1 29:1,1 | 182:1,1 183:1,1 184:1,1 |
| 91:24 145:15 | 30:1,1 31:1,1 32:1,1 33:1,1 | 185:1,1 186:1,1 187:1,1 |
| **additional** 30:9 64:20 173:21 | 34:1,1 35:1,1 36:1,1 37:1,1 | 188:1,1 189:1,1 190:1,1 |
| **address** 31:18,22 36:18 | 38:1,1 39:1,1 40:1,1 41:1,1 | 191:1,1,4,4 |
| 59:20 161:10 | 42:1,1 43:1,1 44:1,1 45:1,1 | **Albany** 3:18,19,22 9:7,8 |
| **addresses** 32:4 | 46:1,1 47:1,1 48:1,1 49:1,1 | 147:11 |
| **adds** 61:21 | 50:1,1 51:1,1 52:1,1 53:1,1 | **alcohol** 127:6,13,18 128:14 |
| **Adirondack** 122:5,7,17,20 | 54:1,1 55:1,1 56:1,1 57:1,1 | 128:17,20,24 129:15 174:7 |
| | 58:1,1 59:1,1 60:1,1 61:1,1 | 174:9 |

Serving all of New York State

**alcohol's** 127:25
**Alex** 150:5
**ALFRED** 1:5
**alive** 113:25
**all-inclusive** 116:2
**allow** 58:19 68:17 70:4 87:9
  97:18 123:8 141:2 145:2
**allowed** 69:12 90:9 109:3,3,8
  129:18 130:4,14 131:13
  133:20 134:5,22 140:19
  153:5 175:5
**allows** 74:8
**amend** 158:20
**amendment** 21:21 22:4,11
  22:23 29:25 61:20 71:3
  72:22 73:2,23 74:15,19,21
  75:8,11 76:18 85:3 91:19
  92:10 98:12 109:22 110:4
  114:6 124:23 130:22 136:2
  137:12,18,25 138:11
  140:11,13 142:17 145:21
  146:3 158:15 169:25
  175:17 177:9 181:12
  182:17 184:13,22
**America** 21:9 95:5
**American** 86:18 136:7
**Ames** 17:6,12,18,21 45:20
  48:2
**ammo** 89:11
**ammunition** 48:6,10 77:19
  152:13
**amount** 106:17
**amusement** 113:6
**and/or** 191:8
**angry** 148:17,25
**animals** 65:8 104:4 112:19
**announcement** 87:11,18
**announcements** 87:15
**annoying** 107:11
**answer** 10:11,18 11:4,5,20
  12:16,19 15:17 37:22 74:14
  74:18 76:17 79:14,15,18
  98:11 106:20 108:7 123:17
  123:18 126:12 133:6
  136:13 160:21 177:4
  180:11 184:21

**answered** 93:17 135:18
**answering** 11:8
**answers** 7:9 10:5,25 12:23
**anticipate** 111:7 125:5
**Antonyuk** 1:1,4 2:1 3:1 4:1
  5:1 6:1 7:1 8:1 9:1 10:1
  11:1 12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1 70:1
  71:1 72:1 73:1 74:1 75:1
  76:1 77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1 85:1
  86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1
  96:1 97:1 98:1 99:1 100:1
  101:1 102:1 103:1 104:1
  105:1 106:1 107:1 108:1
  109:1 110:1 111:1 112:1
  113:1 114:1 115:1 116:1
  117:1 118:1 119:1 120:1
  121:1 122:1 123:1 124:1
  125:1 126:1 127:1 128:1
  129:1 130:1 131:1 132:1
  133:1 134:1 135:1 136:1
  137:1 138:1 139:1 140:1
  141:1 142:1 143:1 144:1
  145:1 146:1 147:1 148:1
  149:1 150:1 151:1 152:1
  153:1 154:1 155:1 156:1
  157:1 158:1 159:1 160:1
  161:1 162:1 163:1 164:1
  165:1 166:1 167:1 168:1
  169:1 170:1 171:1 172:1
  173:1 174:1 175:1 176:1
  177:1 178:1 179:1 180:1
  181:1 182:1 183:1 184:1
  185:1 186:1 187:1 188:1

  189:1 190:1 191:1,4
**anxious** 125:23
**anybody** 15:7,10 20:24
  32:11 38:2 78:21,22 79:3
  87:14 94:21 102:22 130:9
  131:4 132:12,22 138:23
  163:7 164:24
**anymore** 26:12 54:25 127:16
**anyway** 69:13 91:15 120:22
  141:6
**apologies** 17:8 27:23
**apologize** 21:3 37:8 43:16
  58:21 74:24 75:7,9 80:6
  144:13
**Apparently** 172:3
**appearance** 8:7
**APPEARANCES** 3:2
**appendix** 76:5
**applicants** 58:16
**application** 55:23 56:2,16
  57:13 58:8,15
**applied** 58:22 70:18
**apply** 61:14 119:14 120:21
  146:21
**appointed** 163:21
**appointment** 15:14
**appreciate** 135:18
**appropriate** 65:19 191:10
**approximately** 14:20 19:11
  27:24 36:11 38:18 45:23
  47:5 48:20 55:24 64:17
**April** 1:17 8:5 27:14
**aquarium** 104:11
**area** 16:15 20:3 47:2 71:13
  78:4 87:24 108:21 154:22
  155:18 184:7
**areas** 83:23 84:10 89:2
**arm** 131:7
**armed** 110:24 115:19,23
  149:23
**arming** 102:6
**armored** 78:5
**army** 54:7
**arrest** 170:6,22 171:2
**arrested** 43:6 48:3 87:5,5
  90:16,23 162:22 172:17

**arrests** 162:11
**article** 34:11 35:7 88:12,15
**Asia** 113:17
**Asian** 114:12,12
**asked** 11:5 12:23 52:25 69:3
  69:22 72:17 75:3 100:13
  133:21,22,24 135:20 149:5
  160:25 172:15
**asking** 14:12 36:6 37:18 38:3
  69:15,16,25 70:2 71:6 72:8
  72:9 82:14 84:5,11,13,20
  89:22 92:5 98:4 116:10
  130:12,23 131:9 135:17
  136:16 155:21 170:16
**assault** 73:10 75:3 93:10
**Assistant** 8:17 9:7
**Associated** 190:10 191:2
**assume** 10:18 105:15 107:3
**assumed** 155:16
**assuming** 85:24 113:21
  155:14
**attached** 119:17 189:6
**attaches** 74:8
**attack** 42:2
**attend** 131:21
**attended** 176:13
**attention** 80:21 144:20
**attorney** 1:19 2:5,8,11 3:9,14
  7:15 8:15,18,21 9:3,7,8,25
  10:2 11:3 15:4 21:5 44:14
  44:16 160:11 191:6,12
**attorneys** 7:3 8:6
**Auburn** 131:23
**audience** 132:8
**August** 60:7
**auto** 61:21 74:9
**automatically** 135:13,14
**Ava** 47:2
**available** 161:15
**average** 126:2
**avoid** 107:9
**aware** 24:8 40:24 45:12,13
  45:15 48:4 56:7 57:5,20
  58:2,6 59:3 62:2 83:3 87:23
  113:11 114:4 118:12
  136:10 140:20 147:24

  158:21 162:15,24 164:7
  170:18 176:5,6 180:15
  181:18 183:12
**Awesome** 187:22
**awful** 87:21

---
**B**

**B** 6:2 58:11 119:14
**B'ville** 119:19
**back** 16:17 17:24 18:3,4
  19:22,23 29:23 41:13 43:9
  45:19 48:2,15 51:21 52:5
  55:18,19 64:5 72:17 92:24
  93:3 95:9 111:17 112:16
  113:14,16 118:19 121:8
  131:7,8 139:5 141:24
  143:17,18,24 146:6,12,25
  147:9,15 151:5 154:6
  155:20 156:8 172:11 173:4
**background** 48:6,10 56:22
  115:5
**bad** 26:10 40:15,18,23
  128:24 129:4,6 152:2
**bag** 157:15 176:14,17,20,21
  176:23,24 177:3
**bags** 157:12
**Baldwinsville** 17:7,9 18:5,6
  18:9 161:16,22,23
**ballpark** 171:14
**ban** 167:3
**Banaszek** 3:20 9:6,6 159:10
  166:6,10 187:20
**banned** 96:12,25 175:2
**banning** 88:25
**bar** 128:13
**barrel** 67:3,8,10
**baseball** 141:25 142:11
  175:20,24
**based** 11:4
**basic** 160:18
**basically** 10:4 20:2 22:20
  54:2 65:20 122:2
**basis** 89:24 92:15 96:18 97:4
  112:21 170:13,19 171:3
**Bates** 6:9 51:8
**bear** 67:22 68:2

**bears** 65:9 113:5
**beat** 100:2
**beautiful** 16:15,15
**began** 39:19
**behalf** 8:18,22 9:4
**behavior** 40:10
**belief** 49:12 112:21 151:2
**believe** 21:13 25:12,19 28:17
  37:22 38:20,21 39:4 41:6
  43:13 44:6,17 46:25 47:3,4
  47:4 50:8 52:3,7 53:13 56:9
  56:17 57:4,23 58:4 60:3,7
  64:3 69:20 71:24 80:11
  85:17,19 89:3 90:12 91:24
  92:13,17 93:5,9,12,19,23
  94:3,6 95:24 97:22,25
  105:5,6 108:23 111:14
  113:18 114:8,9 115:25
  116:8,12 117:3,4,7 121:10
  123:14,16,20 126:13
  127:17 133:3,18 135:7
  136:15,18,21 137:3,7
  139:15 145:12 147:4,13
  152:5,6 153:4 155:11,24
  157:17 160:18 161:16
  163:18 164:18,21 167:8
  168:21,25 169:2,5,6,7
  172:10 173:19 174:25
  175:4 178:22 179:18
  183:19 184:4 185:25
**believed** 170:5
**belong** 36:7
**best** 41:22 158:6
**better** 11:24 12:4 29:12,22
  46:22 52:14 127:10,17
  129:14 149:18 159:24
**beyond** 130:6 158:18,22
**big** 87:11,17 181:19,20,23
  182:2,5,11,14,19,21
**bike** 39:14
**billion** 125:25 127:4 128:9
  132:11
**biometric** 78:8
**bird** 104:11
**bit** 11:18 15:23 38:12 41:24
  53:24 54:12 91:5,18 103:15

159:17 160:20
**blanket** 167:3
**Blue** 146:25 147:9,15
**body** 76:3
**bogus** 43:10
**bolt** 68:22 71:8
**book** 114:24
**books** 113:3,8
**booths** 102:6
**born** 15:25 16:4
**boroughs** 60:20
**boss** 15:14 26:3,13
**bottom** 51:12 64:7 90:5,5
  95:12 121:10,14
**bought** 64:21
**boundaries** 178:20 183:13
**Bowman** 71:16
**box** 3:6 61:21 181:19,20,23
  182:21
**boy** 58:12
**Branch** 3:7
**brandish** 86:13
**brandishing** 87:6 171:24
**break** 11:7,10 40:5 54:17
  88:5 91:17 143:3,7
**breaking** 38:16 39:24,24
  40:2 42:15 89:11
**Brenneck** 44:17
**Bridge** 180:22,23 181:6
**briefly** 64:19
**bring** 69:12,12,15,19 77:14
  82:4 87:4 123:6 132:2
  133:16 134:8 169:23
  175:14 177:6
**bringing** 89:8 134:11,17
  153:6,20
**brings** 18:10
**broad** 16:4
**broken** 54:16 154:22
**brother** 172:11
**brought** 19:21,22 49:19
  68:19 70:3 97:25 132:8
  142:14 150:10 152:23
  180:9 181:9 182:15 184:11
  184:18
**BRUEN** 1:12

**Buffalo** 127:9,14 129:14
  174:8,11 185:6,10,13
**building** 82:21,25 83:2,17
  98:9
**buildings** 70:18 81:4 82:9,20
  82:23 83:8,14,24 84:7,16
  84:24 97:10,13,20 98:6,17
  117:25,25 155:11
**bullet** 144:21
**bumped** 172:5,8,12
**bunch** 41:3 87:2 157:4
**Burger** 127:10,17 129:14
**business** 92:9 96:17 97:7
  101:8 117:11
**busted** 40:25 88:8
**buy** 48:5,9 105:24 110:14
**bypassing** 78:11
**Byrne** 178:13,23 179:3,3
  182:8

---

**C**

**C** 5:2 119:14
**C-O-R-E-** 9:12
**C.C.A** 166:24
**C.C.I.A** 55:14 68:13,17,25
  71:8,19 91:21,21,24 92:6
  97:23 98:2 106:4 112:7
  117:7,24 123:6,12 128:11
  132:13 134:25 155:6,15
  164:8,18,20,23,25 166:13
  166:24 167:19
**C.C.I.A.'s** 167:3
**call** 26:2 42:17 180:8
**called** 14:7 19:20 110:15
**calls** 60:4
**camels** 104:9
**Camillus** 131:22 185:9,21
  186:4
**camps** 120:5,9
**campus** 120:18
**capacities** 24:3
**capacity** 1:11 2:2,3,5,6,7,8,9
  2:10 23:21 164:17
**caption** 190:5
**captured** 88:18
**car** 41:13,25 42:3,12 54:16

79:6 110:16 131:7 172:9,11
**care** 88:5 91:15 109:11
  126:23 132:12,17
**Carolina** 16:12 17:22
**Carousel** 87:3 89:8 90:3,6,10
  104:7 131:23 174:22 175:3
**carriage** 68:17 88:25 97:19
  116:7 155:22
**carried** 82:2 88:16 98:8
  132:13 137:9,15,21 138:4,7
**Carrier** 178:11
**carries** 80:25 81:20 135:23
**carry** 25:8 26:23 53:7 58:20
  62:16 63:3,8 66:5,10,15,17
  66:23 68:10,12,14,20,21,22
  69:4 71:5,6,16,18 72:11
  75:18,21,25 76:5,11,14,22
  76:24 77:4,11,11 78:23
  81:2,24 82:8,16,17,21,24
  83:10 84:3,11,12,13,20,22
  87:12,15,18,20 88:6 89:6
  91:11 92:9 96:12,12,19,21
  96:23 97:9,12 98:5,16,19
  100:10,23 102:4,10 103:4,4
  109:10 112:18,24 113:4
  116:13,15,18 118:3 120:17
  123:7,21 124:20 125:24
  126:11,14 128:13 130:4
  131:6 135:2,3,4 136:5,19
  136:23 138:16 139:4,24
  140:3,6,7 141:2,5,15
  145:11,15,24 146:8 153:5
  167:2,4 168:2,3,7
**carrying** 41:14 63:7 69:11
  71:14,14 77:9,13 84:14
  99:4 100:20 101:6 112:15
  116:3 123:12 126:17
  127:22 128:4,6,18 130:13
  137:4,5 145:18 155:16
**cars** 41:3 89:11,12 154:22
**case** 14:3,5 24:18 25:3,11,23
  26:5 30:7,8 32:11 34:3
  36:19,20 37:4,4 40:25 43:9
  43:11 44:25 48:13,16,19
  49:11 57:3 68:10,12 69:9
  69:18 70:3,25 72:2 89:12

95:23 97:18,21 115:2 118:22 121:21 155:3 191:4
**cases** 77:3,6
**categories** 83:13 155:12
**cats** 104:9
**Catskill** 122:4,8,17,21 123:13,22
**cause** 7:16 148:8 190:4
**cease** 18:22 19:14
**Cecile** 2:6 163:18 164:12,16 167:17 168:9
**certain** 15:17 43:25
**certified** 7:16
**certify** 190:2
**chain** 139:22
**challenge** 97:21
**challenging** 95:22 120:25 121:3
**chance** 35:22
**change** 134:25 135:2 136:13 139:24 158:20
**changed** 53:6
**changes** 191:8
**Channel** 114:20
**charge** 28:5 38:14 42:14 43:24 47:9 80:12 167:25 168:4
**charged** 38:10,13 43:21
**charges** 44:18
**Charlotte** 16:14
**check** 48:6,10 56:23 61:21 62:6 157:12,13,16 176:24 189:5
**checkpoint** 106:11
**checkpoints** 77:8
**checks** 176:14,17,20,21,23
**chief** 2:7 9:4 163:16,23 164:6 164:11,12,16 167:16,17 168:8
**child** 99:3,14 100:19 101:17
**child's** 99:4 100:20 101:23
**children** 107:13,14
**China** 16:14
**choice** 97:23 127:24
**chose** 141:18
**Christopher** 49:4,7

