UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

IVAN ANTONYUK, COREY JOHNSON, and
ALFRED TERRILLE,

                          Plaintiffs,

            -against-                              Case No. 22 Civ. 986 (GTS) (PJE)

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,
WILLIAM FITZPATRICK, in his official capacity as
Onondaga County District Attorney, TOBIAS J.
SHELLEY, in his official capacity as Sheriff of
Onondaga County, MARK RUSIN, in his official
capacity as Chief of Police of Syracuse, and LEE C.
KINDLON, in his official capacity as District Attorney
of Albany County,

                          Defendants.
--------------------------------------------------------------------X

### SUPERINTENDENT JAMES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT

                                        LETITIA JAMES
                                        Attorney General of the State of New York
                                        300 South State Street, Suite 300
                                        Syracuse, New York 13202
                                        <u>Attorney for Superintendent James</u>

Patrick Blood, NDNY Bar Roll No. 519910
Timothy Mulvey, NDNY Bar Roll No. 510757
James M. Thompson, NDNY Bar Roll No. 703513
<u>Of counsel</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL AND CASE BACKGROUND .................................................................. 2

STANDARD OF REVIEW ........................................................................................ 9

ARGUMENT ............................................................................................................ 10

    I.    PLAINTIFFS' CHALLENGE IS FACIAL AND THEREFORE DISFAVORED.... 10

    II.    JOHNSON AND TERRILLE'S DECISION TO INVOKE THE FIFTH AMENDMENT IN THIS CIVIL CASE ESTABLISHES THAT THEY ARE NOT "LAW-ABIDING CITIZENS" .................................................................... 12

    III.    NEW YORK'S SENSITIVE LOCATION LAWS ARE CONSTITUTIONAL ........ 14

        A.    Plaintiffs' "Second Amendment Methodology" Is Ahistorical And Contrary To Supreme Court And Second Circuit Precedent ............................................ 14

        B.    Guns May Constitutionally Be Prohibited From Public Parks .......................... 17

        C.    The Law Prohibiting Guns In Places Selling Alcohol Is Constitutional .......... 22

        D.    The Law Prohibiting Guns In Theaters Is Constitutional ................................. 28

        E.    The Law Prohibiting Guns In Zoos Is Constitutional ...................................... 32

        F.    Plaintiffs' Challenge To The Law Prohibiting Guns In Airports Fails .............. 34

    IV.    PLAINTIFFS' PRIVATE PROPERTY CHALLENGE FAILS ............................... 36

        A.    The Challenge To The Law As Applied To Property Open To The Public Is Moot .......................................................................................................... 36

        B.    Any Challenge To The Private Property Provision As To Locations Closed To The Public Fails ....................................................................................... 38

            1.    Plaintiffs Did Not Plead A Challenge To Locations Closed To The Public ................................................................................................ 38

            2.    The Second Amendment Is Not A Right To Take Guns Into Other People's Homes Without Their Knowledge Or Consent ......................... 39

    V.    PLAINTIFFS' REMAINING CLAIMS ARE WITHOUT MERIT ......................... 43

VI.    ANY INJUNCTION SHOULD BE LIMITED TO THE PLAINTIFFS AND STAYED FOR TWO WEEKS TO ALLOW AN APPEAL ...................................... 44

CONCLUSION.............................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

Amusement Indus., Inc. v. Stern, 293 F.R.D. 420 (S.D.N.Y. 2013) ............................................ 13

Andrews v. State, 50 Tenn. 165 (1871) .................................................................................... 25

Antonyuk v. Bruen, 624 F. Supp. 3d 210 (N.D.N.Y. 2022) ........................................................ 3

Antonyuk v. Hochul, 639 F. Supp. 3d 232 (N.D.N.Y 2022) ("Antonyuk I") ................. 4, 7, 33, 40

Antonyuk v. Hochul, No. 22-2908, 2022 WL 18228317 (2d Cir. Dec. 7, 2022) ......................... 45

Antonyuk v. James, 144 S. Ct. 2709 (2024) ............................................................................... 4

Antonyuk v. James, 120 F.4th 941 (2d Cir. 2024) ("Antonyuk II") ..................................... passim

Antonyuk v. James, No. 22 Civ. 986, 2026 WL 496934 (N.D.N.Y. Feb. 23, 2026)
    ("Antonyuk III") ................................................................................................................ 7, 39

Aymonier v. United States, 432 Fed. App'x 66 (3d Cir. 2011) ................................................... 20

Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Human Servs., 150 F.4th 76
    (2d Cir. 2025) ..................................................................................................................... 44

Brokamp v. James, 573 F. Supp. 3d 696 (N.D.N.Y. 2021) ......................................................... 10

Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021) ..................................................................... 44

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .......................................................................... 10

CFPB v. StratFS, LLC, No. 24-CV-40, 2025 WL 1180031 (W.D.N.Y. Mar. 25, 2025) ............. 13

Christian Fellowship Centers of N.Y., Inc. v. Village of Canton, 377 F. Supp. 3d 146
    (N.D.N.Y. 2019) ................................................................................................................. 10

Christian v. James, 176 F.4th 189 (2d Cir. 2026) ................................................................. passim

Commonwealth v. Power, 48 Mass. 596 (1844) ........................................................................ 41

Conn. Citizens Defense League, Inc. v. Lamont, 6 F.4th 439 (2d Cir. 2021) ............................. 37

Crain v. State, 69 Tex. Crim. 55 (Ct. Crim. App. Tex. 1913) .................................................... 32

Culberson v. State, 47 S.E. 175 (Ga. 1904) .............................................................................. 31

Dark Storm Indus. v. Cuomo, 471 F. Supp. 3d 482 (N.D.N.Y. 2020) .......................................... 9

District of Columbia v. Heller, 554 U.S. 570 (2008)................................................................ passim

Doe v. Reed, 561 U.S. 186 (2010).................................................................................. 17, 18

English v. State, 35 Tex. 473 (1871) ...................................................................................... 25

Field Day, LLC v. County of Suffolk, 463 F.3d 167 (2d Cir. 2006)..................................... 10, 11

Fin. Guaranty Ins. Co.. v. Putnam Advisory Co., LLC, No. 12 Civ. 7372, 2020 WL 264146
    (S.D.N.Y. Jan. 17, 2020)................................................................................................ 43

Florida v. Jardines, 569 U.S. 1 (2013) .................................................................................. 41

Frey v. City of New York, 157 F.4th 118 (2d Cir. 2025) ...................................................... passim

Giambalvo v. Suffolk County, 155 F.4th 163 (2d Cir. 2025)............................................... 37, 38

Guthrie v. State, 73 Tex. Crim. 538 (Tex. Ct. Crim. App. 1914) .......................................... 43

Hill v. State, 53 Ga. 472 (1874) ........................................................................................... 25

Iancu v. Brunetti, 588 U.S. 388 (2019).................................................................................. 22

Isaiah v. State, 176 Ala. 27 (1911)........................................................................................ 43

Janakievski v. Executive Director, Rochester Psychiatric Ctr., 955 F.3d 314 (2d Cir. 2020)...... 37

Jobe v. City of Catlettsburg, 409 F.3d 261 (6th Cir. 2005). ................................................. 44

Kerzer v. Kingly Mfg., 156 F.3d 396 (2d Cir. 1998)............................................................ 10

Kipke v. Moore, 165 F.4th 194 (4th Cir. 2026)......................................................... 21, 23, 24, 39

Koons v. Platkin, 673 F. Supp. 3d 515 (D.N.J. 2023) .......................................................... 40

Libertarian Party of Erie Cty. v. Cuomo, 300 F. Supp. 3d 424 (W.D.N.Y. 2018) ...................... 11

LiButti v. United States, 107 F.3d 110 (2d Cir. 1997).......................................................... 13

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .......................................................... 37

Maryland v. King, 567 U.S. 1301 (2012) .............................................................................. 45

Maupin v. State. 17 S.W. 1038 (Tenn. 1890) ........................................................................ 29

McDonald v. City of Chicago, 561 U.S. 742 (2010) ........................................................... 16, 32

Metz v. Astrue, No. 06 Civ. 1509, 2010 WL 2243343 (N.D.N.Y. Apr. 21, 2010) ................. 44

Mintz v. Chiumento, 724 F. Supp. 3d 40 (N.D.N.Y. 2024)..................................................... 32, 33

N.Y. State Firearms Ass'n v. James, 157 F.4th 232 (2d Cir. 2025) ............................................. 39

Nastri v. Dykes, 807 F. Supp. 3d 112 (D. Conn. 2025).................................................................. 21

Nat'l Shooting Sports Found., Inc. v. James, 144 F.4th 98 (2d Cir. 2025) ................................. 11

NYSRPA v. Bruen, 597 U.S. 1 (2022) ................................................................................. passim

NYSRPA v. James, No. 22 Civ. 907, 2025 WL 553423 (N.D.N.Y. Feb. 18, 2025).................... 38

Owens v. State, 3 Tex. App. 404 (1878)................................................................. 25, 29, 31

Presser v. Illinois, 116 U.S. 252 (1886)........................................................................... 21

Salahuddin v. Goord, 467 F.3d 263 (2d Cir. 2006) ........................................................... 10

Schoenthal v. Raoul, 150 F.4th 889 (7th Cir. 2025) ......................................................... 35

Seila Law LLC v. CFPB, 591 U.S. 197 (2020) ................................................................. 22

Spears v. State, 281 P. 167 (Okla Crim. Ct. App. 1929) ............................................. 27, 32

Spokeo, Inc. v. Robins, 578 U.S. 330 (2016) .......................................................... 34, 36, 37

State v. Pigg, 85 Mo. App. 399 (K.C. Ct. App. Mo. 1900) ............................................. 32

State v. Shelby, 90 Mo. 302, 2 S.W. 468 (1886) .................................................... 24, 25, 31

State v. Wilforth, 74 Mo. 528 (1881)........................................................................ 25, 29

Succow v. Blanche, No. 3:25-CV-250, 2026 WL 2130113 (D. Conn. July 23, 2026) ................. 8

Summerlin v. State, 3 Tex. App. 444 (1878)..................................................................... 32

Torraco v. Pt. Auth. of N.Y. & N.J., 615 F.3d 129 (2d Cir. 2010)................................... 35

Trump v. CASA, Inc., 606 U.S. 831 (2025) ..................................................................... 45

United States ex rel. Bilokumsky v. Tod, 263 U.S. 149 (1923) ...................................... 13

United States v. Cruikshank, 92 U.S. 542 (1875)............................................................ 20

United States v. Diaz, 122 F. Supp. 3d 165 (S.D.N.Y. 2015) ........................................ 26

United States v. Harris, 144 F.4th 154 (3d Cir. 2025)..................................................... 22

United States v. Hemani, 146 S. Ct. 1677 (2026).............................................. 16, 24, 28

v

United States v. Libertad, 681 F. Supp. 3d 102 (S.D.N.Y. 2023)................................................ 34

United States v. Rahimi, 602 U.S. 680 (2024).......................................................... passim

United States v. Rivers, No. 24-CR6154, 2025 WL 1006338 (W.D.N.Y. Apr. 4, 2025)............. 26

United States v. Salerno, 481 U.S. 739 (1987) .......................................................... 11

We the Patriots, Inc. v. Grisham, 119 F.4th 1253 (10th Cir. 2024).............................................. 38

Wildlife Preserves, Inc. v. Romero, 153 F.4th 192 (2d Cir. 2025)................................................ 10

Willingham v. County of Albany, 593 F. Supp. 2d 446 (N.D.N.Y. 2006).................................... 13

Wolford v. Lopez, 146 S.Ct. 2032 (2026) .......................................................... passim

Wolford v. Lopez, 686 F. Supp. 3d 1034 (D. Haw. 2023) ............................................................ 40

Wynne v. State, 123 Ga. 566, 51 S.E. 636 (1905) .......................................................... 31

Zherka v. Bondi, 140. F.4th 68 (2d Cir. 2025) .......................................................... 14

Ziegenfuss v. Martin, 824 F. Supp. 3d 540 (N.D. Tex. 2026)................................................ 23, 26

## **Statutes**

18 U.S.C. § 926A.......................................................... 34, 35

54 U.S.C. § 104906.......................................................... 21

Alaska Stat. § 11.61.220 .......................................................... 36

Ark. Code Ann. § 5-73-306 .......................................................... 36

Conn. Gen. Stat. § 53-202d.......................................................... 36

D.C. Code § 7-2509.07 .......................................................... 36

