UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

IVAN ANTONYUK, COREY JOHNSON, and
ALFRED TERRILLE,
,

                          *Plaintiffs,*

          -against-                         Case No. 22 Civ. 986 (GTS) (PJE)

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police,
WILLIAM FITZPATRICK, in his official capacity as
Onondaga County District Attorney, TOBIAS J.
SHELLEY, in his official capacity as Sheriff of
Onondaga County, JOSEPH CECILE, in his official
capacity as Chief of Police of Syracuse, and P. DAVID
SOARES, in his official capacity as District Attorney of
Albany County,

                          *Defendants.*
-------------------------------------------------------------------X

### DECLARATION OF PATRICK CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.      I have been retained by the Office of the Attorney General for New York as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.      New York is defending multiple lawsuits challenging its firearms regulations, including this one, *Antonyuk et al v. James et al*, a challenge to New York's laws restricting the carrying of firearms at parks, restaurants serving alcohol, theaters, baseball games, the state fair,

1

first amendment events, private property open to the public without the owner's consent, and government buildings.

4.    I have read the Supreme Court's decisions in *United States, v. Rahimi*, 144 S. Ct. 1889 (2024), *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller* 554 U.S. 570 (2008). as well as the Second Circuit's decision in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024). New York has asked me to expound on the history of the law restricting armed carriage in locations jurisprudentially referred to as "sensitive places."

<u>Background and Qualifications</u>

5.    I am a historian, legal scholar, and author of dozens of articles and books on the Constitution, legal history, and standards of review. I received my L.L.M. in Legal Theory and History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from George Washington University in 2005. My writings on the history of the law have been cited by the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts, and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

6.    For the past 15 years I have served as a historian for the United States Air Force (USAF) in several capacities, including deploying several times with Special Operations Forces (SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as a Senior Historian for the Air Force Historical Support Division (AF/HOH) located at Joint Base Anacostia-Bolling, where I oversee the Department of the Air Force's (DAF) Air Staff History program. This declaration was compiled and completed outside my official duties for the DAF

2

and USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, Department of War (DoW), or the federal government.

7.    Over the past four years, I have submitted expert declarations on behalf of defendants in the following cases:

| Year | Government Served | Case Name, Case Number, and Court |
|------|-------------------|-----------------------------------|
| 2022 | New York State | Corbett v. Hochul, Case No. 1:22-CV-5867 (S.D. N.Y.) |
| 2022 | New York State | Goldstein v. Hochul, Case No. 22-CV-8300 (S.D. N.Y.) |
| 2022 | New York State | Hardaway v. Nigrelli, Case No. 22-CV-771 (W.D. N.Y.) |
| 2023 | New York State | Mintz v. Nigrelli, Case No. 1:23-CV-0795 (N.D. N.Y.) |
| 2022 | California State | B&L Productions, Inc. v. Newsom, Case No. 8:22-CV-01518 (C.D. Cal.) |
| 2023 | New Jersey State | Siegal v. Platkin, Case No. 1:22-CV-07463 (D. N.J.) |
| 2023 | Montgomery County, Maryland | Maryland Shall Issue v. Montgomery County, Maryland, Civil Action No. TDC-21-1736 (D. Md.) |
| 2023 | Maryland State | Kipke v. Moore, Case No. 1:23-CV-01293 (D. Md.) |
| 2023 | Maryland State | Novotny v. Moore, Case No. 1:23-CV-01295 (D. Md.) |
| 2023 | California State | May v. Bonta, Case No. 8:23-CV-01696 (C.D. Cal.) |
| 2024 | Tennessee AG | Hughes v. Lee, Case No. 24475 (Gibson County Chancery Court, Tenn.) |
| 2024 | New York State | Mintz v. Nigrelli, Case No. 1:23-CV-0795 (N.D. N.Y.) |
| 2025 | Illinois Department of Children and Family Services | Miller v. Mueller, Case No. 3:18-CV-3085 (C.D. Ill.) |
| 2025 | California State | May v. Bonta, Case No.: 8:23-cv-01696-MRA-ADS (C.D. Cal.) |
| 2026 | New York State | NYSRPA v. James, Case No. 1:22-cv-00907-MAD-CFH (N.D. N.Y.) |

8.    I am being compensated for my work on this declaration, as well as any follow-on deposition or trial testimony, at a rate of $400 per hour.

9.    This declaration is broken into six parts. Part I provides a macro history of the "sensitive places" doctrine up through the close of the nineteenth century, particularly its growth

and expansion during the mid-to-late nineteenth century. Part II examines the history and tradition of "sensitive places" relative to the protection of children." Part III examines the history and tradition of sensitive places relative to protecting the gathering public at designated places and times. Part IV examines the history and tradition of "sensitive places" relative to places of worship or religious congregation. Part V examines the history of regulating liquor and arms bearing. Lastly, Part VI provides a summary of the historical findings contained within this declaration.

## I.    A Macro History of "Sensitive Places" Through the Nineteenth Century

10.    For nearly five centuries in England, from the late thirteenth- through the late eighteenth century, what constituted a so-called "sensitive place" in which arms-bearing could be regulated or altogether prohibited was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes or commerce. The "fairs" and "markets" language contained in the 1328 Statute of Northampton makes this clear. 2 Edw. 3, c. 3 (1328) (Eng.). So too do several other English legal sources. *See, e.g., Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster*, MEMORIALS OF LONDON AND LIFE 268-69, 273 (H.T. Riley ed., 1868), https://catalog.hathitrust.org/Record/000196583 (proclamation of 1351 declaring it unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King"); JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON (Henry Thomas Riley ed., 1861), https://catalog.hathitrust.org/Record/000106660 (treatise of 1419 stipulating that "no one, of whatever condition he be, go armed in the said city [of London] or in the suburbs, or carry arms, by day or by night, except the va[]lets of the great

lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour.").

11.     The extent to which this broad, English understanding of what constituted a "sensitive place"—that is where arms bearing could be outright prohibited—traveled across the Atlantic is unknown. As Justice Joseph Story explained in 1831, the American Colonies received English statutes that were "pass[ed] before the emigration of our ancestors" and "applicable to our situation" as "a part of our common law." *Doe* v. *Winn*, 30 U.S. 233, 241 (1831). Yet local enforcement records did not survive for posterity, and therefore it is impossible for historians or anyone to reconstruct exactly how often, when, and where armed carriage restrictions were enforced. Most instances of legal enforcement were done at the local level, and the records of said enforcement have been lost. Those records of enforcement that have survived often require time consuming, archival research. *See, e.g.,* Laura Edwards, *Weapons and the Peace*, DUKE CTR. FOR FIREARMS LAW, July 25, 2023, https://firearmslaw.duke.edu/2023/07/weapons-and-the-peace/.

12.     What the historical record does inform is that there were "sensitive place" firearm restrictions on the law books in the American Colonies and later United States from the mid-seventeenth century through the early nineteenth century. *Bruen*, 597 U.S. at 30-31. For instance, as early as 1647, Maryland prohibited the carrying of dangerous weapons in its

legislative assemblies. 1647 Md. Laws 216; 1650 Md. Laws 273.[1] Meanwhile, Delaware, in its

1776 Constitution, prohibited the act of going armed before any election. Del. Const. of 1776,

art. XXVIII.

13.    In the decades that followed, American lawmakers sporadically adopted sensitive-

places restrictions.  *See*, *e.g.*, GENERAL DIGEST OF THE ORDINANCES AND RESOLUTIONS OF THE

CORPORATION OF NEW ORLEANS 371 (1831), https://catalog.hathitrust.org/Record/008604022;

Patrick J. Charles, *The Second Amendment and* Heller*'s "Sensitive Places" Carve-Out Post-*

Rahimi*: A Historiography, Analysis, and Basic Framework*, 58 UIC L. REV. 813, 845-849

(2025) (providing examples of sensitive-places laws at universities and colleges during the early

to mid-nineteenth century); *see also* Julia Hesse & Keven Schascheck II, *The Expansive*

*'Sensitive Places' Doctrine: The Limited Right to 'Keep and Bear Arms' Outside the Home*, 108

CORNELL L. REV. ONLINE 218, 236-45 (2023) (providing examples of sensitive places laws from

the late eighteenth-century through the late nineteenth century). It was not until the mid-to-late

nineteenth century, however, with the advent and commercial proliferation of revolvers and

repeating firearms,[2] the first firearms capable of carrying out mass shootings at the hands of a

---

[1] The text of both Maryland laws can be found in 1 ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND: JANUARY 1637/8—SEPTEMBER 1664 (1883), https://catalog.hathitrust.org/Record/009788538.

[2] There are several events that led to the production increase and proliferation of revolvers and repeating firearms during the mid-to-late nineteenth century, including a change in marketing strategy by firearm manufacturers, the needs of the Civil War, and the expiration of Colt's revolver patent. For some historical background on these points, see PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016); CARL R. HELLSTROM, SMITH & WESSON: THE STORY OF THE REVOLVER (1953), https://catalog.hathitrust.org/Record/000188143; HUGH B.C. POLLARD, A HISTORY OF FIREARMS (1936); *see also Gun Timeline*, PBS HISTORY DETECTIVES (last visited December 1, 2024), https://www.pbs.org/opb/historydetectives/technique/gun-timeline. For information on how mid-to-late nineteenth century contemporaries viewed the impact of revolvers and repeating firearms on increasing the death count, see W.C. DODGE, BREECH-LOADERS VERSUS MUZZLE-LOADERS OR HOW TO STRENGTHEN OUR ARMY AND CRUSH THE REBELLION WITH A SAVING OF LIFE AND TREASURE 3 (1864), https://catalog.hathitrust.org/Record/011535245 ("[A] child even could comprehend the fact, that a soldier armed with a gun that he could load and fire *ten times in a minute* would be able to kill or disable

single individual,[3] that location specific armed carriage restrictions appeared regularly in statute and ordinance books. Across the country, state, territorial, and local governments alike adopted these location specific restrictions, to include the State of Tennessee, which in 1869 adopted a law restricting the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed., 1871), https://catalog.hathitrust.org/Record/010432413. Not long thereafter, in 1870, Texas followed suit by restricting the carrying of dangerous weapons "into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…" 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (1873), https://catalog.hathitrust.org/Record/010448003. That very same year, Georgia adopted a law providing that "no person in said State of Georgia be permitted or allowed to carry about his or her person any…pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of

---

*ten times as many* of the enemy, as one armed with a gun which he could load and fire but once a minute, other things being equal."); *id*. at 4 ("As a general rule, a breech-loader can be loaded and fired *six times to the muzzle-loader's once*…What then, would be the result of arming one hundred thousand men with such guns? Simply and surely making them *equal to [six] hundred thousand*.").

[3] Prior to this technological development in firearms, a mass shooting would have required an armed group or assembly working in concert. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 GEO. J.L. & PUB. POL'Y 323, 326-27, 374-90 (2011).

public worship, or any other public gathering in this State…" ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED…AT THE SESSION OF 1870, at 421 (1870), https://catalog.hathitrust.org/Record/100143502.

14. In 1874, Missouri followed suit by restricting the carrying of "any kind of fire-arms…or other deadly weapon" into "any church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings…" ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874), https://catalog.hathitrust.org/Record/000534559; *see also* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-EIGHTH GENERAL ASSEMBLY 50-51 (1875), https://catalog.hathitrust.org/Record/000534559 (same).[4] In 1879, Missouri adopted an additional firearms-related violence protection for court houses, churches, and schools, by making it unlawful for any person to "discharge or fire off any gun, pistol, or fire-arms of any description" in the "immediate vicinity of any court house, church or building used for school or college purposes," which could encompass distances upwards of "two hundred yards." LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE THIRTIETH GENERAL ASSEMBLY 90-91 (1879), https://catalog.hathitrust.org/Record/000534559.

15. In 1889, the U.S. Territory of Arizona adopted a law providing that "[i]f any person shall go into any church or religious assembly, any school room, or other place where persons are

---

[4] In 1883, Missouri amended the law to increase the fine. LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76 (1883), https://catalog.hathitrust.org/Record/000534559.

assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm…he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person." ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA 30-31 (1889), https://catalog.hathitrust.org/Record/010083734. Then there was U.S. Territory of Oklahoma, which in 1890 restricted the carrying of dangerous weapons "into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly…" STATUTES OF OKLAHOMA 1890, at 495-96 (Will T. Little, L.G. Pitman, & R.J. Barker eds., 1891), https://catalog.hathitrust.org/Record/010447936.[5]

16.    In addition to the above state and territorial laws, there was an abundance of local ordinances restricting the carrying of dangerous weapons in so-called "sensitive places."[6] The

---

[5] For the relevancy of these U.S. territorial laws in the context of constitutional interpretation, see Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 WASH. U. L. REV. 1 (2023).

