**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IVAN ANTONYUK,<br>COREY JOHNSON, and<br>ALFRED TERRILLE,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, WILLIAM FITZPATRICK, in his official capacity as Onondaga County District Attorney, TOBIAS J. SHELLEY, in his official capacity as Sheriff of Onondaga County, MARK RUSIN, in his official capacity as Chief of Police of Syracuse, and LEE C. KINDLON, in his official capacity as District Attorney of Albany County,<br><br>Defendants. | ) | Civil Action No. 22-986 (GTS-PJE) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SUPERINTENDENT JAMES' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

ARGUMENT

I. DEFENDANT MAY NOT REFRAME PLAINTIFFS' CHALLENGE TO HIS LIKING ........ 1

II. DEFENDANT'S ATTEMPT TO CONDITION ONE CONSTITUTIONAL RIGHT ON THE SURRENDER OF ANOTHER IS "INTOLERABLE" ........ 3

III. NEW YORK'S "SENSITIVE LOCATIONS" ARE UNCONSTITUTIONAL ........ 8

A. Contrary to the Supreme Court's Precedents, Defendant Urges "Freewheeling Reliance on Historical Practice" from All Historical Time Periods ........ 8

B. The CCIA's Parks Ban Violates the Second Amendment, Facially and As Applied ........ 9

1. Defendant's Attempt to Reframe Plaintiffs' Challenge Falls Flat ........ 9

2. There Is No Historical Tradition of Banning Firearms in Rural Parks ........ 10

C. The CCIA's Gun Ban in Locations Selling Alcohol Is Unconstitutional ........ 14

1. Defendant's "Location-Based" Argument Fails ........ 15

2. Defendant's "Vulnerable Populations" Argument Fails ........ 17

3. Defendant's "Crowded Spaces" Argument Fails ........ 18

4. Defendant's "Social Settings" Argument Fails ........ 19

5. Defendant's Remaining Arguments Fall Flat ........ 19

D. The CCIA's Ban on Guns in Theaters Is Unconstitutional ........ 22

E. The CCIA's Ban on Guns in Zoos Is Unconstitutional ........ 28

F. The CCIA Plainly Prohibits the "Possession" of Firearms in "Airports," So Plaintiffs Have Standing to Challenge It ........ 32

IV. PLAINTIFFS' PRIVATE PROPERTY CHALLENGE IS NOT MOOT ........ 34

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

***Page***

**U.S. Constitution**

Amendment I ....................7
Amendment II .................... 3, passim
Amendment IV....................7
Amendment V ....................3, 4
Amendment VI....................7
Amendment XIV....................9

**Statutes**

18 U.S.C. § 926A....................33, 34
1632 Va. Acts 198 ....................25
1869-1870 Tenn. Pub. Acts, 2d. Sess., ch. 13, § 1....................27
1871 Tex. Gen. Laws 1st Sess. 25, ch. 34, §§ 1-9 ....................28
1879 Mo. Rev. Stat., ch. 24, art. 2, §§ 1274-1278 ....................28
1881 Statutes of Nevada 20 ....................24
1889 Ariz. Sess. Laws 30 no. 13, §§ 1-9....................28
1890 Okla. Terr. Sess. Laws 495, ch. 25, art. 47, §§ 1–10 ....................28
Concealed Carry Improvement Act .................... 1, passim
N.Y. Penal Law § 70.00(2)(e) ....................28
N.Y. Penal Law § 265.01-e(1)....................32
N.Y. Penal Law § 265.01-e(2)(n)....................32
N.Y. Penal Law § 265.01-e(2)(o)....................17
N.Y. Social Services Law § 390....................31

**Cases**

*ANJRPC, Inc. v. Att'y Gen. N.J.*, 2026 U.S. App. LEXIS 21156 (3d Cir. July 17, 2026)................5
*Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022) ....................3, 31
*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023)....................22
*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) ....................32, 34
*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) .................... 1, passim
*Baxter v. Palmigiano*, 425 U.S. 308 (1976)....................4
*Christian v. James*, 176 F.4th 189 (2d Cir. 2026) ....................9, 10
*Citizens United v. FEC*, 558 U.S. 310 (2010)....................3, 21
*District of Columbia v. Heller*, 554 U.S. 570 (2008).................... 8, passim
*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020)....................14
*Ex parte Royall*, 117 U.S. 241 (1886)....................5
*Giambalvo v. Suffolk County*, 155 F.4th 163 (2d Cir. 2025) ....................35
*Hardaway v. Nigrelli*, 639 F. Supp. 3d 422 (W.D.N.Y. 2022)....................22
*Hill v. State*, 53 Ga. 472 (1874)....................28
*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)....................15, 16
*Kisor v. Wilkie*, 588 U.S. 558 (2019) ....................34
*Koons v. Att'y Gen. N.J.*, 156 F.4th 210 (3d Cir. 2025) ....................16
*Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023) ....................28, 31, 32

*Lee v. City of Troy*, 520 F. Supp. 3d 1915 (N.D.N.Y. 2021) ....................4
*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................9
*Michigan v. DeFillippo*, 443 U.S. 31 (1979) ....................34
*Mirlis v. Greer*, 952 F.3d 36 (2d Cir. 2020) ....................4
*NAGR v. Lamont*, 153 F.4th 213 (2d Cir. 2025) ....................3, 10
*NSSF v. James*, 144 F.4th 98 (2d Cir. 2025) ....................1
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .................... 4, passim
*Simmons v. United States*, 390 U.S. 377 (1968) ....................7
*Stevenson v. Blytheville Sch. Dist. #5*, 762 F.3d 765 (8th Cir. 2014) ....................35
*Torraco v. Port Auth. of N.Y.*, 615 F.3d 129 (2d Cir. 2010) ....................33
*United States v. Hemani*, 146 S. Ct. 1677 (2026) .................... 6, passim
*United States v. Rahimi*, 602 U.S. 680 (2024) .................... 6, passim
*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) ....................27
*Viramontes v. Cook County*, No. 25-238 (U.S. June 30, 2026) ....................5
*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) ....................15
*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) .................... 5, passim
*Wolford v. Lopez*, 686 F. Supp. 3d 1034 (D. Haw. 2023) ....................17
*Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025) ....................6, 7
*Ziegenfuss v. Martin*, 824 F. Supp. 3d 540 (N.D. Tex. 2026) ....................15, 16, 19

**Other Authorities**

Appellant's Excerpts of Record Volume 2 of 4, *Rhode v. Bonta*, No. 24-542 (9th Cir. May 24, 2024) ....................16
Complaint, *Boron v. Bruen*, No. 1:22-cv-00695 (W.D.N.Y. Sept. 13, 2022) ....................10
*Epilogue to Secular Music in Early Massachusetts*, in *Music in Colonial Massachusetts 1630-1820*, Colonial Society of Massachusetts (1985) ....................24
*Firearm Transportation*, NRA-ILA ....................33
*Grazing*, National Park Service ....................11
Rodger C. Henderson, *Demographic Patterns and Family Structure in Eighteenth-Century Lancaster County, Pennsylvania*, 114 Pa. Mag. Hist. & Biography 349 (1990) ....................31
*Irish in Charleston*, Preservation Society of Charleston (Mar. 16, 2026) ....................24
David B. Kopel & Joseph G.S. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205 (2018) ....................29
Marcia Kramer & Dick Brennan, *Fresh Off Primary Win, Gov. Kathy Hochul Drives Right into Guns – Who Can Get Them and Where They Can Take Them*, CBS NY (June 28, 2022) ....................22
Laws of the Territory of New Mexico (1860) ....................16
*Letter from William C. C. Claiborne to James Madison*, Founders Online (Jan. 31, 1804) ....................26
James M. Lindsay, *The Louisiana Purchase*, Council on Foreign Relations (Apr. 30, 2026) ....................26
*New Playwrights for New Stages*, University of Virginia Library ....................24
Oral Argument Transcript, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023) ....................6
*Prohibition of Weapons in Balls, Theatres, etc.*, Duke Center for Firearms Law ....................24
Dwayne W. Pickett et al., *"The Old Theatre Near the Capital": Archaeological and Documentary Investigations into the Site of the Third Theatre*, Colonial Williamsburg Digital Library (Apr. 1998) ....................23
Hugh F. Rankin, *The Colonial Theatre: Its History and Operations*, Colonial Williamsburg

Digital Library (1955) ....................24
The Revised Charter and Ordinances of the City of Chicago (1851) ....................16
Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012) ......20
Kyle Schnitzer et al., *Green Bay Packers Player Rasheed Walker Arrested on Gun Charges at NYC's LaGuardia Airport: Sources*, New York Post (Jan. 23, 2026) ....................33
*School Metal Detectors and Weapons Detection*, National School Safety and Security Services ....................30
Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. 201 (2024) ....................13
Samantha Sokol, *On This Day in NYC History, January 29th, 1798: The Park Theater Opened as the First Major Theater in NYC*, Untapped Cities (Jan. 29, 2014) ....................24
The Strategic Counsel, *Marketing to Kids – Baseline Survey and Focus Groups on Recall of Food and Beverage Marketing*, Health Canada (May 2019) ....................30

## ARGUMENT

### I. DEFENDANT MAY NOT REFRAME PLAINTIFFS' CHALLENGE TO HIS LIKING.

At the outset, Defendant James asserts that Plaintiffs levy only facial challenges against various provisions of the Concealed Carry Improvement Act ("CCIA"). Superintendent James' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of His Cross-Motion for Summary Judgment ("James XMSJ") at 10-11, ECF #187-1. First, he claims the Second Circuit already "found that Plaintiffs' challenge to the sensitive places … was facial...." *Id.* at 10 (citing *Antonyuk v. James*, 120 F.4th 941, 1047-48, 1048 nn.124, 126 (2d Cir. 2024)). Second, he asserts that pre-enforcement challenges are "'presumptively'" facial. *Id.* at 11 (quoting *NSSF v. James*, 144 F.4th 98, 107 (2d Cir. 2025)). Thus, Defendant claims, Plaintiffs must "'establish that no set of circumstances exists under which the Act would be valid.'" *Id.* (citation omitted). But Defendant is wrong on all counts.

