UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

IVAN ANTONYUK, COREY JOHNSON, and ALFRED TERRILLE,

Plaintiffs,

-against-

Case No. 22 Civ. 986 (GTS) (PJE)

STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, WILLIAM FITZPATRICK, in his official capacity as Onondaga County District Attorney, TOBIAS J. SHELLEY, in his official capacity as Sheriff of Onondaga County, MARK RUSIN, in his official capacity as Chief of Police of Syracuse, and LEE C. KINDLON, in his official capacity as District Attorney of Albany County,

Defendants.
------------------------------------------------------------------X

**SUPERINTENDENT JAMES' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
Attorney General
State of New York
300 South State Street, Suite 300
Syracuse, New York 13202
Attorney for Superintendent James

Patrick Blood, NDNY Bar Roll No. 519910
Timothy Mulvey, NDNY Bar Roll No. 510757
James M. Thompson, NDNY Bar Roll No. 703513
Of counsel

# TABLE OF CONTENTS

ARGUMENT ..... 1

I. PLAINTIFFS CANNOT USE THEIR SUMMARY JUDGMENT PAPERS TO RAISE AS-APPLIED THEORIES THEY DID NOT PLEAD ..... 1

II. THE COURT MUST NOT COUNTENANCE PLAINTIFFS' REFUSAL TO ANSWER FUNDAMENTAL QUESTIONS AT THEIR DEPOSITIONS ..... 2

III. PLAINTIFFS HAVE NOT UNDERMINED THE STRONG HISTORY AND GOVERNING CASE LAW SUPPORTING THE CHALLENGED MEASURES ..... 4

A. The Second Amendment Does Not Require Guns in Public Parks ..... 5

B. The Second Amendment Does Not Require Guns Where Alcohol Is Served ..... 7

C. The Second Amendment Does Not Require Guns In Theaters ..... 10

D. The Second Amendment Does Not Require Guns In Zoos ..... 12

E. Plaintiffs Cannot Manufacture A Case Or Controversy Regarding Airports, And The Second Amendment Does Not Require Guns There ..... 14

IV. THE PRIVATE PROPERTY CLAIM IS MOOT, OR FAILS ON THE MERITS ... 15

V. PLAINTIFF FAILED TO OPPOSE A STAY OF ANY INJUNCTION ..... 15

CONCLUSION ..... 16

# TABLE OF AUTHORITIES

## Cases

Amorous v. State, 57 S.E. 999 (Ga. Ct. App. 1907) .......... 10

Antonyuk v. James, 120 F.4th 941 (2d Cir. 2024) ("Antonyuk II") .......... passim

Bank of Am., N.A. v. Fischer, 927 F. Supp. 2d 15 (E.D.N.Y. 2013) .......... 3

Charter Oak Fire Ins. Co. v. Yeadon Fabric Domes, LLC, 783 F. Supp. 3d 696 (N.D.N.Y. 2024) .......... 1

Christian v. James, 176 F.4th 189 (2d Cir. 2026) .......... 2, 5, 6

City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2010 WL 2653369 (E.D.N.Y. June 25, 2010) .......... 3

Culberson v. State, 47 S.E. 175 (Ga. 1904) .......... 10

District of Columbia v. Heller, 554 U.S. 570 (2008) .......... 12

Field Day, LLC v. County of Suffolk, 463 F.3d 167 (2d Cir. 2006) .......... 1

Fisk v. State, 71 P.2d 499 (Okla. Crim. Ct. App. 1937) .......... 9

Frey v. City of New York, 157 F.4th 118 (2d Cir. 2025) .......... 4, 14

Hill v. Chalanor, No. 9:06-CV-0438 GTS/GHL, 2009 WL 6315325 (N.D.N.Y. June 8, 2009) .. 15

Kipke v. Moore, 165 F.4th 194 (4th Cir. 2026) .......... 8

McDonald v. City of Chicago, 561 U.S. 742 (2010) .......... 12

Mintz v. Chiumento, 724 F. Supp. 3d 40 (N.D.N.Y. 2024) .......... 13

NYSRPA v. Bruen, 597 U.S. 1 (2022) .......... 4, 13

Owens v. State, 3 Tex.App. 404 (1878) .......... 8

Schoenthal v. Raoul, 150 F.4th 889 (7th Cir. 2025) .......... 14

Spokeo, Inc. v. Robins, 578 U.S. 330 (2016) .......... 14

State v. Alexander, 27 Tex. App. 533 (Ct. App Tex. 1889) .......... 13

State v. Shelby, 2 S.W. 468 (Mo. 1886) .......... 8

Thomas v. N.Y. City Dep't of Educ., No. 21-1799-cv, 2022 WL 2236948 (2d Cir. June 22, 2022) .......... 2