**Cicero** 185:16,21,24
**Circle** 178:11
**circuses** 113:7
**city** 4:3 9:3,4 58:19 60:20 121:3 124:19,19 160:11 161:6 162:6,13 163:16 167:14,21 173:16,18 174:2 174:10,20 175:23 177:13 177:20,25 178:2,20,23 179:13 180:14,18 181:16 181:20 182:21,24 183:2,8 183:14 185:11,14 187:4,6
**Civil** 7:5
**civilians** 102:3
**claim** 11:4
**claiming** 87:6 109:2 170:7
**clarification** 83:20
**clarify** 10:17
**class** 28:10 29:9 64:22 66:10 100:9,20
**classes** 27:14 107:7
**classification** 117:5
**Clay** 39:5,6 45:6
**clear** 58:22 75:2 151:4
**clearest** 71:22
**Clerk** 63:24
**close** 115:10 157:20 166:15 166:16 169:10,13,14,21
**closed** 182:10,11 186:2
**closer** 11:19 54:15 118:10
**co-counsel** 8:18
**Coalition** 21:20 22:3 23:3
**Code** 6:19 144:10
**collective** 105:12
**college** 16:22 120:17
**Colt** 54:7
**Columbine** 87:3 98:24 100:15
**combination** 80:3
**come** 10:24 16:17,19 29:11 42:20 101:19 143:17,18 174:14 182:23 183:15
**comes** 163:6
**coming** 9:24 11:23 15:12 54:15
**commenced** 8:2

**comment** 164:22
**comments** 34:10
**Commission** 189:12
**commit** 34:25
**committed** 92:22 150:20
**common** 35:20 49:3 100:13 100:14 154:2,3
**commonly** 49:4 179:19
**communicate** 33:24
**community** 45:22
**companies** 140:21 142:12
**company** 19:20 141:3,12
**compete** 23:9,10,14,18
**competition** 53:3,4,19,25 65:6 66:7,14 100:2
**competitions** 46:19 47:15 62:19
**competitive** 23:16
**complainant** 45:11
**complaint** 6:13 80:13
**complete** 12:22
**completed** 56:2
**completely** 144:13
**computer** 111:19
**conceal** 68:14,21
**concealed** 25:8 53:7 68:16,20 68:21 75:24 76:10 78:6 80:25 81:21 96:11,23 103:4 123:7 126:11,18 132:22 134:19 168:2,7
**concern** 126:6 132:23 168:7 168:10
**concerned** 69:10 79:10,12,12 99:17,18 125:23 126:4 127:2 149:8,12
**concluded** 188:5
**conditions** 12:15
**Conduct** 6:19 144:10
**conference** 164:20
**confirmed** 171:19
**conflict** 148:14
**conflicts** 129:9
**Congratulations** 16:21
**connect** 94:22
**connected** 119:22 120:12
**connection** 49:11

Associated Reporters Int'l., Inc.                    www.courtsteno.com

cons 117:10
consider 116:10,11 117:23
   118:2,4 153:25
considered 119:20 120:7
   141:18 155:18 185:16
consisting 190:9
console 77:22,23 78:5
constantly 87:3
constitute 117:11
constitutional 70:12,14
   91:11 92:13,16,18 93:10,16
   93:20,24 94:4,7 116:7
   117:2 133:4 135:15 136:2,9
   136:13,19,22 137:4,8
Constitutionally 115:24
   117:20
Cont'g 12:7 144:4 156:10
   160:6
Cont'g 1:13 2:2 50:5
contact 25:9,11
container 78:17
contemplation 43:18
content 24:23,25 25:21 26:2
   30:18
continue 145:18
contractor 26:19
contractors 101:21
control 133:16 134:3,4 136:7
   171:5
controlled 157:7,10
controls 58:4
controversy 122:4
Conveniently 48:12
conversation 10:22 14:12
conversations 25:21
conversion 74:9
CONWAY 2:5
cop 158:2
cops 149:11,15,16 150:24
copy 7:16 32:15
Corey 1:1,4,16 2:1 3:1 4:1
   5:1,3 6:1,6 7:1 8:1 9:1,12
   9:19 10:1 11:1 12:1,3 13:1
   14:1 15:1 16:1 17:1 18:1
   19:1 20:1 21:1 22:1 23:1
   24:1 25:1 26:1 27:1 28:1

29:1 30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1 48:1
49:1,3,8 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1
118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1
138:1 139:1 140:1 141:1
142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1
150:1 151:1 152:1 153:1
154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1
162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1
170:1 171:1 172:1 173:1
174:1 175:1 176:1 177:1
178:1 179:1 180:1 181:1
182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1,3
189:9 190:1,3 191:1,5,25
corner 38:23
corporation 4:3 105:18
correct 18:18 30:2 50:16
   51:9 53:12 59:10 61:4,5,12
   62:7 63:11 64:24 66:17
   72:14,15 75:19 81:10 82:19
   83:25 90:18 93:17,18 94:16
   95:23 97:10 100:5 103:17

107:19 112:10 121:17,22
122:21 127:6,10 139:7,10
139:13 142:12 144:24
145:3 146:17 148:4,11
150:12 151:17 153:3,4
154:7 160:12 161:3 164:14
174:22 175:3,7 176:8
178:15 186:5,14 189:5,7
corrected 34:10,11 191:16
   191:18,19,20,21,22,23
corrections 7:11 191:8,11,15
correctly 116:24 167:7
counsel 4:3 9:7,7 13:3 14:16
   14:17 190:5
count 46:7
counter 148:11
counties 35:11
countries 113:22 114:12
county 2:4,5,6,8,10,11 3:18
   3:19 4:7,8 8:14,15 9:8,8
   35:13 44:8 55:15 56:5,6
   59:4,7,8 61:3 63:23 88:17
   89:19 124:4 128:12,15
   161:14 164:22 170:22,24
   189:2
couple 36:6 59:9 86:25 127:8
   156:12 157:13 172:24
   180:3
course 27:9,16 28:5,6,12,22
   29:18 46:12 60:23 74:25
   149:15
court 1:2 8:4,12,23,25 9:9,14
   9:20 10:8 11:17,22,25 12:4
   13:16,22 30:20,22 32:18,22
   36:24 37:2 38:17 39:3,7,10
   43:8 45:6,13 46:5,6 49:20
   50:2,23 51:17 62:8,23
   79:24 80:16,19 81:5 82:11
   83:6 84:5,8,10,12,18 91:13
   91:15 102:13 105:21
   107:21 119:3 136:12
   143:20,24 144:15,18 156:5
   156:8 159:23 160:4 176:16
   176:19 178:11,12 187:24
   188:3
Court's 83:10

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

courtesy 160:22
courthouse 83:17 98:9 102:4
  102:18
courthouses 81:3 82:9,16
  83:14,24 84:7,15,23 97:9
  97:13,19 98:6,16,20 102:2
  102:15 117:24
courtroom 103:2,12
covered 83:18
COVID 21:14 147:12
cowboy 53:21,25
cowboys 54:3
coyotes 85:10,13
create 30:18
created 33:12
creator 24:23,25 25:21 26:2
credentials 22:16
crime 38:10 43:23 88:25
  89:7,7 92:22 112:8 154:22
  166:13 168:12
crimes 34:25 88:15
criminal 44:25 45:10,17
  87:12,19 88:22 90:18,25
criminals 87:15
crowd 106:13
crowded 107:17 139:6,16
  156:24
Crump 5:9 24:17,20 25:2,18
  32:8 94:16
cultures 113:22 114:13
curious 171:17
current 27:21 55:14 66:5
  163:16 164:6
currently 19:6 20:13 60:24
  83:7 86:15 117:22
Curtis 40:14,17
custodians 109:9
Cut 20:10

**D**

D 5:2,2 6:2 31:24,24 119:14
  166:14
D.A 41:2 44:9,10
D.E.C 122:15
dads 100:9,19
daily 33:22 66:17 183:9

Dairy 178:13,23 179:3,4
  182:8
damage 42:16
danger 42:10 111:8 115:18
  115:22 125:6
dangerous 87:24
date 1:17 19:12,12 30:12
  53:12 61:7 147:12,14
  168:18 170:12 173:24
  191:3,5,24
daughter 172:25
Dave 25:24
DAVID 2:7
day 28:7 56:3 64:2 72:12
  76:13 81:23 86:21 88:14
  103:6 106:15 111:10 151:4
  189:11
day-to-day 20:8 92:9 97:4
days 28:8 48:25 49:2 76:25
  166:21 168:14,18,20 191:9
  191:10
deal 96:18
Dear 191:7
death 150:4 151:21
December 53:12
decent 11:25
decide 21:15 23:6 24:6 62:17
  72:23 73:7,12,22 77:10
  134:7 141:16
decided 87:2 91:10,14
  110:19
decision 56:15 165:16
decisions 57:22 58:5 128:25
  129:4,6
declaration 6:15 111:15
  117:18 165:4,7,11,18,24
  166:3
deer 66:13 71:16
Deescalation 41:21
defend 139:16
defendant 3:8,13 4:2 7:6
  37:20 45:10 57:3
defendant's 6:6
Defendants 1:14
defending 42:2
Defense 25:25 26:16,21 27:3

  27:7,11,17,20,25
define 17:3
definitely 41:21
definition 73:10,17,20
delay 48:17,23 160:20
delayed 48:12 49:4
delays 49:10
delivered 191:10
delivery 19:10 20:12
denied 48:7,8
deny 57:25
department 56:22 83:9
  162:12 163:4,8,9,12 167:18
  170:25
Department's 173:17
Depends 106:15
Deponent 191:5
deposed 11:15
deposition 1:16 7:5,11,14,15
  7:17 8:2 10:4,6 13:8 14:18
  15:7,11 50:15 78:24 79:13
  160:19 188:5 191:5
Depot 181:4,6
describe 20:7 63:21 85:11
  156:16 157:9
described 6:4 81:5 82:10
  83:5 84:4 187:2
describing 171:25
description 65:20,23
despite 91:12 140:4,8 145:25
details 150:14,16 171:20
detectors 98:21 176:8,12
device 74:7
diabetic 127:25
diagnosed 127:25
died 153:11
difference 24:24 87:11
  149:15
different 21:17 55:13 56:20
  65:4 67:14 69:3,25 81:19
  84:9 89:22 92:3 97:17 98:4
  100:18 101:19 115:15
  155:9 161:6
difficult 10:13,24 34:23
  125:16 130:5 160:16
dig 49:17

**diligence** 93:2
**direct** 5:4,5 9:21 64:6 80:21 95:11 111:16 112:6 144:20 146:6,12 159:13
**dis** 151:17
**disagree** 119:13 120:3,3
**discharge** 151:9
**discharges** 151:17,18,19
**discuss** 15:15
**discussed** 15:7,20 68:4 72:19
**discussing** 95:21
**dishwasher** 138:21
**dismissal** 43:18
**dismissed** 38:10 43:13 44:2 44:19 45:17
**dispatching** 66:12
**distances** 67:13
**distracted** 39:13
**District** 1:2,3 2:5,8,11 8:15 9:8 161:24
**divided** 22:13
**document** 14:5,5 49:17 50:7 51:2,3 52:15 62:11,12 80:6 80:10 111:12,13,22 118:7 142:20 144:6,9
**documentaries** 114:20
**documented** 112:25
**documents** 13:9,13,13,24 51:21 52:5 69:21 143:11
**dogs** 126:23
**doing** 46:10 168:11
**dollars** 28:3,7,10
**DON** 2:8
**door** 39:23 141:10
**Doran** 2:3 43:8 44:24 45:2 56:18,20,25 57:2,5,7,10
**double** 62:6
**downloaded** 59:6
**Downsizing** 18:24
**Downstate** 17:9
**Downtown** 88:19
**dozen** 169:10,13,15,20,21 186:11
**Dragons** 31:25
**draw** 42:8 86:12
**drawn** 172:16

**dress** 54:3
**drew** 172:12
**drink** 127:19,21,24 128:3,4,5 128:17 129:2,4
**drinking** 128:24 129:6,9
**drinks** 127:15
**drive** 20:19 63:6,16 161:3
**drive-in** 131:24
**driven** 42:23
**driver** 18:20 19:10 40:4
**driving** 39:12 63:5
**drove** 63:23
**drug** 41:2,2
**due** 30:9 92:25
**duly** 7:14 190:6
**Dungeons** 31:25
**duty** 46:7,11 117:10 158:8

**E**

**E** 5:2,2,2,8,8 6:2,2 120:3
**e.g** 144:24
**Eagle** 3:21
**earlier** 32:8 44:25 50:9 59:10 97:8 100:4,13 155:20 170:5
**early** 22:24 164:20
**easily** 153:14
**East** 4:5
**easy** 109:10,13
**eat** 183:17
**effective** 29:6 67:23,24
**effectiveness** 89:25
**efficient** 67:3
**effing** 39:20
**eighteen** 27:8 60:23 66:9
**eighty-eight** 49:2
**either** 57:22 115:22 116:2 176:12,24 187:23
**elderly** 106:24 172:5
**elected** 163:20
**electrical** 19:25
**electricians** 20:3
**electronically** 111:24
**elephants** 104:8,9
**eliminated** 89:7
**else's** 137:6,16
**email** 25:4,9,10 31:16,18

32:4 36:17
**emailed** 32:10
**emailing** 32:7
**emails** 5:9 32:15
**employed** 20:13
**employees** 117:10
**employment** 17:2 26:4 27:21
**empty** 106:16
**enactment** 96:11,23
**encounter** 41:10
**encouraged** 55:2 112:18,23 113:4
**endangering** 139:17
**ended** 38:10,15,16 39:24 150:11
**endorsement** 61:15
**enforce** 164:18,23 167:19
**enforcement** 99:9,19,24 102:14 150:11 153:16,21 158:5,8 164:8 171:4 173:15
**engage** 40:9
**enjoyment** 126:19
**enormous** 122:21
**enter** 105:25
**entering** 162:13
**entire** 186:12
**entity** 105:7,19
**entrance** 157:7 169:19
**entry** 176:6
**equipment** 20:11
**erA** 54:9
**errata** 189:7
**escalated** 41:21
**escaped** 113:6
**especially** 34:12 101:11 104:18 124:10
**ESQ** 3:5,20 4:9
**essential** 119:6
**essentially** 43:23 59:22
**establish** 162:5
**estimate** 169:11 175:11 177:24
**et** 1:1,1 2:1,1 3:1,1 4:1,1 5:1 5:1 6:1,1 7:1,1 8:1,1 9:1,1 10:1,1 11:1,1 12:1,1 13:1,1 14:1,1 15:1,1 16:1,1 17:1,1