Haw. Rev. Stat. § 134-9.1 .......................................................... 6, 28

La. Rev. Stat. § 40:1379.3.......................................................... 36

N.Y. Penal Law § 140.17.......................................................... 14

N.Y. Penal Law § 265.01-d .......................................................... passim

N.Y. Penal Law § 265.01-e.......................................................... 3, 4, 5, 25

N.Y. Penal Law § 265.02 ........................................................................................... 14

N.Y. Penal Law § 265.03 ........................................................................................... 14

N.Y. Penal Law § 265.45 ............................................................................................. 3

N.Y. Penal Law § 400.00 ................................................................................... 3, 14, 37

## Rules

Fed. R. Civ. P. 56 ...................................................................................................... 10

Fed. R. Evid. 201 ......................................................................................................... 9

Local Civil Rule 56.1 ................................................................................................. 14

## Other Authorities

An Act Authorizing a Grant to the State of California of the Yo-Semite Valley, and of the Land embracing the Mariposa Big Tree Grove, ch. 184, 13 Stat. 325 (1864) ................................... 19

An Act for Punishment of Crimes and Offences, within the District of Columbia (1816) .......... 25

Andrew Willinger, The Territories Under Text, History, and Tradition, 101 Wash. U. L. Rev. 1 (2023) ............................................................................................................... 26

Benjamin Rush, An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind (8th Ed., Boston, James Loring 1823) ...................................................................... 23

CDC National Center for Health Statistics, Firearm Mortality, available at https://www.cdc.gov/nchs/state-stats/deaths/firearms.html ....................................... 9

Kellen Heniford & Kari Still, Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons ban in a Post-Bruen Context, 73 Buff. L. Rev. 679 (2025) ..................................... 26

National Park Service and Related Programs, Pub. L. No. 113-287, 128 Stat. 3094, 3168-69 (2014) .............................................................................................................. 21

Restatement (First) of Torts .................................................................................... 41

Sponsor's Memo, N.Y. State Senate Bill S51001 (2022) ............................................... 2

Village of Baldwinsville, Parks and Trails, https://www.baldwinsville.gov/parks-trails/ ............ 22

William Blackstone, <u>Commentaries on the Laws of England</u> (Clarendon Press 1768) ............... 41

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, respectfully submits this Memorandum of Law in opposition to the motion for summary judgment filed by Plaintiffs Ivan Antonyuk, Corey Johnson, and Alfred Terrille (collectively, the "Plaintiffs"), ECF No. 178, and in support of his cross-motion for summary judgment, submitted contemporaneously herewith.

## PRELIMINARY STATEMENT

After years of hard-fought litigation and judicial decisions, this long-running Second Amendment case has narrowed to a challenge against a discrete group of sensitive location laws, each of which has been upheld by the Second Circuit. New York's prohibition on guns in parks has already been upheld twice; although Plaintiffs now try to reframe their lawsuit into an as-applied challenge to so-called "rural" parks, that challenge is not properly pled and would fail on the merits because many of the spaces covered by the "mountain of regulations" adduced by New York's expert, Dr. Terence Young, covered rural or wild spaces. The prohibition on guns in places serving liquor is supported by four separate and sufficient traditions already recognized by the Second Circuit: laws prohibiting intoxicated persons from carrying guns, laws protecting locations containing impaired or vulnerable people, laws prohibiting guns in crowded and enclosed spaces where armed self-defense threatens innocent life, and the tradition of prohibiting firearms in social gatherings, parties, and ballrooms.

The latter two traditions also cover theaters, which are enclosed and crowded spaces closely analogous to the places of recreation and social gathering where guns were historically excluded. Zoos are crowded locations where people gather for recreation, but are also protected due to the historical tradition of keeping guns out of educational spaces and areas frequented by children. As to Plaintiffs' challenge regarding airports, standing is improper because federal law

1

already allows them to carry weapons in checked baggage for interstate travel, and broader carry in airports can be prohibited for the same reasons the Second Circuit found it historically justified to prohibit guns on subways and trains.

Plaintiffs also challenge New York's law requiring gun owners to obtain consent from a property owner before bringing a gun onto his or her property, but that provision has already been enjoined in another case as to property open to the public—the only challenge Plaintiffs have raised in this case. Recognizing the lack of actual or imminent (not conjectural or hypothetical) injury, and therefore the lack of subject-matter jurisdiction, Plaintiffs now try to reframe their challenge into an as-applied case about carrying guns without consent onto property *not* open to the public— such as people's homes. Not only did Plaintiffs not plead such a challenge, both the Supreme Court and the Second Circuit have drawn a bright line against their theory. The Court should uphold those challenged laws where Plaintiffs have standing, consistent with Supreme Court and Second Circuit precedent, and decline their eleventh-hour attempt to create as-applied challenges where none have existed.

**FACTUAL AND CASE BACKGROUND**

In June 2022, the Supreme Court held in New York State Rifle & Pistol Association v. Bruen that New York State's requirement of "proper cause" to carry a concealed firearm in public violated the U.S. Constitution. 597 U.S. 1, 8, 12 (2022). In response to the Bruen decision and the May 14, 2022 racially-motivated mass shooting at a Tops Supermarket in Buffalo, the New York Legislature adopted the Concealed Carry Improvement Act ("CCIA") in July 2022, with the twin goals of "protect[ing] individuals' Second Amendment rights as determined by the Supreme Court" and "preventing death and injury by firearms." Sponsor's Memo, N.Y. State Senate Bill S51001 (2022), https://www.nysenate.gov/legislation/bills/2021/S51001. The CCIA created new

"shall issue" rules for issuing handgun permits, see N.Y. Penal Law § 400.00; prohibited carrying guns in an enumerated list of "sensitive location[s]," id. § 265.01-e; established a default rule requiring consent to carry guns on other people's private property, id. § 265.01-d; and amended a statute requiring responsible storage of guns left unattended in cars, id. § 265.45(2). These provisions took effect on September 1, 2022.

Out-of-state gun groups quickly brought several lawsuits challenging the law, including this one. See Complaint, ECF No. 1 (the "Compl.") ¶¶ 21, 23 (discussing involvement of Gun Owners of America, a Northern Virginia-based nonprofit, and its affiliate organizations). As initially pled, the Complaint was on behalf of six plaintiffs against a host of defendants, including the Governor, the Superintendent of State Police, Onondaga County Court Judge Matthew Doran, and local law enforcement officials in Onondaga, Oswego, Greene, and Albany Counties, as well as the Chief of Police of the City of Syracuse.[1] See id. p. 1. Plaintiffs challenged various aspects of the licensing process, including the revised "good moral character" standard—which the CCIA narrowed to focus on dangerousness: "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," N.Y. Penal Law § 400.00(1)(b)—as well as other requirements like character references, training requirements, an in-person interview, and the interviewer's ability to ask

---

[1] Plaintiff Antonyuk and the Gun Owners of America had brought a previous lawsuit against the Superintendent that the Court dismissed for lack of standing. See Antonyuk v. Bruen, 624 F. Supp. 3d 210 (N.D.N.Y. 2022). The Court found that "Plaintiff Antonyuk does not have standing" to challenge the sensitive location laws, id. at 237, and that dismissal was required due to "lack of subject-matter jurisdiction," id. at 261. The Court nonetheless issued a "judicial dictum" opining on how it intended to rule if it did have jurisdiction over the case. Id. at 246-61. The Court indicated that it would strike down the sensitive locations laws in their entirety because the Superintendent had not adduced "historical analogs for restricting firearms at *all* of the [enumerated] locations." Id. at 257 (emphasis in the original).

follow-up questions. See Compl. ¶¶ 67-83, 257. Plaintiffs challenged all of the sensitive locations in Section 265.01-e(2) and the consent requirement in Section 265.01-d, alleging that they "are unconstitutional on their face." Compl. ¶ 116.

After expedited briefing, the Court issued a temporary restraining order, see ECF No. 27, and then a preliminary injunction, granting Plaintiffs' application in part and denying it in part. See Antonyuk v. Hochul, 639 F. Supp. 3d 232, 349 (N.D.N.Y 2022) ("Antonyuk I"). Regarding the provisions at issue in the current cross-motions for summary judgment (which represent the entirety of the remaining case and controversy), the Court enjoined the laws prohibiting guns in public parks, see id. at 325-26, in places serving alcohol, id. at 333, in theaters, id. at 335, in zoos, id. at 327, and at airports (but only "to the extent the license holder is complying with all federal regulations there"), id. at 331. The Court also enjoined the private-property consent rule, id. at 347, but noted that "the Court has been persuaded by the State Defendants that the Second Amendment is not the best place to look for protection from that restriction, because thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's own home or in public."[2] Id. at 343 (emphasis in the original). The Court also dismissed all claims against Governor Hochul for lack of standing. See id. at 294-96.

The Superintendent and Judge Doran appealed, and (after an initial opinion was vacated for further consideration in light of United States v. Rahimi, 602 U.S. 680 (2024), Antonyuk v. James, 144 S. Ct. 2709 (2024)), the Second Circuit issued a 246-page ultimate determination jointly signed by Judges Dennis Jacobs, Gerard Lynch, and Eunice Lee, substantially reversing on these issues. See Antonyuk v. James, 120 F.4th 941 (2d Cir. 2024) ("Antonyuk II");

---

[2]  The Court separately enjoined this aspect of the law on First Amendment grounds, finding that it compelled speech. See Antonyuk I, 639 F. Supp. 3d at 347.

4

https://ww3.ca2.uscourts.gov/decisions/OPN/22-2908_opn.pdf. On parks, the panel found that New York's law fit "the Nation's history of regulating firearms in quintessentially crowded areas and public forums," at least as to urban parks, and that Plaintiffs' facial challenge therefore failed. Id. at 1019. On locations serving alcohol, the Circuit found the law was justified by "historical statues regulating firearms in other crowded spaces such as fairs and markets," and held that those analogues "establish a consistent and representative tradition of regulating access to firearms by people with impaired self-control or judgment, specifically those who are intoxicated." Id. at 1031, 1030. As to theaters, the Circuit held that New York's law is supported by "a tradition of regulating firearms in quintessentially crowded places, particularly those spaces that are (1) discrete in the sense that they contain crowds in physically delineated or enclosed spaces, *e.g.*, circuses, ball rooms, fairs, and markets, and (2) where persons are assembled for amusement, or for educational or literary purposes." Id. at 1038 (citation modified). The Circuit found that the prohibition on guns in zoos was consistent with three different historical traditions: "regulating firearms in places of educational and scientific opportunity, places heavily trafficked by children, and places that are densely crowded." Id. at 1027. Accordingly, the Circuit vacated the preliminary injunction with regard to each of these sensitive locations. See id. at 1048. The Circuit later issued an opinion upholding other subsections of Section 265.01-e that prohibit guns in Times Square and on the New York City Subway and Metro-North Railroad, further expanding the governing law on sensitive locations. See Frey v. City of New York, 157 F.4th 118, 134-36 (2d Cir. 2025).

As to the private-property consent law, the Antonyuk II Court reviewed the relevant historical antecedents and found that they "would have been understood to refer to private land not open to the public," and accordingly "assume[d] without deciding that the State's analogues demonstrate a well-established and representative tradition of creating a presumption against

5

carriage on enclosed private lands, *i.e.*, private land closed to the public." 120 F.4th at 1047, 1046. However, the Court found that the historical analogues "failed to situate § 265.01-d's prohibition on private property open to the public."[3]    Id. at 1047. The Court therefore modified the preliminary injunction "to enjoin enforcement of [Section 265.01-d] only with respect to private property open to the public," and otherwise remanded. Id. at 1048.[4]

The case has returned to this Court, but more limited in scope. This Court previously found that Plaintiffs lacked standing as to (1) places of government administration; (2) libraries; (3) locations of programs providing services to children and youth; (4) summer camps; (5) locations of programs regulated by the Office for People with Developmental Disabilities; (6) locations of programs regulated by the Office of Addiction Services and Supports; (7) locations of programs regulated by the Office of Mental Health; (8) locations programs regulated by the Office of Temporary and Disability Assistance; (9) homeless shelters, family shelters, domestic violence shelters, and emergency shelters; (10) residential settings regulated by the Department of Health;

---

[3] The Circuit did not reach Plaintiffs' compelled speech theory, but it did "confess a certain skepticism about that claim," noting that speech would be required no matter the default rule; "[t]hat someone will need to express his wishes regardless of the chosen default rule is just a fact of life, and not a violation of the First Amendment." Antonyuk II, 120 F.4th at 1048 n.125.