[6] *See, e.g.,* JEWELL'S DIGEST OF THE CITY ORDINANCES TOGETHER WITH THE CONSTITUTIONAL PROVISIONS, ACTS OF THE GENERAL ASSEMBLY, AND DECISIONS OF THE COURTS RELATIVE TO GOVERNMENT OF THE CITY OF NEW ORLEANS 1-2 (1882) (**Exhibit 2**) (1879 New Orleans, Louisiana ordinance prohibiting the carrying of any dangerous weapons "into any theatre, public hall, tavern, pic-nic ground, place for shows or exhibitions, house or other place of public entertainment or amusement."); *An*

9

reason that so many localities adopted these ordinances was the prevailing legal practice of "firearms localism," which encompassed a preference among state lawmakers to delegate the regulation of firearms and other deadly weapons to the local level. *See* Joseph Blocher, *Firearms Localism*, 123 YALE L.J. 82, 112-16 (2013).[7] One example is that of Columbia, Missouri, which in 1890 adopted an ordinance expressly restricting the carrying of dangerous weapons "into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court

---

*Ordinance*, July 9, 1891, *reprinted in* WACO DAILY NEWS (TX), July 12, 1891, at 8 (**Exhibit 3**) ("If any person shall go into any church or religious assembly, any schoolroom, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or social party or social gathering or to any election precinct on the day or the days of any election, where any portion of the people of the State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any public duty, or to any other public assembly, and shall have or carry about [their] person a pistol or other firearm…[they] shall be punished by a fine…").

[7] Many mid-to-late nineteenth century state laws and local government charters bear this out. *See, e.g.,* ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY 1066, 1076 (1893), https://catalog.hathitrust.org/Record/010134273 (providing all Kentucky cities "of the third class" wide latitude to "regulate the sale of fire-arms, and to prevent the carrying of concealed deadly weapons" and make "all police regulations to secure and protect the general health, comfort, convenience, morals and safety of the public"); THE LAWS OF THE STATE OF KANSAS 118, 134 (1871), https://catalog.hathitrust. org/Record/100836175 (providing all Kansas cities "of the third class" wide latitude to "prohibit and punish the carrying of firearms or other deadly weapons, concealed or otherwise"); LAWS OF THE STATE OF INDIANA PASSED AT THE FIFTY-FIRST REGULAR SESSION OF THE GENERAL ASSEMBLY 201, 202 (1879), https://catalog.hathitrust.org/Record/008892461 (1879 law providing all Indiana towns the authority "to regulate or prohibit the use of firearms, fireworks, or other things tending to endanger persons and property"); ACTS OF TENNESSEE: EXTRAORDINARY SESSION 48, 55 (1885), https://catalog.hathitrust.org/Record/100666682 (providing the mayor and alderman of the city of Knoxville the authority to "prevent and suppress the sale of fire-arms and carrying of concealed weapons'); ACTS OF THE ONE HUNDRED AND TWELFTH LEGISLATURE OF THE STATE OF NEW JERSEY AND THE FORTY-FOURTH UNDER THE NEW CONSTITUTION 483, 501 (1888), https://catalog.hathitrust. org/Record/010134285 (1888 law providing all New Jersey towns the authority "to regulate or prohibit the use of firearms and the carrying of weapons of any kind"); THE COMPLETE CODES AND STATUTES OF THE STATE OF MONTANA IN FORCE JULY 1, 1895, at 424, 427 (1895), https://catalog.hathitrust .org/Record/010447759 (providing all Montana "city or town council[s]" the authority to "prevent and suppress the sale of firearms the carrying of concealed weapons"); *see also* Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623, 662 n.256, 685 n.406 (2023) (providing more than two dozen examples of firearms localism within state laws and local government charters).

room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in* GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890), https://catalog.hathitrust.org/Record/001754262.[8] The Columbia ordinance mirrored Missouri state law, and was not the only Missouri locality to do so. The localities of Gainesville (1896),[9] Huntsville (1894),[10] Leonard (1891),[11] Marceline (1892),[12] Ridgeway

---

[8] *See* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-NINTH GENERAL ASSEMBLY 158, 166 (1877), https://catalog.hathitrust.org/Record/000534559 (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise"). Like Columbia, Webb City, Missouri and Huntsville, Missouri adopted similar laws. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, MISSOURI, 1905, at 99, 100 (1905), https://catalog.hathitrust.org/Record/008604358; *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, *reprinted in* THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894), https://everytownlaw.org/documents/2022/12/huntsville-mo-1894.pdf/.

[9] *Ordinances, of the Incorporation of the Town of Gainesville*, May 26, 1896, *reprinted in* OZARK COUNTY NEWS (Gainesville, MO), June 4, 1896, at 1 (**Exhibit 4**) ("It shall be unlawful for any person…to go into any public gathering or place where people are assembled for any lawful purpose, with any kind of fire-arms…or other deadly weapon…").

[10] *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, *reprinted in* THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, *supra*, at 58-59.

[11] *Ordinance No. 23: Ordinance Concerning the Carrying of Deadly Weapons*, July 6, 1891, *reprinted in* SHELBY COUNTY HERALD (Shelbyville, MO), July 29, 1891, at 4 (**Exhibit 5**).

[12] *Ordinance No. 9*, September 12, 1892, *reprinted in* MARCELINE JOURNAL-MIRROR (MO), October 28, 1892, at 8 (**Exhibit 6**).

(1893),[13] Rocheport (1895*),[14] and Warrensburg (1890),[15] all adopted similar ordinances.

Meanwhile, other Missouri localities, including Collins (1887),[16] Craig (1880*),[17] Cuba (1881),[18]

Granby (1873),[19] and Jackson (1877*),[20] just to name a few, adopted ordinances restricting the

carrying of dangerous weapons within their "corporate" or "incorporate" limits, whether such

carrying was open, concealed, or both. This meant that the carrying of dangerous weapons within

---

[13] *Town Ordinance No, XXVIII: An Ordinance in Relation to Misdemeanors*, April 3, 1893, *reprinted in* RIDGEWAY JOURNAL (MO), April 6, 1893, at 4 (**Exhibit 7**).

[14] *An Ordinance: Misdemeanors*, undated, *reprinted in* ROCHEPORT COMMERCIAL (MO), September 20, 1895, at 8 (**Exhibit 8**) ("If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any court, or into any public assemblage of persons met for a lawful purpose, having upon or about his person any kind of fire arms…or other deadly weapon…shall be deemed guilty of a misdemeanor…"). The use of the star (*) throughout this report is meant to note that the published ordinance did not contain an "approved" or "enacted" date. Hence, why the term "undated" appears directly after the title.

[15] *Concealed or Deadly Weapons*, June 5, 1890, *reprinted in* JOHNSON COUNTY STAR (Warrensburg, MO), June 7, 1890, at 4 (**Exhibit 9**).

[16] *Town Ordinances: Adopted by the Board of Trustees of the Town of Collins, Mo.: Ordinance No. 4*, May 2, 1887, *reprinted in* OSCEOLA ADVANCE (Osceola, MO), July 7, 1887, at 4 (**Exhibit 10**) ("Any person who shall carry any concealed weapon or any revolver, pistol, knife or dirk which may not be concealed within the corporate limits of the town of Collins, shall…be fined…except however, that upon good cause shown, the board may grant a permit to any citizen of good reputation to carry weapons for self defense.").

[17] *Ordinances of Craig, Mo.: Ordinance No. 8—Carrying Concealed Weapons*, undated, *reprinted in* CRAIG WEEKLY GAZETTE (MO), October 13, 1880, at 4 (**Exhibit 11**) ("Any person who shall within the corporate limits of said city of Craig, carry of have upon his person, any concealed weapon or weapons, shall be adjudged guilty of a misdemeanor…").

[18] *Revised Ordinances: Ordained and Established May 24, 1881: Chapter VIII: Misdemeanors*, May 24, 1882, *reprinted in* CRAWFORD MIRROR (Steelville, MO), July 27, 1882, at 1 (**Exhibit 12**) ("If any person be found carrying concealed about his person in the corporate limits, any kind of fire arms…or other deadly weapon, within the limits of said town he shall be fined...").

[19] *Ordinances of the Town of Granby: No. 8: An Ordinance Concerning the Carrying of Weapons*, October 30, 1873, *reprinted in* GRANBY MINER (Granby, MO), November 1, 1873, at 2 (**Exhibit 13**) ("That any person within the corporate limits of the town of Granby who shall be found carrying, either openly or concealed, any pistol…or any other offensive weapon…shall be fined…").

[20] *Ordinances of the Town of Jackson: No. XIII: An Ordinance in Relation to the Carrying of Deadly Weapons, Etc.*, undated 1877, *reprinted in* MISSOURI CASH-BOOK (Jackson, MO), January 17, 1878, at 2 (**Exhibit 14**) ("That every person who, within the corporate limits of said town, shall…carry about with him or have upon or about his person, whether openly or secretly, any kind of fire-arms, dagger, slung-shot, bowie-knife, dirk, or other deadly weapon, shall be punished by a fine of not less than ten, nor more than twenty dollars.").

these localities' commercial and public epicenters (*i.e.*, downtown, high traffic shopping areas, the public square, and government buildings) was legally off limits. The carrying of weapons immediately outside these commercial and public epicenters, however, could be lawful.

17.     Localities throughout the State of Kansas adopted similar ordinances. Indeed, in the case of Stockton, Kansas, persons were prohibited from carrying dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in* STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1 (**Exhibit 15**). However, most Kansas localities that adopted restrictions on the carrying of dangerous weapons in "sensitive places" did so by making their entire commercial and public epicenters off limits, whether such carrying was open, concealed, or both. Abilene (1870),[21] Arkansas City (1885),[22]

---

[21] *An Ordinance Relating to the Carrying of Fire Arms and Other Deadly Weapons*, to take effect on May 20, 1870, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), May 12, 1870, at 1 (**Exhibit 16**) ("That any person who shall carry, within the limits of the town of Abilene, or commons, a pistol, revolver….or other dangerous weapon…either openly or concealed, except to bring the same and forthwith to deposit it or them at their house, boarding house, store room or residence, shall be fined…").

[22] *Ordinance No. 1*, May 11, 1885, *reprinted in* ARKANSAS CITY WEEKLY TRAVELER (KS), May 20, 1885, at 4 (**Exhibit 17**) ("That any person carrying any deadly or dangerous weapons, such as loaded fire-arms…or any other weapons which when used are liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city" shall pay a fine of $1 to $10, and the carrying of said weapons "concealed" will pay a fine of $5 to $25).

Beloit (1872),[23] Caldwell (1885),[24] Coolidge (1886),[25] Elk City (1898),[26] Harper (1887*),[27]

Howard (1889),[28] Kendall (1887),[29] Meade Center1885),[30] Mount Hope (1887),[31] and Scandia

(1893)[32] are just a few examples in this regard.

---

[23] *An Ordinance in Relation to the Carrying of Fire-Arms or Other Weapons*, September 9, 1872, *reprinted in* BELOIT GAZETTE (KS), September 19, 1872, at 4 (**Exhibit 18**) ("That any person who shall be found within the corporate limits of this city with any revolver, pistol…or any other dangerous or deadly weapon concealed or otherwise shall be deemed guilty of a misdemeanor…").

[24] *Revised Ordinances of the City of Caldwell*, undated, *reprinted in* CALDWELL ADVANCE (KS), May 4, 1885, at 2 (**Exhibit 19**) ("Any person carrying any deadly or dangerous weapon, such as firearms…or any other weapon which when used is liable to produce death or great bodily harm, unconcealed, within the corporate limits of the city" shall pay a fine of $10 to $100, and carrying of said weapons "concealed" will pay a fine of $15 to $100).

[25] *An Ordinance Concerning Offenses in the Nature of Misdemeanors*, April 26, 1886, *reprinted in* BORDER RUFFIAN (Coolidge, KS), May 1, 1886, at 1 (**Exhibit 20**) ("It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon withing the corporate limits of this city…Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons…within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.").

[26] *Ordinance No. 165*, March 7, 1898, *reprinted in* ELK CITY ENTERPRISE (KS), March 11, 1898, at 2 (**Exhibit 21**) ("That any person within the corporate limits of said city of Elk City who…shall carry or have on his or her person in a concealed manner, or otherwise any pistol…or any deadly weapon…shall be deemed guilty of a misdemeanor…").

[27] *Ordinance No. 180*, undated, *reprinted in* HARPER DAILY SENTINEL (KS), August 23, 1887, at 2 (**Exhibit 22**) ("That it shall be unlawful for any person to carry any deadly or dangerous weapon, such as fire arms…within the incorporate limits of said city.").

[28] *Ordinance No. 72: An Ordinance to Prevent Carrying Concealed Weapons and the Discharge of Firearms*, May 16, 1889, *reprinted in* CITIZEN (Howard, KS), May 22, 1889, at 3 (**Exhibit 23**).

[29] *Ordinances: Of the City of Kendall, in the County of Hamilton, State of Kansas*, undated, *reprinted in* KENDALL FREE PRESS (KS), March 23, 1887, at 1 (**Exhibit 24**) ("It shall be unlawful for any person or persons to display or make any improper use of any deadly weapon withing the corporate limits of this city…Any person or persons, other than the duly appointed and commissioned officers of this city, or officers of this county or State, carrying concealed deadly weapons…within the corporate limits of the city, shall, upon conviction, be deemed guilty of a misdemeanor.").

[30] *City Ordinances*, November 23, 1885, *reprinted in* MEADE GLOBE (Meade Center, KS), November 28, 1885, at 2 (**Exhibit 25**) (prohibiting all persons "not authorized by the laws of the United States or the state of Kansas" from carrying a "pistol…or other deadly weapons" within the "incorporate limits").

[31] *Ordinance No. Twelve: Peace, Good Government and Welfare*, May 4, 1887, *reprinted in* MOUNT HOPE CLARION (KS), May 5, 1887, at 3 (**Exhibit 26**) (prohibiting all except officers and travelers from carrying "firearms…or other deadly weapons, concealed, within the corporate limits," and "any person under the age of twenty one years of age" from "carrying any deadly weapon, concealed or otherwise").