*First*, the Second Circuit never characterized Plaintiffs' challenges as only facial, and it certainly never treated them as such. The court expressly recognized an as-applied distinction for rural public parks, and "doubt[ed] that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves," thus *opening the door* to as-applied relief. *Antonyuk*, 120 F.4th at 1019.[1] Of course, Plaintiffs' as-applied challenges to the CCIA's sensitive-place bans are not some new development, but rather have existed all along. For starters, Plaintiffs stated *three times* that they were bringing both facial and as-applied challenges. Compl. ¶¶245, 254, 264, ECF

[1] Moreover, the Second Circuit "emphasize[d] that we are here reviewing facial challenges to these provisions at a very early stage of this litigation. … *Our affirmance or vacatur ... does not determine the ultimate constitutionality of the challenged CCIA provisions, which await further briefing, discovery, and historical analysis....*" *Antonyuk*, 120 F.4th at 1048 n.126 (emphasis added); *see* James XMSJ at 10 (citing the same).

#1. But even if "'[t]he label is not what matters'" (James XMSJ at 17-18), Plaintiffs also pled facts to support their as-applied challenges. Plaintiffs discussed their desire to carry firearms in *specific parks* in their Complaint – Adirondack Park, before that ban was repealed (Compl. ¶106); Catskill Park (*id.* ¶¶122, 201, 204); Mercer Park (*id.* ¶152); Bowman Lake State Park (*id.* ¶153); and Thacher State Park (*id.* ¶167). Plaintiffs fleshed out their as-applied challenge during discovery. *See id.* ¶¶152, 153, 155; *see also* Plaintiffs' Statement of Material Facts in Support of Their Motion for Summary Judgment ¶¶19-20, ECF #178-8 (Saratoga Spa State Park). And while in the Second Circuit, Plaintiffs explained that "the CCIA broadly makes it unlawful for Plaintiff Johnson to carry a firearm while he goes fishing, and for Plaintiff Leman to provide emergency services (while armed) in rural, sparsely populated, backcountry parks." Plaintiffs-Appellees' Answering Brief in Response to Defendants-Appellants Nigrelli and Doran at 50, No. 22-2908 (2d Cir. Feb. 1, 2023), Doc. 277.[2] Plaintiffs now seek relief as to Bowman Lake State Park, Thacher State Park, Saratoga Spa State Park, and Mercer Park. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment ("MSJ") at 9-13, ECF #178-9. If this is not an as-applied challenge, it is difficult to see what would be.

The same goes for Plaintiffs' challenge to the CCIA's alcohol-premises ban. From the start, Plaintiffs explained that they wished to carry in restaurants while *sober*. *See* Compl. ¶99 ("the CCIA prohibits … firearms in places where alcohol is served, regardless of whether a person (like Plaintiffs Johnson and Terrille) is actually consuming alcohol"), ¶155 (Plaintiff Johnson participates in a snowmobile competition where he must "check in at various locations along the way," including "restaurants that serve alcohol"), ¶176 ("Plaintiff Terrille routinely goes out to eat with his grandkids at restaurants … th[at] serve alcohol" but does "not consum[e] alcohol"); *see*

[2] https://tinyurl.com/8jyhu3z5.

*also* Plaintiffs' Reply to State Defendants' Opposition at 35, ECF #69 ("No Plaintiff asks the Court to authorize drunk carry...."); MSJ at 17-18.

*Second*, the Second Circuit already has rejected Defendant's rigid facial/as-applied construct. For instance, in *NAGR v. Lamont*, 153 F.4th 213 (2d Cir. 2025), the court "acknowledged that the distinction between facial and as-applied challenges 'goes to the breadth of the remedy employed by the court, not what must be pleaded in a complaint.'" *Id.* at 229 n.16; *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case"). Thus, the Second Circuit has "instructed … to consider partial invalidation (and by extension, a provision's severability), when evaluating facial challenges." *NAGR*, 153 F.4th at 229 n.16. So even if Plaintiffs raised only facial challenges (and they did not), this Court *still* must consider whether it can grant as-applied relief.[3]

## II. DEFENDANT'S ATTEMPT TO CONDITION ONE CONSTITUTIONAL RIGHT ON THE SURRENDER OF ANOTHER IS "INTOLERABLE."

Next, Defendant questions "the applicability of the Second Amendment," which he claims is "complicated" as to Plaintiffs Johnson and Terrille,[4] on the theory that each "invok[ed] the Fifth Amendment right against self-incrimination" in response to deposition questions regarding their compliance with various aspects of New York's gun-control regime. James XMSJ at 12. Thus, because courts have "'broad discretion to draw adverse inferences'" under such circumstances,

[3] Defendant likewise misstates the facial-challenge standard. He asserts that a challenged law is facially unconstitutional only if "'no set of circumstances exists under which the Act would be valid.'" James XMSJ at 11. But the Second Circuit alternatively allows a plaintiff to "show that the law lacks 'a plainly legitimate sweep.'" *Antonyuk*, 120 F.4th at 983.

[4] As this Court already found, Plaintiff Antonyuk is extremely law-abiding. *See Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 236-37 (N.D.N.Y. 2022) ("He is law abiding and respectful. … [W]hen he speaks of his life after the law takes effect, he speaks of himself feeling the repercussions of *complying* with it.").

Defendant asks this Court to assume that Plaintiffs Johnson and Terrille are not "in fact[] 'law-abiding, responsible citizens'" and thus not entitled to the Second Amendment's protections at all. *Id.* at 14. Accordingly, Defendant asserts that Plaintiffs Johnson and Terrille "lack standing" at the outset. *Id.* This Court should reject this ridiculous argument for at least seven reasons.

*First*, and most simply, no adverse inferences may be drawn against Plaintiffs Johnson and Terrille because Defendant has failed to present independent, probative evidence that Plaintiffs engaged in criminal activity. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (emphasis added) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify *in response to probative evidence offered against them*"); *Mirlis v. Greer*, 952 F.3d 36, 47 (2d Cir. 2020) ("'[A]n adverse inference can be drawn when *independent evidence* exists of the fact to which the party refuses to answer.'"). If Defendant wishes to imply that Plaintiffs own illegal firearms or carry in gun-free zones, he should have "'put up or shut up.'" *Lee v. City of Troy*, 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021).

*Second*, many of the questions Defendant asked were irrelevant to this case. For instance, Defendant asked what types of firearms Plaintiffs own and how they think other people "feel" about their public carry. *See* Deposition of Corey Johnson at 72-73, ECF #178-2 ("long guns," "semi-automatic rifles"), at 107-08 (how people "would feel"); Deposition of Alfred Terrille at 36-37, ECF #178-3 ("rifles, shotguns or other firearms," "assault weapons"), at 59-60 (how people "would feel"). None of this has anything to do with *Bruen*'s test or the CCIA's public-carry bans.

*Third*, it seems unlikely that *anyone* would find it wise to answer vague and open-ended questions about their compliance with New York's sweeping, onerous, nuanced, and highly technical gun control regime, particularly when much of its constitutionality is in question. *See, e.g.*, Deposition of Alfred Terrille at 37:19-20 ("Do you own anything that meets the definition of

an assault weapon?"); *cf. ANJRPC, Inc. v. Att'y Gen. N.J.*, 2026 U.S. App. LEXIS 21156, at *10 (3d Cir. July 17, 2026) (holding New Jersey's "Assault Firearm Provisions unconstitutional with respect to the full class of semi-automatic rifles"); *Viramontes v. Cook County*, No. 25-238 (U.S. June 30, 2026) (granting certiorari in "assault weapons" cases). And no wonder why Plaintiffs refused to answer – Defendant is now threatening that any answers he dislikes would be grounds for a finding that Plaintiffs' lack "good moral character" and "automatic revocation of their firearm licenses...." James XMSJ at 14. There is nothing wrong with simply declining to play Defendants' game. *See Wolford v. Lopez*, 146 S. Ct. 2032, 2049 (2026) (narrating a hypothetical woman's good-faith efforts to comply with Hawaii's substantially similar public-carry regime, where, after inevitable and inadvertent slip-ups, "by the end of an ordinary day, our hypothetical young woman could be a criminal at least six times over").

*Fourth*, Defendant's questions on the particulars of Plaintiffs' challenge fare no better, and they only demonstrate the self-serving circularity of his argument. *See* Deposition of Corey Johnson at 84-85, 98, 109-10, 124, 140, 142 (asking whether Johnson has ever carried in places now deemed "sensitive locations"); Deposition of Alfred Terrille at 59, 61-63, 65, 80 (same). Of course, if a plaintiff need not *violate* a law in order to have standing to challenge it (*see Antonyuk*, 120 F.4th at 1004), it follows that he need not *admit to violating* the law to have standing, either. Yet here, if Plaintiffs decline to answer whether they *have* violated the law in question, Defendant claims they lack standing to challenge it,[5] even though the violation of an unconstitutional law is not a crime. *Ex parte Royall*, 117 U.S. 241, 248 (1886).

---

[5] Hypocritically, in arguing that *Antonyuk I* should be dismissed, Defendant demanded "concrete allegations of an intent to violate the law," including "sufficient facts about any 'sensitive place' into which [a plaintiff] intends to take a gun." Defendant Superintendent Bruen's Response in Opposition at 2, 18, *Antonyuk v. Bruen*, No. 1:22-cv-00734-GTS-CFH (N.D.N.Y. Aug. 15, 2022), ECF #19, https://tinyurl.com/hha7huu8. Now, he objects that Plaintiffs decline to answer

*Fifth*, the Second Amendment does not turn on one's "law-abiding" status, whatever that may mean. James XMSJ at 14. During oral argument in *United States v. Rahimi*, 602 U.S. 680 (2024), Chief Justice Roberts queried: "Is someone who drives 30 miles an hour in a 25 … mile-an-hour zone … law-abiding … or not?"[6] Justice Barrett likewise noted "the ambiguities in that phrase."[7] Thus, when the Court ultimately decided *Rahimi*, it did not do so on *standing* grounds. Nor did it suggest that history supports excluding the merely *non-law-abiding* from the Second Amendment – a category into which, taken to its logical conclusion, *virtually all* Americans would fall. To the contrary, the Court explained that Zackey Rahimi – a clearly non-law-abiding person – could be disarmed *because* he "pose[d] a clear threat of physical violence to another...." *Rahimi*, 602 U.S. at 698. In so holding, "[n]ot a single Member of the Court adopt[ed] the Government's theory" that "the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.'" *Id.* at 772-73 (Thomas, J., dissenting). Likewise, in *United States v. Hemani*, 146 S. Ct. 1677 (2026), the Court found that an *admitted lawbreaker* had full Second Amendment rights. At bottom, even if Plaintiffs *had* peacefully carried firearms in "sensitive locations" (and Defendant proffers no evidence that they have), that would not make them *dangerous*.