Torraco v. Pt. Auth. of N.Y. & N.J., 615 F.3d 129 (2d Cir. 2010) .......... 14

United States v. 4003-4005 5th Avenue, Brooklyn, N.Y., 55 F.3d 78 (2d Cir. 1995) .......... 2, 3, 4

United States v. Hemani, 608 U.S. 772, 794 (2026) .......... 9

United States v. Rahimi, 602 U.S. 680 (2024) .......... 4, 5, 8, 11

United States v. Veeraswamy, No. 23-CV-9379, 2025 WL 3187284 (E.D.N.Y. Nov. 14, 2025) .......... 4

Vidal v. Elster, 602 U.S. 286 (2024) .......... 12

Willingham v. County of Albany, 593 F. Supp. 2d 446 (N.D.N.Y. 2006) .......... 4

Wolford v. Lopez, 146 S.Ct. 2032 (2026) .......... passim

Wynne v. State, 51 S.E. 636 (Ga. 1905) .......... 8

Ziegenfuss v. Martin, 824 F. Supp. 2d 540 (N.D. Tex. 2026) .......... 7

**Statutes**

18 U.S.C. § 926A .......... 14

N.Y. Penal Law § 265.01-d .......... 15

**Rules**

Fed. R. Evid. 702 .......... 5

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, respectfully submits this reply memorandum of law in further support of his cross-motion for summary judgment, ECF No. 187.

## ARGUMENT

### I. PLAINTIFFS CANNOT USE THEIR SUMMARY JUDGMENT PAPERS TO RAISE AS-APPLIED THEORIES THEY DID NOT PLEAD

Plaintiffs'[1] reply asserts that the as-applied arguments made for the first time in their summary judgment papers "are not some new development, but rather have existed all along." ECF No. 201-2 at 1. But they do not respond to the straightforward argument, enumerated at pages 10-11 of the Superintendent's brief, that the only relief sought in the Complaint was explicitly facial in nature, challenging the statute as a whole. See Compl. at 72 (requesting in the relief section only "[a]n order . . . permanently enjoining Defendants . . . from enforcing the challenged sections of the CCIA" and "[a]n order declaring that the challenged sections of the CCIA are unenforceable [and] unconstitutional"); Field Day, LLC v. County of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006). "A complaint cannot be amended merely by raising new facts and theories in a plaintiff's opposition papers to a motion for summary judgment, and hence such new allegations and claims should not be considered in resolving the motion." Charter Oak Fire Ins. Co. v. Yeadon Fabric Domes, LLC, 783 F. Supp. 3d 696, 726 (N.D.N.Y. 2024) (quotation omitted).

Without having sought relief specific to any Plaintiff, and without having sought amendment to add such an argument, Plaintiffs ask the court to read between the lines of their Complaint. But nowhere in the Complaint or its underlying declarations do the Plaintiffs

[1] For ease of reading, this reply uses the same defined terms as the Superintendent's cross-motion brief, ECF No. 187-1.

specifically allege that they never drink alcohol. See Compl. ¶ 99; id. Ex. 2 ¶ 11, Ex. 9 ¶ 19. Nor does the Complaint ever directly argue that their decision not to drink changes the application of the Constitution. Nor did either of the relevant Plaintiffs disclose such an as-applied theory in their interrogatory responses. ECF No. 187-26 at 3-4, ECF No. 187-27 at 3-4. Likewise, the Complaint mentions specific parks, but it made no assertions that the ruralness of such parks changes the Constitutional equation. See ECF No. 178-9 at 9 (acknowledging that "Plaintiffs here did not specifically seek relief as applied to 'rural parks'"). "[S]tray references" to a potential theory cannot create a claim that has not been pled, particularly when "there are no factual allegations regarding [the new as-applied theories] and no related requests for relief." Thomas v. N.Y. City Dep't of Educ., No. 21-1799-cv, 2022 WL 2236948, at *3 (2d Cir. June 22, 2022) (summary order); see Christian v. James, 176 F.4th 189, 203-04 (2d Cir. 2026) (refusing to consider a late-raised as-applied challenge to this law).