Associated Reporters Int'l., Inc.                    www.courtsteno.com

18:1,1 19:1,1 20:1,1 21:1,1 22:1,1 23:1,1 24:1,1 25:1,1 26:1,1 27:1,1 28:1,1 29:1,1 30:1,1 31:1,1 32:1,1 33:1,1 34:1,1 35:1,1 36:1,1 37:1,1 38:1,1 39:1,1 40:1,1 41:1,1 42:1,1 43:1,1 44:1,1 45:1,1 46:1,1 47:1,1 48:1,1 49:1,1 50:1,1 51:1,1 52:1,1 53:1,1 54:1,1 55:1,1 56:1,1 57:1,1 58:1,1 59:1,1 60:1,1 61:1,1 62:1,1 63:1,1 64:1,1 65:1,1 66:1,1 67:1,1 68:1,1 69:1,1 70:1,1 71:1,1 72:1,1 73:1,1 74:1,1 75:1,1 76:1,1 77:1,1 78:1,1 79:1,1 80:1,1 81:1,1 82:1,1 83:1,1 84:1,1 85:1,1 86:1,1 87:1,1 88:1,1 89:1,1 90:1,1 91:1,1 92:1,1 93:1,1 94:1,1 95:1,1 96:1,1 97:1,1 98:1,1 99:1,1 100:1,1 101:1 101:1 102:1,1 103:1,1 104:1,1 105:1,1 106:1,1 107:1,1 108:1,1 109:1,1 110:1,1 111:1,1 112:1,1 113:1,1 114:1,1 115:1,1 116:1,1 117:1,1 118:1,1 119:1,1 120:1,1 121:1,1 122:1,1 123:1,1 124:1,1 125:1,1 126:1,1 127:1,1 128:1,1 129:1,1 130:1,1 131:1,1 132:1,1 133:1,1 134:1,1 135:1,1 136:1,1 137:1,1 138:1,1 139:1,1 140:1,1 141:1,1 142:1,1 143:1,1 144:1,1 145:1,1 146:1,1 147:1,1 148:1,1 149:1,1 150:1,1 151:1,1 152:1,1 153:1,1 154:1,1 155:1,1 156:1,1 157:1,1 158:1,1 159:1,1 160:1,1 161:1,1 162:1,1 163:1,1 164:1,1 165:1,1 166:1,1 167:1,1 168:1,1 169:1,1 170:1,1 171:1,1 172:1,1 173:1,1 174:1,1 175:1,1

176:1,1 177:1,1 178:1,1 179:1,1 180:1,1 181:1,1 182:1,1 183:1,1 184:1,1 185:1,1 186:1,1 187:1,1 188:1,1 189:1,1 190:1,1 191:1,1,4,4

**EUGENE** 2:5
**event** 54:19 89:24 112:18 113:5 163:4 168:2 171:22 171:23,25,25 172:2,4 177:5
**events** 104:19 175:25
**eventually** 110:19
**everybody** 79:21
**evidence** 49:14
**ex** 140:10
**exact** 37:10 147:12 164:24 173:6
**exactly** 42:6,7 133:23 155:13 168:17 171:15
**Examination** 5:4,5 9:21 159:13
**Examining** 191:6
**example** 116:3 187:9
**exception** 92:21
**exceptions** 189:6
**excerpt** 139:12
**exchange** 25:4
**excuse** 166:25
**exhibit** 50:22 51:15 62:7,22 64:6 80:15 95:10 103:15 112:3 119:2 121:10 141:24 144:14,17 146:7,13 154:6,9 165:6 173:6
**exhibits** 104:18
**exist** 113:21 155:6
**existed** 83:8 97:22 98:2 113:12,16,19 114:5,12
**exists** 117:23 120:19
**expert** 115:2 173:15
**expiration** 61:7
**Expires** 189:12
**explain** 23:15,20 26:9 29:3 41:23 59:12 65:15 67:19 82:11 86:23 96:14 109:5 120:23
**explained** 105:8 171:3

**explosives** 93:25
**extend** 160:22
**extent** 72:21 140:10
**extra** 131:3,4

### F

**F** 5:2 120:3
**F.B.I** 99:25
**F.P.C** 22:10 29:25
**Facebook** 33:3,4,17,18,21 34:4
**facilities** 120:12
**facility** 115:13 131:6
**fact** 23:8 26:6 71:18 91:12 109:3 111:21 112:16 114:12,18 139:3 141:16 148:6 152:8 153:25 167:11 168:16
**fail** 191:10
**fair** 57:12,15 99:21 107:3,12 156:14,16,18,19,24 157:7 158:9,12 165:21
**Fairgrounds** 156:20
**fairly** 154:21
**fall** 85:18 155:11 166:18,20 183:4
**falls** 122:14
**familiar** 43:17 44:3 58:7,10 58:14 60:12 74:2 75:8 122:9 150:4
**families** 106:22 107:14 157:4
**family** 81:7 105:12 172:10
**Fan** 6:19 144:10
**far** 13:10,17,22 28:2 29:16 36:23,25 40:24 41:8 59:3 67:22,24 69:22,23 70:6 89:14 104:7 105:3 112:8,12 115:8 121:2 153:12 166:15 168:3 177:12 179:11
**farther** 67:13
**favorites** 166:20
**features** 24:2
**federal** 7:4 70:18 83:8 117:9 117:24 122:3
**federally** 92:21
**fee** 61:22 95:4

Associated Reporters Int'l., Inc.                    www.courtsteno.com

**feel** 57:12,15 86:20,24 94:11 107:24 108:3 118:10 132:8
**feeling** 165:8
**feelings** 133:3 167:20
**feels** 92:25
**felony** 150:18,20,21 167:25 168:4
**felt** 54:10
**field** 107:4
**fifteen** 45:25 60:11 69:16 70:12 71:6 159:8
**Fifth** 72:22,25 73:8,23 74:15 74:19,21 75:5,8,10 76:18 76:20 85:3,4 98:12,14 109:21,23 110:3,5 124:23 124:25 137:12,14,18,20,25 138:3,11,13 140:10,12 142:17,19 145:21,23 146:3 146:5 158:14,16 169:25 170:3 175:17,19 177:9,11 180:12 181:12,14 182:17 182:18 184:13,14,21,23
**fifty** 17:16 28:3,7 99:8,9 149:11 183:5
**fifty-one** 80:22
**fights** 129:10
**figured** 23:11 131:18
**filed** 164:13 167:12
**filing** 164:14 168:15 169:8
**fill** 13:16 50:10 55:15 58:23 61:20
**filled** 173:5
**filling** 55:22 63:25
**final** 183:16
**finally** 55:19
**find** 107:10 125:16 130:3 163:20 165:19 185:13
**fine** 79:20 141:17 163:15
**fingerprint** 52:9
**fingerprinting** 60:23
**fingerprints** 55:16
**finish** 11:8 160:21
**fire** 71:14 74:9 78:16
**firearm** 35:10 41:15,16 42:8 48:6,10 49:5 53:22 54:18 54:20 55:3 59:15 60:6,15

63:7 66:3 68:5 70:15 71:5 77:9,14,21 78:23 81:7 82:24 83:10 85:7 86:7,9,13 86:16 87:6 88:21 91:11 92:9 96:21 100:23,24 112:8 112:16 120:16 127:22 128:4,6,13 130:13 131:7 132:6,16 136:5 139:4,16 140:21 150:21 151:12 166:14 167:2,4 169:23 170:7 171:24 172:7,13,17 175:14 177:6 180:9 181:9 182:15 184:11,18
**firearms** 21:20 22:3 23:3,22 23:24 26:11,22 29:8,20 36:7,9 37:9 41:3 54:4 59:21 60:10 64:20 79:5 81:15 87:9 90:9 92:20 93:3 96:13 96:25 97:19 102:7 103:7 106:3 109:10 112:18,24 113:4 129:16,18,23 132:13 133:19 134:5,22 139:23 140:19 141:2,4 144:23 145:3,6,8 155:16 166:23 167:3 175:2,5
**fired** 148:17
**first** 8:6 10:10 16:25 17:4 53:11 64:7 66:5,10,13 81:20 88:21 96:15 100:8 101:9 112:6 130:22 167:13 173:14
**firsthand** 114:7
**fish** 124:3
**fit** 38:7
**Fitzpatrick** 2:4 8:16
**five** 6:14 11:10 60:20 66:17 112:3 156:3
**fix** 101:21 138:20
**flame** 36:9
**flamingos** 104:9
**floor** 90:5
**focused** 81:16
**follow** 91:14 160:25
**followed** 110:16 172:8
**fond** 23:7
**foot** 39:14

**forbid** 145:5
**forbidden** 123:3
**force** 34:11 35:8
**foregoing** 189:3 190:3,8
**Forensics** 163:12
**forest** 122:10,13,14,18 123:3
**forgetting** 164:21
**forgotten** 31:23 144:13
**form** 7:8 55:15 58:8,11,15,23 58:25 61:21 72:5
**formally** 163:8
**format** 71:23
**formerly** 57:2
**forty-** 66:16
**forty-five** 66:4,11,24 67:20 67:24 75:18
**forty-fours** 64:21
**forty-seven** 67:9 80:22
**forum** 36:22 37:5,8,9
**forums** 36:4,6 37:12
**foundation** 21:21 22:4,11,23 30:2 105:12
**founder** 25:25
**founding** 113:12,19
**four** 6:12 21:13 36:13 55:24 80:15,18 95:12 121:11,15 121:19 146:7,13 154:7,9,11 173:8,12 175:12,13 178:4,7 178:15 180:5,7 184:9,10
**Fourteenth** 114:6
**framing** 146:10
**freaks** 149:11
**free** 94:11 118:10 133:9 135:13
**frequent** 97:7 123:25 124:2
**frequently** 148:11 166:17
**Frgm1363@gmail.com** 31:20
**Friday** 64:4
**friends** 147:2 170:21
**frightening** 149:2,23
**front** 14:3 44:25 46:5 76:8 77:24 118:19 165:5,24 173:9
**frustrated** 24:6
**full** 9:10 49:2,6 55:16 74:9,9

Associated Reporters Int'l., Inc.                          www.courtsteno.com

full-size 67:2
full-time 17:4
fully 151:25 164:23
Fulton 89:19
fundamental 136:8,12
further 7:7,10,13 178:12
  187:13

## G

G 5:2 66:4,16,24 67:9,15,20
  75:18 120:11,12
G.L.C 66:19
G.M 31:23
G.O.A 21:17 22:10 23:6 24:6
  24:11,11 25:15 29:25
G.O.A.'s 25:10
games 33:24 141:25 175:21
  175:24 176:8,12
garbage 90:4
gas 177:18,19,24 178:3,5,8
  178:19
gate 106:11,12 157:12,14
gates 157:15
gear 26:23
Geddes 184:2,4
general 1:19 3:9,14 8:18,21
  10:2 131:16 149:2,5 176:7
  177:18 182:6 191:12
generally 66:23 81:8 148:2
generated 111:19
gentleman 110:12 169:4
  172:3,5,7
gentleman's 172:10
geo 173:17
geographical 162:6 173:18
  178:20 183:13
Getta's 184:8
getting 34:14 38:10 94:19
  174:7
ghost 73:20 75:4
Gifford 103:16,24 104:13,20
  105:10,12 106:6 109:14,19
  109:25 110:8 111:8 124:13
  165:9 166:17 167:5 168:8
  168:16 169:9 173:21 174:3
gift 110:13 172:6,20 173:2

give 9:16 10:5,11,18 12:2,22
  79:4,7 160:15,21 171:19
  187:9,12
given 13:10,13 158:19
gives 89:24 135:16 136:14
giving 147:18 190:6
glad 28:24 29:17 41:20
glasses 49:19
Glenn 38:24
Glock 64:21 66:14,20,22
  67:15 74:3,6,7,10 75:4
Glocks 74:11
glove 40:6
go 16:7,21 19:18,18 30:13
  39:22 42:25 47:8 60:21,22
  60:24 61:20 63:17 71:15
  72:11,17 82:23,23 95:9
  96:19 97:4,6,24 98:21
  103:6 104:6,12 106:10,22
  107:13 109:11,14 111:8,10
  115:19,23 119:11 120:11
  124:3,8 130:2 131:7,19
  142:6 146:22,24 147:22,24
  154:25 159:10 165:8,22
  167:12 168:16,19,21
  169:12,21 172:22,25 173:3
  173:12,13,14 176:7,18
  179:4,6 180:6 182:12 185:4
  186:3,9,16,22 187:10
God 132:15 178:12 179:5
  185:9
goes 101:22 106:18
going 9:16 10:6,9 11:18,19
  29:23 33:25 39:17,19 40:11
  43:8 49:17 50:25 62:5,10
  64:5 72:20 74:13 77:7,13
  79:11 80:2,5 81:14,24
  83:20 84:25 85:17,18 87:2
  87:12,22 88:4,5 91:14,21
  93:7 102:7 104:19 110:3,20
  111:11 112:5 118:7 125:9
  128:8 140:12 141:24
  142:20 147:24 153:23
  154:6 155:20 166:11 167:9
  167:20 168:12,12 170:11
  173:7,11 177:17 179:23

good 9:2 29:2,4,7,8 87:21
  98:15 102:3,13 106:17
  110:20 128:2,17,19 139:20
  143:14 154:24 159:15
  160:8,9 177:4
government 81:3 82:9,20,21
  82:23,25 83:2,14,17,24
  84:7,16,24 92:25 97:10,13
  97:20 98:6,9,17 99:11
  105:19 116:21 117:9
  135:11,13 155:10
governmental 117:25 155:17
Governor 1:11
grade 100:8,8
graduated 16:25
grandparents 16:16
grant 57:25
Graybar 19:6,22,23,24 20:5
  20:14 26:14 27:20
great 11:14 12:6 13:2 19:16
  62:9 160:5,14 163:15
  168:19 175:20 179:11
  181:19 186:12
greatly 135:12
Greene 2:11
grief 147:18
grip 67:2
grocery 179:11,12 180:13
Ground 17:23
group 172:9
groups 31:4 107:10
Grove 16:14
guaranteed 136:3,4
guard 115:20,23
guarded 116:5
guess 89:21 135:6 165:12
guidelines 160:19
gun 21:8,16,18,23 29:24 31:3
  34:6,9,12,17,18 36:8 42:5
  66:5,6,10,14,15,17 69:5,19
  73:17,20 75:4,4 76:11,22
  79:11 82:2,4,17,21 87:12
  87:18,21 88:6,25 89:6
  90:17,22,24 91:23 92:3,6
  92:12 93:6,8,21 95:5 97:5,9
  97:12 98:6,8 99:3 100:10

800-523-7887                                      ARII@courtsteno.com
Serving all of New York State

100:20 101:7,11,16 102:10 102:22 107:24 108:4,13,15 108:18,19 109:18,24 116:7 116:13,15,18,20 123:12,21 124:20 128:7,18 130:14 132:2,9,18,20 133:9 134:8 134:17,20 135:13,24 136:3 136:23 137:4,5,9,15,21,22 138:4,7,8,16,22,24 139:2 139:25 140:3,7 141:5 142:14 145:11,15,19,24 147:18 149:13 150:10,25 151:3,7,7,7,25 152:6,13,23 152:25 153:5,7,11,15,17,17 153:17,17,20,25 158:11

**gun-free** 87:23 133:2

**guns** 34:6 54:5 64:10 66:7,12 69:20 70:4,23 71:18,24 72:5,14,18 84:20 87:4,15 88:8,16,18 89:2,8,11 90:7 98:16,19,22 99:18 101:22 102:4,14,18,21,25 103:11 108:9,22 109:3,3,8 115:23 116:4,5,9 123:3 125:17,20 125:24 126:18 133:17 134:11 135:9,9 136:15 140:24 146:8 148:25 149:4 149:12 150:2,3 151:23,23 152:9 155:22