[4] Subsequent cases have confirmed that distinction. The Second Circuit came to the same outcome in a summary judgment posture in Christian v. James, 176 F.4th 189 (2d Cir. 2026), affirming a permanent injunction against the private property provision "as it applies to private property open to the public," but emphasizing that historical laws were "focused on private property . . . not open to the public." Id. at 201. A few weeks later, the Supreme Court came to the same outcome in Wolford v. Lopez, 146 S.Ct. 2032 (2026), holding that Hawaii could not "prohibit licensed concealed-carry permit holders from carrying handguns on private property open to the public unless the property owner gives express permission." Id. at 2047, 2053. Wolford indicated that historical laws "referred to private property closed to the public," id. at 2052 n.16, and distinguished its private-property-consent ruling from the sensitive locations context, noting that Hawaii separately prohibited guns in locations such as "any 'restaurant serving alcohol'; any 'stadium, movie theater or concert hall,' . . . any 'beach, playground,' or park" and "any . . . zoo," without disturbing any of those measures. Id. at 2046 (quoting Haw. Rev. Stat. § 134-9.1(a)).

(11) educational institutions; and (12) Times Square. Antonyuk II, 120 F.4th at 959 n.7 (citing Antonyuk I, 639 F. Supp. 3d at 261, 267, 273-74, 275, 276-79, 292). Plaintiffs did not challenge those determinations on appeal, id., or in the instant summary judgment motion. The Circuit found that no Plaintiff had standing as to places of worship, id. at 1014, conference centers and banquet halls, id. at 1032-36, or First Amendment gatherings, id. at 1040, rulings that Plaintiffs also do not dispute. On August 2, 2025, former Plaintiff Leslie Leman voluntarily dismissed his claims, and the Court so-ordered his dismissal two days later. See ECF Nos. 155 & 156. On February 23 of this year, the Court granted a motion for judgment on the pleadings filed by the former Oswego County defendants, dismissing all claims by former Plaintiff Joseph Mann, including his challenges to the carry prohibitions on public transportation and locations providing behavioral health services. See Antonyuk v. James, No. 22 Civ. 986, 2026 WL 496934 (N.D.N.Y. Feb. 23, 2026) ("Antonyuk III"). And on March 30, the parties reached a partial settlement resulting in the dismissal of all challenges to New York's firearm licensing law, N.Y. Penal Law § 400.00, and the dismissal of Plaintiff Sloane and Judge Doran as parties. See ECF No. 174.

Accordingly, the remaining claims concern three Plaintiffs—Johnson, Terrille, and Antonyuk—and a discrete group of sensitive locations. Plaintiff Johnson challenges "private property open to the public, parks, zoos, theaters, [and] restaurants that serve alcohol." Johnson Interrog. Resps., TD[5] Ex. 1 at 4. Plaintiff Terrille challenges "private property open to the public, parks, theaters, [and] restaurants that serve alcohol." Terrille Interrog. Resps., TD Ex. 2 at 4. As to Plaintiff Antonyuk, the Complaint only pleads facts regarding a challenge to the private property provision, see Compl. ¶¶ 132-148, though Plaintiffs' Statement of Material facts indicates that he

---

[5] "TD" refers to the Declaration of James M. Thompson, submitted contemporaneously herewith.

7

also wishes to raise a challenge regarding movie theaters and a restaurant that serves alcohol. ECF No. 178-8 ¶¶ 35-36.

The parties proceeded to discovery on these issues. As discussed in Section II, below, Plaintiffs Johnson and Terrille each invoked the Fifth Amendment dozens of times at their depositions, stymieing questions about what guns they own, where they take them, and how they have used them. At the end of fact discovery, the Superintendent designated four experts: Patrick J. Charles, an author of multiple full-length books and articles on the history of gun regulation who has worked for years as an internal historian at the U.S. Air Force; Dr. Brennan Rivas, a scholar of firearm regulation at Wesleyan University who has been extensively cited by courts across the country, see, e.g., Succow v. Blanche, No. 3:25-CV-250, 2026 WL 2130113, at *15 n.12 (D. Conn. July 23, 2026) (describing Rivas after a bench trial as "an expert in historical weapon regulations in the United States" and citing extensively to her declaration and testimony); Dr. Terence Young of California State Polytechnic University, Pomona, a geographer who has been repeatedly cited as an expert on the history of parks; and Dr. Paul Reeping, an epidemiologist who has led many of the most significant studies on the efficacy of sensitive location regulations.[6]   Each expert's declaration, CV, and (where applicable) supporting historical exhibits are submitted along with this memorandum.

New York is and remains one of the safest places to live in America, with the fifth-lowest firearm mortality rate of any state in the Union. See CDC National Center for Health Statistics, Firearm Mortality, available at https://www.cdc.gov/nchs/state-stats/deaths/firearms.html

---

[6] Plaintiffs' summary judgment brief ignores the experts' testimony entirely, other than noting in a footnote that none of them attempts to delineate the boundary between an "urban" and a "rural" park. See ECF No. 178-9 at 11 n.13.

(reflecting 2024 data).[7]    Its firearm death rate of 4.4 per 100,000 is a fraction of the rate in states with laxer gun laws (13.9 in Texas, 19.8 in Tennessee, 22.9 in Louisiana, and 28 per 100,000 in Mississippi, the state with the highest rate). See id. If New York's rate were to increase to match Mississippi's, the result would be the loss of nearly 5,000 additional lives per year. See id. New York's sensitive location laws play an important role in saving lives: although the science of studying the efficacy of these laws is in its infancy, Dr. Reeping notes that "multiple studies across distinct contexts find effects consistent with neutral or protective outcomes, and none provide empirical evidence that gun-free zones increase the likelihood of violence." Reeping Decl. ¶ 11; see also id. ¶¶ 42-43 (discussing limitations of existing research). These include studies considering the effects of prohibiting guns in schools, see id. ¶¶ 36-38, and a study finding that "firearm prohibitions in alcohol-serving establishments are associated with lower rates of nearby shootings." Id. ¶ 41 (emphasis removed).

Plaintiffs have filed for summary judgment, asking for each of the remaining laws to be struck down. The Superintendent opposes, and asks the Court to find, as the Second Circuit did, that each of these laws is "consistent with the principles that underpin our regulatory tradition." Rahimi, 602 U.S. at 692; see Antonyuk II, 120 F.4th at 1048.

**STANDARD OF REVIEW**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant bears the burden of showing that there is no genuine

---

[7] The Court may take judicial notice of the CDC's data because it is taken from a government website "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); see Dark Storm Indus. v. Cuomo, 471 F. Supp. 3d 482, 490 n.2 (N.D.N.Y. 2020) ("any facts subject to judicial notice may be properly considered in a motion for summary judgment" (citation omitted)).

issue of material fact. Celotex, 477 U.S. at 323. If this burden is met, the opposing party must show a material dispute of fact for trial by "point[ing] to specific evidence." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006); Celotex, 477 U.S. at 324. "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) (internal citation omitted). A disputed fact must also be genuinely material: "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." Wildlife Preserves, Inc. v. Romero, 153 F.4th 192, 205 n.14 (2d Cir. 2025) (citation omitted).

## ARGUMENT

I.   **PLAINTIFFS' CHALLENGE IS FACIAL AND THEREFORE DISFAVORED**

Constitutional challenges come in two varieties: "a 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual, while an 'as-applied' challenge requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." Christian Fellowship Centers of N.Y., Inc. v. Village of Canton, 377 F. Supp. 3d 146, 154 n.6 (N.D.N.Y. 2019) (cleaned up) (quoting Field Day, LLC v. County of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006)). In other words, "[a] claim is facial if it 'challenges application of the law more broadly,' but a 'claim is as-applied if it is limited to a plaintiff's particular case.'" Brokamp v. James, 573 F. Supp. 3d 696, 704 n.3 (N.D.N.Y. 2021) (quoting Libertarian Party of Erie Cty. v. Cuomo, 300 F. Supp. 3d 424, 438 (W.D.N.Y. 2018), *aff'd in part, appeal dismissed in part*, 970 F.3d 106 (2d Cir. 2020)).

The Second Circuit found that Plaintiffs' challenge to the sensitive places and private property statutes was facial, see Antonyuk II, 120 F.4th at 1047-48, 1048 nn.124, 126, and the

10

Complaint bears this out, as the relief sought by Plaintiffs amounts to (in pertinent part) "[a]n order . . . permanently enjoining Defendants . . . from enforcing the challenged sections of the CCIA" and "[a]n order declaring that the challenged sections of the CCIA are unenforceable [and] unconstitutional . . ." Compl. p. 72; see Field Day, 463 F.3d at 174 (facial challenge targets "text of the statute itself, not its application to the particular circumstances of an individual"). The facial nature of the challenge is underscored by the fact that none of the challenged statutes have been applied against any Plaintiff. See Nat'l Shooting Sports Found., Inc. v. James, 144 F.4th 98, 107 (2d Cir. 2025) ("NSSF"), ("Generally, however, a challenge to a statute before its enforcement will presumptively constitute a facial challenge."). "Accordingly, [Plaintiff]s' challenge is properly characterized as facial, notwithstanding their [belated] suggestions to the contrary." Id.

Because Plaintiffs' suit targets the law itself rather than any individual application, they must "establish that the law cannot be constitutionally applied against anyone in any situation." NSSF, 144 F.4th at 107, 108. The Supreme Court has emphasized the importance of the facial challenge standard in Second Amendment cases, explaining that "[t]his is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" Rahimi, 602 U.S. at 693 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). Accordingly, in adjudicating this case the "court's task is to seek harmony, not to manufacture conflict," meaning that the Court should "consider the circumstances in which [the challenged law] was most likely to be constitutional," rather than emphasize "hypothetical scenarios where [the law] might raise constitutional concerns." Id. at 701. Plaintiffs cannot meet this high standard, particularly in a challenge to sensitive location laws, which the Supreme Court has repeatedly emphasized as "longstanding" and "presumptively lawful." District of Columbia v. Heller, 554 U.S. 570, 627 & n. 26 (2009); see

11

Bruen, 597 U.S. at 30 ("we are also aware of no disputes regarding the lawfulness of such prohibitions.").

## II.    JOHNSON AND TERRILLE'S DECISION TO TAKE THE FIFTH IN THIS CIVIL CASE ESTABLISHES THAT THEY ARE NOT "LAW-ABIDING CITIZENS"

As a threshold matter, the applicability of the Second Amendment is complicated by Plaintiff Johnson and Terrille's refusal to answer many of the questions posed at their depositions, invoking the Fifth Amendment right against self-incrimination. Plaintiff Johnson took the Fifth 27 times in his three-and-a-half hour deposition, including regarding what long guns he owns, Johnson Dep. Tr., TD Ex. 3 at 72:16-73:2, what semiautomatic rifles he owns, id. 73:3-8; whether he owns a machine gun, ghost gun, or uses a "Glock switch" for fully automatic fire, id. 74:10-75:12; whether he carries his gun to work in violation of company policy, id. 76:14-23; whether he carries his gun in sensitive locations other than schools, courthouses, and government buildings, id. 84:13-85:4; whether he carries guns into various of the sensitive locations at issue in this case, id. 98:8-14, 109:18-110:5, 124:20-25, 140:7-14, 142:14-19; and whether he carries guns into others' private property (including their homes) without permission, even knowing that the gun is not welcome. Id. 137:9-138:13, 145:18-146:5. Plaintiff Terrille took the Fifth 19 times in a four-hour deposition, including on basic questions like what guns he owns, where he carries them, and when he has ever carried them outside his house. See Terrille Tr., TD Ex. 4 at 42:7-43:13. Plaintiff Terrille refused to answer questions about illegal conduct, including whether he owns an assault weapon, id. 42:14-17; whether and why he carries a gun to various sensitive locations, id. 59:8-21 61:20-62:4, 62:23-63:6, 65:9-15, 80:3-11; whether his guns' presence caused discomfort to children and families, id. 60:17-24; and whether he carries weapons into locations (including homes) where the owner prohibits them. Id. 84:14-85:19, 94:24-95:10.