18.     It is impossible to state with specificity just how many localities maintained "sensitive places" ordinances by the close of the nineteenth century. Like most local government records up through the close of the nineteenth century, many local ordinances have been lost. Indeed, often localities published their ordinances in local newspapers, and, in fact, it is from local newspapers that I was able to locate many "sensitive places" ordinances. But as any professional historian or archivist can attest, the records of local ordinances that have survived are only a fragment of the whole. *See* Charles, Heller*'s "Sensitive Places" Carve-Out Post-*Rahimi, *supra*, at 875-77.

19.     Yet despite being unable to fully reconstruct the exact number "sensitive places" laws that existed come the close of the nineteenth century, two things are historically certain. First, throughout the mid-to-late nineteenth century, state and local governments maintained the authority to restrict the carrying of dangerous weapons in a variety of "sensitive places" where people were regularly known to congregate.[33] Historical examples abound that illustrate this

---

[32] *Ordinance No. 79*, December 27, 1893, *reprinted in* SCANDIA JOURNAL (KS), January 5, 1894, at 8 (**Exhibit 27**) (prohibiting the concealed carry of any "pistol…or other deadly weapon" within the "corporate limits" except for persons "engaged in a lawful occupation and of good moral character" who are "granted a permit to carry such concealed weapons").

[33] *See* State v. Shelby, 90 Mo. 302, 468–69 (Mo. 1886); State v. Wilforth, 74 Mo. 528, 530–31 (Mo. 1881); Owens v. State, 3 Tex. App. 404 (Tex. App. 1878), *reprinted in* CASES ARGUED AND ADJUDGED IN THE COURT OF APPEALS OF THE STATE OF TEXAS 404–8 (Vol. 3, 1878); Hill v. State, 53 Ga. 472, 473–75 (Ga. 1874); English v. State, 35 Tex. 473, 473–74, 476 (Tex. 1873); Andrews v. State, 50 Tenn. 165, 168 (Tenn. 1871).

point—from Oregon to Tennessee, from Nebraska to Utah, and so forth,[34] and so forth.[35] Second,

what generally constituted a "sensitive place" by the close of the nineteenth century varied

[34] *See, e.g., Bad Men Squelched*, DAILY ARGUS-LEADER (Sioux Falls, SD), September 27, 1898, at 8 (**Exhibit 28**) (reprint of Fort Pierre, South Dakota ordinance prohibiting the carrying, "either concealed or otherwise…any gun, pistol or other variety of fire arms [in the "city limits"] without first obtaining a permit from the mayor, duly signed by him and endorsed by the city auditor, city attorney and chief of police."); *Ordinance 333*, November 26, 1895, *reprinted in* EVENING TELEGRAM (Superior, WI), December 4, 1895, at 6 (**Exhibit 29**) ("It shall be unlawful for any person…to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger, or any other dangerous weapon within the limits of the City of Superior, and any person convicted…shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars."); *Ordinance and By Laws of the Borough of York Haven, Pa., in Effect Tuesday, March 14th, A.D. 1893*, GAZETTE (York, PA), June 13, 1893, at 2 (**Exhibit 30**) ("That if any firearms may be found upon any person or persons, or discharge, or fire off any firearms, within the Borough limits…on being convicted before a Justice of the Peace or Chief Burgess, each shall pay a fine of One Dollar"); *Ordinances of the Borough of Manchester*, October 30, 1869, *reprinted in* YORK GAZETTE (PA), November 23, 1869, at 1 (**Exhibit 31**) ("That if any fire-arms may be found upon any person or persons…within one hundred yards of any public road or street, or building within the aforesaid Borough…each shall pay a fine of not less than one dollar"); *An Ordinance*, FAYETTEVILLE DEMOCRAT (AR), August 12, 1871, at 3 (**Exhibit 32**) ("no person or persons…will be permitted to wear or bear pistols or bowie knives upon their persons—concealed or otherwise—within the corporate limits of the Town of Fayetteville—unless summoned by some official to aid in enforcing the laws."); *Ordinances of the Borough of Dover*, May 13, 1867, *reprinted in* YORK DEMOCRATIC PRESS (PA), May 24, 1867, at 2 (**Exhibit 33**) ("That if any fire arms may be found upon any person or persons…within one hundred yards of any public road or street, or building within the aforesaid Borough…each shall pay a fine of not less than one dollar"); *Ordinance No. 33*, November 18, 1879, *reprinted in* LEWISTON TELLER (ID), November 21, 1879, at 2 (**Exhibit 34**) ("It shall be unlawful for any person to carry any fire arms or deadly weapons of any kind, in a concealed manner, within the limits of the city of Lewiston."); *Ordinance No. 283*, December 9, 1865, *reprinted in* MORNING OREGONIAN (Portland, OR), December 12, 1865, at 4 (**Exhibit 35**) ("It shall be unlawful for any person or persons to carry any fire-arms or deadly weapons of any kind in a concealed manner within the Corporate limits of the City."); *Ordinance No. 13*, March 3, 1860, *reprinted in* WASHINGTON STANDARD (Olympia, WA), December 22, 1860, at 4 (**Exhibit 36**) ("Any person who shall, in the usual walks of life, within the limits of this town, carry any deadly weapon, shall be liable to a fine of not more than ten, nor less than five dollars.").

[35] *See, e.g., Ordinance No. 20*, February 6, 1900, *reprinted in* WELLSTON NEWS (OK), February 9, 1900, at 4 (**Exhibit 37**) (prohibiting "within the town" of Wellston, Oklahoma the carrying of "any pistol, dirk or bowie knife or other deadly weapon" whether done in a "concealed or unconcealed manner"); *Misdemeanors: Chapter 12, By Laws and Ordinances*, undated, *reprinted in* LAWRENCE DEMOCRAT (Lawrenceburg, TN), July 26, 1895, at 4 (**Exhibit 38**) ("That is shall not be lawful for any person to carry about their person any pistol…or other deadly weapon within this Corporation…"); *Will Be Enforced*, STATE RIGHTS DEMOCRAT (Albany, OR), March 9, 1894, at 3 (**Exhibit 39**) (reprint of Albany, Oregon Ordinance No. 152 prohibiting "any person or persons [from carrying] any deadly or dangerous weapons of any kind whatever in a concealed manner within the corporate limits…"); THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893), https://catalog.hathitrust.org/Record/009037720 ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment.");

16

depending upon local customs and practices. However, the most common locations to be designated by mid-to-late nineteenth century lawmakers as "sensitive places" were a) churches and places of worship; b) places where large public assemblies generally took place, *i.e.*, public parks, town squares, and the like; c) polling places and other buildings where political activity generally took place; d) schools and institutions of higher learning; e) places where events of

---

*Ordinances: Chapter VIII: Deadly Weapons*, August 11, 1891, *reprinted in* SANTA FE WEEKLY SUN (NM), August 15, 1891, at 4 (**Exhibit 40**) ("That it shall be unlawful for any person to carry a deadly weapon, either concealed or unconcealed, within the limits of the city of Sante Fe, unless the same be carried in lawful defense of himself, his family or his property, the same being at the time threatened with danger, or unless by order of legal authority..."); *Ordinance—Continued: Chapter VII: Deadly Weapons*, undated 1891, *reprinted in* THE RUSTLER (Cerrillos, NM), September 11, 1891, at 5 (**Exhibit 41**) ("That it shall be unlawful for any person to carry a deadly weapon, either concealed or unconcealed, within the limits of the Town of Cerrillos, unless the same be carried in lawful defense of himself, his family or his property, the same being at the time threatened with danger, or unless by order of legal authority..."); *Ordinance No. 2133*, July 23, 1889, *reprinted in* OMAHA WORLD-HERALD (NE), August 4, 1889, at 12 (**Exhibit 42**) ("It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slug-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of Omaha."); *Ordinance No. 11*, December 4, 1882, *reprinted in* BLACK HILLS WEEKLY JOURNAL (SD), December 8, 1882, at 1 (**Exhibit 43**) ("That is shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol…or any other dangerous or deadly weapon within the corporate limits of the town of Rapid City, Dakota territory…me[re]… transportation from one place to another" excluded); *Ordinance No. 44*, May 8, 1883, *reprinted in* ARIZONA DAILY STAR (Tucson, AZ), May 11, 1883, at 3 (**Exhibit 44**) ("If any person within the corporate limits if the city of Tucson carry concealed upon his person any gun, pistol, bowie-knife, dagger, or other deadly weapon, he shall be deemed guilty of…a misdemeanor"); *An Ordinance (No. 18): Regulating the Keeping and Bearing of Deadly Weapons*, August 19, 1873, *reprinted in* GALVESTON DAILY NEWS (TX), August 28, 1873, at 4 (**Exhibit 45**) ("That any person carrying on or about his person, saddle or vehicle, within the corporate limits of the city of Galveston, any pistol [or other dangerous weapons]…for the purposes of offense or defense….unless he has reasonable grounds for fearing an unlawful attack on his person, and that such attack shall be immediate and pressing" will be a pay between $25 and $100); *An Ordinance to Prevent the Carrying of Arms*, April 9, 1873, *reprinted in* DAILY TIMES (Chattanooga, TN), April 24, 1873, at 1 (**Exhibit 46**) ("That if any person shall, within the corporate limits of the City of Chattanooga, either publicly or privately carry any dirk, sword-cane, Spanish stiletto, belt or pocket pistol, Bowie knife or any large knife of like form or size to a Bowie knife, brass knuckles or slung shot, [they] shall be deemed guilty of a misdemeanor and…shall be fined not less than fifty dollars and confined in the city jail not less than thirty days."); *An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons*, undated, *reprinted in* DAILY NEBRASKA PRESS (Nebraska City, NE), July 8, 1869, at 3 (**Exhibit 47**) ("That it shall be, and it is hereby declared to be unlawful for any person to carry openly or concealed, any musket, rifle, shot gun, pistol…or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Nebraska…mere…transportation from one place to another" excluded).

amusement took place, *i.e.*, places where people congregate for large planned events; and f) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed. The text and social history of these mid-to-late nineteenth century "sensitive places" laws inform not just one, but multiple *whys* for their adoption. Several of these *whys* are expounded upon further below: 1) the desire to protect children from firearms-related violence; 2) the desire to protect the gathering public from firearms-related violence at designated places and/or times they were generally known to gather; and 3) the desire to protect against armed drunkenness.

## II.    The History of "Sensitive Places" Relative to Protecting Children

20.    The law is rarely stagnant, but fluid. The history and tradition of firearm regulation weighs this out. As firearm technology advanced, firearm lethality increased, and firearms became more commercially available, lawmakers began to regulate firearms in a variety of ways. *See* PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 156-57 (2018). From the mid-to-late nineteenth century, perhaps the most common area of firearm regulation was that of protecting children from firearms-related violence. *Id.* at 156 and accompanying notes. Historical "sensitive place" firearm prohibitions where events of amusement took place and at schools and institutions of higher learning are examples in this regard.

21.    As it pertains to the former—firearm prohibitions where events of amusement took place—there are several historical examples to draw from. *See, e.g.,* JEWELL'S DIGEST OF THE CITY ORDINANCES…OF NEW ORLEANS, *supra*, 1-2 (1879 New Orleans, Louisiana ordinance prohibiting the carrying of any dangerous weapons "into any…place of public entertainment or amusement."); *An Ordinance*, July 9, 1891, *reprinted in* WACO DAILY NEWS (TX), July 12,

18

1891, *supra*, at 8 (prohibiting firearms into any "place where persons are assembled for amusement"). In 1871, Texas seemingly led the way by enacting a firearm prohibition at any "place where persons are assembled for amusement…" 2 PASCHAL, A DIGEST OF THE LAWS OF TEXAS, *supra*, at 1322. In 1889, the U.S. Territory of Arizona followed suit by enacting a law prohibiting firearms within any "place where persons are assembled for amusement …" ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA, *supra*, at 30-31. A year later, the U.S. Territory of Oklahoma also adopted a law prohibiting firearms at any "place where persons are assembled for… amusement…" STATUTES OF OKLAHOMA 1890, *supra*, at 495-96. This was followed by Montana, which in 1903 prohibited the concealed carrying of any firearm into any "place where persons are assembled for amusement…" LAWS, RESOLUTIONS AND MEMORIALS OF THE STATE OF MONTANA 49 (1903), https://catalog.hathitrust.org/Record/010166785.

22.     Historical "sensitive place" firearm prohibitions at schools and institutions of higher learning are even more numerous. One can in fact trace firearm prohibitions at colleges, universities, and institutions of higher learning as far back as the late eighteenth century. *See, e.g.,* FRANKLIN BOWDITCH DEXTER, 2 BIOGRAPHICAL SKETCHES OF THE GRADUATES OF YALE COLLEGE, WITH THE ANNALS OF THE COLLEGE HISTORY 8 (1896), https://catalog.hathitrust.org/Record/001466032 (containing reprint of 1745 law forbidding students from keeping of any "Gun or Pistol"); LAWS OF HARVARD COLLEGE 10 (1655), https://firearmslaw.duke.edu/laws/1655-pub-1876-a-copy-of-the-laws-of-harvard-college-thirdly-concerneing-penall-lawes-no-8-john-wilson-son. Such prohibitions were in fact commonplace across mid-nineteenth century

19

America. Examples can be found in Alabama,[36] the District of Columbia,[37] Illinois,[38]

Kentucky,[39] Maine,[40] Massachusetts,[41] Michigan,[42] Missouri,[43] New Jersey,[44] New York,[45] North

---

[36] *See, e.g.,* ORDINANCES & RESOLUTIONS OF THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA FROM 1822-1833 PART 1, at 144 (1833) (**Exhibit 48**) (1832 board resolution prohibiting any student from keeping firearms, dirks, and dirk knives).