*Sixth*, nor does the Second Circuit's *Zherka* decision stand for what Defendant claims. He concedes that, under *Zherka*, being non-law-abiding "does not exclude [someone] from 'the People' covered" by the Second Amendment's plain text, but he claims it *does* "exclude them from the category of 'law-abiding citizens' that, as a historical matter, the right has covered." James

---

whether they in fact ever have taken a gun in *any* of those places, including ones where it already has been declared unconstitutional to ban firearms. *See, e.g.*, Deposition of Corey Johnson at 84:13-85:4 ("I'm asking you do you carry – do you refrain from carrying your handgun in any sensitive places other than schools, courthouses, and government buildings?").

[6] Oral Argument Transcript at 8:1-4, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023), https://tinyurl.com/2d2rsdnt.

[7] *Id.* at 49:3-4.

XMSJ at 14 (citing *Zherka v. Bondi*, 140 F.4th 68, 89-90 (2d Cir. 2025)). But Defendant's cited pages do not contain such a "law-abiding" limitation. To the contrary, *Zherka* upheld the federal felon-in-possession statute by finding a historical tradition of "disarming broad classes of people," such as felons, as a "status-based, categorical" matter. 140 F.4th at 85, 90. It did not conclude, as a broad historical matter, that the Second Amendment protects only the *law-abiding*. Yet here, Defendant never bothered even to attempt a historical showing that people who carry into "sensitive locations" or own illegal firearms may forever be disarmed as a categorical matter. Thus, Defendant does not ask for just one inference, but a *series* of inferences stacked one on top of the other: for example that, if Plaintiffs refuse to answer what firearms they own, then they *must* own certain firearms, *and* they must own them illegally, *and* that owners of illegal firearms categorically may be disarmed. This Court need not engage with this fanciful train of thought.

*Seventh*, no other constitutional right works the way Defendant proposes here. A person does not lose their First Amendment rights to speak, protest, or worship merely because they have been accused (or even convicted) of a crime. The same is true for their Fourth Amendment right to be free from unwarranted searches and seizures, and their Sixth Amendment right to counsel. Yet here, Defendant believes the Second Amendment may disappear on the mere *inference* of criminality. The Supreme Court rejected this sort of Hobson's choice in *Simmons v. United States*, 390 U.S. 377 (1968). Repudiating an either-or approach to the Bill of Rights, the Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.* at 394. This Court should reject Defendant's novel theory and remind him that the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022).

## III. NEW YORK'S "SENSITIVE LOCATIONS" ARE UNCONSTITUTIONAL.

### A. Contrary to the Supreme Court's Precedents, Defendant Urges "Freewheeling Reliance on Historical Practice" from All Historical Time Periods.

At the outset, Defendant takes issue with Plaintiffs' explication of the Supreme Court's Second Amendment methodology. *See* James XMSJ at 14-17; *cf.* MSJ at 7-9. He denies that this Court should focus its historical analysis on "'Founding-era understandings,'" calling such an approach "restrictive" while also claiming not to know "when that 'era' begins and ends...." James XMSJ at 15-16. Instead, Defendant urges examination of "all 'laws'" and, if the Founding-era record yields no analogue for the CCIA, Defendant believes this Court should look "'later'" until it finds one. *Id.* at 15, 16. Of course, this sort of "freewheeling reliance on historical practice" is precisely what the Supreme Court rejected in *Bruen*. *See* 597 U.S. at 83 (Barrett, J., concurring).

Rather than being "[a]historical" (James XMSJ at 14), Plaintiffs' approach simply tracks the Supreme Court's precedents. Defendant cites several of the Court's Second Amendment decisions, noting the temporal span of the historical evidence reviewed. *See, e.g.*, *id.* at 15 (Founding "'through the end of the 19th century'"). But although the Court may have *addressed* firearm regulations from various historical time periods because litigants had *presented* them, the Court did not treat them all the same. To the contrary, in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court explained that post-Civil War analogues "do not provide as much insight into its original meaning as earlier sources." *Id.* at 614. Likewise, in *Bruen*, the Court "generally assumed" the Second Amendment's scope "is pegged to … 1791," and so "19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'" 597 U.S. at 37. Thus, although the Court considered later, 19th-century laws in *United States v.*

*Hemani*, 146 S. Ct. 1677 (2026) (*see* James XMSJ at 16), the Court still focused on "the founding and … decades following it…." *Hemani*, 146 S. Ct. at 1687.[8]

Resisting the Court's 1791 temporal focal point, Defendant asserts that courts should look far beyond the Founding,[9] particularly when the Founding-era record fails to support a modern gun control law. Such historical silence, he claims, is "'not dispositive….'" James XMSJ at 16. But this logic fails *Bruen* twice over. First, *Bruen* requires "affirmative[] pro[of]" of "firearm regulations," not speculation. 597 U.S. at 19, 17. And second, *Bruen* already instructed courts on what to do if modern restrictions did not exist at the Founding. Courts must "use analogies to those historical regulations" that *did exist* at the Founding, such as "legislative assemblies, polling places, and courthouses" in the case of assessing locational restrictions in "*new*" places today. *Bruen*, 597 U.S. at 30. The Court did not endorse fast-forwarding into recent history until analogues begin to appear. But to the extent this Court is bound by the Second Circuit's use of late-19th-century historical analogues, Plaintiffs respectfully preserve the issue for appeal.

**B. The CCIA's Parks Ban Violates the Second Amendment, Facially and As Applied.**

**1. Defendant's Attempt to Reframe Plaintiffs' Challenge Falls Flat.**

Defendant once again seeks to reframe Plaintiffs' challenge, claiming that "Plaintiffs raised only a facial challenge" against the CCIA's ban on firearms in public parks. James XMSJ at 17. The reason is understandable. Defendant notes that the Second Circuit has rejected a facial challenge to the same statute twice – first in *Antonyuk*, and again in *Christian v. James*, 176 F.4th

[8] Defendant also cites *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which considered historical evidence from 1889. James XMSJ at 16. But *McDonald* was a Fourteenth Amendment incorporation case, and so it surveyed the public understanding at the time of that constitutional provision's enactment.

[9] Notably, many of Defendants' analogues stretch into the 20th century. Not even the Second Circuit's opinion swept so far.

189 (2d Cir. 2026). Thus, Defendant suggests, "this Court should 'decline to consider [an as-applied] challenge'" here. James XMSJ at 18. But this argument fails.

First, *Christian* does not foreclose Plaintiffs' challenge. In that case, the plaintiffs "asserted only a facial challenge … in the district court, *but now also seek to raise an as-applied challenge* … to rural parks." *Christian*, 176 F.4th at 191 (emphasis added). But "it was not until after the summary judgment stage, and … *Antonyuk II*, that Plaintiffs … [pressed] an as-applied challenge to the Public Parks Provision." *Id.* at 204. And even then, the *Christian* plaintiffs' "complaint plainly d[id] not raise such a challenge" as "applied to 'parks outside of urban settings.'" *Id.* at 203. They pleaded no facts to "adequately develop[]" the issue. *Id.* at 204 n.6. They mentioned only Catskill and Adirondack Park in passing, and only one plaintiff alleged he even had visited Adirondack before. Compl. ¶¶38, 43, *Boron v. Bruen*, No. 1:22-cv-00695 (W.D.N.Y. Sept. 13, 2022), ECF #1; *see also id.* ¶¶41, 43 (referencing "local parks" but failing to identify any).[10] In stark contrast here, Plaintiffs clearly preserved an as-applied challenge to rural parks – with great specificity. *See* Section I, *infra*. Alternatively, Plaintiffs have alleged enough for this Court "to consider partial invalidation … when evaluating facial challenges," as the Second Circuit and Supreme Court have "instructed." *NAGR*, 153 F.4th at 229 n.16.

**2. There Is No Historical Tradition of Banning Firearms in Rural Parks.**

Next, Defendant argues that, even if this Court considers Plaintiffs' claims as applied, a historical tradition supports the CCIA's ban as to *rural* parks. James XMSJ at 18-22. Rejecting the Second Circuit's prior decision, which "doubt[ed] that the evidence … could set forth a well-established tradition of prohibiting firearm carriage in rural parks" (*Antonyuk*, 120 F.4th at 1025), Defendant now claims that new "expert research has revealed that rural parks share their origins

[10] https://tinyurl.com/yfr7ymd5.

and purposes with their urban counterparts." James XMSJ at 18. As Defendant tells it, both urban and rural parks evolved as "'places for contemplating natural scenery and for active play.'" *Id.* But his expert's self-serving *characterization* of public parks (which is not evidence of anything) proves only that "he who writes the resolved clause wins the debate" (M. Stanton Evans). *See, e.g.*, Declaration of Dr. Terrence Young ("Young Dec.") ¶¶36-37, ECF #187-22 (modern parks designed for "the improvement of American society" "through a blend of the Beautiful and the Sublime"), ¶8 (contrasting modern parks and "Romantic ideology," "passive contemplation," "leisure," and "recreational" uses with the purported "utilitarian" uses of old),[11] ¶¶15, 13 (asserting that Founding-era community spaces involved "[b]rush, stumps, stones, rubbish, dead trees and stagnant pools," whereas modern parks are purportedly "ornamental" and "manicured").[12] Indeed, to rely on late-coming historical firearm regulations[13] – the only evidence he could muster – Defendant has to pretend that there was *no such thing as a public park* until the 1850s. *See id.* ¶8. Of course, Plaintiffs already showed the existence of public spaces from the 1600s onwards.[14]

---

[11] But Defendant glazes over that, while modern parks are used for "socializing" (Young Dec. ¶18), and Founding-era parks supposedly were used for "organized community activity" as "meetinghouse lots" (*id.* ¶13), *that is the same activity*. Moreover, the Second Circuit already observed that "rural parks much more resemble the commons of yore than the historical and often-crowded public squares," and that those "commons and greens" were "public grazing areas...." *Antonyuk*, 120 F.4th at 1025. Meanwhile, rural lands today (including parks) *are still* used for grazing. *See Grazing*, National Park Service, https://tinyurl.com/yu5m85cz (last visited Aug. 20, 2026) ("When Glen Canyon National Recreation Area was established … the enabling legislation authorized grazing, which had occurred in the area for much of the previous 100 years.").

[12] Defendant ignores the Founding-era examples that undermine his claim. *See, e.g.*, Young Dec. ¶16 (detailing the town squares of 1733 Savannah, Georgia, which by the 1830s contained "railings, walks, and lawns"), ¶13 ("pre-planned squares of Savannah, Georgia and Philadelphia, Pennsylvania").