## II. THE COURT MUST NOT COUNTENANCE PLAINTIFFS' REFUSAL TO ANSWER FUNDAMENTAL QUESTIONS AT THEIR DEPOSITIONS

Plaintiff Johnson invoked the Fifth Amendment 27 times in his three-and-a-half hour deposition, including on basic questions regarding what guns he owns, where he takes them, as well as whether he has taken certain actions that would constitute felonies under New York and federal law. See ECF No. 201-1 ¶ 7. Plaintiff Terrille likewise invoked the Fifth Amendment 19 times in a four-hour deposition, on a similarly broad range of topics. Id. ¶¶ 8-9. "Though constitutionally protected, a civil litigant's invocation of the privilege against self-incrimination during the discovery process is far from costless. It will, for example, always disadvantage opposing parties . . . since it keeps them from obtaining information they could otherwise get." United States v. 4003-4005 5th Avenue, Brooklyn, N.Y., 55 F.3d 78, 82 (2d Cir. 1995). That is

particularly the case here, as information about the guns Plaintiffs Terrille and Johnson own and the way they use them are central to their standing and theory of the case, but solely within their own knowledge.[2] See id. at 82-83 (litigants whose opposing parties claim Fifth Amendment privilege "often have no recourse in the civil litigation other than to comment upon the claim of privilege in the hope of persuading the trier of fact to draw a negative inference"). "Where a litigant has sought to use the Fifth Amendment to abuse or obstruct the discovery process, a district court can prevent prejudice to opposing parties and adopt remedial measures or impose sanctions." City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2010 WL 2653369, at *4 (E.D.N.Y. June 25, 2010); see 4003-4005 Fifth Avenue, 55 F.3d at 85 ("courts must be free to fashion whatever remedy is required to prevent unfairness" (quotation omitted)).

Here, the number of invocations of the Fifth Amendment and the breadth of subjects on which Johnson and Terrille refused to answer questions justify the inference that, had those questions been answered truthfully, the answers would have been harmful and undermined their standing, an issue on which they bear the burden. See Bank of Am., N.A. v. Fischer, 927 F. Supp. 2d 15, 26 (E.D.N.Y. 2013) (imposing adverse inference at summary judgment). This is particularly the case where the two Plaintiffs refused to answer questions relevant to standing but then submitted "supplemental" written declarations in order to shore up their standing, including testimony on their law-abidingness, eligibility to possess firearms, and the places where they carry guns—the same subjects on which they refused to testify. See ECF Nos. 178-5 & 178-6; see 4003-4005 Fifth Avenue, 55 F.3d at 85 (trial court can "bar a litigant from testifying later about matters

[2] For this reason, it makes little sense when Plaintiffs demand that New York "put up or shut up" by providing *additional* evidence regarding the Plaintiffs' own weapons and how they carry them. ECF No. 201-2 at 4.

previously hidden from discovery through an invocation of the privilege."); United States v. Veeraswamy, No. 23-CV-9379, 2025 WL 3187284, at *9 (E.D.N.Y. Nov. 14, 2025) (failure to answer deposition questions should prevent party from "supporting or opposing claims or defenses by introducing her own testimony, including through an affidavit.").

As Plaintiffs must acknowledge, Second Amendment cases are not "subject to an entirely different body of rules" from other areas of litigation. ECF No. 201-2 at 7; NYSRPA v. Bruen, 597 U.S. 1, 70 (2022). Just as federal courts would not accept the misuse of the Fifth Amendment to stymie discovery in a garden-variety case, see Willingham v. County of Albany, 593 F. Supp. 2d 446, 452 (N.D.N.Y. 2006); Veeraswamy, 2025 WL 3187284 at *9, this Court should not do so here.

## III. PLAINTIFFS HAVE NOT UNDERMINED THE STRONG HISTORY AND GOVERNING CASE LAW SUPPORTING THE CHALLENGED MEASURES

Plaintiffs' opposition and reply brief pushes the Court to adopt a methodology for ignoring, rather than honoring, virtually the entirety of American history. That approach is contrary to governing law. Plaintiffs acknowledge that "this Court is bound by the Second Circuit's use of late-19th-century historical analogues," ECF No. 201-2, without ever citing, acknowledging, or responding to the Circuit's extensive discussion of how "[t]he Supreme Court has explicitly sanctioned looking to post-Founding history" and how courts "may comfortably rely on that history, especially from the Reconstruction era." Frey v. City of New York, 157 F.4th 118, 129 (2d Cir. 2025); see United States v. Rahimi, 602 U.S. 680, 728 (2024) (Kavanaugh, J., concurring) ("For more than two centuries—from the early 1800s to this case . . . . [t]he Court has repeatedly employed post-ratification history to determine the meaning of vague constitutional text.").

Plaintiffs' ahistorical Founding[3]-only methodology for constitutional analysis is contrary to governing precedent; "[s]uch assumptions are flawed, and originalism does not require them." Rahimi, 602 U.S. at 740 (Barrett, J., concurring).