**gunshot** 151:6

**guy** 40:20 152:6 172:6,12,15

**guys** 13:15 98:22 131:18

**gym** 101:20

### H

**H** 6:2 120:11

**half** 15:2 106:23 107:2

**halfway** 110:16

**Hampshire** 23:10

**hand** 9:15 118:9 153:13

**handful** 10:7

**handgun** 80:25 81:3,21 82:8 82:16 84:3,14

**handguns** 64:23,25 65:3,12 68:4

**handle** 53:22

**handler** 20:6,9

**handling** 29:7

**hands** 150:17 153:14

**happen** 24:14 34:19 171:20

**happened** 38:23 39:11 43:4 88:16 171:4

**happy** 11:10 79:14 110:13

**harder** 10:12

**harm** 110:7 130:14,24 131:10

**Hartford** 89:20

**hauled** 156:19

**He's** 42:11

**head** 10:22

**heading** 178:13 179:7 189:4

**hear** 11:17 28:24 29:17 39:16 88:23 100:12 105:22 107:21 159:18,19

**heard** 151:6

**hearing** 7:16 100:14

**Heisler** 4:9 8:9,13,13 79:23 159:3

**help** 11:19 117:16

**helpful** 119:12

**helps** 163:14

**hereof** 189:4 190:6

**hereto** 190:5

**Hey** 142:23

**Hi** 159:15

**high** 16:7,25 123:9 125:8

**hike** 67:25

**hiking** 66:15 67:17

**Hill** 105:3

**HILTON** 2:9

**historical** 112:14 115:2

**historically** 112:25

**history** 114:20 115:5

**hit** 40:7 99:13

**Hochul** 1:10 122:6

**hold** 93:13

**holster** 75:25 76:4,9

**home** 39:13 54:15 81:2,21 82:2 136:23 137:6,16 138:8 138:14,16 180:16,17 181:4 181:5,15 182:20

**Homeland** 152:11

**honestly** 17:15 22:25 46:24 52:2 105:20,23 147:14 161:8 170:12

**hoodie** 27:4

**Hook** 100:15

**hoping** 70:3

**horrible** 53:6 54:10 152:21

**hour** 15:2,2 27:8 60:23 66:9

**hours** 172:24

**house** 43:2 54:17 81:9 85:23 85:25

**How's** 28:18

**huh-uh** 10:23

**humans** 85:8

**hundred** 28:2,6,9 80:21

**hundreds** 139:9

**hunt** 71:16 123:8

**hunting** 65:10 66:12 85:12 126:22,24

### I

**I.D** 33:18 36:16 55:17

**idea** 33:11 45:20,25 71:4 95:8 98:15 103:6 110:20,21 113:10 128:17,19 153:12 158:3

**identify** 95:14 103:16,20 131:17

**illegal** 123:21

**illness** 12:15

**imagine** 112:9,13 115:8 166:16

**imitators** 98:25

**impact** 165:7 167:19

**important** 168:3

**impossible** 35:23

**improvement** 68:20 96:12,24 180:16,17 181:15 182:20

**inaccurate** 96:2

**incident** 38:16 39:11 41:15 42:13 45:9 47:25,25 57:16 63:13 85:16,20 86:5 89:23 110:11,17 163:2 170:14,20

**include** 181:22,23

**included** 122:2 173:22

**including** 99:24 139:22

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 204

183:18
**inclusive** 190:10
**incorporate** 92:2
**increased** 153:7
**incrimination** 73:14,24
74:16 76:19 98:13
**Index** 1:9 191:4
**indicate** 88:24 146:19 161:12
161:14 170:4 173:21
**indicated** 161:2 165:3,7,18
171:21,23 176:5
**indicates** 161:15
**individual** 170:7
**infer** 160:17
**influencer** 24:22,25 25:22
**information** 25:11 59:20
79:7 171:18
**infringe** 91:10
**infringed** 71:4
**infringement** 92:10 130:25
131:13
**infringing** 91:18
**inherently** 87:25
**inhibitions** 128:21
**innocent** 139:17
**inquired** 129:19
**inquiring** 14:15
**inside** 76:7 85:24 102:19
122:24 139:10 185:11
**inspired** 53:18
**Instagram** 33:6
**instance** 38:9 89:2 92:19
96:20 97:3 113:15
**instances** 43:25 89:16
**institution** 90:11
**instruct** 74:14 76:17 85:2
98:11 109:21 110:3 124:23
137:12,18,24 138:10
142:16 145:20 146:3
158:14 169:24 175:16
177:9 180:10 181:11
182:16 184:12,20
**instructs** 11:3
**Int'l** 190:11
**intend** 145:24 146:22,24
147:22 167:4 186:16

**intended** 164:18 167:11
**intending** 99:13
**intention** 39:21 70:6,7
**interact** 103:7
**interacting** 46:22
**interactions** 46:14 47:12
153:24 162:12
**interest** 33:13
**interested** 24:17 25:10 36:10
53:19 78:18
**interfere** 126:19
**INTERNATIONAL** 191:2
**internet** 36:4
**interrogatories** 6:7 13:20
95:10 103:17 173:4 187:2
**interrogatory** 95:11 121:9
131:16 156:13
**interrupt** 143:9
**interview** 57:7 151:22
**intimidate** 102:18
**intimidated** 102:20,22,25
**intimidation** 103:12
**invented** 152:15
**investigation** 88:19
**invoke** 72:21,24,25 73:7,8,13
73:23 74:15,20 76:18,20
85:2,4 98:12 109:21,23
110:3,5 124:23,25 137:14
137:18,20,25 138:3,11,13
140:10,12 142:17,19
145:21,23 146:3,5 158:13
158:14,16 169:25 175:17
175:19 177:9,11 180:12
181:12,14 182:17,18
184:13,14,21,23
**invoked** 170:3
**invoking** 74:19,21 75:5,7,10
**involve** 148:11
**involved** 24:19 45:9,16 46:4
85:6 86:6 94:15,19 162:25
163:3 170:22
**involvement** 170:25
**iron** 67:12
**issue** 31:3 32:12 36:20 37:4
41:20 53:12 71:14,15 98:5
108:9 121:21 132:12,14

134:20 141:18 155:3,4,22
**issued** 59:2,4 63:11
**it'd** 80:12 85:18 107:3
141:17 171:9
**it'll** 43:25
**It's** 21:7
**item** 119:5
**items** 144:21
**Ivan** 1:4 191:4

**J**

**J** 2:3 56:24 57:2
**J-O-H-N-S-O-N** 9:13
**James** 1:1 2:1 3:1,8,10,13
4:1 5:1 6:1 7:1 8:1,19,20
8:22 9:1,24 10:1 11:1 12:1
13:1 14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1
118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1
138:1 139:1 140:1 141:1
142:1,23 143:1 144:1 145:1
146:1 147:1 148:1 149:1

150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1,7 160:1,18 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1,16,19,25 180:1,8 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1,4 191:6,13
**janitors** 101:20
**January** 173:24,25 174:2,10 175:11,23 177:19 179:25 180:18,24 181:17,21 182:13,22 183:2,21 184:8 185:2,23 186:8 187:6
**jargon** 43:15
**Jenkins** 5:9 25:24 26:8 32:8
**job** 10:12 17:4 101:17 116:20
**John** 4:9 8:13 24:17,20 38:24 159:2
**Johnson** 1:1,4,16 2:1 3:1 4:1 5:1,3 6:1,9 7:1 8:1 9:1,12 9:12,18,19,23 10:1 11:1,14 12:1,3,8 13:1,2 14:1 15:1 15:22 16:1 17:1 18:1 19:1 20:1,17 21:1,8 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1,16 32:1 33:1 34:1 35:1 36:1 37:1,15 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,13 47:1 48:1 49:1,3,4,8,16 50:1,6,25 51:1,3,9,9 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,5,10 63:1 64:1,7 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1,19 76:1 77:1 78:1 79:1 80:1,6,9,20,24 81:1,2 81:6,20 82:1,8 83:1 84:1,3 85:1,5 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1

95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1,12 112:1,5 113:1 114:1 115:1 116:1 117:1 118:1,8 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1,5 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1,11 157:1 158:1,18 159:1,15 160:1,8 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1,14 188:1 189:1 189:3,9 190:1,3 191:1,5,7 191:25
**Johnson's** 6:6
**join** 21:15 22:22 23:3,6 24:6
**joined** 25:15 33:12 48:13,15 48:18
**joining** 25:10
**JOSEPH** 1:5 2:6,10
**Jr** 4:9 8:13
**judge** 2:3 14:3,8 43:8 44:24 44:25 56:18,20 57:7,9 98:4 155:4,21
**judge's** 45:7
**judges** 102:24 103:11
**June** 38:20,21
**jurisdiction** 161:22 173:17
**jurors** 102:24 103:10
**jury** 46:7,10
**justified** 151:16

---
**K**
---
**KATHLEEN** 1:10

**Kathy** 122:5,6
**keep** 60:22 70:23 71:24 75:14 110:20 116:20
**KEVIN** 1:12
**key** 78:8
**kick** 141:17
**kid** 101:14,15 107:25 108:2
**kid's** 108:9
**kids** 87:2 98:24 106:22 107:7 107:10,23 108:2,3,11,20 109:2 157:4
**kill** 39:20 40:11
**killed** 150:11
**kind** 16:4 41:19 71:17 104:4 125:8 147:13
**kindergarten** 100:8
**kinds** 122:23
**knew** 99:7 103:11 107:24 108:3,12,21 125:23 137:22 138:5,8
**knife** 41:12 42:11
**knives** 144:24
**know** 14:7 15:25 16:2 22:25 37:20 38:14 41:8 43:15,19 44:9 47:14 52:2 54:15 57:24 58:13,18,25 77:7,12 78:13,21 79:9 80:12 81:23 87:21 90:6,13 95:3,6,19 96:24 99:19 100:7 103:5,25 105:11,13,17,20,23 107:25 108:2,8,15 109:4 113:15,17 113:20 114:11,17 121:2 126:3 127:14 129:15 130:9 131:24 134:11,22 136:6 149:19 152:12 155:5 158:4 161:8,8,24 163:7,10,11,12 163:13 164:2,19,24 165:6 168:17,18 170:12 171:4,6 171:15,22 173:14 175:21 175:22 177:23 178:8,15 179:5 181:25 182:10 183:3 184:5 185:8,8 186:9
**knowing** 43:9 167:16
**knowledge** 96:10 113:24 114:7 170:14,19 178:18
**known** 53:21 91:2 96:20

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Page 206

knows 134:18
Kristen 1:24 50:21 51:14
  62:7,21 80:14 112:2 118:25
  144:12 190:2,13
Kristen's 10:12
Kristi 152:11
Kurimsky 163:11 171:19

**L**

L 120:13
laid 150:17 153:14
lake 71:16 124:5,14,15 125:8
Lakeland 161:10
land 105:7
large 80:7 104:9 107:10
  148:3,7,25 149:4,4,22
  154:21 156:19
larger 65:8
largest 40:25
lasted 17:5
law 3:4 6:17 34:22,24 35:3
  35:16 88:5 90:15,22 99:9
  99:19,23 102:14 109:11
  118:12 135:3,3 136:7
  141:13 150:11 153:5,16,20
  158:5,8 171:4 173:15
lawfully 96:12 130:13
Lawler 1:24 190:2,13
LAWRENCE 1:6
laws 23:11 32:11 34:6,9
  35:20 36:20 37:4 88:24
  89:25 91:18,23 92:3,6,12
  97:22
lawsuit 10:3 37:16,21 94:15
  94:19,22,25 95:7 164:14
lawyer 21:4 152:6
lawyers 94:25 95:7
layaway 17:19
lead 148:13
leadership 30:24
leaf 63:17,19
leave 72:23 73:6,12,22 74:13
  77:14,16 81:8 141:19
leaves 63:20 81:2,8,21
leaving 89:11 172:6
left 40:3 51:12 54:16 64:8

89:12 172:16
legal 22:14 43:15 69:4 75:9
  141:14 162:14,19,21
legalities 29:8
legally 120:16 131:12
LEMAN 1:6
LESLIE 1:6
let's 16:24 52:18 53:2,10,10
  65:10 91:4,4,17 95:14
  173:23 174:13 180:19
level 157:21
lever 54:5
Liberty 3:11 191:13
libraries 119:16,21
Library 119:19
license 25:8 26:11 35:17,18
  35:23 43:7,9 44:21 45:2,4
  51:7,22 52:5,10,16,22,24
  53:11,14,18,23 55:19 56:25
  57:16,25 58:15,22 59:18
  60:15,22,25 61:3,6,9,20,21
  61:23 62:15,18 63:2,10,15
  63:22 64:2
licensed 27:13 130:13
licensing 56:8,18,19 58:4
Licensing-official 2:4
life 42:10 61:8 104:10 153:8
  167:25 168:3
lifted 39:18
light 151:4 167:10
lights 101:21
liked 65:24
limit 116:9
limited 24:3,4 139:12
limits 23:21,22,24 24:2 162:6
  173:18 183:8
line 11:9 55:17 154:14
lines 37:11
lions 113:5
list 83:22 96:2 116:2,2 127:8
  141:25 142:4 146:7,13
  154:7 156:13
listed 65:12 154:19
listen 88:15
listening 74:23
listing 121:20

lists 173:13
little 11:18 15:23 23:15 29:4
  38:12 41:24 51:11,11 53:24
  54:12 55:13 61:21 69:3,25
  88:6 89:22 91:5,17 100:7
  103:15 159:17 160:20
live 16:11 20:17,24 35:25
  54:23 60:19 61:2 161:2,22
  162:6 179:22
lives 54:23 139:17
loaded 151:25
local 47:16 99:11 122:2
  131:19 142:7
locally 85:12 124:3
located 104:21 180:20 185:7
location 69:6 81:14 83:16
  84:6 90:17,23 95:15 117:5
  117:11 118:21 119:6
  120:20 155:10 157:18,23
  178:8,19 179:3 182:6
  183:21 184:6,16,25,25
  185:2
locations 69:19 70:5,23
  71:25 83:22 95:22 116:25
  117:4 119:10 121:20 127:9
  127:12 142:2 146:8 155:3
  173:14 181:9 183:20
  186:14,15,20,22 187:4,5
lock 78:11,13
locked 78:5,7,9,16
locking 78:18
Log 59:19
long 4:4 5:5 9:2,2,3 10:4
  14:24 17:6,16 21:11 45:20
  48:23 55:20 60:8 67:3,3
  69:5,19,20 70:4,23 71:18
  71:24 72:5,14,18 98:2
  114:13 124:16 126:18
  141:6 159:6,12,14,18,25
  160:5,6,10 166:4,7 187:13
longer 60:4 67:10
look 32:16,21 52:10,11 61:9
  96:8 97:5 103:15 118:10
  127:16
looked 14:6 161:14
looking 25:7 52:14 63:20

800-523-7887                                                        ARII@courtsteno.com
Serving all of New York State

155:3
**loose** 112:19
**lose** 26:10
**lot** 35:5 54:17 67:25 90:3 93:8 101:19 106:24 150:14 152:2 169:18 172:19,19,21 174:14
**lots** 92:3 182:2,5,14,19
**loud** 50:2 80:23
**love** 65:25
**Lowe's** 19:5,8,12,15,17 185:19
**lowers** 128:21

## M

**M** 4:4 65:24,25 66:4 120:13
**M&P.45** 66:11
**machine** 73:17 75:4 93:20
**Madison** 128:14
**magazine** 23:21 24:2 77:19
**magazines** 152:2
**Magnificent** 19:20
**mail** 60:4 161:9
**mailed** 64:2
**main** 157:14 169:19
**major** 22:14 139:22
**making** 87:11 154:24
**mall** 89:9 90:3,7,10 97:3 104:8 131:23 174:22 175:3 175:7,15
**Malls** 87:3
**Management** 71:13
**manager** 96:10 130:3,10
**managers** 96:16
**MANN** 1:5
**manner** 150:22
**mark** 49:21 50:22 62:7 154:24
**marked** 6:3 47:3 51:15,21 62:22 80:15 112:3 119:2 144:16
**married** 16:20
**Marshalls** 99:25
**Marshals** 99:25
**match** 53:21 66:6
**matches** 99:22

**material** 20:6,8
**materials** 190:11
**Matt** 163:11 171:19
**matter** 102:24 150:25 162:19 162:21
**matters** 162:14
**Matthew** 2:3 56:24 57:2
**Mattydale** 178:13,24 179:7 182:3,5
**mayor** 163:20
**Mc** 118:11
**McKinney's** 118:12
**McKinney's** 6:17
**mean** 13:19 23:20 30:6 40:3 46:16 66:11 67:6 70:15 74:23 78:3 81:13 82:11 86:16,25 96:14 109:5 118:11 119:7 120:24 122:7 134:24 143:10 149:8,14 157:25 161:13
**meaning** 12:12 31:21 81:22
**means** 35:8 43:19 79:5 82:17 90:15,22 99:12 109:8,10 116:12 123:16 152:7,9 153:20 162:2
**meant** 68:21 83:6
**mechanism** 78:19
**media** 25:22 30:15,17 32:24
**medical** 120:12
**medication** 12:18
**meet** 14:17 57:6
**meeting** 14:25
**meetings** 30:13
**meets** 73:9,16,20
**member** 21:8,12,23 22:5,7 22:15 30:9 31:4 46:23 47:17,21 68:20 106:2,5 172:10
**members** 132:8 149:2,24
**membership** 95:4
**mentioned** 9:25 22:9 29:25 31:14 32:7 44:24 47:25 59:10 69:21 100:4 104:10 124:11,12,13 129:13 156:12 164:11 172:15 174:19 182:20 186:25