"A party testifying in a civil proceeding retains the right under the Fifth Amendment to refuse to answer questions if the answers might tend to incriminate him or her, but an adverse party may then be entitled to have the trier of fact draw a negative inference from the invocation of the right." Willingham v. County of Albany, 593 F. Supp. 2d 446, 452 (N.D.N.Y. 2006) (citation omitted). "Thus, where parties or material witnesses invoke their Fifth Amendment right against self-incrimination in response to questions, the court has broad discretion to draw adverse inferences that the testimony those witnesses would have offered would not have been favorable to them." CFPB v. StratFS, LLC, No. 24-CV-40, 2025 WL 1180031, at *13 (W.D.N.Y. Mar. 25, 2025). And where a party repeatedly refuses to answer questions at a deposition, he "obstruct[s] the discovery process, which justifies drawing an inference that any answers he gave in response to the questions would have been unfavorable to him." Amusement Indus., Inc. v. Stern, 293 F.R.D. 420, 428 (S.D.N.Y. 2013). "As for the weight to be accorded to adverse inferences, the district court should be mindful of Justice Brandeis' classic admonition: 'Silence is often evidence of the most persuasive character.'"   LiButti v. United States, 107 F.3d 110, 124 (2d Cir. 1997) (quoting United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1923)). The answers that Plaintiffs Johnson and Terrille withheld would have shed significant light on their standing, conduct, and eligibility to own firearms; the Court can and should infer that they did in fact engage in the conduct at issue in each of the questions they refused to answer.[8]

---

[8]  Indeed, Plaintiffs themselves seek to make this adverse inference where it benefits them. In their Local Civil Rule 56.1(a) statement, they affirmatively cite to Page 137 of Plaintiff Johnson's deposition (in which he invokes the Fifth Amendment three times) to help establish their standing to challenge N.Y. Penal Law § 265.01-d as applied to private property closed to the public. See ECF No. 178-8 ¶ 9. This allegation is the only statement in Plaintiffs 56.1(a) statement supporting any challenge as-applied to areas closed to the public, and Plaintiff Johnson's invocation of the Fifth Amendment is the only testimony supporting it. See id.

The repeated invocation of the Fifth Amendment necessarily impacts Johnson and Terrille's Second Amendment claims. Even if each of New York's sensitive places laws were unconstitutional—which they are not, as discussed below—Plaintiffs Johnson and Terrille invoked the Fifth Amendment regarding conduct that constitutes multiple felonies, including trespassing with guns where a private property owner has forbidden them and the possession of assault weapons or machine guns. See, e.g., N.Y. Penal Law §§ 140.17, 265.02(7), 265.03(1)(a). While such conduct does not exclude them from "the People" covered by the Second Amendment, see Zherka v. Bondi, 140. F.4th 68, 77 (2d Cir. 2025), it does exclude them from the category of "law-abiding citizens" that, as a historical matter, the right has covered. See id. at 89-90; Bruen, 597 U.S. at 29 (Second Amendment question considers "how and why the regulations burden a law-abiding citizen's right to armed self-defense"). Likewise, the conduct regarding which Plaintiffs Johnson and Terrille refused to answer questions would be grounds for automatic revocation of their firearm licenses, see N.Y. Penal Law § 400.00(11)(a), and the Supreme Court has emphasized the constitutionality of licensing laws "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"    Bruen, 597 U.S. at 38 n.9. Plaintiffs Johnson and Terrille's repeated refusal to answer questions justifies the inference that they lack standing in this case.

## III.    NEW YORK'S SENSITIVE LOCATION LAWS ARE CONSTITUTIONAL

### A.    Plaintiffs' "Second Amendment Methodology" Is Ahistorical And Contrary To Supreme Court And Second Circuit Precedent

When evaluating a Second Amendment challenge, "[h]istory, not policy, is the proper guide." Rahimi, 602 U.S. at 717 (Gorsuch, J., concurring). "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Id. at 692; accord Wolford, 146 S. Ct. at 2045. And in doing so, the Court

14

must consider all "laws that our tradition is understood to permit." Rahimi, 602 U.S. at 692. Among those laws, "[a] party defending against a Second Amendment claim may rely on a single analogue or a group of analogues," id. at *6, and courts should consider how many jurisdictions adopted a law and how widely accepted it was—an inquiry which includes "judicial decisions" that "explicitly acknowledged the rule's legality," but also considers acceptance demonstrated "when a restriction on the keeping or carrying of arms was 'open, widespread, and unchallenged.'" Id. at *7 (quoting Bruen, 597 U.S. at 36). Beyond historical analogues, "[a] variety of sources, including scholarship, may aid this inquiry." Wolford, 146 S. Ct. at 2044. Put succinctly, "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" Id. at *6.

Plaintiffs ask the Court to do something different. They argue that the Court should base its decision only on "Founding-era understandings"—though they do not define when that "era" begins and ends—and argue that if there is no specifically-on-point Founding-era law in the record, then the Court should strike down a law passed by the People's elected representatives based on silence alone. ECF No. 178-9 at 8-9 (emphasis omitted). That is not the law.

"[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." Rahimi, 602 U.S. at 691-92. The Justices "ha[ve] repeatedly employed post-ratification history to determine the meaning of vague constitutional text," id. at 728 (Kavanaugh, J., concurring); see, e.g., Heller, 554 U.S. at 605 (reviewing history "from immediately after [Second Amendment's] ratification through the end of the 19th century.");

15

Bruen, 597 U.S. at 30 (looking to "18th- and 19th-century 'sensitive places'"); McDonald v. City of Chicago, 561 U.S. 742, 776-77 (2010) (looking to "[e]vidence from the period immediately following the ratification of the Fourteenth Amendment" and multiple state provisions from 1889); United States v. Hemani, 146 S. Ct. 1677, 1688, 1690 & n.5 (2026) (considering large numbers of 19th century laws from as late as 1890). To be sure, "not all history is created equal," and "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" Bruen, 597 U.S. at 34 (quoting Heller, 554 U.S. at 634-35) (emphasis omitted). But nothing in the Supreme Court's holdings or practice indicates that history can be arbitrarily ignored, let alone based on Plaintiffs' restrictive "Founding era" framework.

Second Circuit precedent has "expressly rejected [Plaintiffs'] view." Christian, 176 F.4th at 205. As the Circuit has repeatedly emphasized, "the absence of Founding-era law is not dispositive because 'it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms.'" Id. (quoting Frey, 157 F.4th at 130); accord Rahimi, 602 U.S. at 739–40 (Barrett., J., concurring) (rejecting contention that "founding-era legislatures maximally exercised their power to regulate" because "[s]uch assumptions are flawed, and originalism does not require them."). Accordingly, "[w]here there is no strong historical evidence from the Founding era, it is appropriate to look toward, and rely upon, later historical evidence." Frey, 157 F.4th at 130. Moreover, in the Second Circuit, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," Antonyuk II, 120 F.4th at 972, and even "Twentieth-century evidence" is "not weightless" so long as it is not "*inconsistent* with prior practices." Id. at 989 n.41 (emphasis in the original).

As shown below, New York's sensitive places laws are solidly grounded in our Nation's

16

tradition, and Plaintiffs have made no appreciable affirmative showing that anyone at any point in American history viewed their predecessors as anything other than constitutional.

### B. Guns May Constitutionally Be Prohibited From Public Parks

A facial challenge to the Public Parks Provision has reached the Second Circuit twice and lost both times. See Christian, 176 F.4th at 206; Antonyuk II, 120 F.4th at 1025-26. "[T]he Public Parks Provision," the court held, "is facially constitutional." Christian, 176 F.4th at 206. "[A]s applied to urban parks," it "is part of a well-established tradition" of firearms regulation that is sufficient to survive constitutional review. Id. at 204. Recognizing that their claim fails under binding precedent, Plaintiffs' motion for summary judgment switches to a new, as-applied argument that the Public Parks Provision is unconstitutional in rural parks. ECF No. 178-9 at 10. Yet that new argument makes no appearance in Plaintiffs' complaint, and it cuts against a tradition of regulations that runs back to the first such parks in the nation. To the extent that Plaintiffs raised any argument that survives Christian v. James, it is foreclosed by the historical record.

Plaintiffs raised only a facial challenge in their complaint. "[T]he important point" in determining the scope of a constitutional challenge "is . . . plaintiffs' claim and the relief that would follow." Doe v. Reed, 561 U.S. 186, 194 (2010). Here, Plaintiffs claimed that "*all*" the challenged provisions are "*entirely* without historical example, and thus violate the Second Amendment." Compl. ¶ 238 (emphasis added). As for relief, they requested "[a]n order . . . permanently enjoining Defendants . . . from enforcing the challenged sections of the CCIA" and "declaring" that those sections are "unenforceable" and "unconstitutional." Id. p. 72. These claims and remedies "reach beyond the particular circumstances of these plaintiffs." Doe, 561 U.S. at 194. "They must therefore satisfy [the] standards for a facial challenge." Id.

It makes no difference that the words "as applied" appear in the complaint, because "[t]he

17

label is not what matters." Id. Plaintiffs' single assertion that every law they challenge "violate[s] the Second Amendment . . . both facially and as applied to Plaintiffs," Compl. ¶ 245, says nothing about any particular application, let alone any particular park or any as-applied relief. Indeed, as Plaintiffs admit, the urban-rural distinction on which they build their as-applied argument "did not exist until the Second Circuit created it on appeal." ECF No. 178-9 at 9. In substance, Plaintiffs presented only a facial claim before their motion for summary judgment, then tried to recast it as entirely as-applied. Like the Western District and the Second Circuit in another suit to enjoin the Public Parks Provision, this Court should "decline to consider such a challenge." Christian, 176 F.4th at 204.[9]

Even if Plaintiffs have properly raised an as-applied challenge, applying the Public Parks Provision to rural parks does not "infringe the historical understanding" of the Second Amendment. Wolford, 146 S. Ct. at 2044. Since the preliminary injunction stage of this litigation, expert research has revealed that rural parks share their origins and purposes with their urban counterparts: Both exist because they are "places for contemplating natural scenery and for active play." Young Decl. ¶ 11. Guns are inconsistent with these purposes and have been banned from rural parks for as long as those parks have existed. Id. ¶¶ 39-44, 54-55. And today, that line of prohibitions includes the Public Parks Provision, which shares the same "why" and "how" as its regulatory forebears—to preserve the peacefulness of parks by restricting carriage. This continuity renders the Provision "relevantly similar to laws our tradition is understood to permit" and therefore constitutional. Frey, 157 F.4th at 127 (quoting Rahimi, 602 U.S. at 692).

---

[9] See also Christian, 176 F.4th at 204 n.6 ("Citizens United . . . provides no support for considering an as-applied challenge where a complaint brings only a facial one). Contra ECF No. 178-9 at 10 (citing Citizens United for opposite proposition).

18

America's system of state and national parks shares the same origins and purposes as the modern tradition of urban parks.[10] After a federal land grant in 1864, California opened Yosemite as the nation's first state park, with one of the designers of Central Park sitting on its inaugural board of commissioners. See An Act Authorizing a Grant to the State of California of the Yo-Semite Valley, and of the Land embracing the Mariposa Big Tree Grove, ch. 184, 13 Stat. 325 (1864); Young Decl. ¶¶ 23, 36, 49. The Federal Government established Yellowstone National Park in 1872, then Mackinac National Park in 1875, and New York followed with the state-run Niagara Falls Reservation in 1883. Id. ¶¶ 38, 39, 50. Like urban parks, all of these rural parks aimed to improve society by providing natural environments for contemplation and recreation. Id.; cf. Christian, 176 F.4th at 206 (describing early urban parks as "dedicated spaces for peaceful recreation and quiet contemplation of natural scenery"). And these purposes carried through to the growing number of other "rural" state and national parks established through the early decades of the twentieth century. Young Decl. ¶¶ 42, 43, 53.

In keeping with this emphasis on peaceful aesthetic enjoyment, Americans swiftly prohibited firearms in "rural" state and national parks. Yosemite banned firearms discharge in 1879. Young Decl. ¶ 54. Mackinac's 1882 park rules prohibited "carry or discharge" of "fire-arms in the park." Young Decl. Ex. 81. Yellowstone required visitors to leave their guns at the entrance guard station in 1894, and Sequoia National Park prohibited carriage without a signed license by

---

[10] Even many of the municipal laws discussed in the "mountain of regulations" attached to Dr. Young's declaration, Christian, 176 F.4th at 205, create parks that are rural in nature. While bans on guns in parks located in New York, Brooklyn, Philadelphia, or San Francisco may have concerned urban spaces, see Young Decl. Exs. 3-6, the exhibits to Dr. Young's Declaration also include many regulations banning guns in parks issued by small towns located in rural areas. See, e.g, id. Ex. 20 (Berlin, WI); id. Ex. 32 (Canton, IL); id. Ex. 34 (Centralia, IL); id. Ex. 49 (Neligh, NE).

the Park superintendent in 1890. Young Decl. Exs. 79, 80. As the federal government established other national parks, each of them prohibited firearms "except upon written permission of the superintendent." Young Decl. Ex. 83 (collecting regulations from eighteen parks); id. Ex. 84 (standardizing regulation system-wide). And the state parks that came after Yosemite and Niagara likewise often banned guns. Young Decl. ¶¶ 54-55 (collecting eighteen states' laws enacted before 1936); id. Exs. 85-114 (reprinting laws). Like their urban counterparts, rural park regulations reflect an "unbroken history of prohibiting gun carriage" that grew from Americans' desire "to keep" rural parks "as peaceable recreational spaces." Christian, 176 F.4th at 206, 205.