[37] *See, e.g.,* LAWS OF COLUMBIAN COLLEGE 10 (1824), https://www.loc.gov/item/07026751/ ("No student shall keep…fire arms, or any deadly weapon whatever.").

[38] *See, e.g., Laws of Illinois College* (1850), *reprinted in* 11 TRANSACTIONS OF THE ILLINOIS STATE HISTORICAL SOCIETY 241, 253 (1906), https://catalog.hathitrust.org/Record/003931962 ("No student shall carry deadly weapons upon his person on penalty of admonition, dismission or expulsion, according to the aggravation of the offence.").

[39] *See, e.g.,* BY-LAWS, AND SYSTEM OF EDUCATION ESTABLISHED AT AUGUSTA COLLEGE IN KENTUCKY 21 (1828), https://www.loc.gov/item/42044956/ ("No student is allowed to keep any fire arms, gunpowder, dirk, or other offensive weapon in College…And if any student shall fire a gun, or pistol, within the College walls, or yard, or near the College, he shall be punished as the faculty may direct.").

[40] *See, e.g.,* LAWS OF WATERVILLE COLLEGE, MAINE 11 (1832), https://catalog.hathitrust.org/Record/100677063 ("No student shall keep fire arms, or any deadly weapon whatever.").

[41] *See, e.g.,* LAWS OF WILLIAMS COLLEGE 14 (1829), https://catalog.hathitrust.org/Record/008376261 ("No student is allowed to keep any fire-arms or gun-powder in College, nor go a gunning or fishing, without leave from the President…And if any scholar shall fire any gun or pistol within the College walls or yard, or near the College, he shall be fined, not exceeding fifty cents; and if the act be done with any criminal intent, he shall also be otherwise punished.").

[42] *See, e.g.,* ANNUAL REPORT OF THE SUPERINTENDENT OF PUBLIC INSTRUCTION AND ACCOMPANYING DOCUMENTS 117 (1853), https://catalog.hathitrust.org/Record/000549828 (1852 Wesleyan Seminary and Albion Female Collegiate Institute rule prohibiting the carrying of any "fire arms, deadly weapons, nor gunpowder on the Seminary premises.").

[43] *See, e.g.,* THE LAWS OF KEMPER COLLEGE, NEAR SAINT LOUIS, MO. 9 (1840), https://catalog.hathitrust.org/Record/009735350 ("No Student shall keep arms of any sort, or keep or fire powder on the College premises.").

[44] *See, e.g.,* CATALOGUE OF THE TEACHERS AND PUPILS OF THE WEST JERSEY COLLEGIATE SCHOOL 10 (1853), https://www.google.com/books/edition/Catalogue_of_the_Teachers_and_Pupils_wit/aj5OAAAAYAAJ?hl=en&gbpv=0 ("No pupil is permitted to have gunpowder, fire-arms, or any species of weapon, in his possession."); STATUTES OF RUTGERS COLLEGE, IN THE CITY OF NEW BRUNSWICK, N.J. 15 (1845), https://catalog.hathitrust.org/Record/008966764 ("No Student shall keep fire-arms…").

[45] *See, e.g.,* CATALOGUE OF THE OFFICERS AND STUDENTS OF THE JEFFERSON COUNTY INSTITUTE 27 (1853), https://www.google.com/books/edition/Catalogue_of_the_Officers_and_Students_o/FjeX13QwWyQC?hl=en&gbpv=0&kptab=overview ("keeping or using fire-arms or gun-powder in the Institute buildings, and all other practices calculated to injure the morals or disturb the good order of the School, are forbidden."); LAWS OF UNION COLLEGE 15 (1815), https://catalog.hathitrust.org/Record/011621447 ("No student shall keep in his room any kind of fire-arms, or gun-powder, nor fire any, in or near the college, in any manner whatever; and if any student shall violate this law, he shall be liable to a fine, or to be admonished, rusticated, or expelled.").

Carolina,[46] Ohio,[47] Pennsylvania,[48] Rhode Island,[49] South Carolina,[50] Tennessee,[51] Vermont,[52]

Virginia,[53] and Wisconsin.[54] These firearm prohibitions at colleges, universities, and other places

[46] *See, e.g.,* ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838), https://archive.org/details/actsofgeneralassnort ("No Student shall keep a dog, or fire arms, or gun powder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any deadly weapon; nor shall he use fire arms without permission from the President.").

[47] *See, e.g.,* THE LAWS MIAMI UNIVERSITY FOR THE GOVERNMENT OF THE FACULTY AND STUDENTS 15 (1843), https://catalog.hathitrust.org/Record/009736032 ("No student shall bring into any of the buildings or on the College premises any cannon, musket, pistol, or other species of fire-arms, or powder in any mode of preparation, without the consent of the Faculty.").

[48] *See, e.g.,* STATUTES OF DICKINSON COLLEGE, IN CARLISLE, PENNS'A 18 (1826), https://www.loc.gov/item/07022992/ ("No student shall keep for his use or pleasure, any…gun, fire arms or ammunition; nor sword, dirk, sword-cane, or any deadly weapon whatsoever…").

[49] *See, e.g.,* THE LAWS OF BROWN UNIVERSITY 11 (1835), https://catalog.hathitrust.org/Record/001974913 ("No student shall keep arms of any sort, or gun-powder in his room, nor fire gun-powder in or near the College premises."); THE LAWS OF RHODE-ISLAND COLLEGE 12 (1803), https://catalog.hathitrust.org/Record/009710952 ("No student shall keep any kind of fire-arms or gun-powder in his room, nor fire gunpowder in or near the College, in any manner whatever.").

[50] *See, e.g.,* LAWS OF THE SOUTH CAROLINA COLLEGE 41 (1848), https://www.loc.gov/item/41035082/ ("If any student shall keep in his room, or within the College, or in the town of Columbia, or its vicinity, any pistol, dirk, sword-cane, bowie knife, or other deadly weapon, he shall be forthwith suspended and reported for expulsion.").

[51] *See, e.g.,* LAWS AND REGULATIONS OF FRANKLIN COLLEGE 16 (1845), https://catalog.hathitrust.org/Record/102183154 ("students guilty of *carrying weapons*…of any description will not be esteemed worthy to remain at the institution."); LAWS OF THE UNIVERSITY OF NASHVILLE, IN TENNESSEE 15 (1840), https://www.loc.gov/item/09008675/ ("No student shall bring, or cause to be brought into College, or, on any occasion, keep in his room, any…fire-arms or ammunition of any kind; nor a sword, dirk, sword-cane or any deadly weapon whatever, upon penalty of such censure or punishment as the Faculty may judge the offence to deserve").

[52] *See, e.g.,* THE LAWS OF MIDDLEBURY COLLEGE 18 (1839), https://www.loc.gov/item/07022995/ ("No student is allowed to keep any kind of fire-arms or gunpowder in his room or in any part of the College buildings, nor to fire a gun or pistol within or near said buildings.").

[53] *See, e.g.,* ENACTMENTS RELATING TO THE CONSTITUTION AND GOVERNMENT OF THE UNIVERSITY OF VIRGINIA 39 (1847), https://catalog.hathitrust.org/Record/008913168 ("No student shall…keep or use fire-arms or other weapons…"); LAWS AND REGULATIONS OF THE COLLEGE OF WILLIAM AND MARY 4 (1830), https://catalog.hathitrust.org/Record/009727266 ("Carrying arms privately, shooting or making noise in the night or day in the City [is prohibited]."); LAWS OF HAMPDEN SIDNEY COLLEGE 12 (1819), https://www.loc.gov/item/12003427/ ("No student shall be permitted to keep powder, fire arms, or dogs, or on any pretence engage in shooting, or hunting").

[54] *See, e.g.,* LAWS OF BELOIT COLLEGE 4 (1850), https://www.loc.gov/item/ca09006043/ ("no student shall be allowed to have in his room…[or] to use of keep upon the College premises, fire-arms, or gunpowder…").

21

of higher learning continued unabated through the close of the nineteenth century,[55] and were even adopted by many military colleges, universities, and academies, with a exception of course for supervised military firearm instruction.[56]

---

[55] *See, e.g.,* CATALOGUE OF KITTRELL COLLEGE [NORTH CAROLINA] 24 (1900), https://catalog.hathitrust.org/Record/100599642 ("Fire arms [are] not allowed in possession of students."); CATALOGUE OF ST. JOHN'S COLLEGE [MARYLAND] 75 (1897), https://catalog.hathitrust.org/Record/005807859 ("Keeping of fire-arms or explosives of any kind whatsoever [is prohibited]."); CATALOGUE OF THE OFFICERS AND STUDENTS OF ALCORN A. & M. COLLEGE, WESTSIDE MISSISSIPPI 29 (1895), https://catalog.hathitrust.org/Record/100657742 ("Students bringing fire-arms or other dangerous weapons, must on entering [the college], deposit them with the President."); TWENTY-FIRST ANNUAL CATALOGUE OF BENNET COLLEGE [NORTH CAROLINA] 18 (1894), https://catalog.hathitrust.org/Record/009591748 (prohibiting "weapons of any kind" on campus); CATALOGUE OF THE HAMPTON NORMAL AND AGRICULTURAL INSTITUTE, HAMPTON, VIRGINIA 42 (1892), https://catalog.hathitrust.org/Record/102664757 ("Students are not allowed to retain fire arms in their possession. The Commandant will retain and receipt for any brought."); CATALOGUE OF MT. MORRIS COLLEGE, MOUNT MORRIS, ILL. 20 (1885), https://catalog.hathitrust.org/Record/100632330 ("Students should not bring *(a)* revolvers or other weapons, as there is neither use nor room for them here"); EIGHTH ANNUAL REGISTER OF PIERCE CHRISTIAN COLLEGE [CALIFORNIA] 24 (1882), https://catalog.hathitrust.org/Record/009946338 ("Students shall not use…nor carry any pistol, dirk, or other deadly weapon of the kind usually called concealed."); LAWS OF WILLIAMS COLLEGE [MASSACHUSETTS] 13 (1878), https://catalog.hathitrust.org/Record/102159232 ("No student shall have or keep any gunpowder or fire-arms in his room, or in any building or other place on College grounds; nor shall he at any time use gunpowder or fire-arms within half a mile of the College grounds."); CATALOGUE OF THE OFFICERS AND STUDENTS OF WACO UNIVERSITY, WACO, TEXAS, FOR 1870-71, at 22 (1871), https://catalog.hathitrust.org/Record/012188104 ("No student shall carry about his person, or keep, fire-arms or other dangerous weapons; and if found guilty shall be suspended or otherwise punished."); CATALOGUE OF THE OFFICERS AND STUDENTS OF THE EAST ALABAMA COLLEGE, AUBURN, ALA. 14 (1868) (**Exhibit 49**) ("No student will be allowed to carry deadly weapons, on the penalty of expulsion for so doing."); THE LAWS AND REGULATIONS OF AMHERST COLLEGE [MASSACHUSETTS] 16 (1855), https://catalog.hathitrust.org/Record/012103779 ("In no case shall a student bring into the College premises, any cannon, musket, pistol, or other species of fire-arms, or any gunpowder in any mode of preparation; and in no case, in term time, shall any student be concerned in the discharge of any fire-arms or fire-works in the town of Amherst.").

[56] The United States Army Academy at West Point, New York appears to have been the first (although the rule may already been in effect as a verbal order). *See* REGULATIONS ESTABLISHED FOR THE ORGANIZATION AND GOVERNMENT OF THE MILITARY ACADEMY, AT WEST POINT, NEW YORK, BY ORDER OF THE PRESIDENT OF THE UNITED STATES 42 (1839), https://catalog.hathitrust.org/Record/008431013 ("Cadets are prohibited from having in their possession, any description of fire-arms or other weapon not issued to them by [the] proper authority."); REGULATIONS OF THE U.S. MILITARY ACADEMY, AT WEST POINT 37 (1832), https://catalog.hathitrust.org/Record/009990986 ("Cadets are prohibited from having in their possession, any description of firearms or other weapon not issued to them by the proper authority."). Other military colleges, universities, and academies seemingly followed suit. *See, e.g.,* RULES AND REGULATIONS OF HORNER & GRAVES'S SCHOOL 5 (1874), https://catalog.hathitrust.org/Record/102402806 ("Students are prohibited from having in their possession gun-powder or any description of fire-arms or any other weapons not issued by the proper authority."); REGULATIONS OF THE LITERARY AND MILITARY DEPARTMENTS OF THE STATE AGRICULTURAL AND MECHANICAL COLLEGE OF ALABAMA 15-16 (1873) (**Exhibit 50**) ("Students are prohibited, under penalty of dismission, from having

23.     And given the wide prevalence of these college and university firearm prohibitions, when the dangers associated with minors accessing, acquiring, and misusing firearms precipitously increased during the mid-to-late nineteenth century,[57] it is not that surprising that the rule was eventually applied to public schools. The expansion of the rule coincides with the precipitous growth and changes to public education during the mid-to-late nineteenth century.[58] The states of Maryland,[59] Missouri,[60] Texas,[61] Vermont,[62] and Washington,[63] as well as the territories of

---

in their possession ammunition, weapons or arms not issued for the performance of military duty; nor shall these be retained loaded in quarters under any pretext.").