[13] *See, e.g.*, Young Dec. ¶¶33, 54 (relying on 1926 and 1928 sources on firearm bans in parks); *Bruen*, 597 U.S. at 66 (rejecting a "slight uptick in gun regulation during the late-19th century" and later).

[14] *See* Plaintiffs-Appellees' Answering Brief in Response to Defendant-Appellant Cecile at 26-27, No. 22-2972 (2d Cir. Feb. 7, 2023), Doc. 216, https://tinyurl.com/yc6ff25j.

Defendant's argument is also illogical. New York's rural parks of today are vast tracts of wilderness with unblemished forests – the same as they were 250 years ago, likely with some of the same trees. Back then, Americans were free to carry firearms there. But today, in New York, they are not. That is evidence enough that the CCIA's parks ban defies the Second Amendment's historical understanding. It does not matter what New York now labels these locations. They have not changed, and neither can the scope of the Second Amendment.[15]

Nor do Defendant's new historical offerings provide any support for his "expert's" contrived "blend of the Beautiful and the Sublime."[16] He claims that guns "have been banned from rural parks for as long as those parks have existed," and promises all of these purported restrictions "share[] the same 'why' and 'how' as" the CCIA. James XMSJ at 18. Not so. First, Defendant cites the 1875 creation of Mackinac National Park, and its alleged 1882 gun ban. But the 821-acre Mackinac (Young Dec. ¶39) operated far more like an urban park than a rural one. At the time, it was a hugely popular tourist destination, with an onsite fort and military garrison, whose commander was tasked to run the park. *See* ECF #187-23, Ex. 81 at 22. And its temporary

[15] Defendant changes his tune. Previously, Defendant claimed that "modern" parks did not exist at the Founding and, as soon as urban centers adopted them in the 19th century, firearms were regulated. *See Antonyuk*, 120 F.4th at 1025. Based on that urban-park distinction, the Second Circuit facially upheld the CCIA's parks ban. But now, Defendant claims a "'mountain of regulations' … [also] covered rural or wild spaces," and that *rural parks* likewise did not arise until the late 19th century. James XMSJ at 1. In other words, Defendant's prior argument formed the basis of the Second Circuit's *distinction*, yet now he claims all parks are *the same*.

[16] Of course, all of Defendant's history falls decades (if not a century-plus) beyond the Founding, and so it "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66. Indeed, after *Bruen* and *Rahimi*, the Court has only continued to look to the Founding first and foremost. *See United States v. Hemani*, 146 S. Ct. 1677, 1686 (2026) (grounding analysis in "the founding and in the decades following it"); *Wolford v. Lopez*, 146 S. Ct. 2032, 2050 (2026) (analyzing "colonial and early state laws"). Thus, without grounding his historical evidence first in an analogous Founding-era tradition, there is nothing for Defendant's evidence to "'mere[ly] confirm[].'" *Bruen*, 597 U.S. at 37. Even so, should this Court believe it is bound by the Second Circuit's erroneous dual focus on "1868 and 1791" (*Antonyuk*, 120 F.4th at 972), Plaintiffs respectfully preserve the issue for appeal.

restriction on firearms was short-lived – it "stayed in effect [for 13 years] until Congress transferred the park to the state of Michigan in 1895."[17] Second, Defendant's 1879 Yosemite, 1872 Yellowstone, and 1890 Sequoia firearm restrictions are even less helpful. For starters, each was an anti-poaching restriction, having nothing to do with ensuring "passive contemplation" of "the Beautiful and the Sublime." Young Dec. ¶¶9, 28; *see* ECF #187-23, Ex. 79 (Yellowstone addressing "[h]unting or killing, wounding, or capturing of any bird or wild animal"); Young Dec. ¶41 (Yosemite noting "the game in the park has increased in numbers … the result, no doubt of the rigid enforcement of the rules against carrying firearms in the park"); ECF #187-23, Ex. 80 (governing "the wanton destruction of the fish and game from within the park"). *Wolford* expressly rejected anti-poaching laws as relevant to Hawaii's public-carry ban on private properties. *Wolford*, 146 S. Ct. at 2051. Those laws – and their entirely different "why" – are no more helpful here. Next, as Defendant himself notes, Yosemite's regulation addressed only "firearms discharge," James XMSJ at 19, unlike the CCIA's broad ban on public carry. Next, in Yosemite the "patrols take all the firearms found in possession of tourists and campers" (ECF #187-23, Ex. 82 at LXXXV) – in other words, a temporary confiscation (a different "how"), in stark contrast to the CCIA's felony criminal penalties. Finally, Yellowstone and Sequoia National Parks restricted firearms, but only "without a signed license by the Park superintendent...." James XMSJ at 19-20; ECF #187-23 Exs. 79, 80; *see also* James XMSJ at 20 ("collecting regulations from eighteen [federal] parks" that had similar requirements to obtain a carry license). The "how" and "why" of these post-Reconstruction restrictions could not be more different from the CCIA's gun ban.[18]

---

[17] Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. 201, 226 (2024), https://tinyurl.com/49kp7xdk.

[18] Young references another thirty-two laws on firearms within parks. Young Dec. ¶¶54-55. But these generally fail for a number of reasons. First, they arose after 1900. Second, thirteen of the supposed analogues appear to be anti-poaching laws (Exs. 85, 86, 88, 89, 90, 92, 93, 96, 97,

Nevertheless asserting a purported tradition of gun bans in "indisputably rural" parks, Defendant claims that this state of affairs existed "for well over a century...." James XMSJ at 20. But the Supreme Court has refused to rely on "a tradition" that "arose in the second half of the 19th century," even in "more than 30 States," which "cannot by itself establish an early American tradition." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020). Defendant alternatively claims that his regulations are "relevantly similar" to the CCIA. James XMSJ at 21. But at no point did he claim the prospect of public carry in vast wilderness areas is some "unprecedented societal concern[] or dramatic technological change[]" (*Bruen*, 597 U.S. at 27) – nor could he. Thus, his analogues must be "distinctly similar" to the CCIA – not "relevantly similar." *Id.* at 26. And finally, Defendant never addresses Plaintiffs' severability argument that "the parks ban must be invalidated in its entirety." MSJ at 13; *cf.* James XMSJ at 21-22. So if this Court remains unconvinced by Defendants' arguments that rural parks should be treated the same as urban parks, Plaintiffs reiterate their request for facial invalidation of the parks ban due to lack of severability.

**C. The CCIA's Gun Ban in Locations Selling Alcohol Is Unconstitutional.**

Defendant claims that "[o]ur forefathers understood the danger of mixing alcohol and guns." James XMSJ at 22. But the Supreme Court understands history quite differently: "[h]ad habitual drunkard laws applied to those who simply drank regularly, many notable early Americans could have faced trouble." *Hemani*, 146 S. Ct. at 1688 (describing the vast quantities of alcohol consumed by the Framers). As the Court put it, "[t]here was, in short, a 'culture of copious drinking' in early America," and yet no one was disarmed unless "their substance use ha[d] the

100, 102, 105, and 116); two deal with the discharge (not carry) of firearms (Exs. 101, 115); nine allow for the receipt of permission to carry a firearm (Exs. 94, 95, 96, 105, 106, 107, 108, 113 and 114); and only ten appear to be outright prohibitions on firearms (Exs. 87, 90, 98, 99, 103, 109, 110, 111, 112 and 115), while Exs. 109 through 112 appear repeat New York's 1936 regulations.

kind of incapacitating effect" that rendered them "practically incapacitated and incapable of managing their affairs." *Id.* at 1688, 1689. Undaunted, Defendant claims that nothing has changed since the Second Circuit issued its decision in October of 2024, Defendant cites a Third Circuit case (*Harris*) that was vacated after *Hemani*, a Texas case (*Ziegenfuss*, on appeal) whose main source of authority was the Ninth Circuit's now-repudiated *Wolford* opinion, and a Fourth Circuit case (*Kipke*) that predates *Hemani* and *Wolford*, conflicts with both, and which is now pending a petition for certiorari. James XMSJ at 22-23. Ignoring these cases' tenuous footing, Defendant relies on them plus vague references to the opinion of his "expert" to assert a series of four historical traditions Defendant claims support the CCIA's alcohol-premises ban. None does.

**1. Defendant's "Location-Based" Argument Fails.**

First, Defendant references what he claims to be a "location-based approach." James XMSJ at 23. Initially, he claims that "localities prohibited alcohol … at musters or meetings of the militia." *Id.* (citing Declaration of Patrick Charles ("Charles Dec.") ¶¶37-38, ECF #187-3). But militia laws involved an entirely different "how" – rather than prohibiting sales of alcohol (guaranteed by no enumerated right), the CCIA prohibits "bear[ing] Arms." Rejecting such analogues, a Texas court explained the different "why" – "[t]he purpose of those laws was to ensure militiamen were fit for military service and not to disarm lay people from carrying firearms for fear of violence ensuing." *Ziegenfuss v. Martin*, 824 F. Supp. 3d 540, 555 (N.D. Tex. 2026); *see also Wolford v. Lopez*, 116 F.4th 959, 985-86 (9th Cir. 2024) ("[t]hat line of regulations is not directly on point … and those laws did not prohibit firearms at all places serving alcohol"), *rev'd*, 146 S. Ct. 2032 (2026). Certainly, the Second Circuit never relied on militia laws.

Defendant also claims a tradition of banning guns at locations that serve and sell alcohol. James XMSJ at 23. But examples are sparse. The Second Circuit identified only two such laws

"prohibiting firearms in liquor-serving or -selling establishments" (*Antonyuk*, 120 F.4th at 1030) – the 1889 Arizona and 1890 Oklahoma territorial laws. But as Plaintiffs have shown, those were short-lived and did not survive admission to the Union. MSJ at 14-15. Defendant's "expert" now adds a third (not cited in Defendant's brief) – New Mexico's 1852 territorial law.[19] Charles Dec. ¶39. But it was even shorter-lived than the others – it did not survive New Mexico's 1860 statutory rewrite, which made it a crime only to "discharge or draw any deadly weapon" or "fire off or discharge any firearm" in "any baile or fandango," and expressly provided that "all laws or parts of laws in conflict with this act are hereby repealed."[20] Finally, *Ziegenfuss* referenced a 1656 Virginia law prohibiting "shooting" at "drinking" events (824 F. Supp. 3d at 553) – but that law banned only *discharge* in drunken revelry, not concealed carry by a sober person.[21] There appears to be no relevant historical analogue – from the 1600s through the 1800s – explicitly banning firearms in any place that happens to serve alcohol.