### A. The Second Amendment Does Not Require Guns in Public Parks

Plaintiffs use scare-quotes when referring New York's "expert," Dr. Terence Young, but his work has been cited in courts across the country, including by the Second Circuit in upholding the very same statute they are challenging. See Christian, 176 F.4th at 206. Dr. Young's history of the parks movement and the "mountain of regulations" he adduced are more than sufficient to uphold the challenged law. Id. at 205, 206.

First, consider what Plaintiffs' opposition and reply brief does *not* dispute. The brief does not directly address urban parks or dispute that the dozens of laws cited by Dr. Young demonstrate a sufficient tradition for prohibiting guns in these spaces. ECF No. 201-2 at 10; see Antonyuk v. James, 120 F.4th 941, 1022 (2d Cir. 2024) ("Antonyuk II"); Christian, 176 F.4th at 204-05. Nor do they dispute that this tradition is sufficient to uphold the statute facially, as the Second Circuit has done twice. Antonyuk II, 120 F.4th at 1025-26; Christian, 176 F.4th at 206. Nor (despite the scare-quotes) do they dispute Dr. Young's qualifications or argue that his testimony is inadmissible under Fed. R. Evid. 702. Nor, despite asserting that they have lodged "an as-applied challenge to rural parks [] with great specificity," ECF No. 201-2 at 10, do they explain how to define the two categories.[4] See ECF No. 178-9 at 9. Indeed, Plaintiffs' previous counsel acknowledged in their

---

[3] As Plaintiffs' reply acknowledges, the Superintendent's moving brief challenged them to explain "when that 'era' begins and ends." ECF No. 201-2 at 8 (quoting ECF No. 187-1 at 14). Plaintiffs' reply makes no attempt to set a date after which history should be arbitrarily cut off, let alone to ground that date in law or doctrine.

[4] Plaintiffs' attempt to apply the urban-rural distinction underscores the way that they have not clearly pled an as-applied challenge or given the Court a clear rule they wish it to synthesize.

moving brief that "it is impossible to judicially line-draw some 'as-applied' urban-rural distinction . . . or to decide where along the spectrum" to place "suburban parks." Id. at 10. The Court should not take on an as-applied challenge that was not pled in order to draw a line that Plaintiffs themselves cannot locate. See Antonyuk II, 120 F.4th at 1025 (evaluating the current Complaint and stating that "we need not resolve this line-drawing issue on a facial challenge.").

On the history, Plaintiffs hang their hat on the same argument the Second Circuit has rejected twice. They dispute Dr. Young's expert testimony that public *parks* date from the late 1850s, asserting that they "already showed the existence of public *spaces* from the 1600s onwards." ECF No. 201-2 at 11 (emphasis added). But Christian cited Dr. Young and explained that "modern urban public parks in the mold of Olmstead's Central Park did not yet exist in significant numbers before [the 1850s]." 176 F.4th at 206; see Antonyuk II, 120 F.4th at 1025. The Circuit distinguished the pre-park "public spaces" raised by Plaintiffs here, explaining that they were not "principally created as dedicated spaces for peaceful recreation and quiet contemplation of natural scenery," but also utilitatian purposes like cattle grazing, military exercises, and public executions. Christian, 176 F.4th at 206; see Antonyuk II, 120 F.4th at 1025 (describing Plaintiffs' argument as an "analogical error"). This issue is already resolved.

Plaintiffs' additional efforts to distinguish Dr. Young's "mountain of regulations," Christian, 176 F.4th at 205, fare no better. They attempt to wave away federal restrictions on guns in Mackinac National Park as "short-lived" because "Congress transferred the park to the state of

---

They characterize the former Mackinac National Park (which consists of eighty percent of an island surrounded by Lake Huron) as "far more like an urban park," ECF No. 201-2 at 12, but the Mackinack Island State Parks Commission describes the area as "in its natural condition to be enjoyed," with "[h]istoric landmarks, breathtaking vistas, spectacular rock formations, quiet forests and inspiring nature trails." https://tinyurl.com/4ct8bhpm.