**Mercer** 124:2,12
**messages** 34:2,5
**metal** 98:21 176:8,11
**Mets** 6:19 142:9,9,10,10,15 144:11 145:2,25 175:22,25 177:6
**middle** 27:13 154:16
**Midler** 184:4,16
**Midway** 158:2
**miles** 183:5
**military** 66:2,3
**millimeter** 67:21,24
**millimeters** 67:23
**mind** 52:19 94:10 156:2 163:6 174:15 182:23 183:15
**mine** 154:5
**Minnesota** 150:8 153:4
**minute** 187:12
**minutes** 56:13 59:9 60:11 63:25 143:2 156:3 158:3 159:9
**Mirabito** 178:11
**mirror** 38:17 39:25 40:2,3,4 40:5 42:15
**misconceptions** 35:20
**missed** 39:13
**missiles** 94:4
**missing** 96:3
**Mississippi** 3:7
**misunderstanding** 35:4
**modified** 66:3 74:11
**modular** 66:25 67:5
**moment** 41:19 166:7 173:3 174:17
**moment's** 157:25
**moms** 100:9,19
**Monday** 64:3,4
**money** 23:12 27:24 64:2
**Montgomery** 4:10
**month** 128:5 170:11 171:7,8 171:9
**months** 55:24
**Montrose** 63:23
**morning** 9:3 82:3
**mother-in-law's** 85:23

**motorcycle** 39:12
**mouth** 168:6
**move** 11:19 18:4 39:20 166:2 173:12
**moved** 17:22,24 18:3
**moves** 151:4 173:8
**movie** 131:16,21,22,23 132:3 132:9 139:6,17,25 140:8 174:18,21 175:6,10
**movies** 65:25
**Mulvey** 3:15 8:17,17
**municipality** 161:7

### N

**N** 5:2,2 6:2 120:18
**N.R.A** 22:5,11,13,15,20
**name** 9:10,24 12:2 33:10,19 37:10 40:19 44:11 45:7 49:3,5,7 58:13 59:20 114:23 131:24 147:3 160:10 164:4,21 179:6 191:4
**names** 110:15
**nasty** 172:21
**nature** 53:25
**near** 124:10 184:16
**nearly** 112:17
**necessarily** 126:8 157:16
**necessary** 140:23
**need** 11:6,10 35:14 41:20 59:18 61:3,14 63:2 65:3 67:2,7 78:13,21 79:11,15 83:20 86:16 143:16 145:9 145:14 166:7 168:6
**needed** 53:4 54:19 58:23 85:6 86:7,12
**needs** 72:21 115:22
**negative** 47:19
**Negligent** 151:18
**neighborhood** 104:24
**neither** 67:23
**Nerdy** 32:3
**nervous** 125:23 132:19
**never** 24:24 38:2 44:10,13 68:19 82:17 94:10 106:16 108:10 138:23 162:22

172:17
**new** 1:3,12,21 2:3 3:9,12,12 3:14,17,22 4:6,11 15:24 17:7,24 18:4 20:19 23:9,18 24:3 25:8 29:9 34:22 35:13 35:22,23,24,25 36:7,8 37:9 41:2 46:14,17,23 47:4 51:6 58:18,19 59:14 60:20 61:23 75:15 78:15 83:21 84:18,21 85:21 89:19 91:8,12,14 103:3 104:22 121:2,3 143:11 147:7 156:18,20 163:20,23 165:20 183:19 185:7 191:12,14,14
**news** 24:17 30:12 54:15 86:22 88:10 89:17
**night** 14:23 43:6 90:4
**nine** 8:5 65:24,25 66:4 67:22 111:17,17 125:25 127:3 128:9 132:10
**ninety** 166:21 168:14,18,20
**Noem** 152:12
**non** 26:18
**non-** 105:18
**non-concealed** 168:3
**non-uniform** 158:4
**noon** 143:19
**normal** 15:24 96:18 115:12 117:10 131:2
**normally** 130:7 131:3,5,19
**North** 16:12 17:11,22
**NORTHERN** 1:3
**notary** 7:12 189:12 191:9
**note** 8:6 26:24
**noted** 189:4,6
**notice** 157:25
**noticed** 53:5
**nuclear** 94:7 115:12 116:4 116:15,25 117:8,13
**number** 10:6 51:15 59:21 64:6 80:21 95:11 144:13 148:7,25 149:4,22 173:6,7 178:2 183:17 184:9 190:9 191:4
**numbers** 59:21 148:3
**NYSRPA** 22:7,12,19

### O

**O** 5:2,2 51:9,9,9,9,21,21,22 51:22 52:5,5,5,6 64:7,7 120:18
**oath** 12:9,12 99:20 160:12 169:6
**object** 72:21 73:11 76:16 84:25 98:10 108:5 137:11 137:24 138:10 140:9 142:16 145:20 146:9 158:13 169:24 180:10 181:11 182:16 184:12,20
**objection** 11:3 50:24 51:18 62:24 73:6,12,21 74:12 80:17 109:20 110:2 112:4 119:4 124:22 137:17 144:19 146:2 175:16 177:8
**objections** 7:7
**obligation** 134:14
**observe** 169:15
**obtain** 55:11
**obtained** 52:22
**obtaining** 52:23 53:10
**obvious** 81:4 82:9 83:4,11,18 84:4
**obviously** 53:22 71:10 116:22 120:20 177:17
**occasions** 175:14 176:24 177:5 184:11
**occur** 170:10
**offhand** 164:5 174:5 178:4,8 187:9
**office** 1:19 3:9,14 4:3 8:21 9:25 44:5,7 50:10 191:12
**officer** 56:18,19 108:18 150:18 151:3 153:13
**officers** 99:23 102:14,14,21 153:23,24 158:4,8 168:24 169:15
**official** 1:10 2:2,3,4,6,7,8,9 2:10 163:10 164:17
**oh** 8:10,25 16:15 43:3 44:15 45:19 66:21 95:16,18 132:15 143:4,12 154:15 159:23 163:22 177:4 179:5 185:9 186:3

Associated Reporters Int'l., Inc.                    www.courtsteno.com

**Ohio** 23:9
**okay** 8:4,10,12,23 9:9,14,20 11:11,20 14:11 17:25 18:3 28:4 37:3 43:3 44:15 46:3 50:4 52:17,20 56:4,14 59:5 60:12 62:9 64:9 79:17,25 80:2 85:5 91:6 94:9,14 95:20 96:4 102:2,9,23 103:14 114:4,14 115:7 117:6 118:11 119:8,13,25 121:5,16 123:15,24 124:20 125:2 127:5 133:12 139:21 143:20 145:4 148:2 149:17 154:15 155:25 156:5 158:24 159:22 160:2,4,5,5 160:14,22,23 161:5,11,17 161:20,25 162:8,9,20 163:7 163:15,19 164:2,6,11,16 165:3 166:11,12 167:6,9,16 168:5,14,19,23 169:20 170:4,10,23 171:11,21 173:11,20,25 174:6,16,24 175:6,9,20 176:4,11,21 177:12,16,22 178:7,18 179:2,8,11,21,23 180:4,6 180:13,16,23 181:3,8,15,19 181:24 182:4,9,13,19,24 183:6,16,23 184:10,15,24 185:6,22 186:3,7,12,24 187:10,24 188:2,3
**old** 17:16
**older** 125:9 172:10
**Olive** 3:7
**Olson** 25:11
**once** 14:21 28:13 104:14 166:18,21 168:20 178:6 186:10
**one's** 185:25
**ones** 22:2 24:8 28:14 33:2 68:7 119:10 142:6 177:17 178:15,16 182:12 186:25 187:2
**online** 60:2 88:18
**Onondaga** 2:4,5,6 4:7,8 8:14 8:15 44:8 55:15 56:5,6 59:4 59:7,7 61:2,10 88:17 89:18

124:4,14,15 125:8 128:12 164:22 169:2 170:21,23
**open** 78:5,10 90:13 103:4 105:15 126:14 181:25
**open-carry** 126:10
**open-carrying** 126:17
**opened** 39:23
**operated** 105:18
**opine** 89:25
**opinion** 14:9,10 152:7,9
**opinions** 13:23
**option** 41:22 97:23
**order** 35:15 51:20 53:4 63:3 63:8 70:4 97:18 98:5 140:24 155:4,22
**organization** 21:22
**organizations** 21:18,24 22:10 24:7 29:24 30:5,10 30:19,25 31:12
**original** 7:13,17 80:11,12,13 111:14 185:2
**originally** 24:12,14 121:25
**Oswego** 2:8,10 131:25
**otter** 110:13
**otters** 104:10 166:19
**outside** 16:8,10 31:3 35:24 35:25 75:15 82:2 92:6 129:18 169:19
**overstepping** 135:12
**owned** 90:14 96:13 119:19
**owner** 21:16 130:14 139:2
**owner's** 134:16 135:8,22 136:7
**owners** 21:8 36:8 95:5 133:16,18 134:7,10
**ownership** 93:20,24 94:4,7

_____
**P**
_____

**P** 1:12 2:7 3:15 5:2 58:11,11 120:18 151:2,15
**P.D.F** 166:8
**P.D.P** 66:6,13
**p.m** 1:18 143:23 156:6,7 188:6
**P.O** 3:6
**P.P.B** 58:7,11

**packaging** 67:4
**page** 36:8,9,12,16 50:11,12 51:21,22 59:7 64:7 80:22 95:12,12 111:16,17 121:10 121:10,11,13,14,14,19 144:21 146:7,13 154:7,9,11 173:8,8,12 190:5
**pages** 6:13,15 51:8,19 190:9
**paid** 63:25
**Panchito's** 174:8 183:18,20 183:20
**papers** 14:8 117:14
**paperwork** 55:17,18 63:25
**PaperWorks** 18:9
**paragraph** 80:21 96:9 112:6 117:18 166:3,12 167:6
**parent** 99:2 100:18 101:17
**parentheses** 166:14,15
**parents** 101:20 109:8
**park** 105:4,6 106:9 122:2,15 123:8 124:2,4,4,9,12,12,14 124:15,16 126:20 169:3,4,7 170:22,24
**parking** 54:16 90:3 169:18
**parks** 113:6 121:6,17,22,24 121:25 122:5,8,17,21 123:13,22,24 124:5,6,11,17 124:21 125:3,6,12 169:2 173:22,22,23,25
**parole** 41:9
**part** 26:6 29:24 30:7 34:15 35:5,6 56:10 69:8,17 70:24 95:24 97:17 119:18 120:4 120:10 122:5 123:14 163:13 176:6
**part-time** 26:19
**participated** 164:13
**participation** 49:11
**particular** 24:18 53:17 63:13 63:14 86:16 92:14 96:10 111:7 113:15 125:5 168:15
**particularly** 43:22 97:5
**parties** 7:4 191:10
**parts** 20:3 118:13,16 119:14 120:11
**party** 37:16,20,21

800-523-7887                                                        ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

**passed** 144:6
**patrol** 169:7
**pay** 19:16,16 28:13 61:22 161:15
**paying** 30:9 94:24 95:6
**peace** 125:16
**peaceful** 125:12 152:12
**peeping** 63:17,19
**Penal** 6:17 118:12
**penance** 92:23
**Pennsylvania** 23:9 62:15,18 62:20 63:3,4,6,17
**people** 10:22 25:7 29:19,22 34:21,22,22,24 35:2,7,9 47:12 54:3 68:21 74:23 79:19 87:3,5,21,22 88:4,8 88:16 89:8,9,11 92:21 98:16,18,20 99:18,19 100:22 101:3,19,21 102:6 102:13,18 103:7,11 106:17 106:19,22,24 107:13 108:25 109:12,15 112:15 112:18 113:4 115:12,19,22 116:3,5 125:9,9,13,16,20 125:22,24 126:2,6,7,17,17 126:21,25 127:4 128:10,17 128:24 129:3,5,8 132:11,13 132:21,25 133:16 134:8,11 139:3,9 148:3,7,17,25 149:4,9,20,23,25 150:2 154:22,22,23,25 157:14,24 158:25 172:21
**people's** 34:10,12,13 126:19 128:21
**percent** 99:12
**perfect** 66:25 143:15 160:3
**perfectly** 166:25
**period** 43:25 54:3 128:3 169:22
**period-appropriate** 54:4
**permissible** 166:25
**permission** 131:6 135:16 136:22 137:5,10,16 141:2
**permit** 34:13,14 35:14,15 43:7 54:21 55:3,12,15 56:16 76:21 81:14 90:7

129:16,23
**permitted** 106:3 141:5
**permitting** 155:22
**person** 10:14 15:24 38:14 39:13 40:15,18,23 86:10 87:4 90:4 108:19 126:2 134:17 135:8,23 153:2 157:13,16
**personal** 25:25 26:15,21 27:3 27:7,11,17,20,23,25 49:12 113:23 127:24
**personality** 25:23
**personally** 89:16,23 126:13
**Pest** 17:23
**Peter** 58:11,11
**pharmacy** 18:21
**PharmaLogic** 18:10,13,19 18:23 19:3,22
**phenomenal** 28:23,25
**Phil** 9:6 166:4,8
**Philip** 159:7 187:19
**PHILLIP** 3:20
**phone** 39:13 60:4
**phonetic** 17:23
**photo** 6:11 55:16
**Photos** 6:9
**phrase** 83:19 191:16,17,18 191:19,20,21,22
**Pick** 88:14
**picture** 64:12
**pictures** 124:10
**pipe** 20:10
**pistol** 27:8 35:15,18 43:7 44:21 45:4 51:6 52:22,24 53:4,4,23 55:12 58:15 60:25 64:22 66:8 68:10,11 71:15,17 72:11 85:14
**pistols** 54:5 61:11 72:7,18
**place** 17:2 53:6 54:10 77:20 77:21 88:21 90:22 96:10 101:9 109:17 111:9 112:9 112:13 115:8,9,10,16,22 116:11,11 117:9,17,20,21 117:22,23 118:2,4,5 119:11 120:19 125:12 128:13 141:4,22 147:5 155:6

156:24 166:16 167:22 189:4 190:4
**places** 67:25 68:18 69:11,11 81:4 82:10,18 83:5,7,9,9,12 83:19,23 84:4,9,11,15,21 87:9 89:25 90:15 96:16,19 96:25 97:4 116:24 118:3 120:12 123:7 132:4 156:13 173:21 174:14
**Plaintiff** 1:8 3:3 37:20 80:24 81:2,6,20 82:7 84:3 96:9
**Plaintiffs** 8:11
**Plainville** 85:21,22
**plan** 15:17
**platform** 33:13
**play** 33:24 94:18
**playgrounds** 119:16,21
**plead** 98:14
**please** 9:10 10:10,17,25 150:16 160:15 166:2 189:5 191:8,9
**Plex** 131:22,23
**PLLC** 3:4
**plus** 48:22
**podcast** 26:2
**point** 10:15,16 11:6 16:17 18:7 25:2 41:22 46:18 49:24 57:6 63:8 128:11 134:19,23 141:21 142:25 144:21 148:6,20 152:20 176:15 183:11
**pointing** 149:10
**points** 139:13
**police** 2:3,7 9:5 10:3 35:13 42:18,20 43:5 46:14,17,23 47:13,15,16,16,18,22,22 56:5,8 57:21 58:4 59:2,15 88:17 89:18,19,20 99:7,11 99:11,17,23 102:21 108:18 147:19 149:18 150:17 153:13,22,24 158:4 162:12 162:18,23 163:4,8,9,13,14 163:16,23 164:7,12 167:17 167:17,18 168:24 169:2,15 169:18 170:25 173:17
**policies** 140:17,21

800-523-7887                                                    ARII@courtsteno.com
Serving all of New York State