The tradition is particularly relevant for two reasons. First, national parks like Yellowstone and Yosemite are indisputably rural. Cf. Aymonier v. United States, 432 Fed. App'x 66, 68 (3d Cir. 2011) (finding that even the Gateway National Recreation Area, on the South end of New York Harbor, was "a 'rural or semi-rural' tract of land."). And second, national parks were federal land, and thus among the few places where the Second Amendment always applied directly. See Heller, 554 U.S. at 625 ("For most of our history, the Bill of Rights was not thought applicable to the states."); United States v. Cruikshank, 92 U.S. 542, 553 (1875) (interpreting Second Amendment to apply against "no more than . . . Congress"); Presser v. Illinois, 116 U.S. 252, 265 (1886) (same). Yet for well over a century, [11] firearms possession was prohibited in these frequently-visited, federally-governed rural lands, with no indication that our forefathers viewed the measures as infringements on the Second Amendment, or ever thought to dispute them. See Wolford, 146 S. Ct. at 2044 (historical acceptance demonstrated where a regulatory tradition was

---

[11] It was not until 2014 that Congress permitted firearms in national parks, see National Park Service and Related Programs, Pub. L. No. 113-287, 128 Stat. 3094, 3168-69 (2014), and that statute permits armed carriage in national parks only "in compliance with the law of the State in which the [park] is located." 54 U.S.C. § 104906(b)(2).

"open, widespread, and unchallenged." (quoting <u>Bruen</u>, 597 U.S. at 36)); Young Decl. ¶¶ 47, 57. Under <u>Bruen</u>, such "longstanding" laws recognizing a sensitive place establish the measures' constitutionality, particularly where there were "no disputes regarding the lawfulness of such prohibitions." <u>Bruen</u>, 597 U.S. at 30.

As applied to rural parks, the Public Parks Provision is "relevantly similar" to the laws in this tradition. <u>Wolford</u>, 146 S. Ct. at 2044. The early state and national parks "imposed a restriction similar to that imposed by" the Public Parks Provision, namely, prohibiting carriage. <u>Id.</u> And their "rationale was similar" too—to preserve peaceful natural spaces for outdoor recreation. <u>Id.</u> These "well-established and representative historical analogue[s]" demonstrate that the Public Parks Provision is "consistent with the Nation's historical tradition of firearm regulation." <u>Bruen</u>, 597 U.S. at 30, 24 (emphasis omitted); <u>see also</u> <u>Nastri v. Dykes</u>, 807 F. Supp. 3d 112, 146 (D. Conn. 2025) (upholding restrictions in Connecticut state park and greenway); <u>Kipke v. Moore</u>, 165 F.4th 194, 215-16 (4th Cir. 2026) (same for Maryland state forests).

Plaintiffs ignore this history, focusing instead on an argument that the application to rural parks is not severable from the rest of the Public Parks Provision. ECF No. 178-9 at 9-13. But severability issues don't arise here, where the challenged applications are all constitutional.[12] Of the four parks Plaintiffs name in their motion for summary judgment, three are state parks— Bowman, Thacher, and Saratoga Spa—that fall directly in the lineage of regulating firearms in state and national parks. <u>See</u> ECF No. 178-9 at 12. The fourth, Mercer Park, has no principled

---

[12] Even if severability mattered, plaintiffs omit the test, instead citing a collection of inapposite cases on the limits of statutory interpretation. ECF No. 178-9 at 13 (citing, *inter alia*, <u>Iancu v. Brunetti</u>, 588 U.S. 388, 397-398 (2019)). But under the "'traditional' rule," the application to rural parks would be severable because Plaintiffs have made no showing that "the statute created in its absence is legislation that [the legislature] would not have enacted." <u>Seila Law LLC v. CFPB</u>, 591 U.S. 197, 234 (2020) (citation omitted).

21

distinction from the recognized tradition of regulations in urban parks—it is in the middle of Baldwinsville, with a reservable gazebo and pavilion for public gatherings. See id.; Village of Baldwinsville, Parks and Trails.[13]  Plaintiffs submit one paragraph of historical argument to the contrary, relying on the Second Circuit's "doubt" at the preliminary-injunction stage "that the evidence presently in the record" addressed rural parks. *Id.* at 10-11 (quoting Antonyuk II, 120 F.4th at 1025). Yet the record has changed, see, e.g., Young Decl., and Plaintiffs have left the new historical evidence unrebutted. Even if Plaintiffs had properly raised an as-applied challenge regarding rural parks, that challenge would fail.

### C.    The Law Prohibiting Guns In Places Selling Alcohol Is Constitutional

Our forefathers understood the danger of mixing alcohol and guns, and "[w]hen the Founders crossed the Atlantic, they carried these concerns with them. Dr. Benjamin Rush, a signer of the Declaration of Independence, delegate to the Continental Congress, and preeminent Founding-era medical authority, noted that intoxication breeds crime, including 'fighting,' 'burglary,' and 'murder.'"   United States v. Harris, 144 F.4th 154, 158 (3d Cir. 2025) (Bibas, J.) (quoting Benjamin Rush, An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind 2 (8th Ed., Boston, James Loring 1823)) (brackets omitted), vacated and remanded for further consideration, 2026 WL 1854989 (U.S. Jun. 29, 2026). New York's law prohibiting weapons in locations serving alcohol grows out of that same concern, and fits four separate and sufficient historical traditions: first, "analogues prohibiting intoxicated persons from carrying or purchasing firearms," Antonyuk II, 120 F.4th at 1031; second, "the tradition of regulating firearms in locations frequented by concentrations of vulnerable or impaired people, here intoxicated individuals, who either cannot defend themselves or cannot be trusted to have firearms around

---

[13]  https://www.baldwinsville.gov/parks-trails/

22

them safely," id. at 1029; third, the tradition of "regulating firearms in crowded places and keeping such spaces peaceful," id. at 1031; and fourth, the tradition of "prohibiting firearms at social gatherings, parties, and ball rooms." Id.

First, "[t]he Founders [] inherited and enforced a legal tradition that regulated the mix of firearms and alcohol." Ziegenfuss v. Martin, 824 F. Supp. 3d 540, 553 (N.D. Tex. 2026) (Pittman, J.) (upholding Texas' law prohibiting guns in places serving alcohol). New York's expert, Patrick Charles, traces this tradition from 1679 through 1891, demonstrating the many ways in which colonial and early Americans enacted laws to prevent drunk persons from harming the people around them. Charles Decl. ¶¶ 37-41; see Kipke, 165 F.4th at 217 (citing Charles in holding that "[r]estricting firearms at locations that sell alcohol is consistent with the historical tradition of banning firearms in sensitive places."). Many jurisdictions used a location-based approach: where New York's modern law prohibits guns where alcohol will be—at bars and locations with liquor licenses—some states and localities prohibited alcohol where guns would be, at musters or meetings of the militia. Charles Decl. ¶¶ 37-38. Other jurisdictions, including Kansas, Wisconsin, and Missouri, "prohibited intoxicated persons from carrying firearms." Antonyuk II, 120 F.4th at 1030; see Charles Decl. ¶¶ 39-40; Kipke, 165 F.4th at 218 (discussing 1808 Virginia law prohibiting 'shooting any gunns at drinkeing (marriages and ffunerals onely excepted)'"). Still others "prohibited retailers of liquor from keeping gunpowder." Kipke, 165 F.4th at 218. And these laws were not just widespread, but broadly accepted.[14]    See State v. Shelby, 90 Mo. 302, 2 S.W.

---

[14] Nothing in United States v. Hemani, 146 S.Ct. 1677 (2026), undermines the long tradition of keeping intoxicated persons from having guns. Hemani dealt with the "permanent disarmament" of an intermittent marijuana user, id. at 1684, not a location-based law keeping guns out of places where persons will become drunk. The Hemani Court noted that its decision had no bearing on "efforts to ban . . . those presently intoxicated[] from possessing a firearm." Id. at 1693.

23

468, 469 (1886) ("The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments.").

Next, the Second Circuit has identified "a tradition prohibiting firearms in locations where vulnerable populations congregate." Antonyuk II, 120 F.4th at 1012. The Court of Appeals placed New York's law prohibiting guns in bars within that tradition, explaining that "liquor-licensed establishments are . . . frequented by intoxicated individuals who cannot necessarily be trusted with firearms and who may also, due to their intoxication, be unable to defend themselves effectively." Id. at 1031. It based this finding in part on early militia laws from Maine, Massachusetts, and Rhode Island, which "prohibited those with mental illness, intellectual disabilities, and alcohol addiction from serving in militias." Id. at 1011; see TD Exs. 5-8. And Hemani buttressed that conclusion when it interpreted historical "habitual drunkard" disarmament laws as intended "to protect habitual drunkards from themselves and their families from financial devastation." 146 S. Ct. at 1690. It is entirely consistent with history to view intoxicated people—who will inevitably be present at liquor-licensed establishments—as at least temporarily vulnerable, and to protect them by law rather than expect them to engage in armed, impaired self-defense.

Third, the Second Circuit tied Section 265.01-e(2)(o) to "historical statutes regulating firearms in other crowded spaces such as fairs and markets," noting that these laws "provide support for regulating firearms in crowded places and keeping such spaces peaceful." Antonyuk II, 120 F.4th at 1031. The tradition extends back to England but carried over into the early United States, including in the District of Columbia, where the Second Amendment applied directly and a suit could have been raised at any time if the law had been perceived as unconstitutional. See id.

24

at 1019-20; An Act for Punishment of Crimes and Offences, within the District of Columbia § 40 (1816), TD Ex. 9; see also 1786 Va. Laws 35, TD Ex. 10; Rivas Decl. ¶¶ 14, 21-29. And the tradition extends forward to the Fourteenth Amendment era, when jurisdictions prohibited "weapons in public forums and crowded places such as assemblies for 'educational, literary or scientific purposes, or into a ball room, social party, or other social gathering.'"  Antonyuk II, 120 F.4th at 1020 (quoting 1870 Tex. Gen. Laws 63 ch. 46 and collecting similar laws); see also Charles Decl. ¶¶ 13-15; TD Exs. 11-17. Localities across the country adopted similar sensitive places laws, or even barred weapons within their city limits. See Charles Decl. ¶¶ 16-17 (citing dozens of examples from Kansas and Missouri alone). And such laws were both applied and upheld. See, e.g., Shelby, 90 Mo. 302; State v. Wilforth, 74 Mo. 528, 530–31 (1881); Owens v. State, 3 Tex. App. 404, 407 (1878); Hill v. State, 53 Ga. 472, 475-78 (1874); English v. State, 35 Tex. 473, 477 (1871); Andrews v. State, 50 Tenn. 165, 168 (1871).[15]

Lastly, early "Americans inherited and continued a legal tradition consisting of location-based prohibitions on carrying firearms in certain social settings," Ziegenfuss, 824 F. Supp. 3d at 553, particularly those where alcohol was consumed. Jurisdictions like Texas, New Mexico, Missouri, and Oklahoma prohibited weapons at social gatherings and in locations like ballrooms.

---

[15] Plaintiffs argue that Wolford "implicitly overrules the Second Circuit's analysis as to crowded spaces," ECF No. 178-9 at 14, but Wolford is not a sensitive locations case, reiterated Heller's sensitive locations holding, and noted Hawaii's sensitive location laws but left them undisturbed. See 146 S.Ct. at 2042, 2046. Moreover, even if there were any material in Wolford that would cast doubt on the Second Circuit's jurisprudence—which there is not—the issue would be for the Circuit to determine. District courts within the Second Circuit must follow a Circuit precedent, including on Second Amendment issues, "unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." United States v. Rivers, No. 24-CR6154, 2025 WL 1006338, at *1 (W.D.N.Y. Apr. 4, 2025) (quoting United States v. Diaz, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)). Whatever may be said of Plaintiffs "implicitly overruled" theory, it comes nowhere close to that level.