[57] *See* CHARLES, ARMED IN AMERICA, *supra*, at 156.

[58] *See, e.g.,* IRA KATZNELSON AND MARGARET WEIR, SCHOOLING FOR ALL: CLASS, RACE, AND THE DECLINE OF THE DEMOCRATIC IDEAL 58-85 (1985); JOHANN N. NEEM, DEMOCRACY'S SCHOOLS: THE RISE OF PUBLIC EDUCATION IN AMERICA 177-78 (2017); *see also* Carl F. Kaestle, *Common Schools Before the "Common School Revival": New York Schooling in the 1790's*, 12 HIST. EDUC. Q. 465, 465 (1985) (noting that in the case of the state of New York it was not until 1850 that the "notion of a unified, articulated, hierarchical" school system supplanted the preexisting "haphazard," "temporary," and "patchwork" school system).

[59] BY-LAWS FOR THE GOVERNMENT OF THE BOARDS OF SCHOOL COMMISSIONERS OF MARYLAND 14 (1865), https://catalog.hathitrust.org/Record/009600621 ("Smoking, chewing tobacco, carrying fire arms or other dangerous weapons, either in the school house or on the premises, are strictly forbidden.").

[60] ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874). *See also Rules for the Government of Brownsville Public School*, BROWNSVILLE HERALD (MO), October 26, 1883, at 3 (**Exhibit 51**) ("No carrying a pistol or drawing a knife, nor the use of any other dangerous weapon, will be permitted under any circumstances, either at school or on the way. Penalty: instant expulsion."); *Rules and Regulations of Memphis Public Schools*, MEMPHIS CONSERVATIVE (MO), October 23, 1879, at 2 (**Exhibit 52**) ("Any pupils carrying firearms, or other deadly weapons, shall be suspended and reported to the Board.").

[61] 2 PASCHAL, A DIGEST OF THE LAWS OF TEXAS, *supra*, at 1322.

[62] THE SCHOOL LAWS OF VERMONT IN FORCE APRIL 1, A. D. 1893, at 64 (1893), https://www.loc.gov/item/01003872/ ("Any person who shall carry or have in his possession while member of and in attendance upon any school, any firearms, dirk, knife, bowie knife, dagger, or other dangerous or deadly weapon, shall upon conviction thereof, be fined not exceeding twenty dollars.").

[63] TENTH REPORT OF THE SUPERINTENDENT OF PUBLIC INSTRUCTION OF THE STATE OF WASHINGTON 107 (1890), https://catalog.hathitrust.org/Record/000641086 (stipulating that the "carrying of deadly weapons" or the "using of dangerous playthings, shall constitute good cause for suspension or expulsion form school"). This rule of law was in effect before Washington achieved statehood in 1889. REPORT OF THE SUPERINTENDENT OF PUBLIC INSTRUCTION OF THE TERRITORY OF WASHINGTON 22 (1881), https://catalog.hathitrust.org/Record/100658138 ("Willful disobedience…or the carrying of deadly or dangerous weapons, shall constitute good cause for suspension or expulsion from school.").

Arizona[64] and Oklahoma,[65] are examples in this regard. Each prohibited firearms and other deadly weapons in and around their school systems.

24.      State and territorial level lawmakers, however, were not the only government actors to make firearms and other deadly weapons off limits at schools. In accord with the tenets of firearms localism—this being a preference among state lawmakers to delegate the regulation of firearms and other deadly weapons to the local level —so did many local school boards and administrators. The rules and regulations of local school boards and administrators across the

---

[64] ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA, *supra*, at 30-31.

[65] STATUTES OF OKLAHOMA 1890, *supra*, at 495-96.

states of California,[66] Illinois,[67] Kansas,[68] and Michigan[69] are examples in this regard. So too are

the mid-to-late nineteenth century public school (and sometimes private school) rules and

---

[66] *See, e.g.,* ANNUAL REPORT OF THE EDUCATIONAL DEPARTMENT OF THE CITY OF SAN DIEGO, CALIFORNIA, JANUARY, 1892, at 23 (1892), https://catalog.hathitrust.org/Record/010320160 ("Willful disobedience…or carrying deadly or dangerous weapons, shall constitute good cause for suspension or expulsion from school."); ANNUAL REPORT OF THE BOARD OF EDUCATION OF THE CITY OF LOS ANGELES, CAL. 28 (1882), https://catalog.hathitrust.org/Record/010303343 ("Willful disobedience…or carrying deadly or dangerous weapons, shall constitute good cause for suspension or expulsion from school."); *The Public Schools*, ALAMEDA ARGUS (CA), July 4, 1878, at 3 (**Exhibit 53**) ("Willful disobedience…or carrying of deadly weapons, shall constitute good cause for suspension or expulsion from the school.").

[67] *See, e.g., Rules, Regulations, Etc. Recently Adopted by the Board of Education of Dwight: Duties of Pupils*, DWIGHT STAR AND HERALD (IL), September 2, 1899, at 4, 5 (**Exhibit 54**) ("No firearms or dangerous weapons of any kind shall be brought on the premises."); TWENTIETH ANNUAL REPORT OF THE SUPERINTENDENT OF PUBLIC SCHOOLS TO THE BOARD OF EDUCATION OF THE CITY OF JACKSONVILLE, ILLINOIS 36 (1887), https://catalog.hathitrust.org/Record/100569996 ("Any pupil carrying fire-arms or other deadly weapons shall be suspended and reported to the Board, through the Superintendent.").

[68] *See, e.g., Our Schools*, TRI-COUNTY NEWS (Scottsville, KS), December 5, 1890, at 4 (**Exhibit 55**) ("Any pupil carrying firearms or other deadly weapons shall be suspended and not received again without permission of the school board."); *Meade Center, Kansas, Public Schools, Rules and Regulations, Adopted By the School Board, Sept. 7th, 1887*, MEADE REPUBLICAN (KS), September 21, 1887, at 4 (**Exhibit 56**) ("Pupils are prohibited from bringing fire-arms or other dangerous weapons into the school rooms or upon the play grounds…."); *Rules and Course of Study of the Public Schools of Cawker City, Kansas*, PUBLIC RECORD (Cawker City, KS), October 13, 1887, at 1 (**Exhibit 57**) ("Any pupil carrying fire-arms, or other deadly weapons, shall be suspended and not received again without a permit from the board."); *Rules & Regulations for Pupils Attending Public Schools of District No. 1*, ELLIS COUNTY FREE PRESS (Hays, KS), September 18, 1886, at 8 (**Exhibit 58**) ("If any pupil shall…carry fire-arms or other deadly weapons…he shall be liable to suspension, expulsion or other punishment, according to the nature of the offence."); *Rules and Regulations of the Blue Rapids City School Board*, BLUE RAPIDS TIMES (KS), March 12, 1885, at 2 (**Exhibit 59**) ("Any pupil carrying fire-arms, or other deadly weapons shall be reported to the Board and may be suspended…"); *Public School Rules*, DISPATCH (Clay Center, KS), October 25, 1883, at 3 (**Exhibit 60**) ("Pupils shall not carry fire arms…during school hours."); *Rules, Regulations and Course of Study, of Washington Public School!*, WASHINGTON REPUBLICAN (KS), November 11, 1881, at 2 (**Exhibit 61**) ("Any pupil carrying fire-arms or exhibiting the same on or about the school premises will be suspended, for a second offense be expelled from the school."); *General Rules*, PLEASANTON OBSERVER (KS), February 28, 1880, at 2 (**Exhibit 62**).

[69] *See, e.g.,* CATALOG OF THE ALMONT PUBLIC SCHOOLS FOR 1891-92, at 18 (1891), https://catalog.hathitrust.org/Record/005700610 ("Pupils…[may not] have in possession any kind of fire arms or dangerous weapons or gun-powder or other explosive…on or about the school premises."); CIRCULAR OF THE ROCHESTER PUBLIC SCHOOLS 15 (1889), https://catalog.hathitrust.org/Record/005652927 ("Pupils shall not bring, or have in their possession, fire arms or weapons of any kind upon the School grounds…"); *St. Joseph Union School*, ST. JOSEPH HERALD (MI), February 20, 1869, at 4 (**Exhibit 63**) ("Pupils are required to abstain from any of the following acts…from carrying fire-arms upon the premises…").

regulations for localities across the United States.[70] From New York[71] to Idaho,[72] from Georgia[73]

to Iowa,[74] or from New Jersey[75] to New Mexico,[76] there are historical examples abound. Exactly

---

[70] To date, I have located more than 70 examples in virtually every state and territory in addition to the states and territories listed above. For some examples, see SECOND ANNUAL REPORT OF THE PUBLIC SCHOOLS OF THE CITY OF SALT LAKE FOR THE YEAR ENDING JUNE 30, 1892, at 17 (1892), https:// catalog.hathitrust.org/Record/100076206 ("Any pupil found carrying fire-arms or other deadly weapons about the school premises shall be suspended."); RULES AND REGULATIONS FOR THE GOVERNMENT OF THE PUBLIC SCHOOLS OF PHENIX CITY, ALA. 10-11 (1891) (**Exhibit 64**) ("Scholars will render themselves liable to expulsion by…carrying deadly weapons…or persistent violation of any of the Regulations."); ELEVENTH BIENNIAL REPORT OF THE PUBLIC SCHOOLS OF WILLIAMSPORT, PA. 65 (1890), https://catalog.hathitrust.org/Record/008697057 ("Any pupil found carrying fire-arms, or what is termed concealed weapons, shall be suspended from school, and reported to the Board by the teacher for expulsion and arrest."); *Public School Rules and Regulations*, HERALD (Big Stone City, SD), January 11, 1889, at 8 (**Exhibit 65**) ("The carrying of any toy pistol or ordinary pistol, revolver, sling-shot or pea-shooter on the school grounds or into the school building is strictly forbidden, and any repetition of this offense, after having once been warned against it, will subject the offender to immediate expulsion from the school."); *The Board of Education*, DAILY AMERICAN (Nashville, TN), March 3, 1880, at 4 (**Exhibit 66**) ("In view of the fact that four pupils had recently been found with pistols upon their persons…a resolution, which was adopted, provided that any pupil found having pistols or other unlawful weapons shall be expelled and shall not be readmitted during the session."); BINGHAM SCHOOL, ORANGE COUNTY, NORTH CAROLINA, at 2 (1866-79), https://catalog.hathitrust.org/Record/102403018 ("Deadly weapons …are strictly prohibited."); COMMON SCHOOLS OF CINCINNATI 57 (1863), https://catalog.hathitrust.org/ Record/000520430 ("Any pupil of the Public Schools bearing arms during school hours, shall at once be expelled from said Schools."); *Educational: Rules for School Government*, STAR OF THE NORTH (Bloomsburg, PA), February 7, 1856, at 2 (**Exhibit 67**) ("All pupils are prohibited from…using fire-arms, gun-powder or fireworks of any description on the school premises.").

[71] *See, e.g.,* MANUAL OF HERKIMER UNION SCHOOL, HERKIMER, N.Y., 1882, 11 (1891), https://catalog. hathitrust.org/Record/005651373 ("[C]arrying of firearms or any other explosive on the school premises is strictly prohibited."); ANNUAL REPORT OF THE BOARD OF EDUCATION OF THE CITY OF JAMESTOWN, FOR THE SCHOOL YEAR ENDING JULY 25, 1890, AND ANNOUNCEMENTS FOR 1890-91, at 26 (1890), https://catalog.hathitrust.org/Record/005651377 ("firearms…on or about the school premises…are, strictly forbidden"); PROCEEDINGS OF THE BOARD OF EDUCATION OF THE CITY OF ELMIRA, FOR 1874-75, at 77 (1874), https://catalog.hathitrust.org/Record/009593896 ("Pupils are prohibited from…bringing any dangerous plaything, as bows and arrows, fire-crackers, or any sort of firearms or weapons about the school premises.").

[72] *See, e.g., Denver Public School*, IDAHO COUNTY FREE PRESS (Grangeville, ID), January 11, 1895, at 4 (**Exhibit 68**) ("Willful disobedience…or the carrying of deadly weapons or dangerous weapons, shall constitute cause for suspension or expulsion for school."); *Rules and Regulations of the Lewiston School District*, LEWISTON TELLER (ID), November 2, 1882, at 1 (**Exhibit 69**) ("Willful disobedience…carrying deadly weapons…shall constitute good cause for suspension.").

[73] *See, e.g.,* TWENTY-SIXTH ANNUAL REPORT OF THE PUBLIC SCHOOLS OF THE CITY OF MACON AND BIBB COUNTY, GA. 78 (1898), https://www.google.com/books/edition/Annual_Report_of_the_Public _Schools_of_t/gSZRAQAAMAAJ ("Any pupil bringing deadly weapons of any description upon the school grounds shall be immediately expelled.").