Defendant next references a tradition of banning intoxicated persons from acquiring or carrying firearms. James XMSJ at 23; Charles Dec. ¶¶39-40.[22] But all of those "governed

[19] The Fourth Circuit found these to be the only "laws that are 'directly on point'...." *Kipke v. Moore*, 165 F.4th 194, 218 (4th Cir. 2026).

[20] Laws of the Territory of New Mexico 96, 98 (1860), https://tinyurl.com/3dbv3dbc; *see also Koons v. Att'y Gen. N.J.*, 156 F.4th 210, 240 n.81 (3d Cir. 2025) (confirming that, by 1869, New Mexico prohibited only "'draw[ing] or us[ing] any deadly weapon in any ball [or] dance'"), *vacated, reh'g en banc granted*, 162 F.4th 100 (3d Cir.).

[21] Defendant also references ordinances prohibiting "retailers of liquor from keeping gunpowder." James XMSJ at 23 (citing *Kipke*, 165 F.4th at 218). But these ordinances – from 1851 Chicago and 1858 St. Paul – were explosive licensing and fire safety laws. *See* The Revised Charter and Ordinances of the City of Chicago ch. 16, §§ 1-9, at 123-25 (1851), https://tinyurl.com/msacybe8; Appellant's Excerpts of Record Volume 2 of 4, at 170-71, *Rhode v. Bonta*, No. 24-542 (9th Cir. May 24, 2024), https://tinyurl.com/bdwtwtab.

[22] Defendants' expert cites numerous such ordinances, including 1867 Kansas, 1878 Mississippi, 1879 Missouri, 1883 Wisconsin, 1884 Grand Junction, Colorado, 1895 Rocheport, Missouri, 1873 Brooklyn, New York, 1866 New York City, 1891 Lyons, Kansas, 1894 Blackwell, Oklahoma, and 1887 Wallace County, Kansas. Aside from coming roughly a century after the Founding era, none banned sober persons from being armed for self-defense.

behavior, while § 265.01-e(2)(o) governs places" (*Antonyuk*, 120 F.4th at 1028) – an entirely different "how." Moreover, Plaintiffs never sought the right to be armed while drunk; rather, their as-applied challenge deals only with sober carry. *See* MSJ at 18. And to the extent that the Second Circuit in any way relied on intoxicated disarmament laws to disarm the sober, *Hemani* forecloses such reliance now. *See* MSJ at 17-18.[23] Indeed, the historical "habitual drunkard" laws sought to "promote productivity," "suppress … vices," and promote "'good morals'" – an entirely different "why" than the modern statute's supposed end of 'public safety.' *Hemani*, 146 S. Ct. at 1690, 1691. And they also flunk the "how" – "[t]he historical laws … usually provided some form of process before an individual lost any of his liberties, even temporarily." *Id.* at 1691. The CCIA contains no such mechanism, instead disarming all who enter an enumerated "sensitive location."

**2. Defendant's "Vulnerable Populations" Argument Fails.**

Second, Defendant asserts that New York may ban *all patrons* of a "'liquor-licensed establishment[]'" from carrying a firearm, on the theory that intoxicated people not only are not to "be trusted with firearms," but also that they are "vulnerable" enough that they need "protect[ion]." James XMSJ at 24. But this argument is incoherent. It presupposes that drunk people – too impaired to "'defend themselves effectively'" (*id.*) – need to be protected from *law-abiding, New York-licensed concealed carriers*.[24] (Indeed, those who are intent on carrying illegally will do so anyway, with or without the CCIA's alcohol-premises ban.) But at the same time, Defendant posits

[23] In fact, *Hemani* repudiates the blanket disarmament of even *the intoxicated* at a restaurant or bar. The Court rejected the notion that "anyone who regularly uses marijuana is categorically violent and dangerous without any further showing." *Hemani*, 146 S. Ct. at 1693. Even so, Plaintiffs only seek to carry in these locations *while sober*.

[24] *See Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1075 (D. Haw. 2023) ("According to the GOA Amicus Brief, the vast majority of individuals in the United States with concealed carry permits are law-abiding.").

that drunk people are *also too dangerous* and must be disarmed to protect the law-abiding concealed carriers New York just disarmed. This is circular reasoning at its finest.

Unsurprisingly, Defendant's untenable theory conflicts with precedent. *Rahimi* conditioned disarmament on an individualized judicial finding of "a clear threat of physical violence to another...." 602 U.S. at 698. *Hemani* similarly expressed no concern over one's drug usage generally, focusing instead on his dangerousness. *See* 146 S. Ct. at 1693. Yet here, the CCIA not only disarms *drunk people* as dangerous, but also *sober people as a class* on the theory that they may harm drunk people. But there has been no finding that Plaintiff Terrille is a threat to anyone when he eats a meal with his grandchildren. Indeed, as a license holder, New York already made the determination that Terrille is of "good moral character," something the Second Circuit described as a "proxy for dangerousness." *Antonyuk*, 120 F.4th at 981. Thus, "affording the government that kind of 'broad power to designate any group as dangerous and thereby disqualify its members from having a gun' would risk allowing it to 'quickly swallow' the Second Amendment." *Hemani*, 146 S. Ct. at 1693. Which, of course, is a feature, not a bug, of the CCIA.

**3. Defendant's "Crowded Spaces" Argument Fails.**

Third, Defendant claims the CCIA's alcohol-premises ban finds support in vague historical regulation of "'crowded spaces.'" James XMSJ at 24. But the Second Circuit's "very early" finding (*Antonyuk*, 120 F.4th at 1048 n.126) provides no basis to uphold this provision of the CCIA. First, *Wolford* undermines the notion that firearms may be banned in merely "crowded" areas. Indeed, Hawaii's "regime hobble[d] what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives," including in "restaurants" and "coffee shops" – obviously crowded social settings. *Wolford*, 146 S. Ct. at 2041. The Second Amendment's scope cannot shrink in the presence of people, as if the right belongs only to loners.

To the contrary, "the Second Amendment has the same meaning in all parts of the United States." *Id.* at 2050. Second, the Second Circuit's crowded places analysis pointed only to the 1889 Arizona and 1890 Oklahoma territorial laws that Plaintiffs have now rebutted. *See Antonyuk*, 120 F.4th at 1030 n.101; *cf.* MSJ at 14-16 ("*both* of these territorial laws were short-lived, and *neither* survived statehood"). And third, as *Ziegenfuss* explained, "[p]laces are not sensitive 'simply because [they are] crowded,' even though 'people sometimes congregate in "sensitive places."' … Otherwise, the general right to publicly carry arms 'would [be] eviscerate[d].'" 824 F. Supp. 3d at 552.

**4. Defendant's "Social Settings" Argument Fails.**

Fourth, Defendant relies on a supposed broad tradition of banning firearms in "'certain social settings,'" such as "'ballrooms'" and "'drinking saloon[s].'" James XMSJ at 25-26. But this argument fails for the same reasons that governments cannot ban firearms in "crowded spaces" – social settings are naturally crowded, and *Wolford* rejected the banning of firearms in "places that people routinely visit in the course of [their] daily routines," including specifically "restaurants." 146 S. Ct. at 2041. This no doubt includes many places where "people assemble for amusement," as the Second Circuit described. *Antonyuk*, 120 F.4th at 1038; *cf.* James XMSJ at 27 ("Bars and locations serving alcohol would certainly constitute 'social gathering[s][']' and locations 'where persons are assembled for amusement.'"). Put simply, any "tradition" of banning guns in social settings does not survive *Wolford*. All told, none of Defendant's four supposed "traditions" justifies the CCIA's alcohol-premises ban here.

**5. Defendant's Remaining Arguments Fall Flat.**

Lastly, Defendant unpersuasively attempts to rebut Plaintiffs' point as to the short-lived Arizona and Oklahoma territorial laws, and the applicability of the Supreme Court's recent *Wolford* and *Hemani* decisions. James XMSJ at 26-28; *cf.* MSJ at 14-18. *First*, Defendant concedes that

the Arizona and Oklahoma territorial laws were in fact short-lived. James XMSJ at 26 ("That may be true...."). But he claims that *other* laws in those jurisdictions prohibited the same conduct, and lasted into the 1900s. *See id.* at 26-27 (citing laws generally covering places of "assembly"). But a "material variation in terms suggests a variation in meaning," and "[t]he expression of one thing implies the exclusion of others," suggesting that saloons and other similar establishments would have been *excluded* from these other laws. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170, 107 (2012). Defendant presents no evidence that "assembly" laws ever were enforced against saloons, other than his *opinion* that saloons "would certainly constitute" assemblies. James XMSJ at 27. Under *Bruen*, that is not enough. *See* 597 U.S. at 58 ("little evidence that authorities ever enforced").

*Second*, Defendant disputes that *Wolford* changed anything, hyper-literally claiming that *Wolford* "struck down a law 'prohibiting firearms on private property [but only] *without the express and affirmative consent of the property owner*.'" James XMSJ at 27 (emphasis added). But Defendant ignores the Court's underlying criticism of Hawaii's private-property law: it "hobble[d] what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives," *such as in* the particular example locations the Court identified. *Wolford*, 146 S. Ct. at 2041. Indeed, the Supreme Court stated – in so many words – that the Second Amendment "*protects*" public carry in ordinary public locations. Nor does it matter that *Wolford* "noted that Hawaii prohibited guns at 'any "restaurant serving alcohol,"' but left that provision untouched" (James XMSJ at 27) – that specific provision was *not at issue* on appeal. But what *was* at issue was the notion that ordinary Americans have a right to public carry "in the course of their daily routines...." *Wolford*, 146 S. Ct. at 2041. And if Hawaii's *less*-absolute

restriction on public carry was unconstitutional – property owners could opt out – then Defendant cannot credibly claim that *Wolford* somehow allows the CCIA's *more*-absolute restriction.

*Third*, Defendant claims that *Hemani* did not undermine the CCIA's alcohol-premises ban, but he misses the point. *See* James XMSJ at 27-28. If even a regular drug user cannot be disarmed when not under the influence, then a sober person cannot be, either. Defendant focuses only on whether "'users of a particular drug'" or "'intoxicated individuals'" may be disarmed. *Id.* at 28. But Plaintiffs are neither. *See* MSJ at 17-18 (Plaintiffs do not drink when carrying).