Michigan in 1895," ECF No. 201-2 at 12-13, but ignore Exhibit 91 to Dr. Young's declaration, which demonstrates that Michigan continued to prohibit guns in its parks. See ECF No. 187-23 at 611 ("To carry or have firearms in possession in a State Park is unlawful."). Similarly, Plaintiffs attempt to brush off the comprehensive bar on guns in National Parks—federal land where the Second Amendment has always applied directly—as merely forbidding hunting. See ECF No. 201-2 at 13; but see Wolford v. Lopez, 146 S.Ct. 2032, 2057-58 (2026) (Barrett, J., concurring) (rejecting as "too narrow" an attempt to treat hunting laws as irrelevant). But multiple contemporary statements (cited in Exhibit 83 to Dr. Young's declaration) reject any self-defense rationale for carrying guns in National Parks and state that laws were enforced accordingly. See, e.g., ECF No. 187-23 at 504 (stating that "tourists entering this park have no use for guns" and rejecting "the belief that the general right to carry guns in the park exists"); id. at 510 ("[A] large number of applications for permits to carry rifles and shotguns into [Yosemite] for alleged 'protection' were received," but all but one were rejected); id. at 512 ("there is absolutely no reason for carrying firearms for 'protection' in the park, and the rules do not permit the carrying of firearms"). Because laws prohibiting guns in urban and rural public parks were "open, widespread, and unchallenged," Wolford, 146 S.Ct. at 2044, history shows them to be constitutional.

### B. The Second Amendment Does Not Require Guns Where Alcohol Is Served

The Superintendent's moving brief and the expert testimony of Patrick Charles traced the many ways that early Americans "inherited and enforced a legal tradition that regulated the mix of firearms and alcohol." Ziegenfuss v. Martin, 824 F. Supp. 2d 540, 553 (N.D. Tex. 2026). The historical analogues for New York's modern law included locational laws banning alcohol in places where guns would be, Charles Decl. ¶¶ 37-38, laws that "prohibited intoxicated persons from carrying firearms," Antonyuk II, 120 F.4th at 1030; see Charles Decl. ¶¶ 39-40; laws that

"prohibited retailers of liquor from keeping gunpowder," Kipke v. Moore, 165 F.4th 194, 218 (4th Cir. 2026); laws prohibiting persons addicted to alcohol from being part of the militia, see Antonyuk II, 120 F.4th at 1011; TD Exs. 5-8; and laws specifically prohibiting guns in places where "where intoxicating liquors are sold." Antonyuk II, 120 F.4th at 1030 (quoting 1890 Okla. Terr. Stats., Art. 47, § 7). The Superintendent also located New York's law within four separate traditions already held sufficient by the Second Circuit: "analogues prohibiting intoxicated persons from carrying or purchasing firearms," Id. at 1031; "the tradition of regulating firearms in locations frequented by concentrations of vulnerable or impaired people," id. at 1029; the tradition of "regulating firearms in crowded places and keeping such spaces peaceful," id. at 1031; and the tradition of "prohibiting firearms at social gatherings, parties, and ball rooms." Id.

Plaintiffs muster the same set of arguments for why none of the history should count. They argue that the only "relevant historical analogue" would be one "explicitly banning firearms in any place that happens to serve alcohol," ECF No. 201-2 at 16—in other words a "dead ringer." The Supreme Court holds just the opposite. Rahimi, 602 U.S. at 698. And Plaintiffs discount even the "dead ringers" from Arizona and Oklahoma as "short-lived," ECF No. 201-2 at 16, despite the Superintendent showing that laws prohibiting the same conduct remained on the books into the 1930s (and presumably beyond); See TD Exs. 19 & 20. Plaintiffs argue that the Superintendent was required to show specifically that the laws "were enforced against saloons," ECF No. 201-2 at 20, but case law includes any number of examples of enforcement at locations that are analogous (or directly on point). See, e.g State v. Shelby, 2 S.W. 468, 469 (Mo. 1886) ("the dining room" of a "public house" that served "intoxicating drink"); Owens v. State, 3 Tex.App. 404, 406 (1878); Wynne v. State, 51 S.E. 636, 637 (Ga. 1905) ("A barbecue on the 4th of July"); see also Fisk v.

State, 71 P.2d 499, 499-500, 502 (Okla. Crim. Ct. App. 1937) (noting in dicta that defendant had violated Section 2589, Oklahoma's sensitive places law, by carrying a pistol into a "night club" where one could "order[] drinks"). And to the extent that Plaintiffs disagree with the American tradition of keeping guns out of places containing vulnerable or impaired people, quintessentially crowded spaces, or locations of social and recreational gatherings, their position is contradicted by both history and binding precedent. See Antonyuk II, 120 F.4th at 1029-31.