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

Page 211

policy 21:20 22:3 23:3 90:8
   140:4,8,24 141:12 164:7
   166:23 175:4
political 31:11
politics 31:5
Ponchito's 127:9,15
poorly 99:7
position 30:24
possess 112:8 166:14
possession 41:2 150:21
possibility 125:19
possible 125:7 129:7
possibly 150:3 179:21
post 30:15 36:3,19 37:3,12
   88:18 130:4 133:19 134:21
   134:25 145:7,9,14
posted 30:16 33:14 34:2,5
   36:5 134:24 135:5 164:9
posting 36:12
posts 34:8
potentially 132:5 168:11
power 57:25
powered 123:9
powerful 67:22
practical 102:24
pre-existed 71:11
precise 135:19
preface 14:11
premises 166:23
prep 20:11
preparation 14:17
prepare 13:8 15:20
prepared 190:10
preschool 120:5,7
presence 102:17,25 132:18
   158:5 190:4 191:8
present 15:3 42:21 89:24
   163:5
presented 11:9
preserve 122:10,13,14 123:4
Preserves 122:18
President 151:21 152:4,8
President's 152:5,6
press 164:19
Pretti 150:5,10 151:22
   152:22

Pretti's 151:21
pretty 21:19 71:4 82:12
   88:19 99:14 107:16 183:4
   183:10
prevent 77:9,13
preventing 112:15
previous 13:11,16 164:12
previously 94:14 112:23
Prevost 40:14,17 41:11
   42:17
principals 109:9
principle 134:7
prior 53:14 71:7,19 90:17
   96:11,23 97:22 113:21
   117:24 128:11 132:13
   155:14,14 176:6 182:2
prison 115:13 116:18
prisoners 116:22
prisons 116:25
private 90:11,12 105:14,15
   105:18 134:10 137:10
   142:11 186:22
privately 90:14
privilege 11:4
pro 147:21
Pro- 147:17
pro-gun 146:16 147:16,21
   177:12,13
pro-police 147:16
probably 34:7 36:17 52:13
   56:13 60:11 104:14 113:16
   128:10 159:8
Procedure 7:5
proceed 48:11
proceeding 45:10,17 46:4,5
proceedings 13:17,22 75:9
process 34:14 38:16 39:23
   43:8 52:23 53:10 55:11,13
   55:21 56:4,8,10,11 59:13
   59:14 60:21,22 61:18 63:21
produced 51:20
production 122:15
professional 115:4
profit 105:19
prohibit 70:12,14 93:10,20
   93:24 94:4,7 116:7 123:12

   126:10 140:24
prohibited 89:2 92:21
   115:24 144:24 153:2 155:6
   155:16
prohibiting 166:23
prohibitions 93:6,8
prohibits 139:23
prompted 164:17
proof 49:13
properties 135:12
property 42:2,16 86:3 90:13
   105:14,14 119:20 133:14
   133:15,17,18 134:7,8,10,12
   134:16,17,21 135:8,14,22
   136:3,7,8,15 137:10,22
   138:5 141:6 145:8 186:22
prosecuted 165:2
prosecution 47:18
prosecutor's 44:5,7
prosecutors 43:21
protect 98:20 99:20 101:17
   102:7 149:16
protected 98:22 133:4
protection 65:8
protest 148:22 150:11
   152:23,25 153:5,7,20
protestor 152:13
protests 148:3,10,11 150:7
   152:16
proven 88:7,9,10
provide 169:11 175:10
   177:23,24
provided 146:13 152:25
   190:11
public 7:12 90:11,14 105:13
   105:16 149:2,5,16,24
   189:12 191:9
publicly 122:6
pull 20:10 165:5,19
pulled 39:14 41:12 46:18,25
   132:20 151:3 162:23
pulling 90:3
purchase 120:16
purchased 64:14
purpose 128:22 130:2
purposely 107:9 130:10

172:7
**purposes** 28:14 65:4,16
  119:6 125:12
**purses** 125:9
**pursuant** 7:6
**put** 23:12 24:11 51:19 89:18
  89:19,19,20 168:6 172:7
**puts** 26:3
**putting** 121:21 134:4

---
**Q**
**qualifier** 99:8,9
**qualities** 29:5 115:16
**quarter** 104:15 186:10
**question** 10:11,16,19 11:5,8
  15:9 16:4 23:2 27:24 37:17
  37:23 38:8 46:21 53:8,9
  58:21 69:3,24,25 71:22
  72:17 74:14 75:23 76:17
  79:15,16,17 81:19 83:21,25
  85:2 87:16 89:21 90:20
  93:15 97:16 98:3,11 100:17
  101:18 102:11,12 103:9
  106:20 114:25 115:15
  121:18 123:10,18 126:13
  126:16 130:11 132:24
  133:7,21,22,23 134:6 135:6
  135:19,20 139:5 140:6
  141:9 145:14,14 155:8,21
  160:21 163:2 165:13
  167:10 173:7 180:11
  184:15 187:11
**questioned** 43:5 162:23
**questioning** 11:9 143:9
  172:14
**questionnaire** 13:15,19 50:9
  173:5
**questions** 7:8 10:5,7 12:16
  12:19,23 14:14 15:17 36:6
  69:22 75:3,13 156:12 159:3
  159:5,7,11 160:25 183:17
  187:14,21,23
**quick** 156:12
**quickly** 95:13 156:3
**quietly** 95:17
**quite** 145:13 179:24

**quote** 164:24 166:13,15,16

---
**R**
**R** 5:2,8 120:20
**radio** 39:17,17
**rage** 38:15 172:20
**rail** 147:16
**Raise** 9:14
**raised** 15:25
**rallies** 146:16,23 148:3,10,18
  177:12,13
**rally** 146:20,22 147:9,15,16
  147:16,18,19,21 148:6,21
  148:21 149:20,23
**ran** 132:14
**Ranch** 124:16
**Ranger** 170:22,24
**rangers** 106:9 122:15 169:3
  169:7
**ranges** 29:20
**ratification** 114:5
**re-enact** 87:2
**reach** 154:4,4
**reactor** 116:4,15 117:8,14
**reactors** 116:25
**read** 7:10 13:9 50:3 71:2
  80:22 86:22 88:14,15 95:13
  95:16,17 114:19,21,22,24
  118:14,16,19 145:19,25
  166:11 167:6 189:3 191:8
**reading** 80:24 95:14 96:9
  112:7 152:12 166:13
**ready** 20:11 95:19
**realized** 47:9 153:16
**really** 78:20 108:10 147:17
  186:13
**Realms** 31:23
**rear** 74:8
**rear-** 38:14
**reason** 12:21 26:10 49:10
  58:3 63:14 72:4,5,7,9 82:22
  101:14
**recall** 36:15 39:3 46:22 113:8
  117:13 135:25 147:3,11
  183:7
**recertification** 56:11 59:10

59:13
**recertified** 60:6
**recertify** 35:12 59:17
**recognize** 50:6 51:3 62:11
  80:9 111:12 118:8
**recognized** 136:12
**recollection** 161:12 165:9
**record** 8:5,7 9:11 52:14
  143:21,22,23,25 144:7
  156:4,6,7,9 161:15 188:4
  189:4 190:10
**recount** 39:10
**recruit** 94:21
**redacted** 79:18,25
**redacting** 79:14
**reduce** 88:25
**reduced** 89:7
**refer** 84:6 121:8 165:10
**reference** 31:24 61:10
  112:15 165:20
**references** 55:16 108:25
**referred** 24:11 87:17 179:19
**referring** 13:23,25 34:17
  35:6 64:20 83:12 88:12,20
  96:25 117:19 142:8 162:21
  186:13
**refrain** 84:14
**refresh** 161:12 165:9
**Regal** 139:23 140:4,8
**regarding** 34:11
**registered** 31:7
**regular** 10:21 86:21
**regulated** 93:5
**related** 21:24 119:15 120:4
**relation** 17:10
**relax** 125:13,16
**relevant** 68:10 78:12
**reliable** 67:4
**relief** 69:8,17 72:13 97:17
**remember** 10:8 14:4 17:15
  37:10 44:11 45:7 46:24
  47:11,14 147:14 164:4
  165:20,21 173:6
**remove** 67:8
**removed** 123:14,17
**render** 157:18,22

**renew** 61:3
**renewal** 60:13,18,19
**rent** 20:22
**repeat** 58:9 102:11 136:25
  140:5
**rephrase** 133:13
**Reported** 1:24
**Reporter** 8:4,12,23,25 9:9,14
  9:20 10:8 11:17,22,25 12:4
  30:20,22 32:18,22 36:24
  37:2 45:13 49:20 50:3,23
  51:17 62:8,23 79:24 80:16
  80:19 105:21 107:21 119:3
  143:20,24 144:15,18 156:5
  156:8 159:23 160:4 176:16
  176:19 187:24 188:3
  190:13
**Reporters** 190:11 191:2
**reports** 89:17
**represent** 10:2 136:11
  139:21 151:20 152:10
  174:20
**represented** 13:3
**reputation** 151:16
**request** 32:15 79:25
**require** 126:10 132:5 136:19
  136:22 137:4
**required** 140:25 176:7
**requirements** 23:25 61:24
**requires** 29:9 78:15
**reserved** 7:9
**residence** 20:25
**residences** 20:20
**resistant** 78:16
**resolve** 43:11 110:17
**respect** 139:3 164:8
**respective** 7:4
**respond** 157:25
**response** 6:6 48:17,21 49:2
  131:15 156:13 160:15
**responses** 50:19 121:9
**responsibilities** 20:8
**responsibility** 134:16 135:8
  135:9,22,23
**responsible** 81:6 128:8
**responsiveness** 7:8

**rest** 143:16 154:7,10,15,20
  154:21,23 155:2,5,9,15,18
  155:23 182:24,25 183:3,5,7
  183:12
**restate** 123:10
**restaurant** 130:10
**restaurants** 127:6,20 129:14
  129:15,21 174:7,9 177:18
  183:18
**restored** 57:16
**restrict** 72:5,7
**restricted** 83:23 115:12
  126:15 186:20,21,21 187:3
  187:5
**restriction** 71:10 92:18,20
  128:12,15
**restrictions** 23:22,24 70:17
**restrictive** 84:9
**result** 42:14 48:11 103:12
**retaliation** 151:5
**Return** 191:11
**returned** 7:15 44:22
**review** 88:15 111:21
**reviewed** 50:15
**revoke** 137:12
**revoked** 61:8
**revolvers** 64:24
**ridiculous** 71:5,17
**rifle** 35:15,17 55:7,8 61:15
  61:21 68:14 69:5,11,12
  71:8 72:5 85:14 126:24
**rifles** 61:12 68:4,9,14,18,22
  69:12 70:4,8 73:4 123:9
**right** 9:15 14:4 15:22 17:14
  20:16 32:14 35:10 36:3
  39:15,21 49:9,16 50:21
  52:8 59:9 61:10 62:4 64:5
  72:16,22,24 73:2,7,23
  74:15 76:18 80:18 85:3
  91:22 94:9 95:9 98:12
  100:3 101:20 103:20
  104:14 109:22 110:4 112:2
  117:12 118:24 121:19
  124:24 131:14 133:2,9,16
  133:19 134:7,11 136:3,5,7
  136:9,13,14 137:13,19,25

  138:11,25 139:3,5 140:11
  140:13 141:20 142:17
  143:7,20 144:2,6 145:5,7
  145:21 146:4 147:8 148:8
  148:14,21 152:24 154:16
  156:21 158:15 159:23
  160:24 165:23 166:12,24
  169:25 171:12,14 173:11
  175:17 177:10 178:7
  181:12 182:17 184:13,22
  187:12
**rights** 73:13 91:11,19 92:11
  92:24 133:4 135:15
**risk** 153:7
**Rivers** 71:13 126:22
**road** 38:15 39:15 45:9 47:25
  57:18 169:7 179:6
**Rob** 25:11
**Rochester** 25:25 26:15,20
  27:3,6,11,17,19,25
**role** 56:8 57:21 94:18
**room** 3:21 4:5 79:19,21
  143:16
**Rosamond** 103:16,24 104:13
  104:20 105:10 106:6
  109:14,19 110:7 111:8
  165:8 166:17 167:5 168:8
  168:16 169:9 173:20 174:3
**Rosamund** 109:25
**roughly** 186:7
**round** 67:23,25
**rounds** 24:3 99:13
**route** 179:15,15 181:5
**routes** 155:7,15
**routinely** 80:25 81:12,20,22
**row** 154:13
**rule** 35:16
**rules** 7:5 91:13
**ruling** 14:8
**run** 22:19 27:14 35:10,21
  56:4 147:13
**runs** 105:9
**rural** 124:17

—————————
**S**
—————————
**S** 5:2,8 120:20

Associated Reporters Int'l., Inc.                www.courtsteno.com

**S.R** 66:7
**safe** 29:20,21 88:2 91:20,24 92:6 101:24 112:17
**safely** 139:16
**safer** 87:8,13,24
**safety** 27:9 29:7 64:22 100:23
**Sandy** 100:15
**satisfied** 29:14
**Saturday** 28:10,19
**saw** 108:16,18 168:25
**saying** 14:12 25:10 70:22 71:23 87:20 98:5 110:15 135:12,14 141:4 160:17 165:13,21
**says** 35:16 63:10 64:7 84:2 84:12,21 88:6 91:16 109:8 117:7 118:11 133:19 134:4 136:2,4 144:23 161:9,9 166:13 175:5
**scare** 132:18
**scared** 108:12,17,19,21
**scary** 99:14 149:5
**scheduled** 147:24
**school** 16:7,25 83:17 98:9,23 99:3,5 100:10,12,21 101:6 101:9,14,15,23 107:4 119:15,17,18,19,20,22 120:8,10,19 161:16,23
**schools** 70:18 71:10 81:3 82:8,16 83:8,13,24 84:6,15 84:23 97:9,13,19 98:6,16 98:19,19,22 101:19 107:10 117:24 120:4
**science** 88:24
**Scott** 44:17
**screaming** 132:15
**screen** 166:5,8
**sea** 104:10
**sealed** 45:17
**seasonal** 19:21
**seats** 77:24
**sec** 49:22
**second** 21:20 22:4,10,22 29:25 53:8,9 66:6 71:2 91:19 92:10 100:8 168:22

184:25
**Secret** 99:25
**Secretary** 152:11
**section** 104:11 118:12 119:6 186:13,15,17
**sections** 22:14
**secure** 116:20
**secured** 77:18 78:4 81:14
**security** 59:20 77:8 81:6,7 102:6 106:8 152:11 157:18 157:21 165:8
**see** 33:24 54:14 65:10 68:9 68:24 70:13,14,20 71:7 72:3,4,9 78:12,12,21 79:18 86:24 87:10 92:19 95:14 97:5,14 101:15 102:16 104:17 106:23 107:7 108:14,15,17 116:16,19,23 118:4 119:5 125:18 126:3,5 126:7,14 129:17 131:19 132:12 141:3 144:5 149:7,8 149:10,13 153:21 154:10 154:15 155:17 158:2 166:8 166:19 168:24 169:18 174:13 179:23 180:19
**seeing** 23:8 54:17 89:13 117:13 126:7 135:25
**seeking** 69:9,18 70:24 72:2 72:14 97:18
**seen** 29:21 67:25 89:5,13,15 89:16 106:9 108:25 113:3 114:19,20 164:9
**self-** 73:13,23 74:15 76:18 98:12
**self-defense** 85:7 86:7,17
**self-explanatory** 71:4 82:13
**self-incrimination** 72:22 85:3 109:22 110:4 124:24 137:13,19 138:2,12 140:11 142:18 145:22 146:4 158:15 170:2 175:18 177:10 181:13
**semi-auto** 35:15,17 74:9
**semi-automatic** 61:11,15 73:3
**Seneca** 20:18 161:3

**sense** 10:19 11:12 40:13 44:15 114:15 117:11
**sensitive** 68:18 69:5,19 70:5 70:23 81:4 82:10 83:5,12 83:19,22 84:4,9,15 89:25 90:15,22 95:15,22 112:9,13 115:8,9,10,16 116:10,11,25 117:3,5,17,19,21,22,23 118:2,4,5,21 119:11,23 120:6,8,19 121:20 141:25 155:10,18 157:19,22 166:16 167:22 186:14,20 187:3,5
**sent** 13:15 25:9,9,11 34:2,5 50:9 144:6
**sentence** 81:20 84:2 112:7
**separate** 63:2 105:7 145:10 171:22 174:4
**separately** 61:15 77:19
**separates** 178:24
**September** 167:12 169:8
**serial** 59:21
**serious** 43:23
**serve** 127:6,12 129:15 174:7 174:9
**served** 92:23 128:13
**service** 45:22 99:25 141:23
**serving** 127:17
**set** 6:6 9:20
**seven** 6:18 19:21 50:12 144:15,17
**seventeen** 112:6 117:18 166:3,12 167:6
**seventy** 99:12
**Seymour** 17:23
**shake** 10:22
**sharing** 167:10
**sheet** 189:7
**Shelley** 8:14
**shelves** 17:20
**Sheriff** 2:6,10 8:14 88:17 164:22
**sheriff's** 56:22 59:4,7,8 63:24 83:8 89:18
**shoot** 53:4 54:4 62:19 67:13 99:7