See TD Exs. 11, 14, 17, 18. "The prohibitions on firearms in ballrooms are especially probative

because ballrooms 'often served' alcohol 'and drinking (sometimes copiously) was a favorite

ballroom activity.'"    Ziegenfuss, 824 F. Supp. 3d at 555 (quoting Kellen Heniford & Kari Still,

Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons ban in a Post-Bruen Context,

73 Buff. L. Rev. 679, 703 (2025)). Balls "united wine, whiskey, [and] honor-conscious men often

heavily armed," and "[v]iolence [was] commonplace." Id. And as the Second Circuit noted,

Arizona "required the keepers of 'drinking saloon[s] to keep posted up in a conspicuous place in

his bar room . . . a plain notice to travelers to divest themselves of their weapons,'" Antonyuk II,

120 F.4th at 1030 (quoting 1889 Ariz. Sess. Laws 17), while Oklahoma "prohibited carriage in

'any place where intoxicating liquors are sold,' id. (quoting 1890 Okla. Terr. Stats., Art. 47, § 7).

Plaintiffs for their part assert that the Arizona and Oklahoma laws regarding "drinking

saloons" and "any place where intoxicating liquors are sold" do not appear to have been included

in statutory compilations after the territories became states.[16]    That may be true, but the laws were

also duplicative, and the conduct remained prohibited well into the 20th century. Arizona separately

prohibited carrying "any pistol or other firearm" (among other weapons) into "any place where

persons are assembled for public, religious, political, educational, social, or scientific purposes, or

for amusement," and this law remained on the books at least until at least 1939. See 3 Henry D.

Ross et al., Arizona Code 1939, 248 § 43-2206, TD Ex. 19. Oklahoma likewise prohibited persons

other than a peace officer to "carry [pistols, revolvers, and other weapons] into any church or

religious assembly, any school room or other place where persons are assembled for public

---

[16] Moreover, the territories were federal areas subject to the Second Amendment directly, see generally Andrew Willinger, The Territories Under Text, History, and Tradition, 101 Wash. U. L. Rev. 1, 18-37 (2023), and Plaintiffs have raised no evidence of any challenge to the laws during the decades when they were effective.

worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any political convention, or to any other public assembly," a law that remained in force until 1931 at least. I Frank O Eagin & C.W. Van Eaton, <u>Oklahoma Statutes 1931</u> ch. 15, Art. 90 § 2589, at 840 (Harlow Pub. Co. 1932), TD Ex. 20; <u>see also</u> <u>Spears v. State</u>, 281 P. 167 (Okla Crim. Ct. App. 1929) (sustaining conviction under the statute for bringing a gun into "a public gathering, to wit, a public dance . . . in a place known as Slaughter's Dance Hall."). Bars and locations serving alcohol would certainly constitute "social gathering[s] and locations "where persons are assembled for amusement."

Nor is there any merit to Plaintiffs' contention that the Supreme Court's recent opinions in <u>Wolford</u> or <u>Hemani</u> undermine the sensitive places laws. Plaintiffs contend that <u>Wolford</u> "rejected a Hawaii law that banned firearms in 'gas stations, convenience stores, restaurants, [and other locations open to the public]," ECF No. 178-9 at 16-17 (quoting 146 S. Ct. at 2041), but the law at issue did no such thing. Instead, <u>Wolford</u> struck down a law "prohibiting firearms on private property without the express and affirmative consent of the property owner." <u>Id.</u> at 2040. <u>Wolford</u>'s holding did not concern sensitive location laws, and the Court reiterated <u>Heller</u>'s language that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." <u>Id.</u> at 2042 (quoting <u>Heller</u>, 554 U.S. at 626). More specifically, <u>Wolford</u> explicitly noted that Hawaii prohibited guns at "any 'restaurant serving alcohol,'" but left that provision untouched. <u>Id.</u> at 2046 (quoting Haw. Rev. Stat. § 134-9.1(a)).

Similarly, <u>Hemani</u> does not, as Plaintiffs contend, say that only "presently intoxicated" persons may be disarmed, and in fact carves out space for "other prophylactic laws [a legislature]

27

may adopt after determining that users of a particular drug pose a special risk of misusing firearms." 146 S.Ct. at 1693. And even if active intoxication were required for disarmament, prohibiting guns at establishments selling liquor would be on the right side of that line, as "liquor-licensed establishments . . . are frequented by intoxicated individuals who cannot necessarily be trusted with firearms, and who may also, due to their intoxication, be unable to defend themselves effectively." Antonyuk II, 120 F.4th at 1031; see Wolford, 146 S. Ct. at 2058 (Barrett, J., concurring) (deriving from history "the principle that when a state identifies specific places that are prone to particular abuses of the right, it can respond with focused regulations to address the threat" (citation modified)).

Lastly, Plaintiffs argue that the Court should transmute their facial challenge to the prohibition on guns in places serving liquor into an as-applied one, as Plaintiff Terrille testified that he never drinks alcohol and Plaintiff Johnson testified that he does not drink while carrying a gun. See ECF No. 178-9 at 17-18. But Plaintiffs did not plead that challenge: none of the relevant sections of the Complaint contend that the Plaintiffs' individual practices make the law unconstitutional as-applied. See Compl. ¶¶ 99, 154, 155, 176. More broadly, it misapprehends the nature of the sensitive location laws, which operate categorically to establish a location "where weapons [a]re altogether prohibited." Bruen, 597 U.S. at 30; see id. ("[S]ensitive places" are locations "where arms carrying could be prohibited consistent with the Second Amendment."). Historical courts likewise rejected arguments seeking exemptions from categorical sensitive location laws based on individual circumstances. See, e.g., Owens, 3 Tex. App. at 408; Wilforth, 74 Mo. At 529; Maupin v. State. 17 S.W. 1038, 1039 (Tenn. 1890).

### D.    The Law Prohibiting Guns In Theaters Is Constitutional

The Second Circuit has found that banning firearms possession in theaters falls within the

28

"tradition of regulating firearms in quintessentially crowded places." Antonyuk II, 120 F.4th at 1038. More specifically, the CCIA "regulates firearms in discrete, densely crowded physical spaces wherein people assemble for amusement, educational, or literary purposes, which fairly describes theaters." Id. (footnote omitted). Yet Plaintiffs contend that this controlling authority "was based on the repudiated theory that firearms can be banned in 'in quintessentially crowded places' as a general category." ECF No. 178-9 at 19 (citation omitted). Plaintiffs' contention misses the mark.

Plaintiffs attempt to undermine the Second Circuit's binding precedent with conclusory assertions that misstate what the Supreme Court has and has not held. For instance, they assert that the Supreme Court declared that "courts cannot declare 'a sensitive place' simply because it is crowded," ECF No. 178-9 at 19 (quoting Bruen, 597 U.S. at 31), but the actual quote is that the law cannot "effectively declare *the island of Manhattan* a 'sensitive place' simply because it is crowded and protected generally by the [NYPD]." Bruen, 597 U.S. at 31 (emphasis added). Plaintiffs' description of Bruen is deeply misleading, as the Supreme Court's language stated that crowdedness could not be used as a pretext to prohibit "public carriage generally," not that crowdedness cannot be considered in the context of "a specific prohibition on carriage in confined, crowded spaces." Antonyuk II, 120 F.4th at 1039 n.115. Likewise, as discussed in Section III(C), above, Plaintiffs are simply wrong to assert that Wolford "rejected" the notion of crowded social spaces being sensitive. Wolford was not a sensitive location case, repeated Heller's assurances of the constitutionality of sensitive location laws, and noted that Hawaii had a law prohibiting guns in "any 'stadium, movie theater, or concert hall'" without striking down the law or even calling it into doubt. 146 S. Ct. at 2042, 2046.

Plaintiffs also do not meaningfully engage with the historical analogues demonstrating that

29

recreational and entertainment venues were among public spaces protected by locational weapons restrictions. See ECF No. 178-9 at 23-25; cf. Rivas Dec. ¶ 34. While the record does not include regulations that single out theaters for protection, the Second Circuit has discounted that historical "silence." Antonyuk II, 120 F.4th at 1038 n. 112, and the Bruen test does not require that a law be a "dead ringer" to serve as an analogue. 602 U.S. at 692. "[S]uch regulations may not have been necessary given that the statutes prohibiting carriage at social, amusement, literary, or educational gatherings appear to have naturally covered theaters," and "the record . . . lacks any affirmative evidence that gun regulations in theaters were considered unlawful." Antonyuk II, 120 F.4th at 1038 n.112. Dr. Rivas provides additional historical context, discussing both the architecture of the nation's early cities and the habits of the people who lived there, noting that American cities at the time of the founding "featured relatively few sizeable buildings," and none comparable to modern Broadway theaters or concert arenas. See Rivas Decl. ¶¶ 16-17.

Plaintiffs also attempt to discount the common-law tradition of prohibiting weapon carriage in "fairs and markets," saying that "affray laws serve as no analogues for prohibiting the concealed carry of firearms for self-defense—whether generally, or in any particular public place." ECF No. 178-9 at 20. But the Supreme Court's opinion in Rahimi demonstrates that these laws inform our historical understanding in more than just the narrow situation in which they applied. See id. at 697-98. If these laws are relevantly similar enough to uphold the prohibition on persons under domestic violence restraining orders—a situation surely not contemplated in the 18th century, see id.—then they certainly serve as analogues for the crowded "fairs and markets" explicitly enumerated in the statutes themselves.

The historical record also supports a principle of protecting public gatherings. Nineteenth-century statutory restrictions in numerous states ranged "from ballrooms to circuses, race courses,

30

shows, public exhibitions, and 'place[s] where persons are assembled for amusement or for educational or scientific purposes.'"  Rivas Dec. ¶ 34 (quoting 1871 Tex. 34, § 34); see TD Exs. 11-20. As that long list of settings indicates, legislators endeavored to include "as many gathering places as possible under the umbrella of protective disarmament[.]" Id. These statutes at times employed catch-all language, such as "or to any other public assembly," "or any other public gathering in this State," language that would certainly cover entertainment and recreational spaces such as theaters. Id.; see Culberson v. State, 47 S.E. 175, 176 (Ga. 1904) ("The law throws its protection around the 'public gathering,' whether the same be assembled at a court of justice, an election precinct, or ground, a place of public worship, 'or any other [place] of public gathering in this state.'"). And the subsequent history of courts interpreting such laws does in fact demonstrate that they were applied to a wide variety of public spaces and gatherings, many of which were geared toward fun rather than public function. See, e.g., Owens, 3 Tex. App. at 406 ("a ball-room . . . where an assembly was then and there congregated for social purposes"); Shelby, 2 S.W. at 469 (the "dining room" of "the Place Hotel, which was a public house in the city of Gallatin"); Wynne v. State, 123 Ga. 566, 51 S.E. 636, 637 (1905) ("A barbecue on the 4th of July, at which the public is assembled in considerable numbers."); State v. Pigg, 85 Mo. App. 399, 402 (K.C. Ct. App. Mo. 1900) ("the dwelling house of Josiah Jones, where there was a social gathering"); Spears, 281 P. at 167 ("a public gathering, to wit, a public dance which was being held in a place known as Slaughter's Dance Hall"); Crain v. State, 69 Tex. Crim. 55, 55-57 (Ct. Crim. App. Tex. 1913) (a "gathering at Redland Church in the evening" and a "party at Monroe Johnson's that night"); see also Summerlin v. State, 3 Tex. App. 444, 446 (1878) (describing a "justice's court" as constituting "a 'public assembly' within the meaning of the law").

Try as they might, Plaintiffs cannot wipe away "the Nation's tradition of regulating

31

firearms in quintessentially crowded social places." Antonyuk II, 120 F.4th at 1037. The prohibition on guns in theaters is consistent with that tradition, and should be upheld.