26

how many local school boards and administrators adopted these prohibitions is unknown. As with most local government records up through the close of the nineteenth century, many, if not most, mid-to-late nineteenth century public school rules and regulations have been lost. Indeed, I was able to locate many examples through popular online databases and search engines. However, the historical sources found on these databases and search engines only provide us with a fragment of the regulatory whole. What is historically certain is that "sensitive place" firearm prohibitions at public (and some private) schools were widespread by the by the turn of the twentieth century.[77] What is also historically certain is that lawmakers sometimes extended

---

[74] *See, e.g.,* RULES AND REGULATIONS AND COURSE OF STUDY OF THE PUBLIC SCHOOLS OF BLOOMFIELD, IOWA 9 (1897), https://catalog.hathitrust.org/Record/100803697 ("Pupils are forbidden to bring fire-arms, fire-crackers or torpedoes about the building or grounds."); *Regulations of Correctionville Public Schools*, SIOUX VALLEY NEWS (Correctionville, IA), September 10, 1885, at 1 (**Exhibit 70**) ("THINGS PROHIBITIED…bringing fir[e]arms or other weapons to school…").

[75] *See, e.g., The Blairstown Presbyterial Academy, N.J.*, *contained in* 9 HOME, THE SCHOOL, AND THE CHURCH; OR THE PRESBYTERIAN EDUCATION REPOSITORY 44, 47 (1859), https://www.google.com/ books/edition/Home_the_School_and_the_Church_Or_the_Pr/7m80AQAAMAAJ ("The use of…fire-arms, or any kind of weapon, utterly prohibited.").

[76] *See, e.g., The City Schools*, EDDY ARGUS (NM), September 8, 1893, at 7 (**Exhibit 71**) ("Pupils may be suspended…for carrying firearms or offering personal violence to any teacher…"); FIRST ANNUAL REPORT OF THE PUBLIC SCHOOLS OF ALBUQUERQUE, NEW MEXICO, FOR THE SCHOOL YEAR ENDING MAY 27, 1892, at 24 (1892), https://archive.org/details/firstannualrepor00albu/page/24/mode/2up ("No fire-arms, slings, 'beanies,' or other things, the use of which is likely to put person or property in danger, shall be brought to school.").

[77] *See, e.g.,* REVISED CHARTER AND ORDINANCES OF THE CITY OF LOCKPORT 475 (1913),  https://www. google.com/books/edition/Revised_Charter_and_Ordinances_of_the_Ci/Zx5EAAAAYAAJ ("Pupils shall not be allowed to explode torpedoes or firecrackers, or have in their possession fire-arms or dangerous weapons of any kind while on or about the school premises."); ANNUAL REPORT OF THE CITY SCHOOLS HENDERSON, KY. 86 (1911), https://www.google.com/books/edition/Annual_Report_Course_of_Study _Rules_Etc/NqINAQAAIAAJ ("Whenever teachers shall find pupils carrying knives or other sharp-edged instruments or fire-arms they shall immediately take possession of and deliver the same to the Principal..."); BY-LAWS, RULES AND REGULATIONS: PUBLIC SCHOOLS OF FORT COLLINS, COLORADO 33 (1908), https://www.loc.gov/item/27016755/ ("Pupils shall not be allowed to carry fire arms, ammunition, slings, or other dangerous weapons or play things….while on the school premises or on the streets adjoining."); SHELBYVILLE PUBLIC SCHOOLS 1903: SUPERINTENDENT'S REPORT, COURSE OF STUDY, RULES AND REGULATIONS AND CATALOGUE OF GRADUATES 103 (1903), https://catalog.hathitrust.org/ Record/005651644 ("Pupils shall not bring fire arms or other dangerous weapons, fire cracker or any explosive material about the school premises."); THIRTY-SIXTH ANNUAL REPORT OF THE PUBLIC SCHOOLS, COLUMBUS, GEORGIA 54 (1903), https://www.google.com/books/edition/Annual_Report _of_the_Public_Schools_Colu/zZwNAQAAIAAJ ("Pupils will render themselves liable to expulsion

these prohibitions to children and adults alike. *See, e.g., Rules Governing the White Public Schools*, OUACHITA TELEGRAPH (Monroe, LA), October 30, 1886, at 3 (**Exhibit 72**) ("[C]arrying dangerous weapons…on the school grounds by pupils or *teachers*, positively prohibited.") (emphasis added); *School Regulations*, CHEROKEE ADVOCATE (Tahlequah, OK), January 4, 1884, at 3 (**Exhibit 73**) ("*Drunkenness, profanity, gambling and carrying unlawful weapons* are prohibited, and if *practiced by a teacher will lead to the cancellation of his certificate*, or by a pupil to his expulsion from the school.") (emphasis added); *Rules and Regulations [for the Government of the District Schools of Boon Township, Warrick County]*, BOONVILLE INQUIRER (IN), December 27, 1873, at 2 (**Exhibit 74**) ("Pupils and *teachers* are forbidden to bring firearms, ammunition or fire crackers upon the school premises.") (emphasis added); *see also* 2 PASCHAL, A DIGEST OF THE LAWS OF TEXAS, *supra*, at 1322 (extending prohibition to all persons); THE SCHOOL LAWS OF VERMONT IN FORCE APRIL 1, A. D. 1893, *supra*, at 64 (same); ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA, *supra*, at 30-31 (same); STATUTES OF OKLAHOMA 1890, *supra*, at 495-96 (same).

## III. The History of "Sensitive Places" Relative to Protecting the Gathering Public at Designated Places and/or Times

25. "Without question, the overarching [historical] rationale that binds virtually all firearms regulations from their genesis…through the close of the nineteenth century is that of public safety." Charles, Heller*'s "Sensitive Places" Carve-Out Post*-Rahimi, *supra*, at 891.

---

by…carrying weapons, or persistent violation of any of the rules and regulations."); ANNUAL REPORT OF THE PUBLIC SCHOOLS OF CHIPPEWA FALLS WIS. 30 (1903), https://catalog.hathitrust.org/Record/005652131 ("Pupils shall not bring to school any fire-works, gunpowder, fire-arms or percussion caps…unless directed by a teacher.").

"Whether it be laws prohibiting armed assemblage without the consent of government officials or laws prohibiting the discharge of firearms withing city limits, the long arc of firearm regulation historically informs…that ensuring public safety from firearms violence has always been an important legislative interest." *Id*. This especially bodes true for historical "sensitive places" laws, which were generally adopted to protect the public from firearms-related violence at designated places and times where the public was generally known to gather, whether it be to engage in commerce or recreation.

26.    Most mid-to-late nineteenth century state "sensitive places" law bear this out. Consider Missouri's "sensitive places" law adopted in 1874. ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874), https://catalog.hathitrust.org/Record/000534559.  The law not only prohibited the carrying of firearms at designated places where the public was generally known to gather, such as schoolrooms and places where "people *may be* assembled for educational literary, or social purposes, but also at designated times, such as in churches "*where* people have assembled for religious worship[.]" *Id*. (emphasis added). Next consider Georgia's "sensitive places" law adopted in 1870. ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED…AT THE SESSION OF 1870, at 421 (1870), https://catalog. hathitrust.org/Record/100143502. The law not only prohibited the carrying of firearms at designated places, such as "*any* Court of justice" or "any place of public worship," but also at designated times, such as during elections or public gatherings. *Id*. (emphasis added).

27.    Most locality "sensitive places" laws were also adopted to protect the public from firearms-related violence at designated places and times where the public was generally known to gather to engage in commerce or recreation. Laws prohibiting armed carriage within a locality's "incorporate" or "corporate" limits, whether done openly, concealed, or both, are

29

perhaps the most sweeping examples of lawmakers prohibiting firearms at designated places where the public generally gathered, *i.e.,* the locality's commercial and public epicenters. *See supra* pp. 12-17 and accompanying notes. Another notable example is firearm prohibitions within public parks. Charles, Heller*'s "Sensitive Places" Carve-Out Post*-Rahimi, *supra*, at 878-84 and accompanying notes. Across the country, from Connecticut to California, from Michigan to Georgia, and so forth, and so forth, firearm prohibitions at parks were adopted by state and local lawmakers alike and continued unabated into the early twentieth century. *Id* (providing over 45 mid-to-late nineteenth century examples and an additional 30 early twentieth century examples); *see also* Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 HARV. L. & POL'Y REV. 201 (2024).

28.    In addition to localities adopting "sensitive places" laws where the public was generally known to engage in commerce and recreation, event specific firearm prohibitions were posted in local newspapers from time to time. Indeed, many of these event specific firearm prohibitions were posted by the proprietors of exhibition halls, theaters, and the like.[78] However,

---

[78] *See Amusements*, DAILY MEMPHIS AVALANCHE (TN), March 5, 1878, at 4 (**Exhibit 75**) ("No weapons allowed in the Hall."); *Masquerade Ball*, PUBLIC LEDGER (Memphis, TN), November 27, 1872, at 4 (**Exhibit 76**) ("No weapons or arms of any kind will be allowed in the building."); *Utah: The Public Places*, GOLD HILL DAILY NEWS (NV), April 21, 1864, at 2 (**Exhibit 77**) (noting that at the Salt Lake City theater the rules stipulate "no fire-arms allowed to be carried"); *NOTICE*, NEW YORK HERALD (New York, NY), March 25, 1864, at 8 (**Exhibit 78**) ("No weapons allowed on the floor [of the Ball of the Young Bachelors' Dramatic and Social Union]."); *Get Your Ticket in Time*, AMERICAN CITIZEN (Canton, MS), November 10, 1877, at 2 (**Exhibit 79**) ("No concealed weapons allowed inside of Ball room under any circumstance.").

some were expressly directed by local government officials[79] or perhaps directed by local

government officials given the event took place on public land.[80]

29.     It is impossible to historically determine how often firearms were banned at

public or private events throughout the nineteenth century. To my knowledge, there is nothing in

nineteenth century statute or ordinance books requiring proprietors or event planners to post

firearm prohibition notices in a local newspaper prior to a public event being held. In many, if

not most cases, the proprietors or event planners may have simply posted a "no firearms

allowed" or "no weapons allowed" notice at the event itself.[81] What is for certain is that it was

well within the contours of local government police power to reduce firearms-related deaths and

injuries during public events by either a) ramping up the enforcement of existing firearm

restrictions or b) to temporarily applying more stringent firearm restrictions. The history and

tradition of local governments more heavily restricting the use and carrying of firearms during

Fourth of July celebrations weigh this out.

---

[79] *See, e.g., Washington and American Ball Room*, DAILY PICAYUNE (New Orleans, LA), February 8, 1946, at 3 (**Exhibit 80**) ("No weapons allowed in Ball Room, by order of the City Council."); *Orleans Ball Room*, DAILY PICAYUNE (New Orleans, LA), January 12, 1945, at 3 (**Exhibit 81**) ("No weapons are allowed in the Ball Room, by order of the City Council."); *Orleans Ball Room*, DAILY PICAYUNE (New Orleans, LA), November 10, 1844, at 3 (**Exhibit 82**) ("No weapons are allowed in the Ball Room, by order of the City Council.").

[80] *See, e.g., Premium List of the Fifth Annual Fair, of the Lafayette Ag'l & Mech. Society: Regulations*, WEEKLY CAUCASIAN (Lexington, MO), July 29, 1871, at 3 (**Exhibit 83**) ("The carrying of fire-arms is positively prohibited, and any person found with them on, will be promptly disarmed."); *Premium List of the Lafayette Ag'l & Mech. Society to be Held at Lexington: Regulations*, WEEKLY CAUCASIAN (Lexington, MO), August 13, 1870, at 4 (**Exhibit 84**) ("The carrying of fire-arms is positively prohibited, and any person found with them on will be promptly disarmed."); *Notice*, LEXINGTON REGISTER (MO), October 21, 1869, at 3 (**Exhibit 85**) ("The carrying of fire-arms on the Fair Grounds is expressly and positively forbidden, and any person having them in their possession will be promptly disarmed. This order will and shall be obeyed.").

[81] *See, e.g., [Texas Democratic Congressional Convention]*, SEATTLE DAILY PRESS (WA), August 28, 1888, at 2 (**Exhibit 86**) (noting how every door in the hall where the Texas Democratic Congressional Convention had a notice stating, "No weapons allowed in this hall," and every person who entered was searched); *Weapons Not Allowed*, EVENING STAR (DC), October 20, 1893, at 9 (**Exhibit 87**); *New Orleans Gambling*, PRESS (Cleveland, OH), April 9, 1885, at 4 (**Exhibit 88**).

30.     Throughout the nineteenth century, most U.S. residents lived outside of urban centers. *See* Leon E. Truesdell, *The Development of the Urban-Rural Classification in the United States: 1874 to 1949*, CURRENT POPULATION REPORTS 1-8 (Bureau of the Census, 1949). It was not until 1850 that more than 10 percent of U.S. residents lived inside urban centers, and not until 1920 that the 50 percent threshold was achieved. *See id*. at 8-9; *The Progress of the Nation—1790-1870, in* FRANCIS A. WALKER, STATISTICAL ATLAS OF THE UNITED STATES BASED ON THE RESULTS OF THE NINTH CENSUS 1870, at 5 (1874). This U.S. population shift towards urban centers, coupled with advancements in firearm technology, *see supra* pp. 6-7, 18, prompted local governments to more stringently regulate firearms come the mid-to-late nineteenth century. And perhaps no single mid-to-late nineteenth century event prompted more stringent local firearm restrictions than the Fourth of July.