*Fourth*, Defendant asserts that Plaintiffs brought only a "facial" challenge to the CCIA's alcohol-premises ban, and that they cannot be permitted to "transmute" it "into an as-applied one" at this late date. James XMSJ at 28. But this is a blatant mischaracterization of the pleadings. To the contrary, Plaintiffs explained from the start that "the CCIA prohibits … firearms in places where alcohol is served, regardless of whether a person (like Plaintiffs Johnson and Terrille) is actually consuming alcohol...." Compl. ¶99; *see also id.* ¶176 ("Plaintiff Terrille routinely goes out to eat with his grandkids" where firearms are banned, "even if he were not sitting in the bar area and not consuming alcohol."); Declaration of Alfred Terrille ¶19, ECF #1-10; Declaration of Corey Johnson ¶¶11-12, ECF #1-3; Plaintiffs' Reply to State Defendants' Opposition at 35, ECF #69 ("Defendants' reliance on laws banning intoxicated persons from carrying firearms is irrelevant.... No Plaintiff asks the Court to authorize drunk carry...."). Not to mention, the Supreme Court does not treat facial/as-applied distinctions so rigidly, as Plaintiffs already explained. *See* *Citizens United*, 558 U.S. at 331. Plaintiffs have pled more than sufficient facts, and preserved more than sufficient argument, for this Court to grant them as-applied relief.[25]

---

[25] Defendant also asserts that Plaintiffs' as-applied challenge "misapprehends the nature of the sensitive location laws, which operate categorically to establish a location 'where weapons [a]re altogether prohibited.'" James XMSJ at 28. This unexplained argument is nonsense, as it

**D. The CCIA's Ban on Guns in Theaters Is Unconstitutional.**

Defendant begins with the assertion that *Bruen*'s admonition not to "effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded" *in fact* allows governments to ban guns "in 'specific … crowded spaces'" – apparently so long as together they do not sweep too far and cross over into "prohibit[ing] 'public carriage generally....'" James XMSJ at 29. Of course, nothing in *Bruen* allows such wiggle room, and *Wolford* confirmed that governments cannot ban guns in even crowded places[26] like restaurants, coffee shops, barber shops, and hair salons – places that people frequent in their daily lives. *Wolford*, 146 S. Ct. at 2048. Even so, the CCIA was designed and intended from the ground up to prohibit guns virtually everywhere – not just in "specific" places. As Governor Hochul quipped, only "maybe some streets" would remain free of the CCIA's sweeping gun ban. Marcia Kramer & Dick Brennan, *Fresh Off Primary Win, Gov. Kathy Hochul Drives Right into Guns – Who Can Get Them and Where They Can Take Them*, CBS NY (June 28, 2022), https://tinyurl.com/yr8vyfhk; *see Wolford*, 146 S. Ct. at 2046 n.9

---

would mean that no as-applied relief ever could be had against the CCIA's gun bans, and that every "categorical" weapon ban would be immune to as-applied challenge. That is not the law.

[26] Surprisingly, Defendant objects to *Wolford*'s relevance, claiming that "*Wolford* was not a sensitive location case" (James XMSJ at 29) – apparently because the CCIA labeled private property a "restricted location" instead of a "sensitive location." Potato, poh-tah-toe. Defendant also demurs that *Wolford* "repeated *Heller*'s assurances of the constitutionality of sensitive location laws...." *Id.* But while *Wolford* referenced *Heller*'s presumption that guns might be banned at "schools and government buildings" (146 S. Ct. at 2042), none of those places is anything like a "theater." *See Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 440 (W.D.N.Y. 2022) (emphases removed) ("sensitive places" are "civic locations sporadically visited in general, where a bad-intentioned armed person could disrupt key functions of democracy," and are "typically secured locations, where uniform lack of firearms is generally a condition of entry, and where government officials are present and vulnerable to attack"), *vacated on other grounds, Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). Finally, Defendant theorizes that *Wolford* "noted that Hawaii had a law prohibiting guns in 'any "stadium, movie theater, or concert hall"' without striking down the law." James XMSJ at 29. But that is simply because the issue was not before the Court. Failing to strike down laws that are *not under review* is hardly a ringing endorsement of their constitutionality. This Court previously labeled a similar argument by Defendant to be "just disingenuous." Transcript of Oct. 25, 2022 Motion Hearing at 60:15, ECF #72.

(explaining that Hawaii's similar statute banned carry in "96.4% of the publicly accessible land in Maui County").

Next, Defendant faults Plaintiffs for "not meaningfully engag[ing]" with his "expert" on theaters. James XMSJ at 29-30. Yet in the same breath, Defendant admits that his expert found no "dead ringers" for the CCIA's gun ban in theaters. *Id.* at 30 (the "record does not include regulations that single out theaters for protection"). Nevertheless, Defendant claims that "social, amusement, literary, or educational gatherings" analogues broadly suffice, which he claims "naturally cover theaters."[27] *Id.* Of course, that "read[s] a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). And as *Wolford* now makes clear, locations cannot be subjected to categorical gun bans simply because they are for social gatherings or amusement. 146 S. Ct. at 2046.

Defendant claims that "Dr. Rivas provides additional historical context," referencing the fact that large theaters generally did not exist at the Founding. James XMSJ at 30 (citing Declaration of Dr. Brennan Rivas ("Rivas Dec.") ¶¶16-17, ECF #187-17).[28] But Rivas is *entirely wrong* that theaters – even large ones – did not exist at the Founding. For example, a 1716 "First Theater" in Williamsburg had a footprint of 2,600 square feet.[29] Numerous other colonial theaters existed as well, including in 1776 Philadelphia (4,750 sq ft), 1761 New York City (3,600 sq ft),

---

[27] Interestingly enough, although Defendant claims historical bans on "gatherings" should be read broadly enough to encompass "theaters," the Second Circuit elsewhere claimed that "[i]t is unreasonable to interpret" the CCIA's ban on guns in places where people "express their constitutional rights to protest or assemble … to include every gathering or even every 'expressive gathering.'" *Antonyuk*, 120 F.4th at 1040.

[28] Of course, Defendant's sudden focus on the Founding is ironic, since virtually everywhere else in his brief he focuses exclusively on late-1800s analogues. *See generally* James XMSJ. Yet now, when not even *later* analogues exist, apparently the Founding is what matters.

[29] Dwayne W. Pickett et al., *"The Old Theatre Near the Capital": Archaeological and Documentary Investigations into the Site of the Third Theatre*, Colonial Williamsburg Digital Library (Apr. 1998), https://tinyurl.com/yt7b4wt8, at 4.

1763 Charleston (2,600 sq ft), 1769 Halifax, North Carolina (1,800 square feet), and 1771 Annapolis.[30] Seating capacity at such locations was not insignificant – a 1750 newspaper reported seating of 292 for a play in a "warehouse" in Philadelphia, while in 1762 the Chapel Street Playhouse in New York sat 352. *Id.* at 51, 260. Indeed, "by the end of the eighteenth century, original works by American playwrights started to appear to answer the needs of a new nation, and theatres sprouted up in every major metropolitan area."[31] The Charleston Theatre opened in 1793, two years after ratification of the Second Amendment, seating 1,200 people.[32] The following year, the Boston Theatre opened, seating 1,000.[33] The Chestnut Street Theater in Philadelphia began construction in 1792, and seated 2,000. *Id.* at 849. New York's Park Theatre opened in 1798, also seating 2,000.[34] If Plaintiffs could uncover these examples of large Founding-era theaters with a simple Internet search, certainly Dr. Rivas should have been able to as well.[35]

Next, Defendant seems to concede that his "fairs and markets" statutes generally prohibited only "affray" – *i.e.*, offensive brandishing, not merely peaceable carry. James XMSJ at 30. Nevertheless, he argues they still apply, theorizing that if affray "laws are relevantly similar enough

---

[30] Hugh F. Rankin, *The Colonial Theatre: Its History and Operations*, Colonial Williamsburg Digital Library (1955), https://tinyurl.com/29y33msf, at 253.

[31] *New Playwrights for New Stages*, University of Virginia Library, https://tinyurl.com/muv9f39w (last visited Aug. 25, 2026).

[32] *Irish in Charleston*, Preservation Society of Charleston (Mar. 16, 2026), https://tinyurl.com/2wtpw6w8.

[33] *Epilogue to Secular Music in Early Massachusetts*, in *Music in Colonial Massachusetts 1630-1820*, Colonial Society of Massachusetts (1985), https://tinyurl.com/s746nvz8 at 848-49.

[34] Samantha Sokol, *On This Day in NYC History, January 29th, 1798: The Park Theater Opened as the First Major Theater in NYC*, Untapped Cities (Jan. 29, 2014), https://tinyurl.com/2s4ebn8n.

[35] Famously, President Lincoln was assassinated in Ford's Theatre, shot in the head in 1865. And yet the first (and perhaps only) historical gun ban mentioning theaters did not arise until 1879 (New Orleans) and 1881 (Nevada, banning only "discharge"). *See Prohibition of Weapons in Balls, Theatres, etc.*, Duke Center for Firearms Law, https://tinyurl.com/2s3k3w4j (last visited Aug. 25, 2026); 1881 Statutes of Nevada 20, https://tinyurl.com/mspphjwu.

to uphold the prohibition on persons under domestic violence restraining orders," then they are good enough justify the CCIA's theater ban. *Id.* But affray laws focused on dealing with dangerous persons, which is what made them analogues for *Rahimi*'s domestic-violence disarmament. As the Court explained, affray laws were "a mechanism for punishing those who had menaced others with firearms," not a means to broadly disarm the law-abiding. 602 U.S. at 681. These laws aimed at conduct that "disrupted the public order and le[d] almost necessarily to actual violence." *Id.* at 697. *Rahimi* simply held that a law targeting individuals specifically "found by a court to present a threat to others fits neatly within the tradition the … going armed [affray] laws represent." *Id.* at 698. In stark contrast here, New York State licensing officers have determined that Plaintiffs are *not* dangerous and do *not* pose a danger to anyone – thus issuing them firearm licenses. There is no credible and individualized risk of "affray" by a New York concealed carrier going about his daily life, and historical "affray" laws do not justify his disarmament.