Stepping away from the history, Plaintiffs attempt to construct their own precedent, arguing that the recent Wolford case implicitly holds most or all sensitive location laws unconstitutional. They say that the Court's "underlying criticism" of Hawaii's private property consent law contains an unstated holding that sensitive location laws cannot apply in "ordinary public locations," however that might be defined. ECF No. 201-2 at 20. In fact, the Wolford Court was very careful to explain what it was and was not holding: the majority specifically cited Hawaii's sensitive location laws (including quoting the portion covering "any 'restaurant serving alcohol'") and distinguished it from the law "at issue in this case."[5] 146 S.Ct. at 2046 (quoting Haw. Rev. State. § 134.91(a)). And Justice Barrett made the ongoing constitutionality of sensitive location laws unambiguous, deriving a historic "principle that when a State identifies specific places that are prone to particular abuses of the right, it can respond with focused regulations to address the

[5] United States v. Hemani similarly cautions readers against imputing the kind of implicit holding Plaintiffs want. Justice Gorsuch's majority opinion explains that the case is "a narrow one," and that "[a]ll that is before us is one, if surely ambitious theory. . . that [the federal government] may automatically strip Mr. Hemani of his Second Amendment right to possess a firearm because he uses marijuana a few times a week." 608 U.S. 772, 794 (2026). The Court explicitly stated that "[w]e do not address other prophylactic laws" a legislature might adopt "after determining that users of a particular [intoxicant] pose a special risk of misusing firearms." Id.

threat." Id. at 2058 (Barrett, J., concurring) (quotation omitted). The problem with Hawaii's law was that the state did not "confin[e] the rule to specific places where firearms are likely to be misused." Id. New York's sensitive location laws, and particularly its law prohibiting guns in places serving alcohol, do precisely that.

### C. The Second Amendment Does Not Require Guns In Theaters

The Second Circuit has already found that prohibiting guns in theaters falls within the "tradition of regulating firearms in quintessentially crowded places," Antonyuk II, 120 F.4th at 1038, and the Superintendent has adduced a host of historical gathering laws, many of which specifically cover "shows, public exhibitions, and places where persons are assembled for amusement." Rivas Dec. ¶ 34 (quotation omitted); see, e.g., TD Ex. 11-14, 16-18. And as discussed in Section III(C), above, the Superintendent adduced a large body of case law demonstrating that these laws were understood to cover a broad spectrum of gatherings. ECF No. 187-1 at 31; see Amorous v. State, 57 S.E. 999, 1001 (Ga. Ct. App. 1907) ("we think it plain that it is the purpose of section 342 to protect all public gatherings"); Culberson v. State, 47 S.E. 175, 176 (Ga. 1904).

Rather than focus on history, Plaintiffs portray the Supreme Court as saying something it did not say and holding something it did not hold. They assert that Wolford "confirmed that governments cannot ban guns in even crowded places," ECF No. 201-2 at 22, but the location Plaintiffs cite, 146 S.Ct. at 2048, does not contain any such holding. Instead, that portion of Wolford is part of Justice Alito's discussion of a "hypothetical young woman" going about her day, describing how difficult it would be as a practical matter to know where guns were allowed by private owners or to obtain their express consent. Id. Plaintiffs' reply does not keep its message straight: while they say it is "surprising[]" that the Superintendent describes Wolford as "not a sensitive location case," ECF No. 201-2 at 22 n.26, they brush away the fact that the Supreme

Court specifically noted Hawaii's sensitive location laws—including the one covering "any stadium, move theater, or concert hall," 146 S.Ct. at 2046, but did not disturb any of them. Plaintiffs say that this "is simply because the issue was not before the Court," ECF No. 201-2 at 22 n.26, but that is exactly the Superintendent's point: Wolford is not a sensitive location case.

Once they reach the history, Plaintiffs do not dispute the genuineness of any of the cited historical laws and cases, but rather fall back to the familiar argument that none of the history should count. See ECF No. 201-2 at 28 (historical laws "are all irrelevant here"). Plaintiffs again complain that Dr. Rivas "found no 'dead ringers'" specifically singling out theaters, but such identical laws are not required.[6] See Rahimi, 602 U.S. at 692 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'"). And they complain that all the cited laws are "simply too late under Bruen" ECF No. 201-2—in other words, that all the historical laws were always unconstitutional, but that none of the legislatures, litigants, or courts at the time thought to say so. That is a formula for ignoring history, not honoring it, and it is inconsistent with governing law from the Second Circuit, Antonyuk II, 120 F.4th at 972 ("1868 and 1791 are both focal points of our analysis"), and the Supreme Court.