800-523-7887                                    ARII@courtsteno.com
Serving all of New York State

**shooter** 23:16 53:3 55:7
**shooting** 53:20,20,21,25 65:7
  89:9 109:12,15 150:24
**shootings** 98:23 100:12
**shop** 110:14 172:6,20 173:2
**short** 19:19 65:22,22
**shortly** 19:23
**shot** 46:19 47:15 90:4 99:23
  99:24 151:7
**shotgun** 68:15 69:5 72:6
  85:15
**shotguns** 54:5 68:5,18,22
  70:5
**should've** 49:19
**shoulder** 39:14,22
**shoulders** 10:23
**show** 34:12,17,18 49:17 51:2
  52:11 62:5,10 80:5 111:11
  118:7 142:20 148:7,7 166:5
**shown** 51:22
**shows** 152:13
**shrug** 10:22
**side** 40:3,4 81:8 89:10 104:8
  104:25
**sides** 148:14
**Sig** 151:2,15
**sighting** 63:17
**sights** 67:12
**sign** 7:11 45:3 47:10 87:20
  88:6 109:7 111:21 133:19
  133:25 134:4,21,25 140:23
  140:25 141:7,10 145:8,9,15
  152:14 176:5 191:8,10
**signature** 50:12 56:25
  111:18,20 191:11
**signed** 7:14 43:8 45:3 135:5
  191:24
**significant** 17:2,3
**signs** 89:6 96:19 97:5 109:2
  129:17 140:18 141:22
**similar** 44:6
**Similarly** 10:21 158:17
**simply** 72:10 97:25 123:7
  141:22
**single** 10:12 46:16 48:18
  53:20 54:4,6,7 65:21 99:10

139:10 183:10
**sir** 9:10
**sitting** 124:6 131:20 147:20
**situation** 42:7,8 85:6,11 86:6
  132:5 152:21 157:25
**six** 6:16 28:17 48:22 56:3
  100:16 119:2 154:17,17
  181:2
**size** 66:25
**skim** 119:9
**skimpy** 158:5
**skipping** 150:13
**slide** 67:8 74:8
**sliding** 67:10
**SLOANE** 1:7
**small** 96:17 100:18 184:9
**smaller** 157:15
**Smith** 36:5 37:5,7,7 66:11
**SOARES** 2:7
**sober** 129:11
**social** 25:22 30:15,16 32:24
  59:20 88:24
**society** 53:20
**soft** 159:20
**Solvay** 161:9
**somebody** 37:18 46:17 54:17
  79:4,7 88:20 96:17 101:13
  108:16 109:11 130:3
  132:15,20 134:20 135:16
  138:20 149:13 151:6
  153:14,15 171:23
**someone's** 136:23 137:10,22
  138:5,8
**someplace** 23:12 77:7,13
  81:24 115:11,18,19 130:20
  141:9
**son** 54:16,20 100:4
**son-in-law** 172:11,15
**soon** 49:17
**sorry** 10:16 15:8 18:14,25
  24:23 30:21 32:18 36:24
  39:25 40:16 52:4 58:9,10
  66:21 74:20,21 81:16 90:19
  93:14 95:18 102:11 105:21
  117:6 121:12 122:6 136:20
  136:24,25 138:5 140:5

141:8 147:12 149:3 154:8,9
  169:12 170:15 176:16,18
  180:6
**sort** 30:23 43:3 46:4 54:7
  66:17 71:21 76:6 106:11
  157:17
**sought** 63:14
**sound** 37:24 161:18
**sounds** 44:3 54:2
**south** 1:20 3:16 89:10
**space** 21:18 77:24 133:2,9
**spaces** 139:6
**speak** 11:18 25:2,12,17
  130:21
**SPEAKER** 39:8
**speaking** 148:2
**special** 104:18
**specific** 13:24 14:5,5 23:23
  65:12 86:19 88:11,12 92:4
  93:8 104:23,24 124:6 127:8
  131:17 142:4 146:20
  182:14 183:7
**specifically** 120:4 122:7
**specificity** 95:15
**specify** 121:24
**speculation** 108:6
**speeding** 47:2
**Speedway** 178:10,12
**spell** 9:10
**spelling** 17:23
**spending** 172:24
**Spent** 63:24
**split** 134:21
**spoke** 44:10,13 50:9 175:21
**spoken** 57:9 174:24
**sporty** 66:4
**Square** 88:8 121:2,4
**stadium** 142:5 145:3,6
  175:22 176:2 177:6
**stalking** 85:13
**Stamboulieh** 3:4,5 8:10,11
  11:2 13:5 14:13 15:6,16
  32:16,20 49:25 50:24 51:18
  62:24 72:20 73:5,11,21
  74:12 76:16 79:22 80:8,17
  84:25 98:10 108:5 109:20

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

110:2 111:5 112:4 119:4 124:22 137:11,17,24 138:10 140:9 142:16,23,25 143:5,8,12,15 144:19 145:20 146:2,9 158:13,24 159:16 160:3 169:24 175:16 177:8 180:10 181:11 182:16 184:12,20 187:18,22

**stamp** 51:9,11

**stand** 50:18

**standing** 149:11

**stands** 31:4 66:22 69:7 91:9 132:13

**STANZIONE** 2:10

**start** 8:7 18:12 19:12 27:10 38:15 53:2 65:17 109:12,14 136:20 143:11

**started** 18:20 19:9 27:12 38:15 39:15 40:25 55:22

**starters** 91:20

**starts** 173:7

**state** 1:11,20 2:3 3:9,14,16 9:10 10:3 16:8,10 29:9 34:23 35:11,13,23,25 36:8 36:8 37:9 46:14,17,23 47:4 47:12,15,17,22,22 51:6 54:15 56:5,8 57:21 58:4,20 59:2,15 63:5 75:15 78:15 83:22 84:8,18,21 91:14 92:24 99:11 103:3 117:9 121:3 122:3 155:7,15,17 156:14,16,18,20,24 157:7 158:9,12 165:21 189:2 191:12

**stated** 167:18 190:5

**statement** 13:10,11,16 140:14 145:10 146:10 168:8

**states** 1:2 6:6 23:8,19 24:4 99:8,9 113:13 152:8 168:15

**statewide** 58:15,17,18

**station** 63:24 178:3

**stations** 177:18,20,24 178:9 178:19

**statute** 117:21 118:14,16,21

155:12

**Stay** 30:11

**steal** 79:11

**Stephen** 3:5 8:9,10 32:14

**stepping** 135:14

**Steven** 3:8,13 187:16 191:4

**stick** 52:18

**sting** 41:2

**stipulate** 79:14

**STIPULATED** 7:3,7,10,13

**STIPULATIONS** 7:2

**stocking** 17:20

**stole** 45:21

**stolen** 41:3

**stop** 36:12 62:6 63:7 110:22 111:2 147:18 154:23 155:18 167:9 168:12 183:5 183:7,12

**stopped** 90:16,23 110:19 111:3 183:4,10

**stopping** 63:6

**stops** 154:7,10,15,20,21,23 155:2,5,9,15,23 182:24,25 183:3

**store** 26:23 77:17 131:8 187:8

**stores** 179:12,12 180:13,16 180:17 181:16,19,20,23 182:20,21

**story** 88:12

**straight** 39:22 41:13

**straightforward** 123:20

**stranger** 99:3 108:4,12,15

**strangers** 99:18 102:25 108:22 125:17

**street** 1:20 3:11,16,21 4:5,10 71:12,19 79:3,6 101:4 169:19 178:11,12 179:6,16 179:20,25 180:8,22,23 181:6 182:8 184:2,4 191:13

**streets** 89:10

**structure** 105:6

**students** 29:11,14

**studies** 88:24

**stuff** 41:4 45:21 152:2

**stupid** 45:21

**style** 23:25 65:25 66:2

**submit** 55:16 176:23

**submitted** 56:2

**subpoena** 7:6

**Subsection** 166:14

**subsequent** 24:14

**subsets** 120:2

**subsidiary** 22:20

**substance** 14:13,15 25:6 26:7 35:3

**suburbs** 124:19

**Suddaby** 14:3 98:5 155:4,21

**sued** 37:18 38:2,3

**suffering** 12:14

**sufficient** 157:18,22

**suing** 91:8

**Suite** 1:20 3:16

**sum** 25:5 26:7 35:3

**summarize** 64:19 70:21

**summarizing** 116:23

**summer** 120:5,9 156:19

**Sunday** 28:10,20

**super** 67:3

**superintendent** 2:2 8:19,22 10:3 57:21,24

**supply** 20:2 180:19

**support** 148:8

**suppose** 16:3

**Supreme** 81:5 82:11 83:6,9 84:5,8,10,11,17 91:13,15 136:12

**sure** 10:25 15:10 24:24 29:19 30:16 34:24 35:2 37:25 38:4,18 43:17 46:15,18,20 52:11 56:12 62:23 65:14,17 65:22 69:14,24 75:2 81:18 82:15 89:21 90:21 105:5,11 107:6,15 108:17 113:16 123:19 135:9 137:3 140:15 149:25 150:15 155:13 157:5 160:19 165:14 166:7 171:16 174:21 178:24 182:3,11 185:9,10

**surprise** 88:23

**surprised** 163:19

**swear** 9:15

Associated Reporters Int'l., Inc.                               www.courtsteno.com

**swearing** 39:15
**switch** 74:3,6,7,11 75:4
**switches** 74:10
**sworn** 5:3 9:19 78:25 99:20 149:16 189:10 190:7
**Syracuse** 1:19,21 2:7 3:17 4:2,3,6,11 6:19 9:4,4 16:5 16:17 17:10,11 18:4,10 20:3,18,19 34:18 38:25 88:17 89:18 104:5,22 124:19 142:9,10,15 144:11 145:2,25 156:20,21 160:11 161:3,6,10 162:7,12,13,17 162:23 163:4,8,9,12,13,14 163:17 166:18 167:14,18 167:21 168:24 169:2,15,18 170:25 173:17,18 174:2,10 174:14,20 175:21,23,25 177:6,14,20,25 178:2,21,23 178:25 179:13 180:14,18 181:16,21 182:22,25 183:2 183:5,8,14,19 185:7,11,14 187:4,6

**T**

**T** 5:8 6:2 120:21
**tables** 157:12
**take** 11:6,7,10,10 12:18 31:4 43:7 55:21 60:4,8 71:8 96:8 104:17 118:10 143:2,6 152:21 156:2
**taken** 7:6 64:13 99:8 109:18 109:24 158:11 189:4 190:3
**talk** 26:5 34:21 39:18 53:10 53:24 55:10 75:17 78:20 96:16 127:5 130:3
**talked** 14:14,16 15:11 29:16 44:12 45:18 46:17 75:17 83:13 162:10,15,17 174:18
**talking** 10:14 117:19,20 118:22 184:6 186:17,19
**tamper-proof** 78:16
**Taqueria** 127:10 183:18
**target** 109:4,6
**taught** 28:12,13
**tax** 161:14,16

**teach** 27:8 28:22 29:15 118:17 154:2
**teachers** 101:21 109:9
**teaching** 29:8
**team** 142:5
**teams** 142:11
**technically** 122:17 161:13,21
**technician** 18:21
**telecommunications** 20:2,11
**telephone** 25:18
**tell** 12:13 15:14,23 25:5 34:8 38:11 39:19 40:23 46:16 52:21 54:12 61:17 75:21 78:22,25 79:3 83:6 89:16 91:7 92:8 99:2,22 103:23 110:10,23 119:10 131:20 132:10,22 134:14 138:15 138:21,23 153:22,23 154:19 170:24 172:24 178:5
**telling** 40:11 70:21 79:2
**temporary** 18:8
**ten** 24:3 56:13 65:3 67:21,24 68:3 89:14 100:16 143:2 158:3
**term** 43:18 60:13 74:2 84:6 117:17 122:10,13
**terms** 93:4
**TERRILLE** 1:5
**Test** 159:25
**testified** 81:13 94:15 97:8
**testify** 190:7
**testifying** 115:2
**testimony** 9:16 116:24 158:19 170:5 189:4 190:3,6 191:8
**Texas** 99:10
**text** 79:13
**thank** 9:23 11:22 12:5 30:22 32:22 37:2 46:10 80:4 144:2 159:6,12 160:14 170:4 183:16 187:14,15
**Thanks** 62:25 142:22
**that'd** 84:18 90:13 114:3 125:18,19 134:3
**theater** 131:24 132:3,9

139:10,13,17,22,25 140:4,8 174:18,21 175:6,10,15
**theaters** 131:15,16,17,19,21 139:6,6,23 140:18
**they'd** 108:17
**thing** 10:12 22:21 100:13,14 100:15 113:6 154:3 155:17 172:25
**things** 10:7 26:9 29:12,21 54:14,18 55:6 70:19 71:10 89:13 122:23 177:18
**think** 19:20 29:10 42:4 47:3 49:10 52:13 65:19 70:11,16 70:22 71:2 87:8,14 92:15 93:13,15 98:15,18 101:10 102:3,5,13,17,23 103:10 104:10 106:25,25 107:23 108:3,9,11,20 109:13 112:12 115:9 116:3,6,14,17 116:24 117:2 119:10,22 120:6 124:7 125:15,22 126:9,18,25 127:4 128:7,19 129:5 132:7,25 133:8 134:15 135:11,21 140:23 141:5,14,15 147:21 149:14 149:22 150:23 151:8 152:19,22,24 153:6,10 157:22 158:17,22 161:2 169:3 174:5,13,19 178:4 180:21 182:4 184:16 185:2 185:15,15,20 187:25
**thinking** 38:5
**third** 37:21 62:11 124:13 154:13,13
**third-party** 26:19
**thirty** 63:25 99:12 191:9,10
**thirty-three** 8:5
**Thompson** 3:10 5:4 8:20,20 8:24 9:22,24 11:23 12:6,7 32:14 49:22 50:5,21 51:14 62:4,9,21,25 79:20 80:14 80:18 112:2 118:25 142:24 143:4,6,10,13,17 144:2,4 144:12,16 146:11 156:2,4 156:10 158:22 159:2,4,21 161:2 173:6 179:15,15

800-523-7887                                                    ARII@courtsteno.com

Associated Reporters Int'l., Inc.                    www.courtsteno.com

Page 218

187:16,25 191:6,13
**thought** 42:23 93:16 108:10
125:17
**thousands** 34:21 99:22
**threat** 86:16 126:8 153:15,21
153:25
**threatened** 47:18 86:20,24
110:6 125:3
**threatening** 40:10 108:16
132:21
**threats** 86:23 172:9
**three** 6:10 22:9 28:9,19,19
30:10,24 36:13 48:25 51:9
51:23 52:3,6 58:8,11 59:16
60:21 62:22 64:18,21 71:13
83:12 85:13 95:11,12 98:24
121:10,14 126:22 131:16
151:3,15 156:14 173:7,8
175:12,13 180:5,7 184:9,10
185:5
**three-dollar** 61:22
**thrower** 36:10
**ticket** 47:9 105:24
**tigers** 113:5
**time** 1:18 7:6,15 10:14 11:2
11:2 16:24 17:6,16 19:19
23:4 24:9 41:17 43:25
45:20 46:16,22,25 48:18
53:5,11 54:3 55:17,22,23
55:25 60:5 61:19 64:12
77:12 81:25 88:7,7,18
92:23 98:23 113:12,19
114:5 131:11,11 132:14
134:22 143:14,18 147:3
152:11 156:25 162:13
167:11,17 168:22 169:22
176:19 178:17 189:4 190:4
**times** 14:20 28:11,15 30:16
36:6 47:24 48:21 53:8 88:8
100:16 120:25 121:4 169:8
169:15,20,21,22 175:9
178:2,5 179:24 180:7,24
184:7,24 185:5 186:7,11
**Timothy** 3:15 8:17
**Tipperary** 105:3
**title** 163:11