### E. The Law Prohibiting Guns In Zoos Is Constitutional

The Supreme Court in Bruen "assume[d] it settled" that carrying weapons in sensitive locations like schools "could be prohibited consistent with the Second Amendment," and declared that "modern regulations . . . are constitutionally permissible" when they "prohibit[] the carry of firearms in new . . . sensitive places" that are analogous to schools. Bruen, 597 U.S. at 30 (emphasis deleted). The Second Circuit accordingly found that the history and tradition of sensitive place laws extends to "prohibiting firearms in places frequented by children" and other "locations where vulnerable populations congregate." Antonyuk II, 120 F.4th at 1026, 1012; cf. Mintz v. Chiumento, 724 F. Supp. 3d 40, 64 (N.D.N.Y. 2024) (prohibitions on "carrying firearms into places that were populated by vulnerable individuals, such as children" were a "common theme" among historical regulations). These "longstanding" carriage regulations at schools are "presumptively lawful regulatory measures." Heller, 554 U.S. at 626 & n.26; accord McDonald, 561 U.S. at 786; Bruen, 597 U.S. at 30; Rahimi, 602 U.S. at 735 (Kavanaugh, J., concurring); Wolford, 146 S. Ct. at 2042; Mintz, 724 F. Supp. 3d at 59.

"Given that 70 percent of zoo visitors come accompanied by children, the tradition of prohibiting firearms in places frequented by children straightforwardly supports the regulation of firearms in zoos." Antonyuk II, 120 F.4th at 1026-27.[17]   "From the mid-to-late nineteenth century, perhaps the most common area of firearm regulation was that of protecting children from firearms-

---

[17] Plaintiff Johnson estimated that "maybe half" of the persons going to the Rosamund Gifford Zoo in Syracuse are families with children, but he also testified that "I purposely try to avoid when schools are there. I find large groups of kids annoying." Johnson Tr. 106:13-107:11.

related violence." Charles Decl. ¶ 20. In particular, firearms prohibitions included places of amusement, schools, and even institutions of higher learning. Id. ¶¶ 21-24 . Zoos combine elements from all these locations.

Judge D'Agostino conducted a similar analysis in Mintz, affirming the constitutionality of the CCIA's provision on summer camps in part on the basis of historical firearms regulations in spaces frequented by children. See 724 F. Supp. 3d at 40.[18]   Drawing off Antonyuk I and related federal decisional law, Judge D'Agostino stated that "the State can protect children and other vulnerable individuals by prohibiting guns not only in schools, but also in analogous sensitive locations where children congregate, such as daycares, preschools, playgrounds, community centers, and other places where they congregate for educational purposes." Id. at 64-65. Judge D'Agostino also noted that summer camps, like zoos, "are a development that postdates the Bruen timeframe," and that "[a]ccordingly, any Second Amendment Analysis regarding summer camps must be a flexible one." Id. at 64; see Antonyuk II, 120 F.4th at 1026 n. 98 (noting that the first public zoo in United States opened in 1874).

Plaintiffs acknowledge that the Second Circuit connected zoos to three different separate and sufficient historical traditions: "places of educational and scientific opportunity"; "places heavily trafficked by children"; and "places that are densely crowded." ECF No. 178-9 at 21; see Antonyuk II, 120 F.4th at 1026-27; Johnson Tr. 106:21-107:22 (acknowledging that the Rosamund Gifford Zoo is frequented by children, that schools send field trips there, and that "zoos can get pretty crowded"). Even so, Plaintiffs suggest that the "logical conclusion" of the Second Circuit's

---

[18] Cross-motions for summary judgment in the Mintz case are currently pending before Judge Coombe, to whom the case was reassigned. See Mintz v. James, No. 23 Civ. 795 (N.D.N.Y.), ECF Nos. 81, 87, & 89.

reasoning would "justify banning the Second Amendment in nearly all public places." ECF No. 178-9 at 21. That assertion ignores governing precedent, which establishes that sensitive location laws cannot "exempt cities from the Second Amendment," Bruen, 597 U.S. at 31, but that they do apply to "discrete, densely crowded physical spaces wherein people assemble for amusement, educational, or literary purposes, which fairly describes [zoos]." Antonyuk II, 120 F.4th at 1038.

### F.        Plaintiffs' Challenge To The Law Prohibiting Guns In Airports Fails

Lastly, Plaintiffs lack standing to challenge the law prohibiting guns in airports because federal law, rather than state law, governs the conduct at issue and because there is no "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" invasion of any legally protected interest. Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016). The challenge to the airport law comes through Plaintiff Terrille, who alleges that he wishes to "tak[e] a firearm with him to the airport, . . . unloaded, locked, and properly declared in his checked baggage in compliance with federal regulations." Compl. ¶ 168; see ECF No. 178-8 ¶ 32. If he does so, then state law does not apply to him because 18 U.S.C. § 926A "allows gunowners to transport guns between states so long as they 'may lawfully possess and carry such firearm' in both states, transport the gun unloaded, and meet[] various other requirements." United States v. Libertad, 681 F. Supp. 3d 102, 111 n.4 (S.D.N.Y. 2023). Specifically, the federal law establishes that:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter . . . shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible[.]

18 U.S.C. § 926A. Accordingly, federal law provides that "gun owners may travel interstate with their guns unloaded and in carrying cases," including through airports, Torraco v. Pt. Auth. of N.Y.

& N.J., 615 F.3d 129, 139 (2d Cir. 2010), and state law is no barrier to doing so. The NYSP does not view the state prohibition on guns in airports as nullifying this federal law and does not enforce it in such a manner as to prevent persons who comply with the federal statute and regulatory regime from taking their gun into an airport to check it in their baggage. See Deyo Decl. ¶ 3.

To the extent that Plaintiffs may argue on reply that they intend their challenge to cover carrying a weapon on airport grounds *outside* of federal law and regulations, they have repeatedly disclaimed that argument in their complaint, see Compl. ¶¶ 168, 170; Plaintiff Terrille's written affidavits, ECF No. 1-10 ¶ 9, ECF No. 178-6 ¶ 15, his deposition testimony, Terrille Tr. 98:15-99:13, and Plaintiffs' moving papers, ECF No. 178-9 at 7, 22 n.34. Even if such a challenge had been pled and lodged, the prohibition on guns in airports should be upheld under "our historical tradition of regulating firearms in quintessentially crowded places." Frey, 157 F.4th at 135. Like the mass transit systems at issue in Frey, airports are areas "packed with passengers," akin to "enclosed crowded spaces, such as ballrooms, as places where prohibiting firearms carriage was appropriate." Id. (emphasis omitted) (collecting historical antecedents). And like mass transit systems, airports and air travel are a "dramatic technological change" that requires "a more nuanced approach." Id. at 136; see Schoenthal v. Raoul, 150 F.4th 889, 914 (7th Cir. 2025) ("The Founders could not have anticipated the modern transit system, either as mass transit exists in Illinois or in air travel."). The challenge to airports should be dismissed for lack of standing because there is no injury from the law that is "actual or imminent, not conjectural or hypothetical," Spokeo, 578 U.S. at 339, particularly when federal law would prevent the provision from being applied to Plaintiff Terrille in the hypothetical fact pattern he describes. And in any case, prohibiting guns in airports is fully "consistent with the principles that underpin our regulatory tradition." Wolford, 146 S. Ct. at 2045 (quoting Rahimi, 602 U.S. at 692).

35

## IV.    PLAINTIFFS' PRIVATE PROPERTY CHALLENGE FAILS

Plaintiffs' final argument is that the Second Amendment provides a right to carry guns onto all private property, whether open to the public or not—in other words, a right to carry a gun into someone's home without their knowledge or consent. This is an extraordinary argument supported by neither text, nor history, nor tradition, and it would fatally undermine longstanding laws passed in states across the country. See, e.g., Alaska Stat. § 11.61.220(a)(1)(B) (person may not carry concealed weapon "within the residence of another person unless the person has first obtained the express permission of an adult residing there"); D.C. Code § 7-2509.07(b)(1) (carrying concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in control of the premises"); La. Rev. Stat. § 40:1379.3(O)(2) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the consent of that person."); see also Conn. Gen. Stat. § 53-202d(f)(1) (assault weapons may only be carried "on property owned by another person with the owner's express permission."); Ark. Code Ann. § 5-73-306(18)(A)(iv) ("Any licensee entering a private home shall notify the occupant that the licensee is carrying a concealed handgun.").

### A.    The Challenge To The Law As Applied To Property Open To The Public Is Moot

Plaintiffs' challenge to N.Y. Penal Law § 265.01-d (the "Private Property Provision"), which required an owner or lessee's express consent prior to bringing a gun onto his or her property, has been mooted as to property open to the public by the Second Circuit's decision in Christian and the Supreme Court's decision in Wolford. In addition to upholding New York's law prohibiting guns in public parks (as discussed in Section III(B), above), Christian also affirmed a district court order that "permanently enjoined [Superintendent James] from enforcing the Private

36

Property Provision, as applied to private property open to the public." 176 F.4th at 191, 206. Weeks later, Wolford struck down a functionally similar Hawaii law as applied to "private property open to the public." 146 S. Ct. at 2047. Because of Christian's injunction and Wolford's holding, there is no reasonable expectation that any Plaintiff will have the Private Property Provision enforced against them regarding any property open to the public, see Deyo Decl. ¶ 2, and any challenge to it is moot.

To have standing to sue (and therefore for the Court to have subject-matter jurisdiction over a claim), a plaintiff must establish an injury that is "actual or imminent, not conjectural or hypothetical." Spokeo, 578 U.S. at 339 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Similarly, "[i]f, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." Conn. Citizens Defense League, Inc. v. Lamont, 6 F.4th 439, 444 (2d Cir. 2021) (quoting Janakievski v. Executive Director, Rochester Psychiatric Ctr., 955 F.3d 314, 319 (2d Cir. 2020)).

Mootness in this case is governed by the Second Circuit's holding in another recent Second Amendment action, Giambalvo v. Suffolk County, 155 F.4th 163, 179 (2d Cir. 2025). In Giambalvo, a group of Long Island plaintiffs sued to enjoin N.Y. Penal Law § 400.00(1)(o)(iv), which was already enjoined by Antonyuk II. The Circuit held that "[t]hat determination renders the challenge against the same provision here moot" because a "subsequent request for similar relief in a different case . . . 'would not have any real-world effect.'" Id. (quoting We the Patriots, Inc. v. Grisham, 119 F.4th 1253, 1258 (10th Cir. 2024)). This was the case even though the parties were not identical, since there was "no indication in the record" that any party was "presently enforcing a state law provision that the State is actively enjoined from enforcing." Id. Given that

37

the preliminary injunction in <u>Giambalvo</u> was sufficient to moot challenges to the enjoined statute, the same outcome is all the more warranted in the context of the permanent injunction affirmed in <u>Christian</u>. <u>See also</u> <u>NYSRPA v. James</u>, No. 22 Civ. 907, 2025 WL 553423, at *9 (N.D.N.Y. Feb. 18, 2025) (dismissing challenge against provision where an injunction in another case had already "been [] upheld by the Second Circuit" and "any relief granted by this Court would not have any real-world effect."). Because Plaintiffs' challenge regarding property open to the public seeks injunction of a statute that is already permanently enjoined, there is no live case or controversy and the challenge must be dismissed as moot.

**B.** **Any Challenge To The Private Property Provision As To Locations Closed To The Public Fails**

Without a live case or controversy as to their primary challenge to the Private Property Provision, Plaintiffs now go a step further and challenge the law as to areas closed to the public—arguing, in other words, that the Second Amendment gives them the right to carry weapons into another person's home without his or her knowledge or consent. The challenge fails both on justiciability grounds and on the merits.

1. Plaintiffs Did Not Plead A Challenge To Locations Closed To The Public

As an initial matter, the Court need not reach the issue because no Plaintiff has pled a challenge to the law as applied to property closed to the public, or facts sufficient to support standing for one. The Complaint does not include any allegation that any of the remaining plaintiffs[19] wishes to carry a weapon onto private property closed to the public. Plaintiff Johnson,

---

[19] Former Plaintiff Mann arguably raised such a claim, <u>see</u> Compl. ¶ 190 ("he frequently travels to homes of people addicted to drugs" with a gun and refuses to "get express consent, sometimes of an addict"), but he has been dismissed from the case. <u>See</u> <u>Antonyuk III</u>, 2026 WL 496934 at *11.

for example, alleges that he wants to carry weapons into locations "such as gas stations, grocery stores, big box stores, and others" and to "various businesses and establishments in Onondaga County," Compl. ¶ 159 (citation omitted), while Plaintiff Terrille wants to carry weapons into banks, "gas stations, grocery stores, home improvement stores, and others" and "various businesses and establishments in Albany County," id. ¶ 171-72. See Kipke, 165 F.4th at 220 (finding no standing to challenge similar Maryland law where "no Plaintiff states that they wish to bring a firearm into a dwelling.").[20] The only fact alleged in Plaintiffs' 56.1(a) statement that would support such a challenge is a citation to Plaintiff Johnson's own invocation of the Fifth Amendment when questioned about the subject. See ECF No. 178-8 ¶ 9 (citing Johnson Tr. p. 137). Plaintiffs Antonyuk and Terrille object to the law as requiring them to post signs or otherwise give consent for *other* people to bring a gun into their homes, see Compl. ¶¶ 140-42, 174, but this allegation does not give rise to a Second Amendment claim because it fails to implicate *Plaintiffs'* right to carry a gun or engage in armed self-defense. See N.Y. State Firearms Ass'n v. James, 157 F.4th 232, 247 (2d Cir. 2025) (no Second Amendment claim where challenged law "do[es] not meaningfully constrain Plaintiffs' ability to 'keep' or 'bear' arms.").