31.     Given the number of firearm-related injuries that typically took place within urban centers during Fourth of July festivities, this is unsurprising.[82] Thus, it became common for localities to post notices in newspapers reminding residents that the discharging and use of firearms during Fourth of July festivities would not be countenanced.[83] This is not to say, of

---

[82] *See, e.g., Useless Waste of Human Life*, SALT LAKE HERALD (Salt Lake City, UT), July 6, 1906, at 1 (**Exhibit 89**); *Erie*, CLEVELAND LEADER (OH), July 7, 1880, at 1 (**Exhibit 90**) ("There were quite a number of accidents [in Erie, PA] on Monday, the majority being caused by firearms."); *A Dark Record: Accidents and Deaths in Cleveland, for the Past Ten years, by Careless Shooting on the Fourth of July*, CLEVELAND LEADER (OH), June 24, 1879, at 8 (**Exhibit 91**); *Accidents: Fourth of July Accidents*, BOSTON EVENING TRANSCRIPT (MA), July 5, 1877, at 1 (**Exhibit 92**; *Casualties: Accidents from Fire Arms and Fireworks*, PHILADELPHIA INQUIRER (PA), July 6, 1874, at 2 (**Exhibit 93**); *The Fourth of July*, NEW-YORK TRIBUNE (New York, NY), July 6, 1864, at 7 (**Exhibit 94**) (providing a list of firearm-related injuries from the Fourth of July in New York City and Brooklyn respectively).

[83] *See, e.g., Official Notice*, WILMINGTON DAILY COMMERCIAL (DE), July 3, 1874, at 1 (**Exhibit 95**); *Fire Explosives Forbidden in the City: The Law to be Respected and Enforced*, DAILY ARGUS (Rock Island, IL), June 24, 1876, at 4 (**Exhibit 96**); *Special Notice—4th of July*, EVENING STANDARD (New Bedford, MA), June 26, 1868, at 2 (**Exhibit 97**); *Proclamation*, CHARLESTON DAILY COURIER (SC), December 22, 1869, at 2 (**Exhibit 98**); *Mayor's Proclamation*, DAILY MISSOURI REPUBLICAN (St. Louis, MO), July 4, 1861, at 2 (**Exhibit 99**).

course, that every locality prohibited the discharging and/or use of firearms during Fourth of July

festivities.[84] Some localities provided almost carte blanche licenses for their residents to

discharge their firearms in the air in celebration.[85] Meanwhile, others directed residents to

discharge their firearms in celebration of the Fourth of July only at specific locations and/or

during specific times.[86] Nevertheless, the historical fact remains that it was common for localities

to severely restrict the use and carrying of firearms to reduce firearms-related deaths and injuries

during the Fourth of July,[87] as well as during other festive holidays.[88]

---

[84] This is not surprising given the prevalence of firearms localism from the mid-to-late nineteenth century through the mid-twentieth century. *See supra* p. 10.

[85] *See, e.g., Allegheny Councils*, PITTSBURGH COMMERCIAL (PA), June 24, 1876, at 4 (**Exhibit 100**); *City Ordinances*, EFFINGHAM DEMOCRAT (IL), July 1, 1875, at 2 (**Exhibit 101**); *Ordinance No. 8*, June 9, 1871, *reprinted in* OSAGE WEEKLY CHRONICLE (Burlingame, KS), June 15, 1871, at 2 (**Exhibit 102**); ORDINANCES, BY-LAWS AND RESOLUTIONS, OF THE INCORPORATED VILLAGE OF RAVENNA, OHIO, OF GENERAL CHARACTER, IN FORCE NOVEMBER 20, 1869, at 19 (1870), https://catalog.hathitrust.org/Record/008604555.

[86] *See, e.g., By the Mayor*, RICHMOND ITEM (IN), July 1, 1884, at 1 (**Exhibit 103**); *By the Mayor*, PRESS AND DAILY DAKOTAN (Yankton, SD), July 3, 1882, at 4 (**Exhibit 104**); *Mayor's Proclamation*, ST. JOSEPH DAILY GAZETTE (MO), July 3, 1880, at 4 (**Exhibit 105**).

[87] *See, e.g., The City*, FALL RIVER EVENING NEWS (MA), July 1, 1873, at 2 (**Exhibit 106**) (directing the marshal to strictly enforce the city order to prohibit the discharging of firearms from the evening of July 3rd through July 5th); *Proclamation*, PITTSBURGH COMMERCIAL (PA), June 27, 1870, at 1 (**Exhibit 107**) (directing the chief of police to "strictly" enforce the prohibition on firing firearms during the Fourth of July); *City Government*, STANDARD-TIMES (New Bedford, MA), July 3, 1863, at 2 (**Exhibit 108**) (noting how the Board of Aldermen ordered the major to "employ a sufficient number of extra police on the night preceding the 4th, to prevent the discharge of fire-arms"); *City Marshal's Office*, PORTLAND DAILY PRESS (ME), July 2, 1878, at 3 (**Exhibit 113**) (noting the strict enforcement of the ordinance prohibiting the discharge of firearms on the Fourth of July).

[88] *See, e.g., A City Ordinance Against Firearms and Fireworks*, MACON TELEGRAPH AND MESSENGER (GA), December 24, 1881, at 1 (**Exhibit 131**) ("That the use of fire-arms of any kind or description inside the city limits during the holidays, shall be strictly prohibited, and any person who shall be found violating the city ordinance in this respect shall be fined to the fullest extent of the penalty prescribed in the charter."); *Proclamation*, ALEXANDRIA GAZETTE (VA), December 23, 1870, at 1 (**Exhibit 109**) (directing "additional police" be on duty to enforce the prohibition on discharging firearms during the Christmas and New Years holidays); *State of South Carolina: City of Charleston*, CHARLESTON MERCURY (SC), December 26, 1853, at 1 (**Exhibit 110**) (ordering the appointment of dozens of special constables to enforce the city's firearm discharge laws during the Christmas and New Years holidays).

32.    In 1872 for instance, on the Fourth of July, Brooklyn, New York "strictly enforce[d]" its "law against the using of any species of firearms within the precincts of [Prospect Park]" to protecting the attending from dangerous associated with the improperly discharged firearms.[89]  Two years later, in 1874, Baltimore, Maryland, both widely publicized and strictly enforced its prohibition on discharging firearms and fireworks during its Fourth of July festivities. The result was "[n]ot one accident or offense, fatal or otherwise…from firearms," nor a "single serious criminal case…reported."[90] Similarly, in 1880, Cleveland, Ohio ordered that there "be no firearms allowed on the streets during [its Fourth of July] celebration[.]"[91]  The result was a "very material reduction…in the risk of serious accidents," of which "no one found any fault" in the prohibition.[92] Subsequently in 1889, St. Louis, Missouri adopted very strict enforcement measures to prevent the use and discharging and firearms during its Fourth of July celebration. "We shall try to put a stop to the use of guns, pistols, cat-rifles and other firearms which not only annoy by their noise, but endanger the lives of citizens," stated St. Louis Mayor Edward A. Noonan in the weeks leading up to the celebration, adding, "the Chief of Police…must be more vigilant than usual on the Fourth, and we will put a stop to the use of firearms if we have to fill the station-houses."[93] The result was a notable absence of firearm-related injuries.[94]

---

[89] *The Fourth of July*, BROOKLYN DAILY UNION (NY), July 1, 1872, at 1 (**Exhibit 132**).

[90] *National Independence Day*, THE SUN (Baltimore, MD), July 6, 1874, at 1 (**Exhibit 111**); *see also What Baltimore Has Proved About the Fourth of July*, CHICAGO DAILY TRIBUNE (IL), July 13, 1874, at 2 (**Exhibit 112**).

[91] *Local Brevities*, CLEVELAND LEADER (OH), June 30, 1880, at 8 (**Exhibit 114**).

[92] *A Regal Day*, CLEVELAND LEADER (OH), July 6, 1880, at 1 (**Exhibit 115**).

[93] *A Quiet Fourth of July*, ST. LOUIS POST-DISPATCH (MO), June 17, 1889, at 8 (**Exhibit 116**). *See also The Glorious Fourth*, ST. LOUIS POST-DISPATCH (MO), July 3, 1889, at 4 (**Exhibit 117**).

[94] *Independence Day*, ST. LOUIS POST-DISPATCH (MO), July 5, 1889, at 3 (**Exhibit 118**).

**IV.      The History of Places of Worship or Religious Congregation as a "Sensitive Place"**

33.      It is difficult to say when the first express prohibition on carrying dangerous weapons into places of worship or religious congregation was adopted. In Wales, as early as 1403, it was established that "no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people…" 4 Hen 4, c. 29 (1403). A little more than a century later, the prohibition was affirmed, making it unlawful to bring any dangerous weapons, such as any "handg[u]n…halberde…or any other man[n]er of weapon, privye cote or armour defence," before any "Sessions or Courte or to any place within the distaunce of two myles from the same…nor to any towne, church, fayre, market, or other congregacion, except [i]t be upon the hu[e] or outcr[y]made of any felonye robberie done or perpetrated" across Wales. 26 Hen. 8, c. 6, § 3 (1534).

34.      As far as I am aware, the Wales prohibition was not extended or expressly adopted within the American Colonies.[95] It was not until the mid-to-late nineteenth century—the

---

[95] From the mid-seventeenth through the late eighteenth century, several American colonies adopted laws requiring parishioners to bring their arms to church service. However, the purpose behind these laws was **_not_** to codify a right to go armed in or around churches. Rather these laws were adopted to either a) quell potential slave revolts, *see, e.g.,* 7 THE STATUTES OF LARGE OF SOUTH CAROLINA 417-19 (1840), https://catalog.hathitrust.org/Record/008607543 (reprint of a 1743 South Carolina law requiring white persons to bring arms to church for the "better ordering and government negroes and other slaves"); 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA (pt. 1) 137-38 (1911), https://catalog.hathitrust.org/Record/010447506 (law requiring white persons to bring arms to church to quell "internal dangers and insurrections"); *see also* SALLY E. HADDEN, SLAVE PATROLS: LAW AND VIOLENCE IN VIRGINIA AND THE CAROLINAS 140-41 (2001); Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, CARDOZO L. REV. 1343, 1350-51 (2022), or b) logistically streamline the ability of local militia officers to hold the government sponsored training of "well-regulated" militias, *see, e.g.*, 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 534 (1819), https://catalog.hathitrust.org/Record/001625679 (1755 Virginia law declaring it will be lawful for militia officers to require all militiamen "to go armed to their respective parish churches" for training). These latter, "well-regulated" militia-centric 'bring your arms to church' laws were *compulsory* laws adopted within the constitutional confines of state plenary power to call forth and muster the militia for training. *See* Charles, *1792 National Militia Act*, *supra*, at 344-46, 374-90 (outlining the history of this state

period when most categorical "sensitive places" laws were becoming engrained and widespread with the advent and commercial proliferation of repeating firearms—that American lawmakers began adopting laws expressly prohibiting dangerous weapons at places of worship or religious congregation. *See supra* pp. 6-18. The North Carolina religious campgrounds of Stanley Creek and Rock Spring for instance obtained the consent of the North Carolina Assembly to prohibit "the carrying of guns or pistols within the incorporate limits of the Camp Ground" when people were "assembled for public worship...." *Stanley Creek Camp Ground, Gaston County, N.C.— Laws and Regulations*, *reprinted in* SOUTHERN HOME (Charlotte, NC), September 22, 1873, at 2 (**Exhibit 119**); *Rock Spring Camp Ground, Lincoln Co., N.C.: Laws and Regulations*, *reprinted in* CHARLOTTE DEMOCRAT (NC), July 30, 1872, at 2 (**Exhibit 120**). Similarly, the town of Columbia, Missouri, which in accord with Missouri state law,[96] passed an ordinance prohibiting the carrying of dangerous weapons "into any *church, or place where people have assembled for religious worship*; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers,*

---

plenary power over the militia); *see also Presser v. Illinois*, 116 U.S. 252 (1886) (affirming state plenary power to muster, assemble, and train the militia); *District of Columbia v. Heller*, 554 U.S. 570, 620-21 (2008) (noting that nothing in *Heller* seeks to upend *Presser*'s holding of forbidding bodies of men from marching or assembling with arms).

[96] ACTS OF THE…GENERAL ASSEMBLY OF THE STATE OF MISSOURI 43 (1874), https://catalog.hathitrust. org/Record/000534559; *see also The Supreme Court: On Carrying Concealed Weapons*, STATE JOURNAL (Jefferson City, MO), April 12, 1878, at 2 (**Exhibit 121**) (copy of 1878 Missouri Supreme Court decision *State v. Reando*, upholding a constitutional challenge to the state's "sensitive places" law). The case cannot be found in the Missouri Supreme Court Historical Database but was briefly reported in a contemporaneous issue of *The Central Law Journal*. *See Abstract of Decisions of the Supreme Court of Missouri: October Term, 1877*, 6 CENTRAL L. J. 16, 16 (1878) ("The act of the legislature prohibiting the conveying of fire-arms into courts, churches, etc….is constitutional. It is a police regulation not in conflict with the provisions of the organic law…*State v. Reando*.").