Next, Defendant asserts that "[t]he historical record also supports a principle of protecting public gatherings," pointing to a 19th-century list of various non-theater settings that he nevertheless speculates "would certainly cover … theaters." James XMSJ at 30-31. But at the outset, some of these locations included churches – places where, at the Founding, some jurisdictions *required* firearms to be carried.[36] Defendant's historical materials are therefore suspect, as "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66. Indeed, Defendant's "expert" cites *only* "nineteenth-century statutes" to support Defendant's "public

[36] *See, e.g.*, 1632 Va. Acts 198, 198, https://tinyurl.com/3ybyba84; *see also* Plaintiffs-Appellees' Answering Brief in Response to Defendant-Appellant Cecile at 30, No. 22-2972 (2d Cir. Feb. 7, 2023), Doc. 216, https://tinyurl.com/yc6ff25j (collecting sources).

spaces" argument. Rivas Dec. ¶34; *see also id.* at ¶¶21-25 (titled "Nineteenth-Century Locational Restrictions"). That is simply too late under *Bruen*.

Nor can these materials justify the CCIA under *Bruen* and *Wolford*. Rivas claims her historical record "endeavor[ed] to cover as many gathering places as possible under the umbrella of protective disarmament...." Rivas Dec. ¶34. But that is the *opposite* of what *Bruen* explained the Second Amendment protects – a "general right to public carry" (597 U.S. at 33) – *i.e.*, a rule where carry is the norm and disarmament is the highly limited exception, not where guns are banned in "as many … places as possible" (Rivas Dec. ¶34). That means New York cannot "effectively declare … a 'sensitive place' simply because it is crowded" (*Bruen*, 597 U.S. at 31), such as in "many places that people routinely visit in the course of their daily routines" (*Wolford*, 146 S. Ct. at 2041). This Court should reject Rivas's ahistorical claim outright.

But the problems with Rivas's materials do not end there. Rivas cites an 1804 regulation out of New Orleans, which banned firearms in ballrooms. Rivas Dec. ¶21. But this period in New Orleans was especially troubled – the City had recently been handed over from Spain to France, and then from France to the United States during the 1803 Louisiana Purchase.[37] During that time, French citizens in the city were causing problems – "a few of the French officers and citizens who are here continue to evidence a disorderly disposition," and "[t]he public Ball room has been the theatre of all the disorders."[38] In other words, New Orleans in 1804 had the equivalent of wartime governance. And, as in *Bruen*, "[t]here is thus little indication that these military dictates were designed to align with the Constitution's usual application during times of peace." 597 U.S. at 63

---

[37] James M. Lindsay, *The Louisiana Purchase*, Council on Foreign Relations (Apr. 30, 2026), https://tinyurl.com/4sbcymar.

[38] *Letter from William C. C. Claiborne to James Madison*, Founders Online (Jan. 31, 1804), https://tinyurl.com/5ymheb36.

n.26. The focus was on disarming foreign French agitators – the equivalent of Founding-era prohibitions on selling guns to Indians, where "there is evidence suggesting that early Americans didn't think of the Native Americans as part of 'the people' at all." *United States v. Williams*, 113 F.4th 637, 652 (6th Cir. 2024).

Next, Rivas seeks to rewrite history, "challeng[ing] the commonplace assumption that laws and constitutional provisions from that era were adopted with racially discriminatory intent." Rivas Dec. ¶22 n.23. Rivas maintains that racist Reconstruct-era gun control in fact was often enacted *by* "Black Americans" (*id.* ¶22) – a truly fantastical proposition, and one the Supreme Court has rejected. Indeed, as *Bruen* noted, even the Reconstruction-era Court suffered from misgiving that, "[i]f blacks were citizens … they would be entitled to … 'keep and carry arms wherever they went.'" 597 U.S. at 60 (citing *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857)). Judge Kavanaugh recounted "the Nation's history of racial discrimination" during this period, cautioning that "courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind." *Rahimi*, 602 U.S. at 723 (Kavanaugh, J. concurring). Indeed, "legislatures in defeated Confederate States … enacted so-called Black Codes … to perpetuate the subjugation of blacks." *Wolford*, 146 S. Ct. at 2053. Thus rebuking Hawaii's reliance on Reconstruction-era gun control, the Court explained that such "tainted artifact[s] … cannot be taken seriously." *Id.*

Rivas's remaining "analogues" are entirely unhelpful. She cites an 1869 Tennessee law (Rivas Dec. ¶23), but a year later Tennessee banned all public carry[39] – so likely not the best place to look to understand the Second Amendment's meaning. The same is true for Rivas's 1870 Texas

[39] 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1, https://tinyurl.com/yzpvxwzy.

law.[40] *See* Rivas Dec. ¶24. Next, Rivas cites an 1870 Georgia law, but that "law's ban on firearms did not apply across the board to all public assemblies and gatherings." *Koons v. Platkin*, 673 F. Supp. 3d 515, 631 (D.N.J. 2023). The Georgia law also imposed a maximum punishment of 20 days in jail, far unlike the CCIA's felony prison term. N.Y. Penal Law § 70.00(2)(e). Rivas also notes that the Georgia statute was upheld in *Hill v. State*, 53 Ga. 472 (1874), but that court believed the Second Amendment to restrict only the federal government. *Id.* at 473. Again, perhaps not the best source of authority. Rivas's next analogue is an 1879 Missouri law (Rivas Dec. ¶25) that expressly exempted carry for self-defense and traveling – so not the sweeping ban that Rivas believes.[41] Rivas next cites an 1890 Oklahoma territorial law that imposed a maximum 30-day penalty, and which appeared to entirely ban the carrying of pistols (§1),[42] a nonstarter after *Bruen*. Finally, Rivas's 1889 Arizona territorial law was punishable by fine, not felony imprisonment, and entirely banned carrying a firearm in any settlement, town, village, or city[43] – precisely what *Bruen* said a government cannot do. *See* 597 U.S. at 31 ("no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place'"). And, of course, all of these "analogues" arose nearly a century after the Founding. They are all irrelevant here.

**E. The CCIA's Ban on Guns in Zoos Is Unconstitutional.**

To prove that guns can be banned in zoos, Defendant begins by claiming that guns can be banned in schools, stretching *Bruen* two steps away from what it actually said. First, *Bruen* never approved of banning guns in schools, but instead merely referenced that *Heller* had offered the

---

[40] An Act to Regulate the Keeping and Bearing* of Deadly Weapons, ch. 34, §§ 1-9, 1871 Tex. Gen. Laws 1st Sess. 25, 25-27, https://tinyurl.com/2fy344db.

[41] Mo. Rev. Stat., ch. 24, art. 2, §§ 1274-1278, https://tinyurl.com/bdcsnp2d.

[42] Concealed Weapons, ch. 25, art. 47, §§ 1–10, 1890 Okla. Terr. Sess. Laws 495, 495-96, https://tinyurl.com/2r7nd2x7.

[43] Act of Mar. 18, 1889, no. 13, §§ 1-9, Ariz. Sess. Laws 30, 30-31, https://tinyurl.com/y7aj8ekr.

Court's presumptive thoughts. *See* 597 U.S. at 30. And when *Bruen* offered its list of sensitive places, it included "legislative assemblies, polling places, and courthouses" – not schools. *Id.* In fact, *Bruen* referenced the *presence* of guns in schools historically, noting "a Freedmen's Bureau" school where "'[t]he superintendent of schools came down and brought [the teacher] a revolver' for his protection." *Id.* at 61. Second, *Bruen* certainly never held that a state has some sweeping authority to ban guns in any place it claims to be "analogous to schools." James XMSJ at 32. To the contrary, *Bruen* said that "we therefore can assume it settled that ***these*** locations were 'sensitive places'" – *i.e.*, "legislative assemblies, polling places, and courthouses" – not other locations Defendant might dream up. *Bruen*, 597 U.S. at 30 (emphasis added). Likewise, when *Bruen* allowed for the possibility of "*new* and analogous sensitive places" which may be "constitutionally permissible," it meant they must be "analogous" to "these locations." *Id.*

Nevertheless, Defendant then provides a string cite of cases he claims approved of gun bans in schools. James XMSJ at 32. But as he notes, *Heller* said they were only "presumptively lawful" (554 U.S. at 626), and *Bruen*'s further historical analysis undermines *Heller*'s initial tentative conclusion. In fact, the law review article *Bruen* cited with approval explains that, "[f]or most of the [19th] century, there were few laws about arms at schools, and none of them attempted to make schools 'gun-free.'" David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244 (2018); *see also id.* at 249-252 (explaining that even 19th-century laws banned only *students* from having guns on campus, and sometimes only certain uses or discharge, and that "[n]one of the above laws provides support for *Heller*'s designation of 'schools' as sensitive places where arms carrying may be banned"). In fact, Defendant's "expert" report bears this out, demonstrating that virtually every (if not every) school gun ban was directed at "students," "pupils," and "cadets" – not faculty, parents, or visitors – and provided for

"suspension" or "expulsion" – not arrest and imprisonment for felony crime. Charles Dec. ¶¶22-23, ECF #187-3. Defendant's remaining sources (James XMSJ at 23) are the Court merely referencing *Heller*'s initial thoughts but, again, they were never more than *dicta* and certainly never a legal holding – and, as noted, *Bruen* subsequently undermined *Heller* on this point.

Of course, this Court need not decide the issue, because zoos are nothing like schools. Schools are responsible for the safety, care, and custody of children when away from their parents – zoos are not. Schools are generally closed to the general public – zoos are open to the general public. Schools utilize locked doors, and occasionally bag searches and metal detectors.[44] There is no evidence that the Rosamond Gifford Zoo has any of these security features.

Next, Defendant notes the Second Circuit's holding that guns can be banned in locations that are "frequented by children," and its finding that "70 percent of zoo visitors come accompanied by children...." James XMSJ at 32 (citing *Antonyuk*, 120 F.4th at 1026-27). But if this were true, then guns could be banned at grocery stores, where 87 percent of parents report bringing their kids with them.[45] Yet *Wolford* explicitly rejected the notion that guns can be banned in "grocery stores" (146 S. Ct. at 2041, 2052), and *Bruen* cautioned that "expanding the category of 'sensitive places' simply to all places of public congregation … defines the category of 'sensitive places' far too broadly" (597 U.S. at 31). Simply replacing the word "public" with "children" cannot undermine the Court's rejection of broad gun bans in public places. Indeed, "[t]he mere presence of children at a particular location does not mean that location is a 'sensitive place' where firearms can be completely banned … such an argument stretches the sensitive places

---

[44] *See School Metal Detectors and Weapons Detection*, National School Safety and Security Services, https://tinyurl.com/3szb7k4b (last visited Aug. 24, 2026).