---

[6] Plaintiffs attack Dr. Rivas for saying that "theaters – even large ones – did not exist at the Founding," ECF No. 201-2 at 23—something she did not say. What her declaration actually says is that "there were few public gathering spaces comparable to modern sports stadiums, convention centers, hospitals, school buildings, office complexes, and the like," and even a major city like Philadelphia had "relatively few sizeable buildings." Rivas Dec. ¶¶ 16-17; see also id. ¶ 35 (discussing "theaters and race tracks" in early America). Plaintiffs base their assertions on "a simple internet search," ECF No. 201-2 at 24, but the source they cite, https://tinyurl.com/bdcms57s, emphasizes that such theaters were "of a necessity, small," that the Chapel Street theater in New York that they tout was not "a permanent structure," and that "the typical theatre building in the colonies measured 81 feet by 37 feet," or the size of a tennis court. Id. at 252-54; cf. https://www.itftennis.com/media/7221/2026-rules-of-tennis-english.pdf, at 2 (78 feet by 36 feet). Dr. Rivas' statement that there was "no equivalent structure to the size and cultural significance" of modern theaters, arenas, and concert venues, Rivas Dec. ¶ 35, was correct.

See, e.g., District of Columbia v. Heller, 554 U.S. 570, 605 (2008) ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); Vidal v. Elster, 602 U.S. 286, 301-08 (2024) (Thomas, J.) (considering cases from 1867 through 1928 in surveying the "history and tradition" of the First Amendment).

Public gathering laws, like the earlier "fairs and markets" laws, "pursued an analogous goal in an analogous way," Wolford, 146 S.Ct. at 2056 (Barrett, J., concurring), restricting guns in discrete, crowded areas where the presence of deadly weapons is inappropriate and where armed self-defense is impracticable. "Because th[ese] historical law[s] w[ere] understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right." Id. at 2044 (majority op.).

**D. The Second Amendment Does Not Require Guns In Zoos**

Plaintiffs' argument on zoos underscores the fundamental radicalism of their position, as it is predicated on their disagreement with what they describe as the "claim[] that guns can be banned in schools." ECF No. 201-2. The Supreme Court has repeatedly reemphasized that "nothing in our opinion[s] should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools," Wolford, 142 S.Ct. at 2042 (quoting Heller, 554 U.S. at 626), but Plaintiffs cast doubt nonetheless, explaining their view that the Court has "never approved of banning guns in schools," and that the language in Heller, repeated again and again in subsequent opinions, was merely "presumptive thoughts." ECF No. 201-2 at 28-29. There is absolutely no basis for their contention. See McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) ("We made it clear in Heller").

These statements from the Supreme Court, along with Antonyuk II and "a large body of federal case law, support[] Defendants' position that the State can protect children and other

vulnerable individuals by prohibiting guns not only in schools, but also in analogous sensitive locations where children congregate." Mintz v. Chiumento, 724 F. Supp. 3d 40, 64-65 (N.D.N.Y. 2024); see Bruen, 597 U.S. at 30. That broader understanding is reflected in history, as states and localities protected educational spaces well beyond just schools. See Charles Decl. ¶¶ 13-17. These laws included one from Texas in 1870 covering "any school-room or other place where persons assembled for educational, literary, or scientific purposes," id. ¶ 13, laws with similar scope from Missouri, Arizona, Oklahoma, id. ¶¶ 14-15, and "an abundance of local laws" adopting substantially identical language covering not just schools, but educational and recreational spaces. See, e.g., Charles Dec. ¶ 16, 17 & Exs. 3, 5, 6, 7, 9, & 15. These laws were "open, widespread, and unchallenged." Wolford, 146 S. Ct. at 2044 (quoting Bruen, 597 U.S. at 36).

Plaintiffs' attempts to distinguish these laws make little sense. Their characterization of historical laws as being directed only at students is contradicted both by the plain text of the laws, which applied to "any person," see, e.g., TD Exs. 11, 14, 16, & 17, and by their enforcement. See State v. Alexander, 27 Tex. App. 533, 537 (Ct. App Tex. 1889) (sustaining conviction of a "school-teacher" for bringing a gun to his own schoolhouse). Nor is there any merit to Plaintiffs' contention that "zoos are nothing like schools," ECF No. 201-2 at 30 or that they are simply used by "the general public," particularly when the assertion is contradicted by their own testimony. See Terrille Tr. 106:13-107:22 (estimating that approximately half of visitors he sees at the Gifford Zoo are families with children, but noting that "I purposely try to avoid when schools are there. I find large groups of kids annoying."). And the fact "that zoos were unproblematically covered by the firearm regulations of their surrounding parks tends to show that our forebearers took no Second Amendment issue with the regulation of firearms at zoos." Antonyuk II, 120 F.4th at 1027.