**Tobias** 8:14
**today** 9:24 12:9,15,24 13:3
15:14 27:4 82:5 97:2
123:22 124:7 131:20
147:20 158:19 187:3
**today's** 13:8 14:17
**Todd** 4:4 9:2,3 159:4 160:10
**told** 110:22 170:16
**tools** 65:9
**top** 59:8 61:11 95:12 121:11
121:14,19 173:12
**topics** 97:25
**torn** 120:13,14
**total** 28:10,16
**totally** 37:24
**tough** 177:17
**tourists** 154:24
**tours** 63:17
**town** 39:4,6,8,9,10 45:6 47:2
131:25
**Tractor** 180:19
**trafficking** 41:3
**trail** 125:7 126:7
**trails** 68:2
**trained** 98:18 99:4 100:23
101:3,24 149:16,17,17,20
**trainer** 28:23,25
**training** 22:14,16,16 26:22
27:12,16 28:5,14 29:11,18
65:7,9 66:7
**transcript** 10:13,24 75:2
79:13 189:5,7 191:8,10,11
**transcription** 190:9
**transcripts** 13:24
**travel** 183:9
**travelers** 154:24
**trespassing** 141:18
**trial** 7:9,16
**tried** 48:5,9 54:17
**trip** 71:15
**trips** 107:4,5 124:9
**trooper** 47:4
**true** 36:2 59:23 149:21
161:18 172:23,23 189:5,7
190:10
**trump** 133:4 151:21

**truth** 9:16,17,17 12:13 78:25
78:25 79:2 190:7,7,8
**truthful** 12:23
**truthfully** 12:16
**try** 71:22 107:9 124:9
**trying** 15:8 70:2,20 72:9,10
84:2 117:15 123:6 136:24
141:8 152:20 174:13
**turn** 39:15,21 55:17,18 67:9
159:16
**turned** 36:9 39:17 40:14,17
40:22 42:7 172:16
**turning** 41:13 50:11
**turnoff** 179:10
**twenty** 151:3,15
**Twenty-eight** 100:11
**twenty-nine** 66:14 67:15
**twenty-one** 62:3
**twenty-two** 66:7
**twice** 166:18 186:10
**Twitter** 33:7,10
**two** 6:8 22:13 28:8 47:24
51:8,9,16,21 52:3,4,5 55:16
62:7 64:6,7 74:23 87:5
118:12 119:5 129:13
148:14 151:25 157:11
159:25 162:10 172:11
176:3,4,12,24 177:5 180:5
180:7 183:16,20 185:4
**types** 93:4
**typewritten** 190:8

---

**U**

**U** 5:8
**U.S** 99:25
**uh-huh** 10:23 111:4 121:7
150:19 186:24
**ultimate** 56:15
**ultimately** 43:6 44:18
**un** 147:23 158:4
**unable** 85:15
**unarmed** 87:22 131:6
**Uncommitted** 151:19
**unconstitutional** 70:22
71:24 91:25 92:7 93:6,14
126:10 167:4

**undercover** 158:3
**understand** 10:17 12:9 15:9
  34:22,24 35:3,8,10 37:17
  42:3 68:16,17 69:4 71:3
  75:23 82:12,13 83:21 87:16
  90:19 92:14 96:5 99:7
  103:9 106:19 116:21
  117:16 121:18 123:11,12
  123:18 126:4,12 133:6
  136:17 152:3 155:9 160:11
  165:12 167:23,24 173:2
**understanding** 12:11 29:11
  34:13 43:24 60:17 74:5
  115:17,21 122:12,16 123:2
  123:5 161:21 166:22
  167:13,21 173:16 175:2
  183:19
**understood** 10:18 27:15
  28:15 29:23 35:19 38:11
  45:8 68:23 69:2 75:14
  96:22 99:16 135:17 145:13
  149:14 168:11
**unfortunately** 172:22
**UNIDENTIFIED** 39:8
**unilaterally** 91:10
**unique** 65:15
**United** 1:2 113:12 152:8
**unloaded** 77:18 85:14
**unnecessary** 150:22
**unofficial** 22:15
**unpack** 136:24 141:8
**updated** 34:25
**urban** 124:17,18
**use** 31:16,19 32:5 33:11,20
  33:23 34:11 35:8,9,9 64:22
  65:10 66:9,12 67:12,20
  85:6,13,15 86:7 90:24
  100:23 117:17 132:6
  141:23 143:16 173:24
  178:16
**useless** 33:13
**user** 33:18
**username** 33:18 36:16
**usually** 31:19 43:20 48:24
  75:18 76:5 106:13,17,18
  124:9 126:6 148:12 157:15

  178:5 185:4

---
**V**
---

**v** 1:1,9 2:1 3:1 4:1 5:1 6:1
  7:1 8:1 9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1 62:1
  63:1 64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1 77:1
  78:1 79:1 80:1 81:1 82:1
  83:1 84:1 85:1 86:1 87:1
  88:1 89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1 97:1
  98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1
  106:1 107:1 108:1 109:1
  110:1 111:1 112:1 113:1
  114:1 115:1 116:1 117:1
  118:1 119:1 120:1 121:1
  122:1 123:1 124:1 125:1
  126:1 127:1 128:1 129:1
  130:1 131:1 132:1 133:1
  134:1 135:1 136:1 137:1
  138:1 139:1 140:1 141:1
  142:1 143:1 144:1 145:1
  146:1 147:1 148:1 149:1
  150:1 151:1 152:1 153:1
  154:1 155:1 156:1 157:1
  158:1 159:1 160:1 161:1
  162:1 163:1 164:1 165:1
  166:1 167:1 168:1 169:1
  170:1 171:1 172:1 173:1
  174:1 175:1 176:1 177:1
  178:1 179:1 180:1 181:1
  182:1 183:1 184:1 185:1
  186:1 187:1 188:1 189:1
  190:1 191:1,4

**vacation** 156:19
**various** 157:13
**vault** 77:22 78:2,3
**vehicle** 38:17 77:14,17,21,25
**VENUE** 1:19
**verbal** 11:2 160:15
**verified** 50:19
**verify** 59:15,19
**verifying** 59:23
**Vermont** 23:9
**video** 24:16 25:7 151:2
**videos** 24:22 30:11
**view** 20:18 83:18 92:7 161:3
**village** 39:6
**violation** 130:21 135:15
  164:25
**violence** 110:7
**violent** 40:10 90:17,24
  148:23
**Virginia** 147:2,5
**virtually** 139:22
**visible** 76:9
**visit** 166:17,20 167:5
**visiting** 110:7 125:3
**visits** 96:11
**visor** 39:18
**vote** 31:9
**voter** 31:7

---
**W**
---

**waistband** 76:7
**wait** 10:10 55:17,18 93:13
**walk** 43:4 65:5,11,11 68:7
  71:9,12,13 79:6 101:4
  104:17 124:4 126:21
  130:20 131:5,8 151:23
  158:2
**walked** 128:14
**walking** 106:24 125:10
  126:23,23 149:9 169:4
**walks** 101:13 130:10
**Walther** 66:13
**wand** 157:14
**want** 8:7 15:25 29:18,21
  49:20 50:3 53:23 54:18
  55:5 65:17 74:25 78:20

95:17 96:21 97:12 99:3 100:19,22 101:3,22 104:23 116:22 132:2 134:20 138:15,21 139:24 140:10 143:4,6,8,17,18 145:8 158:19 159:8 162:5 165:10 165:18,23 166:4,5 172:25 173:3,13

**wanted** 53:7,7 63:18 66:2 67:13 71:9 94:12 98:24 100:9

**wanting** 110:14

**wants** 72:24 73:7,13,22

**war** 14:3

**warehouse** 19:9 20:2

**Washington** 4:5

**wasn't** 23:7 24:8 42:10 81:16 100:12 110:20 113:25 147:17 150:24,25 151:5 152:25 153:3 168:12 170:18

**wasted** 131:11

**watch** 30:11 53:21

**watching** 151:2

**water** 124:10

**way** 23:10,18,18 29:15 30:6 42:6 45:11 46:21 60:3 81:19 87:13,21 90:18,24 97:17 98:4 100:18 101:19 105:8 115:15 130:15 132:25 134:4 155:9,19 172:8

**we'll** 11:7 56:12,12,13 173:24 180:8

**we're** 52:13,14 80:18 91:14 91:21 120:25 143:10,21,24 144:14 156:5,8 186:13,17 186:19 188:2,3

**we've** 15:20 47:25 68:4 72:19 118:21

**weapon** 63:3 67:2 73:10 75:3 76:14,24 77:4,11,11 93:10 94:8 99:4 123:7

**weapons** 24:2 75:14 92:18 93:5 144:24

**wearing** 26:24

**website** 59:19 141:4,9 145:10

**websites** 140:17,21

**week** 89:8 178:6 185:5

**weekends** 76:25

**weeks** 56:3 86:25

**Wegmans** 179:14,20,25 180:8

**welcome** 135:10 137:23 138:9

**went** 26:10 38:17 41:13 53:5 53:21 55:11 63:22 64:3 100:14 144:7 146:25 147:2 151:3,6 177:5

**weren't** 112:16

**Wesson** 37:5,8 66:11

**Wesson's** 36:5

**West** 104:8,25

**when's** 81:25

**whoever's** 56:21

**wife** 21:2 33:12 63:16 90:2 104:17 124:8 166:17,19 167:5

**wife's** 168:2

**Wild** 127:9,14 129:14 174:8 174:11 185:6,10,13

**Wildlife** 71:13

**William** 2:4 8:15

**window** 39:16,24

**Wings** 127:9,14 129:14 174:8,11 185:6,10,13

**winter** 85:18 150:8

**wire** 20:10

**wise** 144:14

**wish** 41:18

**wit** 74:13

**withdraw** 31:15 163:2 187:11

**withdrawn** 136:20 138:6 146:11

**witness** 7:10,14 11:21 12:3 49:23 72:21,23,25 73:6,8 73:12,22 74:14 76:17 79:23 85:2 98:11 109:21,23 110:3 110:5 124:23 137:12,18,25 138:11 142:17 145:21

146:3 158:14 159:19 160:2 166:9 169:25 175:17 177:9 180:11 181:12 182:17 184:13,21 187:15 190:6

**witnessed** 89:23

**witnesses** 103:11

**Wolf** 179:6

**wolves** 104:9 166:19

**women** 125:9

**wonder** 154:2

**wondering** 170:19

**woods** 86:2

**word** 24:21 61:10 191:16,17 191:18,19,20,21,22

**words** 91:7 168:6

**work** 17:12 18:7 19:4,6,18 20:5 21:21 26:11 29:5 46:21 76:15,22,25 90:13 182:12 183:10

**worked** 17:19,20,22 18:8,9 18:15 19:5 45:20 47:22 163:9

**working** 18:10,12,22 19:14 19:19 21:18 27:10

**workplace** 76:21

**works** 11:25 105:6 163:8,11

**world** 33:25 54:10

**world's** 53:5

**worried** 99:14

**worth** 167:25

**would've** 42:4 153:10,13 172:16

**wouldn't** 25:25 79:3 84:17 89:7,9,10,13 102:10 126:8 128:25 129:10 131:3 132:22 141:23 165:22

**write** 81:12,19 82:7 112:7 131:15 141:25 146:16

**written** 14:8 140:17 147:4

**wrong** 75:9 152:4,17

**wrote** 96:22 121:16,21

---

**X**

**X** 1:15 2:11 5:2 6:2,2 33:6 189:8,11

Associated Reporters Int'l., Inc.                              www.courtsteno.com

**Y**

**Y** 9:13
**yeah** 8:25 9:2 14:10 15:10 32:3 49:9,22 51:13 53:2 54:8 65:22 66:21 104:24 107:18 133:13 142:24 143:5 147:6 148:22 154:12 156:22 159:19,24 162:4,4 163:22,25 165:17 166:6 169:5 170:17 174:12,12 179:21 184:3 185:12,17 186:19
**year** 17:5 27:24 31:23 100:16 163:24 168:22
**years** 17:16 21:13 33:12 36:13,13 59:16 60:22 89:14 100:11 147:12 156:25 157:11
**yell** 39:23 151:6
**yelling** 39:15
**York** 1:3,12,21 2:3 3:9,12,12 3:14,17,22 4:6,11 17:7,24 18:4 20:19 23:18 24:3 25:8 29:9 34:23 35:13,22,23,24 35:25 36:8,8 37:9 41:2 46:14,17,23 47:4 51:6 58:18,19 59:14 60:20 75:15 78:15 83:21 84:18,21 85:21 91:8,14 103:3 104:22 121:2 121:3 147:7 156:18,20 165:21 183:19 185:7 191:12,14,14
**Yorker** 15:25 91:12
**young** 45:21
**YouTube** 24:16,22 25:22 26:3

**Z**

**zero** 167:23 168:5,6
**zone** 47:3
**zones** 87:24
**zoo** 69:16 70:12 71:7 87:5 103:16,19,24 104:13,21 105:10,17 106:6,8,14,18,22 107:5,8 109:14,19,25 110:8 111:8 112:8,12,16 113:15

118:4 124:3,13 125:4 165:9 165:22 166:14,17,20,22 167:2,5,12,14,20 168:8,13 168:16 169:8,9,16,17,21 170:6 171:24 172:22 173:21 174:3
**zoom** 91:4
**zoos** 70:23 103:15 107:13,16 112:16,24 113:5,11,18 114:5,12 167:3

**0**

**002-003** 6:9

**1**

**1** 190:5,9
**100** 20:18 161:3
**10005** 3:12 191:14
**106** 3:21
**11:48** 143:22
**112** 6:14
**119** 6:16
**12:02** 143:23
**12:15** 156:6
**12:19** 156:7
**12:53** 1:18 188:5
**12207** 3:22
**13202** 1:21 3:17 4:6,11
**13209** 20:19
**1363** 31:23
**144** 6:18
**159** 5:5
**1750** 113:14
**1776** 113:25
**1790** 113:14
**1800-1900's** 113:4
**1868** 114:5
**188** 190:9
**1990-ish** 46:2
**1st** 6:6 173:24,25 174:2,10 175:11,23 177:19 179:25 180:18,24 181:17,21 182:13,22 183:2,21 184:8 185:2,23 186:8 187:6

**2**

**200** 113:17
**2000** 18:14,14,15
**2008** 40:25
**2015** 18:11,16
**2016** 19:13
**2018** 19:13
**2019** 53:12,18
**2020** 18:14 38:20 47:6
**2021** 23:5 24:5 47:6 147:13
**2022** 48:15 167:12 169:9 173:25 174:3,10 175:11,23 177:19 180:2,18,25 181:17 181:21 182:2,14,22 183:2 183:21 184:8 185:3,24 186:8 187:7
**2023** 22:24 38:21 41:5,6 85:18
**2024** 22:24 63:11 85:19
**2025** 27:13 60:7
**2026** 1:17 8:6 189:11
**20th** 167:12
**22** 147:13
**22-cv-986** 1:9 191:4
**233** 4:5
**24** 3:21
**265** 118:12,13
**265.01** 6:17
**28** 3:11 191:13
**29** 1:17
**29th** 8:5

**3**

**30** 191:9,10
**300** 1:20,20 3:16 4:5
**300A** 3:16
**32** 5:9
**35** 34:11 35:7
**38654** 3:7

**4**

**4-29-22** 191:5
**4-29-26** 1:1 2:1 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1

Associated Reporters Int'l., Inc.                                    www.courtsteno.com

27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1

**421** 4:10

**428** 3:6

**481** 183:5

---
**5**

**51** 6:5,8

**523-7887** 191:2

**57** 38:23

---
**6**

**63** 6:10

**6th** 53:12

---
**7**

**73** 6:13

---
**8**

**80** 6:12

**800** 191:2

**81** 183:5

---
**9**

**9** 5:4 6:15

**9:33** 1:18 8:2

**90** 46:2

**90s** 48:2

**91** 17:13

**92** 17:13

**96** 18:2