2. The Second Amendment Is Not A Right To Take Guns Into Other People's Homes Without Their Knowledge Or Consent

Even if Plaintiffs' claim were properly pled, it would fail on the merits. This Court already rejected Plaintiffs' position in Antonyuk I, explaining that "with regard to the extent to which this regulation restricts concealed carry on privately owned property that is *not open to the public* (including other persons' homes), the Court has been persuaded by the State Defendants that the

---

[20] Plaintiffs Johnson and Terrille both specified in their interrogatory responses that their challenge concerned "private property open to the public." Johnson Responses, TD Ex. 1 at 4; Terrille Responses, TD Ex. 2 at 4.

Second Amendment is not the best place to look for protection from that restriction, because thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's *own* home or in *public*." 639 F. Supp. 3d at 343 (emphasis in the original); accord Wolford, 146 S. Ct. at 2044 (Bruen covers "carrying commonly used firearms in public for self-defense."). Other courts have likewise rejected Bruen challenges to laws requiring consent to carry a gun onto another person's private property closed to the public. See Koons v. Platkin, 673 F. Supp. 3d 515, 615 (D.N.J. 2023), aff'd in part, rev'd in part, 156 F.4th 210 (3d Cir. 2025), vacated, 162 F.4th 100 (3d Cir. 2025); Wolford v. Lopez, 686 F. Supp. 3d 1034, 1073 (D. Haw. 2023) ("Plaintiffs are not likely to succeed on the merits . . . to the extent that [Hawaii law] prohibits carrying firearms on private property not held open to the public. Plaintiffs' facial challenge is therefore unlikely to succeed."); see also Christian, 176 F.4th at 198 (discussing historical consent laws "as applying to private lands *not open to the public*" (citation omitted)).

Nothing in the Supreme Court's recent decision in Wolford supports Plaintiffs' position.[21] The Court's decision concerned private property open to the public, and it was predicated on the common-law rule that "opening up private property to the general public implies a 'license to all persons to enter,' meaning that 'no person is a trespasser by merely entering therein' unless the property owner has given 'due notice' that such a person is banned." 146 S.Ct. at 2045 (quoting Commonwealth v. Power, 48 Mass. 596, 602 (1844)). In spaces closed to the public, the common-law rule is just the opposite: not only does a person become a trespasser for entering such a space without consent, but the doctrine also covers objects he or she brings into a private space without

---

[21] In fact, Wolford noted that Hawaii's law had been upheld earlier in the case "with respect to private property that is *closed* to the public," and took no steps to revisit that determination. 146 S.Ct. at 2047.

40

permission. See Restatement (First) of Torts § 158 ("One who intentionally and without a consensual or other privilege [] enters land in possession of another or any part thereof or causes a thing or third person to do so . . . is liable as a trespasser."); see also Florida v. Jardines, 569 U.S. 1, 8 (2013) ("Our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." (quotation omitted)). As Blackstone described it, the nature of property means "that the owner may retain to himself the sole use and occupation of his soil: every entry therefore thereon without the owner's leave, and especially if contrary to his express order, is a trespass or transgression." III William Blackstone, Commentaries on the Laws of England 209 (Clarendon Press 1768).[22]

Plaintiffs' position is also contrary to the historical record. As will be familiar to the Court from the preliminary injunction motion in this matter and the Wolford case, states regularly passed laws requiring an owner's consent to come onto lands that, at a minimum, included private property otherwise closed to the public, particularly homes. See Wolford, 146 S. Ct. at 2052 n.16; see, e.g., 1715 Md. Laws 90, TD Ex. 21 ("upon any person's land, whereon there shall be a seated plantation"); James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801 vol III, p. 254-55 (Clarence M. Busch, Printer, 1896), TD Ex. 22 ("on the improved or inclosed lands of any plantation other than his own"); 1741 N.J. Laws 101, TD Ex. 23 ("on the improved or inclosed Lands in any Plantation, other than his own"); 2 Laws of New-York from The Year 1691, to 1773, inclusive, 441-42 (Hugh Gaine, ed. 1774), TD Ex. 24 ("into, upon, or through any Orchard,

---

[22] Blackstone described a space having been opened to the public as a justification defense to the general law of trespass. See Blackstone, supra at 212 ("a man may justify entering into an inn or public house, without the leave of the owner first specially asked; because, when a man professes the keeping of such inn or public house, he thereby gives a general license to any person to enter his doors.").

Garden, Corn-Field, or other inclosed Land whatever, within the City of New-York, or the Liberties thereof"); 1771 N.J. Laws 344, TD Ex. 25 ("on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession"); George Paschal, ed., 4 Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875, TD Ex. 26, at 1321-22 ("on the inclosed premises or plantation of any citizen"); 1893 Or. Laws 79, TD Ex. 27 ("upon any enclosed premises or lands"); see also Order of General Sickles Disregarding the Code (Jan. 17, 1866) reprinted in Edward McPherson, A Political Manual For 1866 at 37 § XVI, TD Ex. 28 (striking down South Carolina's Black Codes and emphasizing that the right to bear arms does not "authorize any person to enter with arms upon the premises of another against his consent").[23]     While this language may not be broad enough to cover land open to the public given the common-law presumption of access, see Wolford, 146 S. Ct. at 2045, 2052, both the Supreme Court and the Second Circuit have found that the these statutes encompassed land closed to the public.[24]     See id. at 2052 n.16 (viewing New Jersey law as "prohibition against armed trespass on 'improved land' closed to the public" and stating that "improved land naturally referred to private property closed to the public."); Antonyuk II, 120 F.4th at 1047 ("[These laws]

---

[23]  An additional analogue, 1865 La. Extra Acts 14-17, TD. Ex. 29, required an owner's consent to "carry fire-arms on the premises or plantations of any citizen," but the Wolford court found that it should be disregarded based on the racial animus of the Louisiana Legislature. The concern with private property rights embedded within the order issued by General Sickles—a New Yorker who lost his leg (but won the Medal of Honor) at Gettysburg—to strike down South Carolina's Black Codes underscores that laws requiring an owner's consent to carry guns into his or her home simply do not infringe the right to bear arms, and that this understanding was present on all sides during the Reconstruction Era.

[24]  Indeed, under some state-law cases, it was illegal to carry a gun onto someone else's premises even *with* the owner's permission. See Isaiah v. State, 176 Ala. 27, 29, 37-38 (1911) (upholding as constitutional a statute declaring it "unlawful for any person to carry a pistol about his person on premises not his own or under his control").; Guthrie v. State, 73 Tex. Crim. 538 (Tex. Ct. Crim. App. 1914) ("No one can give to another permission to carry arms on his premises in violation of law.").

would have been understood to refer to private land not open to the public.").

## V.     PLAINTIFFS' REMAINING CLAIMS ARE WITHOUT MERIT

Plaintiffs' complaint contains a single stray assertion (under a First Amendment claim otherwise centered on the now-dismissed licensing claims by former Plaintiff Sloane) that "the CCIA's . . . required posting of sign[s] to permit firearm possession on private property[] is compelled speech."[25]    Compl. ¶ 253. Leaving aside the misinterpretation of the statute (which does not "require[]" the posting of any "sign," id., but only that a person obtain express consent of a property owner to carry a gun onto his or her property, see N.Y. Penal Law § 265.01-d), the law simply does not compel anyone to speak. An owner is free to give consent or not—he or she is not compelled to say anything—and even if the default rule were flipped (such that owners were required to speak to *exclude* guns), some speech would be required, but in no event would the content of that speech be dictated by the law. See Antonyuk II, 120 F.4th at 1048 n.125 ("That someone will need to express his wishes regardless of the chosen default rule is just a fact of life, and not a violation of the First Amendment."); Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Human Servs., 150 F.4th 76, 95 (2d Cir. 2025) (compelled speech doctrine applies when a law "requires the utterance of a particular message favored by the Government." (quotation omitted)). And even if the law regulated speech, it would pass the applicable time-place-and-manner test, as it is appropriately geared towards public safety and protecting owners' right to "hav[e] their private property left alone by those who do not have permission to use it." Jobe v.

---

[25] Plaintiffs' substantive discussion of their First Amendment claim is limited to Footnote 35 of their brief, and so the claim can be dismissed on that basis alone. See Fin. Guaranty Ins. Co.. v. Putnam Advisory Co., LLC, No. 12 Civ. 7372, 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) (declining to address argument where party "raised this argument in its summary judgment briefing, in a footnote" because "courts routinely decline to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised." (quotation omitted)).

43

City of Catlettsburg, 409 F.3d 261, 268 (6th Cir. 2005).

Lastly, Plaintiffs have at times in this case gestured toward certain laws that they disagree with but have not challenged in their summary judgment motion. See, e.g., Compl. ¶ 136 (objecting to requirements for storing unattended guns in a vehicle); Id. ¶ 101-02 (discussing "rallies and protests"); Johnson Interrog. Resps., TD Ex. 1 at 4 (identifying "state fair" as a sensitive location Plaintiff Johnson wishes to put at issue). Summary judgment should be granted on these issues because Plaintiffs have not attempted to carry their burden on standing, cf. Antonyuk II, 120 F.4th at 1041-42 (noting lack of past injury, future intention, or threat of enforcement with respect to carriage at gun shows), because "it is hornbook law that 'arguments may not be made for the first time in a reply brief,'" Browe v. CTC Corp., 15 F.4th 175, 191 (2d Cir. 2021) (citation omitted), and because "[i]t is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived." Metz v. Astrue, No. 06 Civ. 1509, 2010 WL 2243343, at *10 (N.D.N.Y. Apr. 21, 2010). The Court should grant summary judgment against Plaintiffs' complaint in its entirety.

## VI.    ANY INJUNCTION SHOULD BE LIMITED TO THE PLAINTIFFS AND STAYED FOR TWO WEEKS TO ALLOW AN APPEAL

For the reasons discussed above, Plaintiffs' Second Amendment challenge should be dismissed in its entirety and summary judgement granted on the Superintendent's cross-motion. But even if the Court were to rule in Plaintiffs' favor, any injunction must be limited to the individual plaintiffs. See Trump v. CASA, Inc., 606 U.S. 831, 861 (2025) (Injunctions may not be "broader than necessary to provide complete relief to each plaintiff with standing to sue"). Similarly, if the Court were to issue an injunction, the State Defendants respectfully request that the Court stay the injunction pending appeal, or at a minimum for fourteen days to allow them to seek emergency relief in the Second Circuit. "[A]ny time a State is enjoined by a court from

44

effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The harm without a stay would be heightened here given the confusion that would result from a ruling against the sensitive location laws and the Second Circuit's prior grant of a stay in similar circumstances. See Antonyuk v. Hochul, No. 22-2908, 2022 WL 18228317 (2d Cir. Dec. 7, 2022).

## **CONCLUSION**

For the reasons set forth above, and upon all prior proceedings, the Superintendent respectfully asks the Court to deny Plaintiffs' motion for summary judgment, grant his cross-motion for summary judgment, dismiss this action in its entirety and with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated:   Syracuse, New York
         July 31, 2026

LETITIA JAMES
Attorney General of the State of New York
<u>Attorney for the State Defendants</u>

By: _____
Patrick Blood
NDNY Bar Roll No. 519910
Timothy Mulvey
NDNY Bar Roll No. 510757
Assistant Attorneys General
300 South State Street, Suite 300
Syracuse, New York 13202
patrick.blood@ag.ny.gov
timothy.mulvey@ag.ny.gov

James M. Thompson
Special Counsel
NDNY Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
james.thompson@ag.ny.gov

46