*Etc.*, May 22, 1890, *supra*, at 34-35 (emphasis added); *see also* LAWS OF MISSOURI: GENERAL AND LOCAL LAWS PASSED AT THE REGULAR SESSION OF THE TWENTY-EIGHTH GENERAL ASSEMBLY 158, 166 (1877), *available at* https://catalog.hathitrust.org/Record/000534559 (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise").[97] Stockton, Kansas also adopted an ordinance prohibiting the carrying of dangerous weapons "*into any church or place where the people have assembled for public worship*, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *supra*, at 1 (emphasis added).

35.     As for mid-to-late nineteenth century state laws prohibiting the carrying weapons into places of worship or religious congregation, in 1869 Tennessee prohibited the carrying of dangerous weapons into "any election…fair, race course, or *other public assembly of the people*." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, *supra* at 108 (emphasis added). Not long thereafter, Texas prohibited the carrying of dangerous weapons "into any *church or religious assembly*, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or

---

[97] Like Columbia, Webb City adopted a similar law. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, *supra* at 100.

to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…" 2 PASCHAL, A DIGEST OF THE LAWS OF TEXAS, *supra*, at 1322 (emphasis added). That same year, Georgia provided that "no person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any . . . *place of public worship*[.]" ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED…AT THE SESSION OF 1870, at 421 (1870), https://catalog.hathitrust.org/Record/100143502 (emphasis added). By 1877, Virginia prohibited persons from both "habitually carry[ing] about his person, hid from common observation, any pistol . . . or any weapon on the like kind," ACTS AND JOINT RESOLUTIONS PASSED BY THE GENERAL ASSEMBLY OF THE STATE OF VIRGINIA DURING THE SESSION OF 1877-78, at 301 (1878), https://catalog.hathitrust.org/Record/008885427, and more specifically from "carrying any gun, pistol, . . . or other dangerous weapon, *to any place of worship while a meeting for religious purposes is being held at such place*," *id*. at 305 (emphasis added).

36.    In 1889, the U.S. Territory of Arizona followed suit providing that "[i]f any person shall go into any *church or religious assembly* . . . and shall have or carry about his person a pistol or other firearm . . . he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person." ACTS, RESOLUTIONS AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA, *supra*, at 30-31 (emphasis added). Then there was the U.S. Territory of Oklahoma, which by 1890 had prohibited the carrying of dangerous weapons "into any *church or religious assembly*, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social

38

gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly…" STATUTES OF OKLAHOMA 1890, *supra*, at 495-96 (emphasis added).

## V.    The History of Regulating Liquor and Arms Bearing

37.    All the while "sensitive places" laws governing places of worship or religious observation were spreading across the country, as were as other categories of "sensitive places" laws, so too were laws regulating liquor and arms bearing. It is difficult to say when the first law restricting arms bearing and liquor came into existence in the American Colonies. *See, e.g.*, *General Court for Elections, Boston*, May 28, 1679, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 6. MASSACHUSETTS ENACTMENTS 125 (1947), https://catalog. hathitrust.org/Record/100721030 (prohibiting the bringing of "any wine, strong liquor, cider, or any other inebriating" drinks to any militia muster or training). What is known is that in the mid-eighteenth century, many colonial lawmakers viewed liquor and arms bearing as a dangerous combination. For instance, in 1746, New Jersey made it unlawful "to sell any strong Liquor" to any militiaman during the "Days or Times that they are obliged to appear in Arms at the Place of Mustering or Training, or within a Mile thereof, until after they are dismissed for that day"— militiamen on leave from their commanding officers excluded. *An Act for Better Settling and Regulating the Militia of the Colony of New-Jersey, for the Repelling of Invasion, and Suppressing Insurrections and Rebellions*, May 8, 1746, *reprinted in reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF JERSEY 139, 146 (1776), https://catalog.hathitrust .org/Record/010448351. Similarly, in 1756, Delaware made it unlawful to "expose to sale at or Bring on any Pretence whatsoever any strong Liquor" to any militia muster or meeting. *An Act for the Establishing a Militia in this Government*, March 24, 1756, *reprinted in* 2 MILITARY

OBLIGATION: THE AMERICAN TRADITION: PART 3. DELAWARE ENACTMENTS 10, 12 (1947), https://catalog.hathitrust.org/Record/100721030; *see also An Act for Regulating the Militia of the Province of Maryland*, May 22, 1756, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION: PART 5. MARYLAND ENACTMENTS 83, 93 (1947), https://catalog.hathitrust .org/Record/100721030 (prohibiting the selling, disposing, or vending of "Strong Liquor" at "any place of training or at any other Place within Five Miles of any Place of training").

38.    After the ratification of the Constitution, lawmakers continued to view liquor and arms bearing as a potentially dangerous combination. *See, e.g., An Act for the Regulation of the Militia of New-Jersey*, June 13, 1799, *reprinted in* LAWS OF THE STATE OF NEW JERSEY 436, 444 (William Patterson ed., 1800), https://catalog.hathitrust.org/Record/010448353 ("Any person, who shall bring any kind of spiritous liquors to the place of exercise, shall forfeit such liquors…"); *New Militia Law: An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania*, April 11, 1793, *reprinted in* INDEPENDENT GAZETTEER (Philadelphia, PA), April 20, 1793, at 1, 4 (**Exhibit 122**) ("No company or regiment shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged, and any person who shall bring any kind of spiritous liquors to such place of training, shall forfeit such liquors so brought…"); AN ACT FOR THE BETTER REGULATION OF THE MILITIA, IF THE CITY OF BALTIMORE, PASSED BY THE LEGISLATURE OF MARYLAND, DECEMBER SESSION, 1817, at 15 (1818), https://archive.org/details/gpl_1337206/page/n9/mode/2up (law prohibiting militia members from "appear[ing] drunk"). Of course, not every state adopted liquor-related arms bearing restrictions, nor did every locality effectively enforce them. This is in part why the federal-state militia system fell into disrepute by the mid-nineteenth century. *See, e.g., Lena London, The Militia Fine 1830-1860*, 15 MILITARY AFFAIRS 133, 136 (1951) ("The excessive consumption of

liquor at militia musters resulted in more than just inebriation. Disorderly conduct and riots were often the outcome."); CHARLES, ARMED IN AMERICA, *supra*, at 79, 130 (containing historical images of the militia drinking alcohol during musters).

39.    As far non-militia-based restrictions on liquor and arms bearing, the U.S. Territory of New Mexico appears to have been the forefront. There, in 1852, it was unlawful for "any person" to carry "fire arms or other deadly weapons" into any "ball where Liquors are sold…" LAWS OF THE TERRITORY OF NEW MEXICO, PASSED BY THE SECOND LEGISLATIVE ASSEMBLY IN THE CITY OF SANTA FE 69 (1853), https://catalog.hathitrust.org/Record/010476920. However, it was not until after the Civil War—after lawmakers and public officials began to increasingly witness the negative consequences of alcohol on war veterans[98]—that broad, general restrictions on liquor and arms bearing began to spread across the country. At the state level, Kansas (1867),[99] Mississippi (1878),[100] Missouri (1879),[101] Oklahoma (1890),[102] and Wisconsin (1883)[103] all enacted liquor-related arms bearing restrictions.

---

[98] *"Half the Time Unfit for Duty": Alcoholism in the Civil War*, NATIONAL MUSEUM OF CIVIL WAR MEDICINE, September 2, 2021, https://www.civilwarmed.org/alcoholism/.

[99] *An Act to Prevent the Carrying of Deadly Weapons*, February 23, 1867, *reprinted in* LAWS OF THE STATE OF KANSAS 25 (1867), https://catalog.hathitrust.org/Record/100836175 (prohibiting any "person under the influence of intoxicating drink" from carrying dangerous weapons).

[100] *Laws of the State of Mississippi: An Act to Prevent the Carrying of Concealed Weapons, and For Other Purposes*, February 28, 1878, *reprinted in* WEEKLY CLARION (Jackson, MS), March 13, 1878, at 3 (**Exhibit 123**) ("That it shall not be lawful for any person to sell to…any person intoxicated, knowing him to be…in a state of intoxication, any" dangerous weapons).

[101] REVISED STATUTES OF THE STATE OF MISSOURI, 1879 at 224 (1879), https://catalog.hathitrust.org/Record/002030306 (law prohibiting any person from carrying any dangerous weapons "upon his person when intoxicated or under the influence of intoxicating drinks").

[102] STATUTES OF OKLAHOMA 1890, *supra*, at 496 (prohibiting the carrying of dangerous weapons "to any place where intoxicating liquors are sold").

[103] *An Act to Prohibit the Use and Sale of Pistols and Revolvers*, April 7, 1883, *reprinted in* LAWS OF WISCONSIN 290 (1883), https://catalog.hathitrust.org/Record/005877100 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver.").

40.    And given the prevalence of firearms localism during the mid-to-late nineteenth century, *see supra* p. 10, so too did many localities. Much like "sensitive places" and armed carriage licensing laws during this period, it is impossible to historically pinpoint just how many localities enacted ordinances governing liquor and arms bearing. Many localities made intoxication and unlawful arms bearing separate offenses, each with their own penalty or fine. Other localities, however, combined the two offenses into one. Such was the case for Grand Junction, Colorado circa 1884, which made it unlawful to not only "carry any…weapon or weapons when drunk or in a state of intoxication," but also to "sell, barter, loan or deliver any such weapon or weapons to any drunk or intoxicated person." *Grand Junction News Supplement: The Revised Ordinances of the Town of Grand Junction Colo.*, GRAND JUNCTION NEWS (CO), December 20, 1884, at 3, 4. (**Exhibit 124**). In 1895, Rocheport, Missouri adopted an ordinance, prohibiting the carrying of "any…weapon upon or about [their] person when intoxicated or under the influence of intoxicating drinks…" *An Ordinance: Misdemeanors*, undated, *reprinted in* ROCHEPORT COMMERCIAL (MO), September 20, 1895, at 8 (**Exhibit 8**). Meanwhile, in 1891, Lyons, Kansas adopted an ordinance prohibiting the carrying of any "pistol, bowie knife, dirk or other deadly weapon" with the city limits by anyone "not engaged in any legitimate business" or "under the influence of intoxicating drink…" *Ordinance No. 179*, September 7, 1891, *reprinted in* LYONS REPUBLICAN (KS), September 10, 1891, at 4 (**Exhibit 125**). There are indeed other examples to point to,[104] but none as broad as the prohibition adopted by two of the country's

---

[104] *Town Ordinance No. 21*, August 7, 1894, *reprinted in* K COUNTY DEMOCRAT (Blackwell, OK), August 23, 1894, at 8 (**Exhibit 127**) (prohibiting the general carrying of dangerous weapons within the "corporate limits," but also prohibiting all "public officers" from carrying if "under the influence of intoxicating drinks"); *An Ordinance—To Prohibit Intoxication Breach of the Peace, Carrying of Deadly Weapons…and to Repeal Certain Ordinances in Said City*, December 22, 1887, *reprinted in* WALLACE COUNTY REGISTER (KS), December 24, 1887, at 7 (**Exhibit 128**) ("Any person who shall, while intoxicated be found carrying on his person, a pistol…or other deadly weapon, shall upon conviction be fined in a sum not exceeding $100, or by imprisonment in the city jail not exceeding 3 months.");

42

three most populous cities, New York and Brooklyn respectively. Both enacted prohibitions on the selling, loaning, or giving of any dangerous weapon to a person that posed "any danger to [the] life" of others, which naturally would have precluded the selling, loaning, or giving of any dangerous weapons to any intoxicated persons. *See* METROPOLITAN BOARD OF HEALTH: CODE OF HEALTH ORDINANCES, AND RULES AND SANITARY REGULATIONS 52 (1866), https://catalog. hathitrust.org/Record/008905639; *Sanitary Code*, July 15, 1873, *reprinted in* BROOKLYN UNION (NY), August 21, 1873, at 1 (**Exhibit 126**).

41.     As far as I am aware, not one nineteenth century legal commentator or nineteenth century court of law found any liquor-related arms bearing restriction unconstitutional.  In fact, the opposite is true. *See Shelby*, 90 Mo. at 468-69; *see also Tipler v. State*, 57 M. 365 (1880), *reprinted in* 57 REPORTS OF CASES IN THE SUPREME COURT FOR THE STATE OF MISSISSIPPI (1880) (noting that the reasonable ness exception to the state's armed carriage law could not apply to instances of "idle threats" or "'the offspring of intoxication"); *Concealed Weapons: Judge Brannon's Decision on This Subject*, WHEELING REGISTER (WV), October 15, 1883, at 1 (**Exhibit 130**) (noting that the principal purpose of most armed carriage restrictions are to prevent an "armed riot or affray," particularly during "dangerous moments of anger or intoxication").

## VI.     Historical Summary

42.     Laws restricting and/or prohibiting the use and carrying of dangerous weapons at "sensitive places," to include places of worship or religious congregation, places where large

---

*Ordinance No. 39*, January 4, 1886, *reprinted in* DADE COUNTY ADVOCATE (Greenfield, MO), January 21, 1886, at 4 (**Exhibit 129**) (prohibiting the carrying of dangerous weapons by those "intoxicated, or under the influence of intoxicating drinks").

public assemblies generally took place, city/town centers, places where children regularly congregated, planned events, and bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed, are an important part of our American history and tradition of firearm regulation. Said laws date back as far as the late eighteenth century and grew exponentially during the mid-to-late nineteenth century—a time when the country was underdoing significant demographic changes and firearm technology and lethality had advanced significantly.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 9, 2026

_____
PATRICK CHARLES

44