[45] The Strategic Counsel, *Marketing to Kids – Baseline Survey and Focus Groups on Recall of Food and Beverage Marketing*, Health Canada (May 2019), https://tinyurl.com/yvz75cr8, at 14 (54% "frequently" plus 33% "occasionally").

doctrine too far." *Koons*, 673 F. Supp. 3d at 638; *cf.* Charles Dec. ¶¶20-24 (concluding that "perhaps the most common area of firearm regulation was that of protecting children"). But if Charles were correct, then guns would have been banned in the average Founding-era home, because "in 1790 the average number of children born per fertile married woman was 7.76."[46] In contrast, N.Y. Social Services Law § 390 defines a "family day care home" as a location where "child day care is provided in a family home for three to six children," or for "seven or eight [older] children." It goes without saying that the Framers never saw fit to ban guns in their own homes.

Next, Defendant theorizes that guns can be banned in zoos because "vulnerable populations congregate" there. James XMSJ at 32. But this theory suffers from the same problem as disarming sober patrons of locations that serve alcohol – it flips the historical "how" and the "why" on their head. As Defendants' own school analogues make clear, it is *students* who were disarmed. Charles Dec. ¶¶22-23. There is no historical tradition of disarming *the entire general public* in order to protect a purported "vulnerable population," especially when New York's concealed carry license holders have been determined to have "good moral character" and to *not* present a danger to anyone (except maybe for exercising self-defense, *see Antonyuk*, 624 F. Supp. 3d at 247-48).

To put it simply, if person A is vulnerable, person B does not lose his right to defend himself. This would result in parents being disarmed, unable to defend their own children, even though armed criminals by definition do not obey the law, and will not be stopped by the Rosamond Gifford Zoo's lax security features. If any further evidence of this precept were required, *Rahimi* provides it. As the Court explained, it is those *whose characteristics or conduct demonstrate*

---

[46] Rodger C. Henderson, *Demographic Patterns and Family Structure in Eighteenth-Century Lancaster County, Pennsylvania*, 114 Pa. Mag. Hist. & Biography 349, 372 n.75 (1990), https://tinyurl.com/mryzynkp.

*dangerousness* who may be disarmed – not those who the state has vetted and determined *not* to have such characteristics or conduct. *See* 602 U.S. at 700.

Finally, Defendant speculates that, because traditional zoos did not arise until the late 1800s, firearms can be banned there. James XMSJ at 33. But as Judge Bumb's historical analysis reveals, guns were not banned in zoos *even then*: "the State ignores the fact that zoos were scattered throughout the Nation during and after the Reconstruction era," yet most visitors "could apparently carry their arms at the zoo without fear of criminal penalties." *Koons*, 673 F. Supp. 3d at 637.

**F. The CCIA Plainly Prohibits the "Possession" of Firearms in "Airports," So Plaintiffs Have Standing to Challenge It.**

Under the CCIA, "[a] person is guilty of criminal possession of a firearm … in a sensitive location when such person *possesses* a firearm" in an "airport[]." N.Y. Penal Law § 265.01-e(2)(n) (emphasis added). As this Court previously recognized, this prohibition broadly covers the act of "'check[ing] [one's] firearm with [their] luggage in accordance with TSA regulations, which requires declaring the firearm....'" *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 282 (N.D.N.Y. 2022). Indeed, the statute plainly reaches not just "carr[ying] concealed in airports" (*id.*), but *also* the mere possession of an unloaded firearm in one's luggage, "in or upon" any portion of an airport – including an airport ticketing counter. N.Y. Penal Law § 265.01-e(1). Counsel for Defendant's predecessor reflected that understanding at oral argument on Plaintiffs' Motion for Preliminary Injunction, defending the merits of the CCIA's wholesale ban on firearms in airports:

> THE COURT: So as a result of this statute, New Yorkers would not be able to travel with their weapon, concealed carry weapon.
> MR. THOMPSON: I think that the statute covers that. … [C]ertainly airports are sensitive places and the possession of a gun in an airport is prohibited. And justified I would point out.
> THE COURT: So again, according to the statute, there's no way to legally travel with your permitted weapon in New York State as a result of this statute?

> MR. THOMPSON: … I think that the question of how it would be enforced and interpreted is one that law enforcement has the right to make.... [Transcript of Oct. 25, 2022 Motion Hearing at 87:6-88:13, ECF #72.]

But now, Defendant changes his tune. He asserts that Plaintiff Terrille lacks standing to challenge the CCIA's airport ban because federal law protects interstate travel with a firearm. James XMSJ at 34 (citing 18 U.S.C. § 926A). Thus, Defendant posits, "state law is no barrier" to checking a firearm in his luggage, and the New York State Police do "not enforce [the CCIA] in such a manner as to prevent persons who comply with the federal statute and regulatory regime from taking their gun into an airport to check it in their baggage." *Id.* at 35. Of course, that is an incredibly convenient position to suddenly take – particularly in light of New York's longstanding *refusal* to recognize federal protections for interstate travel. Examples of airport detentions and arrests over checked firearms abound. In one consolidated case, three separate travelers "complain[ed] of the actions taken by … police officers when [the travelers] attempted to transport unloaded firearms in checked baggage through various New York airports." *Torraco v. Port Auth. of N.Y.*, 615 F.3d 129, 132 (2d Cir. 2010). Each "relied upon 18 U.S.C. § 926A," yet "[a]ll three … were interviewed and delayed … and two … were arrested...." *Id.* Likewise, "[i]n Albany, N.Y., detention of gun owners and confiscation of firearms have been reported by persons traveling in full compliance with § 926A."[47] As recently as January of this year, "Green Bay Packers player Rasheed Walker was arrested at LaGuardia Airport … after he tried to check a bag that contained a handgun and ammunition...."[48] Defendant's sudden reliance on 18 U.S.C. § 926A may be the first time an anti-gun state has *ever* argued the Firearms Owners' Protection Act protects *anyone*.

---

[47] *Firearm Transportation*, NRA-ILA, https://tinyurl.com/48skw8dp (last visited Aug. 19, 2026).

[48] Kyle Schnitzer et al., *Green Bay Packers Player Rasheed Walker Arrested on Gun Charges at NYC's LaGuardia Airport: Sources*, New York Post (Jan. 23, 2026), https://tinyurl.com/2rbpv9uv.

Nor does Section 926A deprive Plaintiff Terrille of standing to challenge the CCIA's obvious interference with his planned trip. *See* Supplemental Declaration of Alfred Terrille ¶15, ECF #178-6.[49] Indeed, "[p]olice are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality...." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979); *see also Antonyuk*, 120 F.4th at 1005 ("courts … 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund'"). Even if Defendant had temporarily stopped enforcement (there is no evidence that he has), he is free to change his mind about federal law at any time and return to enforcing New York law as it always has been enforced.[50] *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) ("a court should decline to defer to a merely 'convenient litigating position' … to 'defend past agency action against attack'"). Rather than dismiss Plaintiffs' challenge, this Court should provide clarity and declare that checking a firearm in an airport is protected, and enjoin Defendants from interfering with that right.[51]

## IV. PLAINTIFFS' PRIVATE PROPERTY CHALLENGE IS NOT MOOT.

---

[49] Likewise, Defendant's novel interstate-travel argument says nothing about purely *intrastate* flights, such as from Albany to LaGuardia or JFK.

[50] Indeed, Defendant alternatively claims that "prohibiting guns in airports is fully 'consistent with the principles that underpin our regulatory tradition,'" treating the checking of a firearm as an act of legislative (or in this case, executive) grace. James XMSJ at 35. But for the reasons stated in this Court's prior opinion, there is no historical tradition justifying prohibiting the unloaded, inaccessible transportation of a firearm via checked luggage. *See Antonyuk*, 639 F. Supp. 3d at 328-31.

[51] Further demonstrating the necessity of a merits ruling on this issue, Defendants disagree about *what* conduct in an airport is allowed. While Defendant James suddenly claims checking a firearm falls outside the CCIA's scope, Defendant Kindlon has taken the position that "concealed carriage" in airports cannot be prohibited. Defendant Lee C. Kindlon's Memorandum of Law in Support of Motion for Summary and in Opposition to Plaintiffs' Motion for Summary Judgment at 6, ECF #182-3. Clarity from this Court is necessary.

Defendant argues that Plaintiffs' challenge to the CCIA's gun ban on private property open to the public is moot because of *Giambalvo v. Suffolk County*, 155 F.4th 163, 179 (2d Cir. 2025), and *Wolford*. *See* James XMSJ at 36-38. But *Wolford* involved a Hawaii law, and said nothing about New York's independent statute, other than providing conclusive proof that Plaintiffs should prevail here. *Giambalvo*, in turn, involved an interlocutory appeal of the denial of a motion for preliminary injunction only, not the broader (and permanent) relief Plaintiffs seek. 155 F.4th at 171 ("the preliminary injunction motion is moot because the [defendant] is presently preliminarily enjoined"). That makes obvious sense, as there is no need to preserve a party's rights pending final adjudication while another injunction provides "real-world effect." *Id.* at 179.[52] But it is not true that Plaintiffs' underlying constitutional "challenge must be dismissed as moot" simply because they sought (in part) a permanent "injunction of a statute that is already permanently enjoined...." James XMSJ at 38; *see also Stevenson v. Blytheville Sch. Dist. #5*, 762 F.3d 765, 770 (8th Cir. 2014) ("issues implicated by the district court's denial of … preliminary injunction do not 'evade review' 'because [the] request for declaratory relief and for a permanent injunction … remain pending before the district court'"). Not to mention, no other Defendant raises this argument.[53]

**CONCLUSION**

For the foregoing reasons, this Court should deny Defendant James' Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

---

[52] *Giambalvo* is distinguishable for another reason. Not only as Defendant points out (James XMSJ at 37) did the Second Circuit find "no indication in the record" that the defendant was "presently enforcing" the law, but also the court noted an affirmative, observable change in the defendant's conduct. 155 F.4th at 179 (website no longer demanding social media information). That sort of affirmative evidence of non-enforcement is not present here.

[53] Upon further consideration, Plaintiffs do not oppose dismissal without prejudice of their First and Second Amendment claims against the CCIA's private-property provision as applied to properties not open to the public. *See* James XMSJ at 36-44.

Respectfully submitted,

Dated: August 31, 2026

*/s/ Oliver M. Krawczyk*
Oliver M. Krawczyk* (PA # 334423)
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
F: (540) 773-2414
E: oliver@amblerlawoffices.com
NDNY Bar Roll # 707836
**Admitted Pro Hac Vice*

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615
T: (703) 356-5070
F: (703) 356-5085
E: rob@wjopc.com
NDNY Bar Roll # 703779
*Counsel for Plaintiffs*