**E. Plaintiffs Cannot Manufacture A Case Or Controversy Regarding Airports, And The Second Amendment Does Not Require Guns There**

Plaintiffs attempt to manufacture a controversy regarding airports despite the straightforward applicability of the preemption in 18 U.S.C. § 926A, Plaintiff Terrrille's admission that he intends to transport his weapon in accordance with that specific statute, see Compl. ¶ 170, Terrille Tr. 97:24-98:20, and an affidavit from the State Police. ECF No. 187-24 ¶ 3. Plaintiffs demand "evidence" of nonenforcement, Pl. Reply at 34, but they ignore the declaration under oath by NYSP's counsel. They try to manufacture standing based on a 2005 incident involving the Port Authority Police (not the State Police) where the plaintiff "was permitted to board the flight to Arizona," Torraco v. Pt. Auth. of N.Y. & N.J., 615 F.3d 129, 135 (2d Cir. 2010), a hearsay summary from the NRA referring to unnamed "gun owners" and an unnamed law enforcement organization, https://tinyurl.com/48skw8dp; and a *New York Post* story about a football player arrested (also by the Port Authority Police), who unlike Plaintiff Terrille did not have a New York firearm license. https://tinyurl.com/2rbpv9uv. None of this indicates "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quotation omitted).

And even if the Court were to accede to Plaintiffs' demand for "a merits ruling on this issue," Pl. Reply at 34 n.51, Plaintiffs have not disputed the Superintendent's merits argument. As the Superintendent explained, ECF No. 187-1 at 35, treating airports as sensitive is fully consistent with history for the same reasons that the Second Circuit found the Metro-North Railroad and New York City Subway to be sensitive in Frey v. City of New York, 157 F.4th 118, 135 (2d Cir. 2025); see Schoenthal v. Raoul, 150 F.4th 889, 917 (7th Cir. 2025) ("'why' [state law] prohibits firearms in public transit is also why historical laws banned guns in crowded spaces, and why the federal

government bans firearms on airplanes.”). Plaintiffs do not dispute that Frey’s logic applies equally to airports, nor does their brief ever address (let alone distinguish) Frey’s governing precedent.

## IV. THE PRIVATE PROPERTY CLAIM IS MOOT, OR FAILS ON THE MERITS

Plaintiffs’ challenge to the law requiring an owner’s consent to carry guns onto their property is moot, at least as to property open to the public. The constitutionality of that question has already been determined by Wolford and Christian. In asking the Court to turn this case into a third bite at the already-eaten apple, Plaintiffs demand “affirmative evidence of non-enforcement,” again ignoring the signed affidavit from the State Police. See ECF No. 187-24 ¶ 2. And while Plaintiffs’ moving brief sought summary judgment “as to the *rest* of N.Y. Penal Law § 265.01-d, which reaches private properties that are not open to the public,” ECF No. 178-9 at 24, they did not respond to the Superintendent’s historical showing, ECF No. 187-1 at 39-43, and now state that they “do not oppose dismissal . . . as applied to properties not open to the public.”[7] ECF No. 201-2 at 35 n.53. Accordingly, summary judgment should be granted in the Superintendent’s favor.

## V. PLAINTIFF FAILED TO OPPOSE A STAY OF ANY INJUNCTION

Lastly, the Superintendent argued in his moving brief that any injunction should be limited to the individual Plaintiffs and stayed fourteen days to allow an application for interim relief. See State Br. at 44-45. Plaintiffs did not respond. As discussed above, each of the provisions at issue in this case is constitutional as a matter of law and history. However, if the Court were to issue an injunction against any of these measures, the Court should grant the stay application as unopposed.

[7] Plaintiffs ask for dismissal “without prejudice,” ECF No. 201-2 at 35 n.53, but offer no legal authority for the request. To the contrary, “summary judgment is a final judgment on the merits for res judicata purposes.” Hill v. Chalanor, No. 9:06-CV-0438 GTS/GHL, 2009 WL 6315325, at *10 (N.D.N.Y. June 8, 2009), R&R adopted, 2010 WL 1257930 (N.D.N.Y. Mar. 25, 2010).

**CONCLUSION**

For the reasons set forth above, in his opposition and moving papers, and upon all prior proceedings, the Superintendent respectfully asks the Court to deny Plaintiffs' motion for summary judgment, grant his cross-motion for summary judgment, dismiss this action in its entirety and with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated: Syracuse, New York
September 18, 2026

LETITIA JAMES
Attorney General of the State of New York
Attorney for Superintendent James
BY:

Patrick Blood
NDNY Bar Roll No. 519910
Timothy Mulvey
NDNY Bar Roll No. 510757
Assistant Attorneys General
300 South State Street, Suite 300
Syracuse, New York 13202
timothy.mulvey@ag.ny.gov

James M. Thompson
Special Counsel
NDNY Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
james.thompson@ag.ny.gov